## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

KYLE ZEPPELIN, BRAD EVANS, CHRISTINE O'CONNOR,
KIMBERLY MORSE, and JACQUELINE LANSING,

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, an administrative agency of the
United States Department of Transportation,

      Defendant.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

## PRELIMINARY STATEMENT

1.      This is a case against the Federal Highway Administration ("FHWA"), brought

pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 – 706, for failure to

comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and

Section 4(f) of the U.S. Department of Transportation Act of 1966 ("Section 4(f)"), 23 U.S.C. §

138 and 49 U.S.C. § 303, prior to approving construction of the Partial Cover Lowered

Alternative with Managed Lanes Option ("PCL Alternative"), Phase 1, for the I-70 East Project,

as analyzed by FHWA and the Colorado Department of Transportation ("CDOT") in the I-70

East Final Environmental Impact Statement and Section 4(f) Evaluation ("FEIS").

2.      On February 10, 2017, FHWA published in the Federal Register a Formal Notice

that it had issued its Record of Decision ("ROD") approving construction of Phase 1 of the PCL

Alternative, identified therein as "the Central 70 Project."  82 Fed. Reg. 10430 (2017).  FHWA's

publication of the ROD approving the Central 70 Project constitutes a final agency action for the

purpose of APA review.  See id.

3.      NEPA declares a broad national commitment to protecting and promoting

environmental quality.  The twin purposes of NEPA are to require federal agencies to consider

the environmentally significant aspects of their proposed actions and to inform the public that

their decision-making process included environmental concerns.

4.      NEPA and its implementing regulations, 40 C.F.R. Parts 1500-1508, accomplish

these goals through certain "action forcing procedures."  These procedures require agencies to

take a "hard look" at the environmental effects of any "major federal action," and to share that

information with the public through a transparent administrative process.  Prior to approving any

action significantly effecting the quality of the human environment, the proposing agency must prepare and circulate to the public for formal comment a legally adequate environmental impact statement ("EIS").

5.      The scope of an EIS must be reasonably drawn and contain a robust analysis of the direct, indirect, and cumulative impacts of the proposed action, as well as an analysis of the environmental impacts of any connected, similar, or cumulative actions.  An EIS must include a reasonable range of alternatives to the proposed action, consider the differing environmental impacts of each alternative, and set forth measures to mitigate the impacts of the proposed action and each alternative thereto.

6.      Information contained in an EIS must be accurate and credible, and agencies are required to insure the professional and scientific integrity of NEPA documents.

7.      Pursuant to Section 4(f) and its implementing regulations, 23 C.F.R. Part 774, FHWA may not approve a transportation project that requires the use of a public park or site of historic significance unless there are no prudent and feasible alternatives and the project includes all possible planning to minimize harm to the park or historic site.

8.      As approved by FHWA, the Central 70 Project will reconstruct the 10-mile stretch of I-70 between I-25 and Chambers Road.  A key component of the Central 70 Project is the destruction of the viaduct that now runs from Brighton Boulevard to Colorado Boulevard through the Denver neighborhoods of Globeville and Elyria/Swansea.  Pursuant to FHWA's approval, CDOT will destroy this 85-foot-wide raised stretch of highway and replace it with a 195-foot-wide lowered section to be sunk approximately 40 feet below ground.

9.     The total estimated cost of the Central I-70 Project is $1.1 billion.  The Project is funded in large part by the State of Colorado and the City of Denver ("the City").  The Project is financially supported by FHWA and is proceeding only by virtue of FHWA's approval.

10.     Construction of the Central 70 Project will disturb 938 acres of land and 35 known hazardous material sites.  The area where the lowered portion of the highway is to be constructed lies entirely within the Vasquez Boulevard/I-70 Superfund site ("VB/70 Site").[1]

11.     Construction of the PCL Alternative will spread soil and groundwater contamination and expose workers and the public to hazardous materials.  Remediation of these hazardous materials will throw the project off budget and schedule.

12.     The FEIS does not analyze how exposure to hazardous materials during construction of the PCL Alternative might impact the health of workers or the public.  The FEIS does not analyze to what extent the impacts on human health might be exacerbated by a prolonged construction schedule.  The FEIS does not explain how workers and the public can protect themselves from exposure to hazardous materials during construction.  The FEIS does not disclose the cost of hazardous materials remediation and expected construction delays.

13.     These deficiencies render the FEIS inadequate and the ROD unlawful.

/ /

/ /

---

[1] Superfund sites are polluted locations, which require a long-term response to clean up hazardous material contamination.  These sites are identified by the U.S. Environmental Protection Agency ("EPA") and placed on the National Priorities List ("NPL") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.

14.     As planned, the lowered portion of the Central 70 Project will be highly vulnerable to flooding from the Montclair and Park Hill Basins.  The Central 70 Project cannot proceed without 100-year storm protection.[2]

15.     In response to the Central 70 Project, the City designed a 100-year stormwater protection system known as the Two Basin Drainage Project ("TBDP").  The TBDP has since become known as the Platte to Park Hill Stormwater System ("P2PH").

16.     P2PH is partially funded by CDOT.  P2PH offers significant benefits to CDOT and the Central 70 Project.  The City has agreed to deliver P2PH to CDOT on a phased construction schedule to meet the needs of the PCL Alternative.

17.     P2PH and the Central 70 Project are connected actions.

18.     The FEIS does not analyze any aspect of the P2PH Project.

19.     This additional deficiency also renders the FEIS inadequate and the ROD unlawful.

20.     Current cost estimates for P2PH approximate $300 million.

21.     Because FHWA excluded P2PH from the FEIS, the cost of P2PH is not reflected in the $1.1 billion cost estimate for the Central 70 Project and that estimate is inaccurate and underestimated.

22.     This additional deficiency also renders the FEIS inadequate and the ROD unlawful.

---

[2] A 100-year storm is a storm of such size that has a one percent chance, independent of previous years, of occurring every year.  One-hundred-year flood protection is a storm drainage system that will convey waters from a 100-year storm event to open waterways while maintaining less than twelve inches of water depth in the streets.

23.     P2PH spans four sites sitting within or adjacent to the Central 70 Project area: Globeville Landing Park; 39th Avenue; City Park Golf Course; and the Park Hill Golf Course.

24.     The planned improvements for Globeville Landing Park and along 39th Avenue fall within the VB/70 Site.

25.     The first phase of P2PH, known as the Early Action Drainage Project ("EADP"), has already begun.  Current activities include, but are not limited to, construction of the Globeville Landing Outfall ("GLO") at Globeville Landing Park.

26.     Because FHWA excluded P2PH from the FEIS, it has not analyzed the environmental or human health impacts caused by disturbance of hazardous materials during construction at Globeville Landing Park or along 39th Avenue.

27.     This additional deficiency also renders the FEIS inadequate and the ROD unlawful.

28.     The City Park Golf Course is a public park.

29.     The City Park Golf Course is on the National Register of Historic Places.

30.     Because FHWA excluded P2PH from the FEIS, it did not analyze whether there are any prudent and feasible alternatives to construction at the City Park Golf Course.

31.      Because FHWA excluded P2PH from the FEIS, it has not ensured that P2PH includes all possible planning to minimize harm to the City Park Golf Course.

32.     FHWA's failure to comply with Section 4(f) renders the ROD unlawful.

33.     Plaintiffs herein allege that the scope of the challenged FEIS should have included construction of the PCL Alternative and all four components of P2PH, which is a connected,

similar, or cumulative action to the Central 70 Project.  Because the scope of the FEIS is too narrowly drawn, it is inadequate under NEPA.

34.     Plaintiffs herein allege that the true costs of the Central 70 Project are the cost to construct the PCL Alternative, the cost to construct all four components of P2PH, and the cost to remediate hazardous soils and groundwater at these construction sites.  Because the FEIS did not include an accurate estimate of costs, it is inadequate under NEPA.

35.     Plaintiffs herein allege that the true impacts of the Central 70 Project include all ecological, aesthetic, historic, cultural, economic, social, and health effects, whether direct, indirect, or cumulative, from construction of the PCL Alternative and all four components of P2PH.  Because the FEIS did not include a robust analysis of all of these impacts, it is inadequate under NEPA.

36.     Plaintiffs herein allege that because the true scope of the Central 70 Project includes P2PH, and because P2PH includes construction at the City Park Golf Course, the Central 70 Project cannot proceed under FHWA approval until FHWA has demonstrated compliance with Section 4(f) for City Park Golf Course.  Because the FEIS and ROD do not reflect any 4(f) analysis for City Park Golf Course, the ROD is unlawful.

37.     Plaintiffs seek a declaratory judgment that FHWA has violated NEPA and Section 4(f) of the Transportation Act within the meaning of the APA.

38.     Plaintiffs seek preliminary and permanent injunctive relief stopping construction of the Central 70 Project, including all four components of P2PH, until FHWA can demonstrate that it has performed an adequate NEPA analysis and complied with Section 4(f).

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant); 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); 28 U.S.C. § 2412 (costs and fees); and 5 U.S.C. §§ 701 – 706 (administrative review).

40.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.  FHWA's approval of the ROD is a final agency action.  See 82 Fed. Reg. 10430. Plaintiffs have standing to sue.  See Exhibits 1-5 (standing Declarations for all Plaintiffs). Plaintiffs' claims are timely filed.  See 82 Fed. Reg. 10430 (requiring all claims for judicial review of this final agency action be filed on or before July 10, 2017).

41.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e).  All Plaintiffs live in Colorado.  FHWA approved the Central 70 Project through its Colorado Division.  The Central 70 Project lies entirely within the State of Colorado.

## PARTIES

42.     Plaintiff KYLE ZEPPELIN is a citizen and resident of Denver County in the State of Colorado.  He lives and works in the Globeville neighborhood.  He has financial investments along the Platte River, which is the final destination for the stormwater and drainage from the Central 70 Project.  As stated in his Declaration, which is attached as Exhibit 1 and incorporated herein by reference, Mr. Zeppelin submitted comments to FHWA during the NEPA process for the Central 70 Project and is opposed to FHWA's approval of the ROD.

43.     Mr. Zeppelin regularly uses that portion of I-70 subject to the Central 70 Project and lives and works in close proximity to this area.  During the years of construction of the

7

Central 70 Project, Mr. Zeppelin and his family will be exposed to dust, noise, inconvenience, and dispersed contaminants like lead and arsenic.  He is concerned for his health and the health of his family.  Mr. Zeppelin believes that cost overruns and/or construction delays resulting from the remediation of hazardous soils encountered during the highway expansion will likely prolong their exposure.  He is harmed by FHWA's decision to approve the ROD for the Central 70 Project without disclosing to the public an accurate cost estimate for this project and without first taking a hard look at the health impacts from exposure to hazardous materials disturbed during the reconstruction of the highway.

44.     Mr. Zeppelin and his development company have several investments along the Platte River.  He is concerned that construction of the GLO will spread contaminants from the VB/70 Site and further contaminate this waterway, impacting public health and decreasing the value of Zeppelin properties.  He is harmed by FHWA's decision to approve the ROD for the Central 70 Project without first taking a hard look at the health and environmental impacts from disbursing hazardous materials into the Platte River during construction of the GLO.

45.     Mr. Zeppelin has personally viewed documents showing the connection between the Central 70 Project and P2PH.  He is harmed by FHWA's approval of the ROD for the Central 70 Project, which includes the drainage components of P2PH, without analyzing the environmental or health impacts of P2PH.

46.     Mr. Zeppelin has suffered a cognizable injury to his health, financial, aesthetic, and procedural interests caused by FHWA's failure to comply with NEPA and Section 4(f) prior to approving the Central 70 Project.  An Order from this Court requiring FHWA to supplement the FEIS so as to comply with NEPA and Section 4(f) will redress his injuries.

47.     Plaintiff BRAD EVANS is a citizen and resident of Jefferson County in the State of Colorado.  He works full-time in the Globeville neighborhood of Denver.  As set forth in his Declaration, which is attached as Exhibit 2 and incorporated herein by reference, Mr. Evans submitted comments to FHWA during the NEPA Process for the Central 70 Project and is opposed to FHWA's approval of the ROD.

48.     Mr. Evans drives that portion of I-70 subject to the Central 70 Project almost daily.  During the years of construction of the Central 70 Project, he will suffer commuting inconvenience and exposure to the dust and noise of construction.  He is concerned about routine exposure to contaminants like lead and arsenic from the VB/70 Site and how that might impact his health.  He is harmed by FHWA's decision to approve the ROD for the Central 70 Project without first taking a hard look at the health impacts from exposure to hazardous materials disturbed during reconstruction of the highway.

49.     Mr. Evans works just one block from Globeville Landing Park.  The soils and groundwater in the GLO construction site are contaminated with lead, arsenic, and volatile organic compounds ("VOCs").  He is concerned about routine exposure to construction dust from the GLO and how this might impact his health.  He is harmed by FHWA's decision to approve the ROD for the Central 70 Project without first taking a hard look at the health impacts from exposure to hazardous materials disturbed during construction of the GLO.

50.     Mr. Evans has personally viewed documents showing the connection between the Central 70 Project and P2PH.  He is harmed by FHWA's approval of the ROD for the Central 70 Project, which includes the drainage components of P2PH, without analyzing the environmental or health impacts of P2PH.

51.     Mr. Evans has suffered a cognizable injury to his health and procedural interests caused by FHWA's failure to comply with NEPA and Section 4(f) prior to approving the Central 70 Project.  An Order from this Court requiring FHWA to supplement the FEIS so as to comply with NEPA and Section 4(f) will redress his injuries.

52.     Plaintiff CHRISTINE O'CONNOR is a citizen and resident of Denver County in the State of Colorado.  She recreates in City Park and on the City Park Golf Course.  As set forth in her Declaration, which is attached as Exhibit 3 and incorporated herein by reference, Ms. O'Connor submitted comments to FHWA during the NEPA Process for the Central 70 Project and is opposed to FHWA's approval of the ROD.

53.     Ms. O'Connor uses that portion of I-70 slated for reconstruction.  During the four to five years of construction, she will suffer commuting inconvenience and exposure to potentially contaminated dust.  She is concerned about exposure to contaminants from the VB/70 Site and how that might impact her health.  She is harmed by FHWA's decision to approve the ROD for the Central 70 Project without first taking a hard look at the health impacts from exposure to hazardous materials disturbed during reconstruction of the highway.

54.     Ms. O'Connor has personally viewed documents showing the connection between the Central 70 Project and P2PH.  She is harmed by FHWA's approval of the ROD for the Central 70 Project, which includes the drainage components of P2PH, without first analyzing the environmental or health impacts of P2PH.

55.     Ms. O'Connor often walks in City Park and the City Park Golf Course and enjoys the open space, trees, vistas, and historic values these places provide.  During construction of P2PH, the City Park Golf Course will be closed between one and two years, and hundreds of

mature "old growth" trees will be removed.  The peace and serenity of the Park will be marred

by the noise, dust, and general disturbance of construction.  The historic character and

significance of the Golf Course will be altered by P2PH, and Ms. O'Connor's enjoyment of the

Golf Course will be permanently diminished.

56.     Ms. O'Connor has suffered a cognizable injury to her health, aesthetic,

recreational, and procedural interests caused by FHWA's failure to comply with NEPA and

Section 4(f) prior to approving the Central 70 Project.  An Order from this Court requiring

FHWA to supplement the FEIS so as to comply with NEPA and Section 4(f) will redress her

injuries.

57.     Plaintiff KIMBERLY MORSE is a citizen and resident of Denver County in the

State of Colorado.  She lives in the Cole neighborhood.  As set forth in her Declaration, which is

attached as Exhibit 4 and incorporated herein by reference, Ms. Morse submitted comments to

FHWA during the NEPA Process for the Central 70 Project and is opposed to FHWA's approval

of the ROD.

58.     Ms. Morse regularly uses that portion of I-70 slated for reconstruction.  She is

concerned she will be routinely exposed to construction dust containing lead and arsenic from

the Central 70 Project.  She is harmed by FHWA's decision to approve the ROD for the Central

70 Project without first taking a hard look at the health impacts from exposure to hazardous

materials disturbed during reconstruction of the highway.

59.     Ms. Morse has personally viewed documents showing the connection between the

Central 70 Project and P2PH.  She is harmed by FHWA's approval of the ROD for the Central

70 Project, which includes the drainage components of P2PH, without first analyzing the environmental or health impacts of P2PH.

60.     Ms. Morse lives four blocks south of the planned construction area for the 39th Avenue Open Channel component of P2PH.  She is concerned about airborne contaminants from the VB/70 Site reaching her property and worries these toxins will impact her health and diminish her property value.  She is harmed by FHWA's decision to approve the ROD for the Central 70 Project without first analyzing the health and environmental impacts of the 39th Avenue Open Channel, which is part of P2PH.

61.     Ms. Morse has suffered a cognizable injury to her health, financial, and procedural interests caused by FHWA's failure to comply with NEPA and Section 4(f) prior to approving the Central 70 Project.  An Order from this Court requiring FHWA to supplement the FEIS so as to comply with NEPA and Section 4(f) will redress her injuries.

62.     Plaintiff JACQUELINE LANSING is a citizen and resident of Denver County in the State of Colorado.  She lives in the Park Hill neighborhood.  As set forth in her Declaration, which is attached as Exhibit 5 and incorporated herein by reference, Ms. Lansing submitted comments to FHWA during the NEPA Process for the Central 70 Project and is opposed to FHWA's approval of the ROD.

63.     Ms. Lansing has personally viewed documents showing the connection between the Central 70 Project and P2PH.  She is harmed by FHWA's approval of the ROD for the Central 70 Project, which includes the drainage components of P2PH, without analyzing the environmental impacts of P2PH.

64.     Ms. Lansing regularly recreates in City Park and on the City Park Golf Course. She uses these areas for walking, running, golfing, playing tennis and other sports, holding picnics, and viewing nature, animals, and vistas.  Ms. Lansing has been playing the City Park Golf Course for approximately 36 years.  She is aware of and values the historical significance of the Golf Course and the wildlife habitat, trees, and green space it provides.  She is concerned that construction in the City Park Golf Course will negatively impact the area's value and permanently diminish her enjoyment of this place.

65.     Ms. Lansing also recreates at the Park Hill Golf Course.  She uses this area for walking, golfing, and viewing nature, animals, and vistas.  Ms. Lansing is a member of the Park Hill Golf Course Stakeholder group, which was recently formed to aid in determination of the future of this area.  She values the trees, open spaces, natural areas, and opportunities for biodiversity the Park Hill Golf Course provides.  She is concerned that construction in the Park Hill Golf Course will negatively impact the area's value and permanently diminish her enjoyment of this place.

66.     Ms. Lansing has suffered a cognizable injury to her aesthetic, recreational, and procedural interests caused by FHWA's failure to comply with NEPA and Section 4(f) prior to approving the Central 70 Project.  An order from this Court requiring FHWA to supplement the FEIS so as to comply with NEPA and Section 4(f) will redress her injuries.

67.     Defendant FHWA is an agency within the U.S. Department of Transportation. FHWA has the authority, subject to the limitations of Section 4(f), to support State and local governments in the design and construction of interstate highways, and to select and approve for

implementation interstate highway construction projects proposed and to be implemented by State and local governments.

68.     FHWA acted as the joint lead agency with CDOT in the NEPA process for the Central 70 Project.  FHWA issued the ROD approving this Project, signed the environmental analyses done on this Project, and is otherwise obligated to ensure the Central 70 Project complies with NEPA and Section 4(f).

## LEGAL BACKGROUND
### NEPA

69.     As the centerpiece of federal environmental regulation in the United States, NEPA requires all federal agencies to pause before committing resources to a project and to consider the likely environmental impacts of the preferred course of action and all reasonable alternatives thereto.  By focusing both agency and public attention on the environmental effects of proposed actions, NEPA and its implementing regulations facilitate informed decision-making by agencies and allow the political process to check those decisions.  See 42 U.S.C. § 4331(b); N.M. ex rel. Richardson v. BLM, 565 F.3d 683, 703 (10th Cir. 2009).

70.     Before embarking upon any "major federal action," an agency must determine whether the action is likely to "significantly affect[] the quality of the human environment," and, if so, prepare a thorough EIS assessing the predicted impacts of the proposed action on all aspects of the environment, including indirect and cumulative impacts.  See 42 U.S.C. § 4332(2)(C); 40 C.F.R. Part 1502; 40 C.F.R. §§ 1508.11 and 1508.25(c).

71.     An EIS must consider "any adverse environmental effects."  42 U.S.C. § 4332(C)(iii).  This review cannot be superficial; agencies must take a "hard look" at the environmental consequences of proposed actions utilizing public comment and the best scientific

information.  See Biodiversity Conservation Alliance v. Jiron, 762 F.3d 1036, 1085 (10th Cir. 2014).  The "hard look" requirement ensures the agency did a careful job gathering material information and otherwise supporting its position.  See id.  NEPA ensures the agency will not act on incomplete information, only to regret its decision after it is too late to correct.  See Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).

72.     The terms "impacts" and "effects" are used synonymously in NEPA's implementing regulations.  40 C.F.R. § 1508.8.  The types of effects that must be analyzed in an EIS include ecological, aesthetic, historic, cultural, economic, social, and health impacts, whether direct, indirect, or cumulative.  See id.

73.     An EIS must also "rigorously explore and objectively evaluate" all reasonable alternatives to a proposed action in order to compare the environmental impacts of all available courses of action.  See 40 C.F.R. § 1502.14.  For those alternatives eliminated from detailed study, the EIS must briefly discuss the reasons for their elimination.  See id.

74.     Another "important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989) (citing 42 U.S.C. § 4223(C)(ii)).  NEPA regulations require that an agency discuss possible mitigation measures in defining the scope of the EIS, in discussing alternatives to the proposed action, in discussing consequences of the proposed action, and in explaining its ultimate decision.  See 40 C.F.R. §§ 1508.25(b), 1502.14(f), 1502.16(h), and 1505.2(c).

75.     The scope of an EIS must be reasonably drawn to comply with 40 C.F.R. § 1508.25, which requires connected actions to be analyzed in the same document.  "Connected

actions" are those that are closely related to one another. 40 C.F.R. § 1508.25(a)(1). Actions are connected for the purposes of NEPA if: 1) one action automatically triggers the other; 2) one action cannot or will not proceed without the other; or 3) both actions are interdependent parts of a larger action and depend on the larger action for their justification. See id.

76. Connected actions must be analyzed in a single EIS so agencies do not minimize the environmental consequences of a proposed action – and thus short-circuit NEPA review – by segmenting or isolating an individual action that may not, by itself, have a significant environmental impact. See Utahns v. U.S. DOT, 305 F.3d 1152, 1182-1183 (10th Cir. 2002).

77. The fact that one portion of a project is not funded by federal dollars is not a justification for segmentation. See Ross v. FHA, 162 F.3d 1046, 1052 (10th Cir. 1998). Withdrawal of federal funding from a segment of a major federal action does not relieve the government of the duties of NEPA compliance. See id. (citing Scottsdale Mall v. State of Indiana, 549 F.2d 484, 489 (7th Cir. 1977); San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1027 (5th Cir. 1971)).

78. Also pursuant to 40 C.F.R. § 1508.25, similar actions should be analyzed in the same EIS when doing so provides the best way to adequately assess their combined impacts. "Similar actions" are actions that have similarities, which provide a basis for evaluating their environmental consequences together, such as common timing or geography. See 40 C.F.R. § 1508.25(a)(3); Utahns v. U.S. DOT, 305 F.3d at 1183.

79. Furthermore, 40 C.F.R. § 1508.25 mandates that agencies consider cumulative impacts in an EIS. A "cumulative impact" is the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions, regardless of what agency undertakes them.  See 40 C.F.R. § 1508.7.

"Cumulative impacts" can result from individually minor but collectively significant actions

taking place over a period of time.  See id.

80.     At all stages throughout the NEPA process, the public must be informed and its

comments considered.  See 40 C.F.R. §§ 1503.1(a)(4), 1503.1(b), 1506.10, and 1505.2.

81.     Agencies must disclose to the public through the NEPA process "high quality"

information and accurate scientific analysis.  40 C.F.R. § 1500.1(b).  "Agencies shall insure the

professional integrity, including scientific integrity, of the discussions and analysis in

environmental impact statements."  40 C.F.R. § 1502.24.

82.     While NEPA does not require an explicit cost-benefit analysis, where such an

analysis is included it cannot be misleading.  See 40 C.F.R. 1502.23; High Country Conservation

Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174, 1182 (D. Colo. 2014).  "[I]t is essential

that the EIS not be based on misleading economic assumptions."  High Country, at 1182 (citing

Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446-448 (4th Cir. 1996)).

83.     Misleading statements resulting in an unreasonable comparison of alternatives are

not allowed.  See Johnston v. Davis, 698 F.2d 1088, 1094095 (10th Cir. 1983).  Clearly erroneous

cost estimates may not be properly considered when choosing between alternatives.  See Prairie

Band Pottawatomie Nation v. FHA, 751 F.Supp.2d 1174, 1205 (D. Kan. 2010).

### Section 4(f) of the Department of Transportation Act

84.     Unlike NEPA, which sets forth only a requisite procedure, Section 4(f) imposes

substantive limits on the discretion of FHWA to approve federally-funded transportation

projects, which use "publicly owned land of a public park…or land of an historic site of national,

17

State, or local significance."  49 U.S.C. § 303(c).  An "historic site" is "any prehistoric or

historic district, site, building, structure, or object included in, or eligible for inclusion in, the

National Register [of Historic Places]."  23 C.F.R. § 774.17.

85.     FHWA may approve a project that uses Section 4(f) protected land only if there is

no prudent and feasible alternative to using that land and the project includes all possible

planning to minimize harm to the park or historic site.  <u>See</u> 49 U.S.C. § 303(c); 23 C.F.R. §

774.17.

86.     An alternative is not feasible if it cannot be built as a matter of sound engineering

judgment.  <u>See</u> 23 C.F.R. § 774.17.

87.     An alternative is not prudent if:

a.      it compromises the project to a degree that it is unreasonable to proceed

with the project in light of its stated purpose and need;

b.      it results in unacceptable safety or operational problems;

c.      after reasonable mitigation, it still causes:

1.      severe social, economic, or environmental impacts;

2.      severe disruption to established communities;

3.      severe disproportionate impacts on minority or low income

populations; or

4.      severe impacts to environmental resources protected under other

Federal statutes;

d.      it results in additional construction, maintenance, or operational costs of

extraordinary magnitude;

e.      it causes other unique problems or unusual factors; or

f.      it involves multiple factors as identified above that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.  See 23 C.F.R. § 774.17.

88.      If FHWA can show there is no feasible and prudent avoidance alternative to the proposed action on Section 4(f) lands, FHWA may approve, from the remaining alternatives that use Section 4(f) property, the alternative that causes the least overall harm in light of the statute's preservation purpose.  See 23 C.F.R. § 774.3(c); Prairie Band, 751 F.Supp. 2d at 1182.

89.      "Protection of Section 4(f) property is to be given 'paramount importance.' Therefore, if FHWA selects an alternative that uses Section 4(f) property, its selection must be supported by information which demonstrates that 'there are unique problems or unusual factors involved in the use of alternatives that avoid these properties of that the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes.'"  Prairie Band, at 1182 (quoting Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 412-13 (1971); 23 C.F.R. § 771.135).

## APA

90.      A reviewing court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 702(2)(A).

91.       "Agency decisions are arbitrary when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Utahns v. U.S. DOT, 305 F.3d at 1164 (quoting Motor Vehicles Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983)).

## FACTUAL ALLEGATIONS

92.    On August 19, 2003, FHWA published in the Federal Register a notice of intent to prepare an EIS for a joint highway and transit project to include reconstruction of certain portions of I-70.  See 68 Fed. Reg. 49839 (2003).  That notice states: "FHWA and FTA [the Federal Transit Administration] in cooperation with…CDOT, Regional Transportation District (RTD) and the City…will prepare an…EIS / Section 4(f) Evaluation for transportation improvements on the…I-70 Corridor between Interstate 25…and Pena Boulevard and a transit connection between downtown Denver and Denver International Airport (DIA)." Id.

93.    On June 30, 2006, FHWA published in the Federal Register a notice that the transit and highway improvements referenced at 68 Fed. Reg. 49839 would no longer be evaluated as part of a combined highway and transit study, but would instead be broken down into two discrete projects, each with its own EIS.  See 71 Fed. Reg. 37637 (2006).  The notice states the East Corridor Draft EIS would analyze the social, economic, and environmental impacts of various alternatives to implement bus and rail technologies from downtown Denver to DIA.  See id.  It further states the I-70 East Draft EIS would include, but not be limited to, variations of the horizontal and vertical alignment of I-70, as well as capacity and safety improvements.  See id.

94.    According to the Federal Register: "A major concern is environmental justice. I-70 passes through three older communities that have been affected by several actions…beginning with the initial construction of I-70 in the 1960's and subsequent actions including reconstruction of the I-70 viaduct and roadway widening on the western segment of the Corridor.  Other major issues to be evaluated include air quality, noise, aesthetics, community cohesion impacts, and possible disruption of neighborhoods and business and commercial activities."  71 Fed. Reg. 37637.

95.    The "three older communities" referenced by FHWA are the Denver neighborhoods of Globeville and Elyria/Swansea.  These neighborhoods were established in the 1880's and annexed into Denver in 1902.  Multiple smelters historically operated in this area, processing gold, silver, copper, lead, arsenic, and cadmium.  In 1999, the EPA formally added a four-square mile area contaminated with these toxins to the CERCLA NPL as a Superfund site. See 64 FR 39878 (1999).  This four-square mile area, which encompasses the north-central Denver neighborhoods of Globeville, Elyria/Swansea, Clayton, and Cole, is currently known as the VB/70 Site.

96.    EPA has divided the VB/70 Site into three Operable Units ("OUs").  That portion of I-70 slated for reconstruction lies within OU1.  The P2PH Project lies within OU1 and OU2.

97.    The soils in OU1 are known to contain elevated levels of lead and arsenic.  The EPA has accomplished soils remediation in OU1 only in certain residential areas.  Any excavation in commercial or industrial areas of OU1 will disturb and spread known contaminants and could pose a risk to human health and the environment.

98.     The soils and groundwater in OU2 contain elevated levels of lead, arsenic, and

VOCs.  According to EPA, recent investigations in OU2 found lead levels of 100,000 mg/kg, far

above the 400 mg/kg background level.  These same investigations showed levels of arsenic at

OU2 at 1400 mg/kg, far exceeding the 15 mg/kg background level.  Excavation in OU2 will

disturb and spread these contaminants and pose a threat to human health and the environment.

99.     The following diagram shows each OU in the VB/70 Site.



100.    According to EPA: "Lead is classified as a B2 carcinogen... This classification is the result of sufficient animal studies determining that lead compounds are probable human carcinogens. Lead can enter the body via ingestion and inhalation. Children appear to be the segment of the population at greatest risk from toxic effects of lead. Initially, lead travels in the blood to the soft tissues (heart, liver, kidney, brain, etc.), then gradually redistributes to the bones and teeth where it tends to remain. The most serious effects associated with markedly elevated blood lead levels include neurotoxic effects, such as irreversible brain damage. Children have exhibited nerve damage, permanent mental retardation, colic, anemia, brain damage, and death."

101.    According to the EPA: "Large doses of arsenic may be acutely fatal to humans. Symptoms include fever, loss of appetite, enlarged liver and heart rhythm abnormalities. Sensory loss in the peripheral nervous system may also occur. Chronic exposure to arsenic generally results in skin lesions, liver injury, and peripheral vascular disease. The peripheral vascular disease may progress to endarteritis obliternas and gangrene of the lower extremities (blackfoot disease). Arsenic is a human carcinogen based on observation of increased lung cancer mortality due to inhalation exposure and increased skin cancer in individuals exposed to arsenic via drinking water."

102.    Elyria/Swansea has one of the highest rates of asthma, cancer, cardiovascular disease, and diabetes in Denver.

103.    On October 28, 2008, FHWA signed the I-70 East Draft Environmental Impact Statement and Draft Section 4(f) Evaluation ("DEIS"), which was prepared with CDOT. According to the DEIS, the purpose of the project "is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70."

23

104.    The following diagram depicts the I-70 East Project limits.



105.    The DEIS set forth a "no action" alternative and four build alternatives.  It did not identify a preferred alternative.

106.    Two of the build alternatives proposed to keep I-70 on its existing route.  Two of the build alternatives proposed to re-route I-70 off its current alignment between Brighton Boulevard and Quebec Street.  The DEIS did not analyze an alternative that would remove I-70 from the Globeville and Elyria/Swansea neighborhoods by re-routing the highway along I-270 and I-76 ("a full re-route alternative").

107.    The following diagram depicts what public commenters deemed a full re-route of I-70 out of Globeville and Elyria/Swansea – an alternative FHWA and CDOT never analyzed, but instead eliminated early in the scoping process before publication of the DEIS.



108.   Formal comments received on the 2008 DEIS reflected no overwhelming public support for any one of the five alternatives evaluated.  This prompted FHWA and CDOT to form the I-70 Preferred Alternative Collaborative Team ("PACT") in July of 2011.  According to FHWA, the PACT was a "collaborative process" that "involved the public, businesses, and agency stakeholders," which held "many one-on-one meetings with the impacted community members elected officials."  The PACT process was active from July 2011 until July 2012.

109.   Although the PACT members were not able to reach consensus on a preferred alternative for the I-70 East Project, they did agree that I-70 should be kept on its current alignment and that the two re-route alternatives examined in the DEIS should be eliminated.

110.   Sometime after the close of the PACT process in July 2012, CDOT became interested in pursuing a lowered build alternative for the I-70 East Project and began garnering support for this alternative from the City.

111.   On August 2, 2013, the City submitted a request to the Urban Drainage and Flood Control District ("UDFCD") to undertake and prioritize a watershed study for the Montclair and

Park Hill Basins "in light of the proposed CDOT I-70 Lowering project and potential ramifications on the Fast Tracts Metro North Corridor."

112.    On October 16, 2013, CDOT, entered into a Memorandum of Understanding ("MOU") with the City and the Regional Transportation District ("RTD") to, inter alia, "develop a coordinated set of infrastructure improvements that efficiently and effectively integrates the drainage needs of CDOT's I-70 East project from Brighton Blvd. to Colorado Blvd."

113.    The MOU defined two teams to accomplish this collaborative approach: the Management Oversight Team ("MOT") and the Technical Working Team ("TWT").  Over time, the name of the TWT was changed to the Multi Agency Technical Team ("MATT").

114.    On December 19, 2013, UDFCD passed Resolution 69, which bumped the Sloan's Lake Master Drainage Plan study from 2014 to 2015, and applied the funds from the Sloan's Lake study to a Montclair Watershed Study in order to develop "a master plan for the Montclair watershed to coordinate with the drainage alternatives analysis associated with the I-70 Corridor Partial Cover Lowering Project."

115.    On February 10, 2014, Enginuity Engineering Solutions issued a Memorandum to the MATT documenting the MATT's investigation of the Montclair drainage basin hydrology in Denver.  It states the overall goal of the MATT's analysis was "to perform a technical review of the previous Montclair basin hydrologic analysis and modify the modeling, if necessary, in order to provide C-DOT with a mutually agreed upon off-site 100-year design flow rate for the I-70 PCL project."

116.    On June 30, 2014, the City completed the Montclair Creek Drainage Feasibility Evaluation.  It states:

a.      "CDOT is proposing to lower a portion of I-70 near Brighton Boulevard to Colorado Boulevard; known as the I-70 Partially Covered Lowering (PCL) Project.  As part of the project, CDOT proposes to build a 100-year storm pipe system to protect this depressed section of highway from storm water flows."

b.      "A portion of the PCL is located within the Montclair Basin.  At about 9.5 square miles, it is the largest drainage basin in Denver.  The basin hydrology contributing to the PCL during a 100-year storm event has recently been modeled, and it was determined that there is about 4,700 cubic feet per second (cfs) of flow that will need to be captured to protect the lowering.  In an effort to minimize flood risks, protect public safety, reduce property damage, provide environmental benefits, and leverage funding from CDOT, [the City] has investigated alternatives to the 100-year pipe system CDOT is proposing, to include an open channel option."

c.      "As witnessed in the 2013 September floods, existing open channels handled this major storm event better than the storm pipe systems."

d.      "The open channel option meets a number of other [City] goals and initiatives including improved water quality through the use of green infrastructure, increased multi-modal transportation options, and enhanced redevelopment opportunities.  The CDOT pipe option provides no additional benefits other than protection of the PCL project."

e.      "CDOT's I-70…PCL Project Manager, Keith Stefanik[,] has confirmed from his management team that CDOT cannot include any of the Montclair Creek open channel projects in their design/build contract for the I-70 PCL project.  To amend the…EIS to include an open channel option is such a large change in scope that they would have to start their NEPA EIS process essentially over again.  It has taken them two years to get to the point of where they

27

are ready to submit their supplemental package, and they are unwilling to jeopardize their progress on the EIS for the I-70 PCL."

       f.    "It is understood if we are able to secure non-Federal funding for these project [sic], then we would not have to undergo a NEPA process."

117.    On August 4, 2014, FHWA signed the I-70 East Supplemental Draft Environmental Impact Statement and Draft Section 4(f) Evaluation ("SDEIS"), which was prepared with CDOT.  The SDEIS includes a No Action Alternative and two build alternatives: the Revised Viaduct Alternative and the Partial Cover Lowered ("PCL") Alternative.

118.    The SDEIS preliminarily identifies the PCL Alternative as the preferred alternative.  One justification for FHWA's selection of the PCL Alternative is "cost effectiveness."

119.    The SDEIS estimated the total cost of the PCL Alternative at $1.8 billion.

120.    The SDEIS reaffirms FHWA's and CDOT's early elimination of a full re-route alternative.  One stated basis for not analyzing a full re-route within the reasonable range of alternatives is cost.  The SDEIS states: "This [full re-route alternative] requires more than 12 miles of major highway widening along I-270 and I-76.  This [would] increase[] the project construction cost to approximately $3.5 to $4 billion, which is twice as much as existing alignment alternatives."[3]

/ /

/ /

---

[3] As later stated in this Petition, FHWA's cost estimate for the full re-route alternataive proved to be grossly incorrect.

121.    The SDEIS describes the PCL Alternative as follows: "The [PCL] Alternative removes the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard, lowering the highway below grade in this area.  It adds additional lanes in each direction from Brighton Boulevard to Tower Road.  It also adds capacity from I-25 to Brighton Boulevard by restriping.  This alternative includes a cover over the highway between Clayton Street and Columbine Street.  The highway will start descending west of Brighton Boulevard to reach the maximum depth of approximately 40 feet below ground level just east of the [Union Pacific Railroad].  This depth will allow the railroad to cross above the highway.  The remaining portion of the lowered section has a depth of approximately 25 feet below grade.  The lowered highway ascends just east of the Burlington Northern Santa Fe Denver Market Lead Railroad to reach the existing grade east of the Colorado Boulevard interchange."

122.    The following diagram shows the profile view of the PCL Alternative from Brighton Boulevard to Colorado Boulevard, as depicted in the SDEIS.



123.    The SDEIS is clear that: "Lowering I-70 requires capturing offsite surface runoff that currently flows south to north."  The hydrology analysis included in the SDEIS is largely based on the City's Montclair Creek Drainage Feasibility Evaluation and the work of the MATT. FHWA confirmed in the SDEIS that Denver had identified substantial offsite flows through the project area, that Denver's standard recommendation for commercial areas is to design for a five-year flow, and that I-70 must be designed for a 100-year flood event.

124.    The SDEIS states that the No Action Alternative and Revised Viaduct Alternative would have minimal impact to the potential ponding areas that currently exist in the developed watershed surrounding I-70.  These alternatives would require the construction of an onsite drainage north of I-70, designed to capture and convey water from the highway to the South Platte River.  The following diagram shows the onsite drainage system that would run north of I-70, as depicted in the SDEIS.



30

125.     The SDEIS revealed that construction of the PCL Alternative would require the same onsite drainage system required for the other two alternatives *plus* an additional offsite drainage system, designed to capture and convey stormwater flows traveling north towards I-70 before they reach the lowered portion of the highway.

126.     Regarding the PCL Alternative, the SDEIS states:

a.     "The [PCL] Alternative substantially impacts the potential ponding areas located between Brighton Boulevard and Dahlia Street.  The lowering of I-70 will create a depression that captures and retains surface flows from the upstream basin before their discharge to the South Platte River.  The [PCL] Alternative will capture approximately 3,993 cfs of offsite flow between Brighton Boulevard and Dahlia Street that currently drains north through the developed watershed.  The capture of this offsite flow substantially reduces the ponding areas and existing flooding north of I-70."

b.     "To mitigate the risk to human safety, an offsite drainage system is required to capture and convey the offsite surface runoff before reaching the lowered section of I-70 between Brighton Boulevard and Colorado Boulevard and to discharge the stormwater runoff to the South Platte River.  An additional offsite system is required to capture the offsite flows between Colorado Boulevard and Dahlia Street, reduce the discharges in a regional detention pond, and convey the flows north of I-70 to an existing storm drain system."

c.     "The runoff from I-70 will be captured and conveyed in a storm drain system that discharges to the South Platte River.  Prior to discharging to the South Platte River, the system will discharge to a water quality pond to provide water quality treatment."

127.    The following diagram shows the offsite drainage system required for the PCL Alternative as described in the SDEIS.  It consists of one pipe running south of I-70 through Globeville Landing Park and two detention ponds.



128.    The SDEIS makes no mention of the alternatives to this 100-year pipe system that were then being investigated by the City and does not disclose that such alternatives might include an open channel and additional improvements.  Rather, the SDEIS states that FHWA and CDOT will contemplate further development and design for the drainage plan needed to protect the I-70 East Project.

129.    The hazardous materials study area defined in the SDEIS runs along the current I-70 corridor between Downing Street and Tower Road.  This study area as defined by the SDEIS does not extend beyond VB/70 Site OU1.  It is pictured in the following diagram.



Hazardous materials study area (construction limits)

130.    The SDEIS acknowledges that construction of the PCL Alternative (exclusive of any P2PH drainage component) will require excavation through the VB/70 Site and 25 other known hazardous materials sites.  These include three CERCLIS sites,[4] ten RCRA sites,[5] four solid waste landfills ("SWLs"), one Voluntary Cleanup Program ("VCUP") site,[6] 28 underground storage tanks ("USTs"), and 26 leaking underground storage tanks ("LUSTs").

131.    The SDEIS states that construction of the PCL Alternative will also likely disturb additional, unknown contaminants.

---

[4] The Comprehensive Environmental Resonse, Compensation and Liabiltiy Information System ("CERCLIS") is the comprehensive system used to track sites under assessment or needing to be addressed by EPA pursuant to CERCLA.
[5] The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6991 et seq., establishes a framework for proper managment of hazardous and non-hazardous solid wastes. RCRA sites as shown in the SDEIS are those containing hazardous solid wastes.
[6] VCUP is administered by the Hazardous Materials and Waste Management Division of the Colorado Department of Public Health and the Environment.  VCUP provides a framework for the evaluation and cleanup of contaminated sites that do not fall under other regulatory programs.

33

132.     Construction of the PCL Alternative will disturb more hazardous materials sites than the No Action Alternative or the Revised Viaduct Alternative.

133.     Regarding hazardous materials, the SDEIS states:

a.     "Construction of the proposed alternatives likely will encounter sites contaminated by hazardous materials.  Construction activities associated with the alternatives have the potential to release hazardous materials at these locations into soil or groundwater, or they could lead to exposure of workers or the public to these materials if proper health, safety, and remediation efforts are not applied."

b.     "The likelihood of impacting hazardous materials is dependent on the number of hazardous materials sites encountered during construction.  In addition, the location and amount of contamination remaining at the site will also dictate impacts."

c.     "Encounters with hazardous materials are proportional to the amount of ground disturbance.  For example, a larger area of land disturbed is likely to increase encounters of hazardous material sites, leading to a greater impact.  Alternatives that incorporate subsurface improvements versus at-grade improvements also have a higher potential to encounter hazardous materials, soils, and/or groundwater at greater depths."

d.     "The [PCL] Alternative…will potentially encounter 26 hazardous materials sites.  It potentially disturbs approximately 616 acres of land, an approximate 20 percent increase in sites and an approximate 7 percent increase in land area impact compared to the Revised Viaduct Alternative.  Lowering the highway will impact soil and/or groundwater at greater depths than the No Action Alternative and Revised Viaduct Alternative.  Disturbing

greater volumes of soil and/or groundwater increases the potential to encounter hazardous materials."

      e.    "Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination.  Standard construction measures for fugitive dust control and stormwater erosion and sediment controls minimize the spread of contaminated soil. Some sites, particularly NPL sites, may have onsite repositories for soil and debris, active soil vapor extraction systems, or active groundwater remediation systems, including groundwater monitoring wells.  Disturbance of these structural controls by construction activities can result in the release of hazardous materials contamination, as well as additional costs if the impacted controls must be replaced in kind."

      f.    "Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found.  The acquisition of contaminated properties may require additional site investigation and monitoring to evaluate site conditions before and during construction, and construction activities may require the offsite disposal and contaminated soil and debris in permitted facilities."

134.    The SDEIS does not discuss how each of the hazardous materials identified in the study area can negatively impact human health or the environment.  The SDEIS does not discuss how deleterious impacts to human health resulting from exposure to hazardous materials during construction of the PCL Alternative can be mitigated or avoided.

135.    The SDEIS does not estimate or attempt to quantify the cost of remediating the hazardous materials in the PCL Alternative construction area, which will be encountered during

excavation.  There is nothing in the SDEIS to suggest the $1.8 billion cost estimate includes the costs that will be incurred for hazardous materials remediation.

136.    The SDEIS does not estimate or attempt to quantify the time delays in construction of the PCL Alternative, which will result from the need to remediate the hazardous materials encountered during excavation.

137.    The hazardous materials study area for the PCL Alternative does not include the construction areas for any of the drainage components then being investigated by the City.  The SDEIS Hazardous Materials Technical Report conceded that: "At this time, the nature and extent of the contamination at OU2…is unknown."

138.    In September of 2014, the City published, in accordance with Denver Revised Municipal Code, Division 4, Section 56-110, Denver's 2014 Storm Drainage Master Plan ("2014 Master Plan").  Denver's Master Plan is updated every five years.  The purpose of each Master Plan is to "identify and alleviate present and future drainage problems of the city."

139.    The 2014 Master Plan identified $1.5 billion in infrastructure improvements necessary "to meet minimum current drainage criteria in the Recommended Plan for the entire City."  The minimum drainage criteria in Denver for residential properties is protection from a two-year storm event.  The minimum drainage criteria in Denver for commercial properties is protection from a five-year storm event.

140.    The 2014 Master Plan does not contemplate constructing 100-year flood protection between 2014 and 2019.  Instead, it states: "Cost effective implementation of a City-wide 100-year drainage system is not practical because of the significant capital cost of retrofit construction and limited annualized flood hazard reduction.  Consequently, a phased program is

recommended that prioritizes improvements to address current hazards while improving the minor storm system."

141.     On January 20, 2015, the MATT issued its Letter of Recommendation to CDOT, the City, RTD, and UDFCD.  The MATT Recommendation states:

a.       "The purpose of this Letter of Recommendation…is to describe the…MATT recommended technical solution and improvement sequence/schedule to address the October 2013…MOU, which was written to establish an inter-agency collaboration for the development of a coordinated set of infrastructure improvements that efficiently and effectively integrates the drainage needs to…CDOT's I-70 East Project…[,] RTD's North Metro Rail Line[, and the City's] North Denver Cornerstone Collaborative."

b.       "The MATT team conducted a series of working technical meetings from October 2013 through February 2014, where hydrology for the off-site tributary drainage basins was established and agreed upon.  Hydrology developed by the MATT team was documented in two technical memorandums: I-70 PCL Montclair Drainage Basin Hydrologic Analysis and I-70 PCL Park Hill Drainage Basin Hydrologic Analysis, both dated August 1, 2014."

c.       "During the second half of 2014, CDOT and [the City] conducted additional meetings to coordinate and develop potential drainage alternatives for both the I-70 PCL project and [the City's] Open Channel Concept.  The result of these meetings was the development of a recommended technical solution – aka Combined Drainage System – for the MATT team to review and recommend."

d.       "All projects must comply with the City's Storm Drainage Design & Technical Criteria Manual and Colorado Drainage Law.  The minimum design standard is a 5-

year storm system and no adverse impact to private properties during the 100-year event.  The

trench area of CDOT's I-70 PCL project is a sump and must be design [sic] with a drainage

system to handle the 100-year event."

   e. "The recommended technical solution is a *Combined Drainage System*

that addresses off-site drainage for the 100-year design flows from both the Montclair and Park

Hill drainage basins.  (Refer to attached exhibit 'Figure 1 CCD I-70 PCL Alternative Drainage

Concept')." (emphasis in original).

 142. Figure 1 from the MATT Recommendation is pictured below and is publicly

available online.  See www.denverinc.org/wp-content/uploads/2016/05/MATT-LETTER-OF-

RECOMMENDATION_1-20-15_Final-5.pdf (last visited July 7, 2017).



143.     As confirmed by Figure 1 of the MATT Recommendation, the City of Denver I-70 PCL Alternative Drainage Concept encompasses much more than a single pipe running south of I-70, as shown in the SDEIS.  This early proposal for a Montclair / Park Hill Basin drainage system, which would protect the lowered portion of I-70 under the PCL Alternative, includes numerous components, including an open channel outfall through Globeville Landing Park, and an open channel running along 39th Avenue.

144.     On June 3, 2015, the Denver City Council held a public meeting where a proposed Intergovernmental Agreement ("IGA") negotiated between CDOT and the City was introduced to the Council's Infrastructure and Culture Committee.  At that meeting, representatives from Denver Public Works and the Denver Mayor's Office showed a PowerPoint Presentation concerning the proposed IGA.  The slides from that presentation state:

a.     "Proposed IGA includes City and CDOT cooperation on two separate projects: I-70 East Project (the 'Transportation Project') and a Two Basin Drainage Project (the 'TBDP').  Each entity will participate financially and with procurement in both projects."

b.     "The City will procure and execute the TBDP (drainage) project that also benefits CDOT.  This project provides 100-year drainage protection to City neighborhoods and the Transportation project, in addition to providing neighborhood connectivity and open space."

c.     "CDOT will continue to procure and execute the Transportation project, including design elements that the City has identified and requested."

d.     "CDOT will make a contribution to the TBDP (drainage) project equivalent to 40% of costs (estimated to be $53.6m)."

e.      "CDOT must provide 100-year protection for the affected portion of I-70

as part of the Transportation Project.  CDOT would like to take advantage of the efficiencies and

savings that will accrue if they contribute to the cost of the TBDP rather than building a separate

project of their own."

145.    On July 1, 2015, EPA Region 8 approved an Administrative Settlement

Agreement between EPA and the City and issued an Order on Consent authorizing the City to

undertake a Time Critical Removal Action ("TCRA") at OU2.  The purpose of the TCRA is to

allow the City to disturb the hazardous soils at Globeville Landing Park in order to build the

open channel outfall recommended by the MATT.  This open channel outfall through Globeville

Landing Park, currently known as the GLO, is the effluent point for all stormwater captured and

conveyed by P2PH.  Because the GLO is the "end point" of P2PH, i.e., the conduit through

which all the stormwater that would otherwise reach I-70 is instead poured into the South Platte

River, it must be constructed before any other component of P2PH or the Central 70 Project.

146.    Attached to EPA's Agreement and Order on the TCRA is the City's Action

Memorandum requesting approval of the TCRA at OU2 from EPA.  According to the City: "The

purpose of this Action Memorandum is to request and document approval of the removal action

described herein for a portion of…OU2 of the Vasquez Boulevard/Interstate 70 site, City and

County of Denver, Colorado.  This time-critical removal action will be conducted by the City

and County of Denver (CCoD) pursuant to an administrative settlement agreement with EPA

entered under the authority of Section 122 of…CERCLA.  CCoD plans to construct a stormwater

drainage feature through a portion of OU2 (see map showing potential area of disturbance in

Attachment A).  The stormwater drainage feature is part of a larger project that is intended to

40

reduce flooding in the Montclair Drainage Basin area and address stormwater management needs associated with projects being developed by the Regional Transportation District (RTD), the Colorado Department of Transportation (CDOT), and CCoD. It is estimated that construction of this stormwater drainage feature will require the excavation and handling of substantial volumes of potentially metal impacted (lead and arsenic) soils in OU2. Once excavated, the soils, if contaminated, will be disposed off-site. Conditions existing at OU2 present a threat to public health and environment…"

147.    The following diagram is Attachment A to the City's Action Memorandum requesting approval of the TCRA.



148.     On July 6, 2015, the Denver City Council approved the IGA between CDOT and the City.

149.     On July 16, 2015, Tony DeVito, the CDOT I-70 East Project Director, wrote a Memorandum to the City regarding the status of the IGA. Mr. DeVito stated:

a.     "For the last several months, staff has been negotiating the terms of an IGA with the City of Denver that provides $37M direct funding contribution to the I-70 East project, an additional $46M in-kind and risk reductions, and a commitment to prioritize the funding of the I-25 / Alameda project valued at $30M. The IGA also commits CDOT funding support for a comprehensive drainage system."

b.     "The IGA provides that the City…will provide funding support for the I-70 East Project in the form of an annual availability payment totaling $37M net present value, in the form of equal annual installments of $2,688,010 over 30 years. Annual installments will commence upon completion of the project. In addition, the City will ensure in-kind contributions to the efficiency and risk reduction of the I-70 East project, valued at $46M. These efficiencies include relief from City permit fees, set prices for right-of-way purchases, and other commitments that reduce project costs or reduce risk to the Developer. The City has also agreed to accept full ownership and maintenance responsibility for portions of Brighton Blvd., valued at $5M."

c.     "The IGA also provides that CDOT fund 40% of the cost of drainage improvements that provide early action on key elements of the drainage system needed for I-70 East and additionally support creation of a complimentary system that further protects the interstate in a large storm. The State's contribution to the drainage funding includes [a] $42.2

42

million commitment for the initial drainage improvements, known as the Early Action Drainage Plan [("EADP")], and up to an additional $18.3 million for cost overruns on the EADP, as well as the remainder of the Two Basin Drainage Project [("TBDP")], for a total commitment not to exceed $60.5 million."

150.     On September 14, 2015, the State Comptroller approved the IGA between CDOT and the City.

151.     The IGA states:

a.       "CDOT [and the City] must provide 100-year storm protection for the entire I-70 East Project, and a plan for providing that protection is included in the…SDEIS and the ongoing NEPA review…"

b.       "the SDEIS contemplated further development and design for the drainage plan needed for the protection of the I-70 East Project…"

c.       "the City has separately and independently created a drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project alignment (the "Two Basin Drainage Project" or "TBDP")…"

d.       "the City is prepared to initiate construction of the TBDP in order to preserve the property necessary for construction of the proposed TBDP project and to provide protection for certain developing areas of Denver from a 100-year storm event…"

e.       "CDOT…and the City have decided upon a cooperative approach that will result in savings to, and funding contributions for, the I-70 East Project, and which will also result in funding enhancements to the I-70 East Project desired by the City…"

43

f.      "the Parties have determined that there are significant mutual benefits to be achieved by cooperating and working together on the I-70 East Project and related enhancements…"

g.      "The City intends to design and construct the TBDP, beginning with the first phase project, the Early Action Drainage Project (EADP).  The Parties acknowledge that the total estimated cost for the TBDP is $134 million, which sum includes the EADP portion estimated to cost $69 million.  The TBDP, including the EADP, is depicted on Exhibit A. Additional drainage elements not a part of the TBDP but important for the I-70 East Project are the drainage pipe along the southern edge of I-70 as part of the I-70 East Project ("Residual Drainage Pipe") (depicted in Exhibit A) estimated to cost $14.9 million.  The Residual Drainage Pipe will be constructed, paid for, and owned by the State.  The Brighton Boulevard Box Culvert is needed for surface drainage associated with City improvements along Brighton Boulevard, but could also provide an alternative connection point for the Residual Drainage Pipe.  The Brighton Boulevard Box Culvert will be constructed by the City, perhaps as a part of the EADP.  The State will pay the City $2.5 million toward the construction of the Brighton Box Culvert on or before September 15, 2015."

h.      "The Parties believe the TBDP is a necessary and important drainage project, with benefits for the State and the City respectively."

i.      "The Parties agree that the City, in partnership with the Urban Drainage and Flood Control District ("UDFCD"), will undertake the design, construction and installation of all of the TBDP, including the acquisition of property interests for the entire TBDP.  The City

will own the TBDP.  City procurement rules shall apply to the design and construction of the TBDP."

        j.      "The City intends to begin construction of the EADP in the first quarter of 2016, and agrees to have the EADP segment from Pond 7 to the South Platte River operational by December 1, 2017 (see Exhibit A)….  The City agrees to have the remaining portion of the EADP operational by September 1, 2019.  The City also intends to acquire all of the property interests needed for the entire TBDP as part of the EADP.  The Parties acknowledge that not all of the necessary property interests may be acquired by December 1, 2017.  The City acknowledges that the State is relying on the completion schedule for each phase of the TBDP as it structures the contract for the I-70 East Project and related project agreement.  The City acknowledges that a delay in having the EADP from Pond 7 to the South Platte River operational by December 1, 2017 or the remainder of the EADP operational by September 1, 2019, could result in additional costs to the I-70 East Project that can only be estimated at this time.  The City and the State have estimated that any delay in meeting the deadlines listed in this paragraph could result in at least $5,000 a day in additional costs to the I-70 East Project.  Therefore, the City will include a liquidated damages provision in the contract for construction of the EADP that provides for $5,000 per day of liquidated damages in the event that the time limits in any work order are exceeded."

        k.      "…CDOT…will pay 40% of the cost of the TBDP, currently estimated to be $53.6 million, and the City will pay 60% of the cost of the TBDP, currently estimated to be $80.4 million.  The State's funding obligation is limited to the drainage facilities of the TBDP…

If the actual cost of the drainage component of the TBDP exceeds $134 million, the State will pay 40% of the cost increase directly attributable to the drainage elements of the TBDP…"

   l. "The City agrees to design the TBDP to handle 100-year storm protection, as defined in the Letter of Recommendation from the Multi-Agency Technical Team dated January 2015, for the partially covered portion of the I-70 East Project subject to CDOT's review, to meet the State's plan for providing that protection as included in the SDEIS and the ongoing NEPA review.  The parties recognize that the Residual Drainage Pipe and the Brighton Boulevard Box Culvert are necessary components to provide redundant 100-year protection for this portion for the I-70 East Project."

   m. "With the TBDP, the planned detention ponds at Steele and Vasquez that are currently included in the SDEIS will no longer be needed, permitting a reduction in impacts on adjacent neighborhoods.  The TBDP is also expected to reduce the pond size at Colorado Boulevard."

   n. "the City will contract for, or cause the UDFCD to contract for, the design of the EADP.  CDOT…will have the right to review and comment on the design of the EADP…and will have staff assigned to assist in the review and selection process.  The City will contract for the construction of the EADP, and the State will have the right to review and comment on the construction contract."

   o. "The Parties shall act in the best interest of the timely completion of the TBDP and the I-70 East Project.  There shall be weekly status meetings with the Project Contractor in the field, which shall be attended by the Denver and CDOT…Project Manager."

152.     The TBDP as committed to by CDOT and the City in the IGA included multiple

improvements, beginning with the EADP.  The following diagram, which is Exhibit A to the

IGA, titled "CDOT/CCD I-70 PCL Combined Drainage System," shows the design of theses

improvements as of the date the IGA was signed.



153.     On December 18, 2015, FHWA signed the I-70 East Final Environmental Impact

Statement and Draft Section 4(f) Evaluation ("FEIS"), which was prepared with CDOT.  The

FEIS updates the analysis for the SDEIS alternatives, and formally identifies the Partial Cover

Lowered Alternative with Managed Lanes Option ("PCL Alternative") as the preferred

alternative.

154.     The cost estimate for the PCL Alternative as set forth in the FEIS is

approximately $1.7 billion.

155.    Because FHWA and CDOT had secured funding commitments for only $1.1 billion, the FEIS states the I-70 East Project will proceed in phases.

156.    Phase 1 of the I-70 East Project encompasses construction of the PCL Alternative from I-25 to Chambers Road and is known as the Central 70 Project.  If and when additional funding is secured, FHWA and CDOT will complete the remainder of the I-70 East Project by reconstructing that portion of the highway extending from Chambers Road to Tower Road.

157.    The FEIS restates the assertion from the SDEIS that a full re-route alternative for the Central 70 Project was not analyzed, in part, because of cost.  "This [a full re-route] alternative requires more than 12 miles of major highway widening along I-270 and I-76.  This increases the project construction cost to approximately $4 billion, which is twice as much as existing alignment alternatives[,]" including the PCL Alternative.

158.    Regarding drainage and stormwater protection required for the PCL Alternative, the FEIS states: "Lowering I-70 requires capturing offsite surface runoff that currently flows south to north.  The offsite drainage system included in this alternative is designed to prevent the lowered section of I-70 from flooding.  The storm drain system will be conveyed south of I-70 through Globeville Landing Park and discharge to the South Platte River.  Additionally, an onsite drainage system is designed north of I-70 to capture runoff from the highway."

159.    The following diagram shows the onsite drainage system that runs north of I-70 as depicted in the FEIS.



160.    The following diagram shows the offsite drainage system that runs south of I-70 as depicted in the FEIS.



161.    The scope of the offsite drainage system analyzed in the FEIS, and represented by FHWA and CDOT as necessary for the PCL Alternative, does not include any component of the TBDP, as identified in the IGA.  Rather, the FEIS persists in the representation that the only offsite drainage and/or stormwater protection needed for the PCL Alternative is a single pipe running south of the highway through Globeville Landing Park and two detention ponds.

162.    The FEIS acknowledges P2PH, but expressly represents that project as "redundant," i.e., superfluous, to its own offsite drainage system.

163.    The FEIS states: "Denver is in the planning stages of their Two Basin Drainage Project which will provide redundant drainage capacity in the project area.  Depending on the timing of Denver's construction of the Two Basin Drainage Project it could allow for the outflow of I-70 East Offsite system to be modified, eliminating the need to construct the offsite system through Globeville Landing Park and reducing I-70 East impacts for the Partial Cover Lowered Alternative."

164.    Because the P2PH Project is not included in the scope of the FEIS, the cost to build P2PH is not included in the cost estimate for the Central 70 Project.

165.    The FEIS includes a hazardous materials update disclosing the results of additional soil sampling along the I-70 corridor and soil and groundwater testing in OU2 of the VB/70 Site in and around Globeville Landing Park.  With the inclusion of this new data, the FEIS reports that construction of the PCL Alternative will actually disturb 703 acres of land surface area and 28 known hazardous material sites.

/ /

/ /

166.    The FEIS echoes the statements made in the SDEIS that:

a.      "Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination.  Standard construction measures for fugitive dust control and stormwater erosion and sediment controls minimize the spread of contaminated soil.  Some sites, particularly NPL sites, may have onsite repositories for soil and debris, active soil vapor extraction systems, or active groundwater remediation systems, including groundwater monitoring wells.  Disturbance of these structural controls by construction activities can result in the release of hazardous materials contamination, as well as additional costs if the impacted controls must be replaced in kind."

b.      "Construction at hazardous materials sites also may affect the construction budget and schedule.  Construction activities may require the offsite disposal of contaminated soil and debris in permitted facilities, increasing costs.  If previously unidentified contamination is found, costs and schedules both stand to be affected.   The acquisition of contaminated properties may require additional site investigation and monitoring to evaluate site condition.  Remediation at these sites may be necessary before and during the construction."

167.    Like the SDEIS, the FEIS does not discuss how each of the hazardous materials identified in the study area can negatively impact human health or the environment.  The SDEIS does not discuss how deleterious impacts to human health resulting from exposure to hazardous materials during construction of the PCL Alternative can be mitigated or avoided.

168.    Like the SDEIS, the FEIS does not estimate or attempt to quantify the cost of remediating hazardous materials in the PCL Alternative construction area, which will be

encountered during excavation.  There is nothing in the FEIS to suggest the $1.7 billion cost

estimate includes the costs that will be incurred for hazardous materials remediation.

169.    Like the SDEIS, the FEIS dos not estimate or attempt to quantify the time delays

in construction of the PCL Alternative, which will result from the need to remediate the

hazardous materials encountered during excavation.

170.    The hazardous materials study area for the PCL Alternative as shown in the FEIS

does not include the construction area for the TBDP/P2PH.  Of the areas implicated by P2PH,

only Globeville Landing Park is included in the hazardous materials study area in the FEIS for

the Central 70 Project.

171.    On March 2, 2016, the City submitted comments to FHWA on the FEIS.  Those

comments state: "As depicted in the FEIS, the alignment of the I-70 East Drainage pipe conflicts

with both open channel and pipe components designed as a part of CCOD's Globeville Landing

Outfall project…   CDOT will need to realign its drainage system to avoid impacts to CCOD's

planned Globeville Landing Outfall [('GLO')] improvements."

172.    In December 2016, the City completed its Conceptual Planning Alternatives

Analysis Report for the Two Basins Drainage Project ("TBDP Conceptual Planning Document").

It states: "The Platte to Park Hill Stormwater Systems program [("P2PH")] is made up of four

distinct projects under the Two Basin Drainage Project and the Globeville Landing Outfall

Project."

173.    The TBDP Conceptual Planning Document describes these four distinct projects

as:

a.      "Globeville Landing Outfall – Drainage design, park re-design, and water quality."

b.      "39th Avenue Open Channel and Greenway – Linear open space and greenway incorporating an open stormwater channel, recreational trail and water quality in the Cole and Clayton neighborhoods."

b.      "Montclair Basin detention – Location to collect, control, and temporarily hold stormwater and provide water quality."

c.      "Park Hill Basin detention and conveyance – Location to collect, control, and temporarily hold stormwater and provide water quality."

174.    The following diagram is the P2PH Project Context Map as shown in the City's TBDP Conceptual Planning Document.



175.    Regarding the drainage concepts for the Montclair Basin, the TBDP Conceptual Planning Document states: "The [P2PH] Stormwater Systems program proposes to manage the Montclair Basin's runoff from the area upstream (south) of 39th Avenue utilizing two key drainage concepts."

a.    The first drainage concept for the Montclair Basin is to: "Provide stormwater capture and conveyance within the Cole and Clayton neighborhoods in order to intercept and convey surface flows toward the South Platte River.  The stormwater will outlet to pipes under the railroad tracks at approximately 40th Avenue and Blake Street, to the [GLO] Project."

b.    The second drainage concept for the Montclair Basin is to: "Provide stormwater detention within the middle to lower portion of the basin to slow down and temporarily hold stormwater."  According to the City, the two feasible locations for storm water detention under this second concept are "within the Cole neighborhood (between 39th and 40th) or at City Park Golf Course."

176.    The following diagram shows the Montclair Basin Drainage Concept as depicted in the TBDP Conceptual Planning Document.



177.    Regarding the drainage concepts for the Park Hill Basin, the TBDP Conceptual

Planning Document states: "[P2PH] proposes to handle the Park Hill Basin's 100-year runoff

from the area upstream (south) of Smith Road utilizing two key drainage concepts."

a.     The first concept is to: "Provide formalized regional detention at the

northeast corner of the privately owned Park Hill Golf Course.  A majority of the surface flow

within the western portion of the drainage basin naturally flows north through the golf course to

this existing low point where water naturally collects.  This project proposes to utilize this

natural collection point and provide enough detention volume to allow the planned 84-inch Park

Hill Phase V pipe to handle the 100-year event west of Forest Street."

b.     The second concept is to: "From the low point detention area near 38th

Avenue and Holly Street, and east-west storm drain system is proposed to convey flows in

excess of the existing Forest Street outfall's capacity.  The pipe will convey stormwater to the

west into the proposed Park Hill Golf Course detention facility thereby allowing the Forest Street

outfall to handle the 100-year event from the east."

    178.    The following diagram shows the Park Hill Basin Drainage Concept as depicted

in the TBDP Conceptual Planning Document.



    179.    On January 19, 2017, FHWA signed the ROD formally selecting and approving

for construction the PCL Alternative for the Central 70 Project.

    180.    The ROD states estimates the cost for the Central 70 Project at $1.1 billion.

    181.    The ROD again reaffirms that a full re-route alternative for the Central 70 Project

was not analyzed, in part, because of cost, and that one of the reasons the PCL Alternative was

selected was because of its cost effectiveness.  In this regard, the ROD states: "The high-level

cost estimates for the I-270/I-76 [full re-route alternative] have ranged up to approximately $4

billion.  The cost estimates were prepared by the project team and verified by the City...  During

the Final EIS review period, the I-70 Project Team received numerous comments that the cost estimate was too high.  Therefore, a new cost estimate prepared by CDOT, which came in at approximately $3.2 billion…   This would increase the project construction cost by approximately three times when considering Phase 1 of the Preferred Alternative is estimated to cost $1.1 billion…"

182.    The ROD reiterates that the PCL Alternative requires one onsite drainage system to the north of I-70 and one offsite drainage system south of I-70.

183.    The following diagram shows the onsite drainage system necessary for the PCL Alternative and as depicted in the ROD.



184.    The following diagram shows the offsite drainage system necessary for the PCL Alternative and as depicted in the ROD.



185.    The offsite drainage component of the Central 70 Project, as approved by FHWA in the ROD, is significantly different from that described in the FEIS.  It includes physical use of the City's Brighton Boulevard Box Culvert and the GLO.

186.    In this regard, the FEIS states: "Since publication of the Final EIS, Denver has made major advancements in the implementation of its GLO Project – a subcomponent of the TBDP – which creates a conflict with the design of the offsite drainage system of the I-70 East Project proposed and analyzed in the Final EIS.  Denver notified the project team about the conflict in their comments provided on the Final EIS.  The conflict required the redesign of the I-70 East offsite system in vicinity of the Coliseum and South Platte River.  The redesign will utilize the components of the GLO system to convey I-70 storm water to the river creating a

combined outfall system, which will minimize impacts and result in benefits to both projects. Because of this, the components of the GLO system used by I-70 are being treated as part of the I-70 East offsite drainage system and their impacts are analyzed in this ROD as updates to the Final EIS… This does not affect the relationship of I-70 East to other parts of the TBDP that are not conveying I-70 storm water, which continue to be treated as separate, non-connected actions."

187.    The ROD includes a section in the drainage analysis titled, "Connected Actions." There, FHWA expressly rejects the idea that the Central 70 Project and the P2PH Project are connected actions for the purposes of NEPA.

188.    The ROD states:

a.    "The I-70 East Project and the Two Basins Drainage Project (TBDP) (now also know as the Platte to Park Hill (P2P) Stormwater Systems Project) are not connected actions for the purposes of NEPA and they do not need to be analyzed as one project.  The projects are proposed by different agencies, respond to different needs, serve different purposes, have independent utility, and can function independently of each other if one of them was not built."

b.    "The I-70 East Project is a joint state-federal action proposed by CDOT and aided by FHWA to address safety, access, mobility, and congestion issues on the highway system.  The associated drainages for the Preferred alternative are subservient to this purpose and are needed to capture and convey onsite and offsite flows from the highway.  It is a federal action subject to NEPA because it will utilize federal funds and require federal agency approvals. The TBDP is a municipal action by Denver to address longstanding flooding concerns in its northern neighborhoods south of I-70.  The system is designed for the express purpose of

alleviating flooding risk caused by significant precipitation runoff in these areas, not by the improvements planned in the Preferred Alternative.  The TBDP is not a federal action subject to NEPA because its proponent is not a federal agency nor is it utilizing federal assistance.  The two projects are stand-alone actions by different agencies and are not dependent on one another for justification or feasibility.  They each have independent utility such that each of the projects would take place regardless of the other, which is the legal standard adopted in this jurisdiction."

      c.    "CDOT and Denver entered into an Intergovernmental Agreement (IGA) that establishes the framework for collaboration on numerous concerns in the project area including storm water drainage.  Assuming that Denver moves forward with its implementation of the TBDP, CDOT has agreed through the IGA to coordinate efforts and assist with the costs of certain components of the TBDP that would benefit I-70 East, such as the GLO Project explained [in this ROD].  However, CDOT and FHWA have not been involved in the proposal, development, or implementation of the TBDP, but are simply taking advantage of new opportunities for the cooperation, cost savings, and benefits that the TBDP, if it is constructed, offers to the I-70 East Project.  Even though CDOT and Denver have agreed to work together and share some of the financial burdens, each project is nonetheless capable of proceeding on its own merits, has independent utility, and their potential collaboration does not defeat their separateness for the purposes of NEPA.  Furthermore, to the extent that collaboration between the projects alters the design of the Preferred Alternative evaluated in the FEIS, CDOT and FHWA will conduct a reevaluation to determine and disclose the environmental impacts caused by those alterations and their significance."

189.     Because the area of the Central 70 Project disclosed in the ROD is larger that the project area disclosed in the FEIS, the acres of ground to be disturbed and the number of hazardous materials sites to be encountered has once again increased.  According to the ROD, construction of the PCL Alternative will, in fact, disturb 938 surface acres and disturb 35 known hazardous materials sites.

190.     In this regard, the ROD states:

a.     "Construction of the project likely will encounter sites contaminated by hazardous materials.  Construction activities…have the potential to release hazardous materials at these locations into sol or groundwater.  Workers or the public could be exposed to hazardous materials during construction activities if proper health and safety protocols are not followed and remediation efforts are not applied."

b.     "Encounters with hazardous materials are proportional to the amount of ground disturbance.  For example, a larger amount of land disturbed is likely to increase encounters with hazardous material sites, leading to a greater impact.  Alternatives that incorporate subsurface improvements versus at-grade improvements also have a higher potential to encounter soils and/or groundwater contaminated by hazardous materials at greater depths."

c.     "Construction at hazardous material sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found."

191.     The ROD does not discuss how each of the hazardous materials identified in the final Central 70 Project area might negatively impact human health or the environment.  The ROD does not discuss how deleterious impacts to human health resulting from exposure to hazardous materials during construction of the PCL Alternative can be mitigated or avoided.

192.     The ROD does not estimate or attempt to quantify the cost of remediating the hazardous materials in the PCL Alternative construction area, which will be encountered during excavation.  There is nothing in the ROD to suggest the $1.1 billion cost estimate includes the costs that will be incurred for hazardous materials remediation.

193.     The ROD does not estimate or attempt to qualify the time delays in construction of the PCL Alternative, which will result from the need to remediate the hazardous materials encountered during excavation.

194.     The hazardous materials study area for the PCL Alternative as shown in the ROD does not include the construction area for P2PH.  Of the areas implicated by P2PH, only Globeville Landing Park is included in the hazardous materials study area for the Central 70 Project.

195.     The ROD makes clear that the scope of FHWA's NEPA analysis in Globeville Landing Park extended only to "the components of the GLO system used by I-70."  Accordingly, the scope of the ROD and FEIS do not extent to the larger construction activities at Globeville Landing Park under P2PH (park re-design and water quality), nor to any of the other construction activities necessary for completion of the P2PH Project.

196.     The City's current cost estimate for P2PH approximates $300 million.

197.     FHWA did not draw the scope of the Central 70 Project FEIS or ROD to include the P2PH Project.

198.     FHWA did not analyze at any point in the NEPA process the cumulative impacts to human health or the environment from the Central 70 Project and P2PH when taken together.

199.    Because FHWA excluded the P2PH Project from the scope of the Central 70

Project EIS and ROD, the $1.1 billion cost estimate does not include the $300 million needed to

construct P2PH and is thus inaccurate and underestimated.

200.    Because FHWA excluded the P2PH Project from the scope of the Central 70

Project EIS and ROD, FHWA has undertaken no Section 4(f) analysis of whether there exists

any prudent and feasible alternative to construction at the City Park Golf Course.

201.    Because FHWA excluded the P2PH Project from the scope of the Central 70

Project EIS and ROD, FHWA has done nothing to ensure the P2PH Project includes all possible

planning to minimize harm to City Park Golf Course.

### FIRST CLAIM FOR DECLARATORY RELIEF
#### (Violation of NEPA – Failure to Analyze Impacts)

202.    Each and every allegation set forth in this Petition for Review of Agency Action

is herein incorporated by reference.

203.    NEPA requires FHWA to take a "hard look" at the ecological, aesthetic, historic,

cultural, economic, social, and health impact of every "major federal action."

204.    The Central 70 Project is a "major federal action" for the purposes of NEPA.

205.    FHWA acknowledges that construction of the PCL Alternative will require

excavation through OU1 and OU2 of the VB/70 Site.

206.    These areas are known to contain elevated levels of arsenic, lead, VOCs, and

other contaminants, which pose a risk to human health and the environment.

207.    FHWA acknowledges that construction of the PCL Alternative will disturb and

spread these hazardous materials, thereby exposing workers and the public to airborne toxins.

208.    FHWA acknowledges that the amount of hazardous materials that will be disturbed and spread under the PCL Alternative is greater than under the No Action Alternative and the Revised Viaduct Alternative.

209.    But FHWA did not, prior to approving the Central 70 Project, disclose or discuss what, if any, impacts exposure to these disturbed hazardous materials might have on human health and/or the environment.

210.    Rather than undertake this requisite NEPA analysis, FHWA discussed only how the project might affect the hazardous materials themselves.

211.    FWHA acknowledges that hazardous materials remediation will be necessary during construction of the PCL Alternative.

212.    FHWA acknowledges that hazardous materials remediation will affect the construction schedule.

213.    But FHWA did not, prior to approving the Central 70 Project, disclose or discuss how, if at all, impacts to human health and/or the environment caused by exposure to disturbed hazardous materials could or would be exacerbated by a prolonged construction schedule.

214.    FHWA's failure to take a "hard look" at the human health and environmental impacts from exposure to hazardous materials during construction of the Central 70 Project render the FEIS inadequate.

215.    FHWA's approval of the Central 70 Project without first undertaking and/or ensuring an adequate NEPA analysis is unlawful.

216.    Under the APA, this Court shall set aside final agency action that is arbitrary, capricious, or otherwise not in accordance with law.

217.    FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious, and not in accordance with the procedure mandated by NEPA.

218.    The ROD should be set aside.

## SECOND CLAIM FOR DECLARATORY RELIEF
### (Violation of NEPA – Failure to Include Mitigation Measures)

219.    Each and every allegation set forth in this Petition for Review of Agency Action is herein incorporated by reference.

220.    NEPA requires FHWA to discuss possible mitigation measures in defining the scope of the EIS, in discussing alternatives to the proposed action, in discussing consequences of the proposed action, and in explaining its ultimate decision.

221.    FHWA acknowledges that construction of the PCL Alternative will require excavation through OU1 and OU2 of the VB/70 Site.

222.    These areas are known to contain elevated levels of arsenic, lead, VOCs, and other contaminants, which pose a risk to human health and the environment.

223.    FHWA acknowledges that construction of the PCL Alternative will disturb and spread hazardous materials, thereby exposing workers and the public to airborne toxins.

224.    FHWA acknowledges that the amount of hazardous materials that will be disturbed and spread under the PCL Alternative is greater than under the No Action Alternative and the Revised Viaduct Alternative.

225.    But FHWA did not, prior to approving the Central 70 Project, disclose, discuss, or explain how workers and members of the public, who are exposed to hazardous materials disturbed and spread during construction of the PCL Alternative, can avoid or protect themselves from deleterious impacts.

65

226.     FHWA's failure to discuss mitigation measures for human health impacts from exposure to hazardous materials during construction of the Central 70 Project renders the FEIS inadequate.

227.     FHWA's approval of the Central 70 Project without first undertaking and/or ensuring an adequate NEPA analysis is unlawful.

228.     Under the APA, this Court shall set aside final agency action that is arbitrary, capricious, or otherwise not in accordance with law.

229.     FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious, and not in accordance with the procedure mandated by NEPA.

230.     The ROD should be set aside.

### THIRD CLAIM FOR DECLARATORY RELIEF
### (Violation of NEPA – Inaccurate Cost Estimates)

231.     Each and every allegation set forth in this Petition for Review of Agency Action is herein incorporated by reference.

232.     NEPA requires FHWA to disclose only "high quality" information and accurate scientific analysis, and to ensure the professional integrity of the FEIS.

233.     Although NEPA's "hard look" requirement does not require a cost-benefit analysis, once FHWA cites cost as a reason for its selection of the preferred alternative, it has an obligation to ensure its numbers are accurate.

234.     One reason FHWA selected the PCL Alternative as the preferred alternative for the Central 70 Project is because it is more cost effective than other alternatives.

235.     FHWA represents that the total cost to construct the Central 70 Project under the PCL Alternative is $1.1 billion.

236.     FHWA acknowledges that construction of the PCL Alternative will require excavation through OU1 and OU2 of the VB/70 Site.

237.     FWHA acknowledges that hazardous materials remediation will be necessary during construction through these areas.

238.     FHWA acknowledges that such hazardous materials remediation will affect the construction budget.

239.     But FHWA did not, prior to approving the Central 70 Project, attempt to quantify how hazardous soils remediation will increase project costs.

240.     Upon information and belief, the $1.1 billion cost estimate for the PCL Alternative does not include the costs required to remediate hazardous materials in the Central 70 Project Area.

241.     FHWA's approval of the Central 70 Project without first quantifying and disclosing an accurate cost estimate is unlawful.

242.     Under the APA, this Court shall set aside final agency action that is arbitrary, capricious, or otherwise not in accordance with law.

243.     FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious, and not in accordance with the procedure mandated by NEPA.

244.     The ROD should be set aside.

**FOURTH CLAIM FOR DECLARATORY RELIEF**
**(Violation of NEPA – Failure to Analyze Connected Action)**

245.     Each and every allegation set forth in this Petition for Review of Agency Action is herein incorporated by reference.

246.     NEPA requires FHWA to reasonably draw the scope of the FEIS to include connected actions.

247.     Connected actions are those that are closely related to each other.  Actions that cannot or will not proceed without the other are connected for the purposes of NEPA.

248.      The fact that one portion of a project is not funded by federal dollars is not a justification for improper segmentation.

249.     Withdrawal of federal funding from a segment of a "major federal action" does not relieve the government of the duties of NEPA compliance.

250.     The Central 70 Project and P2PH are connected actions.

251.     The PCL Alternative cannot be constructed without 100-year storm protection.

252.     The current Denver infrastructure does not provide 100-year storm protection.

253.     The City of Denver, working in conjunction with CDOT, designed the TBDP, which is currently known as P2PH, to protect the lowered portion of I-70 to be constructed under the PCL Alternative.

254.     The City has committed to deliver all four components of the P2PH – beginning with the EADP – to CDOT on a schedule intended to meet the needs of the Central 70 Project.

255.     The City has committed to be financial penalized for failing to meet the construction schedule demanded by the Central 70 Project.

256.     In exchange for the City's design and timely delivery of this requisite storm water protection, CDOT is funding 40% of the cost of P2PH.

257.     The EADP portion of P2PH is already under construction.  This includes construction of the GLO.

258.    As reflected in the ROD, the PCL Alternative offsite drainage component physically connects to the GLO.

259.    The PCL Alternative cannot function as intended and as described in the ROD without the GLO.

260.    The City would not have designed or implemented the P2PH Project but for CDOT's and FHWA's desire to lower I-70.

261.    The City cannot fund the entirety of P2PH without CDOT's contribution.

262.    CDOT would not agree to pay for the drainage components of P2PH unless it received some benefit therefrom.

263.    The P2PH drainage components are not similar, superfluous, or "redundant" of the offsite drainage component featured in the FEIS and ROD; they are distinct and far more comprehensive.

264.    Upon information and belief, the lowered portion of the highway to be constructed under the PCL Alternative will not be adequately shielded from flooding without the collective protection provided by all four drainage components of P2PH.

265.    But FHWA did not, prior to approving the Central 70 Project, include in the FEIS the four components of the P2PH Project as a connected action.

266.    Accordingly, FHWA did not disclose or analyze any of the ecological, aesthetic, historic, cultural, economic, social, or health effects that construction of P2PH may cause.

267.    Accordingly, FHWA did not analyze any alternatives to the current plan for construction of P2PH.

268.    Accordingly, FHWA did not include the estimated $300 million total cost of P2PH in the $1.1 billion cost estimate for the Central 70 Project.

269.    FHWA's approval of the Central 70 Project without first analyzing P2PH as a connected action in the FEIS is unlawful.

270.    Under the APA, this Court shall set aside final agency action that is arbitrary, capricious, or otherwise not in accordance with law.

271.    FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious, and not in accordance with the procedure mandated by NEPA.

272.    The ROD should be set aside.

## FIFTH CLAIM FOR DECLARATORY RELIEF
### (Violation of NEPA – Failure to Analyze Similar Action)

273.    Each and every allegation set forth in this Petition for Review of Agency Action is herein incorporated by reference.

274.    NEPA requires FHWA to analyze similar actions in the same EIS when doing so provides the best way to adequately assess their combined impacts.

275.    Similar actions are actions that have similarities, which provide a basis for evaluating their environmental consequences together, such as common timing or geography.

276.    The Central 70 Project and P2PH are similar actions.

277.    The Central 70 Project and P2PH are being constructed at the same time and in the same place.

278.    FHWA was required to analyze P2PH in the Central 70 FEIS because doing so is the best way to assess these projects' combined impacts.

279.     But FHWA did not, prior to approving the Central 70 Project, analyze in the FEIS

any of the ecological, aesthetic, historic, cultural, economic, social, or health effects that

construction of P2PH may cause in combination with the PCL Alternative.

280.     Under the APA, this Court shall set aside final agency action that is arbitrary,

capricious, or otherwise not in accordance with law.

281.     FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious,

and not in accordance with the procedure mandated by NEPA.

282.     The ROD should be set aside.

## SIXTH CLAIM FOR DECLARATORY RELIEF
### (Violation of NEPA – Failure to Analyze Cumulative Impacts)

283.     Each and every allegation set forth in this Petition for Review of Agency Action

is herein incorporated by reference.

284.     NEPA requires FHWA to consider cumulative impacts in the FEIS.

285.     Cumulative impacts are the impacts on the environment, which result from the

incremental impacts of the action when added to other past, present, and reasonably foreseeable

future actions, regardless of what agency or person undertakes them.

286.     Cumulative impacts can result from individually minor but collectively significant

actions taking place over a period of time.

287.     The Central 70 Project and P2PH are being constructed at the same time and in

the same place.

288.     Both the Central 70 Project and P2PH will have an effect on human health and the

environment.

289.   FHWA was required to analyze the cumulative impacts from the Central 70 Project and P2PH, when taken together, in the FEIS.

290.   But FHWA did not, prior to approving the Central 70 Project, analyze in the FEIS the cumulative impacts from the Central 70 Project and P2PH.

291.   Under the APA, this Court shall set aside final agency action that is arbitrary, capricious, or otherwise not in accordance with law.

292.   FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious, and not in accordance with the procedure mandated by NEPA.

293.   The ROD should be set aside.

### SEVENTH CLAIM FOR DECLARATORY RELIEF
### (Violation of Section 4(f) of the Transportation Act)

294.   Each and every allegation set forth in this Petition for Review of Agency Action is herein incorporated by reference.

295.   Section 4(f) prevents FHWA from approving the Central 70 Project if that project uses land falling within a public park or historic site unless there is no prudent and feasible alternative to using such land and the project includes all possible planning to minimize harm to these sensitive areas.

296.   One component of P2PH is the construction of a detention facility at the City Park Golf Course.

297.   The City Park Golf Course is a public park.

298.   The City Park Golf Course is on the State and National Registers of Historic Places.

299.     FHWA approved the ROD without completing an adequate NEPA analysis, which included P2PH as a connected action.

300.     Alternatively, FHWA approved the ROD without completing an adequate NEPA analysis, which included P2PH as a similar action.

301.     Accordingly, FHWA approved the Central 70 Project without first showing there is no prudent and feasible alternative to construction at the City Park Golf Course.

302.     Accordingly, and in the event FHWA could show there is no prudent and feasible alternative to construction at the City Park Golf Course, FHWA approved the Central 70 Project without including all possible planning to minimize harm to this sensitive area.

303.     Under the APA, this Court shall set aside final agency action that is arbitrary, capricious, or otherwise not in accordance with law.

304.     FHWA's approval of the ROD for the Central 70 Project is arbitrary, capricious, and not in accordance with Section 4(f) of the Transportation Act.

305.     The ROD should be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kyle Zeppelin, Brad Evans, Christine O'Connor, Kim Morse, and Jacqueline Lansing respectfully request the Court enter judgment providing the following relief:

(A)     A declaratory judgment that Defendant has violated APA § 706(2)(A) by issuing the ROD approving the Central 70 Project without first completing an adequate NEPA analysis caused by one or all of the following failings:

(i)      failure to take a hard look at the health impacts from exposure to hazardous materials that will be disturbed by construction of the PCL Preferred Alternative, which, according to the ROD, includes the drainage components of the GLO;

(ii)      failure to analyze the impacts caused by construction delays and/or a prolonged construction schedule necessitated by remediation of hazardous materials encountered during the excavation required by the PCL Preferred Alternative;

(iii)      failure to set forth mitigation measures for how workers and members of the public can avoid and/or protect themselves from the deleterious impacts of hazardous materials that will be disturbed and spread during construction of the PCL Alternative;

(iv)      failure to disclose an accurate cost estimate for the PCL Preferred Alternative, which includes the costs projected to remediate hazardous materials encountered during excavation;

(v)      failure to include all four components of the P2PH stormwater/drainage project in the FEIS as a connected, similar, and/or cumulative action, and analyze the cost and health and environmental effects thereof;

(vi)      failure to disclose and consider the overall costs of the Central 70 Project and P2PH when comparing alternatives.

(B)      A declaratory judgment that Defendant has violated APA § 706(2)(A) by failing to comply with Section 4(f) of the Transportation Act before issuing the ROD approving the Central 70 Project, which includes, under NEPA, all four components of the P2PH stormwater/drainage project.

74

(C)     An order compelling Defendant to comply with NEPA by issuing for formal comment a supplement to the FEIS that:

(i)     discloses the health impacts from exposure to hazardous materials that will be disturbed by construction of the PCL Preferred Alternative, which, according to the ROD, includes the drainage components of the GLO;

(ii)     sets forth mitigation measures for how workers and members of the public can avoid and/or protect themselves from the deleterious impacts of hazardous materials that will be disturbed and spread during construction of the PCL Alternative;

(iii)     discloses an accurate cost estimate for the PCL Preferred Alternative, including the projected costs to remediate hazardous materials encountered during excavation;

(iv)     discloses and analyzes the impacts caused by construction delays and/or a prolonged construction schedule necessitated by remediation of hazardous materials encountered during the excavation required by the PCL Preferred Alternative;

(v)     includes all four components of the P2PH stormwater/drainage project in the FEIS as a connected, similar, and/or cumulative action;

(vi)     analyzes the ecological, aesthetic, historic, cultural, economic, social, and health impacts, whether direct, indirect, and/or cumulative of all four components of P2PH; and/or

(vii)     discloses and considers the overall costs of the Central 70 Project and P2PH when comparing alternatives.

(D)     An order compelling Defendant to comply with Section 4(f) by issuing for formal comment a supplement to the FEIS that:

      (i)       includes all four components of the P2PH stormwater/drainage project; and

      (ii)      determines if there exists any feasible and prudent alternative to using the land in City Park Golf Course; and, if not,

      (iii)     shows that the project includes all possible planning to minimize harm to the City Park Golf Course.

      (E)     An order awarding Plaintiffs the costs incurred in pursuing this action, including attorneys' fees, as authorized by the EAJA and other applicable provisions.

      (F)     An order granting such other and further relief as the Court may deem just and proper.

      (G)     The retention of jurisdiction to insure that the terms of the decree are carried out.

Respectfully submitted this 9th day of July 2017.

KEATING WAGNER POLIDORI FREE, P.C.

By:   *s/ Melissa A. Hailey*
      Melissa A. Hailey, CO Reg. #42836
      Aaron D. Goldhamer, CO Reg. #41016
      1290 Broadway, Suite 600
      Denver, CO 80203
      Tel: (303) 534-0401
      Fax: (303) 534-8333
      mah@keatingwagner.com
      agoldhamer@keatingwagner.com

      *~ and ~*

      James Jay Tutchton, CO Reg. #21138
      Tutchton Law Office
      6439 East Maplewood Avenue

Centennial, CO 80111
Tel: (720) 301-3843
jtutchtontlo@gmail.com

*Attorneys for Plaintiffs*