**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

KYLE ZEPPELIN, BRAD EVANS, CHRISTINE O'CONNOR,
KIMBERLY MORSE, and JACQUELINE LANSING

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, an administrative agency of the
United States Department of Transportation,

      Defendant.

---

**DECLARATION OF CHRISTINE O'CONNOR**

---

      I, CHRISTINE O'CONNOR, hereby declare:

      1.      The facts set forth in this Declaration are based upon my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

      2.      I am a citizen of the United States and resident of Denver, Colorado. I have lived in Denver for 36 years. I am currently retired, but previously worked as a Colorado licensed attorney practicing in Denver.

      3.      While I have been aware of the plans to reconstruct I-70 for some time, I was motivated to become involved in the public process for this project in early 2016, when the Colorado Department of Transportation ("CDOT") and the City of Denver ("the City") began

marketing their combined Platte to Park Hill ("P2PH") drainage project to the northeast Denver community. Since that time, I have been concerned that CDOT and the City are misrepresenting the purpose, impacts, and cost of this drainage project and improperly shutting the public out of a meaningful discourse.

4.     In order to better educate myself and other concerned citizens – and hopefully influence the decision-makers on the P2PH Project – I have attended meetings, written letters, and actively conducted research with persons from across various disciplines on both the I-70 expansion and the City's drainage issues.

5.     Specifically, I have attended presentations, participated in tours, submitted requests under the Freedom of Information Act ("FOIA") and the Colorado Open Records Act ("CORA"), reviewed publicly available studies and reports, listened to City Council Committee Meetings and Legislative Meetings, and (when possible) asked questions of those involved with P2PH and the Central 70 Project.

6.     I have drafted resolutions regarding P2PH for both the Inter-Neighborhood Cooperation (adopted as 64-1) and Denver's Parks and Recreation Advisory Board (Board not permitted to vote on resolution).

7.     I have written letters to City Council about P2PH. I have written letters to the City Auditor concerning the Intergovernmental Agreement ("IGA") between CDOT and the City, wherein each commits to jointly implement and fund the P2PH project as part of the larger Central 70 Project.

8.     I have researched and participated in meetings specifically regarding one portion of the P2PH project called the Early Action Drainage Project ("EADP"). The EADP is the

subject of the IGA *and* of a separate Time Critical Removal Action ("TCRA") executed by the City and the U.S. Environmental Protection Agency ("EPA") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  The TCRA concerns the drainage portion of the GLO located in Globeville Landing Park.  The GLO is a critical component of P2PH, which directly involves CDOT, as set out more specifically by the IGA.

9.      I have attended various neighborhood meetings on P2PH and the Central 70 Project, including the I-70 Open House at Bruce Randolph on February 3, 2016.  I have spoken at such meetings, including meetings of the Inter-Neighborhood Cooperation, Denver Parks and Recreation Board, Democratic House District 9, City Park Friends and Neighbors, and the Denver City Council.

10.     I submitted multiple comments to the Federal Highway Administration ("FHWA") during its review of the I-70 expansion project under the National Environmental Policy Act ("NEPA").  Pertinent portions of those comments are attached to this Declaration.  These comments concern FHWA's failure to include the P2PH project in the NEPA analysis for the Central 70 Project.  The IGA, which is attached to those comments, plainly shows that P2PH, which is another name for the City's Two Basin's Drainage Project ("TBDP"), is connected to CDOT's construction of the Partial Cover Lowered ("PCL") Alternative.

11.     Among the many other statements in the IGA demonstrating these two projects' connectivity, the IGA states the following:

a.      "CDOT…must provide 100-year storm protection for the entire I-70 East Project, and a plan for providing that protection is included in the Supplemental Draft Environmental Impact Statement [SDEIS]…"

b.      "the SDEIS contemplated further development and design for the drainage plan needed for the protection of the I-70 East Project…"

c.      "the City has separately and independently created a drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project alignment [the TBDP]…"

d.      "the City is prepared to initiate construction of the TBDP in order to preserve the property necessary for construction of the proposed TBDP project and to provide protection for certain developing areas of Denver from a 100-year storm event…"

e.      "CDOT…and the City have decided upon a cooperative approach that will result in savings to, and funding contributions for, the I-70 East Project, and which will also result in funding for enhancements to the I-70 East Project desired by the city…"

f.      "the Parties have determined that there are significant mutual benefits to be achieved by cooperating and working together on the I-70 East Project…

g.      "The City acknowledges that the State is relying on the completion schedule for each phase of the TBDP as it structures the contract for the I-70 East Project and related project agreement."

h.      "The City and the State have estimated that any delay in meeting the deadlines listed in this paragraph could result in at least $5,000 a day in additional costs to the I-70 East Project."

12.      Other documents, also attached to my comments, corroborate this connection. These include:

a. the Ordinance/Resolution Request for the IGA, dated May 26, 2015, which states: "The proposed regionally benefitting drainage plan accomplishes the need to provide 100 year protection for the PCL…"; and

b. the Memorandum to I-70 PCL Drainage Multi-Agency Technical Team ("MATT"), dated August 1, 2014, which states: "Currently, this flood potential does not pose a significant risk to the highway due to its elevated design on a viaduct. However, proposed lowering of alignment below grade will introduce the potential for flood waters to enter the highway if not accounted for in the projects drainage design… [The] overall goal of this analysis [is] to perform a technical review of the previous Montclair basin hydrologic analysis and modify the modeling, if necessary, in order to provide C-DOT with a mutually agreed upon off-site 100-year design flow rate for the I-70 PCL."

13. Notably, and as also referenced in my comments to the Final Environmental Impact Statement ("FEIS") on the Central 70 Project, I watched a City Council meeting on June 3, 2015, where Lesley Thomas from Denver Public Works and Diane Barrett from the Denver Mayor's Office of Special Projects showed a PowerPoint Presentation. I have this PowerPoint presentation in my possession, but did not attach it to my NEPA comments. The slides from that presentation are attached to this Declaration and state the following:

a. "Proposed IGA includes City and CDOT cooperation on two separate projects: I-70 East Project (the 'Transportation Project') and a Two Basin Drainage Project (the 'TBDP'). Each entity will participate financially and with procurement in both projects."

b.       "The City will procure and execute the TBDP (drainage) project that also benefits CDOT.  This project provides 100-year drainage protection to City neighborhoods and the Transportation project, in addition to providing neighborhood connectivity and open space."

c.       "CDOT will continue to procure and execute the Transportation project, including design elements that the City has identified and requested."

d.       "CDOT will make a contribution to the TBDP (drainage) project equivalent to 40% of costs (estimated to be $53.6m)."

e.       "CDOT must provide 100-year protection for the affected portion of I-70 as part of the Transportation Project.  CDOT would like to take advantage of the efficiencies and savings that will accrue if they contribute to the cost of the TBDP rather than building a separate project of their own."

14.       Even the Administrative Settlement Agreement and Order on Consent for the TCRA corroborates the connection between the Central 70 Project and the EADP, which is the first component of P2PH.  That Agreement and Order is attached to this Declaration.  It states: "The stormwater drainage feature [of the EADP] is part of a larger project that is intended to reduce flooding in the Montclair Drainage Basin area and address stormwater management needs associated with projects being developed by Regional Transportation District (RTD), [CDOT], and [the City]."

15.       I know FHWA has denied that it needs to analyze P2PH in the NEPA process, but the documents and presentations published by CDOT, the City, and EPA show otherwise.  It seems clear that the City is providing 100-year storm protection now because it is necessary for CDOT's PCL Alternative.  I know of no reason why CDOT would be paying 40% of the costs of

P2PH if it derived no benefit from this project. I believe the Central 70 Project and the P2PH Project are connected actions.

16.     At the very least, because P2PH and the Central 70 Project are being constructed at the same time and in the same area, their impacts will be cumulative, and CDOT and FHWA should have analyzed the cumulative impacts of these project together. I believe that FHWA has failed to comply with NEPA by approving the Central 70 Project without conducting a robust analysis of the environmental impacts that will occur from construction of P2PH.

17.     P2PH includes four discrete construction components: the EADP, which includes the GLO; the 39th Avenue Greenway and Open Channel; the City Park Golf Course; and the Park Hill Golf Club. The entire EADP (including Globeville Landing Park) and 39th Avenue are being built, or will be built, on or in the Vasquez Boulevard / I-70 Superfund site. Disturbing the soils and groundwater in these areas will spread contaminants and pose a risk to human health and the environment. Construction of the GLO and the EADP has already begun. It is appalling to me that this major and potentially dangerous project is proceeding without the benefit of scientific study and without the public's involvement.

18.     I lived in Park Hill for many years, enjoying Dustin Redd Playground and City Park, both with my children and as a walker. To this day, I continue to enjoy City Park as a walker, as well as the restaurant at City Park Golf Course. I am thankful for the open space, trees, and vistas that City Park and City Park Golf Course offer me as a Park user. I furthermore value the historic significance of the City Park Golf Course, which is listed on the National Register of Historic Places.

19.     If construction of the P2PH project is allowed to proceed, City Park Golf Course will be closed to the public for approximately 18 months, and the typically peaceful ambiance of the Park will be marred by the noise, dust, and other disturbances of construction.  My enjoyment of the Park will be decreased, if not eliminated during this time.  Beyond this, I understand this project will require the removal of up to 280 trees from the City Park Golf Course, as well as extensive excavation and re-grading of the soils.  I also understand that construction in the City Park Golf Course will negatively impact the historic value of this area.  I am concerned the character of the Park will be forever changed, and my enjoyment of this area will never be the same.

20.     I believe my aesthetic and recreational interests in enjoying the natural beauty and serenity of City Park will be harmed during construction of P2PH, and possibly after.  Like all other concerned citizens, I deserved to know the impacts of P2PH and be given a chance to weigh in on this project *before* construction began.  Although the City has already broken ground at Globeville Landing Park without the benefit of a NEPA analysis, it is not too late for CDOT and FHWA to analyze the remainder of the P2PH project and disclose to the public the true scope and impact of the Central 70 Project before deconstruction of the viaduct and excavation of the trench that will house the new lowered portion of the highway.

21.     I use that portion of I-70 subject to the expansion project when traveling west from my home to get to Red Rocks or Evergreen, when running errands in and around north Denver, and for connecting to I-25 north from the eastern portion of the City.  I understand that construction on I-70 is slated to last four to five years and will be occurring in the Vasquez Boulevard / I-70 Superfund site.  This lengthy construction will lead to multiple lane closures,

slower traffic, and increase my travel time. I am concerned about sitting in traffic on I-70 during

construction and breathing toxic dust. I do not believe FHWA and CDOT should be allowed to

proceed with this massive and disruptive endeavor before completing a thorough and transparent

environmental review.

22.     Within the context of this lawsuit, I am asking the Court to enjoin implementation

of the PCL Alternative, which includes further construction of P2PH, until FHWA complies with

NEPA. Requiring FHWA to rectify the current inadequacies with its analysis will redress the

injuries I have complained of here.

23.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States, that to the best of my knowledge, the foregoing is true and correct.


DATED:        July 05, 2017.



_____

Christine O'Connor

**ATTACHMENT TO DECLARATION:**
**Comments on FEIS as Shown in Attachment E to ROD**

From:       "Christine O'Connor" <mitz_4@me.com>
Subject:    Re: Comments on I-70 east Draft EIS
Date:       Mon, February 29, 2016 4:11 pm
To:         contactus@i-70east.com
Cc:         vanessa.henderson@state.co.us,"Carrie Wallis" <carrie.wallis@atkinsglobal.com>,"Anahita
            Behrad" <Anahita.Behrad@atkinsglobal.com>

---

Comments on FEIS from:
Christine O'Connor
144 S Ulster St.
Denver CO 80230

Please accept the following additional comments regarding the FEIS on I-70.

I hereby request that my attachments and this email all be made part of the record in this FEIS.

I.  If the projects are connected, this FEIS is deficient because it fails to comply with Section 1508 of
NEPA.

    A.  Section 1508 of NEPA requires that both direct impacts and indirect impacts of the preferred
alternative be evaluated. The impacts of the drainage projects that are the subject of the IGA between
CDOT and CCD have not been evaluated and a Record of Decision can not be issued. Under NEPA the
impacts to the neighborhoods impacted by the PCL and the accompanying drainage project must be
evaluated in order for the FEIS to be complete.  There has been no analysis of impacts, direct or indirect,
on residents in the numerous neighborhoods that lie south of I-70 and south of 40th as a result of this
TBDP.  There are serious potential impacts to residents in basins 4500 -01, -02 and -03 as they are forced
to sacrifice their homes and designated public park lands in order to reduce flow basins in which the PCL
actually lies.

    B.  As demonstrated in the IGA between Denver and CDOT, this TBDP drainage project and the
CDOT are connected.  The IGA, the materials used to advance the project to Denver Council in June/July
2015, and the representations made by various parties regarding the connection between the TBDP and
the CDOT project all make clear this connection.  While CDOT would like to pretend they are separate
projects so as to not have to comply with NEPA, this argument fails.   See attached IGA and WORD
Document setting forth link between projects.

    C.  The Ordinance Request to Denver Council regarding this IGA makes it indisputable that the
purpose of the IGA includes the drainage project to reduce flow for I-70. See Ordinance Request
attached below. See language on page 2 of Ordinance Request, attached, which provides that the
"proposed regionally benefitting drainage plan accomplishes the need to provide 100 yr protection for
the "PCL."

II.  If the projects are not connected, this FEIS must fail because of inappropriate use of state money.

Both CDOT and Denver maintain that the TDBP is an independent project of the City & County of
Denver.   If the TBDP is not connected to a state project, it would make it illegal for the state to

contribute money to the project.  Under what state enabling provision is CDOT contributing to "Denver's" drainage project?

III.   If the projects are connected, the FEIS must fail because Denver is acting as a surrogate for CDOT on the TBDP.

As a result of the TDBP,  Denver is set up as the government entity with the power to condemn homes for detention and/or entering into franchise or utility agreements with the Parks Department in order to regrade park lands and gain detention.  CDOT would be  unable to take these actions and therefore has entered into an IGA to effect the TBDP.

"But for" the IGA with Denver, CDOT would not be able to carry out the TBDP because CDOT could not condemn property, for example, in Cole, or reconfigure a municipality's park lands for the purpose of being able to carry out its construction by reducing surface flow.  It has been made clear that the intent of the IGA is to reduce flow to the I-70 trenching area (see Word Document attached). It simply does not past the small test that CDOT can contract with Denver to accomplish what it cannot do on its own.

IV.      CDOT's preferred alternative (PCL) created the need for the TDBP.

The August 1, 2014 Engenuity Memorandum in the EIS regarding Montclair Basin, states: Currently, this flood potential does not pose a significant risk to the highway due to its elevated design on a viaduct. However, proposed lowering of alignment below grade will introduce the potential for flood waters to enter the highway if not accounted for in the project's drainage design.

The independent analysis in the Denver 2014 Storm Drainage Master Plan addresses the need for extensive city-wide needed improvements to basin drainage in every part of Denver. There was no independent plan on the part of Denver to implement these steps to provide 100 year protection. This is a joint plan developed because of the decision to prepare for an ROD that approved the PCL.

V.   Data used was selective.
Data was presented to create a "need" to reduce flow south of 40th, with incomplete analysis of what happened to that water after 40th,  no analysis of the feasibility of collecting water or providing detention in industrial areas surrounding I-70 and the National Western site.  Not pointed out, but clear in diagrams, is that there are inundation points other than City Park and the "former channel" (the subject of a yet to be completed study on the history of the Montclair basin).  I was not one sentence about the role of UPRR or NWC or any other industry in the area as to contributions to reduction or detention.

I may have missed this, but I did not see an evaluation of the risk to life and property through by constructing the highway at depth. THe FEIS seems to leave the analysis of groundwater removal and impacts to the "design" stage. THe FEIS should evaluate such risks.

Meanwhile, the assumption in the report is that the estimated 100 year flow coming across from Basin 4500-01 at certain discrete points into basin 0060-02 should be addressed by eliminating historic homes in Basin 4500-01. I saw no analysis that addresses the barriers to drainage created by the Rail yards or other industry.  The report only evaluated one possible 100 year inundation site further down in the basin and a few sites south of 40th. I may have missed it, but saw no evaluation of other potential inundation sites in the vicinity of I-70. It is clear the study was tailored to set up the TBDP as the vehicle

to reduce flow.  The analysis is self-serving to CDOT, establishing the need to eliminate estimated 100 year flow from the south. There is no examination of alternatives for intercepting these flows at industrial sites, in detention created by acquiring parcels north of 40th, alternatives such as eliminating the PCL alternative,  etc. I am not an engineer, but I can read in the report that states:

Currently, this flood potential does not pose a significant risk to the highway due to its elevated design on a viaduct. However, proposed lowering of alignment below grade will introduce the potential for flood waters to enter the highway if not accounted for in the project's drainage design. p. 2 Memorandum by Enginuity (attached)

Overall goal of this analysis: to perform a technical review of the previous Montclair basin hydrologic analysis and modify the modeling, if necessary, in order to provide C-DOT with a mutually agreed upon off-site 100-year design flow rate for the I-70 PCL project. p. 2 Memorandum by Enginuity (attached)

It is this last sentence, expressing the directive to modify the modeling if necessary to make sure CDOT can meet 100 year protection, that illustrates clearly the narrow focus of this study and the MATT's work.   The FEIS fails to rigorously analyze this limited goal of the study and call for more thorough analysis.


VI.  The IGA contains a fundamental misrepresentation, upon which Denver Council's relied in moving the IGA forward.

    That paragraph provides:

WHEREAS, the City has separately and independently created a drainage plan to provide 100-year storm protection for azeas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project alignment (the "Two Basin Drainage Project' or "TBDP")

This is not the case, as the 2014 Storm Drainage Master Plan does not envision construction to the level of 100 year flood protection.  The City worked with CDOT, RTD and UDFCD to come up with a NEW plan for this IGA, specifically to allow the PCL option to move forward, called the Early Action Drainage Plan and the Two Basin Drainage Plan.  The IGA further states the City had created a "drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project alignment," that it would initiate construction of the TBDP "in order to preserve the property necessary for the construction of the proposed TBDP and to provide protection for certain developing areas of Denver from a 100-year storm event," and that all parties had "decided on a cooperative approach that will result in savings to, and funding contributions for, the I-70 East Project."

The connection between these two projects was made clear in the IGA (attached) and as follows in Denver's Powerpoint presentation to Denver City Council's Infrastructure Committee and comments by City officials on June 3, 2015:

Drainage project estimated at $134 Million to be shared by CCD & CDOT, $26.8M upfront by CCD with the remainder of the City's share to be paid in the future through the Wastewater Fund; Additional Transportation elements will be funded as set forth in the IGA under future agreements. (Source, Powerpoint)

Public Works and Urban Drainage and Flood Control District will undertake the construction of the TBDP, which will protect the Transportation Project, RTD's Eagle and North Metro Lines and adjacent City neighborhoods from a 100-year storm. (Source, Powerpoint)

Drainage project estimated at $134 Million to be shared by CCD & CDOT, $26.8M upfront by CCD with the remainder of the City's share to be paid in the future through the Wastewater Fund;

These are a few of my concerns with the project that Denver has undertaken on behalf of CDOT. Neighbors without the money to create engineering reports and hire experts are repeatedly told that these projects will not cause harm, and in fact will enhance their health.  But since, as explained above, the drainage project has not been acknowledged as a CDOT endeavor, the impacts upon these neighborhoods will not be analyzed under NEPA.  This is error, and means that a ROD cannot be issued.

---

Date of Request:  <u>May 26, 2015</u>

**Please mark one:**  ☒ Bill Request   **or**   ☐ Resolution Request

**Is this request:**  ☒ A new contract*   ☐ A contract amendment*   **or**   ☐ Neither

---

**\*If this request is a contract or an amendment, is it:**

☐ A revenue agreement   **or**   ☐ An expenditure agreement   **or**   ☒ An Intergovernmental agreement

**Contract Control Number:**  **201522456**
**Contract Terms/Dates:**  ==Execution plus 25 years==
**Costs (if this is a contract amendment please include the original cost, additional cost and new total.** *Failure to provide this information may delay processing*): **Drainage project estimated at $134 Million to be shared by CCD & CDOT, ==$26.8M== upfront by CCD with the remainder of the City's share to be paid in the future through the Wastewater Fund; Additional Transportation elements will be funded as set forth in the IGA under future agreements.**

1. **Bill Description for the City Council Agenda:** (please give a one **sentence** description of the ordinance request.  Describe if the request is a contract, amendment, lease, grant, change to code, rezoning, etc. and any other information that Council needs to approve the request)

   **Intergovernmental Agreement between the City, CDOT, the High Performance Transportation Enterprise ("HPTE") and the Bridge Enterprise ("BE") regarding Montclair and Park Hill basin drainage improvements and I-70 transportation enhancements.**

2. **Requesting Agency:**  Public Works

3. **Contact Person:**
   - **Name:**  Lesley Thomas, City Engineer
   - **Phone:** 720-865-8719
   - **Email:**  Lesley.thomas@denvergov.org

4. **Contact Person:** (Please list the person who will read this item at Mayor Council and attend first and second reading to answer questions)
   - **Name:**  Angela Casias
   - **Phone:** 720 913 8529
   - **Email:**  angela.casias@denvergov.org

5. **Background on the request:**
All under the heading of the North Denver Cornerstone Collaborative, the City of Denver has several major redevelopment and infrastructure projects taking place that provide a connection from Denver Union Station to Denver International Airport. Named the *Corridor of Opportunity*, the nearly 23-mile stretch is one of the most compelling commercial investment opportunities in the world, with thousands of developable acres. One of six major initiatives currently underway, the Interstate 70 Reconstruction addresses the area between I-25 and Tower Road, which is Colorado's only east-west Interstate connection serving as an essential backbone of state and regional commerce, moving residents and tourist between the airport, downtown Denver, and the communities and resorts to the west. The viaduct (the elevated portion of I-70 on a bridge) was constructed in the early 1960's, and is reaching the point where it must be reconstructed to safely convey the traveling public and freight that keeps the Colorado economy moving.  For the first time in ten years of extensive study, which includes reviewing over 200 options, the Colorado Department of Transportation (CDOT) recently recommended a "preferred alternative" for the I-70 East Environmental Impact Statement (EIS). The Partial Cover Lowered (PCL) option on the Existing Alignment would remove the elevated section of I-70, lower the highway below grade, cover the highway by Swansea Elementary School and reconnect the Elyria and Swansea neighborhood. This alternative was developed over many years of work with community and has broad public support, including from elected officials. In April 2013, the project team held public meetings attended by more than 400, during which the community urged CDOT to move forward with this alternative.

---

*To be completed by Mayor's Legislative Team:*

SIRE Tracking Number: _____          Date Entered: _____

Revised 01/31/14

The proposed regionally benefitting drainage plan accomplishes the need to provide 100 yr protection for the "PCL" and envisions enhancements like accessible open space, connectivity, and other quality of life improvements consistent with the recently adopted Elyria/Swansea Neighborhood plan and the National Western Center plan.

6. **Please complete the following fields:**
   A. **Location:**   I-70 corridor, Montclair Basin and Park Hill Basin
   B. **Affected Council District:**   1, 8, 9 and 11
   C. **Benefits:** The purpose of the project is to allow cooperation and coordination between the City and the State to provide needed stormwater infrastructure improvements that will protect and benefit the entire Montclair and Park Hill basins and the I-70 project. The innovative stormwater project will provide green infrastructure that will also be an amenity to the neighborhoods in which it is located and allow a transportation solution that improves safety, access, and mobility and addresses congestion on I-70. The need for this project results from the following issues:
   - Need to improve stormwater infrastructure to manage both water volumes and water quality
   - Increased transportation demand
   - Limited transportation capacity
   - Safety concerns
   - Transportation infrastructure deficiencies

7. **Is there any controversy surrounding this ordinance? Please explain.**
   **There has been a good deal of controversy over the past 10 years regarding the I-70 reconstruction project and the preferred PCL alternative as well as concerns for air quality and environmental justice generally for the neighborhoods impacted.  The drainage project requires some land acquisition in a burgeoning area for development.**

---

## INTERGOVERNMENTAL AGREEMENT
## BETWEEN THE COLORADO DEPARTMENT OF TRANSPORTATION
## AND THE CITY AND COUNTY OF DENVER

**THIS INTERGOVERNMENTAL AGREEMENT** ("Agreement") is made and entered into by and among the **Colorado Department of Transportation**, a division of the State of Colorado, created pursuant to the Transportation Act, C.R.S. § 43-1-101, *et seq*. ("CDOT"), the Colorado **High Performance Transportation Enterprise** ("HPTE"), a government-owned business within CDOT, created pursuant to C.R.S. § 43-4-806, and the Colorado **Bridge Enterprise** ("BE"), a government-owned business within CDOT created pursuant to C.R.S. § 43-4-805 (CDOT, HPTE and BE may be collectively referred to herein as the "State") and the **City and County of Denver**, a home rule city and political subdivision created by the Colorado Constitution ("City"). The City, the State, CDOT, HPTE, BE, each a Party, and the State and City (collectively referred to as the "Parties").

This Agreement shall not be enforceable until the date on which this Agreement has been approved and signed by all Parties, and the Colorado State Controller or designee (the date of the signature of the Colorado State Controller or designee being the "Effective Date").

### RECITALS

WHEREAS, CDOT, HPTE and BE, after more than ten years of study, have determined that the deteriorating conditions and inadequate capacity of I-70 between I-25 and Tower Road in Denver (the "I-70 East Corridor") require a comprehensive transportation solution to resolve these challenges; and

WHEREAS, based on an ongoing review process being conducted in accordance with the National Environmental Policy Act of 1969 ("NEPA"), the preliminarily preferred technical solution to address these challenges is officially known as the "Partial Cover Lowered Alternative with Managed Lanes Option" (the "Partial Cover Lowered Alternative"). As currently conceived, the Partial Cover Lowered Alternative would include:

a. the removal of the existing viaduct between Brighton Boulevard and Colorado Boulevard;

b. the reconstruction of the I-70 East Corridor, with a portion below the existing ground level; and

c. the construction of a landscaped highway "cover" above one segment of the reconstructed highway, which cover would physically reconnect a divided neighborhood; and

1

WHEREAS, although CDOT, HPTE and BE cannot definitively commit to the Partial Cover Lowered Alternative or any other technical solution until the conclusion of the ongoing NEPA process, it has determined that it is appropriate to prepare for the possibility that the Partial Cover Lowered Alternative ultimately receives approval; and

WHEREAS, the procurement for the potential design, construction, financing, operation and maintenance of a portion of the I-70 East Corridor (the "I-70 East Project") began with the issuance of the Request for Qualifications to Design, Build, Finance, Operate and Maintain the I-70 East Project, issued March 25, 2015, with a view to ultimately selecting an entity to implement the I-70 East Project; and

WHEREAS, the State intends to issue a draft RFP in the Fall of 2015, with proposals due in the Summer of 2016, and with selection of the developer for the I-70 East Project (the "Developer") and financial close in late 2016; and

WHEREAS, the City supports the I-70 East Project as it will provide an opportunity for needed infrastructure and transportation improvements to occur, and will address the safety issue of the aging viaduct, create jobs, restore elements of connectivity to the adjacent neighborhoods and communities, and result in new development; and

WHEREAS, CDOT, HPTE, BE and the City continue to explore additional savings and funding and enhancement opportunities for the I-70 East Project; and

WHEREAS, CDOT, HPTE, and BE must provide 100-year storm protection for the entire I-70 East Project, and a plan for providing that protection is included in the Supplemental Draft Environmental Impact Statement and Section 4(f) Evaluation, dated August 4, 2014 (the "SDEIS") and the ongoing NEPA review; and

WHEREAS, the SDEIS contemplated further development and design for the drainage plan needed for the protection of the I-70 East Project; and

WHEREAS, the City has separately and independently created a drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project alignment (the "Two Basin Drainage Project" or "TBDP"); and

WHEREAS, the City is prepared to initiate construction of the TBDP in order to preserve the property necessary for construction of the proposed TBDP project and to provide protection for certain developing areas of Denver from a 100-year storm event; and

WHEREAS, CDOT, HPTE, BE and the City have decided upon a cooperative approach that will result in savings to, and funding contributions for, the I-70 East Project, and which will also result in funding for enhancements to the I-70 East Project desired by the City; and

WHEREAS, the Parties have determined that there are significant mutual benefits to be achieved by cooperating and working together on the I-70 East Project and related

2

enhancements, including transportation improvements, efficiencies in timely decision making and turnaround, the design of the partial cover identified in the NEPA documents, and other improvements; and

WHEREAS, to the extent permitted by the NEPA process and applicable federal, state, and local laws and regulations, it is the intent of the Parties to set forth their understandings and goals with regard to their respective commitments for funding part of the costs of the I-70 East Project; and

WHEREAS, this Agreement is executed under the authority set forth in C.R.S. §§ 29-1-203, 43-1-110, 43-4-805(5)(i), and 43-4-806(5)(h), and Article XIV, Section 18 of the Colorado Constitution.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the sufficiency of which are mutually acknowledged, the Parties hereto agree as follows.

## 1. The Two Basin Drainage Project and the Early Action Drainage Project – The Drainage Collaboration.

A.    The City intends to design and construct the TBDP, beginning with the first phase project, the Early Action Drainage Project ("EADP"). The Parties acknowledge that the total estimated cost for the TBDP is $134 million, which sum includes the EADP portion estimated to cost $69 million. The TBDP, including the EADP, is depicted on Exhibit A. Additional drainage elements not a part of the TBDP but important for the I-70 East Project are the drainage pipe along the southern edge of I-70 as part of the I-70 East Project ("Residual Drainage Pipe") (depicted in Exhibit A) estimated to cost $14.9 million. The Residual Drainage Pipe will be constructed, paid for, and owned by the State. The Brighton Boulevard Box Culvert is needed for surface drainage associated with City improvements along Brighton Boulevard, but could also provide an alternative connection point for the Residual Drainage Pipe. The Brighton Boulevard Box Culvert will be constructed by the City, perhaps as a part of the EADP. The State will pay the City $2.5 million toward the construction of the Brighton Box Culvert on or before September 15, 2015.

B.    The Parties believe the TBDP is a necessary and important drainage project, with benefits for the State and the City respectively.

C.    The Parties agree that the City, in partnership with the Urban Drainage and Flood Control District ("UDFCD"), will undertake the design, construction and installation of all of the TBDP, including the acquisition of property interests for the entire TBDP. The City will own the TBDP. City procurement rules shall apply to the design and construction of the TBDP.

D.    The City intends to begin construction of the EADP in the first quarter of 2016, and agrees to have the EADP segment from Pond 7 to the South Platte River operational by December 1, 2017 (see Exhibit A). If the City does not award a contract for construction of the EADP and give notice to proceed to the contractor by April 1, 2016, the Parties shall meet to assess the extent and impact of any delays, and determine an appropriate course of action. The City agrees to have the remaining portion of the EADP operational by September 1, 2019. The

3

City also intends to acquire all of the property interests needed for the entire TBDP as part of the EADP. The Parties acknowledge that not all of the necessary property interests may be acquired by December 1, 2017. The City acknowledges that the State is relying on the completion schedule for each phase of the TBDP as it structures the contract for the I-70 East Project and related project agreement. The City acknowledges that a delay in having the EADP from Pond 7 to the South Platte River operational by December 1, 2017 or the remainder of the EADP operational by September 1, 2019, could result in additional costs to the I-70 East Project that can only be estimated at this time. The City and the State have estimated that any delay in meeting the deadlines listed in this paragraph could result in at least $5,000 a day in additional costs to the I-70 East Project. Therefore, the City will include a liquidated damages provision in the contract for construction of the EADP that provides for $5,000 per day of liquidated damages in the event that the time limits in any work order are exceeded. All work orders for work required to make the segment of the EADP from Pond 7 to the South Platte River operational will require that the segment be operational no later than December 1, 2017. All work orders necessary to make the remainder of the EADP operational will require that the EADP be operational no later than September 1, 2019. If the EADP segment from Pond 7 to the South Platte River is not operational by December 1, 2017 or the remainder of the EADP is not operational by September 1, 2019 and this delays the I-70 East Project, the City will enforce the liquidated damages provision and reimburse the State for actual additional costs to the I-70 East Project in the amount of liquidated damages obtained from the City's contractor.

E.      The State believes the TBDP will result in significant benefits for the I-70 East Project and will result in a redundant storm protection system for the I-70 East Project. As a result, it is the general intent of the Parties that CDOT, HPTE, and BE will pay 40% of the cost of the TBDP, currently estimated to be $53.6 million, and the City will pay 60% of the cost of the TBDP, currently estimated to be $80.4 million. The State's funding obligation is limited to the drainage facilities of the TBDP, eligible to be funded by the Denver Wastewater Enterprise Fund under the Denver Revised Municipal Code and shall not be used for amenities, such as trails or lighting unrelated to maintenance, amphitheaters, wayfinding, and art work. If the actual cost of the drainage component of the TBDP exceeds $134 million, the State will pay 40% of the cost increase directly attributable to the drainage elements of the TBDP subject to the limitation described in Paragraph 3.

F.      The Parties intend to establish a mutually agreeable maintenance, operation and repair agreement for the TBDP, which will be generally proportional in cost.

G.      The City agrees to design the TBDP to handle 100-year storm protection, as defined in the Letter of Recommendation from the Multi-Agency Technical Team dated January 2015, for the partially covered portion of the I-70 East Project subject to CDOT's review, to meet the State's plan for providing that protection as included in the SDEIS and the ongoing NEPA review. The Parties recognize that the Residual Drainage Pipe and the Brighton Boulevard Box Culvert are necessary components to provide redundant 100-year protection for this portion of the I-70 East Project. The City agrees that its ongoing drainage plans, policies and regulations will be developed with the goal of maintaining the functional capacity of the TBDP to handle the 100-year flood. The City further agrees not to permit any modifications of the TBDP that would adversely impact the ability of TBDP to convey, carry or otherwise

4

mitigate the 100-year design flow required for this area. This provision shall survive the termination of this Agreement.

H. In order that CDOT, HPTE and BE realize the anticipated benefits of the TBDP, the City agrees to make the TBDP operational by September 1, 2019. The City acknowledges that the State is relying on this schedule as it structures the contract for the I-70 East Project. The City acknowledges that a delay in having the TBDP operational by September 1, 2019, could result in the State having to make delay payments or compensation event payments to the Developer of the I-70 East Project that can only be estimated at this time. The City and the State have estimated that any delay in meeting the September 1, 2019, deadline could result in at least $5,000 a day in additional costs to the I-70 East Project. Therefore, the City will include a liquidated damages provision in the contract for construction of the TBDP that provides for $5,000 per day of liquidated damages in the event that the TBDP is not operational by September 1, 2019. If the TBDP is not operational by September 1, 2019, and this delays the I-70 East Project, the City will enforce the liquidated damages provision and reimburse the State for actual additional costs to the I-70 East Project in the amount of liquidated damages obtained from the City's contractor.

I. With the TBDP, the planned detention ponds at Steele and Vasquez that are currently included in the SDEIS will no longer be needed, permitting a reduction in impacts on adjacent neighborhoods. The TBDP is also expected to reduce the pond size at Colorado Boulevard.

J. The Parties agree that if circumstances arise that allow for a later completion date of either the EADP or the TBDP, that upon request of the City, the State or the Developer may extend the completion date required of the City by written notice to the City, in the sole discretion of the State or the Developer.

2. **Funding for the EADP.**

A. The City will contract for, or cause the UDFCD to contract for, the design of the EADP. CDOT, HPTE, and BE will have the right to review and comment on the design for the EADP as set forth herein, and will have staff assigned to assist in the review and selection process. The City will contract for the construction of the EADP, and the State will have the right to review and comment on the construction contract.

B. The Parties agree to fund the EADP, as follows:

(i) The City will fund $26.8 million which will be the first dollars spent for design and construction draws, as well as acquisition of property interests, until said amount is expended ("City EADP Funds").

(ii) Upon the full expenditure of the City EADP Funds, CDOT, HPTE and BE will fund the remaining amount for the EADP, estimated to be $42.2 million ("State EADP Funds") by transmitting to the City funds for each additional design or construction draw and/or property interest acquisition payment until the EADP is completed. The State's obligation will be to fund the amount of the actual cost of EADP above the City EADP Funds, whether that cost is higher or lower than the estimated

5

$42.2 million. However, in no event shall the State's obligation with respect to the EADP exceed $49.1 million, unless agreed to by the Parties by subsequent amendment to this Agreement, and the State's obligation herein assumes that the assumed EADP project budget contingency of at least 12% will have been expended prior to seeking additional funding from the State. The State EADP Funds will be paid to the City monthly for the requisite design, construction and/or property interest acquisition draw payment in accordance with this Agreement. Any amount the State is required to fund for the EADP in excess of $42.2 million shall be credited to and deducted from the State's obligation to pay $11.4 million for the remainder of the TBDP. For each payment request submitted to the State for acquisition of property interests, the City shall provide any appraisal and valuation information for said payment. The City agrees that it will generally follow the Federal Uniform Relocation Assistance and Real Property Acquisition Act ("Relocation Act") in its acquisition of property interests for the TBDP. The Parties acknowledge that property owned by a railroad is not subject to the Relocation Act.

3. **Funding for the Remainder of the TBDP.** The Parties intend to fund the TBDP as set forth in Paragraph 1. If the final cost for the TBDP for drainage elements exceeds $134 million, it is the agreement of the Parties that any amount above $134 million be funded 60% by the City and 40% by the State; provided, however, that the State obligation for any amount in excess of $53.6 million shall not exceed an additional $6.9 million. If the State's share of the TBDP costs exceed the additional $6.9 million amount, any further funding on the part of the State must be negotiated and any changes in scope will require the State's consent and approval. The City agrees that it will not include in the TBDP pricing for which it asks the State to share in the funding any costs that are not necessary drainage elements eligible to be funded by the Denver Wastewater Enterprise Fund under the Denver Revised Municipal Code.

4. **City-Provided Benefits for the I-70 East Project.** In addition to benefits realized by CDOT/HPTE/BE on the I-70 East Project from the TBDP, the City agrees to the following which will also provide direct benefit to the I-70 East Project:

    A.    Permit Waivers/Suspensions - $15 Million.

        (i)    The City assesses various fees for demolition and construction projects, and agrees to waive/suspend most of those fees for the design and construction of the I-70 East Project as shown on Exhibit B. CDOT/HPTE/BE and/or the Developer (or its contractor) will need to apply for permits, including the estimated construction duration under each permit, and submit to inspections in the ordinary course; however, the process will be expedited and facilitated. The State shall include its project agreement with the Developer provisions for cooperation and coordination with the City to effectuate the processes set forth in this section. The State shall also require the Developer to identify all contractors and subcontractors working on the I-70 East Project in order for the City to be able to determine whether a permit application is subject to the waiver/suspension of fees under this Agreement.

        (ii)    The waiver/suspension of such fees is estimated to save the State $15 million. CDOT/HPTE/BE or the Developer (or its contractor) shall apply for all applicable permits necessary for construction, operation and maintenance of the project

6

and all fees customarily charged by City for such permits shall be identified, and such fees identified on Exhibit B as waived shall not be paid but shall be deemed part of City's participation in the I-70 East Project.

(iii)    With regard to street occupancy permit fees, including fees related to traffic lanes, curb lanes, alleys, sidewalks and meter permits, the State or the Developer (or its contractor) will adhere to the following procedure:  Prior to entering into an agreement with a contractor that requires a street occupancy permit, an authorized representative of the State or Developer (or its contractors) shall provide City with documents describing the project's scope and a good-faith estimate of the time period the project will impact City rights-of-way.  The State and/or the Developer (or its contractors) and City will mutually determine the time period the project will impact City rights-of-way, which will be defined as the "Reasonable Construction Time Period(s)." The State and/or the Developer will include the Reasonable Construction Time Period(s) in the contract documents issued to the contractor for that construction project.  The City, through the normal course of its review, shall issue the requisite entity street occupancy permits and the associated permit fees shall not be paid but shall be deemed part of City's participation in the I-70 East Project.  The duration of the street occupancy permits shall be the Reasonable Construction Time Period(s) plus a grace period of 10% of that time.  If the impact of the I-70 East Project on City rights-of-way has not ceased or will not cease prior to the expiration of the permitted Reasonable Construction Time Period(s) plus the grace period, then the State or the Developer (or its contractor) shall apply for a new or amended street occupancy permit and any remaining time it occupies the right-of-way shall be charged to and paid by the Developer (or its contractor) at the prevailing rate for street occupancy permits.

(iv)    City shall not unreasonably withhold or delay any required permits.  Except as otherwise provided, applicable City permitting requirements shall apply to all project elements constructed within City.  Nothing herein shall be construed as committing City to issue permits or accept any plans for construction or other related work or work product that does not meet all applicable codes, ordinances and regulations.

B.    Risk Reduction - $10 Million.  Benefits attributed to reduced risk total an estimated $10 million, including the certainty for developers and contractors bidding on the I-70 East Project procurement which should in turn result in cost savings for CDOT/HPTE/BE.  In particular, these risk reduction benefits can provide savings due to the prevention of delays. These specific benefits include:  1) pre-negotiation of costs related to the conveyance of City-owned right-of-way to CDOT, saving appraisal costs, and saving staff time; 2) utilizing the City franchise agreements with Xcel and Comcast and other City authority to facilitate utility relocation within the franchises' 90-day period upon the State's request; 3) expediting and facilitating cooperation with Denver Water; and 4) the City agrees to dedicate at least two FTE staff to work with the State and the Developer (and its contractors) at the project office for the I-70 East Project to facilitate and expedite reviews and permits, and the State agrees to provide office space, and office furniture (but not computers) for any FTEs dedicated by the City for the I-70 East Project.

7

C.     Right-of-Way Agreement and Cost Savings - $13 Million.  The Parties agree that the State needs to, and shall, acquire property interests from the City for the I-70 East Project for $25.7 million.  The property interests to be acquired by the State are set forth on Exhibit C.  The Parties also agree that the State will pay the City $12.7 million for said right-of-way, and the State agrees that the City's property provides an additional $13 million contribution to the I-70 East Project.  The Parties agree that the payment for and conveyance of said property interests will occur by May 31, 2016.  By this Agreement, the City Council approves the conveyance of the property on Exhibit C to CDOT in recognition of CDOT's statutory authority to acquire property, C.R.S. §§ 43-1-208, 43-1-210, and 43-3-106.

D.     Fill Dirt - Haul Savings - $3 Million.  As a result of the I-70 East Project, the State will have an excess of suitable clean fill dirt, and the State and the Developer (and its contractor) can realize significant transportation and disposal costs savings if the City accepts fill dirt for reuse in City projects near the I-70 East Project.  Such fill dirt must meet the Colorado Department of Public Health and Environment ("CDPHE") regulatory standards and guidance for the recipient site's proposed land use before the City will accept it.  The City agrees to accept a minimum of 200,000 cubic yards and a maximum of 400,000 cubic yards of fill dirt that meets both the City's structural standards and CDPHE's environmental standards.  The estimated savings is $3 million.  In addition, traffic and noise impacts may be lessened in the adjacent neighborhoods.

E.     Devolution of Brighton Boulevard - $5 Million.  CDOT and the City currently own and maintain Brighton Boulevard north of I-70 to the City limits, and Brighton Boulevard is currently a part of the state highway system.  The Parties agree that as part of this Agreement, CDOT will consider abandonment of a certain portion of Brighton Boulevard to the City, pursuant to C.R.S. § 43-2-106 no later than July 31, 2016.  In the event the Transportation Commission determines that the abandonment of Brighton Boulevard is warranted, the City will then consider an ordinance as provided for in C.R.S § 43-2-106 within 90 days of the determination of the Transportation Commission, which ordinance will include provisions for the City to accept full ownership and maintenance responsibilities for the abandoned portions of Brighton Boulevard.  In consideration for taking over the ownership and maintenance of that portion of Brighton Boulevard, the City will be deemed to have contributed $5 million to offset estimated future operation and maintenance costs, access and utility permit review, and other State costs and risks to the I-70 East Project.

5.     **Transportation Elements to be Included in the I-70 East Project in Exchange for City's Payments.**

A.     Transportation Elements in the Base Scope - $10 Million.  Certain of the transportation elements are included in the State's base scope of work for the I-70 East Project as noted in the Atkins Phase 1 Base Scope dated May 6, 2015.  Specifically, (1) the "bookends" for the partial cover at an estimated value of $4.5 million (Exhibit D); (2) neighborhood street amenities and improvements in connection with 46th Avenue and the neighborhood streets valued at $3.5 million (Exhibit E ); and (3) improvements to lengthen the Quebec Street Bridge to allow for a 12-lane section on Quebec and lengthen the Peoria Street Bridge to allow for 10-lane section on Peoria estimated at $2.0 million are components of the I-70 East Project base scope

8

that the State has agreed to include in the I-70 East Project and in part, for which the City has agreed to make payments to the State as described in Paragraph 6 herein.

      B.      <u>Slip Ramps and Bypass Lanes - $17 Million.</u> The slip ramps and bypass lanes are included in the City's preferred alternative 2C, as shown on Exhibit F. These elements are included in the NEPA review, and will be included in the I-70 East Project should the Partial Cover Lowered Alternative be the preferred alternative and be cleared in the NEPA process. The estimated cost of these elements is approximately $17 million. Maintenance of the slip ramps and bypass lanes shall be the responsibility of the State.

      C.      <u>Enhancements to the Partial Cover - $10 Million.</u> If the Partial Cover Lowered Alternative is the alternative approved in the Record of Decision, the Parties agree as follows:

      (i)      The Parties each acknowledge that the State has committed to constructing approximately a 999-foot long cover over I-70 East between Columbine and Clayton Streets. The costs of constructing this cover are estimated to be $80 million, which does not include additional design and landscaping costs, which are in addition to the estimated $80 million construction costs. (Exhibit G.)

      (ii)      The State is also committed to funding a base level of landscaping necessary to meet the requirements should the Partial Cover Lowered Alternative be the preferred alternative selected in the Record of Decision, once completed and issued, including a cover that can provide an active community space for surrounding residents and local neighborhoods, support social and pedestrian connections in the Elyria-Swansea neighborhood, and provide new space for the Swansea Elementary School.

      (iii)      The Parties acknowledge there is a cost increase between the base cover to be provided by the State and an enhanced cover desired by the City and the community that includes additional elements. This additional cost includes "above-ground" costs such as plazas, pavilions, and water features, as well as the additional structural elements to support them. This additional cost is estimated by the State to be $45 per square foot, totaling an estimated $10 million. These costs do not include any costs for ongoing maintenance. The final design will be informed by the community-led design process. (Current preliminary plan is depicted on Exhibit H.)

      (iv)      The base project lid cover for the I-70 East Project must be designed and constructed, and have the structural integrity, to contain and support the enhanced elements described above.

      (v)      The State agrees to include the additional elements set forth above in the I-70 East Project in exchange for the City's agreement to make payments as set forth herein.

      (vi)      Maintenance for the cover that relates to landscaping, open space development, and recreational and/or educational activities will be the responsibility of the City. Maintenance and repair for the structural elements of the lid, including the Bookends, will be the responsibility of the State.

D.     <u>Right of First Refusal.</u> Upon completion of the I-70 East Project, the City shall have a right of first refusal to acquire any remnant parcels owned by CDOT to the extent permitted as follows. If the property or interest therein is of use only to one abutting owner, such owner shall have the right of first refusal to purchase or exchange the property in accordance with C.R.S. § 43-1-210(5)(a)(iii). If, however the abutting owner does not exercise the first right of refusal to purchase such property, or CDOT determines such property is of use to more than one abutting owner or potential owner, the City shall have the right of first refusal to purchase or exchange such property at the fair market value, in accordance with C.R.S. § 43-1-210(5)(a)(iv)(A).

6.     <u>Payments by City - $37 Million.</u>

A.     If the Partial Cover Lowered Alternative is the alternative selected in the Record of Decision, the City agrees to provide $37 million of funding to the State by making payments in equal annual installments of $2,688,010 for 30 years to be used by the State in making availability payments to the Developer. The City's annual payments will begin upon substantial completion of the I-70 East Project.

B.     The City's payment obligations will be subject to annual appropriation. The Parties acknowledge that (i) by this Agreement, the City does not irrevocably pledge present cash reserves for payments in future fiscal years, and (ii) this Agreement is not intended to create a multiple-fiscal year direct or indirect debt or financial obligation of the City, except to the extent that the funds are currently encumbered or can be legally made available from an enterprise fund. The Parties agree that any expenditure of the City shall extend only to funds appropriated by the Denver City Council for the purpose of this Agreement, encumbered for the purpose of this Agreement and paid into the Treasury of the City and County of Denver. The City, through the Department of Public Works, agrees to include in budget request funds sufficient to fulfill its commitments herein.

C.     Financial obligations of the City payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.

D.     The failure of the City to appropriate funds for said payments shall not be considered a default or breach of the Agreement and shall not give rise to any Party to have a claim of any kind.

E.     Should the City fail to appropriate the annual payment in any year, the State shall have the right to notify the rating agencies of the City's event of non-appropriation.

F.     Upon financial close of the procurement process, the State will notify the City that the I-70 East Project is moving forward. The State will also advise the City of the contract date for completion of the I-70 East Project, and the date upon which the City's payments are projected to begin. One year prior to completion and the date that the State expects the City's payments to commence, the State and the City will meet and determine the process and procedures for the City to make such payments.

7.     **Sharing of Cost Savings.** The Parties acknowledge that the planned P3 procurement for the I-70 East Project may result in a total construction cost less than the currently estimated $800 million. Should savings in fact be realized, the Parties agree that City will receive a proportionate share of the savings to offset the cost of the slip ramps and bypass lanes. The percent of savings that City will receive is 4.6%, calculated based on the City's proportionate share of the cost of the total construction of the I-70 East Project. Any amount of savings credited to the City will reduce the City's annual payment accordingly.

8.     **I-25 Santa Fe Interchange Reconstruction (Alameda to Cedar)/TIGER Grant Support.** The City agrees, at CDOT's request, to make the currently estimated $30 million I-25 Santa Fe/Alameda project (Valley Highway Phase 2.0) its first priority in the next round of TIP requests (2020-2025) to the Denver Regional Council of Governments ("DRCOG") (see Exhibit I). This project is included in the DRCOG Fiscally Constrained Regional Transportation Plan ("RTP") and prior phases are underway and shown in the 2012-17 and 2016-21 TIP and STIP. The local match is estimated to be $6 million, and City and CDOT have each agreed that each intends to fund 50% of the local match, subject to the availability of funds and appropriations of funds. CDOT agrees, at City's request, to support the City's proposed TIGER grant application for the City's I-25 and Broadway project in the next round of applications (see Exhibit J).

9.     **Mutual Cooperation.** The Parties agree to cooperate in the design and implementation of the I-70 East Project and the TBDP, including providing all appropriate access and license agreements on reasonable terms at no additional cost.

10.    **Project Management and Coordination.** The Parties desire to manage the I-70 East Project, the EADP and the TBDP so that the scope and schedule of each of these projects are achieved with a quality work product and timely schedule so that that the project benefits are recognized for all Parties. It is the intent of the Parties to establish regular interaction, consultation and collaboration on the projects referenced in this Agreement. From design review and comment at appropriate intervals, to Developer selection, to contract review and comment, the Parties commit to establishing a protocol of review and comment for each project referenced in this Agreement.

A.     The Parties agree that CDOT/HPTE/BE shall manage the Developer and the design and construction of the I-70 East Project and be responsible for coordination as necessary to complete the I-70 East Project within the schedule and budget. CDOT/HPTE/BE shall be responsible for coordination of the Developer with the Project Management Team ("PMT") described in Subparagraph 10.D.

B.     The City shall manage the contractors designing and constructing the TBDP. The City shall manage the designer and contractor, and all associated contracts and be responsible for coordination as necessary to complete the TBDP within time frame and budget for the TBDP. The City shall be responsible for coordination of the TBDP consultants and contractors with the PMT.

C.     The Parties shall act in the best interest of the timely completion of the TBDP and the I-70 East Project. There shall be weekly status meetings with the Project

11

Contractor in the field, which shall be attended by the Denver and the CDOT/HPTE/BE Project Manager.

D. **Project Management Team**. To ensure coordination among all the Parties, a PMT is hereby created consisting of one (1) employee each from the State and the City. The PMT shall meet at least monthly or as often as necessary. The Project Managers for the projects shall present project schedule and budget updates to the PMT on a monthly basis. The PMT will establish procedures for comment resolution and issue escalation for the TDBP and the I-70 East Project.

E. **Design Review – EADP**.

(i)     CDOT shall have the right to review all plans for the TBDP, including the EADP. CDOT will provide comments focused on the functionality of the drainage plans. When plans for the EADP have achieved 30% design, the City shall submit the plans to CDOT for review and comment. CDOT will have 10 business days to review and comment back to the City. The City will then have 14 business days to discuss with CDOT, if necessary, and to respond to the contractor with comments. When plans are at 60% design, the City will submit the plans to CDOT. CDOT will have 10 business days to review and comment back to the City, as well as verify that responses to the 30% design are acceptable. The City will then have 14 business days to discuss with CDOT, if necessary, and to respond to the contractor with comments. At the time the 100% design plans are submitted, CDOT will have 10 business days to respond and if CDOT provided comments on the 60% design, then the City will provide responses as well as the 100% design. At that time, CDOT will verify that all responses to the 60% design are acceptable. This will be the last time that new comments can be submitted on this plan set. The City will then have 14 days to respond to the contractor with comments. When RFC design has been achieved, CDOT will have five business days to verify that all responses are acceptable. Unless major changes have been to the plans, no additional comments will be considered at this time. City has 10 business days to respond to the contractor to assure that all comments have been incorporated.

F. **Design Review – TBDP**. A similar process will be followed for the design review for the TBDP.

G. **I-70 East Project Coordination**. The detailed process for cooperation between the State and the City for the I-70 East Project is set forth in Exhibit K.

H. **Design Review – Ongoing Consultation**. It is the intent of the Parties that there will be ongoing, interactive consultation with regard to the both the EADP/TBDP and the I-70 East Project.

I. **Project Payment Provisions**.

(i)     EADP/TBDP. The State will reimburse the City for the State's share of the TBDP after the State's review and approval of such charges, subject to the terms and conditions of this Agreement. However, any charges incurred by the City prior

12

to the date this Agreement is executed by the State Controller or his designee will not be reimbursed absent specific State Controller approval thereof.

(ii)     The State will reimburse the City's reasonable, allocable, allowable performance of the work, not exceeding the maximum total amount described in Paragraph 2.B.(ii). To be eligible for reimbursement, costs incurred by the City shall be:

(1)     in accordance with the with the terms of this Agreement;

(2)     necessary for the accomplishment of the drainage portion of the TBDP;

(3)     reasonable in the amount for the goods and services provided;

(4)     actual net cost to the City (*i.e.* the price paid minus any refund in respect of other items of value received by the City that have the effect of reducing the cost actually incurred);

(5)     incurred for work performed after the effective date of this Agreement; and

(6)     satisfactorily documented.

(iii)     The City shall establish and maintain a proper accounting system in accordance with generally accepted accounting standards (a separate set of accounts, or as a separate part of its current accounting scheme) to assure that project funds are expended and costs accounted for in a manner consistent with this Agreement and project objectives.

(1)     All allowable costs incurred for the TBDP, including any approved services contributed by the City or others, shall be supported by properly executed payrolls, time records, invoices, contracts or vouchers evidencing the charges.

(2)     Any check or order drawn up by the City, including any item which is or will be chargeable against the project account shall be drawn with a properly signed voucher then on file in the office of the City which will detail the purpose for which said check or order is drawn. All checks, payrolls, invoices, contracts, vouchers, orders or other accounting documents shall be clearly identified, readily accessible, and to the extent feasible, kept separate from all other such documents.

(iv)     On or before the 15th day of each month, the City will prepare and submit to the State, no more than monthly, costs incurred relative to the EADP and the TBDP. The City's invoices shall include a description of the amounts of services performed, the dates of performance and the amounts and reimbursable expenses. The invoices will be prepared in accordance with the State's standard policies, procedures and standardized billing format to be supplied by the State. The City shall document that all costs for which it is seeking the State's payment are drainage elements of the TBDP.

13

(v)     To be eligible for payment, billings must be received within 60 days after the period for which payment is being requested and final billings on this Agreement must be received within 60 days after the completion of construction of the EADP and TBDP, respectively. The State shall pay invoices submitted by the City within 45 days, unless the State has questions about a given invoice, in which case the State shall notify the City, and representatives shall meet to address and resolve any such issues. Issues shall be resolved by the issue escalation process developed by the PMT.

(1)     Payments pursuant to this Agreement shall be made as earned, in whole or in part form available funds, encumbered for the purchase of the described services. The liability of the State, at any time, for such payments shall be limited to the amount remaining of such encumbered funds.

(2)     In the event this Agreement is terminated, final payment to the City may be withheld at the discretion of the State until completion of final audit.

(3)     Incorrect payments to the City due to omission, error, fraud of defalcation shall be recovered from the City by deduction from subsequent payment under this Agreement or other agreements between the State and City, or by the State as a debt due to the State.

(vi)     A sufficient unencumbered fund balance for the obligations of the State contained herein remains available for the payment of such obligations in the Total Contract Encumbrance Amount of $75.7 million.

J.     Warranties.  The State will require the Developer (or its contractor) to include in contracts for construction work done pursuant to this Agreement and the project agreement a warranty on all parts, materials, components, equipment, systems and other items incorporated into the work related to those elements that upon completion of the I-70 East Project, will either be conveyed to the City or for which the City will have ongoing maintenance responsibility. The Developer (or its contractor) shall warrant that all materials are new, unless otherwise specified, suitable for the intended purpose, of good quality, free from faults and defects and in conformance with the contract documents.

(i)     The Developer (or its contractor) will be required to promptly investigate, repair, replace or otherwise correct any of its workmanship and any parts, materials, components, equipment or other items in the work which contain faults or defects. The Developer (or its contractor) shall bear all costs of investigating and correcting, which includes the design efforts necessary to correct such work covered by the warranties and guarantees.

(ii)     The Developer's (or its contractor's) warranties and guarantees for all work components shall continue for a period of one (1) year after the date of final acceptance for work required to be covered by said warranties.

(iii)     The Developer (or its contractor), at its own expense, shall also investigate, repair or replace any damages to any equipment, facilities or other personal or

14

real property owned or leased by the City, which is damaged as a result of any fault or defect in the work, at no cost to the City.

K.     The City shall begin operation and maintenance of any local improvements constructed by the State or its Developer (or its contractor) upon the State's and the City's final acceptance of these improvements in the I-70 East Project from the Developer and conveyance of the right-of-way interests for local streets back to the City for the I-70 East Project.

11.     **Term of Agreement.** This Agreement shall not be enforceable until the date on which this Agreement has been approved and signed by all Parties, and the Colorado State Controller or designee (the date of the signature of the Colorado State Controller or designee being the Effective Date). The term of this Agreement shall continue until the earlier of thirty years following substantial completion of the I-70 East Project, or until the date of the City's last payment as set forth pursuant to Paragraph 6.B, unless terminated by the State as provided herein. This Agreement may be terminated earlier by mutual written agreement of the Parties. In particular, if the Partial Cover Lowered Alternative is not cleared through the NEPA process and is not identified as the selected, preferred alternative in the Record of Decision for the I-70 East Project by December 31, 2016, this Agreement may be terminated by mutual written agreement of the Parties.

12.     **Survivability.** Only those provisions so expressly stating shall survive the termination of this Agreement.

13.     **Covenants.** The Parties' contractors and developers shall construct improvements in a good and workmanlike manner and in substantial compliance with the plans and specifications and requirements of this Agreement.

14.     **Representations.** Each Party represents that it possesses the legal authority to enter into this Agreement and that it has taken all actions required by its procedures, bylaws, and/or other applicable law to exercise that authority, and to lawfully authorize its undersigned signatory to execute this Agreement and to bind the signing party to its terms.

15.     **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed to have been sufficiently given for all purposes if sent by certified mail or registered mail, postage and fees prepaid, addressed to the Party to whom such notice is to be given, at the address set forth below, or at such other address as has been previously furnished in writing, to the other Party. Such notice shall be deemed to have been given when deposited in the United States mail.

If to City:

Manager of Public Works
201 West Colfax Avenue, Dept. 601
Denver, Colorado 80202

With a copy of any such notice to:

Denver City Attorney's Office
1437 Bannock St., Room 353
Denver, Colorado 80202

If to CDOT:

Colorado Department of Transportation
Attn: Executive Director
4201 East Arkansas Avenue
Denver, Colorado 80222

If to HPTE:

High Performance Transportation Enterprise
Attn: Director
4201 East Arkansas Avenue
Denver, Colorado 80222

If to BE:

Bridge Enterprise
c/o Chief Engineer
4201 East Arkansas Avenue
Denver, Colorado 80222

**16.    Appropriation.**  The Parties acknowledge that (i) financial obligations of the State payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted and otherwise made available, (ii) the Parties by this Agreement do not irrevocably pledge present cash reserves for payments in future fiscal years, and (iii) this Agreement is not intended to create a multiple-fiscal year direct or indirect debt or financial obligation of the Parties, except to the extent that the funds are currently encumbered or can be legally made available from an enterprise fund.  The Parties agree that any expenditure of the City shall extend only to funds appropriated by the Denver City Council for the purpose of this Agreement, encumbered for the purpose of this Agreement and paid into the Treasury of the City and County of Denver.  City, through the Department of Public Works, agrees to include in budget requests funds sufficient to fulfill its commitments herein.

**17.    Liability of the Parties.**  The Parties agree each party is relying upon, and has not waived, the monetary limitations and all other rights, immunities and protections provided by the Colorado Governmental Immunity Act, C.R.S. § 24-10-101, *et seq*.  The provision of services under this Agreement is for the benefit of the Parties.  Each party agrees to be responsible for its own liability incurred as a result of its participation in this Agreement.  If any claim is litigated, each Party will be responsible for its own expenses of litigation or other costs associated with enforcing this Agreement.

**18.** **Additional Documents.** The Parties agree to execute any additional documents or take any additional action that is necessary to carry out the intent of this Agreement or to request approval, in good faith, from their legislative bodies for such agreements or documents.

**19.** **Venue.** Venue for any action hereunder shall be in the District Court, City and County of Denver, State of Colorado, and the Parties waive any right to remove any action to any other court, whether state or federal.

**20.** **Separate Entities.** The Parties enter into this Agreement as separate, independent governmental entities and shall maintain such status throughout.

**21.** **Third Party Beneficiaries.** Enforcement of the terms of this Agreement and all rights of action relating to enforcement are strictly reserved to the Parties. Nothing contained in this Agreement gives or allows any claim or right of action to any third person or entity. Any person or entity other than the Parties receiving benefits pursuant to this Agreement is an incidental beneficiary only.

**22.** **Amendments.** This Agreement may be amended, in whole or in part, only by written instrument executed by the Parties.

**23.** **Non-Discrimination in Employment.** In connection with the performance of work under the Agreement, the Parties may not refuse to hire, discharge, promote or demote, or discriminate in matters of compensation against any person otherwise qualified, solely because of race, color, religion, national origin, gender, age, military status, sexual orientation, gender variance, marital status, or physical or mental disability. The Parties shall insert the foregoing provision in all contracts, and direct that the foregoing provision be included in all subcontracts.

**24.** **Force Majeure.** No Party shall be deemed in default hereunder and neither shall be liable to the other if either is subsequently unable to perform, or is delayed in performing, its obligations hereunder by reason of any cause beyond the reasonable control of said Party, including an act of God, fire, strike, riot, civil disturbance, act of public enemy, embargo, or any judicial order; provided, however, that no party shall be entitled to relief under this paragraph unless such Party shall have given the other Parties reasonable notice of such event, and shall have exhausted all reasonable means of complying or implementing alternative means of compliance with its contractual obligations hereunder.

**25.** **Examination of Records.** Any authorized agent of the City, including the City Auditor or his or her representative, has the right to access and the right to examine any pertinent books, documents, papers and records, involving transactions related to this Agreement until the latter of three (3) years after the final payment under this Agreement or expiration of the applicable statute of limitations.

**26.** **Counterparts, Signatures.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same document.

**27.** **Statewide Contract Management System.** If the maximum amount payable to the City under this Agreement is $100,000 or greater, either on the Effective Date or at any time

17

thereafter, the Statewide Contract Management System applies. The City agrees to be governed, and to abide by the provisions of C.R.S. §§ 24-102-205, 24-102-206, 24-103-601, 24-103.5-101 and 24-105-102 concerning the monitoring of vendor performance on state contracts and inclusion of contract performance information in a statewide contract management system. The City's performance shall be subject to Evaluation and Review in accordance with the terms and conditions of this Agreement, state law, including C.R.S. § 24-103.5-101, and State Fiscal Rules, Policies and Guidance.

28.    **Special Provisions**.

A.    <u>Controller's Approval</u>. C.R.S. § 24-30-202(1). This Agreement shall not be valid until it has been approved by the Colorado State Controller or designee.

B.    <u>Fund Availability</u>. C.R.S. § 24-30-202(5.5). Financial obligations of the State payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.

C.    <u>Governmental Immunity</u>. No term or condition of this Agreement shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protections, or other provisions, of the Colorado Governmental Immunity Act, C.R.S. § 24-10-101 *et seq.*, or the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, as applicable now or hereafter amended.

D.    <u>Independent Contractor</u>. The City shall perform its duties hereunder as an independent contractor and not as an employee. Neither the City nor any agent or employee of the City shall be deemed to be an agent or employee of the State. City and its employees and agents are not entitled to unemployment insurance or workers compensation benefits through the State and the State shall not pay for or otherwise provide such coverage for the City or any of its agents or employees. Unemployment insurance benefits will be available to the City and its employees and agents only if such coverage is made available by the City or a third party. The City shall pay when due all applicable employment taxes and income taxes and local head taxes incurred pursuant to this Agreement. The City shall not have authorization, express or implied, to bind the State to any agreement, liability or understanding, except as expressly set forth herein. The City shall (a) provide and keep in force workers' compensation and unemployment compensation insurance in the amounts required by law, (b) provide proof thereof when requested by the State, and (c) be solely responsible for its acts and those of its employees and agents.

E.    <u>Compliance with Law</u>. The Parties shall strictly comply with all applicable federal and state laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

F.    <u>Choice of Law</u>. Colorado law, and rules and regulations issued pursuant thereto, shall be applied in the interpretation, execution, and enforcement of this Agreement. Any provision included or incorporated herein by reference which conflicts with said laws, rules, and regulations shall be null and void. Any provision incorporated herein by reference which

18

purports to negate this or any other Special Provision in whole or in part shall not be valid or enforceable or available in any action at law, whether by way of complaint, defense, or otherwise. Any provision rendered null and void by the operation of this provision shall not invalidate the remainder of this Agreement, to the extent capable of execution.

        G.      Binding Arbitration Prohibited. The State does not agree to binding arbitration by any extra-judicial body or person. Any provision to the contrary in this Agreement or incorporated herein by reference shall be null and void.

        H.      Software Piracy Prohibition. Governor's Executive Order D 002 00. State or other public funds payable under this Agreement shall not be used for the acquisition, operation, or maintenance of computer software in violation of federal copyright laws or applicable licensing restrictions. The City hereby certifies that, during the term of this Agreement and any extensions, the City has and shall maintain in place appropriate systems and controls to prevent such improper use of public funds. If the State determines that the City is in violation of this provision, the State may exercise any remedy available at law or in equity or under this Agreement, including, without limitation, immediate termination of this Agreement and any remedy consistent with federal copyright laws or applicable licensing restrictions.

        I.      Employee Financial Interest/Conflict of Interest. C.R.S. §§ 24-18-201 and 24-50-507. The signatories aver that to their knowledge, no employee of the State has any personal or beneficial interest whatsoever in the service or property described in this Agreement. The City has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of the City's services and the City shall not employ any person having such known interests.

        J.      Vendor Offset. C.R.S. §§ 24-30-202(1) and 24-30-202.4. **[Not applicable to intergovernmental agreements]** Subject to C.R.S. § 24-30-202.4 (3.5), the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: (a) unpaid child support debts or child support arrearages; (b) unpaid balances of tax, accrued interest, or other charges specified in C.R.S. § 39-21-101, et seq.; (c) unpaid loans due to the Student Loan Division of the Department of Higher Education; (d) amounts required to be paid to the Unemployment Compensation Fund; and (e) other unpaid debts owing to the State as a result of final agency determination or judicial action.

        K.      Public Contracts for Services. C.R.S. § 8-17.5-101. **[Not Applicable to** agreements relating to the offer, issuance, or sale of securities, investment advisory services or fund management services, sponsored projects, **intergovernmental agreements,** or information technology services or products and services.] The City certifies, warrants, and agrees that it does not knowingly employ or contract with an illegal alien who will perform work under this contract and will confirm the employment eligibility of all employees who are newly hired for employment in the United States to perform work under this contract, through participation in the E-Verify Program or the Department program established pursuant to C.R.S. § 8-17.5-102(5)(c), the City shall not knowingly employ or contract with an illegal alien to perform work under this contract or enter into a contract with a subcontractor that fails to certify to the City that the subcontractor shall not knowingly employ or contract with an illegal alien to perform work under this contract. The City (a) shall not use E-Verify Program or

19

Department program procedures to undertake pre-employment screening of job applicants while this contract is being performed, (b) shall notify the subcontractor and the contracting State agency within three days if the City has actual knowledge that a subcontractor is employing or contracting with an illegal alien for work under this contract, (c) shall terminate the subcontract if a subcontractor does not stop employing or contracting with the illegal alien within three days of receiving the notice, and (d) shall comply with reasonable requests made in the course of an investigation, undertaken pursuant to C.R.S. § 8-17.5-102(5), by the Colorado Department of Labor and Employment. If the City participates in the Department program, the City shall deliver to the contracting State agency, Institution of Higher Education or political subdivision a written, notarized affirmation, affirming that the City has examined the legal work status of such employee, and shall comply with all of the other requirements of the Department program. If the City fails to comply with any requirement of this provision or C.R.S. § 8-17.5-101 et seq., the contracting State agency, institution of higher education or political subdivision may terminate this contract for breach and, if so terminated, the City shall be liable for damages.

      L.     <u>Public Contracts With Natural Persons</u>. C.R.S. § 24-76.5-101. The City, if a natural person eighteen (18) years of age or older, hereby swears and affirms under penalty of perjury that he or she (a) is a citizen or otherwise lawfully present in the United States pursuant to federal law, (b) shall comply with the provisions of C.R.S. § 24-76.5-101 et seq., and (c) has produced one form of identification required by C.R.S. § 24-76.5-103 prior to the effective date of this contract.

Remainder of Page Intentionally Blank

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date set forth above.

STATE OF COLORADO
John W. Hickenlooper, GOVERNOR

COLORADO DEPARTMENT OF TRANSPORTATION

_____

By:  Shailen P. Bhatt
     EXECUTIVE DIRECTOR

Date: _____

COLORADO HIGH PERFORMANCE TRANSPORTATION ENTERPRISE

_____

By:  Michael Cheroutes
     DIRECTOR

Date: _____

COLORADO BRIDGE ENTERPRISE

_____

By: _____
Title: _____

Date: _____

APPROVED:
Cynthia H. Coffman, ATTORNEY GENERAL

By: _____
     ASSISTANT ATTORNEY GENERAL

Date: _____

21

## ALL AGREEMENTS REQUIRE APPROVAL BY THE STATE CONTROLLER

C.R.S. §24-30-202 requires the State Controller to approve all State Agreements. This Agreement is not valid until signed and dated below by the State Controller or delegate. The City is not authorized to begin performance until such time. If the City begins performing prior thereto, the State of Colorado is not obligated to pay the City for such performance and/or for any goods and/or services provided hereunder.

**STATE CONTROLLER**
**Robert Jaros, CPA, MBA, JD**


By: _____

_____, Delegee

Date: _____

22

843

**SEAL**                              **CITY AND COUNTY OF DENVER**

**ATTEST:**                           By_____
                                          Mayor

_____
**DEBRA JOHNSON,**
**Clerk and Recorder, Ex-Officio Clerk**
**of the City and County of Denver**

**APPROVED AS TO FORM:**              **REGISTERED AND COUNTERSIGNED:**

**D. SCOTT MARTINEZ,**
**Attorney for the City and County**  By_____
**of Denver**                             Manager of Finance

By_____           By_____
    Assistant City Attorney              Auditor
                                         Contract Control No. 2015 22456-00

23

844

## LIST OF EXHIBITS

Exhibit A   -   Combined Drainage System Proposed 100-Year Protection Montclair and Park Hill Basins

Exhibit B   -   Schedule of City's Customary Permit Fees

Exhibit C   -   Property Interests State will Acquire from City

Exhibit D   -   Bookends Related to Lid Cover

Exhibit E   -   Neighborhood Street Improvements

Exhibit F   -   Slip Ramps and Bypass Lanes included in Denver's Preferred Alternative 2C

Exhibit G   -   Base Lid Cover

Exhibit H   -   Cover with Currently-Discussed Enhancements

Exhibit I   -   Estimated $30 Million I-25 Santa Fe/Alameda Project in the Next Round of TIP Requests to Denver Regional Council of Governments

Exhibit J   -   Proposed TIGER Grant Application for City's I-25 and Broadway Project

Exhibit K   -   City and County of Denver I-70 East Project Document Review Process

24

**EXHIBIT A**

**Combined Drainage System Proposed 100-Year Protection
Montclair and Park Hill Basins**

# EXHIBIT A



CDOT/CCD I-70 PCL
COMBINED DRAINAGE SYSTEM
PROPOSED 100-YEAR PROTECTION
MONTCLAIR AND PARK HILL BASINS

Revised 2015-06-16
Concept Plan
Subject To Change

# EXHIBIT B

## Schedule of City's Customary Permit Fees

# EXHIBIT B

## CCD Fees for I-70 East Project

| Name of Fee | Typical Cost | Waived for I-70 East? | Notes |
|---|---|---|---|
| **Public Works and Development Services** | | | |
| Plan Review - Storm & Sanitary | 2.5% of construction cost | | |
| Plan Review - Extension of Main Line Sewer | 2.5% of construction cost | | |
| Plan Review - Transportation/Roadway | $3,000 (for 800LF or greater) | | |
| Easement and Indemnity Agreement Process | $400 | | |
| Surveying Services | $138/hour | | |
| Plan Review - Surveying | $12,800 (50ac or greater) | | |
| Subdivision Processing Fee | $1,500 | | |
| Minor Site Plan | $600 | | |
| Legal Description Review | $300 | | |
| Address Assignment | $50 | | |
| ROW Construction - curb, gutter or sidewalk | $50 for first 50LF, $1 for each additional LF | | |
| ROW Construction - tree wells, test holes, underdrains | $50, plus $20 for each additional item | | |
| ROW Construction - curb cub | $70/ea | | |
| ROW Construction - asphalt paving or patching | $50 for first 50LF, $1.50 for each additional LF | | |
| ROW Construction - concrete paving | $250 for first 50LF, $1.50 for each additional LF | | |
| ROW Construction - combo c/g/s | $75 for first 50LF, $1 for each additional LF | | |
| Advertising Bench Permit | $50 | | |
| Banner Permit | $100 | | |
| Kiosk Permit | $200 | | |
| Shelter Permit | $200 | | |
| Parking Meter Occupancy | $15 - $50 | | |
| Emergency Truck Tag | $20 | | |
| Special Parking Tag | $4 | | |
| Truck Loading Tag | $180 | | |
| Sewer Use & Drainage Permit (SUDP) | $200 plus $25/ac | | |
| CASDP/Erosion Control Permit | $200 plus $25/ac | | |
| Sewer Tap Fees (Metro and SAFE) | Variable - per current fee schedule on web | | These are pass-through fees. |
| Fees to Denver Water and other External Agencies | Varies | | Pass-through fees cannot be waived by CCD |
| Revocable Street Occupancy Permit | Varies by scope | | |
| Street Cut Permits | Varies by scope | | |
| Transit Amenities - benches, kiosks, shelters with ads | $200 | | |
| Transit Amenities - benches, kiosks, shelters without ads | waived for CCDT & RTD | | |
| Temporary Sign | $50 | | |
| Encroachments/MEPs | Per PW Rules & Regs - initial and annual | | |
| Overweight & Oversize Moving Permit | $25/permit + $15/administrative | | |
| Easement Relinquishments | $1,000 plus $300 additional fee after posting | | |
| Vacation | $1,000 plus $300 additional fee after posting | | |
| Street Name Change | $1,000 plus $300 additional fee after posting | | |
| Utility Plan Review Fee | $180-$1,000 based on LF | | |
| Sewer Inspections - construction/connection/repair | $55/hr/inspector | | |
| TV Inspection | $118/hr/crew | | |
| TV Sealing | $255/hr/crew | | |
| Construction Inspection | $55/hr/inspector | | |
| Special Inspection Services | $55/hr/inspector | | |
| Off-Hours Inspection Surcharge | $108 | | |
| Major Site Plan Review | $500-$50,000 based on acreage | | |
| Industrial Site Plan Review | $250 | | |
| Parking Lot Landscape Plan Review | $250 | | |
| Minor Site Plan Amendment or Mod | $100 | | |
| Comprehensive Sign Plan | $500 | | |
| Transfer of Development Rights | $75-$1,500 | | |
| Building - Permit Fee | Per Building Code Policy ADMIN 138 | | Fees req'd in current Denver Building Code (2012 as amended). |
| Building - Plan Review Fee | Per Building Code Policy ADMIN 139 | | Fees req'd in current Denver Building Code (2012 as amended). |
| Building - Foundation Only Permits | Per Building Code Policy ADMIN 140 | | Fees req'd in current Denver Building Code (2012 as amended). |
| Building - Phased Construction Permits | Per Building Code Policy ADMIN 141 | | Fees req'd in current Denver Building Code (2012 as amended). |
| Building - Design-Build Construction Permits | Per Building Code Policy ADMIN 142 | | Fees req'd in current Denver Building Code (2012 as amended). |
| Building - Appeals, Applications and Other Admin | Per Building Code Policy ADMIN 143 | | Fees req'd in current Denver Building Code (2012 as amended). |
| **Planning & Zoning** | | | |
| Annexation/Minor Boundary Adjustment | $100 | | |
| Rezoning | $1,000-$50,000 based on scope | | |
| Text Amendment | $500 | | |
| GDP Review | Per GDP Rules & Regs | | |
| Zoning Permit for Development | Based on Valuation | | |
| Zoning Lot Amendment | $50 | | |
| Zoning Use Permit | Varies based on type | | |
| Special Event Parking | $25/event plus $1/vehicle over 20 cars | | |
| Mobile Food Vendor | $50 | | |
| Temp. Outdoor Retail Sales | $50/event | | |
| Zoning Compliance Letter | $50 | | |
| Sign Permit | $25 | | |
| Home Occupation | $20 | | |
| Outdoor General Advertising Devices | $225 plus $125 annually | | |
| Design and Application Review | $100 | | |
| Admin Exception for Historic Structures | $75 | | |
| Zoning Permit in Historic District | $75 | | |
| Code Interpretation | $100 (waived with application) | | |
| Variances | Per BOA Fee Schedule | | |
| Appeal of Administrative Decision | Per BOA Fee Schedule | | |
| Over Height Fence | $100 | | |

| | | | |
|---|---|---|---|
| Non-conforming use/structure application | $100 | | |
| Installing of an AC unit in a setback | $100 | | |
| Storage of RV | $100 | | |
| Misc. Zoning Administrator Reviews | $100 | | |
| App. For Preservation Designation (owner) | $250 | | |
| App. For Preservation Designation (non-owner) | $875 | | |
| App. For a Certificate of Non-historic Status | $250 | | |
| Administrative PUD Amendment | $100 | | |
| **Parks & Rec** | | | |
| Forestry Plan Review | $45 | | |
| Forestry Planting Permit | none | | |
| Forestry Demo Permit | none | | |
| P&R Construction and Access Permit | none | | |
| **Fire** | | | |
| Various | Per Fire Dept fee schedule on web | | |

# EXHIBIT C

## Property Interests State will Acquire from City

# EXHIBIT C
## Property Interests State will Acquire
## from City

| Description | * Area (AC) | Area (SF) |
|---|---|---|
| South Platte River to End of Viaduct | | |
| Fee Acquisition - Denver ROW (under I-70 Viaduct) | 17.1 | 743,269 |
| Fee Acquisition - Denver ROW (outside I-70 Viaduct) | 11.7 | 509,865 |
| Fee Acquisition - Denver property | 1.6 | 70,994 |
| Permanent Easement | 4.0 | 172,062 |
| Temporary Easement | 7.9 | 342,077 |
| | | |
| End of Viaduct to Quebec Street | | |
| Fee Acquisition - Denver ROW (on-grade I-70 alignment) | 38.6 | 1,681,277 |
| Fee Acquisition - Denver ROW (outside I-70 alignment) | 27.4 | 1,193,797 |
| Temporary Easement | 11.6 | 503,493 |
| Total | 119.90 | |
| | | |
| Estimated Administrative Acquisition Costs: | $1,500,000 | |
| | | |
| Negotiated Price: | $25,700,000 | |

Notes:
* Timing of the transaction assumed at closing for land which is about Final RFP planned for May 2016
* Reference ROW maps dated March 31, 2015

**EXHIBIT D**

**Bookends Related to Lid Cover**

**EXHIBIT D**

**Swansea Cover Bookends**



# EXHIBIT E

## Neighborhood Street Improvements

**Exhibit E – Neighborhood Street Amenity Opportunities for City Street Network**

All City streets encompassing improvements through the I-70 East project such as the 46th Avenue frontage road design should respond to varying functional needs and neighborhood context. The following are general guidelines for amenities associated with the I-70 East project. The City requests that the Elyria and Swansea Neighborhood Plan adopted by City Council on February 23, 2015 be a reference document in the I-70 East RFP for amenity types for the City streets. The Elyria and Swansea Neighborhood Plan is intended to be reference guidelines for City street amenities versus prescriptive Standard requirements for the Developer. All amenities realized in the final I-70 East project are understood to be constrained by the construction limits as defined by the I-70 East Final Environmental Impact Statement (FEIS) and subsequent Record of Decision (ROD).

**One way streets generally from Brighton Interchange to York Character Area:** 1 way collector streets are intended to support vehicle and large truck access to and from the Brighton Boulevard interchange. Pedestrian trips should be accommodated, but use will be minimal given the grade separation of the frontage road below the adjacent residential uses (north side) and industrial uses (south side). Pedestrian-scaled amenities such as lighting and periodic decorative elements (such as railing, mural artwork, etc.) can contribute to softening the intensity of these vehicle-dominated segments of the frontage road system.

**Two way streets generally between York and Vasquez Interchange Character Area:** A 2-way local street on the north side and a collector street on the south side should be designed to support an active neighborhood center and high levels of pedestrian activity. The frontage road should function as a main street with on-street parking, detached sidewalks, street trees and other amenities to reinforce a pedestrian scale and character, especially surrounding the cover with construction limits as defined by the I-70 East Final Environmental Impact Statement (FEIS) and subsequent Record of Decision (ROD) The street and streetscape should be designed to prioritize and enhance the safety, quality, identity, physical function, and economic vitality of the area. The south edge of the cover, along 46th Ave. should be designed with enhanced pedestrian amenities. Where Elizabeth St. and Thompson Ct. terminate into 46th Ave, additional amenities should be considered, such as bulb outs, artwork, and iconic treatments to orient and attract the community to cross 46th Ave. and use the cover. The enhancements will help catalyze surrounding private development (see the Strong chapter of the Elyria and Swansea Neighborhoods Plan), which will add eyes on the cover and contribute to its success. Street design should discourage through truck movement with a high frequency of signalized intersections. Travel lane widths should be consistent with City standards instead of State highway standards. The design speed should be low to encourage slower speeds. This is the most critical character area along the corridor.

**One way streets generally between Steele/Vasquez Interchange and Colorado Boulevard Interchange Character Area:** Substantial redevelopment is anticipated in the future, especially north of the 40th and Colorado commuter rail station and on all sides of the Steele/Vasquez interchange. Frontage roads should be designed to not preclude an additional highway cover between Vasquez blvd and Cook St. One way streets may encourage high speeds, which highlight the need for detached sidewalks for pedestrian safety within the construction limits as defined by the I-70 East Final Environmental Impact Statement (FEIS) and subsequent Record of Decision (ROD). Efforts should be made to reduce the A-line only to the area needed to convey highway traffic. Access to and from the frontage roads will be critical for economic success of adjacent redeveloping land.

The Elyria and Swansea Neighborhood Plan can be located at
http://www.denvergov.org/Portals/646/documents/planning/Plans/elyria_swansea/Elyria_Swansea_Ne
ighborhood_Final_Web_sm.pdf

**EXHIBIT F**

**Slip Ramps and Bypass Lanes included in Denver's Preferred Alternative 2C**

# EXHIBIT F

## Slip Ramps



**EXHIBIT G**

**Base Lid Cover**

**EXHIBIT G**

**Base Lid Cover**



**EXHIBIT H**

**Cover with Currently-Discussed Enhancements**

# EXHIBIT II

## Swansea Cover Enhanced Cover



**EXHIBIT I**

Estimated $30 Million I-25 Santa Fe/Alameda Project in the Next Round of TIP Requests
to Denver Regional Council of Governments

# EXHIBIT I

## I-25 Santa Fe Interchange Reconstruction (Alameda to Cedar)

### This IGA pertains to Phase 2 only



**EXHIBIT J**

**Proposed TIGER Grant Application for City's I-25 and Broadway Project**

EXHIBIT J





SOUTH BROADWAY



**PROPOSED PROJECT**

TIGER Application Area
of Project

North
Not to Scale

*DRAFT*

**SOUTH BROADWAY –
TIGER FUNDING**

**EXHIBIT K**

**City and County of Denver I-70 East Project Document Review Process**

# EXHIBIT K

### Public Work's Design, Plan and Construction Permit Review Process

**Preamble:** The City and County of Denver (the City) is very sensitive to the overall I-70 East schedule as it pertains to agency review times which affect cost and schedule. The City also feels that in order to prevent issues with changes to the budget and schedule during the design and construction phases a proper review is required for a project the magnitude of I-70 East. In order to allow for a known process to review project documents we are requesting a submittal schedule be produced by the successful Developer within 60 days of Notice to Proceed from CDOT. Understanding that the submittal schedule is subject to change, CDOT and Denver will use the submittal schedule to prepare for upcoming reviews and designate the appropriate staff for a particular submittal review. CDOT and the City will work with the Developer to understand the Developer's needs and to package and time submittal packages to facilitate Public Work's reviews within 10 business days. Changes to the initial Developer provided submittal schedule will require a minimum of three days for the City to evaluate and respond and may require corresponding revisions to Public Work's review times. Public Work's review period for each of its reviews is 10 business days. Should the Developer provided submittal schedule require multiple reviews concurrently or request a review of the complete project by the City, the 10 business day maximum review time will be adjusted to reflect the level of information in the overlapping, or project wide reviews. Within 10 business days, the City will provide all comments on each submittal directly to the Developer and copy CDOT on those comment transmittals. The City will require that all comments be responded to indicating a good faith effort as part of the subsequent submittal or earlier as part of a formal comment resolution process. Any comments not responded to by the Developer, or comment responses that cannot be resolved informally will be resolved pursuant to an escalation process which will be agreed to in writing. If the Developer indicates that a City comment is outside the Contract, the issue will be resolved pursuant to the written escalation process.

**Note:** The City will review project elements and documents with a nexus to City infrastructure and concerns, with a focus on work in City ROW, City-owned infrastructure and any mitigation requirements noted or commented on in the Record of Decision. CDOT will require the Developer to submit a narrative with each review that will assist City staff in locating the applicable information to review.

### The City anticipates reviewing/commenting on and participating in:

1) **Developer Selection Process:** The City will participate in the executive oversight committee for the developer selection. The City will be a member of the finance and technical review teams and review Developer qualifications and proposals.

2) **RFP Documents:**
   a) Invitation to Bid - Introduction/Project Description
   b) RFP Selection Process
   c) Alternative Technical Concepts (ATCs)

d) Sample Contract
e) Final Executed Contract (for Information, not for City review)
f) Technical Requirements
g) Technical Specifications

At a minimum the City anticipates reviewing/commenting on the following Developer submittals. The City will review other submittals with a nexus to City-owned infrastructure or that are necessary to achieve City goals for the project:

1) Design Documents
   a) Preliminary Reports
   b) Baseline Schedule and on-going updates
   c) List of plan set structure and breakdown, with naming conventions to be used by Developer
   d) Design Quality Management Plan
   e) Construction Quality Management Plan
   f) Materials Management Plan (MMP)
   g) Pavement Design (City Network)
   h) Geotechnical Report
   i) Public Information Plan
   j) Incident Management Plan
   k) Drainage Reports
   l) Traffic Management Plan
   m) Health & Safety Plan
   n) Traffic Studies and Reports
   o) Environmental mitigation plans, as required by the NEPA Record Of Decision (ROD)

2) Plan Reviews
   a) RFP Design Review
   b) Over-the-shoulder Design Review
   c) 60%, and 100% Design Review
   d) RFC Design Review
   e) The above reviews will most likely include these major elements:
      - Utilities
      - Roadway
      - Drainage
      - Landscaping
      - Lighting
      - Signals
      - Signing & Striping

# EXHIBIT K

## Public Work's Design, Plan and Construction Permit Review Process

3) **Construction and Post-Design Submittals:**
   a) Methods of Handing Traffic (MHT's)
   b) Mix Designs (City Streets/Infrastructure)
   c) Lighting (City Streets/Infrastructure)
   d) Landscaping & Irrigation (City Streets/Infrastructure)
   e) Requests for Information (RFI's) related to City Infrastructure
   f) Non-Conformance Reports (NCR's) related to City Infrastructure
   g) Design changes related to City Infrastructure
   h) On-going environmental mitigation efforts, as required by the NEPA ROD