**ATTACHMENT TO DECLARATION:**
**IGA**

received
SEP 1 1 2015

PROJECT:
REGION: 01

Routing # / 16 - HAH - ZH - 00059
~~ID # /~~
PO# 471000810
CMS # 83749

2015 - 0265

# INTERGOVERNMENTAL AGREEMENT
## BETWEEN THE COLORADO DEPARTMENT OF TRANSPORTATION
## AND THE CITY AND COUNTY OF DENVER

**THIS INTERGOVERNMENTAL AGREEMENT** ("Agreement") is made and entered into by and among the **Colorado Department of Transportation**, a division of the State of Colorado, created pursuant to the Transportation Act, C.R.S. § 43-1-101, *et seq*. ("CDOT"), the Colorado **High Performance Transportation Enterprise** ("HPTE"), a government-owned business within CDOT, created pursuant to C.R.S. § 43-4-806, and the Colorado **Bridge Enterprise** ("BE"), a government-owned business within CDOT created pursuant to C.R.S. § 43-4-805 (CDOT, HPTE and BE may be collectively referred to herein as the "State") and the **City and County of Denver**, a home rule city and political subdivision created by the Colorado Constitution ("City"). The City, the State, CDOT, HPTE, BE, each a Party, and the State and City (collectively referred to as the "Parties").

This Agreement shall not be enforceable until the date on which this Agreement has been approved and signed by all Parties, and the Colorado State Controller or designee (the date of the signature of the Colorado State Controller or designee being the "Effective Date").

## RECITALS

WHEREAS, CDOT, HPTE and BE, after more than ten years of study, have determined that the deteriorating conditions and inadequate capacity of I-70 between I-25 and Tower Road in Denver (the "I-70 East Corridor") require a comprehensive transportation solution to resolve these challenges; and

WHEREAS, based on an ongoing review process being conducted in accordance with the National Environmental Policy Act of 1969 ("NEPA"), the preliminarily preferred technical solution to address these challenges is officially known as the "Partial Cover Lowered Alternative with Managed Lanes Option" (the "Partial Cover Lowered Alternative"). As currently conceived, the Partial Cover Lowered Alternative would include:

    a.    the removal of the existing viaduct between Brighton Boulevard and Colorado Boulevard;

    b.    the reconstruction of the I-70 East Corridor, with a portion below the existing ground level; and

    c.    the construction of a landscaped highway "cover" above one segment of the reconstructed highway, which cover would physically reconnect a divided neighborhood; and

WHEREAS, although CDOT, HPTE and BE cannot definitively commit to the Partial Cover Lowered Alternative or any other technical solution until the conclusion of the ongoing NEPA process, it has determined that it is appropriate to prepare for the possibility that the Partial Cover Lowered Alternative ultimately receives approval; and

WHEREAS, the procurement for the potential design, construction, financing, operation and maintenance of a portion of the I-70 East Corridor (the "I-70 East Project") began with the issuance of the Request for Qualifications to Design, Build, Finance, Operate and Maintain the I-70 East Project, issued March 25, 2015, with a view to ultimately selecting an entity to implement the I-70 East Project; and

WHEREAS, the State intends to issue a draft RFP in the Fall of 2015, with proposals due in the Summer of 2016, and with selection of the developer for the I-70 East Project (the "Developer") and financial close in late 2016; and

WHEREAS, the City supports the I-70 East Project as it will provide an opportunity for needed infrastructure and transportation improvements to occur, and will address the safety issue of the aging viaduct, create jobs, restore elements of connectivity to the adjacent neighborhoods and communities, and result in new development; and

WHEREAS, CDOT, HPTE, BE and the City continue to explore additional savings and funding and enhancement opportunities for the I-70 East Project; and

WHEREAS, CDOT, HPTE, and BE must provide 100-year storm protection for the entire I-70 East Project, and a plan for providing that protection is included in the Supplemental Draft Environmental Impact Statement and Section 4(f) Evaluation, dated August 4, 2014 (the "SDEIS") and the ongoing NEPA review; and

WHEREAS, the SDEIS contemplated further development and design for the drainage plan needed for the protection of the I-70 East Project; and

WHEREAS, the City has separately and independently created a drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project alignment (the "Two Basin Drainage Project" or "TBDP"); and

WHEREAS, the City is prepared to initiate construction of the TBDP in order to preserve the property necessary for construction of the proposed TBDP project and to provide protection for certain developing areas of Denver from a 100-year storm event; and

WHEREAS, CDOT, HPTE, BE and the City have decided upon a cooperative approach that will result in savings to, and funding contributions for, the I-70 East Project, and which will also result in funding for enhancements to the I-70 East Project desired by the City; and

WHEREAS, the Parties have determined that there are significant mutual benefits to be achieved by cooperating and working together on the I-70 East Project and related

enhancements, including transportation improvements, efficiencies in timely decision making and turnaround, the design of the partial cover identified in the NEPA documents, and other improvements; and

WHEREAS, to the extent permitted by the NEPA process and applicable federal, state, and local laws and regulations, it is the intent of the Parties to set forth their understandings and goals with regard to their respective commitments for funding part of the costs of the I-70 East Project; and

WHEREAS, this Agreement is executed under the authority set forth in C.R.S. §§ 29-1-203, 43-1-110, 43-4-805(5)(i), and 43-4-806(5)(h), and Article XIV, Section 18 of the Colorado Constitution.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the sufficiency of which are mutually acknowledged, the Parties hereto agree as follows.

1.     **The Two Basin Drainage Project and the Early Action Drainage Project – The Drainage Collaboration**.

A.     The City intends to design and construct the TBDP, beginning with the first phase project, the Early Action Drainage Project ("EADP"). The Parties acknowledge that the total estimated cost for the TBDP is $134 million, which sum includes the EADP portion estimated to cost $69 million. The TBDP, including the EADP, is depicted on Exhibit A. Additional drainage elements not a part of the TBDP but important for the I-70 East Project are the drainage pipe along the southern edge of I-70 as part of the I-70 East Project ("Residual Drainage Pipe") (depicted in Exhibit A) estimated to cost $14.9 million. The Residual Drainage Pipe will be constructed, paid for, and owned by the State. The Brighton Boulevard Box Culvert is needed for surface drainage associated with City improvements along Brighton Boulevard, but could also provide an alternative connection point for the Residual Drainage Pipe. The Brighton Boulevard Box Culvert will be constructed by the City, perhaps as a part of the EADP. The State will pay the City $2.5 million toward the construction of the Brighton Box Culvert on or before September 15, 2015.

B.     The Parties believe the TBDP is a necessary and important drainage project, with benefits for the State and the City respectively.

C.     The Parties agree that the City, in partnership with the Urban Drainage and Flood Control District ("UDFCD"), will undertake the design, construction and installation of all of the TBDP, including the acquisition of property interests for the entire TBDP. The City will own the TBDP. City procurement rules shall apply to the design and construction of the TBDP.

D.     The City intends to begin construction of the EADP in the first quarter of 2016, and agrees to have the EADP segment from Pond 7 to the South Platte River operational by December 1, 2017 (see Exhibit A). If the City does not award a contract for construction of the EADP and give notice to proceed to the contractor by April 1, 2016, the Parties shall meet to assess the extent and impact of any delays, and determine an appropriate course of action. The City agrees to have the remaining portion of the EADP operational by September 1, 2019. The

3

City also intends to acquire all of the property interests needed for the entire TBDP as part of the EADP.  The Parties acknowledge that not all of the necessary property interests may be acquired by December 1, 2017.  The City acknowledges that the State is relying on the completion schedule for each phase of the TBDP as it structures the contract for the I-70 East Project and related project agreement.  The City acknowledges that a delay in having the EADP from Pond 7 to the South Platte River operational by December 1, 2017 or the remainder of the EADP operational by September 1, 2019, could result in additional costs to the I-70 East Project that can only be estimated at this time.  The City and the State have estimated that any delay in meeting the deadlines listed in this paragraph could result in at least $5,000 a day in additional costs to the I-70 East Project.  Therefore, the City will include a liquidated damages provision in the contract for construction of the EADP that provides for $5,000 per day of liquidated damages in the event that the time limits in any work order are exceeded.  All work orders for work required to make the segment of the EADP from Pond 7 to the South Platte River operational will require that the segment be operational no later than December 1, 2017.  All work orders necessary to make the remainder of the EADP operational will require that the EADP be operational no later than September 1, 2019.  If the EADP segment from Pond 7 to the South Platte River is not operational by December 1, 2017 or the remainder of the EADP is not operational by September 1, 2019 and this delays the I-70 East Project, the City will enforce the liquidated damages provision and reimburse the State for actual additional costs to the I-70 East Project in the amount of liquidated damages obtained from the City's contractor.

E.     The State believes the TBDP will result in significant benefits for the I-70 East Project and will result in a redundant storm protection system for the I-70 East Project.  As a result, it is the general intent of the Parties that CDOT, HPTE, and BE will pay 40% of the cost of the TBDP, currently estimated to be $53.6 million, and the City will pay 60% of the cost of the TBDP, currently estimated to be $80.4 million.  The State's funding obligation is limited to the drainage facilities of the TBDP, eligible to be funded by the Denver Wastewater Enterprise Fund under the Denver Revised Municipal Code and shall not be used for amenities, such as trails or lighting unrelated to maintenance, amphitheaters, wayfinding, and art work.  If the actual cost of the drainage component of the TBDP exceeds $134 million, the State will pay 40% of the cost increase directly attributable to the drainage elements of the TBDP subject to the limitation described in Paragraph 3.

F.     The Parties intend to establish a mutually agreeable maintenance, operation and repair agreement for the TBDP, which will be generally proportional in cost.

G.     The City agrees to design the TBDP to handle 100-year storm protection, as defined in the Letter of Recommendation from the Multi-Agency Technical Team dated January 2015, for the partially covered portion of the I-70 East Project subject to CDOT's review, to meet the State's plan for providing that protection as included in the SDEIS and the ongoing NEPA review.  The Parties recognize that the Residual Drainage Pipe and the Brighton Boulevard Box Culvert are necessary components to provide redundant 100-year protection for this portion of the I-70 East Project.  The City agrees that its ongoing drainage plans, policies and regulations will be developed with the goal of maintaining the functional capacity of the TBDP to handle the 100-year flood.  The City further agrees not to permit any modifications of the TBDP that would adversely impact the ability of TBDP to convey, carry or otherwise

4

mitigate the 100-year design flow required for this area. This provision shall survive the termination of this Agreement.

H.      In order that CDOT, HPTE and BE realize the anticipated benefits of the TBDP, the City agrees to make the TBDP operational by September 1, 2019. The City acknowledges that the State is relying on this schedule as it structures the contract for the I-70 East Project. The City acknowledges that a delay in having the TBDP operational by September 1, 2019, could result in the State having to make delay payments or compensation event payments to the Developer of the I-70 East Project that can only be estimated at this time. The City and the State have estimated that any delay in meeting the September 1, 2019, deadline could result in at least $5,000 a day in additional costs to the I-70 East Project. Therefore, the City will include a liquidated damages provision in the contract for construction of the TBDP that provides for $5,000 per day of liquidated damages in the event that the TBDP is not operational by September 1, 2019. If the TBDP is not operational by September 1, 2019, and this delays the I-70 East Project, the City will enforce the liquidated damages provision and reimburse the State for actual additional costs to the I-70 East Project in the amount of liquidated damages obtained from the City's contractor.

I.      With the TBDP, the planned detention ponds at Steele and Vasquez that are currently included in the SDEIS will no longer be needed, permitting a reduction in impacts on adjacent neighborhoods. The TBDP is also expected to reduce the pond size at Colorado Boulevard.

J.      The Parties agree that if circumstances arise that allow for a later completion date of either the EADP or the TBDP, that upon request of the City, the State or the Developer may extend the completion date required of the City by written notice to the City, in the sole discretion of the State or the Developer.

2.   **Funding for the EADP.**

A.      The City will contract for, or cause the UDFCD to contract for, the design of the EADP. CDOT, HPTE, and BE will have the right to review and comment on the design for the EADP as set forth herein, and will have staff assigned to assist in the review and selection process. The City will contract for the construction of the EADP, and the State will have the right to review and comment on the construction contract.

B.      The Parties agree to fund the EADP, as follows:

(i)      The City will fund $26.8 million which will be the first dollars spent for design and construction draws, as well as acquisition of property interests, until said amount is expended ("City EADP Funds").

(ii)      Upon the full expenditure of the City EADP Funds, CDOT, HPTE and BE will fund the remaining amount for the EADP, estimated to be $42.2 million ("State EADP Funds") by transmitting to the City funds for each additional design or construction draw and/or property interest acquisition payment until the EADP is completed. The State's obligation will be to fund the amount of the actual cost of EADP above the City EADP Funds, whether that cost is higher or lower than the estimated

$42.2 million. However, in no event shall the State's obligation with respect to the EADP exceed $49.1 million, unless agreed to by the Parties by subsequent amendment to this Agreement, and the State's obligation herein assumes that the assumed EADP project budget contingency of at least 12% will have been expended prior to seeking additional funding from the State. The State EADP Funds will be paid to the City monthly for the requisite design, construction and/or property interest acquisition draw payment in accordance with this Agreement. Any amount the State is required to fund for the EADP in excess of $42.2 million shall be credited to and deducted from the State's obligation to pay $11.4 million for the remainder of the TBDP. For each payment request submitted to the State for acquisition of property interests, the City shall provide any appraisal and valuation information for said payment. The City agrees that it will generally follow the Federal Uniform Relocation Assistance and Real Property Acquisition Act ("Relocation Act") in its acquisition of property interests for the TBDP. The Parties acknowledge that property owned by a railroad is not subject to the Relocation Act.

3. **Funding for the Remainder of the TBDP.** The Parties intend to fund the TBDP as set forth in Paragraph 1. If the final cost for the TBDP for drainage elements exceeds $134 million, it is the agreement of the Parties that any amount above $134 million be funded 60% by the City and 40% by the State; provided, however, that the State obligation for any amount in excess of $53.6 million shall not exceed an additional $6.9 million. If the State's share of the TBDP costs exceed the additional $6.9 million amount, any further funding on the part of the State must be negotiated and any changes in scope will require the State's consent and approval. The City agrees that it will not include in the TBDP pricing for which it asks the State to share in the funding any costs that are not necessary drainage elements eligible to be funded by the Denver Wastewater Enterprise Fund under the Denver Revised Municipal Code.

4. **City-Provided Benefits for the I-70 East Project.** In addition to benefits realized by CDOT/HPTE/BE on the I-70 East Project from the TBDP, the City agrees to the following which will also provide direct benefit to the I-70 East Project:

      A.    Permit Waivers/Suspensions - $15 Million.

          (i)    The City assesses various fees for demolition and construction projects, and agrees to waive/suspend most of those fees for the design and construction of the I-70 East Project as shown on Exhibit B. CDOT/HPTE/BE and/or the Developer (or its contractor) will need to apply for permits, including the estimated construction duration under each permit, and submit to inspections in the ordinary course; however, the process will be expedited and facilitated. The State shall include its project agreement with the Developer provisions for cooperation and coordination with the City to effectuate the processes set forth in this section. The State shall also require the Developer to identify all contractors and subcontractors working on the I-70 East Project in order for the City to be able to determine whether a permit application is subject to the waiver/suspension of fees under this Agreement.

          (ii)    The waiver/suspension of such fees is estimated to save the State $15 million. CDOT/HPTE/BE or the Developer (or its contractor) shall apply for all applicable permits necessary for construction, operation and maintenance of the project

and all fees customarily charged by City for such permits shall be identified, and such fees identified on Exhibit B as waived shall not be paid but shall be deemed part of City's participation in the I-70 East Project.

        (iii)     With regard to street occupancy permit fees, including fees related to traffic lanes, curb lanes, alleys, sidewalks and meter permits, the State or the Developer (or its contractor) will adhere to the following procedure:  Prior to entering into an agreement with a contractor that requires a street occupancy permit, an authorized representative of the State or Developer (or its contractors) shall provide City with documents describing the project's scope and a good-faith estimate of the time period the project will impact City rights-of-way.  The State and/or the Developer (or its contractors) and City will mutually determine the time period the project will impact City rights-of-way, which will be defined as the "Reasonable Construction Time Period(s)."  The State and/or the Developer will include the Reasonable Construction Time Period(s) in the contract documents issued to the contractor for that construction project.  The City, through the normal course of its review, shall issue the requisite entity street occupancy permits and the associated permit fees shall not be paid but shall be deemed part of City's participation in the I-70 East Project.  The duration of the street occupancy permits shall be the Reasonable Construction Time Period(s) plus a grace period of 10% of that time.  If the impact of the I-70 East Project on City rights-of-way has not ceased or will not cease prior to the expiration of the permitted Reasonable Construction Time Period(s) plus the grace period, then the State or the Developer (or its contractor) shall apply for a new or amended street occupancy permit and any remaining time it occupies the right-of-way shall be charged to and paid by the Developer (or its contractor) at the prevailing rate for street occupancy permits.

        (iv)     City shall not unreasonably withhold or delay any required permits.  Except as otherwise provided, applicable City permitting requirements shall apply to all project elements constructed within City.  Nothing herein shall be construed as committing City to issue permits or accept any plans for construction or other related work or work product that does not meet all applicable codes, ordinances and regulations.

        B.    <u>Risk Reduction - $10 Million</u>.  Benefits attributed to reduced risk total an estimated $10 million, including the certainty for developers and contractors bidding on the I-70 East Project procurement which should in turn result in cost savings for CDOT/HPTE/BE.  In particular, these risk reduction benefits can provide savings due to the prevention of delays.  These specific benefits include:  1) pre-negotiation of costs related to the conveyance of City-owned right-of-way to CDOT, saving appraisal costs, and saving staff time; 2) utilizing the City franchise agreements with Xcel and Comcast and other City authority to facilitate utility relocation within the franchises' 90-day period upon the State's request; 3) expediting and facilitating cooperation with Denver Water; and 4) the City agrees to dedicate at least two FTE staff to work with the State and the Developer (and its contractors) at the project office for the I-70 East Project to facilitate and expedite reviews and permits, and the State agrees to provide office space, and office furniture (but not computers) for any FTEs dedicated by the City for the I-70 East Project.

C.     <u>Right-of-Way Agreement and Cost Savings - $13 Million</u>. The Parties agree that the State needs to, and shall, acquire property interests from the City for the I-70 East Project for $25.7 million. The property interests to be acquired by the State are set forth on Exhibit C. The Parties also agree that the State will pay the City $12.7 million for said right-of-way, and the State agrees that the City's property provides an additional $13 million contribution to the I-70 East Project. The Parties agree that the payment for and conveyance of said property interests will occur by May 31, 2016. By this Agreement, the City Council approves the conveyance of the property on Exhibit C to CDOT in recognition of CDOT's statutory authority to acquire property, C.R.S. §§ 43-1-208, 43-1-210, and 43-3-106.

D.     <u>Fill Dirt - Haul Savings - $3 Million</u>. As a result of the I-70 East Project, the State will have an excess of suitable clean fill dirt, and the State and the Developer (and its contractor) can realize significant transportation and disposal costs savings if the City accepts fill dirt for reuse in City projects near the I-70 East Project. Such fill dirt must meet the Colorado Department of Public Health and Environment ("CDPHE") regulatory standards and guidance for the recipient site's proposed land use before the City will accept it. The City agrees to accept a minimum of 200,000 cubic yards and a maximum of 400,000 cubic yards of fill dirt that meets both the City's structural standards and CDPHE's environmental standards. The estimated savings is $3 million. In addition, traffic and noise impacts may be lessened in the adjacent neighborhoods.

E.     <u>Devolution of Brighton Boulevard - $5 Million</u>. CDOT and the City currently own and maintain Brighton Boulevard north of I-70 to the City limits, and Brighton Boulevard is currently a part of the state highway system. The Parties agree that as part of this Agreement, CDOT will consider abandonment of a certain portion of Brighton Boulevard to the City, pursuant to C.R.S. § 43-2-106 no later than July 31, 2016. In the event the Transportation Commission determines that the abandonment of Brighton Boulevard is warranted, the City will then consider an ordinance as provided for in C.R.S § 43-2-106 within 90 days of the determination of the Transportation Commission, which ordinance will include provisions for the City to accept full ownership and maintenance responsibilities for the abandoned portions of Brighton Boulevard. In consideration for taking over the ownership and maintenance of that portion of Brighton Boulevard, the City will be deemed to have contributed $5 million to offset estimated future operation and maintenance costs, access and utility permit review, and other State costs and risks to the I-70 East Project.

**5.     Transportation Elements to be Included in the I-70 East Project in Exchange for City's Payments.**

A.     <u>Transportation Elements in the Base Scope - $10 Million</u>. Certain of the transportation elements are included in the State's base scope of work for the I-70 East Project as noted in the Atkins Phase 1 Base Scope dated May 6, 2015. Specifically, (1) the "bookends" for the partial cover at an estimated value of $4.5 million (Exhibit D); (2) neighborhood street amenities and improvements in connection with 46th Avenue and the neighborhood streets valued at $3.5 million (Exhibit E ); and (3) improvements to lengthen the Quebec Street Bridge to allow for a 12-lane section on Quebec and lengthen the Peoria Street Bridge to allow for 10-lane section on Peoria estimated at $2.0 million are components of the I-70 East Project base scope

that the State has agreed to include in the I-70 East Project and in part, for which the City has agreed to make payments to the State as described in Paragraph 6 herein.

        B.      <u>Slip Ramps and Bypass Lanes - $17 Million</u>**.**  The slip ramps and bypass lanes are included in the City's preferred alternative 2C, as shown on Exhibit F.  These elements are included in the NEPA review, and will be included in the I-70 East Project should the Partial Cover Lowered Alternative be the preferred alternative and be cleared in the NEPA process.  The estimated cost of these elements is approximately $17 million.  Maintenance of the slip ramps and bypass lanes shall be the responsibility of the State.

        C.      <u>Enhancements to the Partial Cover - $10 Million</u>.  If the Partial Cover Lowered Alternative is the alternative approved in the Record of Decision, the Parties agree as follows:

        (i)      The Parties each acknowledge that the State has committed to constructing approximately a 999-foot long cover over I-70 East between Columbine and Clayton Streets.  The costs of constructing this cover are estimated to be $80 million, which does not include additional design and landscaping costs, which are in addition to the estimated $80 million construction costs.  (Exhibit G.)

        (ii)      The State is also committed to funding a base level of landscaping necessary to meet the requirements should the Partial Cover Lowered Alternative be the preferred alternative selected in the Record of Decision, once completed and issued, including a cover that can provide an active community space for surrounding residents and local neighborhoods, support social and pedestrian connections in the Elyria-Swansea neighborhood, and provide new space for the Swansea Elementary School.

        (iii)      The Parties acknowledge there is a cost increase between the base cover to be provided by the State and an enhanced cover desired by the City and the community that includes additional elements.  This additional cost includes "above-ground" costs such as plazas, pavilions, and water features, as well as the additional structural elements to support them.  This additional cost is estimated by the State to be $45 per square foot, totaling an estimated $10 million.  These costs do not include any costs for ongoing maintenance.  The final design will be informed by the community-led design process.  (Current preliminary plan is depicted on Exhibit H.)

        (iv)      The base project lid cover for the I-70 East Project must be designed and constructed, and have the structural integrity, to contain and support the enhanced elements described above.

        (v)      The State agrees to include the additional elements set forth above in the I-70 East Project in exchange for the City's agreement to make payments as set forth herein.

        (vi)      Maintenance for the cover that relates to landscaping, open space development, and recreational and/or educational activities will be the responsibility of the City.  Maintenance and repair for the structural elements of the lid, including the Bookends, will be the responsibility of the State.

      D.    <u>Right of First Refusal.</u>  Upon completion of the I-70 East Project, the City shall have a right of first refusal to acquire any remnant parcels owned by CDOT to the extent permitted as follows.  If the property or interest therein is of use only to one abutting owner, such owner shall have the right of first refusal to purchase or exchange the property in accordance with C.R.S. § 43-1-210(5)(a)(iii).  If, however the abutting owner does not exercise the first right of refusal to purchase such property, or CDOT determines such property is of use to more than one abutting owner or potential owner, the City shall have the right of first refusal to purchase or exchange such property at the fair market value, in accordance with C.R.S. § 43-1-210(5)(a)(iv)(A).

**6.**     **<u>Payments by City - $37 Million</u>**.

      A.    If the Partial Cover Lowered Alternative is the alternative selected in the Record of Decision, the City agrees to provide $37 million of funding to the State by making payments in equal annual installments of $2,688,010 for 30 years to be used by the State in making availability payments to the Developer.  The City's annual payments will begin upon substantial completion of the I-70 East Project.

      B.    The City's payment obligations will be subject to annual appropriation. The Parties acknowledge that (i) by this Agreement, the City does not irrevocably pledge present cash reserves for payments in future fiscal years, and (ii) this Agreement is not intended to create a multiple-fiscal year direct or indirect debt or financial obligation of the City, except to the extent that the funds are currently encumbered or can be legally made available from an enterprise fund.  The Parties agree that any expenditure of the City shall extend only to funds appropriated by the Denver City Council for the purpose of this Agreement, encumbered for the purpose of this Agreement and paid into the Treasury of the City and County of Denver.  The City, through the Department of Public Works, agrees to include in budget request funds sufficient to fulfill its commitments herein.

      C.    Financial obligations of the City payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.

      D.    The failure of the City to appropriate funds for said payments shall not be considered a default or breach of the Agreement and shall not give rise to any Party to have a claim of any kind.

      E.    Should the City fail to appropriate the annual payment in any year, the State shall have the right to notify the rating agencies of the City's event of non-appropriation.

      F.    Upon financial close of the procurement process, the State will notify the City that the I-70 East Project is moving forward.  The State will also advise the City of the contract date for completion of the I-70 East Project, and the date upon which the City's payments are projected to begin.  One year prior to completion and the date that the State expects the City's payments to commence, the State and the City will meet and determine the process and procedures for the City to make such payments.

7.    **Sharing of Cost Savings.**  The Parties acknowledge that the planned P3 procurement for the I-70 East Project may result in a total construction cost less than the currently estimated $800 million.  Should savings in fact be realized, the Parties agree that City will receive a proportionate share of the savings to offset the cost of the slip ramps and bypass lanes.  The percent of savings that City will receive is 4.6%, calculated based on the City's proportionate share of the cost of the total construction of the I-70 East Project.  Any amount of savings credited to the City will reduce the City's annual payment accordingly.

8.    **I-25 Santa Fe Interchange Reconstruction (Alameda to Cedar)/TIGER Grant Support.**  The City agrees, at CDOT's request, to make the currently estimated $30 million I-25 Santa Fe/Alameda project (Valley Highway Phase 2.0) its first priority in the next round of TIP requests (2020-2025) to the Denver Regional Council of Governments ("DRCOG") (see Exhibit I).  This project is included in the DRCOG Fiscally Constrained Regional Transportation Plan ("RTP") and prior phases are underway and shown in the 2012-17 and 2016-21 TIP and STIP.  The local match is estimated to be $6 million, and City and CDOT have each agreed that each intends to fund 50% of the local match, subject to the availability of funds and appropriations of funds.  CDOT agrees, at City's request, to support the City's proposed TIGER grant application for the City's I-25 and Broadway project in the next round of applications (see Exhibit J).

9.    **Mutual Cooperation.**  The Parties agree to cooperate in the design and implementation of the I-70 East Project and the TBDP, including providing all appropriate access and license agreements on reasonable terms at no additional cost.

10.   **Project Management and Coordination.**  The Parties desire to manage the I-70 East Project, the EADP and the TBDP so that the scope and schedule of each of these projects are achieved with a quality work product and timely schedule so that that the project benefits are recognized for all Parties.  It is the intent of the Parties to establish regular interaction, consultation and collaboration on the projects referenced in this Agreement.  From design review and comment at appropriate intervals, to Developer selection, to contract review and comment, the Parties commit to establishing a protocol of review and comment for each project referenced in this Agreement.

A.    The Parties agree that CDOT/HPTE/BE shall manage the Developer and the design and construction of the I-70 East Project and be responsible for coordination as necessary to complete the I-70 East Project within the schedule and budget.  CDOT/HPTE/BE shall be responsible for coordination of the Developer with the Project Management Team ("PMT") described in Subparagraph 10.D.

B.    The City shall manage the contractors designing and constructing the TBDP.  The City shall manage the designer and contractor, and all associated contracts and be responsible for coordination as necessary to complete the TBDP within time frame and budget for the TBDP.  The City shall be responsible for coordination of the TBDP consultants and contractors with the PMT.

C.    The Parties shall act in the best interest of the timely completion of the TBDP and the I-70 East Project.  There shall be weekly status meetings with the Project

11

Contractor in the field, which shall be attended by the Denver and the CDOT/HPTE/BE Project Manager.

        D.      Project Management Team.  To ensure coordination among all the Parties, a PMT is hereby created consisting of one (1) employee each from the State and the City.  The PMT shall meet at least monthly or as often as necessary.  The Project Managers for the projects shall present project schedule and budget updates to the PMT on a monthly basis.  The PMT will establish procedures for comment resolution and issue escalation for the TDBP and the I-70 East Project.

        E.      Design Review – EADP.

        (i)      CDOT shall have the right to review all plans for the TBDP, including the EADP.  CDOT will provide comments focused on the functionality of the drainage plans.  When plans for the EADP have achieved 30% design, the City shall submit the plans to CDOT for review and comment.  CDOT will have 10 business days to review and comment back to the City.  The City will then have 14 business days to discuss with CDOT, if necessary, and to respond to the contractor with comments.  When plans are at 60% design, the City will submit the plans to CDOT.  CDOT will have 10 business days to review and comment back to the City, as well as verify that responses to the 30% design are acceptable.  The City will then have 14 business days to discuss with CDOT, if necessary, and to respond to the contractor with comments.  At the time the 100% design plans are submitted, CDOT will have 10 business days to respond and if CDOT provided comments on the 60% design, then the City will provide responses as well as the 100% design.  At that time, CDOT will verify that all responses to the 60% design are acceptable.  This will be the last time that new comments can be submitted on this plan set.  The City will then have 14 days to respond to the contractor with comments.  When RFC design has been achieved, CDOT will have five business days to verify that all responses are acceptable.  Unless major changes have been to the plans, no additional comments will be considered at this time.  City has 10 business days to respond to the contractor to assure that all comments have been incorporated.

        F.      Design Review – TBDP.  A similar process will be followed for the design review for the TBDP.

        G.      I-70 East Project Coordination.  The detailed process for cooperation between the State and the City for the I-70 East Project is set forth in Exhibit K.

        H.      Design Review – Ongoing Consultation.  It is the intent of the Parties that there will be ongoing, interactive consultation with regard to the both the EADP/TBDP and the I-70 East Project.

        I.      Project Payment Provisions.

        (i)      EADP/TBDP.  The State will reimburse the City for the State's share of the TBDP after the State's review and approval of such charges, subject to the terms and conditions of this Agreement.  However, any charges incurred by the City prior

to the date this Agreement is executed by the State Controller or his designee will not be reimbursed absent specific State Controller approval thereof.

       (ii)      The State will reimburse the City's reasonable, allocable, allowable performance of the work, not exceeding the maximum total amount described in Paragraph 2.B.(ii).  To be eligible for reimbursement, costs incurred by the City shall be:

            (1)      in accordance with the with the terms of this Agreement;

            (2)      necessary for the accomplishment of the drainage portion of the TBDP;

            (3)      reasonable in the amount for the goods and services provided;

            (4)      actual net cost to the City (*i.e.* the price paid minus any refund in respect of other items of value received by the City that have the effect of reducing the cost actually incurred);

            (5)      incurred for work performed after the effective date of this Agreement; and

            (6)      satisfactorily documented.

       (iii)      The City shall establish and maintain a proper accounting system in accordance with generally accepted accounting standards (a separate set of accounts, or as a separate part of its current accounting scheme) to assure that project funds are expended and costs accounted for in a manner consistent with this Agreement and project objectives.

            (1)      All allowable costs incurred for the TBDP, including any approved services contributed by the City or others, shall be supported by properly executed payrolls, time records, invoices, contracts or vouchers evidencing the charges.

            (2)      Any check or order drawn up by the City, including any item which is or will be chargeable against the project account shall be drawn with a properly signed voucher then on file in the office of the City which will detail the purpose for which said check or order is drawn. All checks, payrolls, invoices, contracts, vouchers, orders or other accounting documents shall be clearly identified, readily accessible, and to the extent feasible, kept separate from all other such documents.

       (iv)      On or before the 15th day of each month, the City will prepare and submit to the State, no more than monthly, costs incurred relative to the EADP and the TBDP.  The City's invoices shall include a description of the amounts of services performed, the dates of performance and the amounts and reimbursable expenses.  The invoices will be prepared in accordance with the State's standard policies, procedures and standardized billing format to be supplied by the State. The City shall document that all costs for which it is seeking the State's payment are drainage elements of the TBDP.

(v)     To be eligible for payment, billings must be received within 60 days after the period for which payment is being requested and final billings on this Agreement must be received within 60 days after the completion of construction of the EADP and TBDP, respectively.  The State shall pay invoices submitted by the City within 45 days, unless the State has questions about a given invoice, in which case the State shall notify the City, and representatives shall meet to address and resolve any such issues.  Issues shall be resolved by the issue escalation process developed by the PMT.

(1)     Payments pursuant to this Agreement shall be made as earned, in whole or in part form available funds, encumbered for the purchase of the described services.  The liability of the State, at any time, for such payments shall be limited to the amount remaining of such encumbered funds.

(2)     In the event this Agreement is terminated, final payment to the City may be withheld at the discretion of the State until completion of final audit.

(3)     Incorrect payments to the City due to omission, error, fraud of defalcation shall be recovered from the City by deduction from subsequent payment under this Agreement or other agreements between the State and City, or by the State as a debt due to the State.

(vi)     A sufficient unencumbered fund balance for the obligations of the State contained herein remains available for the payment of such obligations in the Total Contract Encumbrance Amount of $75.7 million.

J.     Warranties.  The State will require the Developer (or its contractor) to include in contracts for construction work done pursuant to this Agreement and the project agreement a warranty on all parts, materials, components, equipment, systems and other items incorporated into the work related to those elements that upon completion of the I-70 East Project, will either be conveyed to the City or for which the City will have ongoing maintenance responsibility.  The Developer (or its contractor) shall warrant that all materials are new, unless otherwise specified, suitable for the intended purpose, of good quality, free from faults and defects and in conformance with the contract documents.

(i)     The Developer (or its contractor) will be required to promptly investigate, repair, replace or otherwise correct any of its workmanship and any parts, materials, components, equipment or other items in the work which contain faults or defects.  The Developer (or its contractor) shall bear all costs of investigating and correcting, which includes the design efforts necessary to correct such work covered by the warranties and guarantees.

(ii)     The Developer's (or its contractor's) warranties and guarantees for all work components shall continue for a period of one (1) year after the date of final acceptance for work required to be covered by said warranties.

(iii)     The Developer (or its contractor), at its own expense, shall also investigate, repair or replace any damages to any equipment, facilities or other personal or

real property owned or leased by the City, which is damaged as a result of any fault or defect in the work, at no cost to the City.

      K.    The City shall begin operation and maintenance of any local improvements constructed by the State or its Developer (or its contractor) upon the State's and the City's final acceptance of these improvements in the I-70 East Project from the Developer and conveyance of the right-of-way interests for local streets back to the City for the I-70 East Project.

      **11.**    **Term of Agreement.**  This Agreement shall not be enforceable until the date on which this Agreement has been approved and signed by all Parties, and the Colorado State Controller or designee (the date of the signature of the Colorado State Controller or designee being the Effective Date).  The term of this Agreement shall continue until the earlier of thirty years following substantial completion of the I-70 East Project, or until the date of the City's last payment as set forth pursuant to Paragraph 6.B, unless terminated by the State as provided herein.  This Agreement may be terminated earlier by mutual written agreement of the Parties. In particular, if the Partial Cover Lowered Alternative is not cleared through the NEPA process and is not identified as the selected, preferred alternative in the Record of Decision for the I-70 East Project by December 31, 2016, this Agreement may be terminated by mutual written agreement of the Parties.

      **12.**    **Survivability.**  Only those provisions so expressly stating shall survive the termination of this Agreement.

      **13.**    **Covenants**.  The Parties' contractors and developers shall construct improvements in a good and workmanlike manner and in substantial compliance with the plans and specifications and requirements of this Agreement.

      **14.**    **Representations.**  Each Party represents that it possesses the legal authority to enter into this Agreement and that it has taken all actions required by its procedures, bylaws, and/or other applicable law to exercise that authority, and to lawfully authorize its undersigned signatory to execute this Agreement and to bind the signing party to its terms.

      **15.**    **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed to have been sufficiently given for all purposes if sent by certified mail or registered mail, postage and fees prepaid, addressed to the Party to whom such notice is to be given, at the address set forth below, or at such other address as has been previously furnished in writing, to the other Party.  Such notice shall be deemed to have been given when deposited in the United States mail.

      If to City:

      Manager of Public Works
      201 West Colfax Avenue, Dept. 601
      Denver, Colorado 80202