**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action Nos:    17-cv-01661-WYD
                      17-cv-01679-WYD

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA
NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION;
and COLORADO LATINO FORUM,

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; ELAINE CHAO, in her official capacity as
Secretary of transportation; and JOHN M. CARTER, in his official capacity as Division
Administrator,

      Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION; and SHAILEN P. BHATT,
in his official capacity as Executive Director of the Colorado Department of Transportation,

      Defendant-Intervenors.

---

**ZEPPELIN PLAINTIFFS' APA § 705 MOTION FOR STAY**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

LIST OF EXHIBITS ...................................................................................................... v

GLOSSARY OF TERMS ............................................................................................... vi

I.      INTRODUCTION ............................................................................................... 1

II.     MATERIAL FACTS ............................................................................................ 2

III.    STANDARD OF REVIEW .................................................................................. 17

IV.     A STAY IS WARRANTED ................................................................................ 18

        A.      Plaintiffs Are Likely to Succeed on the Merits ..................................... 18

                1.      P2PH is a Connected, Similar, and/or Cumulative Action,
                        which FHWA/CDOT Failed to Analyze ..................................... 19

                2.      FHWA/CDOT Failed to Take the Requisite "Hard Look" at the
                        Human Health and Environmental Caused by the Disturbance
                        and Spread of Hazardous Materials ........................................... 24

        B.      Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief ..... 25

        C.      The Balance of Equities Tips in Plaintiffs' Favor .................................. 31

        D.      An Order for Stay Will Serve the Public Interest ................................... 32

V.      CONCLUSION ................................................................................................. 32

# TABLE OF AUTHORITIES

**Statutes**

5 U.S.C. §§ 551 et seq. .................................................................................................. 17

5 U.S.C. § 702 ............................................................................................................... 19

5 U.S.C. § 705 ........................................................................................................... 1, 18

23 U.S.C. § 138 ............................................................................................................... 2

42 U.S.C. §§ 4321 et seq. ............................................................................................... 1

42 U.S.C. § 4332(2)(C) ................................................................................................. 24

49 U.S.C. § 303 ............................................................................................................... 2

**Regulations**

40 C.F.R. Part 1502

40 C.F.R. § 1508.7 .................................................................................................. 20, 23

40 C.F.R. § 1508.8 .................................................................................................. 20, 23

40 C.F.R. § 1508.11 ...................................................................................................... 24

40 C.F.R. § 1508.25(a) .................................................................................................. 20

40 C.F.R. § 1508.25(a)(1) ............................................................................................. 20

40 C.F.R. § 1508.25(a)(1)(ii) ........................................................................................ 20

40 C.F.R. § 1508.25(a)(2) ............................................................................................. 23

40 C.F.R. § 1508.25(a)(3) ........................................................................................ 22, 23

40 C.F.R. § 1508.25(a) .................................................................................................. 24

**Cases**

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) ..................................... 28

Biodiversity Conservation Alliance v. Jiron, 762 F.3d 1036 (10th Cir. 2014) .................... 24

Citizens' Comm. to Save Our Canyons, 297 F.3d 1012 (10th Cir. 2002) .................... 20

Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162 (10th Cir. 1999) .................... 20

Colorado Wild, Inc. v. U.S. Forest Serv., 523 F.Supp.2d 1213 (D. Colo. 2007) .................... 31, 32

Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972 (D.C. Cir. 1985) .................... 18

Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002) .................... 17, 19, 27

Dine Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 109986
        (D.N.M. August 14, 2015) .................... 26

Dine Citizens Against Ruining Our Env't v. Klein, 747 F.Supp.2d 1234
        (D. Colo. 2010) .................... 20, 22

First Premier Bank v. U.S. Consumer Fin. Protection Bureau, 819 F. Supp. 2d 906
        (D.S.D. 2011) .................... 18

Hill Dermaceuticals, Inc. v. U.S. FDA, 524 F.Supp.2d 5 (D.D.C. 2007) .................... 18

John D. MacFarlane, et al. v. the City and County of Denver, et al., Case No.
        2016CV32126 (Denver District Court) .................... 17

Lane v. Buckley, 643 Fed. Appx. 686 (10th Cir. 2016) .................... 27

Motor Vehicles Mfrs. Ass'n v. State Farm, 463 U.S. 29 (1983) .................... 19

Mova Pharm. Corp. v. Shalala, 140 F.3d 1060 (D.C. Cir. 1998) .................... 18

N.M. Dept. of Game & Fish v. U.S. Dept. of Interior, 854 F.3d 1236 (10th Cir. 2017) .................... 25, 31

O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft, 389 F.3d 973(10th Cir. 2004) .................... 18

San Juan Citizens' Alliance v. Salazar, 2009 U.S. Dist. LEXIS 29804
        (D. Colo. March 30, 2009) .................... 23

San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.,
        657 F.Supp.2d 1233 (D. Colo. 2009) .................... 18, 26, 31, 32

Sierra Club v. Hodel, 848 F.2d 1068 (10th Cir. 1988), overruled on other grounds by
    Village of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992) ... 29, 31

Sierra Club v. Marsh, 872 F.2d 497 (1st Cir. 1989) .................................................. 31

Utahns v. U.S. DOT, 305 F.3d 1152 (10th Cir. 2002) .............................................. 19

WildEarth Guardians v. U.S. Forest Service, 828 F.Supp.2d 1223 (D. Colo. 2011) .............. 32

Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008) ........................ 2, 18, 27

## LIST OF EXHIBITS

Exhibit 1      Record of Decision

Exhibit 2      Supplemental Draft Environmental Impact Statement

Exhibit 3      Final Environmental Impact Statement

Exhibit 4      Map of Operating Units within Vasquez Boulevard / I-70 Superfund Site

Exhibit 5      City and County of Denver Storm Drainage Master Plan dated September 2014

Exhibit 6      Email from Mike Anderson to Shea Thomas, dated August 2, 2013

Exhibit 7      Memorandum of Understanding, dated October 16, 2013

Exhibit 8      Enginuity Engineering Solutions Memorandum, dated February 10, 2014

Exhibit 9      Multi-Agency Technical Team Recommendation, dated January 20, 2015

Exhibit 10     DeVito Memorandum, dated July 16, 2015

Exhibit 11     Denver's I-70 East FEIS Response Comment Report, dated March 2, 2016

Exhibit 12     Two Basin Drainage Project Conceptual Planning Alternatives Analysis Report,
               dated December 2016

Exhibit 13     Final Design Report, Environmental Components for Globeville Landing Outfall,
               dated February 5, 2016

Exhibit 14     Aerial Photograph of Globeville Landing Park, taken August 15, 2017

Exhibit 15     Colorado Department of Transportation Statement Regarding Litigation Involving
               I-70, dated July 10, 2017

Exhibit 16     City of Denver 39th Avenue Greenway and Open Channel Fact Sheet

Exhibit 17     City of Denver City Park Golf Course Redesign Fact Sheet

Exhibit 18     Letter from Jane Hann to Steve Turner, dated December 29, 2016

Exhibit 19     Colorado Department of Transportation Press Release, dated August 24, 2017

Exhibit 20     Trial Testimony of Deborah Ortega, given on August 22, 201

**GLOSSARY OF TERMS**

| | |
|---|---|
| APA | Administrative Procedures Act |
| BE | Colorado Bridge Enterprise |
| CDOT | Colorado Department of Transportation |
| DEIS | Draft Environmental Impact Statement |
| EADP | Early Action Drainage Project |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| GLO | Globeville Landing Outfall |
| HPTE | Colorado High Performance Transportation Enterprise |
| IGA | Intergovernmental Agreement |
| MATT | Multi-Agency Technical Team |
| MOU | Memorandum of Understanding |
| NEPA | National Environmental Policy Act |
| OU1 | Vasquez Boulevard / I-70 Superfund Site Operating Unit 1 |
| OU2 | Vasquez Boulevard / I-70 Superfund Site Operating Unit 2 |
| P2PH | Platte to Park Hill Stormwater Drainage Project |
| PCL | Partial Cover Lowered |
| ROD | Record of Decision |
| RTD | Regional Transportation District |
| SDEIS | Supplemental Draft Environmental Impact Statement |

TCRA          Time-Critical Removal Action

TBDP          Two Basins Drainage Project

UDFCD         Urban Drainage and Flood Control District

## I.        INTRODUCTION

This case concerns the single largest infrastructure development project ever undertaken by the Colorado Department of Transportation ("CDOT"): the expansion and lowering of Interstate 70 through Northwest Denver ("Central 70").  The Central 70 Project is a joint effort between CDOT and the Federal Highway Administration ("FHWA").  Central 70 will cost more than $1 billion and demand at least four years of urban construction.  The lowered highway profile requires extensive excavation of contaminated soils and the creation of an elaborate stormwater/drainage system that reaches from the South Platte River all the way to Park Hill.

Under the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., FHWA/CDOT cannot proceed with Central 70 unless they have analyzed the project's impacts on human health and the environment and told the public of the project's true scope, cost, and effects.  Because FHWA/CDOT failed to engage the public in a transparent process and are moving forward on Central 70 on an uninformed basis, Plaintiffs filed the instant litigation and now require preliminary relief to preserve the status quo until their claims are resolved.

Accordingly, and pursuant to 5 U.S.C. § 705, Plaintiffs Kyle Zeppelin, Brad Evans, Christine O'Connor, Kimberly Morse, Jacqueline Lansing, and Janet Feder ("the Zeppelin Plaintiffs") move this Court to stay all further action by Defendant FHWA and Defendant-Intervenors CDOT and Shailen P. Bhatt, in his official capacity as Executive Director of CDOT, (collectively referred to herein as "CDOT"), undertaken in furtherance of Central 70 and the Platte to Park Hill Stormwater Drainage Project ("P2PH") until this case is adjudicated on the merits.

Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel has conferred with counsel for FHWA, CDOT, and the Plaintiffs Sierra Club, Elyria and Swansea Neighborhood Association, Chaffee Park Neighborhood Association, and Colorado Latino Forum ("the Sierra Club Plaintiffs") regarding the substance of this motion.  FHWA and CDOT oppose the relief requested herein.  The Sierra Club Plaintiffs do not oppose.

The Court should grant this motion and issue an stay.  The Zeppelin Plaintiffs are likely to succeed on the merits, their interests will be irreparably harmed without preliminary relief, the balance of equities tips in the Zeppelin Plaintiffs' favor, and an injunction of these projects will serve the public interest.  Accordingly, under Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), as interpreted by the Tenth Circuit and applied to actions under the Administrative Procedures Act ("APA"), the Zeppelin Plaintiffs respectfully request that the Court enjoin FHWA and CDOT from taking any further action on Central 70 and P2PH until the Court issues a ruling on the merits and each agency can demonstrate it has complied with NEPA.

## II.    MATERIAL FACTS

The Zeppelin Plaintiffs filed suit because FHWA approved construction of the Central 70 Project without first conducting an adequate NEPA analysis or ensuring compliance with Section 4(f) of the U.S. Department of Transportation Act of 1966 ("Section 4(f)"), 23 U.S.C. § 138 and 49 U.S.C. § 303.  See First Amended Petition for Review of Agency Action, Dkt. 25.  The environmental review performed on Central 70 was undertaken by FHWA and CDOT as co-lead agencies.  See CDOT's Motion to Intervene, Dkt. 16, at 6.

CDOT was the primary author of the NEPA documents on Central 70, see id. at 3 and 6, which include the Draft Environmental Impact Statement ("DEIS"), dated October 28, 2008, the

2

Supplemental Draft Environmental Impact Statement ("SDEIS"), dated August 4, 2014, the Final Environmental Impact Statement ("FEIS"), dated December 18, 2015, and Record of Decision ("ROD"), dated January 19, 2017.  Central 70 is primarily funded by CDOT and the City of Denver ("Denver").  Id. at 6; CDOT's Answer to Amended Petition, Dkt. 27, at ¶ 9; Ex. 1, ROD, at 29.[1]  FHWA had final authority to approve Central 70, signed the ROD, and will commit federal funds towards the completion of the highway expansion.  Dkt. 16 at 6; Ex. 1 at i.

Central 70 will proceed in accordance with the Partial Cover Lowered ("PCL") Alternative, as first identified by FWHA/CDOT in the SDEIS and as approved by FHWA in the ROD.  Ex. 1 at i; Ex. 2, SDEIS, at 1_6.  A hallmark feature of the PCL Alternative is the destruction of the viaduct that currently runs between Brighton and Colorado Boulevards in Denver and the excavation of a trench approximately 280 feet wide and up to 40 feet below ground to contain a newly constructed stretch of I-70.  Ex. 1 at 12-15.

The trench design of the PCL Alternative requires extensive excavation of soil from Operable Unit 1 ("OU1") of the Vasquez Boulevard / I-70 Superfund Site ("the Superfund site").  Ex. 1, Attachment C4 at 1-5; Ex. 3, FEIS, at 5.18_13; Ex. 4, OU boundary map.  The PCL's trench design also requires an elaborate stormwater drainage system to protect the newly lowered highway from flooding.  Ex. 1 at 21, 174-179.  FHWA/CDOT agree Central 70 cannot function without protection from a 100-year storm event and that excavation of the trench through the Superfund site will likely disturb and spread contaminants, including lead and arsenic.  Id.; Ex. 3 at 5.18_11 − 5.18_12 and 5.18_15 − 5.18_16.

---

[1] Exhibits 1-13 and 15-20 to this Motion, as well as all documents previously filed and referenced herein, are authenticated by Plaintiff Christine O'Connor in her Second Declaration, Dkt. 30.  Exhibit 14 to this Motion is authenticated by Plaintiff Brad Evans in his Second Declaration, Dkt. 31.

3

Prior to FHWA/CDOT's introduction of the PCL Alternative, Denver did not have any infrastructure to protect this portion of I-70 from a 100-year flood and had not planed to implement 100-year flood protection within the Montclair or Park Hill Basins.  Indeed, the September 2014 Storm Drainage Master Plan – Denver's most recent Master Plan to date – states: "[C]ost effective implementation of a City-wide 100-year drainage system is not practical because of the significant capital cost of retrofit construction and limited annualized flood hazard reduction."  Ex. 5, Master Plan, at 4.

In marked departure from this philosophy and in direct reaction to FHWA/CDOT's decision to consider a lowered option for I-70, Denver asked the Urban Drainage and Flood Control District ("UDFCD") to undertake and prioritize an evaluation of drainage in the Montclair and Park Hill Basins, where Central 70 is located.  Ex. 6, email from Mike Anderson (Denver) to Shea Thomas (UDFCD), dated August 2, 2013, at 1 ("Thank you for your understanding in honoring our request to evaluate the drainage for Montclair and Park Hill in light of the proposed CDOT I-70 Lowering Project…").

Denver subsequently collaborated with CDOT and the Regional Transportation District ("RTD") to "develop a coordinated set of infrastructure improvements that efficiently and effectively integrates the drainage needs of…CDOT's I-70 East project[2] from Brighton Blvd. to Colorado Blvd."  Ex. 7, Memorandum of Understanding ("MOU") between Denver, CDOT, and RTD, dated October 16, 2013, at 1. This MOU established a working group ultimately known as the Multi-Agency Technical Team ("MATT"), which went on to "perform a technical review of

_____

[2] The Central 70 Project is Phase I of the I-70 East Project, which runs from Brighton Boulevard to Tower Road.  Ex. 1 at 4.

the previous Montclair basin hydrologic analysis and modify the modeling, if necessary, in order to provide CDOT with a mutually agreed upon off-site 100-year design flow rate for the I-70 PCL project."  Ex. 8, Memorandum from Enginuity Engineering Solutions to I-70 PCL Drainage MATT, dated February 10, 2014, at 2.

On June 30, 2014, Denver Public Works issued the Montclair Creek Drainage Feasibility Evaluation, which was a "coordinated work effort" between Denver, CDOT, UDFCD, and others.  See Attachment to Declaration of Brad Evans, Dkts. 1-2 – 1-5 (Montclair Creek Drainage Feasibility Evaluation), at CCD007343.  It states:

> …CDOT is proposing to lower a portion of I-70 near Brighton Boulevard to Colorado Boulevard; known as the [PCL] Project.  As part of the project, CDOT proposes to build a 100-year storm pipe system to protect this depressed section of highway from storm water flows.
>
> A portion of the PCL is located within the Montclair Basin…  [T]here is about 4,700 cubic feet per second (cfs) of flow that will need to be captured *to protect the lowering*.  In an effort to minimize flood risks, protect public safety, reduce property damage, provide environmental benefits, and leverage funding from CDOT, [the City] has investigated alternatives to the 100-year pipe system CDOT is proposing, to include an open channel option.
>
> *      *      *
>
> This report summarizes the proposed options, how they were evaluated, and how this collaborative work effort concluded that Option A for Reach 1, 2, 3, & 4 best meets the goals for this planning effort.  This scenario is shown in Exhibit 2 to Appendix "A."  Due to the schedule constraints in order to leverage funding from CDOT, it is apparent that Option A for Reach 2 cannot be completed, but it does seem that [the City] can complete a scenario where [the City] implements Option A for Reach 1, 3, & 4, and Option B for Reach 2.  This is shown in Exhibit 4 in Appendix "A."

Dkt. 1-2 at CCD007342 (emphasis added); Dkt. 1-3 at CCD007363 (Appendix A, Exhibit 4).

Notably, CDOT's original plans for all four "reaches" of its proposed 100-year offsite drainage system were dismissed in the Feasibility Evaluation and *replaced* by the City's more

preferred open design options.  Dkt. 1-3 at CCD0007364-7367.  Also importantly, the Feasibility

Evaluation confirms that CDOT and Denver were contemplating, as early as June 30, 2014, that

the portion of the offsite drainage CDOT would ultimately construct would physically tie into

Denver's 200-foot open channel through Globeville Landing Park.  Id. at CCD007364.

At that time, CDOT and Denver identified the following "critical issues" for this

"alternative" 100-year storm protection project:

> **1.      CDOT's I-70…PCL Project Manager, Keith Stefanik[,] has confirmed from
> his management team that CDOT cannot include any of the Montclair Creek open
> channel projects in their design/build contract for the I-70 PCL project.**  To amend
> their Environmental Impact Study (EIS) to include an open channel option is such a large
> change in scope that they would have to start their NEPA EIS process essentially over
> again.  It has taken them two years to get to the point of where they are ready to submit
> their supplemental package, and they are unwilling to jeopardize their progress on the
> EIS for the I-70 PCL.
>
> **2.      NEPA requirements will activate if we use federal funding.**  If any of the
> Montclair Creek projects have to undergo a NEPA process, we understand from CDOT's
> NEPA Project Manager, Kirk Webb, that this process would take a minimum of 2 to 3
> years.  Based on the I-70 PCL schedule, these projects are not a viable option for the City
> and County of Denver to pursue.  It is understood if we are able to secure non-Federal
> funding for these project [sic], then we would not have to undergo a NEPA process.

Dkt. 1-2 at CCD007354 (emphasis in original).

On August 4, 2014, FHWA and CDOT issued the SDEIS, which formally introduced the

PCL Alternative as the preferred alternative for public comment.  There, these agencies

acknowledged: "Lowering I-70 requires capturing offsite surface runoff that currently flows

south to north."  Ex. 2 at 3_25.  The hydrology analysis in the SDEIS is largely based on the

Montclair Creek Drainage Feasibility Evaluation and the MATT's work.  Id. at 5.14_1 – 5.14_7

and Appendix B at Attachment M.  FHWA/CDOT therein confirmed that "Denver [had]

identified substantial offsite flows through the area," that Denver's standard recommendation for

commercial areas is to design for a five-year flow, and that I-70 must be designed for a 100-year flood event.  Id. at 5.14_3 – 5.14_4.

The SDEIS revealed that construction of the PCL Alternative would require the same onsite drainage system required for the other two alternatives *plus* additional offsite drainage designed to capture and convey stormwater flows traveling north towards I-70 before they reach the lowered portion of the highway.  Ex. 2 at 5.14_4.  The offsite drainage system supposedly required for the PCL Alternative consists of one pipe running south of I-70 through Globeville Landing Park and two detention ponds.  Id. at 5.14_6 (Exhibit 5.14_4).  FHWA/CDOT make *no mention* in the SDEIS of the open channel alternative design to this 100-year pipe system that had been proposed in the Feasibility Evaluation and thus did not at that time disclose the true and accurate scope of CDOT's plans for offsite drainage required by the PCL Alternative.

On January 20, 2015, the MATT issued its Letter of Recommendation to CDOT, Denver, UDFCD, and RTD.  It states:

> The purpose of this Letter of Recommendation…is to describe the…MATT recommended technical solution and improvement sequence/schedule to address the October 2013…MOU, which was written to establish an inter-agency collaboration for the development of a coordinated set of infrastructure improvements that efficiently and effectively integrates the drainage needs of…CDOT's I-70 East Project…
>
>    *  *  *
>
> During the second half of 2014, CDOT and [Denver] conducted…meetings to coordinate and develop potential drainage alternatives for both the I-70 PCL project and [Denver's] Open Channel Concept.
>
> …The trench area of CDOT's I-70 PCL project is a sump and must be design[ed] with a drainage system to handle the 100-year event.
>
> …The recommended technical solution is a **Combined Drainage System** that addresses off-site drainage for the 100-year design flows from both the Montclair and Park Hill drainage basins.

7

Ex. 9, MATT Recommendation, at 1-2 (emphasis in original).

The MATT's recommendation for the four "reaches" of the Montclair Basin drainage project track the recommendation for these reaches in the Feasibility Evaluation.  Compare Dkt. 1-3 at CCD0007364-7367; Ex. 9 at 2-3.  The MATT recommendation furthermore includes a proposal for "Reach 5" of the drainage project, which addresses stormwater flowing towards the highway from the Park Hill Basin.  Ex. 9 at 4.

Figure 1 of the MATT Recommendation, entitled "[Denver's] I-70 PCL Alternative Drainage Concept," involves numerous components, including an open channel outfall through Globeville Landing Park and an open channel running along 39th Avenue.  Ex. 9 at 7.  Figure 2 of the MATT Recommendation, entitled "[Denver's] I-70 PCL Alternative Drainage Concept," adopts the Feasibility Evaluation's Option A for Reach 1, which again contemplates that the reduced pipe constructed by CDOT will *physically connect* to the City's open channel set to run through Globeville Landing Park.  Compare id. at 8; Dkt. 1-3 at CCD007364.

Globeville Landing Park sits within Operable Unit 2 ("OU2") of the Superfund site.  Ex. 4.  Because the soils in OU2 contain heightened levels of lead and arsenic, Denver needed EPA approval prior to any excavation.  On June 30, 2015, Denver sent the following Action Memorandum to EPA requesting approval of a Time-Critical Removal Action ("TCRA"):

> The purpose of this Action Memorandum is to request and document approval of the removal action described herein for a portion of…OU2 of the [Superfund site]...  [Denver] plans to construct a stormwater drainage feature through a portion of OU2…  Th[is] feature is part of a larger project that is intended to reduce flooding in the Montclair Drainage Basin area and address stormwater management needs associated with projects being developed by [] RTD, [] CDOT, and [Denver].  It is estimated that construction of this stormwater drainage feature will require the excavation and handling of substantial volumes of potentially metal impacted (lead and arsenic) soils in OU2… **Conditions existing at OU2 present a threat to public health and environment.**

8

> \*      \*      \*
>
> Investigations in OU2 found many areas where surface and subsurface soils contained levels of arsenic and lead above what is considered background levels... **Excavation of these metal contaminated soils pose the threat of additional releases of these hazardous substances to the environment.**
>
> \*      \*      \*
>
> Large doses of arsenic may be acutely fatal to humans...  Arsenic is a human carcinogen based on observation of increased lung cancer mortality due to inhalation exposure and increased skin cancer in individuals exposed to arsenic via drinking water.
>
> Lead is classified as a B2 carcinogen by the EPA...  Lead can enter the body via ingestion and inhalation...  The most serious effects associated with markedly elevated blood lead levels include neurotoxic effects, such as irreversible brain damage.  Children have exhibited nerve damage, permanent mental retardation, colic, anemia, brain damage, and death.

Attachment to Declaration of Christine O'Connor, Dkt. 1-11, Action Memorandum, dated June 30, 2015, at CM/ECF 2 and 5-6 of 29 (emphasis added), and Attachment A, CM/ECF 12 of 29 (map of potential area of disturbance).

On July 1, 2015, EPA Region 8 approved the Administrative Settlement Agreement and issued an Order on Consent authorizing Denver to disturb the hazardous soils at Globeville Landing Park to build the open channel outfall recommended by the MATT.  Dkt. 1-10, Administrative Settlement Agreement and Order, filed July 1, 2015.  Globeville Landing Outfall ("GLO") is the effluent point for all stormwater captured and conveyed by "[Denver's] I-70 PCL Alternative Drainage Concept," which is currently known as P2PH.

Just five days later, on July 6, 2015, Denver authorized an Intergovernmental Agreement ("IGA") with CDOT.  Ex. 10, Memorandum from Tony DeVito to the Colorado Bridge

Enterprise ("BE") and the Colorado High Performance Transportation Enterprise ("HPTE"),[3]

dated July 16, 2015, at 1.  On September 14, 2015, the State Comptroller approved the IGA

between CDOT and the City.  Attachment to Declaration of Kimberly Morse, Dkts. 1-14 – 1-16,

(IGA).  The IGA states in pertinent part:

> …CDOT…must provide 100-year storm protection for the…I-70 East Project…

> **[Denver] has…created a drainage plan to provide 100-year storm protection for…the I-70 East Project (the "Two Basin Drainage Project" or "TBDP")…**

> …there are significant mutual benefits [from] cooperating and working together on the I-70 East Project…

> [Denver] intends to design and construct the TBDP, beginning with the first phase project, the Early Action Drainage Project ("EADP").

> …[Denver], in partnership with [UDFCD], will undertake the design, construction and installation of all of the TBDP, including the acquisition of property interests for the entire TBDP.

> [Denver] intends to begin construction of the EADP in the first quarter of 2016, and agrees to have the EADP segment from Pond 7 to the South Platte River operational by December 1, 2017 (see Exhibit A).

> [Denver] agrees to have the remaining portion of the EADP operational by September 1, 2019.

> [Denver] acknowledges that **[CDOT] is relying on the completion schedule for each phase of the TBDP** as it structures the contract for the I-70 East Project and related project agreement.

> …CDOT, HPTE, and BE **CDOT will pay 40% of the cost of the TBDP**…

> [Denver] agrees to design the TBDP to handle 100-year storm protection, as defined in the Letter of Recommendation from the [MATT] dated January 2015, for the partially covered portion of the I-70 East Project subject to CDOT's review, to meet [CDOT's] plan for providing that protection as included in the SDEIS and the ongoing NEPA review.

---

[3] The BE and HPTE are a government-owned businesses within CDOT created pursuant to C.R.S. §§ 43-4-805 and 43-4-806, respectively.  Ex. 11, IGA, at 1.

[Denver] acknowledges that a delay in having the TBDP operational by September 1, 2019 could result in [CDOT] having to make delay payments…to the Developer of the I-70 East Project…

Therefore, [Denver] will include a **liquidated damages provision** in the contract for construction of the TBDP that provides for **$5,000 per day** of liquidated damages in the event that the TBDP is not operational by September 1, 2019. If the TBDP is not operational by September 1, 2019, **and this delays the I-70 East Project**, [Denver] will enforce the liquidated damage provision and reimburse [CDOT] for actual additional costs to the I-70 East Project…

CDOT…will have the right to **review and comment** on the design of the EADP…and will have staff assigned to assist in the **review and selection process**… [CDOT] will have the right to **review and comment** on the construction contract.

*     *     *

The Parties agree to **cooperate in the design and implementation** of the I-70 East Project and the TBDP…

It is the intent of the Parties to establish **regular interaction, consultation and collaboration** on the projects referenced in this Agreement. **From design review and comment at appropriate intervals, to Developer selection, to contract review and comment, the Parties commit to establishing a protocol of review and comment for each project** referenced in this Agreement.

The Parties shall act in the best interest of the timely completion of the TBDP and the I-70 East Project. There shall be **weekly status meetings** with the Project Contractor in the field, which shall be attended by the Denver and CDOT…Project Manager.

Dkt. 1-14, at CM/ECF 3-5 and 11-12 of 16) (emphasis added); Dkt. 1-15 at CM/ECF 13 of 20

(diagram of TBDP, titled "CDOT/CCD I-70 PCL Combined Drainage System Proposed 100-

Year Protection Montclair and Park Hill Basins").

On December 18, 2015, FHWA/CDOT issued the FEIS on the Central 70 Project. The

requisite offsite drainage system described and depicted by these agencies in the FEIS does not

include any aspect of TBDP or the EADP. Ex. 3 at 5.14_1 – 5.14_11. Instead, FHWA/CDOT

continued representing that the only offsite drainage and/or stormwater protection needed for the

PCL Alternative was a single pipe running south of the highway through Globeville Landing Park and two detention ponds.  Id. at 5.14_9 (Exhibit 5.14_5).  FHWA/CDOT acknowledge in the FEIS that "Denver is in the planning stages of their [TBDP]," Ex. 3 at 3_16, but do not disclose that the stated purpose of the TBDP is to provide 100-year flood protection for the highway.  Instead, FHWA/CDOT frame the TBDP as a stand-alone project that offers only "redundant drainage capacity in the project area."  Id.

On March 2, 2016, Denver submitted comments on the FEIS, stating:

> As depicted in the FEIS, the alignment of the I-70 East Drainage pipe conflicts with both open channel and pipe components designed as a part of [Denver's] Globeville Landing Outfall [("GLO")] project…  CDOT will need to realign its drainage system to avoid impacts to [Denver's] planned [GLO] improvements.

Ex. 11, Denver Public Works I-70 East FEIS Response Comment Report, dated March 2, 2016, at 5 (Comment No. 33).

In December 2016, Denver completed its Conceptual Planning Alternatives Analysis Report for the TBDP.  Ex. 12, TBDP Conceptual Planning Report, dated December 2016.  This document analyzes various alternatives for the TBDP depicted at Ex. A to the IGA, but rebrands the TBDP as P2PH.  Id. at 6.  Although acknowledging that the MATT modeling and technical memorandum from August 2014 served as the basis for both the IGA and P2PH, Denver did not, in the Conceptual Planning Report, identify CDOT as a partner or list as a purpose or need for the project providing 100-year flood protection for I-70.  Id. at 25, 63.  But the Planning Report does declare that P2PH will be comprised of the following four construction endeavors: GLO; the 39th Avenue Open Channel; a stormwater detention area within the Montclair Basin; and a stormwater detention area and conveyance within the Park Hill Basin.  Id. at 6-7.  Construction

of the 39th Avenue Open Channel – like the I-70 trench – requires major excavation through OU1 of the Superfund site.  Ex. 4.

On January 19, 2017, FHWA signed the ROD formally selecting and approving for construction the PCL Alternative for the Central 70 Project as proposed by FHWA/CDOT. Therein, these agencies again failed to analyze the impacts of P2PH and *expressly disclaimed* any connection between these projects.  Ex. 1 at 132-133.  The ROD falsely states: "CDOT…ha[s] not been involved in the proposal, development, or implementation of the TBDP, but [is] simply taking advantage of new opportunities for cooperation, cost savings, and benefits that the TBDP, if it is constructed, offers to the I-70 East Project."  Compare id. at 132; supra at 11 (CDOT commits to attend weekly status meetings with the TBDP/P2PH Project Contractor and to have regular interaction, consultation, and collaboration with Denver).

FHWA/CDOT did, however, finally acknowledge in the ROD that the offsite drainage system required by the PCL Alternative will "utilize components of the GLO system to convey I-70 storm water to the river creating a combined outfall system…"  Ex. 1 at 133.  For that reason, the offsite drainage system depicted in the ROD is significantly different than that depicted in the FEIS, and "the components of the GLO system used by I-70 [were]…analyzed… as updates to the [FEIS]."  Id. at 131 (Exhibit 25) and 133.

In that regard, the ROD states:

Construction of the project likely will encounter sites contaminated by hazardous materials.  Construction activities…have the potential to release hazardous materials at these locations into soil or groundwater.  **Workers or the public could be exposed to hazardous materials during construction activities** if proper health and safety protocols are not followed and remediation efforts are not applied.

Encounters with hazardous materials are proportional to the amount of ground disturbance.  For example, a larger amount of land disturbed is likely to increase

> encounters with hazardous material sites, leading to a greater impact.  Alternatives
> that incorporate subsurface improvements versus at-grade improvements also have
> a higher potential to encounter soils and/or groundwater contaminated by hazardous
> materials at greater depths.

Ex. 1, Attachment C4 at 3 (emphasis added).

Nowhere in the ROD do FHWA/CDOT explain the health hazards posed by any of the

known contaminants in Globeville Landing Park (OU2 of the Superfund site) or analyze how the

disturbance or spread of these contaminants may actually impact human health and the

environment.  See generally Ex. 1 at Ch. 9.15 and Attachment C4.  Similarly, FHWA/CDOT

failed to discuss in the ROD (or the SDEIS or FEIS) how the disturbance and spread of

contaminants in OU1, which they admit will occur when the highway trench is dug, may impact

local residents and/or highway travelers.  See generally id.; Ex. 2 at Ch. 5.18; Ex. 3 at Ch. 5.18.

Construction of GLO is a major undertaking, which includes all the following

environmental components: removal and offsite disposal of waste material from the Coliseum

parking lot; removal and onsite beneficial use and/or offsite disposal of soil and debris from

Globeville Landing Park; strengthening of waste material in the Coliseum parking lot beneath

the reinforced concrete box conduit and open channel segments to support the weight of the

conveyance structures; creation of an impermeable barrier system beneath the open channel

system through both the Coliseum parking lot and Globeville Landing Park; pumping and

treatment of dewatering liquids produced during construction; and methane, odor, and dust

control throughout the project.  Ex. 13, Final Design Report, Environmental Components for

GLO, prepared on February 5, 2016, at 4-6.

Globeville Landing Park is currently closed to the public and has undergone extensive

excavation pursuant to this Final Design Report, the TCRA, and the IGA.  Ex. 14, aerial

photograph of Globeville Landing Park, taken on August 15, 2017.  This excavation and construction is currently ongoing.  Declaration of Kyle Zeppelin, Dkt. 1.1, at ¶ 21; Declaration of Brad Evans, Dkt. 1.2, at ¶ 9.  CDOT has publicly stated it will continue with all aspects of the Central 70 Project, which FHWA/CDOT now admit includes construction of GLO, while this litigation proceeds.  Ex. 1 at 133; Ex. 15, CDOT Statement re Litigation Involving I-70, dated July 10, 2017, at 1.

Importantly, GLO is simply the "end point" of P2PH, i.e., the conduit through which all the stormwater captured and conveyed by P2PH's other three components is discharged into the South Platte River instead of naturally flowing towards and being intercepted by the lowered portion of I-70.  GLO is also just one component of the EADP, the first phase of P2PH, which, according to the IGA, was commenced during the first quarter of 2016.  Dkt. 1-14 at CM/ECF 4 of 16.  The EADP includes construction of the outfall, construction of the open channel running across the Coliseum parking lot and through Globeville Landing Park, and the acquisition of all private property rights needed to complete the other "distinct projects" encompassed within P2PH.  Id.; Dkt. 1-15 at CM/ECF 13 of 20; Ex. 13 at 4-6.

P2PH in its current form includes construction of GLO, construction of the 39th Avenue Open Channel, construction of a stormwater detention at the City Park Golf Course, and construction of a stormwater detention at the Park Hill Golf Course.[4]  Plaintiffs allege that *all*

---

[4] Denver maintains a website on P2PH, which describes the current state of the project and often includes updates and news items.  See http://www.denvergov.org/content/denvergov/en/platte-to-park-hill.html (last visited September 14, 2017).  The Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," FRE 201(b)(2), including governmental webpages.  New Mexico v. Bureau of Land Mgmt., 565 F.3d 683, 702 (10th Cir. 2009).

*four* components of P2PH are connected, similar, and/or cumulative actions to the Central 70

Project, such that *all four* components should have been analyzed in the FEIS prior to approval

of the ROD.  Dkt. 25 at ¶¶ 258-306.  This analysis is necessary because neither GLO nor the

EADP are stand-alone projects; they are instead discrete components of the larger TBDP/P2PH,

which is being constructed to provide the 100-year storm protection required by the Central 70

PCL Alternative.  P2PH has had, and will continue to have, ecological, aesthetic, historic,

cultural, economic, social, and health impacts on the local community.  These impacts must be

analyzed pursuant to NEPA before P2PH continues.

Although FHWA/CDOT will not break ground on the trench for several months, CDOT

intends to move full steam ahead on all aspects of P2PH in the interim.  Construction at

Globeville Landing Park will proceed.  Ex. 14.  The acquisition of private property rights for

completion of the 39th Avenue Open Channel will likewise proceed, and construction of this

open channel will begin in "late 2017."  Ex. 16, Denver 39th Avenue Greenway and Open

Channel Fact Sheet; Declaration of Janet Feder, Dkt. 19-2, at ¶ 7 (describing Denver's recent

efforts to extract temporary construction easement over residential property for the 39th Avenue

open channel).

The construction contract for the stormwater detention at City Park Golf Course has been

approved, and the golf course will close for construction in November 2017 for a period of 18 to

24 months.  Ex. 17, Denver City Park Golf Course Redesign Fact Sheet.  The City Park Golf

Course is listed on the National Register of Historic Places.  Ex. 18, Letter from Jane Hann

(CDOT) to Steve Turner (History Colorado), dated December 29, 2016, at 2.  CDOT has

determined that under any of the leading design options, construction of the stormwater detention

will bring "substantial changes to the setting, feeling, and materials of the property," which will result in an "adverse effect" to its historic character and significance.  Id. at 3.

As for the highway trench, CDOT has selected a contractor for the Central 70 Project, which it now calls "the largest infrastructure development project in CDOT's history."  Ex. 19, CDOT Press Release, dated August 24, 2017, at 1.  Once federal funds are committed, CDOT plans to will break ground on Central 70 in the Spring of 2018, and continue construction for at least four years.  Id.

In sum, while still at the beginning phases, FHWA/CDOT has made clear Central 70 / P2PH is actively moving forward and will not be stopped absent a preliminary Order from this Court.  Ex. 15.  FHWA/CDOT's position persists in the face of recent testimony from long-time Denver City Councilwoman that Central 70 and P2PH are "directly tied" together.  Ex. 20 (Trial Testimony of Deborah Ortega, given on August 22, 2017, in the related case of John D. MacFarlane, et al. v. the City and County of Denver, et al., Case No. 2016CV32126 (Denver District Court)), at 4:14-6:11 and 9:2-12:20.[5]

## III.    STANDARD OF REVIEW

Judicial review of agency NEPA decisions is made available through the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq.  Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002).  The APA allows for preliminary relief in the form of a stay.

---

[5] The Zeppelin Plaintiffs identified MacFarlane as a related case because it includes common facts and/or claims and was pursued by Keating Wagner Polidori Free, P.C.  See Plaintiffs' Notice of Related Cases, Dkt. 11.

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court…may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

"The four-factor standard used by courts for a motion to stay agency action is the same legal standard as that used in a motion for preliminary injunction." Hill Dermaceuticals, Inc. v. U.S. FDA, 524 F.Supp.2d 5, 8 (D.D.C. 2007) (citing Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998); Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam)). See also First Premier Bank v. U.S. Consumer Fin. Protection Bureau, 819 F. Supp. 2d 906, 912 (D.S.D. 2011) ("Courts use the same standard to decide applications for stays of administrative action as for preliminary injunction determinations.").

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv., 657 F.Supp.2d 1233, 1239 (D. Colo. 2009) (citing Winter, 555 U.S. at 20). "[T]he very purpose of preserving the status quo by the grant of a preliminary injunction is to prevent irreparable harm pending a trial on the merits." O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 1001 (10th Cir. 2004) (concurrence) (internal citations omitted).

## IV.   A STAY IS WARRANTED

### A.   Plaintiffs Are Likely to Succeed on the Merits

Pursuant to the APA, reviewing courts shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

18

law." 5 U.S.C. § 702(2)(A). NEPA decisions implicate the arbitrary and capricious standard of review. Davis, 302 F.3d at 1111. "Agency decisions are arbitrary when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Utahns v. U.S. DOT, 305 F.3d 1152, 1164 (10th Cir. 2002) (quoting Motor Vehicles Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983)).

Plaintiffs advance two theories why FHWA and CDOT acted arbitrarily and capriciously in violation of NEPA: 1) because they did not analyze in the FEIS the direct, indirect, and full cumulative impacts of P2PH, which is a connected, similar, and/or cumulative action to Central 70 (Dkt. 25 at ¶¶ 258-306 (Fourth, Fifth, and Sixth Claims for Relief)); and 2) because irrespective of whether the scope of the FEIS is too narrow, FHWA and CDOT failed to take the requisite "hard look" at the impacts to human health and the environment caused by the disturbance and spread of hazardous materials in the Superfund site during construction of Central 70 (id. at ¶¶ 214-231 (First Claim for Relief)).[6] Plaintiffs are likely to succeed on both theories.

### 1.    *P2PH is a Connected, Similar, and/or Cumulative Action, which FHWA/CDOT Failed to Analyze*

NEPA regulations require agencies to reasonably determine the scope of an EIS. 40 C.F.R. § 1508.25. In furtherance of this goal, agencies *must* analyze "connected actions" in the

---

[6] The focus of this Motion should not be construed as a waiver of Plaintiffs' Second, Third, or Seventh Claims for Relief, which also attack the FEIS on grounds that it does not include adequate mitigation measures or an accurate cost estimate and allege that FHWA violated Section 4(f) when it approved the ROD.

same EIS and *should* analyze "similar" or "cumulative" actions in the same EIS if there is a basis

for doing so.  40 C.F.R. § 1508.25(a).  In all instances, NEPA regulations *require* agencies to

analyze the direct, indirect, and cumulative impacts of "past, present, and reasonably foreseeable

future actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions."  40 C.F.R. § 1508.7.  See also Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162,

1175 (10th Cir. 1999).

The terms "impacts" and "effects" are used synonymously in NEPA's regulations.  40

C.F.R. § 1508.8.  They include all ecological, aesthetic, historic, cultural, economic, social, and

health impacts, whether direct, indirect, or cumulative.  Id.

"Connected actions" are actions that are "closely related."  40 C.F.R. § 1508.25(a)(1).

"Actions are connected if they…[c]annot or will not proceed unless other actions are taken

previously or simultaneously."  40 C.F.R. § 1508.25(a)(1)(ii).

> "One of the primary reasons for requiring an agency to evaluate 'connected
> actions' in a single EIS is to prevent agencies from minimizing the potential
> environmental consequences of a proposed action (and thus short-circuiting
> NEPA review) by segmenting or isolating an individual action that, by itself, may
> not have a significant environmental impact."  Citizens' Comm. to Save Our
> Canyons, 297 F.3d 1012, 1028 (10th Cir. 2002).

> *                 *                 *

> [E]ven though an action *could* conceivably occur without the previous or
> simultaneous occurrence, if it *would not occur* without such action it is a
> "connected" action and must be considered within the same NEPA document as
> the underlying action.

Dine Citizens Against Ruining Our Env't v. Klein, 747 F.Supp.2d 1234, 1253-1254 (D. Colo.

2010) (emphasis added).

The evidence that Central 70 and P2PH as connected actions is overwhelming. FHWA/CDOT admit the PCL Alternative requires 100-year flood protection.  Supra at 3.  Prior to FHWA/CDOT's interest in pursuing the PCL Alternative, Denver had no plans to protect the relevant area from a 100-year flood event.  Id.  Despite FHWA/CDOT's express denials in the ROD, numerous other documents plainly show – *if not expressly state* – that Denver is designing and constructing P2PH for the purpose of protecting I-70 from flooding.  Supra at 4-13.  Most prominent among these documents is the IGA signed by CDOT and Denver.

The terms of the IGA not only solidify the purpose of TBDP/P2PH, they show FHWA/CDOT's reliance on this stormwater/drainage project.  First, the IGA states that CDOT will fund (and presumably is currently funding) 40% of the cost of TBDP/P2PH.  Supra at 10.  It defies all logic for a state agency like CDOT to contribute tens or even hundreds of millions of dollars toward a City of Denver project if it is receiving no substantial benefit.  Ex. 20 at 6:12-20 (current cost estimate for P2PH is $300 million).  Indeed, there is no legal authority under which CDOT can "gift" monies to Denver for project that is unrelated to transportation.

Second, the IGA gives CDOT the right to review and comment on the design of TBDP/P2PH, as well as Denver's selection of contractors to build TBDP/P2PH, and commits the parties to *weekly status meetings* on TBDP/P2PH.  Supra at 11.  Again, common sense dictates that CDOT would not (and likely could not) inject itself into the design and construction process for a city-specific project that is unrelated to transportation and/or will not be utilized for transportation purposes.

Third, the IGA includes steep liquidated damages provisions to *ensure* Denver will complete TBDP/P2PH on a timeframe that supports the construction schedule of Central 70.

21

Supra at 11.  To accept the premise that these projects are not connected would be to blatantly ignore the terms of the IGA, which says: "[CDOT] is relying on the completion schedule for *each phase* of the TBDP as it structures the contract for the I-70 East Project and related project agreement."  Id. at 10 (emphasis added).

       This last point is critical because it highlights the fact that GLO is but one of the "four distinct projects" comprising TBDP/P2PH.  Supra at 15.  These four components work jointly to provide 100-year flood protection for the PCL Alternative by capturing and conveying to the South Platte River all of the stormwater that would otherwise flow north through the Montclair and Park Hill Basins towards I-70.  Supra at 15.  To carve out any of the four P2PH components as "unrelated" to the Central 70 Project – especially when FHWA/CDOT have (belatedly) conceded the Central 70 Project needs GLO to function – would be to purposefully short-circuit NEPA review and ignore the prior statements of CDOT and Denver representatives.  Dine Citizens, 747 F.Supp.2d at 1253-1254.  See also supra at 6 (CDOT is "unwilling to jeopardize their progress on the EIS for the I-70 PCL" by including P2PH) and 17 (Central 70 and P2PH are "directly tied" together).

       Moreover, even if the Court does not view the Central 70 Project and P2PH as "connected actions," they are still "similar actions," which should have been examined together. 40 C.F.R. § 1508.25(a)(3).  "Similar actions" are actions that have similarities, which provide a basis for evaluating their environmental consequences together, such as common timing or geography.  Id.

       Central 70 and P2PH are slated to occur at the same time and at the same place.  Dkt. 1.15 at CM/ECF 13 of 20.  The two-fold proximity of these projects "serves as a basis for

22

evaluating their environmental consequences together," 40 C.F.R. § 1508.25(a)(3), especially

when CDOT knew about, and was heavily involved in, TBDP/P2PH prior to issuing the FEIS,

and especially when these two projects *physically connect* to one another.  Supra at 8.

CDOT knew where, when, and for what purpose P2PH would be constructed.  Supra at

10-11.  CDOT was and is, through the liquidated damages provisions of the IGA, controlling the

schedule of "each phase of the TBDP," and has expressly contracted for the right to review and

comment on both the design of TBDP/P2PH and the selection of contractors for TBDP/P2PH.

Supra at 11.  It is unreasonable for FHWA and CDOT to carve out of the NEPA process the

"City's drainage project" when CDOT all along intended to guide that project for the benefit of

the PCL Alternative *and is paying millions of dollars for it*.  Id. ("From design review and

comment at appropriate intervals, to Developer selection, to contract review and comment, the

Parties commit to establishing a protocol of review and comment for each project referenced in

this Agreement."); San Juan Citizens' Alliance v. Salazar, 2009 U.S. Dist. LEXIS 29804 at *44

(D. Colo. March 30, 2009) (examining whether scope of EIS was "reasonable" in determining

whether agency acted arbitrarily and capriciously in declining to analyze "similar action").

Alternatively, and at the very least, FHWA/CDOT failed in their obligation to analyze the

full gamut of cumulative impacts from Central 70 and P2PH.  40 C.F.R. §§ 1508.7 and 1508.8.

The cumulative impacts analysis is contained in Chapter 6 of the FEIS and was unchanged by the

ROD.  Ex. 1 at 186; Ex. 3 at 6_1 – 6_33.  While this analysis fleetingly mentions TBDP, it

makes no effort to discuss the cumulative ecological, economic, or health impacts posed by

TBDP/P2PH and Central 70.  See 40 C.F.R. § 1508.8 (identifying impacts that *must* be analyzed

in an EIS).  For example, the FHWA/CDOT did not analyze the dangers to human health and the

23

environment that will be cumulatively caused by the disturbance and spread of hazardous soils between Brighton and Colorado Boulevards, at Globeville Landing Park, and along 39th Avenue. Certainly, the $300 million cost of the 100-year flood protection provided by P2PH was not disclosed as part of $1.1billion price tag for Central 70.

Without a proper cumulative impacts analysis, it is impossible to determine whether P2PH and Central 70 are "cumulative actions" under NEPA.  40 C.F.R. § 1508.25(a)(2).  But because P2PH includes two projects that require excavation in the Superfund site (GLO and the 39th Avenue Open Channel) and one project that will adversely affect a National historic site (stormwater detention at City Park Golf Course), it is clear error to *assume* P2PH has no significant impact on human health and the environment, and thus does not qualify as a "cumulative action" under NEPA, which should have been fully analyzed in the FEIS.  Id.

### 2. *FHWA/CDOT Failed to Take the Requisite "Hard Look" at the Human Health and Environmental Caused by the Disturbance and Spread of Hazardous Materials*

Before embarking upon any "major federal action," agencies must determine whether the action is likely to "significantly affect[] the quality of the human environment," and, if so, prepare a thorough EIS assessing the predicted impacts of the proposed action on all aspects of the environment.  See 42 U.S.C. § 4332(2)(C); 40 C.F.R. Part 1502; 40 C.F.R. §§ 1508.11 and 1508.25(c).  This review cannot be superficial; agencies must take a "hard look" at the environmental consequences of proposed actions utilizing public comment and the best scientific information.  Biodiversity Conservation Alliance v. Jiron, 762 F.3d 1036, 1085 (10th Cir. 2014).

FHWA/CDOT acknowledge construction of the PCL Alternative will require excavation through the Superfund site.  Supra at 13-14.  This area contains elevated levels of lead and

24

arsenic, which pose a risk to human health and the environment.  Supra at 9.  FHWA/CDOT

acknowledge construction of the PCL Alternative will disturb and spread these hazardous

materials, thereby exposing workers and the public to airborne toxins, but have failed to disclose

or discuss what, if any, impacts exposure to these disturbed hazardous materials may have on

human health and the environment.  Supra at 14.  Strangely, the "hazardous materials" sections

of the DEIS, SDEIS, FEIS, and ROD instead examine the impact Central 70 will have *on the*

*hazardous materials themselve*s.  Id.

To date, the public remains uninformed of the true impacts of digging the I-70 ditch

because FHWA/CDOT have failed to disclose the type and level of risk and mechanism(s) of

potential injury associated with four years of exposure to contaminated dust during construction

in the Superfund site.  The Zeppelin Plaintiffs are concerned about, and deserve to know, what

type and magnitude of risk these toxic materials pose to them, their families, their homes, and

their businesses.

**B.**    **Plaintiffs Will Suffer Irreparable Harm if a Stay is Not Ordered**

To obtain a preliminary injunction, a movant must establish that he [or she] is
likely to suffer irreparable harm in the absence of preliminary relief.  Although
irreparable harm does not readily lend itself to definition, a plaintiff must
demonstrate a significant risk that he or she will experience harm that cannot be
compensated after the fact by money damages.  That harm must be both certain
and great, and not merely serious or substantial.  Moreover, the injury must be
likely to occur before the district court rules on the merits.  While not an easy
burden to fulfill, a plaintiff who can show a significant risk of irreparable harm
has demonstrated that the harm is not speculative.

N.M. Dept. of Game & Fish v. U.S. Dept. of Interior, 854 F.3d 1236, 1250-1251 (10th Cir. 2017)

(internal quotes and citations omitted).

The issue of irreparable harm "is intertwined with the probability of success on the merits." San Luis Valley, 657 F.Supp.2d at 1241.  That is because where, as here, plaintiffs have shown a likelihood of success on the merits, their remedy, which is to require the agencies to cure the deficiencies in the FEIS, "would be meaningless if the [challenged action] were to proceed during the pendency of this litigation."  Id.

> The irreparable-harm prong's overarching inquiry compares (i) what would happen if the preliminary injunction were not granted; with (ii) what would happen if the preliminary injunction were granted; and then (iii) asks whether the difference between (i) and (ii) is irreparable.

Dine Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 109986 at *154-155 (D.N.M. August 14, 2015).

If a stay is not ordered here, the following actions will occur prior to a ruling on the merits: more hazardous materials will be disturbed and spread at Globeville Landing Park (in Superfund Site OU2); more private property rights necessary to complete P2PH will acquired; the City Park Golf Course (National Register of Historic Places) will close for construction; 39th Avenue (in Superfund Site OU1) will be destroyed and excavated, disturbing and spreading more hazardous materials; and FHWA/CDOT will break ground on the trench for the lowered highway segment (in Superfund Site OU1), disturbing and spreading still more hazardous materials.  Supra at 16-17.  See also Proposed Joint Case Management Plan, Dkt. 21, at 5 (merits briefing will commence in March 2018 at the earliest).

If, on the other hand, the Court does issue a stay, FHWA/CDOT's participation in these projects will be halted until the merits of the Zeppelin Plaintiffs' claims are resolved. FHWA/CDOT control the construction schedule and financing of Central 70, which includes GLO.  Supra at 3, 13.  CDOT controls much of the financing for the other three P2PH projects,

26

which are being rushed without analysis only to meet FHWA.CDOT's Central 70 construction schedule.  Supra at 10-11.  An Order temporarily enjoining these agencies from committing further funds or approvals of any part of Central 70 / P2PH would provide meaningful relief.

This Court has the authority to enjoin any further action by FHWA/CDOT on Central 70 and P2PH.  See Davis, 302 F.3d at 1110, n. 2 ("Where NEPA is implicated by a highway project in which state agencies are participating, the state agencies are also proper parties and we have the authority to instruct the district court to enjoin the state agencies from further construction on the highway project.").  Exercise of that authority is warranted because continued progress on these projects will cause irreparable injury to Plaintiffs' health, environmental, financial, aesthetic, and procedural interests.

Plaintiff Kyle Zeppelin lives and works in Globeville, just one block from Globeville Landing Park and three blocks from I-70.  Dkt. 1-1 at ¶¶ 3, 11; Dkt. 1-2 at ¶¶ 2, 7.[7]  Plaintiff Brad Evans works at the same address as Mr. Zeppelin and is in similar close proximity to these areas on a daily basis.  Dkt. 1-2 at ¶ 2.

Messrs. Zeppelin and Evans are aware of the ongoing construction at Globeville Landing Park, that this construction is occurring in OU2 of the Superfund site, that the soils and groundwater there contain elevated levels of contaminants, and that these contaminants are currently being disturbed and spread by the excavation required for GLO.  Dkt. 1-1 at ¶¶ 21-22; Dkt. 1-2 at ¶¶ 7-9.  Messrs. Zeppelin and Evans are concerned that routine exposure to the dust being generated at Globeville Landing Park is harmful to their health.  Dkt. 1-1 at ¶¶ 17, 20; Dkt.

---

[7] To the extent the Court finds that a stay should not be issued on the basis of Declarations alone, Lane v. Buckley, 643 Fed. Appx. 686, 689 (10th Cir. 2016), the Zeppelin Plaintiffs request a hearing on this motion so they can present further evidence in support of the four Winter factors.

1-2 at ¶ 9.  While each was active in the NEPA process, neither has been informed by FHWA or CDOT as to how their health might be impacted by Central 70.  Dkt. 1-1 at ¶¶ 11-15, 22; Dkt. 1-2 at ¶¶ 3-6 and 8-13.  Mr. Evans has stated his procedural interests were harmed because he had no opportunity to comment on GLO because FHWA/CDDOT intentionally carved it out of the FEIS.  Dkt. 1-2 at ¶¶ 10, 13.

Through his development company, Mr. Zeppelin has significant financial investments along the South Platte River.  Dkt. 1-1 at ¶ 19.  Mr. Zeppelin not only has "major concerns" about further environmental contamination of the river arising out of implementation of the PCL Alternative, he is concerned that further contamination could decrease the value of his investments.  Id. at ¶¶ 19-22.

EPA documents are clear: "Conditions existing at OU2 present a threat to public health and environment."  Supra at 9.  Deleterious health impacts cannot be undone with financial compensation and "[e]nvironmental injury, by its nature…is often permanent or at least of long duration, i.e., irreparable."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).  A stay would halt the agencies' participation in the funding and construction of GLO until the Court could determine whether the NEPA documents adequately examined the health and environmental impacts of extensive excavation in this area.

Plaintiffs Christine O'Connor and Jacqueline Lansing recreate in City Park Golf Course.  Declaration of Christine O'Connor, Dkt. 1-6, at ¶ 18; Declaration of Jacqueline Lansing, Dkt. 1-17, at ¶¶ 22-24.  Ms. O'Connor enjoys this area for its exercise opportunities, open spaces, mature trees, vistas, and historic significance.  Dkt. 1-6 at ¶ 18.  Ms. Lansing also enjoys these

28

values, along golfing and the biodiversity the golf course supports.  Dkt. 1-17 at ¶¶ 22-24.  Ms. Lansing has been using the City Park Golf Course for 36 years.  Id. at ¶ 24.

Ms. O'Connor and Ms. Lansing are aware that City Park Golf Course is slated to close for construction of stormwater detention that is part of P2PH.  Dkt. 1-6 at ¶ 19; Dkt. 1-17 at ¶ 23.  These Plaintiffs understand, based on the documents they have read and the meetings they have attended, that P2PH and Central 70 are connected actions.  Dkt. 1-6 at ¶¶ 3-16; Dkt. 1-17 at ¶¶ 4-11, 13-18.  If the closure of, and construction at, City Park Golf Course is allowed to continue with no NEPA analysis, Ms. O'Connor and Ms. Lansing will be shut out of this place, not allowed to enjoy it, and believe the ecological and historic character of the course will be lost or forever changed.  Dkt. 1-6 at ¶ 19; Dkt. 1-17 at ¶ 12, 23, 27.  These Plaintiffs have specifically stated their procedural interests are being harmed by the construction of P2PH proceeding with no NEPA analysis.  Dkt. 1-6 at ¶¶ 17, 20; Dkt. 1-17 at ¶ 12.

A stay would halt CDOT's participation in the funding and construction of P2PH, which includes the City Park Golf Course, until the Court could determine whether P2PH is a connected, similar, or cumulative action.  Such a stay would serve the purpose of NEPA, which is to ensure that the agency and the public are aware of the environmental consequences of a project before it begins.  Sierra Club v. Hodel, 848 F.2d 1068, 1097 (10th Cir. 1988), overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992).

Plaintiffs Kimberly Morse and Janet Feder live within blocks of the forthcoming 39th Avenue Open Channel.  Declaration of Kimberly Sue Morse, Dkt. 1-12, at ¶ 2; Declaration of Janet Feder, Dkt. 19-2, at ¶ 2.  They understand the 39th Avenue Open Channel will be

constructed in the Superfund site and that the disturbance of soil in this area will likely spread contaminants that are harmful to human health and the environment.  Dkt. 1-12 at ¶¶ 4-5; Dkt. 9-12 at ¶ 15.  These Plaintiffs are, in fact, worried for their health, their ability to live in a healthful environment, and for a diminution in their residential property values caused by construction of the 39th Avenue Open Channel.  Dkt. 1-12 at ¶¶ 14-17; Dkt. 19-2 at ¶¶ 3-5, 13-16.  Ms. Feder – whose home is literally next door to the proposed construction zone – is furthermore concerned about inescapable noise and dust, her safety, her quality of life, and her ability to continue in her professional endeavors during the construction period.  Dkt. 19-2 at ¶¶ 8-12, 15.  Ms. Feder has been approached by the City, which is seeking a temporary easement over her property pursuant to the EADP procedures set forth in the IGA.  Dkt. 19-2 at ¶ 7.

Ms. Morse and Ms. Feder are educated about Central 70 and P2PH and understand, based on documents they have read and meeting they have attended, that these projects are connected. Dkt. 1-12 at ¶¶ 7-12; Dkt. 19-2 at ¶¶ 6, 17-20.  They have procedural interests in the government complying with NEPA by analyzing the full gamut of human health and environmental impacts of P2PH.  Dkt. 1-12 at ¶¶ 13, 15; Dkt. 19-2 at ¶¶ 19, 21.  Without a proper NEPA analysis, these Plaintiffs have no confidence CDOT or Denver will prioritize the needs of area residents and/or undertake proper mitigation measures to protect them.  Dkt. 1-12 at ¶¶ 6, 16-17; Dkt. 19-2 at ¶¶ 15-16.  A stay would preserve the status quo for these Plaintiffs, allowing them to stay in their homes in peace while the merits of their claims are resolved.  See Dkt. 1-12 at ¶ 17; Dkt. 19-2 at ¶ 22 (these Plaintiffs have considered relocating because of the forthcoming construction).

Construction of the challenged projects is imminent and in some instances ongoing.  The Zeppelin Plaintiffs have a right to be informed of the true scope and impact of Central 70 and to

comment appropriately.  These Plaintiffs' interests are currently being harmed and will continue to be harmed if this Court allows these projects to continue unabated for the next year or more while their claims are resolved.

The harm to Plaintiffs' interests is irreparable because it cannot be remedied with money damages.  See N.M. Dept. of Game & Fish, 854 F.3d at 1250-1251.  See also Colorado Wild, Inc. v. U.S. Forest Serv., 523 F.Supp.2d 1213, 1221 (D. Colo. 2007) (quoting Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989)) ("Once large bureaucracies are committed to a course of action, it is difficult to change that course – even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'"); Sierra Club, 848 F.2d at 1097 ("permitting construction to proceed before NEPA studies have been completed would defeat the purpose of undertaking the studies, whose purpose is to make the agency aware of relevant environmental concerns before acting").

## C.      The Balance of Equities Tips in the Favor of Granting a Stay

Plaintiffs' health, environmental, financial, aesthetic, and procedural interests will be irreparably harmed if Central 70 and P2PH are permitted to proceed during the pendency of this litigation.  Any harm to FHWA/CDOT, on the other hand, is purely financial and temporary in character.  See San Luis Valley, 657 F.Supp.2d at 1242 ("[Defendant's] harm, delay in drilling the exploratory wells, is not irreparable in that it can be compensated by money damages").  Plaintiffs seek a stay in order to preserve the status quo only until their claims can be resolved.  This is a relatively short amount of time in which to pause what would otherwise be an irretrievable commitment of taxpayer resources towards an unprecedented infrastructure project.

**D.     An Order Granting a Stay is in the Public Interest**

This court has previously held that, "[t]he public has an undeniable interest in the [government's] compliance with NEPA's environmental review requirements and in the informed decision-making that NEPA is designed to promote." San Luis Valley, at 1242 (quoting Colorado Wild, 523 F.Supp.2d at 1223). "The twin purposes of NEPA is to require agencies to consider environmentally significant aspects of a proposed action, and, in doing so, to inform the public that the agency's decision making process includes environmental concerns." WildEarth Guardians v. U.S. Forest Service, 828 F.Supp.2d 1223, 1236 (D. Colo. 2011). Here, those purposes would be rendered meaningless if Central 70 / P2PH were allowed to proceed during the pendency of this case. FHWA/CDOT have failed to inform the public of the true scope and impacts of Central 70 and are likewise proceeding in an uninformed basis. Granting a stay would promote the public's interest in an accurate and transparent administrative process in which the agencies are informed and the public is permitted to meaningfully participate.

**V.     CONCLUSION**

For all the reasons stated herein, the Zeppelin Plaintiffs respectfully request the Court GRANT this Motion and ORDER that Defendant FHWA and Defendant-Intervenors CDOT and Shailen P. Bhatt are enjoined from undertaking any further action on, or making any further irretrievable commitment of resources towards, Central 70 and P2PH until the merits of the Zeppelin Plaintiffs' claims are resolved.

Respectfully submitted this 15th day of September, 2017.

KEATING WAGNER POLIDORI FREE, P.C.

By:    *s/ Melissa A. Hailey*
       Melissa A. Hailey, CO Reg. #42836
       Aaron D. Goldhamer, CO Reg. #41016
       1290 Broadway, Suite 600
       Denver, CO 80203
       Tel: (303) 534-0401
       Fax: (303) 534-8333
       mah@keatingwagner.com
       agoldhamer@keatingwagner.com

*~ and ~*

James Jay Tutchton, CO Reg. #21138
Tutchton Law Office
6439 East Maplewood Avenue
Centennial, CO 80111
Tel: (720) 301-3843
jtutchtontlo@gmail.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2017, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record as follows:

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Brent E. Butzin, Esq.
Assistant Attorney General
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Brent.butzin@coag.gov

*Attorneys for Defendant-Intervenors*

Robert E. Yuhnke, Esq.
Robert E. Yuhnke & Associates
4050 SE Hosner Terrace
Gresham, OR 97080
Bob.yuhnke@prodigy.net

Andrea S. Gelfuso, Esq.
Andrea Gelfuso, Attorney at Law
2402 South Holland Street
Lakewood, CO 80227
Agelfuso6@gmail.com

Gregory Nicholas Corbin
Milligan Rona Duran & King, LLC-Denver
1627 Vine Street
Denver, CO 80206
gnc@mrdklaw.com

*Attorneys for Sierra Club Plaintiffs*

*s/ Melissa A. Hailey*