



# I-70 EAST ROD 1:
## Phase 1 (Central 70 Project)

**January 2017**



I-70 East ROD 1: Phase 1 (Central 70 Project)

# Decision

Based on the information contained in the *I-70 East Final Environmental Impact Statement and Section 4(f) Evaluation*, which is incorporated by reference here, and this Record of Decision, the Federal Highway Administration selects the Preferred Alternative, Phase 1 (also known as the Central 70 Project) for the I-70 East Project. The Federal Highway Administration finds that this alternative is in the best overall public interest, uses all practicable means to restore and enhance the quality of the human environment, and avoids or minimizes any possible adverse effects. Subsequent phases of the project, although analyzed in the Environmental Impact Statement, are not being authorized or acted upon at this time. Based on the considerations identified in the Section 4(f) Evaluation, the Federal Highway Administration also concludes that there are no feasible and prudent alternatives to the use of Section 4(f) protected lands and that the proposed action includes all possible planning to minimize harm to the identified Section 4(f) properties resulting from such use. The Federal Highway Administration has reviewed and considered all comments received on the project during the review period after the Notice of Availability of the Final Environmental Impact Statement appeared in the *Federal Register*.


John M. Cater, P.E.                                    Date
Division Administrator, Colorado Division
Federal Highway Administration

## STATUTE OF LIMITATIONS

The Federal Highway Administration may publish a notice in the *Federal Register*, pursuant to 23 United States Code (USC) Section 139(l), when the Record of Decision is approved. If such notice is published, a claim arising under federal law seeking judicial review of a permit, license, or approval issued by a federal agency for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the *Federal Register* announcing that the permit, license, or approval is final pursuant to the law under which judicial review is allowed. If no notice is published, then the periods of time that otherwise are provided by the federal laws governing such claims will apply.

## INFORMATION AVAILABILITY

The following individuals may be contacted for additional information regarding the I-70 East Record of Decision 1: Phase 1 (Central 70 Project):

Chris Horn, P.E.
Federal Highway Administration
12300 West Dakota Avenue, Suite 180
Lakewood, CO 80228
720-963-3017

Anthony R. DeVito, P.E.
Colorado Department of Transportation
2000 South Holly Street, I-70 East Project Office
Denver, CO 80222
303-512-5900

## ENVIRONMENTAL IMPACT STATEMENT AVAILABILITY

The Draft, Supplemental Draft, and Final Environmental Impact Statements of the I-70 East Project, along with the Record of Decision for the Central 70 Project, are available on the project website for review and download at www.i-70east.com.

# Table of Contents

Chapter/Section                                                                  Page #

Decision ............................................................................................................. i

List of Exhibits ................................................................................................. v

List of Attachments ......................................................................................... viii

Acronyms and Abbreviations ........................................................................ ix

Chapter 1     Introduction ............................................................................ 1
1.1     Final EIS Preferred Alternative and Multiple ROD Approach .................................. 2
1.2     Purpose and Need ........................................................................................... 3
1.3     Project Limits ................................................................................................. 4
1.4     Compliance with 23 USC 109(h) ...................................................................... 4
1.5     Document Organization ................................................................................... 5

Chapter 2     Alternatives Considered ........................................................ 7
2.1     Alternatives Evaluated in the Final EIS ............................................................. 9
2.2     Final EIS Preferred Alternative ........................................................................ 12
2.3     Environmentally Preferable Alternative ............................................................. 17
2.4     Identification of the Preferred Alternative .......................................................... 18
2.5     Design Refinements to the Preferred Alternative ................................................ 22
2.6     Selection of the Central 70 Project ................................................................... 23

Chapter 3     Measures to Minimize Harm ................................................ 25

Chapter 4     Central 70 Project ................................................................ 29
4.1     Central 70 Project Funding Scenario ................................................................. 29
4.2     Description of the Central 70 Project ................................................................. 30
4.3     Logical Termini and Independent Utility ............................................................ 35
4.4     Responsiveness to Purpose and Need ................................................................ 36
4.5     Central 70 Project Environmental Impacts ......................................................... 38

Chapter 5     Central 70 Mitigation Measures .......................................... 43

Chapter 6     Federal, State, and Local Permits and Approvals ............... 67
6.1     Air Quality Transportation Conformity .............................................................. 67
6.2     Section 106 Consultation ................................................................................. 69
6.3     Section 6(f) of the Land and Water Conservation Fund Act .................................. 70
6.4     Section 4(f) of the Department of Transportation Act of 1966 ............................... 70
6.5     Environmental Justice ..................................................................................... 71
6.6     Other Determinations ...................................................................................... 71
6.7     Monitoring and Enforcement ............................................................................ 71

# Table of Contents

Chapter/Section                                                                Page #

**Chapter 7      Community Outreach and Agency Involvement**.....................................**75**

7.1      Community Outreach since the Final EIS ................................................ 75

7.2      Future Outreach Plans.............................................................................. 76

**Chapter 8      Comments on the Final EIS and Air Quality Documents** ....................**79**

8.1      Overview of Comments Received on the Final EIS ................................. 79

8.2      Overview of Comments Received on the Air Quality Documents ........... 81

8.3      Substantive Comments ............................................................................ 81

8.4      Approach Used to Summarize and Respond to Comments ..................... 81

8.5      Responses to Substantive Comments Received ...................................... 84

**Chapter 9      Updates and Clarifications since the Publication of the Final EIS** .**135**

9.1      Transportation ....................................................................................... 136

9.2      Social and Economic Conditions .......................................................... 137

9.3      Environmental Justice ........................................................................... 138

9.4      Land Use ............................................................................................... 139

9.5      Relocations and Displacements ............................................................ 139

9.6      Historic Preservation............................................................................. 140

9.7      Visual Resources and Aesthetic Qualities ............................................ 149

9.8      Parks and Recreational Resources......................................................... 150

9.9      Air Quality ............................................................................................ 155

9.10     Noise ..................................................................................................... 161

9.11     Biological Resources ............................................................................ 173

9.12     Floodplains and Drainage/Hydrology .................................................. 174

9.13     Wetlands and Other Waters of the U.S. ................................................ 179

9.14     Water Quality ........................................................................................ 181

9.15     Hazardous Materials ............................................................................. 185

9.16     Utilities.................................................................................................. 187

9.17     Human Health ....................................................................................... 187

9.18     Cumulative Impacts .............................................................................. 187

**Chapter 10   Section 4(f) Evaluation Updates** ...............................................................**189**

10.1     Updates to the Final EIS Section 4(f) Evaluation ................................ 189

10.2     Changes to the Final EIS Text of the Section 4(f) Evaluation ............. 206

10.3     Central 70 Section 4(f) Evaluation ....................................................... 232

**Chapter 11   References**...................................................................................................**233**

# List of Exhibits

Page #

Exhibit 1    I-70 East Project and Central 70 Project Limits ..................................................... 4
Exhibit 2    Alternative Modification from the 2008 Draft EIS to the
             Supplemental Draft EIS .................................................................................. 8
Exhibit 3    Project Alternatives Capital Cost Summary ....................................................... 9
Exhibit 4    Preferred Alternative Lane Configuration and Interchange Reconstruction. 13
Exhibit 5    Preferred Alternative Typical Section (Between Brighton Boulevard and
             Colorado Boulevard) ..................................................................................... 14
Exhibit 6    Partial Cover Lowered Alternative Profile View of the Lowered Section
             (Between Brighton Boulevard and Colorado Boulevard)............................... 14
Exhibit 7    Preferred Alternative Preliminary Cover Design ........................................... 16
Exhibit 8    Central 70 Project Overview ......................................................................... 30
Exhibit 9    Central 70 Project Typical Section (Between Brighton Boulevard and
             Colorado Boulevard) ..................................................................................... 31
Exhibit 10   Central 70 Project Typical Section (Between Colorado Boulevard and
             Chambers Road)............................................................................................ 32
Exhibit 11   Central 70 Project North-South Connectivity ................................................ 33
Exhibit 12   Central 70 Project Lane Configuration and Interchange Reconstruction ...... 34
Exhibit 13   Summary of the Central 70 Project Impacts ................................................... 38
Exhibit 14   Central 70 Project Mitigation Measures ........................................................ 44
Exhibit 15   Carbon Monoxide Hotspot Analysis Results ................................................. 68
Exhibit 16   PM$_{10}$ Hotspot Analysis Results ...................................................................... 69
Exhibit 17   Summary of Permits and Approvals Necessary for the Project ..................... 72
Exhibit 18   I-70 East Final EIS Public Hearings ............................................................... 75
Exhibit 19   Number of Comments by Submission Type...................................................... 79
Exhibit 20   Number of Commenters.................................................................................. 79
Exhibit 21   I-70 East Final EIS Comment Submittal Locations ........................................ 80
Exhibit 22   Concerns Raised within the Substantive Comments Received on the
             Final EIS ....................................................................................................... 82
Exhibit 23   Community Outreach Timeline ...................................................................... 93
Exhibit 24   Onsite Outfall System North of I-70................................................................ 130
Exhibit 25   Offsite Outfall System South of I-70................................................................ 131
Exhibit 26   Revised Construction Limits ......................................................................... 136
Exhibit 27   Updated Land-Use Impacts............................................................................ 139
Exhibit 28   Updated Business and Non-Profit Relocations by Alternative and
             Neighborhood ............................................................................................... 140
Exhibit 29   Historic Resources within the APE and Their Effects Determination ......... 141
Exhibit 30   Revised APE and Newly Identified Historic Resources within the APE ...... 147

# List of Exhibits

Page #

Exhibit 31   Summary of Effects for Historic Resources within the APE ........................ 148
Exhibit 32   Globeville Landing Park ................................................................................ 152
Exhibit 33   Carbon Monoxide Comparative Analysis Maximum Concentrations .......... 156
Exhibit 34   Maximum Concentration Receptor Location for Carbon Monoxide ............. 157
Exhibit 35   $PM_{10}$ Comparative Analysis Maximum Concentrations ................................ 158
Exhibit 36   Maximum Concentration Receptor Locations for $PM_{10}$ at I-70/ I-25 ........... 159
Exhibit 37   Maximum Concentration Receptor Locations for $PM_{10}$ at I-70/ I-225 ......... 160
Exhibit 38   Globeville Noise Impacts: General-Purpose Lanes Option ........................... 162
Exhibit 39   Globeville Noise Impacts: Managed Lanes Option ...................................... 163
Exhibit 40   Elyria and Swansea Noise Impacts: Partial Cover Lowered Alternative ..... 164
Exhibit 41   Stapleton Noise Impacts: Managed Lanes Option ........................................ 165
Exhibit 42   Peoria Street Area Noise Impacts: General-Purpose Lanes Option ............. 166
Exhibit 43   Peoria Street Area Noise Impacts: Managed Lanes Option ......................... 167
Exhibit 44   Montbello Noise Impacts: General-Purpose Lanes Option ........................... 168
Exhibit 45   Montbello Noise Impacts: Managed Lanes Option ....................................... 168
Exhibit 46   Aurora Noise Impacts: General-Purpose Lanes Option ................................ 169
Exhibit 47   Aurora Noise Impacts: Managed Lanes Option ............................................ 170
Exhibit 48   Summary of Updated Noise Analysis by Neighborhood for Partial
             Cover Lowered Alternative ........................................................................... 171
Exhibit 49   Elyria and Swansea Noise Wall Locations .................................................. 172
Exhibit 50   Impacts to Biological Resources ................................................................. 173
Exhibit 51   Impacts to Riparian Areas ........................................................................... 174
Exhibit 52   Partial Cover Lowered Alternative—South Offsite Drainage Outfall .......... 175
Exhibit 53   Annual Chance Peak Discharge .................................................................. 176
Exhibit 54   Offsite Drainage for the Partial Cover Lowered Alternative South of I-70 .. 177
Exhibit 55   Updated Impacted Wetlands by Alternative ................................................. 179
Exhibit 56   South Platte River Water Quality Effect Summary ...................................... 182
Exhibit 57   Sand Creek Water Quality Effect Summary ................................................ 182
Exhibit 58   Water Quality Factor Summary ................................................................... 183
Exhibit 59   Preliminary Water Quality Pond Locations .................................................. 184
Exhibit 60   Updated Number of Hazardous Material Sites ............................................ 185
Exhibit 61   Hazardous Material Sites by Alternative ..................................................... 186
Exhibit 62   Updates to Section 4(f) Properties and Uses .............................................. 190
Exhibit 63   Delgany Street Public Sanitary Sewer—Partial Cover Lowered
             Alternative .................................................................................................... 193
Exhibit 64   Drainage in the Final EIS—Partial Cover Lowered Alternative .................. 194

# List of Exhibits

Page #

Exhibit 65   Chicago, Burlington and Quincy Railroad/Burlington Northern Santa Fe Railroad—All Alternatives ............................................................... 197
Exhibit 66   Nestlé Purina PetCare Company—Partial Cover Lowered Alternative ....... 199
Exhibit 67   RLW Sand Company—Partial Cover Lowered Alternative ......................... 201
Exhibit 68   High Tech Early College/STRIVE Prep—Build Alternatives ..................... 203
Exhibit 69   NWT Rail Spur—All Alternatives ............................................................ 204
Exhibit 70   Market Street Railroad/Chicago, Burlington & Quincy Railroad Segment—Partial Cover Lowered Alternative .......................................... 208
Exhibit 71   Union Pacific Beltline Railroad Segment—Build Alternatives ................... 209
Exhibit 72   Denver and Kansas Pacific/Union Pacific Railroad Segment— No-Action Alternative ........................................................................... 211
Exhibit 73   Denver and Kansas Pacific/Union Pacific Railroad Segment— Revised Viaduct Alternative .................................................................. 213
Exhibit 74   Denver and Kansas Pacific/Union Pacific Railroad Segment — Partial Cover Lowered Alternative .......................................................... 215
Exhibit 75   Denver and Kansas Pacific/Union Pacific Railroad Segment — Partial Cover Lowered Alternative .......................................................... 216
Exhibit 76   Rocky Mountain Arsenal Railroad Segment—Build Alternatives ............... 218
Exhibit 77   National Western Historic District—Partial Cover Lowered Alternative .... 220
Exhibit 78   Banker's Warehouse—Partial Cover Lowered Alternative .......................... 221
Exhibit 79   Globeville Landing Park—Partial Cover Lowered Alternative, Denver GLO Project ............................................................................. 224
Exhibit 80   Summary of Section 4(f) Property Uses and Changes .................................. 226
Exhibit 81   Section 4(f) Historic Resources Uses ....................................................... 228
Exhibit 82   Summary of Least Overall Harm Analysis .................................................. 229

# List of Attachments

**(Available Electronically)**

**Attachment A**      **Alternatives Maps**

**Attachment B**      **Updates to Agency Consultation Addendum**

**Attachment C**      **Technical Reports and Addenda**

- C1. Revised Elimination of I-270/I-76 Reroute Alternative Technical Memorandum

- C2. Updates to Traffic Technical Report Addendum

- C3. Updates to Conceptual Stage Relocations Technical Report Addendum

- C4. Updates to Hazardous Materials Technical Report Addendum

- C5. Updates to Section 106 Determination of Eligibility and Effects

- C6. Air Quality NEPA Comparison Technical Report

- C7. Air Quality Conformity Technical Report

- C8. Updates to Noise Technical Report

- C9. Updates to Biological Assessment Addendum

- C10. Updates to Hydraulics and Hydrology Technical Report Addendum

- C11. Updates to Wetlands and Other Waters of the US Technical Report Addendum

- C12. Revised Wetland Finding

**Attachment D**      **Section 106 Programmatic Agreement**

**Attachment E**      **Comments on the Final EIS**

**Attachment F**      **Comments on the Air Quality Documents**

# Acronyms and Abbreviations

| A | |
|---|---|
| ACM | Asbestos-containing material |
| ADA | Americans with Disabilities Act |
| AM | Morning peak period |
| APCD | Air Pollution Control Division |
| APE | Area of Potential Effect |
| AST | Above ground storage tank |
| ATM | Active Traffic Management |

| B | |
|---|---|
| BMP | Best Management Practice |
| BNSF | Burlington Northern Santa Fe |
| Btu | British Thermal Unit |

| C | |
|---|---|
| CAA | Clean Air Act |
| CDOT | Colorado Department of Transportation |
| CDPHE | Colorado Department of Public Health and Environment |
| CDPS | Colorado Discharge Permit System |
| CERCLIS | Comprehensive Environmental Response, Compensation, and Liability Information System |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CMAQ | Congestion Mitigation Air Quality |
| CPW | Colorado Parks and Wildlife |
| CRHDC | Community Resources and Housing Development Corporation |
| CWA | Clean Water Act |

| D | |
|---|---|
| dB | Decibel |
| dBA | A-weighted decibel |
| Denver | City and County of Denver |
| DPS | Denver Public Schools |
| Draft EIS | Draft Environmental Impact Statement |
| DRCOG | Denver Regional Council of Governments |
| DRIR | Denver Rock Island Railroad |
| DSRC | Dedicated Short-Range Communications |
| DSS | Decent, safe, and sanitary |

# Acronyms and Abbreviations

| E | |
|---|---|
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| ETC | Electronic Tolling Collection |

| F | |
|---|---|
| FAST Act | Fixing America's Surface Transportation Act |
| FASTER | Funding Advancement for Surface Transportation and Economic Recovery Act |
| FEMA | Federal Emergency Management Agency |
| Final EIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FTA | Federal Transit Administration |

| G | |
|---|---|
| GES | Globeville/Elyria-Swansea |
| GLO | Globeville Landing Park Outfall |
| GHG | Greenhouse gases |

| H | |
|---|---|
| HPTE | High Performance Transportation Enterprise |
| HVAC | Heating, ventilation, and air conditioning system |

| I | |
|---|---|
| I-25 | Interstate 25 |
| I-70 | Interstate 70 |
| I-225 | Interstate 225 |
| I-270 | Interstate 270 |
| IGA | Intergovernmental Agreement |
| ITS | Intelligent Transportation System |

| L | |
|---|---|
| LOS | Level of service |
| LUST | Leaking underground storage tank |
| LWCF | Land and Water Conservation Fund |

# Acronyms and Abbreviations

| M | |
|---|---|
| MATT | Multi-Agency Technical Team |
| MOVES | Motor Vehicle Emissions Simulator modeling software |
| MS4 | Municipal Separate Storm Sewer System |
| MSAT | Mobile Source Air Toxic |
| MVRTP | Metro Vision Regional Transportation Plan |
| µg/m$^3$ | Microgram per cubic meter |

| N | |
|---|---|
| NAAQS | National Ambient Air Quality Standards |
| NAC | Noise Abatement Criteria |
| NEPA | National Environmental Policy Act |
| NFRAP | No further remedial action planned |
| NOI | Notice of Intent |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| NWT | Northwestern Terminal |

| P | |
|---|---|
| P2P | Platte to Park Hill Stormwater Systems Project |
| PA | Programmatic Agreement |
| PACT | Preferred Alternative Collaborative Team |
| PM | Evening peak period |
| PMJM | Preble's meadow jumping mouse |
| PM$_{2.5}$ | Particulate matter less than 2.5 microns in size |
| PM$_{10}$ | Particulate matter less than 10 microns in size |
| ppm | Parts per million |

| R | |
|---|---|
| RCRA | Resource Conservation and Recovery Act |
| RFP | Request for Proposal |
| ROD | Record of Decision |
| ROW | Right of way |
| RTD | Regional Transportation District |
| RTP | Regional Transportation Plan |

# Acronyms and Abbreviations

| S | |
|---|---|
| SEP-14 | Special Experiment Project 14 |
| SHPO | State Historic Preservation Office |
| SIP | State Implementation Plan |
| STIP | Statewide Transportation Improvement Program |
| STP-Metro | Surface Treatment Program-Metro |
| Supplemental Draft EIS | Supplemental Draft Environmental Impact Statement |
| SWL | Solid waste landfill |

| T | |
|---|---|
| TBDP | Two Basins Drainage Project |
| TDM | Transportation Demand Management |
| TIP | Transportation Improvement Program |
| TSS | Total suspended solids |

| U | |
|---|---|
| UDFCD | Urban Drainage and Flood Control District |
| Uniform Act | Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 |
| UPRR | Union Pacific Railroad |
| USACE | U.S. Army Corps of Engineers |
| USC | U.S. Code |
| USFWS | U.S. Fish and Wildlife Service |
| UST | Underground storage tank |

| V | |
|---|---|
| VCRA | Voluntary Clean-Up and Redevelopment Act |
| VMT | Vehicle miles traveled |
| vpd | Vehicles per day |

| W | |
|---|---|
| WQCD | Water Quality Control Division |

# Chapter 1   Introduction

The Federal Highway Administration (FHWA) published a Notice of Intent (NOI) in the *Federal Register* (August 19, 2003) to prepare an Environmental Impact Statement (EIS) as a joint highway and transit project. In June 2006, it was determined that the highway and transit elements serve different travel markets, are located in different corridors, and have different funding sources. At this point, the highway and transit components of the analysis were separated and a new NOI was issued on June 30, 2006. This was done in accordance with the Council on Environmental Quality (CEQ) and FHWA regulations. This Interstate 70 (I-70) Record of Decision (ROD) 1 for the Central 70 Project has been prepared in compliance with 23 Code of Federal Regulations (CFR) §771 and 23 CFR §774, 40 CFR §§1500–1508, and the requirements of the National Environmental Policy Act (NEPA), as amended.

In November 2008, FHWA and the Colorado Department of Transportation (CDOT) published the *I-70 East Draft Environmental Impact Statement and Section 4(f) Evaluation*. There was no preferred alternative discussed in the Draft EIS.

> ### I-70 East Project vs. the Central 70 Project
>
> The I-70 East Project studied and analyzed multiple alternatives through the NEPA process and identified the Partial Cover Lowered Alternative with Managed Lanes Option as the Preferred Alternative. For more information about the Preferred Alternative, see Section 2.2.
>
> This ROD selects the portion of the I-70 East Project, also known as the Central 70 Project, which was introduced as Phase 1 of the identified Preferred Alternative in the Final EIS, for implementation. The Central 70 Project has independent utility and logical termini and can operate as a standalone project. For information regarding the Central 70 Project, see Chapter 4 of this document.
>
> As the I-70 East Project moves through the procurement and developer team selection process, it will be known as the Central 70 Project.

Because of the lack of support for project alternatives presented in the Draft EIS, CDOT initiated a rigorous collaboration process to recommend a preferred alternative. This collaboration process, subsequently named the Preferred Alternative Collaborative Team (PACT), consisted of federal, state, and local agencies; advocacy groups; and stakeholders, including neighborhood representatives. After approximately one year of collaboration and additional analysis, the PACT members were not able to reach consensus on a preferred alternative but did reach consensus on keeping I-70 on its existing alignment and eliminating the realignment alternative. Consequently, CDOT and FHWA decided to review prior decisions in the process, including the previously eliminated alternatives.

In August 2014, FHWA and CDOT published the *I-70 East Supplemental Draft EIS and Section 4(f) Evaluation*, which included reevaluation of the previously eliminated

alternatives. This effort led to the introduction of a new alternative (the Partial Cover Lowered Alternative), updated the analysis and mitigation measures, and preliminarily identified the Partial Cover Lowered Alternative as the Preferred Alternative.

In January 2016, FHWA and CDOT published the *I-70 East Final Environmental Impact Statement and Section 4(f) Evaluation.* The Partial Cover Lowered Alternative with Managed Lanes Option was identified as the Preferred Alternative in the Final EIS, which also included the evaluation of alternatives and the benefits and impacts to natural and community resources associated with each alternative. The Final EIS is incorporated into this ROD by reference. Information about the availability of the Final EIS is included at the front of this document. The Final EIS described the decision-making process and summarized the analysis for identifying the alternatives considered for the Final EIS, their associated impacts, proposed mitigation, and ability to meet the project's purpose and need. *Attachment Q, Supplemental Draft EIS Comments and Responses* of the Final EIS also included all comments received on the Supplemental Draft EIS provided by the public and agencies and FHWA's and CDOT's responses to those comments.



## 1.1    Final EIS Preferred Alternative and Multiple ROD Approach

The Preferred Alternative for the I-70 East Project, as identified in the Final EIS, is the Partial Cover Lowered Alternative with Managed Lanes Option, and includes restriping, reconstruction, and/or widening of I-70 from Interstate 25 (I-25) to Tower Road (see Section 2.2 for more detail).

The identification of a preferred alternative for the entire project in the Final EIS is consistent with FHWA's objective of analyzing and selecting transportation solutions to avoid segmentation. The selection to implement the Central 70 Project in this ROD is consistent with the 2008 FHWA guidance, *Transportation Planning Requirements and Their Relationship to NEPA Process Completion* (along with the February 2011 supplement) to have funding for projects identified before final decisions are made. Because funding for the entire project had not been identified at the time the Final EIS was published, FHWA and CDOT planned for phased implementation of the project and the use of a multiple ROD approach.

As outlined in the Final EIS, it is the intent of FHWA and CDOT to implement the Preferred Alternative in its entirety. However, due to current funding limitations, only Phase 1 of the Preferred Alternative, which is herein referred to as the Central 70 Project, will be selected with the approval of this ROD. The Central 70 Project is a standalone

project with independent utility and logical termini that includes improvements between I-25 and Chambers Road (see Chapter 4, Central 70 Project, of this document for more information).

This ROD is the final step in the NEPA process for the Central 70 Project. Phases that will be necessary to complete implementation of the entire Preferred Alternative but are not included in this ROD may be identified in future RODs, which will be prepared as funding is identified in the Denver Regional Council of Governments (DRCOG) Fiscally Constrained Regional Transportation Plan (RTP). Implementation of future phases may not occur if funding beyond the initial phase cannot be identified.

The timing to implement future phases will be determined through the statewide planning and programming process, which is carried out by CDOT in accordance with 23 CFR §450. Under those regulations, a project that involves federal funding can be implemented only if it is included in the Statewide Transportation Improvement Program (STIP). Additional funding for the future phases also will need to be identified in the DRCOG Fiscally Constrained RTP. The following general considerations will be taken into account when determining the scope of future phases:

- CDOT will consider available funding and the need to balance the construction of improvements throughout the corridor.

- Future phases will have independent utility in that each element would provide transportation benefits, be a reasonable expenditure even if no additional improvements are made in the area, and have logical termini.

When the future phases have been determined, identified in the RTP, and funded, the future RODs will identify impacts and appropriate mitigation measures that are associated with those actions.

## 1.2    Purpose and Need

The purpose of the I-70 East Project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area.

The need for this project results from the following issues:

- Transportation infrastructure deficiencies

- Increased transportation demand

- Limited transportation capacity

- Safety concerns

For more information related to the factors supporting the needs, see *Chapter 2, Purpose and Need,* of the Final EIS. The Central 70 Project selected by this ROD contributes to addressing elements of the I-70 East Project's purpose and need, as discussed in Chapter 4, Central 70 Project, of this document.

## 1.3     Project Limits

The I-70 East Project extends almost 12 miles along I-70 between I-25 and Tower Road through the neighborhoods of Globeville, Elyria and Swansea, Northeast Park Hill, Stapleton, Montbello, Gateway, and a portion of Aurora. The limits for the Central 70 Project extend approximately 9.5 miles along I-70 between I-25 and Chambers Road (see **Exhibit 1**).

**Exhibit 1       I-70 East Project and Central 70 Project Limits**



Existing and forecasted traffic volumes were the main factor in determining the project limits for the I-70 East Project. Forecasted traffic volumes for the year 2035 range from 95,000 vehicles per day (vpd) to 270,000 vpd between I-25 and Peña Boulevard, declining east of there. The western limit is I-25 because of the high diversion of traffic from I-70 to both northbound and southbound I-25. Between 40 percent and 50 percent of traffic traveling westbound on I-70 diverts onto I-25. Tower Road is the eastern limit because the traffic volumes drop substantially east of Peña Boulevard. These limits do not preclude other NEPA transportation improvement studies outside the corridor (DRCOG, 2013).

The project limits and logical termini for the Central 70 Project are discussed in Section 4.3 of this document.

## 1.4     Compliance with 23 USC 109(h)

The environmental review process carried out for the I-70 East Project followed the procedures set forth in 23 CFR §771, which serves to comply with 23 USC §109(h). The process of developing the EIS in accordance with these procedures assured that possible adverse economic, social, and environmental effects related to the I-70 East Project were

fully considered. It ensures that the final decision on the project is made in the best overall public interest and the interest of economically disadvantaged communities, taking into consideration the need for fast, safe, and efficient transportation and public services, and the costs of eliminating or minimizing such adverse effects.

It also assures consideration of the following:

- Air, noise, and water pollution

- Destruction or disruption of man-made and natural resources, aesthetic values, community cohesion, and the availability of public facilities and services

- Adverse employment effects, and tax and property value losses

- Injurious displacement of people, businesses, and farms

- Disruption of desirable community and regional growth

## 1.5    Document Organization

This document is designed to provide readers with a complete record of the environmental process followed to arrive at FHWA's decision to select Phase 1 of the Preferred Alternative (the Central 70 Project) as the project for implementation at this time. This ROD:

- Provides background information on the EIS process for the I-70 East Project as it has evolved during the past 13 years,

- Discusses FHWA's decision to implement the Central 70 Project,

- Responds to overarching concerns raised by the substantive comments that were received on the Final EIS, and

- Presents updates to the analysis and text of the Final EIS and to the Section 4(f) evaluation.

It is comprised of 11 chapters and six attachments that support the information and updates presented. The chapters of this ROD are as follows:

- Chapter 1: Introduction

- Chapter 2: Alternatives Considered

- Chapter 3: Measures to Minimize Harm

- Chapter 4: Central 70 Project

- Chapter 5: Central 70 Mitigation Measures

- Chapter 6: Federal, State, and Local Permits and Approvals

- Chapter 7: Community Outreach and Agency Involvement

- Chapter 8: Comments on the Final EIS and Air Quality Documents

- Chapter 9: Updates and Clarifications since the Publication of the Final EIS

- Chapter 10: Section 4(f) Evaluation Updates

- Chapter 11: References

The attachments to this document are as follows:

- Attachment A: Alternatives Maps

- Attachment B: Updates to Agency Consultation Addendum

- Attachment C: Technical Reports and Addenda

  - C1. Revised Elimination of I-270/I-76 Reroute Alternative Technical Memorandum

  - C2. Updates to Traffic Technical Report Addendum

  - C3. Updates to Conceptual Stage Relocations Technical Report Addendum

  - C4. Updates to Hazardous Materials Technical Report Addendum

  - C5. Updates to Section 106 Determination of Eligibility and Effects

  - C6. Air Quality NEPA Comparison Technical Report

  - C7. Air Quality Conformity Technical Report

  - C8. Updates to Noise Technical Report

  - C9. Updates to Biological Assessment Addendum

  - C10. Updates to Hydraulics and Hydrology Technical Report Addendum

  - C11. Updates to Wetlands and Other Waters of the U.S. Technical Report Addendum

  - C12. Revised Wetland Finding

- Attachment D: Section 106 Programmatic Agreement

- Attachment E: Comments on the Final EIS

- Attachment F: Comments on the Air Quality Documents

# Chapter 2    Alternatives Considered

This chapter provides a summary of the alternatives that were fully analyzed in the 2008 Draft EIS and 2014 Supplemental Draft EIS. It also includes details on the Preferred Alternative identified in the Final EIS and the project's funding scenarios.

To meet the project's purpose and need, as described in Section 1.2 of this document, more than 90 alternatives were considered initially. The project's purpose, need, goals, and objectives were used to develop screening criteria to evaluate the alternatives in the 2008 Draft EIS. Due to the complexity of the project and a large number of initial alternatives, a four-level screening process was used to filter the full range of alternatives considered to the set of reasonable alternatives that were fully evaluated in the 2008 Draft EIS.

The four-level screening process resulted in the following reasonable Build Alternatives that were evaluated in addition to the No-Action Alternative:

- Alternative 1—Existing Alignment with general-purpose lanes
- Alternative 3—Existing Alignment with tolled express lanes
- Alternative 4—Realignment with general-purpose lanes
- Alternative 6—Realignment with tolled express lanes

For more information on the project's goals and objectives and screening criteria, see *Chapter 3, Summary of Project Alternatives*, of the Final EIS.

After the comment period for the 2008 Draft EIS ended, none of the evaluated alternatives had received overwhelming public support, meaning the comments did not help to determine a clear choice of the best alternative for the neighboring areas and corridor travelers. This prompted CDOT and FHWA to undertake a more comprehensive public involvement process to better identify the needs of the local communities and other stakeholders.

A collaborative process, called the PACT, was initiated and involved the public, businesses, and agency stakeholders. Many one-on-one meetings with the impacted community members and elected officials were included in this collaborative process. The PACT members were not able to reach consensus on a preferred alternative, but they did reach consensus on keeping I-70 on its existing alignment and eliminating the realignment alternatives. CDOT and FHWA then revisited and reexamined the 2008 Draft EIS analysis to modify and enhance the alternatives while addressing public comments and continuing to meet the project's purpose and need. This resulted in preparation of the Supplemental Draft EIS, which was released in 2014.

As part of the Supplemental Draft EIS, based on the 2008 Draft EIS public comments, the PACT process, and additional outreach, numerous changes were made to the alternatives,

including revising the Existing Alignment Alternatives (Alternatives 1 and 3) to reduce impacts, eliminating the Realignment Alternatives (Alternatives 4 and 6) from further consideration, and introducing a new alternative (the Partial Cover Lowered Alternative). Additionally, for the purpose of clarity, the name of the Existing Alignment Alternative was changed to the Revised Viaduct Alternative and the alternatives with tolling elements were changed to include a Managed Lanes Option. **Exhibit 2** shows the changes to the alternatives from the 2008 Draft EIS to the 2014 Supplemental Draft EIS (see *Section 3.3* of the Supplemental Draft EIS for more information).

**Exhibit 2        Alternative Modification from the 2008 Draft EIS to the Supplemental Draft EIS**



The Supplemental Draft EIS evaluated the following alternatives:

- No-Action Alternative
- Revised Viaduct Alternative
- Partial Cover Lowered Alternative

Each of these alternatives also included design and operational options. The No-Action Alternative and the Revised Viaduct Alternative included North and South Expansion Options. With the North Option, the highway would expand northward to accommodate the additional width of the highway; with the South Option, the highway would expand southward. The Build Alternatives (Revised Viaduct Alternative and Partial Cover Lowered Alternative) included Operational Options (General-Purpose Lanes or Managed Lanes) to provide a reliable, congestion-free option along the highway. Additionally, the Partial Cover Lowered Alternative included Connectivity Options (Basic and Modified) and included different configurations for interchanges and surface streets.

## 2.1    Alternatives Evaluated in the Final EIS

As a result of the comments received on the Supplemental Draft EIS and additional stakeholder outreach and agency coordination, the Partial Cover Lowered Alternative was refined in the Final EIS to include elements of both the Basic Option and the Modified Option as they were analyzed in the Supplemental Draft EIS. The Final EIS–refined Partial Cover Lowered Alternative maintains interchange access to I-70 at Steele Street/Vasquez Boulevard, as included in the Basic Option, in addition to including the 46th Avenue and local street connectivity improvements and access to I-70 at Colorado Boulevard from the Modified Option. The Revised Viaduct Alternative remained the same in the Final EIS as described in the Supplemental Draft EIS.

> **Proposed drainage**
>
> The No-Action, Revised Viaduct, and Partial Cover Lowered Alternatives include drainage improvements on the north side of I-70 to capture and convey the onsite water runoff from the highway's impervious (paved) area.
>
> The Partial Cover Lowered Alternative also includes an offsite drainage system south of I-70 to capture surface water before it enters the lowered section of the highway

The alternatives that were fully evaluated in the Final EIS include the No-Action Alternative and two Build Alternatives (the Revised Viaduct Alternative and the Partial Cover Lowered Alternative). All of these alternatives include a drainage component.

Capital cost estimates for the alternatives are based on conceptual design and include construction management, construction engineering, indirect costs, and construction costs. The construction costs include earthwork, utility relocation, roadway and structure construction, and right of way. **Exhibit 3** summarizes the preliminary capital cost estimates for the project alternatives.

**Exhibit 3        Project Alternatives Capital Cost Summary**

| Alternatives/Options | Capital Cost, I-25 to Tower Road (in millions of 2016 dollars) | |
|---|---|---|
| | General-Purpose Lanes Option | Managed Lanes Option |
| No-Action Alternative, North Option | $510 | N/A |
| No-Action Alternative, South Option | $600 | N/A |
| Revised Viaduct Alternative, North Option | $1,330 | $1,450 |
| Revised Viaduct Alternative, South Option | $1,450 | $1,570 |
| Partial Cover Lowered Alternative | $1,580 | $1,700 |

### 2.1.1    No-Action Alternative

The No-Action Alternative includes existing, planned, and programmed roadway and transit improvements in the project area, as defined by the DRCOG *2035 Metro Vision*

*Regional Transportation Plan* (MVRTP) (DRCOG, 2015b). Because of the deteriorating condition of the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard, the No-Action Alternative for this project includes a total replacement of the viaduct. This replacement is necessary to maintain safe operation of I-70. There are no improvements proposed between I-25 and Brighton Boulevard or between Colorado Boulevard and Tower Road.

Reconstruction of the existing viaduct in the No-Action Alternative requires additional right of way to maintain traffic flow on I-70 during construction and to rebuild the viaduct in line with current highway design standards. The existing width of the highway bridge from Brighton Boulevard to Colorado Boulevard (three lanes in each direction, six lanes total) is approximately 85 feet. The reconstructed bridge increases the width to 140 feet. This increase in width is due to construction phasing, which will be required to maintain the traffic flow during construction, and adding standard shoulder and lane widths, which are larger than the existing widths. No additional travel lanes will be added.

There are two options for the No-Action Alternative. The North Option pushes the north edge of the highway approximately 70 feet north of the existing viaduct, while the South Option pushes the south edge of the highway 60 feet south.

## 2.1.2   Build Alternatives

The Build Alternatives—the Revised Viaduct Alternative and the Partial Cover Lowered Alternative—include existing, planned, and programmed roadway and transit improvements in the project area, as defined by the DRCOG 2035 MVRTP. They also add capacity to I-70 from I-25 to Tower Road. Capacity is increased by restriping I-70 from I-25 to Brighton Boulevard and widening I-70 from Brighton Boulevard to Tower Road to accommodate additional lanes. The Build Alternatives range from a total of six lanes to 12 lanes, depending on the capacity needs along the corridor.

To address safety issues associated with the aging viaduct between Brighton Boulevard and Colorado Boulevard, the Revised Viaduct Alternative would replace the existing viaduct and the Partial Cover Lowered Alternative would remove it completely and lower the highway below the existing grade with a cover over the highway in the vicinity of Swansea Elementary School.

The Build Alternatives will be constructed up to current safety standards, including lane and shoulder widths and adequate auxiliary lanes. They also will modify most of the bridges and interchanges along the corridor between Brighton Boulevard and Tower Road.

As part of the Build Alternatives, 46th Avenue is redesigned and will continue to serve local traffic

### Elimination of York Street interchange

Because of safety issues related to existing substandard conditions, the Build Alternatives eliminate the York Street interchange.

in the area. For the Revised Viaduct Alternative, 46th Avenue will run underneath the highway viaduct as a two-lane road with turn lanes to provide local east-west connectivity. For the Partial Cover Lowered Alternative, 46th Avenue is a one-way couplet between Brighton Boulevard and Josephine Street and between Milwaukee Street and Colorado Boulevard, with eastbound travel on the south side of I-70 and westbound travel on the north side of I-70. Between Josephine Street and Milwaukee Street, 46th Avenue has two-way operations on both sides of I-70.

Additionally, under the Partial Cover Lowered Alternative on the north side of I-70, 46th Avenue will be discontinued between Clayton Street and Columbine Street to allow for a seamless connection between the school and the highway cover facility. This alternative eliminates the portion of Elizabeth Street north of 46th Avenue and south of 47th Avenue.

For more details on the No-Action Alternative and Build Alternatives, please see *Chapter 3, Summary of Project Alternatives* and *Attachment C, Alternative Analysis,* both in the Final EIS.

### Operational Options: General-Purpose Lanes or Managed Lanes

Two Operational Options were considered for the Build Alternatives to handle the added capacity: the General-Purpose Lanes Option and the Managed Lanes Option. General-purpose lanes are traffic lanes that do not apply any restrictions to the vehicles using them. Managed lanes implement pricing strategies that will be adjusted based on real-time traffic demand on the highway facility. This is accomplished by providing a specially managed travel lane for vehicles to avoid congestion and travel at a higher speed than the general-purpose lanes. The purpose is to provide a reliable, congestion-free option along the highway and provide a way to manage congestion over the long term to reduce the need for future expansion.

The Managed Lanes Option only includes operational strategies for the additional lanes, while keeping the rest as general-purpose lanes. The Managed Lanes Option and the General-Purpose Lanes Option are designed with the same width of approximately 197 feet between Brighton Boulevard and Colorado Boulevard. However, the shoulder widths will be decreased for managed lanes, compared to general-purpose lanes, because of the need for a four-foot buffer between managed and general-purpose lanes in each direction.

There are no additional construction impacts to the surrounding neighborhoods or environments between the two options except at the locations of direct connections. Provisions for access to economically disadvantaged communities are discussed in *Section 5.3, Environmental Justice* of the Final EIS. The construction limits for the Managed Lanes Option increases where there are direct connections from the managed lanes to interchanges. Three proposed direct connections are planned from the managed lanes to Interstate 270 (I-270), Interstate 225 (I-225), and Peña Boulevard to accommodate regional and airport traffic. These direct connections result in a shift of eastbound I-70 to create room for the connections.

## 2.2    Final EIS Preferred Alternative

The Partial Cover Lowered Alternative with Managed Lanes Option was identified as the Preferred Alternative in the Final EIS. The Preferred Alternative removes the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard and lowers the highway below grade in this area. It includes one to two additional lane(s) in each direction from Brighton Boulevard to Tower Road, which will be managed lanes. The existing highway between I-25 and Brighton Boulevard has enough width so that only restriping is necessary to fit the additional capacity.

The Managed Lanes Option is identified as the Operational Option of the Preferred Alternative because of its long-term operational flexibility and mobility. Managed lanes provide drivers with flexibility by allowing them to pay a fee to bypass congestion in the general-purpose lanes. This can improve reliability in travel times. It also allows CDOT to manage congestion over the long term, thereby reducing the need for future expansion. The Managed Lanes Option also has a higher through-put potential in terms of accommodating more people at a given time. This option accommodates express buses and other high-occupancy vehicles and, therefore, it can provide increased service to those riders.

The highway starts descending west of Brighton Boulevard to a maximum depth of approximately 40 feet below the existing ground surface just east of the Union Pacific Railroad (UPRR). This depth is necessary to allow the lowered highway to cross below the existing UPRR railroad crossing. The remaining portion of the lowered section has an average depth of approximately 25 feet below grade. The lowered highway ascends just east of the Burlington Northern Santa Fe (BNSF) Denver Market Lead Railroad to reach the existing grade east of the Colorado Boulevard interchange.

The Preferred Alternative does not provide direct access from westbound I-70 to Steele Street/Vasquez Boulevard or from Steele Street/Vasquez Boulevard to eastbound I-70. Access at Steele Street/Vasquez Boulevard and Colorado Boulevard is provided by a split-diamond interchange. In addition, slip ramps are included to provide an eastbound off-ramp and westbound on-ramp at Colorado Boulevard.

An acceleration/deceleration lane is provided in each direction at the ramp junctions between Brighton Boulevard and Steele Street/Vasquez Boulevard to make it easier for vehicles to safely enter or exit between two facilities with different operational speeds.



**Slip ramps**

A slip ramp generally is located between a freeway mainline and an adjacent frontage road. These ramps allow motorists to "slip" from one roadway to the adjacent parallel roadway. The connection of the slip ramp and the parallel roadway typically is not an intersection, but just a merging zone.

These additional lanes—and space needed for 46th Avenue from Brighton Boulevard to Colorado Boulevard—result in a total width that is approximately three times greater than the existing highway width. **Exhibit 4** shows the total number of lanes and interchange reconstruction as part of the Preferred Alternative.

**Exhibit 4        Preferred Alternative Lane Configuration and Interchange Reconstruction**



**Exhibit 5** shows a typical section for the Preferred Alternative between Brighton Boulevard and Colorado Boulevard. The typical sections shown in these exhibits do not represent the configuration in the covered area of the highway.

The Preferred Alternative continues to provide north-south connectivity at York Street, Josephine Street, Columbine Street, Clayton Street, Fillmore Street, and Steele Street/Vasquez Boulevard. It also provides additional north-south connectivity at Cook Street and Monroe Street over the lowered, reconstructed highway. **Exhibit 6** shows a profile view of the Partial Cover Lowered Alternative from Brighton Boulevard to Colorado Boulevard.

**Exhibit 5**       **Preferred Alternative Typical Section (Between Brighton Boulevard and Colorado Boulevard)**



Note: Shoulder widths may vary but will not exceed what is illustrated in this exhibit.

**Exhibit 6**       **Partial Cover Lowered Alternative Profile View of the Lowered Section (Between Brighton Boulevard and Colorado Boulevard)**





On the north side of I-70, 46th Avenue will be discontinued between Clayton Street and Columbine Street to allow for a seamless connection between Swansea Elementary School and the highway cover facility. This alternative eliminates the portion of Elizabeth Street north of 46th Avenue and south of 47th Avenue.

As part of the Preferred Alternative, the existing UPRR bridge structure that currently passes under the existing viaduct and over 46th Avenue will be reconstructed to allow both I-70 and 46th Avenue to cross below the UPRR. For the BNSF Market Lead Railroad, a new bridge crossing over I-70 and at-grade crossings at 46th Avenue will be provided.

46th Avenue extends across Colorado Boulevard and connects with the existing one-way couplet of Stapleton Drive North and Stapleton Drive South. These streets are extended to the east and connect to the Quebec Street ramps to allow for connectivity between Colorado Boulevard and Quebec Street.

The Preferred Alternative east of Colorado Boulevard includes:

- Removing the existing slip ramps at Dahlia Street and Monaco Street, respectively, and replacing them with a full interchange at Holly Street to avoid conflicts with the geometry of proposed ramp locations at Colorado Boulevard and Quebec Street, as well as to avoid traffic weaving issues

- Maintaining north-south connections at Dahlia Street, Holly Street, Monaco Street, Quebec Street, Central Park Boulevard, Havana Street, Peoria Street, Chambers Road, Airport Road, and Tower Road

- Replacing the I-270 eastbound to I-70 eastbound flyover structure to accommodate the widened highway

- Reconstructing the Quebec Street interchange to maintain the existing access

- Leaving the existing interchange accesses at Havana Street, Central Park Boulevard, Peoria Street, Chambers Road, Airport Boulevard, and Tower Road without modification or reconstruction

- Maintaining the existing highway crossing over the Denver Rock Island Railroad (DRIR) west of Quebec Street

- Including direct connections from the managed lanes to Peña Boulevard, I-225, and I-270

For more details on the Preferred Alternative, please see *Chapter 3, Summary of Project Alternatives* and *Attachment C, Alternative Analysis*, both in the Final EIS.

### 2.2.1    Highway Cover

The Preferred Alternative provides a cover over the highway, located between Clayton Street and Columbine Street in the proximity of Swansea Elementary School. The length of the cover is designed to be less than 1,000 feet due to fire and safety restrictions. A preliminary design for the highway cover is shown in **Exhibit 7**.

CDOT is working with the City and County of Denver (Denver) and Denver Public Schools (DPS) to develop agreements for shared use on the cover and long-term operations and maintenance of the cover. These agreements will be finalized before construction begins.

> **Highway cover**
>
> The cover is intended to be a shared, active space between the surrounding community and Swansea Elementary School. CDOT has worked with the community and the school to identify what amenities work best for the space.
>
> Negotiations are ongoing between Denver and DPS to develop agreements for shared use on the cover and long-term operations and maintenance of the cover.

**Exhibit 7        Preferred Alternative Preliminary Cover Design**



*Note: The design of the elements on the cover continues to evolve throughout the public input process.*

As part of the Preferred Alternative, Elizabeth Street between 46th Avenue and 47th Avenue will be closed to accommodate the proposed redesign of the Swansea Elementary School site to use adjacent parcels.

The cover design includes an urban landscape to serve the community. Strategically placed landscape elements—such as trees and shrubs—are included only at designated locations to minimize the loading on the structure.

The cover is intended to be a shared, active space between the surrounding community and Swansea Elementary School. It is important to provide an active and safe space on the highway cover to maintain the status of the school as a community center in the neighborhood. The school playground is available to the community outside of school hours.

> **Second cover**
>
> To accommodate Denver's interest in constructing a second cover in the future, the Preferred Alternative and the Central 70 Project include an overall approach to design and construction that would not preclude the construction of a second cover over the highway from west of the Steele Street/Vasquez Boulevard highway crossing to east of Cook Street by others in the future.
>
> This second cover is not included as part of the Preferred Alternative or the Central 70 Project.

The design of the cover will have a direct impact on the perception of safety and can influence an individual's willingness to use the space. While designing for safety (and incorporating elements such as lighting and Americans with Disabilities Act (ADA)-compliant facilities) the design also will meet the needs of its users, provide diverse and interesting features, and connect people with place.

The FHWA Livability and Sustainability Principles were utilized on this project during the development of the Preferred Alternative and the design of the highway cover. Incorporation of the highway cover will reconnect the surrounding areas and provide easy and safe connections between these communities for all users, especially pedestrians and bicyclists. The inclusion of the highway cover helps achieve some broader community goals of livability, quality schools, and safe streets.

The landscaped highway cover also supports social connections in the Elyria and Swansea Neighborhood by creating a place where residents and visitors can gather and interact. Based on community input and area needs, the amenities and design in these spaces—such as playgrounds or sports fields (to be determined by the community)—will encourage users to stay and interact.

## 2.3    Environmentally Preferable Alternative

FHWA and CDOT have identified the No-Action Alternative as the Environmentally Preferable Alternative for the I-70 East Project because it causes the least damage to the natural and physical environment.

The identification of the Environmentally Preferable Alternative may involve difficult judgments, particularly when one environmental value must be balanced against another.

To determine the Environmentally Preferable Alternative, all alternatives were compared to one another based on the benefits and impacts they will have to the resources analyzed in *Chapter 5, Affected Environment, Environmental Consequences, and Mitigation,* of the Final EIS.

Although it may seem to be the alternative with the least amount of environmental impacts, the No-Action Alternative does not meet the project's purpose and need. However, it will require fewer residential relocations, has fewer adverse impacts to historical properties, and creates less overall impact to Swansea Elementary School because of the smaller roadway footprint from fewer lanes and leaving 46th Avenue in its current location under the viaduct.

> ### Environmentally Preferable Alternative
>
> Per CEQ regulations (40 CFR §1505.2[b]), the agency is required to identify all alternatives considered in reaching the decision about a preferred alternative, including identifying an environmentally preferable alternative(s).
>
> The Environmentally Preferable Alternative is the alternative that will promote national environmental policy as expressed in NEPA's Section 101. Ordinarily, this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative that best protects, preserves, and enhances historic, cultural, and natural resources.

The No-Action Alternative impacts to the natural environment are much less compared to the Build Alternatives because the No-Action Alternative does not require any construction east of Colorado Boulevard (where most of the wetlands and natural habitats are located) and has a much smaller impervious (paved) surface.

The No-Action Alternative also will result in fewer temporary impacts to rail facilities. The new viaduct can be constructed over the existing railroad segments without disruption to freight service.

These are not the only differences between the No-Action Alternative and the Build Alternatives in regard to resource impacts; however, these are the major factors that ultimately led to the identification of the No-Action Alternative as the Environmentally Preferable Alternative.

## 2.4    Identification of the Preferred Alternative

Although the No-Action Alternative is the Environmentally Preferable Alternative, FHWA and CDOT have identified the Partial Cover Lowered Alternative with Managed Lanes Option as the Preferred Alternative for the I-70 East Project. This alternative has been identified because it meets the project purpose and need, addresses community and stakeholder concerns in the most comprehensive manner, has the most community and agency support as compared to the other alternatives under consideration, and—with the proposed mitigations—causes the least overall impact.

Many factors relating to the needs of the corridor were considered in identifying the Preferred Alternative. The deciding factors are listed below and are described in the following subsections.

- Support from the community
- Environmental justice mitigation measures
- Neighborhood cohesion
- Support from local officials
- Swansea Elementary School location
- Visual and aesthetic qualities
- Drainage

## Support from the community

The project team used an extensive public involvement approach leading up to and following the release of the 2008 Draft EIS, 2014 Supplemental Draft EIS, and 2016 Final EIS. After introducing the Partial Cover Lowered Alternative in the Supplemental Draft EIS, the majority of the public who are directly impacted by the project and live within the project area have consistently expressed a preference for the Partial Cover Lowered Alternative compared to the other reasonable Build Alternative.

## Environmental justice mitigation measures

All evaluated alternatives will result in impacts that include business and residential relocations, increase in noise, disturbing hazardous materials sites, and disruptions during construction. Environmental justice mitigation measures are proposed for each alternative; however, the Partial Cover Lowered Alternative includes additional mitigation measures to alleviate the highway impacts to the low-income and minority populations living in the project area.

The Preferred Alternative will include a highway cover with urban landscaping adjacent to Swansea Elementary School. The cover was developed as mitigation to reconnect the communities that were divided when the viaduct was built in the 1960s. The school property will be redesigned to reconstruct the school playground in a configuration to utilize the additional space from the cover and the adjacent portion of Elizabeth Street, which will be closed.

*Chapter 9, Preferred Alternative Mitigation Commitments*, of the Final EIS lists all the impacts and mitigation measures of the Preferred Alternative. Some of the mitigation measures and benefits unique to the Partial Cover Lowered Alternative include:

- Creating visual benefit by removing the viaduct's visual barrier between Brighton Boulevard and Colorado Boulevard

- Minimizing the presence of the highway in this area since it is below grade and is partially covered

- Reducing highway noise and air quality impacts to the school and adjacent properties by lowering the highway below grade and placing a partial cover over the highway

- Constructing a cover over the highway with an urban landscape area on top of the highway cover adjacent to Swansea Elementary School, providing for greater community cohesion than other alternatives

- Providing $2 million to support affordable housing in the Elyria and Swansea Neighborhood through available programs

## Neighborhood cohesion

All evaluated alternatives will maintain connectivity in the project area, with minor modifications. They also will include bicycle and pedestrian enhancements throughout the area by adding/improving sidewalks and lighting in the neighborhoods. The Partial Cover Lowered Alternative maintains the existing local north-south street network. Additionally, Cook Street and Monroe Street currently do not provide connection across the highway, but are designed to provide connectivity across the highway for vehicles, bicyclists, and pedestrians under the Partial Cover Lowered Alternative. The Partial Cover Lowered Alternative also provides a greater sense of neighborhood cohesion by removing the dominant visual barrier created by the highway structure/viaduct in this neighborhood. The cover connects the Elyria and Swansea Neighborhood back together by providing a shared space for the community to gather.

## Support from local officials

A letter supporting the Partial Cover Lowered Alternative was received on June 6, 2013, from Commissioner Eva Henry of Adams County, Mayor Michael Hancock of Denver, and Mayor Sean Ford of Commerce City. Their preference for this alternative is based on improved pedestrian connections and facilities that are part of the highway cover, as well as overall improvement to north-south and east-west movement in the corridor. A proclamation also was passed by the Denver City Council in support of the Partial Cover Lowered Alternative on April 7, 2014. Additionally, Mayor Michael Hancock has submitted multiple letters after publication of the Supplemental Draft EIS and Final EIS on behalf of Denver reiterating Denver's support of the Partial Cover Lowered Alternative.

Additional letters of support were received during the Final EIS public review period from the North Area Transportation Alliance, Commerce City, and Adams County.

## Swansea Elementary School location

The Swansea Elementary School has been identified by the community as an important and valuable resource in the Elyria and Swansea Neighborhood. The Partial Cover Lowered Alternative provides the best solution compared to the other alternatives to keep the school

in the neighborhood, which was important to the community. The Partial Cover Lowered Alternative also redesigns and expands the school grounds and provides upgrades to the school building.

## Visual and aesthetic qualities

The Partial Cover Lowered Alternative removes the viaduct and reconstructs the highway between Brighton Boulevard and Colorado Boulevard to a maximum depth of 40 feet below the existing ground level, while also adding capacity to the existing facility. Although this alternative increases the highway's total concrete surface similar to the Revised Viaduct Alternative, it does not increase the highway's visible mass to sensitive neighborhood viewers because a large portion of the highway in this area is below ground level and out of sight from surrounding communities.

Noise walls or safety barriers of 10 feet to 20 feet in height will be included, which will provide an opportunity for inclusion of artwork in the neighborhood. Noise walls or safety barriers will not be constructed in the area where the highway cover is located, providing an unobstructed north-south view across the highway for the residents of the Elyria and Swansea Neighborhood.

## Drainage

With the Partial Cover Lowered Alternative, an extensive drainage system is required on the north and south sides of I-70. An onsite drainage system north of the highway is designed for all alternatives to capture and convey the onsite stormwater from the highway's impervious (paved) area and discharge it into the South Platte River. The Partial Cover Lowered Alternative indirectly improves drainage in the surrounding neighborhoods and will help reduce flooding incidents in the neighborhood north of the highway.

The drainage system south of I-70 with the Partial Cover Lowered Alternative is designed to collect offsite storm flows from south of the highway prior to entering the lowered section of the highway and discharge them to the South Platte River. Criteria for the 100-year event (a flood of such a magnitude that it has a 1-percent chance of happening in any given year) are being used for the design to intercept all offsite flows that would potentially reach the below-ground section of the Partial Cover Lowered Alternative. Applying these criteria ensures protection from large-event drainage flows entering the lowered roadway section.

The No-Action Alternative and the Revised Viaduct Alternative do not require a south offsite drainage system because the offsite flows under those alternatives will continue to flow under the highway.

## 2.5    Design Refinements to the Preferred Alternative

There have been minor adjustments and refinements to the project's design of the Preferred Alternative. The changes to the design resulted from public and agency comments on the Final EIS and continued evaluation of the Build Alternatives. This involved additional traffic analysis performed as part of the Interchange Access Request—namely, micro-simulation traffic analysis—and the advanced designs required for approvals related to local infrastructure and railroad coordination.

> ### Interchange Access Request
>
> An Interchange Access Request is submitted to FHWA for review and approval to make modifications to existing interchanges. A request usually includes detailed traffic analysis and how the improvements meet the eight "Considerations and Requirements" set forth in FHWA's policy.

These design refinements include, but are not limited to:

- Incorporating sign structures outside of the project's reconstruction limits leading drivers to the managed lanes

- Revising some intersection configurations to allow for better traffic operations

- Designing a new node building (building that houses the Electronic Tolling Collection (ETC) equipment and the Intelligent Transportation Systems (ITS) equipment on the east end of the project

- Installing ramp meters at entrance ramps from Washington Street, Brighton Boulevard, Vasquez Boulevard/Steele Street, Colorado Boulevard, Holly Street, and Quebec Street

- Installing new conduits east and west of the project limits to allow for fiber-optic connections to the Colorado Transportation Management Center

- Adding turn lanes on frontage roads and other surface streets

- Revising on- and off-ramps, railroad crossings, structures, and managed lane ingress/egress locations

- Revising the offsite drainage system

Additionally, the construction limits were expanded to the public right-of-way lines east of Quebec Street to better accommodate construction. These changes do not result in additional full right-of-way acquisitions or relocations and do not change the overall result of the analysis performed for any of the alternatives. The analyses of various resources have been updated since publication of the Final EIS to include the changes in the construction limits, and these changes are captured in this document in Chapter 9, Updates and Clarifications since the Publication of the Final EIS. *Attachment A, Alternatives Maps,* of this document provides a visual representation of the project alternatives, including the changes in the intersection configurations and construction limits.

## 2.6    Selection of the Central 70 Project

Although the Partial Cover Lowered Alternative was identified as the Preferred Alternative in the Final EIS, CDOT and FHWA select the Central 70 Project for construction at this time due to funding limitations. The Central 70 Project incorporates portions of the Preferred Alternative for the I-70 East Project. The remainder will be built as funding becomes available and if approved in a future ROD. See Chapter 4, Central 70 Project, of this document for more detail.

This page intentionally left blank.

# Chapter 3    Measures to Minimize Harm

The Preferred Alternative was introduced originally as an alternative to reduce the visual presence of the viaduct in the neighborhoods, improve connectivity, and enhance safety. Removing the viaduct improves safety compared to the existing conditions by eliminating the possibility for objects to fall from the structure, removing the dark space under the viaduct, and eliminating the unsafe crossings as they currently exist under the viaduct.

Additional measures to reduce impacts to the surrounding properties and historic resources along the corridor include, but are not limited to:

- Using a 4-percent grade on I-70 will allow the highway to cross over Brighton Boulevard and under the UPRR Bridge without reconstruction of the existing infrastructure west of Brighton Boulevard; a lower grade would cause additional impacts to the infrastructure west of Brighton Boulevard

- Reducing the typical section for 46th Avenue and Stapleton Drive to the greatest extent possible by removing excess width between I-70 and the frontage roads

- Adjusting the I-70 mainline geometry using a lower design speed as compared to the 2008 Draft EIS to minimize the highway footprint between Brighton Boulevard and Colorado Boulevard

- Locating interchange ramps parallel to the I-70 mainline with walls to maintain adequate traffic operations while reducing impacts to the neighborhoods

- Using buffer-separated managed lanes rather than concrete barriers, because a concrete barrier requires additional shoulder width for both the general-purpose lanes and managed lanes, but the striped buffer only requires a four-foot space between the two lane groups.

All practicable means to avoid or minimize environmental harm from the project's Preferred Alternative have been adopted, and appropriate measures to mitigate any environmental harm caused by the Preferred Alternative have been identified. For a full list of mitigation measures associated with the Preferred Alternative, see *Chapter 9, Preferred Alternative Mitigation Commitments,* of the Final EIS.

Considering the comments received on the project alternatives, the project team has developed additional mitigation measures for environmental justice and historic resources beyond those required or normally provided in Colorado to lessen the adverse impacts in the project area. Any mitigation measures included in the ROD for the project must and will be completed (even if the project has funding issues as it is constructed). These impacts and the corresponding additional mitigation measures include, but are not limited to, the following:

- **Highway cover.** To reduce impacts to Swansea Elementary School, reconnect the Elyria and Swansea Neighborhood, and improve community cohesion, CDOT will

construct a cover over I-70, including an urban landscape on top with a base level of landscaping necessary to provide an active community space for surrounding residents and local neighborhoods, support social and pedestrian connections in the neighborhood, and provide additional space for the school.

- **Funding and financial counseling for displaced persons.** To alleviate impacts to displacees who have inadequate financial resources, CDOT has provided funding to the Community Resources and Housing Development Corporation (CRHDC). CRHDC will use these funds to assist residential and business displacees by providing financial counseling and helping them procure financing for replacement properties and secure business and residential loans. All displaced residents and businesses will, in addition, be entitled to benefits provided under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act), as amended.

- **Interior storm windows and air conditioning.** To reduce impacts from dust and noise during construction, for homes between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard, CDOT will provide:
  - Interior storm windows
  - Furnace filters
  - Two portable or window-mounted air conditioning units with air filtration and assistance to pay for the additional utility costs during construction

- **$2 million for low-income housing.** To offset loss of residential units in the Elyria and Swansea Neighborhood, CDOT will provide $2 million through available programs to support affordable housing in the Elyria and Swansea Neighborhood.

- **$100,000 to facilitate access to fresh food.** To alleviate impacts caused by relocating two convenience stores in the Elyria and Swansea Neighborhood, CDOT will provide $100,000 toward the Denver Office of Economic Development's Globeville/Elyria-Swansea (GES) Healthy Food Challenge that will help facilitate access to fresh food (https://www.denvergov.org/content/denvergov/en/denver-office-of-economic-development/funding-opportunities.html).

- **Addressing equity impacts of access to the tolled express lanes.** As described in the Final EIS, the financial burden of the tolled express lanes affecting the residents of Globeville, Elyria, and Swansea have led CDOT to the determination that there are potential equity impacts on low income and minority populations. CDOT has decided to mitigate those impacts through the development of an operational program and policies to reduce the burdens to those residents. Equity impacts for the financial burden of access to the tolled express lanes will be mitigated by providing to eligible residents of Globeville, Elyria, and Swansea free transponders, pre-loading of tolls, or other means determined prior to the opening of the tolled express lanes. Eligibility and the duration of the program are expected to be determined based on factors including, but not limited to, residency, financial burden, number of vehicles per resident or household, etc. The entire program of

actions will not go into effect immediately; however, the details of the program will be developed, with community involvement, nearer to tolling operations commencement. The initiation of these program actions is anticipated to commence approximately 2022. As part of the program, all communities and stakeholders potentially affected will be invited to participate in the operational strategy development.

- **Swansea Elementary School.** To mitigate impacts to Swansea Elementary School, CDOT will redesign and reconstruct the Swansea Elementary School playground, including building a playground in a temporary location during construction and rebuilding school parking facilities. Other mitigation measures for the school include:
  - o Installing new windows and doors and providing a new heating and ventilation system (HVAC) to mitigate for increased dust and noise during construction
  - o Building two additional classrooms

- **Documentary on the history of I-70 East.** To mitigate impacts to historic properties in the area, CDOT provided funding for and participated in the creation of a documentary covering the history of I-70 East and its relationship to the Elyria and Swansea and Globeville neighborhoods. This documentary is available on the project website at www.i-70east.com.

As the design advances, more detailed design decisions and more specific commitments will be made to minimize both environmental impacts and impacts to adjacent properties. CDOT will continue to coordinate with stakeholders and agency partners, including Denver, the Public Utilities Commission, the Regional Transportation District (RTD), the Air Pollution Control Decision (APCD) of Colorado Department of Public Health and Environment (CDPHE), and the U.S. Army Corps of Engineers (USACE) throughout the design and construction phases to ensure the minimum disruption takes place.

This page intentionally left blank.

# Chapter 4    Central 70 Project

FHWA and CDOT identified a Preferred Alternative for the I-70 East Project in the Final EIS, which is described in Section 2.2 of this document. In this document, FHWA selects the Central 70 Project, previously defined as Phase 1 of the Preferred Alternative.

This chapter describes the following elements for the Central 70 Project: funding scenario, description and components included, logical termini and independent utility, how the Central 70 Project addresses the project's purpose and need, and impacts.

## 4.1    Central 70 Project Funding Scenario

The entire Preferred Alternative identified in the I-70 East Final EIS is estimated to cost approximately $1.7 billion (based on preliminary design estimates in 2016 dollars)—including design, right-of-way acquisition, and construction—which is more than the $1.1757 billion currently identified in the DRCOG Fiscally Constrained RTP, as amended (DRCOG, 2016). The following funding sources currently are committed for the Central 70 Project, which is estimated to cost $1.1 billion.

- $850 million—Colorado Bridge Enterprise Safety Surcharge
- $50 million—DRCOG: Surface Treatment Program-Metro (STP-Metro) and Congestion Mitigation Air Quality (CMAQ)
- $180 million—Senate Bill 09-228 Transfers
- $37 million—Denver

The selection in this ROD to implement the Central 70 Project is consistent with the 2008 FHWA guidance, *Transportation Planning Requirements and Their Relationship to NEPA Process Completion* (along with the February 2011 supplement), to have funding for projects identified before final decisions are made. Because funding for the entire project had not been identified at the time the Final EIS was published, FHWA and CDOT planned for phased implementation of the project and the use of a multiple ROD approach.

The elements included in the Central 70 Project are consistent with the projects, priorities, and funding identified in the Fiscally Constrained RTP. Following the publication of the Final EIS, FHWA performed an independent cost estimate review to verify the accuracy and reasonableness of the project's cost estimate. FHWA's review used a probabilistic approach that included risk events and inflation. The results of the review indicated the total project, including past costs, would have a current-year cost between $1.424 billion to

### Central 70 Project delivery

The project team has been using a parallel NEPA and contractor selection process (procurement) in accordance with 23 CFR §636 to expedite the delivery of the project.

$1.866 billion, with a year of expenditure cost ranging from $1.721 billion to $2.329 billion. The Central 70 Project would cost, in current-year dollars, between $1.016 billion and $1.291 billion, with a year of expenditure of $1.097 billion to $1.402 billion.

## 4.2    Description of the Central 70 Project

The Central 70 Project incorporates portions of the Preferred Alternative for the I-70 East Project. It includes improvements to an approximately 10-mile stretch of I-70 East from I-25 to Chambers Road, adding one new tolled express lane in each direction, removing the aging 50+-year-old viaduct, lowering the highway between Brighton Boulevard and Colorado Boulevard, and placing a four-acre cover over a portion of the lowered highway. **Exhibit 8** provides an overview of the Central 70 Project.

Although striped for only one tolled express lane, the lowered section of the highway will be constructed to the full width because it is more cost effective to construct the whole width now than to perform additional future expansion. It also avoids later impacts. However, due to funding limitations, widening to the full width east of Quebec Street is not feasible. Therefore for lane continuity, only a single lane will be striped from Brighton Boulevard to Quebec Street, even though the highway in this area will be wide enough to accommodate two lanes. When funding becomes available for the future phases of the project, an additional lane will be added throughout the project corridor.

> ### Managed lanes vs. tolled express lanes
>
> The Managed Lanes Option was identified as the Operational Option of the Preferred Alternative.
>
> CDOT has elected to manage the additional lanes on I-70 East by implementing tolled express lanes. In this chapter, this document will refer to the additional lanes as tolled express lanes (rather than managed lanes). See Section 8.2 of the Final EIS (page 8-3) for more information.

**Exhibit 8          Central 70 Project Overview**



*Note: Signing and ITS elements extend beyond the limits shown above.*

## Restriping, Reconstruction, and Widening

The restriping, reconstruction, and widening elements of the Central 70 Project include:

- Restriping the existing highway from I-25 to Brighton Boulevard to accommodate one additional tolled express lane in each direction to provide a transition between the existing I-70/I-25 interchange and the recently reconstructed highway

- Fully reconstructing I-70 from Brighton Boulevard to the bridge over Sand Creek (near I-270), adding one tolled express lane in each direction

  o Removing the existing viaduct between Brighton Boulevard and Colorado Boulevard, and rebuilding I-70 below grade along this segment, expanding the roadway to the north of the existing alignment (see **Exhibit 9**)

  o Fully reconstructing I-70 and the associated frontage road between Colorado Boulevard and Quebec Street

  o Including pavement width for the addition of two tolled express lanes in each direction from Brighton Boulevard to Quebec Street (but only striping one tolled express lane from Brighton Boulevard to Chambers Road for lane continuity)

  o Replacing the existing UPRR bridge structure—currently located beneath the viaduct—and any corresponding track work; I-70 mainline and 46th Avenue will cross under the UPRR bridge

  o Constructing a bridge span over I-70 and separate at-grade crossings for the BNSF Market Lead Railroad line at 46th Avenue North and 46th Avenue South, including track design to accommodate the new structures

- Minor widening and restriping to add one tolled express lane in each direction between Quebec Street and Chambers Road (see **Exhibit 10**)

**Exhibit 9**        **Central 70 Project Typical Section (Between Brighton Boulevard and Colorado Boulevard)**



*Note: Shoulder widths may vary but are not to exceed what is illustrated in this exhibit.*

**Exhibit 10        Central 70 Project Typical Section (Between Colorado Boulevard and Chambers Road)**



*Note: The number of general-purpose and auxiliary lanes vary within the widening section (Quebec Street to Chambers Road) to match existing conditions. Roadway widening is to accommodate the additional tolled express lane.*

## Highway Cover

The Central 70 Project includes construction of a highway cover between the Clayton Street and Columbine Street bridges, adjacent to Swansea Elementary School (see Section 2.2.1, Highway Cover, of this document, for more information).

## Connectivity and 46th Avenue

Local north-south and east-west connectivity with the Central 70 Project includes:

- Maintaining north-south connections over the lowered freeway as two-way or one-way streets as they currently exist at Brighton Boulevard, Josephine Street, Columbine Street, Clayton Street, Fillmore Street, Steele Street/Vasquez Boulevard, and Colorado Boulevard (see **Exhibit 11**); York Street will become a two-way street north of 46th Avenue North

- Providing additional north-south connectivity across I-70 at Cook Street and Monroe Street

- Moving 46th Avenue to the north and south side of the highway from its current location under the viaduct, becoming a pair of frontage roads allowing one-way traffic or two-way traffic depending on location (46th Avenue North runs parallel to I-70 on the north side and 46th Avenue South runs parallel to I-70 on the south side)

**Exhibit 11          Central 70 Project North-South Connectivity**



## Interchange Modifications

The modifications to interchanges as part of the Central 70 Project include (see **Exhibit 12**):

- Installation of ramp meters at entrance ramps from Washington Street, Brighton Boulevard, Steele Street/Vasquez Boulevard, Colorado Boulevard, Holly Street, and Quebec Street—existing ramp meters at Central Park Boulevard, Havana Street, and Peoria Street will remain in place

- Replacing the ramps at the Brighton Boulevard interchange

- Removing the York Street interchange and ramps

- Creating a split-diamond interchange configuration with one-way frontage roads between Steele Street/Vasquez Boulevard and Colorado Boulevard with slip ramps at Colorado Boulevard for the eastbound off-ramp and westbound on-ramp

- Removing the existing slip ramps at Dahlia Street and Monaco Street, and replacing them with a full interchange at Holly Street

- Replacing the I-270 eastbound to I-70 eastbound flyover structure

- Widening Quebec Street between the ramp terminals, with minimal vertical alignment changes and reconstructing the interchange ramps, to allow for a center pier for the I-70 bridge replacement

- Making no changes to the Central Park Boulevard interchange, which has been constructed recently, so it will not be disturbed as part of this project

- Making no changes to the Havana Street interchange, which is currently being reconstructed, so it will not be disturbed as part of this project

- Building a new bridge at Peoria Street to maintain the required width for the additional lanes along I-70, widening Peoria Street to accommodate the center pier

**Exhibit 12       Central 70 Project Lane Configuration and Interchange Reconstruction**



## Tolled Express Lanes

The tolled express lanes are included as part of the Central 70 Project strictly as a traffic management strategy. Toll rates will be established by the High Performance Transportation Enterprise (HPTE) Board of Directors and will be set at a level necessary to maintain free-flow traffic conditions in these lanes. Existing general-purpose lanes will not be tolled. The project will comply with the state laws at the time of implementation regarding tolled express lanes and high-occupancy vehicles.

- Ingress/egress locations to allow vehicles to enter and exit the tolled express lanes are located in the general vicinity of Brighton Boulevard, Holly Street, Peoria Street, and I-225 (See *Attachment A, Alternatives Maps* for location of ingress/egress points).

- No express lane direct connections or flyovers (at I-225, I-270, or Peña Boulevard) are included in the Central 70 Project.

- Tolled express lanes, infrastructure, sign structures, tolling facilities, and ITS node buildings will be constructed and installed along the project area.

**Associated Facilities/Infrastructure and Drainage**

The drainage infrastructure and other facility improvements associated with the Central 70 Project include:

- Drainage facilities are included for both the interstate facility and reconstructed local streets adjacent to the highway.

- Stormwater detention facilities also will be constructed.

- Drainage, including the onsite drainage improvements on the north side of I-70 to capture and convey the onsite water runoff and the offsite drainage system to capture surface water before it enters the lowered section of the highway, is included in the Central 70 Project. See Section 9.12 for information on the drainage system needed for the project.

- Other general improvements along the reconstructed 46th Avenue between Colorado Boulevard and Brighton Boulevard will include lighting, pedestrian and bicycle amenities, and other streetscape improvements.

- All pedestrian improvements made as part of the project will comply with the ADA.

## 4.3    Logical Termini and Independent Utility

The identification of the Preferred Alternative in the Final EIS and the Central 70 Project in this document is consistent with FHWA guidance that transportation solutions:

- Be evaluated on a broad scale that provides meaningful analysis and avoids segmentation

- Connect logical termini

- Have independent utility

- Do not restrict consideration of alternatives for other reasonably foreseeable future projects (23 CFR §771.111(f))

When a project is determined to be a reasonable expenditure of public funds to solve problems identified in the project's purpose and need, and would be usable even if no additional improvements are made in the area, it is said to have independent utility. Logical termini are defined as rational end points for a transportation improvement and are of sufficient length to address environmental matters on a broad scope. Section 4.2 of this document identifies the Central 70 Project.

A NEPA proposed action must have rational physical end points and allow for review of environmental impacts on a broad scale. *Chapter 8, Phased Project Implementation*, of the Final EIS identified phases for the entire Preferred Alternative. All phases have independent utility and logical termini. CDOT and FHWA intend to work toward implementation of the Final EIS Preferred Alternative in its entirety through a multiple ROD (phased) approach as funds become available.

On the western end of the Central 70 Project, I-25 serves as a logical terminus. Traffic studies show that half of westbound traffic on I-70 exits onto I-25. In fact, recent traffic projections show only a 4-percent growth in travel along the portion of I-70 west of the I-25/I-70 interchange during the next 30 years. I-25 is consistent with the western terminus of the Preferred Alternative for the I-70 East Project in the Final EIS.

Chambers Road serves as the logical eastern terminus for the Central 70 Project. Eastbound volumes generally decrease up to Central Park Boulevard, where there are approximately 68,000 vpd. The merge of I-270 results in volumes increasing by nearly 50,000 vpd, resulting in a directional high of 118,000 vpd. East of this merge, volumes begin to decrease again at each interchange, with significant diverging volumes at Chambers Road and Peña Boulevard. East of Peña Boulevard, I-70 has only two eastbound lanes and volumes are between 25,000 vpd and 35,000 vpd.

The improvements included in the Central 70 Project do not restrict the consideration of alternatives for the reasonably foreseeable adjacent projects. The construction of the Central 70 Project has independent utility because it provides transportation benefits by decreasing congestion and overall travel times along I-70 East, and is a reasonable expenditure even if no additional improvements are made. The improvements in the Central 70 Project have logical termini, and the environmental impacts have been considered on a broad enough scale.

## 4.4    Responsiveness to Purpose and Need

The Central 70 Project would contribute to addressing elements of the project purpose and need, as described in the following subsections. The I-70 East Preferred Alternative provides additional improvements that will further address transportation infrastructure deficiencies, increased transportation demand, limited transportation capacity, and safety concerns.

### 4.4.1    Transportation Infrastructure Deficiencies

I-70 was built in the early 1960s, with bridge and drainage structures designed to last for 30 years. Nine structures on the corridor are now past their anticipated lifespan and are classified as either structurally deficient or functionally obsolete and in need of repair, rehabilitation, or replacement. Deficiency details are outlined in *Section 2.5.1, Transportation Infrastructure Deficiencies*, of the Final EIS.

The Central 70 Project will address the deteriorating transportation infrastructure by:

- Removing the aging viaduct between Brighton Boulevard and Colorado Boulevard and replacing it with a below-grade highway in this area

- Addressing problems with structural deficiencies on the other I-70 structures by replacing them

## 4.4.2    Increased Transportation Demand

The 2010 and 2035 DRCOG travel demand models have shown recent population and employment growth within the Denver region, which has resulted in increased travel demand on the I-70 East corridor. For more information, see *Section 2.5.2, Increased Transportation Demand*, of the Final EIS.

As supported in *Chapter 8, Phased Project Implementation,* of the Final EIS, the Central 70 Project will provide for reasonable access to transportation facilities by:

- Balancing the need for access with adverse effects on system performance by reconfiguring and consolidating interchanges
- Providing access to transportation facilities for a variety of users by improving interchanges, providing updated sidewalks, and following Denver's bike plan
- Facilitating connections between residential and business activity centers by improving the frontage roads and the interstate access points

The Central 70 Project will enhance mobility by providing transportation choices that:

- Enhance system reliability by providing a congestion-free lane (tolled express lane)
- Balance the transportation needs of local, regional, and national users by providing improvements on an interstate system that is used by local, regional, and national travelers

## 4.4.3    Limited Transportation Capacity

I-70 currently serves close to or more than the capacity of vehicle traffic for which it was designed. Depending on the location along the corridor, between 52,000 vpd and 220,000 vpd travel through the project area. Forecasted traffic volumes for the year 2035 (with or without improvements) show that traffic on I-70 will increase substantially, carrying between 95,000 vpd and 270,000 vpd (DRCOG, 2013).

The Central 70 Project will provide for realistic capacity expansion and minimized future congestion leading to:

- A sufficient transportation system capacity to ensure the efficient movement of people and goods
- Minimized transportation system delay by providing a reliable system through a providing a congestion-free lane (tolled express lane)
- Flexibility for future expansion and modification by preserving right of way, especially in the lowered section of the highway
- Practical and implementable technologies that incorporate a tolled express lane and can take advantage of the latest tolling technologies

### 4.4.4    Safety Concerns

Within the limits of the project, I-70 generally experiences more crashes than the state average for urban freeways. As supported in *Section 2.5.4, Safety Concerns,* of the Final EIS, these crashes cause unpredictable and unavoidable traffic congestion, which adds to or worsens the already existing congestion from travel demand that exceeds the normal roadway capacity. The unpredictable nature of traffic congestion on I-70 increases safety concerns for freight carriers, employers, manufacturers, and business interests in the region, as well as commuters and residents who depend on reliability for their daily travel.

The Central 70 Project will address safety needs and upgrade facilities to current standards by:

- Optimizing safety, thereby minimizing crashes by conforming to engineering design, safety standards, and standard practices for construction, maintenance, and operations
- Providing access for emergency response and evacuation situations through adequate shoulder widths on the highway and ramps and acceleration/deceleration lanes

## 4.5    Central 70 Project Environmental Impacts

Any updates to the Preferred Alternative (previously described in Section 2.5) that resulted in changes to the outcome of the analysis also were evaluated for the Central 70 Project. **Exhibit 13** lists the impacts of the Central 70 Project for each resource. More detail on the impacts and analysis is available in the technical reports attached to this document, if applicable, or in the attachments to the Final EIS. For information on specific determinations and other monitoring or enforcement requirements for the Central 70 Project, see Chapter 6, Federal, State, and Local Permits and Approvals, of this document.

**Exhibit 13        Summary of the Central 70 Project Impacts**

| Transportation |
| --- |
| • Temporary road closures and traffic detours may have impacts on access to certain public services |
| • Improved pedestrian/bicycle facilities |
| • Improved traffic operations due to the addition of new lanes, improvement to ramps, addition of auxiliary lanes, improvements to roadways, and modification of interchanges |
| • Temporary impacts to rail facilities will result from the construction of railroad bridge structures and/or the relocation of track operations |
| • Impacts to local traffic volumes caused by removal of the York Street interchange and changes to the Steele Street/Vasquez Boulevard interchange and the Colorado Boulevard interchange |
| • Improved transportation operations, preservation of transportation capacity, and the ability to provide reliable travel times |

**Exhibit 13        Summary of the Central 70 Project Impacts**

| Social and Economic Conditions |
| --- |

- 56 residential relocations
- 17 business relocations (includes one non-profit relocation)
- Acquisition of right of way from the buffer area between 46th Avenue and the field to the south of Swansea Elementary School
- Temporary effect to the regional economy from construction-related traffic congestion
- Temporary road closures and traffic detours may have impacts on access to certain public services
- $1,736.3 million of regional economic output (9,000 person years of employment)

| Environmental Justice |
| --- |

- Creating new construction-related jobs
- Building the highway to updated standards and improving mobility
- Increasing noise and dust during construction
- Potential for disturbing hazardous material sites during construction
- Impacting mobility during construction due to detours
- Temporarily closing or delaying, or permanently rerouting, public transit services in the area
- Removing the viaduct's visual barrier between Brighton Boulevard and Colorado Boulevard
- Minimizing the presence of the highway in environmental justice areas, since it is below grade and is covered
- Providing multi-modal safety from improved lighting and sidewalks at north-south connections
- Displacing the Pilot Travel Center truck stop, which will eliminate a point-source location for air pollution
- Reducing highway noise and air quality impacts to Swansea Elementary School and adjacent properties by placing a cover over the highway
- Keeping the Nestlé Purina Petcare Company at its existing location
- Improving safety of north-south pedestrian and bicycle connectivity compared to the existing conditions by eliminating unsafe crossings underneath the viaduct
- Relocating 56 residences
- Impacting 109 noise receptors
- Moving the highway closer to Swansea Elementary School
- Displacing Stop N Shop and Pilot Travel Center truck stop
- Creating visual obstruction with safety barriers; eliminating views across the highway
- Creating reliable travel times
- Providing congestion-free lanes
- Reducing congestion in all travel lanes
- Creating a financial burden to low-income community, who may not be able to afford to use the tolled express lanes

| Land Use |
| --- |

- 56.2 acres converted to transportation use
- Creation of a four-acre cover, with public park/open space land use

| Relocations and Displacements |
| --- |

- 56 residential relocations
- 17 business relocations (includes 1 non-profit relocation)

**Exhibit 13        Summary of the Central 70 Project Impacts**

| Historic Preservation |
|---|
| • Adverse Effect—13 historic resources |
| • No Adverse Effect—72 historic resources |
| • No Effect—2 historic resources |
| • Temporary impacts may include dust and debris, visual and auditory degradation related to construction activities, and decreased access |

| Paleontological Resources |
|---|
| • Increased potential for encountering paleontological resources in excavated bedrock of the Denver and Arapahoe Formations |

| Visual Resources and Aesthetic Qualities |
|---|
| • Introducing public space to the area and reducing the roadway's visual dominance by removing the existing viaduct will enhance the visual quality |
| • Ground-level noise walls or safety barriers are less intrusive to viewers' eyes compared to the No-Action and Revised Viaduct Alternatives, but they also introduce a new visual impact by blocking the view across the highway |
| • Views for drivers traveling eastbound and westbound will be entirely different from the existing conditions |
| • New features of the project (e.g., detention ponds, retaining walls) will change the visual environment along the project corridor |
| • Tolled express lanes will create new visual impacts along the project corridor due to the introduction of infrastructure |

| Parks and Recreational Areas |
|---|
| • South Platte River Greenway (Section 6(f) resource) temporary impacts may occur during construction |
| • 0.95 acre of impact to Swansea Elementary School |
| • Impacts from construction of the Globeville Landing Park Outfall (GLO) will result in a temporary non-conforming use under Section 6(f) to Globeville Landing Park during the construction of the enhancements |
| • Part of Globeville Landing Park will be closed during construction |

| Air Quality |
|---|
| • Mobile source air toxic (MSAT) emissions decline dramatically over the life of the project, but could increase temporarily during construction |
| • Construction fugitive dust could cause temporary impacts |
| • No violation of the National Ambient Air Quality Standards (NAAQS) |

| Energy |
|---|
| • 70.0 billion British thermal units (Btu) consumed per day (daily Btu is calculated based on study area, which is the same for all phases) |
| • 5,808 billion Btu consumed during construction |

| Noise |
|---|
| • Number of noise receptors that exceed the Noise Abatement Criteria (NAC) threshold |
|     • Globeville: 27      • Swansea: 37      • Montbello: 3 <br>     • Elyria: 40 (11 increase substantially—  • Stapleton: 0      • Aurora: 2 <br>       by 10 dBA or more)      • Peoria Street: 0 |
| • Construction noise will present short-term effects to those dwelling units located along the corridor and along designated construction access routes |

| Biological Resources |
|---|
| • 369.2 acres of permanent, direct impact to wildlife habitat |
| • 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas |

## Exhibit 13      Summary of the Central 70 Project Impacts

| Floodplains and Drainage/Hydrology |
|---|
| • Impact to potential ponding areas due to the increased width of the highway, which may increase runoff from I-70 |
| • The potential ponding areas between Brighton Boulevard and Dahlia Street will be substantially impacted due to lowered profile of the highway |

| Wetlands and Other Waters of the U.S. |
|---|
| • 5.507 acres of permanent impacts and 0.081 acres of temporary impacts to wetlands |
| • 0.219 acres of permanent impacts and 0.556 acre of temporary impacts to other waters of the U.S |

| Water Quality |
|---|
| • Increase in runoff total suspended solids (TSS) loads of six percent to the South Platte River |
| • Increase in runoff TSS loads of 18 percent to Sand Creek |
| • Stormwater runoff can create erosion and degradation of water quality during and after construction |
| • Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff |

| Geology and Soils |
|---|
| • Excavation is anticipated to extend below the depth of groundwater from approximately the UPRR to Columbine Street |
| • Temporary impacts to groundwater during excavation |

| Hazardous Materials |
|---|
| • 34 hazardous material sites affected |
| • 750 acres of land disturbed |
| • Extensive excavation through a known landfill that contains contaminants |
| • Construction activities at hazardous material sites have the potential to spread soil or groundwater contamination |
| • Construction at hazardous material sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found |

| Utilities |
|---|
| • All utility types will be affected to some extent |
| • Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width |
| • Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency |

| Section 4(f) |
|---|
| • Use of Swansea Elementary School Public Playground |
| • Use of Globeville Landing Park |
| • Use of 22 historic resources, which includes 9 de minimis impact determinations |

This page intentionally left blank.

# Chapter 5    Central 70 Mitigation Measures

Per the *CDOT NEPA Manual* and as discussed in Chapter 3, Measures to Minimize Harm, of this document, prior to mitigation, CDOT always makes best efforts to:

- Avoid the impact altogether by not taking a certain action or parts of an action

- Minimize impacts by limiting the degree or magnitude of the action and its implementation

However, if avoidance or minimization is not feasible, then mitigation measures may be implemented, including:

- Rectifying the impact by repairing, rehabilitating, or restoring the affected environment

- Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action

- Compensating for the impact by replacing or providing substitute resources or environments (CEQ, 40 CFR §1508.20)

FHWA regulations require that mitigation measures presented as commitments in the EIS be incorporated into a project (FHWA and FTA, 23 CFR §771.109[b] and 23 CFR §771.125[a][1]). Monitoring conducted during project construction and operations is the means to ensure mitigation measures are implemented effectively. If monitoring identifies any deficiencies in mitigating the impact, adjustments to the level, timing, and/or procedure of mitigation must be made accordingly.

Mitigation commitments are specific and include information regarding responsibility, monitoring, performance standards, and schedules for implementation. This ROD makes commitments about implementing and monitoring the proposed mitigation measures legally binding. **Exhibit 14** on the following pages includes impacts and mitigation measures for the Phase 1 project. This table is consistent with the CDOT Mitigation Tracking Form and will be used by CDOT and the developer through the design, construction, and maintenance phases to ensure that all mitigation commitments are met.

**Exhibit 14       Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 1 | Transportation | Temporary road closures and traffic detours may have impacts on access to certain public services | Coordinate with RTD for phasing of improvements to minimize disruptions to transit operations | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Chapter 4, p. 4-56 |
| 2 | Transportation | Temporary road closures and traffic detours may have impacts on access to certain public services | Coordinate with RTD more than 30 days in advance during construction to minimize disruptions to service areas and schedules and notify transit users in advance of any closures, delays, or modifications in bus or rail routes; and on modifications or relocation of transit stops or signage along the affected routes since accessibility is required to be maintained | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Chapter 4, p. 4-56 |
| 3 | Transportation | Temporary impacts to rail facilities will result from the construction of railroad bridge structures and/or the relocation of track operations | Coordinate with UPRR, BNSF, and DRIR for phasing of improvements to minimize disruptions to railroad operations | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Chapter 4, p. 4-56 |
| 4 | Transportation | Impacts to local traffic volumes caused by removal of the York Street interchange and changes to the Steele Street/ Vasquez Boulevard interchange and the Colorado Boulevard interchange | Coordinate with Denver to determine appropriate truck routes on city streets | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Chapter 4, p. 4-56 |
| 5 | Transportation | Temporary road closures and traffic detours may have impacts on access to certain public services | Develop and implement a Transportation Demand Management (TDM) program during construction, which could include items such as working with RTD on enhanced transit service and including ITS | CDOT Engineering/ Developer | Pre-construction/ during construction | ROD, Section 9.1, p. 137 |
| 6 | Transportation | Temporary road closures and traffic detours may have impacts on access to certain public services | Coordinate with affected local governments, residents, and businesses to minimize disruptions during construction | CDOT Engineering/ Developer | Pre-construction/ during construction | ROD, Section 9.1, p. 137 |
| 7 | Social and Economic Conditions | 56 residential relocations 17 business relocations (includes 1 non-profit relocation) | Compensate any person(s) whose property needs to be acquired according to the U.S. Constitution and the Uniform Act, as amended | CDOT Right of Way/ Developer | During property acquisition | Final EIS, Section 5.2, p. 5.2-51 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 8 | Social and Economic Conditions | Temporary road closures and traffic detours may have impacts on access to certain public services | Provide safe and efficient connections through neighborhoods during construction for all modes of transportation, including bicycles and pedestrians | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.2, p. 5.2-51 |
| 9 | Social and Economic Conditions | Temporary road closures and traffic detours may have impacts on access to certain public services | Coordinate with emergency service providers during construction to minimize effects on response times | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.2, p. 5.2-51 |
| 10 | Social and Economic Conditions | Temporary effect to the regional economy from construction-related traffic congestion | Use standard measures—such as phased construction, advance notice of road closures and detours, and fixed and variable signage—to reduce effects on local residents, businesses, and services and on I-70 motorists | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.2, p. 5.2-51 |
| 11 | Social and Economic Conditions | Temporary road closures and traffic detours may have impacts on access to certain public services | Use standard measures—such as phased construction, advance notice of road closures and detours, and fixed and variable signage—to reduce effects on local residents, businesses, and services and on I-70 motorists | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.2, p. 5.2-51 |
| 12 | Social and Economic Conditions | Temporary road closures and traffic detours may have impacts on access to certain public services | Provide a robust and context-sensitive communications and outreach plan throughout construction to ensure residents are kept informed | CDOT Public Involvement/ Developer | Pre-construction/ during construction | Final EIS, Section 5.2, p. 5.2-51 |
| 13 | Social and Economic Conditions | Temporary road closures and traffic detours may have impacts on access to certain public services | Coordinate with RTD more than 30 days in advance during construction to minimize disruptions to service areas and schedules and notify transit users in advance of any closures, delays, or modifications in bus or rail routes; and on modifications or relocation of transit stops or signage along the affected routes since accessibility is required to be maintained | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.2, p. 5.2-51 |
| 14 | Social and Economic Conditions | Temporary road closures and traffic detours may have impacts on access to certain public services | Use signs and notifications to reduce adverse effects on access to homes, businesses, and services during the construction period from detours | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.2, p. 5.2-51 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 15 | Social and Economic Conditions | Acquisition of right of way from the buffer area between 46th Avenue and the field to the south of Swansea Elementary School | Removing the viaduct, lowering the highway, and covering portions of the highway to include space for community and neighborhood activities | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.2, p. 5.2-52 |
| 16 | Social and Economic Conditions | Acquisition of right of way from the buffer area between 46th Avenue and the field to the south of Swansea Elementary School | Redesign and reconstruct the school playground; this will include the adjacent parcels as part of the elementary school site and will eliminate Elizabeth Street between 46th Avenue and 47th Avenue and 46th Avenue between Clayton Street and Columbine Street will be removed to allow for a seamless connection between Swansea Elementary School and the landscape on the highway cover | CDOT Engineering/ Developer | Final design/ during construction | Final EIS, Section 5.2, p. 5.2-52 |
| 17 | Environmental Justice | 17 business relocations (includes 1 non-profit relocation) | Provide targeted assistance to encourage businesses that are crucial to low-income and minority populations to find new locations in the same neighborhoods | CDOT Right of Way/ Developer | During property acquisition | Final EIS, Section 5.3, p. 5.3-41 |
| 18 | Environmental Justice | 56 residential relocations<br>17 business relocations (includes 1 non-profit relocation) | Provide funding to CRHDC to assist residential and business displacees with financial counseling and procurement of financing for replacement property and securing business and residential loans; CDOT has already provided funding to CRHDC as early mitigation | CDOT Right of Way and Engineering | During property acquisition/ pre-construction (complete) | Final EIS, Section 5.3, p. 5.3-41 |
| 19 | Environmental Justice | Potential for disturbing hazardous material sites during construction | Collect representative soil samples of three or four recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities | CDOT Environmental/ Developer | Pre-construction/ during construction/ post-construction | Final EIS, Section 5.3, p. 5.3-41 |
| 20 | Environmental Justice | Increasing noise and dust during construction | Provide residents close to the highway construction—between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard—two free portable or window-mounted air conditioning units with air filtration and assistance for the potential additional utility costs during construction | CDOT Engineering and Environmental | Pre-construction | Final EIS, Section 5.3, p. 5.3-41 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 21 | Environmental Justice | Increasing noise and dust during construction | Provide residents close to the highway construction—between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard—interior storm windows | CDOT Engineering and Environmental | Pre-construction | Final EIS, Section 5.3, p. 5.3-41 |
| 22 | Environmental Justice | Increasing noise and dust during construction | Provide residents close to the highway construction—between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard—furnace filters | CDOT Engineering and Environmental | Pre-construction | ROD, Section 9.3, p. 138 |
| 23 | Environmental Justice | 17 business relocations (includes 1 non-profit relocation) | Facilitate opportunities to promote hiring individuals from the communities, such as job fairs with developers | CDOT Civil Rights and Public Involvement/ Developer | Pre-construction/ during construction | Final EIS, Section 5.3, p. 5.3-44 |
| 24 | Environmental Justice | 17 business relocations (includes 1 non-profit relocation) | Execute geographic-based hiring preferences (CDOT has submitted an application and received approval under Special Experiment Project 14 (SEP-14) for the US DOT pilot program) | CDOT Civil Rights and Public Involvement/ Developer | Pre-construction/ during construction | Final EIS, Section 5.3, p. 5.3-41 |
| 25 | Environmental Justice | 17 business relocations (includes 1 non-profit relocation) | Research opportunities to invest funds in a local workforce development program aimed at job readiness training prior to construction | CDOT Civil Rights and Public Involvement/ Developer | Pre-construction/ during construction | Final EIS, Section 5.3, p. 5.3-41 |
| 26 | Environmental Justice | Increasing noise and dust during construction at the school | Provide a new HVAC system, doors, and windows for Swansea Elementary School | CDOT Engineering | Pre-construction | Final EIS, Section 5.3, p. 5.3-41 |
| 27 | Environmental Justice | Moving the highway closer to Swansea Elementary School | Prior to the start of roadway construction, build two new classrooms at Swansea Elementary School to enhance the overall quality of the school | CDOT Engineering | Pre-construction | Final EIS, Section 5.3, p. 5.3-41 |
| 28 | Environmental Justice | Improving safety of north-south pedestrian and bicycle connectivity compared to the existing conditions by eliminating unsafe crossings underneath the viaduct | Remove the viaduct, lower the highway, and cover a portion of the highway to include space for community and neighborhood activities | CDOT Engineering/ Developer | Final design/ during construction | Final EIS, Section 5.3, p. 5.3-44 |
| 29 | Environmental Justice | Displacing Stop N Shop and Pilot Travel Center truck stop | Provide $100,000 toward the Denver Office of Economic Development's GES Healthy Food Challenge that will help facilitate access to fresh food. | CDOT Environmental and Engineering | Pre-construction/ during construction | ROD, Section 9.3 p. 138 |

**Exhibit 14      Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 30 | Environmental Justice | Moving the highway closer to Swansea Elementary School | Redesign and reconstruct the school playground; this will include the adjacent parcels as part of the elementary school site and will eliminate Elizabeth Street between 46th Avenue and 47th Avenue and 46th Avenue between Clayton Street and Columbine Street will be removed to allow for a seamless connection between Swansea Elementary School and the landscape on the highway cover | CDOT Engineering/ Developer | Final design/ during construction | Final EIS, Section 5.3, p. 5.3-44 |
| 31 | Environmental Justice | Relocating 56 residences | Provide $2 million in funding to support affordable housing in the Elyria and Swansea Neighborhood through available programs | CDOT Environmental and Engineering | Pre-construction/ during construction | ROD, Section 9.3 p. 138 |
| 32 | Environmental Justice | Creating a financial burden to the low-income community, who may not be able to afford to use the tolled express lanes | Eligible residents of Globeville, Elyria, and Swansea will be provided mitigation for the financial burden of access to the tolled express lane through either free transponders, pre-loading of tolls, or other means determined prior to the opening of the tolled express lane. Eligibility and the duration of the program are expected to be determined based on factors including, but not limited to, residency, financial burden, number of vehicles per resident or household, etc. | CDOT HPTE | Post-construction | ROD, Section 9.3, p. 139 |
| 33 | Land use | 56.2 acres converted to transportation use | Continue to coordinate with local jurisdictions to ensure compatibility with land use plans and to address any inconsistency that may arise | CDOT Engineering/ Developer | Final design | Final EIS, Section 5.4, p. 5.4-18 |
| 34 | Relocations and displacements | 56 residential relocations 17 business relocations (includes 1 non-profit relocation) | Compensate any person(s) whose property needs to be acquired according to the U.S. Constitution and the Uniform Act, as amended | CDOT Right of Way/ Developer | During property acquisition | Final EIS, Section 5.5, p. 5.5-20 |
| 35 | Relocations and displacements | 56 residential relocations 17 business relocations (includes 1 non-profit relocation) | Provide all impacted owners notification of the acquiring agency's intent to acquire an interest in their property, including a written offer letter of just compensation specifically describing those property interests; assign a right of way specialist to each property owner to assist them with this process | CDOT Right of Way/ Developer | During property acquisition | Final EIS, Section 5.5, p. 5.5-20 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 36 | Relocations and displacements | 56 residential relocations<br>17 business relocations (includes 1 non-profit relocation) | Provide bilingual services for any of the relocated and displaced businesses or households that need them | CDOT Right of Way/ Developer | During property acquisition | Final EIS, Section 5.5, p. 5.5-20 |
| 37 | Relocations and displacements | 56 residential relocations<br>17 business relocations (includes 1 non-profit relocation) | Meet directly with those owners and occupants who would be relocated as a result of the proposed project; conduct multiple meetings with these individuals to provide an introduction and overview of the process associated with the Uniform Act; provide information on resources available, including assistance from local, state, and federal agencies, and private agencies in the community; identify individual eligibility for benefits | CDOT Right of Way/ Developer | During property acquisition | Final EIS, Section 5.5, p. 5.5-20 |
| 38 | Historic preservation | Adverse Effect—13 historic resources | Provide Level II archival documentation for adversely affected resources | CDOT Environmental | Pre-construction/ during construction | Final EIS, Section 5.6, p. 5.6-17 |
| 39 | Historic preservation | Adverse Effect—13 historic properties | Provide funding and participate in the creation of a documentary covering the history of I-70 East and its relationship to the Elyria and Swansea and Globeville neighborhoods (mitigation has been completed, and is available to view at www.i-70east.com) | CDOT Environmental | Pre-construction (complete) | Final EIS, Section 5.6, p. 5.6-17 |
| 40 | Historic preservation | Adverse Effect—13 historic properties<br>Temporary impacts may include dust and debris, visual and auditory degradation related to construction activities, and decreased access | Implement mitigation measures, as identified, in consultation with SHPO and consulting parties as described in the Programmatic Agreement (PA) | CDOT Engineering and Environmental | Pre-construction/ during construction | Final EIS, Section 5.6, p. 5.6-17 |
| 41 | Historic preservation | Discovery of cultural materials related to Indian occupation during construction | Contact consulting Indian tribes if Indian cultural materials are identified at any time during construction | CDOT Engineering and Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.6, p. 5.6-17 |
| 42 | Historic preservation | Potential for construction activities to discover unanticipated, sub-surface historic resources during the course of construction, including, but not limited to, trolley tracks, sewer systems, building foundations, or historic artifacts | Refer to the Section 106 PA, Stipulation VI, Construction Phase Post-Review Discoveries, which sets forth a process for review of unanticipated resources uncovered during construction | CDOT Engineering and Environmental/ Developer | During construction | ROD, Section 9.6, p. 149 |

**Exhibit 14     Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 43 | Historic preservation | Potential for construction activities to discover unanticipated, sub-surface historic resources during the course of construction, including, but not limited to, trolley tracks, sewer systems, building foundations, or historic artifacts | If trolley tracks or any other potential historic resources are discovered during construction and the impact on the resource is determined to be adverse, CDOT will follow I-70 East Corridor Programmatic Agreement Mitigation Stipulation III (6) to determine appropriate mitigation measures. | CDOT Engineering and Environmental/ Developer | During construction | ROD, Section 9.6, p. 149 |
| 44 | Paleontological | Potential for encountering paleontological resources in excavated bedrock of the Denver and Arapahoe Formations | Perform an intensive preconstruction paleontological survey | CDOT Environmental | Pre-construction | Final EIS, Section 5.7, p. 5.7-7 |
| 45 | Paleontological resources | Potential for encountering paleontological resources in excavated bedrock of the Denver and Arapahoe Formations | Perform spot-checking of excavations by a qualified paleontologist in areas of high paleontological potential during all phases of construction until bedrock is reached, then perform continuous paleontological monitoring | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.7, p. 5.7-7 |
| 46 | Paleontological resources | Potential for encountering paleontological resources in excavated bedrock of the Denver and Arapahoe Formations | Cease work immediately upon discovery of any paleontological resources, fence off the area, and allow the paleontologist to conduct sampling or excavation of specimens by hand or with mechanized equipment; do not resume work in the area until receiving formal notification from the paleontologist allowing work to resume | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.7, p. 5.7-7 |
| 47 | Visual resources and aesthetic qualities | Ground-level noise walls or safety barriers are less intrusive to viewers' eyes compared to the No-Action and Revised Viaduct Alternatives, but they also introduce a new visual impact by blocking the view across the highway | Use *Attachment O, Aesthetic and Design Guidelines* of the Final EIS, developed during the EIS process, with Denver and the community during final design to help CDOT identify appropriate aesthetic design elements to ensure compatibility within the community and each viewshed; CDOT is committed to following the guidelines and continued community involvement during final design and construction | CDOT Environmental and Engineering/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.8, p. 5.8-25 |

I-70 East ROD 1: Phase 1 (Central 70 Project)                                    Central 70 Mitigation Measures

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 48 | Visual resources and aesthetic qualities | Views for drivers traveling eastbound and westbound will be entirely different from the existing conditions | Use *Attachment O, Aesthetic and Design Guidelines* of the Final EIS, developed during the EIS process, with Denver and the community during final design to help CDOT identify appropriate aesthetic design elements to ensure compatibility within the community and each viewshed; CDOT is committed to following the guidelines and continued community involvement during final design and construction | CDOT Environmental and Engineering/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.8, p. 5.8-25 |
| 49 | Visual resources and aesthetic qualities | Tolled express lanes infrastructure will create new visual impacts along the project corridor | Use *Attachment O, Aesthetic and Design Guidelines* of the Final EIS, developed during the EIS process, with Denver and the community during final design to help CDOT identify appropriate aesthetic design elements to ensure compatibility within the community and each viewshed; CDOT is committed to following the guidelines and continued community involvement during final design and construction | CDOT Environmental and Engineering/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.8, p. 5.8-25 |
| 50 | Parks and recreational resources | South Platte River Greenway (Section 6(f) resource) temporary impacts may occur during construction | Provide adequate notice and signing to Greenway users prior to and during construction | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.9, p. 5.9-22 |
| 51 | Parks and recreational resources | South Platte River Greenway (Section 6(f) resource) temporary impacts may occur during construction | Coordinate with Denver Parks and Recreation and provide trail detours and ADA-compliant detour signage during construction consistent with the 2007 Denver Construction Detour Standards for Bikeways and Multi-Use Trails | CDOT Engineering/ Developer | During construction | ROD, Section 9.8, p. 154 |
| 52 | Parks and recreational resources | South Platte River Greenway (Section 6(f) resource) temporary impacts may occur during construction | Return Greenway to pre-construction or comparable state following construction | CDOT Engineering/ Developer | During construction/ post-construction | Final EIS, Section 5.9, p. 5.9-22 |
| 53 | Parks and recreational resources | South Platte River Greenway (Section 6(f) resource) temporary impacts may occur during construction | If new trail construction or full trail reconstruction is required, coordinate with Denver Parks and Recreation during the design and construction phase to ensure that all trail construction meets current standards. | CDOT Engineering/ Developer | Final design/ during construction | ROD, Section 9.8, p. 154 |

**Exhibit 14       Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 54 | Parks and recreational resources | 0.95 acre of impact to Swansea Elementary School | Use remnants of adjacent parcels obtained for right-of-way expansion to reconfigure the school site plan and replace all the playground facilities; this includes closing Elizabeth Street between 46th Avenue and 47th Avenue | CDOT Engineering/ Developer | Final design/ during construction | Final EIS, Section 5.9, p. 5.9-22 |
| 55 | Parks and recreational resources | Part of Globeville Landing Park will be closed during construction | Return to pre-construction or comparable state following construction | CDOT Engineering/ Developer | During construction/ post-construction | Final EIS, Section 5.9, p. 5.9-22 |
| 56 | Parks and recreational resources | Globeville Landing Park and South Platte River Greenway temporary impacts may occur during construction | Once final design has occurred and prior to impacts occurring to Globeville Landing Park and the South Platte River Greenway, a Proposal Description/Environmental Screening Form for the temporary non-conforming uses must be completed, submitted, and approved by Colorado Parks and Wildlife (CPW) and the National Park Service (NPS) | CDOT Environmental/ Developer | Pre-construction | ROD, Chapter 9, p. 154 |
| 57 | Air quality | Fugitive dust during construction could cause temporary impacts | Monitor for particulate matter less than 10 microns in size ($PM_{10}$), which will allow for the real-time modification or implementation of various dust control measures during construction | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 58 | Air quality | Fugitive dust during construction could cause temporary impacts | Cover, wet, compact, or use chemical stabilization binding agent to control dust and excavated materials at construction sites | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 59 | Air quality | Fugitive dust during construction could cause temporary impacts | Use wind barriers and wind screens to reduce the spread of dust from the site | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 60 | Air quality | Fugitive dust during construction could cause temporary impacts | Have a wheel wash station and/or crushed stone apron at egress/ingress areas to prevent dirt being tracked onto public streets | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 61 | Air quality | Fugitive dust during construction could cause temporary impacts | Use vacuum-powered street sweepers to remove dirt tracked onto streets | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 62 | Air quality | Fugitive dust during construction could cause temporary impacts | Cover all dump trucks leaving sites to prevent dirt from spilling onto streets | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 63 | Air quality | Fugitive dust during construction could cause temporary impacts | Minimize disturbed areas, particularly in winter | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 64 | Air quality | MSAT emissions could increase temporarily during construction | Prohibit unnecessary idling of construction equipment | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 65 | Air quality | MSAT emissions could increase temporarily during construction | Locate construction diesel engines as far away as possible from residential areas | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 66 | Air quality | MSAT emissions could increase temporarily during construction | Locate construction staging areas close to work sites, while situating them as far away as possible from residential uses | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 67 | Air quality | MSAT emissions could increase temporarily during construction | Require heavy construction equipment to use the cleanest available engines or be retrofitted with diesel particulate control technology | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 68 | Air quality | MSAT emissions could increase temporarily during construction | Use alternatives to diesel engines and/or diesel fuels, such as biodiesel, liquefied natural gas, or compressed natural gas, fuel cells, and electric engines, if applicable. | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.10, p. 5.10-47 |
| 69 | Air quality | MSAT emissions could increase temporarily during construction | Install engine pre-heater devices to eliminate unnecessary idling for wintertime construction | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 70 | Air quality | MSAT emissions could increase temporarily during construction | Prohibit tampering with equipment to increase horsepower or to defeat an emission control device's effectiveness | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 71 | Air quality | MSAT emissions could increase temporarily during construction | Require construction vehicle engines to be properly tuned and maintained | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |

**Exhibit 14       Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 72 | Air quality | MSAT emissions could increase temporarily during construction | Use construction vehicles and equipment with the minimum practical engine size for the intended job | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 73 | Air quality | Construction fugitive dust could cause temporary impacts | Continue the "sweepbox" program on the highway to achieve the current level of fugitive dust reduction; and enhance street sweeping after snow events to reduce the particulate matter accumulation during operations | CDOT Maintenance/ Developer | Post-construction | Final EIS, Section 5.10, p. 5.10-47 |
| 74 | Air quality | MSAT emissions could increase temporarily during construction | Optimize signal timing at intersections and along arterial streets near the freeway to reduce vehicle delay and tailpipe emissions | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 75 | Air quality | MSAT emissions could increase temporarily during construction | Implement congestion pricing and commuter incentive programs that reduce peak-period highway congestion and emissions | CDOT HPTE/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 76 | Air quality | MSAT emissions could increase temporarily during construction | Encourage TDM options, such as high-occupancy vehicle lanes and agreements with major employers to promote and implement flexible work programs | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.10, p. 5.10-47 |
| 77 | Energy | 5,808 billion Btu consumed during construction | Limit idling of construction equipment | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.11, p. 5.11-7 |
| 78 | Energy | 5,808 billion Btu consumed during construction | Encourage employee carpooling and vanpooling for construction workers | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.11, p. 5.11-7 |
| 79 | Energy | 5,808 billion Btu consumed during construction | Encourage use of closest material sources | CDOT Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |
| 80 | Energy | 5,808 billion Btu consumed during construction | Locate construction staging areas close to work sites, while situating them as far away as possible from residential uses | CDOT Environmental and Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |

**Exhibit 14          Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 81 | Energy | 5,808 billion Btu consumed during construction | Encourage use of cleaner and more fuel-efficient construction vehicles (for example, low sulfur fuel, biodiesel, or hybrid technologies) | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |
| 82 | Energy | 5,808 billion Btu consumed during construction | Encourage use of alternative fuels and asphalt binders | CDOT Environmental and Engineering/ Developer | Pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |
| 83 | Energy | 5,808 billion Btu consumed during construction | Implement traffic management schemes that minimize delays and idling | CDOT Engineering/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |
| 84 | Energy | 70.0 billion Btu consumed per day | Implement energy conservation measures where appropriate, such as energy-efficient electrical system specifications, lighting, mechanical equipment, and building insulation in accordance with CDOT's *Lighting Design Guide* (CDOT, 2006) | CDOT Engineering/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |
| 85 | Energy | 70.0 billion Btu consumed per day | Encourage energy-efficient options for the cover facilities | CDOT Engineering/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.11, p. 5.11-7 |
| 86 | Noise | Construction noise will present short-term effects to those dwelling units located along the corridor and along designated construction access routes | Implement best management practices (BMPs) to minimize noise during construction, as per FHWA's *Highway Construction Noise Handbook* (2006) | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.12, p. 5.12-62 |
| 87 | Noise | Construction noise will present short-term effects to those dwelling units located along the corridor and along designated construction access routes | Conduct a benefited receptor survey prior to construction to determine if the recommended noise wall is desired; if the survey results show that the majority of benefitted receptors who respond to the survey desire the noise wall, the noise wall will be optimized and built | CDOT Environmental/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.12, p. 5.12-62 |

**Exhibit 14     Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 88 | Noise | Number of noise receptors that exceed NAC threshold: <br>• Globeville: 27 <br>• Elyria: 40 (11 increase substantially—by 10 dBA or more) <br>• Swansea: 37 <br>• Stapleton: 0 <br>• Peoria Street: 0 <br>• Montbello: 3 <br>• Aurora: 2 | Location and height of feasible and reasonable walls: Elyria: 12 to 20 feet | CDOT Environmental/ Developer | Final design/ during construction | Final EIS, Section 5.12, p. 5.12-62 |
| 89 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat; 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas | Comply with Senate Bill 40, CDOT Impacted Black-Tailed Prairie Dog Policy, and CDOT Standard Specifications for protection of migratory birds | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 90 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat; 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas | Monitor disturbed sites during construction to identify and treat any noxious weed invasion | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.13, p. 5.13-26 |
| 91 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat; 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas | Reclaim disturbed areas in phases throughout construction with native grasses and forbs | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.13, p. 5.13-26 |
| 92 | Biological resources | 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas | Replace riparian trees at a 1:1 ratio and riparian shrubs at a 1:1 square foot ratio | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.13, p. 5.13-26 |
| 93 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Conduct a Burrowing Owl survey following CPW protocols no more than 30 days prior to construction if construction in prairie dog colonies will occur between February 1 and August 31; if a nesting pair is discovered, no construction activity will occur within 150 feet of the nest between March 15 and October 31 | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 94 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Eagle nest surveys will be conducted during the appropriate seasons prior to construction beginning near the winter range and known nest sites, then annually between January 1 and April 31 for the remainder of construction, in the event that a Bald and Golden Eagle Protection Act permit is needed | CDOT Environmental/ Developer | Pre-construction/ during construction | ROD, Section 9.11, p. 174 |
| 95 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Remove or trim vegetation outside of the April 1 to August 31 migratory bird-breeding season | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 96 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Survey areas to be cleared and grubbed, as well as areas within 50 feet of these areas, between April 1 and August 31 for active migratory bird nests within seven days of the work being performed | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 97 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Remove existing nests from structures after August 31 and prior to April 1 | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 98 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Monitor structures at least once every three days for any nesting activity between April 1 and August 31 | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 99 | Biological resources | 369.2 acres of permanent, direct impact to wildlife habitat | Prepare and implement an Integrated Noxious Weeds Management Plan | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 100 | Biological resources | 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas | Perform botanical surveys for Ute ladies'-tresses orchid and Colorado butterfly plant | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.13, p. 5.13-26 |
| 101 | Floodplains and drainage/ hydrology | Impact to potential ponding areas due to the increased width of the highway, which may increase runoff from I-70 | Create detention ponds and implement storm drainage for onsite drainage system improvements | CDOT Engineering and Environmental/ Developer | Final design/ during construction | Final EIS, Section 5.14, p. 5.14-11 |
| 102 | Floodplains and drainage/ hydrology | The potential ponding areas between Brighton Boulevard and Dahlia Street will be substantially impacted due to lowered profile of the highway | Build a south offsite drainage system to reduce the risk of flooding within the lowered section of I-70, as well as the portion of the watershed between I-70 and the South Platte River | CDOT Engineering/ Developer | Final design/ during construction | ROD, Section 9.12, p. 174 |

**Exhibit 14      Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 103 | Floodplains and drainage/ hydrology | Potential impacts to South Platte River | Design the outfalls to the South Platte River to have no adverse impact to the floodplain | CDOT Engineering/ Developer | Final design | ROD, Section 9.12, p. 178 |
| 104 | Floodplains and drainage/ hydrology | Potential conflict with adjacent drainage projects by Denver | Coordinate with adjacent projects to ensure there are no conflicts between the projects | CDOT Engineering/ Developer | Final design | ROD, Section 9.12, p. 178 |
| 105 | Wetlands, open waters, and other waters of the U.S. | 5.507 acres of permanent and 0.081 acre of temporary wetland impacts 0.219 acre of permanent and 0.556 acre of temporary impacts to other waters of the U.S. and open waters | Mitigate unavoidable, permanent impacts at a 1:1 ratio in a wetland mitigation bank in the South Platte River watershed | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.15, p. 5.15-13 |
| 106 | Wetlands, open waters, and other waters of the U.S. | 5.507 acres of permanent and 0.081 acre of temporary wetland impacts 0.219 acre of permanent and 0.556 acre of temporary impacts to other waters of the U.S. | Obtain and follow requirements of Section 404 permitting and Senate Bill 40 certification | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.15, p. 5.15-13 |
| 107 | Wetlands, open waters, and other waters of the U.S. | 5.507 acres of permanent and 0.081 acre of temporary wetland impacts 0.219 acre of permanent and 0.556 acre of temporary impacts to other waters of the U.S. and open waters | Install temporary erosion control and sediment control BMPs before ground-disturbing activities; permanently stabilize completed areas within seven days | CDOT Environmental/ Developer | Pre-construction/ during construction/ post-construction | Final EIS, Section 5.15, p. 5.15-13 |
| 108 | Wetlands, open waters, and other waters of the U.S. | 5.507 acres of permanent and 0.081 acre of temporary wetland impacts 0.219 acre of permanent and 0.556 acre of temporary impacts to other waters of the U.S. and open waters | Restore wetlands temporarily affected during construction to pre-construction conditions | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.15, p. 5.15-13 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 109 | Water quality | Stormwater runoff can create erosion and degradation of water quality during and after construction | Implement the following BMPs for erosion and sediment control, dust control, stormwater control, and expansive soils during and after construction:<br>• Silt fences, erosion control blankets<br>• Sediment traps, sediment basins<br>• Soil stockpile management<br>• Temporary diversion structures<br>• Spill prevention and control measures<br>• Regrading<br>• Seeding and revegetating soils and slopes<br>• Mulch protection for new plantings<br>• Stormwater control channels | CDOT Environmental/ Developer | Pre-construction/ during construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 110 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Prevent over-treating by commencing liquid de-icer application at the beginning of snowfall and no longer pre-treat roads | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 111 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Reduce the application rate of sand and salt mixtures from historic rates by compliance with CDPHE, Air Quality Control Commission's Regulation 16. | CDOT Maintenance/ Developer | During construction/ post-construction | ROD, Section 9.14, p. 184 |
| 112 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Apply liquid de-icer products at the lowest application rate that it will remain effective by adherence to CDOT's Standard Operating Guide for Winter Maintenance and Operations. | CDOT Maintenance/ Developer | During construction/ post-construction | ROD, Section 9.14, p. 184 |
| 113 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Completely remove sand/salt within the "core" sweeping area within four days of snow events, as per DRCOG and CDOT regulations; only 35 percent removal outside the "core" areas is required; for the past two years, it has been CDOT practice to remove all remaining sand/salt from the study area even though it is not in the "core" sweeping area—and CDOT will continue to do so | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |

**Exhibit 14       Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 114 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Perform fleet upgrades that include on-board computers to track the amount of mixture being applied, as well as rates of application of de-icing materials; this technology prevents over-treating; the majority of the CDOT Region 1 fleet is currently equipped with these computers | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 115 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Utilize only de-icing and anti-icing products which are on the Pacific Northwest Snow Fighters Approved Product List. Use product application rates which conform to the manufacturer's recommendations and air and water quality regulations. | CDOT Maintenance/ Developer | During construction/ post-construction | ROD, Section 9.14, p. 185 |
| 116 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Stockpile solid mixtures at the I-70 and Havana Street CDOT maintenance facility; the mixtures are kept under domes to protect them from precipitation, which prevents water high in salts from running off into receiving waters | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-18 |
| 117 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Perform quality assurance audits on de-icing mixtures several times per year to ensure elevated levels of harmful anti-caking compounds are not found in the mixtures | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-18 |
| 118 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Train snowplow drivers annually, stressing the importance of meeting or exceeding water quality and air quality permit requirements | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-18 |
| 119 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Use temperature gauges built into trucks and roadway surfaces to assist with making decisions related to de-icing application rates and mixes | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-18 |
| 120 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Use vacuum sweepers, not side-cast sweepers, as part of ongoing fleet upgrades; trash within the right of way is picked up prior to each sweeping | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 121 | Water quality | Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff | Rely on cameras/ITS systems to determine problem areas during each storm event | CDOT Maintenance/ Developer | During construction/ post-construction | Final EIS, Section 5.16, p. 5.16-18 |

**Exhibit 14          Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 122 | Water quality | Increase in runoff TSS loads of six percent to the South Platte River<br>Increase in runoff TSS loads of 18 percent to Sand Creek | Provide permanent water quality control features (i.e., extended detention pond) as part of the project to treat stormwater runoff from the highway | CDOT Engineering and Environmental/ Developer | Final design/ during construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 123 | Water quality | Increase in runoff TSS loads of six percent to the South Platte River<br>Increase in runoff TSS loads of 18 percent to Sand Creek | Consider environmentally friendly techniques to provide water quality treatment | CDOT Environmental/ Developer | Final design/ during construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 124 | Water quality | Increase in runoff TSS loads of six percent to the South Platte River<br>Increase in runoff TSS loads of 18 percent to Sand Creek | Treat runoff prior to entering the South Platte River and Sand Creek in conformance with CDOT's MS4 Permit and New Development and Redevelopment Program | CDOT Environmental/ Developer | Final design/ during construction/ post-construction | Final EIS, Section 5.16, p. 5.16-17 |
| 125 | Geology and soils | Excavation is anticipated to extend below the depth of groundwater from approximately the UPRR to Columbine Street | Prevent groundwater infiltration into the lowered section of the highway; install underdrain pipes below the pavement to drain any additional groundwater that still enters the lowered section | CDOT Engineering/ Developer | Final design/ during construction/ post-construction | Final EIS, Section 5.17, p. 5.17-9 |
| 126 | Geology and soils | Temporary impacts to groundwater during excavation | Dewater during the construction process | CDOT Engineering/ Developer | During construction | Final EIS, Section 5.17, p. 5.17-9 |
| 127 | Hazardous materials | 34 hazardous materials sites affected; 750 acres of land disturbed | Before right-of-way acquisition, conduct a Phase I Environmental Site Assessment (Phase I) or initial site assessment for those properties identified for acquisition; based on these assessments, additional subsurface investigation may be required depending on the recognized environmental conditions identified and potential risk to the project | CDOT Environmental/ Developer | Prior to property acquisition | Final EIS, Section 5.18, p. 5.18-19 |
| 128 | Hazardous materials | 34 hazardous materials sites affected; 750 acres of land disturbed | Avoid contaminated sites wherever practical; where unavoidable, initiate further site investigation and coordination with affected property owners | CDOT Engineering and Environmental/ Developer | Final design/ during construction | Final EIS, Section 5.18, p. 5.18-19 |
| 129 | Hazardous materials | 34 hazardous materials sites affected; 750 acres of land disturbed | Follow CDOT *Standard Specifications for Road and Bridge Construction*, Section 250, Environmental, Health and Safety Management | CDOT Engineering and Environmental/ Developer | During construction | Final EIS, Section 5.18, p. 5.18-19 |

**Exhibit 14      Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 130 | Hazardous materials | Potential impact to Vasquez Boulevard/ I-70 Superfund site | Coordinate with and obtain approval from the U.S. Environmental Protection Agency (EPA) and CDPHE, as necessary, when construction occurs in the Vasquez Boulevard/I-70 Superfund site | CDOT Engineering and Environmental/ Developer | Final design/ pre-construction/ during construction | ROD, Section 9.15, p. 186 |
| 131 | Hazardous materials | Extensive excavation through a known landfill that contains contaminants | Follow Tri-County Health Department Health and Safety Practices during construction on or near former landfills | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.18, p. 5.18-19 |
| 132 | Hazardous materials | 33 hazardous materials sites affected; 719 acres of land disturbed | Conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any building structures and bridges or elevated structures; if these materials are encountered, remove them in accordance with applicable regulations and guidelines; if asbestos-containing material (ACM) is encountered, including buried utilities, follow CDOT Specification 250.07, Asbestos-Containing Material Management and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure; additionally, depending on the type of ACM, clean up this material in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations | CDOT Environmental/ Developer | During property acquisition/ pre-construction/ during construction | Final EIS, Section 5.18, p. 5.18-19 |
| 133 | Hazardous materials | 33 hazardous materials sites affected; 719 acres of land disturbed | Update contaminated sites search databases to reflect most recent records | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.18, p. 5.18-19 |
| 134 | Hazardous materials | 33 hazardous materials sites affected; 719 acres of land disturbed | Prepare and implement a project-specific Health and Safety Plan and Materials Management Plan to address potential hazardous materials that are encountered during construction; these plans will consist of specific measures to protect worker and public health and safety, as well as programs to manage contaminated materials during construction | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.18, p. 5.18-19 |

**Exhibit 14      Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 135 | Hazardous materials | Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | In the event that unknown contaminated media is encountered during construction, stop working until the contamination is properly evaluated and measures are developed to protect worker health and safety in accordance with the project-specific Health and Safety Plan and Materials Management Plan | CDOT Environmental/ Developer | During construction | Final EIS, Section 5.18, p. 5.18-19 |
| 136 | Hazardous materials | Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination | Implement standard construction measures for fugitive dust control, as well as stormwater erosion and sediment controls, to minimize the spread of contaminated soil; during the construction phase, require the Developer to file and abide by a dust management plan to minimize the effects of dust on surrounding communities; additionally, conduct air monitoring to determine whether dust control efforts are successful in preventing violations of air quality standards | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.18, p. 5.18-20 |
| 137 | Hazardous materials | Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination | Obtain a CDPHE Colorado Discharge Permit System (CDPS) Construction Dewatering Permit, Remediation Activities Discharging to Surface Water or Construction Activities Discharging to Ground Water, as required, utilizing readily available data; the selected Developer will follow the permit requirements | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.18, p. 5.18-20 |
| 138 | Hazardous materials | Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination | If this alternative requires permanent dewatering, obtain and follow the necessary CDPS Dewatering Permits; under the temporary construction and permanent feature dewatering permits, treat and discharge source water onsite in accordance with the permit or characterize and remove source water offsite to a permitted disposal facility | CDOT Environmental/ Developer | Pre-construction/ during construction/ post-construction | Final EIS, Section 5.18, p. 5.18-20 |
| 139 | Hazardous materials | Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | Properly abandon and close monitoring wells or septic systems disturbed during construction activities in accordance with applicable regulations and guidelines; if existing monitoring wells are impacted during construction, the project will replace them, as necessary | CDOT Environmental/ Developer | Pre-construction/ during construction | Final EIS, Section 5.18, p. 5.18-20 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 140 | Utilities | All utility types will be affected to some extent<br><br>Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width<br><br>Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency | Minimize service disruptions by connecting to active utilities, and scheduling to coincide with periods of lower demand | CDOT Utilities/ Developer | During construction | Final EIS, Section 5.19, p. 5.19-26 |
| 141 | Utilities | All utility types will be affected to some extent<br><br>Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width<br><br>Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency | Encase or provide protective cover over any impacted underground utilities | CDOT Utilities/ Developer | During construction | Final EIS, Section 5.19, p. 5.19-26 |
| 142 | Utilities | All utility types will be affected to some extent<br><br>Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width<br><br>Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency | Coordinate with utility owners and operators to identify construction requirements and financial responsibilities for relocations | CDOT Utilities/ Developer | Pre-construction/ during construction | Final EIS, Section 5.19, p. 5.19-26 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 143 | Utilities | All utility types will be affected to some extent<br>Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width<br>Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency | Identify and improve any utility concerns that can be addressed as part of project implementation | CDOT Utilities/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.19, p. 5.19-26 |
| 144 | Utilities | All utility types will be affected to some extent<br>Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width<br>Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency | Integrate above-ground utilities that are impacted by the project into the design, hide them from sight within the design, and/or design them to be aesthetically pleasing to the greatest extent practical | CDOT Utilities/ Developer | Final design/ during construction | Final EIS, Section 5.19, p. 5.19-26 |
| 145 | Utilities | All utility types will be affected to some extent<br>Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width<br>Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency | Move above-ground utilities underground to the greatest extent practical | CDOT Utilities/ Developer | Final design/ pre-construction/ during construction | Final EIS, Section 5.19, p. 5.19-26 |
| 146 | Section 4(f)— Recreation Resources | Use of Swansea Elementary School Public Playground | Use remnants of adjacent parcels obtained for right-of-way expansion to reconfigure the school site plan and replace all the playground facilities; this includes closing Elizabeth Street between 46th Avenue and 47th Avenue | CDOT Engineering/ Developer | During construction | Final EIS, Chapter 7, p. 7-105 |

**Exhibit 14        Central 70 Project Mitigation Measures**

| Mitigation # | Mitigation Category | Impact | Mitigation Commitment | Responsible Branch | Timing/Phase of Construction Mitigation | Source Document |
|---|---|---|---|---|---|---|
| 147 | Section 4(f)—Recreation Resources | Use of Globeville Landing Park | Return to pre-construction or comparable state following construction | CDOT Environmental/ Developer | Pre-construction | Final EIS Chapter 7, p. 7-106 |
| 148 | Section 4(f)—Historic Resources | Use of 22 historic resources, which includes 9 *de minimis* impact determinations | Implement other mitigation measures, as identified, in consultation with SHPO and consulting parties as described in the PA | CDOT Environmental | Pre-construction/ during construction | Final EIS, Chapter 7, p. 7-106 |

# Chapter 6    Federal, State, and Local Permits and Approvals

Transportation projects must comply with a wide range of federal and state environmental laws and regulations, permits, reviews, notifications, consultations, and other approvals. This chapter describes the federal determinations and other monitoring and enforcement requirements for the Central 70 Project, including:

- Air Quality Transportation Conformity

- Section 106 Consultation

- Section 6(f) of the Land and Water Conservation Fund Act

- Section 4(f) of the Department of Transportation Act of 1966

- Environmental Justice

- Other Determinations—includes permits and certifications, such as the Clean Water Act Section 404 Permit and the Senate Bill 40 (SB 40) Certification

- Monitoring and Enforcement—permits and approvals necessary for the project

FHWA and CDOT will monitor this project to ensure that permits, approvals, and mitigation measures contained in this document (and subsequent permits) are implemented. Copies of this document will be provided to responsible public agencies and CDOT project personnel. Commitments within this document will be implemented through the inclusion of these measures in the construction plans for the project.

## 6.1    Air Quality Transportation Conformity

Transportation conformity applies to federally funded projects, as established by the Clean Air Act (CAA) Amendments of 1990. Conformity applies at both a regional and project level in air quality nonattainment and attainment/maintenance areas. The I-70 East Project is in a nonattainment area for ozone, and an attainment/maintenance area for $PM_{10}$ and carbon monoxide; therefore, it must comply with transportation conformity requirements for these NAAQS.

A project-level conformity determination demonstrates that an individual project does not contribute to any new local violations, increase the frequency or severity of any existing violations, or delay attainment of the NAAQS or any required interim emission reductions or other milestones. A project-level conformity determination includes:

- Central 70 Project is included in a conforming Fiscally Constrained RTP and a Transportation Improvement Program (TIP) with a consistent design concept and scope. The regional emissions analysis at the RTP and TIP level demonstrates that regional emissions are within the limits set by the State Implementation Plan (SIP)

- Hot-spot analyses in CO and $PM_{10}$ nonattainment and attainment/maintenance areas
- Compliance with control measures in the $PM_{10}$ SIP

As described in the following subsection, the Central 70 Project has been determined to not cause an exceedance of any NAAQS. The proposed project will not contribute to any new local violations, increase the frequency or severity of any existing violation, or delay timely attainment of the NAAQS or any required interim emissions reductions or other milestones. This project complies with the transportation conformity regulations in 40 CFR §93 and with the conformity provisions of Section 176(c) of the CAA.

## 6.1.1   Regional Air Quality Evaluation for the Proposed Action (Central 70 Project)

The project is included in the DRCOG 2016-2021 TIP (https://drcog.org/sites/drcog/files/resources/DRCOG%202016-2021%20TIP-Amended%20January%2027%202016_0.pdf) and the 2040 RTP (http://coloradotransportationmatters.com/wp-content/uploads/2015/03/DRCOGFinalRTP_02-18-15.pdf), which were found to conform to the carbon monoxide, $PM_{10}$, and ozone SIPs. The design and scope of the Central 70 Project are consistent with what was used in the regional emissions analysis for the RTP and TIP. A conformity redetermination for the 2040 RTP 2015 Cycle 2 Amendment and amended 2016-2021 TIP was done on November 21, 2016.

## 6.1.2   Project–Level Air Quality Conformity for the Proposed Action (Central 70 Project)

As described in *Attachment C, Air Quality Conformity Technical Report,* of this document, and shown in **Exhibit 15** and **Exhibit 16**, the analysis demonstrates that the project would meet the transportation conformity requirements because the Central 70 Project does not contribute to any new local violations, increase the frequency or severity of any existing violation, or delay timely attainment of the NAAQS or any required interim emission reductions or other milestones.

### Exhibit 15        Carbon Monoxide Hotspot Analysis Results

| Analysis Time Period | Time of Day | Carbon Monoxide Concentration in parts per million (ppm) | | | NAAQS (standard) |
|---|---|---|---|---|---|
| | | Background | Modeled | Total Background + Modeled | |
| 1 hour | AM | 5.5 | 1.4 | 6.9 | 1-hour standard 35 ppm |
| | PM | | 1.9 | 7.4 | |
| 8 hour | AM | 3.6 | 0.9 | 4.5 | 8-hour standard 9 ppm |
| | PM | | 1.2 | 4.8 | |

**Exhibit 16       PM₁₀ Hotspot Analysis Results**

| Location | PM$_{10}$ Concentration in micrograms per cubic meter (µg/m³) | | | | NAAQS (standard) |
| | Background | Modeled | Total Background + Modeled | Design Value | |
|---|---|---|---|---|---|
| I-70 and I-25 | | 41.136 | 154.136 | 150 | |
| I-70 in Swansea | 113 | 40.948 | 153.948 | 150 | 24-hour standard 150 µg/m³ |
| I-70 and I-225 | | 32.220 | 145.220 | 150 | |

*To develop these estimates, the 24-hour PM$_{10}$ design value is rounded per guidance to the nearest 10 µg/m³. For example, 155.000 rounds to 160, and 154.999 rounds to 150.*

CDPHE-APCD, in its concurrence letter signed January 5, 2017 (see *Attachment B, Updates to Agency Consultation Addendum*), has concurred with the findings of the Central 70 Project project-level conformity analyses that were completed.

The project location is in the moderate nonattainment area for the Denver-North Front Range Area for the 2008 ozone standard. Since ozone is a regional pollutant, there is no hot spot analysis requirement to analyze potential impacts and no possibility of localized violations of ozone to occur at the project level. Emission inventories for the ozone precursors—nitrogen oxides and volatile organic compounds—were shown in Exhibit 5.10-19 and Exhibit 5.10-20 of the Final EIS, and did not need to be updated.

# 6.2    Section 106 Consultation

CDOT has consulted with the SHPO and consulting parties on determinations of National Register of Historic Places (NRHP) eligibility and effects to historic properties, per 36 CFR §800.8(c), in compliance with Section 106 of the National Historic Preservation Act.

Concurrence on eligibility and determination of effects has been received throughout the project and was most recently received from the SHPO on several dates in 2015 (see *Attachment B, Agency Consultation Addendum*, of the Final EIS for documentation) and concurrence on updated effects after publication of the Final EIS was received in March 2016 (see *Attachment B, Updates to Agency Consultation Addendum*, of this document).

**Consulting parties**

State Historic Preservation Office (SHPO)

Colorado Department of Transportation (CDOT)

Historic Denver, Inc.

Colorado Preservation, Inc.

Denver Landmark Preservation Commission

Fairmount Heritage Foundation

Fairmount Cemetery Company

A PA that provides a process to determine appropriate mitigation for adverse effects and to reevaluate eligibility and effects to historic properties, as appropriate, was executed in April 2016. The PA is included in *Attachment D, Section 106 Programmatic Agreement*, of this document.

## 6.3    Section 6(f) of the Land and Water Conservation Fund Act

Section 6(f) of the LWCF Act of 1965 protects recreational properties that have been purchased or improved with assistance from the LWCF. Globeville Landing Park and the South Platte River Greenway Trail are features of the South Platte River Greenway, which is afforded protection under Section 6(f) of the LWCF Act. The proposed project will have a temporary non-conforming use of the South Platte River Greenway north of I-70 due to construction of an underground drainage system under Section 6(f)(3) of the LWCF Act.

Consultation with CPW and the NPS has been ongoing regarding the Globeville Landing Park and the South Platte River Greenway Trail. As discussed in correspondence with CPW from December 2016, the changes to Globeville Landing Park and the South Platte River Greenway Trail as part of the GLO are considered park improvements/ enhancements, and do not constitute a Section 6(f) conversion (see *Attachment B, Updates to Agency Consultation Addendum*).

The impacts identified to the Globeville Landing Park and South Platte River Greenway Trail, in the Final EIS by the Partial Cover Lowered Alternative's offsite drainage system would not occur as a result of the project. However, the impacts from the construction of both the onsite and offsite drainage systems will result in temporary non-conforming uses under Section 6(f). Conditional approval was received from NPS with the temporary non-conforming uses on January 13, 2017. Once final design has occurred and prior to impacts occurring to Globeville Landing Park and the South Platte River Greenway, a Proposal Description/Environmental Screening Form for the temporary non-conforming uses must be completed, submitted, and approved by CPW and NPS.

## 6.4    Section 4(f) of the Department of Transportation Act of 1966

Section 4(f) has been part of federal law since 1966, when it was enacted as Section 4(f) of the U.S. Department of Transportation Act. It is codified in 23 USC §138 and 49 USC §303. Section 4(f) of the U.S. Department of Transportation Act declares that, "… [it is] the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites … ."

Prior to making *de minimis* impact determinations under 23 CFR §774.3(b), CDOT and FHWA undertook the following coordination process:

For historic properties:

- The consulting parties identified in accordance with 36 CFR §800 were consulted.

- The FHWA received written concurrence from the SHPO in a finding of "No Adverse Effect" or "No Effect" in accordance with 36 CFR §800. The FHWA informed these officials of its intent to make a *de minimis* impact determination based on their

concurrence in the finding of "No Adverse Effect" or "No Historic Properties Affected."

- Public notice and the opportunity to comment were made available as required by 36 CFR §800.

There are no *de minimis* impact determinations for the parks, recreation areas, and wildlife and waterfowl refuges under the Central 70 Project.

The updates to the Section 4(f) approval are included in this document in Chapter 10, Section 4(f) Updates.

The FHWA conducted the necessary consultation with SHPO and the Department of the Interior as part of the Final EIS process and has determined that there is no feasible and prudent avoidance alternative and the Central 70 Project includes all possible planning to minimize harm to the Section 4(f) properties resulting from such use.

## 6.5    Environmental Justice

After considering the benefits of the Central 70 Project along with the avoidance, minimization, and mitigation, the alternative will not cause disproportionately high and adverse effects on any minority or low-income populations, in accordance with the provisions of Executive Order 12898 and FHWA Order 6640.23A. No further environmental justice analysis is required. See *Section 5.3, Environmental Justice,* of the Final EIS for more information.

## 6.6    Other Determinations

Wetlands and other waters of the U.S. within the area require a Nationwide Permit 14 (Linear Transportation Projects) because the permanent impacts to jurisdictional wetlands and other waters of the U.S. are less than the Section 404 Individual Permit threshold of 0.5 acre.

Per the Endangered Species Act, Section 7, a *no effect* determination is made for the Preble's meadow jumping mouse (PMJM), the black-footed ferret, and for all five Platte River Species. A *may affect, not likely to adversely affect* determination is made for the Ute ladies'-tresses orchid and the Colorado butterfly plant. It is also determined that the proposed project would not result in the "take" of Bald Eagles, as described in the Bald and Golden Eagle Protection Act and Migratory Bird Treaty Act.

There are no prime and unique farmlands present in the study area; therefore, no analysis was done per the Farmland Protection Policy Act.

## 6.7    Monitoring and Enforcement

Permits required for the project will be coordinated with the appropriate jurisdiction and obtained prior to construction. Required permits and approvals for the project are likely to

include those shown in **Exhibit 17**. Additional permits may be required and must be obtained.

Additional local permits may be required in concert with activities such as:

- Erosion control/grading
- Utility access, relocation, or surveying
- Construction, slope, and utility easements
- Access and authorizations

**Exhibit 17      Summary of Permits and Approvals Necessary for the Project**

| Environmental Approvals | Purpose | Permitting Agency/ Approval Agency |
|---|---|---|
| Air Pollutant Emission Notice | For determining whether an air quality permit is needed; identifies sources of and levels of emissions from new construction and whether any emission elements are regulated pollutants | CDPHE, APCD |
| Stationary Source Air Quality Permit | For emissions from potable units, rock crushers, generators, asphalt plants, and cement plants used during construction | CDPHE, APCD |
| Fugitive Dust Permit | For fugitive dust emissions due to construction activities | CDPHE, APCD |
| Asbestos Abatement Permit | For abatement of friable asbestos when the quantity of ACM exceeds the trigger levels | CDPHE, APCD |
| Demolition permits | For demolition of any building and other structures | CDPHE and all applicable governmental authorities |
| Historic Structures Demolition Permit | For demolition of any structures that are at least 120 square feet and 1.5 stories in height which are located in the Denver city limits; the Landmark Preservation Office reviews the structure and determines whether the structure qualifies for landmark designation | Denver Landmark Preservation Commission |
| Construction Noise Permit | For noise resulting from construction activities | All applicable governmental authorities |
| Temporary Noise Variance | For allowing a temporary variance for noise generated from construction activities to adhere to local noise ordinances | All applicable governmental authorities |
| Clean Water Act Section 402 Construction Dewatering Permit | For groundwater or surface waters encountered during construction that must be discharged or dewatered | CDPHE, Water Quality Control Division (WQCD) |
| Construction Activities Stormwater Discharge Permit | For stormwater runoff from construction activities that include clearing, grading, grubbing, and demolition that will exceed one acre of disturbance. | Denver Wastewater Management |
| Colorado Discharge Permit System Stormwater Construction Permit | For stormwater discharges and erosion/sediment control | CDPHE, WQCD |
| Municipal Separate Storm Sewer System (MS4) Discharge Permit (CDOT MS4 discharge requirements) | For discharges of stormwater from storm sewer systems of CDOT highway drainage systems; CDOT discharge requirements are outlined in Colorado Discharge Permit Regulations Permit COS-000005 and COR-030000 | CDPHE, WQCD |
| Municipal Separate Storm Sewer System (MS4) Discharge Permit (outside CDOT right of way) | For discharges of stormwater from regulated small municipal separate storm sewer systems (MS4s) | All applicable governmental authorities |
| Subterranean Groundwater Permit | For discharges of source water from subterranean structures (basement, foundation, footer drains, etc.) and/ or well development water to waters of the state | CDPHE, WQCD |

**Exhibit 17        Summary of Permits and Approvals Necessary for the Project**

| Environmental Approvals | Purpose | Permitting Agency/ Approval Agency |
|---|---|---|
| Construction Dewatering Permit | For discharges of ground water from construction in wet areas or excavating; allows for ground water to be discharged to surface water or back to the ground | CDPHE, WQCD |
| Remediation Activities Discharging to Surface Waters Permit | For discharges of remediation activities to surface waters of the state | CDPHE, WQCD |
| Remediation Activities Discharging to Groundwater | For discharges of remediation activities to groundwater | CDPHE, WQCD |
| Substitute Water Supply Plan | For temporary subscription to water rights for use of wells operating within the South Platte River Basin | Colorado Division of Water Resources |
| Notice of Intent to Construct Dewatering Wells | For constructing or re-constructing a dewatering well; does not include water rights | Colorado Division of Water Resources |
| Notification as Resource Conservation and Recovery Act (RCRA) Generator | For any projects that generates hazardous waste of three gallons or more in a calendar year of used solvents that are in the hazardous waste categories: F004, F002, or F005 | CDPHE Hazardous Materials and Waste Management Division |
| Stormwater Quality Discharge Permit for Construction Activities | For discharges of stormwater from construction sites disturbing greater than one acre | City of Aurora |
| Sewer Use and Drainage Permit | For each building and/or individual tenant in a project; permits must be obtained prior to construction | Denver |
| Well Abandonment Report (GWS-09) | For plugging and sealing of permitted wells, monitoring or other holes | State of Colorado, Office of State Engineer |
| Black-Tailed Prairie Dog Removal Permit | For removal and relocation of black-tailed prairie dogs | CPW |
| SB40 Certification/Approval | For projects funded by state monies or implemented by state agencies that will result in impacts to stream banks, stream channels, and riparian areas | CPW |
| Nest Take Permit | For removal or relocation of Bald or Golden Eagle nests | U.S. Fish and Wildlife Service (USFWS) |
| Clean Water Act Section 404 Permit | For impacts to jurisdictional waters of the United States | USACE |
| Special Use Permit | For installation of utilities, or the performance of other types of work, within the state highway right of way | CDOT |
| Proposal Description/Environmental Screening Form | Approval for temporary non-conforming uses of 6(f) properties | CPW and NPS |

This page intentionally left blank.

# Chapter 7    Community Outreach and Agency Involvement

As outlined in *Chapter 10, Community Outreach and Agency Involvement,* of the Final EIS, CDOT has conducted continuous community outreach on the I-70 East Project for more than 13 years, including door-to-door outreach and public and neighborhood meetings in the most directly impacted neighborhoods. Since the beginning of the project, alternatives and mitigation have continuously been refined as a result of feedback from the impacted communities and local governments.

## 7.1    Community Outreach since the Final EIS

The project team continued agency involvement and community outreach efforts after publication of the Final EIS. After the release of the Final EIS, CDOT held two public hearings during the Final EIS public review, offered workshops and meetings focused on the highway cover and aesthetics, opened a right-of-way project office within the most impacted neighborhood, and continued participating in community functions.

The review period began on January 15, 2016, and was scheduled to end on February 16, 2016, but because of multiple requests for additional time, the review period was extended through March 2, 2016. During the Final EIS review period from January 15, 2016, to March 2, 2016, 730 public and agency comment submissions were received. Many of these submittals included multiple comments, resulting in thousands of comments. More information on the comments received on the Final EIS and responses to the overarching concerns raised in the substantive comments can be found in Chapter 8, Comments on the Final EIS and Air Quality Documents, of this document.

During the Final EIS review period, two public hearings were held to provide the public with an update of the recent Final EIS study developments, to summarize the Final EIS document available for public review, and to provide an opportunity for public comment. Originally, three public hearings were scheduled for the project; however, one was cancelled due to inclement weather. **Exhibit 18** lists the hearings and number of attendees at each meeting.

**Exhibit 18        I-70 East Final EIS Public Hearings**

| Meeting Date | Meeting Location | Attendees |
|---|---|---|
| Monday, February 1, 2016 | North Middle School, 12095 Montview Boulevard, Aurora, Colorado | 11 |
| Tuesday, February 2, 2016 | Adams City High School, 7200 Quebec Parkway, Commerce City, Colorado | Cancelled due to inclement weather |
| Wednesday, February 3, 2016 | Bruce Randolph Middle School, 3955 Steele Street, Denver, Colorado | 213 |

CDOT, in partnership with DPS and Denver, organized a cover planning workshop, held on April 7, 2016. The workshop was held to gather public thoughts on the cover design and the features that will be included. The project team also presented design concepts for other design elements throughout the corridor, including noise walls, retaining walls, and gateway elements.

Instead of the monthly Community Leaders meetings, the project team began to offer extended office hours on the first and third Wednesdays of the month from 4:30 p.m. until 6:30 p.m. at the I-70 East/Central 70 Project Right-of-Way Office. This started on April 6, 2016, and was made known to the public through the project website, e-mail blasts, the project kiosk, and flyers available at community centers and community functions. Project staff are available to provide project updates and answer questions during these new extended office hours. The right-of-way project staff also started extended office hours within the neighborhood and distributed right-of-way office information and hours through mailers in the neighborhood.

Additionally, as part of the outreach effort, the project team reserved tables at community functions—such as the RTD station opening event on April 23, 2016, the Swansea Elementary School Carnival on May 14, 2016, and the Growhaus Denver Days on August 6, 2016—to provide information about the project.

## 7.2    Future Outreach Plans

The I-70 East project team has been, and continues to be, committed to community outreach and involvement through the environmental planning process and throughout all phases of construction. The developer will be:

- Required to employ a bilingual community liaison who has extensive knowledge of the Elyria and Swansea Neighborhood to last through the duration of construction

- Responsible for preparing and implementing a Strategic Communications Plan, in collaboration with CDOT, that will outline how important information will be communicated to stakeholders

- Tasked to establish a communications team and hold regular meetings with CDOT to discuss any public information and outreach tasks

The plan will include the following individual plans to assure well-coordinated communications throughout each phase of the project:

- Construction Period Communications Plan

- Maintenance and Operations Communications Plan

- Crisis Communications Plan

Each of the plans will include communications strategies, primary stakeholder lists, and identification of any public information issues and proposed outreach.

A variety of approaches and tools will be used to assure proper communication to stakeholders and the public about project schedule, progress, and construction impacts, and any potential issues that may arise, including:

- Phone and email
- Public meetings
- Business meetings
- Social media
- Stakeholder distribution list
- Tours and communication events
- Lane closure reports
- Traffic alerts

- Web page updates
- Project newsletters
- Translation and bilingual communication for people whose primary language is one other than English
- Public communication materials
- Photos/videos
- Project identification signing

This page intentionally left blank.

# Chapter 8    Comments on the Final EIS and Air Quality Documents

This section summarizes the comments that were received during the review periods for the Final EIS and air quality documents and responds to the overarching concerns raised in the substantive comments.

## 8.1    Overview of Comments Received on the Final EIS

The review period for the Final EIS began on January 15, 2016, and was scheduled to end on February 16, 2016, but because of multiple requests for additional time, the review period was extended through March 2, 2016. During the review period, 730 submissions were received from the public, stakeholders, and agencies. Many of these submittals included multiple comments and some commenters made multiple submissions. There were 591 commenters. Comments on the Final EIS were submitted through a variety of methods, as described in **Exhibit 19**.

**Exhibit 19    Number of Comments by Submission Type**

| Submission Type | Number of Submissions | Submission Description |
|---|---|---|
| Website | 524 | Online feedback form through the project website |
| Email | 107 | Email to contactus@i-70east.com |
| Letter | 20 | Letter sent or delivered to CDOT or FHWA |
| Comment form | 18 | Comment forms received at the public hearings |
| Verbal | 61 | Testimony from the public hearings |
| **Total** | **730** | |

All comments in their entirety are included in this document in *Attachment E, Comments on the Final EIS,* organized into the following groups: Agencies and Elected Officials, Businesses and Special Interest Groups, and Citizens. Comments within each group are ordered alphabetically; citizens are alphabetized by last name. A summary of the number of comments received by type is shown in **Exhibit 20**. The locations from which comments were submitted are shown in **Exhibit 21**.

**Exhibit 20    Number of Commenters**

| Submitter Type | Number of Submissions |
|---|---|
| Agencies and Elected Officials | 14 |
| Businesses and Special Interest Groups | 20 |
| Citizens | 557 |
| **Total** | **591** |

Comments on the Final EIS and Air Quality Documents      I-70 East ROD 1: Phase 1 (Central 70 Project)

**Exhibit 21     I-70 East Final EIS Comment Submittal Locations**



## 8.2    Overview of Comments Received on the Air Quality Documents

The review period for the air quality documents began on December 16, 2016 and concluded on January 14, 2017. During the review period, 151 submissions were received from the public, stakeholders, and agencies. Many of these submittals included multiple comments and some commenters made multiple submissions. There were 130 commenters.

All comments received during the review period for air quality are included in this document in *Attachment F, Comments on the Air Quality Documents*, ordered alphabetically; citizens are alphabetized by last name.

## 8.3    Substantive Comments

This document only responds to the overarching concerns raised in the substantive comments received on the Final EIS and air quality comments, in accordance with CEQ regulations at 40 CFR §1503.4.

Generally, a comment is considered substantive if it raises specific issues or concerns regarding the project or the study process. If the comment merely expresses opinions or support for/against the project or a particular alternative, then it is not considered substantive.

For the comments, the following criteria were used to determine whether a comment was substantive:

1. Requires clarification or modification of an alternative or mitigation measure

2. Requires development of an alternative that was not previously considered

3. Identifies absence of analysis that should have been done; or identifies needed improvements, flaws, or modifications to the analysis that was done

4. Recognizes an issue that is out of scope for the project, but which warrants a response

5. Identifies an issue or contextual error that can be resolved through clarification

6. Identifies procedural issues or other issues requiring a response

In some instances, comments were not considered substantive but responses were included to clarify issues that were frequently commented on.

## 8.4    Approach Used to Summarize and Respond to Comments

At the close of the review period, each submission was reviewed to identify the substantive comments. Some submissions contained no substantive comments; others contained many separate substantive comments.

FHWA and CDOT considered all comments, whether one person or 100 people submitted a particular comment. Receipt of a large or small number of comments expressing a particular idea, preference, or opinion does not make the expressed view more or less valid.

The consideration of public comments is not a vote-counting process in which the outcome is determined by the majority opinion. Relative depth of feeling and interest among the public can serve to provide a general context for decision-making. However, it is the appropriateness, specificity, and factual accuracy of comment content that serves to provide the basis for modifications to planning documents and decisions. Further, because commenters are self-selected, they do not constitute a random or representative public sample. NEPA encourages all interested parties to submit comments as often as they wish regardless of age, citizenship, or eligibility to vote. Commenters may, therefore, include business owners or employees; people from outside the project area, including those living in other countries; children; and people who submit multiple comments. Every substantive comment and suggestion has value, whether expressed by one commenter or many.

Following federal regulations (40 CFR §1503.4), not every comment is responded to. The comments were reviewed to identify substantive comments, which then were addressed. Although each substantive comment was not responded to individually, the substantive comment topic was identified and responded to. A summary of the overall concerns raised in the substantive comments received, sorted by topic, is provided below in **Exhibit 22**. Responses are found following the exhibit according to the page numbers listed in the far right column.

**Exhibit 22        Concerns Raised within the Substantive Comments Received on the Final EIS**

| Comment Topic | | Page # |
|---|---|---|
| **General Topics** | | |
| GEN1 | Scope of the purpose and need statement | 84 |
| GEN2 | Determining boundaries for the I-70 East Project | 85 |
| GEN3 | Use of the American Planning Association's Peer Review | 86 |
| GEN4 | Local hiring | 86 |
| GEN5 | The effects of public comments | 86 |
| GEN6 | Final EIS review period | 87 |
| GEN7 | Air quality documents review period | 88 |
| GEN8 | No predetermined outcomes | 90 |
| GEN9 | Inclusion in regional planning documents | 90 |
| **Outreach Efforts** | | |
| OUT1 | Public involvement to date | 91 |
| OUT2 | Future public involvement and outreach | 94 |
| **Alternatives Analysis** | | |
| ALT1 | No-Action Alternative | 94 |

**Exhibit 22      Concerns Raised within the Substantive Comments Received on the Final EIS**

| | Comment Topic | Page # |
|---|---|---|
| ALT2 | Alternatives development and determining reasonable alternatives | 95 |
| ALT3 | I-270/I-76 Reroute Alternative | 96 |
| ALT4 | Considerations of future technology | 96 |
| **Impacts and Mitigation Measures** | | |
| IMP1 | Mitigation commitments | 99 |
| IMP2 | Impacts to Swansea Elementary School | 102 |
| IMP3 | Hazardous materials | 103 |
| IMP4 | Noise | 104 |
| IMP5 | Energy consumption during construction | 106 |
| IMP6 | Traffic during construction | 106 |
| **Preferred Alternative** | | |
| PA1 | The highway cover | 107 |
| **Air Quality and Health** | | |
| AQ1 | Health impact assessment | 108 |
| AQ2 | Air quality design values and background concentrations | 110 |
| AQ3 | Air quality analysis updates and changes in results | 111 |
| AQ4 | Transportation conformity | 113 |
| AQ5 | Data and modeling files for air quality analysis | 114 |
| AQ6 | Air quality and the highway cover | 114 |
| AQ7 | Air quality monitoring | 115 |
| AQ8 | Air quality and truck emissions | 115 |
| AQ9 | $PM_{2.5}$ and nitrogen dioxide | 116 |
| AQ10 | Greenhouse gases | 116 |
| **Property Impacts** | | |
| PROP1 | Property acquisitions | 117 |
| PROP2 | Replacement housing | 118 |
| **Environmental Justice Considerations** | | |
| EJ1 | Environmental justice | 118 |
| **Transportation and Traffic** | | |
| TRANS1 | Multi-modal considerations | 121 |
| TRANS2 | Intersection at 47th Avenue and York Street | 121 |
| TRANS3 | Traffic forecasting and modeling | 122 |
| TRANS4 | Highway laneage and width | 124 |
| TRANS5 | Restricting truck traffic on I-70 | 125 |
| TRANS6 | Future driving trends | 126 |

**Exhibit 22      Concerns Raised within the Substantive Comments Received on the Final EIS**

| Comment Topic | | Page # |
|---|---|---|
| TRANS7 | Transportation Demand Management | 127 |
| **Funding Strategies** | | |
| FUND1 | Managed lanes | 127 |
| FUND2 | Project funding | 127 |
| **Drainage** | | |
| DRAIN1 | Preferred Alternative Drainage | 129 |
| DRAIN2 | Connected actions | 132 |

# 8.5    Responses to Substantive Comments Received

A list of concerns was prepared and responded to as a way to capture the substantive topics that were commented on. As listed in **Exhibit 22**, these topics include general information, outreach efforts, alternatives analysis, impacts and mitigations, Preferred Alternative, air quality and health, property impacts, environmental justice, transportation and traffic, funding strategies, and drainage.

Responses to substantive comments received on the air quality documents can be found in GEN7, AQ2, AQ3, AQ4, and AQ5.

## General Topics

### GEN1.    Scope of the purpose and need statement

Comments were received that expressed concerns about the limited scope of the purpose and need statement for the I-70 East Project. In general, the purpose and need for a transportation project focuses on the underlying reasons for proposing the transportation project, and, typically, those reasons are based on meeting a transportation need. The purpose and need of a project is essential in establishing a basis for the development of the range of reasonable alternatives required in an EIS and assists with the identification and eventual selection of a preferred alternative. According to FHWA's guidance in Section 6002 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, the concept of purpose and need that was established by CEQ does not substantively change. It simply provides examples of some purposes that *can be* included in a purpose and need statement.

For the I-70 East Project, the purpose and need was developed in early 2004, and was reviewed and discussed with the Intergovernmental Coordination and Compliance Committee and the Executive Oversight Committee of the project team. The purpose and need for the project was first presented to the public in draft form for review and input at corridor-wide meetings in February 2004. The original purpose and need of the project included transit elements since the project was a joint effort between FHWA, the Federal

Transit Administration (FTA), CDOT, and the Regional Transportation District (RTD). The highway and transit elements of the project were separated in 2006 due to funding availability and other reasons. The purpose and need also was presented at public meetings held in December 2008 after revisions were made when the transit elements were removed.

The purpose of the project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area. The need for this project results from the following issues:

- Transportation infrastructure deficiencies
- Increased transportation demand
- Limited transportation capacity
- Safety concerns

### GEN2.    Determining boundaries for the I-70 East Project

Some comments questioned how the project limits were determined and questioned if they were large enough to fully address the issues along I-70. Project limits also are known as logical termini and are defined as: (1) rational end points for a transportation improvement, and (2) rational end points for a review of the environmental impacts.

The I-70 East Project limits extend along I-70 between I-25 and Tower Road, a length of 12 miles. Existing and forecasted traffic volumes were the main factors in determining the project limits on I-70. Forecasted traffic volumes for the year 2035 range from 95,000 vpd to 270,000 vpd between I-25 and Peña Boulevard, declining east of there. The western limit is I-25 because of the high diversion of traffic from I-70 to both northbound and southbound I-25. The 2035 travel demand model forecasted that between 40 percent and 50 percent of traffic traveling westbound on I-70 will divert onto I-25. CDOT has no current or foreseeable future plans to widen I-70 west of the I-25/I-70 interchange in Denver. Tower Road is the eastern limit because the traffic volumes drop substantially east of Peña Boulevard.

The environmental impact review typically covers a broader geographic area than the strict limits of the transportation improvements. For I-70 East, the project area covers locations within Denver, Commerce City, and Aurora. The project area is an approximate one-mile buffer zone around I-70 within the project limits.

In the analysis performed for the EIS, each resource has a specific study area. Those study areas may be the same as the project area or construction limits of the evaluated alternatives, depending on the resource. The project area was primarily identified to initiate this study and identify possible project alternatives. Not all resources will be evaluated for impacts within the entire project area. Some resources—such as social and economic resources—have a broader study area that includes all the neighborhoods impacted along the corridor, while others—such as utilities—are analyzed within the project's construction limits.

### GEN3.    Use of the American Planning Association's Peer Review

Some commenters referenced the Transportation Planning Division of the American Planning Association's (APA) Peer Review in their comments and called out specific findings from the report. This report came about because the APA accepted an invitation from the Denver City Auditor and from one of the Denver City Council Members-at-Large to conduct an expert panel review of the I-70 East Project during the public comment period for the Supplemental Draft EIS. This review was performed independently from CDOT and FHWA, when the I-70 East Project team normally is restricted from participating in such activities. The project team provided some information to answer APA's questions, but was precluded from responding in an in-depth manner during the comment period.

The Transportation Planning Division submitted a final report to the elected officials who sponsored the expert panel. Those officials incorporated information from the report into their comments on the Supplemental Draft EIS. The Final EIS includes responses from CDOT to the sponsoring elected officials and information included in the report, addressing many of the questions it raised, in areas such as travel demand modeling or managed lanes.

### GEN4.    Local hiring

Some comments received requested more details and clarification about CDOT's plan to employ local workers from the project area for the construction of the Preferred Alternative. Typically, CDOT is prohibited by federal law from requiring contractors on any federally funded project to hire from a particular location or neighborhood. However, CDOT submitted an application and received approval under Special Experiment Project 14 (SEP-14) for the U.S. Department of Transportation pilot program to execute geographic-based hiring preferences for the I-70 East Project. Additionally, CDOT will facilitate opportunities to promote local hiring, including hosting local job fairs. CDOT is researching funding a local workforce development program aimed at job readiness training prior to construction. CDOT will look to a variety of tools, including continued community outreach, to ensure that local residents and businesses are well informed of the local hiring and job training opportunities provided as part of the project.

### GEN5.    The effects of public comments

Substantive comments were received expressing a general feeling that public comments were not affecting the project because many comments were received about further examining other alternatives, yet further studies have not happened. The project must consider all comments, whether submitted by one person or 100 people. Receipt of a large or small number of comments expressing a particular idea, preference, or opinion does not make the expressed view more or less valid.

For example, a large number of commenters objecting to an alternative cannot vote the alternative out of the EIS. If it is a reasonable alternative, even if unpopular, the agency has an obligation to evaluate it in the EIS (40 CFR §1502.14). On the other hand, a single commenter can identify a reasonable alternative that the project has overlooked and cause it to be added to the EIS. Comments received have not identified a reasonable alternative

that was overlooked by the project, as discussed in greater detail in ALT2. Many comments received on the Final EIS expressed a desire to further study an alternative that would remove I-70 from its existing alignment and redirect traffic onto I 270/I-76. As further described in ALT3, the I-270/I-76 Reroute Alternative was evaluated and eliminated in the early stages of the 2008 Draft EIS alternatives analysis process because it did not meet the project's purpose and need and is, therefore, not a reasonable alternative.

It is important to recognize that the consideration of public comments is not a vote-counting process in which the outcome is determined by the majority opinion. Relative depth of feeling and interest among the public can serve to provide a general context for decision-making. However, it is the appropriateness, specificity, and factual accuracy of comment content that serves to provide the basis for modifications to the project and future decisions. Further, because commenters are self-selected, they do not constitute a random or representative public sample. NEPA encourages all interested parties to submit comments as often as they wish regardless of age, citizenship, or eligibility to vote. Commenters may, therefore, include business owners or employees, people from other countries, children, and people who submit multiple comments. Every comment and suggestion has value, whether expressed by one commenter or many.

OUT1 further describes the outreach the project has done since 2003, and how this input has informed the project throughout the process.

### GEN6.   Final EIS review period

Some comments raised questions about CDOT's public comment process during the Final EIS review period. Of these, many raised concerns about the public review period being too short and many were experiencing difficulties when trying to submit comments. The review period for the Final EIS began on January 15, 2016, and was scheduled to end on February 16, 2016. Because of multiple requests for additional time, the review period was extended through March 2, 2016. An additional 15 days was added to the review period based on the following factors:

- CDOT has conducted extensive outreach to the local community over the last 13 years and, in particular, the nearly four years since the lowered highway concept was first presented to the public. This outreach has included more than 200 public meetings, regular updates with City Council staff, door-to-door outreach, and regular project updates via flyers, email, and the website (www.i-70east.com).

- The Final EIS document was posted on the website, was provided to local viewing locations in hard copy, and DVDs were mailed to all persons who made substantive comments on the Supplemental Draft EIS on January 4 and January 5, 2016— nearly two weeks before the official release. In addition, the 30-day public review period was actually 33 days due to a weekend and holiday. Therefore, the document was available for review for 44 days rather than 30 days. An additional 15 days allowed the document to be available for 59 days, only one day less than the 60 days that was requested.

- The Final EIS is an updated version of the Supplemental Draft EIS that was released in August 2014 and responds to all comments received during that public comment period. The Supplemental Draft EIS was available for a 60-day public comment period and has continued to be available for review on the website.

- The Final EIS was set up to facilitate public review by providing the Executive Summary in both English and Spanish. It also included boxes at the beginning of each chapter and each resource section within *Chapter 5, Affected Environment, Environmental Consequences, and Mitigation*, which outline the substantive changes. Comments received on the Supplemental Draft EIS are included in *Attachment Q* of the Final EIS and are organized in a Table of Contents to make them easy to find. A Frequently Received Comments and Responses document was prepared and included in both English and Spanish that summarizes the frequently made comments with responses.

- Comments have been and continue to be received that the EIS process has gone on too long as it is and it's time to move forward.

CDOT received hundreds of comments through the feedback form on the website during the review period, and CDOT is aware that some people had issues with the feedback form. There were not any official "down times" recorded for the form during the review period, but there were a few factors that could have caused issues for the users:

- Volume was particularly high at that time

- Submitters were on a slow Internet connection

- Spam filters could have been interfering

- The security text that needed to be filled in at the end of the form (CAPTCHA) was not entered correctly by the submitter

CDOT disabled the CAPTCHA text requirement for the last few days of the review period in an attempt to lessen the number of feedback form submittal errors. All commenters who submitted their comments via the feedback form or email received an email from the project team confirming the comment had been received. Additionally, comments received shortly after the deadline still were accepted.

Other options were available for commenting on the Final EIS. At the bottom of the feedback form, there was a link that provided the project's email address and mailing address in case people had problems with the form. In addition, contact information is included in the Final EIS. When CDOT was asked how to submit comments, the link to the feedback form was provided, as well as the project email address and the contact information from the Final EIS.

## GEN7.    Air quality documents review period

Some comments raised concerns about the public involvement opportunities CDOT provided for the draft revised air quality and conformity analyses, in particular that the

comment period was too short and that certain technical information and data was not available for review. Therefore, the public was unable to provide meaningful comments on the analyses.

The review period for the air quality documents began on December 16, 2016. Announcements of the review period were included in an email to the project distribution list, were included in a flyer in the project kiosk, and a newsletter was hand delivered to several thousand residents in the project area. Links to the air quality documents were posted on the website along with names and phone numbers to speak with someone for assistance. The summary of information released was translated into Spanish, hard copies of the documents were available at the project office within the community, and staff was available at the project office (including translation services) for extended hours to answer questions or receive comments in person, in order to provide more opportunities for the communities to stay involved in the process. The technical data and information used to construct the analyses was available upon request from the beginning of the comment period and was provided to several parties promptly upon request.

A project level conformity determination is required at the completion of the NEPA process (40 CFR 93.104(d)). For the I-70 East project, the project level conformity determination must be made when the ROD is issued (40 CFR 93.101). Federal law and regulations do not require project-level conformity analyses or determinations be opened for comments for any particular time period. The 30-day period provided for the review of the draft updated air quality and conformity analyses is the same that would have been required under NEPA if they had appeared in the Final EIS, and was sufficient to allow for meaningful public review and comment on the new information. CDOT made every effort to promptly provide information and assistance to interested parties during that time. In light of this, the comment period was not extended.

The conformity determination is being made as part of the I-70 EIS process, and an additional period for review was provided as part of that ongoing public involvement process to give the public an additional opportunity to consider the updated hotspot analysis and its role in the conformity analysis.

The Final EIS had a full 45-day comment period including the extensions that were granted. The air quality update reports were not a supplemental EIS nor was one required because they did not reveal new significant impacts that were not already considered in Final EIS. The updated air quality analysis responded to comments raised on the Final EIS, used new data, and more advanced methodologies. The results of the new analysis continued to demonstrate the project level conformity finding of this project. For the air quality documents, there are no changes in the conclusions that there are no exceedances of the NAAQS, the subject of the reports was narrow and included substantial technical information, and any additional data was made available upon request. As such, 30 days was an adequate amount of time to allow the public to review and weigh in on the updated analyses

### GEN8.    No predetermined outcomes

Substantive comments received raised questions about why CDOT was already selecting a developer and purchasing properties if a final decision had not been made. Federal regulation/federal law permits issuance of a Draft Request for Proposal (RFP) concurrent with the NEPA process. However, CDOT cannot and did not definitively commit to any alternative, nor can proposers proceed with final design or construction, prior to completion of the NEPA process and issuance of a ROD. Federal regulation imposes additional limitations on CDOT during the environmental review process, which are further detailed in the Draft RFP documents.

CDOT and HTPE will identify a partner (a developer) to design, build, finance, operate, and maintain the I-70 East Corridor. At this stage in the developer selection process, multiple Draft RFPs have been issued. The RFP is one of the most important elements in this highly competitive selection process. It lays out CDOT's expectations—technical scope, contractual requirements, and performance standards for the project. The developer responds with highly detailed information about how they propose to design, build, finance, operate, and maintain the I-70 East Project. In addition, the developer will be required to provide detailed financial information and outline how it will ensure transparency to be able to meet the goals of the state, the general public, and the impacted communities. No commitment to an alternative, design, construction, developer, or other element was made prior to the issuance of this ROD.

As allowed under 23 CFR §710.501, Early Acquisition, "the State may initiate acquisition of real property at any time it has the legal authority to do so based on program or project considerations. The State may undertake early acquisition for corridor preservation, access management, or other purposes."

In September 2013, CDOT began the early acquisition of properties to assist with implementation of the Preferred Alternative. A number of these property acquisitions would be required by more than one of the proposed alternatives. However, public comments and review of the EIS continue to shape and change the project. None of the early acquisition properties are historic (listed or eligible for listing on the NRHP).

### GEN9.    Inclusion in regional planning documents

The 2040 Fiscally Constrained RTP (https://drcog.org/programs/transportation-planning/regional-transportation-plan) was adopted by DRCOG on February 18, 2015, and the "2015 Cycle 2 Amendments to the 2040 Fiscally Constrained Regional Transportation Plan" were adopted on March 16, 2016. The Fiscally Constrained RTP includes only those transportation projects from the MVRTP that can be built over the next 25 years based on current forecasts for transportation funding. Regionally significant projects like the highway improvements that are being considered as part of this EIS must be part of the Fiscally Constrained RTP and the TIP to be eligible for federal funding.

The improvements included in the Fiscally Constrained RTP are reconstructing I-70 from I-25 to Chambers Road and adding one new managed lane in each direction ($1.1757 billion, 2015 dollars). These improvements listed in the Fiscally Constrained RTP comprise the Central 70 Project.

## Outreach Efforts

### OUT1.   Public involvement to date

Substantive comments on the Final EIS expressed questions about the inclusiveness of CDOT's public involvement process over the life of the I-70 East Project. CDOT has conducted continuous public involvement on the I-70 East Project for more than 13 years, including door-to-door outreach and public and neighborhood meetings in the most directly impacted neighborhoods. Since the beginning of the project, alternatives and mitigation have been refined continuously as a result of feedback from the impacted communities and local governments. The project team has used the concept of context-sensitive solutions to help form all elements of the project, from the outreach through the design.

As part of its outreach efforts, CDOT convened a committee of community and stakeholder representatives in 2009 after publication of the 2008 Draft EIS. This group, the PACT, met regularly over the course of one year to help identify a preferred alternative.

Some of the meetings, such as the Community Leaders meeting, are intended to be informal. Public meetings held by the I-70 East project team are held in the evenings with notices sent to the public and stakeholders at least two weeks prior to the meeting. CDOT has used many different community outreach techniques to invite the public to participate in the meetings. These techniques include, but are not limited to, email announcements, mailers, flyers, door-to-door canvassing, telephone invitations, flyers in school packets, posters at community locations, and a neighborhood informational kiosk.

Extensive notification is provided in advance of each large public meeting, including delivering flyers to all residents near the highway, mailers to property owners, email announcements, flyers in school packets, and posters at community locations throughout the neighborhoods.

To encourage public participation and to make the meetings accessible for the general public, all public meetings have been held at ADA-accessible locations in nearby neighborhoods, including, but not limited to, Elyria and Swansea, Commerce City, Aurora, and Northeast Park Hill. Food, childcare, and Spanish translation also have been provided at all of CDOT's public meetings.

Spanish translators have been available throughout the process at every public meeting and also helped staff the onsite project office during the Supplemental Draft EIS public comment period. The Executive Summary for the Supplemental Draft EIS and the Final EIS are published in both English and Spanish. The materials on the English website are translated to Spanish on a regular basis for inclusion on the Spanish version of the website

(www.i-70east.com/index-es.html). All printed and electronic materials distributed to the public—including mailers, flyers, emails, newsletters, and posters—are bilingual in English and Spanish. Door-to-door outreach in the impacted communities also has been conducted with Spanish-speaking team members.

I-70 East project-specific public meetings are documented and the meeting notes from these meetings are available on the project website (www.i-70east.com) and are available as hard copies upon request. Handout materials from meetings are translated into Spanish and translators are available at every meeting. Official transcripts of the public hearings on the 2008 Draft EIS, 2014 Supplemental Draft EIS, and 2016 Final EIS also are available on the project website. An outline of the community outreach timeline can be found in **Exhibit 23**.

Comments received during the community outreach efforts were considered by CDOT and FHWA and, as appropriate, they were incorporated during the decision-making process. The information gathered during the outreach process has helped the project team refine the project alternatives. These changes include, but are not limited to, refinements to the mitigation commitments, updating the air quality analysis, keeping the Steele Street/Vasquez Boulevard interchange open, and coordinating with Denver.

Please refer to Chapter 7, Community Outreach and Agency Involvement, of this ROD and *Chapter 10, Community Outreach*, of the Final EIS for details about the project's outreach efforts to the public and stakeholders.

I-70 East ROD 1: Phase 1 (Central 70 Project) — Comments on the Final EIS and Air Quality Documents

**Exhibit 23     Community Outreach Timeline**



## OUT2.   Future public involvement and outreach

As the project has proceeded, commenters have expressed a strong desire to remain involved and informed about all aspects of the I-70 East Project. The project team has been, and continues to be, committed to community outreach and involvement through the environmental planning process and throughout all phases of construction. The developer will be tasked to establish a communications team and hold regular meetings with CDOT to discuss any public information and outreach tasks. The developer, in collaboration with CDOT, will be responsible for preparing and implementing a Strategic Communications Plan that will outline how important information will be communicated to stakeholders.

To assure proper communication to stakeholders about project schedules, progress, construction impacts, and any potential issues that may arise, a variety of approaches and tools will be used. Many of these methods—phone and email, public meetings, web page updates—have been used successfully in the past and will be continued. New methods that apply to the construction aspect—lane closure reports, traffic alerts, project identification signing—will be added to the cadre of tools available to make sure the public is fully informed about the project—before, during, and after construction.

For more information on community outreach and involvement, see Chapter 7, Community Outreach and Agency Involvement, of this document.

# Alternatives Analysis

## ALT1.   No-Action Alternative

Some comments asked why a true no-action alternative is not included in the Final EIS. A no-action alternative, required by 40 CFR §1502.14, is an alternative in which a proposed project makes no changes to a facility. Typically, this type of alternative has no impacts other than those brought about by routine maintenance activities. However, the No-Action Alternative for the I-70 East Project cannot be a true "no-action alternative" because of infrastructure deficiencies. The current viaduct is deteriorating and becoming unsafe to use. To date, CDOT has invested in "Band-Aid" solutions that have allowed the structure to remain in service. These types of solutions are short-term, unsustainable fixes that will not maintain the viaduct indefinitely. Therefore, to address the critical safety issues and deficiencies, the No-Action Alternative replaces the viaduct, but does not add capacity in terms of additional lanes.

However, this type of replacement poses additional challenges to a true no-action alternative because of improvements in design and safety standards in the intervening decades since the viaduct was built. Any new facility must be constructed to modern design standards. Achieving these standards on the I-70 viaduct means the replaced structure will be wider than the existing viaduct. In fact, all alternatives that are under consideration, including the No-Action Alternative, require expanding the footprint of the roadway to meet current design and safety standards.

CDOT has evaluated and reevaluated ways to avoid, minimize, and mitigate impacts of the project. See *Chapter 3, Summary of Project Alternatives*, of the Final EIS for more information on the alternatives. See *Chapter 9, Preferred Alternative Mitigation Commitments*, of the Final EIS for more information on planned mitigation of impacts.

### ALT2.    Alternatives development and determining reasonable alternatives

Comments were received that expressed questions about how and why alternatives were eliminated during the EIS process. Alternative analysis is guided by NEPA. NEPA allows for the elimination from further analysis of alternatives that are not reasonable or feasible. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. For the purposes of NEPA, "reasonable" means those alternatives that may be feasibly carried out based on technical, economic, environmental, and other factors, and that meet the project purpose and need. The purpose and need for this project is discussed in GEN1, and in *Chapter 2, Purpose and Need* of the Final EIS. To eliminate the alternatives that are not reasonable, a multi-step evaluation process was used. The first step started with high-level criteria, such as an alternative's ability to meet the purpose and need of the project and to check if there were any fatal flaws. Each successive step provided more detailed analysis until the single Preferred Alternative was reached. See *Chapter 3, Summary of Project Alternatives*, of the Final EIS for more information on the alternatives development and analysis process. If an alternative has been determined to be unreasonable, NEPA does not require additional analysis to be done. This is why not every alternative received the same level of analysis as others.

The alternative screening process for the I-70 East Project has been a continuous effort, with each consecutive release of the EIS further refining and narrowing down the alternatives, beginning with the Draft EIS released in 2008. More than 90 alternatives have been considered during the EIS process, including alternatives that realign and reroute I-70, an alternative to avoid the environmental justice community of Elyria and Swansea, and an alternative that used local networks. See the *Alternative Analysis Technical Report* of the Draft EIS for information on the more than 90 alternatives considered, as well as the specific reasons why not all of them were carried forward.

One alternative that would have realigned a portion of the highway was advanced as an alternative in the 2008 Draft EIS, but was later eliminated because during the public involvement process it became clear that the alternative did not meet the purpose and need of the project. Other alternatives that move the highway away from the current alignment also were evaluated and found not to be reasonable alternatives.

Comments also included considering alternatives that are not reasonable. One example of this is re-signing I-70 to route the through traffic out of the neighborhoods where dense urban development and elementary schools are located within a few hundred meters of I-70 and moving this traffic onto I-76 and I-270; and routing all truck traffic off of the current alignment between Washington Street and Colorado Boulevard, which would require

through truck traffic to use I-76 and I-270 and local truck traffic to disperse on local streets leading to their local destination rather than concentrating on the current alignment next to schools and houses along the highway. The possibility of restricting a portion of traffic from I-70 and rerouting these vehicles to alternative routes also was examined and eliminated (see TRANS5).

All alternatives evaluated in the Final EIS are located on the current alignment of I-70. Additional alternatives that would maintain the same number of travel lanes as the existing conditions, such as a partial cover lowered alternative with only six lanes of traffic, also were considered but eliminated because of the future traffic demands of the corridor (see TRANS8). See ALT3 for more specific information regarding the elimination of the I-270/I-76 Reroute Alternative. Following the release of the Draft EIS, an intensive alternatives enhancement and modification process resulted in the release of a Supplemental Draft EIS, which further refined and reduced the number of alternatives. Conducting another round of analysis and refinement, a Preferred Alternative was identified in the Final EIS. See *Chapter 3, Summary of Project Alternatives*, of the Final EIS for more information on exactly how and why the Preferred Alternative was selected. The plans, impacts, and mitigations for the Preferred Alternative are discussed throughout this document and the Final EIS.

### ALT3.   I-270/I-76 Reroute Alternative

Many comments received on the Final EIS expressed a desire to further study an alternative that would remove I-70 from its existing alignment and redirect traffic onto I-270/I-76. The I-270/I-76 Reroute Alternative was evaluated and eliminated in the early stages of the 2008 Draft EIS alternatives analysis process because it did not meet the project's purpose and need and is, therefore, not a reasonable alternative. Elimination of the alternative was reaffirmed in Section 3.5 of the 2014 Supplemental Draft EIS after additional analysis was performed because it does not meet the project's purpose to implement a transportation solution that improves safety, access, and mobility, and it does not address congestion on I-70. Section 3.9.1 of the Final EIS also discussed elimination of this alternative.

According to NEPA regulations in 40 CFR §1500.2(e), 40 CFR §1502.1, and 40 CFR §1502.14(a), the NEPA process should be used to identify and fully and fairly assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of the actions on the quality of the human environment. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. The reasonable alternatives all should be rigorously explored and objectively evaluated. For alternatives that were eliminated from detailed study, the reasons for their elimination should be briefly discussed.

The I-270/I-76 Reroute Alternative is not a reasonable alternative because:

- Rerouting I-70 while leaving 46th Avenue at its current location encourages highway users to use 46th Avenue to reach their destinations rather than staying on I-70, including the more than 11,000 employees that work within one-quarter mile on either side of I-70 between I-25 and I-270. Because of this, there will be a substantial increase in traffic volumes on 46th Avenue, which introduces safety, access, and mobility issues in the surrounding neighborhoods and also creates a barrier for bicyclists and pedestrians moving through the community.

- Rerouting I-70 also will force delivery trucks and other large vehicles to use 46th Avenue frequently to reach the industrial areas and businesses located near the existing I-70.

- If I-70 were rerouted, some arterials close to the existing I-70 alignment would have reduced traffic volumes; however, some arterials close to the expanded I-270/I-76 corridor would experience increases in traffic. The traffic on the arterials east of I-25 would experience major traffic increases and the local street networks do not have the capacity to hold the forecasted traffic volumes, which would result in safety issues and major delays.

- If I-70 were to be rerouted, traffic volumes forecasted for 2035 on 46th Avenue will be 10 to 20 times higher (more than 50,000 vehicles per day) than the traffic forecasted for 46th Avenue with the alternatives that leave the highway at its current location.

- There would be an increase in out-of-direction travel, causing mobility issues. Of the traffic heading west on I-70, approximately 50 percent continues past I-25, staying on I-70. The I-270/I-76 Reroute Alternative adds two miles of out-of-direction travel for these vehicles. Thirty-five percent of the traffic heading west on I-70 exits to southbound I-25, which translates to an additional four miles of out-of-direction travel for these vehicles, resulting in increased travel times.

- There will no longer be multiple east-west highway route choices in the area, which are beneficial for emergency access and redundancy.

- During the Final EIS review period, numerous comments were received that the cost estimate for the I-270/I-76 Reroute Alternative was too high (previously estimated at $4.0 billion). Therefore, a new cost estimate of $3.2 billion was prepared by CDOT. Note that there are several necessary items that were not included in the new cost estimate, so the cost would be higher than the $3.2 billion estimate. This alternative requires more than 12 miles of major highway reconstruction and widening along I-270 and I-76, and the development of new system-level interchanges, which contribute to the cost being twice as much as existing alignment alternatives.

- Many stakeholders—including Adams County, Adams County Economic Development, Aurora (Mayor's Office and City Council), Colorado Motor Carrier's Association, Commerce City, Denver (Mayor's Office and City Council), and the

North Area Transportation Alliance—have expressed continued opposition to this alternative.

- Additional communities would be impacted by rerouting I-70. Impacts to hazardous materials sites, wetlands, waters of the U.S., wildlife, environmental justice populations, residential and commercial/industrial properties, and increased congestion and safety issues would occur.

- The Globeville and Elyria and Swansea neighborhoods still would be impacted, but would not receive mitigation benefits. Removing I-70 and replacing it with a six-lane principal arterial (46th Avenue) would have several at-grade railroad crossings that would cause congestion and air quality impacts from traffic waiting for trains to pass. Along this route, homes and Swansea Elementary School would be located directly adjacent to the six-lane principal arterial, which means the vehicles would be idling directly outside of the houses during congested conditions. Truck traffic would continue to be high through the neighborhood due to the amount of industrial/commercial businesses in the corridor. This truck traffic could end up using more of the local streets when there is congestion on 46th Avenue, increasing the truck traffic in the neighborhoods.

Because it has been determined that the I-270/I-76 Reroute Alternative is not a reasonable alternative, additional studies to fully analyze the impacts for this alternative are not necessary. To see more details on the analysis performed on the I-270/I-76 Reroute Alternative, including the assumptions used for the cost estimate, please see *Attachment C, Revised Elimination of I-270/I-76 Reroute Alternative Technical Memorandum*.

### ALT4.   Considerations of future technology

Some comments showed support for considering the use of technology, rather than freeway expansion, as a way of meeting the project's purpose and need. Advancements in technology include connected or automated vehicles. This technology is at the forefront of research at this time, but the impact on future traffic volumes is currently unknown. Whether this technology will result in increases or decreases in trips and vehicle miles traveled (VMT) is being debated by industry experts. A large unknown is how long it will take to create market penetration of the given technology to create a significant impact on traffic volumes or miles driven. Traditionally, market penetration depends on economic feasibility and affordability.

CDOT's ITS Section and CDOT's RoadX Program are looking at using new technologies that will benefit traffic operations and safety for the entire state with the focus on higher traffic volume highway corridors such as I-70. With the Central 70 Project, there will be a number of new ITS technologies that CDOT will be implementing while also continuing to look at new technologies as the project is constructed. However, these projects will not address or eliminate the purpose and need for the Project.

Some technologies planned for inclusion in the Central 70 Project involve the installation of Dedicated Short-Range Communications (DSRC) radios to allow for vehicle-to-

infrastructure communications; active traffic management (ATM) elements, such as variable speed limits, dynamic lane control, and expedited incident management; and adaptive ramp metering. CDOT will continue to work on identifying additional opportunities for more integration with technologies as the project moves forward. See http://www.codot.gov/programs/roadx for more information on CDOT's RoadX Program.

## Impacts and Mitigation Measures

### IMP1.   Mitigation commitments

Per the CDOT *NEPA Manual*, prior to mitigation, CDOT always makes its best effort to:

- Avoid the impact altogether by not taking a certain action or parts of an action
- Minimize impacts by limiting the degree or magnitude of the action and its implementation

However, if avoidance or minimization is not feasible, then mitigation measures may be implemented, including:

- Rectifying the impact by repairing, rehabilitating, or restoring the impacted resource
- Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action
- Compensating for the impact by replacing or providing substitute resources or environments (CEQ, 40 CFR §1508.20)

Many of the mitigation measures to which CDOT has committed are typical mitigation measures that would be part of any project. One example is BMPs, which are effective, feasible (including technological, economic, and institutional considerations) conservation practices and land and water management measures that avoid or minimize adverse impacts to natural and cultural resources. BMPs may include schedules for activities, prohibitions, maintenance guidelines, and other management practices. Physical BMPs may include items such as hay bales for erosion control or silt fencing.

Additionally, many of the resources evaluated involve regulatory items or procedures that need to be followed, and may include mitigation requirements. Typical BMPs and regulatory items are included in the estimate to construct the project, and are not called out separately unless there is specific reason for doing so. The majority of these items are captured within the specifications/construction plans for the project.

Examples of typical mitigation measures and standard BMPs and regulatory items to be provided include (note this is not an all-inclusive list):

- Compensate any person(s) whose property needs to be acquired for the Preferred Alternative according to the U.S. Constitution and the Uniform Act, as amended.
- Follow the PA with SHPO for mitigation commitments to historic resources.

- Construct noise walls, as required, to minimize noise impacts for post-construction conditions.

- Conduct preconstruction paleontological surveys and continuous paleontological monitoring during all phases of construction.

- Return all parks and trail crossings to their pre-construction or comparable state, and maintain trail access during construction.

- Cover, wet, compact, or use chemical stabilization binding agents to control dust and excavated materials at construction sites.

- Use wind barriers and wind screens to reduce the spread of dust from the site.

- Cover all dump trucks leaving sites to prevent dirt from spilling onto streets.

- Prohibit unnecessary idling of construction equipment.

- Locate construction staging areas as far away as possible from residential uses.

- Comply with Senate Bill 40 (state wildlife and habitat protection), the CDOT Impacted Black-Tailed Prairie Dog Policy, and CDOT Standard Specifications for protection of migratory birds.

- Mitigate unavoidable, permanent wetland impacts at a 1:1 ratio in a wetland mitigation bank in the South Platte River watershed.

- Return wetlands temporarily impacted to pre-construction conditions.

- Use BMPs for groundwater dewatering, treatment, and disposal during the construction process.

- Implement standard construction measures for stormwater erosion control.

- Investigate ways to maintain safe and efficient connections through the neighborhood during construction for all modes of transportation. This will mean active communication to the residents so that they are aware of temporary street closures and detours. It also could include working with RTD to minimize disruptions to service areas and schedules.

Comments received during community outreach efforts were considered by CDOT and reasonable and feasible mitigation ideas were incorporated into the project as appropriate. In response, the project team has developed additional mitigation measures beyond those required or normally provided in Colorado to lessen the adverse impacts in the project study area. Any mitigation measures included in the ROD for the project must and will be completed (even if the project has funding issues as it is constructed) (40 CFR §1505.3).

- Provide a covered segment over I-70, up to 1,000 feet long, where it will pass below grade through the Elyria and Swansea Neighborhood, including an urban landscape on top.

- Provide for a base level of landscaping on the highway cover necessary to provide an active community space for surrounding residents and local neighborhoods, support social and pedestrian connections in the Elyria and Swansea Neighborhood, and provide new space for the Swansea Elementary School.

- Provide funding to CRHDC, which they will use to assist residential and business displacees with financial counseling and procurement of financing for replacement property and securing business and residential loans. CDOT already has provided funding to CRHDC as early mitigation.

- To reduce impacts from dust and noise during construction, for homes between 45th Avenue and 47th Avenue, from Brighton Boulevard to Colorado Boulevard, provide:

  o  Interior storm windows

  o  Furnace filters

  o  Two portable or window-mounted air conditioning units with air filtration and assistance to pay for the additional utility costs during construction

- Provide $2 million to support affordable housing in the Elyria and Swansea Neighborhood through available programs.

- Equity impacts for the financial burden of access to the tolled express lanes will be mitigated by providing to eligible residents of Globeville, Elyria, and Swansea free transponders, pre-loading of tolls, or other means determined prior to the opening of the tolled express lanes. Eligibility and the duration of the program are expected to be determined based on factors including, but not limited to, residency, financial burden, number of vehicles per resident or household, etc.

- Facilitate opportunities to promote hiring individuals from the communities, such as job fairs with the developer. Other areas that CDOT is researching include investing funds in a local workforce development program aimed at job readiness training prior to construction. Additionally, CDOT applied to and received approval from the U.S. DOT to participate in a pilot program that allows geographic-based hiring preferences for the I-70 East Project.

- Provide $100,000 toward the Denver Office of Economic Development's GES Healthy Food Challenge that will help facilitate access to fresh food.

- Provide a robust and context-sensitive communications and outreach plan throughout construction to ensure residents are kept informed.

- Redesign and reconstruct the Swansea Elementary School playground, including building a playground in a temporary location during construction and rebuilding school parking facilities. Other mitigation measures for the school include:

  o  Install new windows, doors, and a new HVAC system.

  o  Build two additional classrooms.

- Collect representative soil samples of three or four recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities. Require the developer to implement standard dust control measures (specifically, for $PM_{10}$), such as watering, erosion control blankets, or reseeding, as a condition for conducting work.

- Place continuous $PM_{10}$ monitors along portions of the project corridor where active construction is under way. These monitors will have "alert levels" to give early notice to onsite construction workers if there are high dust readings so they can address the problem immediately.

- Provide funding for and participate in a documentary covering the history of I-70 East and its relationship to the Elyria and Swansea and Globeville neighborhoods. CDOT has already completed this task as early mitigation. This documentary is available on the project website at www.i-70east.com.

One mitigation measure that changed after the release of the Supplemental Draft EIS is related to dust and noise during construction. In the Supplemental Draft EIS, mitigation included CDOT providing and facilitating the opportunity for homeowners to rehabilitate homes (such as improvements to doors, windows, and ventilation systems) that are close to the highway construction between 45th Avenue and 47th Avenue in the Elyria and Swansea Neighborhood. This mitigation was changed for the Final EIS to providing interior storm windows and offering two portable or window-mounted air conditioning units with air filtration and assistance to pay for the additional utility costs during construction. This change was made since many residents open their windows in the summer, and interior storm windows and air-conditioning units would better mitigate the dust and noise during construction, allowing residents to leave their windows closed. Additionally, since the Final EIS, furnace filters have been added for residents receiving storm windows and air-conditioning units.

Refer to Chapter 5, Central 70 Mitigation Measures, of this document for a list of mitigation measures committed to for the Central 70 Project. See *Chapter 9, Preferred Alternative Mitigation Commitments*, in the Final EIS for the full list of proposed mitigation measures for the entire I-70 East Project.

### IMP2.   Impacts to Swansea Elementary School

Swansea Elementary School has been identified as a very important and valuable resource in the Elyria and Swansea Neighborhood, and there is strong community support for keeping the school in the neighborhood. The project team researched the neighborhood to identify other suitable locations for the school. The only available site identified was where the Swansea Recreation Center currently is located. The community expressed opposition to moving the school to the recreation center site because of the adjacent railroad tracks. The decision to keep the school at its current location was made during outreach

opportunities conducted to review alternative sites for the school, and surveys of parents at the school during the PACT process.

CDOT developed the Partial Cover Lowered Alternative to keep the school in its current location while minimizing impacts to it. The mitigation for the school redesigns and expands the school grounds and provides upgrades to the school building. The residents of the Elyria and Swansea Neighborhood are in favor of the school remaining at its current location with the Preferred Alternative. DPS also supports this decision.

CDOT has been working with DPS to develop construction mitigation measures for Swansea Elementary School. Mitigation measures for the school include providing a new HVAC system, doors, and windows to reduce the dust and noise impacts to the school and its users, specifically during the roadway construction period. CDOT also will pay for the construction of two new classrooms. Providing additional classrooms will help mitigate some impacts by providing offsetting benefit to the community to enhance the overall quality of the school beyond the construction period. These upgrades will be completed before the construction starts.

CDOT has been coordinating with DPS and Swansea Elementary School's principal throughout the project to identify the school's needs and redesign the school site. The school playground will be temporarily reconfigured to move it away from the construction zone, with ultimate redesign of the school site included in the final design.

Finally, continuous $PM_{10}$ air quality monitoring will be conducted in the area during construction to evaluate for any potential temporary increases in $PM_{10}$ levels during construction. This system will alert the developer when increased construction mitigation measures are needed.

## IMP3.   Hazardous materials

Public comments received on the Final EIS continue to express concerns about hazardous materials in the area and how these types of materials will be handled during construction. CDOT will conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any structures. If these materials are encountered, they will be removed in accordance with applicable regulations and guidelines.

If ACMs are encountered, including buried utilities, the developer is required to follow CDOT Specification 250.07, Asbestos-Containing Material Management, and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure. Additionally, depending on the type of contamination, this material will be cleaned up in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations.

The Colorado Department of Labor and Employment, Division of Oil and Public Safety, regulates petroleum products and chemical underground storage tanks (USTs) and certain petroleum-containing above-ground storage tanks (ASTs). Releases must be reported to the

Division of Oil and Public Safety, and investigation and cleanup must be implemented, as required. Most USTs have had a spill or leak at some point in their life cycle. Small leaks may not be identified until the UST is taken out of service and formally closed.

Groundwater and soil sampling have been performed as part of the hazardous materials analysis for the EIS and the results are available in *Section 5.18, Hazardous Materials*, of the Final EIS.

CDOT has coordinated with EPA on the clean-up efforts for properties within the Superfund boundary. Additionally, CDOT commits to collect representative soil samples of three or four recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities. Any hazardous materials that have been exposed during construction will be identified and treated. This commitment was generated due in large part to comments received during the Supplemental Draft EIS regarding concerns with arsenic and lead.

Additionally, the RFP requires that hazardous materials be identified, managed, removed, and disposed of during construction in compliance with Environmental Law, any applicable governmental approvals and permits, and CDOT Standard Specification 250, Environmental, Health, and Safety Management. The RFP is available at: https://www.codot.gov/programs/high-performance-transportation-enterprise-hpte/projects/i-70/i-70-east-1/request-for-proposals-rfp.

*Section 5.18, Hazardous Materials,* of the Final EIS identifies various mitigation measures that will be implemented during construction to protect community and worker health and safety, as well as measures to manage and prevent the spread of contamination, if present.

## IMP4.   Noise

Substantive comments received raised questions about how the Preferred Alternative will affect the soundscape of the area and how CDOT plans to address these effects. Noise impacts and mitigation measures were analyzed in accordance with CDOT's *Noise Analysis and Abatement Guidelines* (2015) per federal regulations (23 CFR §772). Thorough analysis was conducted for each neighborhood and each alternative, including the noise reduction associated with the lowered highway and cover in the Partial Cover Lowered Alternative.

CDOT must consider noise mitigation measures if the noise level at a sensitive site, such as a residence, meets or exceeds the threshold for the specific land use. Before recommending mitigation—generally in the form of noise walls—CDOT must determine if mitigation is feasible and reasonable.

For a noise wall to be determined feasible, there are three criteria that must be met:

- It must provide at least a 5-dBA (A-weighted decibel) reduction for at least one impacted noise receptor.

- It also must not reduce safety, such as reducing sight distance.

- It must be possible to construct it with reliable and common engineering practices.

CDOT has determined that—for Colorado terrain and weather conditions, including common high wind events—20 feet is the maximum allowable noise wall height without compromising structural integrity under typical construction design specifications.

For a noise wall to be determined reasonable, there are three criteria that must be met:

- As a result of the noise wall, at least one noise receptor must experience a 7-dBA noise reduction.

- A Benefitted Receptor's Survey must be performed, and more than 50 percent of the responding owners and residents must support the construction of the noise wall. The required survey will be deferred until the final design phase of the project.

- The cost-benefit index must be no more than $6,800 per dBA per receptor.

If a noise wall fails to meet all the feasibility and reasonability criteria, the wall cannot be recommended. If a single criterion for feasibility or reasonability is not met, analysis for that particular noise mitigation ends. If a wall does meet all the feasibility and reasonability requirements, it will be recommended pending completion of a benefitted receptor survey with 50-percent approval by owners and residents.

For this evaluation, possible noise walls were analyzed as single-height walls ranging from eight feet up to 20 feet in height by two-foot increments. Feasibility and reasonability were analyzed for single-height walls in each neighborhood. At final design, the Preferred Alternative will be analyzed in a more in-depth manner to optimize the wall heights and lengths. When this optimization takes place, the ultimate goal of each wall will be to maximize the number of benefitted receptors while still meeting feasibility and reasonability requirements.

Measures will be taken to minimize noise during construction. Construction noise mitigation measures can be found in FHWA's *Highway Construction Noise Handbook*. CDOT will require the developer to use BMPs, such as limiting vehicle idling, to reduce noise during construction. Additionally, to reduce impacts from noise (and dust) during construction and minimize the need for window ventilation, for homes between 45th Avenue and 47th Avenue, from Brighton Boulevard to Colorado Boulevard, CDOT will provide:

- Interior storm windows

- Furnace filters

- Two portable or window-mounted air conditioning units with air filtration and assistance to pay for the additional utility costs during construction

This project also will abide by the appropriate city codes as they pertain to construction noise. If noise levels during construction are expected to exceed the limits of the city codes, the developer must obtain the necessary ordinance variance, which typically includes additional mitigation measures. See *Attachment C, Updates to Noise Technical Report* of this document, and *Attachment K, Traffic Noise Technical Report*, of the Final EIS, under Section 6.5, Construction Noise, for further information.

In the vicinity of Swansea Elementary School, construction noise will be reduced to the maximum extent possible during school hours. If possible, construction should take place during times when school is not in session. If this is not possible, high construction noise activities should take place during non-school hours. Temporary noise shielding also could be used around the school playground and other outdoor areas of frequent use.

### IMP5.    Energy consumption during construction

A concern raised in the comments included how the amount of energy consumed during construction was calculated. The amount of energy for construction was calculated based on the California Department of Transportation's *Energy and Transportation Systems Report* (1983) (See *Section 5.11, Energy,* in the Final EIS). Although based on data collected in 1977, the calculation was adjusted using the consumer price index to account for inflation between 1977 and 2015. This is the standard methodology for calculating energy consumption during construction for CDOT and FHWA projects.

### IMP6.    Traffic during construction

Some commenters raised concerns about how CDOT plans to effectively handle traffic congestion during construction of the Central 70 Project. To address this concern, construction phasing and a traffic management plan will be prepared by the developer and reviewed by CDOT. A traffic management plan may be made up of three components: a traffic control plan, a transportation operations component, and a public information component. A traffic control plan describes measures to be used for guiding road users through a work zone. A transportation operations component ensures compliance with the region's lane closure policy and identifies strategies that will be used to mitigate impacts of the work zone on the operation and management of the transportation system within the work zone impact area. A public involvement component includes communication strategies that inform affected road users.

The Central 70 Project is still in early design phases and, therefore, CDOT has not identified a developer for the project. However, when a developer is selected, CDOT and the developer will coordinate with affected local governments, railroad agencies, freight companies, utility providers, law enforcement, emergency services, courtesy patrols, businesses, schools, community groups, and transit providers as necessary in developing a traffic management plan. Additionally, all businesses that will have their access directly affected by construction activities will be directly contacted prior to any access changes to their business to ensure their specific access needs, work times, and other needs are incorporated into the traffic management plan. Any alterations to the access of a business

will be handled with a contract to ensure all business owners are fully aware of the changes, impacts, and mitigation throughout the project. Specific roadway and intersection impacts and mitigations during construction also will be identified within the traffic management plan, including potential detours.

The NEPA process is not able to model all possible detours and potential traffic increases from motorists and trucks using alternate routes during construction. CDOT will develop and implement a TDM program for construction to identify impacts and/or mitigations on alternate routes and detours. Maintaining safe and efficient traffic flow, emergency use, and pedestrian/bike accessibility while considering impacts to local roads will be incorporated into the traffic management plan.

CDOT will ensure that BMPs are used to minimize impacts during construction and provide safe and efficient connections through the neighborhoods during construction for all modes of transportation, including bicycles and pedestrians. CDOT also will ensure that BMPs are used to minimize impacts so that I-70 remains open and operational during construction.

## Preferred Alternative

### PA1.     The highway cover

The Partial Cover Lowered Alternative was developed in response to the community's interest in reconnecting the Elyria and Swansea Neighborhood by removing the visual barrier that is the viaduct. By placing the highway below grade in this area, the visual barrier created by the existing viaduct will be eliminated. The cover for the highway in the Partial Cover Lowered Alternative was developed to mitigate the adverse impacts to the Elyria and Swansea Neighborhood and to restore and enhance neighborhood cohesion, which was disrupted decades ago by the original I-70 construction in the 1960s. Incorporation of the highway cover will help reconnect the Elyria and Swansea Neighborhood by providing easy and safe connections for all users, especially pedestrians and bicyclists. The ease of access to and across the cover will potentially encourage walking and bicycling for short trips to local destinations. The inclusion of the highway cover with an urban landscape and a community space helps achieve some broader community goals of livability, quality schools, and safe streets along with supporting the existing communities along the corridor.

Over the 13 years of study, the project team has heard that Swansea Elementary School is the heart of the community. A portion of the cover will be devoted to a multi-use field that will be used by the school when in session and will be open to the entire community outside of school hours. To provide a seamless connection between the highway cover and the school and a safe environment for students to use the cover facilities, 46th Avenue on the north side of the highway will be discontinued between Clayton Street and Columbine Street. The amenities and design in this space—such as playgrounds and sports fields— will be based on community input and needs. See *Attachment P, Cover Planning*, of the Final EIS for more information regarding cover planning efforts.

The cover will not exceed 1,000 feet in length due to ventilation requirements mandated in fire and safety standards. The lighting inside of the covered section will be designed to meet safety requirements, as well as to avoid the "black hole effect," which was a major issue with the old I-70 Stapleton tunnels. The covered area of the highway will be well lit by using the latest lighting technologies to enhance drivers' safety and operations on the highway.



This photo from the Twin Tunnels on I-70 outside of Idaho Springs, Colorado, is an example of latest lighting technologies (on left) versus old standards of lighting.

The estimated cost to complete the Central 70 Project includes the cost to build the cover. Because the cover provides mitigation, it must be built as part of the Central 70 Project and not deferred. CDOT will be responsible for the maintenance of the structure of the cover. Denver is responsible for the maintenance of the features and landscaping on the cover.

## Air Quality and Health

### AQ1.  Health impact assessment

Based on public comments, much of the public concern for health relates to the air quality surrounding the highway. A health study (health impact assessment or health risk assessment) is not required by NEPA or the CAA and, therefore, it has not been performed for this project. The current health status of the affected communities has been thoroughly discussed in the Denver Department of Environmental Health's *Health Impact Assessment* (September 2014). The Final EIS added to the information discussed in the *Health Impact Assessment* by showing how air quality is likely to change in the future under different project alternatives. The analyses conducted for the Final EIS show that EPA's air quality standards for carbon monoxide and $PM_{10}$ will be met and MSATs will drop by 70 percent to 90 percent regardless of which alternative is chosen. The updated analyses for carbon monoxide and $PM_{10}$ in the ROD (see below) also show that these NAAQS will be met. Potential impacts from the I-70 East Project, including effects of each alternative on the ability to meet the health-based NAAQS, and on levels of MSATs, are discussed in detail in *Section 5.10, Air Quality* and *Section 5.20, Human Health Conditions*, in the Final EIS and in Section 9.9, Air Quality, in this ROD.

The MSAT analysis performed for the Final EIS showed that overall emissions will decrease in the future because of improved mobility, reduced congestion, and cleaner vehicle emission standards. For MSATs, the analysis showed that the I-70 East Project will have a minimal effect on annual emissions within the study area (see Exhibit 5.10-21 of the Final EIS), with the various alternatives showing a range of annual MSAT emissions from 2.1 percent to 3.8 percent above the No-Action Alternative in the design year of 2035. The overall trend in MSAT emissions is clearly downward, with all alternatives showing an

approximately eight- to nine-fold decrease from current rates by 2035 (Exhibit 5.10-21 of the Final EIS). (See *Attachment J, Air Quality Technical Report* of the Final EIS.*)*

The Health Effects Institute Special Report #16, *Mobile-Source Air Toxics: A Critical Review of the Literature on Exposure and Health Effects (2008),* states that the cancer health effects attributable to MSATs are difficult to discern because the majority of quantitative assessments are derived from study groups of workers with high-concentration exposures and because some cancer potency estimates are derived from animal models. The report found that exposure to many MSATs comes from sources other than vehicles, and identifying effects in community studies is challenging because of low ambient concentrations, exposures to multiple possible toxicants, and other confounding factors.

In January 2010, the Health Effects Institute released Special Report #17, investigating the health effects of traffic-related air pollution. The researchers felt that there was "sufficient" evidence for linking asthma to traffic-related pollution. Evidence was "suggestive but not sufficient" for other detrimental health outcomes such as cardiovascular mortality. Study authors also noted that past epidemiological studies may not provide an appropriate assessment of future health associations because vehicle emissions are decreasing over time.

Finally, in 2011, three studies were published by the Health Effects Institute evaluating the potential for MSAT hot spots. In general, the authors confirmed that while highways are a source of air toxics, they were unable to find that highways were the only source of these pollutants. They determined that near-road exposures often were no different or no higher than background (or ambient) levels of exposure and, hence, no true hot spots were identified. These reports (Report Numbers 156, 158, and 160) are available from the Health Effects Institute's website: http://pubs.healtheffects.org/index.php.

Additionally, while the incidence of some health effects (such as asthma, autism, and attention-deficit/hyperactivity disorder) in the U.S. population appears to have been increasing, motor vehicle emissions have declined. This decline in MSAT emissions is documented in Figure 13 of *Attachment J, Air Quality Technical Report,* of the Final EIS and for other pollutants at epa.gov/ttn/chief/trends/. This negative correlation between emissions trends and health effects trends illustrates the complexity of the issues. Health Risk Assessments that have been conducted for highways show health risks well below EPA's acceptable risk factors. For example, the conclusion from the Arizona Department of Transportation's *South Mountain Freeway Health Risk Contributions from Highway Projects* found: "if the MSAT risk estimates in the studies summarized above are correct, it means that the incremental risk of cancer from breathing air near a major roadway is several hundred times lower than the risk of a fatal accident from using a major roadway" (Arizona Department of Transportation, 2014).

Throughout the NEPA process, CDOT and FHWA have consulted extensively with the EPA and CDPHE-APCD on the approach and methods for the air quality analyses. This

consultation has resulted in agreement on the analysis methodologies and the results of these analyses.

As described in *Attachment C, Air Quality NEPA Comparison Technical Report* and *Air Quality Conformity Technical Report* of the ROD, the most recent carbon monoxide comparative analysis for the ROD shows that all alternatives will result in carbon monoxide levels below the NAAQS. The $PM_{10}$ analysis shows that all alternatives will result in levels at or below the NAAQS for this pollutant. It also is worth noting that both analyses were conducted at the worst-case scenario locations within the project study area, ensuring that air quality conditions in other areas will be less than those resulting from the hot spot analyses.

Thus, a health impacts assessment would, at most, show very minor differences between alternatives with much lower impacts than historic or current levels in terms of air quality impacts.

Additionally, modeling receptors for the updated $PM_{10}$ conformity analysis included areas that are occupied by Swansea Elementary School with the results presented in Table 2 of *Attachment C, Air Quality Conformity Technical Report* of this ROD to show that all of the locations modeled would not exceed the health-based NAAQS for $PM_{10}$. Air monitoring will be conducted continuously during construction activities to ensure that air quality does not reach dangerous levels.

## AQ2.    Air quality design values and background concentrations

How air quality design values and background concentrations were determined was another concern raised in the comments on the Final EIS and on the air quality documents.

The project team followed the most recent EPA guidance on hotspot analysis for calculating design values and background concentrations, *Transportation Conformity Guidance for Quantitative Hot-Spot Analyses in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas*, November 2015 (https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100NMXM.pdf) and as recommended for the project by EPA and CDPHE-APCD through Interagency Consultation. As described in the guidance document, design values (modeled value plus background concentration) are compared to the relevant NAAQS after rounding has been done, which occurs in the final steps of design value calculations.

To determine whether a project, once constructed, will exceed the NAAQS, the transportation conformity regulations require a project to add together an estimate of the future background concentration of particulate matter with an estimate of the project's contribution of particulate matter (40 CFR. § 93.123(c)(1)). The particulate matter hotspot guidance refers to this combination of the estimated future background concentration and the estimated project contribution as the transportation project's "design value." The guidance on this topic recommends basing the estimated future background concentration on three years of observed ambient air quality data from an air quality monitor, and the

project contribution on five years of estimated ambient air quality data generated by computer modeling software (EPA, 2015b).

The use of historical data from a single monitor that is representative of the study area is allowed by the EPA guidance and supported by EPA and CDPHE-APCD in this process. The monitoring site used to calculate background concentrations has not changed since the Final EIS. Using the Commerce City monitor for the updated analyses for the I-70 East Project yields a background concentration for $PM_{10}$ of 113 μg/m$^3$. This represents the third highest value from the data recorded between 2012-2014, versus the value of 89 μg/m$^3$ from the data recorded between 2011-2013 used in the Final EIS air quality analysis. Both of these values were derived using EPA's 2015 guidance. The update to the air quality analysis did not use the previous three years of data at this location since the monitor was taken offline in 2015, so values from the last three years of full data were used (2012-2014) as recommended by EPA and CDPHE-APCD (see *Attachment B, Updates to Agency Consultation Addendum*).

The Commerce City monitor values provide the most conservative estimate of background concentrations. The Commerce City monitor has recorded the highest single value of $PM_{10}$ by any metro Denver monitor near the project area, as reported by CHPHE-APCD. The older data from the monitor does not capture the most recent improvements to air quality resulting from more stringent fuel, stationary, and vehicle emission controls and standards. If the conformity hotspot analysis had used any other nearby site to calculate background concentrations, the results of the analysis would have been much lower. Therefore these values represent a worst-case value for the project analyses' background concentrations.

Some comments questioned the use of historic data from a single monitor and suggested that the project use the modeled future concentrations from the $PM_{10}$ maintenance plan. EPA guidance allows the use of future predicted background concentrations only when such concentrations are developed using a chemical transport model. Modeled future concentrations from the $PM_{10}$ maintenance plan cannot be used in this analysis because they were not developed by CDPHE-APCD with a chemical transport model.

As reported in the Final EIS, the monitor near the I-25/I-70 interchange (4905 Acoma Street) has been operating for less than one year and thus does not have the required three years of data.

### AQ3.    Air quality analysis updates and changes in results

Many comments received on the air quality documents raised concerns with the analysis results in comparison to the results from the Final EIS, including the resulting modeled values from the updated analysis. Updated air quality modeling for the project was conducted according to current EPA guidance (EPA, 2015b). Changes in the results can be attributed to a variety of reasons, as discussed below.

In 2016, during the development of the ROD documentation and based on comments received on the Final EIS, the air quality analysis was updated to reflect the year of peak