emissions. Traffic data from the 2040 DRCOG Focus travel demand model was used to address the conformity requirement for the hotspot analysis to consider the year of peak emissions over the time frame of the transportation plan. The worst traffic year is considered to be 2040 and is therefore considered the year of peak emissions. As discussed above, this update is consistent with regional air quality modeling and with the desire to represent the worst-case scenario.

For carbon monoxide hotspot modeling, MOVES2010b emissions rates from 2022 (representing opening year) were used along with 2040 traffic volumes to represent a worst-case condition over the life of the project. CDOT agreed with CDPHE-APCD's request to use 2022 for the updated modeling to represent the opening year. The project analysis is required to account for the year of peak emissions over the time frame of the transportation plan, and 2010 is not within that time frame or that of the project.

Since the release of the I-70 East Final EIS, there have been minor adjustments and refinements to the design of the Preferred Alternative as described in Section 2.5 of the ROD. The changes to the design resulted from public and agency comments on the Final EIS and continued evaluation of the Build Alternatives.

Updated information for the revised modeling included the latest traffic forecasts (link specific car and truck volumes from the 2040 DRCOG Focus model), updated emission reductions commitments from Denver and CDOT, omitting receptor locations within the project right of way that should not have been included in the Final EIS modeling (receptor maps for the Final EIS are shown on pages 76 and 77 of the *Final EIS Air Quality Technical Report* (Attachment J to the Final EIS) and are available on pages 11 and 12 of *Attachment C, Air Quality Conformity Technical Report*, and pages 10 and 11 of *Attachment C, Air Quality NEPA Comparison Technical Report*), revised meteorology data from CDPHE-APCD (which corrected an artifact in the data file), and recent background concentrations.

The dust mitigation controls committed to by CDOT are different than those accounted for in the Final EIS, but consistent with the most recent DRCOG conformity determination. Compared to the Final EIS, the emissions reduction commitment by Denver is more stringent (60 percent, compared to a 40 percent reduction used for the Final EIS), and the emissions reduction commitment for CDOT tolled express lanes is slightly lower (75 percent, compared to 83 percent in the Final EIS). However, the underlying emissions factors to which these emissions reductions are applied have not changed, are consistent with the SIP, and were verified by CDPHE-APCD prior to use in the PM hotspot analysis. The emissions reductions commitments are included as part of the DRCOG conformity determination process for the RTP and TIP.

Air quality modeling in the Final EIS relied on data coordinates provided by DRCOG to locate highway links and receptors. The accuracy and precision of highway link and receptor locations was significantly improved in the current analysis by making the

transition to Geographic Information System derived coordinates using high resolution maps of project design alternatives.

The analysis in the Final EIS relied on assumptions intended to simplify the assessment, which led to conservatively high predictions of ambient $PM_{10}$ concentrations in the vicinity of the project corridor. One such assumption made in the previous assessment was to assume that all highway links are located at ground-level when, in reality, this is not the case because portions of the highway are elevated or below ground depending on the alternative. The current assessment incorporated refined methodologies, consistent with EPA guidance, to account for the true release height of emissions at selected receptor locations, which produces more representative, albeit lower, concentration predictions than the prior, simplified at-grade assumption. The analysis was also revised to use AERMOD in its more refined volume source mode rather than area source mode. The combination of all these changes reduced the calculated project emissions.

Lastly, background concentrations changed as previously described in AQ2, Air quality design values and background concentrations.

## AQ4.    Transportation conformity

Some comments asked if transportation conformity requirements of the CAA have been met. The Final EIS did not make a conformity determination since the Central 70 Project was not yet included in the RTP. Since the release of the Final EIS, DRCOG adopted an amendment to the 2040 Fiscally Constrained RTP (March 16, 2016), which includes the Central 70 Project (Phase 1 of the Preferred Alternative). This extends the hotspot analysis to the DRCOG planning horizon year of 2040, as required by the EPA in 40 CFR §93.116(a). This regulation requires a demonstration that during the time frame of the transportation plan no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project.

CDOT released a Draft Air Quality Conformity Technical Report of which included the conformity analysis and determination on December 16, 2016, for agency and public review and comment in advance of the final conformity determination that would appear in ROD. As described in Section 8.2, 151 comments were received. None of the comments received led to changes in the analysis or conclusions presented in the review documents. The finalized version of that document is included as *Attachment C, Air Quality Conformity Technical Report,* of the ROD. Comments received during the review period for air quality are included in this document in *Attachment F, Comments on the Air Quality Documents.*

The air quality analysis in the ROD was updated to 2040 to meet the conformity requirements. The 2040 conformity analysis accounts for: (1) VMT growth, (2) emissions factors, (3) congestion and speeds, (4) total project emissions, and (5) a background concentration as described above.

As described in Section 6.1 of this ROD, Air Quality Transportation Conformity, regional emissions were found to conform to the carbon monoxide, $PM_{10}$, and ozone SIP. Based on

the carbon monoxide and $PM_{10}$ analyses at the project level, the Central 70 Project has been determined to not cause an exceedance of any NAAQS. The proposed project will not contribute to any new local violations, increase the frequency or severity of any existing violation, or delay timely attainment of the NAAQS or any required interim emissions reductions or other milestones. This project complies with the transportation conformity regulations in 40 CFR §93 and with the conformity provisions of Section 176(c) of the CAA.

Since the Denver Metro area is not in a non-attainment or maintenance area for $PM_{2.5}$ or $NO_2$, transportation conformity does not apply for these pollutants.

### AQ5.    Data and modeling files for air quality analysis

As described in GEN7, Air quality documents review period, some comments raised concerns about not having the information or technical data to provide meaningful comments. The air quality document included substantial information on the air quality analyses and results. Additional modeling data and input information was promptly provided to anyone who requested it from the beginning of the comment period from the contacts identified in the technical reports.

### AQ6.    Air quality and the highway cover

Concerns were raised in the comments about air quality around the highway cover. Air quality around the cover was examined in the I-70/Swansea $PM_{10}$ conformity analysis, utilizing state-of-the-art modeling software to estimate the pollutant concentrations in the area. This analysis showed that all of the areas around Swansea Elementary School and the cover were at or below the NAAQS for $PM_{10}$. See the results presented in Table 2 of *Attachment C, Air Quality Conformity Technical Report,* of this ROD.

With regard to air quality within the covered highway section, the cover was designed to be short enough not to require artificial ventilation during normal operation. As the two directions will be separated by a full-height wall, the action of vehicles moving through each side of the covered section will create a piston effect that keeps air moving through so that pollutants do not accumulate to unhealthy levels. According to a fire safety and ventilation report prepared for the project, traffic would have to be at a complete stand still for 27 minutes before the level of pollutants would rise to the point of requiring ventilation. In such a situation, or in case of a fire or other accident that could cause unhealthy air quality under the cover, an emergency ventilation system will be provided to clear the air and keep it safe for people inside. The design of the cover includes jet fans that will help move the air through the covered portion of the highway, when necessary. All of these things together (piston effect, full-height wall, jet fans, and the highway being below grade) overcome the effects of the natural meteorological conditions of the study area. With regard to air quality near the openings of the covered highway section, studies have shown that pollutant concentrations dissipate rapidly with distance from the tunnel openings. See the *Air Quality Technical Report, Attachment J* of the Final EIS, for more information.

## AQ7.    Air quality monitoring

Substantive comments raised concerns about air quality during and after construction and how CDOT plans to monitor the area. Prior to beginning the construction phase, the developer will be required to produce a Fugitive Dust Control Plan for the project, which must be approved by the CDPHE's APCD as part of the air permitting process. The plan will be reviewed by CDPHE-APCD staff to ensure that BMPs are stipulated for the control of airborne dust from construction activities. Adherence to the plan during construction activities will minimize the effects of dust on surrounding communities.

The construction project team also will establish a Construction Air Quality Monitoring Plan, which will outline the specific monitoring needs, equipment, and processes used to measure, maintain, and report $PM_{10}$ data. It will establish data capture and public data reporting protocols. The plan will include supporting documents that define concentration thresholds for alerting onsite construction management to rising dust levels. Then, construction management will need to implement extra dust suppression BMPs at the target site. A list of BMPs and construction activities will be included in this plan. The plan also will include quality control and action plan items required for EPA and CDPHE-APCD data reporting and equipment calibration and maintenance.

During construction, air monitoring will be conducted to ensure that dust control efforts are successful in preventing violations of air quality standards. The air quality monitoring conducted during construction of the Central 70 Project will focus on $PM_{10}$ monitors in active construction areas along the corridor, as practicable, to monitor hourly $PM_{10}$ concentrations. The purpose of this temporary monitoring will be to maintain awareness of dust generation from active ground-disturbing processes, such as demolition, excavation, rock crushing, etc.; to help in identifying localized rising dust levels; and to activate a responding BMP Implementation Plan if dust levels attain pre-determined thresholds.

Additionally, as noted in *Section 5.18, Hazardous Materials*, of the Final EIS, site-specific health and safety and materials management plans will be developed by CDOT to stipulate required response measures if hazardous materials are encountered during construction to ensure protection of worker and public health and safety.

## AQ8.    Air quality and truck emissions

Commenters raised concerns over how truck emissions were considered in the air quality analysis. Diesel particulate matter was analyzed through an emissions inventory, which was done by CDPHE-APCD using data on truck activity for the Denver Metro Area consistent with that used in the regional conformity modeling. A different methodology was used to represent trucks in the hot spot analysis; in that analysis, truck emissions were explicitly calculated for each link based on the DRCOG-estimated 2040 truck volumes for those links. This is more precise for purposes of a localized assessment. Although the total number of trucks is expected to increase significantly, in most cases the number of light-duty vehicles is increasing at an even faster rate. Thus, in 2040, trucks will make up a lower total percent of volume than in 2010.

## AQ9.   PM$_{2.5}$ and nitrogen dioxide

A concern raised in the comments revolved around why some additional transportation-related pollutants, such as fine particulates and nitrogen dioxide, were not examined like carbon monoxide or course particulates were.

PM$_{2.5}$ and nitrogen dioxide were not modeled for roadside concentrations in the Final EIS because they are not pollutants of concern in the Denver area or the project area at the present time or into the foreseeable future. Instead, PM$_{2.5}$ and nitrogen dioxide were examined through emissions inventories. The Denver area has never violated the NAAQS for PM$_{2.5}$. The value used to determine compliance is the 98th percentile of a three-year trend for PM$_{2.5}$. While the data record from this monitor is incomplete because there is not three full years of data, the readings from CDPHE's I-25/8th Avenue monitoring site (which has higher ADT than the current I-70 East project area) is 30 micrograms per cubic meter (µg/m$^3$), compared to the standard of 35 µg/m$^3$. Since Denver is an attainment area for PM$_{2.5}$, no hot spot modeling for PM$_{2.5}$ is required. With regard to nitrogen dioxide, the EPA conformity regulations do not require hot spot modeling for nitrogen dioxide. 40 CFR §93.116 clearly states that it only applies to non-attainment or maintenance areas, thereby exempting the Denver metro area from performing hot spot analyses for nitrogen dioxide.

The project used the best science and data available to make its determinations about NAAQS violations. The approved methods to determine air quality impacts, developed in consultation with EPA and CDPHE-APCD, show the project will not cause exceedances of the NAAQS.

## AQ10.   Greenhouse gases

Some comments questioned whether the greenhouse gas (GHG) analysis in the Final EIS was adequate. GHG emissions were examined in the Final EIS utilizing state-of-the-art modeling software to estimate the emissions regionally, and followed FHWA guidance in *Interim Guidance Update on Mobile Source Air Toxic Analysis in NEPA (December 6, 2012)*. The analysis used the Motor Vehicle Emissions Simulator (MOVES) model to calculate the carbon dioxide emissions in various years by each of the alternatives discussed in the Final EIS, and reported in *Section 7.4.8, Greenhouse Gas Emissions Inventories*, of *Attachment J, Air Quality Technical Report*.

The two alternatives with general-purpose lanes that were modeled show almost identical GHG emissions, which would be expected because the freeway capacity is the same for both. The Partial Cover Lowered Alternative with Managed Lanes Option results in lower GHG emissions than the modeled Build Alternatives with general-purpose lanes only.

On August 2, 2016, the CEQ issued *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, which describes how agencies should address climate change in NEPA reviews. Though there is new CEQ guidance, Interagency Consultation with FHWA, EPA, and CDPHE-APCD confirmed that it is not necessary to repeat this analysis because of the following reasons:

- Changes to the project design are minimal, so changes to results of analysis at the air quality study area level—which includes the entire project, as well as the surrounding local road network—would not be noticeable

- The study area air quality inventory analysis is primarily a trend-line comparison between project alternatives. The Final EIS adequately discusses these trends for the use of a NEPA comparison and updates to the analysis for the ROD would not alter previously shown study area air quality trends

- The new CEQ guidance states that projects that have published a Final EIS are not required to address the guidance

Consistent with its view that broad-scale efforts hold the greatest promise for meaningfully addressing the global climate change problem, FHWA is engaged in developing strategies to reduce transportation's contribution to GHGs—particularly carbon dioxide emissions—and to assess the risks to transportation systems and services from climate change.

At the state level, there also are several programs underway in Colorado to address transportation GHGs. The CDOT Air Quality Action Plan addresses unregulated MSATs and GHGs produced from Colorado's state highways, interstates, and construction activities. As a part of CDOT's commitment to addressing MSATs and GHGs, CDOT has committed to program-wide activities. Even though project-level mitigation measures will not have a substantial impact on global GHG emissions because of the exceedingly small amount of GHG emissions involved, mitigation measures during construction will have the effect of reducing GHG emissions. These activities are part of a program-wide effort by FHWA and CDOT to adopt practical means to avoid and minimize environmental impacts in accordance with 40 CFR §1505.2(c).

## Property Impacts

### PROP1. Property acquisitions

Concerns raised in the comments include how many properties are being acquired due to the project, relocation assistance provided, and who is eligible. The Preferred Alternative will require the acquisition of property that will result in the relocation of 56 residential units and 17 businesses (including one non-profit organization). Of the 56 residential units, 33 are located in Elyria (9 percent of the available housing stock in Elyria) and 23 are located in Swansea (1.6 percent of the housing stock in Swansea). (These do not add to the 3 percent total reported in other sections of the document. This is because the number reported on this page represents the percentages within the individual Elyria area and Swansea area of the Elyria and Swansea Neighborhood. Statistics in the rest of the document calculate and report these as combined areas.)

CDOT will notify all impacted owners and renters of the intent to acquire an interest in their property, including providing a written offer of just compensation specifically describing those property interests. A right-of-way specialist and, if necessary, a translator, will be assigned to each property owner to help them understand and navigate this process.

The Fifth Amendment of the U.S. Constitution provides that private property may not be taken for a public use without payment of just compensation. Additionally, the Uniform Act is a federally mandated program that applies to all acquisitions of real property or displacements of persons resulting from federal or federally assisted programs or projects, such as the implementation of the I-70 East Project alternatives. The Uniform Act was created to provide for and ensure that just compensation for government-acquired land is applied "uniformly." CDOT requires Uniform Act compliance on any project for which it has oversight responsibility, regardless of the funding source.

Residents (renters or owners) will not be required to move unless at least one comparable Decent, Safe, and Sanitary (DSS) replacement unit is available. DSS standards are established by federal regulations (25 CFR §700.55) and conform to applicable local housing and occupancy codes. CDOT will provide comparable replacement housing that is DSS and within the resident's financial means before any residents will be required to move. If comparable replacement housing is not available, the regulations allow the agency to provide a replacement housing payment in excess of the statutory maximum as part of the Last Resort Housing process.

The only parties eligible for relocation benefits from CDOT are building occupants who are directly displaced by a CDOT acquisition as a result of this project and who meet the applicable requirements for eligibility.

### PROP2. Replacement housing

Substantive comments received questioned how CDOT plans to replenish the housing stock within the neighborhoods after it displaces existing residential properties. To offset the loss of some residential units in the neighborhood, CDOT will provide $2 million in funding to support affordable housing in the Elyria and Swansea Neighborhood through available programs. Additionally, CDOT is looking for ways (e.g., partnerships) to leverage the funding to make the largest positive impact possible. This is separate from and in addition to providing relocation assistance to the 56 residential units being displaced.

## Environmental Justice Considerations

### EJ1.    Environmental justice and Title VI

Per Executive Order 12898, CDOT recognizes that the project passes through environmental justice neighborhoods. Because of this, the agency has provided an unprecedented level of public involvement tailored to the low-income and minority populations of the project area to find ways to improve the project and lessen its impacts.

Title VI of the Civil Rights Act of 1964, which states "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." CDOT is aware of this mandate to not discriminate and seeks to ensure equal access to and treatment of all individuals during the NEPA process. No

specific documentation is required to demonstrate Title VI compliance. However, the record as a whole demonstrates that this standard has been met.

The I-70 East project team used a variety of tools to solicit input and involvement from stakeholders that addressed issues of diversity in language, level of literacy, and exposure to media, including:

- Opening a project office within the project area
- Conveniently locating all public meetings within the project area, accessible by public transportation
- Providing childcare, food, and Spanish translation services at every public meeting
- Providing notifications, advertisements, and other communications in both English and Spanish
- Distributing announcements in local and regional media and at faith-based organizations
- Using local businesses to cater meetings and provide translation services
- Employing project area residents to lead and staff outreach efforts
- Distributing flyers door-to-door to area residences and businesses
- Providing several methods of contact with the project team, including email, telephone, website, postal mail, and walk-ins at the project office

CDOT performed critical analyses that focused on specific impacts in these underserved communities, some of which are mentioned in the 2014 *Health Impact Assessment,* including neighborhood and street connectivity, air quality, access to transit, bicycle and pedestrian facilities, and relocations. To address impacts of the highway project, CDOT has identified mitigation measures above and beyond standard mitigation measures to alleviate the impact on these neighborhoods.

The benefits of the project with the alternatives are fairly distributed in the project area. The project has avoided some impacts, minimized others, and mitigated all impacts that could not be avoided or minimized. Without considering the avoidance, minimization, and mitigation measures, the project will have a disproportionately high and adverse impact to the environmental justice communities. However, the Preferred Alternative includes many innovative mitigation measures to offset the impacts to the low-income and minority populations. Some of these mitigation measures include, but are not limited to:

- Lowering the highway and providing a cover with urban landscape adjacent to Swansea Elementary School
- Providing residents close to the highway construction (between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard) interior storm windows, furnace filters, and two free portable or window-mounted air conditioning

units with air filtration and assistance for the additional utility costs during construction

- Providing $100,000 toward the Denver Office of Economic Development's GES Healthy Food Challenge that will help facilitate access to fresh food

- Providing an HVAC system and upgraded doors and windows for Swansea Elementary School, plus two new additional classrooms

- Providing funding to CRHDC to assist residential and business displacees with financial counseling and procurement of financing for replacement properties and securing business and residential loans

- Providing $2 million in funding to support affordable housing in the Elyria and Swansea Neighborhood through available programs

- Equity impacts for the financial burden of access to the tolled express lanes will be mitigated by providing to eligible residents of Globeville, Elyria, and Swansea free transponders, pre-loading of tolls, or other means determined prior to the opening of the tolled express lanes. Eligibility and the duration of the program are expected to be determined based on factors including, but not limited to, residency, financial burden, number of vehicles per resident or household, etc.

After considering the benefits of the Preferred Alternative along with the avoidance, minimization, and mitigation, the Preferred Alternative will not cause disproportionately high and adverse effects on any minority or low-income populations, in accordance with the provisions of Executive Order 12898 and FHWA Order 6640.23A. Therefore, no further environmental justice analysis is required.

Additionally, the inclusion of managed lanes as part of the Preferred Alternative raises environmental justice questions related to equity impacts: who can use the facility, will there be additional impacts, are there impacts to those who don't have cars, and has everyone been involved in the public process. The managed lanes will provide long-term, reliable travel times for drivers who consider it worth the toll, and overall reduced travel times for users at all income levels. This general reduction in travel time for all users, including those not in the managed lanes, is derived from the reduction of traffic in the general-purpose lanes by the drivers who do choose to use the managed lanes. In addition to this overall reduction in travel times, managed lanes will be implemented with thorough consideration of equity impacts. The project will comply with the state laws at the time of implementation regarding managed lanes and high-occupancy vehicles. See *Attachment E, Traffic Technical Report*, of the Final EIS for more information.

Further, the improvements in north-south connectivity for pedestrian access and bicycle options will increase mobility for those who live in the environmental justice neighborhoods and do not own cars.

See *Section 5.3, Environmental Justice*, of the Final EIS for more information.

# Transportation and Traffic

## TRANS1.    Multi-modal considerations

Concerns raised in the comments include questions about if CDOT accounted for other travel options beyond the car when trying to address the purpose and need of the project. The purpose of this project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area. This project began in 2003 as part of the I-70 East Corridor project, which looked at both highway and transit solutions, including various rail and Bus Rapid Transit routes. The process was initially a joint effort between both highway and transit agencies. In June 2006, the highway and transit elements of the project were separated since it was decided that they serve different travel markets, are located in different corridors, and have different funding sources. The East Corridor transit project connects Denver International Airport to Union Station in downtown Denver along Smith Road, south of I-70. Construction of the East Corridor transit project was complete in 2016. For more information about the transit project, visit: http://www.rtd-fastracks.com/ec_1.

Although the transit portion of the project was split out, the I-70 East Project has taken the effects of the East Corridor transit project, as well as other transit improvements in the area, into consideration. This includes adding their effects into the traffic modeling that was used for the I-70 East Project (see TRANS6 and TRANS12). In addition to including transit projects in the future traffic models, the I-70 East Project also ensures that other known transit projects in the area have not been precluded. Coordination with these other projects will be ongoing throughout construction.

In addition to considering transit in the area, the Preferred Alternative is also consistent with Denver's bike plan and has evolved to follow Denver safety standards for bicycles and pedestrians. It will improve the bicycle and pedestrian experience in the project area by providing safe crossings across the highway and improving sidewalks and lighting in the impacted areas. CDOT is working with Denver to create multi-modal connections and maximize pedestrian access in the project area. For example, at I-70 and Quebec Street, the Preferred Alternative includes sidewalks on both sides of Quebec Street for the length of reconstruction.

For more information on walkability and bicycle route improvements, see *Chapter 4, Transportation Impacts and Mitigation Measures*, of the Final EIS.

## TRANS2.    Intersection at 47th Avenue and York Street

Public comments presented interest in improvements at the intersection at 47th Avenue and York Street. The Central 70 Project does provide improvements to the intersection at 47th Avenue and York Street, including:

- Adding a southbound left-turn pocket

- Reconstructing the crossing

- Adding a railroad pre-signal

In addition to these improvements, Denver has initiated an alternatives analysis for this area to identify potential safety improvements. As part of this process, Denver has submitted a grant application to obtain funding for a pedestrian bridge at this location. The alternative analysis initiated by Denver proposing additional improvements at this intersection will not be a part of the Central 70 Project or the I-70 East Project; however, the Central 70 Project and the I-70 East Project do not preclude them.

### TRANS3.    Traffic forecasting and modeling

Many comments received during the Final EIS review period raised concerns over how future traffic was forecasted and what models were used. Forecasting for this project in the Final EIS was done using the 2035 DRCOG trip-based Compass version 5 travel demand model, which is the latest Compass model released by DRCOG. Compass is a regional model that applies projected land use data, including population and employment growth, to project future traffic conditions. Travel demand models provide output in the form of vehicle demand or volume. This model incorporates household and employment data for the region and accounts for programmed roadway and transit projects, including the East Corridor commuter rail line. DRCOG owns and maintains this regional base model that incorporates every municipality within the DRCOG region, which includes the nine counties of Adams, Arapahoe, Boulder, Broomfield, Clear Creek, Denver, Douglas, Gilpin, Jefferson, and the southwest portion of Weld County. Each alternative considered in the Final EIS was incorporated into DRCOG's base model to determine future travel forecasts within the study area. These projections were used to determine the number of lanes needed for each alternative to accommodate future traffic growth.

The fundamental assumptions/characteristics behind the travel demand model include:

- **Growth of the region.** DRCOG uses the best economists and the State Demographer to estimate employment and population growth. This is the source of the current socio-economic data set used in all DRCOG models.

- **Model acceptance.** The model is accepted and certified by FHWA.

- **Network of roadways and transit.** The network coded into the model for the existing and future year conditions includes all projects contained in the DRCOG-approved Fiscally Constrained RTP, along with other roadway capacity projects to be completed by local governments.

- **Behavioral data.** Behavioral aspects of the model are derived from an extensive travel survey conducted by DRCOG and last collected in 2010. These surveys collect large amounts of data and are essential in helping the model relate behavioral trends to travel choices. They are an infrequent and expensive undertaking and, in the travel demand model community, a survey from 2010 is considered recent and credible.

- **Dynamic nature of the model.** The model is always changing as new land uses and roadway network elements become available. The model is updated frequently and calibrated to new traffic counts and estimates of region-wide VMT. The underlying behavioral assumptions also may change as new tabulations of the Front Range Travel Counts become available.

Throughout the project process, updates to data used in the analysis were consistently monitored in relation to the project. At the time that the project team was working on the 2008 Draft EIS and the 2014 Supplemental Draft EIS, the latest adopted travel demand model was the Compass model. In the interim, DRCOG developed a newer travel demand model, called the Focus model, which was adopted by DRCOG in February 2015, well after the completion of the Supplemental Draft EIS and after the start of the Final EIS process. Federal requirements mandate that NEPA studies use the current adopted regional travel demand model for analysis purposes, which was the DRCOG Compass model until February 2015. Along with the implementation of the Focus model, DRCOG began using a new land use model known as UrbanSim. UrbanSim was scheduled to be adopted at the same time as DRCOG's Focus model. The project team worked to determine how to best incorporate updates to available data if necessary. Due to the timing of the adoption of both models, CDOT and FHWA chose to continue using the DRCOG Compass model.

The project team has done a comparative analysis between the volumes from the Compass model being used in the Final EIS and ROD, and the volumes that would have been generated by the newly adopted Focus model. This analysis found that the volumes from the Compass model are slightly higher than the Focus model volumes (typically, less than a 5-percent difference for I-70), which does not change the number of lanes needed for this project. FHWA reviewed the comparative analysis and agreed that the I-70 Final EIS and ROD could continue to use the volumes from the most recent Compass model, which the project is using to complete most analyses.

One exception to this is the air quality conformity analysis in the ROD, which used the most recent adopted travel demand model, Focus 2040. Air quality is based on the volume of and speed of traffic for the year of peak emissions. Since the release of the Final EIS, DRCOG adopted an amendment to the 2040 Fiscally Constrained RTP (March 16, 2016), which includes the Central 70 Project. This extends the hot spot analysis to the DRCOG planning horizon year of 2040, as required by the EPA in 40 CFR §93.116(a), to demonstrate that during the time frame of the transportation plan no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project.

To further evaluate the traffic operations for the alternatives, the output from the DRCOG Compass model was fed into a dynamic traffic assignment model called DynusT. DynusT simulates traffic supply and demand interactions on the network in greater detail for a sub-area of the regional model. The sub-area is larger than the transportation impacts area to ensure it includes reasonable route diversions that could occur. The sub-area for this project extends west of Wadsworth Boulevard to east of Highway E-470 and extends south

of Colfax Avenue to north of approximately 80th Avenue. This ensures that the model will take into account the effects of I-270, I-25, the I-25/I-70 interchange, and the local roadway network in the analysis. The model projects speeds, travel times, peak volumes, VMT, and local street volumes for the alternatives. For more information, see *Chapter 4, Transportation Impacts and Mitigation Measures*, of the Final EIS.

DRCOG Compass model inputs include:

- Socio-economic data (i.e., income, employment, etc.)

- Household and population data (i.e., number of individuals per household, either current or predicted future populations)

- Existing and future roadway network data (i.e., volumes, speeds, capacity, etc.)

- Transit network information, including buses and trains (i.e., RTD FasTracks); DRCOG relies on RTD to code the transit portion of the model

Highway and transit output data from the model are:

- Vehicular volumes on roads (flows on links)

- Speeds on links

- Network travel times

- Origin/destination patterns; these are represented by zone-to-zone trip tables, which usually are segmented by travel mode

- Mode splits

- Emissions from cars and trucks

- Transit boardings or Park-n-Ride loadings

### TRANS4.    Highway laneage and width

A concern raised in the comments was why CDOT needed to widen the highway beyond its existing six lanes. The Final EIS traffic analysis used the 2035 DRCOG regional travel demand model to forecast horizon-year traffic volumes to determine the number of lanes that will be needed in the horizon year of 2035. This model uses planned employment and population data to determine traffic volumes, as discussed in *Chapter 4, Transportation Impacts and Mitigation Measures,* of the Final EIS. This model also accounts for planned improvements to other modal networks, including transit.

Between Brighton Boulevard and I-270, both eastbound I-70 and westbound I-70 are projected to carry more than 10,000 vehicles per hour in the peak design period. Between I-270 and I-225, both eastbound I-70 and westbound I-70 are projected to carry upwards of 15,000 vehicles per hour in the peak design period.

Based on the Transportation Research Board's *Highway Capacity Manual*, to achieve a minimum level of service threshold for a freeway, approximately 2,000 passenger cars must

pass per hour per lane. The planned Build Alternatives propose a 10-lane cross-section (five lanes in each direction), with an additional lane in each direction between I-225 and I-270 (a total of 12 lanes in this section) to meet the forecasted capacity needs. Detailed traffic modeling confirms the proposed improvements. Additionally, the volumes and proposed number of lanes were compared to other freeways in metro Denver, further confirming the proposed cross sections. Detailed information on traffic volumes and forecasting is available in *Chapter 4, Transportation Impacts and Mitigation Measures,* of the Final EIS. Additionally, CDOT and FHWA also considered the need for the highway lanes based on very recently released DRCOG projections of traffic for 2040 that are slightly lower than the 2035 estimates. Based on the segment-by-segment assessment, the agencies concluded that the Phase 1 project lane configurations were still appropriate. See *Attachment E, Traffic Technical Report,* of the Final EIS, for more information.

The proposed highway width of the Partial Cover Lowered Alternative between Brighton Boulevard and Colorado Boulevard includes five lanes of through traffic in each direction (two managed lanes and three general-purpose lanes), for a total of 10 lanes. In some locations, near on-ramps and off-ramps, there is an additional auxiliary lane to allow vehicles to speed up or slow down while entering or exiting the highway. This results in some sections of highway being up to 12 lanes wide. The highway also includes an inside and outside shoulder, which accounts for some of the additional width. Additionally, 46th Avenue is being relocated from its current position underneath the highway to beside the highway. This adds additional width to the footprint of the project.

At present, I-70 has many design deficiencies that do not meet current standards, such as narrow lane widths and insufficient shoulder width of only two feet in some sections. Reconstruction of the highway, along the existing alignment or at any other location, would require that the deficiencies identified be addressed and that the highway be built to meet current design standards.

### TRANS5.    *Restricting truck traffic on I-70*

Some comments received asked if CDOT could restrict truck traffic on portions of I-70 to reduce the traffic and meet the project's purpose and need without widening the highway. Part of the purpose of the interstate system is to promote economic development, and trucking is a major influence on the nation's economy. The areas adjacent to I-70 East are highly industrial and rely heavily on the need for trucks to move in and out of the area with ease. If truck access to I-70 were restricted, they would be forced to use local streets to access the local businesses in the area, negatively impacting safety and mobility in the nearby neighborhoods.

Except in limited circumstances (e.g., adverse weather, construction zones), per 23 CFR §658.11(d), the state of Colorado cannot deny truck access nor place restrictions on the interstate system without FHWA approval. The request needs to be based on safety concerns. It requires an analysis of the impact to interstate commerce, and analysis and recommendations of alternative routes. A rebuilt I-70 East would significantly improve

safety along this stretch of interstate for trucks and all other vehicles and surrounding neighborhoods.

CDOT conducted a heavy vehicle traffic study to determine how many heavy vehicles travel between I-270 and I-76 in a continuous journey (See *Attachment E, Traffic Technical Report,* of the Final EIS). The heavy vehicles that travel through this area represent less than 3 percent of the average, directional heavy vehicle traffic and less than 0.5 percent of total directional traffic. This demonstrates that a significant number of heavy vehicles either make stops or redirect north or south in this section.

The collected data represents the total number of heavy vehicles that would be eliminated from the I-70 corridor if an I-270/I-76 reroute were implemented. Due to the low numbers of heavy vehicles passing all the way through the corridor and the off-peak travel distribution of those heavy vehicles, rerouting heavy vehicles to I-270/I-76 would not change the number of lanes required for the I-70 project.

### *TRANS6.    Future driving trends*

The project team has incorporated as much knowledge as possible into forecasting traffic patterns and trends. Although some recent studies have shown that people are driving less, the 2035 MVRTP predicts the Denver metropolitan area will continue to experience large growth through 2035, including a 59-percent increase in population and a 64-percent increase in employment as compared to 2005 numbers. This means that although individual drivers may drive less, the net increase in the total number of drivers on the road will result in an overall increase in VMT. It is CDOT's responsibility to provide a transportation system that will accommodate this growth. Before conducting the analysis, future (2035) transportation system characteristics were identified. DRCOG uses the economists and the State Demographer to estimate employment and population growth. This is the source of the current socio-economic data set used in all DRCOG models. All I-70 project alternatives assume implementation of the transportation improvements identified in the DRCOG 2035 MVRTP. This includes both programmed projects (those budgeted in the five-year DRCOG 2016–2021 TIP and planned projects (those not in the TIP, but included in the adopted DRCOG 2035 MVRTP). The more significant planned and programmed improvements to the transportation system within the study area are shown in *Chapter 4, Transportation Impacts and Mitigation Measures*, of the Final EIS.

In addition to planned roadway improvements, the analysis assumed the implementation of major transit system improvements within the Denver region as part of RTD's FasTracks program. Of most significance in the study area is the East Corridor commuter rail project, which runs from downtown Denver to Denver International Airport. The future traffic modeling accounted for these projects and their impact on travel demand.

The higher transit ridership due to expansion in transit was considered in the analysis of the Final EIS. Even with expanded transit use, the analysis shows an increase in ADT in the future, which requires additional lanes on the highway to accommodate the added traffic.

In addition, while some comments have pointed to national reductions in VMT following the recession of 2007-08, recent FHWA data have shown that VMT has been increasing again during the last 18 months and has reached pre-recession levels. For more information, see: https://www.fhwa.dot.gov/policyinformation/travel_monitoring/15juntvt/15juntvt.pdf.

### TRANS7.    Transportation Demand Management

Some comments received expressed concern regarding TDM considerations and the importance of including TDM strategies as a measure to minimize impacts. Therefore, the following mitigation commitment has been added to the transportation mitigation measures during construction: Develop and implement a TDM program during construction, which could include items such as working with RTD on enhanced transit service and ITS improvements.

## Funding Strategies

### FUND1.  Managed lanes

Some comments received questioned why managed lanes are being included as part of the Preferred Alternative. The Managed Lanes Option is selected as the Operational Option of the Preferred Alternative because of its long-term operational flexibility and mobility benefits. Managed lanes provide drivers with flexibility by allowing them to pay a fee to bypass congestion in general-purpose lanes, improving reliability in travel times. It also allows CDOT to manage congestion over the long term, reducing the need for future expansion. The Managed Lanes Option also has a higher throughput potential, meaning it accommodates more people at a given time. This option accommodates express buses, carpools, and other high-occupancy vehicles, providing increased service to those riders. This option also promotes the use of carpools to avoid congestion.

Managed lanes are proposed for I-70 East strictly as a traffic management strategy, not to generate revenues or as part of a public-private partnership. The effects of the Managed Lanes Option on corridor operations were analyzed for the Final EIS, but the pricing structure has not yet been established. Through discussions related to pricing and policies of managed lanes throughout the state, it was determined that toll rates will be established by the HPTE Board of Directors and will be set at a level necessary to maintain free-flow traffic conditions in these lanes. The HPTE is determining policies for managed lanes at a statewide level and will determine pricing on a corridor-by-corridor basis. The project will comply with state laws that are established regarding express lanes and high-occupancy vehicles. Existing general-purpose lanes will not be tolled.

### FUND2.  Project funding

How much the project will cost and project funding were two questions raised in the comments. The entire Preferred Alternative identified in the I-70 East Final EIS is estimated to cost approximately $1.7 billion and the Central 70 Project is estimated to cost $1.1 billion (based on preliminary design estimates in 2016 dollars)—including design, right-of-way acquisition, and construction— The full I-70 East Preferred Alternative would

cost more than the $1.1757 billion currently identified in the DRCOG Fiscally Constrained RTP, as amended (DRCOG, 2015c). Because the FHWA can only approve project improvements in a ROD that are included in a fiscally constrained plan, a phased approach is necessary. The identification of an initial phase for implementation, now called the Central 70 Project, is consistent with FHWA requirements to have funding for projects identified before final decisions are made.

The elements included in the Central 70 Project are consistent with the projects, priorities, and funding identified in the DRCOG Fiscally Constrained RTP. Following the publication of the Final EIS, FHWA performed an independent cost estimate review to verify the accuracy and reasonableness of the Preferred Alternative's cost estimate. FHWA's review used a probabilistic approach that included risk events and inflation. The results of the review indicated the total project, including past costs, would have a current-year cost between $1.424 billion to $1.866 billion, with a year of expenditure cost ranging from $1.721 billion to $2.329 billion. The Central 70 Project would cost, in current-year dollars, between $1.016 billion and $1.291 billion, with a year of expenditure of $1.097 billion to $1.402 billion.

The following funding sources are currently committed to the project:

- $850 million—Colorado Bridge Enterprise Safety Surcharge
- $50 million—DRCOG: STP-Metro and CMAQ
- $180 million—Senate Bill 09-228 Transfers
- $37 million—Denver

Projects that will be necessary to complete implementation of the entire Preferred Alternative, but are not included in the Central 70 Project, may be identified in the future. As funding is identified and projects are identified in the Fiscally Constrained RTP, new RODs will be completed. These future projects will be designed to minimize interim infrastructure for those parts of the project that would not have to be built if the entire Preferred Alternative were built at one time. These interim pieces come with additional impacts, which would result in irretrievable losses of labor, funding, energy, and materials, and environmental impacts such as an extended construction period resulting in more traffic delays and detours that would inconvenience residents, adjacent businesses, and community facilities. Implementation of future phases may not occur if funding beyond the Central 70 Project cannot be identified.

Taxes would not be raised to pay for this project and CDOT is not looking at managed lanes as a way to finance construction of the I-70 East Project.

The Colorado Bridge Enterprise was formed by CDOT in 2009 as part of the FASTER (Funding Advancement for Surface Transportation and Economic Recovery) legislation to finance, repair, reconstruct, and replace structurally deficient bridges. It is funded from a bridge safety surcharge on vehicle registration based upon vehicle weight. Originally, 128

bridges were determined to be eligible for the program and the viaduct was among the 30 worst bridges on the list. As of November 2016, the sufficiency rating of the viaduct was 62 out of a possible 100 points and it is considered functionally obsolete. The I-70 viaduct is the last of the worst 30 bridges and one of the last bridges of the 128 total to be addressed. Due to the concern about the funding impact of the I-70 viaduct replacement on long-term revenues available for rehabilitating other Colorado bridges, the Transportation Commission has required that 50 percent of the available bridge funds (from FASTER) be retained for other needed projects across the state.

For additional information and details on the project funding strategy, see Section 4.1, Central 70 Project Funding Scenario, of this document.

## Drainage

### DRAIN1.    Preferred Alternative Drainage

The drainage needs for the I-70 East Project are provided for by an assortment of improvements incorporated in the design of the project along the full length of the project area. These improvements are required to construct the Central 70 Project and have been designed to accommodate flows associated with or affecting the highway.

To address the drainage needs specific to the Central 70 Project between Brighton Boulevard and Dahlia Street, two systems—an onsite outfall system north of I-70 and an offsite outfall system south of I-70—are needed. The onsite outfall system includes the storm drain system necessary to drain I-70, including the lowered section. The system captures and conveys flows that are generated from I-70 to water quality detention ponds that provide water quality treatment. The system is designed to treat and convey a 100-year flow from I-70 into the South Platte River, as shown in **Exhibit 24**.

The offsite outfall system is designed to intercept surface storm runoff generated by lands surrounding I-70 and protect the lowered section of the Central 70 Project between Brighton Boulevard and Colorado Boulevard from flooding in the 100-year event. This system is designed to capture surface flow south of I-70 and prevent it from entering the lowered section of I-70 (Brighton Boulevard to Colorado Boulevard). The design of the offsite outfall system has been modified since the publication of the Final EIS to avoid conflict with Denver's GLO Project, as discussed in Section 9.12 of this document. The offsite outfall system is designed to capture and convey the stormwater and discharge it into the South Platte River, as shown in **Exhibit 25**.

To address the drainage needs east of Dahlia Street, the systems required to address onsite flows (stormwater generated within the interstate) and offsite flows (storm runoff draining into the interstate right of way from surrounding lands) are addressed by a single system. This system is a modification of the existing system in place; it is resized to capture and treat the increased runoff caused by the increase in impervious (paved) surface.

**Exhibit 24        Onsite Outfall System North of I-70**



| — Drainage | ▮ Detention pond | ▯ Construction limits |

**Exhibit 25        Offsite Outfall System South of I-70**



The length of I-70 that will be located below groundwater level is relatively short, between Vine Street and York Street. It is not uncommon for construction of roadways to be located below the groundwater level, including highways in the Denver metro area. The final design effort will further look to limit the length of I-70 that would be below groundwater and consider the associated effects to the groundwater levels.

For more information about the drainage plan for the Central 70 Project, see Section 9.12, Floodplains and Drainage/Hydrology, in this ROD.

### DRAIN2.    Connected actions

The I-70 East Project and the Two Basins Drainage Project (TBDP) (now also known as the Platte to Park Hill (P2P) Stormwater Systems Project) are not connected actions for the purposes of NEPA and they do not need to be analyzed as one project. The projects are proposed by different agencies, respond to different needs, serve different purposes, have independent utility, and can function independently of each other if one of them was not built.

The I-70 East Project is a joint state-federal action proposed by CDOT and aided by FHWA to address safety, access, mobility, and congestion issues on the highway system. The associated drainages for the Preferred Alternative are subservient to this purpose and are needed to capture and convey onsite and offsite flows from the highway. It is a federal action subject to NEPA because it will utilize federal funds and require federal agency approvals. The TBDP is a municipal action by Denver to address longstanding flooding concerns in its northern neighborhoods south of I-70. The system is designed for the express purpose of alleviating flooding risk caused by significant precipitation runoff in these areas, not by the improvements planned in the Preferred Alternative. The TBDP is not a federal action subject to NEPA because its proponent is not a federal agency nor is it utilizing federal assistance. The two projects are stand-alone actions by different agencies and are not dependent on one another for justification or feasibility. They each have independent utility such that each of the projects would take place regardless of the other, which is the legal standard adopted in this jurisdiction.

CDOT and Denver entered into an Intergovernmental Agreement (IGA) that establishes the framework for collaboration on numerous concerns in the project area including storm water drainage. Assuming that Denver moves forward with implementation of the TBDP, CDOT has agreed through the IGA to coordinate efforts and assist with the costs of certain components of the TBDP that would benefit I-70 East, such as the GLO Project explained below. However, CDOT and FHWA have not been involved in the proposal, development, or implementation of the TBDP, but are simply taking advantage of new opportunities for cooperation, cost savings, and benefits that the TBDP, if it is constructed, offers to the I-70 East Project. Even though CDOT and Denver have agreed to work together and share some of the financial burdens, each project is nonetheless capable of proceeding on its own merits, has independent utility, and their potential collaboration does not defeat their separateness for the purposes of NEPA. Furthermore, to the extent that collaboration

between the projects alters the design of the Preferred Alternative evaluated in the Final EIS, CDOT and FHWA will conduct a reevaluation to determine and disclose the environmental impacts caused by those alterations and their significance.

Since publication of the Final EIS, Denver has made major advancements in the implementation of its GLO Project—a subcomponent of the TBDP— which creates a conflict with the design of the offsite drainage system of the I-70 East Project proposed and analyzed in the Final EIS. Denver notified the project team about the conflict in their comments provided on the Final EIS. The conflict required the redesign of the I-70 East offsite system in vicinity of the Coliseum and South Platte River. The redesign will utilize the components of the GLO system to convey I-70 storm water to the river creating a combined outfall system, which will minimize impacts and result in benefits to both projects. Because of this, the components of the GLO system used by I-70 are being treated as part of the I-70 East offsite drainage system and their impacts are analyzed in this ROD as updates to the Final EIS. Additional details can be found in Section 9.12, Floodplains and Drainage/Hydrology. This does not affect the relationship of I-70 East to other parts of the TBDP that are not conveying I-70 storm water, which will continue to be treated as separate, non-connected actions.

This page intentionally left blank.

# Chapter 9   Updates and Clarifications since the Publication of the Final EIS

There have been some changes to the design and construction limits of the alternatives since the Final EIS for the I-70 East Project was published. The project team revisited all of the analyses performed for the Final EIS. Although these changes did not affect the analysis performed for many of the environmental resources, some resources have updated analyses and slightly different impacts compared to the Final EIS.

As stated in the comments received from Denver on the Final EIS, the Partial Cover Lowered Alternative's offsite drainage outfall shown in the Final EIS would result in a conflict with Denver's GLO Project. Subsequently, the Partial Cover Lowered Alternative's south offsite drainage system was redesigned to avoid the conflict. The redesigned system ties into the GLO Project, rather than have two separate outfalls in Globeville Landing Park that would result in impacting the park twice. Therefore, the impacts associated with the portions of the where the Partial Cover Lowered Alternative's water will flow are evaluated for applicable resources in this chapter. More information on the offsite drainage system are included in Section 9.12, Floodplains and Drainage/Hydrology.

Additionally, there are some other changes and clarifications to the Final EIS based on comments received during the public review period. This chapter discusses the updates to the analysis along with the text changes from the Final EIS for those resources or Final EIS chapters that require updating or changes. The strikethrough text represents deletion of a word or a phrase from the Final EIS text, while the underlined text shows the new text. All exhibits that present the construction limits in the Final EIS are updated to include the revised construction limits as shown in **Exhibit 26**. If this revision resulted in changes to the analysis of a resource, the updated analysis has been included in this chapter.

The resources that required no updates or changes to the Final EIS text include:

- Paleontology
- Energy
- Geology and Soils
- Irreversible/Irretrievable Commitment of Resources
- Short-Term Uses versus Long-Term Productivity

**Exhibit 26        Revised Construction Limits**



9.1    Transportation
# 9.1    Transportation

## Updates to the Final EIS Analysis

> The most recent 2035 socioeconomic/demographic forecasts from DRCOG were used as a basis for the travel modeling conducted for the Final EIS.

The traffic analysis as it was reported in the Final EIS has not been updated. The majority of the changes to the roadway network that were done subsequent to the submittal of the Final EIS are minor in nature and located on the local street network (between Brighton Boulevard and Quebec Street). Specifically, the frontage roads have changed the most since the release of the Final EIS. An update to the traffic analysis was not necessary because the type of changes made would not result in substantive changes in volumes within the study area, or generate or reduce trips in the project area; thus, the results as presented in the Final EIS remain unchanged.

## Changes to the Final EIS Text

The following discussions include clarifications on *Chapter 4, Transportation Impacts and Mitigation Measures,* of the Final EIS:

**Updates to transportation mitigation measures:**

The following mitigation commitments have been added to the transportation mitigation measures during construction:

- Develop and implement a TDM program during construction, which could include items such as working with RTD on enhanced transit service and ITS improvements.

- Coordinate with affected local governments, residents, and businesses to minimize disruptions during construction.

## 9.2    Social and Economic Conditions

### Updates to the Final EIS Analysis

Although there have been minor modifications to the Preferred Alternative's design, these changes do not affect the analysis performed for the Social and Economic Conditions section of the Final EIS. However, a change to the Relocations and Displacements section of the Final EIS results in one less business relocation for the Revised Viaduct Alternative, North Option; the Revised Viaduct Alternative, South Option; and the Partial Cover Lowered Alternative. Since this information also is presented in the Social and Economic Conditions section of the Final EIS, this change also must be reflected there.

The business property at 4375 Havana Street in the Stapleton Neighborhood is a CDOT maintenance facility that has been confirmed to be owned by CDOT versus being owned by Denver, as was assumed in the Final EIS. Since CDOT owns and operates this property, this business relocation is not applicable. Therefore, the number of business relocations, including non-profit, for each Build Alternative analyzed is reduced by one:

- Revised Viaduct Alternative, North Option—previous: 15, new: 14

- Revised Viaduct Alternative, South Option—previous: 27, new: 26

- Partial Cover Lowered Alternative—previous: 18, new: 17

### Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.2, Social and Economic Conditions,* of the Final EIS:

**Global change in Section 5.2 of the Final EIS:**

All text discussions regarding the number of business relocations are updated to reflect the revised numbers for all alternatives, as discussed previously.

All text regarding pedestrian improvements is clarified to state that they will all comply with the ADA.

**Page 5.2-34—Fourth paragraph now reads:**

The Partial Cover Lowered Alternative will ~~affect~~ acquire 56 housing units, which is approximately 3 percent of the housing units in the Elyria and Swansea Neighborhood.

## 9.3     Environmental Justice

### Updates to the Final EIS Analysis

There are no updates or changes to the Environmental Justice analysis and results since the publication of the Final EIS.

### Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.3, Environmental Justice*, of the Final EIS:

**Global change in Section 5.3 of the Final EIS:**

All text discussions regarding the number of business relocations and the number of impacted noise receptors are updated to reflect changes discussed in Section 9.5, Relocations and Displacements, and Section 9.10, Noise.

**Page 5.3-38—Second paragraph now reads:**

The equity impacts on low-income and minority populations can be mitigated through careful design and implementation of the operational strategy programs and policy. To offset impacts to the low-income communities, there are statewide policy decisions that will be refined and implemented later as part of a statewide initiative and not specific to this project. ~~Mitigation strategies being considered by CDOT used in other highway projects with managed lanes across the nation—include allowing vehicles with three or more occupants to use the managed lanes free of charge.~~ <u>The project will comply with the state laws at the time of implementation regarding managed lanes and high-occupancy vehicles.</u>

**Updates to environmental justice mitigation measures:**

The following mitigation commitment has been added since the publication of the Final EIS:

- <u>Provide residents close to the highway construction—between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard—furnace filters.</u>

The following mitigation commitments have been updated since the publication of the Final EIS:

- ~~Provide contributions to existing programs that facilitate access to fresh food.~~ <u>Provide $100,000 toward the Denver Office of Economic Development's GES Healthy Food Challenge that will help facilitate access to fresh food.</u>

- Provide $2 million in funding to ~~develop~~ <u>support</u> affordable housing ~~units~~ in the Elyria and Swansea Neighborhood through available programs.

- ~~Research ways to provide assistance for low-income populations within the area (such as free transponders) for using the managed lanes~~

Eligible residents of Globeville, Elyria, and Swansea will be provided mitigation for the financial burden of access to the tolled express lanes through either free transponders, pre-loading of tolls, or other means determined prior to the opening of the tolled express lanes. Eligibility and the duration of the program are expected to be determined based on factors including, but not limited to, residency, financial burden, number of vehicles per resident or household, etc.

## 9.4    Land Use

### Updates to the Final EIS Analysis

The modifications to the project footprint and construction limits for the Partial Cover Lowered Alternative have resulted in changes to the acreage of existing land use converted to a transportation use. Additionally, changes to the offsite drainage system design for the Partial Cover Lowered Alternative result in changes to the general land-use category Parks/Open space, which was not identified previously. **Exhibit 27** captures the updated acreage for each land-use category for the Partial Cover Lowered Alternative.

**Exhibit 27        Updated Land-Use Impacts**

| Alternative | Land Use Category | | | | | | |
|---|---|---|---|---|---|---|---|
| | Commercial | Government/ Institutional | Industrial | Parks/Open Space | Residential | Vacant | Total Acres |
| Partial Cover Lowered Alternative | 30.1 | 1.1 | 28.0 | 0 1.1 | 7.4 | 0.1 | 66.6 67.7 |

### Changes to the Final EIS Text

The following discussion includes clarifications on *Section 5.4, Land Use*, of the Final EIS:

The updated land-use impacts in **Exhibit 27** replaces the Partial Cover Lowered Alternative table entries in Exhibit 5.4-8 of the Final EIS.

## 9.5    Relocations and Displacements

### Updates to the Final EIS Analysis

Since publication of the Final EIS, ownership of the business property at 4375 Havana Street in the Stapleton Neighborhood, which is a CDOT maintenance facility, has been confirmed to be CDOT-owned rather than Denver-owned, as was stated in the Final EIS. Since CDOT owns and operates this property, this business relocation is no longer applicable.

The number of business relocations for each alternative analyzed is reduced by one and this information is presented in **Exhibit 28**.

**Exhibit 28      Updated Business and Non-Profit Relocations by Alternative and Neighborhood**

| Alternative/Option | Neighborhood | Business Relocations | Non-Profit Relocations |
|---|---|---|---|
| Revised Viaduct Alternative, North Option | Elyria and Swansea | 10 | 1 |
| | Northeast Park Hill | 3 | — |
| | Stapleton | ~~1~~ 0 | — |
| | **Total** | ~~14~~ 13 | 1 |
| Revised Viaduct Alternative, South Option | Elyria and Swansea | 22 | 1 |
| | Northeast Park Hill | 3 | — |
| | Stapleton | ~~1~~ 0 | — |
| | **Total** | ~~26~~ 25 | 1 |
| Partial Cover Lowered Alternative | Elyria and Swansea | 13 | 1 |
| | Northeast Park Hill | 3 | — |
| | Stapleton | ~~1~~ 0 | — |
| | **Total** | ~~17~~ 16 | 1 |

## Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.5, Relocations and Displacements,* of the Final EIS:

The updated business relocations in **Exhibit 28** replaces the Build Alternative entries of Exhibit 5.5-9 in the Final EIS.

**Global change in Section 5.5 of the Final EIS:**

All text discussions and exhibits regarding the number of business relocations are updated to reflect the changes discussed in the subsection above.

# 9.6      Historic Preservation

## Updates to the Final EIS Analysis

Design refinements since the Final EIS have caused changes to the Area of Potential Effect (APE) and historic resource impacts. Additionally, some properties have reached the age threshold for consideration as a historic resource since the last time the surveys were conducted and now include properties built in 1968 or earlier. These changes require the addition of several historic resources not previously included. These changes are captured in the Section 106 consultation in September 2015, February 2016, and October 2016, and were concurred upon by SHPO in September 2015, March 2016, and November 2016,

respectively (see *Attachment B, Agency Consultation Addendum* in the Final EIS and *Attachment B, Updates to Agency Consultation Addendum* in this document).

**Exhibit 29** presents all the historic resources within the APE with their effects determinations. The newly identified historic resources that have been surveyed and are eligible for listing on the NRHP since the Final EIS was published are included at the end of the table. The effects determinations have been abbreviated as follows:

- AE: Adverse Effect
- NAE: No Adverse Effect
- NE: No Effect

**Exhibit 29      Historic Resources within the APE and Their Effects Determination**

| # | Property Name and Address | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|---|
| | | North Option | South Option | North Option | South Option | |
| 1 | Ponce Residence 4668 High Street (5DV10034) | NAE | NAE | NAE | NAE | NAE |
| 2 | Rudy/Bernal Residence 4618 High Street (5DV9735) | AE | NAE | AE | AE | AE |
| 3 | Garcia Residence 4617–4625 Race Street (5DV9780) | AE | NAE | AE | AE | AE |
| 4 | Abrams/Loretta Residence 4679 Vine Street (5DV10135) | NAE | NAE | NAE | NAE | NAE |
| 5 | Toth/Kelly Residence 4639 Claude Court (5DV9668) | NAE | NAE | NAE | NAE | AE |
| 6 | Brown and Alarid Residence 4637 Claude Court (5DV9667) | NAE | NAE | NAE | NAE | AE |
| 7 | Huffman Residence 4707 Josephine Street (5DV10058) | NAE | NAE | NAE | NAE | NAE |
| 8 | Krutzler/Barajas Residence 4681 Josephine Street (5DV9761) | NAE | NAE | NAE | NAE | NAE |
| 9 | Hovan/Plazola Residence 4673 Josephine Street (5DV1172) | NAE | NAE | NAE | NAE | NAE |
| 10 | James Residence 4651 Josephine Street (5DV9753) | NAE | NAE | NAE | NAE | NAE |
| 11 | Waggoner Residence 4647 Josephine Street (5DV9751) | NAE | NAE | NAE | NAE | NAE |
| 12 | Lovato Residence 4696 Josephine Street (5DV5623/5DV9765) | NAE | NAE | NAE | NAE | NAE |

**Exhibit 29      Historic Resources within the APE and Their Effects Determination**

| # | Property Name and Address | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|---|
| | | North Option | South Option | North Option | South Option | |
| 13 | Geo Trust/Araujo Residence 4682 Josephine Street (5DV9762) | NAE | NAE | NAE | NAE | NAE |
| 14 | Tomas/Eagan Residence 4653 Columbine Street (5DV9996) | NAE | NAE | NAE | NAE | NAE |
| 15 | Miranda Residence 4632 Josephine Street (5DV5677) | NAE | NAE | NAE | NAE | NAE |
| 16 | Pavon Residence 4633 Columbine Street (5DV9706) | NAE | NAE | NAE | NAE | NAE |
| 17 | Chavez Residence 4628 Josephine Street (5DV9748) | NAE | NAE | NAE | NAE | NAE |
| 18 | Castorena/Braswell Residence 4631 Columbine Street (5DV9705) | NAE | NAE | NAE | NAE | NAE |
| 19 | Stop-N-Shop Food Store 4600 York Street (5DV9801) | AE | NAE | AE | NAE | AE |
| 20 | Sanchez Business 2381 East 46th Avenue (5DV9655) | AE | NAE | AE | NAE | AE |
| 21 | Portales Residence 4608 Josephine Street (5DV9746) | AE | NAE | AE | NAE | AE |
| 22 | Kenworthy/Wyckoff Residence 4529 Josephine Street (5DV9745) | NAE | NAE | NAE | AE | NAE |
| 23 | Langenberg Residence 4502 Josephine Street (5DV9742) | NAE | NAE | NAE | NAE | NAE |
| 24 | Gonzales Residence 4515 Columbine Street (5DV9994) | NAE | NAE | NAE | NAE | NAE |
| 25 | Portales Residence/ Windsor Artesian Water Company 4623–4625 Thompson Court (5DV9787) | NAE | NAE | NAE | NAE | NAE |
| 26 | Colonial Manor Motel Tourist Court 2615 East 46th Avenue (5DV7130) | AE | NAE | AE | NAE | AE |
| 27 | 4541 Clayton LLC Residence 4541 Clayton Street (5DV9679) | NAE | NAE | NAE | AE | NAE |
| 28 | Rodriquez Residence 4539 Clayton Street (5DV9678) | NAE | NAE | NAE | AE | NAE |
| 29 | Clay II LLC/Rosthan Residence 4459 Thompson Court (5DV10124) | NAE | NAE | NAE | NAE | NAE |
| 30 | Olive Street LLC Property 4503 Fillmore Street (5DV9714) | NAE | NAE | NAE | NAE | NAE |

**Exhibit 29       Historic Resources within the APE and Their Effects Determination**

| # | Property Name and Address | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|---|
| | | North Option | South Option | North Option | South Option | |
| 31 | Tenenbaum Residence 4453 Fillmore Street (5DV10014) | NAE | NAE | NAE | NAE | NAE |
| 32 | Guerca/Perez Residence 4446 Fillmore Street (5D10013) | NAE | NAE | NAE | NAE | NAE |
| 33 | Lopez/Hartzell Residence 4461 Milwaukee Street (5DV10065) | NAE | NAE | NAE | NAE | NAE |
| 34 | Alfred R. Wessel Historic District (5DV10126) | AE two contributing resources | NAE | AE seven contributing resources | AE two contributing resources | AE nine contributing resources |
| 35 | Union Pacific Railroad Segment (5DV6248.4) | NAE | NAE | NAE | NAE | AE |
| 36 | York Street/East 40th Ave. Brick Sanitary Sewer (5DV11283) | NAE | NAE | NAE | NAE | AE |
| 37 | Ralston Purina Plant/Nestlé Purina PetCare Company 2151 East 45th Avenue (5DV9245) | NAE | AE | NAE | AE | NAE |
| 38 | Riverside Cemetery 5201 Brighton Boulevard (5AM125) | NAE | NAE | NAE | NAE | NAE |
| 39 | National Western Historic District (5DV10050) | NE | NE | NAE | NAE | NAE |
| 40 | Banker's Warehouse Co. (5DV11720) | NAE | NAE | NAE | NAE | NAE |
| 41 | E.G. Trading Post 1630–1632 East 47th Avenue (5DV9805) | NAE | NAE | NAE | NAE | NAE |
| 42 | Kosik Residence 4681–4683 Baldwin Court (5DV1247) | NAE | NAE | NAE | NAE | NAE |
| 43 | Torres Residence 4656 Baldwin Court (5DV9660) | NAE | NAE | NAE | NAE | NAE |
| 44 | Miller Residence 4675 Williams Street (5DV9823) | NAE | NAE | NAE | NAE | NAE |
| 45 | Herzberg Property 4665–4669 Williams Street (5DV9828) | NAE | NAE | NAE | NAE | NAE |
| 46 | Adams Clock LLC/Mann Residence 4645 Williams Street (5DV9795) | NAE | NAE | NAE | NAE | NAE |
| 47 | Allen Investment Group, Inc./Kretschmar Residence 4662–4664 Williams Street (5DV10085) | NAE | NAE | NAE | NAE | NAE |

**Exhibit 29      Historic Resources within the APE and Their Effects Determination**

| # | Property Name and Address | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|---|
| | | North Option | South Option | North Option | South Option | |
| 48 | Garcia Residence 4695 High Street (5DV10040) | NAE | NAE | NAE | NAE | NAE |
| 49 | McGee Residence 4460 Adams Street (5DV9968) | NAE | NAE | NAE | NAE | NAE |
| 50 | Yoshimura Residence 4450 Adams Street (5DV9966) | NAE | NAE | NAE | NAE | NAE |
| 51 | Vasquez Residence 4450 Cook Street (5DV10003) | NAE | NAE | NAE | NAE | NAE |
| 52 | Tri-R Recycling 3600 East 48th Avenue (5DV9227) | NAE | NAE | NAE | NAE | NAE |
| 53 | Core Power Construction/Buckley JD Inc.- Buckley Explosives of Wyoming 4701 Jackson Street (5DV10047) | NAE | NAE | NAE | NAE | NAE |
| 54 | General Motors Corporation-Goalie Construction Business 4715 Colorado Boulevard (5DV9988) | NAE | NAE | NAE | NAE | NAE |
| 55 | 4800 Colorado LLC/United States Rubber Company 4800 Colorado Boulevard (5DV9989) | NAE | NAE | NAE | NAE | NAE |
| 56 | Safeway Distribution Center Historic District (5DV9232) | NE | NE | NAE | NAE | NAE |
| 57 | Univar 4300 Holly Street (5DV9231) | NE | NE | NAE | NAE | NAE |
| 58 | Burlington Ditch/ O'Brien Canal (5AM465.9) | NE | NE | NE | NE | NE |
| 59 | Delgany Common Interceptor Sewer (5DV4725.5) | NE | NE | NE | NE | NAE |
| 60 | Burlington and Colorado/Chicago, Burlington, and Quincy Railroad Segment (5DV6247.3) | ~~NE~~ NAE | ~~NE~~ NAE | ~~NE~~ NAE | ~~NE~~ NAE | ~~NE~~ NAE |
| 61 | Market Street RR/ Chicago Burlington & Quincy Railroad Segment (5AM1298.2) | NAE | NAE | NAE | NAE | AE |
| 62 | Union Pacific Beltline RR Segment (Denver Rock Island Railroad, 5AM2083.1) | NE | NE | NAE | NAE | NAE |
| 63 | Rocky Mountain Arsenal Railroad Segment (5DV7048.2) | NE | NE | AE | AE | AE |
| 64 | High Line Canal (5AM261.2) (Not pictured in Exhibit 5.6-2) | NE | NE | NE | NE | NE |

**Exhibit 29        Historic Resources within the APE and Their Effects Determination**

| # | Property Name and Address | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|---|
| | | North Option | South Option | North Option | South Option | |
| 65 | Garden Place District | NAE | NAE | NAE | NAE | NAE |
| 66 | Globeville District | NAE | NAE | NAE | NAE | NAE |
| 67 | NWT Rail Spur (5DV12437) | NAE | NAE | NAE | NAE | NAE |
| 68 | RLW Sand Company, 4390 Milwaukee Street (5DV12304) | NAE | NAE | NAE | NAE | NAE |
| 69 | National Western Security and Employment Building, 4695 Franklin Street (5DV12317) | NAE | NAE | NAE | NAE | NAE |
| 70 | High Tech Early College/STRIVE Prep , 11200 East 45th Avenue (5DV12320) | NE | NE | NAE | NAE | NAE |
| 71 | Stallcop Residence, 2000 East 47th Avenue (5DV12302) | NAE | NAE | NAE | NAE | NAE |
| 72 | Lechuga-Rosales Residence, 4684 Race Street (5DV12303) | NAE | NAE | NAE | NAE | NAE |
| 73 | 4683 Vine Street LLC Property, 4683 Vine Street (5DV12305) | NAE | NAE | NAE | NAE | NAE |
| 74 | Guzman Residence, 4681 Race Street (5DV12306) | NAE | NAE | NAE | NAE | NAE |
| 75 | RLW Sand Company, 4695 Milwaukee Street (5DV12308) | NAE | NAE | NAE | NAE | NAE |
| 76 | Sanchez Residence, 4700 Fillmore Street (5DV12309) | NAE | NAE | NAE | NAE | NAE |
| 77 | Snyder Residence, 4680 Fillmore Street (5DV12310) | NAE | NAE | NAE | NAE | NAE |
| 78 | Arrieta Residence, 4691 Vine Street (5DV12311) | NAE | NAE | NAE | NAE | NAE |
| 79 | Chavez Residence, 4690 Fillmore Street (5DV12312) | NAE | NAE | NAE | NAE | NAE |
| 80 | Urbina Residence, 4685 Milwaukee Street (5DV12313) | NAE | NAE | NAE | NAE | NAE |
| 81 | Stadium Arena, National Western Complex, 1325 E 46th Avenue (5DV.3815) | NE | NE | NE | NE | NAE |
| 82 | Delgany Street Public Sanitary Sewer (5DV.4725.6) | NE | NE | NE | NE | AE |
| 83 | Denver Coliseum, 4600 Humboldt Street (5DV.9162) | NE | NE | NE | NE | NAE |
| 84 | Livestock Bridge and Flyover, 1325 East 46th Avenue (5DV.10447) | NE | NE | NE | NE | NAE |

**Exhibit 29        Historic Resources within the APE and Their Effects Determination**

| # | Property Name and Address | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|---|
| | | North Option | South Option | North Option | South Option | |
| 85 | Burlington and Colorado, Chicago (5DV.6247.1 and 5DV.6247.2) | NE | NE | NE | NE | NAE |
| 86 | Union Pacific Railroad Railyard (5DV.6248.3, 5DV.6248.5, 5DV.6248.10) | NE | NE | NE | NE | NAE |
| 87 | Burlington Northern Railroad Overpass (5DV.7057) | NE | NE | NE | NE | NAE |
| 88 | Concrete Railroad Bridge (5DV.7058) | NE | NE | NE | NE | NAE |
| 89 | 38th Street Underpass (5DV.7110) | NE | NE | NE | NE | NAE |

**Exhibit 30** shows the revised APE and the newly identified historic resources within the APE west of Peoria Street. Because there are no changes to the APE east of Peoria Street, the APE east of that location is not pictured in this exhibit. The numbers associated with the NRHP-eligible properties correspond to the numbers listed in **Exhibit 29**.

In addition to the new resources listed in **Exhibit 29** and shown in **Exhibit 30**, modifications to the design resulted in changes in impacts to some resources; however, these revised impacts did not alter the determinations of effect. These resources are:

- Union Pacific Railroad Segment (5DV6248)
- Nestlé Purina PetCare Company (5DV9245)
- Banker's Warehouse Co. (5DV11720)
- Market Street Railroad/Chicago, Burlington & Quincy Railroad Segment (5AM1298.2)
- Union Pacific Beltline Railroad Segment (Denver Rock Island Railroad, 5AM2083.1)
- Rocky Mountain Arsenal Railroad Segment (5DV7048.2)
- National Western Historic District (5D10050)

**Exhibit 30          Revised APE and Newly Identified Historic Resources within the APE**



A new segment of the Union Pacific Railroad that will be impacted by the Partial Cover Lowered Alternative was recently surveyed and determined eligible for the NRHP. However, this addition does not change the determination of effect to the linear resource. For details on the changes to the impacts, see Chapter 10, Section 4(f) Evaluation Updates, of this document.

The changes to historic resources include only one new Adverse Effect for the Partial Cover Lowered Alternative for the Delgany Street Public Sanitary Sewer (5DV.4725.6). Additionally, the effect on the Burlington and Colorado/Chicago, Burlington & Quincy Railroad Segment (5DV6247.3) has changed from No Effect to No Adverse Effect for all alternatives due to the installation of a permanent easement for a storm drain.

**Exhibit 31** summarizes the updated total number of effects for historic resources within the updated APE.

**Exhibit 31        Summary of Effects for Historic Resources within the APE**

| Effect | No-Action Alternative | | Revised Viaduct Alternative | | Partial Cover Lowered Alternative |
|---|---|---|---|---|---|
| | North Option | South Option | North Option | South Option | |
| Adverse Effect[1] | 7 | 1 | 8 | 8 | ~~13~~ 14 |
| Adverse Effect due to acquisition/demolition[2] | 7 | 1 | 7 | 6 | 9 |
| No Adverse Effect | ~~50~~ 64 | ~~56~~ 70 | ~~54~~ 69 | ~~54~~ 69 | ~~50~~ 73 |
| No Effect | ~~9~~ 18 | ~~9~~ 18 | ~~4~~ 12 | ~~4~~ 12 | ~~3~~ 2 |

Note:  There are no differences in effect between the General-Purpose Lanes and Managed Lanes Options because the project footprint is the same for both options between Brighton Boulevard and Colorado Boulevard, where the majority of historic resources are located.

1.    Total includes adverse effects to entire historic district (includes the Alfred R. Wessel Historic District as one resource) and does not include individual contributing resources

2.    Adverse effects generally consist of full acquisition and demolition of historic structures, except in the instance of linear resources and historic districts

The mitigation measures outlined for the historic resources remain the same as those listed in the Final EIS. The PA that provides a process for determining mitigation for adverse effects and reevaluating eligibility and effects to historic properties, as appropriate, was executed in April 2016. The PA is included in this document as *Attachment D, Section 106 Programmatic Agreement.*

## Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.6, Historic Preservation,* of the Final EIS:

With the addition of the historic resources listed previously, there are now 89 historic resources within the project APE. Six of these are previously identified historic districts that contain multiple contributing elements, and 83 are individually eligible resources.

Design refinements since the Final EIS and additional historic resources have resulted in changes to the APE. Exhibit 5.6-1 from the Final EIS is representative of the revised APE and the updated APE west of Peoria Street is shown in the revised APE and the updated APE west of Peoria Street is shown in **Exhibit 30**.

As shown in **Exhibit 29** and **Exhibit 30**, newly identified historic resources have been added within the APE. The resources shown in **Exhibit 30** are in addition to the resources shown in Exhibit 5.6-2 and Exhibit 5.6-3 from the Final EIS. **Exhibit 29** and **Exhibit 31** replace Exhibit 5.6-5 and Exhibit 5.6-4, respectively, in the Final EIS.

**Updates to the historic preservation mitigation measures:**

CDOT acknowledges the potential for construction activities to discover unanticipated, sub-surface historic resources during the course of construction, including, but not limited to, trolley tracks, sewer systems, building foundations, or historic artifacts. Therefore, the

following mitigation commitments have been added to the historic preservation mitigation measures during construction:

- Refer to the Section 106 Programmatic Agreement, Stipulation VI, Construction Phase Post-Review Discoveries, which sets forth a process for review of unanticipated resources uncovered during construction.

- Follow the I-70 East Corridor Programmatic Agreement Mitigation Stipulation III (6) to determine appropriate mitigation measures if trolley tracks or any other potential historic resources are discovered during construction and the impact on the resource is determined to be adverse.

**Global change in Section 5.6 of the Final EIS:**

All text discussions in Section 5.6 of the Final EIS, including Exhibit 5.6-6, regarding effects for historic resources within the APE, are updated to reflect the effects shown in **Exhibit 31**.

## 9.7    Visual Resources and Aesthetic Qualities

### Updates to the Final EIS Analysis

There are no updates or changes to the Visual Resources and Aesthetic Qualities analysis and results since the publication of the Final EIS.

### Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.8, Visual Resources and Aesthetic Qualities,* of the Final EIS:

**Page 5.8-8—last paragraph now reads:**

In addition, the Managed Lanes Option for the Revised Viaduct Alternative and Partial Cover Lowered Alternative will require construction and installation of new infrastructure on the highway in the form of overhead gantries and new signage. This addition will create new visual impacts along the project corridor and west of the I-25 interchange. Since no specific features have been designed at this time, it is not possible to estimate how many gantries or signs will be needed or where they will be located exactly. Because there are other similar managed lanes facilities already in use in the Denver metro area, e.g., along US 36 and I-25, it is reasonable to assume that the new managed lanes infrastructure along I-70 would be very similar in appearance. Despite the lack of specifics, it is important to acknowledge that managed lanes infrastructure will create a different visual image than people on or off the highway are accustomed to seeing, but these facilities will be designed in accordance with the *Aesthetic and Design Guidelines*, as seen in Attachment O of this document.

## 9.8    Parks and Recreational Resources

### Updates to the Final EIS Analysis

Since publication of the Final EIS, the Partial Cover Lowered Alternative's offsite drainage system has been revised, which resulted in increasing the impact to Globeville Landing Park from 0.3 acre to 1.14 acres. The additional impact is a result of improvements and enhancements to the park from the GLO (see Section 9.12, Floodplains and Drainage/Hydrology, for more information on the GLO).

GLO improvements would rehabilitate the entire park, removing all existing park facilities and replacing them with park amenities that have been identified through public outreach efforts conducted by Denver.

The construction of the GLO would result in the replacement of two picnic tables and portions of the disc golf course as part of post construction rehabilitation of the park that includes replacement and construction of these and other amenities. The enhancements to the park will result in a temporary closure of the South Platte River Greenway Trail connection within the park, which will be reconstructed and reopened when the rehabilitation is complete. However, there will be a trail detour in place during the temporary closure.

Because Globeville Landing Park and the South Platte River Greenway Trail are protected under Section 6(f)(3) of the Land and Water Conservation Fund Act, consultation with Colorado Parks and Wildlife and the National Park Service has been ongoing. As discussed in correspondence with Colorado Parks and Wildlife from December 2016, the changes to Globeville Landing Park and the South Platte Greenway River Trail as part of the GLO are considered park improvements/enhancements, and do not constitute a Section 6(f) conversion (see *Attachment B, Updates to Agency Consultation Addendum*).

Therefore, the impacts identified to the Globeville Landing Park and South Platte River Greenway Trail, which are features of the South Platte River Greenway Section 6(f) resource, in the Final EIS by the Partial Cover Lowered Alternative's offsite drainage system would not occur as a result of the project. However, the impacts from construction of the GLO will result in a temporary non-conforming use under Section 6(f) during the construction of the enhancements.

### Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.9, Parks and Recreational Resources,* of the Final EIS:

**Page 5.9-14—Updates to South Platte River Greenway (Section 6(f) resource only), new text added as third paragraph under heading:**

Concurrence that the proposed project will have a temporary non-conforming use of the South Platte River Greenway north of I-70 due to construction of an underground drainage system under Section 6(f)(3) of the Land and Water Conservation Fund Act of 1965 was received from the Denver Parks & Recreation Department on December 13, 2016 and Colorado Parks and Wildlife on December 21, 2016. Conditional concurrence was received from the National Park Service on January 13, 2017 (see *Attachment B, Updates to Agency Consultation Addendum*).

**Page 5.9-16, Globeville Landing Park discussion—has been replaced and now reads:**

The Partial Cover Lowered Alternative will construct an offsite drainage system south of I-70. The alignment, as shown on Exhibit 5.9-14, will connect to the GLO. The GLO includes a redesign of Globeville Landing Park and the South Platte River Greenway Trail connection combined with a new stormwater open channel connecting to the South Platte River. Globeville Landing Park encompasses 7.29 acres of park area. Two areas of the park—one location is 0.70 acre in size and the other is 0.44 acre in size (totaling 1.14 acres)—would be used for construction of the GLO.

Construction of the GLO would rehabilitate the entire park, removing all existing park facilities and replacing them with park amenities that have been identified through public outreach efforts conducted by Denver. The 0.70-acre area is located in the northwest section of the park and slopes toward the South Platte River. One basket for the disc golf course is located in this area and the rest of this area is an open field with a maintained lawn with limited recreational value because of moderately steep topography. The 0.44-acre area, located on the east side of the park, is relatively flat. It has one basket for the disc golf course and two picnic tables in this area.

The construction of the GLO would result in the replacement of two picnic tables and portions of the disc golf course as part of the rehabilitation of the park that includes replacement and construction of these and other amenities. The enhancements to the park will result in a temporary closure of the South Platte River Greenway Trail connection within the park, which will be reconstructed and reopened when the rehabilitation is complete. A detour will be in place during the temporary closure of the trail.

The I-70 East Project's redesigned drainage system to connect into the GLO requires some additional grading within one of the open channels; however, it does not have additional permanent impacts to Globeville Landing Park.

Because Globeville Landing Park and the South Platte River Greenway Trail are protected under Section 6(f)(3) of the Land and Water Conservation Fund Act, consultation with Colorado Parks and Wildlife and the National Park Service has been ongoing. As discussed

in correspondence with Colorado Parks and Wildlife from December 2016, the changes to Globeville Landing Park and the South Platte River Greenway Trail as part of the GLO are considered park improvements/enhancements, and do not constitute a Section 6(f) conversion (see *Attachment B, Updates to Agency Consultation Addendum*). However, the impacts from construction of the GLO will result in a temporary non-conforming use under Section 6(f) during the construction of the enhancements.

Impacts to this resource also require a Section 4(f) analysis, which is updated in Chapter 10, Section 4(f) Evaluation Updates.

**Exhibit 32 replaces Exhibit 5.9-14 of the Final EIS.**

**Exhibit 32        Globeville Landing Park**



**Page 5.9-19—Updates to South Platte River Greenway—mitigation details**

Although South Platte River Greenway is not a recreational resource, because it is considered a Section 6(f) resource, the temporary impacts as a result of the drainage pipe will be minimized by providing adequate notice and signing to Greenway users prior to construction. The area of temporary disturbance will be returned to existing or a comparable state following construction.

Once final design has occurred and prior to impacts occurring to the South Platte River Greenway, a Proposal Description/Environmental Screening Form for the temporary non-conforming uses must be completed, submitted, and approved by CPW and NPS.

**Page 5.9-20—Updates to Globeville Landing Park—mitigation details**

During construction in Globeville Landing Park, the area surrounding the construction will be fenced off to install the drain pipe. The majority of the park will remain open to the public for recreational use. Once final design has occurred and prior to impacts occurring to Globeville Landing Park, a Proposal Description/Environmental Screening Form for the temporary non-conforming use must be completed, submitted, and approved by CPW and NPS.

Temporary impacts to Globeville Landing Park and the South Platte River Greenway Trail within the park due to construction of the GLO and enhancements to the park will be minimized by providing adequate notice and signing to the park users prior to construction and a trail detour during the temporary closure. Following construction, areas of temporary disturbance to the park will be enhanced or returned to pre-construction conditions.

~~To minimize the use of the park, an alignment north of the South Platte River Greenway Trail and bridge over the South Platte River was selected for the storm drainage system through the park. This alignment also avoids placement of storm manhole lids within the park, which would permanently use the park. Most of this alignment option is a temporary disturbance to the park and the drainage easement/access permit area will be available for recreational use following construction, with the exception of constructing a 0.3-acre drop structure. To offset this impact, the 0.3-acre drop structure of the park permanently converted to a non-recreation use will be replaced in-kind with land of at least current fair market value and of reasonable equivalent usefulness and location. Also, since the drainage easement/access permit area could also limit the function of the area in the future (Denver may not want to located certain activities there in case repairs would need to occur), the 22,360 square foot area will also be replaced in-kind with land of at least current fair market value and of reasonable equivalent usefulness and location.~~

~~With the exception of constructing a boulder drop structure, use of the property will be limited to temporary ground-disturbing activities, which will remove ground vegetation and trees, and will temporarily diminish the use of the disc golf course. After the storm drain is put into place, all of the easement, except the 0.3-acre drop structure, will be available for~~

recreational use, although the aesthetics of the immediate area will be disturbed by construction. As mentioned, following construction, areas of temporary disturbance will be returned to pre-construction conditions. This includes any impact to the disc golf course and replacement of vegetation and trees.

To provide the replacement land, the project is investigating acquiring additional land that Denver has identified near Milstein Park, which is also along the South Platte River trail.

Coordination with and concurrence from Denver Parks and Recreation (official with jurisdiction) has occurred, and correspondence is included in Attachment B, Agency Consultation Addendum. Conditional approval from Colorado Parks and Wildlife (CPW) and National Park Service (NPS) is anticipated before the ROD is completed. FHWA has indicated that approval, or lack of objection, at this point is sufficient for NEPA clearance. Near the end of construction, but before closing the project, a formal Section 6(f) conversion proposal will be submitted to the NPS by CPW. CDOT will prepare the request for CPW with their approval.

**Updates to the parks and recreational resources mitigation measures:**

The following mitigation commitments have been added to the parks and recreational resources mitigation measures:

- Coordinate with Denver Parks and Recreation and provide trail detours and ADA-compliant detour signage during construction consistent with the 2007 Denver Construction Detour Standards for Bikeways and Multi-Use Trails.

- Coordinate with Denver Parks and Recreation during the design and construction phase to ensure that all trail construction meets current standards if new trail construction or full trail reconstruction is required.

- Once final design has occurred and prior to impacts occurring to Globeville Landing Park and South Platte River Greenway, a Proposal Description/Environmental Screening Form for the temporary non-conforming use must be completed, submitted, and approved by CPW and NPS.

The following mitigation commitments have been removed from the parks and recreational resources mitigation measures:

- Coordinate with Denver Parks and Recreation, CPW, and NPS regarding impact to Globeville Landing Park, a Section 6(f) resource

- Replace 0.3 acre of land converted to a non-recreation use by the construction of the spillway in Globeville Landing Park and the utility easement/access permit area with in-kind land of at least current fair market value and reasonable equivalent usefulness and location and investigate the acquisition of land identified by Denver near Milstein Park for this replacement

- ~~Conditional approval from CPW and NPS is anticipated before the ROD is completed. FHWA has indicated that approval, or lack of objection, at this point is sufficient for NEPA clearance. Near the end of construction, but before closing the project, a formal Section 6(f) conversion proposal will be submitted to the NPS by CPW. CDOT will prepare the request for CPW with their approval.~~

# 9.9    Air Quality

## Updates to the Final EIS Analysis

Air quality continues to be an important resource for the I-70 East Project. This section discusses updates to the air quality analysis completed in the Final EIS for carbon monoxide and $PM_{10}$. Transportation conformity air quality analysis is discussed in Section 6.1.

As presented in the Final EIS, emissions inventories for MSATs show declining trends and almost no difference between project alternatives. Through interagency consultation, it was determined that minor changes in the project design since publication of the Final EIS will not impact results of emission inventory analyses for MSATs, criteria pollutants, and greenhouse gases. Results of emissions inventory analysis of total pollutants in the air quality study area remain as presented in the Final EIS.

The air quality analysis procedures for the NEPA comparative analysis build upon the air quality analysis conducted for the 2014 Supplemental Draft EIS and the 2016 Final EIS. Traffic data from the 2040 DRCOG regional travel demand model were used to conduct the analysis. Additional details on the analysis update for the ROD can be found in *Attachment C, Air Quality NEPA Comparison Technical Report*.

The November 2015 updates to the EPA guidance report EPA-420-B-15-090 were formalized since the Final EIS modeling results were published. These updates were followed for the analysis for the Final EIS under the direction of the interagency consultation partners. These procedures were used again for the updates completed for this ROD. Further explanation of the changes to the analysis are detailed within *Attachment C, Air Quality NEPA Comparison Technical Report* and *Air Quality Conformity Technical Report*, which includes information on interagency consultation and decisions.

The following subsections summarize results for the carbon monoxide and $PM_{10}$ NEPA comparative analysis for the alternatives evaluated in the Final EIS. Additional details of the analysis are provided in *Attachment C, Air Quality NEPA Comparison Technical Report*.

### Carbon Monoxide Comparative Analysis Results

As with the Final EIS, the Colorado Boulevard interchange was identified as the location to represent the worst traffic conditions on the corridor. For the Final EIS, a sensitivity analysis was performed using the DynusT traffic model to validate the choice of the I-70

interchange at Colorado Boulevard as the worst-case location for the carbon monoxide NEPA comparative analysis. The analysis found that the I-70 interchanges at Quebec Street and Colorado Boulevard are the two worst interchanges in 2035, with the model predicting slightly higher carbon monoxide emissions at the Quebec Street interchange due to higher traffic volumes and longer delays.

While updating the traffic data to the most recent 2040 Focus model released since publication of the Final EIS, the traffic volumes at Colorado Boulevard and Quebec Street were reviewed again. The predicted 2040 traffic Level of Service (LOS) at Colorado Boulevard in the morning (AM) and afternoon (PM) peak hours is LOS D. The same relatively small differences in traffic and congestion between the two intersections exist in the new 2040 model as was reported in the Final EIS. The predicted results from modeling carbon monoxide emissions would vary only by 0.2 parts per million (ppm) to 0.4 ppm, as disclosed in the Final EIS *Air Quality Technical Report*. Given the minimal differences, continued use of the I-70 and Colorado Boulevard interchange as the location for the carbon monoxide analysis is appropriate.

For the update of the carbon monoxide NEPA comparative analysis, the methodology remained primarily the same as the Final EIS. The highest emission factors (2022) were combined with the highest traffic volumes (2040). This method overstates carbon monoxide concentrations, but ensures the maximum potential carbon monoxide concentrations are considered. Other modeling parameters, such as meteorology, were consistent with those used during Final EIS carbon monoxide hot spot analysis.

**Exhibit 33** shows the modeled 1-hour and 8-hour carbon monoxide concentrations from CAL3QHC and the resulting total carbon monoxide concentrations for the Preferred Alternative and Central 70 Project for the AM and PM peak periods at I-70 and Colorado Boulevard. Concentrations in the table are shown for the receptors with the highest levels inside the study area for the carbon monoxide analysis. As the numbers indicate, the 8-hour design values resulting from the AM and PM analysis are both well below the 8-hour NAAQS limit of 9.0 ppm. Since the carbon monoxide comparative analysis is a worst-case scenario, it is reasonable to conclude that the carbon monoxide concentrations at any intersection also would be well below the NAAQS limit.

**Exhibit 33      Carbon Monoxide Comparative Analysis Maximum Concentrations**

| Analysis Time Period | Time of Day | Carbon Monoxide Concentration in parts per million (ppm) | | |
|---|---|---|---|---|
| | | Background* | Modeled | Total Background + Modeled |
| Preferred Alternative (Partial Cover Lowered Alternative with Managed Lanes) | | | | |
| 1-hour | AM | 6.73 5.5 | 3.61 1.4 | 10.34 6.9 |
| | PM | | 2.53 1.9 | 10.26 7.4 |
| 8-hour | AM | 4.55 3.6 | 3.53 0.9 | 7.08 4.5 |
| | PM | | 2.47 1.2 | 7.02 4.8 |

**Exhibit 33          Carbon Monoxide Comparative Analysis Maximum Concentrations**

| Analysis Time Period | Time of Day | Carbon Monoxide Concentration in parts per million (ppm) | | |
|---|---|---|---|---|
| | | Background* | Modeled | Total Background + Modeled |
| **Central 70 Project (Phase 1 of the Preferred Alternative)** | | | | |
| 1-hour | AM | 5.5 | 1.4 | 6.9 |
| | PM | | 1.9 | 7.4 |
| 8-hour | AM | 3.6 | 0.9 | 4.5 |
| | PM | | 1.3 | 4.9 |

The receptor with the maximum carbon monoxide concentrations included in **Exhibit 33** are shown in **Exhibit 34**. The maximum receptor for both the AM and PM periods is located in the southwestern quadrant of the Colorado Boulevard interchange. This location differs from results presented in the Final EIS, which showed the maximum receptor in the northwestern quadrant in the AM period. Modeled concentrations make up such a small percentage of the total carbon monoxide concentrations that small variations in traffic input are exaggerated in the comparisons between modeling estimations for each receptor. This exaggeration would explain differences between the Final EIS and ROD modeling results.

**Exhibit 34          Maximum Concentration Receptor Location for Carbon Monoxide**



## PM$_{10}$ Comparative Analysis Results

NEPA comparative analysis was conducted at locations that are expected to have the highest concentrations of PM$_{10}$ across the study area. Considerations for locations with the highest concentrations include areas with the highest traffic volumes and congestion,

nearby land uses with public access, high numbers of diesel vehicles, and other factors. The locations analyzed for NEPA comparative analysis for $PM_{10}$ are the interchange of I-70 and I-25 and the interchange of I-70 and I-225. **Exhibit 35** contains the comparative analysis results at the locations for the alternatives evaluated in the Final EIS.

**Exhibit 35       $PM_{10}$ Comparative Analysis Maximum Concentrations**

| Alternative | General-Purpose Lanes Option ($\mu g/m^3$) | | | Managed Lanes Option ($\mu g/m^3$) | | |
|---|---|---|---|---|---|---|
| | Modeled | Project + Background[1] | Design Value | Modeled | Project + Background[1] | Design Value |
| **I-70 at I-25** | | | | | | |
| No-Action Alternative | ~~62~~ 40.396 | ~~151~~ 153.396 | 150 | N/A | N/A | N/A |
| Revised Viaduct Alternative | ~~62~~ 41.554 | ~~151~~ 154.554 | 150 | ~~64~~ 41.073 | ~~153~~ 154.073 | 150 |
| Partial Cover Lowered Alternative | ~~63~~ 41.703 | ~~152~~ 154.703 | 150 | ~~57~~ 41.196 | ~~146~~ 154.196 | 150 |
| Central 70 (Phase 1) | N/A | N/A | N/A | ~~61~~ 41.136 | ~~150~~ 154.136 | 150 |
| **I-70 at I-225** | | | | | | |
| No-Action Alternative | ~~26~~ 28.732 | ~~115~~ 141.732 | ~~120~~ 140 | N/A | N/A | N/A |
| Revised Viaduct Alternative | ~~35~~ 30.564 | ~~124~~ 143.564 | ~~120~~ 140 | ~~41~~ 32.968 | ~~130~~ 144.968 | ~~130~~ 140 |
| Partial Cover Lowered Alternative | ~~46~~ 31.085 | ~~135~~ 144.085 | 140 | ~~40~~ 32.285 | ~~129~~ 145.285 | ~~130~~ 150 |
| Central 70 (Phase 1) | N/A | N/A | N/A | ~~41~~ 32.220 | ~~130~~ 145.220 | ~~130~~ 150 |

Note: Design values for all alternatives at the I-25 and I-225 hot spot locations are less than the 24-hour $PM_{10}$ NAAQS of 150 $\mu g/m^3$. To develop these estimates, the 24-hour $PM_{10}$ design value is rounded per guidance to the nearest 10 $\mu g/m^3$. For example, 155.000 rounds to 160, and 154.999 rounds to 150.
1. A background concentration of 113 $\mu g/m^3$ was used to estimate total 24-hour concentrations

Similarly to the Final EIS, $PM_{10}$ concentration levels vary throughout the I-25 and I-225 $PM_{10}$ comparative analysis areas depending on the alternative modeled. **Exhibit 36** and **Exhibit 37** show receptor locations and maximum receptor values for the I-70/I-25 and I-70/I-225 $PM_{10}$ comparative areas for all alternatives analyzed.

As with results presented in the Final EIS, the design values presented in **Exhibit 36** simulate worst-case conditions because they represent the highest $PM_{10}$ concentrations at the highest traffic volume locations in the corridor. Therefore, it can be assumed that the $PM_{10}$ concentrations would be lower than these values at every possible receptor location throughout the corridor, including all schools, parks, open spaces, and other places.

**Exhibit 36        Maximum Concentration Receptor Locations for PM$_{10}$ at I-70/ I-25**



● Receptor          ● Maximum receptor all alternatives

Approximate Scale

0                    1,000 feet

**Exhibit 37       Maximum Concentration Receptor Locations for PM$_{10}$ at I-70/I-225**



| | | |
|---|---|---|
| ● Receptor | Maximum receptor: ○ | ┌ No-Action Alternative<br>└ Partial Cover Lowered Alternative – Phase 1 |
| | | ┌ Partial Cover Lowered Alternative – General Purpose Lanes<br>● ├ Partial Cover Lowered Alternative – Managed Lanes<br>└ Revised Viaduct Alternative – General Purpose Lanes |
| | | ● ─ Revised Viaduct Alternative – Managed Lanes |

Approximate Scale
0          1,000 feet

## *Air Quality Analysis Summary*

The air quality analysis for PM$_{10}$ and carbon monoxide have been updated since the publication of the Final EIS to reflect minor differences in the roadway configuration of the Preferred Alternative, and the corresponding minor traffic volume variations. The conclusions of this analysis have not changed:

- The Preferred Alternative (Partial Cover Lowered Alternative with Managed Lanes) has been shown to meet all of the EPA-required NAAQS.

- There is not a substantial difference between alternatives in the declining trends for MSAT emissions in the project study area. MSAT emissions decline by 88.6 percent in the project area if the project is built, and by 88.9 percent if the project is not built.

- Traffic volume and traffic speed are the primary drivers of project-level air quality impacts.
- Road dust emissions are the primary indicators of future particulate matter emissions.

## Changes to the Final EIS Text

The discussions under Section 9.9 supersede information for the carbon monoxide and $PM_{10}$ presented in subsection 5.10.6 of the Final EIS. All other discussions under *Section 5.10, Air Quality*, in the Final EIS remain unchanged.

Additional analysis has been performed as part of the Transportation Conformity process and is available in Section 6.1 of this document.

# 9.10   Noise

## Updates to the Final EIS Analysis

Since the completion of the analysis for the Final EIS, CDOT's *Colorado Noise Analysis and Abatement Guidelines* were updated (November 2015). This update is in the form of a memo titled *CDOT Noise Analysis and Abatement Guidelines Update: Long-Term Noise Measurements*. This update does not change the noise analysis performed for the Final EIS.

However, the minor changes in the project design since publication of the Final EIS prompted a new noise analysis to be performed on the Partial Cover Lowered Alternative to identify any potential changes in the impacts and mitigations. The methodology for updating the noise analysis remains the same as the methodology used in the Final EIS. Only neighborhoods and alternatives that were affected by changes in the design were re-analyzed. The analysis results are available in detail in *Attachment C, Updates to Noise Technical Report*. All mitigation commitments from the Final EIS document remain the same.

The updated impacts and mitigation discussions are included in the following subsections by neighborhood.

### *Globeville*

The Globeville Neighborhood is located north and south of I-70 and spans between I-25 and Washington Street. Of the 232 receptors evaluated in Globeville, 38 (14 north of I-70 and 24 south of I-70)—which is 18 modeled locations—would meet or exceed their respective NAC thresholds, although none would experience substantial increases (10 dBA or more above existing levels) in noise as shown in **Exhibit 38**. Noise levels under the General-Purpose Lanes Option would range from 60 dBA (A-weighted decibel level) to 70 dBA north of I-70, and increase by as much as 3 dBA over existing noise levels. Noise levels south of I-70 would range from 61 dBA to 68 dBA, and increase by 1 dBA to 4 dBA over the existing noise levels.

A mitigation analysis was done for the General-Purpose Lanes Option north of I-70 for the purpose of determining if higher noise walls would benefit the neighborhood, which can be found in *Attachment C, Updates to Noise Technical Report*. However, higher noise walls were found to be neither feasible nor reasonable. For the neighborhood south of I-70, higher noise walls were determined to be feasible but not reasonable. Therefore, existing noise walls will remain in place for the Globeville Neighborhood north and south of I-70.

For the Managed Lanes Option, noise levels north of I-70 would range from 60 dBA to 70 dBA, and would increase by up to 3 dBA higher than existing noise levels. South of I-70, noise levels range from 61 dBA to 68 dBA, and would increase by 1 dBA to 3 dBA over existing noise levels. Of the 232 receptors in Globeville, 32 (13 north of I-70 and 19 south of I-70, 15 modeled locations, see **Exhibit 39**) are anticipated to meet or exceed their respective NAC thresholds. None of the Globeville receptors experience a substantial (10 dBA or greater) increase over existing noise levels for the Managed Lanes Option.

The mitigation analysis for the Managed Lanes Option determined that higher noise walls are neither feasible nor reasonable for the neighborhood north and south of I-70 (available in *Attachment C, Updates to Noise Technical Report).* Therefore, existing noise walls will remain in place for the Globeville neighborhood.

**Exhibit 38        Globeville Noise Impacts: General-Purpose Lanes Option**



**Exhibit 39        Globeville Noise Impacts: Managed Lanes Option**



**Elyria and Swansea**

The Elyria and Swansea Neighborhood is located between Brighton Boulevard and Vasquez Boulevard. For the noise analysis, this neighborhood has been divided into sections: Elyria and Swansea. Elyria includes the western part of the neighborhood from Brighton Boulevard to York Street and Swansea includes the eastern part of the neighborhood from York Street to Steele Street/Vasquez Boulevard.

Of the 129 receptors in Elyria, 63 receptors (27 modeled locations) are anticipated to meet or exceed their respective NAC thresholds under the Partial Cover Lowered Alternative (see **Exhibit 40**). Of these 63 impacted receptors, 15 also would experience a substantial increase (10 dBA or more) in noise. The noise levels in Elyria would range from 60 dBA to 76 dBA, measuring from 3 dBA lower to 17 dBA greater than the existing noise levels.

A mitigation analysis for Elyria (available in *Attachment C, Updates to Noise Technical Report*) determined that 12-foot to 20-foot noise walls were found to be both feasible and reasonable. A 16-foot wall height is recommended based on all analyzed feasible and reasonable potential noise wall heights and the average number of benefitted receptors.

In Swansea, of the 287 receptors, 50 receptors would meet or exceed their respective NAC thresholds under the Partial Cover Lowered Alternative (see **Exhibit 40**). None of the 50 impacted receptors would experience a substantial noise increase (10 dBA or more). The

noise levels for the Partial Cover Lowered Alternative range from 52 dBA to 74 dBA, measuring from 6 dBA lower to 8 dBA greater than existing noise levels.

A mitigation analysis for the Swansea Neighborhood north of I-70 determined that noise walls were found to be neither feasible nor reasonable (available in *Attachment C, Updates to Noise Technical Report*). For the neighborhood south of I-70, noise walls were determined to be feasible, but not reasonable. Therefore, no noise wall mitigation is recommended for the Swansea Neighborhood north or south of I-70.

**Exhibit 40       Elyria and Swansea Noise Impacts: Partial Cover Lowered Alternative**



### Stapleton

The commercial area near Central Park Boulevard is known as Northfield Stapleton. None of the receptors in this area meet or exceed the NAC threshold under the General-Purpose Lanes Option or with the Managed Lanes Option (see **Exhibit 41).** The noise levels at the modeled receptors for the General-Purpose Lanes Option would range from 61 dBA to 69 dBA, which is 2 dBA to 6 dBA greater than existing noise levels. The noise levels for the Managed Lanes Option would range from 61 dBA to 68 dBA, which is 2 dBA to 5 dBA greater than existing noise levels. For both options, none of the six receptors meet or exceed their respective NAC thresholds or experience a substantial increase (10 dBA or more). For this reason, mitigation consideration was not required.

**Exhibit 41        Stapleton Noise Impacts: Managed Lanes Option**



Points shown represent modeled locations. Some modeled locations represent multiple receptors.

■ NAC Category E, <71 dBA        ━━━ Construction limits

*Note: Exhibit shows construction limits for the Managed Lanes Option, modeled locations also reflect the General-Purpose Lanes Option.*

### Peoria Street

The Peoria Street area includes hotel receptors north of I-70 near Peoria Street. For the General-Purpose Lanes Option, noise levels would range from 62 dBA to 71 dBA, which is 1

dBA to 4 dBA greater than existing noise levels (see **Exhibit 42**). For the Managed Lanes Option, noise levels would range from 62 dBA to 70 dBA, which would equal existing noise levels or increase them by as much as 4 dBA (see **Exhibit 43**). Of the 100 receptors (14 modeled locations), one receptor would meet or exceed the NAC threshold in the General-Purpose Lanes Option, and no receptors would meet or exceed their NAC threshold in the Managed Lanes Option. In both options, none of the 100 receptors would experience a substantial increase (10 dBA or more) in noise levels.

For this reason, mitigation consideration was not required for the Managed Lanes Option. For the General-Purpose Lanes Option, eight-foot to 20-foot noise walls were analyzed and none of the options were found to be feasible or reasonable. Therefore, no noise wall mitigation is recommended for the Peoria Street impacts.

**Exhibit 42**        **Peoria Street Area Noise Impacts: General-Purpose Lanes Option**



Points shown represent modeled locations. Some modeled locations represent multiple receptors.

- ● NAC Category B or C, <66 dBA
- ■ NAC Category E, <71 dBA
- ■ NAC Category E, ≥71 dBA
- ▬ Construction limits

**Exhibit 43        Peoria Street Area Noise Impacts: Managed Lanes Option**



Points shown represent modeled locations. Some modeled locations represent multiple receptors.

● NAC Category B or C, <66 dBA       ■ NAC Category E, <71 dBA       — Construction limits

### Montbello

Located northeast of the I-70/I-225 interchange and just west of Chambers Road is the Montbello Neighborhood. For the General-Purpose Lanes Option, 32 (12 modeled locations) of the 112 receptors would meet or exceed their NAC threshold, but none of the 32 impacted receptors would experience a substantial noise increase (10 dBA or more) as shown in **Exhibit 44**). Noise levels would range from 59 dBA to 69 dBA, which is 1 dBA to 5 dBA greater than existing noise levels. The mitigation analysis for the General-Purpose Lanes Option was performed for walls ranging from eight feet to 20 feet high and it was determined that walls 16 feet to 20 feet were feasible, but not reasonable (available in *Attachment C, Updates to Noise Technical Report*). Therefore, no noise wall mitigation is recommended.

Under the Managed Lanes Option, 32 (13 modeled locations) of the 112 receptors would meet or exceed their NAC threshold, and none of the 32 impacted receptors would experience a substantial noise increase (10 dBA or more) as shown in **Exhibit 45**). Noise levels would range from 59 dBA to 69 dBA, which is 1 dBA to 6 dBA greater than existing noise levels. The mitigation analysis for the Managed Lanes Option was performed and it was determined that walls 14 feet to 20 feet high were feasible but not reasonable (available in *Attachment C, Updates to Noise Technical Report)*. Therefore, no noise wall mitigation is recommended.

Updates and Clarifications                    I-70 East ROD 1: Phase 1 (Central 70 Project)

**Exhibit 44        Montbello Noise Impacts: General-Purpose Lanes Option**



- 🔵 NAC Category B or C, <66 dBA        ── Existing wall        ── Construction limits
- 🟠 NAC Category B or C, ≥66 dBA

**Exhibit 45        Montbello Noise Impacts: Managed Lanes Option**



- 🔵 NAC Category B or C, <66 dBA        ── Existing wall        ── Construction limits
- 🟠 NAC Category B or C, ≥66 dBA

### Aurora

This noise analysis includes a portion of Aurora which is the residential areas east of Chambers Road and South of I-70, For the General-Purpose Lanes Option, noise levels would range from 62 dBA to 70 dBA, which is 1 dBA lower to 2 dBA higher than existing conditions. Three of the seven receptors would meet or exceed their respective NAC thresholds, but none would experience a substantial noise increase (10 dBA or more) as shown in **Exhibit 46**). The mitigation analysis performed for the General-Purpose Lanes Option was done for eight-foot to 20-foot walls and it was determined that none of the options were feasible or reasonable (available in *Attachment C, Updates to Noise Technical Report)*. Therefore, no noise wall mitigation is recommended.

For the Managed Lanes Option, noise levels would range from 61 dBA to 70 dBA, which is 2 dBA lower than existing conditions (see **Exhibit 47**). Three of the receptors would meet or exceed their respective NAC thresholds, but none would experience a substantial noise increase (10 dBA or more). The mitigation analysis performed for the Managed Lanes Option determined that walls ranging from 10 feet to 20 feet high were feasible but did not meet reasonability requirements (available in *Attachment C, Updates to Noise Technical Report)*. Therefore, no noise wall mitigation is recommended.

**Exhibit 46          Aurora Noise Impacts: General-Purpose Lanes Option**



Points shown represent modeled locations. Some modeled locations represent multiple receptors.

● NAC Category B or C, <66 dBA        ● NAC Category B or C, ≥66 dBA        ⎯⎯ Construction limits

**Exhibit 47        Aurora Noise Impacts: Managed Lanes Option**



The noise analysis for each of the neighborhoods for the Partial Cover Lowered Alternative and each Operational Option is summarized in **Exhibit 48**. This table summarizes data presented in the previous sections.

**Exhibit 48**     **Summary of Updated Noise Analysis by Neighborhood for Partial Cover Lowered Alternative**

| Neighborhood | Location | Alternative/ Option | Number of Noise Receptors | Number of Noise Receptors that meet or Exceed NAC Threshold | Number of Noise Receptors with a Substantial Noise Increase (10 dBA or more) |
|---|---|---|---|---|---|
| Globeville | North of I-70 | General-Purpose Lanes Option | 130 | ~~13~~ 14 | 0 |
| | South of I-70 | | 102 | ~~11~~ 24 | 0 |
| | **Total** | | **232** | **~~24~~ 38** | **0** |
| | North of I-70 | Managed Lanes Option | 130 | ~~12~~ 13 | 0 |
| | South of I-70 | | 102 | ~~6~~ 19 | 0 |
| | **Total** | | **232** | **~~18~~ 32** | **0** |
| Elyria and Swansea | Elyria | Partial Cover Lowered Alternative | 129 | ~~55~~ 63 | ~~11~~ 15 |
| | Swansea North of I-70 | | 123 | 21 | 0 |
| | Swansea South of I-70 | | 164 | 29 | 0 |
| | **Total** | | **416** | **~~105~~ 113** | **15** |
| Stapleton | | General-Purpose Lanes Option | 6 | 0 | 0 |
| | | Managed Lanes Option | 6 | 0 | 0 |
| Peoria | | General-Purpose Lanes Option | 100 | 1 | 0 |
| | | Managed Lanes Option | 100 | 0 | 0 |
| Montbello | | General-Purpose Lanes Option | 112 | ~~34~~ 32 | 0 |
| | | Managed Lanes Option | 112 | ~~29~~ 32 | 0 |
| Aurora | | General-Purpose Lanes Option | 7 | 3 | 0 |
| | | Managed Lanes Option | 7 | 3 | 0 |

## *Mitigation*

The mitigation measures for the noise impacts have not changed since the publication of the Final EIS. The mitigation analysis (available in *Attachment C, Updates to Noise Technical Report)* for Elyria determined that 12-foot to 20-foot walls were found to be both feasible and reasonable. A 16-foot wall height is recommended based on all analyzed feasible and reasonable potential noise wall heights and the average number of benefitted receptors (see **Exhibit 49**). The length of the wall would be approximately 2,300 feet. The wall would effectively decrease noise by 7 dBA or more for 27 receptors. The wall also would benefit an additional 51 receptors by decreasing noise by 5 dBA or more.

**Exhibit 49        Elyria and Swansea Noise Wall Locations**



Points shown represent modeled locations. Some modeled locations represent multiple receptors.

- 🔴 Below NAC; <5-dBA reduction from noise walls
- 🟣 At or above NAC; <5-dBA reduction from noise walls
- 🟢 Below NAC; ≥5-dBA reduction from noise walls
- 🟤 At or above NAC; ≥5-dBA reduction from noise walls

— Recommended 16-ft noise wall
···· Analyzed noise wall (not feasible and reasonable)
— Construction limits
▨ Highway cover limits

## Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.12, Noise,* of the Final EIS:

The discussions under Section 9.10 supersede information presented in subsections 5.12.4 through 5.12.8 of the Final EIS. All other analysis under *Section 5.12, Noise,* in the Final EIS remain unchanged.

**Global change in Section 5.12 of the Final EIS:**

The Final EIS text is updated to use "meet or exceed" the noise abatement criteria, as noise levels that meet the NAC also are considered to be impacts, not just those that are greater than the NAC.

# 9.11    Biological Resources

## Updates to the Final EIS Analysis

Changes to the construction limits have led to minor changes in impacts to biological resources along the corridor. The revised construction limits extend farther south along the South Platte River to better reinforce the existing degraded bank. The riparian areas along the South Platte River were remapped to include the new areas, and impacts were calculated based on the revised construction limits.

All of the impacts to South Platte River riparian areas in Globeville Landing Park are expected to be short-term impacts since any trees removed during construction will be replaced per Denver's tree replacement policy.

In addition to the changes in impacts to the South Platte River, permanent impacts to biological resources since the Final EIS have increased for the Build Alternatives due to the construction limits expanding. The majority of the increase is east of Quebec Street, where the construction limits were pushed beyond the physically impacted area to the existing right-of-way boundary to represent a worst case for potential impacts. **Exhibit 50** illustrates the updated impacts to the biological resources and **Exhibit 51** shows the updated impacts to riparian areas for each alternative.

**Exhibit 50        Impacts to Biological Resources**

| Alternative | Mule Deer Limited-Use Area (acres) | Mule Deer Resident Population Area (acres) | White-Tailed Deer Overall Range (acres) | Bald Eagle Winter Range (acres) | Total Impacts to Wildlife Habitat (acres) |
|---|---|---|---|---|---|
| No-Action Alternative | 3.5 | — | — | — | 3.5 |
| **Build Alternatives, General-Purpose Lanes Option** | | | | | |
| Revised Viaduct Alternative | 3.5 | ~~110.9~~ 134.1 | ~~117.7~~ 273.7 | ~~21.8~~ 27.6 | ~~313.9~~ 438.9 |
| Partial Cover Lowered Alternative | ~~6.6~~ 12.1 | ~~110.9~~ 134.1 | ~~117.7~~ 273.7 | ~~21.8~~ 27.6 | ~~317.0~~ 447.5 |
| **Build Alternatives, Managed Lanes Option** | | | | | |
| Revised Viaduct Alternative | 3.5 | ~~117.0~~ 136.6 | ~~222.9~~ 355.4 | ~~21.8~~ 27.6 | ~~365.2~~ 523.1 |
| Partial Cover Lowered Alternative | ~~6.6~~ 12.1 | ~~117.0~~ 136.6 | ~~222.9~~ 355.4 | ~~21.8~~ 27.6 | ~~368.3~~ 531.7 |

Note:     Impacts were calculated based on conceptual design and are subject to change, total impacts may not add due to rounding.
          Direct mule deer limited-use area habitat impacts are due to the construction of the drainage to the South Platte River.
          Total impact calculations do not account for overlapping wildlife areas.
Source:   CPW 2014

**Exhibit 51        Impacts to Riparian Areas**

| Alternative | Riparian Impacts (acres) | |
|---|---|---|
| | Permanent | Temporary |
| No-Action Alternative | 0.014 0.002 | 0.011 0.012 |
| **Build Alternatives, General-Purpose Lanes Option** | | |
| Revised Viaduct Alternative | 0.977 1.439 | 0.222 0.149 |
| Partial Cover Lowered Alternative | 1.025 1.439 | 0.234 0.895 |
| **Build Alternatives, Managed Lanes Option** | | |
| Revised Viaduct Alternative | 1.249 1.639 | 0.241 0.166 |
| Partial Cover Lowered Alternative | 1.298 1.639 | 0.253 0.913 |

*Note:      Impacts were calculated based on conceptual design and are subject to change, total impacts may not add due to rounding*

## Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.13, Biological Resources,* of the Final EIS:

**Exhibit 50** and **Exhibit 51** replace Exhibits 5.13-7 and 5.13-8 in the Final EIS.

**Updates to biological resources mitigation measures:**

The following mitigation commitment has been added to the biological resources mitigation measures with regard to Bald and Golden Eagles:

- Eagle nest surveys will be conducted during the appropriate seasons prior to construction beginning near the winter range and known nest sites, then annually between January 1 and April 31 for the remainder of construction, in the event that a Bald and Golden Eagle Protection Act permit is needed.

**Global change in Section 5.13 of the Final EIS:**

The text discussion and exhibits regarding acreage of impacts are updated to reflect changes discussed in the subsection above.

## 9.12    Floodplains and Drainage/Hydrology

### Updates to the Final EIS Analysis

As part of the updates to the project's design, an additional storm drain is proposed to the east of Colorado Boulevard along Smith Road for the Partial Cover Lowered Alternative. The purpose of this storm drain is to cut off flows in the existing drain and convey the flows to the north into the proposed detention pond designed in the southeast quadrant of the Colorado Boulevard and I-70 interchange. This storm drain crosses under the UPRR and RTD commuter rail tracks.

As stated in the comments received from Denver on the Final EIS, the Partial Cover Lowered Alternative's south offsite drainage outfall shown in the Final EIS would result in a conflict with the Denver GLO. Subsequently, the Partial Cover Lowered Alternative's offsite drainage system was redesigned to convey some of the offsite flows into the box culvert being built as part of Denver's Brighton Boulevard Project and the rest flows through a pipe that connects into the GLO to avoid disturbing Globeville Landing Park multiple times. The Partial Cover Lowered Alternative's offsite drainage is designed to capture and convey all of the anticipated offsite flows before they reach the lowered section of the highway to protect the lowered section from flooding. This conflict did not change the northern outfall that is designed for onsite flows, which will capture and convey flows from the highway itself and is added protection against flooding in the lowered portion. **Exhibit 52** shows the revised offsite drainage outfall for the Partial Cover Lowered Alternative.

**Exhibit 52        Partial Cover Lowered Alternative—South Offsite Drainage Outfall**



Open Channel          Drainage Pipe

## Changes to the Final EIS Text

The following discussions include clarifications on *Section 5.14, Floodplains and Drainage/ Hydrology*, of the Final EIS:

**Page 5.14-2—text below is added before the last paragraph and now includes:**

Executive Order 13960, "Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input" (Obama, 2015) provides several amendments to Executive Order 11988 to further improve the existing floodplain

management strategy in accordance with the Climate Action Plan. The Federal Flood Risk Management Standard acts as a flexible framework involving stakeholder input and assessments. New requirements include:

- Increase resilience against flooding and help preserve the natural values of floodplains

- Expand management from the current base flood level to a higher vertical elevation and corresponding horizontal floodplain to address current and future flood risk

- Be consistent with the Federal Flood Risk Management Standard

**Page 5.14-3—first paragraph now reads:**

Both Denver and Aurora have specific regulations and/or ordinances related to the proper management of floodplains. Denver's regulations are presented in the *Storm Drainage Design and Technical Criteria Manual* (Denver Wastewater Management, ~~2006~~ revised 2013) and a Floodplain Ordinance in the Revised Municipal Code. The general purpose of Denver's floodplain regulations includes:

**Page 5.14-6—Second paragraph and Exhibit 5.14-3 now read:**

Additional analysis of the Montclair Basin and Park Hill Basin provided detailed information about the surface overflows impacting I-70. Because of the complexity of the project, local interest in the potential ponding areas, the fact that multiple projects would be impacted by the ponding areas, and the need for additional analysis of existing conditions, a Multi-Agency Technical Team (MATT) was developed. This MATT included CDOT, Denver, RTD, Urban Drainage and Flood Control District (UDFCD), and the National Western Complex staff. Analysis of the existing ponding areas was developed through the MATT for use in this EIS and with future project planning by others. The I-70 Partial Cover Lowered Alternative Drainage Multi-Agency Technical Team Memo, dated August 1, 2014, provides peak discharges at I-70, which also are provided in **Exhibit 5.14-3.**

**Exhibit 53, below replaces Exhibit 5.14-3 in the Final EIS (changes due to an error in the numbers originally reported).**

**Exhibit 53        Annual Chance Peak Discharge**

| Location | 1-Percent Annual Chance Peak Discharge (cfs) |
|---|---|
| I-70 at Race Street | ~~2,649~~2,852 |
| I-70 at York Street | 1,190 |
| I-70 at Steele Street | ~~1,120~~1,131 |
| I-70 at Colorado Boulevard | ~~1,995~~2,176 |

**Page 5.14-7—Fourth paragraph now reads:**

The drainage system included with the Partial Cover Lowered Alternative will capture and convey offsite flows between Brighton Boulevard and Dahlia Street that currently drain north under the existing I-70 viaduct. The capture and conveyance of this offsite flow ~~substantially~~ reduces the ponding areas and existing flooding north of I-70. This drainage system (see **Exhibit 5.14-5**) starts at the Market Lead Railroad low point approximately 1,220 feet to the west of Colorado Boulevard and is located within the 46th Avenue right of way on the south side of I-70. The storm drain continues to the west looping around the south of the Denver Coliseum within McFarland Drive, through the parking lot of the Coliseum, <u>connecting into and discharging the offsite flow into an open channel within Globeville Landing Park, ultimately conveying the flow into the South Platte River.</u> ~~and through Globeville Landing Park, ultimately discharging the offsite flow into the South Platte River.~~ <u>Water also flows down Brighton Boulevard, through a box culvert, ultimately flowing in to the same open channel.</u> It will not change the boundary of the existing floodplain.

**Page 5.14-9—Exhibit 54 replaces Exhibit 5.14-5**

**Exhibit 54**      **Offsite Drainage for the Partial Cover Lowered Alternative South of I-70**



**Page 5.14-9—First paragraph now reads:**

The Build Alternatives may impact the floodplain for Sand Creek, with bridge construction and new bridge structures crossing this waterway and the I-270 flyover ramp. Bridge piers are considered ~~as~~ a minimal floodplain encroachment; however, new bridge structures will be designed to have minimal effect on the existing regulatory base flood elevation and floodplain limits. The I-270 flyover ramp impacts the existing Sand Creek overflow channel. The Sand Creek overflow channel will have to be reconstructed and analyzed once the final design for the bridge pier is known. If the bridge pier does result in adverse effects to the Sand Creek flood zone, they will need to be addressed during final design.

**Page 5.14-10—First paragraph now reads:**

The No-Action Alternative and the Build Alternatives will not negatively impact the floodplain resources for the South Platte River and Sand Creek. The effects to human safety, health, and welfare will be minimized and the beneficial values of the floodplains will be preserved. Any encroachment into the Sand Creek or South Platte River floodplain or floodway will require compliance with the Federal Emergency Management Agency, National Flood Insurance Program, and Denver local floodplain permitting requirements.

**Page 5.14-10—Third paragraph now reads:**

The ~~potential~~ existing ponding areas between Brighton Boulevard and Dahlia Street will be substantially impacted by the Partial Cover Lowered Alternative. To mitigate the risk to human safety, an offsite drainage system is required to capture and convey the offsite surface runoff before reaching the lowered section of I-70 between Brighton Boulevard and Colorado Boulevard and to discharge the stormwater runoff to the South Platte River. This south offsite drainage system also will mitigate the existing ponding in this area. An additional offsite system is required to capture the offsite flows between Colorado Boulevard and Dahlia Street, ~~reduce the discharges in a regional detention pond, and convey the flows north of I-70 to an existing storm drain system~~. The proposed drainage system captures the offsite flow at 46th Avenue to the south of I-70 and conveys the flow to a proposed detention pond. A proposed storm drain cuts off the flow conveyed in the existing 10-foot by 4-foot concrete box culvert located to the southeast of the intersection of Colorado Boulevard and the UPRR tracks. The proposed storm drain then conveys the flow to the north into the proposed detention ponds that reduce the peak flows to levels at or below existing flows and release them to the north of I-70 within the existing flow paths.

**Updates to floodplains and drainage/hydrology mitigation measures:**

Two mitigation commitments have been added since the publication of the Final EIS:

- Design the outfalls to the South Platte River to have no adverse impact to the floodplain

- Coordinate with adjacent projects to ensure there are no drainage or floodplain conflicts between the projects

Additionally, one of the mitigation commitments has been updated:

- Design the Sand Creek bridge structures to have no adverse impact to the Sand Creek floodplain; <u>if no adverse impact is unfeasible, the structures will be designed to minimize adverse impacts to the floodplain to the maximum extent practicable</u>

## 9.13    Wetlands and Other Waters of the U.S.

### Updates to the Final EIS Analysis

Changes to the construction limits since the publication of the Final EIS have led to changes in impacts to wetlands and other waters of the U.S.

Since the I-70 East Project's offsite drainage had to be redesigned and now includes Denver's GLO, there are additional wetland impacts in Globeville Landing Park that weren't previously included as part of the I-70 East Project. A wetland and other waters of the U.S. delineation and impact analysis was conducted by Denver for the GLO. The delineation identified two new wetlands and one new other water of the U.S. within Globeville Landing Park, all of which are being added to the I-70 East wetlands analysis. Previously, these features were not included in the I-70 East analysis because they were located 50 feet outside of the original construction limits.

One additional jurisdictional water of the U.S. (OW276-01), which is located south of I-70 near Madison Street and East 44th Avenue, was identified during a field visit on February 4, 2016. More information about this resource is available in *Attachment C, Updates to Wetlands and Others Waters of the U.S. Technical Report Addendum*.

The updated impacts to jurisdictional and non-jurisdictional wetlands and other waters of the U.S. are captured in **Exhibit 55**. There are no changes to the identified mitigation measures as presented in the Final EIS.

**Exhibit 55        Updated Impacted Wetlands by Alternative**

| Alternative/Option | Jurisdictional | | | | Non-Jurisdictional | | | |
|---|---|---|---|---|---|---|---|---|
| | Wetlands (acres) | | Other Waters of the U.S. (acres) | | Wetlands (acres) | | ~~Open Waters (acres)~~ | |
| | Perm | Temp | Perm | Temp | Perm* | Temp | ~~Perm~~ | ~~Temp~~ |
| No-Action Alternative | — | — | — | 0.005 | — | — | — | — |
| Revised Viaduct Alternative, General-Purpose Lanes Option | ~~0.098~~ 0.086 | ~~0.009~~ 0.003 | ~~0.291~~ 0.223 | ~~0.043~~ 0.040 | ~~4.254~~ 5.618 | ~~0.233~~ 0.078 | ~~0.402~~ — | — |
| Revised Viaduct Alternative, Managed Lanes Option | ~~0.104~~ 0.095 | ~~0.010~~ 0.003 | ~~0.310~~ 0.250 | ~~0.042~~ 0.042 | ~~4.338~~ 5.618 | ~~0.234~~ 0.078 | ~~0.402~~ — | — |
| Partial Cover Lowered Alternative, General-Purpose Lanes Option | ~~0.098~~ 0.126 | ~~0.009~~ 0.003 | ~~0.350~~ 0.410 | ~~0.081~~ 0.570 | ~~4.254~~ 5.618 | ~~0.233~~ 0.078 | ~~0.402~~ — | — |
| Partial Cover Lowered Alternative, Managed Lanes Option | ~~0.104~~ 0.135 | ~~0.010~~ 0.003 | ~~0.369~~ 0.437 | ~~0.080~~ 0.572 | ~~4.338~~ 5.618 | ~~0.234~~ 0.078 | ~~0.402~~ — | — |

*Note:     Permanent impacts to wetlands includes shading, which is discussed in further detail below.

**Exhibit 55** includes shading impacts to wetlands in the vicinity of Sand Creek. CDOT will mitigate for these impacts per their own guidance; however, shading impacts are not regulated by the USACE, and would not be considered a loss of waters of the U.S. during Section 404 permitting. Permitted impacts for discharge of dredged or fill impacts will be significantly less than those shown above and will remain within the Nationwide Permit 14 (Linear Transportation Projects) parameters. The permanent impacts for the project requiring a permit (not including shading impacts) are currently estimated at 0.236 acre (0.040 acre of permanent wetlands impacts, and 0.196 acre of permanent impacts to other waters of the U.S. for the Preferred Alternative).

Impacts associated with the addition of the GLO to the I-70 East Project total 0.04 acre of permanent impacts to wetlands, 0.16 acre of permanent impacts to other waters of the U.S., and 0.49 acre of temporary impacts to the South Platte River channel, as per the Preconstruction Notification letter to the USACE dated November 5, 2015. Impacts from the GLO are only associated with the Partial Cover Lowered Alternative.

## Changes to the Final EIS Text

The following sections include clarifications to *Section 5.15, Wetlands and Other Waters of the U.S.*, of the Final EIS:

**Exhibit 55 replaces Exhibit 5.15-3 of the Final EIS.**

**Global change in Section 5.15 of the Final EIS:**

Five features classified as open waters have been removed from *Section 5.15, Wetlands and Other Waters of the U.S.,* of the Final EIS. Under Section 404 of the Clean Water Act (CWA), the term "open waters" includes features with flowing or standing water, such as streams, lakes, and ponds, to the extent that an ordinary high water mark can be determined. Based on this definition, these five features were removed since they are stormwater basins and do not meet the criteria for open waters. Therefore, the phrase "open waters" is removed from the section.

**Page 5.15-10, Section 5.15.5—has been replaced and now reads:**

Each alternative results in unavoidable impacts to wetlands and other waters of the U.S. However, a number of measures were implemented for each alternative to reduce the overall construction footprint of the roadway improvements and other associated facilities to avoid and minimize impacts to the maximum extent practicable.

All of the alternatives will require an onsite drainage system. Onsite flows from each of the alternatives will be directed north through a pipe to a detention basin near Riverside Cemetery. From there, the overtopping flows will be routed through a pipe west under Race Court on to the north edge of the National Western Complex property, finally discharging to the South Platte River. The location and design of the structure was determined using a number of factors. Locating the onsite drainage outfall south of Race Court lessens the

impacts to the Burlington Ditch/O'Brien Canal, which is classified both as a water of the U.S. and a Section 4(f) resource. In addition, moving the outfall further south would avoid impacts to the South Platte River Trail, which also is classified as a Section 4(f) resource.

An offsite drainage system is required for the Partial Cover Lowered Alternative. The offsite drainage system uses a portion of the GLO by directing stormwater in a new culvert Denver is installing under Brighton Boulevard. The remaining stormwater would be placed in a pipe under the Coliseum parking lot. This pipe connects into the headwall created by the GLO pipe entering the channel and flows I-70 offsite stormwater through the park in the channel and then to an outlet to the South Platte River. The limits for the drainage upgrades in Globeville Landing Park and the proposed south drainage system (GLO) stop at the South Platte River ordinary high water mark. This work results in temporary impacts to the channel, which will be returned to pre-existing contours after construction is completed.

The majority of the impacts to wetlands and other waters of the U.S. at Sand Creek result from shading due to the construction of new on- and off-ramps to Quebec Street. The existing I-70 bridge spanning Sand Creek will remain in place. The Build Alternatives propose widening the structure; however, no new piers for the main structure will need to be constructed. The new ramps for all Build Alternatives require piers near the Sand Creek channel. One pier for the north off-ramp will be constructed in a wetland, causing fill-related permanent impacts. This unavoidable impact is caused by design standards that need to be upheld to ensure roadway safety for motorists using the off-ramp.

I-70 has a number of roadway ditches and stormwater basins that exhibit wetland functions. These water-quality features along the corridor are non-jurisdictional wetlands. The remaining impacts to wetlands for the Build Alternatives will result from widening the roadway, which impacts the non-jurisdictional water-quality features.

## 9.14   Water Quality

### Updates to the Final EIS Analysis

Advancements in the I-70 East Project's design and changes to the construction limits have led to changes in the impervious area calculations and therefore changes in water quality impacts. Additionally, analysis done for the Final EIS was identified to have miscalculations, and have been updated for this analysis. The updated impact summaries are presented in **Exhibit 56** and **Exhibit 57**. The main reasons for the changes are:

- The expanded construction limits increase the overall footprint of the project and therefore increase the existing impervious area. This has a reduced effect on the percentage increase in TSS since the impervious area of project alternatives is not much greater than existing, with some alternatives having less.

- The more advanced design delineates the green belts which are not considered an increase in impervious area and sometimes represent a decrease in impervious area

- The design now includes the impacts for the updated south offsite drainage system which is considered a pervious area and results in a decrease in impervious area.

**Exhibit 56        South Platte River Water Quality Effect Summary**

| Alternative/Option | Water Quality Factor (pounds per mean storm event) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Percent impervious | Lead | Copper | Phosphorous | Zinc | TSS | Percentage TSS Increase |
| Existing Conditions | 55%<br>64.4% | 2.20<br>2.99 | 0.30<br>0.40 | 2.20<br>2.99 | 1.81<br>2.46 | 781<br>1,062 | N/A |
| No-Action Alternative, North Option | 58%<br>62.6% | 2.29<br>2.92 | 0.31<br>0.39 | 2.29<br>2.92 | 1.88<br>2.40 | 811<br>1,038 | 4%<br>-2% |
| No-Action Alternative, South Option | 51%<br>59.9% | 2.08<br>2.82 | 0.28<br>0.38 | 2.08<br>2.82 | 1.71<br>2.32 | 738<br>1,001 | 0%<br>-6% |
| Revised Viaduct Alternative, North Option | 67%<br>75.7% | 2.58<br>3.42 | 0.35<br>0.46 | 2.58<br>3.42 | 2.12<br>2.81 | 915<br>1,214 | 17%<br>14% |
| Revised Viaduct Alternative, South Option | 60%<br>65.8% | 2.35<br>3.04 | 0.32<br>0.41 | 2.35<br>3.04 | 1.94<br>2.50 | 836<br>1,080 | 7%<br>2% |
| Partial Cover Lowered Alternative | 63%<br>68.9% | 2.44<br>3.16 | 0.33<br>0.43 | 2.44<br>3.16 | 2.01<br>2.60 | 866<br>1,123 | 11%<br>6% |

**Exhibit 57        Sand Creek Water Quality Effect Summary**

| Alternative/Option | Water Quality Factor (pounds per mean storm event) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Percent impervious | Lead | Copper | Phosphorous | Zinc | TSS | Percentage TSS Increase |
| Existing Conditions | 32%<br>34.2% | 5.31<br>4.17 | 0.72<br>0.56 | 5.31<br>4.17 | 4.37<br>3.43 | 1,886<br>1,479 | N/A |
| Build Alternatives, General-Purpose Lanes Option | 37%<br>47.7% | 6.46<br>5.32 | 0.87<br>0.72 | 6.46<br>5.32 | 5.31<br>4.38 | 2,292<br>1,888 | 22%<br>28% |
| Build Alternatives, Managed Lanes Option | 40%<br>50.3% | 7.26<br>5.54 | 0.98<br>0.75 | 7.26<br>5.54 | 5.97<br>4.56 | 2,576<br>1,968 | 37%<br>33% |

**Exhibit 58** shows the updated percentage of impervious area over streams for each alternative. Although these numbers have changed, it does not require any additional mitigation from what was discussed in the Final EIS.

### Exhibit 58          Water Quality Factor Summary

| Alternative/Option | Water Quality Factor | | | |
|---|---|---|---|---|
| | Percent Increase in Impervious Surface | Daily Traffic Volume (vehicles per day) | Number of Stream Crossings | New Impervious Surface Over Streams (acres) |
| **South Platte River** | | | | |
| Existing Conditions | N/A | 143,800 | 1 | 0 |
| No-Action Alternative, North Option | ~~0~~ -2% | 191,700 | 1 | 0 |
| No-Action Alternative, South Option | ~~22~~ 8% | 191,700 | 1 | 0 |
| Revised Viaduct Alternative, North Option | ~~9~~ 14% | 214,600 | 1 | 0 |
| Revised Viaduct Alternative, South Option | ~~14~~ 3% | 214,600 | 1 | 0 |
| Partial Cover Lowered Alternative | ~~14~~ 8% | 214,600 | 1 | 0 |
| **Sand Creek** | | | | |
| Existing Conditions | N/A | 132,300 | 1 | 0 |
| No-Action Alternative | N/A | 174,300 | 1 | 0 |
| Build Alternatives, General-Purpose Lanes Option | ~~13~~ 39% | 229,100 | 1 | ~~1.08~~ 2.59 |
| Build Alternatives, Managed Lanes Option | ~~25~~ 47% | 174,500 | 1 | ~~3.15~~ 3.55 |

The potential locations of water quality ponds have been updated since the Final EIS and are shown in **Exhibit 59**.

**Exhibit 59          Preliminary Water Quality Pond Locations**



## Changes to the Final EIS Text

The following sections include clarifications to *Section 5.16, Water Quality*, of the Final EIS:

**Exhibit 56, Exhibit 57, Exhibit 58, and Exhibit 59 replace Exhibit 5.16-5, Exhibit 5.16-6, Exhibit 5.16-7, and Exhibit 5.16-8 in the Final EIS.**

**Global change in Section 5.16 of the Final EIS:**

The text discussion and exhibits are updated to reflect changes discussed above.

**Updates to the water quality mitigation measures:**

The following mitigation commitments have been revised:

- ~~Apply sand/salt mixtures (30 percent/70 percent, respectively) at rates of 105 pounds to 115 pounds per lane mile, which is roughly one third of the maximum allowable amount of 300 pounds per lane mile. Use~~ <u>Reduce the application rate of sand and salt mixtures from historic rates by compliance with Colorado Department of Public Health and Environment, Air Quality Control Commission's Regulation 16</u>.

- <u>Apply</u> liquid de-icer products, ~~such as magnesium chloride and Caliber (a mixture of magnesium chloride, cornstarch, alcohol, and tree sap; apply these~~ <u>at the lowest</u>

application rate that will remain effective by adherence to CDOT's Standard Operating Guide for Winter Maintenance and Operations.

- Utilize only de-icing and anti-icing products ~~at~~ that are on the Pacific Northwest Snow Fighters Approved Product List. Use product application rates ~~of 10 pounds that conform~~ to ~~80 pounds per lane mile~~ the manufacturer's recommendations and air and water quality regulations. ~~Use Ice Slicer, another solid mixture; this product is a sand/salt mixture with anti-corrosive additives and is applied at a rate of 100 pounds to 150 pounds per lane mile; this product is preferred over regular sand/salt mixtures because it produces less fugitive dust.~~

## 9.15    Hazardous Materials

### Updates to the Final EIS Analysis

An environmental records search was conducted in February 2016 using the same search criteria summarized in the Final EIS (see *Attachment C, Updates to Hazardous Materials Technical Report Addendum,* for details).

Fewer leaking underground storage tank (LUST) sites were identified within the study area. However, three additional solid waste landfills (SWLs); four additional Voluntary Clean-up and Redevelopment Act (VCRA) sites; one additional Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS), No Further Remedial Action Planned (NFRAP) site; and five additional Resource Conservation and Recovery Act (RCRA) sites were identified within the study area. **Exhibit 60** summarizes the updated number of sites now identified within the study area.

### Exhibit 60        Updated Number of Hazardous Material Sites

| Hazardous Material Database | Number of Sites |
|---|---|
| Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS) | ~~0~~ 2 |
| CERCLIS, No Further Remedial Action Planned | ~~3~~ 4 |
| National Priority List | 1 |
| Resource Conservation and Recovery Act (RCRA) Generator Facilities | ~~8~~ 5 |
| RCRA Non-Generator Facilities | ~~1~~ 8 |
| RCRA Non-CORRACTs Treatment, Storage, and Disposal | 1 |
| Solid Waste Landfill | ~~4~~ 7 |
| Voluntary Clean-Up Plan/Voluntary Clean-Up and Redevelopment Program | ~~1~~ 5 |
| Underground Storage Tank | ~~28~~ 18 |
| Leaking Underground Storage Tank | ~~26~~ 18 |

*Source: Attachment C, Updates to Hazardous Materials Technical Report Addendum*

Because of the modifications to the design, there is a larger area of ground disturbance for each of the alternatives. The Revised Viaduct Alternative will not increase the number of hazardous material sites impacted; however, the Partial Cover Lowered Alternative would increase the number of impacted sites.