


COLORADO
Department of
Transportation

# I-70 East Final Environmental Impact Statement
## and Section 4(f) Evaluation

**JANUARY 2016**

**VOLUME 1 OF 3**

**AQC R600-165**
**Subaccount 13599**
**I-70 East**
I-70 East from I-25 to Tower Road
Denver, Colorado

## FINAL ENVIRONMENTAL IMPACT STATEMENT
## AND SECTION 4(f) EVALUATION

Document Submitted Pursuant to:
16 USC §460l-4, 23 USC §138, 42 USC §4332 (2)(c), 49 USC §303,
and Executive Orders 11990 and 12898
by the
U.S. Department of Transportation
Federal Highway Administration
and
Colorado Department of Transportation

**Cooperating Agencies**
Colorado Department of Public Health and Environment, Air Pollution Control Division
Federal Transit Administration
U.S. Army Corps of Engineers
U.S. Environmental Protection Agency
Regional Transportation District


Joshua Laipply, P.E.
Chief Engineer
Colorado Department of Transportation

John M. Cater, P.E.
Division Administrator, Colorado Division
Federal Highway Administration


12/18/2015
Date of Approval

12-18-2015
Date of Approval

The Federal Highway Administration may publish a notice in the *Federal Register*, pursuant to 23 United States Code (USC) Section 139(l), when the Record of Decision is approved. If such notice is published, a claim arising under federal law seeking judicial review of a permit, license, or approval issued by a federal agency for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the *Federal Register* announcing that the permit, license, or approval is final pursuant to the law under which judicial review is allowed. If no notice is published, then the periods of time that otherwise are provided by the federal laws governing such claims will apply.



# CHAPTER 1: INTRODUCTION

*This chapter presents a brief description of the NEPA process and how the I-70 East project started. It also summarizes the project's progress to date, including the publication of the 2008 Draft EIS and the 2014 Supplemental Draft EIS. Public involvement has significantly influenced the project thus far, so additional information about how the public can maintain involvement through the remainder of the process is included. Lastly, this chapter includes a list of all the chapters in this document and associated technical reports, which are attached to this document as Volume 2 and 3.*

**History and purpose of NEPA**

Congress enacted NEPA in December 1969, and President Nixon signed it into law on January 1, 1970. NEPA was the first major environmental law in the United States. NEPA established this country's national environmental policies.

Since the Supplemental Draft EIS was published in August 2014, additional analyses and content review have been performed for many of the resources discussed in this document. These updates, along with changes resulting from the comments received on the Supplemental Draft EIS, have been incorporated into this Final EIS. In this chapter, no content-related updates were made.

## 1.1   What is the NEPA process?

NEPA requires analysis of projects with a federal nexus, such as federal funding, that may impact the environment. This is done through a rigorous process that allows the public to understand and comment on the benefits and impacts of the project. Federal agencies are required by NEPA to prepare an EIS for major federal actions that could significantly affect the quality of the human and natural environment. EISs are intended to disclose the effects of a project at a stage in the project where decision making can still be shaped by the environmental analysis and agency and public comments. This process allows decision makers to consider effects on the environment with other important considerations, such as need, feasibility, cost, and the safety of the traveling public.

## 1.2   What is the history of I-70?

Planning for I-70 started nearly 60 years ago. As part of the recommendation for the "Valley Highway" (I-25), it was determined that Denver's major east-west thoroughfare should be located along 46th Avenue to the east of the Valley Highway and along 48th Avenue to the west.

In 1947, Denver formally requested that the 46th Avenue/48th Avenue corridor be designated as a state highway between Sheridan Boulevard and Colorado Boulevard. Detailed studies and design efforts continued in the 1950s and 1960s, and I-70 construction was completed in 1964. The elevated section of I-70 East from Brighton Boulevard to Colorado Boulevard, known as the I-70 Viaduct, now carries approximately 145,000 vehicles per day, providing east-west access for commuters, freight, transit, and general-purpose traffic.

CDOT and FHWA propose improvements to the I-70 corridor where it crosses northeast Denver, Colorado, from I-25 on the west to Tower Road on the east.

**What is a federal nexus?**

Under federal law, NEPA applies to any proposed action or transportation project that has a federal nexus, including, but not limited to, instances where:

- Federal funds are involved

- Federal permits or approvals are required

- New or revised access to the interstate highway system is included







*Historic photos of 46th Avenue from* Commemorating the Opening of the East 46th Avenue Freeway (I-70), *1964*

The intent of the I-70 East EIS is to identify highway improvements along I-70 by:

- Analyzing alternatives that are intended to meet the project's purpose and need, and detailing the highway improvement alternatives development process;

- Evaluating the social, economic, and environmental effects (positive and negative) of the alternatives; and

- Identifying measures to avoid, minimize, or mitigate negative effects.

The aging viaduct is vulnerable to failure within the next 10 to 15 years, even with recent maintenance activities that were completed in 2011. In addition, by 2035, the corridor is projected to carry nearly twice as many vehicles as it was originally designed for, resulting in extended congestion and impaired mobility. The uninterrupted and safe movement of people and goods across I-70 through the Denver metropolitan area is essential to the region's economic vitality and quality of life.

## 1.3   What is the I-70 East EIS project?

This EIS process began in 2003 as part of the I-70 East Corridor EIS, which looked at both highway and transit solutions. The process was a joint effort among several agencies initially, including CDOT, FHWA, RTD, FTA, and Denver.

In June 2006, it was determined that the highway and transit elements of the I-70 East Corridor EIS process serve different travel markets, are located in different corridors, and have different funding sources. At this point, the highway and transit components of the analysis were separated.

The I-70 East EIS focuses on needed highway improvements between I-25 and Tower Road and is being conducted by CDOT and FHWA. The EIS for the transit elements in this area (East Corridor EIS) were completed by RTD and FTA in 2009; construction of the commuter rail transit line is anticipated for completion in 2016. The East Corridor EIS evaluated more than 100 alternatives (alignment, station locations, and technologies including bus rapid transit, light rail, and commuter rail). More information on the transit elements of this corridor is available at www.rtd-fastracks.com.



In November 2008, a Draft EIS was issued that evaluated the impacts of multiple alternatives. Following issuance of the Draft EIS, CDOT began a collaborative process with formation of the PACT in July 2010 to help decision makers with identifying a preferred alternative.

After many discussions, open dialogues, and public input, the PACT recommended the Current Alignment as the preferred alignment, but did not choose an alternative from those presented in the 2008 Draft EIS as the preferred alternative.

Following the PACT process, CDOT re-examined previously eliminated alternatives and developed a new alternative.

In August 2014, a Supplemental Draft EIS was released that updated the analysis in the Draft EIS and included additional analysis for the newly developed alternative.

NEPA allows lead agencies to preliminarily identify a preferred alternative at the Draft EIS stage. Although no preferred alternative was identified in the Draft EIS, FHWA and CDOT preliminarily identified a preferred alternative in the Supplemental Draft EIS. That alternative was refined and is identified as the Preferred Alternative in the Final EIS. Chapter 3, Summary of Project Alternatives, includes additional details on the Preferred Alternative.

Preparing this document provides an opportunity to respond to comments from agencies, stakeholders, and the public; further evaluate the Preferred Alternative that was preliminarily identified in the Supplemental Draft EIS; improve and modify previous analyses, as appropriate; and make updates to previous environmental documentation.

**What is the PACT?**

The PACT is the Preferred Alternative Collaborative Team, which was comprised of state and federal agencies, advocacy groups, and stakeholders—including neighborhood representatives from Adams County, Aurora, Commerce City, and Denver. It was formed in July 2010 to help decision makers with identifying a preferred alternative.

## 1.4   Who has been involved in the I-70 East NEPA process?

NEPA requires that one or more lead agencies take responsibility for the environmental review process. For this project, FHWA is the federal lead agency and CDOT is the state lead agency. FHWA is providing highway design guidance and environmental oversight. CDOT is leading the highway design efforts and development of the EIS. The lead agencies also closely consider public comments on the project.

Staff from the affected jurisdictions and representatives of state and federal resource agencies provide advice and recommendations to the lead agencies about the scope and content of environmental analysis. These "cooperating agencies" are defined under NEPA as other agencies with jurisdiction by law or special expertise over evaluated resources (42 United States Code [USC] §§ 4331[a] and 4332[2]).



## 1.5   How were comments on the Supplemental Draft EIS addressed?

During the comment period, nearly 900 individual submissions—many containing multiple comments—were received from the public, stakeholders, and agencies on the Supplemental Draft EIS during the public review period from August 2014 to October 2014. Every comment was reviewed individually for response development. The comments and responses are provided in Attachment Q of this document. CDOT modified and revised the content of the document where appropriate in response to these comments.

## 1.6   What happens after the Final EIS?

After publishing the Final EIS and holding a public review period, the final step in the NEPA process is the preparation of a ROD that will select the preferred alternative, document FHWA's final decision for the project, explain why it has taken a particular action, and present the mitigation measures and commitments to be incorporated into project construction and operation. The ROD will identify funding for the approved action consistent with the fiscally constrained section (Fiscally Constrained RTP) of the DRCOG 2040 MVRTP (DRCOG, 2015b).

## 1.7   When will the project be built?

Funding constraints limit the ability to fully construct the Preferred Alternative at one time. Therefore, the project will be built in phases. For more information regarding the phasing of the Preferred Alternative, refer to Chapter 8, Phased Project Implementation. Pending the completion of the NEPA process, construction of the first phase of the project is anticipated to begin in 2017.

## 1.8   How to stay involved and how CDOT will communicate with the public

The best way to stay involved and receive project updates is to join the project mailing list. To do this, visit the project website at: www.i-70east.com or call the project hotline at 303-757-9413. CDOT will continue to keep the public informed about decision making and opportunities for input. Chapter 10, Community Outreach and Agency Involvement, summarizes all the techniques that CDOT practices to engage the public in the NEPA process.

To learn more about this document or to voice your comments and concerns, three public hearings are scheduled during the public review period and are listed below:

- Aurora: February 1, 2016
  North Middle School

- Commerce City: February 2, 2016
  Adams City High School

- Denver: February 3, 2016
  Bruce Randolph Middle School

## 1.9   How is this document organized?

This document is designed to provide readers with a complete record of the environmental analysis performed and the decision-making process that resulted in the identification of the Preferred Alternative. Accordingly, it includes the full analysis of the alternatives evaluated in the Supplemental Draft EIS, the No-Action Alternative and the Revised Viaduct Alternative, as well as updated analysis of the Preferred Alternative, the Partial Cover Lowered Alternative.

This document includes 10 chapters (Volume 1) and 15 attachments (Volumes 2 and 3) that support the analysis and information presented. It has the same chapter

arrangement as the Supplemental Draft EIS, but adds two new chapters (Chapter 8, Phased Project Implementation, and Chapter 9, Preferred Alternative Mitigation Commitments) and moves Community Outreach and Agency Involvement to Chapter 10. Each chapter includes multiple sections and subsections to make it easier for the reader to find the information they are looking for.

Volume 1 of the Final EIS includes the following chapters:

- Executive Summary (also included in Spanish)
- Chapter 1—Introduction
- Chapter 2—Purpose and Need
- Chapter 3—Summary of Project Alternatives
- Chapter 4—Transportation Impacts and Mitigation Measures
- Chapter 5—Affected Environment, Environmental Consequences, and Mitigation
- Chapter 6—Cumulative Impacts
- Chapter 7—Section 4(f) Evaluation
- Chapter 8—Phased Project Implementation
- Chapter 9—Preferred Alternative Mitigation Commitments
- Chapter 10—Community Outreach and Agency Involvement

A list of references and a list of preparers are included as a part of this volume to source the data and identify the authors of the document.

The 15 attachments provided in Volumes 2 and 3 present technical data and detailed analysis supporting the results provided in this document. Some of these technical reports include an addendum, which updates the analysis that was previously performed in preparing the Supplemental Draft EIS. There are three new attachments, presented as Attachments O, P, and Q.

Attachment A, *Alternative Maps*, is a standalone 11-inch by 17-inch booklet providing detailed maps for the project. Attachments B through P are provided in Volume 2. Attachment Q, *Supplemental Draft EIS Comments and Responses*, is provided in three parts in Volume 3 (also 11-inch by 17-inch). Attachments E, F, I, J, K, O, and P are new documents, while Attachments B, C, D, G, H, L, M, and N are addenda. The Supplemental Draft EIS Technical Reports for these addenda are included on the DVD attached to this document.

The attachments to this document are as follows:

- Attachment A—Alternative Maps

- Attachment B—Agency Consultation
  Agency Consultation Addendum

- Attachment C—Alternative Analysis
  Alternative Analysis Technical Report Addendum

- Attachment D—Community Outreach and Agency Involvement
  Community Outreach and Agency Involvement Technical Report Addendum

- Attachment E—Traffic
  Traffic Technical Report

- Attachment F—Environmental Justice
  Environmental Justice Technical Report
  (The Supplemental Draft EIS attachment required no modifications or updating, no addendum or new Technical Report has been prepared as part of the Final EIS)

- Attachment G—Relocations and Displacements
  Conceptual Stage Relocation Technical Report Addendum

- Attachment H—Hazardous Materials
  Hazardous Materials Technical Report Addendum

- Attachment I—Historic Preservation (Section 106)
  Section 106 Determinations of Eligibility and Effects
  Documentation for Finding of Adverse Effect

- Attachment J—Air Quality
  Air Quality Technical Report

- Attachment K—Noise
  Noise Technical Report

- Attachment L—Biological Assessment
  Biological Assessment Addendum

- Attachment M—Hydrology and Hydraulics
  Hydrology and Hydraulics Technical Report Addendum

- Attachment N—Wetlands and Other Waters of the U.S.
  Wetland Finding
  Wetlands and Other Waters of the U.S. Technical Report Addendum

- Attachment O—Aesthetic and Design Guidelines (new)

- Attachment P—Cover Planning (new)

- Attachment Q—Supplemental Draft EIS Comments and Responses (new)

# 5.14    Floodplains and Drainage/Hydrology

*This section discusses floodplain and drainage/hydrology resources and explains why they are important to the project. The impacts from the project alternatives on these resources also are evaluated, and proposed mitigation measures are discussed to minimize negative effects.*

> Since the Supplemental Draft EIS was published in August 2014, additional analyses and content review have been performed for many of the resources discussed in this document. These updates, along with changes resulting from the comments received on the Supplemental Draft EIS, have been incorporated into this Final EIS. In this section, the updates include the following items:
>
> - Added in reasons for evaluation under NEPA.
>
> - Included information on potential ponding areas north of I-70.
>
> - Refined offsite flow summary.
>
> - Revised onsite drainage alignment.

## 5.14.1    What are floodplains and ponding areas and why are they important to this project?

Floodplains typically are defined as areas adjacent to streams and rivers that periodically are flooded by water. The flood zones that are designated by the Federal Emergency Management Agency (FEMA) within the study area are located along the South Platte River and Sand Creek. Both of these areas are classified as having a 1-percent chance of flooding each year—also referred as a 100-year flood event. Potential ponding areas are developed areas with limited-capacity storm drain systems that result in periodic flooding during storm events. It is important to perform a detailed analysis of floodplains, ponding areas, and drainage to ensure that adequate drainage is designed for the project alternatives in case of a storm and that the project alternatives will not negatively impact the floodplains and ponding areas.

### *Reasons for evaluation of floodplains under NEPA*

CDOT conducts floodplain assessments to:

- Ensure that floodplains are identified and their services and functions are protected to the maximum extent possible

- Comply with CDOT's Environmental Stewardship Policy, which ensures that the statewide transportation system is constructed and maintained in an environmentally responsible, sustainable, and compliant manner

- Comply with federal acts and executive orders

The regulations, advisories, and orders are directed toward the treatment of floodplains under NEPA. The intent of these regulations is to avoid or minimize highway encroachments within 100-year (base) floodplains, where practicable, and to avoid supporting land use development that is incompatible with floodplain services. Under the requirements of Executive Order 11988, "Floodplain Management" (Carter, 1977b), all federal-aid projects must make diligent efforts to:

- Avoid support of incompatible floodplain development

- Minimize the impact of highway actions that adversely affect the base floodplain

- Restore and preserve the natural and beneficial floodplain services

- Be consistent with the standards/criteria of the National Flood Insurance Program (NFIP) of FEMA

In addition to federal and state laws and regulations, local jurisdictions may have ordinances and regulations that must be followed. The CDOT Project Engineer must coordinate with counties, cities, and other jurisdictions in the study area to ensure any proposed encroachment or alteration of a floodplain meets their requirements.

Both Denver and Aurora have specific regulations and/or ordinances related to the proper management of floodplains. Denver's regulations are presented in the *Storm Drainage Design and Technical Criteria Manual* (Denver Wastewater Management, 2006) and a Floodplain Ordinance in the Revised Municipal Code. The general purpose of Denver's floodplain regulations includes:

- To reduce the hazards of floods to life and property
- To protect and preserve the hydraulic characteristics of water courses used for conveyance of flood waters
- To protect the public from extraordinary financial expenditures for flood control and relief

Aurora's policy for floodplains lists the major concerns as:

- Prevention of excessive erosion, flood heights, or flow velocities
- Protection of any use within or adjacent to a floodplain from damage
- Control or alteration of natural floodplains and channels
- Prevention of barriers which would divert flood waters and increase flood hazards in other areas

Analysis of drainage and floodplains seeks to encompass all of the policies and regulations to determine the best solution to drainage and floodplain issues.

## 5.14.2    What study area and process were used to analyze floodplains and drainage?

The study area for floodplains and drainage is the combined construction limits of the project alternatives. It includes bridge crossings at the South Platte River and Sand Creek, as seen in **Exhibit 5.14-1**. Both streams include a delineated 100-year floodplain. Due to the new smaller study area, Westerly Creek is no longer impacted by this project.

A review of the effective FEMA Flood Insurance Rate Maps (FIRMs) was completed for the study area. The South Platte River and Sand Creek both have detailed hydrologic and hydraulic studies and delineated floodplains.

Additionally, I-70 East crosses potential ponding areas identified in several locations. These are located in areas of the watershed that receive substantial surface flows or where water collects during extreme rainfall events.

**Exhibit 5.14-1     Floodplains and Drainage Study Area**



Smaller drainage crossings are not defined by FEMA; however, Denver has identified potential ponding areas within the study area. Potential ponding areas identified in the *Denver Storm Drainage Master Plan* (Denver Wastewater Management Division, 2014), *Park Hill (North of Smith Road) Drainage Outfall System Plan Conceptual Design Report* (Enginuity & Matrix Design Group, 2012), *Lower Montclair Street Flow Criteria Analysis Memorandum* (Enginuity, 2010), and the *Memorandum for I-70 Partial Cover Lowered Montclair Drainage Basin Hydrologic Analysis* (Enginuity, 2014a), and the *Memorandum for I-70 Partial Cover Lowered Park Hill Drainage Basin Hydrologic Analysis* (Enginuity, 2014b) were used to identify areas for additional drainage consideration and analysis.

### 5.14.3 What are the areas of floodplain and drainage interest that are being analyzed and what are their existing conditions?

The South Platte River is a confined urban floodplain that has been narrowed by previous development. The existing I-70 bridges and frontage road bridges cross the South Platte River. At this time, FEMA delineates the floodplain as Zone AE with calculated base flood elevations. A primary source of stream flow in the South Platte River is releases from upstream reservoirs, including Chatfield and Cherry Creek Reservoirs. Although waters in the reservoirs originate as groundwater, snowmelt, precipitation, effluent discharge, and stormwater runoff, instream flows are strongly influenced by releases from upstream reservoirs and, as a result, may not always reflect the timing of precipitation events.

The existing I-70 bridge crosses Sand Creek. FEMA currently delineates the floodplain as Zone AE with calculated base flood elevations.

**Exhibit 5.14-2** shows the identified potential ponding areas along the I-70 corridor. These potential ponding areas represent flooding risks for the existing developed watershed, including flooded streets and structures.

> **FEMA floodplain zones**
>
> Floodplain zones are geographic areas that FEMA has defined according to varying levels of flood risk. These zones are shown in a community's Flood Insurance Rate Map (FIRM) or Flood Hazard Boundary Map.
>
> Each zone reflects the severity or type of flooding in the area.

> **Cubic feet per second**
>
> Cubic feet per second (cfs) denotes the volume of water passing any given point in one second.

**Exhibit 5.14-2      Potential Ponding Areas**



Denver's *Storm Drain Master Plan* identified substantial offsite flows through the area, including surface overflows crossing I-70 between Brighton Boulevard and York Street, near Steele Street/Vasquez Boulevard, and between Colorado Boulevard and Dahlia Street. The Denver standard is to design local storm drain systems for a 20-percent annual chance (five-year) storm event.

Additional analysis of Montclair Basin and Park Hill Basin provided detailed information about the surface overflows impacting I-70. Because of the complexity of the project, local interest in the potential ponding areas, the fact that multiple projects would be impacted by the ponding areas, and the need for additional analysis of existing conditions, a Multi-Agency Technical Team (MATT) was developed. This MATT included CDOT, Denver, RTD, and the National Western Complex staff. Analysis of the existing ponding areas was developed through the MATT for use in this EIS and with future project planning. The I-70 Partial Cover Lowered Alternative Drainage Multi-Agency Technical Team Memo, dated August 1, 2014, provides peak discharges at I-70, which also are provided in **Exhibit 5.14-3**.

**Exhibit 5.14-3      I-70 East Offsite Flow Summary Table**

| Location | 1-Percent Annual Chance Peak Discharge (cfs) |
|---|---|
| I-70 at Race Street | 2,649 |
| I-70 at York Street | 1,190 |
| I-70 at Steele Street | 1,120 |
| I-70 at Colorado Boulevard | 1,995 |

## 5.14.4  How do the project alternatives potentially affect floodplains and drainage?

The increased width of the viaduct for the No-Action Alternative and the Revised Viaduct Alternative could increase the amount of onsite water runoff from the I-70 viaduct. However, the additional runoff will follow existing flow patterns and the necessary drainage infrastructure will be in place to avoid an adverse impact to the surrounding areas.

A proposed onsite drainage system (see **Exhibit 5.14-4**) is included for all alternatives to capture and convey the onsite stormwater and discharge it into the South Platte River. This outfall will not change the boundary of the existing South Platte floodplain.

The No-Action Alternative and the Revised Viaduct Alternative have a minimal impact to the potential ponding areas. However, the Partial Cover Lowered Alternative substantially impacts the potential ponding areas located between Brighton Boulevard and Dahlia Street. The lowering of I-70 will create a depression that captures and retains surface flows from the upstream basin before their discharge to the South Platte River.

The drainage system included with the Partial Cover Lowered Alternative will capture and convey offsite flows between Brighton Boulevard and Dahlia Street that currently drain north under the existing I-70 viaduct. The capture and conveyance of this offsite flow substantially reduces the ponding areas and existing flooding north of I-70. This drainage system (see **Exhibit 5.14-5**) starts at the Market Lead Railroad low point approximately 1,220 feet to the west of Colorado Boulevard and is located within the 46th Avenue right of way on the south side of I-70. The storm drain continues to the west looping around the south of the Denver Coliseum within McFarland Drive, through the parking lot of the Coliseum, and through Globeville Landing Park, ultimately discharging the offsite flow into the South Platte River. It will not change the boundary of the existing floodplain.

> **Proposed drainage**
>
> All the alternatives include drainage improvements on the north side of I-70 to capture and convey the onsite water runoff.
>
> The Partial Cover Lowered Alternative also includes an offsite drainage system south of I-70 to capture surface water before it enters the lowered section of the highway.

**Exhibit 5.14-4**          **Onsite Drainage System North of I-70**



**Exhibit 5.14-5      Offsite Drainage for the Partial Cover Lowered Alternative South of I-70**



The Build Alternatives may impact the floodplain for Sand Creek, with bridge construction and new bridge structures crossing this waterway. Bridge piers are considered as a minimal floodplain encroachment; however, new bridge structures will be designed to have minimal effect on the existing regulatory base flood elevation and floodplain limits.

Attachment M, *Hydrology and Hydraulics Technical Report Addendum*, includes additional detail on the hydrologic and hydraulic analysis of the offsite and onsite drainage. A preliminary onsite hydrological analysis was done to estimate flows and size the drainage system to route the onsite flows to the South Platte River. Additional design and analysis for the proposed drainage facilities, including pipe and pond sizes, will be conducted as part of the final design.

### 5.14.5    How are the negative effects from the project alternatives mitigated for floodplains and drainage?

The No-Action Alternative and the Build Alternatives will not negatively impact the floodplain resources for the South Platte River and Sand Creek. The effects to human safety, health, and welfare will be minimized and the beneficial values of the floodplains will be preserved. Any encroachment into the Sand Creek floodplain or floodway will require compliance with FEMA, NFIP, and Denver local floodplain permitting requirements.

The potential ponding areas between Brighton Boulevard and Dahlia Street will be minimally impacted by the No-Action Alternative and Viaduct Alternatives. On-site detention, to reduce possible increases in runoff from the widened I-70 will be implemented to match pre-existing runoff rates from I-70 and runoff will follow historical flow paths.

The potential ponding areas between Brighton Boulevard and Dahlia Street will be substantially impacted by the Partial Cover Lowered Alternative. To mitigate the risk to human safety, an offsite drainage system is required to capture and convey the offsite surface runoff before reaching the lowered section of I-70 between Brighton Boulevard and Colorado Boulevard and to discharge the stormwater runoff to the South Platte River. An additional offsite system is required to capture the offsite flows between Colorado Boulevard and Dahlia Street, reduce the discharges in a regional detention pond, and convey the flows north of I-70 to an existing storm drain system.

The runoff from I-70 will be captured and conveyed in a storm drain system that discharges to the South Platte River. Prior to discharging to the South Platte River, the system will discharge to a water quality pond to provide water quality treatment. Additional detail on water quality is discussed in Section 5.16, Water Quality. **Exhibit 5.14-6** lists the impacts and mitigations associated with floodplains and drainage/hydrology.

**Exhibit 5.14-6    Summary of Floodplains and Drainage/Hydrology Impacts and Mitigations**

| Alternative | Impacts and/or Benefits | Mitigation Measures Specific to Alternatives |
|---|---|---|
| No-Action Alternative | Minimal impact to potential ponding areas due to the increased width of the viaduct, which may increase runoff from I-70 | • Create detention ponds and implement storm drainage for onsite drainage system improvements<br>• Design proposed bridge structures to cause no adverse impact to the Sand Creek floodplain |
| Revised Viaduct Alternative | • May impact the floodplain for Sand Creek since bridge construction and new bridge structures will cross this waterway<br>• Minimal impact to potential ponding areas due to the increased width of the viaduct, which may increase runoff from I-70 | |
| Partial Cover Lowered Alternative | • Impact to the Sand Creek floodplain with the proposed bridge construction and new bridge structures will cross this waterway<br>• Impact to potential ponding areas due to the increased width of the highway, which may increase runoff from I-70<br>• The potential ponding areas between Brighton Boulevard and Dahlia Street will be substantially impacted due to lowered profile of the highway | • Create detention ponds and implement storm drainage for onsite drainage system improvements<br>• Build an offsite drainage system to reduce the risk of flooding within the lowered section of I-70, as well as the portion of the watershed between I-70 and the South Platte River<br>• Design proposed bridge structures to cause no adverse impact to the Sand Creek floodplain |

This page intentionally left blank.

# 5.18    Hazardous Materials

*This section provides data on hazardous materials in the study area and explains why locating, identifying, and analyzing them is important to the project. The impacts of the project alternatives on sites that contain hazardous materials also are evaluated, then proposed mitigation measures are discussed to offset any potential adverse effects.*

Since the Supplemental Draft EIS was published in August 2014, additional analyses and content review have been performed for many of the resources discussed in this document. These updates, along with changes resulting from the comments received on the Supplemental Draft EIS, have been incorporated into this Final EIS. In this section, the updates include the following items:

- Based on the revised construction limits, impacts were updated.

- Additional subsurface investigation reports were reviewed; this revealed additional impacts to soil and groundwater, which are discussed in detail.

- Subsurface investigations were conducted along I-70 between I-25 and I-270; this revealed additional impacts to groundwater, which are discussed in detail.

- CERCLIS NFRAP sites were evaluated, resulting in an additional three known hazardous materials sites in both the Revised Viaduct and Partial Cover Lowered Alternatives.

- The Fugitive Dust Control, Dewatering, and Asbestos-Containing Materials mitigation measures were revised.

## 5.18.1    What are hazardous materials and why are they important to this project?

Hazardous materials are solids, liquids, or gases that are harmful to human health and to the environment. Hazardous materials are likely present along the I-70 East corridor because of current or past land uses. Identified known releases of hazardous materials are primarily from leaking underground storage tanks (LUST) that released gasoline, diesel, waste oil, or other vehicle maintenance/ fuel products into the ground or the groundwater. Other identified known releases are primarily from industrial uses in the area—from hazardous substances associated with past land uses and the use and storage of hazardous waste.

Hazardous materials may impact the health and safety of construction workers, environmental resources, and

**Common contaminants**

Common contaminants identified in soil and/or groundwater include:

- Petroleum products (i.e., fuels, waste oils)

- Chlorinated solvents

- Metals

- Asbestos

community residents located within the project corridor and surrounding area. Also, encountering hazardous materials during construction can impact the cost of construction, as contaminated media generated during construction must be managed in accordance with federal and state regulations.

## 5.18.2   What study area and process were used to analyze hazardous materials?

The hazardous materials analysis uses two different search areas. One is a larger area for an environmental records search to comply with the American Society for Testing and Materials (ASTM) standards (ASTM, n.d.); hereafter, this section refers to this as the data search area. The second area—the one shown throughout this chapter on exhibits—is smaller and accounts for project ground disturbance; hereafter, referred to the study area.

The data search area, which extends between one-quarter mile and one mile from the project construction limits, is in accordance with the requirements of ASTM Standard E 1527-05, The objective was to identify specific federal and state environmental sources and search distances for each record source to be included in a Standard Environmental Record Search. The data search was completed in October 2012. Attachment H, *Hazardous Materials Technical Report*, in the 2014 Supplemental Draft EIS fully details the results of the records search.

The study area corresponds to the greatest potential extent of the project construction limits and is used to assess potential encounters with hazardous materials by project alternatives, shown in **Exhibit 5.18-1**. This area has a long history of commercial and industrial activity associated with hazardous materials.

**Exhibit 5.18-2** summarizes the database results from the search, together with the number of sites within each database the environmental records search identified within the study area.

**Environmental records search**

An environmental records search was conducted using ASTM Standard E 1527-05 search distances for environmental resources.

Databases were searched for the following resources:

- Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS)

- National Priorities List (NPL)

- Resource Conservation and Recovery Act (RCRA)

- Solid Waste Landfill (SWL)

- Voluntary Cleanup Program (VCUP)

- Underground Storage Tank (UST)

- Leaking Underground Storage Tank (LUST)

**Exhibit 5.18-1      Hazardous Materials Study Area**



Hazardous materials study area (construction limits)

**Exhibit 5.18-2      Environmental Records Search Results**

| Hazardous Material Database | Number of Sites |
|---|---|
| CERCLIS | 0 |
| CERCLIS, No Further Remedial Action Planned | 3 |
| NPL | 1 |
| RCRA, Generators (Large, Small, and Transporter) | 8 |
| RCRA, Corrective Action (CORRACTS) | 1 |
| RCRA, Treatment, Storage, and Disposal Facilities | 1 |
| SWL | 4 |
| VCUP | 1 |
| UST | 28 |
| LUST | 26 |

*Sources: Satisfi, Inc., 2012*

Two previous subsurface investigations were performed within the study area. A preliminary subsurface investigation was performed in October 2012 at the western portion of the study area, along I-70 between Brighton Boulevard and Colorado Boulevard. A subsurface investigation also was performed between March 2014 and February 2015 along I-70 between Colorado Boulevard and I-270. Soil and groundwater samples were collected and

analyzed for common contaminants, including petroleum hydrocarbons, chlorinated solvents, heavy metals, volatile organic compounds, semi-volatile organic compounds, and pesticides.

Results of the 2012 preliminary subsurface investigation are included in the 2014 Supplemental Draft EIS in Attachment H, *Hazardous Materials Technical Report*. The Supplemental Draft EIS is available for review on the I-70 East project website at www.i-70east.com. Results of the 2015 subsurface investigation report are included in Attachment H, *Hazardous Materials Technical Report Addendum,* in this document.

### 5.18.3    What are the areas of interest for hazardous materials that are being analyzed and what are their existing conditions?

The environmental records search, conducted in 2012, presented in the *Environmental FirstSearch Database Report* identified more than 1,300 sites in the data search area, of which 132 sites were located within the study area. The more significant hazardous materials sites identified in the environmental records search include Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), RCRA, Colorado VCUP, SWL, and UST/LUST sites, of which 73 sites were identified within the study area. **Exhibit 5.18-3** through **Exhibit 5.18-10** include sites within and outside of the study area identified within the data search area.

#### CERCLA Assessment and Response Program

The CERCLA Assessment and Response Program, as described in the National Contingency Plan (40 CFR Part 300), commonly known as the Superfund Program, provides a framework for identifying, evaluating, and cleaning up sites with uncontrolled hazardous substance releases from past industrial activities that pose a threat to human health and the environment. CERCLIS is the comprehensive system used to track sites under assessment or needing to be addressed, and sites where releases are currently being addressed or have been addressed. The environmental data search identified the following sites listed in CERCLIS:

- Three CERCLIS sites, as shown on **Exhibit 5.18-3** (CERCLIS sites are actively undergoing initial evaluation for contamination)

- Twenty-six CERCLIS, No Further Remedial Action Planned (NFRAP) sites, as shown on **Exhibit 5.18-4** (sites have been evaluated and no further action is planned; the EPA or CDPHE could reopen these sites at any time in the future if new information or data are made available)

- One proposed NPL site (Asarco Globe Plant) and two active NPL sites (Chemical Sales Site and Vasquez Boulevard at I-70 Site), as shown on **Exhibit 5.18-5**

CERCLIS and NPL sites are discussed in further detail in Appendices A and B of Attachment H, *Hazardous Materials Technical Report* of the Supplemental Draft EIS.

**Exhibit 5.18-3      CERCLIS Sites**



**Exhibit 5.18-4    CERCLIS, NFRAP Sites**



**Exhibit 5.18-5    NPL Sites**



### RCRA Corrective Action Program

The RCRA Corrective Action Program, administered in Colorado by CDPHE, provides the framework for the identification, evaluation, and cleanup of sites contaminated by the release of RCRA hazardous waste and waste constituents that pose a threat to human health and the environment. RCRA sites in the data search area include 32 sites, as shown on **Exhibit 5.18-6**.

RCRA Corrective Action sites are discussed in further detail in the Supplemental Draft EIS in Appendix C of Attachment H, *Hazardous Materials Technical Report*.

**Exhibit 5.18-6      RCRA Corrective Action Sites**



### Solid Waste Landfill and Voluntary Cleanup Program

The Solid Waste and Materials Management Program, which is administered by CDPHE's Hazardous Materials and Waste Management Division, regulates SWLs. SWL locations in the data search area include six sites and 40 areas, as shown on **Exhibit 5.18-7**.

CDPHE's Hazardous Materials and Waste Management Division, VCUP, provides a framework for the evaluation and cleanup of contaminated sites that do not fall under other regulatory programs. There are three VCUP sites located within the data search area, as show on **Exhibit 5.18-8**.

SWL and VCUP sites are discussed in further detail in Appendices D and E of Attachment H, *Hazardous Materials Technical Report* of the Supplemental Draft EIS.

**Exhibit 5.18-7     Solid Waste Landfill Sites**



**Exhibit 5.18-8     Voluntary Cleanup Program Sites**



## AST, UST, and LUST Sites

The Colorado Department of Labor and Employment, Division of Oil and Public Safety, regulates petroleum products and chemical USTs and certain petroleum-containing above-ground storage tanks (ASTs). Releases must be reported to the Division of Oil and Public Safety, and investigation and cleanup must be implemented, as required. Most USTs have had a spill or leak at some point in their life cycle. Small leaks may not be identified until the UST is taken out of service and formally closed. AST, UST, and LUST sites within the data search area include 289 registered AST/UST sites and 343 LUST sites, as shown on **Exhibit 5.18-9** and **Exhibit 5.18-10**.

LUST sites are discussed in further detail in Appendix F of Attachment H, *Hazardous Materials Technical Report* of the Supplemental Draft EIS.

**Exhibit 5.18-9        Petroleum Storage Tank Locations**



**Exhibit 5.18-10    Leaking Underground Storage Tank Locations**



### 5.18.4    Are there other hazardous material regulations the project will follow?

CDPHE's Hazardous Materials and Waste Management Division regulates asbestos in soil. Regulations require awareness of the possibility of asbestos-containing building materials found in soil. If asbestos is encountered during soil disturbance activities, such as construction, the regulations require that material to be removed and disposed of in accordance with regulatory requirements. Some of the main indicators that there may be asbestos in soil include, but are not limited to:

- Any remnants of an old building (i.e., visible footings, old foundations, partial structure components, construction debris, etc.)

- Indication of historical land-filling activities

- Evidence of old utility pipelines

In addition to the many types of hazardous materials and waste sites that have been identified in the data search area, the potential exists for currently unknown contamination. This may be due to the following factors:

- Contaminated areas associated with known sites that are not accurately identified because of factors such as contaminant migration, or limitations in the ability to determine the extent of contamination

- New contamination sites that have occurred because of recent activities

- Old contamination sites for which records do not exist, or which were not identified previously

## 5.18.5   How do the project alternatives potentially encounter hazardous materials?

Construction of the proposed alternatives will likely encounter sites contaminated by hazardous materials. Construction activities associated with the alternatives have the potential to release hazardous materials at these locations into soil or groundwater. They could also lead to exposure of workers or the public to these materials if proper health, safety protocols are not followed and remediation efforts are not applied.

The likelihood of impacting hazardous materials is dependent on the number of hazardous materials sites encountered during construction. In addition, the location and amount of contamination remaining at the site also will dictate impacts.

Encounters with hazardous materials are proportional to the amount of ground disturbance. For example, a larger area of land disturbed is likely to increase encounters with hazardous material sites, leading to a greater impact. Alternatives that incorporate subsurface improvements versus at-grade improvements also have a higher potential to encounter hazardous materials, soils, and/or groundwater at greater depths.

The No-Action Alternative will potentially disturb approximately 41 acres of land and encounter seven known hazardous materials sites.

The Revised Viaduct Alternative, North Option (General-Purpose Lane Option) will potentially encounter 25 known hazardous materials sites, while the Revised Viaduct Alternative, South Option (General-Purpose Lane Option) will potentially encounter 24 sites. Both North and South Options disturb approximately 575 acres of land. This is a larger potential impact to hazardous materials than the No-Action Alternative. Replacing the General-Purpose

**Summary of encounters with hazardous materials sites by alternative**

No-Action Alternative:

- 7 hazardous materials sites affected

Revised Viaduct Alternative:

- North—25 hazardous materials sites affected

- South—24 hazardous materials sites affected

Partial Cover Lowered Alternative (General-Purpose and Managed Lanes Options):

- 28 hazardous materials sites affected

Lanes Option with the Managed Lanes Option would increase land disturbance by an additional 83 acres. No additional known hazardous materials sites would be encountered with the Managed Lanes Option.

The Partial Cover Lowered Alternative (General-Purpose and Managed Lanes Options) will potentially encounter 28 hazardous materials sites, an approximate 19-percent increase in sites compared to the Revised Viaduct Alternative. The Partial Cover Lowered Alternative, General-Purpose Lanes Option will potentially disturb approximately 620 acres of land, an approximate 7-percent increase in land area impact compared to the Revised Viaduct Alternative, General-Purpose Lanes Option.

The Partial Cover Lowered Alternative, Managed Lanes Option will potentially disturb approximately 703 acres of land, an approximate 22-percent increase in land area impact compared to the Revised Viaduct Alternative, General-Purpose Lanes Option, and a 13-percent increase in land area impact compared to the Partial Cover Lowered Alternative, General-Purpose Lanes Option. Additionally, lowering the highway will impact soil and/or groundwater at greater depths than the No-Action Alternative and Revised Viaduct Alternative. Disturbing greater volumes of soil and/or groundwater increases the potential to encounter hazardous materials, both documented and undocumented.

The Managed Lanes Option for both the Revised Viaduct Alternative and the Partial Cover Lowered Alternative increases the ground disturbance by approximately 83 acres due to a large construction footprint; however, the number of known hazardous materials sites identified within the construction footprints will not increase. Additional ground disturbance may result in a greater likelihood to encounter hazardous materials. Since this area has been previously developed, undocumented contaminants may be disturbed during construction activities. Potential encounters with known hazardous materials sites and area of ground disturbance by alternative or option is summarized in **Exhibit 5.18-11**.

**Exhibit 5.18-11    Summary of Potential Hazardous Materials Sites and Area of Ground Disturbance Impacted by Project Alternatives**

| Alternative/Option | Number of Known Hazardous Materials Sites | Area of Ground Disturbance (acres) |
|---|---|---|
| No-Action Alternative | 7 | 41 |
| **Build Alternatives, General-Purpose Lanes Option** | | |
| Revised Viaduct Alternative, North Option | 25 | 575 |
| Revised Viaduct Alternative, South Option | 24 | 575 |
| Partial Cover Lowered Alternative | 28 | 620 |
| **Build Alternatives, Managed Lanes Option** | | |
| Revised Viaduct Alternative, North Option | 25 | 658 |
| Revised Viaduct Alternative, South Option | 24 | 658 |
| Partial Cover Lowered Alternative | 28 | 703 |

## Specific facilities of concern likely to be encountered by alternatives

The I-70 and Vasquez Boulevard NPL site has been identified within all the proposed alternatives. NPL sites are likely to have a greater effect on the alternatives. The level of effect depends on the level of hazardous materials contamination remaining at the site, as well as the location of the contamination relative to the right of way/construction footprint.

The site was placed on the NPL because of metals contamination identified in soil and groundwater associated with historic smelter operations. Remediation activities have occurred at the site. Soil and groundwater contamination (lead and arsenic) at this site have not been fully characterized. Construction activities associated with the proposed alternatives will likely encounter the contaminants identified at the NPL site.

An NPL site (Chemical Sales Company) has been identified adjacent to and north of all the proposed alternatives. Chemical Sales Company was a wholesale distributor of commercial and industrial chemicals, detergents, and pool chemicals. Contaminants of concern in soil and groundwater include tetrachloroethylene (PCE), trichloroethylene (TCE), and benzene.

Extensive remediation has occurred at the site. However, a groundwater plume has been identified in the shallow alluvial aquifer south of Sand Creek, which is located approximately one mile north of the proposed alternatives. Groundwater flow generally moves north to northwest, away from the alternative footprints. Paleochannels in the alluvium influence regional flow, at times resulting in flow patterns that are different from the regional flow. Contaminants associated with the NPL site may be encountered during construction of the alternatives.

An NPL site (ASARCO, Inc.) is located northwest of the proposed alternatives. ASARCO, Inc. was a heavy-metal smelter and refining facility. Contaminants of concern in soil and groundwater at the facility include cadmium, arsenic, lead, and zinc. Groundwater flow generally moves north to northwest, away from the alternative footprints. However, similar to the Chemical Sales Company facility, paleochannels in the alluvium influence regional flow, at times resulting in flow patterns that are different from the regional flow. Therefore, contaminants associated with the NPL site may be encountered during construction of the alternatives. NPL sites are discussed in further detail in the Supplemental Draft EIS in Appendices A and B of Attachment H, *Hazardous Materials Technical Report*.

Multiple closed LUST sites have been identified within all highway alternatives. Since these facilities have been issued closure/No Further Action notices, they are expected to have minor effects during the construction phase. The hazardous materials contamination at these sites has been removed or remediated to meet state or federal action levels; however, low levels of residual contamination may remain in soil and groundwater at the sites. In some cases, unknown contamination not identified during the previous site investigations may be present. LUST sites are discussed in further detail in the Supplemental Draft EIS in Appendix F of Attachment H, *Hazardous Materials Technical Report*.

Historical landfills have been identified within the Revised Viaduct and Partial Cover Lowered Alternatives. Recent subsurface investigation at the Denver Coliseum—a historical landfill that overlaps the I-70 and Vasquez Boulevard NPL site—has identified chloroform, PCE, TCE, manganese, iron, arsenic, hexavalent chromium, and cadmium in groundwater that exceed standards. Hazardous materials also have been identified in soils in this area, including asbestos-containing materials (ACM), arsenic, and

landfill gas at levels that can result in a potential explosion hazard during construction. Construction activities associated with all of the proposed alternatives will likely encounter the contaminants at this site. The Partial Cover Lowered Alternative will likely encounter these contaminants to a greater extent based on the location of the Globeville outfall specific for this alternative.

Subsurface investigations conducted along I-70 between I-25 and I-270 identified contaminants, including metals, semi-volatile organic compounds (SVOCs), and VOCs in groundwater at levels that exceed permitted standards. Hydrocarbons and arsenic also were identified in soil at levels above regulatory standards. The subsurface investigations are discussed further in Attachment H, *Hazardous Materials Technical Report Addendum* of this document.

Effects of hazardous materials and waste also are associated with runoff of contaminants in stormwater. Contaminants likely to be in stormwater runoff include fuel and lubricants, metals, compounds from tires, and automobile engine coolants. Additional operational effects may include herbicide use for weed control and magnesium chloride for de-icing operations.

## 5.18.6   What are the impacts to hazardous materials during construction?

Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination. Standard construction measures for fugitive dust control and stormwater erosion and sediment controls minimize the spread of contaminated soil. Some sites, particularly NPL sites, may have onsite repositories for contaminated soil and debris, active soil vapor extraction systems, or active groundwater remediation systems, including groundwater-monitoring wells. Disturbance of these structural controls by construction activities can result in the release of hazardous materials contamination, as well as additional costs if the impacted controls must be replaced in kind.

Metals and VOCs that exceed regulatory standards (expected permit limits) have been identified in groundwater. Construction activities for any of the alternatives would require dewatering and associated permitting if contaminated groundwater is encountered during construction. Dewatering activities include treating and discharging water onsite or characterizing and removing

water offsite to a permitted disposal facility, resulting in increased construction costs. The dewatering activities would be more substantial for the Partial Cover Lowered Alternative because the excavation will reach below groundwater elevation. In addition, permanent dewatering may be required for this alternative since a portion of the below-grade section will be constructed below groundwater elevation, potentially resulting in additional post-construction costs for this alternative.

Construction at hazardous materials sites also may affect the construction budget and schedule. Construction activities may require the offsite disposal of contaminated soil and debris in permitted facilities, increasing costs. If previously unidentified contamination is found, costs and schedules both stand to be affected. The acquisition of contaminated properties may require additional site investigation and monitoring to evaluate site condition. Remediation at these sites may be necessary before and during the construction.

## 5.18.7   How are the negative effects from the project alternatives mitigated for hazardous materials?

Any contamination encountered during the construction of the project will be cleaned up in compliance with applicable state and federal regulations, which will benefit the area in the future. Implementation of several mitigation measures will avoid or minimize the effects of the alternatives on hazardous materials including:

- Before right-of-way acquisition, conduct a Phase I Environmental Site Assessment (Phase I) or initial site assessment for those properties identified for acquisition. Based on these assessments, additional subsurface investigation may be required depending on the recognized environmental conditions identified and potential risk to the project.

- The project will avoid contaminated sites whenever practical. However, where avoidance is not feasible, further site investigation will be required and will be coordinated with the affected property owner.

- Follow *CDOT Standard Specifications for Road and Bridge Construction*, Section 250, Environmental, Health and Safety Management.

- Follow Tri-County Health Department Health and Safety Practices during Construction on or Near Former Landfills.

- Conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any building structures and bridges or elevated structures; if these materials are encountered, remove them in accordance with applicable regulations and guidelines. If ACM is encountered, including buried utilities, follow CDOT Specification 250.07, Asbestos-Containing Material Management and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure. Additionally, depending on the type of ACM, clean up this material in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations.

- Update contaminated sites search databases to reflect most recent records.

Additionally, the following construction mitigation measures will avoid or minimize the effects of the alternatives on hazardous materials including:

- Prepare and implement a project-specific Health and Safety Plan and Materials Management Plan to address potential hazardous materials that are encountered during construction; these plans will consist of specific measures to protect worker and public health and safety, as well as programs to manage contaminated materials during construction.

- In the event that unknown contaminated media is encountered during construction, stop working until the contamination is properly evaluated and measures are developed to protect worker health and safety in accordance with the project-specific Health and Safety Plan and Materials Management Plan.

- Implement standard construction measures for fugitive dust control, as well as stormwater erosion and sediment controls, to minimize the spread of contaminated soil. During the construction phase, require the contractor to file and abide by a dust management plan to minimize the effects of dust on surrounding communities. Additionally, conduct air monitoring to determine whether dust control efforts are successful in preventing violations of air quality standards.

- The contractor will obtain a CDPHE CDPS Construction Dewatering Permit, Remediation Activities Discharging to Surface Water Permit or Construction Activities Discharging to Ground Water Permit, as required, utilizing readily available data. The selected contractor will follow the permit requirements.

- The Partial Cover Lowered Alternative (both options) will require excavation below existing groundwater. If this alternative requires permanent dewatering, obtain and follow the necessary CDPS Dewatering Permits. Under the temporary construction and permanent feature dewatering permits, treat and discharge source water onsite in accordance with the permit or characterize and remove source water offsite to a permitted disposal facility.

- Properly abandon and close monitoring wells or septic systems disturbed during construction activities in accordance with applicable regulations and guidelines. If existing monitoring wells are impacted during construction, the project will replace them, as necessary.

**Exhibit 5.18-12** lists the impacts and mitigations associated with hazardous materials.

**Exhibit 5.18-12    Summary of Hazardous Materials Impacts and Mitigations**

| Alternative/ Option | Impacts and/or Benefits | Mitigation Measures Applicable to All Alternatives |
|---|---|---|
| No-Action Alternative | • 7 hazardous materials sites affected<br>• 41 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Before right-of-way acquisition, conduct a Phase I Environmental Site Assessment (Phase I) or initial site assessment for those properties identified for acquisition; based on these assessments, additional subsurface investigation may be required depending on the recognized environmental conditions identified and potential risk to the project<br>• Avoid contaminated sites wherever practical; where unavoidable, initiate further site investigation and coordination with affected property owners<br>• Follow *CDOT Standard Specifications for Road and Bridge Construction,* Section 250, Environmental, Health and Safety Management<br>• Follow Tri-County Health Department *Health and Safety Practices during Construction on or Near Former Landfills* |
| Revised Viaduct Alternative, General-Purpose Lanes Option | • 24 to 25 hazardous materials sites affected<br>• 575 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any building structures and bridges or elevated structures; if these materials are encountered, remove them in accordance with applicable regulations and guidelines; if ACM is encountered, including buried utilities, follow CDOT Specification 250.07, Asbestos-Containing Material Management and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure; additionally, depending on the type of ACM, clean up this material in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations<br>• Update contaminated sites search databases to reflect most recent records |
| Revised Viaduct Alternative, Managed Lanes Option | • 24 to 25 hazardous materials sites affected<br>• 658 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Prepare and implement a project-specific Health and Safety Plan and Materials Management Plan to address potential hazardous materials that are encountered during construction; these plans will consist of specific measures to protect worker and public health and safety, as well as programs to manage contaminated materials during construction<br>• In the event that unknown contaminated media is encountered during construction, stop working until the contamination is properly evaluated and measures are developed to protect worker health and safety in accordance with the project-specific Health and Safety Plan and Materials Management Plan |

**Exhibit 5.18-12    Summary of Hazardous Materials Impacts and Mitigations**

| Alternative/ Option | Impacts and/or Benefits | Mitigation Measures Applicable to All Alternatives |
|---|---|---|
| Partial Cover Lowered Alternative, General-Purpose Lanes Option | • 25 hazardous materials sites affected<br>• 620 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Implement standard construction measures for fugitive dust control, as well as stormwater erosion and sediment controls, to minimize the spread of contaminated soil; during the construction phase, require the contractor to file and abide by a dust management plan to minimize the effects of dust on surrounding communities; additionally, conduct air monitoring to determine whether dust control efforts are successful in preventing violations of air quality standards<br>• Obtain a CDPHE CDPS Construction Dewatering Permit, Remediation Activities Discharging to Surface Water Permit or Construction Activities Discharging to Ground Water Permit, as required, utilizing readily available data; the selected contractor will follow the permit requirements |
| Partial Cover Lowered Alternative, Managed Lanes Option | • 28 hazardous materials sites affected<br>• 703 acres of land disturbed<br>• Extensive excavation through a known landfill that contains contaminants<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Obtain and follow the necessary CDPS Dewatering Permits if this alternative requires permanent dewatering; under the temporary construction and permanent feature dewatering permits, treat and discharge source water onsite in accordance with the permit or characterize and remove source water offsite to a permitted disposal facility<br>• Properly abandon and close monitoring wells or septic systems disturbed during construction activities in accordance with applicable regulations and guidelines; if existing monitoring wells are impacted during construction, the project will replace them, as necessary |



# CHAPTER 6: CUMULATIVE IMPACTS

*A cumulative impacts analysis considers all aspects of the environment affected by project alternatives in the context of other past, present, and reasonably foreseeable future actions in an area. The analysis identifies topics and areas where the project alternatives may contribute incrementally to impacts over time.*

Since the Supplemental Draft EIS was published in August 2014, additional analyses and content review have been performed for many of the resources discussed in this document. These updates, along with changes resulting from the comments received on the Supplemental Draft EIS, have been incorporated into this Final EIS. In this chapter, the updates include the following items:

- Additional foreseeable future actions identified in recently completed plans and investment programs were incorporated.

- Additional contextual information was included.

## 6.1    What are cumulative impacts and why are they important to this project?

Cumulative impacts are: "The impact on the environment which results from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (CEQ, 1978).

## 6.2    What resources, study areas, and methods are included in this cumulative impacts analysis?

Environmental resources that are analyzed for cumulative impacts were identified through scoping and by the degree to which the resources are directly impacted, as documented in Chapter 5, Affected Environment, Environmental Consequences, and Mitigation. Formal scoping for this project began in 2003, as detailed in Chapter 10, Community Outreach and Agency Involvement. **Exhibit 6-1** summarizes resources identified for cumulative impacts analysis through scoping and direct impact analysis and contains the rationale for their inclusion in the cumulative impacts assessment, in addition to their potential to contribute to cumulative impacts.

Cumulative impact study areas vary by resource. Study areas are determined by the individual resource to ensure that cumulative impact analyses consider all relevant factors in a boundary that is logical and appropriate to a particular resource. For example, the boundary required to assess cumulative impacts to air quality is different than the boundary used to examine stormwater runoff. The rationale for their geography is documented in **Exhibit 6-1**, and **Exhibit 6-2** displays these geographic boundaries for each resource.

**What are incremental impacts?**

Incremental impacts appear over time, can be minor individually, and can occur in small amounts. Collectively, however, these impacts can be substantial.

**Exhibit 6-1        Key Resources Evaluated for Cumulative Impacts**

| Resource | Basis for Inclusion | Study Area Rationale |
|---|---|---|
| Land use | This resource is included based on agency and stakeholder scoping requests and its relationship to other resources evaluated for cumulative impacts. | Agency and stakeholder scoping conducted during the EIS process determined that the land use study area (see **Exhibit 6-2**) provides adequate context for determining cumulative impacts. |
| Relocations and displacements | This resource is included because of specific public, agency, and stakeholder scoping requests, as well as the presence of direct impacts (21 to 74 potential relocations). | Agency and stakeholder scoping conducted during the EIS process determined that the relocation study area (see **Exhibit 6-2**) provides context for understanding past, present, and foreseeable future relocations and displacements. |
| Social and economic conditions | Agency and stakeholder scoping requests qualified this resource for inclusion in the cumulative analysis; additionally, the presence of direct impacts—such as barriers, relocations, and access—called for inclusion. | The study area is based on the neighborhood boundaries that are potentially impacted by project alternatives and used as analytical boundaries in Sections 5.2, Social and Economic Conditions, and Section 5.3, Environmental Justice. |
| Historic preservation | This resource is included because of the number of potential direct impacts (1 to 13 historic resources adversely affected). | This study area is based on agency and stakeholder scoping. |
| Air quality | Requests made by agencies and the general public during scoping qualified this resource for inclusion in the cumulative impacts analysis. | The study area is based on the analytical boundaries used in Section 5.10, Air Quality, to quantify impacts. |
| Noise | This resource is included based on the presence of direct impacts (up to 403 noise receptors exceed established noise thresholds with Build Alternatives, compared to 84 under existing conditions) and neighborhood concerns. | The study area is based on the neighborhood boundaries that are potentially impacted by project alternatives and used as analytical boundaries in Section 5.12, Noise. |
| Wetlands and other waters of the U.S. | Agency and stakeholder scoping requests and severity of impacts obligated this resource for inclusion. Build Alternatives permanently impact 4.352 acres to 4.442 acres of jurisdictional wetlands and 0.693 acres to 0.771 acres of other waters of the U.S. and open waters. | This study area is determined through agency and stakeholder scoping. |
| Water quality | This resource is included due to agency and stakeholder scoping requests and the severity of direct impacts (potential for ponding and flooding risks, as well as changes in water quality to South Platte River and Sand Creek). | Agency and stakeholder scoping conducted during the EIS process determined that the water quality study area (see **Exhibit 6-2**) provides adequate context for determining cumulative impacts. |
| Environmental justice | The presence of potential direct impacts through property displacements, noise, air quality, mobility, and neighborhood cohesion could be especially apparent in the minority and low-income populations. | The study area is based on the neighborhood boundaries that are potentially impacted by project alternatives and used as analytical boundaries in Sections 5.2, Social and Economic Conditions, and Section 5.3, Environmental Justice. |

**Exhibit 6-2          Cumulative Impact Resource Study Areas**



The analysis timeframe of 1960 through 2035 has been established based on scoping and stakeholder input. The year 1960 is used because it coincides with the initial planning and construction of I-70. The analysis uses the end year of 2035 because it is the forecast year for DRCOG's 2035 travel demand model origin-destination trip data.

The cumulative impacts analysis involves adding the effects of project alternatives to similar resource effects caused by other past, present, and reasonably foreseeable future actions. If the Build Alternatives have no direct or indirect impacts on a resource, then they have no cumulative impacts on that resource.

To perform a cumulative impact assessment, a baseline condition must be evaluated for each resource topic. That baseline has been identified as the impacts resulting from all other past, present, and reasonably foreseeable future projects. These are identified in Section 6.3, below. Although the No-Action Alternative typically is included in the baseline conditions, the No-Action Alternative for I-70 East has impacts and is evaluated in the cumulative discussions below.

## 6.3    What past, present, and future actions are considered?

To determine cumulative impacts, project alternatives are analyzed for their combined impact when coupled with the other past, present, and reasonably foreseeable future actions. The project team obtained information on these actions through review of local, state, and federal planning documents. It is not the intent to provide an exhaustive list of every project in each study area, but rather to provide a reasonable characterization of projects that have affected or may affect key resources being evaluated.

As a starting point, past, present, and reasonably foreseeable future actions are separated into transportation and development categories, as shown in **Exhibit 6-3** and cataloged in **Exhibit 6-4** and **Exhibit 6-5**. For the purposes of this analysis, transportation and development projects considered are large-scale projects that change either the way people move or live, or dramatically change physical geography (for example, the development of previously unused land). Generally, present and reasonably foreseeable future transportation projects are those listed in either long-range transportation plans or capital improvement programs. Local and regional land use and other comprehensive planning documents generally identify foreseeable future development projects.

**Exhibit 6-3          Transportation and Development Project Locations**



**Exhibit 6-4          Past, Present, and Future Transportation Projects**

| Exhibit 6-3 Identifier | Project | Timeframe | Description |
|:---:|---|---|---|
| 1 | I-70 | Past, 1961 | Opening of I-70 through metropolitan Denver and Aurora |
| 2 | I-270 | Past, 1968 | Opening of I-270 between I-70 to I-25, adjacent to Sand Creek |
| 3 | I-225 | Past, 1976 | Opening of three-lane highway through Aurora linking I-70 and I-25 |
| 4 | 16th Street Mall Shuttle | Past, 1982 | One-mile city street in Denver's central business district closed to private vehicles and replaced with public bus and pedestrian corridor |

**Exhibit 6-4        Past, Present, and Future Transportation Projects**

| Exhibit 6-3 Identifier | Project | Timeframe | Description |
|---|---|---|---|
| 5 | E-470 | Past, 1991 | Ten-mile circumferential toll facility connecting to I-25 north and south of the Denver metropolitan area |
| 6 | RTD Light Rail | Past, 1994 | First light rail line, from I-25 and Broadway to the Auraria Campus |
| 7 | Peña Boulevard | Past, 1995 | Construction of Peña Boulevard, providing access to DIA from I-70 via more than 10 miles of divided roadway |
| 8 | DIA | Past, 1995 | Development of international airport northeast of metropolitan Denver. |
| 9 | I-70 Viaduct Replacement | Past, 2003/09 | Viaduct replaced from Washington Street to Brighton Boulevard |
| 10 | Colorado Boulevard Bridge Replacement | Past, 2005 | Safety and capacity improvement 0.8 mile north of I-70 |
| 11 | I-25 High-Occupancy Vehicle | Past, 2006 | High-occupancy vehicle lane conversion to high-occupancy vehicle/toll—20th Street to US 36 |
| 12 | 56th Avenue | Past, 2010 | Road widening for new through lanes from Quebec Street to Havana Street |
| 13 | US 36 Bus Rapid Transit Corridor | Past, 2010 | Bus rapid transit and roadway improvements between Denver and Boulder along US 36; Phase 1 is complete |
| 14 | Central Park Boulevard | Past, 2012 | New I-70 interchange at Central Park Boulevard. |
| 3 | I-225 Widening | Past, 2014 | Widening of I-225 between I-25 and I-70. |
| 15 | Denver Union Station | Past, 2014 | Expansion of major intermodal center in downtown Denver connecting regional corridors |
| 16 | RTD West Corridor (Transit) | Present | Twelve-mile commuter rail line between downtown Denver and Golden |
| 17 | RTD I-225 (Transit) | Present | Approximately 11-mile transit line connecting Southeast Corridor and East Corridor though Aurora |
| 18 | RTD East Corridor (Transit) | Present | Twenty-three-mile commuter rail line between Denver and DIA |
| 8 | DIA terminal expansion | Present | New terminal, commuter rail station, and hotel |
| 19 | Peoria Street-Smith Road area improvements | Present | Peoria Street-Smith Road commuter rail related road, crossing, bike, and pedestrian access improvements |
| 20 | North Metro commuter rail, Segment One | Present | First segment of the North Metro commuter rail line from Denver Union Station to 124th Avenue in Northglenn |

**Exhibit 6-4          Past, Present, and Future Transportation Projects**

| Exhibit 6-3 Identifier | Project | Timeframe | Description |
|---|---|---|---|
| 21 | RTD Gold Line (Transit) | Present | Approximately 11-mile electric commuter rail transit corridor from Denver Union Station to the vicinity of Ward Road in Arvada |
| 22 | Tower Road | Present | Roadway widening from Colfax Avenue to 48th Avenue |
| 23 | RTD Northwest Corridor, Segment One (Transit) | Present | Six-mile commuter rail line between Denver Union Station and Westminster |
| 24 | RTD Central Corridor (Transit) | Future | One-mile transit extension from 30th Avenue/Downing Street to East Corridor alignment |
| 25 | I-270 | Future | Capacity improvements from Vasquez Boulevard to Quebec Street |
| 8 | DIA expansion | Future | Adding capacity through new runways, de-icing facilities, concourse space, parking, cargo facilities, and air traffic control tower |
| 26 | Brighton Boulevard | Present, Future | Construct critical public infrastructure (e.g., cycle track, sidewalks, curb/gutter, on-street parking) helping develop gateway to Denver. |

*Source: Statewide Transportation Improvement Program, DRCOG Transportation Improvement Plan, Denver Six-Year Capital Improvement Plan, Commerce City Capital Improvement Program*

**Exhibit 6-5          Past, Present, and Future Development Projects**

| Exhibit 6-3 Identifier | Project | Timeframe | Description |
|---|---|---|---|
| 1 | Skyline Redevelopment | Past, 1969 to 1977 | Redevelopment of 30 blocks of the old Central Business District |
| 2 | Auraria Campus | Past, 1969 to 1974 | Construction of a higher education center over former residential neighborhood |
| 3 | National Western Stock Show | Past, 1973, 1991, 1995, Present, Future | Expansion of National Western Complex to more than 600,000 square feet of developed facilities. Redevelopment and expansion of the 95-acre National Western Complex site |
| 4 | Downtown Redevelopment | Past, Present, Future | Addition of 47,000 jobs and 21,000 households in downtown Denver from 2000 to 2020 |
| 5 | Prairie Gateway Development | Past, Present | Development of 900 acres of the former Rocky Mountain Arsenal National Wildlife Refuge property to an entertainment/ commercial retail complex |

**Exhibit 6-5        Past, Present, and Future Development Projects**

| Exhibit 6-3 Identifier | Project | Timeframe | Description |
|---|---|---|---|
| 6 | Stapleton Redevelopment | Past, Present | Redevelopment of former Stapleton airport site into mixed-use commercial and residential land uses |
| 7 | Green Valley Ranch | Present | Development of more than 5,000 acres featuring a complete town center, 500 acres of open space, commercial development, and residential neighborhoods |
| 8 | Gateway Park | Present | Addition of between 34,000 and 65,000 new residents and more than 54 million square feet of commercial space |
| 9 | Fitzsimons | Present | Redevelopment of 570 acres, anchored by the 227-acre University of Colorado Health Sciences Center and 160-acre Colorado Bioscience Park in Aurora; at build-out, employment is expected to exceed 32,000 jobs |
| 10 | Reunion | Present | A new 3,000-acre development northeast of the Rocky Mountain Arsenal National Wildlife Refuge offering full range of retail, industrial, office, and residential |
| 11 | Majestic Commercenter | Present | Development of 15 million square feet of industrial and warehousing space on 1,200 acres |
| 12 | Denver Union Station | Present | Development of 1.8 million square feet in lower downtown Denver coupled with multi-modal improvements to the transit hub |
| 13 | Denver Connection | Present | Addition of 400 acres of mixed-use development of high- and low-rise office, hospitality, research and development, industrial, retail, and residential buildings |
| 14 | High Point Development | Present | A mixed-use development covering 2,000 acres with plans for 3,000 residential units and more than 11 million square feet of commercial space |
| 15 | Denver International Business Center | Present | Development of 450 acres for high-end business hotels, corporate headquarters, and restaurants |
| 16 | Transit-oriented Development | Present, Future | Increased mix-use (re)development near transit stations |
| 17 | Eastgate | Future | Future location of 350-acre warehousing and office complex |
| 18 | ProLogis Park | Future | Future location of 2.7 million square feet of industrial space on 260 acres |
| 19 | Mile High Greyhound Park Redevelopment | Future | 65 acres owned by Commerce City Urban Renewal Authority for future development |
| 20 | Denver Two Basin Drainage Project | Future | 120 acres for protecting existing and future development from 100-year floods. |

*Source: Area comprehensive plans, 2035 DRCOG Metro Vision Plan.*

## 6.4    What are the anticipated cumulative impacts?

The discussion below assesses and documents cumulative impacts for the resources summarized in **Exhibit 6-1**. Other past, present, and future actions documented in **Exhibit 6-4** and **Exhibit 6-5** provide the baseline from which No-Action Alternative impacts and Build Alternatives impacts are assessed.

### 6.4.1    Land use

Land use has changed dramatically in the greater cumulative impacts study area since 1960. For purposes of this analysis, historic development is defined in two ways: (1) development activity as measured by years in which homes were built, and (2) land use changes as measured by land cover analysis and identification of major projects.

Generally, development has increased over the past four decades. In the 1960s, development activity within the land use and development cumulative impacts study area occurred primarily in and around Denver's central business district and near the newly constructed I-70 and I-270. The 1970s marked the beginning of new suburban development, including Montbello in the east and other planned communities in the northwest. The 1980s, however, were heavily affected by economic slowing with little new development or redevelopment in Denver's urban areas.

Still affected by economic conditions of the 1980s, the early 1990s were initially characterized by slow growth, but growth increased markedly through the decade. Influenced heavily by the construction of Denver's new international airport in the northeast and plans for redevelopment of the former Stapleton Airport, 1990 marked the beginning of increased development in the east as well as redevelopment within Denver's central business district. This development and redevelopment trend continued through the early 2000s, but slowed through the nationwide economic recession of December 2007 to June 2009. Recovery has been steady since mid-2009 and remains ongoing.

The number of homes built since 1960 also measures development activity. By this measure, development activity has increased 254 percent in study area neighborhoods (neighborhoods are indicated in **Exhibit 6-2**) from 1960 to 2010, as illustrated in **Exhibit 6-6**.

**Degree of impact**

This cumulative impacts analysis examines direct and indirect impacts occurring as a result of project alternatives and how they affect resources of concern. These impacts can build on each other—they do not always result in a one-to-one relationship. Instead, they can compound the degree of impact.

Development and redevelopment is expected to continue into the foreseeable future. As indicated in **Exhibit 6-5**, numerous large-scale residential, commercial, hotel, and mix-use development projects are planned throughout the land use study area. Foreseeable future development-related projects immediately adjacent to I-70 East include:

- **National Western Complex.** Expansion of the 95-acre National Western Complex includes more than 600,000 square feet of developed facilities.

- **Transportation-oriented development.** Surrounding new transit stations, increased mix-use (re)development is planned. Transit oriented development immediately adjacent to I-70 East include the National Western Stock Show, 40th and Colorado, Central Park Boulevard, Peoria and 40th, and Airport stations.

- **Two Basin Drainage Project.** To protect current and future development from 100-year floods, approximately $134 million in drainage improvements will be made near I-70 East (see **Exhibit 6-5**). The project requires approximately 120 acres of property acquisition.

**Exhibit 6-6        Total Neighborhood Home Quantities, 1960 to 2010**



*Source: U.S. Census Bureau, 2011b*
*Note: This term is used to describe a small portion of Aurora that is included in the land use study area, as illustrated in **Exhibit 6-2**.*

In addition to the future actions discussed in Section 6.3, above, future land use also is discussed in Section 5.4, Land Use. Exhibit 5.4-7 identifies three planned "Areas of Change" that are linked by I-70. Areas of Change represent parts of Denver where change is underway, desirable, and will benefit from increased population, economic activity, and investment.

### Impacts

Cumulative impacts to land use are evaluated based on a project alternative's ability to induce unplanned development and its likelihood to add to other unplanned development caused by the other foreseeable future projects. Induced development is possible when alternatives require highway access points where there currently are none or when new highway access points are planned for low-density or undeveloped areas, since these areas are more susceptible to new growth brought on by project implementation. The distinction between planned and unplanned development is made because land use change is not inherently detrimental if it is part of a predetermined vision and is formally planned for in state and municipal plans. Conversely, unplanned development may impact surrounding land uses or impede regional and local planning objectives.

Project alternatives are not anticipated to cause unplanned development because no new highway access points are planned in areas where there currently are none or in low-density or undeveloped areas. Therefore, project alternatives will not contribute to cumulative land use impacts. As discussed in Section 5.4, Land Use, I-70 East improvements and continued I-70 mobility are cited and relied upon in municipal and CDOT long-range planning documents.

When combined with other past, present, and reasonably foreseeable future transportation projects (see **Exhibit 6-4** for a full list of projects), the Build Alternatives will improve future mobility more than the No-Action Alternative will. The improved mobility will support developing urban centers, such as the Stapleton and Gateway Neighborhoods, as well as the Elyria and Swansea Neighborhood and other well-established neighborhoods in the study area. Neighborhoods in the study area are expected to benefit from the reduced congestion levels provided by the project alternatives in combination with past, present, and foreseeable development because an aspect of building and maintaining viable neighborhoods relies on efficient transportation access and mobility.

### Summary

In summary, when combined with other past, present, and reasonably foreseeable future projects, project alternatives will not substantially contribute to cumulative land use impacts in the study area.

## 6.4.2       Relocations and displacements

Extensive land and infrastructure development-related right-of-way acquisitions and relocations have occurred in the study area over the past 50 years. In the 1960s, transportation projects—including I-70 and I-270—required large-scale relocations. Just outside of the relocations and displacements study area identified in **Exhibit 6-2**, major development relocations occurred in the Auraria Neighborhood (1969) to accommodate Denver's higher education campus. The new campus displaced 169 acres of largely low-income, Latino residential neighborhoods. Widespread right-of-way acquisitions occurred in the 1970s as part of the "Skyline" urban renewal effort where 30 downtown city blocks were designated for demolition in hopes of sparking redevelopment. The Rocky Mountain Arsenal's 1992 conversion into a national wildlife refuge prompted Denver to annex 2,000 acres of agricultural land for the future development of the Gateway area. Through intergovernmental agreement, 27,500 acres of largely agricultural and rural residential land was identified as the "Commerce City Annexation Area" to be developed around DIA. Residential acquisitions and relocations near I-70 were associated with the expansion of the National Western Complex Hall of Education (1973), Expo Hall (1991), and Events Center (1995).

Foreseeable future right-of-way acquisitions will occur through the implementation of the *National Western Center Master Plan* and the Two Basin Drainage Project. The *National Western Center Master Plan* recommends purchasing available land for expansion improvements. Drainage improvements and protection from flooding, as part of the Two Basin Drainage Project, will require the acquisition of nearly 120 acres of industrial, commercial, and residential property.

### Impacts

Cumulative relocation impacts exist in cases where foreseeable future projects cause relocations to occur in the same area and timeframe. In these situations, projects may

**Land use**

Project alternatives will not substantially contribute to land use-related cumulative impacts.

have to compete to relocate businesses or residences in suitable (nearby and equivalent) locations while not exceeding available housing stock. Relocations due to project implementation are, therefore, considered with other foreseeable future projects for their combined, cumulative impact. This type of cumulative relocation impact is not expected from the project alternatives because relocations will not occur within the same timeframe as other foreseeable projects illustrated in **Exhibit 6-3** that also have potential right-of-way acquisitions and relocations. Also, housing stock based on 2010 Census data exceeds the potential relocation need that will be created by the project alternatives.

Mitigation for federally funded projects requires strict adherence to the Uniform Act, which requires that just compensation be provided to any residential property owner or business owner and that relocation assistance be provided to any owner occupant, renter, or business that is displaced due to the acquisition of property by a public entity for public use.

### *Summary*

When combined with other past, present, and reasonably foreseeable future projects, project alternatives will not substantially contribute to cumulative relocations and displacements impacts because the proposed project schedule does not overlap with other relocation-intensive project timetables or exceed available housing stock. In addition, compliance with the Uniform Act will minimize the project's contribution to incremental impacts related to property acquisition.

**Relocations and displacements**

Project alternatives will not contribute to relocation and displacements-related cumulative impacts.

### 6.4.3    Social and economic conditions

Public outreach and research conducted on behalf of this project indicates that past projects have impacted neighborhood cohesion within the study area. The residential communities of Elyria and Swansea, Globeville, and Northeast Park Hill became bisected when I-70 was originally constructed in the early 1960s. During these early I-70 years, areas along the interstate urbanized with commercial and industrial uses that benefitted from being close to the highway. While Denver's central business district and the neighborhoods immediately surrounding downtown have seen redevelopment in the past 30 years, other neighborhoods immediately adjacent to I-70 have not benefitted from this urban renewal.

Into the foreseeable future, existing transportation corridors are expected to be improved in response to increasing travel demand. Many of these improvements will occur in communities that have been affected by past transportation projects, including I-70. The following communities affected by past projects are likely to experience future transportation project expansion:

- Globeville, which will experience additional future activity from these projects: I-70 East, East Corridor (commuter rail transit), US 36 Corridor (bus rapid transit), Brighton Boulevard corridor redevelopment, and North Metro Corridor (commuter rail transit).

- Elyria and Swansea, which will experience additional future activity from these projects: I-70 East, Brighton Boulevard corridor redevelopment, North Metro Corridor, East Corridor, and station and redevelopment activities at National Western Center.

- Five Points Neighborhood, which will experience additional future activity from these projects: North Metro Corridor, East Corridor, and Central Corridor/Downing Street Extension (light rail transit).

### Impacts

The No-Action Alternative will not contribute to the viability of local and regional communities since it will not add much-needed mobility. The No-Action Alternative will further affect historically impacted neighborhoods along I-70 through property acquisitions. Property acquisitions can have additive effects on neighborhood cohesion through the removal of homes and businesses, which causes loss of neighborhood consistency. Because of the No-Action Alternative's limited revisions, the requirements of the Uniform Act, and the availability of housing stock, these acquisitions will add to, but will be less severe than, displacements of the past.

The No-Action Alternative will not improve long-term mobility. As traffic volumes and travel times increase on I-70, congestion will increase on adjacent neighborhood roads when motorists and truck traffic seek alternate routes east and west. In turn, this will adversely affect social and economic conditions by impacting pedestrian safety, increasing pollution, delaying emergency services, lowering commercial patronage, hindering mobility and access, and increasing local street noise. These effects will be felt most in densely populated communities adjacent to I-70, including

Globeville, Elyria and Swansea, Northeast Park Hill, Stapleton, and Montbello.

Future regional mobility provided by the Build Alternatives and other foreseeable future transportation projects support the viability of new communities and the sustainability of existing neighborhoods, unlike the No-Action Alternative. All of the Build Alternatives will contribute to the collective positive effects of other foreseeable future transportation projects to maintain or enhance regional connectivity. The Partial Cover Lowered Alternative provides neighborhood cohesion benefits by removing the viaduct, lowering the highway, and adding a cover over the highway to be used as public community space.

Like the No-Action Alternative, property acquisitions necessary for the Build Alternatives will impact historically affected neighborhoods adjacent to I-70. As the Build Alternatives require more properties and housing relocations than the No-Action Alternative, the cumulative impacts are greater in this scenario.

### Summary

Communities throughout the region rely on sufficient mobility to maintain social and economic conditions. Only the Revised Viaduct Alternative and the Partial Cover Lowered Alternative provide this regional mobility. Property acquisitions required by all alternatives impact social and economic conditions in historically impacted communities immediately adjacent to I-70. However, the Build Alternatives do so to a greater degree because of their larger footprints. Since the reconstructed viaduct will have a larger footprint, the Revised Viaduct Alternative has the potential to add to past social and economic condition cumulative impacts that resulted from constructing the original I-70 viaduct in the 1960s. However, the Partial Cover Lowered Alternative provides neighborhood cohesion benefits by removing the viaduct, lowering the highway, and adding a highway cover for use as a public community space.

Although the Partial Cover Lowered Alternative requires the greatest number of acquisitions, removing the viaduct, lowering the highway, and adding a cover over the highway to be used as public community space will improve neighborhood cohesion by reconnecting communities bisected by I-70 since its construction in 1960. Therefore, potential impacts to social and economic conditions from the Partial Cover Lowered Alternative are anticipated to be

> **Social and economic conditions**
>
> Project alternatives will not contribute substantially to social and economic conditions cumulative impacts.

offset and not contribute substantially to cumulative impacts. Regardless of the alternative, any residential owner/occupant, renter, or business that is displaced receives assistance.

In summary, when combined with other past, present, and reasonably foreseeable future projects, project alternatives will not substantially contribute to social and economic conditions cumulative impacts.

## 6.4.4    Historic preservation

Public outreach and research conducted for this study indicates that past projects have impacted neighborhood cohesion within the study area. The residential communities of Elyria and Swansea, Globeville, and Northeast Park Hill became bisected when I-70 was originally constructed in the early 1960s which also supported the growth of large-scale commercial operations along the interstate. In the 1960s, transportation projects—including I-70—required residential and commercial relocations. Residential acquisitions and relocations near I-70 were associated with the expansion of the National Western Complex Hall of Education (1973), Expo Hall (1991), and Events Center (1995). During these early I-70 years, areas along the interstate urbanized with commercial and industrial uses that benefitted from being close to the highway.

While Denver's central business district and the neighborhoods immediately surrounding downtown have seen redevelopment in the past 30 years, other neighborhoods immediately adjacent to I-70 have not experienced this urban renewal or investment in their significant historic districts. The relationship between socioeconomics, neighborhood cohesion, land use, right-of-way acquisition, noise, public infrastructure, and historic resources has been weak in the Elyria and Swansea Neighborhood. Even though the neighborhood has a number of significant historic resources, there has been very little effort prior the I-70 East project to better understand the history or to preserve or save buildings that are threatened. In addition, very little investment has been made in the historic resources in the neighborhood, either through grant-funded preservation projects or by supporting the continued usage of older buildings as residences or as viable businesses or restaurants. The cohesion of the neighborhood has been negatively impacted by the location of the viaduct, which is a barrier for residents who want to travel within the

neighborhood, including access to the Swansea Elementary School or local businesses.

## Impacts

Subsection 800.5 of the Section 106 regulations (36 CFR Part 800) requires federal agencies to consider the effects of their projects on historic resources. The criteria of adverse effect [800.5(a)(1)] includes the following language pertinent to cumulative effect assessments: "Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative."

The methodology for this Section 106 cumulative effects assessment is reflective of reasonably foreseeable future effects, based on an analysis of past and present actions; reasonably foreseeable future effects are evaluated for each alternative and option, as required by 36 CFR Part 800. Much of the analysis regarding potential cumulative effects to historic resources is discussed in Attachment I, *Section 106 Determinations of Eligibility and Effects*. Cumulative impacts analysis in this section incorporates the findings of the Section 106 cumulative effects assessment.

The project alternatives, coupled with other transportation and development projects identified in **Exhibit 6-1** and **Exhibit 6-2**, would utilize the existing highway alignment, but would expand for constructability reasons or for additional capacity, requiring right-of-way acquisitions. A central concern with regard to the potential project and alternatives under evaluation with regard to cumulative effects to historic preservation is related to land use and the potential for induced development. As noted in Section 5.4, Land Use, induced development occurs when project alternatives directly change how land is used or if project implementation induces enough anticipated or unanticipated development that land use patterns change. Induced development is possible when alternatives require highway access points where there are currently none.

Present and future threats to historic resources continue through private development, which is not subject to the same oversight standards or avoidance controls as federal projects. Foreseeable future projects that have the greatest potential for historical impacts are land development projects or those infrastructure projects that may spur private development. In the foreseeable future, transit projects are the most likely to induce new private

development through transit-orient development. Transit projects in the study area (East Corridor, North Metro Corridor, Central Corridor, Gold Line, West Corridor, and the I-225 Corridor, as identified in **Exhibit 6-3**) are expected to foster transit-oriented development near stations, which could create cumulative threats to historical resources. In the foreseeable future, the National Western Complex will be redeveloped and existing buildings within the National Western Historic District would be replaced. Foreseeable future changes involving property acquisition include the Two Basin Drainage Project, which will require the acquisition of nearly 120 acres, including a portion of the Market Street Lead railroad.

However, I-70 East project alternatives will not induce development and will not contribute to loss of historic resources through private development.

Improved mobility may support developing urban centers within the Elyria and Swansea Neighborhood. These urban centers could result in foreseeable investments in residential and commercial development, which could ultimately benefit historic resources through restoration and rehabilitation efforts. Conversely, the investment in the community could result in the redevelopment of the area and demolition or alteration of historic buildings, resulting in impacts to the historic character of the community.

### Summary

Subsection 800.5 of the Section 106 regulations (36 CFR Part 800) requires federal agencies to consider the effects of their projects on historic resources. The criteria of adverse effect [800.5(a)(1)] includes the following language pertinent to cumulative effect assessments: "Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative."

The methodology for this Section 106 cumulative effects assessment is reflective of reasonably foreseeable future effects, based on an analysis of past and present actions; reasonably foreseeable future effects are evaluated for each alternative and option, as required by 36 CFR Part 800. Much of the analysis regarding potential cumulative effects to historic resources is discussed in Attachment I, *Section 106 Determinations of Eligibility and Effects*.

When combined with other past, present, and reasonably foreseeable future projects, project alternatives are not

> **Historic preservation**
>
> When combined with other past, present, and reasonably foreseeable future projects, project alternatives are not anticipated to result in setting changes that would diminish the eligibility of historic resources beyond those affected by acquisition, are not anticipated to result in induced development, and would not result in significant cumulative effects.

anticipated to result in setting changes that would diminish the eligibility of historic resources beyond those affected by acquisition, are not anticipated to result in induced development, and would not result in significant cumulative effects.

## 6.4.5    Air quality

Air quality in the Denver region has fluctuated over the past 50 years. From the 1960s to the late 1980s, air quality got steadily worse due primarily to increased traffic tied to population growth in the region. In the late 1980s, the Denver metropolitan area was frequently in violation of the EPA air quality standards for carbon monoxide, particulate matter, and ozone—the criteria pollutants that have been of concern in the Denver region because of past exceedances of the NAAQS standards. Failure to meet these standards resulted in a designation of nonattainment by the EPA.

In the 1990s, regulatory and other actions (such as vehicle emissions programs, ethanol in gasoline during the winter, adding scrubbers to factories/refineries, road sweeping programs, etc.) were mandated by the federal and state governments in their quest to improve air quality. These efforts have contributed significantly to reducing air pollution in the Denver region.

Of the three criteria pollutants—carbon monoxide, particulate matter, and ozone—ozone is the only one for which the region is currently in nonattainment. The Denver region has been re-designated to attainment/maintenance status for $PM_{10}$ (2002) and carbon monoxide (2001).

As of December 2012, all areas in Colorado are in attainment of all NAAQS for criteria pollutants, except for ground-level ozone. Seven counties in the Denver metropolitan area and portions of two counties in the Colorado North Front Range are currently designated as nonattainment for exceeding the 8-hour ozone standard. The region was originally designated as nonattainment under the 1-hour standard, which has since been replaced by an 8-hour standard. Prior to 2006, there was only one exceedance of the ozone standard at any of the four monitoring stations in the study area; however, several exceedances have been recorded at north Denver's Welby station since then.

On December 12, 2008, the Colorado Air Quality Control Commission approved the Ozone Action Plan, including revisions to the SIP, for the Denver Metro Area and North

**Climate change**

The CEQ instructs that NEPA documents comment on global climate change. These discussions are detailed in Attachment J, *Air Quality Technical Report* and in Section 5.10, Air Quality.

Front Range. The Ozone Action Plan identifies specific control measures designed to bring the region into compliance with the ozone standard by 2015.

The Denver region was designated nonattainment for carbon monoxide in 1978, subsequent to the Clean Air Act Amendments of 1977. On September 27, 2010, all carbon monoxide areas in the country were re-designated to maintenance status. There have not been any exceedances of the carbon monoxide standard at any of the four monitoring stations in the study area since 1999.

The region was re-designated to attainment/maintenance status for $PM_{10}$ by the EPA on September 16, 2002 (EPA, 2002). There was one exceedance of the $PM_{2.5}$ standard in 2001, but this was not enough to trigger a nonattainment designation for that pollutant.

### Impacts

The I-70 East project will be a substantial congestion-reducing transportation improvement for the Denver region. As big as it is, however, the project's vehicular travel and associated emissions are relatively small in comparison to those of the greater Denver region. **Exhibit 6-7** shows the VMT for the project alternatives in the study area compared to the VMT for the Denver region. **Exhibit 6-8** shows project-related on-road mobile source emissions compared to those of the Denver region, where applicable.

As the data in **Exhibit 6-7** indicate, the project's VMT ranges from 9.7 percent to 10.4 percent of the regional VMT, depending on the alternative. The Build Alternatives have between 3.9 percent and 6.5 percent higher VMT than the No-Action Alternative. Since the No-Action Alternative is consistent with the most recent conformity analysis for the regional transportation plan, it is part of the baseline for regional on-road mobile source emissions. The information in **Exhibit 6-7** also indicates that VMT increases a small degree for the Build Alternatives compared to the No-Action Alternative. While any increase or decrease is noteworthy, it is also important to note that these differences are extremely small when taken in context of regional travel and emissions.

**Exhibit 6-8** provides perspective for the carbon monoxide, $PM_{10}$, volatile organic compounds, and nitrogen oxides emissions associated with the project alternatives as compared to the regional emissions and State Implementation Plan emissions budgets. As the data show,

project-related emissions are a fraction of the regional emissions; and the regional emissions, which are from the most recent conformity determination conducted by DRCOG, are much lower than the SIP budgets.

**Exhibit 6-7          Project and Regional Vehicle Miles of Travel (2035)**

| Alternative | 2035 VMT | Percent of Regional VMT | Percent Difference from No-Action VMT |
|---|---|---|---|
| No-Action | 10,453,600 | 9.7% | n/a |
| Revised Viaduct, General-Purpose Lanes Option[1] | 11,129,500 | 10.4% | 6.5% |
| Revised Viaduct, Managed Lanes Option | 10,865,200 | 10.1% | 3.9% |
| Partial Cover Lowered, General-Purpose Lanes Option[1] | 11,129,700 | 10.4% | 6.5% |
| Partial Cover Lowered, Managed Lanes Option | 10,885,000 | 10.0% | 4.1% |
| Denver Region[2] | 107,259,600 | n/a | n/a |

1.   Note: for air quality study area
2.   Source: Appendix C, Modeling Summary Tables, 2013 Amendment Cycle 1 Denver Southern Subarea 8-hour Ozone Conformity Determination (DRCOG, 2013)

**Exhibit 6-8          2035 Project and Regional Emissions (tons per day)**

| Pollutant | I-70 East (Study Area Emissions) | | Regional Emissions | No-Action Emissions as a Percent of Regional Emissions | Allowance[3] |
|---|---|---|---|---|---|
| | No-Action Alternative | Build Alternatives | | | |
| Volatile organic compounds | 1.0 | 1.0 | 21.6[1] | 4.6% | 89.7[1] |
| Nitrogen oxides | 3.4 | 3.4 to 3.6 | 17.5[1] | 19.0% | 102.4[1] |
| Carbon monoxide | 48.2 | 32.6 to 48.2 | 958.8[2] | 5.0% | 1,600.0[2] |
| $PM_{10}$ | 0.7 | 0.5 to 0.7 | 43.1[2] | 1.6% | 55.0[2] |

1.   Source: Appendix C, Modeling Summary Tables, of 2013 Amendment Cycle 1 Denver Southern Subarea 8-hour Ozone Conformity Determination (DRCOG, 2013)
2.   Source: 2013 Amendment Cycle 1 DRCOG carbon monoxide and $PM_{10}$ Conformity Determination for the Amended Fiscally Constrained 2040 Regional Transportation Plan and the Amended 2012-2017 Transportation Improvement Program (DRCOG, 2015d)
3.   Allowance estimates are budgeted amounts from the State Implementation Plan

Ozone is considered a regional issue rather than a localized street or intersection issue, and an individual highway project will typically have little or no effect on regional ozone concentrations. Ozone is evaluated using the volatile organic compounds and nitrogen oxides emission precursors in an emission inventory burden analysis. To review the results of air quality analysis in its entirety, see Section 5.10, Air Quality.

**Exhibit 6-9** shows the 2010 volatile organic compounds and nitrogen oxides emissions estimates for each of these sources from the region's 8-hour Ozone Attainment Plan. On-road mobile sources are only 6.7 percent and 16.8 percent of total volatile organic compounds and nitrogen oxides emissions in the region. Combining this information with the percent of project emissions to regional emissions shows that the project volatile organic compounds and nitrogen oxides emissions are roughly 0.1 percent and 0.5 percent of total regional volatile organic compounds and nitrogen oxides emissions, respectively.

**Exhibit 6-9          2010 Volatile Organic Compounds and Nitrogen Oxides Regional Emissions**

| Source Category | VOC (tons per day) | % of Total | NOx (tons per day) | % of Total |
|---|---|---|---|---|
| Point | 37.0 | 2.3% | 86.4 | 11.8% |
| Oil and Gas Point & Area | 203.3 | 12.4% | 46.2 | 6.3% |
| Area | 61.0 | 3.7% | 22.1 | 3.0% |
| Non-Road Mobile | 61.3 | 3.7% | 61.0 | 8.4% |
| On-Road Mobile | 109.2 | 6.7% | 122.9 | 16.8% |
| Anthropogenic[1] | 471.8 | 28.8% | 338.6 | 46.4% |
| Biogenic[2] | 694.0 | 42.4% | 53.0 | 7.3% |
| Total | 1,637.6 | | 730.1 | |

*Source: Denver Metro and North Front Range 8-Hour Ozone Attainment Plan (Colorado Air Quality Control Commission, 2008)*
1.   *Anthropogenic refers to emissions produced by human beings*
2.   *Biogenic refers to emissions produced by living organisms*

## Other Actions

As part of the discussion of cumulative air quality effects, it is necessary to identify other actions that could contribute to long-term air quality degradation. These will be actions associated with or potentially influenced by the project and its alternatives. The East Corridor rail commuter line to DIA being constructed as part of the Fastracks program is noteworthy in this regard. Although a separate project from the I-70 East project, it is being constructed in relative proximity to the I-70 corridor.

In terms of long-term effects, these two major transportation improvements will potentially attract new private sector investment to the corridor. This could possibly include redevelopment of existing land uses in some locations with higher densities and a mix of retail, office, and residential

uses. Additional industrial development is possible as well. While it is possible that localized emissions could increase with increased economic activity in the general area, it could have positive regional air quality impacts due to shorter trip lengths and increased transit use. These future potential actions are extremely difficult to predict, especially at the local level, but they are worth mentioning for disclosure purposes. Other factors, such as infrastructure investment, could affect future impacts as well.

### Summary

If project alternatives contribute to air quality degradation and nonattainment of air quality standards when coupled with other foreseeable future actions, they cause cumulative impacts to air quality. Based on the air quality analysis reported in Section 5.10, Air Quality, and in the summary of air quality analysis results discussed earlier in this subsection, no substantial direct impacts were determined for all project alternatives. Project alternatives will not contribute to an increase of air pollutants region-wide and no NAAQS air quality violations are expected with implementation of these project alternatives at a local level. Because there are no direct impacts due to these project alternatives, there will be no meaningful additive impacts with other reasonably foreseeable future actions.

### 6.4.6    Noise

The geographic extent of noise impacts has grown with increased urbanization in the study area. Noise levels have been influenced by increasing urban density and intensity of use over time. Noise impacts associated with urban areas have encroached into rural lands as new development and transportation systems have been constructed over the past 50 years. These changes occur when unbuilt areas are replaced or become encroached upon by more intensive (and noisy) land uses, such as roads or urban development. Major transportation projects that have previously increased noise levels include the construction of I-70 and I-270 during the 1960s, E-470 in 1991, and Peña Boulevard and DIA in 1995. While noise levels have generally increased and have expanded spatially, some improvements have been made, such as the closure of Stapleton International Airport in 1995.

Foreseeable future actions also will contribute to urban noise as new development in the east will convert large areas of rural land into more noise-intensive urban

> **Air quality**
>
> Project alternatives will not substantially contribute to air quality related cumulative impacts.

development. Continuing downtown redevelopment also is expected to contribute to noise levels in the western part of the study area. Additional housing, office, and commercial capacity coupled with forecasted population and employment growth will intensify noise generation in these areas. Future rail transit projects also will contribute to increased noise levels, especially where rail transit corridors converge downtown. Transit alignments located in existing transportation corridors will have the potential for cumulative impacts through combined highway and rail transit noise; however, mitigation can be, and is being, used to limit noise levels to reduce noise impacts.

### Impacts

If project alternatives increase noise levels or contribute to the collective noise impacts of foreseeable future projects, then they are likely to have cumulative noise impacts.

As illustrated in Section 5.12, Noise, both the No-Action Alternative and the Build Alternatives will have direct noise impacts. While mitigation that complies with CDOT's Noise Abatement Criteria (CDOT, 2015) will be implemented and existing noise walls replaced, noise will not be mitigated when unreasonable or infeasible or not recommended. In these very localized areas, noise will incrementally increase due to the project alternative and cause a cumulative noise impact. In the Elyria and Swansea Neighborhood, the Partial Cover Lowered Alternative impacts fewer receptors than any other alternative, including the No-Action Alternative. Across the cumulative noise study area identified in **Exhibit 6-2**, noise impacts will not be substantial due to the overall benefits of noise mitigation.

### Summary

In summary, when combined with other past, present, and reasonably foreseeable future projects, the project alternatives will contribute to cumulative noise impacts in very localized areas by increasing noise over existing conditions. In the Elyria and Swansea Neighborhood, the Partial Cover Lowered Alternative impacts fewer receptors than any other alternative, including the No-Action Alternative. Throughout the cumulative noise impact study area, where reasonable and feasible or required by guidance and regulations, noise will be minimized through construction of noise walls and will not substantially contribute to cumulative noise impacts after mitigation.

**Noise**

Project alternatives will not substantially contribute to noise-related cumulative impacts after mitigation.

## 6.4.7     Wetlands and other waters of the U.S.

Urbanization in the study area has affected wetlands and other waters of the U.S. through physically displacing and degrading streams, rivers, ponds, or lakes. As the study area has urbanized over time, streams have been channelized little by little and cleared of meanders that were once prone to periodic overflow. The stormwater detention ponds and roadside drainages that came with urbanization prevented flooding, creating wetland conditions in historically dry areas.

For the purposes of this document, hydrologic change is measured by the degree to which impervious surfaces intrude into hydrologic areas. This is determined by spatially overlaying urbanized areas since 1965 with hydrologic features data (rivers, streams, ponds, and lakes). By detecting impervious surfaces within 100 feet of hydrologic features, it was found that 8 percent of hydrologic features were overlapped by urbanized land in 1965, 8 percent in 1980, and 14 percent in 1990. By 2002, more than 20 percent of hydrologic features in the study area were intruded upon by impervious surfaces.

In 1965, impervious, urbanized areas near hydrologic features were mostly located in the west portion of the study area in places such as the South Platte River, Sand Creek, Cherry Creek, and Clear Creek. Development along I-70 in the 1960s encroached into these riparian areas. Wetland protection during this time was minimal, so unmitigated development into these areas was allowed. Although change in impervious surface from 1965 to 1980 was limited in quantity, increased urbanization near hydrologic features occurred primarily along Sand Creek, adjacent to I-270.

Land use changes between 1980 and 1990 marked an increase of impervious surface in existing urban areas. The following decade marked expanded urbanization into previously unbuilt areas. By 2002, urbanization had further encroached along hydrologic features in the west, including the South Platte River, Sand Creek, Clear Creek, Fisher Ditch, and the Rocky Mountain Ditch. Urbanization near hydrologic features also began in the east during this time, primarily due to DIA and the build-out of Green Valley Ranch.

In the reasonably foreseeable future, wetlands and other waters of the U.S. will be most threatened in the northeast portion of the study area where undeveloped land is under

**Impervious surface**

Impervious surfaces include roads, parking lots, driveways, sidewalks, compacted soils, and rooftops— surfaces that reduce infiltration and increase surface runoff, altering the pathways by which water reaches urban streams.

increasing development pressure. Urbanization in this area will require greater flood control measures and the possibility of physical wetland displacement. The condition of wetlands and other waters of the U.S. in urbanized areas west and south of Stapleton is not expected to change dramatically in the future, since these areas are generally established and close to full build-out. This area is fortifying drainage though the Two Basin Drainage Project which will provide 100-year storm protection and desired redundancy. Future actions that directly and indirectly affect these resources will be subject to mitigation as regulated by the federal Water Pollution Control Act, Clean Water Act, and Executive Order 11990, "Protection of Wetlands" (Carter, 1977).

### Impacts

The Build Alternatives will cause cumulative impacts to wetlands or other waters of the U.S. if wetlands lost or modifications to other waters of the U.S. dramatically contribute to losses experienced region-wide or if there are substantial induced losses (wetlands lost through project-induced, unplanned development).

If left unmitigated, the Build Alternatives will directly affect local wetlands. As discussed in Section 5.15, Wetlands and Other Waters of the U.S., the Build Alternatives permanently impact 4.352 acres to 4.442 acres of wetlands and 0.693 acre to 0.771 acres of other waters of the U.S. and open waters.

The regional sustainability of wetland resources is dependent on the ability of each individual future action to be sufficiently mitigated to avoid further incremental degradation. To this end, the project will mitigate both jurisdictional and non-jurisdictional wetlands at a 1:1 ratio to offset impacts to wetlands. Therefore, impacts will cumulatively contribute to wetland loss in the short term at the onset of the impact, but are not expected to contribute to long-term cumulative wetland loss because of mitigation measures.

Wetlands and other waters of the U.S. also are susceptible to cumulative impacts through private development by either direct displacement or degradation due to changes in stormwater runoff and non-point pollution. Because the No-Action Alternative and the Build Alternatives are not expected to induce development, they will not add to

cumulative impacts to wetlands or other waters of the U.S. due to increased development.

## Summary

In summary, when combined with other past, present, and reasonably foreseeable future projects, the Build Alternatives will not contribute substantially to long-term cumulative wetland loss because of compliance with Executive Order 11990 and FHWA's and CDOT's policies of no net loss. In addition, the Build Alternatives are not expected to substantially contribute to cumulative impacts to other waters of the U.S. given the minimal permanent impacts and implementation of BMPs (as discussed in Section 5.15, Wetlands and Other Waters of the U.S.). Because the No-Action Alternative has no wetland impacts, it will have no cumulative effects to wetlands and no long-term cumulative effects to other waters of the U.S.

> **Wetlands and other waters of the U.S.**
>
> Project alternatives will not contribute substantially to negative wetland cumulative impacts.

### 6.4.8    Water quality

Historically, land use patterns and urbanization have influenced water quality by changing stormwater runoff levels and composition. The nature of runoff is directly related to land uses and the geographic coverage of urbanized areas. Growth of the water quality study area's urban footprint since 1960 has increased the potential of stormwater runoff to affect water quality. In addition, increases in impervious area affect the ability of existing drainage systems to accommodate peak stormwater events. Through the land cover analysis discussed in Section 6.4.7, it is estimated that impervious surface in the stormwater and water quality study area (study area boundary illustrated in **Exhibit 6-2**) has increased 255 percent from 1965 to 2002, translating to an increase of approximately 32,000 acres during the 36-year span.

Despite this increase in impervious urban land cover, water quality has improved throughout the region. Local, state, and federal regulations enacted during this timeframe have produced positive changes to water quality. Ordinances have strengthened over time, beginning with the federal Water Pollution Control Act of 1972, and later in 1974 with the passage of the Safe Drinking Water Act. The resulting National Pollutant Discharge Elimination System permit program places limits on the amount of pollutants that may be discharged from point sources. The EPA granted Colorado the authority to issue and manage these permits through

> **Definition of point-source pollution**
>
> Point-source pollution is pollution that comes from a single source, such as an oil refinery's wastewater discharge outlet.

Regulation 61 of the Colorado Discharge Permit System Regulations (CDPHE, 2006).

These regulations require operators of large municipal storm sewer systems—such as Denver, Aurora, and CDOT—to obtain permits and develop stormwater management programs. These programs include issuance of construction and maintenance BMPs for preventing harmful pollutants from entering stormwater systems. Recent changes provide more stringent controls on construction-related discharges by requiring construction projects one acre in size or larger to secure a Colorado Discharge Permit System permit for stormwater discharges.

Foreseeable future development at Stapleton and farther east in the study area will result in additional stormwater runoff and may adversely affect water quality due to conversion of rural, pervious land into impervious urban development. New development east of Stapleton could contribute to cumulative stormwater runoff impacts on Second Creek and Third Creek (creek locations are shown in **Exhibit 6-2**). Local, state, and federal stormwater regulations will control and minimize the impacts of this foreseeable future development, however.

Foreseeable future stormwater improvements will be made through the forthcoming Two Basin Drainage Project. At a cost of $134 million, the project will provide 100-year storm protection and desired redundancy for the I-70 East project area. The project will add necessary stormwater detention areas, open channels, storm pipes, and storm drains.

## *Impacts*

The increase in impervious surface caused by the project alternatives will be negligible when considering the study area as a whole. These changes will have no impact on stormwater runoff and water quality because drainage and detention standards require control of stormwater release and compliance with local, state, and federal water quality standards. In fact, the project alternatives may improve water quality since the existing highway was constructed before such rigorous stormwater and water quality standards existed. The project alternatives may, therefore, have beneficial cumulative impacts for stormwater runoff and water quality.

The No-Action Alternative will improve water quality, since reconstruction of the viaduct will require new stormwater detention features. These improvements are limited to the

area between Brighton Boulevard and Colorado Boulevard, but will have a minor beneficial cumulative impact on regional water quality.

The Build Alternatives will have impacts to water quality if unmitigated, as documented in Section 5.16, Water Quality. Because of these potential impacts, mitigation—such as water quality ponds—will be used as part of any Build Alternative implemented. The Partial Cover Lowered Alternative has the potential to create ponding areas between Brighton Boulevard and Dahlia Street. The alternative requires mitigation to reduce surface runoff to prevent water from reaching the lowered section of I-70. It also must allow for safe discharge of stormwater runoff to existing drainage systems. Implementation of mitigation measures is expected to improve water quality conditions by treating runoff that otherwise would be untreated.

### Summary

In summary, when combined with other past, present, and reasonably foreseeable future projects, the increased impermeable surface caused by the project alternatives—and resulting increase in stormwater runoff—will not contribute substantially to negative cumulative water quality impacts. This is due to compliance with stormwater regulations, implementation of BMPs, and utilization of stormwater collection improvements, all of which are ultimately expected to improve water quality over existing conditions.

**Water quality**

Project alternatives will not contribute substantially to water quality cumulative impacts.

### 6.4.9    Environmental justice

While Section 5.3, Environmental Justice, examines how direct and indirect resource impacts affect low-income and minority populations, the environmental justice cumulative impacts analysis examines if these specific populations could be harmed by the collective effect of other past, present, and foreseeable actions in combination with the project alternatives.

As established in the preceding cumulative resource sections (Section 6.4.1 through 6.4.8), neighborhoods adjacent to I-70 East have a history of cumulative impacts. These communities include the low-income and minority neighborhoods of Globeville, Elyria and Swansea, Northeast Park Hill, Montbello, Aurora, and Gateway, as identified in Section 5.3, Environmental Justice. The residential communities of Elyria and Swansea, Globeville, and

Northeast Park Hill became bisected when I-70 was originally constructed in the early 1960s. In the 1960s, transportation projects—including I-70 and I-270—required large-scale relocations in this area. Community cohesion was impacted in these neighborhoods as a result.

A foreseeable future project that could potentially contribute to environmental justice cumulative impacts is the redevelopment of the National Western Stock Show facilities. While the *National Western Center Master Plan* emphasizes stronger local connections and other neighborhood benefits, the project may require further land acquisition. Details about the range of possible relocations are not known at this time. The Two Basin Drainage Project, will also require the acquisition of nearly 120 acres of industrial, commercial, and residential property. The project will examine environmental justice impacts during NEPA-level review. The other large-scale project being implemented in these neighborhoods is the East Corridor rail-transit line. It was documented though NEPA review that the project will have positive long-term environmental justice effects in these neighborhoods.

### Impacts

Cumulative environmental justice impacts are determined by examining the cumulative resource impacts documented in Sections 6.4.1 through 6.4.8 for their effect on the low-income and minority populations identified in Section 5.3, Environmental Justice (**Exhibit 5.3-5**).

All alternatives have the following environmental justice cumulative impacts:

- Social and economic conditions impacts caused directly through property acquisitions

- Overall noise increase

In addition to the cumulative environmental justice impacts noted above, the No-Action Alternative also will have the following cumulative environmental justice impacts:

- Lack of mobility will not support the viability of regional neighborhoods, including other low-income and minority populations

- Increased neighborhood congestion caused by cut-through traffic will affect safety, air quality, emergency services, noise, and local mobility

In addition to the list of cumulative environmental justice impacts shared among all alternatives noted above, the Build Alternatives will have the following cumulative environmental justice impacts:

- Improved mobility will support the viability of regional neighborhoods, including other low-income and minority populations

- Social and economic conditions impacts will be caused by the large number of property acquisitions required for implementation

- The Partial Cover Lowered Alternative will improve neighborhood cohesion in historically impacted low-income and minority neighborhoods by providing new, open, public community space and removing physical barriers (the viaduct) within the neighborhood

- Historic resources will be acquired during implementation

### Summary

In summary, when combined with other past, present, and reasonably foreseeable future projects, both the No-Action Alternative and the Build Alternatives have the potential to substantially contribute to environmental justice cumulative impacts.

The tradeoffs between cumulative impacts for the No-Action Alternative and the Build Alternatives are subjective and are open to wide interpretation. For example, the No-Action Alternative benefits I-70 East adjacent low-income and minority neighborhoods by avoiding extensive property displacements. As a tradeoff, however, this scenario also causes mobility-related impacts to the local neighborhoods, as well as other low-income and minority neighborhoods region-wide. Also, the viaduct remains a barrier to neighborhood cohesion. The Build Alternatives, however, require more property displacements, but as a tradeoff, avoid mobility-related impacts to local and regional low-income and minority neighborhoods. The Partial Cover Lowered Alternative has the added benefit of improving neighborhood cohesion in historically impacted low-income and minority neighborhoods by restoring community connectivity.

**Environmental justice**

Project alternatives have the potential to contribute to environmental justice cumulative impacts.

## 6.5      What are the cumulative benefits?

Project alternatives coupled with other past, present, and future projects have the cumulative benefits necessary to support a growing metropolitan area. Cumulative benefits are the positive effects experienced through the collective implementation of past, present, and foreseeable future projects in combination with the proposed alternatives.

The primary benefit of the Build Alternatives is increased mobility. Mobility is an integral component of maintaining a viable city. Mobility supports aspects of commercial and private travel, as well as local and regional access, without which commerce, quality of life, and the overall function of a city will be overloaded. The Build Alternatives will improve future mobility more than the No-Action Alternative, thereby supporting developing urban centers, such as the Stapleton and Gateway Neighborhoods, as well as the Elyria and Swansea Neighborhood and other well-established neighborhoods in the study area.

The Partial Cover Lowered Alternative provides additional benefits to neighborhood cohesion by removing the viaduct, lowering the highway, and adding a highway cover for use as a public community space. Because an aspect of building and maintaining viable and cohesive neighborhoods relies on efficient transportation access and mobility, neighborhoods in the study area are expected to benefit from the reduced congestion levels provided by the Build Alternatives over the No-Action Alternative.

This page intentionally left blank.