**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Actions Nos.     17-cv-01661-WJM-MEH
                       17-cv-01679-WJM-MEH


KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA
NEIGHBORHOOD ASSOCIATION; CHAFEE PARK NEIGHBORHOOD
ASSOCIATION; and COLORADO LATINO FORUM,

        Plaintiffs,

   v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CARTER; in his official capacity as Division
Administration,

        Defendants,

   v.

COLORADO DEPARTMENT OF TRANSPORTATION, et al.,

        Defendant-Intervenors.

---

**DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO ZEPPELIN
PLAINTIFFS' MOTION FOR STAY**

---

BRENT E. BUTZIN
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6638
brent.butzin@coag.gov

JOHN E. PUTNAM
NICHOLAS A. DIMASCIO
KAPLAN KIRSCH & ROCKWELL LLP
1675 Broadway, Suite 2300
Denver, CO  80202
(303) 825-7000
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Index of Attachments .................................................................................................... v

Introduction .................................................................................................................... 1

Legal Background—NEPA ........................................................................................... 2

Factual Background ....................................................................................................... 3

    I.    The Central 70 Project ..................................................................................... 3

    II.   Denver's Stormwater Project ............................................................................ 5

Standard of Review ....................................................................................................... 8

Argument ....................................................................................................................... 9

    I.    Plaintiffs cannot succeed on the merits............................................................ 9

        A.    FHWA reasonably determined that Denver's stormwater project
            has independent utility .............................................................................. 9

        B.    The Agencies took a hard look at the Central 70 Project's potential
            to disturb hazardous materials ............................................................... 17

    II.   Plaintiffs have not shown irreparable harm from the Central 70 Project ............. 19

    III.  The balance of equities favors allowing the Central 70 Project to proceed.......... 23

    IV.  Denial of the requested injunction would serve the public interest ...................... 25

    V.   Any preliminary injunction must be narrowly tailored......................................... 28

Conclusion .................................................................................................................... 29

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Airport Neighbors Alliance v. United States*, 90 F.3d 426 (10th Cir. 1996) ................................10

*Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87 (1983)........................................2

*Biodiversity Conservation Alliance v. Jiron,* 762 F.3d 1036 (10th Cir. 2014) .............................17

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ..................................................................................28

*Citizen Band Potawatomi Indian Tribe v. Okla. Tax Comm'n*, 969 F.2d 943 (10th Cir. 1992) ............................................................................................................................................28

*City of Alexandria v. Slater*, 198 F.3d 862 (D.C. Cir. 1999) ........................................................18

*City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992 (S.D. Tex. 2004) ..................................16

*Clairton Sportsmen's Club v. Pa. Turnpike Comm'n*, 882 F. Supp. 455 (W.D. Pa. 1995) ..........16

*Coal. for Healthy Ports v. U.S. Coast Guard*, 2015 U.S. Dist. LEXIS 159090 (S.D.N.Y. Nov. 24, 2015) ....................................................................................................................18

*Colo. Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150 (D. Colo. 2011) ........................................................................................................................10, 14, 17

*Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) ..................................11, 17

*Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010) .........11

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) ..............................................................................................................................................8

*Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162 (10th Cir. 2007).................................17, 19

*Friends of the Bow v. Thompson*, 124 F.3d 1210 (10th Cir. 1997) .................................................9

*George Washington Home Owners Ass'ns v. Widnall*, 863 F. Supp. 1423 (D. Colo. 1994).........23

*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250 (10th Cir. 2003)......................................20

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003).........................................20, 22, 23

*Jones v. Peters*, 2007 U.S. Dist. LEXIS 70332 (D. Utah Sept. 21, 2007).....................................15

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 536 (10th Cir. 1994) ........................................................................................................21

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) .........15

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*, 2011 U.S. Dist. LEXIS 161316 (C.D. Cal. Aug. 11, 2011).......................................16

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*, 2012 U.S. Dist. LEXIS 184663 (C.D. Cal. Dec. 17, 2012) ....................................16

*Lower Ark. Valley Water Conservancy Dist. v. United States*, 578 F. Supp. 2d 1315 (D. Colo. 2008) ...........................................................................................................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................................9, 21

*Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984).................................9, 21

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)................................................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......................9

*N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661 (M.D.N.C. 2001)..........................................................................................................16

*N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236 (10th Cir. 2017) ...........8, 20

*Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008)...................16

*Nw. Resource Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060 (9th Cir. 1995)...............14

*Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005) .......................................................21

*Petrella v. Brownback*, 787 F.3d 1242 (10th Cir. 2015)................................................................20

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) .............................................................28

*Rags Over the Ark. River v. Bureau of Land Mgmt.*, 77 F. Supp. 3d 1038 (D. Colo. 2015) ..........2

*San Juan Citizens' Alliance v. Salazar*, 2009 U.S. Dist. LEXIS 29804 (D. Colo. Mar. 30, 2009) ...................................................................................................................15

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005)..............................................23

*Sierra Club v. Clinton*, 746 F. Supp. 2d 1025 (D. Minn. 2010) ...................................................16

*Valley Cmty. Pres. Comm. v. Mineta*, 373 F.3d 1078 (10th Cir. 2004)..................................25, 26

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684
    (S.D. Tex. 2011)............................................................................................................................23

*Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220 (10th Cir. 2008) .........10, 11

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ...............................................8, 20, 22, 23

*Young v. General Servs. Admin.*, 99 F. Supp. 2d 59 (D.D.C. 2000)..............................................18

**Federal Statutes**

5 U.S.C. § 705.......................................................................................................................................8

5 U.S.C. § 706(2)(A).............................................................................................................................9

42 U.S.C. § 4332(2)(C)........................................................................................................................2

**Federal Regulations**

40 C.F.R. § 1508.25(a)(1) ...................................................................................................................6

40 C.F.R. § 1508.25(a)(1)(ii) ............................................................................................................11

40 C.F.R. § 1508.25(a)(3)...................................................................................................................15

**State Statutes**

Colo. Rev. Stat. § 43-2-102 ...............................................................................................................23

Colo. Rev. Stat. § 43-4-802(1)-(2).....................................................................................................23

Colo. Rev. Stat. § 43-4-802(2)(b) ......................................................................................................26

Colo. Rev. Stat. § 43-4-802(2)(c) ......................................................................................................26

Colo. Rev. Stat. § 43-4-805 ...............................................................................................................26

## INDEX OF ATTACHMENTS

Exhibit 1
Excerpts from I-70 East Final Environmental Impact Statement and Section 4(f) Evaluation, January 2016

Exhibit 2
Attachment H to I-70 East Final Environmental Impact Statement:  Hazardous Materials Technical Report Addendum

Exhibit 3
Attachment M to I-70 East Final Environmental Impact Statement:  Hydrology and Hydraulics Technical Report Addendum

Exhibit 4
I-70 East ROD 1:  Phase 1 (Central 70 Project), January 2017

Exhibit 5
I-70 East ROD 1:  Phase 1 (Central 70 Project):  Updates to Hazardous Materials Technical Report Addendum, January 2017

Exhibit 6
Connected Action Finding:  I-70 East and Two Basins Drainage Project and Addendum

Exhibit 7
Colorado Department of Transportation Reevaluation Form, Reevaluation Date:  September 18, 2017

Exhibit 8
Excerpts from Denver Storm Drainage Master Plan 2014

Exhibit 9
Presentation from Platte to Park Hill:  Stormwater Systems Kickoff Public Meeting, November 17, 2015

Exhibit 10
Platte to Park Hill:  Stormwater Systems, Your Questions:  Answered.

Exhibit 11
Declaration of Lesley Thomas

Exhibit 12
Declaration of Anthony R. DeVito

Exhibit 13
Declaration of David I. Spector

Exhibit 14
Declaration of Nicholas A. DiMascio

Exhibit 15
Testimony of Leslie Thomas, August 21, 2017,  *MacFarlane v. City and County of Denver*
(Denver Dist. Ct. No. 16-cv-32126)

Exhibit 16
Testimony of Bruce Uhernik, August 23, 2017,  *MacFarlane v. City and County of Denver*
(Denver Dist. Ct. No. 16-cv-32126)

Exhibit 17
July 7, 2011 Video of Flooding at 36th and High Street

Exhibit 18
CDOT Structure Inspection and Inventory Report, September 23, 2016

Exhibit 19
Declaration of Chris Horn

# INTRODUCTION

The Colorado Department of Transportation ("CDOT"), with the approval of the Federal Highway Administration ("FHWA"; collectively, the "Agencies"), intends to construct the Central 70 Project ("Central 70" or the "Project") in order to relieve congestion, improve safety, and provide community space along a deteriorating section of I-70 in Denver.  Central 70 is the first phase of a larger I-70 plan that the Agencies reviewed as "I-70 East."  FHWA issued the Record of Decision ("ROD"), while CDOT is the Project's state sponsor.  (ECF 16.)  As part of the required environmental review, the Agencies considered the environmental impacts of the stormwater facilities CDOT is providing for the Project.  Independently, the City and County of Denver is constructing the Platte to Park Hill Stormwater Systems Project ("Denver's stormwater project") in the same drainages in which Central 70 is located, in order to protect lives, homes, and businesses from flood risks in Denver's northern neighborhoods.

Kyle Zeppelin and his co-Plaintiffs (collectively, "Plaintiffs") seek to preliminarily enjoin the construction of Central 70 based not on the alleged harms from that project, but only alleged harms from Denver's independent stormwater project.  As explained in FHWA's separately-filed motion to dismiss, this Court lacks jurisdiction over Plaintiffs' connected- and similar-action claims under the National Environmental Policy Act ("NEPA"), which are the primary basis for their injunction request; FHWA has never been involved in Denver's stormwater project and lacks authority over it.  Moreover, Plaintiffs lack standing because their alleged injuries are caused not by the improvements to I-70 approved in FHWA's ROD, but by independent actions taken by Denver, a third party that is not before the Court.

Even if the Court had jurisdiction, Plaintiffs' injunction request should be denied because it does not meet any of the tests necessary for the grant of a preliminary injunction. Substantial evidence in the forthcoming administrative record supports the FHWA's finding that the projects are not connected actions, because they serve different purposes and would each occur without the other. The extensive environmental review conducted for the Project by the Agencies fully meets all NEPA and other legal requirements. Further, the harms Plaintiffs allege are speculative and arise from the independent Denver stormwater project, *not* Central 70. Staying the Central 70 ROD would not prevent Denver from completing its stormwater project. Instead, an injunction would serve only to delay its many transportation, safety, and community benefits, as well as dramatically increase the cost to Colorado drivers.

## LEGAL BACKGROUND—NEPA

Under NEPA, federal agencies must prepare an environmental impact statement ("EIS") before taking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA thus ensures that agencies "consider every significant aspect of the environmental impact of a proposed action," and "inform the public that it has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 97, 108 (1983). Because, "[a]t its heart, NEPA is a 'procedural' statute, not an 'environmental' statute," mere "disagreement" with a project on environmental grounds is "not sufficient to warrant reversal." *Rags Over the Ark. River, Inc. v. Bureau of Land Mgmt.*, 77 F. Supp. 3d 1038, 1052-53 (D. Colo. 2015).

# FACTUAL BACKGROUND

## I.    The Central 70 Project

Central 70 is a critical part of Colorado's transportation system, carrying over 200,000 cars per day.  (Ex. 1_FEIS 2-8.)  Despite the vital role it plays, Central 70 is in dire need of reconstruction, especially the viaduct from Brighton to Colorado Boulevards.[1]  First, the viaduct has exceeded its anticipated lifespan and is "structurally deficient," meaning that engineers have identified a "major defect" in the viaduct's structure requiring replacement.  (Ex. 12_DeVito Decl. ¶ 7; *see also* Ex. 1_FEIS 2-5.)[2]  Second, travel demand along I-70 already exceeds capacity, resulting in heavy congestion for as many as ten hours per day and causing drivers to divert into surrounding neighborhoods.  (*Id.* at 2-9, 4-33, 4-36, 4-43, 4-52.)  Third, the Denver area is experiencing rapid growth that will cause speeds as low as ten miles per hour and hour-long commutes between I-25 and Tower Road.  (*Id.* at 2-6 to 2-7, 4-39, 4-43, 4-46.)  Fourth, I-70 has more accidents than the state average for urban freeways—2,872 collisions and seven fatalities in a three-year period—because it does not meet current design standards.  (*Id.* at 2-10.)

CDOT has been planning to improve I-70 for more than a decade.  The Agencies performed extensive public outreach and offered multiple opportunities to comment on the 2008

---

[1] The Final Environmental Impact Statement ("FEIS") and ROD for Central 70 are publicly available on the official Project website, http://www.i-70east.com/reports.html.

[2] Citations in this brief first refer to the number of the exhibit attached to this brief, then provide the name of the document, and then provide the page number for the citation.  When a document already appears in the docket for this case, the citation instead first refers to the ECF number of the document in Civil Action No. 17-cv-1661.  All of the documents cited in this factual background and Section I of the Argument were considered by the FHWA and will be part of the administrative record in this case, as required for cases under the Administrative Procedure Act.

Draft Environmental Impact Statement ("EIS"), 2014 Supplemental Draft EIS, and the FEIS. (*Id.* at 1-3 to 1-5, 10-1 to 10-35; Ex. 4_ROD 79-134.)  Informed by the public process, the Agencies developed a preferred alternative that includes removing the structurally deficient viaduct, lowering a section below grade, and widening to add tolled express lanes.  (Ex. 1_FEIS 3-11 to 3-18.)  The Project also provides a four-acre cover over part of the lowered section as a local community park.  CDOT added the cover to "mitigate the adverse impacts to the Elyria and Swansea Neighborhood and to restore and enhance neighborhood cohesion, which was disrupted decades ago by the original 1-70 construction in the 1960s."  (*Id.* at 5.3-33.)

Because I-70 must be able to withstand a 100-year flood, CDOT designed an independent, stand-alone drainage system for Central 70 capable of capturing and conveying stormwater during such an event.  (*Id.* at 5.14-10; Ex. 4_ROD 129-31.)  The "offsite" drainage system consists of a system of detention ponds, culverts, and pipes south of I-70 that discharge into the South Platte River near Globeville Landing Park.  (Ex. 3_FEIS Attach. M at 5-9.)

The Agencies also thoroughly considered and mitigated the potential for Central 70 to disturb hazardous materials.  The Agencies exhaustively identified all hazardous material sites and types of contamination within the Project area.  (Ex. 1_FEIS at 5.18-2 to 5.18-15; Ex. 2_FEIS Attach. H.)  The Agencies recognized that construction activities within those sites "*could* … lead to exposure of workers or the public to these materials *if* proper health [and] safety protocols are not followed and remediation efforts are not applied."  (Ex. 1_FEIS at 5.18-11 (emphasis added); *id.* at ES-22.)  The Agencies therefore committed to clean up any contamination encountered "in compliance with applicable state and federal regulations."  (*Id.* at 5.18-15 to 5.18-16.)  The ROD further committed, in enforceable mitigation measures, to

4

implement construction protocols, such as fugitive dust control techniques, that will avoid or minimize any spread of contamination.  (Ex. 4_ROD 61-63; Ex. 1_FEIS at 5.18-16 to 5.18-18.)

## II.  Denver's Stormwater Project

The Agencies acknowledged that Denver was in the "planning stages" of its stormwater project, "which will provide redundant drainage capacity in the project area."  (Ex. 1_FEIS 3-16.)  Denver's northern neighborhoods have a "documented history of significant flood events."  (Ex. 6_Connected Actions Finding 12-14; *see also* Ex. 8_Master Plan 8-13; Ex. 17_Video of 2011 Flooding.)  Denver's stormwater project therefore aims to "establish 100-year drainage protection for City neighborhoods" designed "for the express purpose of alleviating flood risk caused by significant precipitation runoff in these areas."  (Ex. 6_Connected Actions Finding at 12-14, 18; *see also* ECF 32-15_Conceptual Report at CCD008740-64 (Denver's statement of purpose and need); Ex. 4_ROD 132; Ex. 9_Kick-off Meeting Presentation; Ex. 10_Your Questions Answered.)

To coordinate efforts and assist with the costs of parts of Denver's project that would benefit Central 70, CDOT and Denver agreed "to work together and share some of the financial burdens" of Denver's stormwater project.  (Ex. 4_ROD 132.)  Specifically, "[a]ssuming that Denver moves forward with implementation of [its project], CDOT … agreed to coordinate efforts and assist with the costs of certain components of [Denver's project] that would benefit" Central 70 by reducing stormwater flows.  (Ex. 6_Connected Actions Finding 18.)  However,

none of the funds CDOT will provide to Denver are federal funds, and the drainage system approved in the ROD was capable of addressing I-70's drainage needs independently.  (*Id.*)[3]

As a result, FHWA concluded that mere cooperation between CDOT and Denver did not defeat the "separateness [of the two projects] for the purposes of NEPA," because each project has "independent utility" and is "capable of proceeding on its own merits."  (Ex. 4_ROD 132.) As FHWA explained, Denver's project aims to "update stormwater infrastructure and reduce flooding risk in the adjacent neighborhoods and is not triggered or required by the proposed improvements of I-70."  (Ex. 6_Connected Actions Finding 19.)  And, although the projects do "share some overlapping objectives related to drainage in the same geographic area," they do not "depend on one another for justification or feasibility," and each project "would take place regardless of the other."  (*Id.*; *see also* Ex. 4_ROD 132.)

Because Denver's stormwater project is not a "connected action" within the meaning of NEPA (*see* 40 C.F.R. § 1508.25(a)(1)), the FEIS for Central 70 analyzed the cumulative impacts of the Denver project and its stormwater system.  (*See* Ex. 1_FEIS 6-9 (listing "Denver Two Basin Drainage Project"); *id.* at 6-10 to 6-32 (cumulative impacts within the study area).)

In comments on the FEIS, Denver informed the Agencies that there was a physical conflict between a small portion of the planned drainage system for I-70 and one component of Denver's stormwater project.  Specifically, CDOT's plan to install a dedicated pipe outfall for I-70's drainage system at Globeville Landing Park would conflict with Denver's plan to install

---

[3] Denver is raising utility fees for City customers and is issuing bonds against this revenue to pay for this and other Denver stormwater projects.  (Ex. 10_Your Questions Answered 2.)

an open-channel outfall for its stormwater system, because the pipe would cross the open channel in one location.  (Ex. 4_ROD 133; ECF 32-14_Denver Comment 33.)

In response, CDOT redesigned the outfall for I-70's drainage system to utilize Denver's outfall, thus "creating a combined outfall system."  (Ex. 4_ROD 133.)  FHWA's ROD consequently analyzed the direct, indirect and cumulative impacts of directing stormwater to Denver's outfall at Globeville Landing Park in the ROD.  (*Id.* 133, 135-87; Ex. 5_HazMat Report Update.)  This section of Denver's outfall is a very small portion of its overall project, well downstream of the 39th Street Channel, and physically unconnected to the City Park and Park Hill Golf Course detention.  (*See* Ex. 4_ROD 175; ECF 32-16_Conceptual Report at CCD008820 (map of Denver's system).)  The ROD nevertheless clarifies that the change in I-70's outfall still preserves Central 70's independence from "other parts of [Denver's stormwater project] that are not conveying I-70 storm water."  (Ex. 4_ROD 133; Ex. 6_ Connected Actions Finding 18-19, Addendum.)[4]

On September 18, 2017, the FHWA released a written reevaluation of Central 70's drainage system, because Denver's progress on its system since the ROD, including Denver's approvals of construction contracts, showed "a clear commitment … to complete its drainage program."  Denver's project will "reduce flood flows throughout the Montclair and Park Hill

---

[4] FHWA further acknowledged that, "[d]epending on the timing of Denver's construction of [its stormwater project,]" it could allow Central 70's offsite stormwater system to be further modified, thereby reducing impacts for Central 70.  (Ex. 6_Connected Actions Finding 19.) FHWA committed to evaluate environmental effects of such a change.  (Ex. 4_ROD 132-33.)

basins that include portions of I-70, thus reducing the volume of flows the Central 70 drainage system will need to capture." (Ex. 7_Reevaluation at 5-6.)[5] The only material change to the system proposed in the ROD was to eliminate a proposed pipe running through the Denver Coliseum parking lot, thereby reducing the "likelihood of encountering the hazardous materials identified in this area." (Ex. 7_Reevaluation 6, 11.)

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (citations omitted); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (right to relief must be "clear and unequivocal") (quotation omitted). To obtain such extraordinary relief, the movant must clearly show *all* of the following factors: (1) she is substantially likely to succeed on the merits; (2) she will suffer irreparable injury if the injunction is denied; (3) her threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017).[6]

In evaluating the likelihood of success on the merits of NEPA claims, courts apply the deferential arbitrary-and-capricious standard of review under the Administrative Procedure Act

---

[5] The full attachments to the Written Reevaluation are hundreds of pages long and are available at https://www.codot.gov/projects/i70east/re-evaluation-i-70-from-i-25-to-chambers-road.

[6] The same standard applies under Section 705 of the Administrative Procedure Act. (*See* 5 U.S.C. § 705; Stay Motion 18.)

("APA").  5 U.S.C. § 706(2)(A).  Under that standard, the court may not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Rather, a court may set aside the agency's decision only if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997) (quotation omitted).

## ARGUMENT

### I.     Plaintiffs cannot succeed on the merits.

Plaintiffs raise just two merits claims in their motion, both of which lack substance.

#### A.     FHWA reasonably determined that Denver's stormwater project has independent utility.

Plaintiffs argue that FHWA erred in determining that Central 70 and Denver's stormwater project were not connected actions.  (Stay Motion 19.)  That argument fails for two reasons.  First, as explained in FHWA's separately-filed motion to dismiss, this Court lacks jurisdiction over Plaintiffs' connected- and similar-action claims.  FHWA has never been involved in Denver's stormwater project and lacks authority over it; thus, the NEPA regulations and the segmentation theory are inapplicable.  (*See* FHWA's Motion to Dismiss, Section A.1.) Moreover, Plaintiffs lack standing because their alleged injuries are caused, not by the improvements to I-70 approved in the ROD, but rather by independent actions taken by Denver—a third party that is not before the Court.  *See id.* at Section A.2; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Second, even if this Court did have jurisdiction over those claims, Plaintiffs cannot succeed on the merits.  The Tenth Circuit applies an "'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS." *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1228 (10th Cir. 2008) (quotation omitted).  The independent-utility test asks "whether each of two projects would have taken place with or without the other."  *Id.*  Two actions are not "connected" merely because one action makes the other "more likely."  *Colo. Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150, 1164 (D. Colo. 2011) (citing *Wilderness Workshop*, 531 F.3d at 1231).  Nor does the fact that two actions are "mutually beneficial … make them connected *per se*."  *Id.*  (citing *Utahns for a Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1183 (10th Cir. 2002)).

Rather, if an action will occur because it has an "immediate purpose" independent from another action, the two actions are not connected.  *Wilderness Workshop*, 531 F.3d at 1230; *see also Airport Neighbors Alliance v. United States*, 90 F.3d 426, 431 (10th Cir. 1996) (second action possessed a "justification independent from" first); *Colo. Rail*, 843 F. Supp. 2d at 1166 (examining action's "purpose" in applying independent utility test).

Here, Denver's stormwater project does not depend on Central 70 for its "justification or feasibility."  (Ex. 4_ROD 132.)  Denver's project aims to "address longstanding flooding concerns in its northern neighborhoods" and therefore "would take place regardless of" Central 70.  (*Id.*)  Denver's project also does not require any FHWA approval and will not utilize any federal funds.  (*See id.*; *see also* Ex. 6_Connected Actions Finding 18-19, Addendum 3.)  By contrast, Central 70 aims to address transportation and safety deficiencies of I-70.  Because Denver's stormwater project has an immediate purpose separate from Central 70, FHWA

reasonably concluded that Denver's project would take place regardless of Central 70 and therefore has independent utility.  *See Wilderness Workshop*, 531 F.3d at 1230.

Plaintiffs argue that actions are connected if they "[c]annot or will not proceed" independently.  (Stay Motion 20 (quoting 40 C.F.R. § 1508.25(a)(1)(ii)).)  They rely on *Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010), to assert the broad notion that, because CDOT and Denver have consulted on the design and funding of the two projects, they must be "connected actions."  But *Dine* does not stand for such a broad proposition.  In that case, a document in the record explicitly stated that, absent the subject approval, a road "*would not* be moved and improved and … 50 additional acres *would not* be disturbed."  *Id*. at 1254 (emphasis in original).  Plaintiffs have identified no equivalent record evidence in this case showing the kind of "but for" relationship that is required.

In order to overcome that fatal flaw in their position, Plaintiffs selectively quote several documents to create the misimpression that Denver is undertaking its stormwater project solely or primarily in order to protect the lowered portion of I-70.  (Stay Motion 4-12.)[7]  The documents do not support such a tortured reading, however.  The documents cited by Plaintiffs— Memorandum of Understanding (ECF 32-10), Feasibility Evaluation (ECF 1-2), Letter of Recommendation (ECF 32-12), Intergovernmental Agreement (ECF 1-14), and Conceptual Report (ECF 32-15)—all show that Denver had its own stormwater-management needs, plans,

---

[7] Many documents cited by Plaintiffs will not be in the administrative record for this case because FHWA did not consider them in reaching its decision.  (Ex. 19_Horn Decl. ¶ 5)  In evaluating Plaintiffs' likelihood of success on the merits of its APA claims, the Court should not consider documents outside the administrative record for FHWA's decision.  *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001).

and goals, and was merely seeking to collaborate with CDOT to identify cost savings, time efficiencies, and other mutual benefits, because the City and State projects will occur in the same drainage basins.  The Feasibility Evaluation, for example, explicitly states that Denver's goal was to "minimize flood risks, protect public safety, reduce property damage, provide environmental benefits, and leverage funding from CDOT"; it explains why an "open channel" system would better meet Denver's goals than the pipe system CDOT was developing for I-70. (ECF 1-2 at CCD007342; *see also* ECF 32-10_Memorandum of Understanding 1 (referring to Denver's "North Denver Cornerstone Collaborative" effort).)

Denver's Conceptual Report also shows that the "Montclair and Park Hill Basins have been identified as the most at-risk in the City for catastrophic flooding."  (ECF 32-15 at CCD008759.)  Specifically, Denver's experience and recent flood modeling show that "[s]everal hundred properties" in several northern neighborhoods are at-risk during a major storm event, and the estimated damage in the "Montclair Basin alone is in the hundreds of millions of dollars."  (*Id.* at CCD008746; *see also id.* at CCD008763 (map showing areas of neighborhood flooding).)  The express purpose of Denver's project, therefore, is to "increase[] flood protection within portions of the Elyria, Swansea, Cole, Clayton, Skyland, Whittier, Five Points and Northeast Park Hill neighborhoods" to prevent "significant impacts to property and life."  (*Id.* at CCD008759; *see also* Ex. 10_Your Questions Answered 1-4.)

Plaintiffs cite Denver's 2014 Master Drainage Plan to assert that Denver previously had "no plans to protect the relevant area from a 100-year flood event."  (Stay Motion 4, 21.)  But the single sentence they quote does not support that assertion.  The Plan says that "cost effective implementation of a *City-wide* 100-year drainage system is not practical."  (ECF 32-8 at

CCD009416 (emphasis added).)  As Denver explained, the Master Drainage Plan "is not a static document" and evaluates only "high level needs" that often "fall short of providing the City's desired level of service in large basins without defined open waterways."  (ECF 32-15_Conceptual Report at CCD008764.)  The Plan therefore assumed the City would follow up with further study to "evaluate in more detail, on a smaller scale, … the precise basin-level system needs."  (*Id.*; *see also* Ex. 10_Your Questions Answered 4 (discussing Master Plan).)

That is precisely what Denver did.  Denver is undertaking its stormwater project to meet the hydrological needs of the Montclair and Park Hill Basins during a 100-year storm event.  (*See* ECF 1-2_Feasibility Evaluation at CCD007342 (concluding, based on the September 2013 floods, that "open channels" handle major storm events and meet City goals better than "pipe systems."); ECF 32-12_Letter of Recommendation 1, 5 (summarizing benefits that Denver's "Open Channel Concept" would have for the "local community" and "the Montclair/Park Hill watersheds");[8] ECF 32-15_Conceptual Report at CCD008746, 8748 (Montclair Basin lacks "a defined open waterway" and requires stormwater facilities).  Nothing in those documents suggests that the sole or primary purpose of the stormwater projects in the Montclair and Park Hill Basins is to protect I-70; the evidence shows independent, local reasons for the Denver project.  This supports FHWA's analysis and conclusion that Denver's stormwater project has independent utility and would occur regardless of Central 70.  *See Colo. Rail*, 843 F. Supp. 2d at 1164-66 (record need only contain sufficient evidence).

---

[8] This document is an unsigned draft that was not executed by CDOT, not considered by FHWA and will not be included in the administrative record.  (Ex. 19_Horn Decl. ¶ 5).  Thus, Plaintiffs cannot rely upon it for purposes of showing a likelihood of success on the merits.

Additionally, Plaintiffs rely on an Intergovernmental Agreement between CDOT and Denver (Stay Motion 21) that FHWA disclosed in its connected-actions analysis and finding. (Ex. 4_ROD 132; Ex. 6_Connected Actions Finding 18.)  Plaintiffs selectively quote the Agreement to suggest that Denver "created a drainage plan to provide 100-year storm protection for … the I-70 East Project."  (Stay Motion 10 (emphasis omitted).)  The omitted portion of the quoted text, however, states Denver's full purpose:  "[T]he City has separately and independently created a drainage plan to provide 100-year storm protection for *areas that could be inundated by water from the Montclair and Park Hill basins*, including the I-70 East Project alignment."  (ECF 1-14_Intergovernmental Agreement 2 (emphasis added).)

Lacking the kind of "but for" link between the two projects required by law, Plaintiffs rely on the fact that Denver's stormwater project "would benefit" the lowered portion of I-70, because it will lie within the basins that Denver's project protects (Ex. 4_ROD 132.)  But, two projects being "mutually beneficial does not make them connected *per se*."  *Colo. Rail*, 843 F. Supp. 2d at 1164; *accord Nw. Resource Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1069 (9th Cir. 1995) (rejecting connected-actions claim where projects "could exist without the other, although each would benefit from the other's presence") (quotation omitted).

Here, the two projects serve different purposes and would occur without each other. However, there is a legitimate desire to cooperate to reduce redundancy and costs.  Accordingly, the Intergovernmental Agreement reflects a "cooperative approach" that would have "significant mutual benefits" for the two projects.  (ECF 1-14_Intergovernmental Agreement 2-3.) Communication and cooperation is good government and use of public resources; it does not mean that Denver is "designing and constructing [its stormwater project] for the purpose of

14

protecting I-70 from flooding." (Stay Motion 21.) The two projects have "independent utility" because they serve different purposes, each project is "capable of proceeding on its own merits," and each project "would take place regardless of the other." (Ex. 4_ROD 132.)

Plaintiffs' fallback arguments fare no better. They contend that Central 70 and Denver's stormwater project are "similar actions" that "should have been examined together." (Stay Motion 22.) As an initial matter, the NEPA similar-action regulation makes it clear that it applies only to federal "agency actions" (40 C.F.R. § 1508.25(a)(3)); it therefore does not apply to Denver' stormwater project, which has remained entirely outside of FHWA's authority. (*See* FHWA's Motion to Dismiss, Section A.1.) Even if Denver's stormwater project was a federal action, the NEPA regulation states only that an agency "*may* wish to analyze [similar] actions in the same impact statement," and it "should do so" when that is the "*best* way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions." 40 C.F.R. § 1508.25(a)(3) (emphasis added). Numerous courts have interpreted that text to grant agencies wide discretion concerning whether to analyze "similar actions" in a single EIS. *See e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 1001 (9th Cir. 2004) (agencies receive "more deference" in deciding how to analyze similar actions) (citation omitted); *San Juan Citizens' Alliance v. Salazar*, 2009 U.S. Dist. LEXIS 29804, *44 (D. Colo. Mar. 30, 2009) ("[N]othing in the relevant regulations compels the preparation of a single EIS for 'similar' actions."); *Jones v. Peters*, 2007 U.S. Dist. LEXIS 70332, *85 (D. Utah Sept. 21,

2007) (similar-action regulation speaks "in terms of what agencies 'may' or 'should' do, without imposing a mandatory requirement for preparation of a single EIS").[9]

Given FHWA's detailed analysis of the two projects' independent purposes, and its conclusion that each project would proceed regardless of the other, FHWA did not abuse its discretion in deciding not to analyze Denver's stormwater project as a "similar action."  (Ex. 4_ROD 132; Ex. 6_Connected Actions Finding 12-19.)  Moreover, as Plaintiffs concede, the Agencies did analyze Denver's stormwater project in the cumulative-impacts section of the FEIS.  (*See* Ex. 1_FEIS 6-9 to 6-32 (referring to Denver's "Two Basin Drainage Project").)

Plaintiffs accuse the Agencies of making "no effort to discuss the cumulative ecological, economic, or health impacts posed by" Denver's stormwater project.  (Stay Motion 23.)  But, the Agencies' cumulative-impacts analysis in fact did just that.  The Agencies explicitly discussed the cumulative impacts of Denver's project with respect to land use, relocations, historic preservation, wetlands, water quality, and environmental justice within the Central 70 study area.  (Ex. 1_FEIS 6-11, 6-13, 6-27, 6-29, 6-31.)  It is therefore not true that the Agencies simply "*assume[d]*" that Denver's project would have no cumulative impacts on human health or the environment.  (Stay Motion 24.)  The Agencies presented the cumulative effects of Denver's

---

[9] *See also Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1042 (D. Minn. 2010); *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 125 (D.N.H. 2008) (similar-actions regulation provides "no basis for finding a violation of NEPA") (quotation omitted); *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1012 (S.D. Tex. 2004); *N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 684 n.19 (M.D.N.C. 2001); *Clairton Sportsmen's Club v. Pa. Turnpike Comm'n*, 882 F. Supp. 455, 476 (W.D. Pa. 1995); *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior,* 2012 U.S. Dist. LEXIS 184663, *27 (C.D. Cal. Dec. 17, 2012); *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*, 2011 U.S. Dist. LEXIS 161316, *28 (C.D. Cal. Aug. 11, 2011).

stormwater project "in a reasonable and good faith manner that would allow the public to make educated, informed comments and the agency to make an informed decision.  NEPA requires no more."  *See Colo. Rail*, 843 F. Supp. 2d at 1167 (citing *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007)).

> **B.    The Agencies took a hard look at the Central 70 Project's potential to disturb hazardous materials.**

Plaintiffs devote just three paragraphs to arguing that the Agencies failed to take a "hard look" at the environmental impacts of hazardous materials that may be encountered during construction of Central 70.  (Stay Motion 24-25.)  According to Plaintiffs, the NEPA documents do not sufficiently detail the environmental consequences of possible hazardous materials releases.  However, "NEPA does not require that an agency discuss every impact in great detail; it simply requires a reasoned evaluation of the relevant factors."  *Forest Guardians*, 495 F.3d at 1172.  This Court need only determine whether "there is a reasonable, good faith, objective presentation of the topics," such that it "foster[s] both informed decision-making and informed public participation."  *Id.* (quoting *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001)); *see also Biodiversity Conservation Alliance v. Jiron,* 762 F.3d 1036, 1052 (10th Cir. 2014) (NEPA merely seeks to ensure agency did a careful job at fact gathering and supporting its position) (quotation omitted).

The Agencies' analysis easily meets that standard.  The FEIS acknowledges that hazardous materials are harmful to human health.  (Ex. 1_FEIS 5.18-1; Ex. 4_ROD 41.)  The FEIS, the ROD, and multiple supporting technical reports identified all known locations of hazardous materials (dozens within the I-70 industrial corridor of I-70) and the nature of the

contaminants at each site.  (Ex. 1_FEIS 5.18-3 to 5.18-11; Ex. 2_FEIS Attach. H.)[10]  The FEIS identified the numerous laws that apply to the use and handling of hazardous materials that are designed to prevent their release into the environment.  (Ex. 1_FEIS 5.18-4 to 5.18-11.)  Finally, to avoid or minimize the release of hazardous materials, the ROD and FEIS incorporated a long list of mitigation measures and procedures that must be followed if unanticipated hazardous materials are found.  (Ex. 4_ROD 61-63; Ex. 1_FEIS 5.18-15 to 5.18-20.)

That analysis easily meets the "hard look" requirement under NEPA.  *See, e.g.*, *City of Alexandria v. Slater*, 198 F.3d 862, 870 (D.C. Cir. 1999) (upholding agency decision that referenced "federal and state regulatory provisions [that] require the mitigation of any short-term construction impacts … [including] the emissions of dust"); *Young v. General Servs. Admin.*, 99 F. Supp. 2d 59, 80-81 (D.D.C. 2000) (agency took hard look where its analysis "reasonably provide[d] developers with an idea of where the contaminants may be located" and the project's "proposed remediation measures would be sufficient to deal with whatever hazardous wastes might be encountered at the site"); *Coal. for Healthy Ports v. U.S. Coast Guard*, 2015 U.S. Dist. LEXIS 159090, *75-76 (S.D.N.Y. Nov. 24, 2015) (agency satisfied NEPA because it identified potential sources and determined that mitigation would minimize any exposure).

Plaintiffs' arguments do not meet their burden of showing otherwise.  First, they point to no evidence to suggest that the identified array of mitigation measures will be ineffective in minimizing the release of hazardous materials from I-70 construction.  (Stay Motion 24-25.)

---

[10] *See also* the full version of FEIS Attach. H; Supplemental Draft EIS Chapter 5.18 & Attach. H; Draft EIS Chapter 5.18 & Hazardous Materials Technical Report, *available at* http://www.i-70east.com/reports.html.  These materials span thousands of pages, so are not attached.

Plaintiffs simply argue that the Agencies failed to study the effects of spreading contamination; they do not challenge the reasonableness of the Agencies' conclusion that compliance with standard construction mitigation measures and all applicable laws will avoid any harmful release.

Further, Plaintiffs incorrectly assert that the Agencies "admit" that the Project "will" result in the release of hazardous materials, and that the FEIS only analyzes the impacts of the Project "*on the hazardous materials themselves*."  (Stay Motion 14, 25.)  That argument badly misreads the FEIS, which states that the release of hazardous materials "*could* … lead to exposure of workers or the public to these materials *if* proper health [and] safety protocols are not followed and remediation efforts are not applied."  (Ex. 1_FEIS 5.18-11 (emphasis added).)  The FEIS goes on to conclude, however, that compliance with applicable laws and other standard mitigation measures will "avoid or minimize" the release of hazardous materials.  (*Id.* at 5.18-16 to 5.18-18; Ex. 4_ROD at 61-63.)  Thus, there is no admission that the Project will result in a dangerous release of hazardous materials.

Moreover, the FEIS discusses how the Project could disturb hazardous materials because understanding disturbance is how agencies protect health and the environment, and does not reflect a desire to protect the hazardous materials, as Plaintiffs strangely suggest.  Because the Agencies made "a reasonable, good faith, objective presentation" of the potential for Central 70 to disturb hazardous materials, Plaintiffs cannot succeed on the merits of their NEPA claim.  *See Forest Guardians*, 495 F.3d at 1172 (quotation omitted).

## II.      Plaintiffs have not shown irreparable harm from the Central 70 Project.

Plaintiffs must establish *all* four factors for preliminary injunctive relief.  *See Winter*, 555 U.S. at 23; *N.M. Dep't of Game & Fish*, 854 F.3d at 1246.  Because Plaintiffs are unlikely to

prevail on the merits, this Court "need not address the remaining preliminary injunction factors." *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). Nevertheless, the other factors—irreparable harm, balance of the equities, and the public interest—provide independent grounds to deny Plaintiffs' motion.

To qualify as irreparable, an injury must be "certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). The mere "possibility" of harm is insufficient; Plaintiffs must make a "clear showing" that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. That is "not an easy burden to fulfill." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (citation omitted).

Plaintiffs have not shown that Central 70 will cause them any irreparable harm. Instead, they focus almost exclusively on the alleged impacts of Denver's construction of its stormwater project. (Stay Motion 25-31.) Plaintiffs commit just one unsupported sentence to the possibility that, when CDOT breaks ground on the lowered portion of I-70 next year, they could "spread[] … hazardous materials." (Stay Motion 26.) Aside from that single sentence, Plaintiffs focus solely on the work that Denver is performing at Globeville Landing Park, City Park Golf Course, and along 39th Avenue. (Stay Motion 26-31.)

Denver, however, is not a party to this action and is not before the Court. Denver requires no permit from FHWA and is using no federal funds for any part of its stormwater project. (Ex. 4_ROD 132.) Although CDOT is contributing some state funds to Denver's stormwater project, there is no evidence that Denver will halt work if it does not receive those funds. To the contrary, Denver has committed to complete its project regardless of Central 70's

implementation.  (Ex. 11_Thomas Decl. ¶ 22; Ex. 14_DiMascio Decl. ¶ 5; Ex. 15_Thomas Testimony 45:8-25; Ex. 16_Uhernik Testimony 44-45.)  And, FHWA does not control CDOT's use of its own funds.  An injunction therefore cannot and will not redress any alleged harm from Denver's activities.  Plaintiffs lack standing to request an injunction because their alleged injuries are "the result of the independent action of some third party not before the court."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Lujan*, 504 U.S. at 560).

Moreover, Plaintiffs' delay in filing their motion "cuts against finding irreparable injury" from construction of the outfall system.  *See Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994) (citations omitted); *see also Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.") (quotation omitted).  Denver began constructing the outfall system in November 2016 and has substantially completed all necessary excavation in areas with hazardous materials.  (Ex. 11_Thomas Decl. ¶¶ 17-18)  If the potential for spreading hazardous materials was a real risk, Plaintiffs should have sought an injunction against Denver long ago.[11]

_____

[11] Moreover, the ROD did analyze the direct, indirect and cumulative effects of the outfall system that Denver is constructing at Globeville Landing Park, because stormwater from the highway's drainage system will pass through that outfall.  (Ex. 4_ROD 133, 135-87; Ex. 5_HazMat Report Update.)  Plaintiffs' motion identifies no specific flaw in that analysis.

More fundamentally, Plaintiffs' fears that Denver will spread contamination (Stay Motion 27-30) are the kind of speculative or "theoretical" harms that do not justify preliminary relief. *Heideman*, 348 F.3d at 1189. Denver has already completed nearly all of the excavation in the areas with hazardous materials.[12] (Ex. 11_Thomas Decl. ¶ 18) Denver is following strict U.S. Environmental Protection Agency and state requirements to prevent the spread of contamination. (*Id.*) Denver also has been conducting daily monitoring and has observed *no exceedances* of any state or federal standard. (*Id.*; Ex. 5_HazMat Report Update 2.) Similarly, when CDOT begins reconstructing I-70, it will apply industry-standard construction mitigation measures to avoid the spread of contamination and will comply with all state and federal requirements concerning the cleanup of contaminated sites. (Ex. 1_FEIS 5.18-2 to 5.18-18; Ex. 4_ROD 61-63.) Plaintiffs provide no evidence that either project will likely or certainly spread contamination, and their subjective concerns about the mere "possibility" of such an occurrence are insufficient to obtain a preliminary injunction. *Winter*, 555 U.S. at 22.

Plaintiffs' unsubstantiated fears that their investments or property values could decline are equally as speculative and come with no evidence. (Stay Motion 28, 30.)[13] It is equally, if not more, possible that their property values will increase due to the flood-control, open-space, transportation, and safety benefits conferred by the two projects. Nor is the temporary noise and

---

[12] The aerial photograph attached to Plaintiffs' motion shows clearly the extent to which excavation has already occurred and critical structures such as box culverts are already built. ECF/CM 32-18.

[13] Further, such purely economic injuries lie outside of NEPA's zone of interests. *Lower Ark. Valley Water Conservancy Dist. v. United States*, 578 F. Supp. 2d 1315, 1338 (D. Colo. 2008) (citations omitted).

inconvenience of construction a sufficiently "great" harm to justify preliminary relief. *See Heideman*, 348 F.3d at 1189; *see also W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2011).

Finally, Plaintiffs' alleged procedural injuries (Stay Motion 27-30), "standing alone, [are] insufficient as a basis for injunctive relief." *George Washington Home Owners Ass'ns v. Widnall*, 863 F. Supp. 1423, 1427 (D. Colo. 1994); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (no "thumb on the scales is warranted" in NEPA cases); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[T]here is no presumption of irreparable harm in procedural violations of environmental statutes.").

In sum, Plaintiffs have not made the necessary strong showing that they are likely to suffer irreparable harm from the improvements authorized by the Central 70 ROD.

**III.    The balance of equities favors allowing the Central 70 Project to proceed.**

Plaintiffs' failure to demonstrate anything but speculative injuries also means that they cannot demonstrate that the balance of equities tips in favor of a preliminary injunction. *See Winter*, 555 U.S. at 24-26 (movant must demonstrate that balance of equities tips in her favor). Plaintiffs' speculative, unproven injuries are outweighed by the serious harms that an injunction would cause to the Agencies' ability to fulfill their missions on behalf of the public.

First, CDOT has a fundamental interest in the management of its facilities and protection of public safety. *See e.g.*, Colo. Rev. Stat. §§ 43-2-102, 43-4-802(1)-(2). The I-70 viaduct was built in 1964 and is standing on borrowed time. The two-mile long viaduct that supports a section of I-70 has exceeded its expected 30-year lifespan by over 20 years and is classified as structurally deficient. (Ex. 12_DeVito Decl. ¶ 7; Ex. 1_FEIS 2-5.) "This means that engineers

have identified a major defect in the bridge's support structure or deck." (Ex. 1_FEIS 2-5.) The viaduct is crumbling, with large pieces of concrete falling from the structure onto 46th Avenue. (*Id.*) A 2017 structural inspection confirmed the structural deficiency of the viaduct and showed significant deterioration of condition since the last inspection and the condition reported in the Final EIS, "including an inventory of fatigue cracks and tears, girders skewed 45 degrees, exposed rebar, rust, and concrete spalling and delamination." (Ex. 12_DeVito Decl. ¶ 7; Ex. 18_Viaduct Inspection). "In June, another series of emergency repairs were necessary after several post tension rods (which essentially hug the structure together and were designed and installed to help distribute loading across the piers of the structure) catastrophically failed and sprung loose from the bridge." (*Id.*) While recent rehabilitation has extended the lifespan to probably 10-15 more years, construction of *any* replacement project (new viaduct or the proposed lowered Project) is expected to last at least four years. (Ex. 12_DeVito Decl. ¶ 7, 13; Ex.1_FEIS at 2-5.) A preliminary injunction would erode the limited time to replace this structurally deficient structure, over which more than 200,000 vehicles travel every day. (Ex. 1_FEIS at 2-8.)

Second, the lives and safety of CDOT employees would be endangered by extending the time that the serious safety deficiencies on I-70 remain in place. The FEIS detailed safety problems on I-70 resulting from obsolete designs, including shoulders as narrow as two feet, inadequate acceleration/deceleration lanes, and insufficient sight distances at ramps. (*Id.* at 2-10.) As a result, I-70 has a higher-than-average accident rate and a history of fatal accidents. (*Id.*) This puts the CDOT employees tasked with maintenance and keeping I-70 safe at a heightened risk for an extended period during any injunction. (Ex. 12_DeVito Decl. ¶ 6.)

24

Third, CDOT and the motorists of Colorado will be financially injured by a preliminary injunction.  (Ex. 13_Spector Decl. ¶ 12.)  An injunction would disrupt the project procurement effort that CDOT has undertaken for two years at a cost of over $40 million.  (*Id.* ¶ 5.)  And it would likely cause CDOT to lose its firm construction cost bid, exposing it to construction cost increases of $50 million or greater, interest rate increase risk that could cost $70 million, and $10-15 million in contractual costs with railroads and utilities.  (*Id.* ¶ 7.)  The best estimate of additional cost associated with a one-year delay from a preliminary injunction, not including interest rate risk, would be at least $60 million.  (*Id.* ¶ 12.)

These financial costs are not just a private harm to a private party that can be addressed through money damages.  CDOT's funding, for this Project and in general, comes from taxes and fees, such as the fuel tax and bridge fee, which all motor vehicle owners pay to replace, maintain, and operate infrastructure.  (Ex. 4_ROD at 127-9.)  Costs increases resulting from a preliminary injunction will necessarily reduce funds available for other needed bridge replacements, safety improvements, and other projects in the State.  (Ex. 13_Spector Decl. ¶¶ 8-9.)  This would delay work on structurally deficient bridges currently on the list for replacement in Huerfano, Otero, Park, Delta, Eagle, Grand, Saguache, Sedgwick, and Archuleta counties.  (*Id.*)

## IV.    Denial of the requested injunction would serve the public interest.

The public interest would not be served by staying the Central 70 ROD.  *See, e.g.*, *Valley Cmty. Pres. Comm. v. Mineta*, 373 F.3d 1078, 1087 (10th Cir. 2004) (movant must show public interest favors injunction).  As with CDOT employees, the hundreds of thousands of people who use I-70 every day will experience heightened risk of accidents, injury, and death by delaying

needed safety improvements.  Unlike Plaintiffs' alleged injuries, these risks are not speculative.

More crashes occur on I-70 than the state average for urban freeways.  (Ex. 1_FEIS 2-10.)

For example, from 2009 to 2012, there were 2,872 crashes on I-70 within the project

area.  (*Id.*)  Of these crashes, 1,068 occurred on the I-70 interchange ramps and crossroads and

1,804 occurred on mainline I-70.  (*Id.*)  Over the three-year period, there were seven fatalities on

this portion of I-70.  (*Id.*)  The deteriorating viaduct also poses additional safety risks for drivers,

pedestrians, and cyclists on and under it.  (*Id.*)  An injunction would extend these unsafe

conditions for a year or more, depending on the duration of the litigation.

The Colorado Legislature has declared that "[t]here is an urgent present need to repair

and replace structurally deficient and functionally obsolete bridges and improve highway safety

in the state."  Colo. Rev. Stat. § 43-4-802(2)(b).  Accordingly, it created the bridge surcharge on

motor-vehicle registrations to accelerate funding and construction of projects like the I-70

project.  *Id.* §§ 43-4-802(2)(c), 43-4-805.  An injunction would delay and frustrate this clearly

identified public interest to protect public safety.  In the context of the public interest prong for

preliminary injunctions, the Tenth Circuit has recognized that the "well-recognized important

public interest in safety on the roads and highways" weighs in favor of completing projects that

alleviate safety risks.  *Valley Cmty.*, 373 F.3d at 1087 (quotation omitted).

Further, delaying the Project would extend the public harms associated with congestion

and lost time.  The portion of I-70 between I-25 and Tower Road is one of the most heavily-

traveled and congested highway corridors in the region and state, currently serving over 200,000

vehicles a day.  (Ex. 1_FEIS 2-8.)  Some segments are congested for as many as ten hours per

day.  (*Id.* 2-9.)  Trips take approximately twice as long during morning and evening peak hours,

resulting in over 66,000 excess vehicle hours traveled each day due to congestion.  (*Id.* 4-14, 4-19.)  Even a year's delay in construction would result in travelers losing almost 22 million additional hours due to I-70 congestion that could not be spent with families, community, work, or recreation.  (*Id.*)  Further, congestion on I-70 causes drivers to divert onto local streets, causing additional congestion and safety issues within those neighborhoods.  (*Id*. 4-33, 4-36, 4-43, 4-52.)

An injunction would also prolong the community divisions and impacts caused by the existing viaduct.  The Project will increase neighborhood connectivity by removing the viaduct, lowering a section of I-70, and constructing a four-acre cover that will serve as a public park. (*Id.* at 3-11 to 3-18.)  The cover will benefit the surrounding communities by removing a major visual barrier, providing open space, and increasing neighborhood mobility for drivers, pedestrians, and bicyclists.  (*Id.* at 5.3-30 to 5.3-35.)  The Project also will provide other substantial community benefits that would be delayed by an injunction, including $2 million for affordable housing, $100,000 for fresh food initiatives, upgrades to Swansea Elementary School, safe routes to school, local hiring initiatives, and investment in air conditioning for residents. (Ex. 4_ROD 25-27.)  The Project will create 13,900 jobs across the local economy, from low-wage workers to high-wage professionals.  (Ex. 1_FEIS 5.2-48, 5.3-13.)

Further, although Denver is not before this Court, and staying the ROD for Central 70 will not affect Denver's planned activities, Plaintiffs' wish is to halt a Denver project that will protect lives, homes, and businesses in the City's northern neighborhoods from catastrophic flooding.  (Ex. 11_Thomas Decl. ¶ 5; ECF 32-15_Conceptual Report at CCD008746, 8759, 8763.)  "The City's past experience and stormwater modeling show that, during large storm

events, substantial portions of the downstream neighborhoods in the Montclair and Park Hill Basins will experience surface water depths of three feet or more, and some areas would experience depths as great as 6 feet." (Ex. 11_Thomas Decl. ¶ 9; ECF 32-15 Conceptual Report at 8763 (map of flooding); Ex. 17_Video of 2011 Flooding.) "The Denver area typically experiences several rainfall events per year. Should a 100-year storm event occur under existing conditions, the result would be catastrophic. Several hundred properties are at risk, and the estimated damage in the Montclair Basin alone would be in the hundreds of millions of dollars." (Ex. 11_Thomas Decl. ¶ 9)  Flooding would also endanger residents and first responders. (*Id.*)

Again, unlike Plaintiffs' alleged injuries, these flooding risks are not speculative. Widespread flooding has occurred in storms over the past 100 years, including events with loss of life. (*Id.* ¶ 6; Ex. 8_Master Plan 8-13.)  "Even during moderate storm events, stormwater in the downstream neighborhoods ha[s] flooded properties and created unsafe conditions for residents and first responders." (Ex. 11_Thomas Decl. ¶ 8.)  Those clear and present dangers to Denver residents heavily outweigh Plaintiffs' subjective and unsubstantiated fears about the spread of contamination and the diminution of their investment portfolios. (Stay Motion 28.) The balance of the equities and the public interest overwhelmingly favor denying the motion.

## V.    Any preliminary injunction must be narrowly tailored.

Preliminary injunctions must be "narrowly tailored" to address the irreparable harm caused by specific legal violations. *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004); *Citizen Band Potawatomi Indian Tribe v. Okla. Tax Comm'n*, 969 F.2d 943, 948 (10th Cir. 1992).  Injunctive relief should be "no more burdensome to the defendant than necessary" to provide relief to the plaintiffs. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiffs request the Court to stay "all further action" by the Agencies "undertaken in furtherance of Central 70 and [Denver's stormwater project]."  (Stay Motion 1.)  Even if Plaintiffs had met the standards for a preliminary injunction, this Court should not issue such an overbroad one.  Plaintiffs' legal claims and alleged harms focus almost entirely on Denver's stormwater project, and most of those are on the Globeville Landing Outfall site.  An order putting a wholesale stop to Central 70 would be far broader than necessary to address the limited harms from Denver's stormwater project alleged in Plaintiffs' motion.  Any stay must be narrowly tailored to address any such harms that the Court might find.

CDOT further requests that Plaintiffs be required to post an injunction bond.  "The court may issue a preliminary injunction … *only* if the movant gives security …."  Fed. R. Civ. P. 65(c) (emphasis added).  The lead Plaintiff in this case, Mr. Zeppelin, is a real-estate developer who professes an interest in protecting the value of his company's many investments in the booming River North area.  (ECF 1-1, Zeppelin Decl. ¶¶ 4-5, 19; Stay Motion 28.)  A bond of $60 million would be appropriate to compensate for the likely financial harms CDOT and taxpayers will sustain if it is wrongfully enjoined from proceeding with Central 70 for the duration of this litigation.  (Ex. 13_Spector Decl. ¶ 12.)

## CONCLUSION

Plaintiffs cannot use the ROD for Central 70 to attack a separate Denver stormwater project.  FHWA reasonably concluded that Central 70 and Denver's stormwater project serve different purposes, and each will take place regardless of the other.  Plaintiffs' motion should be denied so that the Agencies can deliver the long-planned benefits of Central 70 to the public.

Respectfully submitted,

BRENT E. BUTZIN                          JOHN E. PUTNAM
Assistant Attorney General               NICHOLAS A. DIMASCIO
1300 Broadway, 10th Floor                KAPLAN KIRSCH & ROCKWELL LLP
Denver, CO  80203                        1675 Broadway, Suite 2300
(720) 508-6638                           Denver, CO  80202
Brent.Butzin@coag.gov                    (303) 825-7000
                                         jputnam@kaplankirsch.com
                                         ndimascio@kaplankirsch.com


                                         *Attorneys for Defendant-Intervenors*

SEPTEMBER 27, 2017                        *s/ John Putnam*_____
                                         JOHN E. PUTNAM

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September, 2017, I electronically filed the

foregoing document and all of its attachments with the Clerk of the Court using the CM/ECF

system which will send notification of such filing to the following email addresses:

Melissa A. Hailey
Aaron D. Goldhamer
Keating Wagner Polidori Free, P.C.
1290 Broadway, Suite 600
Denver, CO 80203
(303) 534-0401
(303) 534-8333
mah@keatingwagner.com
agoldhamer@keatingwagner.com

James Jay Tutchton
Tuchton Law Office
6439 East Maplewood Avenue
Centennial, CO 80111
(720) 301-3843
jtuchtontlo@gmail.com

Robert E. Yuhnke
4050 Se Hosner Terrace
Gresham, OR  97080
Yuhnke@prodigy.net
303-499-0425

Andrea S. Gelfuso
Andrea Gelfuso, Attorney at Law
2402 South Holland Street
Lakewood , CO  80227
303-955-1910
Email:Agelfuso6@gmail.com

Carter F. Thurman
Mayte Santacruz
U.S. Department of Justice
Env't & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0465 (phone)
(202) 305-0506 (fax)
carter.thurman@usdoj.gov
mayte.santacruz@usdoj.gov

David A. Carson
United States Department of Justice
Env'l Natural Resources Division
Environmental Defense Section
Denver Place Building
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
(303) 844-1349
david.a.carson@usdoj.gov

Gregory Nicholas Corbin
Milligan Rona Duran & King, LLC
1627 Vine Street
Denver , CO  80206
720-414-2000
Fax: 855-395-5525
Email:Gnc@mrdklaw.com


s/ John Putnam
JOHN E. PUTNAM