**Exhibit 13**

**Declaration of David I. Spector**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Actions Nos.    17-cv-01661-WYD-MEH
                      17-cv-01679-WYD-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE; JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

        Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as Secretary of Transportation; and JOHN M. CARTER; in his official capacity as Division Administration,

        Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, et al.,

        Defendant-Intervenors.

## DECLARATION OF DAVID I. SPECTOR IN SUPPORT OF OPPOSITION TO ZEPPELIN PLAINTIFFS' MOTION FOR STAY

I, DAVID I. SPECTOR, being competent to make this statement, do swear and affirm the following:

1. I am the Director of the Colorado High Performance Transportation Enterprise (HPTE), an enterprise within the Colorado Department of Transportation that was created by the Legislature to implement and facilitate innovative financing of transportation projects. Procurement and development of the Central 70 Project was referred to HPTE by the Colorado Transportation Commission.

1

2. This Declaration is based on my personal knowledge and information from business records which are maintained in the ordinary course of business and from entries made therein at or near the time of the events so recorded. I am authorized to testify to the matters herein. If called as a witness, I could competently testify regarding the facts in this declaration.

3. The primary funding to replace the structurally deficient viaduct on I-70 (Central 70 Project) will come from the Colorado Bridge Enterprise (CBE). The Bridge Enterprise was formed in 2009 as part of the Funding Advancement for Surface Transportation and Economic Recovery (FASTER) legislation. Like HPTE, it operates as a government-owned business within the Colorado Department of Transportation. The Colorado Transportation Commission serves as the CBE Board of Directors. The purpose of the CBE is to finance, repair, reconstruct and replace bridges designated as structurally deficient or functionally obsolete and rated "poor." In order to accomplish this goal, a bridge safety surcharge ranging from $13 to $32 has been imposed on vehicle registration based upon vehicle weight. Revenues from the bridge safety surcharge fee are estimated to generate approximately $100 million in annual funding.

4. The State recently selected a private partner to design, build, operate, finance and maintain the Central 70 Project. This is the result of a more than two-year competitive procurement process that involved extensive diligence to ensure and protect the public interest, including a request for qualifications and a request for proposals that included a project agreement against which all interested teams would bid. The State has selected the proposal that offered to deliver the project to the State for the best value and lowest cost. The State is now working to reach "commercial close" by the end of the year, at which the developer and State would sign the project agreement and related documents. This would be followed by a "financial close" at which CBE, developer and lenders would execute financing documents and issue bonds

and borrow over $600 million dollars for the construction of Central 70. Pursuant to the RFP, the Project is required to reach financial close by January 28, 2017, after which key elements of the preferred proposer's bid are subject to cost escalation. CBE has delegated many of its obligations related to the execution of the financing of the Central 70 Project to HPTE.

5. The Central 70 Project procurement process has taken over two years and cost over $40 million in State dollars. The State's private partner will be obligated by contract to deliver the project within the schedule and at the bid price submitted. The contract is expected to be executed in November.

6. However, under the request for proposals, the design and construction prices from the bid process are only certain for a period of 180 days after submission of bids (August 1, 2017). The State is entitled to extend the bid prices by another 180 days, but would also be required to pay construction cost inflation and the full change in interest rates on the private partner's proposed financing. If a preliminary injunction were granted that would last past July 27, 2018, the State would have to renegotiate the price or rebid the process completely. It would thus lose many of the hard-won price and schedule guarantees it received in the competitive process and that it has negotiated with the private partner on the largest project ever undertaken by the Bridge Enterprise.

7. The State would be exposed to construction cost inflation of 4% or more per year, as well as risks inherent in the renegotiation of construction pricing outside of a competitive procurement process, which could amount to another 4% increase in construction costs. Assuming a year of delay from a preliminary injunction, overall escalation of construction costs of delay would be $50 million or greater (per year) in additional Bridge Enterprise funding needed to complete construction of the Central 70 Project, consuming a large proportion of the

approximately $100 million per year the Bridge Enterprise would collect in revenues over the next year.

8. As a result, an injunction will immediately set back the State's bridge replacement program by as much as 6 months due to the resulting uncertainty in the availability of funds for other projects. If an injunction causes delay in this project, additional Bridge Enterprise funds will have to be set aside to account for cost increases caused by the delay. These set-aside funds will consequently not be available for other needed State bridge projects.

9. As of 2016, the State had 59 structurally deficient and functionally obsolete bridges remaining statewide that were eligible for replacement, and which would be at risk of delay by an injunction. Many of these bridges are located in rural areas of the State. (The structurally deficient and functionally obsolete bridges most recently added to the Bridge Enterprise's scheduled replacement program in 2015-2016 are focused overwhelmingly in areas of the State outside of the Denver Metropolitan Area, including bridges in Huerfano, Otero, Park, Delta, Eagle, Grand, Saguache, Sedgwick, and Archuleta counties.) In the absence of an injunction, these bridges would be constructed as soon as funds become available.

10. A delay to the project also exposes the State to increases in interest rates and other financing-related costs. The State's private partner was required to bid against benchmark interest rates representative of the current low interest rate environment. To the extent interest rates rise prior to financial close, the State's payment to the private partner will increase to account for rate increases. Interest rate increases ranging from 0.5% to 1.0% would result in an additional cost of approximately $70 million to $140 million in additional costs to the Bridge Enterprise over the term of the financing for the Project.

11. Additional costs to the State would arise from the preliminary injunction that Plaintiffs seek as a result of penalties and costs under third-party agreements with railroads and utilities (*e.g.*, Xcel Energy, Comcast, Denver Water and Metro Wastewater) that CDOT is relocating as part of the Central 70 Project. Assuming a one-year delay, I estimate that the State could be exposed to another $10-15 million in costs related to third party delays and remobilization efforts. The largest and most costly of these impacts would result to any delays in payment or approvals for the Union Pacific Railroad to reconstruct track for its crossing of I-70, an essential and time-critical part of the Central 70 Project. Under the Union Pacific agreement with CDOT, which is typical of railroad relocation contracts for highway projects, the Railroad conducts the track and signal work itself and is reimbursed by the State. If CDOT is enjoined, the Railroad would suspend this work until the injunction is dissolved. Because the Railroad's construction labor forces are scheduled nationally and are scheduled for up to a year out, getting those forces rescheduled will be entirely out of our control and the costs of demobilization, remobilization and cost increases are borne by CDOT as the party requiring the change to the existing tracks. I conservatively assume a three-month delay in remobilization of Railroad and utility work forces.

12. Considering the range of reasonable harms, I estimate that CDOT would experience financial losses in excess of $60 million in the event of a one-year preliminary injunction, exclusive of additional risk exposure due to shifting interest rates. Actual harms will only be knowable in retrospect, because future construction cost, remobilization and other elements will depend on construction cost inflation and other factors. Because construction cost and other increases are a function of time and rate of increase, the financial losses would be greater if the injunction goes longer and be reduced if the period of the injunction is shorter.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Name

Executed this 27th day of September, 2017, at Denver, Colorado.