## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Nos:   17-cv-01661-WYD
                    17-cv-01679-WYD

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE; JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; ELAINE CHAO, in her official capacity as Secretary of transportation; and JOHN M. CARTER, in his official capacity as Division Administrator,

      Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION; and SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado Department of Transportation,

      Defendant-Intervenors.

### DECLARATION OF DENNIS E. ROYER, P.E.

I, DENNIS E. ROYER, hereby declare:

1.     The facts set forth in this Declaration are based upon my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter, which is based

on the years of educational and professional experience shown in my curriculum vitae ("CV"). A current version of my CV is appended hereto as Attachment 1.

2.  I am a citizen of the United States and resident of Denver, Colorado. I currently work as the President of DER Consultant Services, a company that provides management, environmental, and engineering services to the public and private sectors. DER Consultant Services specializes in government efficiency analysis, private development impact analysis and site planning, traffic engineering safety and operational improvements, environmental impact analysis, and transportation planning. I have served as the President of DER Consultant Services since 2010.

3.  I have both a Bachelor of Science degree and a Master of Science degree in Civil Engineering, and have served as adjunct faculty at the University of Denver. I am licensed as a professional engineer in the State of Colorado. I have been licensed as a professional engineer since 1976, first in the State of Virginia and in 1979 in the State of Colorado. I have maintained my Colorado license.

4.  I worked for the City and County of Denver from 1979-2006. Within that time, I served as the City's Director of Transportation Engineering / City Traffic Engineer, the Director of Program Development, the Deputy Manager of Public Works for Program Development, and the Deputy Manager of Public Works for Operations. Within these various capacities, I was responsible for the planning, design, implementation, and maintenance of the City of Denver's transportation system. This included the coordination of the design, construction, and operation of state highways. Also within these various capacities, I was responsible for overseeing the City's agencies for finance and administration, street maintenance, fleet maintenance, and design

2

and construction management. I have personally developed construction programs for the City of Denver and secured and negotiated funding for state highway and interstate projects. Most recently with the City of Denver, I assumed responsibility for overseeing the solid waste and wastewater operations agencies. One of my major program responsibilities in that capacity was to implement the Platte River water quality improvements to meet Federal Clean Water standards.

5. From 2006 to 2010, I served as the Chief of Public Works and Transportation for the City of Boston, Massachusetts. During that same time frame, I was also appointed Commissioner of Boston Public Works. Within these roles, I was directly responsible for managing the City's street maintenance, central fleet maintenance, sanitation, recycling, engineering, bridges, parking, street lighting, signals, and capital infrastructure construction.

6. In 2012, I served on a temporary six-month assignment as the Operations Expert for the Colorado Department of Transportation ("CDOT"). At that time, I conducted an independent assessment of the I-70 Mountain Corridor. This included reviewing operational functions involving Intelligent Transportation System, maintenance, incident management, event management, and traffic operations. As Operations Expert, I developed an operations plan with recommendations for improved travel demand management along the mountain corridor.

7. Since returning to Denver in 2010, I have been aware of CDOT's plans to expand I-70 in Northwest Denver. I am not opposed to the idea of an I-70 expansion; however, I am opposed to CDOT undertaking such a huge infrastructure project without disclosing the actual scope, costs, and impacts of this endeavor. I have attended numerous meetings on the Central 70 Project over the years, spoken with myriad government officials and private citizens about this

project, and submitted formal comments to CDOT and the Federal Highway Administration ("FHWA") during the National Environmental Policy Act ("NEPA") process. Those comments are appended to this Declaration as Attachment 2.

8. Since submitting those formal comments in February 2016, I have become aware of and reviewed the Intergovernmental Agreement ("IGA") between CDOT and the City of Denver. The IGA expressly states that CDOT must provide 100-year storm protection for the entire I-70 East Project and that the City's Two Basin Drainage Project ("TBDP"), which has subsequently been expanded to the Platte to Park Hill Stormwater Drainage Project ("P2PH"), will be designed to provide such protection for the interstate. Under the terms of the IGA, CDOT committed to fund 40% of the TBDP and was given the right to review and comment on the design of the Early Action Drainage Project ("EADP"), which is the first phase of P2PH. The IGA expressly acknowledges that the City's construction of the TBDP will significantly benefit CDOT and is specifically intended for the I-70 corridor.

9. It is common knowledge in the industry that interstate highways must be accompanied by 100-year flood protection. Unsurprisingly, the Record of Decision ("ROD") for the Central 70 Project states that construction of the Partial Cover Lowered ("PCL") Preferred Alternative requires 100-year flood protection for I-70.

10. I have reviewed the Supplemental Draft Environmental Impact Statement ("SDEIS"), the Final Environmental Impact Statement ("FEIS"), and the ROD for the Central 70 Project. The PCL Alternative is strikingly similar to the below-ground design alternatives first proposed when the I-70 expansion was part of the anticipated joint highway and transit project involving FHWA, the Federal Transit Administration ("FTA"), CDOT, the Regional

4

Transportation District ("RTD"), and the City of Denver. I know at that time that CDOT, the City, and others believed a lowered design was feasible, but I also know that these entities acknowledged the difficulty of digging the trench for the lowered portion of the highway while the viaduct is still standing.

11.     I requested a feasibility analysis during our environmental study of the I-70 Mousetrap in the 1990's when we were looking at extending construction beyond Brighton Boulevard. The consultant acknowledged that depending on the separation between the trench and the viaduct and construction methodology utilized, it was feasible to dig a trench for the highway while the viaduct was still standing. The consultant also advised that although feasible, digging the trench while the viaduct was standing would be expensive and most likely beyond CDOT funding capability at the time. Now that CDOT has established the PCL Alternative as the preferred and approved alternative for Central 70, the impacts of construction become significant relative to the flooding potential of the construction site and the surrounding neighborhoods.

12.     CDOT must maintain the structural integrity of the subsurface foundation for the viaduct to avoid collapse while digging the trench. At the same time, CDOT needs to provide drainage protection for the trench during construction. Since the depth of the trench approaches the existing water table, and building the approach grades to the full depth section will permit runoff from storms to enter the depressed section, CDOT requires flood protection to avoid flooding the trench during construction. (This is to avoid a similar situation to what occurred during the construction of T-REX (the I-25 reconstruction between Broadway and Lincoln Avenue) when the Logan underpass was flooded by a rain storm during construction.)

13. Unfortunately, both the FEIS and the ROD present incomplete data for accurately analyzing the ability to build the piping system with the viaduct in place. In both documents the plan and profile drawing for the segment between Steele Street and York Street is omitted. (This plan is important because it would show the placement of the piping system and the nine inlets.) Right of way acquisition drawings are also omitted, so it must be assumed that no right of way acquisition is proposed along the south side of the existing viaduct. Without a south-side right of way, it is impossible for CDOT to build the off-site drainage system shown in the FEIS and ROD prior to the viaduct being removed. A field review of the construction site furthermore indicates that it is highly improbable that the piping system could be constructed without removing the viaduct.

14. Nothing about the physics of highway construction has changed since 2003-2008 when CDOT and its former partners first explored the option of lowering the I-70 below grade. I have studied the ROD and am familiar with the Central 70 construction area. The right of way necessary for the lowered I-70 expansion is 3.4 times wider than the current footprint of the viaduct (88 feet not counting access ramps). The finished right of way for the trench itself is approximately 200 feet, with a 45-foot right of way on both the north and south sides for frontage roads. Thus, the entire cross section needed between Brighton Boulevard and Colorado Boulevard is approximately 290 feet.

15. The off-site drainage components of the Central 70 Project as represented in the ROD consist of a series of detention ponds and an underground pipe running along the southern border of the highway to Globeville Landing Outfall ("GLO"). That underground pipe is designed to be situated directly underneath where the viaduct currently stands. For this reason,

6

the pipe cannot be constructed until after the viaduct is destroyed. Of course the viaduct cannot be destroyed until the trench for the below-grade highway is dug and that lowered portion of highway is functional enough to accept the traffic that will be diverted from the viaduct so it can be torn down.

16. It is my opinion, based on my review of the NEPA documents, my familiarity with the Central 70 construction area, and my education and professional experience, that construction of the lowered portion of the highway can only be accomplished in this step-wise fashion: dig the highway trench directly beside and to the north of the viaduct; complete enough of the lowered portion of the highway to handle diverted traffic; divert traffic from the viaduct onto the lowered highway; tear the viaduct down; excavate for the pipe on the former path of the viaduct; and construct the pipe within that pipe trench. This step-wise approach necessarily leaves the lowered portion of the highway totally unprotected from a 100-year storm event until the off-site drainage pipe can be completed. Based on my years of education and experience and my review of the ROD, I estimate that period of time from when the lowered portion of the highway begins to accept traffic and when the off-site drainage pipe is complete to be approximately 2-3 years.

17. FHWA and CDOT maintain in the ROD that CDOT's off-site drainage pipe is "redundant" to the drainage components of P2PH and that CDOT's off-site drainage system can, on its own, protect the lowered portion of the highway from flooding in a 100-year storm. Based on my years of education and experience and my review of the ROD, it is my professional opinion that the Central 70 Project is dependent on at least that portion of P2PH consisting of the first phase of the EADP that must be completed by December 1, 2017, to protect the highway

7

trench from flooding during – at a minimum – the initial construction phase of the I-70 expansion project as described above.

18.     I have personal knowledge of Denver's most recent Storm Drainage Master Plan. That Master Plan does not contemplate providing 100-year flood protection to the older established neighborhoods of the City of Denver. To my knowledge, providing 100-year flood protection was never on the City's agenda until CDOT began seriously discussing the PCL Alternative. The P2PH project is not included in the adopted 2014 Storm Drainage Master Plan, nor has the City attempted to amend the plan to include this project. It is my opinion, based on my years of education and experience, including my employment with the City of Denver and my short-term employment with CDOT, and on my review of the IGA, Denver's Storm Drainage Master Plan, and the Central 70 NEPA documents, that but for CDOT's need to protect the lowered portion of I-70 to be constructed under the PCL Alternative, the City would not now be undertaking construction of the EADP.

19.     Various provisions of the IGA directly address the fact that the City will undertake construction of the EADP to meet CDOT's deadlines for the Central 70 Project. The IGA even includes liquidated damages provisions to ensure that the EADP is functional before CDOT begins excavation for the highway. In my experience with CDOT and the City, I know that CDOT does not have the authority to "gift" funds to the City without a specific legislative declaration. Rather, CDOT can commit funds to the City only for the purposes of funding projects directly related to highways and that benefit those highways. There is no doubt in my mind, based on my years of professional experience, including my experience with CDOT and the City, that P2PH was designed and is being constructed to protect I-70 from flooding.

20. The ROD states that CDOT will re-evaluate its off-site drainage component if necessitated by progress on P2PH. It my professional opinion, based on my years of experience and review of the ROD and IGA, that CDOT will announce on or before September 1, 2019 – the date in the IGA by which the entirety of the EADP must be completed – that its "redundant" off-site drainage components are, in fact, unnecessary in light of P2PH. I believe that CDOT and FHWA purposefully segmented P2PH from the I-70 NEPA analysis in order to expedite the ROD and construction of the trench and hide the true scope, cost, and impacts of this project.

21. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that to the best of my knowledge, the foregoing is true and correct.

DATED:   October 6th, 2017.

_____
Dennis E. Royer, P.E.

9

# ATTACHMENT 1

# RESUME

| | | |
|---|---|---|
| DENNIS E. ROYER | HOME | 720-328-5553 |
| 2325 Monaco Parkway. | BUSINESS/CELL | 303-518-4313 |
| Denver, Colorado 80207 | EMAIL | royer_dennis@yahoo.com |

## PROFILE

Dedicated and innovative professional manager/engineer with over twenty-five years of proven accomplishments in increasingly responsible positions in public administration, project management, transportation planning, consulting and business development. Proficient in problem resolution, collaborative decision making, supervising and implementing diversified policies, programs, and procedures for optimum productivity and cost efficiency. Adept at both oral and written communication skills, interacting effectively with individuals from all backgrounds including the general public, politicians, the media, technicians and planners. Excels at directing and motivating a cohesive staff in the successful attainment of agency and regional objectives.

## PROFESSIONAL EXPERIENCE

### DER CONSULTANT SERVICES

President                                                                                                              2010- Present

Provides management, environmental, and engineering services to the public and private sectors. Specializing in government efficiency analysis, private development impact analysis and site planning, traffic engineering safety and operational improvements, environmental impact analysis, and transportation planning.

### COLORADO DEPARTMENT OF TRANSPORTATION

Operations Expert                                                                                                                    2012

On a temporary six month assignment, conducted an independent assessment of the Interstate 70 Mountain Corridor. Reviewed operational functions involving ITS, maintenance, incident management, event management, and traffic operations. Developed an operations plan with recommendations for improved travel demand management.

### CITY OF BOSTON, MASSACHUSETTS

Chief of Public Works and Transportation                                                                            2006 to 2010

Appointed to cabinet position by Mayor Thomas Menino following a nationwide search. Also appointed Commissioner of Public Works, assuming all legal authority as well as daily management responsibilities of the Public Works Department. Directly responsible for management of street maintenance, central fleet maintenance, sanitation, recycling, engineering, bridges, parking, street lighting, signals and capital infrastructure construction. Major accomplishments include:

- Implementation of single stream recycling citywide with projected annual savings of $3.3 million
- Implementation of state of the art waterless, dustless street sweepers, saving 3.5 million gallons of water annually.

1

- Replaced aging parking meters with 96 multispace and 9,500 single-space for a 12% increase in meter and enforcement revenue with a projected increase of 37%, when completely implemented.
- Merged the Public Works and Transportation Departments into a single agency with annual savings projected at $2.5 million.
- Secured $39 million in American Recovery and Reconstruction Act stimulus transportation funding for the City of Boston.
- Annual operating budget of $110 million, capital budget, $46 million
- Improved operational efficiency every year while experiencing 10% budget reduction and 15% staff reduction.

CITY AND COUNTY OF DENVER, COLORADO

Deputy Manager of Public Works for Operations                                2005-2006

Following a functional reorganization of the Department, assumed responsibility for management oversight of the Street Maintenance, Solid Waste, and Wastewater Operations agencies. Major program responsibilities included implementation of the citywide, automated recycling conversion program, the unimproved alley paving program, expansion of the pavement management program, and the implementation of the Platte River water quality improvements to meet Federal Clean Water Standards by 2008.

Deputy Manager of Public Works for Program Development                      2001-2005

Assumed expanded responsibilities for the management oversight of the Finance and Administration, Street Maintenance, Fleet Maintenance, and Design and Construction Management agencies.

- Secured $17.2 million in federal funding earmarks for the 56th Avenue and Quebec Street corridors associated with the Prairie Gateway (Colorado Rapids Soccer Stadium) Development as well as the Central Park Boulevard Interchange.
- Created the 10-year, $24 million unimproved alley program to address citywide alley construction deficiencies.
- Developed the construction program, scheduling and budget for the $378 million Justice Center ballot initiative approved by voters in May 2005.
- Streamlined the city construction contracting process improving the time line by 40%.

Director of Program Development                                              2000-2001

Serving at the request of the Manager of Public Works, I was responsible for providing a macroscopic overview of the department functions and interfacing with atypical, nonoperational issues involving other city and regional agencies, private development and federal appropriations. I provided management oversight for the Parking Management Division and the Southeast Initiative.

- Secured $8.5 million in discretionary federal funding for interstate ramp access improvements for the new football stadium.
- Negotiated a funding resolution and implementation plan for new parking garages for the Denver Zoo and Museum of Nature and Science.
- Resolved a private development dispute with the T-REX project resulting in a net savings of $1.0 million in acquisition and construction costs.

2

<u>Director of Transportation Engineering/City Traffic Engineer</u>                          1985-2000

Appointed by Mayor Federico Pena. Responsible for planning, design, implementation and maintenance of the city transportation system. Management and coordination of personnel, operating and construction budgets totaling in excess of $40 million annually. Coordination of design, construction, and operation of regional improvements totaling over $300 million involving IVHS and signal system communications, light rail transit operation and state highway operations.

- Implemented state of the art technology improvements for shared communications and operations between the city, state and regional transit agencies.
- Implemented special event traffic operations center (Coors Field) as the first public/private joint venture in the state.
- Established IVHS infrastructure system, including central computer controlled signal system for on-line implementation in 1997.
- Implemented program modifications resulting in capital and operating budgets cost savings of $500,000 annually.
- Improved operational efficiency in maintenance programs by over 50% while absorbing a staff reduction of 24%
- Upgraded citywide signal system efficiency with annual savings of $400,000 and reduced vehicle emissions by 20%
- Implemented safety programs contributing to a 45% reduction in pedestrian fatalities and a 27% reduction overall.

<u>EDUCATION:</u>

Bachelor of Science in Civil Engineering
Ohio State University

Master of Science in Civil Engineering
Ohio State University

Co-adjunct professor at University College, University of Denver, instructing a course entitled Alternative Dispute Resolution-Public Sector Issues, 1994-1998

Co-Adjunct professor at University College, University of Denver, instructing courses entitled Public Policy-City Systems and Public Policy- City Services, 2004.

Professional Engineering License, State of Colorado - #16357

3

# ATTACHMENT 2

February 29, 2016

Mr. Shaun McGrath
Administrator
Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO 80202-1129

Mr. John Cater
Division Administrator
Federal Highway Administration, Colorado Division
12300 West Dakota Avenue, Suite 180
Lakewood, CO 80228

Mr. Shailen Bhatt
Executive Director Colorado Department of Transportation
4201 East Arkansas Avenue
Denver, CO 80222

Re: **Formal Protest of the Interstate 70 NEPA Process**

Gentlemen:

We formally submit to you our comments and protest of the Interstate70 NEPA process presented publicly via the Supplemental Draft and Final Environmental Impact Statement. We do not take this step lightly. In fact, we are saddened that we need to submit this letter to you. However, based on our years of public service and experience, and witnessing the handling of this process by the Colorado Department of Transportation staff and consultants, we feel we have no other recourse.

Before proceeding, allow us to introduce ourselves:

Dennis Gallagher – 44 years as an elected official serving in the Colorado Legislature, Denver City Council and Denver City Auditor representing the interests of the citizenry of Colorado and Denver. Renowned for the Gallagher Amendment that protects Colorado home owners, as well as numerous other bills and investigations into the public handling of funds and performance.

Dennis Royer – Over 40 years as a transportation professional and public works official. Served as Cabinet Chief of Public Works and Transportation/Commissioner of Public Works under Mayor Thomas Menino in Boston. Deputy Manager of Public Works and City Traffic Engineer for the City and County of Denver involved in all environmental analyses, such as the Mouse Trap and T-REX for Denver. As a consultant was a member of the team that performed the EIS for Secretary Coleman in 1978 for the Interstate 466 Extension (Dulles Access Road) in Virginia that was a state of the art success for innovation.

As stated earlier, we do not enjoy making the admissions that will follow. However, we have witnessed firsthand, the heavy handed approach taken with the impacted neighborhoods and the complete ignoring of citizen comments and desires, as well as the misreporting of impacts in official documentation. As a result, we have no other recourse but to bring this to your attention.

Gallagher/Royer Letter, Page 2

## 1. Pre-determination of Preferred Alternative:

- Public statements by CDOT representatives and statements in the SDEIS "predetermined" the preferred alternative without proper analysis. This is a major violation of NEPA process and despite repeated comments pointing out this fact and challenges by citizens were totally ignored by CDOT.
- The "managed lane" concept was selected in the SDEIS despite failure to properly analyze the concept. The analysis was deferred/postponed to the FEIS denying the public proper review and comment on the adequacy of the concept at that time. The FEIS does not appear to provide the delayed analysis as promised in the SDEIS to justify the selected preferred alternative.
- Challenges to the "pre-determination" by the public were dismissed at public meetings by CDOT representatives as not valid despite providing no justification to the challenges and moving forward with the P3 process which seems to be only utilized in managed lane and toll facility projects.
- CDOT initiated the P3 process in 2014 by contracting for outside assistance nearly one and a half years before the FEIS was released and having determined the final selected alternative.
- CDOT issued their "Value of Money" report and held a public workshop on selecting P3 as the preferred methodology for construction contracting in February, 2015. A request for the backup information on the analysis presented in the report was denied stating "--- it would put CDOT at a competitive disadvantage." It raises a serious question to public transparency of the process and an explanation as to whom CDOT was competing with. The public was given notice of the meeting and report two days in advance and it was held with Commissioners at the CDOT Headquarters at 8 AM. The notice, the time, nor the location was conducive to public involvement. Only six members of the public spoke, required by process to be in advance of any discussion with Commissioners, rather than in response to the meeting discussion and staff presentation. The hearing room was standing room only as it was filled with consultants and contractors desiring to obtain the design and construction contracts. Of particular note is that setting a meeting and agenda with for the Commissioners' attendance requires substantially longer than the two day notice given the public.
- At the February workshop, a CDOT Commissioner told the attendees, emphasizing to the public "You people need to understand that the train has already left the station." Obviously, the Commission was already on board with the predetermined alternative and P3 methodology.

## 2. Dismissal of "Reasonable Alternatives":

- CDOT eliminated "reroute/diversion" alternatives by cursory review based on cost, despite overwhelming demands from the public and the affected neighborhoods to consider such alternatives.
- Under NEPA Section 1502.14 – "Alternatives including the proposed action." states "In this section agencies shall: (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which are eliminated from detailed study, briefly discuss the reasons for their being eliminated." The CDOT response to public requests for the "rigorous" evaluation resulted in a one and one half page e-mail with a cost estimate for $4.35 B. This clearly fails the requirement to "rigorously explore and objectively evaluate" the alternatives put forth by the neighborhood. CDOT did examine the "double decker" viaduct alternative put

Gallagher/Royer Letter – Page 3

forth by the neighborhood, as well as reroute through the northern portion of the neighborhood. These were obviously eliminated due to excess right of way acquisition and direct impacts similar to the neighborhood as posed by the preferred alternative.
- Cost is a possible justification for elimination of alternatives but not usually in the early phases of analysis. If cost was the sole determining factor the reconstruction of Interstate93 in Boston (the "Big Dig") would not have been allowed nor would the preferred alternative for T-REX which was the most expensive. CDOT has an obligation to examine requests from the impacted neighborhoods before discarding them. CDOT built the existing viaduct and alignment in the 1960's over the objections of the City and County of Denver and the impacted neighborhoods which desired it to be built along the City boundary ten blocks north. Environmental impact analyses were not conducted in the manner they are today, if at all, during the early years of the interstate system construction. The neighborhoods have lived with this severely negative impact for 50 years. The least CDOT could do is conduct a thorough impact analysis of the neighborhoods' strong desire.
- No comparison of environmental impact was addressed despite the fact that the preferred alternative results in the maximum impact to the adjacent neighborhood. Citizens have pointed out to CDOT staff that a diversion route would impact practically no homes or businesses, but of course, without CDOT performing a comparative analysis there is no record for review.
- When the citizens pointed out the maximum impact regarding environmental justice, the CDOT response has been that they did what was required and exceeded that requirement.
- The reroute/diversion alternative was strongly supported by the neighborhood in the SDEIS and FEIS public hearings and comments, despite elimination by CDOT. Other cities, namely San Francisco, Portland and Boston have eliminated existing routes and blocked extensions through the environmental process.
- CDOT response to an open records request for the complete analysis was a one and one half page e-mail only showing the cost estimate. If a more thorough analysis does exist or if there is any additional information utilized to make the decision, then CDOT violated the state open records act.
- The CDOT cost estimate seems unreasonably inflated when compared to T-REX costs. Per the Southeast Corridor Constructors and CDOT documentation, the 17 miles of roadway, exclusive of light rail, cost $3.8 M per lane mile. CDOT claims the 12.8 M reroute will cost $21.2 M per lane mile. If that cost were applied to the preferred alternative, the project would cost $4.25 B, not the $1.86 they claim. With the recession and market rebound, it is still unlikely that construction costs have increased 5X since 2001.

### 3. Language/statements in the FEIS are intentionally "word-smithed" to support the preferred alternative:

- Statements are erroneously presented or information relative to decisions are buried in extensive technical reports or written to make negative impacts appear positive.
- A half diamond interchange at Steele/Vasquez has been re-inserted in the FEIS as a benefit to the neighborhood. In reality, this continues the intrusion of truck and car traffic from the north

Gallagher/Royer Letter – Page 4

- along Vasquez rather than diverting it to the Colorado Boulevard interchange as presented in the SDEIS.
- The FEIS describes the interchange as a "split diamond" between Steele/Vasquez and Colorado Boulevard with additional ramps at Colorado. This is, in reality, a half diamond interchange at Steele/Vasquez and a full diamond at Colorado Boulevard. It is described this way to justify the re-introduction of the ramps at Steele/Vasquez. According to a presentation to City Council in June, 2015, by the City Planning Director, the ramps are needed to improve redevelopment opportunities at the interchange with the excess land acquisition. The ramps will be "compressed" against the interstate to maximize the available excess land for redevelopment, not as a benefit to the neighborhood.
- The north frontage road is described as a benefit to the neighborhood as "improved access" when it affords more intrusion of traffic from the east due to the extension of the frontage roads to reach the two interchanges. The south frontage road is sufficient to accommodate projected traffic volumes on 46th Avenue. The elimination of the north frontage road reduces the necessary land acquisition, thereby reducing the number of lost homes and businesses which is a benefit to the neighborhood.
- Conversion of the Colorado Boulevard interchange to a diamond is described as having no negative impacts on traffic efficiency despite removing the heavily utilized northbound to westbound loop ramp and adding an additional traffic signal on Colorado. The technical traffic study does not analyze the traffic impact of this change which is an obvious loss of efficiency along this segment of Colorado. The traffic assignments, also buried in the technical study, show this segment of Colorado carrying 70,000+ vehicles per day. The only need for the elimination of the loop ramp is found in the hydrology technical report where the area is to be utilized as a drainage detention pond. Detention is considered more important than traffic efficiency. A similar argument occurred in the T-REX project where a proper analysis resulted in the retention of the loop ramp. The inside area of the loop ramp can be utilized for retention and a culvert installed to allow further detention north to 48th Avenue. Since this is an environmental "impact" study shouldn't changes of this nature be clearly analyzed and openly addressed in the document, rather than have pieces buried for discovery, if found.
- The SDEIS stated that a managed lane analysis was unavailable at the time of publication but would be presented in the FEIS. There is no detailed analysis of the managed lane concept presented in the FEIS. There are comparisons of performance of the alternatives similar to those presented in the SDEIS, but no detailed analysis that defines the various advantages of managed lanes over general purpose lanes. Various statements supporting the managed lane concept in the report are not accurate. The report claims that the managed lanes will spread the peak; however, the report claims that the existing I-70 peak is presently five hours in the morning and five hours in the afternoon. You have to wonder how much spreading can actually occur. There is no discussion of the industrial nature of the corridor where workers are usually on shifts, not flexible schedules. We have tried to get workers and their bosses to adjust schedules so they can avoid the traffic peaks for decades with little success. CDOT presents this as happening because they will have variable rates for use of the managed lanes. At public meetings and in comments for the SDEIS, CDOT was requested to provide details about the usage of managed lanes on I-25 and US 36, so existing performance could be examined and compared to CDOT's supposed usage of the I-70 managed lanes. Of course, CDOT would not provide this information.

Gallagher/Royer Letter – Page 5

- CDOT states that managed lanes will divert the least amount of traffic to parallel roadways in the study area. According to Exhibit 4-42: Build Alternatives, Screenline Volumes, the PCL-ML alternative, the preferred alternative, actually diverts the highest volumes to the parallel roadways. OOPS!
- CDOT states that the managed lanes will accommodate the volumes in the corridor more efficiently and that volumes in the corridor are not a distinguishing factor between alternatives. Since a detailed study of managed lanes is not provided, such statements are not supported by facts. Managed lanes are the lowest volume alternatives compared to general traffic lane alternatives. You can accommodate 2200vph per lane in general traffic lanes at capacity or 11,000vph in each direction. Because managed lanes are being held to 45 mph their capacity is 900vph per lane or 8400vph in each direction. This actually supports the volumes in Exhibit 4-42 where the most traffic is diverted to the parallel street network. However, with a differential of 2600vph per direction, the screen line volumes seem to under estimate the total volume diversion.
- Another statement requiring clarification pertains to the efficiency of managed lanes and their ability to reduce congestion. Once again, buried in the technical traffic study, Attachment E – Appendix E – I-70 Congestion Figures, the least congestion in the corridor throughout the day is shown in the General Purpose Lane Alternatives, not the Managed Lane Alternatives. This information clearly supports the need for a detailed managed lane analysis and refutes the CDOT claims that the preferred managed lane alternative is the best alternative for future traffic in the corridor.
- In the SDEIS we complained that screen lines were utilized to disguise the assignments to the roadway system in the study network. In the FEIS assignments are provided, but it required enlargement to 1200% or higher to read the numbers. However, none of the roadways were identified which required extensive maneuvering of the pages to determine which roadways were which. At least the information was provided if not in convenient fashion. Again, it appears the information is purposely buried and made difficult to read, let alone find. After hours of studying the assignments, numerous questions are raised relative to the modelling and coding of the network. As an example, Monaco is shown north of I-70 carrying 12,000vpd. This is quite interesting, since it is a dead end that only extends one block. It then drops off a cliff into a rail yard but the model shows 600vpd in the rail yard connecting up the cliff which does not exist. The report claims that volumes will grow in the study area over the next 25 years by 50% or more. Yet the assignment shows volumes on some arterial streets like the $13^{th}/14^{th}$ one way pair, significantly below existing levels. 17th Avenue Parkway will carry volumes much higher than Colfax Avenue which has business destinations along its entire length while 17th is high end residential that reduces to two lanes at Monaco. Rather than continue to point out anomalies in the forecast, let us simply raise the issue of whether anyone involved checked the assignments and had sufficient knowledge of the network to determine if the assignments made sense.
- Neighborhood representatives have consistently pointed out to CDOT that the preferred alternative has the maximum impact on the neighborhood. The CDOT response has been that they have done everything required by NEPA and then some.
- When citizens pointed out the 16-foot shoulders that would allow the restriping to 12 to 14 lanes in the future, the CDOT response is that the design has been accepted by FHWA, despite the fact that they have historically stated that FHWA requires 10-foot outside and 4-foot inside shoulders as shown in the original 2008 DEIS.

Gallagher/Royer Letter – Page 6

- Three years ago, the City and County of Denver developed a 148-foot cross section for the I-70 corridor through the neighborhood that permitted eight lanes with a future expansion to ten lanes by restriping and eliminated the north frontage road. Most of the opposition was willing to accept this option as a compromise. It suddenly disappeared; CDOT announced they were examining a depressed section with a lid; and the cross section expanded to 297 feet with two frontage roads. From that point on there has been no discussion of a compromise or reduced cross section by CDOT. There appears to have been some political manipulation involved that has resulted in the current preferred alternative being steam rolled forward.
- CDOT is emphasizing the need to replace the viaduct due to its deterioration. Who is responsible for that? According to a former CDOT Executive Director, CDOT dropped to 50th out of 50 states last year for maintenance. By their own standards which we used in challenging the Denver International Airport replacement of 20 year old bridges, CDOT says bridges should last 75 to 100 years. The viaduct is only 50 years old. How can you place a priority on replacement as a justification when it is your own negligence that created the need?

It is possible to continue pointing out discrepancies and failures in the report and process, but that would only make this letter much longer than it currently is. The points have been made. We truly believe that this process has been intentionally manipulated to get the desired result by CDOT. We do not agree, nor do we believe that the process conforms to the requirements of NEPA. As such we are appealing to those in authority to require the appropriate analyses and deal with the affected community in a straightforward and transparent manner. Throughout our professional careers we have found this to be the most successful approach resulting in a collaborative response for ultimate success.

Sincerely and respectfully submitted,

*Dennis J. Gallagher*                                            *D. Royer*

Dennis J. Gallagher                                              Dennis E. Royer, P.E.

CC: Gina McCarthy, EPA
    Jeff Marootian, FHWA