**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Nos:     17-cv-01661-WYD
                       17-cv-01679-WYD

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA
NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION;
and COLORADO LATINO FORUM,

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; ELAINE CHAO, in her official capacity as
Secretary of transportation; and JOHN M. CARTER, in his official capacity as Division
Administrator,

      Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION; and SHAILEN P. BHATT,
in his official capacity as Executive Director of the Colorado Department of Transportation,

      Defendant-Intervenors.

---

**DECLARATION OF CHARLES H. NORRIS**

---

I, CHARLES H. NORRIS, hereby declare:

1.     The facts set forth in this Declaration are based upon my personal knowledge.  If

called as a witness, I could and would testify competently to these facts.  As to those matters that

reflect an opinion, they reflect my personal opinion and judgment on the matter, which is based

1

on the years of educational and professional experience shown in my curriculum vitae ("CV"). A current version of my CV is appended hereto as Attachment 1.

2.      I am a citizen of the United States and resident of Denver, Colorado.  I have a Bachelor of Science degree in geology (University of Illinois), a Master of Science in geology (University of Washington), and substantial post-master's coursework in Geology.  My professional career began in the petroleum industry, working for major international companies and major and regional independent companies.  Eventually I incorporated a small exploration company of my own.  After the industry collapse in the mid-1980s, I held a non-teaching faculty position at the University of Illinois for 6 years with the Laboratory for Supercomputing in Hydrogeology.  I continued my career in geology in Denver, consulting in hydrogeology, first through a consulting company and subsequently through my own firm, Geo-Hydro, Inc., which I founded in 1996.  My client base has been broad.  I and the company have helped concerned citizens, regional and national environmental groups, regulated industries, state governments and federal agencies, including state regulatory agencies.  Expert testimony in litigation, on behalf of clients, has been an element of my career nearly from the start.  I have also testified as an individual before State and Congressional committees and have twice been solicited for testimony by the National Academies of Science.

3.      As a long-term resident of Denver, I have been peripherally aware of conversations and potential 'solutions' to the I-70 corridor for years.  I became aware of the incised roadbed concept, one of multiple concepts being discussed quite a few years ago, through both personal and professional contacts.  I became more intimately aware of the currently approved project for an incised highway ("Central 70 Project") during the heightened attention

2

the proposal received during the 2016 election cycle, at some point in 2015.  Based upon my background and career, friends and concerned citizens asked me to look into the concept and the plans.  As I did so, I became substantially concerned at the insufficiencies of the environmental impact assessments with respect to hydrogeology, my area of expertise.  My concern was not that the assessments were in error.  My concern was that there were no appropriates assessment at all.

4.      I became aware of the Platte to Park Hill Stormwater Drainage Project ("P2PH") about a year, perhaps a year and a half ago.  The awareness arose from two directions.  One was my personal exposure to the magnitude of increasing fees for waste water treatment combined with the dedication of a large part of those fees to surface water projects, not waste water.  The other was through personal conversations, yard signs, and an increasing activity of citizens groups.  I have attended residential meetings of citizens concerned with P2PH, both how it arose and what it would to do.  Their comments and concerns intrigued me and I have investigated, and am investigating, P2PH in itself and in its relationship to Central 70 Project.  That investigation has led me to attend multiple meetings of the Community Advisory Group ("CAG") for the I-70/Vasquez Superfund Site and I will attend more.  CAGs are a public participation element of the United States EPA Superfund program.  This CAG currently is focusing in detail on the construction occurring at Globeville Landing, where the outfalls from both Central 70 Project and P2PH combine and discharge to the South Platte River.  I am also reviewing technical documents related to hydrogeologic aspects of other elements of P2PH.

5.      There is no question that P2PH is intimately connected with Central 70 Project, far beyond the common discharge point into the South Platte River.  The explosive appearance of

P2PH and the strident urgency of the arguments for it, alone, warrant skepticism.  More to the point, upon detailed and technical review, the arguments are hollow and synthetic with respect to P2PH independence from Central 70 Project.  P2PH did not exist, even in concept, in Denver flood control planning before Central 70 Project.  Denver flood management has been remarkably resilient with its historical design of storm sewers for routine precipitation onto the tributary basins and distributed, curb-to-curb (street) storm flow routing for high-intensity events.  Improving the existing system needs only local redesign and tweaking, not a major do-over.  The construction of an incised highway entirely across the existing historical drainage design negates that historical design.  Rerouting the distributed flow of the historical system into a concentrated flow that is diverted westward to the South Platte River requires significant engineering and construction.  P2PH is one option toward achieving that purpose; it is a partial replacement for the water management design adjacent to the incised highway.  This is acknowledged in the Final Environmental Impact Statement ("FEIS") for Central 70 Project in its discussions of the Two Basin Project (P2PH) in Chapter 3 Summary of Project Alternatives.  P2PH is a mechanism to subsidize the incised highway, not an independently needed flood control system.

6.     The comments that follow, relating to the insufficiencies in the environmental assessment for Central 70 Project, are developed from my investigation of technical data pertinent to the hydrogeology of the project area and any assessments that are proffered of environment impacts on hydrogeology by the project.  My opinions are derived from that investigation, buffered by my education, training, and the experience gained through a professional career of more than four decades.  Among the document specific to this project that

I reviewed are the hydrogeologically pertinent portions that relate to the incised highway from the following NEPA documents:  portions in the Draft Environmental Impact Statement ("DEIS"), portions in the Supplemental Draft Environmental Impact Statement ("SDEIS"), the FEIS, the Record of Decision ("ROD") (20170119), and the re-evaluation ROD (20170901).

7.      I believe a brief history of the relevant area's pre-development hydrogeology is useful.  The following discussion is focused on Central 70 Project as approved by the Federal Highway Administration ("FHWA") on February 10, 2017.

8.      The shallow hydrogeology of the areas that will be impacted by the proposed construction of Central 70 Project is characterized by north- and northwest-draining topography underlain by alluvial sediments of the South Platte River valley and of north- and northwest-draining streams that are/were tributary to the South Platte River before Denver existed.  These alluvial sediments overlie the eroded bedrock surface of the Denver Formation.[1]  The area upslope (south) of Central 70 Project separates the headwater and mid-reach portions of the tributary streams and their alluvium from the areas where these streams and their alluvium converge with the flow and alluvium of the South Platte River system.

9.      Pre-settlement of this area, the hydrogeology of the tributary drainage basins was simple.  Water into the tributary basins was by direct precipitation.  Rain and snow melt either sank into the ground or ran off as surface water into the northward draining streams.  The water that sank into the ground was either lost to evaporation or plant usage (evapotranspiration) or percolated deeper into the alluvial sediments to the water table, the top of groundwater.

---

[1]The hydraulic connection between the aquifers of the Denver Formation and the alluvial sediments is so limited that the flow between them will be considered insignificant for the purposes of discussing impacts of Central 70 Project.

Groundwater – the water in saturated alluvial sediment of the basin – flowed northward also, and obliquely toward the tributary streams.  Whether transported by streams or by groundwater, precipitation onto the tributary basins that was not lost to evapotranspiration eventually flowed to the South Platte River.

10.     The partitioning of precipitation between ground- and surface water historically varied with time and location.  During times of light and intermittent rain, all water might soak into the soil with no surface water runoff.  During times of heavy and persistent precipitation or snow melt, the alluvial sediments might become fully saturated and all further precipitation ran as surface water.  Further, the initial partitioning of precipitation between groundwater and surface water was not persistent; surface water may have infiltrated to become groundwater and groundwater may have discharged to become surface water.

11.     Surface water flow is very dynamic; it responds quickly to changes in precipitation patterns or events.  Groundwater flow is slower and, therefore, more resistant to short duration precipitation events.  As a result, early in a precipitation event, when a stream has risen in immediate response to the added water, the stream may lose water to the ground through its bed, *i.e*., surface water becomes groundwater.  Alternatively, after a precipitation event, the stream quickly drops.  Groundwater, on the other hand, still has its share of the event.  When groundwater levels are above stream levels, groundwater discharges into the stream, providing baseflow that maintains stream flow between precipitation events.

12.     Stream (surface water) flow and groundwater flow in alluvial sediments are not separate entities, conveying water independently of each other.  They are components of an

integrated flow system that dynamically interact to convey water.[2]  An event or structure that impacts surface water flow will impact groundwater flow and an event or structure that impacts groundwater flow will impact surface water flow.

13.     Today, the hydrogeology of the north Denver tributary basins differs greatly in detail from that which existed before Denver existed.  Water into the tributary basins now includes imported water added to natural precipitation.  Natural precipitation patterns and soil frost patterns may be changing.  Open expanses of vegetation-covered soils able to absorb precipitation are far less extensive as areas have become covered with impermeable urban surfaces.  Streams within the tributary basins are now largely absent, buried under fill.  The natural surface water conduits have largely been replaced by storm sewers and by distributed storm-water flow using streets as conduits.  Differences in vegetation types and distributions generate different evapotranspiration rates and patterns.

14.     Despite all of the changes to these basins over the generations, the fundamental hydrogeology remains.  Water into the basins still partitions among evapotranspiration, surface water (storm sewer and street) flow and groundwater flow.  Both surface water and groundwater still largely flow to the north and northwest to discharge into the South Platte River north of the proposed Central 70 Project.

15.     The primary difference between the pre-Denver and contemporary hydrogeologic systems is that the initial partitioning of water between the ground- and surface water elements of the system is artificially determined.  A secondary difference is that exchanges between the two systems are more restricted.  The changes between the natural and current condition are

---

[2] This reality is reflected in Colorado Water Law that recognizes alluvial water and stream water collectively as Tributary Water.

certainly not insignificant.  Yet, in spite of all the existing changes, the natural patterns that existed pre-Denver still function today.

16.     Central 70 Project proposes more changes to the surface and subsurface hydrogeology of the north Denver tributary basins.  The proposed changes will produce impacts that exceed the environmental impacts of all of the changes since pre-Denver conditions, collectively.  For all of its length, for all of its detail, the FEIS for Central 70 Project does not understand, or does not express, that.  The FEIS is, quite simply, inadequate.  It does not address in any meaningful manner the environment impacts that would result from the proposed hydrogeologic changes caused Central 70 Project, itself, or synergistically with other infrastructure modifications occurring in the area concurrently.

17.     Central 70 Project proposes to sever the northward flow of surface water component of the north Denver tributary basins at the trace of the highway for almost two miles, from the South Platte River on the west to near Colorado Boulevard on the east.  Almost all surface water will be intercepted and diverted to the Globeville Landing Outfall ("GLO") and into the South Platte River just south of I-70.  To accomplish this diversion, Central 70 Project would use a series of 5 ponds (Ponds 3, 4, 6, 7, and 7a) [3] with a combined area of approximately 9 acres.  The highway will be incised below the water table from west of the Union Pacific Rail Road ("UPRR") overpass eastward to almost Columbine Street, creating a dam blocking the existing northward flow of groundwater over a distance of about 1600 feet.

18.     The FEIS discusses extensively the proposed westward diversion of the northward flowing surface water from the north Denver basins to GLO from the engineering perspective of

---

[3] Pond 6 at York Street will partition a portion its discharge into a storm drain bridge over the highway to replicate the current north flowing storm sewer flowing under I-70.

creating the diversion.  There is some discussion of the environmental impacts that may result from the construction activities, but there is almost no discussion of the environmental impacts to the South Platte River which may result from diversion of most surface water flow from the basins to a single discharge point relative to the previous disseminated discharge to the river further to the north.  Neither does the FEIS contain an evaluation of the physical impact of the groundwater dam to groundwater south or north of the highway.  Correspondingly, there is no evaluation of the potential environmental impacts of that physical impact beyond an acknowledgement that changes to groundwater flow may spread existing contamination.

19.     The groundwater dam that is proposed by the incised highway will raise groundwater levels south of Central 70 Project.  Just as a boulder or a bridge abutment in a stream creates higher water levels upstream of the blocking object, the groundwater dam inevitably will raise water levels south of the dam.  The water levels will necessarily rise to an elevation sufficient for the north-flowing groundwater to find an alternative path, around the dam, to the South Platte River.  The FEIS makes no evaluation of magnitude of this rise of groundwater, the area of the rise, or the impacts that would result from the alternative paths of flow.  Each of these physical impacts potentially generates environmental impacts, *e.g.*, changing migration paths of existing contaminant plumes, inundation of sequestered contaminants currently above the water table with subsequent mobilization of the contaminants in groundwater, flooding of basements, drowning of trees, and/or combinations of these and other environmental impacts.

20.     More importantly, the FEIS does not evaluate, or even discuss, how the impacts of changes to the ground- and surface water systems will interact and feed upon one another to

generate impacts cumulatively greater those of either system individually.  This is a critical insufficiency of the FEIS.

21.     The incised roadway will raise groundwater levels south of Central 70 Project to undetermined levels.  The offsite drainage system CDOT says will be constructed to divert all north-flowing surface water to GLO requires approximately 9 acres of surface ponds to detain/retain surface water from the south.  These two elements are not independent.  Water that is held in ponds and any open conveyances along the south side of I-70 will discharge water from the ponds into groundwater, raising the levels of groundwater beyond that of the groundwater damming alone.[4]  Ponds east and west of the groundwater dam would also raise groundwater levels beneath those ponds, restricting the ability of groundwater to flow east or west around the dam, contributing indirectly to yet higher groundwater levels south of the groundwater dam.

22.     The FEIS asserts that the scale of its surface water management system to divert north-flow surface water from the tributary basins may be reduced in the event that Denver constructs an alternative diversion system for (some of) that surface water.  In that event, the size of the ponds associated with Central 70 Project may be reduced.  It is reasonable to expect, in that case, that the surface water discharge to groundwater from the ponds would be reduced and, correspondingly, the surface water contribution to rising groundwater levels along the south side of Central 70 would be reduced, but not eliminated.  It may work that way, but it may not.

---

[4] This discharge of surface water to groundwater presumes the rise of groundwater due to damming is not sufficient to raise groundwater above the bottom of a pond.  Were such the case, groundwater would discharge to the pond and correspondingly reduce the capacity of the surface water system to meet the surface water management requirements.

23.     The current diversion plan by the City of Denver, which might allow reduction in the scale of Central 70 Project's surface water diversion system is P2PH.  A major feature of P2PH is the open diversion channel that will extend for about a mile along 39th Avenue.  As envisioned now, prior to groundwater levels that will develop subsequent to damming by Central 70 Project, the 39th Avenue channel base will be above existing groundwater elevations.  This means that this channel will be a linear source of surface water infiltrating to groundwater.  This added groundwater will increase the mass of groundwater that must get around the dam created by Central 70 Project, which generates higher groundwater levels between P2PH and Central 70 Project.  Thus, P2PH – a drainage and stormwater system used to rationalize CDOT's shrinking its own surface water management system – may, as currently envisioned, in fact aggravate the groundwater impacts on the environment rather than mitigate them.

24.     The environmental impacts of Central 70 Project are not adequately assessed and, therefore, the FEIS is necessarily inadequate.  A principle cause of the inadequacy is a failure to consider the physical, and subsequent environmental, impacts of damming a significant portion of the groundwater flow system that currently exists under the elevated interstate highway.  But the overarching inadequacy is the parsing of the environmental assessment into subparts of the total existing system without ever stopping to combine those sub-impacts into a cumulative picture of what Central 70 Project will impact and to what extent.  I therefore believe the cumulative impacts analysis in the FEIS is inadequate for failure to analyze the cumulative hydrological effects of Central 70 Project and P2PH.

25.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that to the best of my knowledge, the foregoing is true and correct.

DATED:      October 6, 2017.


_____

Charles H. Norris

# ATTACHMENT 1

# Charles H. Norris, P.G.

**SUMMARY OF QUALIFICATIONS**

Forty plus years of professional experience in geology, hydrogeology and management in the applied and theoretical geosciences. Experience includes performance, oversight review, or management of site assessment; RI/FS; computer modeling of fluid flow, contaminant transport, and geochemistry (applications and code development); policy and rule making procedures; aquifer evaluation; resource development; and litigation support; nationwide and internationally.


**PROFESSIONAL EXPERIENCE**

Geo-Hydro, Inc., (1996-present), Principle, Officer, Co-owner

Hydro-Search, Inc., (1992-1996), Director of Hydrogeology

University of Illinois at Urbana-Champaign, (1987-1992), Research Associate; Manager, Industrial
        Consortium for Research and Education for the Laboratory for Supercomputing in Hydrogeology

Consulting Hydrogeologist/Geologist, Champaign, Illinois and Denver, Colorado, (1980-1992)

MGF Oil Corporation, (1985 - 1986), Manager Geological Engineering

Emerald Gas and Oil, (1980 - 1986), President and Owner

Petro-Lewis Corporation, (1980), District Geologist

Tenneco Oil Company, (1977-1980), Senior Geological Engineer

Amoco International Oil Company, (1975-1977), Senior Geologist

Shell Oil Company, (1972-1975), Exploration Geologist


**PROFESSIONAL REGISTRATIONS, MEMBERSHIPS, AND AFFILIATIONS**

Professional Geologist: Illinois (196-001082), Indiana (2100), Georgia (PG002123), Kentucky (KY-2470), Missouri (2011012527), Pennsylvania (PG003994), South Carolina (2616), Utah (5532631-2250), Virginia (2801 001834), Wisconsin (No. 924), Wyoming (No. 2989)

Registered Environmental Professional (#5350), State of Colorado, Petroleum Storage Tank Fund


National Ground Water Association

Colorado Groundwater Association (Board Member (various years), Vice President 1999, President 2000, Past-President 2001)


Phi Beta Kappa, Phi Kappa Phi, Sigma Xi


**EDUCATION**

B.S., Geology, University of Illinois, High Honors and Distinction in Geology, 1969

M.S., Geology, University of Washington, National Science Foundation Fellow, 1970

University of Illinois, all but dissertation completed for Ph. D., Hydrogeology, 1992

**Select Project Experience**

*RI/FS and Site Investigations*

- Manager for technical assistance through a Technical Assistance Program (TAP) grant from PRPs to local citizens' group. Assistance through grant to provide assessment and feedback on site work products as they are developed and implemented, explain the remediation processes and activities to the citizens, and serve as technical liaison between citizens and remediation team.

- Modeler and hydrogeologic consultant at industrial tank farm adjacent to the Chicago Sanitary and Ship Canal in northeastern Illinois. Assess hydrogeologic data, interpret aquifer testing, and model groundwater flow in soil and fractured carbonate bedrock in area of DNAPL accumulation as part of site characterization and voluntary remediation design.

- Manager and Hydrogeologist of groundwater investigation at an industrial dump site adjacent to the Illinois River in north Central Illinois. Investigated fate and transport of 3-4 decades of disposal of mixed, hazardous industrial wastes at a non-engineered floodplain dump site. Expert testimony and legal support. Pre-trial settlement provided for installation of monitoring system in lieu of site characterization.

- Manager of groundwater flow modeling performed as part of the groundwater characterization effort and as part of the preliminary remedial designs. The site is a Superfund site involving both organic and metals contaminants at a wood treating facility in an urban area in Alabama adjacent to a major commercial waterway.

- Manager of groundwater flow modeling performed as part of the groundwater characterization effort and as part of the 90% and final remedial designs. The site is a high profile Superfund site involving both organic and metals contaminants at a wood treating facility in Northern California.

- Technical Advisor assisting in the evaluation of aquifer properties and well performances for an extraction well field near Sacramento CA. A high volume pump and treat system for chlorinated solvents showed strong and anomalous decline in productivity. Detailed evaluation identified both possible causes and recommended operations changes to alleviate the problems.

- Technical Advisor assisting in the evaluation of aquifer properties and well performances for initial installation of a high volume extraction well field in Southern California. The chlorinated solvent plume associated with a Superfund site impacted a large area in a layered, heterogeneous groundwater basin managed intensively for public water supplies.

- Senior oversight and review in the evaluation of aquifer and soil properties, and the remediation of the soils contamination and groundwater impacts associated with compressor facilities of interstate gas transmission companies. Various projects and sites in western Colorado, Wyoming, and the Texas panhandle.

- Technical Advisor for the Remedial Investigation/Feasibility Study (RI/FS) of the Landfill Solids and Gases Operable Units at the Lowry Landfill CERCLA site located near Denver, Colorado. This project involves the characterization of the extent of potential contamination within the unsaturated zone adjacent to this high profile site. Work involves extensive coordination and interaction with multiple PRP groups as well as various regulatory agencies.

- Project Manager for independent oversight of a proposed low-level radioactive waste disposal site. Task was to develop technical and legal program for governmentally funded intervener's case as part of adjudicatory hearings on a high-profile, proposed disposal facility and involved

identifying, retaining and educating legal staff, retaining a team of technical experts, negotiating fees, coordinating work product and presentations, providing liaison with citizen's groups, responding to press and integrating personal testimony on hydrogeology and modeling.  Expert testimony and legal support.

## Landfill Services

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment of existing water quality and off-site migration from existing licensed landfill near Joliet IL.  Work includes groundwater flow modeling of remedial alternatives and groundwater impact assessments of various alternatives for submittal to IEPA.

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment for siting of a proposed expansion for a hazardous waste landfill in Peoria County, Illinois.  Expert testimony and legal support.   Review identified errors in application, unaddressed contamination on facility property, and inappropriate modeling design and implementation.

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment for siting of a proposed regional landfill by expansion of local landfill in Ogle County, Illinois.   Expert testimony and legal support.   Review identified in errors application, unaddressed existing leakage, and potential risk to public water supply.  (Three hearings)

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment for siting of a proposed regional landfill by expansion of local landfill in Kankakee County, Illinois.  Expert testimony and legal support.   Review identified errors in application, unaddressed existing off-site leakage, and inappropriate modeling design and implementation.  (Two hearings)

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment of a proposed regional landfill in Will County, Illinois.  Expert testimony and legal support.   Research documented numerous errors in application which resulted in underestimation of infiltration rates and potential migration rates.  Identified evidence of sub-karstic migration pathway from site to nearby stream.

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment of a proposed regional landfill expansion at East Peoria, Illinois.  Research documented current leakage from the existing landfill into the regional unconfined aquifer within the cone of depression of the municipal water supply wells.  In part as a result of the evaluation, the proposed expansion has been abandoned.  Expert testimony and legal support.

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment of a proposed regional landfill at Ottawa, Illinois.  Provided testimony at county hearings identifying and documenting site-specific conditions that invalidated part of the ground water evaluation testing, necessitating the need to re-evaluate the groundwater flow system and redesign the monitoring system.  Expert testimony and legal support.

- Project Manager and Hydrogeologist for a geologic and hydrogeologic assessment of existing municipal landfills and a proposed landfill redesign and expansion at Salem, Illinois.  Provided testimony at city hearings documenting existing landfill leakage and identifying site-specific conditions that complicate the design of a reliable monitoring system.  Expert testimony and legal support.

- Project Manager and Hydrogeologist for site evaluations of the geology and hydrogeology of several proposed municipal landfills and a landfill expansion in Bartholomew County, Indiana.  The review of the expansion demonstrated inadequate monitoring of the existing facility.  One

proposed site showed possible, current ground water usage from under the proposed facility and conditions that may preclude state-level site approval.

- Project Manager and Hydrogeologist serving in consultation to the Board of Wayne County, Illinois, regarding a proposed expansion to a regional landfill.  Investigation and oversight established viability of the physical site and improvements that were needed in operating procedures and monitoring efforts.  Expert testimony and legal support.

- Project Manager and Hydrogeologist for an assessment of an existing regional municipal landfill at Urbana, Illinois.  Principle problems included ground water contamination, unplugged well(s) within the facility boundary that penetrated the aquifer serving public water supplies and a monitoring system inadequate to evaluate the contaminant migration.  Results of the evaluation include an expanded system of monitoring wells, improved protocols for ground water sampling and revised statistical procedures to determine background water chemistries.

- Project Manager and Hydrogeologist for a site assessment of a proposed municipal landfill expansion in west central Indiana.  Established feasibility of using the engineering and design features of the expansion to prevent contamination from the pre-existing non-engineered facility.

- Project Hydrogeologist for a site assessment of a proposed saturated-zone, regional balefill in central Illinois.  Principal problems involved the evaluation of the hydrogeologic characteristics of the strip mine spoils within which excavation would occur, the blasted mine bottom upon which the liners would be built and the materials available for liner construction.  Expert testimony and legal support.

- Project Manager and Hydrogeologist for a site assessment of a proposed municipal landfill expansion in Livingston County, Illinois.  Principal problems involved the evaluation of the impact of shallow coal tunnel mining beneath the site and reaction of waste leachate with unusual clay mineralogy important to waste isolation at the site.  Expert testimony.

- Technical Reviewer of site assessment and re-assessment of a proposed inter-governmental regional landfill in central Illinois.  Verified unanticipated, politically unacceptable risks to major aquifer system serving public water supplies.  Assisted in drafting of technical policy statement that permitted new siting efforts to proceed in the jurisdiction.  Expert testimony.

### WATER RESOURCE EVALUATION & DEVELOPMENT

- Manager for ground water modeling effort associated with the development of a high-volume ground-water supply and delivery project in Colorado.  The effort included investigating and evaluating a previously used, court-accepted model, adapting and updating the model, and applying the model to assess the impacts of a proposed private ground-water diversion project that would be the largest in the United States.  Ongoing effort includes subsequent review of alternative proposed model and further litigation support.

- Manager for review of an application for an expansion of a large long-wall mine in southeastern Ohio.  The review identified extensive unrecognized mining-related impacts to water supplies from historic mining and identified hydrologic risks to a unique old-growth forest adjacent to the proposed expansion, and resulted in an appeal of the application.  Expert testimony and legal support.

- Manager for ground water modeling effort associated with the development of a surface reservoir designed for conjunctive use of ground and surface water to reduce peak ground water pumping demands in Denver metro area.  The effort included investigating and evaluating a previously

used, model, adapting and updating the model, and applying the model to assess the impacts of project on other water rights.  Study is a component of the EIS.

- Project Manager for multi-company effort to model thermal loading of northern Nevada surface waters as a result of mine dewatering project.  Successful liaison among technical staffs and regulators and modeling work for a high profile EIS resulted in approval of discharge permit.

- Project Hydrogeologist for the feasibility study of a small lake for a northern Illinois nursery, to be used for recreation, fishing and irrigation.  Evaluated shallow and intermediate ground water and surface run-off, reviewed engineering design and directed ground and surface water sampling program to determine nutrient levels.

## HYDROCHEMISTRY

- Principal Investigator for grant to research the geochemical implications of using alkaline addition as one means for preventing and/or remediating inorganic contamination resulting from acid mine/rock drainage.  Empirical and modeling evidence showed conditions under which alkaline addition can cause or exacerbate contamination of some constituents of concern.

- Project Manager, hydrogeologist, geochemist for ongoing investigation of metals contamination of a trout stream in West Virginia.  Impacts from natural and industrial sources , present and past, evaluated to segregate relative significance of various sources.  Includes expert testimony and legal support.

- Project Geochemist and Hydrogeologist for evaluation and critique of modeling protocols used by USEPA for risk assessments performed as part of regulatory determinations for various solid wastes.  Identified errors in methodology and input that had caused previous modeling to mischaracterize risks for settings with observed damage cases.  Computer modeling.

- Geochemist and Hydrogeologist for evaluations of inorganic groundwater chemistry at an industrial RCRA site near Joplin MO.  Federal lawsuit filed pursuant to PRP contribution and sources and timing of contamination.  Was able to use geochemical interpretations to establish significant elements of aquifer characteristics and implications for contamination routes.  Expert testimony.

- Project Hydrogeologist and Geochemist for evaluations of proposed coal combustion waste disposal as part of reclamation activities at surface coal mines in Southwestern Indiana.  Ongoing efforts are targeted toward refining regulatory framework for disposal efforts, establishing effective characterization and monitoring programs and determining appropriate operation and engineering practices.  Project involves extensive interdisciplinary effort and expert testimony.

- Project Geochemist for the investigation of the impacts of remediating acid mine drainage by installing bulkheads to flood exhausted mine working.  Predictively modeled water chemistries in situ, within flooded mine, along flow paths and upon surface discharge.  Assisted in preparation of testimony that resulted in permit approval for the San Juan County, Colorado project.

- Project Manager and Project Geochemist/Hydrogeologist for investigation of potential environmental impacts of disposal of coal combustion wastes (CCW) as part of a reclamation plan at a surface coal mine in northern New Mexico.  Performed or directed geochemical, infiltration and flow modeling of the proposed project to identify optimum disposal methods and worst case impacts.  Presentation to State resulted in approval of this precedent-setting project.

- Project Manager, Geochemist and Hydrogeologist for an investigation of a proposed disposal/construction project to build a central Illinois ski mountain from fly ash produced by a co-generating plant operated by a major food products manufacturer.  The investigation involved

overseeing an engineering review of project plans, a site investigation and evaluation, geochemical modeling of initial and final mineralogical composition of the mass and of the leachate chemistry and evolution and the impact on the hydrogeologic and structural integrity of the project.  Expert testimony and legal support.

*PETROLEUM INDUSTRY EXPERIENCE*

- Project Manager for the environmental assessment of 82 Texas producing properties targeted for acquisition.  Evaluations included site walk-overs, surface soil and liquid sampling, radiological monitoring and geoprobe sampling of soils and ground water.  The assessments documented a multitude of impacts from both exempt and non-exempt wastes that, unrecognized, could have resulted in substantial financial exposure to the client.

- Project Geologist and Petrophysicist for an investigation of resource potential of coal bed methane in San Juan Basin of New Mexico and Colorado.  Study focused on innovative log analysis techniques; formation water chemistries, production rates and disposal problems; well drilling, completion and re-completion practices; and detailed subsurface facies and structural mapping and stratigraphic correlation in shallow coal beds of Kirtland/Fruitland/Pictured Cliffs shoreline complex and relationships to overlying Tertiary sandstones.

- Developed a successful play in the Hunton and Mississippi Lime formations of northwest Oklahoma.  The play recognized the secondary porosity systems of both formations (dolomitization and fracturing, respectively) and the genetic significance to each of the buried topography at the intervening unconformity.

- Managed a detailed reservoir study of a Cotton Valley gas field in east Texas that resulted in RRC approval of non-standard spacing based upon the recognition of secondary porosity and a dual-conductivity system that resulted from drape-induced fractures.  The revised spacing both protected resource ownership and conserved the costs of infill drilling.   Expert testimony and legal support.

- Project Geologist, Petrophysicist and Expert  for various contested adjudicatory hearings apportioning  oil and gas ownership.  Cases involved primary recovery of both oil and gas and secondary recovery of oil.  Accepted as expert (geology, hydrogeology, and/or geological engineering) in Oklahoma, Texas, and Wyoming.

*ADDITIONAL PROFESSIONAL EXPERIENCE*

- Invited presenter to National Research Council of the National Academy of Sciences, Committee on Mine Placement of Coal Combustion Wastes.

- Appointed member of a Quality Assurance Committee under the West Virginia Department of Environmental Protection.  The committee, comprised of representatives of state and federal regulators, industry , and interveners, was charged with a year-long review of state mining applications and approval practices relative to mining under the state and federal surface mining laws.

- Invited presenter to National Research Council of the National Academy of Sciences, Subcommittee on Alternatives, Study on Coal Waste Impoundments.

- Project Manager and Hydrogeologist for the review of Proposed and Revised Proposed Criteria for the Siting of a Low Level Radioactive Waste Disposal Facility in Illinois.  Evaluation was targeted toward both technical content and processes of selection.  Testimony and written

comments led to significant improvements and flexibility in the Criteria as finally published.

- Project Hydrogeologist testifying at hearings before the Illinois Pollution Control Board on regulatory language for the Illinois Ground Water Protection Act.  Contributed major conceptual and specific language changes to the final promulgated rules for Ground Water Quality Standards and Regulations for Existing and New Activities with Setback Zones and Regulated Recharge Areas.  Expert testimony and legal support.

- Project Hydrogeologist and Log Analyst for three applications to U.S. EPA for permits to continue deep well disposal of hazardous wastes in east central Illinois and southern Ohio. Project required evaluation of geophysical logging data to determine injection zone and confining layer properties, regional flow systems, chemical interactions of the waste stream with the native rock and the ability of the injection system to isolate the waste from the environment.

*REPORTS, PRESENTATIONS, AND PUBLICATIONS*

Norris, Charles H., 2005, "Water Quality Impacts from Remediation Acid Mine Drainage with Alkaline Addition", draft version released to National Research Council of the National Academy of Sciences, Committee on Mine Placement of Coal Combustion Wastes, Geo-Hydro, Inc., Denver CO, July 3, 2005

Norris, C. H., "notes from the front. . . Overview of three sites", invited paper before National Research Council of the National Academy of Sciences, Committee on Mine Placement of Coal Combustion Wastes, Evansville IN, March 2005.

Norris, Charles H**.,** 2004, "Environmental Concerns and Impacts of Power Plant Waste Placement in Mines", Presented at Harrisburg PA, May 4-6, 2004.  Published in Proceedings of State Regulation of Coal Combustion By-Product Placement at Mine Sites: A Technical Interactive Forum, Kimery C Vories and Anna Harrington, eds, by U. S. Department of Interior, Office of Surface Mining, Alton IL, and Coal Research Center, Southern Illinois University, Carbondale IL.

Norris, C. H., "Developing Reasonable Rules for Coal Combustion Waste Placement in Mines.  Why? When?  Where?  How?", USEPA Contract 68-W-02-007, IEI Subcontract 7060-304, Invited paper at USEPA MRAM meeting, Rosslyn VA, September, 2003.

Norris, C. H., "So, You Think You're a Geologist? (F. Kafka to A. Liddell, In Wonderland)", Colorado Ground Water Association Monthly Meeting,, Denver CO, September, 2002.

Norris, C. H., "Assessment of the Anker Energy Corporation proposal for mining and reclamation, Upshur County, West Virginia."  Independent evaluation on behalf of Anker Energy Corporation and West Virginia Highlands Conservancy, July, 2002.

Norris, C. H., "Coal Combustion Waste: Coming soon to a neighborhood (and maybe a faucet) near you." Colorado Ground Water Association Monthly Meeting,, Denver CO, May, 2001.

Norris, C. H., "Slurry-to-ashes, and ashes-to . . .  A case of a coal company and citizens working together to evaluate alternatives."  Invited paper before National Research Council of the National Academy of Sciences, Subcommittee on Alternatives, Study on Coal Waste Impoundments, St. Louis MO, June, 2001.

Norris, C.H., and C. E.  Hubbard, "Use of MINTEQA2 and EPACMTP to Estimate Groundwater

Pathway Risks from the Land Disposal of Metal-Bearing Wastes", for Environmental Technology Council, submitted as public comment to USEPA on regulatory determination for Fossil Fuel Combustion Wastes, May, 1999.

Norris, C.H., "Report on the Determination of Intermittent Streams and the Potential Impacts of Valley Fill on Area Drainages, Southern West Virginia", expert report for litigation prepared for Mountain State Justice, Inc, Charleston WV, March, 1999.

Norris, C.H., "Report on the Geology and Hydrogeology of the Caterpillar Levee Site with an Evaluation of Potential Pathways on- and off-site for the Movement of Solid and Hazardous Wastes", expert report for litigation prepared for Citizens for a Better Environment, Chicago IL, March, 1998.

Norris, C.H., "Dr Pepper, Biorhythms, and the Eight-Hour Pumping Test ", Colorado Ground Water Association Annual Meeting, Golden CO, December, 1997.

Norris, C.H., "Characterizing Ash Composition and (vs.) Projecting Environmental Impact for Purposes of Permitting CCW Disposal ", Coal Combustion By-Products Associated with Coal Mining - Interactive Forum, Southern Illinois University at Carbondale, Carbondale IL, October, 1996.

Norris, C.H., "Geochemical Modeling".   Co-instructor for Short Course on Hydrogeologic Issues Related to Mine Permitting, Reclamation and Closure, SME Annual Convention, Phoenix AZ; March, 1996.

Norris, C.H., An Improved Method for Middle Time Analysis of Slug and Bail Test.  Unpublished.  1994.

Norris, C.H., "Evolution of the Landfill", presentation as part of a Telnet program, *Garbage Dilemma Educational Series*, sponsored by Illinois Farm Bureau and Cooperative Extension Service of the College of Agriculture, University of Illinois, Urbana, Illinois, April 20, 1992.

Norris, C.H., "Technical Analysis or Political Acceptability:  The Domesticated Fowl or its Ovum", Solid Waste Management and Local Government Workshop, sponsored by Institute of Government and Public Affairs, University of Illinois, Urbana, Illinois, Jan-Apr, 1992.

Norris, C.H., Report on the Geology and Hydrogeology [of the] SWDA Proposed Landfill Site, Township 8 North, Range 6 East, Section 31, Bartholomew County, Indiana, for Central States Education Center, Champaign, Illinois, 1991.

Norris, C.H., Hydrogeology and Modeling of the Proposed Illinois Low Level Radioactive Waste Disposal Site at Martinsville, Illinois; testimony before the LLRW Siting Commission, October and November, 1991, Martinsville, Illinois.

Norris, C.H., Ground Water Quality Standards for the Illinois Ground Water Protection Act; testimony before Illinois Pollution Control Board, Chicago, Illinois; February, May, October and December, 1990; May, 1991.

Norris, C.H., Hearing on a Petition for a Special Use Permit for the Construction of a Ski Mountain in Oakley Township, Macon County, Illinois; testimony before the Macon County Zoning Board of Appeals; February 16, 1990.

Norris, C.H., Hearing on a Solid Waste Disposal Permit for the Siting of a Municipal Landfill for Streator, Illinois; testimony before the Livingston County Board; August 6, 1990.

Norris, C.H., In the matter of the Gallatin National Company Proposed Balefill, Fulton County, Illinois, written comments to the Illinois Environmental Protection Agency, Springfield, Illinois, 1990.

Norris, C.H., 1990, Log Analysis of the Allied Chemical Corporation Waste Injection Well, Danville, Illinois, for Alberto Nieto, Champaign, Illinois.

Norris, C.H., 1989, Log Analysis of the Cabot Corporation Waste Disposal Wells, Tuscola, Illinois, for Alberto Nieto, Champaign, Illinois.

Norris, C.H., Regulations for Existing and New Activities Within Setback Zones and Regulated Recharge Areas for the Illinois Ground Water Protection Act; testimony before Illinois Pollution Control Board, Chicago, Illinois, June, 1989.

Norris, C.H., and C.M. Bethke, (Abstract) "Mathematical Models of Subsurface Processes in Sedimentary Basins", Conference on Mathematical and Computational Issues in Geophysical Fluid and Solid Mechanics, Society for Industrial and Applied Mathematics Annual Meeting, Houston, Texas, September 28 (invited paper), 1989.

Norris, C.H., "An Evaluation of the Geology and the Monitoring Well Data [at the] City of Urbana Regional Landfill", report submitted to the City of Urbana, Champaign County, Illinois, for Central States Education Center, Champaign, Illinois, 1989.

Norris, C.H., Gallatin National Proposed Balefill/Landfill [at] Fairview, Illinois; testimony before Fairview Town Council, Fairview, Illinois, November, 1988.

Norris, C.H., "Evaluation of the Hydrogeologic Factors Influencing Risk [at the] ISWDA Regional Landfill Site B", report submitted to the Inter-Governmental Solid Waste Disposal Association, Champaign County, Illinois, 1988.

Norris, C.H., and C.M. Bethke, "Status and Future Directions of Quantitative Flow Modeling in Sedimentary Basins", Workshop on Quantitative Dynamic Stratigraphy (QDS), Colorado School of Mines, Lost Valley Ranch, Colorado, February 14-18, 1988.