**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Nos:   17-cv-01661-WJM-MEH
                    17-cv-01679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE; JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

    Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; ELAINE CHAO, in her official capacity as Secretary of transportation; and JOHN M. CARTER, in his official capacity as Division Administrator,

    Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION; and SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado Department of Transportation,

    Defendant-Intervenors.

---

**ZEPPELIN PLAINTIFFS' REPLY IN SUPPORT OF THEIR
APA § 705 MOTION FOR STAY**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

GLOSSARY OF TERMS ............................................................................................... vi

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR P2PH CLAIMS ......... 1

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR HAZARDOUS
MATERIALS CLAIMS ........................................................................................ 8

III.    PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM ................. 10

IV.    EQUITY AND THE PUBLIC INTEREST FAVOR A STAY .............................. 11

V.     CONCLUSION .................................................................................................... 12

# TABLE OF AUTHORITIES

**Statutes**

5 U.S.C. § 705 ........................................................................................................... 12

42 U.S.C. § 4332(C)(i) ................................................................................................ 9

42 U.S.C. § 4332(C)(ii) ............................................................................................... 9

**Regulations**

40 C.F.R. § 1502.15(a) ............................................................................................... 9

40 C.F.R. § 1502.15(b) ............................................................................................... 9

40 C.F.R. § 1502.15(h) ............................................................................................... 9

40 C.F.R. § 1502.16 .................................................................................................... 9

40 C.F.R. § 1508.8 .................................................................................................. 7, 8

40 C.F.R. § 1508.25(a)(3) .......................................................................................... 6

**Cases**

Coal. for Healthy Ports v. U.S. Coast Guard, 2015 U.S. Dist. LEXIS 159090
    (S.D.N.Y. Nov. 24, 2015) ....................................................................................... 9

Colo. Rail Passenger Ass'n v. Fed. Transit Admin., 843 F.Supp.2d 1150 (D. Colo. 2011) ....... 7

Custer Cnty. Action Ass'n v. Garvey, 256 F.3d 1024 (10th Cir. 2001) ........................ 2

Dine Citizens Against Ruining Our Env't v. Klein, 747 F.Supp.2d 1234 (D. Colo. 2010) ...... 3

Heideman v. S. Salt Lake City, 348 F.3d 1182 (10th Cir. 2003) ................................ 10

Northwest Resource Info. Ctr. v. Nat'l Marine Fisheries Serv., 56 F.3d 1060 (9th Cir. 1995) ... 2

Robertson v. Methow Valley Citizens Counsel, 490 U.S. 332 (1989) ........................ 9

San Juan Citizens' Alliance v. Salazar, 2009 U.S. Dist. LEXIS 29804
    (D. Colo. March 30, 2009) ..................................................................................... 7

Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31 (D.C. Cir. 2015) ................................... 6

St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp., 605 F.2d 1169 (10th Cir. 1979) ...... 3

Western Watersheds Project v. Kenna, 2011 U.S. Dist. LEXIS 135108
    (D. Ariz. November 21, 2011) .................................................................................................. 7

Wilderness Workshop v. U.S. Bureau of Land Mgmt., 531 F.3d 1220 (10th Cir. 2008) ............... 2

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedures Act |
| CDOT | Colorado Department of Transportation |
| EADP | Early Action Drainage Project |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| GLO | Globeville Landing Outfall |
| IGA | Intergovernmental Agreement |
| MATT | Multi-Agency Technical Team |
| MOU | Memorandum of Understanding |
| NEPA | National Environmental Policy Act |
| OU1 | Vasquez Boulevard / I-70 Superfund Site Operating Unit 1 |
| OU2 | Vasquez Boulevard / I-70 Superfund Site Operating Unit 2 |
| P2PH | Platte to Park Hill Stormwater Drainage Project |
| PCL | Partial Cover Lowered |
| ROD | Record of Decision |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| TBDP | Two Basins Drainage Project |
| UDFCD | Urban Drainage and Flood Control District |

I.      **PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR P2PH CLAIMS**

P2PH is not an independent project that happens – by some serendipitous coincidence – to provide the 100-year flood protection required for Central 70 just in time for FHWA/CDOT to break ground.  CDOT's Response to Motion for Stay ("Response"), Dkt. 46, at 5-8.  P2PH was borne of Central 70's need for 100-year flood protection and remains an integral and necessary component of the "major federal action" that is Central 70.  Plaintiffs' Motion for Stay ("Motion"), Dkt. 32, at 4-16; FHWA's Motion to Dismiss, Dkt. 45, at 8-13.[1]  As designed by CDOT and approved by FHWA, the PCL Alternative requires a drainage system to provide 100-year flood protection that, but for CDOT's outsourcing to Denver, CDOT would have to build itself.  After contracting with Denver to construct the 100-year flood protection required for the PCL Alternative, CDOT cannot deny the purpose of P2PH, nor rely on any tangential benefit the City may receive from the project, as a rational justification for carving P2PH out of the Central 70 NEPA analysis.  Compare Motion at 20; Response at 9-15; IGA, Dkts. 1-14 – 1-16.[2]

FHWA/CDOT argue this Court lacks subject matter jurisdiction over the P2PH claims, and Plaintiffs lack standing to pursue these claims, because P2PH is not connected to Central 70 and thus falls outside the scope of its NEPA obligation.  Motion to Dismiss; Response at 9.  FHWA/CDOT put the cart before the horse.  The very question posed by this litigation is

---

[1] Plaintiffs will respond separately to FHWA's 15-page Motion to Dismiss, which CDOT has incorporated by reference into its 29-page Response, despite the Court's Order, Dkt. 38.
[2] FHWA has not produced the partial administrative record, which will be determined by agreement of the parties.  Proposed Joint Case Management Plan, Dkt. 43, at 7-8.  The parties have conferred about the scope of the record, and FHWA/CDOT know Plaintiffs believe all documents cited in support of the Motion should be included.  Ex. 1 (letter from Melissa Hailey to all defense counsel, dated 9/1/17).  The IGA is the most important document for this Court's consideration on Plaintiffs' P2PH claims, and FHWA has verified it will be included in the forthcoming record.  Ex. 2 (email from Carter Thurman to Plaintiffs' counsel, dated 10/4/17).

1

whether the 100-year flood protection afforded by P2PH is part of the Central 70 Project and thus should have been analyzed in the FEIS/ROD. To say the Court lacks jurisdiction or that Plaintiffs' claims are not redressable because P2PH and Central 70 are *not* connected actions would be to improperly assume – without the benefit of merits briefing or the record – that FHWA/CDOT have already prevailed. See Northwest Resource Info. Ctr. v. Nat'l Marine Fisheries Serv., 56 F.3d 1060, 1066-1067 (9th Cir. 1995) (refusing to consider "no final agency action" jurisdictional argument until resolving merits of "connected actions" claim).

Regarding the merits, FHWA/CDOT say Central 70 and P2PH cannot be connected because each has "independent utility" – namely, Central 70 serves a transportation purpose, and P2PH addresses flooding concerns in Denver's northern neighborhoods. Response at 4 and 10. See also Wilderness Workshop v. U.S. Bureau of Land Mgmt., 531 F.3d 1220, 1229 (10th Cir. 2008) ("The crux of the [independent utility] test is whether each of the two projects would have taken place with or without the other…"). This assertion is unconvincing.

First, irrespective of whether the current iteration of P2PH will benefit the City in ways other than protecting the highway, Response at 10-15, the evidence shows the origin of TBDP/P2PH – its *raison d'être* – is rooted in CDOT's need to protect I-70 from flooding.[3] The plain language of the IGA states that CDOT needs 100-year storm protection for Central 70 and that Denver committed to provide it through construction of the TBDP. Dkt. 1-14, at CM/ECF 3 of 16. Although CDOT and Denver had been working since at least October 16, 2013 to design

---

[3] Plaintiff will be filing a Motion to Supplement the Record to add Motion Exs. 6, 9, and 10 to the forthcoming record because: 1) "the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials"; and 2) "the record is deficient because the agency ignored relevant factors it should have considered in making its decision." Custer Cnty. Action Ass'n v. Garvey, 256 F.3d 1024, 1028, n. 1 (10th Cir. 2001).

2

an "alternative" open channel concept to CDOT's proposed off-site drainage system, Motion at 4-10, it was the IGA, authorized by Denver on July 6, 2015, that "directly tied" P2PH to Central 70.  DiVito Memo, Dkt. 32-13, at 1; Ortega Testimony, Dkt. 32-24, at 10:24-25.[4]

FHWA/CDOT have not shown, and cannot show, that Denver would have embarked to provide 100-year flood protection in the Montclair and Park Hill Basins *but for* CDOT's introduction of the PCL Alternative.  Compare Motion at 4; Response at 11.  See also Dine Citizens Against Ruining Our Env't v. Klein, 747 F.Supp.2d 1234, 1254 (D. Colo. 2010) ("even though an action could conceivably occur without the previous or simultaneous occurrence, if it would not occur without such action it is a 'connected' action and must be considered within the same NEPA document as the underlying action").  Indeed, even the Thomas Declaration, Dkt. 46-11, which CDOT filed to directly refute the merits of Plaintiffs' claims, highlights the fatal flaw in FHWA/CDOT's position: the timing is wrong.

Prior to Denver's authorization of the IGA on July 6, 2015, Ms. Thomas says the City had "begun a planning effort to upgrade existing flood protection in the Montclair Basin" by: 1) expanding the stormwater detention capacity of Ferril Lake; and 2) planning for, but not completing, the High Street Outfall to provide *5-year* flood protection.  Dkt. 46-11 at ¶¶ 11-12.  She also says it was not until Denver acquired the Market Lead in January 2016 that the City had the ability to provide Denver neighborhoods with the comprehensive *100-year* flood protection currently known as P2PH.  Id. at ¶ 13.  Importantly, this new-found capacity to protect Denver's neighborhoods came *after* Denver's July 2015 authorization of the IGA, *after* the January 2015 MATT Recommendation, *after* the June 2014 Montclair Creek Drainage Feasibility Evaluation,

---

[4] This Court may take judicial notice of public court records.  See St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979).

3

*after* the October 2013 MATT MOU, and *after* August 2013 when Denver first asked UDFCD to "evaluate the drainage for Montclair and Park Hill in light of the proposed CDOT I-70 Lowering Project." Motion at 4-10. See also Declaration of Dennis Royer, P.E., Dkt. 52, at ¶¶ 8 and 18-20 (rebutting statements by Ms. Thomas that Central 70 and P2PH are not connected actions).

The Thomas Declaration only reinforces what the documentary evidence shows. Prior to Denver's acquisition of the Market Lead, the purpose and scope of the TBDP was limited to protecting I-70 from a 100-year flood. Dkt. 1.15 at CM/ECF 13 of 20. After Denver's acquisition of the Market Lead, Denver rebranded the TBDP as P2PH and announced this flood control project would be expanded to include four components designed to protect northern Denver neighborhoods. Motion at 12 (citing TBDP Conceptual Planning Report); Dkt. 32-15 at CCD008740. But, again, despite whether Denver was able, through the acquisition of the Market Lead, to parlay the "CDOT/CCD I-70 PCL Combined Drainage System Proposed 100-Year Protection" shown in Ex. A to the IGA into the 100-year flood protection now known as P2PH, the documents demonstrate that TBDP/P2PH was triggered by Central 70.

Second, irrespective of whether CDOT had or has its own system "capable of addressing I-70's drainage needs," Response at 6,[5] FHWA/CDOT did not intend, when they issued the FEIS or ROD, to utilize the offsite drainage system depicted in those documents, as CDOT *had already secured* Denver's commitment to meet I-70's needs by designing and constructing the TBDP in a manner and on a timetable that would support Central 70.

---

[5] Without the administrative record, Plaintiffs do not have access to the studies or plans underlying CDOT's off-site drainage component in order to refute this conclusory and suspect allegation. For the reasons set forth in the Royer Declaration, Plaintiffs have a good faith belief that CDOT's off-site drainage system will leave the highway trench unprotected at least during the excavation phase, which could last two to three years. Dkt. 52 at ¶¶ 9-16.

4

FHWA/CDOT's claim that TBDP/P2PH is not the offsite drainage system required by Central 70, but rather "Denver's independent stormwater project" is factually implausible. Response at 1. CDOT is funding 40% of the cost of P2PH, currently estimated at $300,000,000. Dkt. 1-14 at CM/ECF 5 of 16, ¶ E; Dkt. 32-24 at 6:12-20. CDOT has the right to review and comment on the design of TBDP/P2PH, as well as and Denver's selection of contractors to build TBDP/P2PH. Dkt. 1-14 at CM/ECF 5-6 of 16, ¶¶ 1.G and 2.A. CDOT is entitled to *weekly status meetings* with Denver on the progress of TBDP/P2PH, and may charge Denver up to *$5,000 per day* if TBDP/P2PH is delayed off schedule and thus impacts CDOT's ability to structure or pay for the Central 70 contract(s). Id. at CM/ECF 6 of 16, ¶ 1.H; id. at CM/ECF 11 of 16, ¶ 9; id. at CM/ECF 11-12 of 16, ¶ 10.A.-H. Neither FHWA nor CDOT make any effort in their Responses to explain how or why CDOT would have entered into the IGA if TBDP/P2PH was not originally intended to satisfy I-70's drainage needs; nor do they attempt to explain why numerous Denver documents, dated prior to the IGA, speak to the need to protect the highway.

There is no dispute that Central 70 cannot function as designed without 100-year flood protection. The issue is whether FHWA/CDOT can carve the system designed to deliver this requisite 100-year flood protection out of the NEPA process because Denver subsequently expanded the TBDP to provide tangential benefits and/or the FEIS/ROD examined an off-site drainage system CDOT never intended to build. The Zeppelin Plaintiffs urge that NEPA does not allow this kind of segmentation. Plaintiffs furthermore urge that CDOT's "Reevaluation Form," in which it unsurprisingly reveals that it will once again scale back its "paper" off-site drainage project in reliance on the "recent progress" of P2PH, only reinforces their arguments that these projects are connected. Dkt. 46-7 at 5. FHWA/CDOT violated the APA when they

5

failed to disclose or analyze the true scope, cost, and impacts of Central 70 by improperly segmenting P2PH from this "major federal action" in an effort to short-circuit NEPA review. Dkt. 1-2 at CCD007354 (CDOT and Denver will pursue TBDP/P2PH without the use of federal funds so FHWA/CDOT does not have "start their NEPA EIS process essentially all over again").

Even if Central 70 and P2PH are not "connected actions," they are set to take place at the same time and place, and thus should have been analyzed in the same EIS as "similar actions." Motion at 22-23.  CDOT says 40 C.F.R. § 1508.25(a)(3) cannot apply to P2PH because it is "entirely outside of FHWA's authority."  Response at 15.  However, P2PH is not an independent City project without a federal nexus.  P2PH is a necessary component of Central 70, which FHWA/CDOT have impermissibly segmented for the purpose of avoiding NEPA review.

And even if P2PH were a "stand alone" project, there is nothing in the plain language of 40 C.F.R. § 1508.25(a)(3) to suggest this regulation cannot apply.  Response at 15 ("NEPA's similar-actions regulation makes it clear that it applies only to 'agency actions'; thus, for the same reasons stated in Sierra Club [v. U.S. Army Corps of Eng'rs, 803 F.3d 31 (D.C. Cir. 2015)], the similar-action regulation does not apply to nonfederal activity involving purely local projects.")).  CDOT is off base.  The text of 40 C.F.R. § 1508.25(a)(3) does not limit its applicability to "major federal actions," and Sierra Club did not involve a "similar action" claim.

CDOT notes the permissive language of 40 C.F.R. § 1508.25(a)(3), suggesting that the choice to ignore a similar action is so committed to agency discretion that it is beyond judicial review.  Response at 15-16.  CDOT is incorrect.  When crafting the scope of an EIS, agencies must act reasonably, and challenges to the scope of an EIS are plainly reviewable.

> Under NEPA, the hard look standard involves an evaluation of whether the agency considered all relevant information when forming its decision, and if the agency followed

6

the required procedures.  Although deference to agency decisions that are fully informed and well-considered is appropriate, courts need not forgive a clear error of judgment.  An adequate scope of analysis under NEPA includes considerations of not only the proposed action, but also connected actions, similar actions, and cumulative actions.

Western Watersheds Project v. Kenna, 2011 U.S. Dist. LEXIS 135108 at *20-21 (D. Ariz. November 21, 2011) (internal quotes and citations omitted).  See also San Juan Citizens' Alliance v. Salazar, 2009 U.S. Dist. LEXIS 29804 at *44 (D. Colo. March 30, 2009) (examining whether scope of EIS was "reasonable" in determining whether agency acted arbitrarily and capriciously in declining to analyze "similar action").  Here, it was patently *unreasonable* for FHWA/CDOT to refuse to analyze the impacts of P2PH when that project was and is being undertaken by CDOT and Denver jointly for the purpose of protecting the highway.  In response to Plaintiffs' Motion, FHWA/CDOT made no effort to explain why P2PH, which is occurring at the same time and same place as Central 70, should not have been analyzed as a similar action.

"Even where an agency is not required to analyze the full impact of another project, the agency must still adequately analyze the cumulative effects of the project within each individual EIS."  Colo. Rail Passenger Ass'n v. Fed. Transit Admin., 843 F.Supp.2d 1150, 1166 (D. Colo. 2011).  FHWA/CDOT concede they had an obligation to discuss the cumulative effects of P2PH "in a reasonable and good faith manner that would allow the public to make educated, informed comments and the agency to make an informed decision."  Response at 16-17.  The agencies maintain, however, that their cumulative impacts analysis was adequate even though they did not analyze the cumulative ecologic or health impacts posed by P2PH and Central 70, as required by 40 C.F.R. § 1508.8.  Motion at 23-24.

Plaintiffs attached to their Motion the entirety of the cumulative impacts analysis from the FEIS.  Dkt. 32-6 at CM/ECF 44-76 of 77.  Nowhere do FHWA/CDOT discuss human health

7

effects or "the effects on natural resources and on the components, structures, and functioning of affected ecosystems" cumulatively posed by Central 70 and TBDP/P2PH.  Compare id.; 40 C.F.R. § 1508.8.  Examining the cumulative ecological impacts of two major infrastructure projects is not a futile exercise.  Motion at 23-24 (cumulative impacts include disturbance of the Superfund site at the trench, Globeville Landing Park, and 39th Avenue, as well as ballooning costs and historic site destruction).  See also Declaration of Charles Norris, Dkt. 53 (explaining, as another example of a significant ecological impact, the cumulative impact to groundwater from Central 70 and P2PH).  Leaving entire categories of impacts out of the analysis is not proceeding in a "reasonable good faith manner" and does not allow "the public to make educated, informed comments" or "the agencies to make an informed decision."

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR HAZARDOUS MATERIALS CLAIMS

The question posed by Plaintiffs' First Claim for Relief is whether FHWA/CDOT can state in their NEPA documents that construction in the Superfund site is "likely" to disturb and spread hazardous materials, which "could lead" to exposure of workers and the public, as well as disrupt the construction budget and schedule, but *not* disclose or discuss how these contaminants can harm human health and the environment, to what extent people are at risk, and/or how local residents and highway travelers might protect themselves during construction activities.  Dkt. 25 at ¶¶ 142-148, 177-181, 201-205, and 214-231.  In order to meet NEPA's requirements, the agencies must take a "hard look" at the ecological, aesthetic, historic, cultural, economic, social, and health effects of Central 70, which everyone agrees is a "major federal action."  40 C.F.R. § 1508.8.  Here, FHWA/CDOT did *nothing* to explain how and to what extent exposure to hazardous materials might harm people in close proximity to the construction site.

8

Rather than pointing the Court to some discussion of human health impacts from the disturbance and spread of hazardous materials during construction, CDOT relies on inapposite cases to argue that an agency can meet the "hard look" requirement by including in the EIS mitigation measures that "minimize or avoid the harm." Response at 18. There are two problems with CDOT's argument. First, none of the three cases relied upon by CDOT involve a claim of no "hard look" at human health impacts. Coal. for Healthy Ports v. U.S. Coast Guard, 2015 U.S. Dist. LEXIS 159090 (S.D.N.Y. Nov. 24, 2015) does not even involve an EIS.

Second, CDOT is conflating the requirement to take a hard look with the requirement to present "a reasonably complete discussion of possible mitigation measures." Robertson v. Methow Valley Citizens Counsel, 490 U.S. 332, 352 (1989). Pursuant to 40 C.F.R. § 1502.16, an EIS must contain a discussion of the project's direct and indirect effects, the significance of those effects, *and* the actual means to mitigate any adverse effects. Id. § 1502.15(a), (b), and (h). The agency cannot simply skip over the "hard look" at direct and indirect effects and their significance because the EIS includes language about unspecified mitigation measures. See 42 U.S.C. § 4332(C)(i) and (ii) (agencies must include in every EIS "the environmental impact of the proposed action" *and* "any adverse environmental effects which cannot be avoided should the proposal be implemented"); Robertson, at 351 (the mitigation requirements of NEPA's regulations flow from the language of 42 U.S.C. § 4332(C)(ii)). The requirements of 42 U.S.C. 4332(C)(i) and (ii) are separate and distinct. The agencies must treat them as such.

### III. PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM

Plaintiffs Kyle Zeppelin and Brad Evans have alleged irreparable harm from construction of the GLO, which is part of Central 70. Motion at 27-28; Dkt. 32-2 at 133. Plaintiffs Christine

9

O'Connor, Kimberly Morse, Jacqueline Lansing, and Janet Federal have alleged irreparable harm from construction of the remainder of P2PH, which FHWA/CDOT should have included in the FEIS and ROD.  Id. at 28-30.  These harms, which are well explained in Plaintiffs' Declarations, include injury to Plaintiffs' environmental, health, aesthetic, financial, and procedural interests.  Dkts. 1-2 – 1-17 and 25-1.  These harms cannot be remedied by money damages and are not impermissibly speculative.  Plaintiffs have alleged a good faith basis, grounded in government documents, that Central 70 and P2PH will disturb and spread soil and groundwater contamination in their neighborhoods, temporarily close the City Park and Park Hill Golf Courses, forever change the historic character of City Park Golf Course, and cause jarring daily disturbance along 39th Avenue.  Id.  These harms will occur before the Court rules on the merits of Plaintiffs' claims.  Compare Motion at 26-27; Response at 22 (citing Heideman v. S. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003) ("The party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.") (emphasis in original)).

      A preliminary injunction would not be meaningless.  Response at 20-21.  CDOT has significant financial ties with and authority over the design, schedule, and construction of P2PH.  Supra, at 5.  An injunction preventing FHWA and CDOT from taking any further action on Central 70 and P2PH until the merits of Plaintiffs' claims are resolved will redress Plaintiffs' injuries.  Plaintiffs have no doubt this Court can narrowly tailor an injunction here.  Id. at 28-29.

      Plaintiffs' Motion is not late.  Id. at 21.  Plaintiffs filed this action challenging FHWA's approval of Central 70 five months after the ROD was issued.  Dkt. 1.  Plaintiffs filed their Motion for Stay two months thereafter.  Dkt. 32.  CDOT's suggestion that Plaintiffs should have

10

sought an earlier injunction against Denver ignores the related case of MacFarlane et al. v. City and County of Denver, et al., in which Ms. O'Connor is also a Plaintiff. Notice of Related Cases, Dkt. 11; Ex. 3 (MacFarlane Complaint, dated 6/13/16); Ex. 4 (MacFarlane Amended Complaint, filed on 4/15/17). Denver argued in MacFarlane that: "Plaintiffs' case is based on speculation and opposition to other projects, specifically, the I-70 reconstruction planned by [CDOT]." Ex. 5 (Denver's MacFarlane Motion for Summary Judgment) at 2. So while CDOT tries pass the buck to Denver here; Denver has already placed the blame squarely with CDOT.

## IV.   EQUITY AND THE PUBLIC INTEREST FAVOR A STAY

Granting a stay would promote the public's interest in an accurate and transparent NEPA process in which the decision-makers are informed and the public is permitted to participate meaningfully. Motion at 32. Plaintiffs recognize the importance of public safety, but disagree that an injunction during the pendency of this litigation will lead to an onslaught of "accidents, injuries, and death by delaying needed safety improvements." Response at 25.

First, CDOT does not explain, and provides no data to support, its "higher-than-average" accident statistic for Central 70. Response at 24. The notion that the Court's denial of Plaintiff's Motion will prevent thousands of accidents from occurring is pure speculation. Id. at 26.

Second, the viaduct does not pose an imminent safety risk. Relying on a Structure Inspection from September 23, 2016, CDOT says the viaduct has a sufficiency rating of 46. Dkt. 46-18, at CM/ECF 2 of 7. See also Ex. 6 (FHWA Bridge Preservation Guide) at 13 (a "sufficiency rating…is a percentage in which 100 percent would represent an entirely sufficient bridge and zero percent would represent an entirely insufficient or deficient bridge"); http://

11

www.fhwa.dot.gov/indiv/hbrrpeli.cfm (last visited October 5, 2017) (in order to be eligible for replacement, the sufficiency rating must be less than 50).  But the ROD, which was issued in January 2017, tells a different story.  There, CDOT states the viaduct has a sufficiency rating of "62 out of a possible 100 points," Dkt. 32-2 at 129, and thus exceeds the eligibility threshold.

But even if CDOT's number was correct, the agency notes, "recent rehabilitation [of the bridge] has extended the lifespan [by] 10-15 years."  Response at 24.  More importantly, "CDOT will continue to monitor and keep the structure safe for the users above and below the structure."  DeVito Declaration, Dkt. 46-12, at ¶ 7.  There is also no evidence Denver residents are likely to be injured by a 100-year flood while the Court resolves the merits.  Response at 27-28.  A 100-year flood is, by definition, an incredibly unlikely event.  Dkt. 25, at 4, n. 2.  That Denver will experience a 100-year flood during the pendency of this case is, again, total speculation.

Finally, Plaintiffs disagree that a stay will waste taxpayer resources.  Response at 25.  With a price tag of $1.1 billion, allowing Central 70 to proceed when Plaintiffs are likely to succeed on the merits would be to throw good money after bad.  The taxpayers cannot, unfortunately, claw back the funds already spent on Central 70 / P2PH, but this Court can stop the ill-advised flow of money, and protect the public health and environment, by acting now.

## V.   CONCLUSION

For all the reasons stated above and in their Motion for Stay, the Zeppelin Plaintiffs respectfully request the Court GRANT their Motion without the need for a bond, and issue a stay preserving the status quo until the merits of their claims are resolved.  See 5 U.S.C. § 705 (the APA does not mention the need for a bond to accompany a stay to preserve the status quo).

Respectfully submitted this 6th day of October, 2017.

12

|     | KEATING WAGNER POLIDORI FREE, P.C. |
| --- | --- |
| By: | *s/ Melissa A. Hailey* |
|     | Melissa A. Hailey, CO Reg. #42836 |
|     | Aaron D. Goldhamer, CO Reg. #41016 |
|     | 1290 Broadway, Suite 600 |
|     | Denver, CO 80203 |
|     | Tel: (303) 534-0401 |
|     | Fax: (303) 534-8333 |
|     | mah@keatingwagner.com |
|     | agoldhamer@keatingwagner.com |
|     |     |
|     | *~ and ~* |
|     |     |
|     | James Jay Tutchton, CO Reg. #21138 |
|     | Tutchton Law Office |
|     | 6439 East Maplewood Avenue |
|     | Centennial, CO 80111 |
|     | Tel: (720) 301-3843 |
|     | jtutchtontlo@gmail.com |
|     |     |
|     | *Attorneys for Plaintiffs* |

## CERTIFICATE OF SERVICE

      I hereby certify that on this 6th day of October, 2017, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record as follows:

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Brent E. Butzin, Esq.
Assistant Attorney General
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Brent.butzin@coag.gov

*Attorneys for Defendant-Intervenors*

Robert E. Yuhnke, Esq.
Robert E. Yuhnke & Associates
4050 SE Hosner Terrace
Gresham, OR 97080
Bob.yuhnke@prodigy.net

Andrea S. Gelfuso, Esq.
Andrea Gelfuso, Attorney at Law
2402 South Holland Street
Lakewood, CO 80227
Agelfuso6@gmail.com

Gregory Nicholas Corbin
Milligan Rona Duran & King, LLC-Denver
1627 Vine Street
Denver, CO 80206
gnc@mrdklaw.com

*Attorneys for Sierra Club Plaintiffs*

*s/ Melissa A. Hailey*