# EXHIBIT 4

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO**<br>1437 Bannock Street, Rm. 256<br>Denver, CO  80202 | DATE FILED: April 15, 2017 12:21 PM<br>FILING ID: 9870799C80773<br>CASE NUMBER: 2016CV32126 |
| **Plaintiffs:** JOHN D. MACFARLANE, DAVID TORRES, LAMONE NOLES, SARAH EDGELL, VIDA HUGHES, THERESA JOHNSON, HEATHER STRACK MCCUTHCEON, and CHRISTINE O'CONNOR<br><br>v.<br><br>**Defendants:** THE CITY AND COUNTY OF DENVER; MICHAEL B. HANCOCK, in his official capacity as Mayor of the City of Denver, JOSE M. CORNEJO, in his official capacity as Manager of Denver Department of Public Works; ALLEGRA HAYNES, in her official capacity as Executive Director of Denver Department of Parks and Recreation | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiffs:*<br>Aaron D. Goldhamer, #41016<br>KEATING WAGNER POLIDORI FREE, P.C.<br>1290 Broadway, Suite 600<br>Denver, CO 80203<br>Telephone: 303-534-0401<br>Facsimile:  303-534-8333<br>agoldhamer@keatingwagner.com<br><br>*Attorneys for Plaintiff John D. MacFarlane*<br>M. Anthony Vaida, #26411<br>M. ANTHONY VAIDA, P.C.<br>899 Logan Street, Suite 208<br>Denver, CO 80203<br>Telephone: 303.832.2100<br>Facsimile: 303.861.3759<br>manthonyvaidapc@vaida.net | Case No.:  2016CV32126<br><br>Courtroom:  409 |
| **AMENDED COMPLAINT** ||

Plaintiffs, by and through undersigned counsel, state the following for their Complaint against THE CITY AND COUNTY OF DENVER; MICHAEL B. HANCOCK, in his official capacity as Mayor of the City of Denver; JOSE M. CORNEJO, in his official capacity as Manager of Denver Department of Public Works; and ALLEGRA HAYNES, in her official capacity as Executive Director of Denver Department of Parks and Recreation:

# I. <u>INTRODUCTION</u>

1. This case presents the question of whether the City and County of Denver ("City") may construct an industrial-level stormwater management project in designated parkland, designed specifically to protect a highly-controversial federal highway project and other new construction, either without a popular vote, amendment of the Denver City Charter, or a change in applicable law governing designated parkland.

2. The City, through its various agencies, has announced a plan to spend approximately three-hundred million dollars ($300,000,000.00)—funded largely from increased stormwater ratepayer "fees" without a public vote, which is customary for an increase of that size—on a stormwater management project ("Project," sometimes known as the "Platte to Park Hill" Project) that includes, among other things, constructing a multi-acre stormwater detention facility in Denver's City Park Golf Course ("Golf Course"), which is designated parkland.

3. The portion of the Project in Denver's historic City Park Golf Course:

   (i)   violates Denver's zoning code;
   (ii)  is pursuant to an agreement between Denver's Department of Parks and Recreation ("DPR") which is in violation of DPR's charge in the Denver City Charter;
   (iii) violates restrictions on the usage, without a popular vote, of parkland in the Charter; and
   (iv)  is contrary to caselaw interpreting similar dispositions of parkland.

4. To better the poor optics of this Project, the City has obfuscated its purposes. The City asserts that the Project is primarily designed to mitigate a newly-determined "most severe" flooding risk in certain drainage basins—which had not previously been designated as having particular priority over other flood mitigation needs in prior studies. The City has also incorrectly asserted that the Project is not associated with or linked to the Colorado Department of Transportation's ("CDOT") proposed widening of Interstate 70 ("I-70") and the City's new construction plans along the I-70 corridor.

5. In fact, the Project is designed specifically to protect against the risk of flooding to (a) a proposed expansion and lowering of I-70 in north Denver between Brighton and Colorado Boulevards, and (b) public and private development plans for and around the National Western Stock Show, surreptitiously shifting certain costs of these public and private developments from the builders to the stormwater fee paying public at large.

6. Plaintiff seeks declaratory and injunctive relief to abate and correct Defendants' ultra vires planned actions.

## II. <u>PARTIES, JURISDICTION, AND VENUE</u>

7. Plaintiffs are the following:

2

a. J.D. MacFarlane was Attorney General for the State of Colorado from 1975 to 1983, and is a former Colorado State Representative, State Senator, Colorado's Chief Deputy State Public Defender, a Deputy District Attorney and Denver's Manager of Safety. He is a citizen, resident, and taxpayer in Denver, and lives at 2080 Bellaire St., Denver, Colorado, near City Park and the Golf Course.

b. David Torres is a citizen, resident, and taxpayer in Denver, and lives at 4656 Baldwin Court, Denver, Colorado. He has been a regular golfer at City Park Golf Course for eighteen years, since he was twelve years old.

c. LaMone Noles is a citizen, resident, and taxpayer in Denver, and lives at 3011 Cherry Street, Denver, Colorado, near City Park and the Golf Course. She regularly walks around and through City Park Golf Course, regularly travels on all streets around the Golf Course, has attended many public meetings concerning the Project, and has been active in community groups opposing the Project.

d. Sarah Edgell is a citizen, resident, and taxpayer in Denver, and lives at 3141 E. 26th Avenue, Denver, Colorado, across the street from the City Park Golf Course. She has golfed many times at the City Park Golf Course, has been active with the City Park Golf Course women's golf league, regularly walks her dogs at City Park Golf Course, regularly travels on all streets around the Golf Course, and has been active in community groups opposing the Project.

e. Vida Hughes is a citizen, resident, and taxpayer in Denver, and lives at 2931 Milwaukee Street, Denver, Colorado, near the City Park Golf Course. She regularly jogs at City Park Golf Course, regularly travels on all streets around the Golf Course, and has been active in community groups opposing the Project.

f. Theresa Johnson is a citizen, resident, and taxpayer in Denver, and lives at 3711 E. 26th Avenue, Denver, Colorado, across the street from the Golf Course. She also owns separate rental property across the street from the Golf Course, regularly walks her dogs with her husband at the Golf Course, and regularly travels on all streets around the Golf Course.

g. Heather Strack McCutcheon is a citizen, resident, and taxpayer in Denver, and lives at 2255 York Street, Denver, Colorado, on the southwest corner of the Golf Course. She regularly walks in the Golf Course with her husband and regularly travels on all streets around the Golf Course.

3

      h.      Christine O'Connor is a citizen, resident, and taxpayer in Denver, and lives at 144 S. Ulster St., Denver, Colorado. She has detailed knowledge concerning the Project, informed by her multiple Colorado Open Records Act requests concerning issues related to the Project and her many discussions with various government officials concerning the Project.

8. Defendant City is a political subdivision of the State of Colorado governed by a home rule Charter.

9. Defendant Michael B. Hancock is the Mayor of the City, on information and belief resides in Denver, and is named in his official capacity only.

10. Defendant Jose M. Cornejo is the Manager of Denver's Department of Public Works, on information and belief resides in Denver, and is named in his official capacity only.

11. Defendant Allegra Haynes is the Executive Director of Denver's Department of Parks and Recreation, on information and belief resides in Denver, and is named in her official capacity only.

12. Venue is proper in the City and County of Denver because Defendants can be found and served in the City and County of Denver; include the City and County of Denver and its agencies, Mayor and offices; the acts and omissions complained of herein have occurred and continue to occur within the City and County of Denver; and the relief sought invokes the jurisdiction of the District Court.

13. Jurisdiction is proper pursuant to COLO. CONST. art. VI, § 9.

### III. FACTUAL BACKGROUND

**Interstate 70 through north Denver**

14. In the 1960s, I-70 was constructed to run through existing neighborhoods in north Denver.

15. The construction destroyed numerous homes and businesses, and imposed significant noise and pollution burdens on local residents. The structure of I-70 physically isolated many parts of north Denver from the rest of the city. Property values declined, investment in north Denver stagnated, and the residents of north Denver have long suffered from the decision to cut I-70 through existing neighborhoods.

16. Beginning in 2003, the Colorado Department of Transportation ("CDOT") began studying the section of I-70 running through north-central Denver to examine congestion and

infrastructure issues. Over the course of several years, different alternatives were developed and explored, including "no action" and a plan to "reroute" I-70 along interstates 76 and 270.

17. In a Draft Environmental Impact Statement submitted in 2008, CDOT considered—and eliminated from consideration—various subgrade options for I-70, stating that each would result "in unacceptable effects on aquatic and ecological resources," and, in at least one case, "increased potential for encountering contaminated groundwater or soils."

18. In August of 2014, CDOT again considered the subgrade options, and CDOT preliminarily identified a plan to widen and lower I-70 below grade (the "Partial Cover Lowered Alternative" or "PCL Alternative") as its preferred alternative. In its Final Environmental Impact Statement ("EIS") issued in January of 2016, CDOT finally announced the PCL Alternative as its preferred alternative.

19. Construction of the PCL Alternative—because it is below existing grade—is subject to a high risk of flooding from stormwater runoff and requires significant protection from stormwater.

20. CDOT asserted in the January 2016 EIS that the PCL Alternative would cost approximately $1,700,000,000.00, and that "[t]axes would not be raised to pay for this project."

21. The PCL Alternative—because it is being constructed below existing grade, at the downstream end of drainage basins, and within a designated Superfund Site Area—is subject to a high risk of flooding and contamination from stormwater runoff and requires significant protection from harmful floodwaters.

22. The PCL Alternative contemplates the destruction of over fifty homes and eighteen businesses in north Denver, a community with high concentrations of Coloradans of color and a community that has long suffered deleterious effects from I-70.

23. The PCL Alternative is already subject to separate litigation concerning air pollution standards. *See Sierra Club, Citizens for a Greater Denver, Elyria and Swansea Neighborhood Association, Cross Community Coalition v. U.S. Environmental Protection Agency et al.*, United States Court of Appeals for the District of Columbia Circuit Case No. 16- 1097.

24. On information and belief, further litigation will ensue concerning the PCL Alternative if relevant federal agencies issue a final record of decision approving of the PCL Alternative, so the PCL Alternative will face additional hurdles prior to construction.

25. The United States Public Interest Research Group, which advocates for consumers and environmental protections, has called the PCL Alternative a wasteful "boondoggle" in a written report.

26. Public resistance to construction of the PCL Alternative has been vocal and vehement.

27. Construction of the PCL Alternative will, in many cases, further isolate neighborhoods in north Denver due to its expansion and imposition of a wide lowered chasm.

28. Construction of the PCL Alternative will entail the removal of approximately 75,000 dump trucks worth of soil to dig below grade. Much of this soil is contaminated and located in a federally-designated Superfund Site Study Area due to previous industrial activities in north Denver, and disturbing this soil presents significant health risks as it becomes airborne.[1]

29. The deleterious effects of the construction of the PCL Alternative described above will be disproportionately borne by neighborhoods which are heavily Hispanic and working-class or impoverished.

## Denver Stormwater Projects Generally

30. The City and its various subdivisions, including Denver Department of Public Works ("DPW"), periodically analyze stormwater flows within Denver and create and disseminate a Storm Drainage Master Plan ("Master Plan") for stormwater collection, mitigation, detention and diversion.

31. The City's storm drainage plans have traditionally been based upon two to five-year stormwater models, the standard for cities the size of Denver. It is exceedingly rare for a city the size of Denver to plan, construct, and implement stormwater plans based upon a so-called "100-year" storm model, which provides protection against a stormwater event that has a 1% yearly chance of occurring.

32. By contrast, there exist certain federal regulations for interstate highway construction that require 100-year stormwater protection.

33. Denver and most cities its size generally do not plan, construct and implement 100-year stormwater protection (outside of any related interstate highway construction) because the costs of such a plan well exceed any likely benefit. Generally, 100-year storm protection for cities like Denver is both unnecessary and impractical.

34. As recently as 2014, the City developed and issued a Storm Drainage Master Plan. The 2014 Master Plan did not contain any plan or proposal to develop, construct, or implement a new 100-year stormwater protection project on the scale contemplated by the Project. In fact, the 2014 Master Plan recognized the following:

> Cost effective implementation of a City-wide **100-year drainage system is <u>not practical</u>** because of the significant capital cost of retrofit construction and limited

---

[1] The Colorado Department of Public Health and Environment ("CDPHE") conducted analyses of health and cancer risks in this Area, prompted, in part, by U.S. Environmental Protection Agency findings of "high levels of arsenic and lead in soil at some homes in the Swansea, Elyria, Clayton, Cole, and southwest Globeville neighborhoods." According to CDPHE, "the findings of [the] study suggest that there is a generally higher than expected rate of cancer in the [Vasquez Boulevard and I-70] study area."

annualized flood hazard reduction. **Consequently, a phased program is recommended <u>that prioritizes improvements to address current hazards</u> while improving <u>the minor</u> storm system.**

(Emphasis supplied).

35. The Master Plan contained no plan for mitigation, detention or diversion of stormwater in the Cole Neighborhood along 39th Avenue or within the City Park Golf Course, and made no mention of the need for a multi-acre detention pond, or a mile-long open channel connected to that system, both of which the Project currently contemplates

36. Nor did the Master Plan extraordinarily emphasize addressing drainage needs in the Montclair and Park Hill drainage basins (which will feed the Project) at the expense of other needed stormwater projects throughout Denver.

### The Project and I-70

37. In furtherance of the PCL Alternative, and in light of the significant flooding issues that required the PCL Alternative to be protected from 100-year storms, a number of government agencies formed the "I-70 PCL Drainage Multi Agency Technical Team" ("MATT"). Both the City and CDOT were represented at MATT.

38. As early as October 21, 2013 (even before CDOT had announced its preliminary preference for the PCL Alternative), the MATT meeting minutes reflect the possibility of reaching an agreement with DPR concerning stormwater detention and storage in and around the Golf Course.

39. On August 20, 2014, DPR and DPW signed a Memorandum of Understanding ("MOU"). The MOU provided for agreement between DPR and DPW to cooperate and work together to pursue stormwater management projects to assure "the continued reduction of the 100-year flood discharge downstream…."

40. The MOU references planning for 100-year flood protection on seven separate occasions.

41. In January of 2015, MATT issued a Letter of Recommendation, stating, "The trench area of CDOT's I-70 PCL project is a sump and must be design [sic] with a drainage system to handle the 100-year event."

42. On July 6, 2015, the Denver City Council approved an Intergovernmental Agreement ("IGA") between the City and CDOT.

43. The timing of this approval of the IGA was controversial, as it came just before various new Denver City Councilpersons took office and was presented to the Council with limited time to review the IGA. See Susan Greene, <u>Incoming councilman accuses Mayor</u>

Hancock of sneaking millions in public projects past lame-duck council, Colorado Independent, June 22, 2015.[2]

44. The IGA asserts that CDOT and others must provide 100-year storm protection for its I-70 PCL Alternative project.

45. The IGA further asserts that "the City has separately and independently created a drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project…."

46. On information and belief, the assertion that the City "separately and independently" created such a plan independent of I-70's needs is false.

47. Rather, on information and belief, the City's "plan" was made at the request and behest of proponents of the PCL Alternative, including MATT.

48. A letter dated July 15, 2015, from the Project Director of the I-70 East Project expressly acknowledged that "the IGA also provides that CDOT fund 40% of the cost of drainage improvements that provide early action on key elements of the drainage system **needed for I-70 East** and additionally support creation of a complementary system **that further protects the interstate in large storm events**."

49. The "before" and "after" maps created by the City of projected flooding in areas affected by the Project show that flooding will still occur in the event of a ten-year, twenty-five year, fifty-year, and one-hundred year storm in much of the Park Hill and Montclair basins, and that the only areas which will be flood-free during these storms are the areas immediately north of the 39th Avenue trench—such as I-70, the National Western Stock Show, and other areas slated for private development.

50. The connection between the Project and I-70 and other new development has been widely reported-on. See Jon Murray, I-70 link, other concerns complicate Denver drainage projects, The Denver Post, March 20, 2016; Alan Prendergast, Is Denver's Stormwater Fix an Engineer's Dream—or a Neighborhood Nightmare?, Westword, March 15, 2016.[3]

51. At a recent Denver City Council meeting on paying for the Project, City Councilman Rafael Espinoza remarked that "what had happened is some obfuscation" by the City on the need for the Project and the City's assertion that the Project has no connection to the PCL Alternative, and that his questions concerning the Project (and its funding) have not been answered by the

---

[2] Available at http://www.coloradoindependent.com/154054/incoming-councilman-accusesmayor-hancock-of-sneaking-millions-in-public-projects-past-lame-duck-council (last accessed April 13, 2016).
[3] Available at http://www.denverpost.com/2016/03/19/i-70-link-other-concerns-complicatedenver-drainage-projects/ and http://www.westword.com/news/is-denvers-stormwater-fix-anengineers-dream-or-a-neighborhood-nightmare-7700420, respectively (last accessed June 7, 2016).

8

City and its departments in briefings, and that the City is continuing to "pretend[] [the Project] has nothing to do with I-70."[4]

## Project Funding and Public Outreach

52. The terms of the IGA require, among other things, that the City, through its Wastewater Enterprise Fund, pay thirty-seven million dollars ($37,000,000.00) of the initial costs of coordinated stormwater projects to prevent the PCL Alternative project from flooding during 100-year storms.

53. The IGA further provides that the City's Wastewater Enterprise Fund be required to pay for 60% of the first eighteen million dollars ($18,000,000.00) of any overages in the stormwater project. Any overages above and beyond eighteen million dollars will be the sole responsibility of the Wastewater Enterprise Fund.

54. The City originally projected that the total cost of the Project would be one hundred thirty-four million dollars ($134,000,000.00).

55. During an April 6, 2016 subcommittee meeting of the Denver City Council, DPW stated that the projected costs of the Project had increased to between two-hundred sixty-seven ($267,000,000.00) and two-hundred ninety-eight million dollars ($298,000,000.00).

56. As such, the IGA would indebt the Wastewater Enterprise Fund to nearly twohundred million dollars ($200,000,000.00). During that same meeting and in subsequent meetings, Denver City Councilwoman Deborah Ortega and others have commented that a project of this magnitude generally requires a vote of the taxpayers.

57. As a result of the I-70 PCL Alternative project and the IGA, Defendants proposed that Denver enact a substantial stormwater rate increase, without a popular vote.

58. Overall, the stormwater rate is expected to increase approximately 66% through 2020 for stormwater ratepayers, including Plaintiff.

59. While Plaintiff does not, at this time, assert any claims pursuant to Colo. Const. Art. X, § 20, in connection with the financing of the Project, he reserves the right to amend this Complaint to assert such a claim.

60. The City and its hired communication contractors have stated, in public and neighborhood meetings, including to Plaintiff, that the Project has no relationship to the I-70 project.

---

[4] See http://denver.granicus.com/MediaPlayer.php?view_id=21&clip_id=9186 at 2:05:10 and 3:38:39 (last accessed June 7, 2016).

9

61. Instead, officials of Denver and its hired contractors have repeatedly told the public, including Plaintiff, that the stormwater project is designed exclusively to protect Denver residents, particularly those in northeast Denver and in the Cole neighborhood, from repeat serious flooding.

62. In support of these statements, City officials and contractors presented slideshows at neighborhood meetings purportedly showing serious flooding in northeast Denver that the Project would allegedly mitigate. In fact, however, several of the slides used in these presentations were taken from neighborhoods outside of the boundaries of the Project.

63. The City further suggested that Denver's northeast neighborhoods faced an imminent threat of a storm on the magnitude of Hurricane Katrina and those experienced in Boulder in 2013, and that the Project would protect Denver residents from such Katrina and Boulder-like disasters. On information and belief, these representations concerning extreme events were intentionally exaggerated to justify the Project; indeed, the "after" Project completion maps produced by the City still show significant flooding in northeast Denver during large storm events.

64. Recently, as the public has become more informed about the Project, City officials and contractors have offered an alternative explanation that the PCL Alternative and the Project are being undertaken in conjunction with one another to maximize the benefit of flood protection for drainage basins in northeast Denver. The purported justification for combining these two massive infrastructure projects is that these basins are the "highest-rated flood risk" basins, according to a new scoring metric, despite the fact that these basins were not identified as such as recently as the 2014 Master Plan.

65. City officials and contractors engaged in this pattern of obfuscation because they know, or should know, that Denver's residents, who are also stormwater ratepayers, would otherwise oppose the use of significant funds to support a stormwater project designed specifically to benefit the expansion and lowering of I-70. This is particularly true because the proposed Project requires a significant rate increase and, consequently, the diversion of resources from other known and critical stormwater projects in the City.

66. The Project is so expensive that it will necessarily result in a significant depletion of relevant funds over the next 30 years, resulting in the abandonment or delay of other stormwater projects that are necessary to protect ratepayers and neighborhoods from flooding.

67. The Project will also result in the diversion of so much water to the Globeville Outfall that the completion of the Project will be expected to cause the Globeville neighborhood to become susceptible to flooding and/or will require Globeville property owners to purchase flood insurance in order to qualify for home or business loans in the absence of additional ameliorative action.

10

68. The construction of the proposed mile-long 75-100 foot-wide open trench along 39th Avenue, in a designated Superfund Site Study Area, also poses a serious risk to the health and welfare of Cole neighborhood residents.

69. The environmental risks include exposure to heavy metals and other toxins that were deposited in the ground in and along the proposed 39th Avenue trench by years of metal smelting operations.

70. Although the DPW claims to have considered health risks and "environmental justice" in designing the project, DPW Chief Operations Officer George Delaney noted, during a May 18, 2016, City Council subcommittee meeting, that CDOT—who is the City's partner in the Project—"doesn't care about Denver neighborhoods."

## The Project and other Construction

71. The City is participating in a large redevelopment of the National Western Stock Show, located near I-70.

72. New large developments in Denver must meet certain requirements for stormwater drainage and detention.

73. While the City has secured funding for some of its contribution to this overall redevelopment, a gap remains.

74. The City has expressed its intent of "using wastewater funds" to close that gap. See Jon Murray, <u>Denver's $856M National Western funding plan relies on tax extensions</u>, The Denver Post, February 16, 2015.[5] On information and belief, the Project and the abovedescribed proposed stormwater rate increase represent that use of "wastewater funds," thereby shifting the burden of development onto wastewater ratepayers, who did not approve such a burden when voting for tourism-focused taxes in connection with the National Western Stock Show complex in November of 2015.

75. Additional public and private construction projects are planned for areas near the National Western Stock Show complex, which would otherwise have to meet drainage and stormwater detention requirements.

76. On information and belief, the Project (and its financing through increased "fees") is meant to shift the burden of these development costs onto wastewater ratepayers.

## City Park Golf Course

77. The City Park Golf Course is designated to public park purposes.

---

[5] Available at http://www.denverpost.com/2015/02/16/denvers-856m-national-western-fundingplan-relies-on-tax-extensions/ (last accessed June 10, 2016).

78. The Golf Course was designed by a famed golf course architect, Tom Bendelow, and landscape architect, Frederick Law Olmsted, Jr., and the Project will alter its design that highlights Denver's scenic views, natural spaces, and topography.

79. The Golf Course is on the National Register of Historic Places, and hosted Denver's first racially-integrated golfing activities.

80. The portion of the Project located in the Golf Course will necessitate the removal of anywhere from 180 to several hundred large, mature trees. There has been no study of the environmental impact of this removal.

81. The portion of the Project located in the Golf Course may necessitate the demolition of the Golf Course club house, constructed at taxpayer cost only fifteen years ago.

82. The portion of the Project located in the Golf Course will necessitate the closure of the Golf Course for an extended period of time, up to two years.

83. The portion of the Project located in the Golf Course will necessitate the closure of the Golf Course during its proposed function: the detention of industrial amounts of untreated stormwater detention in the Golf Course.

84. The City announced in April of 2016 that a portion of the Project was to be sited in the Golf Course.

85. The City had previously announced some intentions to possibly not locate any portion of the Project in the Golf Course, and instead demolish several residential city blocks in the Cole neighborhood to accommodate stormwater management. On information and belief, this Cole option was a ruse and presented as an alternative to make use of the Golf Course seem more palatable. In fact, on information and belief, the City had already made its decision to site the Project in part in the Golf Course well before its April 2016 announcement; Scott Rethlake, the Director of Golf at the City, made an announcement to the City's golf staff on September 30, 2015, that the City had decided to redesign the Golf Course to accommodate the Project.

86. Subsequently, on information and belief, City employees instructed the golf staff that there were strict orders in place that no one was to discuss the September 30, 2015 announcement with the public.

87. On information and belief, the City saw the above-described Cole alternative and cover-up as necessary because of recent controversy concerning the City's usage or proposed usage of open areas, parks, and areas adjoining parks.[6] On information and belief, the City lacks the political will to bulldoze several city blocks of the Cole neighborhood as part of the Project.

---

[6] *See, e.g., Friends of Denver Parks, Inc. v. City & Cty. of Denver*, 327 P.3d 311 (Colo. App. 2013) (concerning Hentzell Park and related areas); Patricia Calhoun, Parks and Rec Pulls the Plug on City Loop for City Park,

12

88. Construction in and around City Park has been litigated previously. As noted in District Court Judge Clifton Flowers' order dated August 7, 1990, in the McRae v. Etter matter (attached hereto as **Exhibit 1**) which enjoined the City from converting the City Park Pavilion into office space, City Park "is held by the governmental authority in trust for the benefit of the members of the general public, and…the City cannot impose upon such dedicated property any servitude or burden inconsistent with the dedication of the property for public park purposes."

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment**

89. Plaintiff hereby incorporates the foregoing allegations as if set forth in full herein.

90. Pursuant to C.R.C.P. 57 and C.R.S. § 13-51-101 *et seq.*, the Court may declare rights, status, and other legal relations.

91. Relief under C.R.C.P. 57 and C.R.S. § 13-51-101 *et seq.* is appropriate when a municipality attempts to take action without authority. *Denver & Rio Grande W. R. Co. v. City & Cty. of Denver*, 673 P.2d 354, 357 (Colo. 1983).

92. "[A] resident taxpayer of a municipality has the right to maintain a suit to prevent the unlawful disposition by the municipal authorities of the money or property of the town, and to restrain the diversion of property in his town from any public use, in which he shares, to which it has been dedicated." *McIntyre v. Bd. of Comm'rs of El Paso Cty.*, 61 P. 237, 241 (Colo. App. 1900).

93. DPR is charged with "[m]anagement, operation and control of all facilities, either within or without the territorial limits of the City and County, owned by the City and County **for park and recreational purposes**…." Denver Charter § 2.4.4(A) (emphasis added). DPR is not charged with operating storm water detention facilities or leasing land for such detention facilities or otherwise granting permission for itself or to any other agency to operate such detention facilities.

94. The Golf Course is zoned "OS-A," and such zoning is "intended to protect and preserve public parks owned, operated or leased by the City and managed by the City's Department of Parks and Recreation ('DPR') for park purposes." Denver Zoning Code, § 9.3.2.1.A. (emphasis added).

95. DPR and DPW signed a Memorandum of Understanding ("MOU") in 2014. The MOU, while purporting to recognize the "inadvertent" role City Park has played in storm detention and discharge, also provides for "allowing new or changed uses within City Park." (emphasis added). The MOU proposed development of a new master plan and mentions potential

---

Westword, March 24, 2014 (available at http://www.westword.com/news/parks-and-rec-pulls-the-plug-on-city-loop-for-city-park-5905997 ) (last accessed June 11, 2016); Jon Murray, City Park neighbors protest Denver Zoo's animal waste energy system, The Denver Post, December 15, 2014 http://www.denverpost.com/2014/12/15/city-park-neighbors-protest-denver-zoos-animal-wasteenergy-system/ (last accessed June 11, 2016).

13

changes to water detention. While the MOU purports to be between DPW and DPR, the document reflects work by CDOT, apparently in connection with its contemplated I-70 construction.

96. Denver's Charter provides the following:

> No franchise, license or permit for the construction or maintenance of any railway shall ever be granted within the limits of any park or lengthwise upon any parkway <u>nor shall any franchise for the maintenance of any other special privilege within any park be granted</u>….

Denver Charter § 2.4.6 (emphasis added).

97. The Charter likewise prohibits the "sale or leasing" of Denver's parks except by approval of voters. Denver Charter at § 2.4.5.

98. But for the construction of the PCL Alternative and the City's desire to accommodate other construction, the City would not be pursuing construction of a 100-year flood protection undertaking in connection with the Project which would necessitate the use of the Golf Course in relation to same.

99. The Project's location in the Golf Course constitutes DPR action—through its agreement in the MOU to participate in drainage projects—outside of its limited management authority set forth in § 2.4.4(A) of the Denver Charter, because the Project is not "for park and recreational purposes," but rather to support other construction projects.

100. Additionally and alternatively, the Project's location in the Golf Course contravenes § 9.3.2.1.A. of the Denver Zoning Code, because the Project is not "for park purposes." Rather, the Project is for the purpose of supporting other construction.

101. Additionally and alternatively, the Project's location in the Golf Course contravenes Denver Charter § 2.4.6., as the use of dedicated parkland constitutes either a "franchise" for DPW and/or the Wastewater Enterprise Fund or a "special privilege" for DPW and/or the Wastewater Enterprise Fund, or both.

102. Additionally and alternatively, the Project's location in the Golf Course constitutes a "leasing" of designated parkland—both during construction and on an ongoing temporary basis as industrial amounts of untreated stormwater accumulate therein—to DPW and/or the Wastewater Enterprise Fund that has not been approved by voters, in contravention of § 2.4.5. of the Denver Charter.

103. Additionally and alternatively, the Project's location in the Golf Course is inconsistent with the dedication of the Golf Course for public park purposes.

104. A dispute and actual controversy has arisen between the parties as to the Project's location, in part, in the Golf Course. Without limitation, counsel for Plaintiff MacFarlane sent the then-Denver City Attorney, Scott Martinez, a letter outlining the basis for this claim. Mr. Martinez responded, denying that the Project's location within in the Golf Course contravened applicable law.

105. An adjudication as to the legality of placing any part of the Project in the Golf Course would terminate some or all of the controversy giving rise to this action.

106. As such, the Court should declare that the Project's location in the Golf Course is violative of Denver Charter § 2.4.4(A) and/or Denver Zoning Code, § 9.3.2.1.A. and/or Denver Charter § 2.4.5., and/or Denver Charter § 2.4.6., and/or is contrary to common law governing municipal use of the public parkland.

SECOND CLAIM FOR RELIEF Injunctive Relief

107. Plaintiff hereby incorporates the foregoing allegations as if set forth in full herein.

108. Plaintiff has a reasonable probability of success on the merits on his claim for Declaratory Relief.

109. A danger of real, immediate, and irreparable injury—namely, the closure of, extensive destructive construction on, and conversion of the Golf Course into a stormwater detention facility—may be prevented by injunctive relief.

110. There is no plain, speedy, and adequate remedy at law to prevent this injury.

111. The granting of an injunction will not disserve the public interest.

112. The balance of equities favors an injunction.

113. An injunction will preserve the status quo pending a trial on the merits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a. Declaratory judgment that the Project's location in the Golf Course is contrary to applicable law;

b. Preliminary and permanent injunctive relief enjoining the City from constructing the Project in the Golf Course;

c. Attorney fees and costs as allowable by law;

15

d. Any such other relief that this Court deems just and proper.

Dated: April 17, 2017.

                                              KEATING WAGNER POLIDORI FREE, P.C.

                                              */s/ Aaron D. Goldhamer*
                                              Aaron D. Goldhamer, #41016
                                              *Attorneys for Plaintiffs*

                                              M. ANTHONY VAIDA, P.C.

                                              */s/ M. Anthony Vaida*
                                              M. Anthony Vaida, #26411
                                              *Attorneys for Plaintiff MacFarlane*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2017, a true and correct copy of the foregoing was served through CO-COURTS E-FILING and served electronically on the following:

Reneé A. Carmody
Tracy A. Davis
Jessica Brody
Lindsay Sue Carder
Maral Shoaei
City Attorneys Office
201 W. Colfax Ave., Dept. 1207
Denver, CO 80202-5332
*Counsel for Defendants*

                                              *s/ Aaron D. Goldhamer*
                                              Aaron D. Goldhamer