| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO**<br>1437 Bannock Street, Rm. 256<br>Denver, CO 80202 | DATE FILED: October 26, 2017<br>CASE NUMBER: 2016CV32126 |
| **Plaintiff:** JOHN D. MACFARLANE, *et al.*<br><br>**v.**<br><br>**Defendants:** THE CITY AND COUNTY OF DENVER; *et al.* | ▲ COURT USE ONLY ▲ |
| | Case No.: 2016CV32126<br><br>Courtroom: 269 |
| **FINDINGS OF FACT AND CONCLUSIONS OF LAW** | |

This matter came before the Court for a bench trial on August 21, 2017 through August 24, 2017. Plaintiffs appeared represented by counsel, Aaron Goldhamer and Anthony Vaida; Defendants appeared represented by counsel, Tracy Davis, Jessica Brody, and Renee Carmody. After considering the arguments of the parties, the admitted exhibits, the testimony of witnesses, the Court's file, and applicable law, the Court Finds and Orders as follows:

## I.     INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiffs allege that the City and County of Denver ("City") is planning a construction project that will redesign City Park Golf Course ("CPGC") to integrate an industrial-level stormwater management project into CPGC ("Project") in contravention of: (1) the City's zoning code; (2) restrictions on the use of parkland in the Denver City Charter ("Charter"); and (3) case law interpreting similar dispositions of parkland.

Plaintiffs argue that although the City stresses that the Project is designed to mitigate 100-year storm flooding risk in the Montclair Basin, the true purpose of the Project is linked to the Colorado Department of Transportation's ("CDOT") proposed widening of Interstate 70 ("I-

70") and the City's new construction plans along the I-70 corridor. Specifically, Plaintiffs contend that the Project is designed to protect against the risk of flooding to the proposed expansion and lowering of I-70 in north Denver between Brighton and Colorado Boulevards, and public and private development plans for and around the National Western Center. Plaintiffs argue that this shifts the costs of these public and private developments from the builders to the stormwater fee paying public via the Wastewater Management Enterprise Fund ("Fund"), which is the funding mechanism for the Wastewater Management Division of the City.

Preliminarily, the Court notes that its task is narrow—namely, to determine whether Defendants' Project violates the Denver Zoning Code, the Denver City Charter, or Colorado common law. Though the reconfiguration of CPGC may be a thinly veiled subterfuge to pave the way for new construction plans on I-70 and along the I-70 corridor, consideration of the various rationales and funding mechanisms for the Project is beyond the scope of this Court's charge due to the applicable standard of review.

## II.      FINDINGS OF FACT[1]

### A.  Factual Background of the Project

The City is a home rule municipality and a municipal corporation of the State of Colorado pursuant to the Colorado Constitution Art. XX. Defendant Michael B. Hancock is the City's Mayor. Defendant Allegra Haynes is City's Manager of the Department of Parks and Recreation ("Parks").

The City is governed by its Charter, which was adopted pursuant to the Colorado Constitution, Article XX. Parks and Public Works are agencies of the City. The Charter outlines the roles and responsibilities of City departments—including Parks and Public Works—in undertaking their municipal functions. Importantly for this case, the Charter also ensures that designated parkland be used for park purposes, a protection that is further described in the Denver Zoning Code ("DZC").

---

[1] All findings of fact and conclusions of law made in this order are based on what the Court finds to be a preponderance of the admissible, credible, persuasive evidence.  Since the Court sat as the factfinder in this case, in assessing credibility, the Court has applied the same standards that jurors are permitted to apply as set forth in CJI-Civ. 3:16 (2015).

The Charter creates Parks and appoints the Manager as "the officer in full charge and control" of the department. Ex. 1015 §§2.4.1, 2.4.2. The Charter, §2.4.3, creates the Board of Parks and Recreation ("Board"), a nineteen-member board that "advise(s) the Manager with respect to the policy and operation of the Department and [which] shall review and comment on the proposed annual budget for the Department." Denver Charter §2.4.3. The Board is not granted any management authority or authority to approve or reject the Manager's decisions. "Management, operation and control of all facilities … owned by the City and County of Denver for park and recreational purposes" is vested in Parks. Denver Charter §2.4.4(A).

The Charter, §2.3.1, creates Public Works, which is charged with, among other things, "[m]anagement and control of the designing, planning, construction, and reconstruction of all general public improvements" for the City except for Denver Water and the Department of Aviation, though the agency charged with operating the improvement must approve such action. Denver Charter §2.3.3(A). Public Works' Wastewater Management Division provides storm and sanitary wastewater services to property owners throughout Denver. Denver Charter §2.3.3(D); Denver Revised Municipal Code ("DRMC"), Ch. 56, Art. 3. It is responsible for managing the billing of customers and the construction, maintenance, and repair of the sanitary sewer and storm drainage systems. The City manages stormwater in order to reduce damage caused by associated flooding.

The Wastewater Management Enterprise Fund ("Fund") is the funding mechanism for the Wastewater Management Division of the City into which the wastewater fees are deposited and then used to pay for wastewater services. *See* DRMC §§20-17-18. The Fund was established to hold fees paid by Denver property owners to cover the cost of providing wastewater management services and facilities in Denver, including operations and capital expenditures. *See* DRMC at §§20-17-18 and §§56-117-119. The Project is being paid for through the Fund.

The DZC regulates the use of property in Denver. DZC §1.1.3.2.A ("No land shall be used or occupied and no structure shall be designed, erected, altered, used or occupied except in conformity with this Code…"); *see* DRMC §59-1 (codifying DZC). The "OS-A" designation— Open Space Public Parks—"is intended to protect and preserve public parks owned, operated or

leased by the City and managed by the City's Department of Parks and Recreation ... for park purposes." DZC §9.3.2.1.A.

The Manager of Parks has discretion to determine the "[p]ermitted uses, number of uses and applicable use limitations" on land zoned OS-A. DZC §9.3.4.1.A; *McLauthlin v. City and Cnty. of Denver*, 280 P.2d 1103, 1106 (Colo. 1955) (The "Denver Charter grants the Manager of Parks broad discretion in determining the uses to which a particular park area may be put."). The DZC standards demonstrate that decisions on whether to permit a particular use on OS-A zoned land are reserved to Parks' Manager. DZC §9.3.4.5. In addition, the Manager has final approval authority concerning the form of buildings and for design and development standards of structures, including landscaping, parking, and signage, except where this is reserved to City Council. DZC §9.3.3.1.

Denver's Parks Designation Policy articulates Parks' interpretation of what constitutes a park purpose. Park uses include, but are not limited to: playgrounds, playing fields, basketball and tennis courts, golf courses, public swimming pools, picnic tables and shelters, pavilions, public restrooms, or other amenities intended to promote public recreational and outdoor activities. Ex. 6 § 1.1. The policy also makes clear that locating a "natural or even man-made stream, creek, irrigation or drainage ditch, lake, pond, reservoir, or flood control facility... in a Park does not affect the property's classification as a Park." *Id.* at § 2.3.

The City owns CPGC, which is located at 2500 York St., Denver, CO 80205, and is within the Montclair Drainage Basin. Parks manages CPGC for the City. The southern portion of CPGC is designated as a park pursuant to the Charter. The northern portion of CPGC is not designated as a park pursuant to the Charter. However, all of CPGC is zoned OS-A pursuant to the DZC.

CPGC contains a public 18-hole golf course; clubhouse with restaurant, offices, locker rooms, and pro shop facilities; facilities for the City's First Tee youth golf program; and a chipping practice range. CPGC also is open to the public for activities such as walking and jogging. CPGC is listed on the National and Colorado State Register of Historic Places. If the Project is completed, CPGC will continue to serve as a golf course, and will—by design— periodically detain stormwater in CPGC.

The City issued a Request for Qualifications ("RFQ") on October 20, 2016. On January 12, 2017, the City issued a Request for Proposals for the City Park Golf Course project ("RFP") to prequalified bidders. Ex. 1013. The RFP was revised by an addendum dated June 20, 2017. The RFP, as revised, contains the requirements for design and construction for the Project. *Id.* The RFP requires the contractor to protect and replace trees according to the terms of the RFP. *Id.* The RFP requires the contractor to consider the historic nature of CPGC, including the view sheds, course layout, and parkland style of the course. *Id.* The RFP contemplates that construction of the Project will take approximately eighteen to twenty-four months. *Id.* During construction of the Project, CPGC will be closed to the public.

The City entered into a Design-Build Contract titled "City Park Golf Course – Parks and Drainage Improvements Project" with Saunders Construction, LLC, to renovate the City Park Golf Course and provide a redesigned 18-hole regulation municipal golf course designed and constructed to the United States Golf Association recommendation/guidelines, modified to City standards, that has an integrated detention pond that provides flood protection. Ex. 1025. The Project is more particularly described in the RFQ and RFP. Ex. 1013.

### B. CPGC Neighbors and General Opposition to the Project

The Court will address the testimony of the witnesses in this fact-intensive case in some detail. Mr. Torres, Ms. Noles, Ms. Edgell, and Ms. Johnson all live near CPGC and each generally testified in opposition to the Project. The stated reasons for opposing the Project include: (1) not being able to play the course during construction; (2) an extended closure that would create disruption and stress for Park Hill residents; (3) the negative impact on the birds and animals living in CPGC and in the zoo; (4) there is currently no standing water on the course after a heavy rain; (5) parks should not be used for stormwater detention; (6) concerns that the construction fence and relocation of the clubhouse would obstruct views of the course from their homes and surrounding streets; (7) the new events center will make the historic course feel like a country club, which is materially different than its historic character; and (8) the Project would do nothing more than open the proverbial floodgates for further infrastructure projects. Deborah Ortega is a Denver City Council member. Ms. Ortega echoed the sentiments of Plaintiffs, testifying that she voted against the Platte to Park Hill project over concerns to her constituents

who will be negatively impacted by construction associated with I-70 and the National Western Center.

In addition to general opposition to the Project, five material issues related to the Project were discussed by expert witnesses and the Manager of Parks, Allegra "Happy" Haynes: (1) tree canopy and habitat; (2) cultural heritage and historic designations; (3) Montclair Basin flooding and stormwater detention; (4) redesign of the golf course; and (5) the interrelationship between the Project and I-70 expansion.

### C.  Tree Canopy and Habitat

Neighbors of the CPGC focused on the loss of trees and the habitat they provide for birds and animals in CPGC. The Court also took extensive testimony from Plaintiffs' expert Rebecca Wegner, a certified arborist and a member of the American Society of Consulting Arborists. Ms. Wegner described the importance of trees for, among other things, shade, habitat, pollution control, and stormwater control. *See also* Ex. 29 (adding significant detail to Ms. Wegner's testimony at trial regarding the benefits trees provide communities). Larger trees provide more benefits for the habitat and animals. Ms. Wegner testified that a mature canopy, which relies on the diameter of a tree, can take 30 years or more to develop depending on the type of the tree, and up to 70 years to reach the full canopy present in CPGC currently. In her opinion, a change in grading and large scale removal of trees may result in significant detrimental chemical and biological changes to the soil and golf course that could take up to 10 years to manifest.

Ms. Wegner was shown a tree legend marking 227 trees that are going to be removed if the Project is allowed to proceed, including some old growth trees—2 of which date back to the time the golf course was first developed. Ex. 1024. Ms. Wegner is aware that the City plans to plant more than 1,800 trees, but that fewer than half of those trees will be planted on CPGC. The majority of trees will be planted on other City owned properties to create canopy and habitat. However, based on the size of the trees, Ms. Wegner estimated that less than half of the canopy will be replaced on the CPGC. Ex. 1024, CO-8. She admitted that it would be important to her opinion to know how many large trees would be affected, but she was not familiar with the number of large trees at issue. Ms. Wegner testified that it is possible to replace canopy—but the

quality of the canopy may be negatively impacted. Ms. Wegner added that, to the best of her knowledge, most of the trees that are slated to be replaced are smaller than the existing trees.

Happy Haynes has served as the Manager of Parks and Recreation for the last 2 years and is the Deputy Mayor of Denver. *See* Ex. 42. She oversees 250 parks and 6,000 acres, including CPGC. Ms. Haynes testified that she has managed the Project and met with the various stakeholders throughout the process. Based on the input received from stakeholders, Defendants have worked to preserve trees, views, canopies, and habitat for the birds and other animals that live in CPGC. Ms. Haynes recognizes that a number of neighborhood groups, including homeowners in the immediate area, are adamantly opposed to the Project, however, she believes that the City has taken a thoughtful approach with respect to tree preservation and replacement.

To this end, Ms. Haynes testified that Rob Davis, the City's forester, conducted an inventory of the CPGC trees and was intimately involved with the RFP and Design Build Contract.  The Design Build Contract requires that out of 824 trees currently on the CPGC, 561 will be preserved, 760 new trees will be planted, and 25 "old" trees will be removed. *See* Ex. 1025. Five trees will be removed that are considered "extremely large" trees. Ms. Haynes and Mr. Davis believe that many of the trees slated for replacement or removal are not in the best condition.

Ms. Haynes reviewed the Design Build Contract while on the stand. Ex. 1025. Among other things, consistent with Ms. Haynes' testimony regarding tree protection, the Design Build Contract provides for: (1) tree protection over and above the minimum requirements stated in the Technical Requirements; (2) protecting historic groves of trees around the existing clubhouse; (3) protecting approximately 561 existing trees in-place; (4) planting approximately 760 new trees onsite; and (5) providing an independent tree monitoring and watering program that will two times per week evaluate soil and moisture conditions around the remaining trees and provide the necessary water, soil, and tree injections, and fertilization treatments to keep the existing trees in a healthy and vigorous condition during construction. Ex 1025, CCD029482.

The Court finds that although Defendants have taken a thoughtful approach to the golf course renovation, the loss of a mature canopy is materially detrimental to the habitat and the neighborhood. The loss of canopy contemplated by the Project may take decades to redevelop,

and a change in grading and large scale removal of trees may result in detrimental changes to the health of the soil and remaining trees on CPGC.

### D. Cultural Heritage, Historic Character, and Historic Designations

A number of witnesses testified regarding the cultural significance of CPGC and the historic designations bestowed on it, including neighbors, Ms. Haynes, and expert witnesses. Christine O'Connor, a particularly compelling witness, previously lived in the Park Hill neighborhood and emphasized that CPGC and one other golf course in Austin, Texas are the only two municipal golf courses on the National Register of Historic Places. *See generally* Ex. 79 (evidencing Ms. O'Connor's involvement in the process and concern regarding the Project). In light of the historic nature of the golf course and its current functionality, she does not believe the course needs to be redesigned and fears the renovation will result in the loss of historic designations.

Jennifer Hillhouse is a project manager for major projects in the City and County of Denver who has been in communication with Historic Denver regarding the Project. Exs. 52, 53. Historic Denver wrote that "City Park Golf Course is . . . a contributing resource to Denver's City Beautiful Parks & Parkway System. It . . . has a deep cultural significance in the Denver community, therefore this alternative must be carefully considered and thoughtfully discussed." Ex. 52. Historic Denver went on to state that it is "willing to work with the City  . .  but we urge great caution and care, and recognize that the success of this type of project lies almost entirely in the details." *Id.* In October, 2016, Historic Denver reiterated its concern regarding the timing of the Project and the State Register process, opining that "by the time [the] State Historic Preservation Officer issues an opinion, the Design Guidelines will be well on their way to completion, putting these two processes at odds." Ex. 53. No final decisions relative to the historic designations of CPGC will be made until the Project is completed. Exs. 52, 53.

Jackie Lansing was called as an expert witness by Plaintiffs. Among other accomplishments, Ms. Lansing has worked for the National Park Service, was a Natural Heritage Program Coordinator, spent 15 years with the Colorado Trust, and worked with the Register of Historic Places. Ms. Lansing testified that CPGC is a Tom Bendelow golf course, described the attributes of a Tom Bendelow course, and identified the CPGC as the only golf course in

Colorado on the National Register of Historic Places. The golf course is also on the State Register of Historical Properties. She opined that the City could make minor changes to the course, but not major changes to remain on the Registers. She believes that historic preservation calls for the golf course to be maintained as originally built. Ms. Lansing acknowledged that the course has dramatically changed in character from the treeless 9-hole course constructed in 1912.

Scott Rethlake has worked for the City for 11 years and is the Director of Golf, which includes the CPGC. He researched the history of the CPGC. The golf course was built between 1912 and 1913 and reconfigured from a 9-hole course to an 18-hole course in 1918. The golf course was originally a dirt course and trees were added later. The CPGC received historic designation in 1985. Post-designation, the City has added an irrigation pond, changed the tee boxes, planted trees along 26th Avenue, changed the slope of the greens due to erosion, and renovated the clubhouse, all without consequences to the historic designation. There have been temporary closures to accommodate construction for these projects.

The Court finds the testimony of Ms. Lansing to be credible with respect to the historic designations of CPGC. Ms. Lansing has years of experience with cultural and historical organizations and is well-versed in the requirements for historic designation. Ms. Hillhouse's communication with Historic Denver reveals that although no determinations regarding CPGC have been made yet; the proposed renovation of the golf course and/or the addition of a detention facility may lead to a change to the historic character and significance to the community, as well as delisting from the Historic Registers.

### E. The Montclair Basin, Flooding, and Stormwater Detention

Defendants contend that the Project has two main objectives: (1) providing the City with protection against flood damage; and (2) improving CPGC. With respect to stormwater and flooding, the Court was informed by multiple witnesses that both inadvertent and planned detention of stormwater occurs in various Denver parks such as Bible Park, Harvard Gulch, Westerly Creek, Ferril Lake, Wellshire Golf Course, and Overland Golf Course. CPGC detains stormwater because of its topography and the presence of the historic natural drainageway. At present, stormwater collects on CPGC in both 100-year storm events as well as during some

smaller storm events. CPGC presently contains a large water retention pond and other water management features.

Plaintiffs' experts, Dennis Royer and Adrian Brown, are both civil engineers familiar with the 2014 Master Plan, in which no improvements to CPGC are contemplated. *See* Ex. 24. Mr. Brown specializes in groundwater and surface water issues, although his experience has been primarily in the mining industry. Mr. Royer is an expert in public construction projects with experience in wastewater operations. Mr. Royer formerly served as Denver's Deputy Manager of Public Works for Operations. Mr. Royer explained that a 100-year flood is a flood that has a 1% chance of occurring in any given year independent of any other years. Mr. Brown reviewed the IGA and other Project-specific documents. *See* Exs. 3, 24. He calculates that 32 acres within the Montclair Basin would be impacted during major rain storms or flooding but that there is no need for a stormwater detention feature in CPGC based on the 2014 Master Plan. He believes that CPGC already has adequate infrastructure to handle inadvertent water and that the Montclair Basin does not require a backbone to control stormwater. Both testified that the 100 year storm plan came into being after the I-70 project and the Project is solely for the benefit of that project.

Defendants' expert, Bruce Uhernik, is the City Engineer. He has been involved in numerous large projects including Harvard Gulch, Overland Golf Course, Bible Park, 5th and Newport, Westerly Creek, South Forest Street Outfall, and Platte to Park Hill. *See, e.g.* Ex. 77 (delineating the scope of the Platte to Park Hill project). All are projects that were constructed or redesigned to facilitate stormwater detention. He is involved in crafting master plans including the 2014 Master Plan and the yet-to-be-published 2019 Master Plan.

Mr. Uhernik is intimately familiar with the Montclair Basin, which encompasses 95 square miles. He has extensively studied the 20 basins in Denver and the technical documents that were used in creating the RFP. Mr. Uhernik explained that although the Project is not in the 2014 Master Plan, there was a defined need based on the science, as demonstrated by the Flo-2D Analysis model. Exs. 24, 1001. In fact, he believes that the Montclair Basin presents the highest risk of flooding out of any of the basins in the City. Based on hardscaping and population increases in the City, the current storm drain infrastructure is deficient, leaving the Montclair Basin prone to flooding. *See* Ex. 12, CCD008772; *see also* Exs. 1001, 1005, 1008. He testified

that he began reviewing the needs of the Montclair Basin in 2011 and believes that the Project will provide the needed backbone for the Montclair Basin drainage.

Mr. Uhernik testified that the City needs a 100 year storm solution. The last large storm with widespread flooding in Denver occurred in 1965, but the City recently missed a large storm that inundated Boulder and caused significant damage. Another large storm caused significant water damage in Aurora a couple of years prior to the filing of this lawsuit. Other drainage basins in Denver have gulches, ditches, and other facilities to help manage 100-year floods. The Montclair Basin currently does not have a similar backbone to help manage a 100-year flood.

He stated that a water detention facility must be placed in a naturally low lying area and that the new backbone will reestablish the historic flow as contemplated in 1922. He believes water detention in CPGC is an elegant solution. It is a natural low point in the Montclair Basin and water naturally migrates to low points. *See* Ex. 1008. He would like to formalize the water detention within the park and drain the water out at a controlled rate. Moreover, he is not concerned about the quality of water that will flow into CPGC. The RPF provides for trash capture and the soil and contaminants will infiltrate into the grounds where they will be cleansed. Exs. 3, 13, 24, 40, 72 and 73.

With respect to establishing a backbone for the Montclair Basin, Ms. Haynes described a change in stormwater control methods in recent years from old-school water pipes and street drains to control storm flooding to green infrastructure projects that she believes are state-of-the– art practices. *See generally* Ex. 9. This change is necessary, in part, due to more hardscaping, population increases, and the frequency and severity of storms. With respect to the Project, she is merely attempting to use a green solution to solve flooding from stormwater. Ms. Haynes reviewed best practices for parks, which includes green infrastructure that reduces flood damage and provides clean water.

Adrian Benepe was a member of the Trust Public Land and Commissioner for New York City Parks, including New York City's 14 golf courses. He currently works as a consultant and testified as an expert witness for Plaintiffs.  Although he disagreed with Defendants' plan for the Project, Mr. Benepe agreed with Ms. Haynes that efficient use of public resources and best practices focus on dual uses in golf courses, including stormwater detention. Green infrastructure

or "green scaping" is often used to cleanse and store stormwater. Although he is familiar with the CPGC via numerous trips to Denver, he has never visited CPGC and relied solely on his experience in other cities to form his opinion. He assumes that stormwater detention is needed in CPGC, but has not conducted any studies or reviewed technical documents.

The Court finds all three engineers, Ms. Haynes, and Mr. Benepe to be credible witnesses. However, the Court places greater weight on Mr. Uhernik's testimony in understanding the flow of water, the flooding issue, potential solutions, and the proposed renovations to the CPGC due to his intimate involvement with the Project, his review of all the background documents and computer modelling of flood patterns, and his particular knowledge of the Montclair Basin. The Court also credit Ms. Haynes' and Mr. Benepe's testimony regarding the use of green infrastructure as a modern best practice in park planning and renovation.

### F.  CPGC Redesign

The redesign of CPGC involves two main factors: (1) adding amenities to the golf course and (2) retaining the historic character of the course. Ms. Haynes testified at length regarding the goals of the Project other than stormwater detention. Other purposes for the Project include making the clubhouse more functional, expanding the successful "The First Tee" program from 5,000 kids to 10,000 kids, and lengthening the driving range to accommodate woods.

Ms. Haynes testified that the style of the new course will remain consistent with the nature and character of the existing course, which has parkland style character and community significance. The new course will be no less than a par 70 course with yardage at least as long as the current course and it will be ADA compliant. Ms. Haynes also described the relocation of the clubhouse near a high point on the course to take advantage of the views, but no final design has been approved. The clubhouse will be screened with landscaping to minimize disruption and view obstructions.

Steve Eisenberg is a golf course consultant. He has owned a golf course, is a trainer for the US Professional Golf Association, and was recognized as an expert in the management and design of golf courses in Plaintiffs' case. He considers CPGC historic and believes that the

addition of water detention will create design and water issues. He rendered the opinion that the loss of trees will increase maintenance costs and contaminants and degrade the turf. The presence of water may also slow down play on the course. On cross-examination, Mr. Eisenberg acknowledged that he has never worked in Colorado, never studied any golf courses in Colorado, and is not familiar with the soils located in CPGC. Most importantly, he has not visited or played the CPGC.

Mr. Rethlake is involved in the redesign of the CPGC. He helped create the technical requirements for the 18-hole golf course and set minimum distances, as well as protections for trees, views, and watersheds. The proposed stormwater detention area is designed to be playable area and tees and greens will be dry up to a 10 year event. After build-out, he believes the course will play faster and the mountain views and sightlines will be maintained. One of the biggest positive changes to the course will be a returning 9 where the last fairway and green of both a 9-hole and 18-hole round will end at the clubhouse. He also believes that water features will make the golf course more interesting to play—currently there is only one water hazard.

Mr. Rethlake testified that the current clubhouse is outdated and not very functional for the number of golfers and events held at the course. There is also quite a bit of obsolescence and deferred maintenance that has created a noxious odor in and near the bathrooms. The new clubhouse will be sited outside of a floodplain, enjoy better views, will be screened from view by foliage, and be able to better serve the community by accommodating larger events.

Todd Shoeder testified as an expert witness for Defendants. Mr. Shoeder has been a golf course architect since 1995. He specializes in restoring and remodeling golf courses—primarily from the early 20th century. He is the architect of record for a Tom Bendelow golf course in Seattle that was remodeled in 2015. Mr. Shoeder testified that many of his projects involve an integrated stormwater management system. He has lived in Colorado for 17 years and made numerous site visits to CPGC. He is the golf course architect of record for the proposed redesign.

Mr. Shoeder testified that the new golf course design will address all skill levels, protect views and maintain the integrity of a parkland style course which is a lush, verdant golf course with trees, similar to the current design, as opposed to the original design by Mr. Bendelow. Mr. Shoeder believes the golf course has changed "night and day" from the original Bendelow

design. Over the years the golf course has been converted from a dirt course into a parkland style course with the addition of many trees and irrigation—the course plays very differently than the original course would have. He proposes to increase green sizes and reestablish many of the sand traps that have been lost through modifications to the original design. Mr. Shoeder believes the new design is sensitive to the historical character of the course—even with the addition of stormwater detention.

The Court finds the testimony of Mr. Rethlake and Mr. Shoeder to be more credible relative to the redesign of CPGC than Mr. Eisenberg or Mr. Benepe. The Court notes that neither Mr. Benepe nor Mr. Eisenberg have visited CPGC, while Mr. Shoeder has made numerous site visits to the course and is the architect of record for the Project and Mr. Rethlake has worked for the City for over a decade, is the Director of Golf for Parks, and researched the history of CPGC.

**G.  I-70 Expansion and the Project**

A number of witnesses testified regarding the relationship the Project has to the I-70 expansion and the National Western Project. Ms. Thomas testified that the Project will protect the National Western Complex and will also help CDOT provide 100 year flood protection for the I-70 project. Based on timing and the requirement for 100 year storm protection, Ms. Thomas acknowledged that the Project is critical to the I-70 construction project. However, Ms. Hillhouse testified that the I-70 and National Western projects are separate from CPGC, but they are working closely with one another. *See generally* Ex. 31. Ms. Hillhouse and Mr. Uhernik  testified that the I-70 project can and will move forward without the CPGC Project and Ms. Thomas advised the Court that the City will proceed with the CPGC Project with or without the I-70 expansion because it is necessary and in the best interests of the City. *See* Ex 19 (stating that the I-70 project and Platte to Park Hill "are projects proposed by different agencies, respond to different needs, serve different purposes, have independent utility, and can function independently of each other if one of them was not built."). Notably, Ms. Haynes testified that helping the I-70 project is not a park purpose.

Ms. Hillhouse testified that the Fund will be used to pay for the Project, not Parks. Public Works and Parks entered into a Memorandum of Understanding regarding the Project in August, 2014. Ex. 65. The undisputed testimony of Ms. Haynes was that such arrangements are

customary and usual and that Public Works enters into contracts to perform services for all Parks projects in Denver.

As noted above, regardless of any relationship between the I-70 expansion and the CPGC Project, consideration of the rationales for the Project and the funds being used to pay for the Project are beyond the scope of this Court's charge due to the applicable standard of review.

## III.   ANALYSIS

### A.  Applicable Standard of Review

The rules of construction applicable to statutes are used to interpret local ordinances, including zoning codes. *E.g., Walter G. Burkey Trust v. City, County of Denver*, 294 P.3 158 (Colo. App. 2012); *Jackson & Co. (USA), Inc. v. Town of Avon*, 166 P.3d 297, 299-300 (Colo. App. 2007). The court should look to the plain language of the ordinance to give effect to the drafters' intent. *Jackson & Co. (USA), Inc.*, 166 P.3d at 299. "If the statutory language is clear and unambiguous, the language should not be subjected to a strained or forced interpretation." *Id.* at 300 (citation omitted).

The City, and its decision-makers, have discretion to interpret the City's code and are entitled to deference in those interpretations as long as they are reasonable and do not contradict the code. *See Lucero v. Climax Molybdenum Co.*, 732 P.2d 642, 645-46 (Colo. 1987); *see also Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223–24 (Colo. 2005) ("When the agency interpretation is not uniform or consistent, we do not extend deference and will look to other statutory construction aids."). While the Court may defer to the agency's construction of a code, ordinance, or statutory provisions that govern its actions, the Court is not bound by the agency's construction because the Court's review of the applicable law is *de novo*. *Colo. Dept. of Revenue v. Hibbs*, 122 P.3d 999, 1002 (Colo. 2005); *Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223 (Colo. 2005).

Courts ordinarily defer to an agency's guidance, rules, and determinations, if they are within the agency's statutory authority and do not contravene constitutional requirements. *Colorado Dep't of Revenue v. Hibbs*, 122 P.3d 999, 1002 (Colo. 2005) (citing *Wash. County Bd. of Equalization v. Petron Dev. Co.*, 109 P.3d 146, 150 (Colo. 2005)). When government agencies

and officials act in the course of their statutory duties, their actions are presumed to be valid. *Public Utilities Com'n v. District Court*, 431 P.2d 773, 776-77 (Colo. 1967) ("The presumption of regularity supports the official acts of public officials and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (internal citation omitted)).

Here, the Court finds and concludes that Defendants have acted in the course of their statutory duties, accordingly, the actions of Defendants are presumed to be valid. *Id.* Although Plaintiffs strongly disagree with the Project, they have not presented clear and credible evidence that Defendants have improperly discharged their duties. As a result of the presumption of regularity of the official acts of public officials, the Court accords deference to Defendants' determinations with respect to parkland generally, and CPGC specifically. *See Colorado Dep't of Revenue v. Hibbs*, 122 P.3d 999, 1002 (Colo. 2005). As discussed further, the determination of park purposes is within the discretion of the Manager of Parks. Ex. 1025 §§ 2.4.2, 2.4.4(A). Such determinations are well within Parks' statutory authority and do not contravene constitutional requirements. *Id.*; *Hibbs*, 122 P.3d 999 at 1002.

## B. Charter and Zoning Code

The City is governed by the Charter, which explains the roles and responsibilities of various City agencies, including Parks and Public Works. The Charter also ensures that designated park land be used for park purposes, a protection that is further described in the DZC. Pursuant to the Charter, Parks is charged with the "[m]anagement, operation and control of all facilities, either within or without the territorial limits of the City and County, owned by the City and County for park and recreational purposes…." Ex. 1015 § 2.4.4(A).

Under the DZC, the OS-A zone district "is intended to protect and preserve public parks owned, operated or leased by the City and managed by the City's Department of Parks and Recreation for park purposes." Ex. 1016 § 9.3.2.1.A. DZC authorizes the Manager of Parks to determine the "permitted uses, number of uses and applicable use limitations, in the OS-A zone district." Ex. 1016 § 9.3.4.1.A. Notably, the DZC regulates the use of land, but vests authority in the Manager of Parks to determine the precise application of the term "park purpose."

The Parks Designation Policy is related to both the Charter and the DZC as it further specifies the Manager of Parks' definition of a park purpose and sets forth the official policies of Parks. Exs. 6, 68. As stated in the introduction, "[t]his Policy is adopted by the Denver Department of Parks and Recreation for the purpose of providing some clarity as to the designation status of and the protections afforded to Denver parks under the existing legal framework." Ex. 6. The Parks Designation Policy sets forth criteria both for what a park is and for what a park is not. The Policy states that "man-made open drainageways, detention or water quality ponds, and wetland channels which may incidentally provide open space, natural areas, and some public access but are not located in a Designated Park or Dedicated Park" are not Parks. *Id.* at ¶ 2.3. "HOWEVER, there are situations where a natural or even man-made stream, creek, irrigation or drainage ditch, lake, pond, reservoir, or flood control facility is located in a Park and this location in a Park does not affect the property's classification as a Park." *Id.* (emphasis in original). This statement is consistent with both the Charter and the DZC's grant of authority to the Manager of Parks to determine what constitutes a "park purpose."

The issue presented by Plaintiffs is whether the Project fulfills a park purpose. Preliminarily, the Court notes that the Manager of Parks is vested with the authority to determine what a proper park purpose is. Here, the language vesting such authority in Ms. Haynes is clear and unambiguous and will not be subjected to further interpretation. See *Jackson & Co. (USA), Inc. v. Town of Avon*, 166 P.3d 297, 300 (Colo. App. 2007) (citation omitted). Keeping in mind the applicable standard of review, so long as Ms. Haynes' determinations are within her authority and do not contravene other legal requirements, they are accorded due deference. *See Colorado Dep't of Revenue v. Hibbs*, 122 P.3d 999, 1002 (Colo. 2005).

Plaintiffs contend that the Project does not, on the whole, advance a park purpose and/or is inconsistent with park purposes, and therefore violates DZC § 9.3.2.1.A. Plaintiffs assert that the following park purposes would be undermined if the Project is permitted to move forward: (1) providing a location for trees to grow; and (2) the preservation of historic landscapes. In addition, Plaintiffs argue that stormwater detention is not a park purpose and that the Project will prevent CPGC from being used for its zoned use as a park for a prolonged period of time due to closure for construction. The Court appreciates the concerns of Plaintiffs and recognizes the real

and substantial impact the Project would have on their use of CPGC during the pendency of the Project as well as concerns regarding the proposed changes to the layout of the course.

During Ms. Haynes' testimony, she stated that playgrounds, trees, wetlands, pavilions, hardscape (basketball courts), cultural facilities, trails, lakes, golf courses, and stormwater detention are all park purposes. She believes that stormwater detention is a natural feature and function of parks, particularly modern parks that incorporate the best practice of using green infrastructure. Ms. Haynes further pointed out that there are currently over 500 acres serving as detention ponds in the parks that she oversees, albeit a significant portion of the acreage is comprised of lakes.

i.    Tree Canopy

Plaintiffs and Defendants both agree that providing a place for trees to grow serves a park purpose. Both parties desire healthy trees with a healthy canopy in CPGC and the RFP requires tree protection. Ex. 1025 §§ 17.1.7, 17.1.8. Although the loss of trees, canopy, and old growth trees is unfortunate, based on the testimony at trial, the relative credibility findings, and the requirements of the RFP and Design Build Contract for tree protection, the Court cannot find any evidence that Defendants' actions are being improperly discharged with respect to tree preservation.

Where, as here, government agencies and officials act in the course of their statutory duties, their actions are presumed to be valid. *See Public Utilities Com'n v. District Court*, 431 P.2d 773, 776-77 (Colo. 1967) ("The presumption of regularity supports the official acts of public officials and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (internal citation omitted)). Based on the credible evidence and standard of review, the Court concludes that the loss of tree canopy contemplated by the Project does not violate either the Charter or the DZC.

ii.   Historic Designations

Ms. Lansing, Ms. Hillhouse, and Ms. O'Connor all discussed CPGC's listing on the National Register of Historic Places and the Colorado State Register of Historic Properties and expressed concern that the Project may cause CPGC to be removed from the Registers due to the

changed layout of the course. Ms. Hillhouse testified that no decision relative to the historic designation of CPGC will be made until the Project is completed and the RFP requires the contractor to consider the historic nature of CPGC, including the view sheds, course layout, and parkland style of the course. *See* Ex. 1013, §§ 1.10, 1.11. The Court finds that it would be a significant detriment to the residents of Denver to lose these historic designations.

With respect to the preservation of CPGC on the Colorado State Register of Historic Properties or the National Register of Historic Places, the Court is constrained. The City's decision-makers are granted the discretion to interpret the City's code and are entitled to deference in those interpretations as long as they are reasonable and do not contradict the code. *See Lucero v. Climax Molybdenum Co.*, 732 P.2d 642, 645-46 (Colo. 1987). The Court finds and concludes that it is not the charge of the Court to substitute its judgment for the judgment of the City's political decision-makers with respect to the merits of retaining historic designations for city parks. Even if the Project would result in the loss of these historic identifiers, it is not within this Court's purview to halt the Project as a result. The Court concludes that the loss of designation on the historic registers is not dispositive with respect to the present controversy.

### iii.  Stormwater Detention

Regarding Mr. Torres' and Ms. Noles' contention that stormwater detention is not a park purpose, the Court finds the Parks Designation Policy instructive. The Parks Designation policy specifically comments that "there are situations where a natural or even man-made . . . flood control facility is located in a Park and this location in a Park does not affect the property's classification as a Park." Ex. 1018 ¶ 2.3. Ms. Haynes repeatedly testified that the efficient use of park space requires utilizing the space for multiple uses. Some parks include walking trails, playgrounds, streams, and a venue for music events. Others may include swimming pools, picnic areas, and tennis courts. Ms. Haynes, Ms. Thomas, and Mr. Benepe all maintained, as is highlighted in the Parks Designation Policy, that use of parkland for flood control, stormwater detention, or drainage is viewed as a best practice in modern green infrastructure. Ms. Haynes also testified that the improvements to CPGC that will be made as part of the Project all fulfill park purposes: the course will have enhanced playability, the clubhouse will be relocated and improved, and The First Tee program will be better quality.

Ms. Haynes, as the Manager of Parks, has the discretion to determine the "[p]ermitted uses, number of uses and applicable use limitations" on land zoned OS-A. DZC §9.3.4.1.A; *McLauthlin v. City and Cnty. of Denver*, 280 P.2d 1103, 1106 (Colo. 1955) (The "Denver Charter grants the Manager of Parks broad discretion in determining the uses to which a particular park area may be put."). The DZC's district-specific use standards demonstrate that decisions on whether to permit a particular use on land zoned OS-A are reserved to Parks' Manager. DZC §9.3.4.5. Ms. Haynes testified that in her discretion, stormwater detention is an appropriate park purpose for part of CPGC. This decision is hers to make pursuant to the Charter and the DZC. In the absence of clear and credible evidence that Ms. Haynes has improperly discharged her duties, this Court accords deference to Ms. Haynes' decision. The Court concludes that Ms. Haynes' determination that stormwater detention is a proper park purpose is within the authority granted to her by the Charter and DZC.

   iv.  <u>Construction Closure and Park Renovation</u>

With respect to the contention that the Project will prevent CPGC from being used for its zoned use as a park during construction, the Court is not persuaded. Although the Court is loath to see a park that is enjoyed by so many Denver residents and visitors to our city close for construction for even a short period of time, the proposed closure would be required to maintain safety near the construction area. Construction is not a use of the land, nor will it affect the use of the land for park purposes post-construction—it is simply a means to an end. Ms. Haynes testified regarding other parks in the City that have been closed or materially limited during construction and/or renovation projects including Sundial, Ferril Lake, Globeville Outfall, Johnson Habitat, and Pasquinel's Landing Park. The Court does not find Mr. Benepe's contention that it would not be necessary to close the golf course during construction as credible as that of other witnesses, such as Ms. Haynes and Mr. Shoeder, who are more familiar with CPGC generally and the Project more specifically. Both Ms. Haynes and Mr. Shoeder testified that the Project would require the complete closure of CPGC for a period of approximately 18 months to ensure the safety and welfare of both the crews and visitors.

While the Court finds the Plaintiffs' concerns and testimony to be sincere and truthful, their positions regarding the permitted uses of CPGC are not consonant with the legal framework

applicable to this analysis. The Court found the testimony of Ms. Thomas, Mr. Rethlake, Mr. Uhernik, Ms. Haynes, and Mr. Shoeder to be more compelling relative to the delineation of authority and responsibilities set forth in the Charter, the DZC, and the applicable standard of review. These witnesses evidenced a deep knowledge of the facts at issue, have been in the best position to observe of Project's progression since inception, and have made decisions regarding the Project in conformity with the provisions set forth in the Charter and the DZC. The Court concludes that the closure of the park, even for an extended period of time, does not violate either the Charter or the DZC.

### C.  Colorado Common Law Regarding Parkland

In addition to the Charter and the DZC, the common law of Colorado surrounding the use of parkland is relevant to the determination of this matter. In 1900, the Colorado Court of Appeals stated that: "a resident taxpayer of a municipality has the right to maintain a suit to prevent the unlawful disposition by the municipal authorities of the money or property of the town, and to restrain the diversion of property in his town from any public use, in which he shares, to which it has been dedicated." *McIntyre v. Bd. of Comm'rs of El Paso Cty.*, 61 P. 237, 241 (Colo. App. 1900). As applicable to the present case, the Court finds that if the Project is completed, CPGC will remain a golf course. It will continue to be put to the public use to which it was dedicated, as a public golf course. No portion of CPGC will be disposed of in such a way that it is no longer a park. As pointed out vigorously in the testimony of both Ms. Haynes and Mr. Shoeder, CPGC is a park, and if the Project is completed, it will still be a park, albeit one that serves multiple purposes in the event of a 100 year flood. The Court finds that the Project, if completed, will not be an unlawful disposition of public land—CPGC will simply be a re-designed golf course.

In a slightly more recent case, the Colorado Supreme Court stated that "[i]n this jurisdiction we have adopted the modern concept for a dedicated public park. . . . These uses would include tennis courts, playground and dancing facilities, skating, a swimming pool and bathhouse, horseshoe pitching, walking, horseback riding, athletic sports and other outdoor exercises, as may be needed, and if conditions are conducive therefor, golfing and baseball with the necessary equipment therefor . . . for the use by, and enjoyment of, the public. The Denver

charter grants the Manager of Improvements and Parks broad discretion in determining the uses to which a particular park area may be put." *McLauthlin v. City and Cnty. of Denver*, 280 P.2d 1103 (Colo. 1955).

The *McLauthlin* court highlighted that so long as the Manager of Parks is using discretion in determining park purposes fairly and reasonably, the trial court should not interfere in the Manager's determination of proper park purposes. *Id.* at 1105. This Court finds that admonition instructive. Here, Ms. Haynes has determined that a portion of CPGC should serve dual purposes, retaining its purpose as a golf course, while providing stormwater detention to aid the City in flood damage mitigation. In addition to the multiple uses to which the land will be put, Ms. Haynes testified that the Project would fulfill a number of other park purposes, including making the clubhouse more functional, expanding "The First Tee" program, lengthening the driving range to accommodate woods, and becoming ADA compliant. The Court finds that Defendants, and Ms. Haynes specifically, have made the decision to move forward with the Project fairly and reasonably and have demonstrated that the Project fulfills numerous park purposes.

The Court's consideration of Colorado's common law regarding parkland serves to strengthen its conclusions relative to the Charter and DZC. The Court concludes that the Project is not contrary to Colorado case law.

### D.  Declaratory Judgments

To have standing to bring seek a declaratory judgment claim, the plaintiff must allege an injury in fact to a legally protected interest that can be effectively resolved by the declaratory judgment. *Farmers Ins. Exch. v. District Court*, 862 P.2d 944, 947 (Colo. 1993); *County Comm'rs v. Bowen/Edwards Assocs.*, 830 P.2d 1045, 1052 (Colo. 1992); *Wimberly v. Ettenberg*, 570 P.2d 535, 539 (1977). One seeking declaratory relief must "demonstrate that the challenged [action] will likely cause tangible detriment to conduct or activities that are presently occurring or are likely to occur in the near future." *Mt. Emmons Mining Co. v. Crested Butte*, 690 P.2d 231, 240 (Colo. 1984).

"A declaratory judgment action is only appropriate when the rights asserted by the plaintiff are present and cognizable ones." *Farmers Ins. Exchange v. District Court for Fourth Judicial Dist.*, 862 P.2d 944, 947 (Colo. 1993). A present and cognizable claim is based upon present, established facts. *Id.* "[T]he requirement is that all relevant events have occurred, so that the court is addressing a present dispute." *Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 165 (Colo. 1994).

The Court finds that Plaintiffs have standing to bring this declaratory judgment action. However, based on the above analysis of the facts, the applicable law, and the appropriate standard of review, Plaintiffs' request for a declaratory judgment must be DENIED.

### E.  Injunctive Relief

"An injunction is an extraordinary and discretionary equitable remedy" that is "intended to prevent future harm." *Bd. of Cnty. Comm'rs v. Vandemoer*, 205 P.3d 423, 430 (Colo. App. 2008). Trial courts are vested with broad discretion to formulate the terms of injunctive relief. *Colo. Springs Bd. of Realtors, Inc. v. State*, 780 P.2d 494, 498 (Colo. 1989). The grant or denial of injunctive relief lies within the sound discretion of the trial court. *Scott v. City of Greeley*, 931 P.2d 525 (Colo. App. 1996). A party seeking a permanent injunction must show that: (1) the party has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Langlois v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 78 P.3d 1154, 1158 (Colo. App. 2003).

As described above, Plaintiffs have not prevailed on the merits of this action. In light of Plaintiffs' failure to prevail on the merits, the Court has considered, but need not address whether irreparable harm will result, whether the threatened injury outweighs the harm the injunction may cause to the opposing party, or whether an injunction would adversely affect the public's interest. As Plaintiffs cannot show actual success on the merits, Plaintiffs' request for a permanent injunction must be DENIED.

## IV.    ORDER

The Court Finds and Concludes that neither the Denver City Charter, the Denver Zoning Code, nor Colorado common law provides a basis for this Court to enter a declaratory judgment in favor of Plaintiffs. As Plaintiffs have not prevailed on the merits of their claim, their request for a permanent injunction must be denied. Plaintiffs' requests for declaratory relief and for a permanent injunction are both DENIED.

Signed and dated this 26th day of October, 2017.

SO ORDERED.

_____

David H. Goldberg
Denver District Court Judge