# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER;

*and*

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE
PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CARTER, in his official capacity as Division
Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and SHAILEN P. BHATT, in his
official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

### SIERRA CLUB PETITIONERS' MOTION FOR STAY OF AGENCY ACTION PENDING REVIEW ON THE MERITS
#### (Case No. 17-cv-1679-WJM-MEH)

---

ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

COUNSEL FOR PETITIONERS

## GLOSSARY OF TERMS

APA:  Administrative Procedures Act

CAA:  Clean Air Act

CDOT:  Colorado Department of Transportation

DEIS:  Draft Environmental Impact Statement

FEIS or Final EIS:  Final Environmental Impact Statement

F-AHA:  Federal Aid Highway Act

FHWA:  Federal Highway Administration

MSAT:  Mobile Source Air Toxics

NEPA:  National Environmental Policy Act

NO2:  Nitrogen Dioxide

PCL:  Partial Cover Lowered

PM:  Particulate Matter

PM2.5:  fine particles 2.5 µm or smaller that penetrate into the lungs

PM10:  thoracic particles 10 µm or smaller that penetrate into the lungs

ROD:  Record of Decision

SDEIS or Supplemental DEIS:  Supplemental Draft Environmental Impact Statement

**TABLE OF CONTENTS**

GLOSSARY

INTRODUCTION…………………………………………………………………1

I.     BACKGROUND……………………………………..…………………………2

    A.     EPA Finds Highway Pollutants Cause Premature Death, Debilitating Diseases, and Impair Childhood Development ……………………………………………...2

        1.     Pollutants with established National Ambient Air Quality Standards ("NAAQS")…………………………………………………………..3

            a.     Particulate Matter ("PM")……………………………...3

            b.     Nitrogen Oxides (a byproduct of fossil fuel combination in engines)……………………………..……………...4

        2.     Vehicle emission pollutants without established NAAQS……………4

        3.     CAA Conformity Rule……………………………………………4

    B.     FHWA's Environmental Review Failed to Consider Health Impacts…………5

II.    ARGUMENT……………………………………………………………………10

    A.     Standard of Review……………………………………………………10

    B.     Standing…………………………………………………………………...11

    C.     Petitioners Will Suffer Irreparable Harm……………………………………13

        1.     Petitioners' Members' Health Will Suffer Increased Harm During Construction………………………………………………………13

            a.     Increased Exposure to Pollutants in Construction Emissions Will Harm Petitioners' Health………………………………..14

            b.     Construction Dust (PM10) Threatens Health……………..…16

            c.     Unmitigated PM2.5 and NOx Emissions from Construction Equipment Threaten Health………………………………20

            d.     FWHA Failed to Mitigate PM2.5 Adequately to Protect Health………………………………………………………...21

        2.     Petitioners' Will Suffer Irreparable Harm If Limited Resources are Irretrievably Committed…………………………………………22

    D.     Petitioners Will Likely Prevail on the Merits……………………………24

        1.     FHWA/CDOT Unlawfully Refused to Address Health Effects of Increased Exposure to PM2.5 and PM10 and Overall Exposure to All Pollutants Emitted from Highways (Including CO, NO2 and MSATS…………………………24

        2.     FHWA/CDOT Failed to Satisfy the F-AHA's Substantive Requirements………………………………………30

    E.     The Balance of Hardships Favors Petitioners…………………………32

    F.     Public Interest Favors a Stay………………………………………….33

CONCLUSION……………………………………………………………….34

# INTRODUCTION

The Sierra Club, Elyria Swansea Neighborhood Association, Chaffee Park Neighborhood Association, and Colorado Latino Forum ("Petitioners") move to stay the Federal Highway Administration's ("FHWA") Record of Decision ("ROD") for the I-70 Central Project, Phase 1 ("Project") to protect their members who reside or send their children to schools near the Project from adverse health effects of increased pollution. In addition to I-70's ongoing motor vehicle emissions, when construction activities commence in 2018, harmful air pollutant emissions will increase, which will expose them to significant increased risks of asthma onset, asthma attacks, bronchitis, cancer, premature death from cardiovascular disease, and other harmful health effects.

A stay will preserve $1.175 billion of public resources from unlawful expenditure. Petitioners are likely to prevail on one or more claims that Project approval violates the National Environmental Policy Act ("NEPA"), Federal-Aid Highway Act ("F-AHA") and Clean Air Act ("CAA"). Defendants' NEPA violations include: failing to evaluate and disclose significant adverse human health impacts from exposing residents and children attending schools in the Project area to increased concentrations of particulate matter and other air pollutants and failing to compare the preferred alternative's adverse health impacts with reasonable alternatives that would minimize adverse community health impacts by reducing exposures to harmful pollutants.

Defendants' failure to assess human health impacts from Project emissions violates F-AHA requirements to identify "possible adverse…environmental effects relating to [the] proposed project" from "air pollution," determine the "costs of eliminating or minimizing such

adverse effects," and weigh such adverse effects and costs to make "final decisions on the project…in the best overall public interest." 23 U.S.C. §109(h).

Defendants' CAA conformity determination violates EPA's criteria and procedures and withhold evidence that Project emissions violate EPA's conformity test from the public and decisionmaker.

Petitioners seek a stay, pursuant to Section 705 of the Administrative Procedures Act ("APA"), to "postpone the effective date of [the] agency action [and] preserve status or rights pending conclusion of review proceedings." 5 U.S.C. § 705. A stay will avoid irreparable harm to human health, and preserve Project funds to evaluate NEPA-required alternatives that "restore and enhance" the human environment and address F-AHA-required mitigation that "eliminate[s] or minimize[s]" harm to public health from Project air pollution.

## I.     BACKGROUND

In the 1960s, when I-70 was constructed over 46th Avenue through North Denver neighborhoods, research into the health effects of air pollution was in its infancy, Congress had enacted an incipient version of the CAA after California promulgated the first-ever motor vehicle tailpipe standards, and NEPA had yet to be suggested. Highways were built without regard for public health consequences from exposure to highway pollution.

### A.  EPA Finds Highway Pollutants Cause Premature Death, Debilitating Diseases, and Impair Childhood Development.

A half century of global research into the health effects of air pollution has identified the hazards of exposure to highway air pollution. In 2016, the United States Environmental Protection Agency ("EPA") summarized the evidence of health effects from exposure to pollutants commonly emitted from motor vehicles, including PM2.5 (fine particles 2.5 µm or

smaller), PM10 (thoracic particles 10 µm or smaller), nitrous oxides (including NO2), and air

toxics.

    1.   Pollutants with established National Ambient Air Quality Standards ("NAAQs"):

       a.   Particulate Matter ("PM")

EPA concluded that:

a "causal relationship exists" between both long- and short-term exposures to PM2.5 and premature mortality and cardiovascular effects and that "a causal relationship is likely to exist" between long- and short-term PM2.5 exposures and respiratory effects. Further, there is evidence "suggestive of a causal relationship" between long-term PM2.5 exposures and other health effects, including developmental and reproductive effects (e.g., low birth weight, infant mortality) and carcinogenic, mutagenic, and genotoxic effects (e.g., lung cancer mortality).

….

[T]he available scientific evidence significantly strengthens the link between long- and short-term exposure to PM2.5 and mortality, while providing indications that the magnitude of the PM2.5-mortality association with long-term exposures may be larger than previously estimated. The strongest evidence comes from recent studies investigating long-term exposure to PM2.5 and cardiovascular-related mortality. The evidence supporting a causal relationship between long-term PM2.5 exposure and mortality also includes consideration of studies that demonstrated an improvement in community health following reductions in ambient fine particles.

….

[E]pidemiological studies…provide strong evidence of respiratory-related morbidity effects associated with long-term PM2.5 exposure. The strongest evidence for respiratory-related effects is from studies that evaluated decrements in lung function growth (in children), increased respiratory symptoms, and asthma development. The strongest evidence from short-term PM2.5 exposure studies has been observed for increased respiratory-related emergency department visits and hospital admissions for chronic obstructive pulmonary disease (COPD) and respiratory infections.

81 Fed. Reg. 73,478, 73,836-37 (Oct. 25, 2016) (setting heavy-duty vehicle standards).

    EPA linked the strongest effects of tailpipe emissions (mostly from heavy-duty trucks

and construction equipment) and dust particles kicked up by earthmoving equipment to short-

term exposures (*i.e.*, a few days or less) to particles smaller than 10µm that penetrate the upper

respiratory tract. As of 2009, available evidence:

was "suggestive of a causal relationship" between short-term exposures to PM10-2.5 and cardiovascular effects (e.g., hospital admissions and Emergency Department (ED) visits, changes in cardiovascular function), respiratory effects (e.g., ED visits and hospital admissions, increase in markers of pulmonary inflammation), and premature mortality.

*Id.* at 73,837.

### b. Nitrogen Oxides (a byproduct of fossil fuel combustion in engines)

EPA found that:

The 2016 ISA for Oxides of Nitrogen concluded that people with asthma, children, and older adults are at increased risk for NO2-related health effects. In these groups and lifestages, NO2 is consistently related to larger effects on outcomes related to asthma exacerbation, for which there is confidence in the relationship with NO2 exposure.

*Id.* at 73,839.

### 2. Vehicle emission pollutants without established NAAQS:

EPA found that:

Heavy-duty vehicle emissions contribute to ambient levels of air toxics that are known or suspected human or animal carcinogens, or that have noncancer health effects. The population experiences an elevated risk of cancer and other noncancer health effects from exposure to the class of pollutants known collectively as "air toxics." These compounds include, but are not limited to, benzene, 1,3-butadiene, formaldehyde, acetaldehyde, acrolein, polycyclic organic matter, and naphthalene. These compounds were identified as national or regional risk drivers or contributors in the 2011 National-scale Air Toxics Assessment and have significant inventory contributions from mobile sources.

*Id.* at 73,841.

### 3. CAA Conformity Rule:

To ensure that federal transportation investments do not contribute to NAAQS violations,

Congress amended the CAA in 1977 to prohibit federal funding for activities that do not conform

to a State Implementation Plan. Congress strengthened this requirement in 1990, prohibiting

federal support for transportation projects unless it can be determined that emissions "will not

…cause or contribute to any new violation of any standard in any area…." 42 U.S.C. §7506

(c)(1)(B)(i). Congress also directed EPA to "promulgate, and periodically update, criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects." *Id.* at §7506(c)(4)(B).

EPA's initial conformity rule required quantitative modeling analysis of highway project emissions for carbon monoxide and PM10. 58 Fed. Reg. 62,189, 62,212 (Nov. 24, 1993). Following promulgation of the PM2.5 NAAQS, EPA also required that highway projects model for PM2.5, because "studies provide strong evidence of elevated PM2.5 concentrations along roadways" with "elevated PM2.5 concentrations of 8% to 60% for high-traffic roadways to 285% for major truck stops, compared to background concentrations." 71 Fed. Reg. 12,468, 12,472 (Mar. 10, 2006).

In 2013, EPA determined that incremental exposure to PM2.5 near highways requires a "network of near-road compliance PM2.5 monitors [ ] to provide characterization of concentrations in near-road environments including for comparison to the NAAQS." 78 Fed. Reg. 3086, 3238 (Jan. 15, 2013). Colorado installed a near-road PM2.5 monitor in Globeville east of I-25, 4 blocks north of I-70. Annual mean concentrations at this monitor are 9.3 µg/m$^3$ or above, compared to 8 µg/m$^3$ or less at regional monitors not near an interstate highway. *See* Declaration of Dr. George Thurston, Attach. A (monitoring data) (Exhibit 12).

**B.  FHWA's Environmental Review Failed to Consider Health Impacts.**

FHWA's review of the Colorado Department of Transportation's ("CDOT") proposal to widen I-70's viaduct from 6 to 10 lanes, plus shoulder lanes, began over a decade ago. Starting with the 2008 Draft Environmental Impact Statement ("DEIS"), FHWA/CDOT received extensive and detailed public comment identifying their failure to consider the Project's human

health impacts. FHWA/CDOT never addressed these issues fully or adequately. The ROD is replete with such concerns, some of which are noted below.

In 2009, the Sturm College of Law's Environmental Law Clinic ("Clinic") filed extensive comments challenging the DEIS's failure to address adverse community health impacts:

> There is now compelling and unambiguous scientific evidence that demonstrates that diverse air pollutants from trucks and motor vehicles (including diesel particulate matter, fine and ultrafine particulate matter) cause an increased risk of asthma, heart disease and cancer in those living immediately adjacent to interstate highways.

> The DEIS fails to adequately analyze, using readily available data and methodologies, a key environmental harm - increased mortality and morbidity in those who live, work, travel and recreate on or immediately adjacent to the [Project].[1]

The Clinic asked FHWA/CDOT to identify the exposed population, estimate likely effects of exposure to Project emissions using available emission models and quantitative risk tools, and rely on studies assessing health effects from exposure to the full array of pollutants in the complex pollution mixture emitted from highways.[2]

In 2014, FHWA proposed lowering 1.8 miles of the expanded highway between Brighton and Colorado Boulevards, covering 900 feet of this 9,500-foot trench, and blowing concentrated, untreated pollutants from each end of the cover into the ambient air.[3] Supplemental Draft EIS ("SDEIS"). The cover's west end would be located across the side street from Swansea Elementary School's playground. The SDEIS included required air quality modeling analyses for carbon monoxide and PM10 to demonstrate CAA conformity[4], but included no quantitative

---

[1] Sturm College of Law Environmental Law Clinic Comment on DEIS (Comment No. 133) at 16-17 (Exhibit 18).
[2] *Id.* at 18-19.
[3] 2014 Supplemental Draft EIS ("SDEIS"), *attached as* Excerpts from the Agency Record ("EAR") at EAR 0029-37.
[4] *Id.* at EAR 0042

analysis of community exposures to the full array of Project pollutants.[5] Nor did it quantify community health impacts and compare health benefits for Project alternatives.[6]

Sierra Club asked the agencies to address community exposures[7], attaching a link to the City of Denver's 2014 Health Impact Assessment of these neighborhoods.[8] The DEH Report showed roughly 50% greater cardiovascular mortality in the four City Council Districts along I-70 than in other Denver neighborhoods. As to Elyria/Swansea and Globeville, the report shows significantly more pediatric emergency room visits for asthma than in other Denver neighborhoods; 40% higher in Elyria/Swansea (38.6 vs. 28.5 admissions/1,000) and 20% higher in Globeville.[9]

Sierra Club asserted this evidence required "a health impact assessment" that addresses health impacts of increased pollutant exposures," because "these residents are currently experiencing serious adverse effects of current pollutant exposures."

> The higher pollutant exposures expected from increasing traffic by 30% … in these
> neighborhoods will significantly further degrade the health status of these communities.
> Sacrificing the health of children and increasing years of life lost to build a regional
> transportation facility is not an acceptable public policy.[10]

Sierra Club also asked FHWA/CDOT to:

> investigate and identify alternatives and/or mitigation measures that can enhance the
> human environment by reducing community exposure to harmful air pollutants, and

---

[5] *Id.* at EAR 0038

[6] *Id.*

[7] Sierra Club Comments on SDEIS ("Sierra Club Comments"), at EAR 0224-226.

[8] Denver Department of Environmental Health, Health Impact Assessment, "How Neighborhood Planning Affects Health in Globeville and Elyria Swansea," (Sept. 2014) ("DEH Report"), Fig. 6 at 16 (Exhibit 1).

[9] *Id.*, Fig. 7 at 16.

[10] Sierra Club Comments, at EAR 0222-223.

avoid the adverse health effects that will result from increasing exposure to these pollutants that will result if traffic in the corridor is allowed to increase by 30%.[11]

The Final EIS ("FEIS") acknowledged DEH's finding that "[h]ighway traffic is the main source of air pollution in the [Globeville, Elyria, Swansea] communities,"[12] without discussing how additional pollution would impair neighborhood health. FHWA/CDOT neither dispute that emissions from the interstates are linked to increased cardiovascular mortality and childhood asthma, nor do they claim these adverse health effects are insignificant impacts. Instead, FHWA/CDOT ignored the data, making no assessment of health risks posed by pollutant exposures or the health benefits of four proposed alternatives.[13]

All alternatives proposed to reduce exposures were rejected, but none were evaluated for their health benefits: (1) the Law Clinic's proposed full-length cover with pollutant removal; (2) re-route I-70 onto the I-76/I-270 alignments; (3) prohibiting truck traffic to remove nearly half of the emissions from the proposed expansion; or (4) relocation assistance for high-risk residents within I-70's health hazard zone. Traffic modeling for the re-route alternative showed only 50,000 and 65,000 vehicles/day would use 46th Avenue instead of 177,000 on existing I-70 or 230,000 on a future expanded I-70.[14] This analysis provides compelling evidence that the re-route would reduce emissions by 65% to 80% in Globeville and Elyria-Swansea, thereby providing significant air quality and health benefits to neighborhoods along I-70. But FHWA/CDOT never used these data to estimate lives saved, children protected from asthma,

---

[11] DEH Report, Ex. 1, at 2.
[12] FEIS at EAR 0078.
[13] *Id.* at EAR 0077, 0083-85.
[14] ROD, Attach. C-1 Revised Elimination of I-270/I-76 Reroute Alternative Technical Memorandum, at EAR 0276.

asthma attacks avoided or any other health indicators that could be used to compare the health impacts of the re-route alternatives.

The FEIS includes a section titled "Human Health Conditions," but discussion is limited to air quality modeling for carbon monoxide and PM10:

> [T]he No-Action Alternative and the Build Alternatives will not cause or contribute to any new localized carbon monoxide or particulate matter violations, nor will they increase the frequency or severity of any existing violations based on the hotspot analysis. Therefore, no specific mitigation measures are necessary for the project to proceed.[15]

FHWA/CDOT did not assess community health impacts, claiming health effects are uncertain and mobile source air toxic ("MSAT") emissions are declining.[16] The ROD discusses expected MSAT reductions, but never acknowledges the health consequences of significantly increased PM emissions.[17]

FHWA/CDOT's claim of scientific uncertainty is based on a selected fraction of outdated research.[18] FHWA/CDOT ignored EPA's review of all data available through 2010, on which it based its conclusion that asthma, cardiovascular disease and premature mortality are caused by exposure to PM2.5. The Sierra Club objected to cherry-picking inconclusive data from the vast body of scientific research, while ignoring highly confident results and a large volume of post-2011 research:

> The agency's duty under the law is to consider all the evidence relevant to its obligations under NEPA and section 109(h). Probative evidence cannot simply be ignored. *Cotter v. Harris*, 642 F.2d 700, 706-07 (3rd Cir. 198[1]); *See [v.] Washington Metro. Transit Auth.*, 36 F.3d 375, 384 (D.C. Cir, 1994). Reasoned decisionmaking requires that "the agency must examine the relevant data." *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*,

---

[15] FEIS at EAR 0067.
[16] *Id.* at EAR 0068, 0077.
[17] ROD at EAR 0259.
[18] FEIS, Attach. J, Air Quality Technical Report, at EAR 0094-96.

463 U.S. 29, 43 (1983). FHWA's failure to consider evidence relevant to its duties under NEPA, i.e., the obligation to consider alternatives and mitigation that can minimize the adverse impacts of highway pollution on community health, is arbitrary and capricious.[19]

FHWA/CDOT offered no explanation for their limited review of outdated studies, or apparent decision to ignore findings in EPA's Integrated Science Assessments and EPA's scientific record used to review the PM and NOx NAAQS. Furthermore, the published, peer-reviewed studies cited by Dr. Thurston in his declaration, Exhibit 28, were relevant and available to FHWA/CDOT.

Sierra Club also objected to FHWA/CDOT's extremely narrow definition of purpose and need, defined primarily as reducing congestion on I-70, as a strategy for unlawfully excluding "off-corridor" alternatives to avoid consideration of health benefits from alternatives such as expanding I-270, thereby defeating NEPA's purpose to protect health and the F-AHA's policy "to encourage and promote … transportation systems that will serve mobility needs … while minimizing … air pollution." 23 U.S.C. § 134 (a)(1).[20]

## II.   ARGUMENT

### A.  Standard of Review

Courts review motions to stay agency actions and motions for preliminary injunction under the same standard. *E.g., Hill Dermaceuticals, Inc. v. U.S. FDA*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007).

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

---

[19] Sierra Club Comments, ROD, Attach. E, at EAR 0326.
[20] *Id.* at EAR 0327-331.

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv*., 657 F. Supp. 2d 1233, 1239

(D. Colo. 2009) (*citing Winter v. Natural Resources Defense Council,* 555 U.S. 7, 20 (2008)). A

court may "preserve the status quo pending a judicious, calm and orderly judicial determination

of [a] judiciable problem. That is the classic office of a preliminary injunction." *United States v.*

*Moore*, 427 F.2d 1020, 1024 (10th Cir. 1970).

### B.  Standing

Petitioners have standing to invoke this Court's jurisdiction to challenge FHWA's ROD

approving the Project because pollution emitted from construction and increased highway traffic

after construction will "invade a legally protected interest," causing injury "which is (a) concrete

and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Petitioners' members will suffer injury (1) from

exposure to increased pollution levels that will occur when construction begins, and when more

traffic is added after construction completes; (2) that is directly traceable to FHWA's action

issuing the ROD; and (3) will be prevented if FHWA's ROD is vacated, thereby barring

construction until FHWA issues a fully adequate EIS that complies with NEPA and F-AHA.

In support of standing and this motion for stay, to establish that Petitioners and their

members will suffer irreparable harm if Project construction is not stayed, Petitioners submit and

incorporate the following declarations:

- Nine members of Petitioner organizations, Exhibits 19–27;
- Dr. George D. Thurston, Professor of Environmental Medicine and Population

   Health and Director of the Program in Human Exposures and Health Effects,

New York University School of Medicine, and former member of EPA's Clean
Air Science Advisory Committee, Exhibit 28.

Petitioners' members' declarations establish that they or their family members currently
suffer from the diseases of air pollution—some requiring medication—or are in a class of highly
sensitive persons known to be at high risk of injury from the diseases of air pollution. They
explain why they are likely to suffer additional harm, such as increasing incidence or severity of
asthma attacks, if they are exposed to increased levels of pollution from construction activities.
*See* Lovato, Hernandez, Elliott, Sanchez, Dutcher, Roybal, and Espino Declarations, Exhibits
19–25. Anticipating these effects, Declarants expect to be trapped inside their homes during the
4-5 years of construction, unable to enjoy their children or grandchildren who will not be able to
play outside during family gatherings, and unable to participate in outdoor activities, such as
exercise or gardening. *Id.* Some Declarants also describe why the measures planned for
mitigation of construction emissions described in the FEIS are not likely to prevent harm. For
example, Declarants residing just beyond the one block zone where CDOT promises to install
indoor storm windows and air conditioners will receive no protective measures. Cram and
Sanchez Declarations, Exhibits 23 and 25.

Dr. Thurston reviews the published peer-reviewed evidence of the health effects of air
pollution to show that increasing public exposure to the harmful pollutants emitted during
construction and from traffic on the highway after construction, will increase the risk of harm
from the diseases of air pollution and the incidence of such diseases in exposed populations. He
explains that such harm can occur at concentrations allowed by the NAAQS under the CAA, and
that the difference in exposures measured by the concentrations reported at the Globeville
monitor near I-70 are consistent with the increased incidence of mortality from cardiovascular
disease and hospitalization for treatment of childhood asthma reported by DEH in its assessment

of community health.[21] He concludes that increased exposure to fugitive dust during construction will harm Petitioners' health.

### C. Petitioners Will Suffer Irreparable Harm.

Petitioners will suffer harm if construction begins because: (1) members and their families will suffer adverse health effects from exposure to additional concentrations of harmful pollutants; and (2) CDOT will irretrievably commit limited resources needed for any meaningful consideration of alternatives.

### 1. Petitioners' Health Will Suffer Increased Harm During Construction.

Beginning with the initiation of construction, the health of Petitioners and their families living adjacent to I-70's construction zone will be harmed from exposure to elevated concentrations of harmful pollutants. According to FHWA/CDOT, construction involves demolishing the existing 85' wide viaduct, replacing it with a 280' wide right-of-way containing 12 paved lanes (10 travel lanes and two shoulder lanes) and interchange access ramps, and excavating a 1.8-mile trench between Brighton and Colorado Boulevards up to 40 feet deep[22] through soils known to contain multiple hazardous waste disposal sites.[23] If construction proceeds, Petitioners' members and families living in the Project area will suffer increased asthma attacks and risk of cardiovascular disease—diseases that EPA has found to be caused by motor vehicle pollutants.

Project construction will require operation of heavy-duty, diesel powered construction equipment, *e.g.,* front loaders, excavators, heavy-duty haul trucks, cement mixers, and asphalt

---

[21] DEH Report, Ex. 1, at 15-16.
[22] ROD at EAR 0248-251.
[23] *Id.* at EAR 0257.

spreaders, for 4-5 years.[24] FHWA admits that emissions of harmful pollutants, including PM10,

PM2.5, NOx, SO2, and MSATs emitted in diesel exhaust, will increase during construction.[25]

**a. Increased Exposure to Pollutants in Construction Emissions Will Harm Petitioners' Members' Health.**

FHWA does not dispute that exposures to equipment exhaust and airborne dust will

increase during the 4-5 years when construction emissions are added to traffic pollution.

Elevated exposures to the array of pollutants emitted from construction activities will increase

adverse health outcomes from air pollution, whether or not the NAAQS are maintained.

Dr. George Thurston, explains research evidence showing that adverse health effects occur at

concentrations below the levels established in the NAAQS. *See* Declaration of Dr. George

Thurston (Exhibit 28). Dr. Thurston identifies three primary reasons why NAAQS fail to protect

against health effects caused by exposures to these pollutants even at concentrations allowed by

the NAAQS.

First, for PM2.5, Dr. Thurston explains EPA acknowledged in its last NAAQS revision

that it did not set the standard at a level to protect against all mortality risks. EPA's analysis of

health effects data found that mortality declined as PM2.5 concentrations were reduced, but

significant mortality would occur below the NAAQS level. Based on EPA's mortality risk curve,

Dr. Thurston concludes that significant mortality is expected at levels below the NAAQS, and

that mortality can be reduced by reducing PM2.5 concentrations. Dr. Thurston found that the

higher measured concentrations of PM2.5 at the Globeville monitor (just north of I-70, east of I-

---

[24] Fact Sheet," Construction and Community Access," https://codot.gov/projects/i70east/fact-sheets-8-2.16/construction-and-community-access_03-09-17.pdf, last accessed November 5, 2017 (Exhibit 29).
[25] ROD, at EAR 257; FEIS Attach. J at EAR 089-93.

25), compared to concentrations measured at other metro region monitors, are consistent with the higher incidence of cardiovascular mortality reported by DEH in Council Districts 1, 8, 9 and 11, where I-70 and I-25 are located, compared to other Denver Council Districts not situated near such high traffic highways. Based on the mortality risk curve that EPA derived from the data, Dr. Thurston concludes that increasing PM2.5 exposures from construction above current baseline levels will increase the expected incidence of mortality, asthma onset and asthma episodes requiring emergency treatment. Conversely, he concludes that removing traffic from these neighborhoods will reduce exposures and the incidence of adverse health outcomes caused by exposure to highway pollutants.

Second, Dr. Thurston points to evidence that adverse health outcomes in neighborhoods closely proximity to highways are produced by simultaneous exposure to the full array of pollutants comprising the complex mixture of highway emissions. The CAA requires each NAAQS to protect against known effects of exposure to a single pollutant. The CAA does not require that NAAQS account for, and protect against, exposure to the multiple pollutant mixtures emitted from highways that cause both cumulative and synergistic effects on human health.

Third, Dr. Thurston notes that the scientific understanding of health effects caused by PM has advanced significantly since 2009, when EPA identified the mortality risk curve. The severity and statistical significance of the health consequences of pollutant exposures that are now well understood, were not yet identified in 2009, and could not be considered or prevented by EPA's decision to strengthen the annual PM2.5 NAAQS from 15 to 12 $\mu g/m^3$.

Pollutant concentrations allowed by the NAAQS are not "safe" or risk free. The residual health risks experienced by communities exposed to unique localized pollutant mixtures cannot

be prevented through national single pollutant standards, but can be accounted for on a case-by-case basis when project impacts are properly evaluated under NEPA.

In addition, Dr. Thurston reviewed the data showing levels at which coarse particles have been found to cause harm, and concluded that baseline levels currently monitored in Globeville are above the known threshold of harm and that increased exposure to particles during construction will worsen health of residents in the neighborhoods affected by the Project.

### b. Construction Dust (PM10) Threatens Health.

Heavy-duty diesel equipment will excavate, lift and haul 3.9 million cubic yards of material, including soil from the trench and debris from demolishing the existing viaduct.[26] In comments on the SDEIS, Denver City Auditor Dennis Gallagher stated that excavating the 1.8 mile trench will require removing 1.7 million cubic yards, equating to 85,000 round trips by heavy-duty haul trucks, each carrying 20 cubic yards of material.[27] Moving 3.9 million cubic yards of excavated soils and debris will require 195,000 round trips by haul trucks through nearby neighborhoods to as yet undesignated disposal sites.

FHWA/CDOT acknowledge that PM emissions from airborne soil particles will increase during construction.[28] Soil particles contaminated with toxic metals will be released when 750 acres at 34 known hazardous materials sites are disturbed within the Project's construction footprint.[29] Soils testing at a few scattered locations within this footprint found high concentrations of lead, arsenic and cadmium.[30] When these waste sites are excavated, loaded

---

[26] Denver Auditor Dennis Gallagher Comments on SDEIS, at EAR 0189.
[27] *Id.*
[28] ROD, at EAR 0256.
[29] *Id.,* Attach. C-4, Table 4, at EAR 0291.
[30] FEIS, at EAR 0056.

onto trucks and hauled through nearby neighborhoods, airborne dust will expose residents and

school children to toxic contaminants.

FHWA/CDOT recognized that construction dust is a significant health threat deserving

"special consideration" because of

the potential effects on people within or near a major construction project such as I-70
East. Dust particles can be so small that they pass through the nasal cavity and into the
lungs to cause damage. Also, toxic and cancer-causing chemicals can attach to dust and
produce much more profound effects when inhaled.[31]

To avoid exacerbating the effects of toxic particles, Denver Mayor, Michael Hancock, and others

asked FHWA/CDOT to require testing to detect "toxic metals content as related to contaminants

of concern from hazardous materials disturbed within the project footprint," using "suitable air

monitoring" for "particulate matter with speciation for toxic materials encountered during

construction."[32] Mayor Hancock, and neighborhood associations asked FHWA/CDOT to:

Sample for lead, cadmium and arsenic in the construction zone. If the daily
average air samples exceed 1.5 microgram/m3 for lead, work stops and work
practices should be altered to minimize dust. An action level for arsenic should be
defined as well.[33,]

In addition, they asked that homes in the two rows nearest to the highway be tested for

lead, and "if dust levels are above HUD residential standards, test next row of homes to

identify how far the lead dust travelled."[34] To protect public health, Mayor Hancock asked

that homes "contaminated with lead dust should be cleaned to below lead dust clearance

---

[31] FEIS, at EAR 0054.
[32] Denver Mayor Hancock Comments on SDEIS, at EAR 0164.
[33] *Id.,* Globeville, Elyria, Swansea Organizers Group Comments on SDEIS, at EAR 0206.
[34] Denver Mayor Hancock Comments on SDEIS, at EAR 0164. Globeville, Elyria Swansea
Organizers Group Comments on SDEIS, at EAR 0206.

standards as per state regulation."[35] FHWA/CDOT refused, agreeing only to: "collect representative soil samples of three or four recently cleaned-up residential properties…to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities."[36]

Despite admitting that "[c]onstruction activities may release hazardous materials at these sites into soil or groundwater or result in exposure to these materials by workers or the public,"[37] FHWA did not require CDOT to monitor for significant public health risks, or to implement mitigation measures that ensure protection from "profound effects" caused by inhaling toxic contaminants. FHWA/CDOT promise to "[p]repare and implement a project-specific Health and Safety Plan and Materials Management Plan," to "consist of specific measures to protect worker and public health and safety,"[38] But the promise to develop a plan provides no assurance that the plan, once developed, will ensure adequate protection for the public. The promised plan does not require CDOT to test soils for dangerous deposits of lead, cadmium or arsenic, monitor air for these metals, adopt action levels based on thresholds needed to protect community health rather than worker health, trigger protective actions when contaminants are identified, or prescribe mitigation measures certain to stop contaminants from becoming airborne.

No specific mitigation measures are prescribed if monitored PM10 levels exceed the NAAQS.

---

[35] *Id.*
[36] Response to City of Denver Comments on SDEIS, at EAR 0164; IMP6 of the Frequently Received Comments and Responses on the [SDEIS], at EAR 0112.
[37] ROD Attach. C-4 at EAR 0290.
[38] FEIS at EAR 0289.

Dr. Thurston's declaration summarizing the effects of exposure to PM10, establishes that "adverse health risks caused by exposure to PM and the mixture of gaseous and vapor co-pollutants from traffic-related sources will increase if exposures to these pollutants are increased," and "increasing exposures to PM10 and PM2.5 at levels below the NAAQS will increase both the incidence of asthma attacks and asthma onset in the community, increase personal risk for those already diagnosed with asthma, and increase risk of suffering acute effects and mortality from cardiovascular disease." [39] Dr. Thurston explains that exposures to levels below the NAAQS harm health, and exposure to increased concentrations resulting from construction will increase risk and harm even if the NAAQS are met. FHWA/CDOT have committed to monitor air quality during construction at the Swansea Elementary School, but they have not committed to action levels that protect against increases in exposure above baseline levels below the NAAQS, nor have they committed to taking any protective actions to prevent exposures that will exceed the NAAQS.

Because FHWA has not required CDOT to monitor wherever construction activities are being implemented, has not prescribed action levels, and has not ensured that significant increases in exposure to PM10 will be prevented, Petitioners' members will be exposed to periodic increases in PM10 that will harm their health. In addition, FHWA's failure to require soils testing for lead, cadmium and arsenic before excavation or to conduct air-monitoring when moving contaminated soils, or to implement mitigation measures that provide adequate protection from toxins in PM10, will subject Petitioners' and their families to significantly

---

[39] Declaration of Dr. George D. Thurston, Exhibit 28, at 18.

increased health risks over at least four to five years from exposure to fugitive dust, with the

impacts continuing thereafter.

### c. Unmitigated PM2.5 and NOx Emissions from Construction Equipment Threaten Health.

Sierra Club asked CDOT/FHWA to model emissions from heavy-duty diesel equipment

to "investigate and disclose likely violations of the NAAQS for PM-10, PM2.5 and NO2 caused

by those pollutants emitted from heavy equipment and traffic during construction."[40] Petitioners

requested that FHWA/CDOT investigate adverse effects from construction equipment emissions

to obtain information needed to determine specific mitigation to minimize known health hazards

of diesel engine pollutants.[41] Elevated exposure to diesel pollutants during 4-5 years of

construction will exacerbate existing adverse community health impacts, including the effects of

historical long-term exposure to highway pollutants.

In its 2016 rulemaking to limit heavy-duty vehicle emissions, EPA summarized the

health effects evidence from exposure to diesel pollution, finding that:

> Diesel exhaust consists of a complex mixture composed of particulate matter, carbon
> dioxide, oxygen, nitrogen, water vapor, carbon monoxide, nitrogen compounds, sulfur
> compounds and numerous low-molecular-weight hydrocarbons. A number of these
> gaseous hydrocarbon components are individually known to be toxic, including
> aldehydes, benzene and 1,3-butadiene. The diesel particulate matter present in diesel
> exhaust consists mostly of fine particles (<2.5 [mu]m), of which a significant fraction is
> ultrafine particles (<0.1 [mu]m). These particles have a large surface area which makes
> them an excellent medium for adsorbing organics, and their small size makes them highly
> respirable. Many of the organic compounds present in the gases and on the particles, such
> as polycyclic organic matter, are individually known to have mutagenic and carcinogenic
> properties.

---

[40] Sierra Club Comments, at EAR 0222.
[41] *Id.*

81 Fed. Reg. 73,477, 73,840 (Oct. 25, 2016). *See* Background, *supra,* for EPA's summary of health effects associated with these pollutants.

Since most particulate matter emitted from diesel vehicles and equipment are "fine particles," increased PM exposure during 4-5 years of construction will cause significant community health consequences. In addition, EPA recognizes that exposure to toxic air pollutants emitted from diesel exhaust causes human cancer:

> …the World Health Organization's International Agency for Research on Cancer (IARC), a recognized international authority on the carcinogenic potential of chemicals and other agents, evaluated the full range of cancer-related health effects data for diesel engine exhaust. IARC concluded that diesel exhaust should be regarded as "carcinogenic to humans."

*Id.* at 73,841.

### d. FHWA Failed to Mitigate PM2.5 Adequately to Protect Health.

To ensure the public is adequately protected from pollutants in equipment exhaust and airborne construction dust, Petitioners specifically requested that FHWA/CDOT use EPA's latest air quality modeling tools to estimate non-road emissions for construction equipment.[42] Denver also requested that FHWA/CDOT monitor air quality for MSATs.[43]

FHWA/CDOT refused both requests, responding that the Project's contractor will "perform air monitoring for PM10…to assess construction effects on air quality and ensure that construction work is not producing unhealthy levels of dust in the adjacent community."[44]

 "[A]ssessing[ing] construction effects on air quality" by monitoring does not *prevent* harmful exposures. It simply shows when harmful exposures have occurred, *after*

---

[42] *Id.* at EAR 0235.
[43] City of Denver SDEIS Comments, at EAR 0128.
[44] *Id.*

*the harm is done.* Modeling construction pollution identifies activities that may cause unacceptable health risks *before they occur,* and allows agencies and the public to implement proactive measures to ensure that harm does not occur.

Monitoring for PM10 provides no assessment of harmful exposures to the other pollutants in diesel exhaust (*e.g.*, PM2.5, NOx, mobile source air toxics), or to toxic metals dredged up from hazardous waste disposal sites.

Absent committed mitigation measures that actually avoid increased exposure to PM and toxic metals, Petitioners' members living adjacent to the construction zone will certainly suffer harm to health. The FEIS is devoid of commitments to take specific actions to "avoid" increased exposure to pollutants emitted during construction. To avoid harm, construction must not be allowed to commence before a fully adequate EIS is completed.

**2.   Petitioners Will Suffer Irreparable Harm If Limited Resources are Irretrievably Committed.**

Petitioners' interests in a clean and healthful environment will be harmed irreparably if CDOT signs design-build contracts that commit vast, yet finite, resources, without first evaluating how increased pollutant exposures will harm community health, and without considering how alternatives that avoid or reduce harm could benefit community health.

FHWA and CDOT plan to execute a Project Agreement, pursuant to 23 U.S.C. §106(a)(2), to fund Project construction. A signed Agreement obligates federal funds. *Id.*, §106(a)(3). *See Vermont v. Goldschmidt*, 638 F.2d 482, 483 (2d Cir. 1980); *Arizona v. United States*, 494 F.2d 1285, 1287 (Ct. Cl. 1974). Then the Project can be put to bid, contracts signed, and construction commenced. Resources allocated to this corridor will then be unavailable for Project alternatives and/or mitigation (or for needs elsewhere in Colorado) if this Court later

determines that the ROD was issued improperly before full consideration of alternatives to reduce harmful exposures.

Colorado has finite resources for transportation projects. CDOT's traffic modeling of the re-route alternative strongly suggests that a comprehensive assessment of the health risks caused by exposure to highway pollution will show that the I-270 alternative to widening I-70 will achieve significant health benefits. Consideration of that option would be effectively foreclosed if design-build contracts have been signed committing $1.175 billion to widen I-70, and a large fraction of that resource is spent before this Court finally adjudicates Petitioners' claims. Those funds would no longer be available for alternatives or mitigation measures that could eliminate or minimize public health risks. *Stop H-3 Ass'n v. Volpe*, 353 F. Supp. 14, 16 (D. Haw. 1972) (halting highway construction and project expenditures pending NEPA review to ensure project is not a "*fait accompli*").[45] Maintaining the status quo is less expensive and less wasteful than starting construction only to decide later that it is not "in the best overall public interest" under 23 U.S.C. § 109(h) after all the relevant factors are considered.

---

[45] *See Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1262 (E.D. Cal. 1999) (enjoining activity on one segment road, noting that work on that segment had not yet started and potentially severe environmental impacts); *New York v. Kleppe*, 429 U.S. 1307, 1312 (1976) ("It is axiomatic that if the Government, without preparing an adequate impact statement, were to make an 'irreversible commitment of resources,' a citizen's right to have environmental factors taken into account by the decisionmaker would be irreparably impaired."); *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.) (noting "the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project"); *Lathan v. Volpe*, 350 F. Supp. 262, 266 (W.D. Wash. 1972) (preparing SEIS after construction of extra lanes is "locking the barn door after the horses are stolen"); *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1327 (4th Cir. 1972) ("Further investment of time, effort, or money in the proposed route would make alteration or abandonment of the route increasingly less wise and, therefore, increasingly unlikely.").

Irreparable injury will result if construction is substantially completed during these proceedings because claims would become moot, or effective relief unavailable. "A stay is issued to maintain the *status quo* where otherwise, absent the stay, there is a substantial likelihood that the basis for the appeal will be mooted by the operation of the injunction." *Stop H-3*, 353 F. Supp. at 16 (9th Cir. 1951). Maintaining the *status quo* is essential so that the serious issues raised in this litigation are not rendered moot or beyond effective relief.

**D.  Petitioners Will Likely Prevail on the Merits.**

Petitioners are likely to succeed on at least these two of their 17 claims: FHWA's failure to (1) assess adverse health impacts from exposure to highway pollution, compare health impacts of alternatives and consider mitigation that could restore healthier air quality, or avoid or minimize additional harm to community health; and (2) identify mitigation sufficient to "eliminate[e] or minimiz[e]" such adverse health impacts and weigh the cost of those measures in making the "public interest" determination required by F-AHA.

**1.     FHWA/CDOT Unlawfully Refused to Address Health Effects of Increased Exposure to PM2.5 and PM10 and Overall Exposure to All Pollutants Emitted from Highways (Including CO, NO2 and MSATs).**

Evidence of the disproportionate incidence of diseases of air pollution in Council Districts where I-70 is located, as reported by DEH, demonstrates that a significant adverse impact on human health is occurring in the neighborhoods affected by I-70 emissions. FHWA acknowledge in the Air Quality Technical Report, FEIS Attachment J, that exposure to fugitive dust will increase 43% by 2035 as a result of the Project,[46] tailpipe emissions of PM10 will

---

[46] FEIS, at EAR 0110.

increase 10% between 2015 and 2035,[47] and the PM10 air quality modeling analysis shows that increasing Project emissions will add at least 41 µg/m$^3$, from 113 µg/m$^3$ to 154 µg/m$^3$.[48] Carbon monoxide emissions will increase by 14% by 2035.[49]

Dr. Thurston presents substantial evidence that Project emissions will cause long-lasting, irreparable injury to community health, both from increased exposure to harmful pollutants during construction and from continuing or increased exposure to PM over the life of the Project. He concludes that current exposures are consistent with harm reported by DEH, and that increased exposures will increase risks of developing asthma, more frequent asthma attacks, and risks that older residents will suffer increased coronary heart disease, cancer and premature mortality. His review of the relevant evidence demonstrates irreparable harm to the health of those who live or attend school next to a heavily traveled highway.

Protecting health is a relevant factor under NEPA. NEPA declares a healthful environment to be a national policy objective: "The Congress recognizes that each person should enjoy a healthful environment …." 42 U.S.C. §4331(c). NEPA commits federal agencies to use their powers and resources to protect health:

> In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may-
>
> ….
> (2) assure for all Americans safe, *healthful* … surroundings;
> (3) attain the widest range of beneficial uses of the environment without degradation, risk to *health* or safety, or other undesirable and unintended consequences ….

---

[47] *Id.*, Table 23, at EAR 0106.
[48] ROD, Attach. C7, Table 2, at EAR 0304
[49] FEIS, Fig. 22, at EAR 0109

42 USC §4331(b) (emphasis added).

Harm to health is a significant environmental impact. Effects on health are the kinds of effects that must be disclosed under NEPA. 40 C.F.R. §1508.8(b)("effects includes … health…."); §1508.27(b)(2)("Significantly as used in NEPA" includes "the degree to which the proposed action affects public health….").

This Project and its Alternatives must be compared based on their impacts, including health, "thus sharply defining the issues and providing a clear basis for choice among options…." §1502.14. "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

FHWA' deprives the decisionmaker and the public of the information needed to understand the full consequences of expanding I-70 by failing to use available modeling tools to (1) quantify the increased mortality and years of life lost from cardiovascular disease and cancer; (2) estimate the number of children who will suffer the lifelong consequences of impaired lung development and asthma; (3) consider the medical costs to families that will suffer these diseases; (4) evaluate how these diseases interfere with the education of children and contribute to lost income that results from missing school; and (5) compare those impacts with alternatives that can minimize harm or restore air quality and enhance health. Those consequences were neither understood nor considered when I-70 was built 50 years ago.

"NEPA's 'twin aims' require a federal agency 'to consider every significant aspect of the environmental impact of a proposed action,' and to 'inform the public that it has indeed considered environmental concerns in its decision-making process.'" *Rags Over the Arkansas v.*

*BLM*, 77 F. Supp. 3d 1038, 1047 (D. Colo. 2015). FHWA/CDOT's failure to consider health

impacts "defeat[s] [NEPA's] goals of informed decision making and informed public comment."

*Id.* at 1048 (citation omitted).

An EIS is inadequate if the agency has not "adequately considered and disclosed the

environmental impact of its actions." *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d

1205, 1208 (10th Cir.2002)(*quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,

462 U.S. 87, 97-98 (1983)). Here, FHWA/CDOT's actions are arbitrary and capricious because

they failed to consider the life and death consequences for nearby neighborhoods and vulnerable

populations.

Courts enjoin highway projects when health impacts are not considered: a project can be

enjoined because "[t]he impact statement inadequately describe[d] the detrimental effects of air

pollution on people (e.g. residents and drivers) in the vicinity of the corridor...." *Lathan v.*

*Volpe*, 350 F. Supp. 262, 266 (W.D. Wash. 1972), *aff'd in relevant part, vacated in part*, 506

F.2d 677 (9th Cir. 1974) (*en banc*); *Keith v. Cal. Highway Comm'n,* 506 F.2d 696, 697-698 (9th

Cir. 1974) (enjoined until agency adequately considered air pollution impacts on public health);

*City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1143 (C.D. Cal. 1999) (enjoined due to

"possibility ... [of] significant air quality impacts which ha[d] yet to be appropriately

considered").

NEPA demands that FHWA/CDOT use the best science to characterize impacts to

identify alternatives or mitigation measures that would avoid or minimize health risks, while

satisfying transportation needs. The scientific evidence that EPA discussed regarding PM2.5

shows health effects occur below levels prohibited by the NAAQS. FHWA/CDOT may not

assert NAAQS compliance as an alternative to considering the adverse health impacts that EPA

acknowledges, and the health effects science demonstrates, is occurring in communities exposed

to highway pollution. NEPA charges decisionmakers with responsibility for investigating

residual environmental effects "where…emissions…complied with Clean Air Act standards but,

collectively, they significantly impacted the environment." *Wildearth Guardians v. O.S.M.R.E.,*

104 F. Supp. 3d 1208, 1227 (D. Colo. 2015). "[U]nder NEPA, federal agencies must take a hard

look at the environmental impacts of a proposed action even if the action is compliant with other

laws and regulations." *Id.* at 1229. Here, NEPA requires that FHWA understand and disclose

how many will die or suffer lifelong diseases from pollution levels not prohibited by NAAQS.

This evidence must then be assessed to carefully weigh alternatives to seek ways of avoiding or

minimizing these public health consequences. FHWA has completely disregarded this awesome

responsibility.

That analytical tools cannot provide precise estimates of expected mortality and

morbidity is not grounds for shirking this statutory responsibility. "Reasonable forecasting and

speculation is thus implicit in NEPA, and [courts] must reject any attempt by agencies to shirk

their responsibilities under NEPA by labeling any and all discussion…as 'crystal ball inquiry.'"

*Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

"[D]egradation in air quality is indeed something that must be addressed in an EIS if it is

'reasonably foreseeable.'" *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d

520, 549 (8th Cir. 2003). "[W]hen the *nature* of the effect is reasonably foreseeable but its *extent*

is not, we think that the agency may not simply ignore the effect." *Id.* (emphasis in original).

Here, EPA's summary of health effects caused by highway pollutants leaves no ambiguity that the *nature* of the effect is supported by strong evidence and is not highly uncertain:

> •**"a causal relationship exists between short-term exposures to PM2.5 and mortality."**
> •**"a causal relationship exists between long-term exposures to PM2.5 and mortality."**
> •**"a causal relationship exists between short-term exposures to PM2.5 and cardiovascular effects."**
> •**"a causal relationship exists between long-term exposures to PM2.5 and cardiovascular effects."**[50]

Uncertainty is limited to the extent of public exposure for each alternative, not its nature. NEPA directs FHWA/CDOT to apply the best scientific tools available, such as EPA's MOVES emissions model, to estimate public exposure. 40 C.F.R. §1500.1 ("accurate scientific analysis is…critical"); §1502.24. The inability to predict exposure with precision does not authorize FHWA/CDOT to "completely ignore[] the effects" of project emissions on public health. *See id.* at 550. *Cf. Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1024 (9th Cir. 2003)(requiring consideration of health threats posed by diesel exhaust), *reversed on other grounds*, 124 S. Ct. 2204 (2004).

In *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 739 (9th Cir. 2001), consideration of degradation of air quality was required before allowing increased ship traffic in Glacier Bay, where the exact nature of future effects was uncertain, "when the proposed project may significantly degrade some human environmental factor, injunctive relief is appropriate." *Id.* at 737. Here, too, equitable relief is needed where degradation of human health is a

---

[50] *Integrated Science Assessment for Particulate Matter* (U.S. EPA, December 2009), at 2-10, 2-11, 2-12 (bold in original), Exhibit 30.

significant impact, but remains unevaluated, and FHWA/CDOT have not evaluated alternatives that could restore and enhance human health for those benefits.

### 2. FHWA/CDOT Failed to Satisfy the F-AHA's Substantive Requirements.

The F-AHA and its implementing regulations require a three-step evaluation of air quality impacts and mitigation measures to ensure that "final decisions on the project are made in the best overall public interest." 23 U.S.C. §109(h). FHWA must determine the "possible adverse economic, social and environmental effects relating to any proposed project;" determine "the costs of eliminating or minimizing such adverse effects and … (1) air…pollution;" and weigh "the costs of eliminating or minimizing such adverse effects" together with "the need for fast, safe and efficient transportation" to make a final decision on the project "in the best overall public interest." *Id.* FHWA's implementing regulations require that measures necessary to mitigate adverse effects be incorporated into the project. 23 C.F.R. §771.105(d).

The Project ROD asserts baldly "that possible adverse economic, social, and environmental effects related to the I-70 East Project were fully considered."[51] But the ROD fails to include consideration of the possible adverse effects on health and the mitigation needed to eliminate these effects.

Adverse impacts on public health is relevant to determining whether the Project is "in the best overall public interest." "Whatever else it may mean, however, we think the public interest indisputably includes the public health. There is perhaps a broader public consensus on that value, and also on its core meaning, than on any other likely component of the public interest." *Bahnzaf v. F.C.C.*, 405 F.2d 1082, 1097 (D.C. Cir. 1968).

---

[51] ROD, at EAR 0245-246.

The FEIS contains no consideration of the potentially severe adverse health effects of PM2.5, or the health consequences of increasing PM10 exposure to levels a fraction of 1 µg/m$^3$ shy of the NAAQS, not to speak of the social and economic costs of not eliminating or minimizing adverse health effects of these pollutants. This record is devoid of any explanation of how FHWA struck the balance between eliminating adverse health effects and the benefits of improved mobility. Without explaining its decision, the record is a void. "[T]he Court may not 'defer to a void.'" *Wildearth Guardians*, at 1219 (citation omitted).

F-AHA §109(h) calls for investigation of "*possible* adverse…environmental effects," including "air pollution." 23 U.S.C. § 109(h) (2004) (emphasis added). This analysis necessitates "the gathering and evaluation of evidence on potential pollution hazards." *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1242 (D.C. Cir. 1971). EPA's analysis of health effects linked to PM2.5 in its Integrated Science Assessment (finding that cardiovascular disease and mortality are caused by PM2.5) and its decision to make the NAAQS more protective and require near-road monitors to ensure NAAQS compliance near highways, provide "evidence on potential pollution hazards" relevant under §109(h). Pollution hazards are not restricted to certain pollutants. The Court rejected the contention "that certain hazards are, as a matter of law, immaterial to the Secretary's evaluation of a project's safety." *D.C. Fed'n*, 459 F.2d at 1242.

The EIS does not consider, or explain, how FHWA considered "the costs of eliminating or minimizing" the adverse effects of air pollution. Without such analysis, FHWA could not determine that the Project is "in the best overall public interest," nor could it incorporate "measures necessary to mitigate adverse impacts." 23 U.S.C. §109(h) (2004); 23 C.F.R. §771.105(d) (2004). A court may affirm an agency's decision only "on the grounds articulated by

the agency itself." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1565 (10th Cir. 1994). Where neither the FEIS nor the ROD articulate the grounds for the public interest determination, the determination has no legally sufficient basis in the record.

Courts "'set aside an agency action if … the agency has … ignored factors that must be taken into account under any [governing] source of law.'" *Cerrillo-Perez v. INS*, 809 F.2d 1419, 1422 (9th Cir. 1987) (quoting *A Rest. of Scope-of-Review Doctrine*, 38 Admin. L. Rev. 235, 235 (1986))(some alterations in original); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Environmental Defense Fund, Inc. v. EPA*, 898 F.2d 183, 188 (D.C. Cir. 1990) (agency decision remanded for failure to address statutory factors). FHWA/CDOT has not considered the relevant factors defined in the F-AHA.

> **E.      The Balance Of Hardships Favors Petitioners.**

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Post-*Amoco* cases have usually enjoined actions when environmental injury is likely. *See Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 737 (9th Cir. 2001).

When decisionmakers are not adequately informed of the consequences of their actions, an injunction is necessary to ensure NEPA is implemented. *Id.*, at 738 n. 18; *City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1143 (C.D. Cal. 1999) ("Although an injunction is not automatic whenever the court identifies a NEPA violation, the Ninth Circuit has recognized that an injunction is the appropriate remedy absent unusual circumstances."). Unusual circumstances

include interference with long-term contractual relationships or irreparable harm to the environment. *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 n. 11 (9th Cir. 1987) (*citing Amoco Prod. Co.*).  Neither of these circumstances is present here.

Federal funds are not yet obligated until FHWA and CDOT sign a project agreement. 23 U.S.C. §106(a). Construction contracts cannot be executed until a project agreement is signed. Funds expended to-date on rights-of-way do not tip this balance in favor of FHWA/CDOT. The government would now own property worth its fair market value. *Keith v. California Highway Comm'n*, 506 F.2d 696, 697-98 (9th Cir. 1974) (no loss from injunction since State acquired property having value equal to expenditures). Environmental harm outweighs the harm resulting from increased costs.  *City of South Pasadena*, 56 F. Supp. 2d at 1143-44 (environmental harm from possible increase in air pollution outweighs harm from traffic delays). *Puerto Rico Conservation Found. v. Larson*, 797 F. Supp. 1066, 1072-73 (D.P.R. 1992) (costs were self-induced where construction commenced during litigation); *Stop H-3 Ass'n v. Volpe*, 353 F. Supp. 14, 17 (1972) (enjoining highway despite delay costs).

Threats to public health tip the balance of hardship towards a stay. *Lopez v. Heckler*, 713 F.2d 1432, 1436-37 (9th Cir. 1983) (plaintiffs' physical suffering outweighs administrative cost injury). Cost harms weigh in favor of expediting appeal, not ignoring the agencies' statutory duties and allowing the project to proceed. *Lathan v. Brinegar*, 506 F.2d 677, 691 (9th Cir. 1974) (*en banc*).

### F.    Public Interest Favors a Stay.

Public interest factors support an injunction. The Tenth Circuit requires an injunction when significant impacts of a highway project are not considered under NEPA: "the public

interest associated with completion of the Project must yield to the obligation to construct the Project in compliance with the relevant environmental laws." *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002). "[F]oremost consideration must be given to any demonstrable danger to the public health." *Reserve Mining Co. v. United States*, 498 F.2d 1073, 1077 (8th Cir. 1974).

The public interest can tolerate temporary disruptions in construction that an injunction may cause, but residents who suffer increased asthma attacks, children who develop asthma—a lifetime condition—and adults who suffer heart attacks or die from pollution exposures during or following construction will suffer irreparable harm. The costs of delay pale in comparison to the public's right to a full, meaningful review of the Project's health effects.

## CONCLUSION

For the reasons set forth above, Petitioners respectfully request that the Court stay FHWA's ROD to protect the public health, preserve the *status quo*, and preserve the justiciability of Plaintiff's claims pending a decision on the merits.

Respectfully submitted,

  /s/Gregory N. Corbin     
ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC

1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

## CERTIFICATE OF COMPLIANCE WITH D.COLO.LCivR 7.1(a)

Pursuant to D.COLO.LCivR 7.1(a), undersigned counsel has conferred with counsel for FHWA, CDOT, and the in Civil Action No. 17-cv-01661-WYD (the "Zeppelin Plaintiffs") regarding the substance of this motion. FHWA and CDOT oppose the relief requested herein. Zeppelin Plaintiffs do not oppose.

 /s/ Gregory N. Corbin
 Gregory N. Corbin

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of November, 2017, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

/s/ Gregory N. Corbin
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202

jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Brent E. Butzin, Esq.
Assistant Attorney General
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Brent.butzin@coag.gov

*Attorneys for Defendant-Intervenors*

Melissa A. Hailey
Aaron D. Goldhamer
1290 Broadway, Suite 600
Denver, CO 80203
mah@keatingwagner.com
agoldhamer@keatingwagner.com

James Jay Tutchton
Tutchton Law Office
6439 East Maplewood Avenue
Centennial, CO 80111
jtutchtontlo@gmail.com

*Attorneys for Zeppelin Plaintiffs*