# APPENDIX

---

# Excerpts From The Agency Record

# Table of Contents

**Excerpts From the Draft Environmental Impact Statement**            EAR  0002

   Draft EIS-Public Comments                                         EAR  0003

   Comment 133 - Sturm School of Law                                EAR  0004

**Excerpts From the Supplemental Draft Environmental Impact Statement**   EAR  0006

   Supplemental Draft EIS Volume 1                                  EAR  0007

   Executive Summary                                                EAR  0008

   Section 3.7.3 Partial Cover Lowered Alternative                  EAR  0029

   Section 5.2.8 What are the current health conditions in the study area?   EAR  0038

   Section 5.10.4 What are the existing conditions for air quality?   EAR  0041

**Excerpts From the Final Environmental Impact Statement**            EAR  0047

   Final Environmental Impact Statement - Volume 1                  EAR  0048

   Section 5.10 Air Quality                                         EAR  0049

   Section 5.10.1 What are air quality concerns and why are they important to this project?   EAR  0051

   Section 5.18 Hazardous Materials                                 EAR  0056

   Section 5.18.7 How are the negative effects from the project alternatives mitigated for hazardous materials?   EAR  0057

   Section 5.20 Human Health Conditions                             EAR  0064

   Section 5.20.1 Why discuss human health conditions?              EAR  0065

   Section 5.20.2 How are project impacts, benefits, and mitigation measures related to human health evaluated in this document?   EAR  0064

   Section 5.20.3 What conclusions can be drawn about potential human health impacts?   EAR  0074

   Section 5.20.4 What additional studies were conducted by others on human health conditions within or near the study area?   EAR  0076

Section 5.20.5 What additional studies conducted by others on human health conditions outside of the study area were reviewed?                     EAR  0084

Final Environmental Impact Statement - Volume 2                     EAR  0087

Attachment J: Air Quality                     EAR  0088

Section 2 Resource Definition                     EAR  0090

Section 2.1 Criteria Pollutants                     EAR  0090

Section 2.2 Mobile Source Air Toxics                     EAR  0093

Section 2.3 Greenhouse Gases                     EAR  0094

Section 2.4 Construction Fugitive Dust                     EAR  0094

Section 5.2 Existing Conditions--Mobile Source Air Toxics                     EAR  0095

Section 5.2.1 Existing Conditions--Mobile Source Air Toxics                     EAR  0095

Section 5.2.1.1 Incomplete or Unavailable Information for Project-Specific MSAT Health Impacts Analysis                     EAR  0095

Section 5.2.2 Existing (2010) MSAT Emissions                     EAR  0097

Section 5.2.2.1 National MSAT Trends                     EAR  0097

Section 5.2.3 MSAT Research                     EAR  0099

Section 5.3 Existing Conditions--Greenhouse Gases                     EAR  0102

Section 7.3.1 Particulate matter                     EAR  0106

Section 7.3.2 Carbon monoxide                     EAR  0109

Section 7.4.9 Road dust emissions inventory                     EAR  0111

Section 7.4.10 Fugitive emissions during construction                     EAR  0111

Final Environmental Impact Statement - Volume 3 - Attachment Q                     EAR  0112

IMP6 - How will CDOT handle hazardous materials identified and/or encountered within the project area?                     EAR  0113

Comment - Mayor Michael B. Hancock                     EAR  0114

Comment - Mayor Michael B. Hancock - with Responses                     EAR  0116

Comment - City of Denver Auditor, Dennis Gallagher                     EAR  0176

Comment - Globeville, Elyria-Swansea Organizers Group Public Comment     EAR  0204

Comment - Sierra Club, Rocky Mountain Chapter and Joe Elliott     EAR  0221

**Excerpts From the Record of Decision**     EAR  0245

Record of Decision     EAR  0246

Section 1.4 Compliance with 23 USC 109(h)     EAR  0247

Section 2.2 Final EIS Preferred Alternative     EAR  0249

Section 2.2.1 Highway Cover     EAR  0253

Section 4.5 Central 70 Project Environmental Impacts     EAR  0255

Section 9.9 Air Quality - Updates to the Final EIS Analysis     EAR  0260

Record of Decision – Attachment Cl - Revised Elimination of 1-270/1-76 Reroute Alternative Technical Memorandum     EAR  0267

Record of Decision – Attachment C4 - Updates to Hazardous Materials Technical Report Addendum     EAR  0289

Record of Decision – Attachment C7 - Air Quality Conformity Technical Report     EAR  0293

Record of Decision – Attachment E – Comments on the Final EIS     EAR  310

Comment - Sierra Club     EAR  312

# Excerpts From The Draft Environmental Impact Statement

EAR 0001



# DEIS - Public Release Comments

| No. | DATE | Agency (as needed) | NAME | | Comments or questions about the DEIS (Please note that comments that included attachments are linked within this PDF). | Comment submitted via |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Last | First | | |
| Public Hearing Comments | | | | | | |
| 1 | 12/9/08 | | Brake | Tony | My name is Tony Brake and neighborhood is Sable El Toro (phonetic), we live on East Montview (phonetic) Boulevard. And we use I-70, obviously to go about anywhere we need to go. My immediate impression and actually it reinforces the thought that I've already put into this project as I've looked at it is that the cheapest is the best here and I don't know how other people feel about these high occupancy vehicle lanes but I see them not being used. I see them using resources that are paid for and they're not effectively being used. I don't know about the strings that the federal government has on these things where they require them to be built in order to get the federal contribution, that's something that needs to be considered. But, as far as from a practical standpoint, I do not see these toll lanes, if you will, as being effective, cost effective or productive. They just seem to take lanes away that never get used.

One of the main things I want to point out is that when you take a detour like that, realigning of the I-70, it introduces some bad curves in there folks. Whether they're gradualized or not, they're still curves and when the weather is bad, when we have ice and snow, it's a safety factor. It's a hazard. Anyway you look at it. And then it makes your commute, your drive to downtown from the east side or back and forth, etc., it makes it longer everyday. And it puts out more air pollution into the air. So every time you drive, every time we go to downtown or to wherever we're going, we're actually burning more fuel because we make that detour. So, I'm definitely against the realignment of I-70.

Historically it's been there, everybody counts on it being there, everybody who lives in the area. That area is depressed. On the north side it might even create some urban revitalization if we tore down some of that junk. As long as we give the people their honest value when we go in and condemn their properties, if we give them what it's worth, then I think they'll probably be good with it. So clearly --

I've got one minute left, thank you. So I think you're getting my drift of what I'd like to see. It's much cheaper, it's the cheapest alternative that we've seen up here. Leave the alignment the same. Do not put in any lanes that everyone cannot use. Lanes that everybody can use. Forget the nonsense about having these empty lanes that nobody's using. Use them all and keep the alignment the same. Move the thing to the north so that you're not tearing out all of those expensive businesses and you're done. We can't afford anything else. Look at the economy. Thank you, you're beautiful. | Public Hearing via transcript |
| | 12/9/08 | | Circle | Kent | My name is Kenton Circle and I'm here just because of curiosity. My neighborhood is Aurora. I live in southeast Aurora, however, I did work about 20 years in the neighborhood of I-70 and Vasquez and I worked there while the re-did the deck of the elevated portion. And it seems to me that I-70 needs to get out of there.

Now, I know that's different from this gentleman that just spoke but you've got some considerations here. I think there ought to be a strong consideration of keeping the National Western where it is. But allowing them for expansion to do what they want to do. They're talking about moving because they don't have enough room, they don't have -- they have to shorten their activities in order to keep it with the time and so on. I think that strong consideration ought to be in the National Western, allow them to expand. Also I think, need to get I-70 away from Purina. | Public Hearing via |

| No. | DATE | Agency (as needed) | NAME | | Comments or questions about the DEIS (Please note that comments that included attachments are linked within this PDF). | Comment submitted via |
|---|---|---|---|---|---|---|
| | | | Last | First | | |
| 132 | 3/31/09 | Colorado Preservation Inc. | Daniels | Jane | Colorado Preservation, Inc. was founded in 1984 as a statewide organization dedicated to promoting and advancing historic preservation in the State of Colorado.  After our first year we were incorporated as a 501(c) (3) non-profit organization.  One of our missions is to help enrich and support all communities in the state, with much of our work as preservation advocates for communities that would otherwise be forgotten. This mission as well as many others has gained us the respect and recognition from many different constitutes across the state and nationally.

Colorado Preservation, Inc. is a consulting party for compliance with Section 106 of the National Historic Preservation Act.  We understand that while earlier plans called for use of the NEPA substitution process (allowed in 36 C.F.R. § 800.8(c)) for compliance with Section 106, the processes have now been separated.  Therefore, we will reserve additional comments about the Section 106 process until a later date when consultation resumes.


Furthermore, CPI believes that Alternatives 4 and 6 (east or west) are less impactful to historic resources, particularly to the neighborhoods immediately to the north of I-70, including portions of Elyria-Swansea and Northeast Park Hill.  The DEIS describes between 11 and 14 historic properties that would be adversely effected as compared to up to 34 adverse effects from the widening alternatives, 1 and 3.  In addition, removing the existing viaduct and returning 48th Avenue to a surface street appears to have positive effects on the adjacent historic neighborhoods by restoring connectivity, removing a major visual barrier and reducing noise.

Of course, there are still significant effects on historic properties under Alternatives 4 and 6.  Of particular note are the effects on the National Western Complex Historic District Livestock Bridge/Flyover and the Stadium Arena.


While we expect that these and any other effects would be resolved during the Section 106 process, we also suggest that modifications to the precise alignment of Alternatives 4 and 6 could be made to avoid or minimize the impacts on these and other historic resources and encourage CDOT to investigate possible refinements, should Alternatives 4 or 6 be determined as the preferred alternative.

We appreciate your consideration of our comments and look forward to continuing our role as a Section 106 consulting party as the process moves ahead.

Sincerely,

Jane Daniels
Project Manager | letter sent via Contact Us |
| | | | | | Project Team note:
Katie Johnston, Sarah April, Sean Cumberlege, Professor Michael Harris, and Professor Craig Pease submitted a 36 page letter/report with comments to the DEIS. The Summary of Comments section is included here and the letter is attached for reference. (see attachment)
• The original implementation of I-70 deeply impacted the make-up, health, and character of the neighboring communities.  While the current DEIS acknowledges the past impacts of I-70 on the neighborhoods of Globeville, Swansea and Elyria, it provides no discussion on how realignment of the highway will further impact these neighborhoods.
• The current DEIS analysis of highway alternatives is inadequate because it lacks sufficient analysis of social cohesion and health issues that clearly impact neighboring communities. | |

EAR  0003

| No. | DATE | Agency (as needed) | NAME | | Comments or questions about the DEIS (Please note that comments that included attachments are linked within this PDF). | Comment submitted via |
|-----|------|------|------|------|------|------|
| | | | Last | First | | |
| 133 | 3/31/2009 | University of Denver | Harris | Michael | o The DEIS lacks an adequate assessment of neighborhood cohesion issues for each alternative, including the direct and indirect impacts each proposed alternative would have on social cohesion issues in the area. <br><br> o Additionally, DEIS lacks an adequate analysis of the direct, indirect, and cumulative impacts on air quality, especially as it relates to the health of those living immediately adjacent (< 400 m) to the highway. <br><br> In light of the availability of both data detailing the negative health impacts of DPM, and scientific modeling tools, the I-70 expansion needs to include a quantitative analysis of the public health risks that DPM from this project poses. <br><br> The DEIS impacts analysis fails to acknowledge or address the DPM hotspots that are well known to exist around interstate highways.  These Hot spots are thus a reasonably foreseeable result of the expanded I-70 highways (and increased traffic).  As such, the agency is under a duty to provide the public with information about them, and to fully evaluate them in the DEIS. <br><br> Before the EIS is finalized, the agency must quantify the increased incidence of asthma, heart disease and cancer in those who will live, work and recreate immediately adjacent (< 400m) to the various proposed alternatives, as a result of being exposed to elevated levels of air pollutants from vehicles on I-70 East. <br><br> The DEIS impacts analysis is insufficient because it fails to adequately take into account the cumulative effects of the proposed highway project <br><br> • The area is highly populated with children, highly exposed to existing industrial development, and some neighborhoods exist at the confluence of both I-70, I-25, as well as rail-yards. <br><br> • A more comprehensive assessment of the cumulative health impacts in many of the neighborhoods is clearly warranted to give a better understanding of the health risk each alternative poses to the local communities. <br><br> o The DEIS is also inadequate because it fails to provide alternatives and/or mitigation measures that would address both the community cohesion concerns and the impact the highway has on public health in the surrounding area.  Such mitigation could include, but not be limited to: use of below grade construction (like the I-25 corridor in south Denver); the use of tunnels, parkway type construction; to include open space, greenways, bike and pedestrian paths; increased local road over-passes; and making the structure more aesthetically pleasing. <br><br> o The stated purpose and need of the project is too narrow in scope, as it failed to take into account the needs of the surrounding communities, and resulted in an inadequate alternatives screening process.  To fully evaluate the impacts of the I-70 East Project, and to address the impact on the communities of Globeville, Elyria, and Swansea, continued planning of the project should be done in coordination with the City of Denver and the affected community-based organizations, and should be done in conjunction with ongoing neighborhood planning efforts. <br><br> o The Section 4(f) Analysis is insufficient because it fails to justify that there are no prudent and feasible alternatives to using 4(f) land and also failed to identify the least harmful alternatives. | letter submitted via contact us and hand delivered to CDOT |

# Excerpts From The Supplemental Draft Environmental Impact Statement



# I-70 EAST

## SUPPLEMENTAL DRAFT ENVIRONMENTAL IMPACT STATEMENT AND SECTION 4(F) EVALUATION

AUGUST 2014

**VOLUME 1 OF 3**

EAR_0006

I-70EAST.COM

# Executive Summary

*The Executive Summary of the Supplemental Draft Environmental Impact Statement (EIS) provides an overview of the project, including the project purpose and need, project description, evaluated alternatives, project benefits, and major findings. The Executive Summary does not include a detailed analysis since it is presented in the document and the technical reports. For details on the information provided in this Executive Summary, refer to the corresponding chapter.*

## ES.1    What is the I-70 East EIS project and where is it located?

The I-70 East EIS is a joint effort between the Federal Highway Administration (FHWA) and the Colorado Department of Transportation (CDOT). This EIS identifies potential highway improvements along I-70 in the Denver metropolitan area between I-25 and Tower Road and assesses their potential effects on the human and natural environment. The National Environmental Policy Act of 1969 (NEPA) requires projects that have a federal nexus and may have an impact on the environment to be analyzed through a rigorous process that allows the public to understand and comment on the benefits and impacts of the project.

As shown in Exhibit ES-1, the project limits extend along I-70 between I-25 and Tower Road. The project area covers neighborhoods within Denver, Commerce City, and Aurora. However, the Supplemental Draft EIS mostly focuses on the neighborhoods of Globeville, Elyria and Swansea, Northeast Park Hill, Stapleton, Montbello, Gateway, and a portion of Aurora.

Each resource has a specific study area that is discussed in Chapter 5, Affected Environment, Environmental Consequences, and Mitigation.

**What is a federal nexus?**

Under federal law, NEPA applies to any proposed action or transportation project that has a federal nexus, including, but not limited to, instances where:

- Federal funds are involved
- Federal permits or approvals are required
- New or revised access to the interstate system is included

**Logical termini**

Using NEPA terminology, project limits are the same as logical termini. Logical termini for project development are defined as rational end points for both a transportation improvement and a review of the environmental impacts.

EAR  0007

**Exhibit ES-1.    I-70 East project limits**



## ES.2    What is the background of the I-70 East EIS project?

The I-70 East project began in 2003 as part of the I-70 East Corridor EIS, which was a combination of highway and transit improvements. In 2006, the transit and highway components of the project were separated because it was determined that they addressed different corridors, travel markets, and funding sources. The Regional Transportation District (RTD) and the Federal Transit Administration (FTA) completed the EIS for the transit elements (East Corridor EIS) in 2009. Completion of construction on the transit line is anticipated in 2016.

The *I-70 East Draft Environmental Impact Statement* and the *Section 4(f) Evaluation* for highway improvements were published in 2008. None of the alternatives analyzed in the 2008 Draft EIS received overwhelming support from the public and stakeholders because of associated impacts to the built, natural, and social environment.

Because of the lack of support, CDOT and FHWA decided not to identify a preferred alternative at that time and initiated a rigorous collaboration process to recommend a preferred alternative. This collaboration process, subsequently named the

EAR  0008

Preferred Alternative Collaborative Team (PACT), consisted of federal, state, and local agencies; advocacy groups; and stakeholders, including neighborhood representatives from Adams County, Aurora, Commerce City, and Denver.

After approximately one year of collaboration and additional analysis, the PACT members were not able to reach consensus on a preferred alternative. Consequently, CDOT and FHWA decided to review prior decisions in the process, including the previously eliminated alternatives. As a result, a new alternative was developed that addressed the public and stakeholder concerns while satisfying the project's purpose and need.

### ES.2.1    What is the purpose of the Supplemental Draft EIS?

In accordance with NEPA regulations, a Supplemental Draft EIS for I-70 East was prepared to address the substantial changes in the proposed alternatives, along with any new or revised regulations since the release of the 2008 Draft EIS for environmental resources required to ensure compliance.

This document only includes changes and updates to the Draft EIS published in 2008, such as revised analysis and modifications to the project area and the project alternatives. It does not repeat any of the valid analysis and actions performed previously.

### ES.3    What is the project's purpose and need?

Currently, I-70 between I-25 and Tower Road is one of the most heavily traveled and congested highway corridors, both in the region and in the state. The corridor provides a number of important transportation functions, including interstate and intrastate travel along I-70; regional access from downtown Denver and the metropolitan area to Denver International Airport (DIA); linkage as an inner beltway between I-225 and I-270; and access to adjacent employment areas, neighborhoods, and new development centers. Using input from scoping, data gathering, and technical analysis, the project purpose and need was developed as part of the 2008 Draft EIS process. The project purpose has not changed since the 2008 Draft EIS, although some of the data used to describe why the project is needed have been updated.

The purpose of the I-70 East EIS project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area.

The need for this project results from the following issues:

**NEPA Regulations for Supplemental Draft EIS**

According to NEPA, an agency must prepare a Supplemental Draft EIS when one of the following occurs:

- The agency makes substantial changes in the proposed action that are relevant to environmental concerns

- There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 Code of Federal Regulations [CFR] §1502.9[c][1])

EAR  0009

- **Transportation infrastructure deficiencies**

  I-70 was constructed in the early 1960s with bridge and drainage structures designed to last for 30 years. Nine structures on the corridor are now past their anticipated life spans and are classified as either structurally deficient or functionally obsolete. This means they are in need of replacement, rehabilitation, or repair.

- **Increased transportation demand**

  The project area is experiencing rapid growth and development. This includes areas of new development and redevelopment, with substantial residential populations and business activity. Population growth estimates show a 41 percent increase and employment is expected to increase 59 percent from 2010 to 2035. The land use and development trends within the corridor will result in additional demands on the transportation system. Providing access and maximizing travel to, through, and within the corridor are critical to maintaining the economy. This includes maintaining and enhancing connections between major activity centers near the corridor.

- **Limited transportation capacity**

  I-70 serves a growing number of users, ranging from commuters and tourists from outlying areas and DIA to regional trucking and local traffic. The demand from these users is exceeding the current design capacity of I-70 and associated interchanges.

**What qualifies a bridge as "structurally deficient"?**

Federal guidelines classify bridges as "structurally deficient" if the components are rated at poor or worse on inspection. This means that engineers have identified a major defect in the bridge's support structure or deck. If a bridge is rated "structurally deficient," the bridge needs substantial maintenance or rehabilitation, or it needs to be replaced.

**When is a bridge "functionally obsolete"?**

A bridge is functionally obsolete when it cannot properly accommodate traffic due to poor roadway alignment or out-of-date design standards.



*Falling pieces of concrete show a structurally deficient viaduct. The photo was taken on 46th Avenue under the viaduct.*

EAR  0010

Within the project area, I-70 carries between 47,000 and 205,000 vehicles per day (average daily traffic), depending on the location along the corridor. Forecasts for the year 2035 show that traffic volume on I-70 will increase substantially. The forecast ranges from 117,000 to 285,000 vehicles per day depending on the location in the corridor. This increase in traffic will result in more hours of congestion, longer delays, and increased potential for crashes.

- **Safety concerns**

  Based on CDOT's safety evaluation conducted in 2013, some sections of I-70 have higher-than-average crash rates. Higher-than-average crash rates often can be attributed to roadway conditions that do not meet current design standards. Crashes on I-70 cause unpredictable and unavoidable traffic congestion, which adds to or worsens the already existing congestion from travel demand that exceeds the normal roadway capacity. The unpredictable nature of traffic congestion on I-70 increases safety concerns for freight carriers, employers, manufacturers, and business interests in the region, as well as commuters and residents who depend on reliability for their daily travel.

These issues are discussed in more detail in Chapter 2, Purpose and Need.

## ES.4    Which alternatives are analyzed in this Supplemental Draft EIS?

Based on the outcome of the 2008 Draft EIS comments, PACT process, and additional outreach, the Current Alignment Alternative (2008 Draft EIS Alternatives 1 and 3) was revised to reduce impacts, the Realignment Alternatives were eliminated from further consideration, and a new alternative (the Partial Cover Lowered Alternative) was developed (see Exhibit ES-2). The No-Action Alternative also was adjusted to be consistent with the criteria used to design new and updated Build Alternatives and options.

EAR  0011

**Exhibit ES-2.    Alternatives evolution since 2008 Draft EIS**



This document fully evaluates the No-Action, Revised Viaduct, and Partial Cover Lowered Alternatives with several design options. These alternatives and their associated options are discussed briefly in the following subsections and are summarized with their key features in Exhibit ES-3.

**Exhibit ES-3.    Summary of project alternatives and options**

| Alternative | | Expansion Options | Connectivity Options | Operational Options |
|---|---|---|---|---|
| No-Action | | • North<br>• South | N/A | N/A |
| **Build Alternatives** | Revised Viaduct | • North<br>• South | N/A | • General-Purpose Lanes<br>• Managed Lanes |
| | Partial Cover Lowered | N/A | • Basic<br>• Modified | • General-Purpose Lanes<br>• Managed Lanes |

### ES.4.1    No-Action Alternative

The No-Action Alternative includes planned and programmed roadway and transit improvements in the project area and the replacement of the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard without adding capacity.

Due to the age and deteriorating condition of the viaduct, replacing it is necessary to maintain the safety and operation of I-70. The width of the structure also will be increased to meet current highway standards. However, the No-Action Alternative does not add additional lanes to the existing highway configuration. Instead, reconstruction of the existing viaduct with the No-Action Alternative includes two Expansion Options,

**What is a viaduct?**

A viaduct is a long, elevated roadway consisting of a series of shorter bridge spans supported on arches, piers, or columns.

North and South. Each option, respectively, widens the highway to the north or to the south. Both options require additional right-of-way acquisition to maintain the traffic flow on I-70 during construction.

### ES.4.2   Build Alternatives

The Build Alternatives add capacity to I-70 between I-25 and Tower Road by widening I-70 from Brighton Boulevard to Tower Road to accommodate additional lanes and by restriping from I-25 to Brighton Boulevard.

To address safety issues associated with the aging viaduct between Brighton Boulevard and Colorado Boulevard, the Build Alternatives replace the existing viaduct or remove it completely. The Build Alternatives will reconstruct bridges and interchanges affected by the widening improvements between Brighton Boulevard and Tower Road. The Central Park Boulevard, I-70 bridge over Sand Creek, I-225, I-270, Chambers Road, Airport Road, and Tower Road interchanges will remain and be modified as needed.

Safety concerns caused by deficient geometrics will necessitate elimination of the York Street interchange. Additionally, access at Steele Street/Vasquez Boulevard and Colorado Boulevard will be provided through a split diamond interchange (eastbound off ramp and westbound on ramp at Steele Street/Vasquez Boulevard and eastbound on ramp and westbound off ramp at Colorado Boulevard).

There are two Build Alternatives proposed for improvements between Brighton Boulevard and Colorado Boulevard: the Revised Viaduct Alternative and the Partial Cover Lowered Alternative. The Revised Viaduct Alternative includes Expansion Options that shift the highway to the north or to the south. The Partial Cover Lowered Alternative includes Connectivity Options, Basic and Modified, between Brighton Boulevard and Colorado Boulevard, which are explained later in this section.

The Build Alternatives also offer the chance to consider Operational Options to manage the added capacity of the highway. This is important for better mobility and reliability between I-25 and Tower Road. The General-Purpose Lanes Option will allow all vehicles to use all the lanes on the highway, while the Managed Lanes Option implements operational strategies using tolls or vehicle occupancy restrictions.

The Managed Lanes Option allows for a reliable travel-time option for the users of the managed lanes because vehicles can

EAR  0013

travel at higher speeds than in the adjacent general-purpose lanes.

**Revised Viaduct Alternative**

The Revised Viaduct Alternative replaces the viaduct between Brighton Boulevard and Colorado Boulevard. The Revised Viaduct Alternative, North Option expands the north edge of the highway up to 160 feet north from the existing highway edge in some areas. The Revised Viaduct Alternative, South Option extends the south edge of the highway up to 140 feet south of the existing highway edge. Local east-west access is available along 46th Avenue, a four-lane road located underneath the south side of I-70.

**Partial Cover Lowered Alternative**

The Partial Cover Lowered Alternative removes the viaduct between Brighton Boulevard and Colorado Boulevard and reconstructs I-70 below the existing ground level. The location of 46th Avenue will be adjacent to I-70. The Partial Cover Lowered Alternative includes two Connectivity Options: Basic and Modified. With the Basic Option, a highway cover is designed over I-70 between Clayton Street and Columbine Street, adjacent to Swansea Elementary School. Urban landscape is proposed on the cover, with the potential to include playgrounds, plazas, outdoor classrooms, and community gardens. The Modified Option includes a second cover between St. Paul Street and Cook Street to create a potential for redevelopment in that vicinity. To accommodate the second cover, highway access at Steele Street/Vasquez Boulevard is moved to Colorado Boulevard. These options are discussed in more detail in Chapter 3, Summary of Project Alternatives.

Design variations for the Basic and Modified Options are considered in this document, but not fully evaluated and remain as unresolved issues. The variations under consideration relate to the following elements:

- Access to I-70 at Steele Street/Vasquez Boulevard

- Highway cover

- Frontage roads

- North-south connectivity

Additional analysis will be performed prior to completion of the Final EIS. The Partial Cover Lowered Alternative could include some or none of these variations.

EAR  0014

## ES.5 What is the project's preliminarily identified Preferred Alternative and why?

FHWA and CDOT have preliminarily identified the Partial Cover Lowered Alternative with Managed Lanes Option as the Preferred Alternative for I-70 East. This alternative and associated option is the preliminarily identified Preferred Alternative because it meets the project purpose and need, best addresses community concerns, has the most community and agency support, and—with the proposed mitigations—appears to cause the least overall impact.

FHWA and CDOT will consider feedback provided during the Supplemental Draft EIS public review process before identifying the Preferred Alternative in the Final EIS. The two Connectivity Options (Basic and Modified) for the Partial Cover Lowered Alternative are being evaluated in more detail, and the selected Preferred Alternative may include elements of the Basic and/or Modified Options.

The recommended Preferred Alternative is evaluated fully in this document, along with the other reasonable alternatives, and is compared to the No-Action Alternative.

## ES.6 What are the project's transportation impacts?

Based on the population and employment projections for 2035, access to activity centers, residential areas, and employment will become more difficult without improvements. The benefit of increased connectivity and mobility will be most important for people who use I-70 regularly.

Consistent with federal regulations, this document fully evaluates potential effects to the transportation facilities that might result from a No-Action Alternative and the Build Alternatives.

Exhibit ES-4 displays the I-70 peak-period traffic volumes and Exhibit ES-5 shows the average daily traffic on I-70 for the Supplemental Draft EIS alternatives forecasted for 2035. The data for the Managed Lanes Option represents the total volume included in all lanes of I-70 (general-purpose lanes plus managed lanes). In general, due to the added capacity, daily traffic volumes on I-70 will increase between 30 percent and 50 percent for the Build Alternatives compared to the No-Action Alternative. The peak-period volumes display similar growth trends as the daily volumes. Overall, both of the Build Alternatives have similar volumes throughout the day.

EAR 0015

**Exhibit ES-4.    2035 Peak period traffic on I-70**



AM peak period = 6:00 a.m. to 11:00 a.m.; PM peak period = 2:00 p.m. to 8:00 p.m.



*Source: 2035 DynusT models*

**Exhibit ES-5.   2035 Average daily traffic on I-70**



*Source: 2035 DynusT models*

Evaluation of the impacts of the No-Action Alternative and the Build Alternatives on mobility and access needs of the study area has considered:

- The effectiveness of the improvements on traffic operations and safety on I-70

- The impact to access and circulation needs on the local streets in the vicinity of I-70

- The impact on the other transportation facilities in the study area (transit, freight, and bicycle/pedestrian)

Generally, either of the Build Alternatives will improve I-70 operations compared to the No-Action Alternative, due to the proposed roadway improvements, including the addition of new lanes, improvement to ramps, addition of auxiliary lanes, and modification of interchanges to facilitate traffic movements. Implementation of managed lanes will provide additional benefits to the operation of I-70 as a whole, will preserve capacity on I-70 into the future, and will provide reliable travel times for users of the managed lanes. The general-purpose lanes will operate slightly less efficiently than the managed lanes.

The removal of the York Street interchange in both Build Alternatives and changes to the Steele Street/Vasquez Boulevard and Colorado Boulevard interchanges also will have impacts on circulation. These changes might cause an increase in traffic on some of the local streets and reduce traffic on other streets.

Freight service within and through the study area via rail will be unaffected, as none of the existing rail lines will be severed by I-70 improvements. Through-truck freight movements will be improved by the added capacity and improved safety of both Build Alternatives. Local truck traffic along surface streets will increase slightly due to changes in interchanges at York Street, Steele Street/Vasquez Boulevard, and Colorado Boulevard.

Neither of the Build Alternatives will adversely affect any of the existing or planned transit or bicycle/pedestrian facilities in the study area. Both of the Build Alternatives provide for improved pedestrian/bicycle facilities through the construction of sidewalks, accessible features such as ramps at intersections, and the addition of the cover(s) over I-70 in the Partial Cover Lowered Alternative. Access to the managed lanes will improve some of the operations and reliability of bus transit along I-70, especially the express routes.

EAR  0018

## ES.7    What resources are evaluated for impacts and benefits in the project area?

Detailed studies were conducted to determine the effects of the project alternatives on the following built, natural, and social environmental resources:

- Social and economic conditions
- Environmental justice
- Land use
- Relocations and displacements
- Historic preservation
- Paleontological resources
- Visual resources and aesthetic qualities
- Parks and recreation
- Air quality
- Energy
- Noise

- Biological resources
- Floodplains and drainage/hydrology
- Wetlands and other waters of the U.S.
- Water quality
- Geology and soils
- Hazardous materials
- Utilities
- Irreversible and irretrievable commitment of resources
- Short-term use and long-term productivity

The project alternatives and design options benefit or impact each environmental resource differently. For example, while all the design options for the Build Alternatives improve transportation conditions, individual design options impact more properties than others or benefit visual resources more than others.

### ES.7.1    What types of environmental impacts are causing the greatest concern?

Of the environmental resources listed above, those shown to be of greatest concern to the public and stakeholders include social and economic conditions, environmental justice, relocations and displacements, historic preservation, visual resources and aesthetic qualities, parks and recreation, air quality, noise, and hazardous materials. The following subsections summarize impacts to these resources.

Chapter 5, Affected Environment, Environmental Consequences, and Mitigation, discusses in more detail the existing conditions in the corridor; effects of the project alternatives on the various

EAR 0019

social, environmental, and economic resources; and mitigation strategies.

### How will social and economic conditions be affected?

All alternatives affect the local economies and social conditions of the area. Many social and economic effects relate to property acquisition that results in the relocation of residential units and businesses serving either the local neighborhood or regional interests. Property acquisition also reduces property tax revenue for local taxing authorities.

In general, the improved mobility on I-70 from the Build Alternatives will bolster the economic and social success of developing urban centers in the Stapleton and Gateway Neighborhoods, as well as redevelopment opportunities in existing neighborhoods, such as the Elyria and Swansea Neighborhood. This is in contrast to the No-Action Alternative, which will not add capacity and, therefore, does not have the beneficial effect of improved travel time on I-70.

A variety of mitigation measures, such as providing additional relocation assistance and maintaining connectivity throughout construction, are available for potential impacts to social and economic resources. Mitigation measures will continue to be developed throughout the public comment and review period.

### How will low-income and minority populations (environmental justice considerations) be impacted?

The majority of the neighborhoods along the project corridor have notable concentrations of minority and low-income populations. The total population of the study area is 48.0 percent Hispanic or Latino and 23.0 percent Black or African American. The total low-income population of the study area is 22.8 percent. These percentages are considerably higher than the Denver and Adams Counties averages.

Without mitigation, the construction of the project alternatives has disproportionately high and adverse impacts that are predominantly borne by the low-income or minority populations of the Elyria and Swansea Neighborhood because all of the residences and most of the businesses impacted by the project are located within this neighborhood. When all the mitigation measures are implemented and benefits realized with the Build Alternatives, there will be no disproportionately high and adverse impacts to the low-income and minority populations. Since no mitigation measures have been identified for the No-Action Alternative other than the relocation-related benefits, the

EAR 0020

impacts from the No-Action Alternative remain disproportionately high and adverse.

## What type of relocations will be required?

Property acquisition is an important element in all of the project alternatives because additional right of way is required for each of them. In the case of occupied buildings, it is necessary to "relocate" or "displace" individuals from those properties (residential, business, or non-profit) to a replacement site.

The total number of residential relocations estimated for each alternative ranges from 13 residences (No-Action Alternative, South Option) to 53 residences (Partial Cover Lowered Alternative, Basic Option). More than half of the residential relocations are tenant occupied instead of owner occupied. All of the residential relocations are located in the Elyria and Swansea Neighborhood. Current market conditions indicate that an adequate supply of decent, safe, and sanitary replacement housing is available to support the residential displacements that result from any of the project alternatives.

The project alternatives will relocate between five (No-Action Alternative, North Option) and 24 businesses (Revised Viaduct Alternative, South Option). All of the alternatives and options—except the No-Action Alternative, South Option—require the relocation of the Ministry Outreach Center, which is part of the Denver Rescue Mission, a 501(c)3 non-profit organization.

All eligible persons will be provided with relocation benefits regardless of race, color, religion, sex, or national origin. Benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act)—to which each eligible owner or tenant may be entitled—will be determined on an individual basis and explained to them in detail by an assigned right-of-way specialist (CDOT, 2011b).

## How will historic properties be affected?

Historic properties include several nationally significant locations, including the National Western Historic District, the Alfred R. Wessel Historic District, and the Nestlé Purina PetCare Company building. A survey determined that 126 resources within the Area of Potential Effect (APE) are either officially eligible for listing in the National Register of Historic Places (NRHP) as individual properties, are supporting segments of eligible linear resources, or are contributing properties of historic districts within the APE.

EAR 0021

Potential adverse effects to historic properties include direct or indirect alteration of any characteristics of a historic property that qualify the property for inclusion in the NRHP in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. The No-Action Alternative adversely affects from one to seven historic resources, while the Revised Viaduct Alternative adversely affects seven to eight historic resources and the Partial Cover Lowered Alternative adversely affects 12 historic resources. CDOT will discuss potential mitigation projects with the Colorado State Historic Preservation Office (SHPO) and consulting parties as part of the Final EIS and Section 106 Programmatic Agreement or Memorandum of Agreement processes to mitigate adverse effects. At a minimum, Level II archival documentation will be provided.

### How will visual resources and aesthetic qualities be affected?

Effects to visual resources caused by the project alternatives focus on the changes to the aesthetic quality of the area. The greatest visual impacts occur from Brighton Boulevard to Colorado Boulevard. The No-Action Alternative will not change the overall visual character of the corridor or project area.

Views of the highway are a big concern for the local residential communities. The greatest impacts of the project alternatives occur where a physical widening of the highway results in acquisition of homes within the established neighborhoods.

The new facility will improve the overall character and quality of this area under all the alternatives. The No-Action and Revised Viaduct Alternatives improve the visual quality by replacing the old viaduct with a new structure. The Partial Cover Lowered Alternative improves the visual quality more than the other alternatives, since it introduces public space to the area and reduces the viaduct's visual domination.



*Bird's-eye view simulation of Partial Cover Lowered Alternative, looking west from Fillmore Street (Basic Option)*

Although the Partial Cover Lowered Alternative increases the highway surface similar to the Revised Viaduct Alternative, it does not increase the highway visible mass because a large portion of the highway in this area is below ground level. With

EAR 0022

the Partial Cover Lowered Alternative, the area becomes less visually dominated by the highway.

**How will parks and recreation resources be affected?**

Parks and recreational areas in the study area include various existing and proposed resources, including: parks, recreation centers, golf courses, open space/nature areas, a multi-use special events center, regional trails/greenways, and school playgrounds/ball fields. The South Platte River Greenway Trail, Globeville Landing Park, Swansea Elementary School playground, and Sand Creek Greenway Trail each will be affected by one or more of the project alternatives.

All of the alternatives will require an easement over the South Platte River Greenway Trail for a storm drain on the north side of I-70. The trail will remain open during construction via a detour route and be returned to its pre-construction condition.

The Partial Cover Lowered Alternative requires a permanent easement across Globeville Landing Park to facilitate storm drain pipe construction and permanently converts approximately 0.06 acre of the park into a spillway. Conversion of the park would be mitigated in-kind, and temporary disturbance within the 52-foot easement would be returned to pre-construction conditions.

The No-Action Alternative, North Option requires 0.16 acre of right-of-way acquisition from the Swansea Elementary School playground, compared to 0.53 acre under the Revised Viaduct Alternative, North Option, and 0.52 acre to 0.88 acre under the Partial Cover Lowered Alternative. An additional 0.23 acre buffer is also required for these alternatives to maintain a safe environment for children. The South Option of the No-Action and Revised Viaduct Alternatives will avoid the school.

Lastly, the Build Alternatives require minor realignment of the Sand Creek Greenway Trail to facilitate eastbound ramp bridge construction at Quebec Street.

Mitigation measures will be implemented during and immediately following construction of the alternatives to avoid and minimize long-term effects to the Swansea Elementary School playground, Globeville Landing Park, Sand Creek Greenway Trail, and South Platte River Greenway Trail. For example, the redesign of the school property for the Partial Cover Lowered Alternative, Modified Option will increase the school playground from 1.4 acres to up to 2.9 acres and provide a safe recreation area.

EAR  0023

## How will air quality be affected?

The I-70 East project will be a very significant congestion-reducing transportation improvement for the Denver region. As big as it is, however, the project's vehicular travel and associated emissions are relatively small in comparison to those of the greater Denver region. The project's vehicle miles of travel (VMT) ranges from 10.3 percent to 10.7 percent of the regional VMT, depending on the alternative. The Build Alternatives have between 1.2 percent and 4.3 percent higher VMT than the No-Action Alternative. However, these increases only amount to between 0.1 percent and 0.4 percent of regional on-road mobile emissions. Since the No-Action Alternative is consistent with the most recent conformity analysis for the regional transportation plan, it does not increase regional on-road mobile source emissions.

Specific analyses for carbon monoxide, volatile organic compounds, and nitrogen oxides were conducted and analyses show that the No-Action and Build Alternatives meet the National Ambient Air Quality Standards (NAAQS) and Statewide Improvement Plan budget.

The results of the hotspot analysis for particulate matter up to 10 micrometers in size ($PM_{10}$) demonstrates that the No-Action Alternative and the Partial Cover Lowered Alternative (with Basic and Managed Lanes Options) will be in compliance with the applicable NAAQS standard for $PM_{10}$ at the I-25 hotspot location. All calculated design values are less than or equal to the $PM_{10}$ NAAQS of 150 µg/m³ at I-225 and I-70. The other alternatives examined in this analysis, if implemented, would exceed the NAAQS standard for $PM_{10}$ at the I-25 hotspot location.

## How will noise levels be affected?

Noise levels vary between A-weighted decibels (dBA) in the high 50s to low 70s depending on how close the noise receptor is to the highway. CDOT considers a noise impact to occur when the loudest hour of noise is at or above 66 dBA (for residential dwelling units) or when there is an increase of 10 dBA or more affecting a noise receptor. Noise levels above the loudest hour, as well as substantial noise increases above 10 dBA, are expected without the construction of noise walls. The Partial Cover Lowered Alternative impacts 234 to 257 fewer dwelling units than the Revised Viaduct Alternative because of the lowered profile of the highway. To alleviate noise impacts, noise walls are recommended for all alternatives in the Elyria and Swansea Neighborhood and for the Build Alternatives in the Montbello Neighborhood.

EAR  0024

**How will hazardous materials sites be affected?**

Construction of the proposed alternatives will likely affect sites contaminated by hazardous materials. Construction activities associated with the alternatives have the potential to release hazardous materials at these sites into soil or groundwater, or lead to hazardous materials exposure of workers or the public if proper health, safety, and remediation efforts are not applied.

The No-Action Alternative will potentially affect seven hazardous material sites and disturb approximately 41 acres of land assumed to be contaminated. The Build Alternatives have the potential to affect 21 to 26 hazardous material sites and disturb 575 to 616 acres of land assumed to be contaminated. Compared to the Revised Viaduct Alternative, the Partial Cover Lowered Alternative impacts approximately 21 percent more sites, increasing the work within land assumed to be contaminated by approximately 7 percent. Lowering the highway below street level impacts soil and/or groundwater at greater depths than the No-Action and Revised Viaduct Alternatives. Disturbing greater volumes of soil and/or groundwater increases the potential to affect hazardous materials. The Managed Lanes Option increases ground disturbance by an additional 65 acres; however, it does not increase the potential to impact hazardous material sites.

Any contamination encountered during the construction of the project will be cleaned up in compliance with applicable state and federal regulations, which will benefit the area in the future.

## ES.8    How are the public and stakeholders involved in the I-70 East EIS project?

The I-70 East EIS has followed an extensive community and agency involvement process since the project began in 2003. The overall goal of the community outreach and agency involvement process has been to solicit input through a transparent, open, and dynamic process that includes community members; businesses; federal, state, and local agencies; stakeholders; and community groups within the project area. This process helped the project team identify and document any issues and incorporate them in the planning and decision-making process.

After publishing the Draft EIS in 2008, CDOT and FHWA started a more focused outreach process to better understand some of the issues that were brought up during the public comment period and develop solutions to address the public concerns and eventually select a preferred alternative. The project team used innovative public outreach techniques along

EAR  0025

with traditional methods to reach out to the community and stakeholders for their input. Some of these outreach techniques were corridor-wide meetings, one-on-one meetings, website updates, monthly community meetings, and telephone town-hall meetings. Detailed information on community and agency involvement is in Chapter 7, Community Outreach and Agency Involvement.

Corridor-wide meetings and community leaders meetings will continue to keep the public informed about the project's progress through the ROD and, after that, through project final design and construction phases. In addition, the project team members will continue to participate in neighborhood-related activities, such as festivals and picnics, to interact with community members, inform them about the upcoming project activities, and answer questions.

## ES.9    What are the project impacts to Section 4(f) resources?

Section 4(f) of the U.S. Department of Transportation Act of 1966 stipulates that FHWA and other U.S. Department of Transportation agencies cannot approve the use of land from publicly owned parks or recreational areas, wildlife or waterfowl refuges, or public or private historic sites unless the following conditions apply:

- A determination is made that there is no feasible and prudent alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use; or

- The use of property, including any measures to minimize harm, will have a *de minimis* impact on the property.

The project area has 243 historic properties, parks, or other recreational resources that are considered Section 4(f) resources. Chapter 8, Section 4(f) Evaluation, discusses the Section 4(f) resources in the project area and the use of those resources.

Because there are no feasible or prudent alternatives that avoid the use of all Section 4(f) resources, an analysis is required to determine which alternative causes the least overall harm. Based on this analysis, the Partial Cover Lowered Alternative causes relatively equal or less overall harm when compared to other alternatives. While it has greater right-of-way needs, and therefore has greater initial impacts, its ability to mitigate for those impacts lessens the magnitude of remaining harm for both Section 4(f) properties and non-Section 4(f) resources.

EAR  0026

## ES.10   What are the next steps after the Supplemental Draft EIS?

After publishing this document with a 45-day public comment period, CDOT and FHWA will proceed with preparation of the Final EIS. The comments received during the public and agency comment period will be addressed in the Final EIS. The preliminary identification of the Preferred Alternative will be confirmed or revised and identified as the Preferred Alternative in the Final EIS based on the public comments and more detailed analysis.

After issuing the Final EIS with a public review period, a ROD will be prepared. A Preferred Alternative will be selected in the ROD. The ROD will discuss plans for implementation of the project and identify mitigation commitments in compliance with NEPA regulations.

The ROD concludes the NEPA process and sets the project up for further engineering design and implementation. Funding constraints limit the ability to fully construct the Preferred Alternative at one time. Pending the results of the Final EIS and ROD, the construction for the highway between Brighton Boulevard and Colorado Boulevard could begin in 2016, after project permits are received. The highway is anticipated to open to traffic in 2020. If full funding is available, the rest of the project could be completed by the same date or, if not, by 2030.

EAR 0027

and Economic Conditions, for design options for the space under the viaduct.

This alternative includes a drainage system north of I-70 to capture onsite water runoff from the viaduct via an underground storm drain pipe. The alignment for this drainage system is shown in Section 5.14, Floodplains and Drainage/Hydrology.

The Revised Viaduct Alternative east of Colorado Boulevard includes the improvements discussed earlier in Section 3.7.

### 3.7.3   Partial Cover Lowered Alternative

The Partial Cover Lowered Alternative removes the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard, lowering the highway below grade in this area. It adds additional lane(s) in each direction from Brighton Boulevard to Tower Road. It also adds capacity from I-25 to Brighton Boulevard by restriping. This alternative includes a cover over the highway between Clayton Street and Columbine Street. The highway will start descending west of Brighton Boulevard to reach the maximum depth of approximately 40 feet below ground level just east of the UPRR. This depth will allow the railroad to cross above the highway. The remaining portion of the lowered section has a depth of approximately 25 feet below grade. The lowered highway ascends just east of the Burlington Northern Santa Fe (BNSF) Denver Market Lead Railroad to reach the existing grade east of the Colorado Boulevard interchange.

Exhibit 3-14 shows a profile view of the Partial Cover Lowered Alternative from Brighton Boulevard to Clayton Street.

**Partial Cover Lowered Alternative, Expansion Options**

The Partial Cover Lowered Alternative does not include Expansion Options because I-70 can only be widened to the north with this alternative. Widening to the south is not possible because of the location of the UPRR rail yard west of the Nestlé Purina PetCare Company facility.

**Exhibit 3-14.   Profile view of the Partial Cover Lowered Alternative from Brighton Boulevard to Colorado Boulevard**





There are two Connectivity Options with this alternative between Brighton Boulevard and Colorado Boulevard: the Basic Option and the Modified Option (shown in Exhibit 3-15).

**Connectivity Options**

The Partial Cover Lowered Alternative includes two Connectivity Options to create a multimodal transportation system to support a livable, connected, and sustainable city.

EAR 0029

**Exhibit 3-15.  Partial Cover Lowered Alternative**



The Partial Cover Lowered Alternative east of Colorado Boulevard includes the improvements discussed earlier in Section 3.7.

Lowering I-70 requires capturing offsite surface runoff that currently flows south to north. The offsite drainage system included in this alternative is designed to prevent the lowered section of I-70 from flooding. This storm drain system will be conveyed south of I-70 through Globeville Landing Park and discharge to the South Platte River. An onsite drainage system is designed north of I-70 to capture runoff from the highway. Design of the Partial Cover Lowered Alternative includes the same lane configuration as the Revised Viaduct Alternative, which is shown in Attachment A, *Alternative Maps*.

Partial Cover Lowered Alternative, Basic Option

With the Basic Option local east-west connectivity is provided through 46th Avenue, which is designed as a one-way two-lane road in each direction. Eastbound 46th Avenue is located on the south side of the highway and westbound 46th Avenue is located on the north side. There are sidewalks adjacent to the roadway.

Highway access with the Basic Option is provided through a split-diamond interchange at Colorado Boulevard and Steele



*Bird's-eye view simulation of Partial Cover Lowered Alternative looking west from west of Vasquez Boulevard (Basic Option)*

EAR  0030

Street/Vasquez Boulevard. Exhibit 3-16 illustrates the number of lanes for this option and shows which interchanges will be reconstructed or remain the same.

**Exhibit 3-16.  Partial Cover Lowered Alternative, Basic Option lane configuration and interchange reconstruction**



The additional lanes and space needed for 46th Avenue result in a footprint that is approximately three times greater than the existing footprint. Exhibit 3-17 shows a typical section for the Partial Cover Lowered Alternative, Basic and General-Purpose Lanes Options. Exhibit 3-18 shows a typical section for the Partial Cover Lowered Alternative, Basic and Managed Lanes Options.

EAR  0031

**Exhibit 3-17.  Typical section of the Partial Cover Lowered Alternative, Basic Option with general-purpose lanes (between Brighton Boulevard and Colorado Boulevard)**



**Exhibit 3-18.  Typical section of the Partial Cover Lowered Alternative, Basic Option with managed lanes (between Brighton Boulevard and Colorado Boulevard)**



The local connectivity north-south across I-70 between Brighton Boulevard and Colorado Boulevard is provided by highway overpasses at York Street, Josephine Street, Columbine Street, Clayton Street, Steele Street/Vasquez Boulevard, and Monroe Street, as shown in Exhibit 4-20 in Chapter 4, Transportation Impacts and Mitigation Measures. Elizabeth Street will be closed between 46th Avenue and 47th Avenue to accommodate the Swansea Elementary School expansion.

EAR 0032

The Basic Option extends the edge of I-70 155 feet and the outside edge of the 46th Avenue sidewalk 195 feet closer to the Swansea Elementary School building. The front of the school will be approximately 65 feet from the edge of the 46th Avenue sidewalk.

This option includes a cover above the highway between the Clayton Street and Columbine Street bridges. This 900-foot-long cover is adjacent to Swansea Elementary School.

This is the most desirable location along the corridor for the highway cover because of its proximity to the school and because it accommodates the maximum length of the cover that can be placed on the highway. An increased length of cover will require consideration for additional safety features, such as fire suppressant and ventilation systems.

The highway cover design includes an urban landscape to serve the community with the potential to include playgrounds, plazas, outdoor classrooms, and community gardens. Strategically placed landscape elements—such as trees and shrubs—are included only at designated locations to minimize the loading on the structure. Ownership and maintenance of the cover has not been determined at this time. CDOT is working with Denver and various other stakeholders to develop agreements for ownership and maintenance, which will be finalized before construction begins. Exhibit 5.2-16 in Section 5.2, Social and Economic Conditions, shows three different options for the conceptual design of the urban landscape on the highway cover.

### Partial Cover Lowered Alternative, Modified Option

The Modified Option of the Partial Cover Lowered Alternative removes the current highway access at Steele Street/Vasquez Boulevard. Instead, a full interchange is designed at Colorado Boulevard, allowing eastbound and westbound access at this location. Local east-west connectivity is provided by making 46th Avenue two way on the north side and the south side of the highway. However, 46th Avenue is discontinued on the north side of the highway between Clayton Street and Columbine Street to allow for a seamless connection of Swansea Elementary School to the highway cover, which is located in that area.

Exhibit 3-19 illustrates the number of lanes for this alternative and shows which interchanges will be reconstructed or remain the same.

> **Colorado Boulevard: A full interchange**
>
> The Modified Option of the Partial Cover Lowered Alternative removes the highway access at Steele Street/Vasquez Boulevard. Instead, a full interchange is designed at Colorado Boulevard, allowing eastbound and westbound access at this location.

EAR  0033

**Exhibit 3-19. Partial Cover Lowered Alternative, Modified Option lane configuration and interchange reconstruction**



The removal of the interchange at Steele Street/Vasquez Boulevard eliminates auxiliary lanes. This will provide a smaller highway footprint than currently exists from York Street to Steele Street/Vasquez Boulevard. Also, the centerline of I-70 moves 24 feet further south compared to the Basic Option. This reduces the construction limits on the north side of the highway while keeping the south construction limits the same as they are with the Basic Option.

Exhibit 3-20 shows a typical section for the Partial Cover Lowered Alternative, Basic and General-Purpose Lanes Options. Exhibit 3-21 shows a typical section for the Partial Cover Lowered Alternative, Basic and Managed Lanes Options.

**Exhibit 3-20.  Typical section of the Partial Cover Lowered Alternative, Modified Option with general-purpose lanes (between Brighton Boulevard and Colorado Boulevard)**



**Exhibit 3-21.  Typical section of the Partial Cover Lowered Alternative, Modified Option with managed lanes (between Brighton Boulevard and Colorado Boulevard)**



The additional lanes and space needed for 46th Avenue result in a highway footprint that is approximately three times greater than the existing footprint. The Partial Cover Lowered Alternative, Modified Option pushes the north edge of the highway up to approximately 150 feet north from the existing edge of the highway.

Local north-south connectivity across I-70 is similar to the Basic Option with additional connection provided at Milwaukee Street. A pedestrian bridge is designed at Josephine Street across the

EAR 0035

highway to create a safe crossing location for bicycles and pedestrians. York Street between 45th Avenue and 48th Avenue is converted from its current one-way configuration to one that is two-way, as shown in Exhibit 4-21 in Chapter 4, Transportation Impacts and Mitigation Measures.

The Modified Option moves the edge of I-70 120 feet closer to the school. With this option, 46th Avenue is removed between the highway and the school.

The Modified Option includes a second cover over I-70 between St. Paul Street and Cook Street. Denver is currently investigating the potential of providing redevelopment opportunities with this additional cover. Any development on the cover proposed by Denver has to comply with FHWA airspace requirements.

## 3.8    Are other design variations being considered?

Design variations are being considered for the Partial Cover Lowered Alternative. There are no design variations being considered for any of the other alternatives at this time. The Basic and Modified Connectivity Options for the Partial Cover Lowered Alternative are fully evaluated in this document. Other design variations to these options are being considered but are not evaluated and remain as unresolved issues. As part of the public outreach process, CDOT and FHWA will continue to seek feedback from the community, stakeholders, and public agencies on these variations.

The variations under consideration relate to the following elements:

- Access to I-70 at Steele Street/Vasquez Boulevard
- Highway cover
- Frontage roads
- North-south connectivity

These variations were developed to respond to community concerns and to balance community, business, and transportation needs. The following goals helped to develop these variations:

- Maintain the Steele Street/Vasquez Boulevard access to I-70 as an important local and regional access point for businesses needing access to the interstate for commerce

**Design variations**

Design variations are possible changes to the original design of a transportation facility element that do not pose major additional impacts to the environment and stay within the project's construction limits.

EAR  0036

public services and facilities, mobility, or safety in these neighborhoods.

No matter which alternative is selected as the Preferred Alternative, some homes that are not currently adjacent to I-70 will be after construction. In other cases, some homes will be closer to the highway than they are today.

Potential impacts from the project alternatives to Elyria and Swansea and Northeast Park Hill are identified in Section 5.2.9 and Section 5.2.10 by neighborhood.

There are impacts to Swansea Elementary School from all of the alternatives. However, there will be no impacts to other schools in the study area such as Garden Place Elementary School from any of the alternatives.

### 5.2.8   What are the current health conditions in the study area?

Various health studies have been conducted over the years related to the proximity of populations near large transportation corridors. In general, health conditions related to air and soil pollutants are of particular concern because of the immediate proximity of residential areas to the project area. However, it should be noted that large transportation corridors also are associated with heavy industrial activities and related health conditions, which occur adjacent to the project area. Many of the health conditions listed below can be associated with smoking, dietary habits, genetics, and alcohol consumption. Additionally, a number of factors used to measure health conditions—such as mortality, asthma, obesity, diabetes, and cancer—can be linked to socioeconomic factors, such as age and income. As a result, no conclusive statements can be made regarding the cause and effect of the proposed project to the health conditions of local residents. Taking into consideration the entire body of evidence on primary vehicle emissions, a recent review determined that there is sufficient evidence of a causal association between exposure to traffic-related air pollution and asthma exacerbation and suggestive evidence of a causal association for onset of childhood asthma, nonasthma respiratory symptoms, impaired lung function, all-cause mortality, cardiovascular mortality, and cardiovascular morbidity (CDC, 2013).

The following is an updated list of health studies that have occurred within and near the project area. The occurrence of cancer in these communities—while not a comprehensive gauge of health status—is an important indicator of human health conditions.

**Highway and health risks**

Although studies show a higher occurrence of certain health issues within populations living in proximity to a highway, there are several factors associated with these health outcomes which are not related to the highway, including smoking, dietary habits, and alcohol consumption. There is no reliable quantitative analysis available to measure how much the highway affects the residents' health conditions.

EAR  0037

Cancer occurrence studies conducted by the Colorado Department of Public Health and Environment (CDPHE) in 2000 and 2005 responded to concerns about exposure to environmental contaminants associated with hazardous waste sites located in the area. As summarized in the 2008 Draft EIS, the studies provided a reliable index of cancer occurrence in the communities in and near the study area. Based on CDPHE's cancer studies, the occurrence of certain types of cancer is higher in the study area than in the Denver MSA as a whole. CDPHE noted that other factors—such as exposure to carcinogens in the occupational, indoor, and ambient air—and behavioral risk factors—such as smoking, dietary habits, and alcohol consumption also may contribute to the overall individual and population risk (2002, 2003a, 2003b, 2003c). The most recent update of this information does not indicate a change in the previously reported trends (CDPHE, 2010). Additional discussion on air quality is included in Section 5.10 of this document.

In a 2006 report, CDPHE linked occurrences of cancer to airborne pollutants exhibited at air monitoring stations near I-70 East in May 2002 to April 2003. Although none of the pollutants and the pollutant concentrations were unique to Denver, total cancer risks were found to range from 100 to 200 more instances of cancer per million people (CDPHE, 2006). This range is at the upper end of the Environmental Protection Agency's (EPA) proposed "acceptable" health risk for carcinogens. The report also concluded that there were little to no known non-cancer health risks associated with the pollutants exhibited in the area (CDPHE, 2006).

Going One Step Beyond in North Denver: A Neighborhood Scale Air Toxics Assessment, otherwise known as the Good Neighbor Project, was a detailed air pollution modeling assessment that evaluated known sources of emissions in the Globeville and Elyria and Swansea neighborhoods, as well as in Commerce City. It built upon previous assessments conducted by the Denver Department of Environmental Health (DEH).

The primary goal of the Good Neighbor Project was to evaluate concentration gradients near major roadways like I-70, I-25, I-270 and Colorado Boulevard. Earlier Denver DEH assessments apportioned county-level emissions to census block groups using a variety of surrogate data, such as VMT and population density. Earlier assessments tended to spread the emissions across the entire block group, whereas the Good Neighbor Project did not.

The Good Neighbor Project predicted higher concentrations nearest to roadways, with concentrations dropping off by more

than 50 percent within 150 feet of I-70. This matches with real-world air pollution monitoring data collected along freeways in California (Zhu et al, 2002). It provided a much improved level of detail over earlier Denver DEH assessments, though it required a significantly higher level of resources across a limited geographic area.

The U.S. Department of Agriculture (USDA) and the Economic Research Service (ERS) have documented food deserts as part of the Healthy Food Financing Initiative. Using the definition of a "food desert" as a low-income census tract with limited access to healthy food, the Economic Research Service has identified 10 census tracts in the project area as food deserts (USDA, 2013). This analysis could imply health conditions are related to nutrition and are connected with related health conditions, such as obesity, diabetes, and heart failure.

Additional studies considering human health effects were reviewed during the documentation of health conditions for the study area. Several references were provided by stakeholders of the project. A literature review of sources related to health conditions is included in Attachment J, *Air Quality Technical Report.*

### 5.2.9   How does the No-Action Alternative impact neighborhood social conditions?

The No-Action Alternative impacts only the Elyria and Swansea Neighborhood. In general, the effects to social resources by the No-Action Alternative are similar regardless of whether the North Expansion Option or South Expansion Option is discussed. Both options will affect comparable numbers of housing units and local businesses in the Elyria and Swansea Neighborhood. The No-Action Alternative does not add capacity to the highway, so it does not have the beneficial effect of improved travel time in the study area.

**Neighborhoods Impacted by the No-Action Alternative**

Elyria and Swansea

#### Housing and population

The effect to social resources by the No-Action Alternative is similar regardless of choosing the North Expansion Option or the South Expansion Option. Both options will affect comparable numbers of housing units (13 to 14) and local businesses. The relocations represent less than one percent of the existing housing in the neighborhood (see Section 5.5).

As previously noted, renters occupy the majority of the housing units (52 percent) in the neighborhood. The neighborhood's 2010 vacancy rate was approximately 8.1 percent; therefore, it may be possible for displaced residents to relocate within the

EAR  0039

**Exhibit 5.10-1.   Air quality study areas**



### 5.10.4  What are the existing conditions for air quality?

The Denver metropolitan area is located in the South Platte River drainage area, with mountains located to the west and relatively high terrain to the south and north. Under certain meteorological conditions, the local topography has the tendency to trap pollutants, resulting in elevated ambient concentrations. The pollutants can be trapped under strong atmospheric temperature inversions that inhibit dispersion and cause poor air quality.

Existing air quality conditions are described in this subsection in terms of the Denver region's attainment and nonattainment status for criteria pollutants, the status of the project as it relates to transportation conformity requirements, and the estimated 2010 emissions levels based on modeling of criteria pollutants, MSATs, and greenhouse gases.

EAR  0040

**Existing conditions—criteria pollutant emissions**

EPA air quality status

As of December 2012, all areas in Colorado were in attainment of all NAAQS criteria pollutants except for ground-level ozone. Seven counties in the Denver metropolitan area and portions of two counties in the Colorado North Front Range are currently designated as nonattainment for exceeding the 1997 and 2008 8-hour ozone standards.

The Denver region was previously designated nonattainment for carbon monoxide and $PM_{10}$. The region was re-designated to attainment/maintenance status (see box to the right) for carbon monoxide by the EPA on January 14, 2002, and for $PM_{10}$ by the EPA on September 16, 2002 (EPA, 2002). Denver is in attainment for both the 1997 and 2006 $PM_{2.5}$ standards. There have not been any exceedances of the carbon monoxide standard at any of the four monitoring stations in the study area since 1999. There has been one exceedance of the 24-hour $PM_{2.5}$ standard in 2001 at the CAMP station. Monitoring stations in the study area were shown previously in Exhibit 5.10-1.

Transportation conformity

Regional and project-level conformity applies to transportation projects in air quality nonattainment and attainment/maintenance areas. To pass regional conformity, the project must be included in a conforming RTP and TIP. Project level conformity also includes a hotspot analysis in carbon monoxide areas and for projects of air quality concern in PM areas. Additionally, in PM areas, the project must comply with any control measures in the applicable *State Implementation Plan*. A project cannot create new air quality violations, increase the frequency of these violations, or exacerbate the severity of them. Furthermore, the design and concept for the proposed project must be adequately defined and must remain consistent with the project's definition in the conforming RTP and TIP.

If the project changes in concept or design during the planning process, or if it was not originally included in the RTP and TIP, the regional emission analysis will need to be revisited and a conformity determination completed before the project could proceed (40 CFR 93.107). This is the case with I-70 East. There are some elements of the alternatives included in the 2035 MVRTP (DRCOG, 2011), but, none of the alternatives are fully included in the fiscally constrained RTP and TIP. Funding must be identified for I-70 East and an amendment to the RTP and TIP will be necessary before the FHWA issues a Record of Decision.

> **Attainment/ Maintenance Status**
>
> Any geographic region of the United States previously designated nonattainment pursuant to the CAA Amendments of 1990 and subsequently redesignated to attainment subject to the requirement to develop a maintenance plan under section 175A of the CAA, as amended.

EAR  0041

Because this is the Supplemental Draft EIS, the purpose of this EIS is not to determine regional or project-level conformity. As a proactive measure, a project-level analysis was performed to evaluate whether alternatives of the project would meet the relevant NAAQS and conformity, if implemented. The actual regional and project-level conformity determination will be made during the Final EIS.

Emission inventories—criteria pollutants

Emission inventories were developed for the NAAQS criteria pollutants. Emission inventories are modeled estimates of the total daily pollutant emissions expected to be generated as a result of the implementation of each Build Alternative. The year 2010 is used to represent existing levels of emissions, since this year is consistent with the base year of the DRCOG regional travel demand model and the conformity determination for the RTP and TIP. Existing emissions of criteria pollutants (or their precursors, as defined in Section 5.10.1) in the I-70 air quality study area are shown in Exhibit 5.10-2.

**Exhibit 5.10-2.    Existing (2010) criteria pollutant emissions (study area, tons per day)**

| Pollutant | January | July |
|---|---|---|
| Volatile organic compounds (Ozone precursor) | 3.46 | 3.51 |
| Nitrogen oxides (Ozone precursor) | 15.95 | 15.25 |
| Carbon monoxide | 54.22 | 56.53 |
| $PM_{10}$ | 0.95 | 0.70 |
| $PM_{2.5}$ | 0.77 | 0.54 |
| Sulfur dioxide* | 0.09 | 0.07 |

Note: Because lead has been eliminated from on-road vehicle fuels, it is no longer a pollutant of concern from roadway emissions, so it is not included in the analysis of criteria pollutants.

*Sulfur dioxide was analyzed because it is a pollutant of general air quality concern and contributes to the overall conditions of the study area. Sulfur dioxide is not considered a transportation-related criteria pollutant.

**Existing conditions—MSAT emissions**

Although FHWA guidance recommends a quantitative analysis of MSATs, there are no national standards. Knowledge of MSATs is progressing and research continues. FHWA has issued interim guidance (Marchese, 2012) that addresses incomplete or unavailable information related to MSATs, and that language is included in Attachment J, *Air Quality Technical Report*. The technical report also contains information about national MSAT trends and ongoing MSAT research.

EAR  0042

Emission inventories—MSATs

Emission inventories were modeled for the seven MSATs. The year 2010 is used to represent existing levels of emissions, since this year is consistent with the base year of the DRCOG regional travel demand model and the conformity determination for the RTP and TIP. Existing MSAT emissions in the I-70 air quality study area are shown in Exhibit 5.10-3.

**Exhibit 5.10-3.   Existing (2010) MSAT emissions (study area, tons per day)**

| Pollutant | January | July |
|---|---|---|
| Benzene | 0.069 | 0.096 |
| Formaldehyde | 0.052 | 0.056 |
| 1,3-Butadiene | 0.010 | 0.012 |
| Acrolein | 0.004 | 0.004 |
| Naphthalene | 0.007 | 0.008 |
| Polycyclic organic matter | 0.003 | 0.003 |
| Diesel particulate matter | 0.395 | 0.398 |

**Existing conditions—Greenhouse gas emissions**

The daily greenhouse gas emission inventories were estimated by CDPHE/APCD to be 4,064 tons per weekday in January 2010 and 4,318 tons per weekday in July 2010. There are no specific requirements for conducting a greenhouse gas analysis for a NEPA project. To date, no national standards have been established regarding greenhouse gases, nor has the EPA established criteria or public health and safety thresholds for ambient greenhouse gas emissions pursuant to its authority to establish motor vehicle emission standards for carbon dioxide under the CAA.

The Air Quality Protocol developed through the Interagency Consultation process calls for the reporting of global, national, statewide, and regional emissions of greenhouse gases to provide context for the study area emissions calculated for the I-70 alternatives. Greenhouse gases are different from other air pollutants evaluated in federal environmental reviews because their impacts are not localized or regional due to their rapid dispersion into the global atmosphere. The affected environment for carbon dioxide and other greenhouse gas emissions is the entire planet. In addition, from a quantitative perspective, global climate change is the cumulative result of numerous and varied emissions sources (in terms of both absolute numbers and types), each of which makes a relatively small addition to global atmospheric greenhouse gas concentrations. In contrast to broad

EAR 0043

scale actions such as actions involving an entire industry sector or very large geographic areas, it is difficult to isolate and understand the greenhouse gas emissions impacts from a particular transportation project. Furthermore, there is currently no scientific methodology for attributing specific climatological changes to a particular transportation project's emissions.

FHWA has concluded, based on the nature of greenhouse gas emissions and the exceedingly small potential greenhouse gas impacts of the proposed action, that the greenhouse gas emissions from the proposed action will not result in "reasonably foreseeable adverse impacts on the human environment" (40 CFR 1502.22(b)).

The transportation sector is the second largest source of total greenhouse gas emissions in the U.S., behind electricity generation. According to data from the *Inventory of Greenhouse Gas Emissions and Sinks, 1990-2010* (EPA, 2011), the transportation sector was responsible for approximately 27 percent of all anthropogenic (human caused) greenhouse gas emissions in the U.S. in 2010. Carbon dioxide makes up the largest component of these greenhouse gas emissions. The U.S. Energy Information Administration calculates that U.S. transportation carbon dioxide emissions currently account for about 6 percent of worldwide carbon dioxide emissions.

While the contribution of greenhouse gases from transportation in the U.S. as a whole is a large component of U.S. greenhouse gas emissions, as the scale of analysis is reduced, the greenhouse gas contributions become quite small. Exhibit 5.10-4 presents the relationship between current and projected state and global motor vehicle carbon dioxide emissions, as well as information on the scale of the project relative to statewide travel activity.

**Exhibit 5.10-4.   Existing (2010) greenhouse gas emissions**

| Carbon dioxide emissions (million metric tons[1]) | | Colorado motor vehicle emissions, % of global total | Project study area VMT, % of statewide VMT |
|---|---|---|---|
| Global | Colorado motor vehicle | | |
| 29,670 | 24.1 | 0.0813% | 4.7% |

[1] *These estimates are from the Energy Information Administration's* International Energy Outlook 2010, *and are considered the best-available projections of emissions from fossil fuel combustion. These totals do not include other sources of emissions, such as cement production, deforestation, or natural sources; however, reliable future projections for these emissions sources are not available.*

EAR  0044

Based on emissions estimates from EPA's MOVES model and global carbon dioxide estimates and projections from the Energy Information Administration, carbon dioxide emissions from motor vehicles in the entire state of Colorado contributed less than one tenth of one percent of global emissions in 2010 (0.0813 percent).

The VMT in the project study area is about 4.7 percent of total VMT in the state. While there is not an exact correlation between VMT and emissions, there is a very strong relationship between the two, so it could reasonably be stated that the greenhouse gas emissions in the study area are roughly 5 percent of total statewide emissions from motor vehicles in 2010.

## 5.10.5  What process was used to analyze air quality?

The air quality analysis procedures for this document build upon the air quality analysis conducted for the 2008 Draft EIS. In some cases, the process was repeated, possibly with modifications, and in some cases, sensitivity tests were conducted and combined with the results from the 2008 Draft EIS analysis to arrive at new and/or revised conclusions. For some pollutants, new guidance from EPA and/or FHWA affected the analysis methodology.

There are many pollutants being considered as part of the air quality analysis for I-70 East. While similarities exist, the methodology for estimating pollution concentrations is specific to each pollutant. There also are separate requirements and procedures for conducting analyses for transportation conformity and NEPA.

The approach outlined here goes beyond federal requirements in several areas so that air quality concerns expressed during the public involvement process can be addressed. These procedures are specific to this project only and should not be considered a precedent for other CDOT projects in the Denver region or the state of Colorado. The following subsections summarize the air quality study area and the methodologies used for the carbon monoxide and $PM_{10}$ hotspot analyses and the emissions inventory burden analysis for NAAQS criteria pollutants, MSATs, and greenhouse gases. Additional details of the analysis are in Attachment J, *Air Quality Technical Report*.

### Carbon monoxide hotspot methodology

The Denver region is an attainment/maintenance area for the pollutant carbon monoxide. Because of this, a quantitative project-level hotspot analysis was conducted for this Supplemental Draft EIS. The Transportation Conformity Rule

# Excerpts From The Final Environmental Impact Statement





# I-70 East Final Environmental Impact Statement
## and Section 4(f) Evaluation

JANUARY 2016

VOLUME 1 OF 3

EAR 0047

# 5.10    Air Quality

*This section presents the air quality analysis for the study area. The discussion includes air quality concerns, emissions of interest, evaluation methodology, air quality impact analyses, and mitigation evaluations. Additionally, hotspot analysis for carbon monoxide and PM$_{10}$ is included for Transportation Conformity. All other analyses and evaluations included in this section are not intended for conformity purposes.*

**Federal and state regulations**

- NEPA
- CEQ Regulations
- Clean Air Act
- Transportation Conformity Rule
- Colorado Air Pollution Prevention and Control Act

Since the Supplemental Draft EIS was published in August 2014, additional analyses and content review have been performed for many of the resources discussed in this document. These updates, along with changes resulting from the comments received on the Supplemental Draft EIS, have been incorporated into this Final EIS. In this section, the updates include the following items:

- Updated traffic data from the DRCOG Compass model (Version 5.0) was used in the analysis.

- Only the Preferred Alternative (Partial Cover Lowered Alternative) was modeled in the carbon monoxide hotspot analysis, since all of the alternatives were modeled previously and showed low values, and there were only minor changes to the traffic data. This alternative resulted in the highest carbon monoxide concentrations in the previous modeling, so it is assumed that if the modeled values are in conformity with air quality standards, all of the other alternatives would be as well.

- An updated/corrected inspection and maintenance file was used for the carbon monoxide hotspot analysis.

- Dispersion modeling for the PM$_{10}$ hotspot analysis used meteorological data from the Stapleton meteorological station to better represent the weather conditions at the project location.

- The PM$_{10}$ background concentration for the hotspot analysis was determined using new guidance from EPA.

- On the recommendation of the EPA, changes were made to how the below-grade section of highway in the Preferred Alternative was modeled for the PM$_{10}$ hotspot analysis, and the receptor network was expanded to include all locations outside the project right of way.

- An updated emissions inventory for NAAQS pollutants/precursors and Mobile Source Air Toxics (MSAT) pollutants is included.

- An updated discussion on greenhouse gases is included.

- Objectives and requirements for an air quality monitoring plan that will be utilized during the construction phase of the project to monitor for PM$_{10}$ emissions are included.

- An update on the transportation conformity determination is included.

## 5.10.1    What are air quality concerns and why are they important to this project?

Air pollution comes from many different sources: stationary sources, such as factories, power plants, and dry cleaners; on- and off-road mobile sources, such as cars, buses, planes, trucks, and trains; and naturally occurring sources, such as windblown dust and emissions from vegetation.

The primary air quality concerns about the I-70 East highway improvements focus on local population exposure to criteria pollutants—specifically, particulate matter, carbon monoxide, and ozone; MSATs; and fugitive dust from construction activities—because this project is proposing to add capacity. Although stationary sources exist in this project area the air quality impact analysis is focusing on analysis from mobile sources. Greenhouse gases, while not an exposure issue, also are of interest due to climate change concerns.

### Criteria pollutants

The Clean Air Act of 1970, as amended, identifies six commonly found air pollutants, also known as criteria pollutants. Each of the criteria pollutants has been proven through scientific study to have adverse effects on human health and the environment and/or property (see Attachment J, *Air Quality Technical Report,* for health effects of the criteria pollutants).

The criteria pollutants for which NAAQS have been set by the EPA are ozone, carbon monoxide, particulate matter ($PM_{10}$ and $PM_{2.5}$), nitrogen dioxide, sulfur dioxide, and lead. The EPA and state and local air quality agencies track these criteria pollutants through actual measurements of pollutant concentrations in the air at monitoring sites across the nation, including in the Denver region.

Of the NAAQS criteria pollutants, only ozone, particulate matter ($PM_{10}$), and carbon monoxidehave been of concern in the Denver region, since current and/or historical monitoring data have shown exceedances of the standards. Of these three, ozone is the only pollutant for which the region is currently in nonattainment. The Denver region was re-designated to attainment/ maintenance status for carbon monoxide (2001) and $PM_{10}$ (2002).

**Criteria pollutants**

- Ozone ($O_3$)
- Carbon monoxide (CO)
- Particulate matter 10 microns or less ($PM_{10}$)
- Particulate matter 2.5 microns or less ($PM_{2.5}$)
- Nitrogen dioxide ($NO_2$)
- Sulfur dioxide ($SO_2$)
- Lead (Pb)

**What is a nonattainment area?**

A "nonattainment area" is a locality where air pollution levels persistently exceed NAAQS.

### Ground-level ozone

Ozone is a pollutant created by the chemical reaction of volatile organic compounds and nitrogen oxides in the presence of sunlight. The ozone molecule is formed through this chemical transformation, which typically occurs downwind from the volatile organic compounds and nitrogen oxides emission sources. As a result, ozone is considered a regional issue rather than a localized street or intersection issue, and an individual highway project will typically have little or no effect on regional ozone concentrations. Ozone is evaluated using the volatile organic compounds and nitrogen oxides emission precursors in an emission inventory burden analysis instead of using a localized, or hotspot, analysis as is typical for particulate matter and carbon monoxide, because it is a regional air quality pollutant.

As of 2015, the Denver region is classified as nonattainment for the 8-hour 2008 ozone standard. The region was originally designated under the 1-hour standard, which has since been replaced with an 8-hour standard in 2008.

### Particulate matter

Particulate matter is a complex mixture of very small particles and liquid droplets classified as either inhalable coarse-sized particles ($PM_{10}$ refers to particles 10 microns or less) or fine particles ($PM_{2.5}$ refers to particles 2.5 microns or less and makes up a portion of $PM_{10}$). Diesel tailpipe emissions; road, brake, and tire dust; and dust from construction activities all contribute to particulate matter. Particulate matter is not a major component of emissions from gasoline-powered vehicles, which are the predominant source of traffic in this corridor.

$PM_{10}$ is a product of vehicle emissions, road sanding, and brake and tire wear. This includes some particles that are large enough to be visible. $PM_{2.5}$ is not visible to the naked eye and is mainly a product of vehicle emissions and other combustion sources.

The ratio of $PM_{2.5}$ to $PM_{10}$ varies. Based on the emissions inventory analysis presented in this chapter below, non-dust $PM_{2.5}$ accounts for approximately 57 percent of non-dust $PM_{10}$ emissions; for road dust, EPA has estimated the ratio of $PM_{2.5}$ to $PM_{10}$ emissions to be 25 percent (EPA, 2011a).

$PM_{10}$ has been a concern in the Denver region in the past, but the region is currently in attainment/maintenance for this pollutant. The Denver $PM_{10}$ nonattainment area was re-designated to attainment/maintenance status by the EPA

on September 16, 2002 (EPA, 2002) and has maintained the NAAQS since that time.

Denver is in attainment for both the 1997, 2006, and 2012 $PM_{2.5}$ standards. There has been one exceedance of the 24-hour $PM_{2.5}$ standard since 1999, which occurred at the Denver Continuous Air Monitoring Program (CAMP) monitoring station in 2001; however, $PM_{2.5}$ is not a pollutant of concern in the Denver area at the present time, or for the foreseeable future.

### Carbon monoxide

Carbon monoxide is a colorless, odorless gas emitted directly from vehicle tailpipes as a product of incomplete combustion. Because of this, carbon monoxide tends to concentrate at busy intersections with high vehicle delays and congestion.

Carbon monoxide has been a concern in the Denver region in the past, but the region was re-designated to an attainment/ maintenance area for this pollutant in December 2001 (EPA, 2001).

### Mobile source air toxics

As part of the Hazardous Air Pollutants (HAP) Program of the Clean Air Act Amendments of 1990, EPA has identified approximately 188 pollutants that are known to cause health problems. Of the 188 HAP toxic air pollutants, 21 have been identified by the EPA as Mobile Source Air Toxics (MSATs; see box to the right). MSATs are compounds emitted from motor vehicles and motorized equipment that are known or suspected to cause cancer or other serious health and environmental effects.

Of the 21 MSATs, the EPA has indicated that the majority of adverse health effects come from seven pollutants, which FHWA has labeled as priority MSATs for NEPA studies. These pollutants are benzene, formaldehyde, naphthalene, diesel particulate matter/diesel exhaust organic gases, acrolein, 1,3-butadiene, and polycyclic organic matter (see Attachment J, *Air Quality Technical Report,* for health effects of the seven priority MSAT pollutants). Based on FHWA's analysis using the EPA's air quality models, diesel particulate matter is the dominant MSAT of concern.

The EPA has programs to reduce emissions of many MSATs through emission control technologies and other methods. Primary among these is EPA's *Control of Hazardous Air Pollutants from Mobile Sources: Final Rule to Reduce Mobile*

**Mobile source air toxics**

MSATs include seven pollutants designated by EPA as having serious health and/or environmental effects:

1. Benzene
2. Formaldehyde
3. Naphthalene
4. Diesel particulate matter/Diesel exhaust organic gases
5. Acrolein
6. 1,3-Butadiene
7. Polycyclic organic matter

Of these, diesel particulate matter has become the primary MSAT of concern. Diesel particulate matter refers to the particles emitted from heavy diesel vehicles, such as freight/delivery trucks and construction equipment.

*Source Air Toxics*, issued February 26, 2007, to lower emissions of benzene and other air toxics.

In response to concerns from Denver and residents about the effects of MSATs on the communities of north Denver and Commerce City, CDOT provided additional emissions modeling data to the Denver Department of Environmental Health to use in their independent air quality study for the area, which is called *Going One Step Beyond in North Denver: A Neighborhood Scale Air Pollution Modeling Assessment* (The Good Neighbor Project 2015). The study's results are available on the Denver Environmental Health website at www.denvergov.org/content/denvergov/en/environmental-health/environmental-quality/air-quality.html.

### Greenhouse gases

Greenhouse gases trap heat and make the planet warmer. The primary sources of greenhouse gas emissions in the United States are from electricity production, transportation, industry, commercial and residential activities, and agriculture. Most of the emissions are due to burning fossil fuels, such as petroleum, coal, and natural gas. Others are due to the handling and waste management of certain chemicals. Recent concerns with climate change (global warming) have prompted directives to reduce greenhouse gases, of which carbon dioxide is the primary component.

The full effects of global warming caused by greenhouse gases are largely unknown but potentially very serious, including changes in precipitation causing flooding and drought; heat waves; warming of the oceans with the associated melting of the ice caps and rising sea levels; and higher acidity in the oceans.

### Fugitive construction dust

Fugitive dust in the lower atmosphere is a type of particulate matter. It can be harmful to humans and the environment. Fugitive dust has been linked to asthma, emphysema, chronic obstructive pulmonary disease, bronchitis, and heart disease. It is also a component of haze, which causes visibility problems. It has both natural and man-made causes. Natural examples of fugitive dust include wind erosion and wildfires. Human activities that cause fugitive dust include agriculture, construction, commercial and industrial operations, burning materials, vehicle exhaust, and travel (for example, unpaved roads, tire wear,

and brake dust). The term "fugitive" refers to the widespread or open-area sources of the dust as compared to a single-point source, such as a smokestack.

Fugitive construction dust is only one component of lower atmospheric dust and particulate matter, but it is singled out for special consideration because of the potential effects on people within or near a major construction project such as I-70 East. Dust particles can be so small that they pass through the nasal cavity and into the lungs to cause damage. Also, toxic and cancer-causing chemicals can attach to dust and produce much more profound effects when inhaled. These situations may be worsened during construction projects requiring longer durations to complete.

## 5.10.2 What is required for Transportation Conformity?

All state governments are required to develop a State Implementation Plan (SIP), which explains how the State will comply with the requirements of the Clean Air Act. The Act requires that transportation plans, programs, and projects that are developed, funded, or approved by FHWA must demonstrate that such activities "conform" to the SIP. Transportation conformity requirements apply to any transportation-related criteria pollutants for which the project area has been designated a nonattainment or attainment/maintenance area (for the I-70 East project, these criteria pollutants are carbon monoxide, $PM_{10}$, and ozone).

Under Section 176(c) of the Clean Air Act, a transportation project is said to "conform" to the provisions and purposes of the SIP if the project, both alone and in combination with other planned projects, does not:

- Cause or contribute to new air quality violations of the NAAQS,

- Worsen existing violations of the NAAQS, or

- Delay timely attainment of the NAAQS or required interim milestones.

Conformity applies at both a regional and project level for transportation projects in air quality nonattainment and attainment/ maintenance areas. The regional conformity evaluations are not performed by CDOT, nor are they performed for individual CDOT projects. The regional evaluations are done by the Metropolitan Planning Organization (DRCOG, in this case) and the Colorado

**5.18** Hazardous Materials

Extensive remediation has occurred at the site. However, a groundwater plume has been identified in the shallow alluvial aquifer south of Sand Creek, which is located approximately one mile north of the proposed alternatives. Groundwater flow generally moves north to northwest, away from the alternative footprints. Paleochannels in the alluvium influence regional flow, at times resulting in flow patterns that are different from the regional flow. Contaminants associated with the NPL site may be encountered during construction of the alternatives.

An NPL site (ASARCO, Inc.) is located northwest of the proposed alternatives. ASARCO, Inc. was a heavy-metal smelter and refining facility. Contaminants of concern in soil and groundwater at the facility include cadmium, arsenic, lead, and zinc. Groundwater flow generally moves north to northwest, away from the alternative footprints. However, similar to the Chemical Sales Company facility, paleochannels in the alluvium influence regional flow, at times resulting in flow patterns that are different from the regional flow. Therefore, contaminants associated with the NPL site may be encountered during construction of the alternatives. NPL sites are discussed in further detail in the Supplemental Draft EIS in Appendices A and B of Attachment H, *Hazardous Materials Technical Report*.

Multiple closed LUST sites have been identified within all highway alternatives. Since these facilities have been issued closure/No Further Action notices, they are expected to have minor effects during the construction phase. The hazardous materials contamination at these sites has been removed or remediated to meet state or federal action levels; however, low levels of residual contamination may remain in soil and groundwater at the sites. In some cases, unknown contamination not identified during the previous site investigations may be present. LUST sites are discussed in further detail in the Supplemental Draft EIS in Appendix F of Attachment H, *Hazardous Materials Technical Report*.

Historical landfills have been identified within the Revised Viaduct and Partial Cover Lowered Alternatives. Recent subsurface investigation at the Denver Coliseum—a historical landfill that overlaps the I-70 and Vasquez Boulevard NPL site—has identified chloroform, PCE, TCE, manganese, iron, arsenic, hexavalent chromium, and cadmium in groundwater that exceed standards. Hazardous materials also have been identified in soils in this area, including asbestos-containing materials (ACM), arsenic, and

landfill gas at levels that can result in a potential explosion hazard during construction. Construction activities associated with all of the proposed alternatives will likely encounter the contaminants at this site. The Partial Cover Lowered Alternative will likely encounter these contaminants to a greater extent based on the location of the Globeville outfall specific for this alternative.

Subsurface investigations conducted along I-70 between I-25 and I-270 identified contaminants, including metals, semi-volatile organic compounds (SVOCs), and VOCs in groundwater at levels that exceed permitted standards. Hydrocarbons and arsenic also were identified in soil at levels above regulatory standards. The subsurface investigations are discussed further in Attachment H, *Hazardous Materials Technical Report Addendum* of this document.

Effects of hazardous materials and waste also are associated with runoff of contaminants in stormwater. Contaminants likely to be in stormwater runoff include fuel and lubricants, metals, compounds from tires, and automobile engine coolants. Additional operational effects may include herbicide use for weed control and magnesium chloride for de-icing operations.

## 5.18.6    What are the impacts to hazardous materials during construction?

Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination. Standard construction measures for fugitive dust control and stormwater erosion and sediment controls minimize the spread of contaminated soil. Some sites, particularly NPL sites, may have onsite repositories for contaminated soil and debris, active soil vapor extraction systems, or active groundwater remediation systems, including groundwater-monitoring wells. Disturbance of these structural controls by construction activities can result in the release of hazardous materials contamination, as well as additional costs if the impacted controls must be replaced in kind.

Metals and VOCs that exceed regulatory standards (expected permit limits) have been identified in groundwater. Construction activities for any of the alternatives would require dewatering and associated permitting if contaminated groundwater is encountered during construction. Dewatering activities include treating and discharging water onsite or characterizing and removing

water offsite to a permitted disposal facility, resulting in increased construction costs. The dewatering activities would be more substantial for the Partial Cover Lowered Alternative because the excavation will reach below groundwater elevation. In addition, permanent dewatering may be required for this alternative since a portion of the below-grade section will be constructed below groundwater elevation, potentially resulting in additional post-construction costs for this alternative.

Construction at hazardous materials sites also may affect the construction budget and schedule. Construction activities may require the offsite disposal of contaminated soil and debris in permitted facilities, increasing costs. If previously unidentified contamination is found, costs and schedules both stand to be affected. The acquisition of contaminated properties may require additional site investigation and monitoring to evaluate site condition. Remediation at these sites may be necessary before and during the construction.

## 5.18.7   How are the negative effects from the project alternatives mitigated for hazardous materials?

Any contamination encountered during the construction of the project will be cleaned up in compliance with applicable state and federal regulations, which will benefit the area in the future. Implementation of several mitigation measures will avoid or minimize the effects of the alternatives on hazardous materials including:

- Before right-of-way acquisition, conduct a Phase I Environmental Site Assessment (Phase I) or initial site assessment for those properties identified for acquisition. Based on these assessments, additional subsurface investigation may be required depending on the recognized environmental conditions identified and potential risk to the project.

- The project will avoid contaminated sites whenever practical. However, where avoidance is not feasible, further site investigation will be required and will be coordinated with the affected property owner.

- Follow *CDOT Standard Specifications for Road and Bridge Construction*, Section 250, Environmental, Health and Safety Management.

- Follow Tri-County Health Department Health and Safety Practices during Construction on or Near Former Landfills.

- Conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any building structures and bridges or elevated structures; if these materials are encountered, remove them in accordance with applicable regulations and guidelines. If ACM is encountered, including buried utilities, follow CDOT Specification 250.07, Asbestos-Containing Material Management and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure. Additionally, depending on the type of ACM, clean up this material in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations.

- Update contaminated sites search databases to reflect most recent records.

Additionally, the following construction mitigation measures will avoid or minimize the effects of the alternatives on hazardous materials including:

- Prepare and implement a project-specific Health and Safety Plan and Materials Management Plan to address potential hazardous materials that are encountered during construction; these plans will consist of specific measures to protect worker and public health and safety, as well as programs to manage contaminated materials during construction.

- In the event that unknown contaminated media is encountered during construction, stop working until the contamination is properly evaluated and measures are developed to protect worker health and safety in accordance with the project-specific Health and Safety Plan and Materials Management Plan.

- Implement standard construction measures for fugitive dust control, as well as stormwater erosion and sediment controls, to minimize the spread of contaminated soil. During the construction phase, require the contractor to file and abide by a dust management plan to minimize the effects of dust on surrounding communities. Additionally, conduct air monitoring to determine whether dust control efforts are successful in preventing violations of air quality standards.

- The contractor will obtain a CDPHE CDPS Construction Dewatering Permit, Remediation Activities Discharging to Surface Water Permit or Construction Activities Discharging to Ground Water Permit, as required, utilizing readily available data. The selected contractor will follow the permit requirements.

- The Partial Cover Lowered Alternative (both options) will require excavation below existing groundwater. If this alternative requires permanent dewatering, obtain and follow the necessary CDPS Dewatering Permits. Under the temporary construction and permanent feature dewatering permits, treat and discharge source water onsite in accordance with the permit or characterize and remove source water offsite to a permitted disposal facility.

- Properly abandon and close monitoring wells or septic systems disturbed during construction activities in accordance with applicable regulations and guidelines. If existing monitoring wells are impacted during construction, the project will replace them, as necessary.

**Exhibit 5.18-12** lists the impacts and mitigations associated with hazardous materials.

**Exhibit 5.18-12     Summary of Hazardous Materials Impacts and Mitigations**

| Alternative/ Option | Impacts and/or Benefits | Mitigation Measures Applicable to All Alternatives |
|---|---|---|
| No-Action Alternative | • 7 hazardous materials sites affected<br>• 41 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Before right-of-way acquisition, conduct a Phase I Environmental Site Assessment (Phase I) or initial site assessment for those properties identified for acquisition; based on these assessments, additional subsurface investigation may be required depending on the recognized environmental conditions identified and potential risk to the project<br>• Avoid contaminated sites wherever practical; where unavoidable, initiate further site investigation and coordination with affected property owners<br>• Follow *CDOT Standard Specifications for Road and Bridge Construction,* Section 250, Environmental, Health and Safety Management<br>• Follow Tri-County Health Department *Health and Safety Practices during Construction on or Near Former Landfills* |
| Revised Viaduct Alternative, General-Purpose Lanes Option | • 24 to 25 hazardous materials sites affected<br>• 575 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any building structures and bridges or elevated structures; if these materials are encountered, remove them in accordance with applicable regulations and guidelines; if ACM is encountered, including buried utilities, follow CDOT Specification 250.07, Asbestos-Containing Material Management and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure; additionally, depending on the type of ACM, clean up this material in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations<br>• Update contaminated sites search databases to reflect most recent records |
| Revised Viaduct Alternative, Managed Lanes Option | • 24 to 25 hazardous materials sites affected<br>• 658 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Prepare and implement a project-specific Health and Safety Plan and Materials Management Plan to address potential hazardous materials that are encountered during construction; these plans will consist of specific measures to protect worker and public health and safety, as well as programs to manage contaminated materials during construction<br>• In the event that unknown contaminated media is encountered during construction, stop working until the contamination is properly evaluated and measures are developed to protect worker health and safety in accordance with the project-specific Health and Safety Plan and Materials Management Plan |

**Exhibit 5.18-12    Summary of Hazardous Materials Impacts and Mitigations**

| Alternative/ Option | Impacts and/or Benefits | Mitigation Measures Applicable to All Alternatives |
|---|---|---|
| Partial Cover Lowered Alternative, General-Purpose Lanes Option | • 25 hazardous materials sites affected<br>• 620 acres of land disturbed<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Implement standard construction measures for fugitive dust control, as well as stormwater erosion and sediment controls, to minimize the spread of contaminated soil; during the construction phase, require the contractor to file and abide by a dust management plan to minimize the effects of dust on surrounding communities; additionally, conduct air monitoring to determine whether dust control efforts are successful in preventing violations of air quality standards<br>• Obtain a CDPHE CDPS Construction Dewatering Permit, Remediation Activities Discharging to Surface Water Permit or Construction Activities Discharging to Ground Water Permit, as required, utilizing readily available data; the selected contractor will follow the permit requirements |
| Partial Cover Lowered Alternative, Managed Lanes Option | • 28 hazardous materials sites affected<br>• 703 acres of land disturbed<br>• Extensive excavation through a known landfill that contains contaminants<br>• Construction activities at hazardous materials sites have the potential to spread soil or groundwater contamination<br>• Construction at hazardous materials sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found | • Obtain and follow the necessary CDPS Dewatering Permits if this alternative requires permanent dewatering; under the temporary construction and permanent feature dewatering permits, treat and discharge source water onsite in accordance with the permit or characterize and remove source water offsite to a permitted disposal facility<br>• Properly abandon and close monitoring wells or septic systems disturbed during construction activities in accordance with applicable regulations and guidelines; if existing monitoring wells are impacted during construction, the project will replace them, as necessary |

**5.20** Human Health Conditions

EAR   0063

## 5.20      Human Health Conditions

*This section discusses what the existing concerns are about health issues in the project area (based on public comment), and relates these concerns to the analyses of air quality, noise, and hazardous materials performed for this project.*

*Additionally, at the request of the public commenters, it summarizes human health studies performed in the area in recent years by other parties that are not part of this project specifically.*

> Since the Supplemental Draft EIS was published in August 2014, additional analyses and content review have been performed for many of the resources discussed in this document. These updates, along with changes resulting from the comments received on the Supplemental Draft EIS, have been incorporated into this Final EIS.
>
> This Chapter is a new inclusion for the Final EIS and was not included in the Supplemental Draft EIS. Previously, the discussion summarizing health studies was included in Section 5.2, Social and Economic Conditions.

### 5.20.1      Why discuss human health conditions?

Human health conditions are important in the project area. Several of the analyses in the Final EIS are designed to determine if project activities create new health hazards that are not currently present, worsen existing health conditions, or contribute to a cumulative adverse impact to the health of residents or workers in the area.

During project scoping meetings for the proposed improvements to I-70, the public expressed concerns about various health issues within and near the project study area that they felt should be evaluated. In addition, the proximity of Swansea Elementary School to I-70 in the project area raised concerns about potential health impacts to children attending the school.

Following the release of the Draft EIS in 2008 and the Supplemental Draft EIS in 2014, many comments were received on health and how it relates to the project.

## 5.20.2   How are project impacts, benefits, and mitigation measures related to human health evaluated in this document?

The concerns to human health included in this section are organized by topics identified during project scoping and from public comments received on the 2008 Draft EIS and the 2014 Supplemental Draft EIS. Specific resource sections in this Final EIS listed below were reviewed to determine if there would be associated potential impacts to human health. The following discussions are not listed in order of importance, but in the order in which they appear in this Final EIS:

- Transportation facilities and choice
- Air quality
- Noise
- Water quality
- Hazardous materials

A full discussion of project impacts for each of the resources listed above can be found in Chapter 4 and Section 5.2 for transportation facilities and choice, Section 5.10 for air quality, Section 5.12 for noise, Section 5.16 for water quality, and Section 5.18 for hazardous materials. In the following subsections, a short summary of possible outcomes is included.

Each of these resources also includes a discussion of the benefits related to health and the highway cover included in the identified Preferred Alternative, the Partial Cover Lowered Alternative with Managed Lanes Option. Construction impacts and mitigations also are discussed.

### *Transportation facilities and choice*

As noted in Chapter 4, Transportation Impacts and Mitigation Measures, of this document, pedestrian and bicycle facility improvements associated with the Build Alternatives will enhance the safety of pedestrians and bicyclists within the study area. Intersections that are being improved will have countdown lights installed at signalized crosswalks to improve pedestrian safety. More opportunities to enhance the pedestrian environment include sidewalk connectivity, ADA improvements, greater sidewalk width, and improved lighting. These enhancements will potentially benefit human health by improving multi-modal connectivity in the project area. In addition, the Build Alternatives will

enhance the safety of the motorists using the facilities by utilizing the current highway design standards (such as shoulder widths, lane widths, grades, and curves).

### Benefits of the highway cover (Preferred Alternative only)

The proposed landscaped highway cover between Columbine Street and Clayton Street that is included as part of the Partial Cover Lowered Alternative will provide multiple benefits to human health in the Elyria and Swansea neighborhood. The proposed cover will reconnect the north and south sides of the neighborhood by providing a safe connection for pedestrians and bicyclists across I-70, allowing them to cross anywhere along the cover area and thereby improving non-motorized connectivity. The cover also will provide a place for activity and exercise. The Partial Cover Lowered Alternative also maintains the existing local north-south street network and it provides a greater sense of neighborhood cohesion by removing the dominant visual barrier created by the highway structure in this neighborhood.

### Construction Mitigation

As discussed in Section 5.2, Social and Economic Conditions, temporary construction impacts associated with project alternatives include construction-related travel disruptions (such as road closures, detours, and access and circulation disruptions), RTD service disruptions and/or delays, and traffic-related travel disruptions. These impacts will cause temporary quality-of-life disruptions to households near construction areas. People who work near construction areas or use affected roadways to travel to other activities (for example, health care) also will experience some temporary disruption during construction.

Proposed mitigation measures for these disruptions include:

- Provide safe and efficient connections through the neighborhood during construction for all modes of transportation, including bicycles and pedestrians.

- Coordinate with local municipal officials during construction to minimize effects on emergency service providers and response times.

- Coordinate with RTD more than 30 days in advance during construction to minimize disruptions to service areas and schedules and notify transit users in advance of any closures, delays, or modifications in bus or rail routes.

EAR 0066

## Air quality

As summarized in Section 5.10, Air Quality, the air quality analysis follows guidelines established by EPA for conducting analysis of air quality impacts for project alternatives. With regard to carbon monoxide and $PM_{10}$ for all project alternatives, the project is not expected to cause any new violations of any standard, increase frequency or severity of any existing violation, or delay timely attainment of the NAAQS or required interim milestones. The modeled values are below the NAAQS and demonstrate that there is no exceedance or impact from the project based on EPA's health-based standards for these pollutants.

Results of the carbon monoxide hotspot analysis indicate that both the 1-hour and 8-hour concentrations at the worst-case location, Colorado Boulevard, are below the NAAQS. Results of $PM_{10}$ analysis indicate 24-hour $PM_{10}$ concentrations do not exceed the NAAQS for any of the project alternatives, including the identified Preferred Alternative, the Partial Cover Lowered Alternative with Managed Lanes Option.

A comparison of air quality conditions for all pollutants demonstrates the effects of minor differences in traffic volume and roadway configuration between the alternatives; air pollution impacts for all design alternatives are similar.

Several factors are evident at the conclusion of the analysis:

- Air quality conditions under the No-Action Alternative are similar to all alternatives analyzed.

- Traffic volume and traffic speed are the primary drivers of project-level air quality impacts.

- Fugitive dust emissions from road sanding, as well as road dust and brake and tire wear, are the primary indicators of future particulate matter emissions.

Motor vehicle emissions from the implementation of the No-Action Alternative and the Build Alternatives will not cause or contribute to any new localized carbon monoxide or particulate matter violations, nor will they increase the frequency or severity of any existing violations based on the hotspot analysis. Therefore, no specific mitigation measures are necessary for the project to proceed. Although mitigation is not required, one or more of the potential emission reduction measures described below will be utilized to minimize impacts to air quality. Each of these measures will result in a benefit to human health.

- Any transportation-related measures or voluntary baseline emission reduction strategies already included as part of carbon monoxide or particulate matter maintenance plans that relate to I-70 East, such as street sanding/sweeping activities, will continue to be implemented.

- During construction, dust emissions should be minimized by following BMPs to control fugitive dust (see **Exhibit 5.10-26** for a summary of these activities and practices).

- Ongoing and planned strategies to reduce precursor emissions of volatile organic compounds and nitrogen oxides in the Denver/North Front Range ozone nonattainment area—including multi-modal transportation options, rideshare programs, vehicle emissions testing, and intersection improvements—will be implemented. Likewise, several strategies have been, and continue to be, implemented to maintain carbon monoxide and $PM_{10}$ attainment. For details of these strategies to manage criteria pollutant emissions, see Attachment J, *Air Quality Technical Report*.

- Construction-related fugitive particle emissions will be minimized by implementing dust control practices in accordance with requirements in CDPHE Air Quality Control Commission Regulation No. 1, Emission Control for Particulate Matter, Smoke, Carbon Monoxide, and Sulfur Oxides.

In summary, the NAAQS limits set by the EPA protect human health. The modeled values for the I-70 East project are below the NAAQS and demonstrate that there is no exceedance or impact from the project based on the EPA's health-based standards for these pollutants. Therefore, there are no projected impacts from the project related to NAAQS.

In addition, CDOT conducted a mobile source air toxic emissions analysis for the area affected by the project, and the analysis estimates that emissions in the project design year will be roughly 80 percent lower than current emissions. Additionally, the emissions for all of the Build Alternatives vary from 2.1 percent to 3.8 percent higher than the No-Action Alternative.

EAR 0068

## Benefits of the highway cover (Preferred Alternative only)

The cover included with the Partial Cover Lowered Alternative is an emissions reduction strategy for the area around Swansea Elementary School. The cover will redirect $PM_{10}$, carbon monoxide, and other emissions away from the school and the surrounding neighborhood. It also includes trees as an amenity on top of the highway cover, since trees provide incidental benefits to air quality.

## Construction Mitigation

Dust during construction could be particularly problematic for residents in the Elyria and Swansea Neighborhood who do not have air conditioners and ventilate their homes by opening windows. For households using window ventilation, construction dust could be an issue on windy days. Dust suppression measures (for example, stabilizing and covering loads of soil and debris during transport and storage, or stabilizing and revegetating exposed areas after construction) will be implemented to control dust impacts.

To mitigate additional dust concerns during construction for residents close to the highway, between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard, CDOT will provide:

- Two free portable or window-mounted air conditioning units with air filtration and assistance for the potential additional utility costs
- Interior storm windows

Also, an Air Quality Monitoring, Maintenance, and Mitigation Plan will be prepared prior to construction and will include continuous $PM_{10}$ monitoring during construction, as described in Section 5.10, Air Quality.

## *Noise*

Section 5.12, Noise, of this chapter identifies existing noise conditions and potential noise impacts from the proposed improvements to I-70. Results of the analysis show that all of the alternatives will cause noise to exceed the NAC of 66 dBA at various locations, including Swansea Elementary School. The section includes a discussion on where noise mitigation is needed, what that noise mitigation will look like, and how much noise reduction the mitigation will achieve. **Exhibit 5.20-1** summarizes by alternative the number of noise receptors that exceed the NAC threshold both with and without mitigation.

**Exhibit 5.20-1    Noise Receptors Exceeding NAC Threshold by Alternative**

| Alternative/Option | Number of Noise Receptors | Number of Noise Receptors that Exceed NAC Threshold | | Number of Noise Receptors with a Substantial Noise Increase | |
|---|---|---|---|---|---|
| | | Without Mitigation | With Mitigation | Without Mitigation | With Mitigation |
| Existing | 940 | 91 | | N/A | |
| No-Action Alternative, North Option | 890 | 362 | 59 | 40 | 0 |
| No-Action Alternative, South Option | 857 | 360 | 54 | 34 | 0 |
| Revised Viaduct Alternative, North Option | 896 | 453 | 114 | 97 | 0 |
| Revised Viaduct Alternative, South Option | 873 | 432 | 83 | 68 | 2 |
| Partial Cover Lowered Alternative | 873 | 155 | 108 | 11 | 0 |

As discussed in Section 5.12, Noise, noise walls will be constructed, where feasible and reasonable, to mitigate the future traffic noise from the reconstructed I-70. In several locations, the proposed noise walls will reduce the number of noise receptors below existing conditions, resulting in a benefit to human health.

### Benefits of the highway cover (Preferred Alternative only)

The proposed landscaped highway cover between Columbine Street and Clayton Street that is included as part of the Partial Cover Lowered Alternative helps reduce noise pollution at Swansea Elementary School and in the surrounding neighborhood. The highway cover is a noise barrier that will assist in reducing the number of noise receptors below existing conditions, resulting in a benefit to human health.

### Construction Mitigation

Construction noise will present short-term effects to those receptors located along the corridor and along designated construction access routes. It is anticipated that a portion of the construction will occur at night to minimize traffic disruption. The primary source of construction noise is expected to be diesel-powered equipment, such as trucks and earth-moving equipment, and construction activities, such as demolition hammers on trackhoes, rubble load outs, and tailgate and bucket bang.

Ambient noise from construction is a concern among the residents around the construction zone—specifically in the Elyria and Swansea Neighborhood, since many residents do not have air conditioners and ventilate their homes by opening windows. As previously described under air quality

for construction impacts related to dust, to mitigate noise concerns during construction for residents close to the highway, between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard, CDOT will provide:

- Two free portable or window-mounted air conditioning units with air filtration and assistance for the potential additional utility costs

- Interior storm windows

CDOT also will comply with Denver regulations on construction noise, as discussed in Section 5.12, Noise.

Pile driving and demolition are expected to be the loudest construction operations. Piles will be required at most major bridge installations. Bridge and road demolition also will be required at many locations.

Measures will be taken to minimize noise during construction. Mitigation actions specific to construction noise impacts are summarized in Section 5.12 and include limiting construction noise during school hours in the vicinity of Swansea Elementary School and idling equipment motors when the equipment is not in use.

### Water quality

As discussed in Section 5.16, Water Quality, both the South Platte River and Sand Creek cross the I-70 corridor and are listed on the Section 303(d) list for impaired waters. The primary reason both streams are listed for impairment is most likely due to polluted urban runoff in the highly urbanized watershed in which they are located. CDOT cannot prevent individuals from having contact with these impaired water bodies; however, efforts by CDOT to prevent polluting factors from impacting water quality in the study area will benefit human health.

The following is a list of polluting factors from roadway runoff during storm events and the reason why they are analyzed:

- Lead, copper, and zinc are a concern because they dissolve in water and can have toxic effects when they build up in water plants and aquatic life.

- Total Suspended Solids is a concern because it can increase the murkiness of water; as the floating particles in murky water settle, this can lead to loss of aquatic habitat and channel instability.

EAR  0071

- Phosphorus is a concern because it can increase the production of algae in water, which can reduce oxygen levels in streams.

As noted in Section 5.16, Water Quality, runoff from I-70 will be captured and conveyed in a storm drain system that discharges to the South Platte River. Prior to discharging to the receiving streams, the onsite drainage system will discharge to a water quality pond to provide water quality treatment. The outlet of the pond is smaller than the inlet of the pond, so runoff is temporarily stored in the pond and releases over a period of a few days. During this time (CDOT requires a minimum drain time of 40 hours), sediment settles out of the runoff and is stored in the pond; then, the runoff, with reduced sediments, discharges to the receiving stream.

Additional permanent BMPs discussed in Section 5.16 also will be implemented to remove particulate pollutants from stormwater. This will provide further benefits to human health.

## Construction Mitigation

During construction, as soils are disturbed, storm runoff may create erosion and degradation of water quality if proper BMPs are not employed. Alternative implementation will be done in accordance with the programs established under CDOT's MS4 permit. Site-specific engineering design studies will be performed during final design, and care will be exercised during construction to prevent problems of stability and erosion during and after construction. To mitigate these effects, BMPs for erosion and sediment control, dust control, stormwater control, and expansive soils will be implemented during construction. BMPs for erosion and blowing dust during construction include the use of silt fences, erosion control blankets, sediment traps, sediment basins, soil stockpile management, temporary diversion structures, and spill prevention and control measures.

After construction, other BMPs will be followed for permanent erosion control. These include regrading as necessary, seeding and revegetating soils and slopes, mulch protection for new plantings, and stormwater control channels.

### *Hazardous materials*

During construction activities, hazardous materials may impact the health and safety of workers, as well as environmental resources and community residents located

**Common contaminants**

Common contaminants identified in soil and/or groundwater include:

- Petroleum products (i.e., fuels, oils)
- Chlorinated solvents
- Metals
- Asbestos

within the project corridor and surrounding area. Also, encountering hazardous materials during construction can impact the cost of construction, as contaminated media generated during construction must be managed in accordance with federal and state regulations.

Section 5.18, Hazardous Materials, of this chapter provides a summary of the environmental records search conducted on the project study area. As noted in Section 5.18, the likelihood of impacting hazardous materials is dependent on the number of hazardous materials sites encountered during construction. In addition, the location and amount of contamination remaining at the site also will dictate impacts. The Partial Cover Lowered Alternative could affect up to 25 known hazardous materials sites since it will require a large amount of soil displacement to lower the highway below grade. This soil displacement has raised concerns from local residents since several extensive soil remediation projects have occurred in the project corridor.

Any contamination encountered during the construction of the project will be cleaned up in compliance with applicable state and federal regulations, which will benefit human health by removing contaminated soils. CDOT also is working with the EPA and will collect representative soil samples of recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities; this will include identifying three or four properties from the EPA's database and contacting those property owners to ensure they will participate in this activity. Specific mitigation measures related to hazardous materials are detailed in Section 5.18 of this chapter.

### 5.20.3    What conclusions can be drawn about potential human health impacts?

As previously discussed, several impact categories could result in negative effects to human health in the project study area. However, with implementation of BMPs and mitigation measures, these potential negative effects will be avoided or minimized. BMPs and mitigation measures are listed in Chapter 9, Preferred Alternative Mitigation Commitments. **Exhibit 5.20-2** summarizes the impacts and mitigations highlighted in this section.

**Exhibit 5.20-2      Summary of Impacts and Mitigations**

| Resource | Impacts and/or Benefits and Mitigations |
|---|---|
| Transportation facilities and choices | • Pedestrian and bicycle facility improvements associated with the Build Alternatives will enhance the safety of pedestrians and bicyclists within the study area<br>• The proposed cover will reconnect the north and south sides of the neighborhood by providing a safe connection for pedestrians and bicyclists across I-70, the cover also will provide a place for activity and exercise |
| Air quality | • Air quality conditions under the No-Action Alternative are similar to all alternatives analyzed<br>• Motor vehicle emissions from the implementation of the No-Action Alternative and the Build Alternatives will not cause or contribute to any new localized carbon monoxide or particulate matter violations, nor will they increase the frequency or severity of any existing violations based on the hotspot analysis<br>• Modeled values for the I-70 East project are below the NAAQS and demonstrate that there is no exceedance or impact from the project based on EPA's health-based standards for these pollutants<br>• The cover included with the Preferred Alternative is an emissions reduction strategy for the area around Swansea Elementary School. The cover will redirect $PM_{10}$, carbon monoxide, and other emissions away from that stretch of highway and the surrounding neighborhood |
| Noise | • Noise walls will be constructed, where feasible and reasonable, to mitigate the future traffic noise from the reconstructed I-70<br>• In several locations, the proposed noise walls will reduce the number of noise receptors below existing conditions, resulting in a benefit to human health<br>• The highway cover included with the Preferred Alternative is a noise barrier that will assist in reducing the number of noise receptors below existing conditions, resulting in a benefit to human health |
| Water quality | • Prior to discharging to the receiving streams, the onsite drainage system will discharge to a water quality pond to provide water quality treatment<br>• Additional permanent BMPs discussed in Section 5.16 also will be implemented to remove particulate pollutants from stormwater which will provide further benefits to human health |
| Hazardous materials | • Any contamination encountered during the construction of the project will be cleaned up in compliance with applicable state and federal regulations, which will benefit human health by removing contaminated soils<br>• Collect representative soil samples of three or four recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities |

Additionally, the landscaped cover over the highway in the identified Preferred Alternative will potentially provide improved health outcomes. When combined with project BMPs and mitigation measures, opportunities to improve existing human health conditions may be even greater.

## 5.20.4   What additional studies were conducted by others on human health conditions within or near the study area?

In addition to the project impacts, benefits, and mitigation measures (discussed in the previous subsection) that could have an impact on human health due to the project alternatives, a review of recent studies of human health conditions within and near the project area was conducted. Studies conducted by major agencies responsible for public health—including CDPHE, the Denver Department of Environmental Health, and the USDA—were identified that included information about the study corridor.

Although not a study, the EPA announced in December 2014 that residential soil sampling and cleanup is complete at the Vasquez Boulevard and I-70 Superfund site. However, EPA was not able to gain access from the owners of a few properties. Reviewing these properties will be part of the state of Colorado's operation and maintenance responsibilities and these properties will be reviewed as part of future Vasquez Boulevard and I-70 five-year reviews.

Some of the reports summarized below have been brought to the attention of the project team by members of the public. The listing of these studies does not infer any endorsement, nor does it include any conclusions regarding the accuracy or applicability of these studies. Six relevant studies were identified to review:

- Health Impact Assessment: *How Neighborhood Planning Affects Health in Globeville and Elyria Swansea* (Denver, 2014)

- *Good Neighbor Project* (Denver Department of Environmental Health, 2007)

- CDPHE cancer study: Urban Air Toxics Concentration in Denver, May 2002 through April 2003 (CDPHE, 2006)

- CDPHE cancer study: *Analysis of Diagnosed Versus Expected Cancer Cases in Residents of the Vasquez*

*Boulevard/I-70 Superfund Site Study Area* (CDPHE, 2003a)

- CDPHE cancer study: *Cancer in North Denver: 1998-2000* (CDPHE, 2002)

- CDPHE cancer study: *Analysis of Diagnosed Versus Expected Cancer Cases for the Northeast Denver Metropolitan Area in the Vicinity of the Rocky Mountain Arsenal, 1979-1996 and 1997-2000* (CDPHE, 2003a and 2003b)

A summary of each study is discussed below and the study areas for three of these studies are shown in **Exhibit 5.20-3**. Boundaries are not shown for the other three studies as they are too small or are consistent with neighborhood boundaries.

**Exhibit 5.20-3   Areas of Analysis for Studies Conducted by Others Within or Near the Study Area**



Cancer occurrence studies were conducted by the CDPHE in response to concerns about exposure to environmental contaminants associated with hazardous waste sites located within and near the project study area. The studies provide an index of cancer occurrence in some of the communities in

and near the study area. Based on CDPHE's cancer study results, the occurrence of certain types of cancer is higher in the EIS study area than in the Denver MSA as a whole. CDPHE noted that other factors—such as exposure to carcinogens in the occupational, indoor, and ambient air—and behavioral risk factors—such as smoking, dietary habits, and alcohol consumption—also may contribute to the overall individual and population risk (CDPHE 2002, 2003a, 2003b, 2003c). The most recent update of this information does not indicate a change in the previously reported trends (CDPHE, 2010).

This discussion is not a comprehensive assessment of the current health status in the study area. The studies summarized here do not provide indicators of human health as it relates to the proposed project and are being provided only to establish that many studies of this area have been done over the past 15 to 35 years.

### *How Neighborhood Planning Affects Health in Globeville and Elyria Swansea*

The Health Impact Assessment (HIA), *How Neighborhood Planning Affects Health in Globeville and Elyria Swansea* was completed in September 2014 by the Denver Department of Environmental Health. The HIA focuses solely on the Globeville and Elyria Swansea Neighborhood Plans and does not examine specific development projects, including I-70 East. This HIA is described as a "process to incorporate health considerations into a plan, project, or policy." Through resident participation in the neighborhood planning and HIA processes, five major health factors were identified and analyzed in the HIA. These included:

- Environmental quality

- Connectivity and mobility

- Access to goods and services

- Community safety

- Mental wellbeing

Key findings of the HIA reflect the public's concerns for the population groups and resources identified in Sections 5.2.4 and 5.2.5 of the Final EIS, and the findings of studies previously discussed in this section. The key findings of the HIA are discussed in the following subsections.

## Environmental quality

- Highway traffic is the main source of air pollution in the communities

-  There are noticeable spikes in poor air quality depending on location, time of day, and weather. Annual average air pollution is not higher than in other areas of Denver.

- Odors emitted from industrial operations sometimes cause short-term health effects, such as watering eyes or throat irritation.

- Highway traffic, freight trains, and industrial plants generate noise at levels that sometimes exceed recommended federal thresholds.

- Two large soil cleanup projects have mostly been completed over the last several decades, yet residents continue to express concerns about hazardous materials in the soil and a distrust of government intentions in the cleanup efforts.

- A lack of trees and green infrastructure in the Globeville and Elyria and Swansea neighborhoods does not help to improve air and water quality.

## Connectivity and mobility

- Physical barriers, such as railroad tracks and disconnected roads, isolate residents and limit opportunities for physical activity, including walking.

- Residents are concerned with the number of freight trucks on residential streets.

- Many streets lack sidewalks, bus stops lack benches or safe places to stand, and there is minimal bicycle infrastructure.

- Many residents do not own a vehicle and therefore, must rely on public transportation. Pedestrian, bicycle, and bus connections to four new transit rail stations in the neighborhoods are unclear to residents.

## Access to goods and services

- There is no grocery store in the community and convenience stores do not offer affordable, nutritious, or fresh produce.

- Residents must travel outside of the neighborhoods since there are few retail stores or local services.

- Residents reported concerns about safety and amenities in the neighborhoods. Residents also identified a lack of programming at neighborhood recreation centers that meets their needs.

### Community safety

- Vehicle crashes at some intersections has raised concerns about unsafe conditions for pedestrians and bicyclists.

- Resident perception of crime is higher than reported crime rates. There is some concern that crime may go unreported due to resident unwillingness to interact with law enforcement.

- Street lighting is inadequate and less than in other Denver neighborhoods.

- Residents raised safety concerns due to the presence of graffiti, illegal activities, and stray animals.

### Mental wellbeing

- Odor and noise impacts add stress to residents in their lives.

- Trains cause lengthy delays for vehicles and pedestrians.

- Concerns about safety limit resident use of parks and the South Platte River Greenway trail.

- Resident perception of and fear of pollution continue despite the substantial environmental cleanup activities. Lack of outreach in Spanish regarding this issue has led to continued misperceptions among residents who only speak Spanish.

- Unknown impacts associated with the construction activities of the I-70 project and other large redevelopment projects in the neighborhoods add to residents' stress.

### Good Neighbor Project

*Going One Step Beyond in North Denver: A Neighborhood Scale Air Toxics Assessment* (Denver Department of Environmental Health, 2007), otherwise known as the Good Neighbor Project, was a detailed air pollution modeling assessment that evaluated known sources of emissions in the Globeville and Elyria and Swansea neighborhoods, as well as in Commerce City. It built upon previous

assessments conducted by the Denver Department of Environmental Health.

The primary goal of the Good Neighbor Project was to evaluate concentration gradients of air pollutants near major roadways like I-70, I-25, I-270, and Colorado Boulevard. Earlier Denver Department of Environmental Health assessments apportioned county-level emissions to census block groups using a variety of surrogate data, such as VMT and population density. Earlier assessments tended to spread the emissions across the entire block group, whereas the Good Neighbor Project allocated on-road mobile source emissions to actual roadways.

Key findings of this study include:

- Modeled mean annual concentrations from highways were well below estimated Integrated Risk Information System (IRIS) cancer (1/100,000) and non-cancer risk values for all six MSAT;

- Modeled concentrations dropped off sharply within 150 feet of roadways;

- Modeled MSAT concentrations tended to be higher along highways near the Denver Central Business District (CBD) than along the I-70 East corridor (in some cases, they were higher within the CBD itself, as were the monitored values); and

- Dispersion model results were generally lower than monitored concentrations but within a factor of two at all locations.

These findings match with air pollution monitoring data collected along freeways in California (Zhu et al, 2002). The Good Neighbor Project study provided a much improved level of detail over earlier Denver Department of Environmental Health assessments, though it required a significantly higher level of resources across a limited geographic area.

### CDPHE cancer studies: Urban Air Toxics Concentration in Denver, May 2002 through April 2003

In this 2006 report, CDPHE discusses occurrences of cancer, from May 2002 to April 2003, and airborne pollutants exhibited at air monitoring stations near I-70 East (CDPHE, 2006). Although none of the pollutants or the pollutant concentrations were unique to Denver, total cancer risks were found to range from 100 to 200 excess cancers per one

million people. This range slightly exceeds the EPA's proposed "acceptable" health risk for carcinogens which is one in one million to 100 per million. The report also concluded that there were little to no known non-cancer health risks associated with the pollutants exhibited in the area.

### CDPHE cancer studies: Analysis of Diagnosed Versus Expected Cancer Cases in Residents of the Vasquez Boulevard/I-70 Superfund Site Study Area

The *Analysis of Diagnosed Versus Expected Cancer Cases in Residents of the Vasquez Boulevard/I-70 Superfund Site Study Area* (CDPHE, 2003a) investigated cancer occurrence for neighborhoods in the Vasquez Boulevard/I-70 Superfund Site in north-central Denver. Previous studies conducted by the U.S. EPA have indicated high levels of arsenic and lead in soil at some homes in the Elyria and Swansea, Clayton, Cole, and southwest Globeville neighborhoods. The study was conducted at the request of citizen representatives of Colorado People's Environmental and Economic Network and the Cole, Elyria and Swansea, and Clayton Neighborhood Coalition to conduct a review of cancer rates in their community. The study area for this report is shown in **Exhibit 5.20-3**.

CDPHE found an elevated incidence of cancer in the Superfund Site Study Area. Additional statistical analyses did not detect an association between the occurrence of lung cancer and high levels of arsenic in the soil of homes where individuals with lung cancer lived. CDPHE notes that many or most of the lung and laryngeal cancers reported from these neighborhoods are likely related to smoking.

### CDPHE cancer studies: Cancer in North Denver: 1998-2000

The primary focus of *Cancer in North Denver: 1998-2000* (CDPHE, 2002) was to analyze cancer rates in North Denver compared to those in the Denver MSA, and to identify behavioral and other risk factors that could be contributing to observed elevated rates. The study area for this report is shown in **Exhibit 5.20-3**.

The principal findings of the comparisons between North Denver and the remainder of the Denver MSA include:

- For all cancer types combined, cancer rates in North Denver were statistically higher for men of all racial/ethnic backgrounds combined, and for non-

Latino White men and women considered as subgroups.

- For some specific cancer types, cancer rates in North Denver were statistically higher for men and women of all racial/ethnic backgrounds combined, and for non-Latino White men and women considered as subgroups, but not for Latino men or women, nor for non-Latino African-American men or women.

- Cancer rates in North Denver were not statistically higher for Latino or non-Latino African-American men and women, either considering all cancer types together or for individual types of cancer.

### *CDPHE cancer studies: Analysis of Diagnosed Versus Expected Cancer Cases for the Northeast Denver Metropolitan Area in the Vicinity of the Rocky Mountain Arsenal, 1979-1996 and 1997-2000*

These two reports (CDPHE, 2003a and 2003b), covering the periods 1979 through 1996 and 1997 through 2000, report the initial and follow-up findings of previous cancer surveillance for communities in the northeast Denver metropolitan area—specifically, the area surrounding the Rocky Mountain Arsenal National Wildlife Refuge in Adams County (north of 56th Avenue), and the Stapleton and Montbello neighborhoods. Both reports have the same study area shown in **Exhibit 5.20-3**.

As indicated in both the 1979 to 1996 and 1997 to 2000 analyses, when all cancers were combined together within a study area, there were not statistically significant differences between the study area populations and the Denver metropolitan area population. However, when the data were disaggregated and examined to show different types of cancer, statistically significant differences between the populations of each study area and the Denver metropolitan area population were identified.

## 5.20.5   What additional studies conducted by others on human health conditions outside of the study area were reviewed?

As previously noted, air quality in the project area or the Denver region is not anticipated to worsen over existing conditions. However, public concern regarding air quality continues. An additional review of literature on air pollution health effects was conducted, including the following reports:

- Health Risk Contributions from Highway Projects

- Status of Research on Potential Mitigation Concepts to Reduce Exposure to Nearby Traffic Pollution (Air Resources Board of California Environmental Protection, 2012)

- Air Quality in Southern California—Time for a Paradigm Shift (Winer, 2004)

- Near-Roadway Air Pollution and Coronary Heart Disease: Burden of Disease and Potential Impact of a Greenhouse Gas Reduction Strategy in Southern California (Environmental Health Perspectives, July 2015)

- Associations of Mortality with Long-Term Exposures to Fine and Ultrafine Particles, Species and Sources: Results from the California Teachers Study Cohort (Environmental Health Perspectives, June 2015)

The last four reports were cited by members of the public, identifying correlations between human health effects to roadway proximity. FHWA's listing of the last four studies does not infer any endorsement, nor does it include any conclusions regarding the accuracy or applicability of these studies. The following are summaries of the additional literature review.

### Health Risk Contributions from Highway Projects

At the request of EPA, FHWA conducted a review of four separate health risk assessments from around the country for the South Mountain Freeway (Loop 202) EIS in Arizona. FHWA's review focused on the methodologies used in the studies and the findings related to incremental health risks. All four studies reported a very low risk of estimated incremental cancer risk from vehicle traffic at each studies' worst-case location. The following is the conclusion from the South Mountain Freeway EIS review of these reports.

"To help put these low health risks from roadway emissions into perspective, FHWA compared them with health risks from traffic fatalities. In 2010, there were 2.47 million deaths in the United States, and 32,728 of these were due to traffic fatalities, meaning that the risk of dying in a traffic accident in 2010 was 0.0106 percent. Converted to terms of risk per million people, this represents a risk of 106 in a million per year, or 7,420 in a million as a 70-year lifetime risk, consistent with cancer risk estimation. While this risk is very high, and while FHWA is actively working to improve highway safety, most people seem to consider this risk "acceptable" in the sense that they do not avoid vehicle trips to reduce it. Also, if the MSAT risk estimates in the studies summarized above are correct, it means that the incremental risk of cancer from breathing air near a major roadway is several hundred times lower than the risk of a fatal accident from using a major roadway.

EPA must make decisions regarding acceptable risk when it develops regulations to control hazardous air pollutants (air toxics) under Titles II and III of the Clean Air Act. EPA's National Emission Standards for Hazardous Air Pollutants for benzene emissions is based on attaining a risk level of no more than 100 cases of cancer per million people. EPA's 2007 MSATs rule, covering vehicles, fuels, and fuel containers, is designed to result in a remaining risk of approximately 5 in a million. Both of these risk levels, considered acceptable by EPA as an outcome of its rulemaking processes, are much higher than the estimated risk from the highway projects that FHWA reviewed." (pg 4-81, AZDOT FEIS 2014)

### Status of Research on Potential Mitigation Concepts to Reduce Exposure to Nearby Traffic Pollution (Air Resources Board of California Environmental Protection, 2012)

In the *Status of Research on Potential Mitigation Concepts to Reduce Exposure to Nearby Traffic Pollution*, the Air Resources Board of California Environmental Protection reports that populations living within 500 feet of busy roadways are highly prone to pollutants associated with vehicular traffic. They also reported that among residents living near roadways, children are more vulnerable to adverse health effects of traffic emissions because they tend

to spend a larger amount of time outside and have higher breathing rates per unit of body mass relative to adults.

### Air Quality in Southern California—Time for a Paradigm Shift (Winer, 2004)

The *Air Quality in Southern California – Time for a Paradigm Shift*, reports that poor health conditions exist in close proximity to heavy traffic corridors, especially at locations were the traffic make-up consists of diesel fuel vehicles. Pollution from these vehicles has been linked with declines in lung function and increased respiratory symptoms. The study concludes that pollution is both a regional and localized issue for people living near to major roadways.

### Near-Roadway Air Pollution and Coronary Heart Disease: Burden of Disease and Potential Impact of a Greenhouse Gas Reduction Strategy in Southern California (Environmental Health Perspectives, July 2015)

The study investigated the burden of coronary heart disease from near-roadway air pollution and compared it with the $PM_{2.5}$ burden in the California South Coast Air Basin for 2008 and under a compact urban growth greenhouse gas reduction scenario for 2035. The study results suggest that a large burden of preventable coronary heart disease mortality is attributable to near-roadway air pollution and is likely to increase even with decreasing exposure by 2035 due to the vulnerability of an aging population. The study also notes that greenhouse gas reduction strategies developed to mitigate climate change offer unexploited opportunities for air pollution health co-benefits.

### Associations of Mortality with Long-Term Exposures to Fine and Ultrafine Particles, Species and Sources: Results from the California Teachers Study Cohort (Environmental Health Perspectives, June 2015)

The study researched the effectiveness of near-road vehicle emissions modeling to assess human effects. Using an emissions-based model, the research team observed significant positive associations between ischemic heart disease mortality and both fine and ultrafine particle species and sources. The results of this research project suggest that the exposure model effectively measured local exposures and facilitated the examination of the relative toxicity of particle species.





# I-70 East Final Environmental Impact Statement
## and Section 4(f) Evaluation

**JANUARY 2016**

**VOLUME 2 OF 3**
**ATTACHMENTS**

EAR  0086

**ATTACHMENT J: Air Quality**



# Air Quality Technical Report

**January**

**2016**

**I-70 East Final Environmental Impact Statement**

EAR 0088

# 2    RESOURCE DEFINITION

The primary air quality concerns for potential I-70 East highway improvements focus on the exposure of local populations to criteria pollutants, MSATs, GHGs, and fugitive dust from construction activities.

## 2.1    Criteria Pollutants

The Clean Air Act of 1970 (CAA), as amended, identifies six commonly found air pollutants, also known as criteria pollutants, as harmful to human health and the environment.

**Ground-level ozone ($O_3$)**. Ozone is a pollutant created by the chemical reaction of volatile organic compounds (VOC) and nitrogen oxides ($NO_x$) in the presence of sunlight. The $O_3$ molecule is created through this chemical transformation, which typically occurs downwind from the VOC and $NO_x$ emission sources. As a result, ozone is considered a regional issue rather than localized to streets or intersections, and an individual highway project will typically have little or no effect on regional ozone concentrations. Ozone is evaluated using the VOC and $NO_x$ emission precursors in an emission inventory burden analysis instead of a localized, or hotspot, analysis.

Health effects include breathing problems, reduced lung function, asthma, irritated eyes, stuffy nose, reduced resistance to colds and other infections, and acceleration of the aging of lung tissue. Ozone also damages plants, trees, rubber products, fabrics, and other materials. As of 2015, the Denver region is classified as nonattainment for the 8-hour 2008 ozone standards. The region was originally designated under the 1-hour standard, which has since been replaced with an 8-hour standard in 2008.

**Particulate matter.** PM is a complex mixture of very small particles and liquid droplets classified as either inhalable coarse-sized particles ($PM_{10}$ refers to particles 10 microns or less) or fine particles ($PM_{2.5}$ refers to particles 2.5 microns or less and makes up a portion of $PM_{10}$). PM includes diesel tailpipe emissions; road, brake, and tire dust; and dust due to construction activities (particulate matter is not a major component of emissions from gasoline-powered vehicles, which are the predominant source of traffic in this corridor).

Health effects include nose and throat irritation, lung damage, and bronchitis. $PM_{10}$ has been a concern in the Denver region in the past, but the region is currently in attainment/maintenance for this pollutant. The Denver nonattainment area was redesignated to attainment/maintenance status by the EPA on September 16, 2002 (EPA, 2002) and has maintained the NAAQS since that time.

While $PM_{10}$ constitutes both visible and fine dust particles, $PM_{2.5}$ is mainly a product of vehicle emissions and other combustion sources, and is not visible to the naked eye. The ratio of $PM_{2.5}$ to $PM_{10}$ varies. According to the results of the emission inventory analysis (Section 7.3), $PM_{2.5}$ accounts for approximately 57 percent of non-dust $PM_{10}$ vehicle exhaust emissions; however, particulate matter pollution sources, such as road sanding and brake and tire wear, are the primary contributing factors of $PM_{10}$ emissions for the Final EIS. For road dust, EPA has documented the ratio of $PM_{2.5}$ to $PM_{10}$ to be 25 percent (EPA, 2011a).

Denver is in attainment for the 1997, 2006, and 2012 $PM_{2.5}$ standards. There has been one exceedance of the 24-hour $PM_{2.5}$ standard since 1999, which occurred at the Denver Continuous Air Monitoring Program (CAMP) monitoring station in 2001; therefore, $PM_{2.5}$ is not a pollutant of concern in the Denver area at the present time or for the foreseeable future.

**Carbon monoxide.** Carbon monoxide is a colorless, odorless gas emitted directly from vehicle tailpipes as a product of combustion. Because of this, carbon monoxide tends to concentrate at intersections with high vehicle delays and poor level of service. Carbon monoxide reduces the ability of blood to bring oxygen to body cells and tissues. High concentrations of carbon monoxide may be particularly hazardous to people who have heart or circulatory problems and people who have damaged lungs or breathing passages. In severe cases, carbon monoxide poisoning can cause death.

Carbon monoxide has been a concern in the Denver region in the past, but the region was redesignated to an attainment/maintenance area for this pollutant in December 2001 (EPA, 2001).

**Nitrogen dioxide.** Nitrogen dioxide ($NO_2$) is a highly reactive gas that is emitted during the combustion process. Health effects include lung damage and illnesses of the respiratory system. $NO_2$ has not been and is not currently an issue in the Denver region or the state of Colorado.

**Sulfur dioxide.** Sulfur dioxide ($SO_2$) is one of a group of highly reactive gases emitted during the combustion process. $SO_2$ causes breathing problems and lung damage. The Denver region has not had any violations of the $SO_2$ standard, nor has any location within Colorado. Sulfur dioxide is a pollutant of general air quality concern and contributes to the overall air shed of the project study area. Sulfur dioxide is not considered a transportation-related criteria pollutant.

**Lead.** Lead is a metal found naturally in the environment. It is used in manufacturing and historically was added to gasoline to reduce engine knocking, boost octane ratings, and decrease wear and tear on engine components. Lead poisoning causes serious health effects, including seizures, high blood pressure, learning disabilities, behavioral disorders, and central nervous system problems. Lead has been phased out of paint and automotive fuels. Monitoring data show that lead is not a pollutant of concern in the Denver region.

The six criteria pollutants are regulated by EPA through the NAAQS, which defines primary and secondary limits for these air pollutants based on human health and environment/property damage, respectively. Table 1 summarizes the concentration standards for the NAAQS criteria pollutants. Each of the criteria pollutants has been proven through scientific study to have adverse effects on human health and the environment and/or property.

EPA tracks these criteria pollutants in two ways: through measurements of pollutant concentrations in the air at monitoring sites across the nation, including the Denver region, and through analytical estimates of emissions based on implementation of transportation plans, improvement programs, and individual projects.

To summarize, of the NAAQS criteria pollutants, only carbon monoxide, $PM_{10}$, and ozone have been of concern in the Denver region, and ozone is the only pollutant for which the region is currently in nonattainment. The region was originally designated under the 1-hour standard,

which has since been replaced with an 8-hour standard in 1997 that was updated in 2008. The Denver region was redesignated to attainment/maintenance status for $PM_{10}$ by the EPA on September 16, 2002 (EPA, 2002a), and for carbon monoxide on December 14, 2001 (EPA, 2001).

**Table 1.    National Ambient Air Quality Standards**

| Pollutant | Primary Standards | Averaging Time | Secondary Standards | Form | Final Rule Citation |
|---|---|---|---|---|---|
| CO | 9 parts per million (ppm) | 8-hour | None | Not to be exceeded more than once per year | 76 Federal Register (FR) 54294 August 31, 2011 |
| | 35 ppm | 1-hour | None | Not to be exceeded more than once per year | |
| Lead | 0.15 micrograms per cubic meter ($\mu g/m^3$) | Rolling three-month average | Same as Primary | Not to be exceeded | 73 FR 66964 November 12, 2008 |
| $NO_2$ | 53 parts per billion (ppb) | Annual | Same as Primary | Annual mean must not exceed standard | 75 FR 6474 February 9, 2010; 61 FR 52852 October 8, 1996 |
| | 100 ppb | 1-hour | None | 98th percentile averaged over three years must not exceed standard | |
| $PM_{10}$ | 150 $\mu g/m^3$ | 24-hour[1] | Same as Primary | Not to be exceeded more than once per year on average over three years[2] | |
| $PM_{2.5}$ | 12 $\mu g/m^3$ | Annual | 15 $\mu g/m^3$ | Annual mean averaged over three years must not exceed standard | 78 FR 3086 January 15, 2013 |
| | 35 $\mu g/m^3$ | 24-hour[1] | Same as Primary | 98th percentile averaged over three years must not exceed standard[3] | |
| Ozone | 0.075 ppm | 8-hour | Same as Primary | Annual fourth- daily maximum 8-hour concentration, averaged over three years must not exceed standard[5] | 73 FR 16436 March 27, 2008 |
| $SO_2$[6] | 75 ppb | 1-hour | None | 99th percentile of 1-hour maximum concentrations averaged over three years must not exceed standard | 75 FR 35520 June 22, 2010 38 FR 25678 September 14, 1973 |

Source: EPA, 2014 (http://www.epa.gov/air/criteria.html)

1. To attain this standard, the three-year average of the annual arithmetic mean $PM_{2.5}$ concentrations from single or multiple community-oriented monitors must not exceed 15 $\mu g/m^3$.

2. The annual average standard for $PM_{10}$ was revoked by EPA in a rule making in September 2006. The previous standard was 50 $\mu g/m^3$.

3. This standard was revised from 65 to 35 $\mu g/m^3$ by EPA in a rule making in September 2006, and will be implemented over a lengthy period. To attain this standard, the three-year average of the 98th percentile of 24-hour concentrations at each population-oriented monitor within an area must not exceed 35 $\mu g/m^3$. This standard becomes effective December 18, 2006.

4. To attain this standard, the three-year average of the fourth highest daily maximum 8-hour average ozone concentrations measured at each monitor within an area over each year must not exceed 0.08 ppm.

5. (a) The standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is < 1. (b) The 1-hour standard is applicable to all areas notwithstanding the promulgation of 8-hour ozone standards under Sec. 50.10. On June 2, 2003, (68 FR 32802) EPA proposed several options for when the 1-hour standard would no longer apply to an area.

6. Colorado has a 3-hour $SO_2$ standard of 267 ppb more than once in any 12-month period. (https://www.colorado.gov/pacific/sites/default/files/5-CCR-1001-14.pdf)

## 2.2   Mobile Source Air Toxics

Toxic air pollutants, also known as Hazardous Air Pollutants (HAP), are those known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. Through the HAP Program of the CAA Amendments of 1990, EPA has identified approximately 187 pollutants that are known to cause health problems. Of the 187 HAP toxic air pollutants, 21 have been identified by EPA as MSATs. MSATs are compounds emitted from motor vehicles and equipment that are known or suspected to cause cancer or other serious health and environmental effects.

Of the 21 MSATs, EPA has indicated that the majority of adverse health effects arise from seven pollutants, which FHWA has labeled as priority MSATs for National Environmental Policy Act (NEPA) studies.

Most air toxics originate from mobile sources (e.g., cars, trucks, buses), stationary sources (e.g., factories, refineries, power plants), and indoor sources including building materials and cleaning solvents.

**Benzene.** Benzene is a component of gasoline vapors and motor vehicle exhaust. Acute (short-term) exposure can cause eye, skin, and respiratory tract irritation, while chronic (long-term) exposure can cause blood disorders, reproductive effects, and cancer.

**Formaldehyde.** Formaldehyde is a component of motor vehicle exhaust. Both acute and chronic exposure can result in respiratory symptoms, as well as eye, nose, and throat irritation. The EPA also considers formaldehyde a probable human carcinogen.

**Naphthalene.** Naphthalene is a component of motor vehicle exhaust. Acute and chronic exposure can lead to anemia and cataracts, as well as liver and neurological damage. The EPA considers naphthalene a possible human carcinogen.

**Diesel Particulate Matter (DPM)/Diesel Exhaust Organic Gases.** DPM and organic gases constitute a mixture of numerous pollutants released during the combustion of diesel fuel. Acute exposures can cause irritation and inflammation, and may exacerbate allergies and asthma symptoms. Chronic exposure may damage the lungs in various ways, and likely poses a lung cancer hazard.

**Acrolein.** Acrolein is a component of motor vehicle exhaust. Acute and chronic exposure may result in upper respiratory tract irritation and congestion, as well as irritation to the eyes. It is unclear from the scientific evidence if acrolein poses a reproductive or cancer risk to humans.

**1,3 Butadiene.** 1,3 butadiene is a component of motor vehicle exhaust that breaks down quickly in the atmosphere, but nonetheless is found in the ambient air at low levels in urban and suburban areas. Acute exposure causes irritation of the eyes, nasal passages, throat, and lungs. Chronic exposure may result in cardiovascular diseases, leukemia, and other cancers.

**Polycyclic Organic Matter (POM).** POM defines a broad class of compounds, including polycyclic aromatic hydrocarbons (PAHs), which are formed by combustion and are present in the atmosphere in particulate form. Compounds in this class may have various acute effects, but the principal concern is that chronic exposure can increase the risk of cancer in humans.

EAR  0092

Based on FHWA's analysis using EPA's air quality models, DPM is the dominant MSAT of concern.

EPA has programs to reduce emissions of many MSATs through control technologies and other methods. Primary among these is EPA's Control of Hazardous Air Pollutants from Mobile Sources: Final Rule to Reduce Mobile Source Air Toxics, issued February 26, 2007, to significantly lower emissions of benzene and other air toxics.

## 2.3   Greenhouse Gases

GHGs trap heat and make the planet warmer. The primary sources of GHG emissions in the United States are from electricity production, transportation, industry, commercial and residential activities, and agriculture. Most of the emissions are produced by burning fossil fuels, such as petroleum, coal, and natural gas. The handling and waste management of certain chemicals also increases GHGs. Recent concerns with climate change (global warming) have prompted calls to reduce GHGs, of which carbon dioxide ($CO_2$) is the primary component.

The full effects of global warming caused by GHGs are known to include broad impacts to society and ecosystem. For example, climate change can increase or decrease rainfall, influence agricultural crop yields, affect human health, cause changes to forests and other ecosystems, or even impact energy supply.

## 2.4   Construction Fugitive Dust

Fugitive dust in the lower atmosphere is a type of particulate matter and is harmful to humans and the environment. The term "fugitive" refers to the widespread or open area sources of the dust as compared to a single point source such as a smokestack. Fugitive dust has been linked to asthma, emphysema, chronic obstructive pulmonary disease, bronchitis, and heart disease. It is also a component of haze, which causes visibility problems. It has both natural and man-made causes. Natural examples of fugitive dust include wind erosion and wildfires. Human activities that cause fugitive dust include agriculture, construction, commercial and industrial operations, burning materials, vehicle exhaust, and travel (for example, unpaved roads, tire wear, and brake dust).

Fugitive construction dust is only one component of lower atmospheric dust and particulate matter, but it is singled out for special consideration due to the potential effects on people within or near a major construction project such as I-70 East. Dust particles can be so small that they pass through the nasal cavity and into the lungs to cause damage. Also, toxic and cancer-causing chemicals can attach to dust and produce much more profound effects when inhaled. These situations may be worsened during construction projects requiring longer durations to complete.

**Table 12.  Existing (2010) criteria pollutant emissions (tons per day)**

| Pollutant | January | July |
|---|---|---|
| CO | 53.10 | 55.58 |
| $NO_x$ | 15.38 | 14.64 |
| $SO_2$* | 0.09 | 0.07 |
| VOC | 3.34 | 3.38 |
| $PM_{10}$ | 0.91 | 0.66 |
| $PM_{2.5}$ | 0.74 | 0.51 |

Note: CO and VOC emissions are higher in the summer because there are more cold starts in summer, and thus more cars traveling the (project area) highways while their catalytic converters are still warming up.
*Sulfur dioxide was analyzed because it is a pollutant of general air quality concern and contributes to the overall conditions of the study area. Sulfur dioxide is not considered a transportation-related criteria pollutant.

## 5.2    Existing Conditions—Mobile Source Air Toxics

Controlling air toxic emissions became a national priority when Congress passed the Clean Air Act Amendments of 1990. The amendments mandated that the EPA regulate HAPs. EPA assessed HAPs in their latest rule on the Control of Hazardous Air Pollutants from Mobile Sources (Federal Register, Vol. 72, No. 37, page 8430, February 26, 2007). In addition, EPA identified seven compounds with significant contributions from mobile sources that are among the national and regional-scale cancer risk drivers. These are acrolein, benzene, 1,3 butadiene, diesel particulate matter plus diesel exhaust organic gases, formaldehyde, naphthalene, and polycyclic organic matter.

FHWA released its revised interim guidance on when and how to analyze MSATs in the NEPA process for highways (Marchese, 2012). The guidance describes a tiered approach for MSAT analysis in NEPA projects: (1) no analysis necessary for projects with no potential MSAT effects; (2) a qualitative analysis for projects with low potential MSAT effects; and (3) a quantitative analysis to differentiate alternatives with higher potential MSAT emissions effects. One of the criteria requiring a quantitative analysis is a project with design year traffic volumes in the range of 140,000 to 150,000 vehicles per day or greater, which the I-70 East project exceeds by a wide margin in the 2035 design year. The quantitative approach is presented in Chapter 4, Methodology. It includes an emissions burden analysis that forecasts emissions trends over time to use as the basis for comparing the effects of the alternatives.

### 5.2.1    Incomplete or Unavailable MSAT Information

Although FHWA guidance recommends a quantitative analysis of MSATs, there are no national standards in place to regulate them. Knowledge of MSAT implications is progressing and research continues. FHWA has issued standard language that addresses incomplete or unavailable information related to MSATs. That language is repeated here for reference:

#### 5.2.1.1    Incomplete or Unavailable Information for Project-Specific MSAT Health Impacts Analysis

*In FHWA's view, information is incomplete or unavailable to credibly predict the project-specific health impacts due to changes in MSAT emissions associated with a proposed set of highway*

alternatives. The outcome of such an assessment, adverse or not, would be influenced more by the uncertainty introduced into the process through assumption and speculation rather than any genuine insight into the actual health impacts directly attributable to MSAT exposure associated with a proposed action.

The U.S. Environmental Protection Agency (EPA) is responsible for protecting the public health and welfare from any known or anticipated effect of an air pollutant. They are the lead authority for administering the Clean Air Act and its amendments and have specific statutory obligations with respect to hazardous air pollutants and MSAT. The EPA is in the continual process of assessing human health effects, exposures, and risks posed by air pollutants. They maintain the Integrated Risk Information System (IRIS), which is "a compilation of electronic reports on specific substances found in the environment and their potential to cause human health effects" (EPA, http://www.epa.gov/iris/). Each report contains assessments of non-cancerous and cancerous effects for individual compounds and quantitative estimates of risk levels from lifetime oral and inhalation exposures with uncertainty spanning perhaps an order of magnitude.

Other organizations are also active in the research and analyses of the human health effects of MSAT, including the Health Effects Institute (HEI). Two HEI studies are summarized in Appendix D of FHWA's Interim Guidance Update on Mobile source Air Toxic Analysis in NEPA documents. Among the adverse health effects linked to MSAT compounds at high exposures are; cancer in humans in occupational settings; cancer in animals; and irritation to the respiratory tract, including the exacerbation of asthma. Less obvious is the adverse human health effects of MSAT compounds at current environmental concentrations (HEI, http://pubs.healtheffects.org/view.php?id=282) or in the future as vehicle emissions substantially decrease (HEI, http://pubs.healtheffects.org/view.php?id=306).

The methodologies for forecasting health impacts include emissions modeling; dispersion modeling; exposure modeling; and then final determination of health impacts - each step in the process building on the model predictions obtained in the previous step. All are encumbered by technical shortcomings or uncertain science that prevents a more complete differentiation of the MSAT health impacts among a set of project alternatives. These difficulties are magnified for lifetime (i.e., 70 year) assessments, particularly because unsupportable assumptions would have to be made regarding changes in travel patterns and vehicle technology (which affects emissions rates) over that time frame, since such information is unavailable.

It is particularly difficult to reliably forecast 70-year lifetime MSAT concentrations and exposure near roadways; to determine the portion of time that people are actually exposed at a specific location; and to establish the extent attributable to a proposed action, especially given that some of the information needed is unavailable.

There are considerable uncertainties associated with the existing estimates of toxicity of the various MSAT, because of factors such as low-dose extrapolation and translation of occupational exposure data to the general population, a concern expressed by HEI (http://pubs.healtheffects.org/view. php?id=282). As a result, there is no national consensus on air dose-response values assumed to protect the public health and welfare for MSAT compounds, and in particular for diesel PM. The EPA (http://www.epa.gov/risk/basic information.htm#g ) and the HEI (http://pubs.healtheffects.org/ getfile.php?u=395) have not established a basis for quantitative risk assessment of diesel PM in ambient settings.

There is also the lack of a national consensus on an acceptable level of risk. The current context is the process used by the EPA as provided by the Clean Air Act to determine whether more stringent controls are required in order to provide an ample margin of safety to protect public health or to prevent an adverse environmental effect for industrial sources subject to the maximum achievable control technology standards, such as benzene emissions from refineries. The decision framework is a two-step process. The first step requires EPA to determine an "acceptable" level of risk due to emissions from a source, which is generally no greater than approximately 100 in a million. Additional factors are considered in the second step, the goal of which is to maximize the number of people with risks less than 1 in a million due to emissions

EAR_0095

*from a source. The results of this statutory two-step process do not guarantee that cancer risks from exposure to air toxics are less than 1 in a million; in some cases, the residual risk determination could result in maximum individual cancer risks that are as high as approximately 100 in a million. In a June 2008 decision, the U.S. Court of Appeals for the District of Columbia Circuit upheld EPA's approach to addressing risk in its two step decision framework. Information is incomplete or unavailable to establish that even the largest of highway projects would result in levels of risk greater than deemed acceptable.*

*Because of the limitations in the methodologies for forecasting health impacts described, any predicted difference in health impacts between alternatives is likely to be much smaller than the uncertainties associated with predicting the impacts. Consequently, the results of such assessments would not be useful to decision makers, who would need to weigh this information against project benefits, such as reducing traffic congestion, accident rates, and fatalities plus improved access for emergency response, that are better suited for quantitative analysis.*

## 5.2.2      Existing (2010) MSAT Emissions

Emission inventories were modeled in accordance with the procedures and assumptions presented in Chapter 4, Methodology. The year 2010 is used to represent existing levels of emissions as this year is consistent with the base year of the DRCOG regional travel demand model and the conformity determination for the regional transportation plan and improvement program. Estimated MSAT emissions in the I-70 air quality study area are shown in Table 13.

**Table 13.  Existing (2010) MSAT emissions (tons per day)**

| Pollutant | January | July |
|---|---|---|
| Benzene | 0.066 | 0.093 |
| Formaldehyde | 0.050 | 0.053 |
| 1,3 Butadiene | 0.009 | 0.011 |
| Acrolein | 0.003 | 0.004 |
| Naphthalene | 0.007 | 0.007 |
| Polycyclic organic matter | 0.003 | 0.003 |
| Diesel particulate matter | 0.374 | 0.377 |

## 5.2.2.1      National MSAT trends

According to an FHWA analysis using EPA's MOVES2010b model, as shown in Figure 14, even if vehicle-miles traveled (VMT) increase by 102 percent as assumed from 2010 to 2050, a combined reduction of 83 percent in the total annual emissions for the priority MSATs is projected for the same time period (Marchese, 2012).

**Figure 14.**     **U.S. annual vehicle miles traveled vs. mobile source air toxics emissions, 2010 to 2050, using EPA's MOVES2010b model**



Source:
*http://www.fhwa.dot.gov/environment/air_quality/air_toxics/policy_and_guidance/aqintguidmem.cfm* (Marchese, 2012)

Note: Trends for specific locations may be different, depending on locally derived information representing vehicle-miles travelled, vehicle speeds, vehicle mix, fuels, emission control programs, meteorology, and other factors.

## 5.2.3        MSAT Research

*Human epidemiology and animal toxicology experiments indicate that many chemicals or mixtures termed air toxics have the potential to impact human health. As toxicology, epidemiology and air contaminant measurement techniques have improved over the decades, scientists and regulators have increased their focus on the levels of each chemical or material in the air in an effort to link potential exposures with potential health effects. The EPA's list of 21 mobile source toxics represents their prioritization of these chemicals or materials for further study and evaluation. The EPA's strategy for evaluating air toxic compounds effects is focused on both national trends and local impacts. The FHWA has embarked on an air toxics research program with the intent of understanding the mobile source contribution and its impact on local and national air quality. Several of studies either initiated or supported by FHWA are described below[2].*

*Air toxics emissions from mobile sources have the potential to impact human health and often represent a regulatory agency concern. The FHWA has responded to this concern by developing an integrated research program to answer the most important transportation community questions related to air toxics, human health, and the NEPA process. To this end, FHWA has performed, funded or is currently managing several research projects. Many of these projects are based on an Air Toxics Research Workplan that provides a roadmap for agency research efforts[2]. These efforts include[3]:*

## 5.2.3.1        The National Near Roadway MSAT Study

*The FHWA, in conjunction with the EPA and a consortium of State departments of transportation, studied the concentration and physical behavior of MSAT and mobile source PM 2.5 in Las Vegas, Nevada and Detroit, Michigan. The study criteria dictated that the study site be open to traffic and have 150,000 Annual Average Daily Traffic or more. These studies were intended to provide knowledge about the dispersion of MSAT emissions with the ultimate goal of enabling more informed transportation and environmental decisions at the project-level. These studies are unique in that the monitored data was collected for the entire year. The Las Vegas, NV report revealed there are a large number of influences in this urban setting and researchers must look beyond the roadway to find all the sources in the near road environment. Additionally, in Las Vegas, meteorology played a large role in the concentrations measured in the near road study area. More information is available at http://www.fhwa.dot.gov/environment/air_quality /air_toxics/research_and_analysis/mobile_source_ air_toxics/.*

## 5.2.3.2        Traffic-Related Air Pollution

### 5.2.3.2.1        Going One Step Beyond: A Neighborhood Scale Air Toxics Assessment in North Denver (The Good Neighbor Project)

*In 2007, the Denver Department of Environmental Health (DDEH) issued a technical report entitled Going One Step Beyond: A Neighborhood Scale Air Toxics Assessment in North Denver (The Good Neighbor Project). This research project was funded by FHWA. In this study, DDEH conducted a neighborhood-scale air toxics assessment in North Denver, which includes a portion of the proposed I-70 East project area. Residents in this area have been very concerned about both existing health effects in their neighborhoods (from industrial activities, hazardous waste sites, and traffic) and potential health impacts from changes to I-70.*

---

[2] The information provided here is an update to research work discussed in the 2009 release of this interim guidance. The current title of each research activity is followed by the title used to describe the activity previously.
[3] Available at http://www.fhwa.dot.gov/environment/airtoxic/workplan/index.htm

*The study was designed to compare modeled levels of the six priority MSATs identified in FHWA's 2006 guidance with measurements at existing MSAT monitoring sites in the study area. MOBILE6.2 emissions factors and the ISC3ST dispersion model were used (some limited testing of the CALPUFF model was also performed). Key findings include: 1) modeled mean annual concentrations from highways were well below estimated Integrated Risk Information System (IRIS) cancer (1/100,000) and non-cancer risk values for all six MSAT; 2) modeled concentrations dropped off sharply within 50 meters of roadways; 3) modeled MSAT concentrations tended to be higher along highways near the Denver Central Business District (CBD) than along the I-70 East corridor (in some cases, they were higher within the CBD itself, as were the monitored values); and 4) dispersion model results were generally lower than monitored concentrations but within a factor of two at all locations.*

### 5.2.3.2.2    Mobile Source Air Toxic Hotspot

*Given concerns about the possibility of MSAT exposure in the near road environment, The Health Effects Institute (HEI) dedicated a number of research efforts at trying to find a MSAT "hotspot." In 2011 three studies were published that tested this hypothesis. In general the authors confirm that while highways are a source of air toxics, they were unable to find that highways were the only source of these pollutants and determined that near road exposures were often no different or no higher than background or ambient levels of exposure, and hence no true hotspots were identified. These links provide additional information where monitored on-road emissions were higher than emission levels monitored near road residences, but the issue of hotspot was not ultimately discussed.*

*http://pubs.healtheffects.org/getfile.php?u=659 page 137,*
*http://pubs.healtheffects.org/getfile.php?u=656 page 143, and*
*http://pubs.healtheffects.org/getfile.php?u=617 page 87,*

### 5.2.3.2.3    Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects

*In January 2010, HEI released Special Report #17, investigating the health effects of traffic related air pollution. The goal of the research was to synthesize available information on the effects of traffic on health. Researchers looked at linkages between: (1) traffic emissions (at the tailpipe) with ambient air pollution in general, (2) concentrations of ambient pollutants with human exposure to pollutants from traffic, (3) exposure to pollutants from traffic with human-health effects and toxicologic data, and (4) toxicologic data with epidemiological associations. Challenges in making exposure assessments, such as quality and quantity of emissions data and models, were investigated, as was the appropriateness of the use of proximity as an exposure-assessment model. Overall, researchers felt that there was "sufficient" evidence for causality for the exacerbation of asthma. Evidence was "suggestive but not sufficient" for other health outcomes such as cardiovascular mortality and others. Study authors also note that past epidemiologic studies may not provide an appropriate assessment of future health associations as vehicle emissions are decreasing overtime. The report is available from HEI's website at http://www.healtheffects.org/. The FHWA provides financial support to HEI's research work.*

### 5.2.3.2.4    HEI Special Report #16

*In November 2007, the HEI published Special Report #16: Mobile-Source Air Toxics: A Critical Review of the Literature on Exposure and Health Effects. The purpose of this Report was to accomplish the following tasks:*

- *Use information from the peer-reviewed literature to summarize the health effects of exposure to the 21 MSATs defined by the EPA in 2001;*

- *Critically analyze the literature for a subset of priority MSAT; and*

EAR  0099

- *Identify and summarize key gaps in existing research and unresolved questions about the priority MSAT.*

*The HEI chose to review literature for acetaldehyde, acrolein, benzene, 1,3 butadiene, formaldehyde, naphthalene, and polycyclic organic matter (POM). Diesel exhaust was included, but not reviewed in this study since it had been reviewed by HEI and EPA recently. In general, the Report concluded that the cancer health effects due to mobile sources are difficult to discern since the majority of quantitative assessments are derived from occupational cohorts with high concentration exposures and some cancer potency estimates are derived from animal models. The Report suggested that substantial improvements in analytical sensitively and specificity of biomarkers would provide better linkages between exposure and health effects. Noncancer endpoints were not a central focus of most research, and therefore require further investigation. Subpopulation susceptibility also requires additional evaluation. The study is available from HEI's website at http://www.healtheffects.org/.*

## 5.2.3.2.5    Kansas City PM Characterization Study (Kansas City Study)

*This study was initiated by EPA to conduct exhaust emissions testing on 480 light-duty, gasoline vehicles in the Kansas City Metropolitan Area (KCMA). Major goals of the study included characterizing PM emissions distributions of a sample of gasoline vehicles in Kansas City; characterizing gaseous and PM toxics exhaust emissions; and characterizing the fraction of high emitters in the fleet. In the process, sampling methodologies were evaluated. Overall, results from the study were used to populate databases for the MOVES emissions model. The FHWA was one of the research sponsors. This study is available on EPA's website at: http://www.epa.gov/otaq/emission-factors-research/420r08009.pdf*

## 5.2.3.2.6    Transportation Contribution to Particulate Matter Pollution (Air Toxics Supersite Study)

*The purpose of this study was to improve understanding of the role of highway transportation sources in particulate matter (PM) pollution. In particular, it was important to examine uncertainties, such as the effects of the spatial and temporal distribution of travel patterns, consequences of vehicle fleet mix and fuel type, the contribution of vehicle speed and operating characteristics, and influences of geography and weather. The fundamental methodology of the study was to combine EPA research-grade air quality monitoring data in a representative sample of metropolitan areas with traffic data collected by State departments of transportation (DOTs) and local governments.*

*Phase I of the study, the planning and data evaluation stage, assessed the characteristics of EPA's ambient PM monitoring initiatives and recruited State DOTs and local government to participate in the research. After evaluating and selecting potential metropolitan areas based on the quality of PM and traffic monitoring data, nine cities were selected to participate in Phase II. The goal of Phase II was to determine whether correlations could be observed between traffic on highway facilities and ambient PM concentrations. The Phase I report was published in September 2002. Phase II included the collection of traffic and air quality data and data analysis. Ultimately, six cities participated: New York City (Queens), Baltimore, Pittsburgh, Atlanta, Detroit and Los Angeles.*

*In Phase II, air quality and traffic data were collected. The air quality data was obtained from EPA AIRS AQS system, Supersite personnel, and NARSTO data archive site. Traffic data included ITS (roadway surveillance), Coverage Counts (routine traffic monitoring) and Supplemental Counts (specifically for research project). Analyses resulted in the conclusion that only a weak correlation existed between $PM_{2.5}$ concentrations and traffic activity for several of the sites. The existence of general trends indicates a relationship, which however is primarily unquantifiable. Limitations of the study include the assumption that traffic sources are close enough to ambient monitors to provide sufficiently strong source strength, that vehicle activity is an appropriate surrogate for*

*mobile emissions, and lack of knowledge of other factors such as non-traffic sources of PM and its precursors. A paper documenting the work of Phase II was presented at the 2004 Emissions Inventory Conference and is available at http://www.epa.gov/ttn/chief/conference/ei13/ mobile/black.pdf.*

## 5.3   Existing Conditions—Greenhouse Gases

Emission inventories for GHG were prepared as specified in Chapter 4, Methodology. The daily GHG emission inventories were estimated by APCD to be 4,064 and 4,318 tons per weekday in January and July 2010, respectively. There are no specific requirements for conducting a GHG analysis for a NEPA project. However, the Air Quality Protocol developed through the Interagency Consultation process calls for the reporting of global, national, statewide, and regional emissions of GHGs to provide context for the study area emissions calculated for the I-70 alternatives.

Climate change is an important national and global concern. While the Earth has gone through many natural changes in climate in its history, there is general agreement that the Earth's climate is currently changing at an accelerated rate and will continue to do so for the foreseeable future. Anthropogenic (human-caused) greenhouse gas emissions contribute to this rapid change. Carbon dioxide makes up the largest component of these GHG emissions. Other prominent transportation GHGs include methane and nitrous oxide.

Many GHGs occur naturally. Water vapor is the most abundant GHG and makes up approximately two thirds of the natural greenhouse effect. However, the burning of fossil fuels and other human activities are adding to the concentration of GHGs in the atmosphere. Many GHGs remain in the atmosphere for time periods ranging from decades to centuries. GHGs trap heat in the Earth's atmosphere. Because atmospheric concentration of GHGs continues to climb, our planet will continue to experience climate-related phenomena. For example, warmer global temperatures can cause changes in precipitation and sea levels.

To date, no national standards have been established regarding GHGs, nor has EPA established criteria or thresholds for ambient GHG emissions pursuant to its authority to establish motor vehicle emission standards for carbon dioxide under the Clean Air Act. However, there is a considerable body of scientific literature addressing the sources of GHG emissions and their adverse effects on climate, including reports from the Intergovernmental Panel on Climate Change, the U.S. National Academy of Sciences, and EPA and other federal agencies.

GHGs are different from other air pollutants evaluated in federal environmental reviews because their impacts are not localized or regional due to their rapid dispersion into the global atmosphere, which is characteristic of these gases. The affected environment for carbon dioxide and other GHG emissions is the entire planet. In addition, from a quantitative perspective, global climate change is the cumulative result of numerous and varied emissions sources (in terms of both absolute numbers and types), each of which makes a relatively small addition to global atmospheric GHG concentrations. In contrast to broad scale actions such as actions involving an entire industry sector or very large geographic areas, it is difficult to isolate and understand the GHG emissions impacts for a particular transportation project. Furthermore, presently there is no scientific methodology for attributing specific climatological changes to a particular transportation project's emissions.

EAR  0101

Under NEPA, detailed environmental analysis should be focused on issues that are significant and meaningful to decision-making. FHWA has concluded, based on the nature of GHG emissions and the exceedingly small potential GHG impacts of the proposed action, as discussed below and shown in Table 14, that the GHG emissions from the proposed action will not result in "reasonably foreseeable significant adverse impacts on the human environment" (40 CFR 1502.22(b)). The GHG emissions from the project Build Alternatives will be insignificant, and will not play a meaningful role in a determination of the environmentally preferable alternative or the selection of the preferred alternative. More detailed information on GHG emissions "is not essential to a reasoned choice among reasonable alternatives" (40 CFR 1502.22(a)) or to making a decision in the best overall public interest based on a balanced consideration of transportation, economic, social, and environmental needs and impacts ( 23 CFR 771.105(b)). For these reasons, a limited alternatives-level GHG analysis has been performed for this project based on emission inventories for each alternative for each five-year increment between 2010 and 2035. This allows for a basic comparison of potential GHG emissions among alternatives.

The context in which the emissions from the proposed project will occur, together with the expected GHG emissions contribution from the project, illustrate why the project's GHG emissions will not be significant and will not be a substantial factor in the decision-making. The transportation sector is the second largest source of total GHG emissions in the U.S., behind electricity generation. The transportation sector was responsible for approximately 27 percent of all anthropogenic GHG emissions in the U.S. in 2010.[4] The majority of transportation GHG emissions are the result of fossil fuel combustion. Carbon dioxide$_2$ makes up the largest component of these GHG emissions. U.S. carbon dioxide emissions from the consumption of energy accounted for about 18 percent of worldwide energy consumption carbon dioxide emissions in 2010.[5]. U.S. transportation carbon dioxide emissions accounted for about 6 percent of worldwide carbon dioxide emissions.[6]

While the contribution of GHGs from transportation in the U.S. as a whole is a large component of U.S. GHG emissions, as the scale of analysis is reduced the GHG contributions become quite small. Using carbon dioxide because of its predominant role in GHG emissions, Table 14, below, presents the relationship between current and projected Colorado highway carbon dioxide emissions and total global carbon dioxide emissions, as well as information on the scale of the project relative to statewide travel activity.

Based on emissions estimates from EPA's MOVES model[7], and global carbon dioxide estimates and projections from the Energy Information Administration, carbon dioxide

---

[4] Calculated from data in U.S. Environmental Protection Agency, Inventory of Greenhouse Gas Emissions and Sinks, 1990-2010.

[5] Calculated from data in U.S. Energy Information Administration International Energy Statistics, Total Carbon Dioxide Emissions from the Consumption of Energy, http://www.eia.gov/cfapps/ipdbproject/IEDIndex3.cfm?tid=90&pid=44&aid=8, accessed 2/25/13.

[6] Calculated from data in EIA figure 104: http://www.eia.gov/forecasts/archive/ieo10/emissions.html and EPA table ES-3: http://epa.gov/climatechange/emissions/downloads11/US-GHG-Inventory-2011-Executive-Summary.pdf

[7] http://www.epa.gov/otaq/models/moves/index.htm. EPA's MOVES model can be used to estimate vehicle exhaust emissions of carbon dioxide ($CO_2$) and other GHGs. $CO_2$ is frequently used as an indicator of overall transportation GHG emissions because the quantity of these emissions is much larger than that of all other transportation GHGs combined, and because $CO_2$ accounts for 90-95% of the overall climate impact from transportation sources.

emissions from motor vehicles in the entire state of Colorado contributed less than one tenth of one percent of global emissions in 2010 (0.0813 percent). These emissions are projected to contribute an even smaller fraction (0.0612 percent) in 2040[8]. VMT in the project study area represents 5.6 percent of total Colorado travel activity; and the project itself would increase statewide VMT by an estimated 0.0 percent. (Note that the project study area, as defined for the MSAT analysis, includes travel on many other roadways in addition to the proposed project.) As a result, based on the Build Alternative with the highest VMT, FHWA estimates that the proposed project could result in a potential increase in global carbon dioxide emissions in 2040 of 0.0000002 percent (less than one one hundred-thousandth of one percent). This very small change in global emissions is well within the range of uncertainty associated with future emissions estimates.[9, 10]

**Table 14.  Statewide and Project Emissions Potential, Relative to Global Totals**

|  | Global $CO_2$ emissions, MMT[11] | Colorado motor vehicle $CO_2$ emissions, MMT[12] | Colorado motor vehicle emissions, % of global total | Project study area VMT, % of statewide VMT[13] | Percent change in statewide VMT due to project |
|---|---|---|---|---|---|
| Current Conditions (2010) | 29,670 | 24.1 | 0.0813% | 5.6% | (None) |

---

MOVES includes estimates of both emissions rates and VMT, and these were used to estimate the Colorado statewide highway emissions in Table 5-3.

[8] Colorado emissions represent a smaller share of global emissions in 2040 because global emissions increase at a faster rate.

[9] For example, Figure 114 of the Energy Information Administration's *International Energy Outlook 2010* shows that future emissions projections can vary by almost 20%, depending on which scenario for future economic growth proves to be most accurate.

[10] When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency is required make clear that such information is lacking (40 CFR 1502.22). The methodologies for forecasting GHG emissions from transportation projects continue to evolve and the data provided should be considered in light of the constraints affecting the currently available methodologies. As previously stated, tools such as EPA's MOVES model can be used to estimate vehicle exhaust emissions of carbon dioxide ($CO_2$) and other GHGs. However, only rudimentary information is available regarding the GHG emissions impacts of highway construction and maintenance. Estimation of GHG emissions from vehicle exhaust is subject to the same types of uncertainty affecting other types of air quality analysis, including imprecise information about current and future estimates of vehicle miles traveled, vehicle travel speeds, and the effectiveness of vehicle emissions control technology. Finally, there presently is no scientific methodology that can identify causal connections between individual source emissions and specific climate impacts at a particular location.

[11] These estimates are from the EIA's *International Energy Outlook 2010*, and are considered the best-available projections of emissions from fossil fuel combustion. These totals do not include other sources of emissions, such as cement production, deforestation, or natural sources; however, reliable future projections for these emissions sources are not available.

[12] MOVES projections suggest that Colorado motor vehicle $CO_2$ emissions may increase by 15.5% between 2010 and 2040; more stringent fuel economy/GHG emissions standards reflected in MOVES2010b will not be sufficient to offset projected growth in VMT.

[13] *Statewide VMT in 2010 (46,940 million) provided by U.S. DOT, FHWA, Highway Statistics, April 26, 2012*

EAR  0103

| Future Projection (2040) | 45,500 | 27.9 | 0.0612% | 5.6% | 0.0000002% |

Table notes: MMT = million metric tons. Global emissions estimates are from International Energy Outlook 2010, data for Figure 104, projected to 2040. Colorado emissions estimates are from MOVES2010b.

# 6    DESCRIPTION OF ALTERNATIVES

Consistent with federal regulations, the Final EIS fully evaluates the No-Action, Revised Viaduct, and Partial Cover Lowered Alternatives for impacts to transportation. The alternatives and options are presented in Table 15 and shown in Figure 15.

For more detail on the alternatives and their options, see Attachment C, Alternative Analysis Technical Report. Attachment A, Alternatives Maps, included as part of this document, contains figures showing the roadway configurations within the study area for each of the future alternatives.

**Table 15.  Alternatives and Options**

| Alternative | | Expansion Options | Operational Options |
|---|---|---|---|
| No-Action Alternative | | • North<br>• South | N/A |
| Build Alternatives | Revised Viaduct | • North<br>• South | • General-Purpose Lanes<br>• Managed Lanes |
| | Partial Cover Lowered | N/A | • General-Purpose Lanes<br>• Managed Lanes |

## 6.1    No-Action Alternative

The No-Action Alternative replaces the existing viaduct between Brighton Boulevard and Colorado Boulevard without adding any capacity; the remainder of the corridor will reflect current conditions and include existing, planned, and programmed roadway and transit improvements (such as FasTracks) in the study area.

## 6.2    Build Alternatives

Build Alternatives add capacity to I-70 by constructing additional lane(s) or restriping between I-25 and Tower Road.

**Revised Viaduct Alternative.** This alternative replaces the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard. It adds two lanes in each direction from Brighton Boulevard to Tower Road. It also adds capacity from I-25 to Brighton Boulevard.

**Partial Cover Lowered Alternative.** The Partial Cover Lowered Alternative is shown in Figure 15. As a result of the comments received on the Supplemental Draft EIS and additional stakeholder outreach and agency coordination, the Partial Cover Lowered Alternative has been refined to include elements of both the Basic Option and the Modified Option of the

EAR  0104

section do occur on roadways affected by the project. Also note that the differences in emissions between alternatives reported in the various exhibits below are solely due to the project. Criteria pollutant values are shown in pounds. Each of the Build Alternatives as well as the No-Action Alternative have been analyzed to determine if any of the alternatives result in a pollutant to become a discriminating factor, or outlier, in this analysis. Any variations in the general emission inventory trends are noted.

The criteria pollutants are:

- Ozone
- Particulate matter
- Carbon monoxide
- Nitrogen oxides
- Sulfur dioxide
- Lead

Ozone formation requires a complex chemical reaction of other pollutants to occur. It is discussed herein based on the inventories of its two primary precursor pollutants: nitrogen oxides and volatile organic compounds. Lead has been completely phased out of motor vehicle fuels in the United States and is no longer a vehicle emission concern, so no inventories were prepared for that pollutant.

The 2010, 2015, and 2020 emissions are the same for all alternatives for any given pollutant. Future Build conditions begin after opening day and are reflected in the 2025, 2030, and 2035 emissions in the table and exhibits in this section.

### 7.3.1    Particulate matter

Table 22, Table 23, Figure 20, and Figure 21 show the values for the $PM_{2.5}$ and $PM_{10}$ emission inventories. From 2010 forward, both pollutants trend downward, due primarily to the cleaner standards for diesel engines, until about 2025 or 2030, when they trend higher as projected vehicular travel growth overtakes the technology-based emission reduction estimates. Although there are minor differences in emissions among the No-Action and Build Alternatives, there is no real discernible difference, since they are all very close in any given year. Therefore, the particulate matter emissions are not a discriminating factor in the selection of a preferred alternative.

**Table 22.   PM$_{2.5}$ emission inventories (tons per day)**

| Year | No-Action | Revised Viaduct—GP | Revised Viaduct—ML | Partial Cover Lowered—GP | Partial Cover Lowered—ML | Phase 1 |
|------|-----------|--------------------|--------------------|--------------------------|--------------------------|---------|
| January | | | | | | |
| 2010 | 0.74 | 0.74 | 0.74 | 0.74 | 0.74 | 0.74 |
| 2015 | 0.44 | 0.44 | 0.44 | 0.44 | 0.44 | 0.44 |
| 2020 | 0.38 | 0.38 | 0.38 | 0.38 | 0.38 | 0.38 |
| 2025 | 0.34 | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| 2030 | 0.35 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 |
| 2035 | 0.37 | 0.39 | 0.38 | 0.39 | 0.38 | 0.38 |
| July | | | | | | |
| 2010 | 0.51 | 0.51 | 0.51 | 0.51 | 0.51 | 0.51 |
| 2015 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 |
| 2020 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 |
| 2025 | 0.18 | 0.19 | 0.19 | 0.19 | 0.19 | 0.19 |
| 2030 | 0.19 | 0.19 | 0.19 | 0.19 | 0.19 | 0.19 |
| 2035 | 0.20 | 0.20 | 0.20 | 0.20 | 0.20 | 0.20 |

**Table 23.   PM$_{10}$ emission inventories (tons per day)**

| Year | No-Action | Revised Viaduct—GP | Revised Viaduct—ML | Partial Cover Lowered—GP | Partial Cover Lowered—ML | Phase 1 |
|------|-----------|--------------------|--------------------|--------------------------|--------------------------|---------|
| January | | | | | | |
| 2010 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 |
| 2015 | 0.60 | 0.60 | 0.60 | 0.60 | 0.60 | 0.60 |
| 2020 | 0.59 | 0.59 | 0.59 | 0.59 | 0.59 | 0.59 |
| 2025 | 0.57 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 |
| 2030 | 0.61 | 0.62 | 0.61 | 0.62 | 0.61 | 0.61 |
| 2035 | 0.66 | 0.66 | 0.66 | 0.67 | 0.66 | 0.66 |
| July | | | | | | |
| 2010 | 0.66 | 0.66 | 0.66 | 0.66 | 0.66 | 0.66 |
| 2015 | 0.43 | 0.43 | 0.43 | 0.43 | 0.43 | 0.43 |
| 2020 | 0.41 | 0.41 | 0.41 | 0.41 | 0.41 | 0.41 |
| 2025 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 |
| 2030 | 0.43 | 0.43 | 0.43 | 0.43 | 0.43 | 0.43 |
| 2035 | 0.47 | 0.47 | 0.47 | 0.47 | 0.47 | 0.47 |

**Figure 20. PM$_{2.5}$ emission inventories (tons per day)**



**Figure 21. PM$_{10}$ emission inventories (tons per day)**



### 7.3.2    Carbon Monoxide

Table 24 and Figure 22 show the carbon monoxide emission inventories. In almost all cases, the January emissions are shown to be higher than July emissions because of differing fuel specifications. The July emissions trend down from 2010 to 2035 largely because of fuel economy standards and engine technology. However, the January emissions show a different trend, as they begin to increase after 2020. This is explained by an increasing effect of engine cold starts in the colder months. There are minor differences in emissions among the alternatives in any given year; therefore, carbon monoxide is not a discriminating factor in the selection of a preferred alternative.

**Table 24.  Carbon monoxide emission inventories (tons per day)**

| Year | No-Action | Revised Viaduct—GP | Revised Viaduct—ML | Partial Cover Lowered—GP | Partial Cover Lowered—ML | Phase 1 |
|------|-----------|--------------------|--------------------|--------------------------|--------------------------|---------|
| **January** | | | | | | |
| 2010 | 53.10 | 53.10 | 53.10 | 53.10 | 53.10 | 53.10 |
| 2015 | 40.84 | 40.84 | 40.84 | 40.84 | 40.84 | 40.84 |
| 2020 | 41.52 | 41.52 | 41.52 | 41.52 | 41.52 | 41.52 |
| 2025 | 41.30 | 43.87 | 42.90 | 43.84 | 43.06 | 42.29 |
| 2030 | 42.97 | 45.65 | 44.63 | 45.61 | 44.80 | 44.00 |
| 2035 | 45.37 | 48.20 | 47.13 | 48.16 | 47.31 | 46.46 |
| **July** | | | | | | |
| 2010 | 55.58 | 55.58 | 55.58 | 55.58 | 55.58 | 55.58 |
| 2015 | 41.17 | 41.17 | 41.17 | 41.17 | 41.17 | 41.17 |
| 2020 | 39.64 | 39.64 | 39.64 | 39.64 | 39.64 | 39.64 |
| 2025 | 36.06 | 38.64 | 37.63 | 38.58 | 37.79 | 37.03 |
| 2030 | 33.70 | 36.11 | 35.17 | 36.05 | 35.31 | 34.60 |
| 2035 | 31.25 | 33.48 | 32.61 | 33.43 | 32.75 | 32.09 |

**Figure 22. Carbon monoxide emission inventories (tons per day)**



EAR  0109

## 7.4.9    Road dust emissions inventory

Estimates for road dust include all particulate debris that is made airborne through the movement of traffic, including residual material from road sanding along with soils and minerals blown on to the road. Estimates for road dust show an increase of 43 percent between 2010 and the 2035 No-Action Alternative, a direct result in the increase in VMT estimated along the corridor. As shown in Table 36, there is only a slight difference between the 2035 No-Action Alternative and Build Alternatives; the Preferred Alternative has 1.6 percent more road dust in tons per day than the No-Action Alternative.

**Table 36.  Fugitive dust emissions inventory**

| Alternative | Total Fugitive Dust Emissions (tons/day) | Percent Difference from No-Action Alternative |
|---|---|---|
| No-Action Alternative | 4.9 | N/A |
| Revised Viaduct Alternative (General-Purpose Lanes) | 5.0 | 2.7 |
| Revised Viaduct Alternative (Managed Lanes) | 5.0 | 1.6 |
| Partial Cover Lowered Alternative (General-Purpose Lanes) | 5.0 | 2.8 |
| Partial Cover Lowered Alternative (Managed Lanes) | 5.0 | 1.6 |

Source: APCD (2015)

## 7.4.10    Fugitive emissions during construction

As discussed previously, the estimation of fugitive emissions during construction is not possible until specific construction methods and sequencing are developed for the selected preferred alternative. It is possible, however, to use the amount of material handled to provide an indication of the relative construction emissions for each alternative as a result of the movement of dirt, but emissions from construction vehicles is not included in this estimate.

Table 37 presents the volume of material estimated to be handled for each project alternative. These numbers represent the amount of material brought to the project area to serve as embankment material. This quantification assumes that the Partial Cover Lowered Alternative will use excavation material derived from Brighton Boulevard to Colorado Boulevard as embankment material elsewhere within the project, requiring less new material to be handled. Excluding the No-Action Alternative, the Revised Viaduct Alternative is projected to have the highest volume of material to be handled, and will, therefore, likely generate the greatest amount of fugitive emissions and equipment-related exhaust particulate emissions during construction.

The difference between the highest and lowest volumes of material is 97 percent.

EAR  0110