

# I-70 East ROD 1:
# Phase 1 (Central 70 Project)

## Revised Elimination of I-270/I-76 Reroute Alternative Technical Memorandum

# January 2017



EAR  0267

Case No. 1:17-cv-01661-WJM-MEH   Document 88-18   filed 11/07/17   USDC Colorado   pg 3 of 74

# TABLE OF CONTENTS

**Chapter**                                                                                                    **Page**

1    PURPOSE OF THIS REPORT ..................................................................................... 1
2    BACKGROUND ..................................................................................................... 1
3    REASONS FOR ELIMINATION OF THE I-270/I-76 REROUTE ...................................... 3
     3.1   Does not Improve Congestion and Safety Conditions ...................................... 3
     3.2   Negatively Affects Mobility ....................................................................... 11
     3.3   Eliminates Emergency Access and Route Redundancy, Reducing Safety .......... 12
     3.4   Financial Feasibility ................................................................................ 12
     3.5   Additional Considerations ........................................................................ 14
4    CONCLUSION ..................................................................................................... 17

**Tables**

Table 1    46th Avenue 2035 traffic volumes .................................................................. 8

**Figures**

Figure 1    I-270/I-76 Reroute Alternative ..................................................................... 2
Figure 2    Change in daily traffic with 46th Avenue as a six-lane principal arterial ............... 5

# LIST OF ACRONYMS

| | |
|---|---|
| CDOT | Colorado Department of Transportation |
| CFR | Code of Federal Regulations |
| CMCA | Colorado Motor Carriers Association |
| DRCOG | Denver Regional Council of Governments |
| EIS | Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FTA | Federal Transit Administration |
| NATA | North Area Transportation Alliance |
| NEPA | National Environmental Policy Act |
| PACT | Preferred Alternative Collaborative Team |
| RTD | Regional Transportation District |

# 1   PURPOSE OF THIS REPORT

Due to the intense public interest regarding the Interstate 270/Interstate 76 (I-270/I-76) Reroute Alternative, the Interstate 70 (I-70) Project Team prepared this memorandum to explain in detail why this alternative is not reasonable given the purpose and need for the project and why it was not fully evaluated as part of the range of reasonable alternatives for the I-70 East project. Based on public comments received on the I-70 East Final Environmental Impact Statement (EIS), the I-70 Project Team reviewed several items related to this alternative, including the cost estimate and rerunning the traffic model, and this memorandum has been revised accordingly. This memorandum supersedes previous versions.

# 2   BACKGROUND

Currently, I-70 between Interstate 25 (I-25) and Tower Road is one of the most heavily traveled and congested highway corridors in the region and state. The corridor provides a number of important transportation functions, including interstate and intrastate travel along I-70; regional access from downtown Denver and the metropolitan area to Denver International Airport; linkage as an inner beltway between I-225 and I-270; and access to adjacent employment areas, neighborhoods, and new development centers. In July 2003, the EIS process began as the I-70 East Corridor EIS, which looked at both highway and transit solutions along the I-70 corridor from I-25 to Tower Road. The process was a joint effort among several agencies, including the Colorado Department of Transportation (CDOT), the Federal Highway Administration (FHWA), the Regional Transportation District (RTD), and the Federal Transit Administration (FTA). Using input from scoping, data gathering, and technical analysis, the project purpose and need was developed. After the draft purpose and need was developed, it was reviewed and discussed with the Intergovernmental Coordination and Compliance Committee and the Executive Oversight Committee and then presented to the public in draft form for review and input at corridor-wide meetings in February 2004. In June 2006, it was determined that the highway and transit elements of the I-70 East Corridor EIS process served different travel markets, were located in different corridors, and had different funding sources. Therefore, the highway and transit elements were separated into two EIS processes. When the processes were separated, CDOT and FHWA reviewed the purpose and need again to determine if it was still applicable. Minor adjustments were necessary to remove the transit elements from the purpose and need and it was again made available for public review at a corridor-wide meeting held in December 2008.

The purpose of the project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area. The need for this project results from the following issues:

- Transportation infrastructure deficiencies

- Increased transportation demand

- Limited transportation capacity

- Safety concerns

Several alternatives for the project were developed based on input from the community at corridor-wide meetings, through involvement with affected agencies at scoping and committee meetings, and from previous studies and new concepts developed by the project team.

One of the alternatives initially considered would reroute I-70 along I-270 and I-76 (shown in Figure 1). The existing viaduct between Brighton Boulevard and Colorado Boulevard would be removed, leaving 46th Avenue in place. 46th Avenue and the remaining portions of I-70 from Colorado Boulevard to I-270 and 47th/48th Avenue from Brighton Boulevard to the existing I-70/I-76 interchange would be converted to a six-lane principal arterial. This alternative also would require the reconstruction of the I-76/I-270/I-25/U.S. Highway 36 (US 36) interchanges; modifications to the I-25/I-70 interchange; improvements to I-25 between the I-70/I-76 Reroute Alternative and the existing I-70; and major widening and reconstruction of I-270 and I-76 (currently only four lanes each) for approximately 13 miles to accommodate relocated traffic. Note this has been updated from 12 miles to 13 miles because the distance is actually 12.76 miles.

**Figure 1    I-270/I-76 Reroute Alternative**



It is important to note that the I-270/I-76 Reroute Alternative described above has changed since the original 2008 Draft EIS in order to be more consistent with what a local advocacy group, Unite North Metro Denver, has been showing as an alternative that the group feels would be better than FHWA's and CDOT's Preferred Alternative. The Unite North Metro Denver group was formed to advocate for the I-270/I-76 Reroute Alternative. The group has put together a video and other materials that show the group's vision for the rerouting of I-70 and the six-lane arterial that would replace I-70. Therefore, CDOT and FHWA used that information when developing traffic modeling and cost estimates to ensure those are representative of what's being proposed by the group.

After identifying the initial alternatives, the project team performed a four-level screening process to refine and evaluate the alternatives using more detailed goals and objectives that were developed based on the project's purpose and need. CDOT and FHWA eliminated the I-270/I-76 Reroute Alternative from consideration as part of the first level of this screening process, as documented in the 2008 Draft EIS.

After the 2008 Draft EIS was published, based on requests and comments received from the public, the project team reexamined the I-270/I-76 Reroute Alternative as part of a comprehensive review of past decisions. The intent of this reexamination was to ensure that past decisions and assumptions were still valid given new information and community feedback.

The additional analysis confirms the earlier decision to remove the I-270/I-76 Reroute Alternative from consideration. Described below are the primary reasons for not advancing this alternative as a result of the additional analysis.

# 3   REASONS FOR ELIMINATION OF THE I-270/I-76 REROUTE

According to the Council on Environmental Quality's National Environmental Policy Act (NEPA) regulations in 40 Code of Federal Regulations (CFR) §§1500.2(e), 1502.1, and 1502.14(a), the NEPA process should be used to identify and fully and fairly assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of the actions on the quality of the human environment. Reasonable alternatives include those that are practical or feasible from a technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. The reasonable alternatives should all be rigorously explored and objectively evaluated. For alternatives that were eliminated from detailed study, the reasons for their elimination should be discussed briefly. This section explains why the I-270/I-76 Reroute Alternative is not a reasonable alternative and was eliminated.

The overall reason for the elimination of this alternative is that it does not meet the project's purpose and need, which is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70. CDOT based this conclusion on the following considerations. It is important to note that no single consideration was the sole reason for elimination of the alternative, but rather it was the combination of them that made the alternative unreasonable.

## 3.1   Does not Improve Congestion and Safety Conditions

The I-270/I-76 Reroute Alternative does not meet the project's purpose and need because it would add safety and congestion problems rather than improving those that exist today. While, in a sense, removing I-70 would "eliminate" the current congestion and safety problems the project seeks to remedy (as there would no longer be an I-70 on that alignment), after its removal, traffic volumes on local streets will increase and transfer the safety and mobility problems from I-70 to the local network, including a restored 46th Avenue that would take its place. In essence, as explained further below, the same issues that underlie the present need for the project would only be duplicated and compounded in the same location, albeit on different roads, by the removal and reroute of I-70.

A travel analysis was performed using the Denver Regional Council of Governments (DRCOG) 2035 Regional Travel Demand Model (Version 5.0, the most recently available version), which simulated the rerouting of I-70 between Wadsworth Boulevard (essentially I-76) and Central Park Boulevard (essentially I-270) on the I-76 and I-270 corridors in conjunction with a new 46th Avenue principal arterial. Following the publication of the Final EIS, the travel analysis was updated to be more consistent with the design Unite North Metro Denver proposes. The four-lane option for 46th/48th Avenue has been dropped because the Unite North

Metro Denver video illustrates 46th/48th Avenue as six lanes. For this analysis, I-270 and I-76 were modeled as four lanes, five lanes, and six lanes in each direction, and the new 46th/48th Avenue arterial was modeled as six lanes. I-270 and I-76 were modeled using three scenarios because Unite North Metro Denver has shown both eight lanes and 10 lanes on those roads in their materials over the years, but CDOT's traffic analysis has shown that 12 lanes would be needed for operations.

Currently, there are 684 businesses within the quarter-mile buffer on each side of I-70 between I-25 and I-270, with approximately 11,408 employees who would lose highway access with rerouting I-70 and will be forced to use surface streets. It is unknown how many businesses are located west of I-25 since that is outside of the I-70 East project area, but similar conditions may exist. Rerouting I-70 while leaving 46th Avenue at its current location encourages highway users needing to access these locations to use 46th Avenue to reach their destinations rather than staying on I-70. Rerouting I-70 will also force delivery trucks and other large vehicles to use 46th Avenue frequently to reach the industrial areas and businesses located near the existing I-70. The resulting high traffic volumes and the truck traffic on 46th Avenue could degrade the quality of the neighborhood and cause safety concerns for neighborhoods, pedestrians, bicyclists, and motorists.

Figure 2 shows the potential effect on daily traffic if I-70 was to be rerouted onto an eight-lane (four lanes in each direction) alignment along I-270 and I-76 and a six-lane principal arterial was constructed in its place. Roadways that are shown in green would attract lower traffic levels if I-70 was rerouted while those in yellow, orange, and red would carry higher levels of traffic. In general, most of the north-south arterials are relieved (traffic is reduced), while most of the west-east arterials realize an increase in traffic. This pattern is caused by a few factors including; an insufficient supporting arterial grid network, fewer access options to the highway, and movement of the only east to west freeway further to the north.

As shown in Figure 2, the I-270/I-76 Reroute Alternative would not have a well-developed or planned arterial grid network immediately surrounding the highway in the area between Pecos Street and Brighton Boulevard. In addition, the I-270/I-76 Reroute Alternative would not have as many accesses (interchanges) where vehicles can move to and from the highway. Finally, I-70, which is the only east-west freeway through Denver would be moved to the north and would result in drivers having to travel more distance to complete trips. As a result, drivers would not drive the extra distance from the areas around the existing I-70 to access the rerouted I-70, primarily due to a lack of north-south arterials, but would choose to use the existing local street networks, mostly east-west arterials, to complete trips. The local street networks most likely would not have the capacity to accommodate the forecasted traffic volumes; therefore, the increase in the local street traffic would result in safety issues and major delays on many of the local streets. The responsibility for improving these problems would fall on the local jurisdictions.

Figure 3 and Figure 4 show similar maps for the ten lane and twelve lane I-270/I-76 Reroute Alternative scenarios, respectively. These scenarios show more arterials that would experience a reduction in volumes. These figures show that adding additional capacity (more lanes in each direction on the I-270/I-76 Reroute Alternative) results in the east-west roadways carrying less traffic, while north-south routes would tend to become more congested by carrying more vehicles. The main reason for this is because more vehicles would be able to use the highway, so rather than using congested east-west surface streets, drivers would choose to make the extra drive north-south to get to the highway.

EAR 0273

**Figure 2    Change in daily traffic with 46th Avenue as a six-lane principal arterial**



**Figure 3    Change in daily traffic (10 lane I-270/I-76 Reroute Alternative Scenario)**



I-70 East ROD 1:
Phase 1 (Central 70 Project)

Revised Elimination of I-270/I-76 Reroute
Alternative Technical Memorandum

**Figure 4   Change in daily traffic (12 lane I-270/I-76 Reroute Alternative Scenario)**



Revised Elimination of I-270/I-76 Reroute
Alternative Technical Memorandum

I-70 East ROD 1:
Phase 1 (Central 70 Project)

Table 1 shows the projected bi-directional traffic for each of the I-270/I-76 Reroute Alternative lane configuration scenarios (8, 10, and 12 lanes) for the proposed six-lane 46th/48th Avenue arterial. The table also shows the projected volumes on 46th Avenue for the Preferred Alternative identified in the Final EIS and the comparisons between the projected traffic volumes for each of the I-270/76 Reroute Alternative scenarios to those from the Preferred Alternative. The increase in 46th/48th Avenue traffic introduces safety, access, and mobility issues in the surrounding neighborhoods, and therefore, fails to address the purpose and need of the project.

**Table 1      46th/48th* Avenue 2035 traffic volumes**

| 46th Avenue Section Between | 2035 Average Daily Traffic | | | | | | |
|---|---|---|---|---|---|---|---|
| | Final EIS Preferred Alternative | 8-Lane I-270/I-76 Reroute Alternative Scenario | % Change** | 10-Lane I-270/I-76 Reroute Alternative Scenario | % Change** | 12-Lane I-270/I-76 Reroute Alternative Scenario | % Change** |
| I-270 Ramps & Quebec St. | - | 79,150 | - | 76,050 | - | 74,100 | - |
| Quebec St. & Monaco St. | 17,900 | 76,000 | 325% | 74,200 | 315% | 72,700 | 306% |
| Monaco St. & Ivy St. | 15,050 | 57,500 | 282% | 55,950 | 272% | 54,050 | 259% |
| Ivy St. & Holly St. | 15,900 | 57,350 | 261% | 55,750 | 251% | 53,650 | 237% |
| Holly St. & Dahlia St. | 5,800 | 56,950 | 882% | 54,800 | 845% | 52,000 | 797% |
| Dahlia St. & Colorado Blvd. | 2,550 | 50,300 | 1873% | 47,400 | 1759% | 45,100 | 1669% |
| Colorado Blvd. & Steele St. | 18,700 | 52,500 | 181% | 49,500 | 165% | 46,800 | 150% |
| Steele St. & Clayton St. | 10,700 | 67,700 | 533% | 63,650 | 495% | 60,350 | 464% |
| Clayton St. & Josephine St. | 9,500 | 66,700 | 602% | 64,200 | 576% | 61,800 | 551% |
| Josephine St. & York St. | 15,100 | 66,100 | 338% | 63,550 | 321% | 60,000 | 297% |
| York St. & Brighton Blvd. | 10,350 | 64,700 | 525% | 62,200 | 501% | 59,350 | 473% |
| Brighton Blvd. & E 47th Ave. | - | 53,000 | - | 48,850 | - | 46,700 | - |
| E 47th Ave. & Washington St. | - | 53,300 | - | 48,900 | - | 46,650 | - |
| Washington St. & Lincoln St. | - | 78,900 | - | 76,400 | - | 73,650 | - |
| Pecos St. & I-25 Ramps | - | 46,500 | - | 43,550 | - | 42,200 | - |
| Pecos St. & Zuni St. | - | 42,650 | - | 40,200 | - | 39,200 | - |
| Zuni St. & Federal Blvd. | - | 41,250 | - | 38,950 | - | 38,100 | - |
| Federal Blvd. & Lowell Blvd. | - | 51,300 | - | 49,500 | - | 47,900 | - |
| Lowell Blvd. & Tennyson St. | - | 50,250 | - | 48,350 | - | 46,850 | - |
| Tennyson St. & Sheridan Blvd. | - | 51,350 | - | 49,050 | - | 47,650 | - |
| Sheridan Blvd. & Harlan St. | - | 51,350 | - | 49,950 | - | 44,800 | - |
| Harlan St. & I-76 Ramps | - | 44,900 | - | 42,550 | - | 41,400 | - |

*Source: 2035 DRCOG Compass 5.0 model.*

*\* In the Final EIS Preferred Alternative – Partial Covered Lowered with Managed Lanes (PCL-ML), 46th Avenue will be continuous between Brighton Boulevard and Quebec Street east of I-25. In the I-270/I-76 Reroute Alternative scenarios, I-70 would be removed between I-76 and I-270 and replaced with a six-lane principal arterial that is assumed to be 48th Avenue west of I-25 and 46th Avenue east of I-25 to provide continuous connectivity between I-76 and I-270.*

*\*\*The percent change is compared to the Final EIS Preferred Alternative – PCL-ML. A positive change means the I-270/I-76 Reroute Alternative scenario results in an increase in traffic on that section of roadway and a negative change means a decrease in volume on that section of roadway.*

The projected average daily traffic on 46th/48th Avenue ranges from about 40,000 to about 79,000 vehicles per day (vpd) in 2035 in all I-270/I-76 Reroute Alternative scenarios. West of I-25, the volumes would range between about 40,000 to 50,000 vpd, while east of I-25, the volumes would range between 50,000 and 79,000 with typical volumes ranging between 50,000 and 65,000 vpd in the area between Brighton Boulevard and Colorado Boulevard. These volumes would result in congested conditions during the peak hours and would require the addition of multiple turn lanes to accommodate traffic demands, making the roadway as much as eight to ten lanes wide at major intersections (as much as 150 feet in width to accommodate curbing, medians, sidewalks, and landscaping). The traffic volumes on 46th Avenue in the I-270/I-76 Reroute Alternative traffic analysis are typically three to eight times higher than the traffic volumes in the Preferred Alternative.

It should be noted that the more lanes added to the I-270/I-76 Reroute Alternative alignment would result in decreasing volumes on the 46th/48th Avenue arterial. The addition of two lanes (one in each direction) to I-270/I-76 results in about a three to five percent reduction in traffic on the 46th/48th Avenue arterial. Thus, with a twelve lane I-270/I-76 Reroute Alternative scenario, the traffic on the 46th/48th Avenue arterial would be less than 10 percent lower than if there were eight lanes and would still be between 50,000 and 60,000 vpd in the area between Brighton Boulevard and Colorado Boulevard.

For comparative purpose, a review of traffic counts collected along major six-lane arterials in the greater Denver area found a few arterials that are currently experiencing volumes similar to those projected to occur on 46th/48th Avenue with the I-270/I-76 Reroute Alternative scenario. It should be noted that a review of the regional traffic counts did not reveal many arterials with volumes this high; typical six-lane arterials are currently accommodating less than 45,000 vpd. Based on counts downloaded from the DRCOG website that were collected in the last two to three years, the following arterials are currently experiencing similar conditions to what 46th/48th Avenue is projected to experience in 2035 with the I-270/I-76 Reroute Alternative:

- Colorado Boulevard on the section from I-25 to I-70 currently has volumes between 45,000 and 65,000 vpd, which is still less than the highest projected volumes for 46th/48th Avenue. This portion of Colorado Boulevard typically has six lanes plus turn lanes at most intersections, similar to what 46th/48th Avenue would require with the projected traffic volumes.
- Wadsworth Boulevard on the section from US 285 to I-70 currently has volumes between 45,000 and 60,000 vpd. This portion of Wadsworth Boulevard typically has six lanes plus turn lanes at most of the major intersections similar to what 46th/48th Avenue would require with the projected traffic volumes.
- Arapahoe Road from University Boulevard to Parker Road currently has volumes between 35,000 and 65,000 vpd. This portion of Arapahoe Road typically has six lanes plus turn lanes at most of the major intersections similar to what 46th/48th Avenue would require with the projected traffic volumes.

If I-70 was rerouted and 46th/48th Avenue became a boulevard, there would be residential units directly adjacent to the roadway. Based on the projected traffic volumes that would use the boulevard, the residences along the roadway would experience congested conditions for many hours of the day. An example of this is shown in Figure 5 and Figure 6, which show existing conditions along Colorado Boulevard

as it passes through residential areas along the roadway. These pictures are very similar to what the 46th/48th Avenue boulevard would look like through the residential areas.

**Figure 5    Example of congested conditions expected along 46th/48th Avenue**



*Source: Photo taken by CDOT on November 23, 2016 near Colorado Boulevard and 5th Avenue at approximately 3:00pm.*

**Figure 6    Example of congested conditions expected along 46th/48th Avenue (zoomed in)**



*Source: Photo taken by CDOT on November 23, 2016 near Colorado Boulevard and 5th Avenue at approximately 3:00pm.*

Table 2 shows the projected bi-directional traffic for each of the I-270/I-76 Reroute Alternative lane configuration scenarios (eight, 10, and 12 lanes) for the I-76/I-270 alignment. The table also shows the projected volumes on these highways for the Preferred Alternative identified in the Final EIS. The table also contains comparisons between the projected traffic volumes on I-76/I-270 for each of the scenarios and those from the Preferred Alternative.

The projected volumes on the I-270/I-76 Reroute Alternative alignment (I-76/I-270) are nearly double those of the Preferred Alternative for all lane scenarios. Volumes on the rerouted I-70 would range between about 100,000 and more than 135,000 vpd in one direction. These volumes are similar to those projected on I-70 in the Preferred Alternative and would require at least ten to twelve lanes to accommodate the traffic demand. The more lanes added to the I-270/I-76 Reroute Alternative alignment would result in a higher volume on the highway and a reduction in volume on the local streets, including a reduction of traffic on the 46th/48th Avenue arterial.

**Table 2     I-270/I-76 2035 Average Daily Traffic**

| Section Between | 2035 Average Daily Traffic (6 Lanes on 46th/48th Avenue) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Final EIS Preferred Alternative | 8-Lane I-270/I-76 Reroute Alternative Scenario | % Change** | 10-Lane I-270/I-76 Reroute Alternative Scenario | % Change** | 12-Lane I-270/I-76 Reroute Alternative Scenario | % Change** |
| I-70 & Quebec St. | 111,500 | 224,700 | 102% | 245,900 | 121% | 258,800 | 132% |
| Quebec St. & Vasquez Blvd. | 123,800 | 218,200 | 76% | 243,300 | 97% | 258,700 | 109% |
| Vasquez Blvd. & Brighton Blvd. | 126,300 | 242,900 | 92% | 269,300 | 113% | 285,300 | 126% |
| Brighton Blvd. & York St. | 126,300 | 247,600 | 96% | 273,600 | 117% | 289,500 | 129% |
| I-270 & I-25 | 107,700 | 197,000 | 83% | 213,700 | 98% | 223,000 | 107% |
| I-25 & Pecos St. | 109,800 | 201,800 | 84% | 217,900 | 98% | 226,700 | 106% |
| Pecos St. & Federal Blvd. | 110,500 | 203,600 | 84% | 219,000 | 98% | 227,000 | 105% |
| Federal Blvd. & Sheridan Blvd. | 115,600 | 208,000 | 80% | 221,300 | 91% | 227,000 | 96% |
| Sheridan Blvd. & I-70 | 113,000 | 193,700 | 71% | 203,600 | 80% | 207,900 | 84% |

Source: 2035 DRCOG Compass 5.0 model.

* In the Final EIS Preferred Alternative – Partial Covered Lowered with Managed Lanes (PCL-ML), 46th Avenue will be continuous between Brighton Boulevard and Quebec Street east of I-25. In the I-270/I-76 Reroute Alternative scenarios, I-70 would be removed between I-76 and I-270 and replaced with a six-lane principal arterial that is assumed to be 48th Avenue west of I-25 and 46th Avenue east of I-25 to provide continuous connectivity between I-76 and I-270.

**The percent change is compared to the Final EIS Preferred Alternative – PCL-ML. A positive change means the I-270/I-76 Reroute Alternative scenario results in an increase in traffic on that section of roadway and a negative change means a decrease in volume on that section of roadway.

## 3.2   Negatively Affects Mobility

There would be an increase in out-of-direction travel, causing mobility issues. Of the traffic heading west on I-70, approximately 50 percent continues past I-25, staying on I-70. The I-270/I-76 Reroute Alternative adds two miles of out-of-direction travel for these vehicles. Thirty-five percent of the traffic heading west on I-70 exits to southbound I-25. This alternative adds four miles of out-of-direction travel for these vehicles, resulting in additional travel times.

## 3.3   Eliminates Emergency Access and Route Redundancy, Reducing Safety

I-70 and I-270 serve as reliever routes when one highway or the other becomes extremely congested or closed due to major incidents/accidents. With the I-270/I-76 Reroute Alternative, the redundancy of the highway network, which is important for emergency response in the area, is limited. If I-70 was rerouted to combine with I-270 and I-76, there would be no alternate highway connecting the Denver neighborhoods to the rest of the region. This concern has been brought up several times by Adams County, Aurora, the Colorado Motor Carriers Association (CMCA), Commerce City, and the City and County of Denver (see Section 3.5.1 below).

## 3.4   Financial Feasibility

This alternative requires close to 13 miles of major highway widening along I-270 and I-76 to accommodate the relocated traffic and is estimated to cost substantially more than the Partial Cover Lowered Alternative. The high-level cost estimates for the I-270/I-76 Reroute Alternative have ranged up to approximately $4 billion. The cost estimates were prepared by the project team and verified by City and County of Denver staff. During the Final EIS review period, the I-70 Project Team received numerous comments that the cost estimate was too high. Therefore, a new cost estimate was prepared by CDOT, which came in at approximately $3.2 billion (see below for what is and what is not included in this cost estimate). This would increase the project construction cost by approximately three times when considering Phase 1 of the Preferred Alternative is estimated to cost $1.1 billion and this estimate doesn't include several necessary items such as improvements to I-70 east of the existing I-70/I-270 interchange or updates to the existing I-70/I-25 interchange (see below for a full list of what's not included). Also, the Bridge Enterprise funding that the I-70 East project is receiving ($850 million) would not be available for the I-270/I-76 Reroute Alternative because none of the bridges along I-270 and I-76 are rated as poor, which means that they are not eligible. The increase in construction cost and lack of Bridge Enterprise funding essentially removes the chances of near-term funding for a reroute project.

This estimate is a high-level cost estimate based on typical construction costs for bridge and highway construction per lane mile and average right-of-way costs based on recent projects. The following list includes the assumptions used in the updated cost estimate for the I-270/I-76 Reroute Alternative:

- Complete reconstruction of the entire length of the I-270/I-76 Reroute Alternative necessitated by structural issues due to the highways being built on large amounts of fill over landfills. Some areas could require up to 20 feet of unclassified excavation.

- 12 lanes total with lanes and shoulders built to current safety standards. Note that this includes the existing four lanes of I-76 and I-270 traffic plus an additional eight lanes that would be needed to accommodate the rerouted I-70 traffic. Lanes and shoulders were assumed to be 12 feet wide, which is the standard for lanes and standard for shoulders on official hazardous materials routes (I-270 has this designation). A four-foot managed lane buffer and two foot-median barrier were also calculated into the width.

- Reconstruction of all mainline bridges to accommodate 12 lanes with shoulders built to current standards. An additional 10 percent was added to the bridge lengths to accommodate wider spans for improvements to local roads, bikeways, sidewalks, etc., in the future. Ramp bridge structures

Case No. 1:17-cv-01661-WJM-MEH   Document 88-18   filed 11/07/17   USDC Colorado   pg 17 of 74

I-70 East ROD 1:                                           Revised Elimination of I-270/I-76 Reroute
Phase 1 (Central 70 Project)                                    Alternative Technical Memorandum

were accounted for by assuming 25 percent of the future mainline bridge length multiplied by 38 feet, which is the standard ramp bridge width.

- Reconstruction of ramps and auxiliary lanes. Ramp and auxiliary lane pavement costs were accounted for by assuming this value to be 20 percent of the mainline pavement quantities.

- Interchange reconstruction at I-70/I-270, I-270/I-76/US 36, I-76/I-25, and I-76/State Highway 121. The interchanges at I-270/I-76/US 36 and I-76/I-25 would require substantial improvements and may become new "mousetrap" types of interchanges (similar to the existing I-70/I-25 "mousetrap").

- Culverts/drainage throughout the length of the reroute. It was assumed that there would be one eight-foot by six-foot box culvert per mile. The lengths were assumed to be the width of the roadway plus an additional 100 feet to account for the embankment.

- Potential noise walls that would be required for neighborhoods along the reroute. It was assumed that there would be noise walls required for 10 percent of the corridor on each side of the highway and that they would be 15 feet tall.

- Structural and embankment walls throughout the length of the reroute. Structural walls were assumed to be three times the bridge width and 15 feet high. Embankment walls were assumed to be 10 percent of the length of the corridor and 15 feet high.

- Hazardous materials clean-up/disposal/other related costs. The reroute goes through industrial areas with known hazardous materials contamination. Hazardous materials mitigation was assumed at $35 million. This estimate only accounts for encountering a moderate amount of possible contaminants in this heavy manufacturing and warehousing area; if significant contamination is encountered, this cost would increase.

- Railroad work to accommodate crossings. Railroad work was assumed at $15 million.

- Work over drainageways and other waterways that would take extra precaution, construction efforts, and mitigation (for example, local roads, Sand Creek, South Platte River, Clear Creek, floodplains, ponds, lakes, gravel pits, and natural areas). This was assumed to be 6 percent of the cost of major items for drainage costs.

- Environmental documentation to satisfy NEPA (likely an EIS). This cost was assumed to be $40 million. The area that would be included is much larger than the current EIS and will require substantially more work to complete.

- Environmental Justice mitigation because there are environmental justice populations along the reroute that would be impacted. This was assumed to be $15 million because the reroute wouldn't include a highway cover with amenities, upgrades to a school, or as much mitigation towards replacement housing or home upgrades.

- Environmental mitigation and standard best management practices during construction. This was estimated at 8 percent of the project cost and does not include Environmental Justice or hazardous materials mitigation. This only estimates a relatively standard cost for mitigating impacts to other environmental resources and communities; if any highly sensitive or important resources are discovered, the cost would increase.

- Right-of-way costs along I-76 and I-270 (not all of the land is existing CDOT property). This was estimated to be $110 million based on the potential need to acquire 39 industrial/commercial properties and 20 residential properties.

- Removing I-70 and the viaduct between I-270 and I-76 and Brighton Boulevard.

- Converting I-70 to a six-lane principal arterial between I-270 and I-76. Note that the conversion is included in the cost estimate, but it would not be work done by CDOT. CDOT would remove/abandon the highway, but the condition would be left as a city street and the local government(s) along the route would need to convert the street into the six-lane principal arterial. It is important to note that this would require others to find funding to accomplish this conversion. Note the exclusions not included in the conversion below.

- Miscellaneous general items such as sidewalks, curb/gutter, excavation, disposal, etc.

This cost estimate does not include:

- Costs to remove I-70 between Brighton Boulevard and Pecos Street, over Clear Creek and Sand Creek.

- Improvements to I-25 between I-76/I-270 and the existing I-70 that would be necessary to accommodate increased traffic on I-25 as a result of out of direction travel.

- Costs associated with improving the local road grid to disperse traffic and encourage alternate transportation.

- Costs associated with improvements to Brighton Boulevard needed to make it a gateway into the city.

- Costs associated with partial acquisitions and easements that may be needed.

- Costs for a six-lane arterial to cross Clear Creek and Sand Creek and the railroads.

- Modifications that would be necessary to the I-25/I-70 interchange to accommodate the six-lane boulevard and the increased north-south traffic on I-25.

- Improvements to I-70 east of the existing I-70/I-270 interchange area, which are included as part of the I-70 East Project.

## 3.5   Additional Considerations

### 3.5.1   Stakeholder Concerns

CDOT has invested more than a decade seeking public input on this project, particularly from the adjacent neighborhoods and the communities most impacted by the project alternatives. The Preferred Alternative Collaborative Team (PACT)—consisting of community, business, and stakeholder agency representatives— was initiated after the publication of the Draft EIS in 2008 to identify the preferred alternative for the project. Based on additional analysis and community input, the group reached a consensus to keep I-70 at its current location. The PACT determined that keeping I-70 at its current location rather than rerouting or realigning it is the most beneficial to the surrounding communities, businesses, and the transportation system because of the amount of traffic that would use 46th Avenue if the highway was moved.

In addition, CDOT has received and continues to receive statements from Adams County, Adams County Economic Development, Aurora (Mayor's Office and City Council), CMCA, Commerce City, Denver (Mayor's Office and City Council), and the North Area Transportation Alliance (NATA) stating their opposition to rerouting I-70 from its current location.

Adams County and Adams County Economic Development have expressed concerns about route redundancy during an incident, citing that from an incident response perspective, it is crucial that I-70, I-76, and I-270 remain separate, regional routes because a major incident on one of these freeways may require the other to be used to re-route traffic to mitigate for congestion delays. Additionally, I-270 is an important connection through Commerce City, whose economic development plans center around logistics and advanced manufacturing industries that rely on I-270 to provide easy and direct access to national and regional roadways. Realigning I-70 to I-270 would significantly alter the city's economic plans for this area, as well as other areas within Adams County.

Aurora cites that I-70 is and will continue to serve as a key east-west mobility corridor for Aurora and the greater eastern metro area, so improvements should be completed on the existing I-70 corridor.

The CMCA does not support a reroute of I-70, citing the PACT process, the impact to local communities along the reroute, additional miles traveled, costs, necessary widening of both I-76 and I-270 that would be needed to meet capacity requirements, and removal of east-west redundancy in the metro area. CMCA indicated that fully closing the I-70 segment between I-270 and I-76 would halt all east-west traffic movement in the corridor and commercial vehicles with no alternate route would be especially impacted by the lack of an alternate route.

Commerce City has expressed continued opposition to any reroute of I-70, citing the decision of the PACT; the new, disproportionate impacts that would be placed on local communities with similar socio-economic challenges; the additional miles traveled by commuters and inter/intrastate travelers, which would result in increased costs and reduced air quality benefits; the additional capacity that would be traveling on routes that are already at maximum capacity; the necessary widening of I-76 and I-270, which would not meet the needed capacity for all three interstates at a reasonable cost; and the elimination of east-west route redundancy, a critical element in a robust transportation system. For emergency responders to hazardous materials shipments and commercial vehicles, having alternate routes is necessary to ensure safety of the traveling public.

A letter received from Commissioner Eva Henry of Adams County, Mayor Michael Hancock of Denver, and Mayor Sean Ford of Commerce City expressed Adams County, Denver, and Commerce City's opposition to move the highway from its current location. The letter cites the decision of the PACT; that it is crucial for I-70, I-76, and I-270 to remain separate, regional routes so incident responders have non-congested options on the freeway because these freeways also serve as critical evacuation routes from east to west; impacts that would occur to the region's access to major attractions such as Dick's Sporting Goods Park, the Rocky Mountain Arsenal National Wildlife Refuge, and the former Mile High Greyhound Park, which is planned as a major retail and professional site; significant impacts would occur that would alter economic growth planned for the area since Commerce City is a hub for logistics and advanced manufacturing; and the rapid deterioration and decreasing ability of I-270 to handle traffic volumes.

Denver has repeatedly expressed the opinion that keeping I-70 on its existing alignment helps support economic development and revitalization plans in the area that Denver has termed the "Corridor of

Opportunity," which is part of the North Denver Cornerstone Collaborative. Denver also has indicated that the Preferred Alternative, which will keep I-70 on its existing alignment, will have the greatest public benefit while minimizing negative impacts to the surrounding community. Denver remains an active partner to make sure the project minimizes impacts and reconnects the neighborhoods along I-70.

NATA has expressed that the group does not support a reroute of I-70 because it primarily impacts the north metro area and simply shifts the problem to the north, compounding significant congestion issues that have yet to be addressed. NATA believes that keeping I-70 on its existing alignment with the Preferred Alternative is a solution that addresses the acute and chronic traffic congestion, and safety needs facing the corridor while balancing the interests of the local communities.

Based on input received to date, support for the I-270/I-76 Reroute Alternative primarily comes from neighborhoods/stakeholders located outside of the impacted area.

### 3.5.2    Impacts to Others

The I-270/I-76 Reroute Alternative also creates new impacts to other areas and communities:

- The existing I-270 and I-76 highways traverse landfills and areas with known hazardous materials sites. Since the landfills have already caused structural issues for the roadways, it is already known that there would be substantial work necessary to correct those structural issues. There also would be new impacts to the landfills and other hazardous materials sites in the area with a reroute.

- Clear Creek and the South Platte River could have new impacts by the reroute that would cross Clear Creek multiple times and the South Platte River once. Therefore, biological impacts—including wetlands, waters of the U.S., and wildlife—could be increased compared to the impacts associated with the Preferred Alternative.

- There could be new, disproportionate impacts that would be placed on local communities with similar socio-economic challenges. An initial review of low-income and minority populations data indicates the reroute is lined with environmental justice communities, as well.

- Rerouting I-70 to the north could cause the congestion and safety issues to move to the north and onto the local roadway network, which would impact additional communities as well as the communities along the existing I-70.

- Removing I-70 and replacing it with a six-lane principal arterial (46th Avenue) means  there would be several at-grade railroad crossings that would cause congestion and air quality impacts from traffic waiting for trains to pass. Homes along this route and Swansea Elementary School would be located directly adjacent to the six-lane principal arterial, which means the vehicles would be idling directly outside of the houses and school during congested conditions.

- Truck traffic would continue to be high through the neighborhood due to the amount of industrial/commercial businesses in the corridor. This truck traffic could end up using more of the local streets when there is congestion on 46th Avenue, increasing the truck traffic in the neighborhoods.

- None of the mitigation currently planned for the residents, businesses, or Swansea Elementary School in the Globeville and Elyria and Swansea neighborhoods would be provided, meaning no interior storm windows, upgrades to sidewalks/lighting, new classrooms, or air conditioning units.

EAR  0285

# 4  CONCLUSION

Based on the reasons discussed earlier in this memorandum, the project team eliminated the I-270/I-76 Reroute Alternative in early stages of the alternatives screening process. The I-270/I-76 Reroute Alternative has been reexamined throughout the development of the Supplemental Draft EIS, Final EIS, and Record of Decision. The additional analyses continue to confirm that this alternative does not address the project's purpose and need (safety, mobility, access) and, therefore, is not considered a reasonable and viable alternative. Since it is not a reasonable alternative, a full detailed analysis is not warranted.

This page intentionally left blank.



# I-70 East ROD 1:
# Phase 1 (Central 70 Project)

## Updates to Hazardous Materials
## Technical Report Addendum

# January 2017



EAR  0288

**Table 1      Number of Hazardous Material Sites within Study Area**

| Hazardous Materials Database | Number of Sites |
|---|---|
| CERCLIS | 2 |
| CERCLIS, No Further Remedial Action Planned | 4 |
| NPL | 1 |
| RCRA Generator Facilities | 5 |
| RCRA Non-Generator Facilities | 8 |
| RCRA Non-CORRACTS* Treatment, Storage, and Disposal | 1 |
| RCRA Corrective Action | 1 |
| SWL | 7 |
| VCUP/VCRA | 5 |
| UST | 18 |
| LUST | 18 |

*Resource Conservation and Recovery Act Corrective Action Sites (CORRACTS)*

# 3   IMPACT ASSESSMENT UPDATES

Due to design modifications and changes in the existing conditions, the Build Alternatives and Phase 1 impacts attributable to encounters with hazardous materials sites have changed compared to what was reported in the Final EIS. The changes to the impact assessment are detailed in the following subsections.

## 3.1   Final EIS Alternatives

The 2014 Hazardous Materials Technical Report in the Supplemental Draft EIS and 2016 Hazardous Materials Technical Report Addendum in the Final EIS provide detailed discussions about impacts from the alternatives. The following discussion provides a summary of effects on hazardous materials from the alternatives, while also comparing the effects described in the I-70 East Final EIS with current findings for each alternative.

Construction of the project likely will encounter sites contaminated by hazardous materials. Construction activities associated with the alternatives have the potential to release hazardous materials at these locations into soil or groundwater. Workers or the public could be exposed to hazardous materials during construction activities if proper health and safety protocols are not followed and remediation efforts are not applied.

Encounters with hazardous materials are proportional to the amount of ground disturbance. For example, a larger area of land disturbed is likely to increase encounters with hazardous material sites, leading to a greater impact. Alternatives that incorporate subsurface improvements versus at-grade improvements also have a higher potential to encounter soils and/or groundwater contaminated by hazardous materials at greater depths.

Changes to impacts since the I-70 Final EIS include an increased area of ground disturbance for each of the alternatives. The Revised Viaduct Alternative will not increase the number of hazardous material sites affected; however, the Partial Cover Lowered Alternative would increase the number of sites affected.

Refer to Table 2, which summarizes the potential hazardous material sites and area of ground disturbance impacted by the project alternatives.

**Table 2    Potential Hazardous Materials Sites and Area of Ground Disturbance Impacted by Project Alternatives**

| Alternative/Option | Number of Known Hazardous Material Sites | Area of Ground Disturbance (acres) |
|---|---|---|
| No-Action Alternative | 6 | 46 |
| **Build Alternatives, General-Purpose Lanes Option** | | |
| Revised Viaduct Alternative, North Option | 25 | 715 |
| Revised Viaduct Alternative, South Option | 20 | 714 |
| Partial Cover Lowered Alternative | 34 | 835 |
| **Build Alternatives, Managed Lanes Option** | | |
| Revised Viaduct Alternative, North Option | 26 | 836 |
| Revised Viaduct Alternative, South Option | 21 | 835 |
| Partial Cover Lowered Alternative | 35 | 938 |

All alternatives may affect sites located within the construction footprint that are potentially contaminated by hazardous materials. Construction activities may release hazardous materials at these sites into soil or groundwater or result in exposure to these materials by workers or the public. Any remediation systems that have been established at the sites may be disturbed or damaged. The likelihood of hazardous material effects to occur is dependent on the number of hazardous materials sites encountered during construction, as well as the location and amount of contamination remaining at the site and the nature of the work or construction activities.

Table 3 identifies the number and type of sites potentially affected by the construction for each alternative and option. The sites are shown in Appendix A, Hazardous Materials Site Locations. The findings are similar to the I-70 East Final EIS; however, fewer LUST sites would be potentially impacted by each of the alternatives and the number of VCRA and SWL sites potentially impacted would increase for the Revised Viaduct Alternative and Partial Cover Lowered Alternative. The VCRA sites are associated with the former Stapleton International Airport. According to the database report, a No Action Determination has been issued for the sites; however, volatile organic compounds were identified in groundwater at one of the sites.

I-70 East ROD 1:
Phase 1 (Central 70 Project)                                     Update to Hazardous Materials Technical Report Addendum

**Table 3     Potentially Affected Hazardous Materials Sites**

| Alternative/Option | Non-CERCLA | | | | CERCLA | | Total |
|---|---|---|---|---|---|---|---|
| | CORRACTS | LUST | SWL | VCRA/VCUP | NPL | NFRAP | |
| No-Action Alternative, North Option | 0 | 4 | 0 | 1 | 1 | 0 | 6 |
| No-Action Alternative, South Option | 0 | 3 | 0 | 1 | 1 | 0 | 5 |
| Revised Viaduct Alternative, North Option, General-Purpose Lanes Option | 0 | 11 | 4 | 5 | 1 | 3 | 24 |
| Revised Viaduct Alternative, North Option, Managed Lanes Option | 0 | 11 | 4 | 5 | 1 | 4 | 25 |
| Revised Viaduct Alternative, South Option, General-Purpose Lanes Option | 0 | 7 | 4 | 5 | 1 | 2 | 19 |
| Revised Viaduct Alternative, South Option, Managed Lanes Option | 0 | 7 | 4 | 5 | 1 | 3 | 20 |
| Partial Cover Lowered, General-Purpose Lanes Option | 1 | 17 | 7 | 5 | 1 | 3 | 34 |
| Preferred Alternative (Partial Cover Lowered, Managed Lanes Option) | 1 | 17 | 7 | 5 | 1 | 4 | 35 |

*CERCLA: Comprehensive Environmental Response, Compensation, and Liability Act; CORRACTS: Corrective Action; LUST: Leaking Underground Storage Tank; NFRAP: No Further Remedial Action Planned; NPL: National Priority List; SWL: Solid Waste Landfill; VCRA: Voluntary Clean-Up and Recovery Act; VCUP: Voluntary Clean-Up Plan*

Refer to the I-70 East Final EIS for additional information regarding specific facilities of concern likely to be encountered by the alternatives and impacts to these facilities.

## 3.2   Phase 1 of the Preferred Alternative

The Phase 1 project for the Preferred Alternative has the same hazardous materials impacts as the Preferred Alternative with the exception of one CERCLIS NFRAP site (Interstate 270 and Quebec), which would not be impacted by the Phase 1 portion. Table 4 compares the hazardous materials impacts between the ultimate build-out and Phase 1 of the Preferred Alternative.

**Table 4     Ultimate Build-Out and Phase 1 Impacts of the Preferred Alternative to Hazardous Material Sites**

| Impacts | Ultimate Build-Out | Phase 1 |
|---|---|---|
| Hazardous materials sites affected | 35 | 34 |
| Do construction activities at hazardous material sites have the potential to spread soil or groundwater contamination? | Yes | Yes |
| Could the construction at hazardous material sites also affect the construction budget and schedule, particularly if previously unidentified contamination is found? | Yes | Yes |
| Land disturbed | 938 acres | 750 acres |



# I-70 East ROD 1:
# Phase 1 (Central 70 Project)
## Air Quality Conformity Technical Report

## January 2017



EAR  0292

EAR  0293

# TABLE OF CONTENTS

**Chapter**                                                                                              **Page**

1     PURPOSE OF THIS REPORT ..................................................................................... 1
2     PROJECT DESCRIPTION ......................................................................................... 1
3     TRANSPORTATION CONFORMITY ........................................................................... 2
4     REGIONAL TRANSPORTATION PLAN ....................................................................... 4
5     DETERMINATION OF REGIONAL AND PROJECT LEVEL CONFORMITY ........................... 4
      5.1     Regional Conformity ................................................................................... 4
6     HOTSPOT METHODOLOGY ..................................................................................... 5
      6.1     Carbon Monoxide Hotspot Analysis Methodology ........................................... 6
      6.2     $PM_{10}$ Hotspot Analysis Methodology ............................................................. 8
7     PROJECT-LEVEL CONFORMITY ANALYSIS ............................................................. 10
8     CONCLUSIONS ................................................................................................... 13
9     REFERENCES ..................................................................................................... 14

**Tables**

Table 1     Carbon Monoxide Concentrations ................................................................. 10
Table 2     $PM_{10}$ Concentrations ............................................................................... 10

**Figures**

Figure 1     Central 70 Project Overview ....................................................................... 2
Figure 2     Diagram of $PM_{10}$ I-25 Model Split ............................................................... 9
Figure 3     Maximum Concentration Receptor Location for $PM_{10}$ at I-25/I-70 ...................... 11
Figure 4     Maximum Concentration Receptor Locations for $PM_{10}$ at Swansea/I-70 .............. 12
Figure 5     Maximum Concentration Receptor Locations for $PM_{10}$ at I-70/I-225 ................... 12

# LIST OF ACRONYMS

| | |
|---|---|
| AM | Morning |
| APCD | Air Pollution Control Division |
| CDOT | Colorado Department of Transportation |
| CDPHE | Colorado Department of Public Health and Environment |
| CFR | Code of Federal Regulations |
| DRCOG | Denver Regional Council of Governments |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| FHWA | Federal Highway Administration |
| FTA | Federal Transit Administration |
| GHG | Greenhouse gas |
| I-25 | Interstate 25 |
| I-70 | Interstate 70 |
| I-225 | Interstate 225 |
| I-270 | Interstate 270 |
| LOS | Level of service |
| MOVES2010b | Motor Vehicle Emission Simulator version 2010b |
| MSAT | Mobile source air toxic |
| NAAQS | National ambient air quality standards |
| NEPA | National Environmental Policy Act |
| PM | Particulate matter |
| $PM_{10}$ | Particulate matter of 10 microns or less in diameter |
| ppm | Parts per million |
| ROD | Record of Decision |
| RTP | Regional Transportation Plan |
| SIP | State Implementation Plan |
| STIP | Statewide Transportation Improvement Plan |
| TIP | Transportation Improvement Program |
| VMT | Vehicle miles traveled |
| $\mu g/m^3$ | Micrograms per cubic meter |

EAR  0295

# 1  PURPOSE OF THIS REPORT

This document describes the methods used to show that the Interstate 70 (I-70) East Project will meet the requirements of the Clean Air Act, and will not cause violations of air quality standards in the Denver region when the project is completed and being used by the traveling public. The Clean Air Act, Section 176(c), requires that federally supported highway and transit projects are consistent with state air quality goals, found in the State Implementation Plan (SIP). The process to ensure this consistency is called Transportation Conformity. Conformity to the SIP means that transportation activities will not cause new violations of the national ambient air quality standards (NAAQS or "standards"), worsen existing violations of the standard, or delay timely attainment of the relevant standard or required interim milestones. Transportation conformity is required for federally supported transportation projects in areas that have been designated by the U.S. Environmental Protection Agency (EPA) as not meeting one or more of the transportation-related NAAQS.

# 2  PROJECT DESCRIPTION

As outlined in the Final EIS, it is the intent of the Federal Highway Administration (FHWA) and the Colorado Department of Transportation (CDOT) to implement the Preferred Alternative of the I-70 East Project in its entirety. However, due to current funding limitations, there is only enough money to implement Phase 1 of the Preferred Alternative, which is herein referred to as the Central 70 Project. The Record of Decision (ROD) for the Central 70 Project allows it to move forward into construction. The Central 70 Project incorporates portions of the identified Preferred Alternative, the Partial Cover Lowered Alternative with Managed Lanes Option. It includes all construction and mitigation commitments included in the Preferred Alternative from Brighton Boulevard to Chambers Road. It also includes several minor design changes that occurred in consideration of comments received on the Final EIS.

As seen in Figure 1, the Central 70 Project includes the complete reconstruction of I-70 from Brighton Boulevard to Interstate 270 (I-270) and widening the remaining stretch from I-270 to Chambers Road to accommodate one additional lane in each direction and restriping the roadway from Interstate 25 (I-25) to Brighton Boulevard.

**Figure 1    Central 70 Project Overview**



# 3  TRANSPORTATION CONFORMITY

In all areas that have been designated as nonattainment or attainment/maintenance for any of the transportation-related criteria pollutants, state governments are required to develop a SIP, which explains how the state will comply with the requirements of the Clean Air Act. The Clean Air Act also requires that metropolitan transportation plans, metropolitan Transportation Improvement Programs (TIPs), and projects that are developed, funded, or approved by FHWA and the Federal Transit Administration must demonstrate that such activities "conform" to the SIP. Transportation conformity requirements apply to any transportation-related criteria pollutants for which the project area has been designated a nonattainment or attainment/maintenance area. For the I-70 East Project, the criteria pollutants of concern are carbon monoxide, course particulate matter of less than 10 microns in size ($PM_{10}$), and ozone.

As noted above, under Section 176(c) of the Clean Air Act, a transportation project is said to conform to the provisions and purposes of the SIP if the project, both alone and in combination with other planned projects, does not:

- Cause or contribute to new air quality violations of the NAAQS,

- Worsen existing violations of the NAAQS, or

- Delay timely attainment of the NAAQS or required interim milestones.

Conformity applies at both the regional level for metropolitan plans and TIPs and at the project level for transportation projects in air quality nonattainment and attainment/maintenance areas. The regional conformity analyses are not performed by CDOT, nor are they performed for individual CDOT projects. The regional air quality analyses are performed by the Colorado Department of Public Health and Environment (CDPHE), Air Pollution Control Division (APCD), in coordination with the Denver Regional Council of Governments (DRCOG) for the formal approval process of the Regional Transportation Plan (RTP) and TIP.

Additionally, if there are significant changes to the project's design concept and scope during the planning process, the regional emission analysis will need to be revisited and a conformity determination completed on the RTP and TIP before the project can complete the National Environmental Policy Act (NEPA) process (40 Code of Federal Regulations (CFR) §93.107).

For certain projects in carbon monoxide and $PM_{10}$ areas, a hotspot analysis is required as part of the project level conformity determination. A hotspot analysis for the I-70 East Project is required for carbon monoxide because the Denver region is an attainment/maintenance area and because it meets the second of the project screening criteria, cited in 40 CFR §93.123 (a), and listed below:

- (i) Projects in or affecting locations, areas, or categories of sites which are identified in the applicable implementation plan as sites of violation or possible violation;

- (ii) Projects affecting intersections that are at Level-of-Service (LOS) D, E, or F, or those that will change to LOS D, E, or F because of increased traffic volumes related to the project;

- (iii) Projects affecting one or more of the top three intersections in the nonattainment or maintenance area with highest traffic volumes, as identified in the applicable implementation plan; and

- (iv) Projects affecting one or more of the top three intersections in the nonattainment or maintenance area with the worst level of service, as identified in the applicable implementation plan.

A $PM_{10}$ hotspot analysis is required for projects of local air quality concern in $PM_{10}$ nonattainment and attainment/maintenance areas per 40 CFR §93.123(b). EPA regulations (40 CFR §93.123(b)) state that a project will be determined to be of local air quality concern if it meets any of five evaluation criteria. Two of the five criteria are related to transit projects and are not applicable to the I-70 East Project. The remaining three criteria are all potentially applicable:

- New highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles.

- Projects affecting intersections that are at LOS D, E, or F with a significant number of diesel vehicles, or those that will change to LOS D, E, or F because of increased traffic volumes from a significant number of diesel vehicles related to the project.

- Projects in or affecting locations in areas, or categories of sites that are identified in the $PM_{2.5}$ or $PM_{10}$ applicable implementation plan or implementation plan submission, as appropriate, as sites of violation or possible violation.

The I-70 East Project was determined to be a project of local air quality concern through the Interagency Consultation process for the following reasons: it is an expanded highway project that has a significant number of diesel vehicles and the project affects intersections that are at LOS D, E, or F with a significant number of diesel vehicles. Interagency consultation confirmed the need for a hotspot analysis to be completed for $PM_{10}$.

# 4   REGIONAL TRANSPORTATION PLAN

As specified in 40 CFR §93.115, a project must be included in a conforming RTP and TIP. Since the release of the Final EIS, DRCOG adopted an amendment to the 2040 Fiscally Constrained RTP (March 16, 2016), which includes the Central 70 Project. This extends the hotspot analysis to the DRCOG planning horizon year of 2040, as required by the EPA in 40 CFR §93.116(a), to demonstrate that during the time frame of the transportation plan no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project. The portions of the Preferred Alternative included in the Central 70 Project, as described in Section 1 above, will be implemented between now and 2021 are included in the conforming TIP.

In addition to extending the planning horizon, the 2040 Fiscally Constrained RTP includes transportation volumes modeled by DRCOG using the Focus travel demand model.

# 5   DETERMINATION OF REGIONAL AND PROJECT LEVEL CONFORMITY

The Central 70 Project is within the Denver maintenance/attainment areas for $PM_{10}$ and carbon monoxide and within the marginal nonattainment area for ozone. The Transportation Conformity Rule, 40 CFR §93.104(d), requires that the I-70 East Project conform prior to being approved or funded. Part of the conformity determination requires the project to be included in the regional emissions analysis for the conforming RTP and TIP. The project-level conformity determination demonstrates that an individual project does not contribute to any new local violations, increase the frequency or the severity of existing violations, or delay timely attainment of the NAAQS or any required interim emissions reductions or other milestones.

## 5.1  Regional Conformity

The development of regional conformity analyses and determinations follow an Interagency Consultation process (Colorado Air Quality Control Commission Regulation 10). As described below, the project meets conformity requirements.

The Central 70 Project is incorporated into the following RTP:

- 2015 Cycle 2 Amendments to the 2040 Fiscally Constrained RTP was adopted by the DRCOG board on March 16, 2016. FHWA, after consultation with EPA, issued the Air Quality Conformity Determination for the DRCOG 2040 Fiscally Constrained RTP 2015 Cycle 2 Amendment on May 18, 2016.

The portions of the Central 70 Project that will be implemented between now and 2021 are included in the DRCOG 2016–2021 TIP amended March 2016, as follows:

- Additional capacity between Brighton Boulevard and I-270, with the addition of one managed lane in each direction

- Additional capacity between I-270 and Chambers Road

- Additional ramps at the Colorado Boulevard and I-70 interchange

The Central 70 Project also is included in the Fiscal Year 2017–2020 Statewide Transportation Improvement Program, adopted May 2016.

DRCOG conformity determinations were made for the RTP and TIPs as noted below:

- 2015 Cycle 2 Amendments, CO and $PM_{10}$ Conformity Determination, for the DRCOG 2040 Fiscally Constrained RTP and the Amended 2016–2021 TIP, as adopted by the DRCOG Board on March 16, 2016, is available at the following website: https://drcog.org/sites/drcog/files/resources/DRCOG%202016-2021%20TIP-%20Amended%20September%2021%202016_0.pdf

- 2015 Cycle 2 Amendments, Denver Southern Subarea 8-Hour Ozone Conformity Determination, for the DRCOG 2040 Fiscally Constrained RTP and the Amended 2016–2021 TIP and the Southern Subarea Portion of the Upper Front Range 2040 RTP and the 2016–2019 Statewide Transportation Improvement Program for the Upper Front Range Transportation Planning Region, as adopted by the DRCOG Board on March 16, 2016, is available at the following website: https://drcog.org/sites/drcog/files/resources/FINAL%202015%20Cycle%202%20Denver%20Southern%20Subarea%208-Hour%20Ozone%20Conformity%20Determination.pdf

- A conformity redetermination for 2040 RTP 2015 Cycle 2 Amendment and amended 2016-2021 TIP was done on November 21, 2016

DRCOG's analysis shows the emission results for determination of regional conformity remain significantly under each of the individual pollutant budgets with the Central 70 Project included in the RTP.

# 6  HOTSPOT METHODOLOGY

The transportation conformity rule requires that the year(s) of peak emissions within the time frame of the RTP be considered in the hotspot analysis. Because the project is included in the DRCOG 2040 RTP, the hotspot analyses have been updated to reflect 2040 as the timeframe of the plan and also as the year of peak emissions, with the highest traffic volumes and $PM_{10}$ emissions, as shown in the RTP, and the highest potential background concentrations for $PM_{10.}$ In November 2015, the EPA published revised guidance that describes how to complete quantitative hotspot analysis for certain highway and transit projects in $PM_{2.5}$

and PM$_{10}$ nonattainment and maintenance areas and the transportation conformity requirements which was followed for the Central 70 conformity analysis.

Although the trip-based Compass travel demand model used for the Final EIS continues to be an approved resource for quantifying traffic in the region the interagency partners determined that traffic volumes used for the 2040 hotspot analysis should be developed from the most recent Focus travel demand model updated for the 2040 RTP.

## 6.1    Carbon Monoxide Hotspot Analysis Methodology

The carbon monoxide hotspot analysis methodology is consistent with processes documented in the Final EIS, with the following modifications: the carbon monoxide hotspot analyses are based on 2040 data from the DRCOG Focus model.

During Interagency Consultation, the EPA Administrator for Region 8 approved a process decision to streamline the comparative intersection analysis of numerous years by creating a worst-case scenario using the worst-case emissions factors combined with the worst traffic volume. As agreed to by the EPA Administrator and reported in the Final EIS, the screening process for the carbon monoxide hotspot analysis for the I-70 East Project used the highest vehicle miles traveled (VMT) activity in the year 2035, combined with the Motor Vehicle Emissions Simulator (MOVES) emissions factors in the opening year 2010.

For the update of the carbon monoxide analysis for conformity, the approach was maintained the same as the Final EIS. The highest emission factors (2022) were combined with the highest traffic volumes (2040). Because the improvements will not be built for several more years, 2022 was judged to be more representative of opening-day conditions than 2010. The method produces overstated carbon monoxide concentrations, but ensures the maximum potential carbon monoxide concentrations are considered. Other modeling parameters such as meteorology were consistent with those used during the Final EIS carbon monoxide hotspot analysis.

## Model selection

An emissions model and an air quality dispersion model were selected through the Interagency Consultation process. As with the Final EIS, the analysis continued to use EPA's MOVES2010b model at the project level to estimate emissions for each roadway link in the carbon monoxide hotspot study area because the update to the analysis started in May 2016 during the MOVES2014 grace period. EPA's CAL3QHC software continued to be used to conduct carbon monoxide dispersion modeling. CAL3QHC is the recommended model for use in estimating carbon monoxide emissions.

## Model year

Traffic data from the 2040 DRCOG Focus model was used to address the conformity requirement for the hotspot analysis to consider the year of peak emissions over the time frame of the transportation plan. MOVES2010b emissions rates from 2022 were used.

The worst traffic year is considered to be 2040. As discussed above, this update is consistent with regional air quality modeling and with the desire to represent the worst-case scenario. CDOT agreed with APCD's request to use 2022 for the updated modeling to represent the opening year. The project analysis is required to account for the year of peak emissions over the time frame of the transportation plan, and 2010 is not within that time frame or that of the project.

## Locations to model

As with the Final EIS, the Colorado Boulevard interchange was identified as the location to represent the worst traffic conditions on the corridor for the conformity analysis. For the Final EIS, a sensitivity analysis was performed using the DynusT traffic model to validate the choice of the I-70 interchange at Colorado Boulevard as the worst-case location for the carbon monoxide hotspot analysis. The analysis found that the I-70 interchanges at Quebec Street and Colorado Boulevard are the two worst interchanges in 2035, with the model predicting slightly higher carbon monoxide emissions at the Quebec Street interchange due to higher traffic volumes and longer delays.

While updating traffic data to the most recent 2040 Focus model, the traffic volumes at Colorado Boulevard and Quebec Street were reviewed again. The predicted 2040 traffic LOS at Colorado Boulevard in the morning (AM) and afternoon (PM) peak hours are LOS D and LOS D, respectively. The same relatively small differences in traffic and congestion between the two intersections exist in the new 2040 model as was reported in the Final EIS. The predicted results from modeling carbon monoxide emissions would vary only by 0.2 parts per million (ppm) to 0.4 ppm, as disclosed in the Final EIS Air Quality Technical Report. Given the minimal differences, continued use of the I-70 and Colorado Boulevard interchange as the location for the carbon monoxide hotspot analysis is appropriate.

## Emission factors

Carbon monoxide emission factors were developed using MOVES2010b for 2022, to address the conformity requirement for the hotspot analysis to consider the year of peak emissions over the life of the RTP. Carbon monoxide emission factors were developed for various vehicle types, road slopes, road types, and vehicle speeds. From these data, composite carbon emission factors were developed for each road segment by referencing emission factors for DRCOG traffic links, depending on the traffic and geographic characteristics of those links.

## Background concentrations

To estimate maximum carbon monoxide concentrations, modeled results were added to background values provided by APCD. Values for background concentrations in the year 2040 related to measured concentrations in the NAAQS are as follows:

- One-hour background concentration = 5.5 ppm
- Eight-hour background concentration = 3.6 ppm

## 6.2   PM$_{10}$ Hotspot Analysis Methodology

Methodology for conducting the PM$_{10}$ hotspot analysis, as well as for calculating a design value, are consistent with processes documented in the Final EIS. EPA's particulate matter hotspot guidance (EPA-420-B-15-084) for calculating design values was applied to the PM$_{10}$ hotspot analysis; and the design values estimated through the comparative analysis were compared against the NAAQS for PM$_{10}$.

### Model selection

Consistent with the Final EIS, EPA's MOVES2010b model continued to be used at the project scale to estimate emissions for each roadway link. As with the Final EIS, the analysis continued to use EPA's MOVES2010b model for use at the project scale level to estimate emissions for each roadway link in the carbon monoxide hotspot study area because the update to the analysis started in May 2016 during the MOVES2014 grace period. EPA's AERMOD model (version 15181) was selected through Interagency Consultation for the air dispersion analysis and estimation of pollutant concentrations at receptors in the local near-road land areas. AERMOD can model lowered sections of roadway, as in the Central 70 Project, as well as the outflow from the proposed covered portion of I-70.

### Model year

As discussed previously, for consistency with regional air quality modeling and based on assumptions developed from regional PM$_{10}$ modeling results, 2040 has been identified as the year of peak emissions for PM$_{10}$, and is, therefore, the most indicative of the worst air quality conditions for analysis.

### Locations to model

Based on the locations of maximum receptors and results presented in the Final EIS, the I-25/I-70 interchange area and the Interstate 225 (I-225)/I-70 interchange have been maintained as the primary focus areas for the air quality analysis**.** To better manage the workflow and reduce execution times of individual AERMOD runs, the project was divided into three areas, as shown in Figure 2 below:

1) I-25 Interchange (yellow/green)—west of the I-25 interchange to just west of Brighton Boulevard
2) Swansea Area (green/blue)—from Washington Street to the Vasquez Boulevard interchange
3) I-225 Interchange—just east of Chambers Road to just west of Tower Road

Even though the west portion of the I-70 East Project was split into two sections for managing modeling workflow and reducing AERMOD run times, there is a half-mile overlap (green area) of the vehicle emission links considered in both the I-25 Interchange (yellow area) and Swansea Area model runs (blue area). Additionally, the I-225 and I-25 interchanges were the original two locations identified during Interagency Consultation for the Final EIS as the hotspot locations to be modeled for PM$_{10}$ conformity. The Swansea area was added to the I-25 area to address air quality concerns raised by the Elyria-Swansea community located east of Brighton Boulevard.

This Swansea area is located east of Brighton Boulevard about one mile from the I-25 interchange with no meaningful concentration contributions from the interchange. Previous modeling indicated that the highest concentrations were predicted along the I-25 corridor and along I-70 at the I-225 interchange.

EAR  0303

**Figure 2     Diagram of PM$_{10}$ I-25 Model Split**



For the analysis, traffic links were included in the air quality model if there was a design or operational change to the roadway network or if the project had a negative impact on roadway operations. This included local roads and intersection operations where there are designs that add capacity. Using this approach, the number of links increased to include additional traffic links on Vasquez Boulevard, Brighton Boulevard, and York Street, as well as at Steele Street and 45th Avenue.

## Emission factors

As in the Final EIS, emission factors for PM$_{10}$ were developed using MOVES2010b. As with the Final EIS, the analysis continued to use EPA's MOVES2010b model at the project level to estimate emissions for each roadway link in the carbon monoxide hotspot study area because the update to the analysis started in May 2016 during the MOVES2014 grace period. PM$_{10}$ emission factors were developed for various vehicle types, road slopes, road types, and vehicle speeds. From these data, composite particulate emission factors were developed for each road segment by referencing emission factors for DRCOG traffic links, depending on the traffic and geographic characteristics of those links.

Road dust from mobile sources is the major contributor of particulate emissions from the project. MOVES does not calculate particulate matter emissions from road dust, however. To estimate road dust and sanding emissions for this analysis, emissions factors from the most recent PM$_{10}$ maintenance conformity modeling were used, accounting for dust mitigation controls committed to by CDOT in consultation with APCD.

## Background concentrations

Updated EPA guidance (see Attachment B, Updates to Agency Consultation Addendum) requires use of the third highest PM$_{10}$ value over a three-year period, excluding exceptional events, to represent background concentrations. For the conformity determination, the background concentrations were estimated using 2012 to 2014 data, resulting in a background PM$_{10}$ value of 113 micrograms per cubic meter ($\mu g/m^3$).

## Receptor grid

The methodology to determine the receptor placement remained the same as described in the Final EIS.

# 7   PROJECT-LEVEL CONFORMITY ANALYSIS

Design values are the metric used to compare the values produced by air quality modeling with the NAAQS. Modeling estimates of carbon monoxide emissions for the Central 70 Project are well below the NAAQS for the hotspots modeled for conformity purposes, as described in Table 1. The results demonstrate that the project will meet the transportation conformity requirements because the Central 70 Project will not cause or contribute to any new localized carbon monoxide violations, nor will it increase the frequency or severity of any existing ozone violations, nor will it delay timely attainment of the carbon monoxide NAAQS.

**Table 1     Carbon Monoxide Concentrations**

| Analysis Time Period | Time of Day | Carbon Monoxide Concentration in parts per million (ppm) | | | NAAQS (standard) |
| | | Background* | Modeled | Total Background + Modeled | |
|---|---|---|---|---|---|
| 1 hour | AM | 5.5 | 1.4 | 6.9 | 1-hour standard 35 ppm |
| | PM | | 1.9 | 7.4 | |
| 8 hour | AM | 3.6 | 0.9 | 4.5 | 8-hour standard 9 ppm |
| | PM | | 1.2 | 4.8 | |

*Background concentrations provided by APCD.*

EPA's PM guidance (EPA-420-B-15-084) for calculating design values was applied to the $PM_{10}$ hotspot analysis. The contributions from the project, nearby sources, and background concentrations from other sources are combined to estimate 2040 emission concentrations (i.e., design values) at receptor locations. Maximum receptor locations are shown in Figure 3, Figure 4, and Figure 5.

Design values for the Central 70 Project are 150 µg/m³ for the $PM_{10}$ hotspots modeled for conformity purposes, as described in Table 2. The results demonstrate that the project will meet the Transportation Conformity requirements because the Central 70 Project will not cause or contribute to any new localized $PM_{10}$ violations, or increase the frequency or severity of any existing ozone violations, or delay timely attainment of the $PM_{10}$ NAAQS.

**Table 2     $PM_{10}$ Concentrations**

| Location | $PM_{10}$ Concentration in micrograms per cubic meter (µg/m³) | | | | NAAQS (standard) |
| | Background | Modeled | Total Background + Modeled | Design Value | |
|---|---|---|---|---|---|
| I-70 and I-25 | 113 | 41.136 | 154.136 | 150 | 24-hour standard 150 µg/m³ |
| I-70 in Swansea | | 40.948 | 153.948 | 150 | |
| I-70 and I-225 | | 32.220 | 145.220 | 150 | |

To develop these estimates, the 24-hour $PM_{10}$ design value is rounded per guidance to the nearest 10 µg/m³. For example, 155.000 rounds to 160, and 154.999 rounds to 150. The Central 70 Project is located in the moderate nonattainment area for the Denver-North Front Range Area for the 2008 ozone standard. Since ozone is a regional pollutant, there is no requirement to analyze potential impacts through hotspot modeling and no possibility of localized violations of ozone to occur at the project level.

I-70 East ROD 1:
Phase 1 (Central 70 Project)

Air Quality Conformity Technical Report

**Figure 3    Maximum Concentration Receptor Location for PM$_{10}$ at I-25/I-70**



**Figure 4    Maximum Concentration Receptor Locations for PM$_{10}$ at Swansea/I-70**



**Figure 5    Maximum Concentration Receptor Locations for PM$_{10}$ at I-70/I-225**



# 8  CONCLUSIONS

As stated above, the project is included in the DRCOG 2016–2021 TIP and the fiscally constrained 2040 RTP, which were found to conform to the carbon monoxide, $PM_{10}$, and ozone SIP. The design and scope of the Central 70 Project are consistent with that used in the regional emissions analysis for the RTP and TIP.

Additionally, based on the carbon monoxide and $PM_{10}$ hotspot analyses conducted, the Central 70 Project has been determined to not cause an exceedance of any applicable NAAQS. The carbon monoxide and $PM_{10}$ hotspot analyses described above demonstrate that the project will not contribute to any new local violations, increase the frequency or severity of any existing violation, or delay timely attainment of the NAAQS or any required interim emissions reductions or other milestones. This project is consistent with the $PM_{10}$ SIP measures. This project complies with the Transportation Conformity Regulations in 40 CFR §93 and with the conformity provisions of Section 176(c) of the Clean Air Act.

# 9   REFERENCES

Clean Air Act of 1990, Pub. L. No.101-549, 42 United States Code (USC) §7401–7661. (1990).

Colorado Department of Transportation. (2016). *2017–2020 State Transportation Improvement Program.* Denver: Author.

Denver Regional Council of Governments. (2016). *DRCOG 2040 Metro Vision Regional Transportation Plan*. Denver: Author.

Denver Regional Council of Governments. (2016). *2016–2021 Transportation Improvement Program*. Denver: Author.

Denver Regional Council of Governments. (2016). *2015 Cycle 2 Amendments, CO and PM$_{10}$ Conformity Determination for the DRCOG Fiscally Constrained Regional Transportation Plan*. Denver: Author.

Denver Regional Council of Governments. (2016). *2015 Cycle 2 Amendments, Denver Southern Subarea 8-hour Ozone Conformity Determination for the DRCOG Fiscally Constrained Regional Transportation Plan*. Denver: Author.

U.S. Environmental Protection Agency. (2012). *Transportation Conformity Regulations*, as amended, 40 CFR §51.390 and §93. Washington, D.C.: U.S. Government Printing Office.

U.S. Environmental Protection Agency. (2015). *Transportation Conformity Guidance for Quantitative Hot-Spot Analyses in PM$_{2.5}$ and PM$_{10}$ Nonattainment and Maintenance Areas.* EPA-420-B-15-084. Washington, D.C.: U.S. Government Printing Office.



# I-70 EAST ROD 1:
## Phase 1 (Central 70)

January 2017

## ATTACHMENT E
### Comments on the Final EIS



# I-70 EAST
Phase 1 (Central 70 Project)
Record of Decision

Attachment E—Comments on the Final EIS

# BUSINESSES AND SPECIAL INTEREST GROUPS



EAR 0311

# SIERRA CLUB COMMENTS I-70 FEIS

The Sierra Club submits the following comments on the I-70 East Final Environmental Impact Statement ("FEIS").  These comments incorporate all of the Sierra Club's previous comments on prior I-70 East National Environmental Policy Act ("NEPA") planning documents as if those comments were fully set forth below.  While CDOT and the FHWA have attempted to respond to many of the concerns set forth in the Sierra Club's prior comments, those responses have been incomplete or inadequate.  In addition the FIES itself fails to resolve the inadequacies of the I-70 East planning process.  Therefore, the Sierra Club has provided the following additional comments.

In summary, the air quality impacts and impacts to community health have not been adequately analyzed or disclosed.  This is because the agencies have failed to employ the analyses required under the Clean Air Act to demonstrate that the preferred alternative will not result in violations of Clean Air Act standards, or have conducted those analyses using the incorrect methodology or assumptions.  The agencies have also failed to adequately address the health impacts of the proposed action, and unlawfully refused to conduct a Health Impact Assessment.

In addition, because the agencies' formulation of the purpose and need for the project was overly narrow, the alternatives considered do not present an appropriate range of options which will both meet transportation needs and minimize negative impacts to human health and the environment.  The agencies have also failed to properly consider their own polices during the course of the NEPA process.  Finally, in the case of the I-270/I-76 reroute option, CDOT and FHWA improperly eliminated this alternative based on incorrect assumptions that it would not meet the purpose and need.

## I.       Project Impacts on Air Quality and Community Health Not Adequately Analyzed and Disclosed.

In comments on the SDEIS, the Sierra Club raised concerns about the modeling analysis for PM10 performed to support the draft conformity determination under the Clean Air Act, and asked FHWA to perform a modeling analysis under NEPA to investigate whether Project emissions will cause or contribute to violations of the NAAQS for PM2.5. In addition, The Club asked that CDOT and FHWA investigate the causal contribution of highway emissions to the disparately high incidence of adverse health outcomes known to be caused by exposure to the pollutants emitted from highways and the likely effect on community health as a result of increasing community exposure to highway emissions in the future.

The PM-10 emissions analysis for the Project was significantly improved thanks largely EPA oversight which resulted in improvements in the inputs used to model the impact of Project emissions, including the selection of more representative meteorological data, and requiring

EAR  0312

receptor locations that more comprehensively include locations where the public is likely to be exposed to Project emissions.

However, the Club continues to believe that requirements of EPA's conformity rule for making hot-spot conformity determinations, 23 CFR §§ 93.116 and .123(c), have not been satisfied. The Club concludes that because of the failure to comply with these requirements the air quality analysis in the revised Air Quality Technical Report does not demonstrate that the Project will not cause or contribute to NAAQS violations in the year of greatest emissions impact, and therefore has not been shown to conform.

In addition, the failure to perform a modeling analysis of PM2.5 emissions to determine if Project emissions will cause or contribute to a violation of the NAAQS fails to comply with the NEPA requirement that the EIS must disclose whether the Project will comply with standards established to protect environmental quality. The report of expected emissions of PM2.5 published in the Air Quality Technical Report is not an air quality analysis to demonstrate that Project emissions will not violate the NAAQS for PM2.5 at the receptor locations where Project emissions are expected to exceed the NAAQS for PM10.

The FHWA and CDOT refused categorically to conduct any investigation for the FEIS of the relationship between adverse health outcomes reported in the communities affected by the Project and air pollution emitted from the Project. The reasons offered by the agencies misrepresent the facts, fail to consider the evidence published in the scientific literature, and are incorrect as a matter of law. The failure of the agencies to investigate the causal relationship between health outcomes and Project emissions, and their failure to consider alternatives that could avoid or minimize those outcomes violate the basic duties imposed by NEPA, 23 U.S.C. § 109(h), and the obligations to prevent disparate impacts established by Title VI of the Civil Rights Act, Executive Order 12, and the Environmental Justice policy adopted for the U.S. DOT by Secretary Pena.

A. Air Quality Analysis Does Not Demonstrate that National Air Quality Standards for PM10 or PM2.5 Will Be Met.

The FEIS includes a proposed determination that the preferred alternative (PA) for I-70 Project will conform under the Clean Air Act (CAA). The Act requires that that Project emissions "will not cause or contribute to a new violation of any [NAAQS]." 42 U.S.C. § 176(c)(1)(B)(i).

To meet the statutory test for conformity, EPA's conformity rule requires that a conformity determination be based on a "hot-spot analysis."

"Hot-spot analysis" is an estimation of likely future localized CO, PM10, and/or PM2.5 pollutant concentrations and a comparison of those concentrations to the national ambient air quality standards.

40 CFR 93.101. To demonstrate conformity, the Project sponsor and FHWA bear the burden of establishing through the hot-spot analysis that the Project will not cause or contribute to a new violation of a national air quality standard. EPA's conformity rule defines this requirement as –

> Cause or contribute to a new violation for a project means:
>
> (1) To cause or contribute to a new violation of a standard in the area substantially affected by the project or over a region which would otherwise not be in violation of the standard during the future period in question, if the project were not implemented; or
>
> (2) To contribute to a new violation in a manner that would increase the frequency or severity of a new violation of a standard in such area.

40 CFR 93.101.

**FEIS Air Quality Technical Report Does Not Affirmatively Establish That Project Emissions will Not Cause Violations.**

The revised air quality hot-spot analysis of Project emissions shows that emissions from the Project will contribute 62 $\mu g/M^3$ at the receptor most impacted by Project emissions in 2035. This compares with the modeling analysis published with the Draft Supplemental EIS which showed that emissions from the PA would contribute only 38 $\mu g/M^3$ at the receptors of greatest impact.

EPA Guidance for Hot-spot analysis requires that the concentrations contributed by Project emissions be added to *future* background concentrations at the receptor of greatest impact. CDOT uses 2011-13 monitoring data to conclude that background emissions contribute 89 $\mu g/M^3$ at the receptor locations in the Project study area. This compares with the finding in the Supplemental Draft EIS that background emissions contribute 113 $\mu g/M^3$. When the most recent estimate of background concentrations are used, and PM10 concentrations expected to be contributed by the Project are added to those background concentrations, total concentrations for a 24-hour period are predicted to reach 151 $\mu g/M^3$. The 24-hour NAAQS for PM10 is 150 $\mu g/M^3$. By application of EPA's rounding convention for determining compliance with the NAAQS for PM10, 151 $\mu g/M^3$ is treated as compliance. But if the background concentrations from the analysis in the SDEIS (113 $\mu g/M^3$) are used to predict future concentrations, Project emissions will contribute to PM10 concentrations of 175 $\mu g/M^3$ which exceed the NAAQS by 25 $\mu g/M^3$.

The Sierra Club contends that the hot-spot analysis is not consistent with the Act and EPA conformity regulations, and does not provide a lawful or credible factual basis for finding that the Project conforms as required by CAA section 176(c).

### 1. Conformity Not Demonstrated During Time Frame of Transportation Plan.

EPA's rule governing the performance of hot spot analyses for making highway project level conformity determinations requires that "estimated pollutant concentrations must be based

on the total emissions burden which may result from the implementation of the project, summed together with future background concentrations…." 40 C.F.R. §93.123(c)(1). EPA's Hot-spot rule requires that conformity must be demonstrated during the entire future period included in the "time frame of the transportation pan." Project conformity is satisfied only --

> … if it is demonstrated that during the time frame of the transportation plan no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project.

40 CFR § 93.116(a).

EPA's Guidance requires that the emissions analysis be performed for "one or more analysis years within the time frame of the transportation plan or regional emissions analysis when emissions from the project, any nearby sources, and background are expected to be highest." **Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM$_{2.5}$ and PM$_{10}$ Nonattainment and Maintenance Areas**, 3.3.3., p. 20 (November 2015)[hereinafter "Hot-spot Guidance"]. "Conformity requirements are met if the analysis demonstrates that new or worsened violations occur in the year(s) of highest expected emissions – which includes the project's emissions in addition to background concentrations." *Id.*. 2.8, p. 15.

In this case, the Project was first added to the Denver Regional Transportation Plan in 2015 as part of the "2040 Fiscally Constrained Regional Transportation Plan," adopted by the DRCOG board on February 18, 2015 ("2040 RTP"). The emissions analysis performed to demonstrate conformity was for 2035. This is a year within the time frame of the 2040 RTP, but it is not "the year(s) of highest expected emissions." In the discussion of factors considered by CDOT to select the analysis year, AQ Technical Report, 4.3.1.4 (carbon monoxide), and 4.4.2 (PM) no consideration was given to emissions between 2035 and 2040 even though 2040 is included in the time frame of the first RTP that included the project.

Since EPA's objective was to make sure that a project both came from a conforming transportation plan, as required by the CAA, § 176(c)(3) and (4), and satisfied the statutory conformity criteria applicable to transportation projects in § 176(c)(1)(B), EPA required that all years be considered during the time frame of the emissions analysis prepared for the transportation plan that included the project. The I-70 Project was not included in the 2035 RTP, and its emissions impact was not included in the emissions analysis used to determine the conformity of the 2035 RTP. The first regional emissions analysis that included the impact of emissions from the I-70 Project was the emissions analysis performed for the 2040 RTP. It was not reasonable or legally permissible for the agencies not to consider all years within the time frame of the 2040 RTP.

The FEIS and the proposed conformity determination do not address the question whether emissions would be highest during the period of the time frame of the 2040 RTP between 2035 and 2040. Given the factors that the agencies considered relevant to their selection of 2035

compared to earlier potential analysis years, 2040 should have been selected as the analysis year because emissions would be expected to be greater in 2040 than 2035.

The factors identified by the agencies as relevant to identifying the year of highest cumulative emissions include 1) VMT growth, 2) emissions factors, 3) congestion and speeds, 4) total project emissions, and 5) background emissions. Each of these factors support the conclusion that the year of highest emissions within the time frame of the RTP will be 2040.

CDOT's analysis of traffic predicts that traffic in the corridor and on I-70 will continue to grow through 2035. Although 2040 is not addressed in the traffic modeling, there is no evidence in the agency record to suggest that traffic growth will end in 2035. Continued traffic growth through 2040 supports the conclusion that 2040 should be the analysis year.

The agencies found that more stringent emission factors for future vehicles, combined with replacement of existing vehicles with future cleaner vehicles, should produce net reductions in emissions through 2030 because emissions per mile will decrease faster than the increase in miles driven.  However, they concluded that after 2030 net emissions would begin to grow because emission factors for new vehicles would no longer achieve reductions greater than VMT growth. Accordingly, they concluded that 2035 would have higher overall emissions than 2030 or earlier years. This logic would necessarily support the conclusion that overall Project emissions will continue to grow along with VMT growth after 2035. This factor therefore supports the conclusion that emissions in 2040 will be greater in 2040 than 2035, and should be selected as the analysis year.

In addition, as VMT increases traffic congestion will worsen and vehicle speeds will drop after 2035. Increased congestion after 2035 will further contribute to increasing emissions after 2035.

Finally, the agencies concluded that background emissions are expected to continue to increase throughout the time frame of the Project.

> The consideration of background $PM_{10}$ concentration trends further supports the use of 2035 as the year of peak emissions. In the APCD's *Colorado State Implementation Plan for* $PM_{10}$, *Revised Technical Support Document* (September 2005), Table 5.1-1 shows a summary of maintenance year model demonstrations in which the sixth highest modeled concentration increases steadily from 2001 through at least 2030. Table 3.1-1 of that document also shows a steadily increasing total $PM_{10}$ emission inventory from 2001 through 2025. In that 2005 document, the analysis does not include 2035, but the evidence is clear—the overall $PM_{10}$ emission inventory is rising over time due to increases in almost all source types. Therefore, it is reasonable to conclude that the year 2035 is the year of peak emissions to model for the $PM_{10}$ hotspot analysis.

Air Quality Technical Report, 4.4.2, p. 35. CDOT identifies no evidence to suggest that the growth in background emissions through 2035 will end that year, and not continue through 2040.

EAR  0316

Each of these factors, separately and collectively, support the conclusion that both Project emissions and background emissions will continue to grow between 2035 and 2040. Based on this evidence, it must be concluded that the year of highest emissions within the time frame of the RTP will be 2040. In order to satisfy the statutory conformity test, CDOT must show that emissions from the Project in 2040 "will not cause or contribute to a new violation of any standard."

The emissions analysis performed for 2035 shows that Project emissions will contribute to a concentration above 150 µg/M$^3$ in 2035. This analysis cannot be relied upon to conclude that higher Project emissions in 2040, along with higher background emissions, "will not cause or contribute to a new violation" in 2040. The emissions analysis in this record does not demonstrate conformity as required by the CAA.

### 2. Determining Background Concentrations for the PM-10 Conformity Emissions Analysis.

EPA explained the purpose of the requirement to analyze the impact of Project emissions during the year of highest emissions is to ensure that NAAQS will continue to be attained as background emissions grow over time.

> EPA intends that the hot-spot analysis compare concentrations with and without the project based on modeling conditions in the analysis year. The hotspot analysis is intended to assess possible violations due to the project *in combination with changes in background levels over time.* [Emphasis added].

72 Fed. Reg. 12,497 (March 10, 2006). In selecting the "analysis year," the agencies properly considered the growth in background emissions as a relevant, but separate factor in determining the year of highest emissions. Having determined that both Project emissions and background emissions would be highest in 2035, it is not reasonable to use 2011-2013 background emissions as the basis for the conformity determination. Based on evidence derived from the air quality modeling performed by CDPHE to demonstrate that attainment of the NAAQS for PM10 would be maintained during the next 20 years, agencies' conclude that "the evidence is clear—the overall PM$_{10}$ emission inventory is rising over time due to increases in almost all source types. Therefore, it is reasonable to conclude that the year 2035 is the year of peak emissions to model for the PM$_{10}$ hotspot analysis." Air Quality Technical Report, 4.4.2, p. 35. The U.S. EPA approved this modeled demonstration of expected future air quality when it approved Colorado's Air Quality Maintenance Plan.

The modeling performed for the Maintenance Plan demonstration showed that future concentrations of PM10 in the Denver Metro area are expected to increase steadily through the forecast period. Predicted peak concentrations reach levels well above current monitored levels.

Table 5.1-1. Summary of Maintenance Year Model Demonstration

EAR 0317

| Modeled Year | Sixth-Highest Modeled Concentration (ug/m3) |
|---|---|
| 2001-Base Year | 126.1 |
| 2009 | 134.9 |
| 2010 | 135.1 |
| 2015 | 137.5 |
| 2020 | 142.0 |
| 2022 (interpolated) | 145.1 |
| 2025 | 149.9 |
| 2030 | 157.6 |

The concentrations predicted to occur at the location of the Welby monitoring station are less than the regional peak, but the upward trend from 2010 to 2025 is consistent with the trend shown in the peak concentrations. The modeled isopleths presented in the Plan predict that by 2025 background levels of PM10 will be above 110 ug/m3 across most of the I-70 corridor, with higher levels near 140 ug/m3 in the area around the I-25/I-70 interchange.

In some respects inputs used for the regional model overestimate current emissions. For example, emission factors for on-road motor vehicles used in EPA's MOVES model are less than the factors used in the MOBILE6.2 model that provided estimates of motor vehicle emissions.

But those reductions are more than offset by significantly greater population growth and VMT than was assumed in the Maintenance Plan modeling. The Plan used 2005 DRCOG population and VMT projections to estimate future emissions. Those projections seriously underestimated actual population growth and future VMT.

The Maintenance Plan estimated that population would not reach 3 million by 2030,[1] whereas the most recent population estimate used by DRCOG shows that Denver Metro population reached 3 million during 2015, and now DRCOG anticipates that regional population will be close to 4 million by 2035.[2]

VMT is the most significant variable driving future vehicle emissions. The Maintenance Plan based its future modeled air quality on emission projections that expected VMT to grow to 76.8 million miles of vehicle travel by 2025.[3] But DRCOG reports in its recently adopted 2040 Regional Transportation Plan that VMT will reach that level this year or next, and that by 2035 regional VMT should exceed 100 million miles of travel.[4]

Clearly, the assumptions regarding growth and vehicle travel used for the modeling in the Denver Maintenance Plan were based on conservative regional vehicle emission projections. The future modeled concentrations provide a compelling basis to support the agencies'

---

[1] Denver Maintenance Plan for PM10, Technical Support Document, Table 3.2, p. 9 (CDPHE 2005).
[2] 2040 Fiscally Constrained Regional Transportation Plan, Table 1, p. 6 (DRCOG, 2016).
[3] Maintenance Plan, op. sit, Table 3.4-1, p. 12.
[4] 2040 RTP, Fig. 5, p. 10.

EAR  0318

conclusion that the emissions analysis for the I-70 Project should be performed for 2035, if not 2040, as the year of highest expected emissions. Having made that determination, it was not consistent with EPA's conformity rule and is arbitrary and capricious to use historical concentrations of PM10 as the background concentration rather than estimates of future background concentrations that are available from the modeling performed for the PM10 Maintenance Plan.

EPA's Quantitative Analysis Guidance for PM Hot Spot Conformity Determinations (November 2015), 8.3.2, p.124, specifically provides for the use of PM SIP modeling to determine future background concentrations. "To account for future emission changes, it may be appropriate in some cases to use future background concentrations that have been calculated based on modeled outputs from a CTM. CTMs are photochemistry models that are routinely used in regulatory analyses, including attainment demonstrations for PM SIPs …."

The data available from the PM Maintenance SIP modeling demonstrate that future background concentrations will at least exceed 110 ug/m3 in the area affected by the Project, which is significantly greater than the 89 ug/m3 value used as background to determine the design values for the I-70 Project. The failure to use background values that reasonably estimate future conditions in 2035 is inconsistent with EPA's conformity rule, and is unlawful. The Project has not been shown to conform and may not be approved by FHWA without modifications to reduce emissions to levels that will ensure attainment throughout the time frame of the 2040 regional transportation plan.

### 3. Design Value Calculation Fails to Demonstrate Attainment.

Even if it were permissible to use historical PM10 concentrations as a surrogate for expected future concentrations in 2035 (or 2040), the methodology used to compare predicted concentrations caused by Project emissions with the NAAQS does not demonstrate that the Project will not cause or contribute to a violation of the NAAQS.

The regulatory appendix to the NAAQS for PM10 defines the conditions that must be demonstrated to meet the standard.

> 2.0 Attainment Determinations
> 2.1 24-Hour Primary and Secondary Standards
> (a) Under 40 CFR 50.6(a) the 24-hour primary and secondary standards are attained when the expected number of exceedances per year at each monitoring site is less than or equal to one.

40 CFR 50.6, Appendix K. EPA allows the standard to be met if the number of 24-hour periods exceeding the standard is 3 or less, which is an average of not more than one exceedance per year. The methodology applied by CDOT does not consider whether the five highest pollution days in the analysis year will exceed the NAAQS and therefore cause or contribute to multiple violations of the NAAQS. CDOT confirmed to the Sierra Club, in an email dated March 1 from

Vanessa Henderson,[5] that the concentrations resulting from Project emissions reported in the Air Quality Technical Report, Tables 19 and 20, are the 6th highest concentrations produced by the AERMOD model. The Act imposes a burden on the agency seeking federal funding for a highway project to establish that project emissions "will NOT cause or contribute" to a violation of the standard. CDOT does not disclose the five highest 24-hour concentrations predicted by the model, and therefore does not demonstrate that Project emissions on those 5 days will not cause or contribute to a violation. Since the concentrations on the 6th highest day are expected to marginally exceed the standard, it is not reasonable or legally permissible to merely infer that higher concentrations on the 5 highest days will not cause violations of the NAAQS.

In the Air Quality Protocol developed to prepare the air quality analysis for the SDEIS, it was determined that "EPA's guidance requires use of the highest PM10 value over a 3-year period, excluding exceptional events, to represent background." Draft Air Quality Analysis Protocol, 4.2, p. 7 (Feb. 2013). Based on this guidance, the background concentration used to determine the design values at receptors affected by Project emissions was 113 ug/m3. In addition, the Protocol stated that the 6th high concentration predicted by the dispersion modeling would be added to the background concentration to determine the design value to be compared with the NAAQS. The model predicted that the 6th highest concentration contributed by the Project would be 38 ug/m3. When added to background, the result was 151 ug/m3. By application of EPA's rounding procedure, any value from 151 to 154 is rounded to 150 and considered to meet the NAAQS.

This procedure leaves unanswered whether the 1st through 5th highest concentrations will cause at least three days when the total of Project emissions added to background will total 155 ug/m3, and therefore violate the NAAQS.

---

[5] Hi Bob - Sabrina forwarded me your questions on the Final EIS to answer for you.  I'm providing the answers below in the same order as your questions in the email.

- We are not able to send you the 1st through 5th high values for the dispersion model.  We use the 6th high as you note the EPA's guidance allows.  In order to get the 1st through 5th values, we would have to re-run the models and that is not something we are planning to do.
- The values for the receptors at Swansea Elementary on Table 21 are, as you note, the design values.  As note 1 to the table indicates, the concentrations noted are the modeled value plus the background concentration of 89 micrograms per cubic meter.  Those values are then rounded.  We are not able to get the actual model values themselves to you before the end of the review period.
- The VMT mix reported in Table 9 is composite data from the 9 county ozone nonattainment area that varies by road type and hour of day.  Table 9 represents the average of those values.
- Yes, the DPM emissions are based on the vehicle mix in Table 9.

If you have any further questions, please submit them as part of your official comments by the end of tomorrow, March 2nd.
Thanks!
Vanessa

EAR 0320

For the hot-spot analysis in the FEIS, this procedure was modified to ignore even more days when Project emissions would likely cause NAAQS violations. Instead of adding the predicted Project impact to the highest background value, the 6th highest 24-hour concentration resulting from Project emissions were added to the fourth highest background concentration. That procedure had the effect of eliminating any cushion for the 5 highest pollution days resulting from Project emissions.

In the hot-spot analysis prepared for the FEIS, the 6th highest concentration resulting Project emissions was modeled to be 62 ug/m3, and the 4th highest background level was determined to be 89 ug/m3. The total is a design value of 151 ug/m3. But in this case we know that on three days the design value will be higher than 151 because the background concentrations include three days higher than 89 ug/m3. Each one of those days could be a violation day if the background concentrations exceeded 93.

Then in addition, the model predicts that Project emissions will contribute concentrations greater than 62 ug/m3 on 5 days. When these 5 higher Project pollution days are added to three higher background pollution days, it is highly probable that at least three of those days will exceed the NAAQS and cause a violation.

But CDOT has not disclosed the three higher background days, or the five highest Project pollution days. Without providing this information to the decisionmaker and the public, CDOT has not met its burden to establish that Project emissions will not cause or contribute to a violation of the NAAQS. The factual predicate required for a conformity determination is not in the agency record. FHWA cannot lawfully determine that the Project conforms based on these facts.

### 4. Emissions Inventories Used to Model Project Impacts Unlawfully Omit Emissions from Half of Truck Trips at Highway Segments with Peak Truck Traffic.

In the email from Vanessa Henderson, CDOT explains that the VMT mix used to estimate emissions on I-70 is the regional VMT mix developed for ozone modeling. This mix is not based on the mix of vehicles using the I-70 corridor. As a result it under represents the number of trucks on I-70, and therefore fails to fully account for the emissions from trucks in the corridor.

The VMT mix used in the hot-spot analysis assumes that trucks are less than 5% of vehicle trips in the corridor. But Traffic counts reported by CDOT for 2012 show AADT at the mousetrap as nearly double the share of trips used for modeling emissions in the hot-spot analysis (truck share shown in parenthesis)[6]:

I-25 south of interchange: 243,000 (9.1%)
I-25 north of interchange: 198,000 (10.9%)

---

[6] Colorado Department of Transportation, Traffic Data Explorer, 2013. Available online at: http://dtdapps.coloradodot.info/Otis/TrafficData (last accessed October 30, 2013).

I-70 west of interchange: 150,000 (9.1%)
I-70 east of interchange: 140,000 (9.3%)

In addition, the traffic modeling performed by CDOT for the EIS shows that the Project will result in increased truck trips in the segment between I-25 and Brighton Boulevard compared to the no-build option. *See* AQ Report, Fig. 3, p. 16, showing I-70 segments with increased truck traffic compared to No Build.

These additional trips resulting from the Project are also not represented in the regional VMT mix used to calculate emissions. Together, the actual truck use on this segment of I-70 reported by CDOT combined with the additional truck use when the Project is built means that only half of future truck emissions are accounted for in the hot-spot analysis.

Given that this segment of the I-70 Project between I-25 and Washington Blvd is where the modeling shows the peak PM hot-spot is expected to occur, and where the design value with only half of expected truck emissions is reported as 151 ug/m3, the failure to include emissions for half of the truck trips in the emissions and dispersion modeling does not comply with EPA Guidance, and unlawfully underestimates the impact of Project emissions at the hot-spot receptors. A hot-spot emissions analysis that omits half of the truck emissions cannot be relied upon to support a conformity determination.

### 5. Modeling Fails to Account for True Impact of Vehicle Emissions under the Cover (Tunnel) Next to Swansea Playground.

The Report notes that only half of the emissions need be accounted for at each end of the tunnel. This makes sense only on calm days which are not common in the So. Platte River drainage basin. The prevailing winds in the area blow from the SSW following the lay of the river bottom. During these periods, the wind will force emissions to exit from under the cover (tunnel) to the east. During warm and hot afternoons, the prevailing winds flow upslope into the mountains. This has been well-demonstrated by the data developed by the National Park Service and CDPHE showing that ozone visible aerosols formed in the urban air shed are transported into RM National Park by upslope winds. Under those transport conditions, local winds at the Project will blow all emissions out from the west end of the cover into the block adjacent to the playground at Swansea Elementary School.

To represent to the parents of families with children at the school that Project emissions will not be concentrated for 800 feet and then released in its entirety from one end of the cover defies reality and common sense. This is the essence of arbitrary and capricious decisionmaking.

### B. Modeling to Demonstrate Attainment of PM2.5 NAAQS Unlawfully Not Performed.

In comments submitted on the Supplemental Draft EIS, the Sierra Club and community groups concerned about the adverse health outcomes occurring in the north Denver neighborhoods affected by the Project requested that a modeling analysis be performed for PM2.5, in addition

EAR  0322

to PM10, to demonstrate that Project emissions will not cause or contribute to future concentrations of PM2.5 in the ambient air that violate the NAAQS for PM2.5. The FEIS does not include a modeling analysis for this pollutant.

The primary reasons given for CDOT's and FHWA's refusal to perform this analysis are 1) the Denver region has no history of violations of the NAAQS for PM2.5, and the emissions increases expected from the Project are not likely to be enough to exceed the NAAQS. These reasons do not consider the impact of highway emissions being measured now at the new near-highway monitors required by EPA's 2012 revision of the NAAQS for PM2.5. It is not consistent with NEPA to omit consideration of these existing measures of highway emissions in the Metro area.

The I-25 monitor has been in operation since mid-2014. It shows one annual concentration for 2015 that is nearly 30% higher than the concentrations measured at Welby which is the site CDOT chose to represent background. The peak 24-hour concentrations at the I-25 site exceed the NAAQS, but not the 98th%ile value which is used to measure attainment. However, the 98th%ile value at this site is also 30% above the background site.

VMT at the I-25 monitor location is less by roughly 1/3 than VMT at the Mousetrap. The AADT along I-25 at 8th Avenue is only 249,000, as reported on the spreadsheet provided by Mr. Will Allison at a meeting with CDPHE in late 2013, whereas at the mousetrap the total trips passing through the interchange are 326,000, more than 30 percent more traffic. In addition, the share of traffic represented by truck trips is approximately 40% greater at the Mousetrap than at the I-25 monitoring station.

For these reasons, the Sierra Club and community groups demanded that a near-highway monitor be located to measure the air quality impact of higher traffic at the Mousetrap. That monitor was located in Globeville at 47th and Acoma. It began operation October 1. PM2.5 measured for the last quarter of 2015 at that location average 14 ug/m3,[7] which far exceeds the levels being measured at the I-25 monitor or at the Welby background site. Most importantly, the mean value for the quarter exceeds the annual NAAQS of 12 ug/m3. These data do not support the rationale in the FEIS for not modeling the impact of Project emissions on PM2.5. If PM2.5 concentrations reported during the 4th quarter of 2015 continue to be measured at the Globeville monitor, the NAAQS will be violated and the area will require redesignation under the CAA as non-attainment.

The decisionmaker needs to know, and must disclose to the public, how much the increase in traffic between now and 2035 can be expected to worsen PM2.5 exposures in the neighborhoods surrounding the Mousetrap. If the Project will exacerbate exceedances of the standard set to protect public health, the Colorado and Denver regional air quality planning agencies need to know so they can begin to develop a control strategy, taxpayers need to know because they will incur additional costs to control CDOT's pollution, and the public needs to

---

[7] See Comment Appendix 1, which summarizes the mean concentrations for PM2.5 and PM10 at the Globeville, I-25 and Yuma, and the Welby monitoring stations. Annual means are reported by EPA. Fourth Quarter means were calculated by Lisa Warren from the hourly and 24-hour concentrations reported on the EPA AIR Data website.

know so they can decide whether to take action to protect themselves and their families from dangerous pollution levels.

Furthermore, NEPA requires that FHWA must consider reasonable alternatives that will reduce emissions and pollutant exposures at the Mousetrap to enhance air quality to levels that will not violate health standards. It is not reasonable or legally permissible under NEPA and 23 USC section 109(h) to not use the best science available to estimate the impact of Project emissions on concentrations of PM2.5, the pollutant that EPA has identified as having the strongest causal impact on cardiovascular disease and mortality from heart attacks and is a major cause of childhood asthma episodes requiring urgent care. These impacts cannot lawfully be disregarded by FHWA.

### C.   Health Impact Assessment Not Performed.

The Sierra Club requested that a health impact assessment be performed to estimate the effect of current highway emissions as a contributor to the adverse health outcomes reported by Denver Environmental Health in north Denver neighborhoods affected by the Project. CDOT and FHWA refused to perform this analysis for invalid reasons.

The FEIS states that there is no need to address the health impacts of the expanded project because a) despite the 15-20% increase in traffic and a significant increase in emissions from the Project no national air quality standard will be violated , and 2) toxic air pollution emissions are expected to decrease.

### 1.   FHWA Ignores Evidence Showing that Project Emissions Will Violate the NAAQS.

FHWA's first reason for not performing a health impact assessment ignores all of the evidence in the record showing that Project emissions, if fully accounted for, when combined with *future* background concentrations, will violate the NAAQS for PM10, and the monitored PM2.5 data showing that the NAAQS is being violated near the Project hot spot right now.

### 2.   NAAQS Compliance Does Not Resolve the Issue of Health Impacts Caused by Highway Pollution.

This response also ignores the vast body of health effects research that links the adverse health outcomes being reported in north Denver communities to both PM2.5 specifically, and to the full mix of air pollution emitted from highways. Most of the literature does not link these health effects to mobile source air toxic (MSATs) pollutants. The fact that MSAT emissions are expected to decline over the life of the Project does not relieve CDOT of the duty to investigate the likely health impacts of community exposure to increasing concentrations of PM10 and PM2.5, and the overall mix of criteria pollutants and MSATs emitted from highways.

The agency failure to respond to requests from many residents and community groups asking for an investigation of the likely relationship between a much greater incidence of diseases of

EAR  0324

air pollution reported by Denver Environmental Health in north Denver communities and exposure to emissions from heavily trafficked freeways merely demonstrates the disregard that transportation agencies have traditionally shown for the impacts of Project emissions on community health. DEH reported much greater frequency of the hospitalization of children with asthma and higher rates of death from cardiovascular disease. These are the two health outcomes that EPA identified as most causally linked to exposure to PM2.5. In addition, recent research shows a direct correlation between these disease outcomes and the portion of PM2.5 that is contributed by carbon particles emitted from diesel trucks and automobiles.

The FEIS cites to studies performed in 2002 and 2004 which had ambiguous results regarding the health impacts of exposure to highway pollution, and to an HEI report published in 2010 that found a link between highway emissions and asthma, but was inconclusive regarding the link with cardiovascular disease. The FEIS does not address EPA's findings regarding the link with cardiovascular disease that was reported in EPA's *Integrated Science Assessment* for PM which reviewed all of the hundreds of published scientific research reports available in 2011, and not just the few selected studies discussed in the FEIS. That review of the research convinced EPA to (i) tighten the NAAQS for PM2.5 in 2012, and (ii) mandate for the first time that states monitor PM air quality in communities adjacent to highways because of the elevated levels of pollution found near highways, and the link between exposure to highway emissions of PM2.5 and adverse health effects.

Nor does the FEIS review and consider the more recent health effects research published since the SDEIS was prepared that conclusively links the adverse health effects associated with PM to the portion of PM emitted from highways. Highways emit particles containing carbon from fuel combustion, tire wear and asphaltic road surface material. The most recent research published by a team from the Keck School of Public Health at USC,[8] and another study published by the California Office of Environmental Health Hazard Assessment[9] identifies carbon particles as the component of PM2.5 most associated with cardiovascular disease.

Research performed in Arkansas show that cardiovascular disease decreased significantly during the decade between 2000 and 2010 because annual PM2.5 concentrations were reduced during that period by 3 ug/M3 at levels below the NAAQS.[10] This research shows that reducing PM concentrations in north Denver can have public health benefits even if the PM NAAQS are not violated.

---

[8] "Near-Roadway Air Pollution and Coronary Heart Disease: Burden of Disease and Potential Impact of a Greenhouse Gas Reduction Strategy in Southern California," Ghosh, et al (EHP, July 2015) http://dx.doi.org/10.1289/ehp.1408865.

[9] "Associations of Mortality with Long-Term Exposures to Fine and Ultrafine Particles, Species and Sources: Results from the California Teachers Study Cohort," Ostro, B, et al. (EHP, January 2015) http://dx.doi.org/10.1289/ehp.1408565.

[10] "Trends of Non-Accidental, Cardiovascular, Stroke and Lung Cancer Mortality in Arkansas Are Associated with Ambient PM2.5 Reductions," Charbot, M., et al. *Int. J. Environ. Res. Public Health* (2014), 11, 7442-7455.

EAR 0325

These health effects research reports were hand delivered by Sierra Club representatives to CDOT Director Bhatt during a meeting in his office last August, and to FHWA Division Director Cater during a meeting in his office last September. The Club brought these reports to the attention of the decisionmakers because they represent the most recent development of a body of research that links exposure to highway pollution with the excessive incidence of adverse health outcomes in the neighborhoods of north Denver along I-70. None of this research published since the 2010 HEI report is discussed in the explanation for not preparing a health impact assessment, or in the response to comments.

FHWA does not have discretion to cherry-pick among the published scientific research which studies it will discuss, and which not. The agency's duty under the law is to consider all the evidence relevant to its obligations under NEPA and section 109(h). Probative evidence cannot simply be ignored. *Cotter v. Harris,* 642 F.2d 700, 706-07 (3rd Cir., 1980); *See v. Washington Metro. Transit Auth.,* 36 F.3d 375,384 (DC Cir, 1994). Reasoned decisionmaking requires that "the agency must examine the relevant data." *Motor Vehicle Mfrs. Assn. v. State Farm Mut.,* 463 U.S. 29, 43 (1983). FHWA's failure to consider evidence relevant to its duties under NEPA, i.e., the obligation to consider alternatives and mitigation that can minimize the adverse impacts of highway pollution on community health, is arbitrary and capricious.

## II.     Project Alternatives Not Adequately Considered

The Sierra Club joined with numerous community groups and residents in requesting that CDOT and FHWA fully investigate two alternatives that offered the possibility of significantly reducing VMT through the neighborhoods of north Denver and thereby minimizing resident exposure to highway emissions from the current alignment of I-70 in north Denver, and providing a significant health benefit for these residents. We repeat that request here:

> At a minimum, two alternatives should be considered to reduce emissions and pollutant exposures in the neighborhoods adjacent to I-70:
>
> 1) re-signing I-70 to route the 40% of traffic that is "through" traffic out of the neighborhoods where dense urban development and elementary schools are located within a few hundred meters of I-70 onto I-76 and I-270; and
>
> 2) routing all truck traffic off of the current alignment between Washington Street and Colorado Blvd which would require through truck traffic to use I-76 and I-270, and local truck traffic to disperse on local streets leading to their local destination rather than concentrating on the current alignment next to schools and houses along the highway.
>
> These alternatives are reasonable because they will add mobility for traffic traveling through the metro area, without significantly increasing the cost of mobility, while at the same time providing health benefits for communities along the current I-70 alignment. These alternatives have not been evaluated in prior NEPA documents.

EAR  0326

CDOT and FHWA denied this request, citing the lack of any evidence of air quality violations, the absence of evidence that diverting traffic would provide health benefits. With respect to the re-route alternative the response declared that re-routing I-70 onto I-76 and 270 would not meet the purpose and need for the Project, and that the cost of this alternative would be excessive. These reasons were not offered as justification for not analyzing the truck diversion option. Instead, CDOT claimed that moving the trucks to another alignment would provide no health benefits because it would simply move the pollution to expose other residential areas.

These responses were not based on any detailed analysis of traffic demand, impacts on congestion, emissions, pollutant exposures or the numbers of people exposed. They rely on assumptions that are not based on evidence in the record. The failure to fully investigate the potential costs and benefits of these alternatives is not consistent with the obligation to consider alternatives and mitigation under NEPA, and not consistent with the obligation under 23 USC 109(h) to identify measures that can fully mitigate adverse impacts, determine the costs of such mitigation, and weigh those costs to determine if the project is in the overall public interest.

### A.   Purpose and Need Is Not Lawful Reason for Rejecting these Alternatives.

NEPA requires that an environmental impact statement briefly describe the purpose and need to which the agency is responding in proposing the alternatives, including the proposed action. *See, e.g.,* 40 C.F.R. § 1502.13.  Chapter 2 of both the DEIS and FEIS describe the purpose and need for I-70 East project.  As set forth in section 2.4 of the FEIS, for example, "[t]he purpose of the project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area."  The need for the project, described in section 2.5 of the FEIS, "results from transportation infrastructure deficiencies, increased transportation demand, limited transportation capacity and safety concerns."

### 1.   The Agencies Improperly Defined the Purpose and Need for the Project.

In this case, the agencies' formulation of the purpose and need is flawed because it is too narrow. Specifically, the purpose and need statement should include preservation or improvements to air quality, just as it has included concerns with safety, congestion and mobility.  This is not a case where NEPA's more general requirements to evaluate the negative effects of its actions can suffice to produce a reasonable range of alternatives that will achieve project objectives while protecting human health and the environment.  Rather, the I-70 East project presents environmental concerns which are so acute and inextricably bound up with the fundamental nature of the action, that impacts to air quality must be included in the purpose and need itself.

In addition, the overlying framework of pre-existing policy already requires that significant transportation projects in Colorado reduce air quality impacts.  For example, the Colorado Department of Transportation developed its own Air Quality Action Plan (the "AQAP") to implement the agency's air quality policy in 2012.  As stated in the AQAP, one of its primary goals is to "reduce transportation related GHG, air toxics and other related emissions statewide, thereby reducing the need to negotiate such measures in an ad hoc manner in subsequent National Environmental policy Act documents

EAR  0327

initiated by CDOT."  AQAP at 3.  The AQAP also explains "CDOT, as a transportation agency, has taken a regional, programmatic approach to emissions reductions, targeting statewide vehicle mobility where the Department has the most direct influence."  *Id.* at 5.  Thus, emissions reductions are central to the agency's mission and goals, and CDOT's stated policy is to address emissions reductions primarily by focusing on vehicle mobility (one of the stated purposes of the project).

Yet vehicle mobility is not the only means the agency has stated it will use to address emissions.  CDOT's AQAP also address how truck routes and restrictions should be considered in each project to reduce emission and exposure to sensitive receptors.  AQAP at 7.  The agency has explained that its NEPA documents should evaluate "opportunities to modify truck routing, delivery scheduling, etc. to minimize MSAT and other pollutant exposure to vulnerable populations such as schools, hospitals, etc." AQAP at 7.  The AQAP also requires the agency to "[e]xplore congestion, lane restrictions and/or speed limitations for motor carriers."  *Id*. at 10.  These limitation restrictions may include right hand only locations, congestion restrictions, time of day lane restrictions and speed restrictions, all in an effort to reduce emissions.

Here, the failure to include emissions reductions as a part of the purpose and need for the I-70 East project—a project that directly affects vehicle mobility--constitutes a failure by the agency to follow its own policy.  More importantly, the failure to include air quality concerns in the purpose and need constitutes a failure to formulate a purpose and need statement that complies with NEPA, and that addresses the national transportation objectives enacted by Congress to minimize fuel consumption and air pollution. 23 USC section 134(c). This failure skews the consideration of alternatives by excluding consideration of the benefits of alternatives that reduce emissions, or place them in areas where they are likely to have fewer environmental impacts or less impact on public health.

### 2. The Agencies Failed to Discuss the Inconsistency of the Preferred Alternative with Pre-existing Plans and Policies.

NEPA requires agencies to address the "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State and local . . . land use plans, policies and controls for the area concerned."  40 C.F.R. § 1502.16(c); *see also*, 40 C.F.R. § 1506.2(d) ("To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.").

As set forth above, CDOT has already developed a plan—the Air Quality Action Plan-- which sets forth considerations and tools the agency should employ to reduce emissions associated with transportation projects.  More specifically, the AQAP requires the agency to consider vehicle mobility, truck routing modifications, time of day lane restrictions, congestion restrictions, and other measures to reduce emissions or otherwise reduce public exposure to harmful pollution.  Yet many of these tools are not substantively considered in the FEIS.   Further, the conflicts and inconsistencies between the preferred alternative and the mandates of the AQAP are not described, and there is no explanation of how the agency would reconcile the proposed action with the AQAP.

### 3. The Agencies Improperly Eliminated the I-270/I-76 Reroute Option in 2008.

a.   **The 2008 DEIS Analysis was Insufficient to Justify Elimination of the I-270/I-76 Reroute Alternative**

As discussed previously in the Sierra Club's comments, the I-270/I-76 reroute potentially offers substantial advantages over the alternatives reviewed in the SDEIS and FEIS, including less significant impacts on human health and the environment, and the enhancement of the human environment (an independent requirement for any alternative evaluated in the NEPA process). Unfortunately, the I-270/I76 reroute alternative was eliminated in 2008, without adequate consideration, based on the agencies' claim that this alternative does not meet the purpose and need of the project.

The 2008 DEIS considered several "Off Existing Alignment" alternatives.  *See* Draft EIS at 3-11. Among them was the alternative to "Improve I-270 and reclassify I-70."  Under this alternative, the construction would "[c]onvert the existing portion of I-70 from I-25 to I-270 to a limited access roadway. Additional capacity would be added to I-270 and I-76.  The viaduct between Washington Street and Colorado Boulevard would be reconstructed or removed."  *Id.  See also*, DEIS at Exhibit 3-11.

The reasons given for its elimination were described in a single paragraph:

> [The alternative to improve I-270 and reclassify I-70] would require the reconstruction of the I-76/I25 interchange to provide for all traffic movements and would require major widening to I-270 and I-76 for approximately 12 miles (5.5 of which are east of I-25) to accommodate the relocated traffic.  These existing facilities are currently only four lanes wide.  This alignment would also require improvements on I-25 between I-76/I270 and the existing I-70/I-25 interchange for traffic that wants to go south on I-25 towards downtown Denver, a major destination from the I-70 corridor. These trips on I-25 to access I-70 result in almost four miles of out of direction travel.

DEIS at Exhibit 3-15.  These justifications fall far short of justifying this alternative's elimination.

First, the DEIS presents no analysis of whether the I-270/I-76 reroute alternative actually meets the factors defining the purpose and need for the project.  In other words, the agency failed to address whether this alternative improves safety, access, and mobility and addresses congestion on I-70 in the project area.  The DEIS also fails to address whether this alternative addressed transportation infrastructure deficiencies, increased transportation demand, limited transportation capacity and safety concerns.  These shortcomings alone demonstrate that the decision to eliminate the I-270/I-76 alternative from further consideration was in violation of NEPA.  When the agencies decided to eliminate this alternative, they did so based on an inadequate analysis and an unsupported conclusion that it would not meet the purpose and need for the project.

In fact, the I-270/I-76 reroute alternative meets the stated purpose and need for the project. Safety, access and mobility would all be improved by rerouting the high traffic volumes and resulting air pollution from the current I-70 corridor to the less populated and less congested I-

EAR  0329

270/I-76 corridor where the traffic and pollution would impact fewer local residents.  *See* 2016 I-70 Health Impact Zone Comparison Study, submitted herewith.  Moreover, the myriad potential reconfigurations of the current I-70 corridor along 46th Avenue which can be implemented under the reroute alternative, including reconstruction or removal of the viaduct between Washington Street and Colorado Boulevard, have the potential to improve both the infrastructure and safety concerns stated in the purpose and need, and present opportunities to enhance mobility by re-establishing north-south connectivity for vehicular, bike and pedestrian traffic along this corridor.

Second, even if this alternative did not fully meet the purpose and need, it remains a reasonable alternative and should nevertheless be afforded more detailed analysis. Were the I-270/I-76 reroute alternative to be more fully considered, it may lead the agencies to conclude that meeting only part of the goals of the stated purpose and need may be worth the tradeoff if the impacts—particularly those to air quality and human health—are less significant or more readily capable of mitigation.

Third, the agency made the decision to eliminate this alternative after considering it only in isolation, rather than together with other alternatives or in conjunction with additional measures that might address its perceived shortcomings. For example, one of the primary concerns the agency expressed in relation to the I-270/I-76 alternative was the potential for increased traffic volume in and around the reconstructed 46th Avenue.  Yet the agencies failed to consider the I-270/I-76 alternative in conjunction with the use of any the Managed Lane Options analyzed in the alternatives considered in the FEIS, or in conjunction with any concrete access limitations[11] such as temporal traffic or truck travel restrictions on 46th Avenue, or the incorporation of enhancements to 58th avenue.  All of these measures might have alleviated the concerns associated with potential increased traffic volumes on and around 46th Avenue. Because the agencies eliminated this alternative so early in the process, the alternative never received the appropriate detailed consideration

Fourth, the justifications do not, on their face, provide a basis for eliminating further consideration.  Each of the alternatives retained for further analysis included significant construction, including major widening and improvements to interchanges.  In addition, the agencies failed to assess the actual negative impacts of out-of-direction travel, or even to define what constitutes out-of-direction travel for an interstate highway that accommodates significant traffic originating outside the project area and moving to multiple destinations beyond it.  While this route may result in additional miles traveled for some traffic, the additional miles do not necessarily translate into longer travel times, increased air pollution or other negative effects—particularly since the reroute will decrease congestion.

Lastly, while the agency ostensibly undertook additional analysis of the I-270/I-76 alternative later in the NEPA process, it is clear that this "analysis" was performed only to support a decision that had already been made.  Following receipt of public comments questioning the

---

[11] The I-270/I-76 alternative originally contemplated that the current I-70 alignment would become a "limited access roadway," yet there is no evidence that the analysis used to eliminate this alternative included any access limitations, such as the Managed Lanes Options considered with other alternatives.

elimination of the I-270/I-76 alternative, the agency sought, explicitly, to confirm that its elimination of this alternative was supportable.  In August of 2014, the agencies included an Alternatives Analysis Technical Report (the "Technical Report"), in their Supplemental Environmental Impact Statement ("SEIS").  See SEIS at Attachment C, Alternative Analysis Technical Report.  Section 4.1 of the Technical Report addresses the elimination of the I-270/I-76 reroute alternative.  This document states unequivocally that the I-270/I76 reroute alternative "was eliminated from consideration early in the project alternative analysis process, as documented I the 2008 EIS."  It also explains that the additional analysis was performed "to confirm the validity of [reroute] elimination."  This is precisely the kind of *post hoc* rationalization that NEPA was intended to avoid.

>    b.    **Additional Discussions of the I-270/I-76 Alternative in the SDEIS and FEIS do not Support its Elimination.**
>
>    <u>Additional Discussion in the SDEIS</u>:
>
>    >    i.    **Additional Traffic on Local Streets**

The primary justification offered in the SDEIS Technical Report for rejecting any analysis of the I-270/I-76 alternative (and one which was developed wholly after the agencies had made their decision to eliminate the alternative) is that it will cause additional traffic on local streets.  The agencies based this claim on a "Travel Analysis using the DRCOG 2035 Regional Travel Demand Model."  *See* Technical Report at § 4.1.1.  However, this Travel Analysis does not appear to have been included in the SDEIS, making it impossible to independently assess its scope, methodology, analysis or conclusions.  For example it is not clear whether the Travel Analysis was performed using the updated information utilized for more accurate analysis of the retained alternatives including the most recent land use scenarios in the DRCOG regional plan, updated socioeconomic lad use data, or updated roadway geometries.  See FEIS at Ch. 4, p. 4-2 (discussing use of updated information).  In addition, it is not clear that the agencies employed the same DynusT modeling tool in the Travel Analysis as that used in the alternatives analysis for the FEIS.

More fundamentally, in using the Travel Analysis as a basis to reject the I-270/I-76 alternative, the agencies referenced only the alleged negative impacts on local traffic when, in fact, the information presented in the Technical Report (two figures and one table purporting to describe the results of the Travel Analysis) indicates significant positive impacts on local traffic in some areas and negative impacts in others.  In other words, it is not at all clear from the information presented in the Technical Report that the overall effect on local traffic would be negative.  In addition, the agencies' conclusions based on the Travel Analysis do not account for potential mitigation of increased local traffic volumes that could be achieved if the alternative is considered together with other alternatives or in conjunction with additional measures that might address its alleged shortcomings.  This failure is particularly acute given that the original I-270/I-76 reroute alternative specifically contemplated a "limited access" roadway in the current I-70/46[th] Avenue corridor, where the problem of additional traffic on local streets is claimed to be the most severe, though the Travel Analysis considered 46th Avenue only as a four or six lane "principal arterial."  In addition, the Travel Analysis did not consider the effect of

using any of the strategies to control traffic flow (e.g. the Managed Lanes Options) considered in conjunction with the retained alternatives, or any other strategies to reduce traffic volume in the area.

### ii. Out-of-Direction Travel

The Technical Report claims that the I-270/I-76 alternative was eliminated, in part, because it would involve out-of-direction travel for highway users. More specifically, the agencies claim that "60 percent of the traffic heading west on I-70 continues past I-25, staying on I-70. The reroute alternative adds two miles of out-of-direction travel for these vehicles. Twenty five to thirty percent of the traffic heading west on I-70 exits to southbound I-25. This alternative adds four miles of out-of-direction travel for these vehicles." With absolutely no supporting analysis or data, the agencies simply claimed "[t]he additional vehicle miles traveled results in increased delays, fuel costs and air pollution in the area." Bare, conclusory statements of this sort do not satisfy NEPA's mandates to take a hard look at the effects of its actions. As explained above, the agencies failed to even to define what constitutes out-of-direction travel for an interstate highway that accommodates significant traffic originating outside the project area and moving to multiple destinations beyond it. Even for travelers who continue west on I-70 or exit on southbound I-25, it is not necessarily the case that the I-270/I-76 reroute results in-out-of direction travel when highway users' final destinations are considered. More fundamentally, even if this alternative results in additional miles traveled for some traffic, the additional miles do not necessarily translate into longer travel times, increased air pollution or other negative effects—particularly since the reroute will decrease congestion and shift traffic and air quality impacts to less populated areas.

### iii. Alternate Highway Route

The Technical Report asserts that the 2008 DEIS "did not fully describe" the importance of I-270 serving as the alternate route to I-70 for emergency access during major incidents or extreme congestion. *See* Technical Report at p. 17. In fact the 2008 DEIS does not appear to mention the "alternate route" justification for eliminating the I-270/I-76 alternative, and thus it does not appear to have been a consideration when the decision was made to eliminate this alternative. In any case, the Technical Report itself fails to fully describe the importance of I-270's function as an "alternate" route because it presents no data or analysis supporting this assertion. Additionally, the agencies again failed to consider the I-270/I-76 alternative in conjunction with other alternatives or measures that could alleviate this concern.

### iv. Additional Cost

The Technical Report also justifies eliminating the I-270/I-76 alternative on the basis that its estimated construction cost would be twice that of other alternatives. However, a higher capital cost for an alternative does not necessarily justify its elimination, particularly when NEPA's requirements to consider the direct, indirect and cumulative effects of a proposed action are taken into account. An alternative with higher capital costs may actually result in long-term savings when factors such as maintenance and operational costs are accounted for, and particularly when costs resulting from negative impacts to human health and the

environment are factored in.  In sum, while the initial construction cost of the I-270/I-76 alternative may be greater, the agencies have not demonstrated that its ultimate direct, indirect and cumulative costs are greater.  Finally, the agencies provided no detail with respect to how the cost of the I-270/I-76 alternative was determined, stating only that it is a "high-level cost analysis based on typical construction costs for bridge and highway construction per lane mile and average right-of-way costs."  Technical Report at p. 18.  Because no detail was shared with the public it is impossible for the public to independently evaluate the agencies' assumptions, analysis, or conclusions.  Finally, it does not appear that the same kind of detailed cost analysis performed for the retained alternatives was undertaken for the I-270/I-76 alternative before concluding it was too costly. Given these shortcomings, additional construction cost does not provide a basis for eliminating the I-270/I-76 alternative from further consideration.

### Additional Discussion in the FEIS:

In the FEIS, the agencies attempted once again to strengthen their justifications for the 2008 elimination of the I-270/I-76 alternative.  The agencies produced an "Alternative Analysis Technical Report Addendum" (the "Addendum"), which purportedly presented "additional analysis performed since the 2014 Supplemental Draft EIS was published."  *See* FEIS, Attachment C, Technical Report Addendum at p. 1.  Section 5 of the Addendum is titled "Technical Report Errata," and presents information the agencies describe as "revisions and clarifications to the Alternatives Analysis Technical Report  . . . that do not constitute new findings or analysis."  Section 5.1 of the Addendum addresses the I-270/I-76 reroute alternative.   In this section, the agencies now claim that after removal of I-70 from its current alignment, traffic volumes on local streets will increase and transfer the safety and mobility problems from I-70 to the local network.  In essence, the same issues that underlay the present need for the project would only be duplicated and compounded in the same location albeit on different infrastructure by the removal and reroute of I-70."  Addendum at section 5.1, p. 9.  While the agencies have now attempted to more directly connect the purported increase in local traffic under the I-270/I-76 alternative with the purpose and need of the project, they still fall short.  The same infirmities found in the SDIES regarding the Travel Analysis and the conclusions the agencies based upon it remain in the FEIS.

Similarly, the agencies continue to justify elimination of the I-270/I-76 alternative based on concerns associated with out-of-direction travel and higher costs.  See Addendum at 10.  However, the FEIS still provides no substantive consideration of what out-of-direction travel is in the broader sense, and no analysis to support the assertion that it results in increased travel times, higher fuel consumption, higher costs or additional emissions. These "revisions and clarifications" do nothing to cure the inadequate analysis undertaken prior to eliminating the I-270/I-76 alternative in 2008.  As the agencies themselves acknowledge, the extra verbiage adds no "new findings or analysis."

One apparently new addition the Technical Report found in the FEIS Technical Report Addendum is its Appendix A, Technical Memorandum, Elimination of I-270-I-76 Reroute Alternative (the "Technical Memorandum") which, as is now described in the Addendum,

explains "the reasons, in more detail, why the I-270/I-76 Reroute Alternative was eliminated."[12] Again, according to the agencies, this portion of the FEIS presents only "revisions and clarifications to the Alternatives Analysis Technical Report . . . that do not constitute new findings or analysis."   However, as with the SDEIS, this document presents justifications for eliminating the I-270/I-76 reroute alternative that were absent from the 2008 EIS, and most of the considerations it presents were obviously not evaluated when the I-270/I-76 alternative was eliminated in 2008.[13] As with the FEIS Technical Report Addendum, this new Technical Memorandum is largely a re-hash of arguments made in the SDEIS, and suffers from the same flaws.[14]  This document constitutes nothing more than an additional attempt to backfill the record to support the agencies' 2008 decision.

### 4.  Conclusion

CDOT and FHWA failed to properly formulate a purpose and need for the project that would result in the consideration of alternatives providing both transportation improvements and protection of human health and the environment, and failed to assess how the preferred alternative will conflict with existing plans and policy.

CDOT and FHWA also eliminated any substantive consideration of the I-270/I-76 alternative in 2008, without sufficient analysis, and based on an erroneous assumption that this alternative would not meet the purpose and need for the project.  In fact, this alternative meets both the purpose and need, and may provide substantial advantages over the alternatives reviewed in the SDEIS and FEIS, including less significant impacts on human health and the environment, and the enhancement of the human environment.

The agencies' additional treatment of this alternative since its elimination in 2008 constitutes nothing more than post hoc rationalization and an attempt to backfill the record to support a decision that does not comply with NEPA.  The agencies' conclusions are based on faulty reasoning, unsupported assumptions, and data and analysis that are unclear or have not been shared with the public.  Accordingly, the elimination of the I-270/I-76 reroute alternative was arbitrary, capricious, not in accordance with the law.

---

[12] The Technical Memorandum is dated "June 2012—Updated August 2015."  While it may have existed in 2012, it does not appear to have been included or referenced in the 2014 SDEIS.  In addition, it is not clear what information in this document was updated in 2015.

[13] As in the other NEPA documents, the Technical Memorandum is clear that "CDOT and Federal Highway Administration (FHWA) eliminated the I-270/I-76 reroute alternative from consideration as part of the first level of this screening process as documented in the 2008 Draft EIS."  *See* Technical Memorandum, Elimination of I-270/I76 Reroute Alternative at p. 2.

[14] In section 2.1 of the Technical Memorandum, the agencies explained that more information regarding the reroute modeling efforts and assumptions can be found in the FEIS 2035 ReRoute Scenario Travel Demand Summary . . . in the appendix of this document."  However, it does not appear that the ReRoute Scenario Travel Demand Summary was included in the Technical Memorandum or elsewhere in the FEIS.

**B.  Smaller Exposed Populations and Lower Pollutant Concentrations Provide Significant Health Benefits from Re-Route Alternative and Truck Diversion Alternative.**

In view of CDOT's refusal to investigate the potential health benefits of re-routing all interstate traffic or heavy duty portion of vehicle traffic out of the north Denver neighborhoods affected by the Project, and CDOT's unsubstantiated assertion that moving trucks off of the I-70 alignment would merely move the pollution to other neighborhoods with no health benefit, the Sierra Club undertook an independent investigation to determine the difference in exposed populations  between the two interstate alternatives.

The study assumed for the purpose of estimating exposed populations that the elevated pollutant levels associated with highway emissions extend 300 meters (1000 feet) on either side of the pavement. Using 2010 census data, we obtained block level population data for the census blocks included in the 300 M zones on both sides of the I-70 and the I-76/I-270 alignments. The 300 M zone and the census blocks are presented in map format in Sierra Club Comment, Figure 1. The population results are reported in Appendix 2.

The analysis demonstrates that, after adjusting for residents who likely live within the portion of a census block that extends beyond the two 300 M health hazard zones adjacent to the highway alignment, the population residing within the 300 M zones along I-70 from the interchange with I-76 and Wadsworth on the west to the interchange with I-270 on the east, is 9,464. These residents are almost three times more people than the 3,427 who reside within the 300 M zones along I-76 and I-270 between the same two interchanges on the west and east.

In addition, the Air Quality Technical Report shows that pollutant concentrations are significantly lower along the 76/270 alignments than along I-70, and the PM10 concentrations at the I-25 and I-76 interchange are expected to be 20-30 ug/m3 less than the concentrations expected at the Mousetrap if I-70 is expanded.

Given that –
1) the hot-spot analysis for PM10 will show violations of the PM10 NAAQS at receptor locations near the Mousetrap after all truck emissions and future increases in background concentrations that will result from population, employment and VMT growth are properly accounted for, and
2) the new near-highway Gloveville monitor is already reporting PM2.5 concentrations that exceed the NAAQS,
the project will cause or contribute to violations of the NAAQS. It cannot be built without significant reductions in VMT or other control measures to reduce emissions.

The Sierra Club therefore urges CDOT and FHWA to reconsider the I-70 expansion, and to give careful consideration to re-routing I-70 onto the I-76/I-270 alignments.

**CONCLUSION.**

EAR  0335

The FEIS is not adequate to satisfy the requirements of NEPA, FAHA or the CAA for the reasons discussed above. A ROD for the proposed I-70 Project may not be signed, or the project funded or approved until –

1) a revised FEIS is prepared that remedies the deficiencies described in these comments and is made available for public review and comment.
2) The Project can be found to conform based upon a hot-spot analysis that accounts for all truck emissions expected in the vicinity of the hot-spot receptors, and future background emissions that approximate expected conditions in the year of highest emissions within the time frame of the 2040 RTP are used to calculate the design values.

Respectfully submitted by

Robert Yuhnke                          Joseph G. Middleton
Becky English                            Temkin & Hardt LLP
                                                1900 Wazee Street, Suite 303
                                                Denver, CO 80202
                                                Main (303) 292-4922
                                                Direct (303) 382-2906

EAR  0336



EAR  0337

Sierra Club Comment Appendix 2.   I-70 Alternative Health Impact Zones: 2000 and 2010 Census Block Housing and Population

| Segment/ HIZ | 2000 Census Block Data | | | 2010 Census Block Data | | | |
|---|---|---|---|---|---|---|---|
| | Households | Population | Blocks | Housing Units | Population | Adjusted Population | Block Groups |
| I-70 | | | | | | | |
| 50m HIZ | 1,953 | 5,784 | 222 | 2,059 | 5,276 | | 331 |
| 150m HIZ | 2,703 | 8,148 | 290 | 2,843 | 7,474 | | 419 |
| 300m HIZ | 4,848 | 14,468 | 407 | 5,097 | 13,278 | 9,464 | 549 |
| I-270 and I-76 | | | | | | | |
| 50m HIZ | 766 | 1,816 | 137 | 772 | 2,300 | | 264 |
| 150m HIZ | 1,186 | 2,937 | 173 | 1,328 | 3,808 | | 328 |
| 300m HIZ | 2,433 | 6,149 | 250 | 2,260 | 6,031 | 3,427 | 445 |
| I-25 | | | | | | | |
| 50m HIZ | 28 | 150 | 50 | 28 | 143 | | 78 |
| 150m HIZ | 79 | 320 | 63 | 76 | 300 | | 98 |
| 300m HIZ | 290 | 1,091 | 81 | 373 | 1,200 | | 119 |

Source: U.S. Census Bureau. 2000 and 2010 Census data ("Rev_Block_2000SF1" and "tabblock2010_08_pophu", respectively). Available online at: https://www.census.gov. Retrieved February 14, 2016.

EAR  0338

**I-25 and Globeville Near-Highway Air Quality Monitoring Stations**

**PM 2.5 and PM10 Mean Concentrations derived from Hourly/Daily Averages**

Micrograms/cubic meter (25 C)

| Site | Parameter | POC | Duration | Mean | Averaging Period |
|------|-----------|-----|----------|------|------------------|
| I-25 | PM10 | 3 | Hourly | 25.6 | 2015 |
| I-25 | PM10 | 3 | Hourly | 25.7 | Oct.-Dec. 2015 |
| I-25 | PM2.5 | 1 | Daily | 9.0 | 2015 |
| I-25 | PM2.5 | 1 | Daily | 9.0 | Oct.-Dec. 2015 |
| I-25 | PM2.5 | 3 | Hourly | 10.0 | 2015 |
| I-25 | PM2.5 | 3 | Hourly | 10.4 | Oct.-Dec. 2015 |
| Globeville | PM10 | 3 | Hourly | 28.1 | Oct.-Dec. 2015 |
| Globeville | PM2.5 | 3 | Hourly | 14.1 | Oct.-Dec. 2015 |

EAR  0339