**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER;

    *and*

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION;
CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and
COLORADO LATINO FORUM,

    Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION,
ELAINE CHAO, in her official capacity as Secretary of Transportation; and
JOHN M. CARTER, in his official capacity as Division Administrator,

    Defendants,

    *and*

COLORADO DEPARTMENT OF TRANSPORTATION, and
SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado
Department of Transportation,

    Defendant-Intervenors.

---

**ORDER REGARDING SUBJECT MATTER JURISDICTION**

---

A portion of Interstate 70 ("I-70") running through northeast Denver was

constructed in the 1960s as a viaduct running above the neighborhoods through which it

passed. This structure has apparently caused concern for some time in light of its age

and the increase in traffic that naturally attends population growth. Defendant Federal

Highway Administration ("Highway Administration") and Intervenor-Defendant Colorado Department of Transportation ("CDOT") (together, "Defendants") have decided that the best way to deal with the viaduct is to tear it down and rebuild the roadway below grade at a depth of up to 40 feet.  For reasons explained below, this plan has become known as the "PCL Alternative."  Given that the Highway Administration needed to approve the PCL Alternative, and will provide some funds to CDOT for the project, the Highway Administration was required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 *et seq.*, to prepare an environmental impact statement ("EIS") thoroughly considering the various effects of the PCL Alternative and other alternatives (such as doing nothing, or modifying the viaduct).

Plaintiffs Kyle Zeppelin, Brad Evans, Christine O'Connor, Kimberly Morse, Jacqueline Lansing, and Janet Feder (together, "Zeppelin Plaintiffs") are among those seeking to stop Defendants, at least temporarily, from proceeding with the PCL Alternative.  The Zeppelin Plaintiffs primarily argue that, in preparing the EIS and connected documents, Defendants intentionally and unlawfully excluded full consideration of a major stormwater project currently being pursued by the City and County of Denver ("Denver").  This project is commonly referred to as Platte to Park Hill or "P2PH."  It involves destruction and rebuilding of Denver's Globeville Landing Park, to accommodate a new stormwater outfall into the South Platte River; construction of a new open channel along a portion of Denver's 39th Avenue; partial destruction and rebuilding of Denver's City Park Golf Course to increase its capacity to detain water during a major storm event; and a certain amount of construction for the same purpose at another golf course, the Park Hill Golf Club.

2

The Zeppelin Plaintiffs believe that P2PH, although being built by Denver, is actually a component of the PCL Alternative, given that it will catch and divert a significant amount of rainfall that would otherwise flow toward and potentially flood the lowered portion of I-70.  It is also undisputed that CDOT is providing millions of dollars to Denver to assist Denver in constructing P2PH.  Thus, the Zeppelin Plaintiffs believe that Defendants were required by NEPA to include full consideration of every aspect of P2PH in their EIS.  The Zeppelin Plaintiffs further allege that the P2PH construction process, and its ultimate results, will harm them in various ways.

The Zeppelin Plaintiffs have sued under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, which gives this Court power to vacate Defendants' decision and require them to redo the EIS before considering again whether to pursue the plan to lower I-70 below grade.  But APA lawsuits normally take months and sometimes years to resolve.  The Zeppelin Plaintiffs have therefore filed an APA § 705 Motion for Stay ("Motion for Stay," ECF No. 32), which seeks relief in the nature of a preliminary injunction to stop the PCL Alternative from progressing while the Court considers their APA claims on their merits.

The Zeppelin Plaintiffs assume that an injunction against the PCL Alternative will also stop Denver's work on P2PH, thus preventing the injuries they believe P2PH will inflict upon them.  But that assumption is arguable.  Denver, not CDOT or the Highway Administration, is building P2PH, and Denver is not a defendant in this lawsuit.  Thus, there is a serious question whether any relief (preliminary or final) awarded by this Court against the Highway Administration and/or CDOT would stop Denver's progress on P2PH.  If the answer is no, then the Constitution does not give this Court subject matter

3

jurisdiction to hear any claim from the Zeppelin Plaintiffs that turns on the ability to prevent P2PH from being built.  That includes the Zeppelin Plaintiffs' Claims 4, 5, and 7, as pleaded in their Amended Petition.  (*See* ECF No. 25.)[1]

Both Defendants have moved to dismiss the Zeppelin Plaintiffs' Claims 4, 5, and 7.  (ECF Nos. 45, 47.)  Defendants argue that the Court lacks subject matter jurisdiction for multiple reasons, including the probability that Denver would press forward with P2PH even if the Court issued an order requiring CDOT to stop contributing money to P2PH or otherwise stop supporting Denver's efforts in that regard.

The Court found that Defendants' motions raised a substantial factual question regarding Denver's intentions concerning P2PH and its ability to carry on if CDOT was required to withhold its support, financial or otherwise.  The Court therefore held an all-day evidentiary hearing on November 3, 2017.  Before that hearing, the Court informed the parties that it would assume a premise that the Zeppelin Plaintiffs hope to prove, namely, that Denver agreed to pursue P2PH as a way of assisting CDOT to protect the PCL Alternative from flooding.  There is colorable evidence for that position, some of which is summarized below.  However, the question for the parties at the evidentiary hearing was essentially as follows: Regardless of *why* Denver agreed to pursue P2PH in the first place, is Denver *now* so committed to the project that it will not abandon it or

---

[1] The Zeppelin Plaintiffs' Claim 7 is actually not a NEPA claim, but a claim seeking similar relief under the U.S. Department of Transportation Act of 1966, as codified in 23 U.S.C. § 138 and 49 U.S.C. § 303.  Those sections prohibit the Highway Administration from approving any project that requires use of public park land unless there is no feasible and prudent alternative.  Claim 7 relates specifically to City Park Golf Course, and assumes that construction planned at City Park Golf Course in furtherance of P2PH is an integral part of the PCL Alternative.  As will become clear below, only Plaintiffs O'Connor and Lansing assert injuries flowing from construction at City Park Golf Course, and so the Court treats Claim 7 as brought by those two plaintiffs only.

reduce it in scale, even if CDOT withdraws funding and/or other participation?

After considering all the evidence submitted at the evidentiary hearing, and for the reasons explained in detail below, the Court finds that the Zeppelin Plaintiffs have not carried their burden to show that Denver would likely abandon or reduce the scope of P2PH, even if the Court granted the relief the Zeppelin Plaintiffs seek against Defendants.  Accordingly, the Court lacks subject matter jurisdiction over the Zeppelin Plaintiffs' Claims 4, 5, and 7, and Defendants' motions to dismiss those claims are granted.  The portion of the Zeppelin Plaintiffs' Motion for Stay seeking preliminary injunctive relief under Claims 4 and 5 is correspondingly denied.[2]  However, the Motion for Stay also seeks relief under the Zeppelin Plaintiffs' Claims 1 and 6, which Defendants have not moved to dismiss, and which appear to be viable regardless of whether P2PH is built.  Accordingly, the Motion for Stay remains pending as to Claims 1 and 6, and will be resolved as to those claims in due course.[3]

## I.  APPLICABLE LEGAL STANDARDS

### A.  Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a case by asserting that the Court lacks subject matter jurisdiction over the claims in the operative complaint.  "[Federal] [d]istrict courts have limited subject matter jurisdiction and may [only] hear cases when empowered to do so by the Constitution

---

[2] The Motion to Stay does not assert Claim 7 as a basis for preliminary relief.

[3] Claims 1 and 6 relate largely to the environmental hazards of constructing the below-grade freeway segment.  The Sierra Club Plaintiffs' Motion to Stay (ECF No. 88) raises somewhat similar claims, and so the Court currently anticipates deciding the Sierra Club Plaintiffs' Motion to Stay and the remaining portion of the Zeppelin Plaintiffs' Motion to Stay in tandem.

and by act of Congress." *Randil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004) (internal quotation marks omitted).  "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  This standard applies to individual claims as much as entire cases.  *See, e.g.*, *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1166 (10th Cir. 2004).

Rule 12(b)(1) motions generally take one of two forms: a facial attack or a factual attack.  Here, the Court faces a factual attack, which gives the Court "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  In such circumstances, the Court's reference to evidence beyond the pleadings will not convert the motion to one under Rules 56 or 12(b)(6), unless the jurisdictional question is intertwined with the merits of the case.  *Id.*; *cf.* Fed. R. Civ. P. 12(i) ("If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.").

**B.    Article III Standing**

Article III of the U.S. Constitution restricts federal courts to deciding "cases" and "controversies."  *See* U.S. Const. art. III, § 2, cl. 1.  These words have been interpreted to restrict federal courts from giving "advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), meaning that a federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of

6

the dispute will have practical consequences to the conduct of the parties," *Columbian*

*Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element

test for "Article III standing":

> First, the plaintiff must have suffered an "injury in fact"—an
> invasion of a legally protected interest which is (a) concrete
> and particularized, and (b) "actual or imminent, not
> 'conjectural' or 'hypothetical.'"  Second, there must be a
> causal connection between the injury and the conduct
> complained of . . . .  Third, it must be "likely," as opposed to
> merely "speculative," that the injury will be "redressed by a
> favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain

alterations incorporated).  Importantly for this case, "the plaintiff bears the burden of

proof" to establish that these elements exist.  *Id.* at 561; *see also United States v.*

*Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994) ("The party seeking to invoke the jurisdiction

of a federal court must demonstrate that the case is within the court's jurisdiction.  The

facts supporting jurisdiction must be affirmatively alleged, and if challenged, the burden

is on the party claiming that the court has subject matter jurisdiction.").  Preponderance

of the evidence is the proper burden of persuasion in a proceeding to determine subject

matter jurisdiction.  *Id.*

## II.  BACKGROUND & ALLEGATIONS

The following summarizes the factual background to this case.  To the extent the

Court cites the Zeppelin Plaintiffs' Amended Petition (ECF No. 25), the Court assumes

those allegations to be true solely for purposes of resolving the motions at issue.

## A.    Early Planning Stages

In August 2003, the Highway Administration published a notice in the Federal

Register that it intended to prepare an EIS encompassing, among other things, potential "variations of the horizontal and vertical alignment of I-70 as well as capacity and safety improvements" from the I-25/I-70 interchange to Peña Boulevard—a stretch of freeway the Highway Administration dubbed the "I-70 East Corridor."  68 Fed. Reg. 49839, 49839 (Aug. 19, 2003).  CDOT, among other governmental entities, would participate with the Highway Administration in this process.  *Id.*

Three years later, the Highway Administration announced that, for purposes of the EIS, the "I-70 East Corridor" would be narrowed in scope to considerations of freeway alterations, and that mass transit-related considerations would be handled in a separate EIS.  71 Fed. Reg. 37637, 37637–38 (June 30, 2006).  Although narrowed in scope, it remained a joint project of CDOT and the Highway Administration, among other entities, and they continued to contemplate "variations of the horizontal and vertical alignment of I-70 as well as capacity and safety improvements."  *Id.* at 37638.

Several years of discussion and proposals followed.  Sometime after July 2012, CDOT became interested in a proposal that would lower a significant stretch of the I-70 East Corridor below grade.  (ECF No. 25 ¶ 122.)  This eventually became known as the PCL Alternative.  (*Id.* ¶ 133.)  PCL is short for "Partial Cover Lowered" and refers to the proposal to lower the stretch of I-70 between Brighton Boulevard and Colorado Boulevard below grade, and then to cover a part of that lowered section between Clayton Street and Columbine Street.  (*Id.*)  The Brighton-to-Colorado portion of I-70 currently comprises an aging viaduct.  (*Id.* ¶¶ 8, 106.)

As is well known in the Denver community, the city's Montclair and Park Hill neighborhoods are uphill from I-70.  Rainwater falling in these neighborhoods therefore

flows more or less toward the freeway.  In light of the proposed PCL Alternative and its potential to collect rainwater—a problem not currently experienced given the raised viaduct—Denver commissioned, in August 2013, a watershed study for the Montclair and Park Hill Basins.  (*Id.* ¶ 123.)

Denver completed its watershed study in June 2014.  (*Id.* ¶ 128.)  The study noted CDOT's PCL Alternative, and that CDOT intended to build a pipe system to protect the lowered freeway segment from a 100-year storm.[4]  The study further stated that Denver had evaluated storm water drainage alternatives to CDOT's then-current plan, which was simply to build a series of pipes necessary to channel water away from the freeway.  One alternative Denver considered was an "open channel option" that had proved more effective in handling large storms, and which would assist Denver to meet various other city goals, "including improved water quality through the use of green infrastructure, increased multi-modal transportation options, and enhanced redevelopment opportunities."  However, the CDOT project manager had informed Denver that its open channel option could not be formally included as part of the PCL Alternative because it would be "such a large change in scope that they would have to start their NEPA EIS process essentially over again."  Nonetheless, it was "understood if we [Denver] are able to secure non-Federal funding for these project [*sic*], then we would not have to undergo a NEPA process."  (*Id.* (internal quotation marks omitted).)

## B.   The PCL Alternative Becomes the Preferred Option

In August 2014, the Highway Administration signed a CDOT-prepared draft EIS that identified the PCL Alternative as the preferred alternative (as compared to doing

---

[4] A 100-year storm is one that has a 1% chance of occurring in any given year.

nothing, or upgrading the present viaduct).  (*Id.* ¶¶ 129.)  The draft EIS included some of the hydrology analysis developed by Denver and stated that I-70 must be capable of handling a 100-year flood event.  (*Id.* ¶ 135.)  The draft EIS proposed a system of pipes and detention ponds to meet this requirement.  (*Id.* ¶¶ 137–39.)  The document did not make mention of Denver's contemplated "open channel option."

In September 2014, Denver published its Storm Drainage Master Plan, which it does every five years per the city's municipal code.  (*Id.* ¶ 150.)  The 2014 Master Plan does not contemplate constructing 100-year flood protection between 2014 and 2019, but instead describes such protection as currently "not practical" given its costs and limited overall value in light of the low risk of a 100-year flood.  (*Id.* ¶ 152.)

In January 2015, a multi-agency group comprising representatives of CDOT, Denver, and the Regional Transportation District formally recommended to its constituent parties a "combined drainage system" to address I-70's need for 100-year flood protection, if lowered.  (*Id.* ¶ 153.)  The combined drainage system included CDOT's plan for a series of pipes and detention ponds, but also, among other things, a plan for Denver to construct an open channel on 39th Avenue and to enhance the detention pond capacity of the Park Hill Golf Club.  (*Id.* ¶¶ 154–55.)

## C.    The IGA

In June 2015, the Denver City Council held a public meeting to discuss a proposed agreement between CDOT and Denver.  (*Id.* ¶ 156.)  The proposed agreement would coordinate Denver's and CDOT's efforts with regard to the I-70 East Corridor and what was then known as the Two Basins Drainage Project, or "TBDP"—an early name for the set of improvements that could help to provide 100-year flood

protection to the PCL Alternative.  TBDP eventually became known by the catchier and much more pronounceable moniker "P2PH," short for "Platte to Park Hill."  The City Council presentation noted that the proposed cooperation would provide 100-year flood protection both to Denver neighborhoods and to I-70, and that "CDOT would like to take advantage of the efficiencies and savings that will accrue if they contribute to the cost of [P2PH] rather than building a separate project of their own."  (*Id.*)

The following month, the City Council approved the agreement with CDOT, known as the Intergovernmental Agreement, or "IGA."  (*Id.* ¶ 160.)  In September 2015, the Colorado State Controller approved the IGA.  (*Id.* ¶ 162.)

The IGA's recitals state that CDOT "must provide 100-year storm protection for the entire I-70 East Project" but that Denver "has separately and independently created a drainage plan to provide 100-year storm protection for areas that could be inundated by water from the Montclair and Park Hill basins, including the I-70 East Project," and so CDOT and Denver "have decided upon a cooperative approach that will result in savings to, and funding contributions for, the I-70 East Project."  (IGA (ECF Nos. 1-14 through 1-16) at 2.)  The IGA makes clear that the timing of P2PH's construction is important to the proposed PCL Alternative construction schedule.  It requires that Denver complete certain portions of P2PH by December 1, 2017, and the remainder by September 1, 2019, and requires Denver to demand from its contractors a $5,000-per-day liquidated damages provision for any delays that cause Denver to miss either of those deadlines.  (*Id.* § 1(D), (H).)  This $5,000-per-day figure was calculated according to the estimated "additional [per-day] costs to the I-70 East Project," including "delay

payments or compensation event payments to the Developer of the I-70 East Project."

(*Id.*)

The IGA further provides that CDOT will contribute 40% of the funds needed to build P2PH because it "will result in significant benefits for the I-70 East Project and will result in a redundant storm protection system." (*Id.* § 1(E).) But, straying somewhat from this characterization of "redundant," the IGA also states that certain detention ponds contemplated in the draft EIS "will no longer be needed" in light of P2PH. (*Id.* § 1(I).) The parties also agreed through the IGA to "establish a mutually agreeable maintenance, operation and repair agreement for [P2PH], which will be generally proportional in cost." (*Id.* § 1(F).)

The IGA gives CDOT "the right to review and comment on" P2PH. (*Id.* §§ 1(A), 2(A), 10(E).) In particular,

> CDOT shall have the right to review all plans for [P2PH].
> CDOT will provide comments focused on the functionality of
> the drainage plans. When plans for the [first phase of P2PH]
> have achieved 30% design, [Denver] shall submit the plans
> to CDOT for review and comment. CDOT will have 10
> business days to review and comment back to [Denver].
> [Denver] will then have 14 business days to discuss with
> CDOT, if necessary, and to respond to the contractor with
> comments. When plans are at 60% design, [Denver] will
> submit the plans to CDOT. CDOT will have 10 business
> days to review and comment back to [Denver], as well as
> verify that responses to the 30% design are acceptable.
> [Denver] will then have 14 business days to discuss with
> CDOT, if necessary, and to respond to the contractor with
> comments. At the time the 100% design plans are
> submitted, CDOT will have 10 business days to respond and
> if CDOT provided comments on the 60% design, then
> [Denver] will provide responses as well as the 100% design.
> At that time, CDOT will verify that all responses to the 60%
> design are acceptable. This will be the last time that new
> comments can be submitted on this plan set. [Denver] will

then have 14 days to respond to the contractor with comments.  When RFC design has been achieved, CDOT will have five business days to verify that all responses are acceptable.  Unless major changes have been [made] to the plans, no additional comments will be considered at this time.  [Denver] has 10 business days to respond to the contractor to assure that all comments have been incorporated.

(*Id.*)

More generally, the IGA provides that CDOT and Denver "agree to cooperate in the design and implementation of the I-70 East Project and [P2PH]," including through "regular interaction, consultation and collaboration" and a "protocol of review and comment."  (*Id.* §§ 9, 10.)  It contemplates "weekly status meetings with the Project Contractor in the field," to be attended by Denver and CDOT representatives.  (*Id.* § 10(C).)  It also establishes a "Project Management Team" comprising one Denver employee and one CDOT employee that would meet at least monthly.  (*Id.* § 10(D).)

## D.   Later Planning Stages & Formal Selection of the PCL Alternative

On December 18, 2015, the Highway Administration signed the final EIS, which was prepared in collaboration with CDOT.  (*See* ECF No. 32-6 at 2.)  The final EIS acknowledged that "[t]he lowering of I-70 [as proposed in the PCL Alternative] will create a depression that captures and retains surface flows from the upstream basin before their discharge to the South Platte River."  (*Id.* at 18.)  Therefore, a drainage system south of the lowered freeway would be needed.  (*Id.*)  The proposed drainage system was the same system of pipes and detention ponds proposed in the draft EIS (*id.* at 20), with no acknowledgment that some of that system would be unnecessary if P2PH is built.  P2PH is instead generally described as a Denver project intended to "protect[] existing and future development from 100-year floods" (*id.* at 52; *see also id.*

13

at 54, 56, 62), although the final EIS also acknowledges that P2PH "will provide 100-year storm protection and desired redundancy for the I-70 East Project area" (*id.* at 72).

In March 2016, Denver submitted a comment on the final EIS, noting that the PCL Alternative's proposed drainage system terminates at Globeville Landing Park, a small park on the South Platte River south of I-70.  (ECF No. 32-14 at 5.)  This proposal, said Denver, had the potential for conflict with Denver's "Globeville Landing Outfall project," which will be described shortly.  (*Id.*)

In December 2016, Denver issued a formal report regarding the proposed P2PH project, identifying four major construction projects:

1.    the Globeville Landing Outfall, where a large portion of the water collected from the Montclair and Park Hill Basins would be discharged into the South Platte River before reaching I-70;

2.    the 39th Avenue Open Channel, which would be an "open stormwater channel" running through a to-be-constructed greenway that would feature a recreational trail;

3.    "Montclair Basin detention," *i.e.*, a location to "collect, control, and hold stormwater" from the Montclair Basin;

4.    "Park Hill Basin detention," providing the same services for storm water from the Park Hill Basin.

(ECF No. 32-15 at 6; *see also* ECF No. 25 ¶ 157 ("the [Globeville Landing Outfall] is the 'end point' of P2PH, *i.e.*, the conduit through which all the stormwater that would otherwise reach I-70 is instead poured into the South Platte River").)  The report's authors recommended that Montclair Basin detention be accomplished through a new

14

detention pond constructed at Denver's City Park Golf Course, and also that the 39th Avenue Open Channel be constructed.  (ECF No. 32-15 at 9.)  The report's authors recommended that Park Hill Basin detention be accomplished mostly through expanded detention capacity at the Park Hill Golf Club.  (*Id.*)

In January 2017, the Highway Administration signed the Record of Decision ("ROD") at issue in this consolidated litigation.  (ECF Nos. 32-1 through 32-4.)  The ROD formally selected the PCL Alternative as the alternative the Highway Administration and CDOT would pursue.  (ECF No. 32-1 at 32–33.)  The ROD describes the PCL Alternative and P2PH as "stand-alone actions by different agencies [that] are not dependent on one another for justification or feasibility.  They each have independent utility such that each of the projects would take place regardless of the other . . . ."  (ECF No. 32-2 at 21.)  Moreover, the ROD claims that

> CDOT and FHWA have not been involved in the proposal, development, or implementation of [P2PH], but are simply taking advantage of new opportunities for cooperation, cost savings, and benefits that [P2PH], if it is constructed, offers to the I-70 East Project.  Even though CDOT and Denver have agreed to work together and share some of the financial burdens, each project is nonetheless capable of proceeding on its own merits, has independent utility, and their potential collaboration does not defeat their separateness for the purposes of NEPA.

(*Id.*)

The mention of "cooperation, cost savings, and benefits" apparently refers, at least in part, to the Globeville Landing Outfall.  The ROD acknowledges Denver's comment about a potential conflict between the PCL Alternative drainage system and Denver's plans for the Globeville Landing Outfall.  (*Id.* at 22.)  The ROD goes on to say that the potential conflict

> required the redesign of the I-70 East offsite [drainage]
> system . . . .  The redesign will utilize the components of the
> [Globeville Landing Outfall] system to convey I-70 storm
> water to the [South Platte River] creating a combined outfall
> system, which will minimize impacts and result in benefits to
> both projects.  Because of this, the components of the
> [Globeville Landing Outfall] system used by I-70 are being
> treated as part of the I-70 East offsite drainage system and
> their impacts are analyzed in this ROD as updates to the
> Final EIS.

(*Id.*)

The Zeppelin Plaintiffs believe that the Highway Administration and CDOT do not really intend to build the drainage system diagrammed in the final EIS or ROD, but instead are counting on Denver to finish P2PH, thereby freeing CDOT and the Highway Administration to significantly scale down the design of the highway drainage system.

**E.     Likely Effect of Planned P2PH Construction Activities**

The entire stretch of freeway proposed to be redeveloped into the PCL Alternative is a Superfund site.  (ECF No. 25 ¶ 10)  Globeville Landing and the portion of 39th Avenue to be reconstructed into the 39th Avenue Open Channel is part of the same Superfund site.  (*Id.* ¶ 24.)  Thus, construction of both projects involves, among many other things, digging through contaminated soils and disposing of them, potentially releasing harmful compounds into the air.

There is no allegation that planned construction at City Park Golf Course or Park Hill Golf Club would potentially release hazardous materials.  However, the City Park Golf Course "will be closed between one and two years, and hundreds of mature 'old growth' trees will be removed.  The peace and serenity of the Park will be marred by the noise, dust, and general disturbance of construction.  The historic character and significance of the Golf Course will be altered by P2PH . . . ."  (ECF No. 25 ¶ 56.)  As for

the Park Hill Golf Club, the effects of construction are less clear, but one of the Zeppelin Plaintiffs, Jacqueline Lansing, is "concerned that construction [there] will negatively impact the area's value and permanently diminish her enjoyment of this place." (*Id.* ¶ 66.)

F.     **Plaintiffs' Claimed Injuries**

Plaintiff Zeppelin lives and works in the Globeville neighborhood, not far from Globeville Landing Park.  Through a real estate investment company, he also has investments along the South Platte River.  Zeppelin worries that construction of the Globeville Landing Outfall will spread contaminants, harming him and his family.  He is also worried that it will further pollute the South Platte River, causing his real estate investments to decrease in value.  (*Id.* ¶¶ 43–47.)

Plaintiff Evans works full-time in the Globeville neighborhood, one block from Globeville Landing Park.  His concerns are similar to Zeppelin's.  (*Id.* ¶¶ 48–52.)

Plaintiff O'Connor often recreates at the City Park Golf Course and enjoys its open space, trees, vistas, and historic significance, which she believes will be destroyed at least during the construction phase and perhaps permanently.  (*Id.* ¶¶ 53–57.)

Plaintiff Lansing enjoys using the Park Hill Golf Club and the City Park Golf Course.  Her concerns are essentially the same as O'Connor's.  (*Id.* ¶¶ 63–67.)

Plaintiff Morse lives four blocks south of where the 39th Avenue Open Channel will be constructed.  She worries about being exposed to contaminated dust dug up during the construction process.  (*Id.* ¶¶ 58–62.)

Plaintiff Feder lives immediately south of the proposed 39th Avenue Open Channel—the north wall of her property is two feet from the proposed construction site.

Her worries are the same as Morse's, but even more acute.  She also worries about the noise and inconvenience of construction so close to her home.  (*Id.* ¶¶ 68–72.)

### III.  EVIDENCE RECEIVED

The following summarizes the salient testimonial and documentary evidence received at the evidentiary hearing.

**A.   Testimonial Evidence**[5]

1.   <u>Lesley Thomas</u>

- Thomas is Denver's City Engineer, and has held that post since 2002.  She has been and remains closely involved with the planning and execution of P2PH.

- Regarding the Globeville Landing Outfall:

  - The project is fully funded and the contracts have been approved, so it needs no further action from the Denver City Council to go forward.

  - It is the end-point where much of the water captured by the P2PH improvements will be discharged into the South Platte River, and particularly the water captured by the proposed 39th Avenue Open Channel.

  - Construction began last summer, and it is expected to be operational by June 2018.  As of the evidentiary hearing, the excavation portion of the construction was nearly complete and the contractors have made

---

[5] This summary of testimonial evidence is presented in the order in which the witnesses testified.  To accommodate certain witnesses' schedules, the witnesses did not testify in the usual order (*i.e.*, witnesses for the plaintiff first, witnesses for the defendant second).  Rather, the order was as follows: Lesley Thomas (cross-designated by the Zeppelin Plaintiffs and Defendants), Laura Perry (for the Defendants), Rafael Espinoza (for the Zeppelin Plaintiffs), and Deborah Ortega (for the Zeppelin Plaintiffs).

significant progress on building the concrete channels through which water will flow.

- If construction were to be stopped, Denver would be left with bare dirt where Globeville Landing Park used to exist, and the partially completed infrastructure would be a "stranded investment."

- If construction *is* finished but the 39th Avenue Open Channel is not built, the new outfall infrastructure would still provide a water quality benefit as to the relatively small amount of stormwater that actually reaches the infrastructure, but the outfall will not serve its "full capacity" and will not provide the flood protection it was intended to provide, given that it is the discharge point for the water that would have been collected by the 39th Avenue Open Channel.

- Thomas believes that constructing the Globeville Landing Outfall without constructing the 39th Avenue Open Channel would not be wasted money because the 39th Avenue Open Channel will eventually be built, one way or the other, given that it would make no sense to build the outfall without the channel.

• Regarding City Park Golf Course:

- The project is fully funded and the contracts have been approved, so it needs no further action from the City Council to go forward.

- Construction was authorized to commence on November 1, 2017.

- The contractors are currently working on erecting fencing.

- Certain trees have been marked for removal, or potential removal,

although none have been removed yet and it is not yet clear when they might be.

- The planned construction would create a detention basin that would have value independent of any other portion of P2PH, because the detention basin would at least slow the flow of water to downstream areas of the city.

- The detention basin served by City Park Golf Course is currently one of "the worst drainage basin[s]" in Denver.

- Regarding the 39th Avenue Open Channel:

   - The funds have not been encumbered and the contracts have not been approved, so further City Council action will be needed to proceed.

   - Denver plans to use CDOT contributions for this project, which is currently in the "procurement" phase.

   - Some utilities have already been relocated.

- Regarding the Park Hill Golf Club:

   - The funds have not been encumbered and the contracts have not been approved, so further City Council action will be needed to proceed.

   - The date on which construction will begin has not been set.

- Denver had no "concrete plans" to construct stormwater improvements on the scale of P2PH before CDOT made the commitments embodied in the IGA.

- The IGA process of review, collaboration, and opportunity for comment between Denver and CDOT is in place, but CDOT does not always attend the prescribed meetings, nor does CDOT always provide comments or feedback on Denver's

plans.

- Since she has become city engineer, Thomas has never seen one of her department's projects canceled due to a budget shortfall, although some have been "adjusted [in] scope."

  2.   <u>Laura Perry</u>

- Perry is the Capital Improvement Program Administrator in Denver's Finance Department.

- She has participated in budget planning for P2PH, including establishing funds and accounts needed to receive and spend revenues associated with the project. She also regularly oversees expenditures and monitors the project's budget.

- The total P2PH budget is $298 million.  It is primarily being funded by revenue bonds backed by wastewater fees charged to Denver residents.

- Denver already completed one P2PH bond issue valued at $115 million in principal, which actually yielded $129 million due to a $14 million bond premium.

- Denver plans to issue a second set of P2PH bonds valued at up to $121 million in principal in the first quarter of 2018.  This bond issue still requires City Council approval.

- From the total P2PH budget, $80.4 million have been fully and finally appropriated for the Globeville Landing Outfall, and $37 million have been spent. Denver has also spent $2.5 million it received from CDOT for a specific portion of the Globeville Landing Outfall infrastructure.

- From the total P2PH budget, $47.5 million have been fully and finally appropriated for the City Park Golf Course project.  None of the appropriated

funds were received from CDOT.

- CDOT's total monetary obligation to Denver under the IGA is $75.7 million, and CDOT has already paid Denver $50.9 million.  The remaining balance is $24.7 million.[6]

- Denver has used CDOT money to reimburse itself for the expense of acquiring the right-of-way for the 39th Avenue Open Channel.

- If CDOT could not pay the remaining $24.7 million—

    - Denver could draw on $21 million in previously appropriated P2PH funds (*i.e.*, without another City Council vote), comprising P2PH's $20 million contingency fund and $1 million in unassigned interest earned on not-yet-spent bond proceeds.

    - Denver could also allocate to P2PH an expected forthcoming land sale, valued at $13.5 million, but this would require City Council approval.

    - Denver could issue the second set of bonds already discussed above, valued at $121 million, and could also realize a $13 million bond premium on that transaction, all of which would require City Council approval.

    3.   Rafael Espinoza

- Espinoza is a Denver City Council member, and was formerly employed as a licensed architect.

- Espinoza understands CDOT's total obligation under the IGA to be $60.5 million. Before his testimony, he did not gather any data on how much of that amount

---

[6] 75.7 million minus 50.9 million is 24.8 million, not 24.7 million.  The Court presumes that Perry's various numbers were rounded approximations and that non-rounded figures would yield 24.7 million.

has already been paid by CDOT to Denver, or spent by Denver.  He also does not know the size of the P2PH contingency fund.

- Espinoza believes that a $60.5 million shortfall (assuming CDOT had paid none of its obligation) would make it more difficult for the City Council to approve the second P2PH bond issue because the entire P2PH project had been presented to the City Council as a way of "leveraging CDOT funds."  If those funds do not materialize, "[t]here would be some serious questions to answer."  A shortfall of $25 million would raise similar problems.

- The City Council enacted a substantial increase in wastewater fees, in part to support P2PH, and in Espinoza's opinion, that has created ill will toward P2PH in the voting public.

### 4.   Deborah Ortega

- Ortega is a Denver City Council member.

- Apparently understanding CDOT's monetary obligation under the IGA to be $60 million, Ortega believes that the sudden loss of that amount would prevent P2PH from proceeding "on its current scope and schedule."  If the shortfall was $25 million instead, the City Council "would still have the same challenge in figuring out where that money comes from."

- She cannot predict how her fellow City Council members would act in such a circumstance but she believes it would "raise a red flag."

- On the other hand, "the city is committed to the project as they proposed it," and it would be politically embarrassing to return to the neighborhoods where drainage improvements were promised and to announce that those

23

improvements will not be built.

**B.    Documentary Evidence**

Apart from the IGA, discussed at Part II.C, above, the Court finds that the following exhibits admitted at the evidentiary hearing are of particular importance:[7]

- The Zeppelin Plaintiffs' Exhibit ("PX") 6, a declaration of Lesley Thomas that Defendants originally submitted at ECF No. 46-11, which provides the following elaboration on certain relevant topics only mentioned briefly in her hearing testimony:

  - A Denver firefighter died in August 2000 attempting to rescue a woman stranded in floodwaters near the Park Hill Golf Club (¶ 6);

  - Denver plans to build the 39th Avenue Open Channel through a now-abandoned and unusable railroad line known as the "Market Lead," and Denver has already purchased that property interest with the intent to build the channel (¶ 12);

- Defendants' Exhibit ("DX") I, showing City Council approval of the Globeville Landing Outfall construction contract.

- DX M, showing City Council approval of the City Park Golf Course construction contract.

- DXs H–M, generally showing City Council resolutions related to P2PH between October 2015 and August 2017, all of which passed with no more than three "nay" votes (out of thirteen possible votes).  The "nay" voters usually included Espinoza and/or Ortega.

---

[7] The parties stipulated to admission of all of their respective exhibits.

- DX B, Denver's ordinance approving the first bond issuance to finance P2PH (formally known as the "Series 2016 Bonds"), which also states (at pages 3–4) that the City Council had previously been provided with a "Preliminary Official Statement relating to the Series 2016 Bonds."

- DX C, the Preliminary Official Statement just mentioned, which is a document analogous to a securities prospectus,[8] and is filed with the Municipal Securities Rulemaking Board.  The Preliminary Official Statement contains the following passage (at Bates page 17):

  > The City currently expects to complete Platte to Park Hill by 2020.  The City considers Platte to Park Hill an essential project being undertaken in accordance with its 100-year flood protection planning.  In addition to proceeds from the Bonds, the City anticipates contributions from the Colorado Department of Transportation, the City's Department of Environmental Health[,] and the Urban Drainage Flood Control District.  Due to the essentiality of these improvements, the City anticipates completing Platte to Park Hill notwithstanding the receipt of these contributions.

- DX D, the finalized Official Statement, containing the same passage (at Bates page 19).

## IV.  ANALYSIS

Again, the matter presently in question is the Zeppelin Plaintiffs' Article III standing to challenge Defendants' choice not to fully evaluate P2PH in the final EIS or ROD.  Standing requires an injury in fact, causation, and redressability.  *Lujan*, 504 U.S. at 560–61.

Defendants do not dispute that the Zeppelin Plaintiffs are claiming the sorts of

---

[8] *See generally* 17 C.F.R. § 240.15c2-12 (a.k.a. SEC Rule 15c2-12).

injuries that can provide standing in a case like this, nor do Defendants dispute that the Zeppelin Plaintiffs' claimed injuries are genuine.  Moreover, this Court has assumed for present purposes that CDOT convinced Denver to pursue P2PH—or in other words, the P2PH is, from CDOT's perspective, an important part of the PCL Alternative.  Under that assumption, there is a fair argument that CDOT's actions were at least the initial cause of the Zeppelin Plaintiffs' claimed injuries flowing from P2PH.  The true controversy at this point is redressability—whether an order directed at the Highway Administration and/or CDOT would prevent Denver from continuing with P2PH, now that Denver has at least partially committed itself to pursue that project.

The Zeppelin Plaintiffs face a significant challenge in this regard.  "[I]t must be likely, as opposed to merely speculative, that [their] injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted).  Given that the behavior of third parties is at issue, the Zeppelin Plaintiffs must show, at a minimum, that "the practical consequence" of an order from this Court "would amount to a significant increase in the likelihood that [they] would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002).  This sort of standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562.

The Zeppelin Plaintiffs have advanced two theories of redressability.  The first is that CDOT's monetary contributions are essential, and stopping those contributions would stop P2PH.  The second is that preventing CDOT from participating in the review and comment process established under the IGA would prevent Denver from moving forward with P2PH.  The second theory, if valid, could stop work on all four phases of P2PH, whereas the first theory must be analyzed as to each individual phase of P2PH.

26

The Court will therefore address the second theory first.

## A.      CDOT's "Seat at the Table"

The Zeppelin Plaintiffs argue that

> [a]n injunction against CDOT would likely redress Plaintiffs' injuries because it would eliminate CDOT's "seat at the table" on [P2PH], thereby halting all CDOT review and selection of designs and contractors, and stop the clock on [the PCL Alternative], which would in turn relieve the urgency on [P2PH]. . . .  Without CDOT's participation and/or an amended agreement allowing Denver to make all decisions on [P2PH] with no input from CDOT, Denver would be unable to meaningfully proceed on [P2PH].

(ECF No. 56 at 16.)  The Court disagrees, for two principal reasons.

First, the testimony of Lesley Thomas shows that CDOT does not always review or comment on plans, or show up for P2PH-related meetings.  P2PH has gone forward regardless, showing that Denver can perform without CDOT's input.  CDOT certainly has a seat at the table, but it does not show up for every meal, and nothing about the project has faltered.

Second, on the terms of the IGA itself, nothing requires Denver to wait for CDOT's approval before proceeding with any portion of P2PH.  CDOT has the "right to review" all of Denver's plans and this right is safeguarded by an obligation on Denver to submit those plans to CDOT (*see* Part II.C, above), but Denver need not wait indefinitely for CDOT to provide feedback.  Rather, the IGA gives CDOT ten business days to respond to any submission from Denver.

If the Court were to enjoin CDOT from participating in P2PH, Denver could proceed as follows:  Denver would develop plans and submit them to CDOT.  By virtue of the Court's injunction, CDOT would be forced to ignore them.  Ten business days

would pass and Denver would hear nothing from CDOT.  Denver could then go forward

with its plans.  Denver would apply to CDOT for reimbursement of its share of the

construction expenses, and CDOT would ignore Denver by virtue of the injunction.  In

theory, Denver could then sue CDOT for the unpaid contributions, but CDOT would

have a strong Supremacy Clause defense based on the Court's injunction, as well as a

contractual *force majeure* defense (*see* IGA § 24 (listing "any judicial order" as a form of

*force majeure*)).  So Denver would need to go looking for those funds elsewhere,

bringing us back to the previous analysis—can and would Denver pay for P2PH if it

could not get CDOT's contributions?

**B.      CDOT's Monetary Contributions to P2PH**

      1.      <u>The Court's Power to Enjoin CDOT from Sending Money to Denver</u>

      There is currently no evidence that CDOT has sent anything but its own money

(*i.e.*, funds not obtained from the federal government) to Denver.[9]  The parties dispute

---

[9] The day before the evidentiary hearing, the Zeppelin Plaintiffs filed a supplemental brief raising the possibility that Denver has received federal funds for P2PH:

> According to [a document the Zeppelin Plaintiffs found posted on CDOT's website], the Colorado Bridge Enterprise ("CBE"), a government-owned business within CDOT, is funding $850 million of the cost of [the PCL Alternative].  Also according to this document, all payments made by CBE under the Project Agreement are from sources including, "moneys paid to CDOT by the U.S. Department of Transportation ('USDOT')."  The IGA, on the other hand, states that the 40% of [P2PH] will be paid for by CDOT, CBE, and the High Performance Transportation Enterprise ("HPTE"), which is another government-owned business within CDOT.  These documents, when read together, raise questions as to whether the State, through the CBE, has in fact given federal dollars to Denver for [P2PH].

(ECF No. 80 at 6 (citations omitted).)  Although an interesting theory, the Zeppelin Plaintiffs have presented no evidence to back it up.  Even if such evidence existed, the Tenth Circuit case law discussed in this Part IV.B.1 would likely not permit this Court to issue an injunction directly against Denver (assuming it was named as a defendant) without a showing that Denver *knew* it

whether the Court can enjoin CDOT from spending its money as it pleases, and perhaps whether the Court can issue *any* injunction against CDOT, which is not a federal agency.

The APA authorizes judicial review of "agency action," 5 U.S.C. § 702, and defines "agency" to mean "each authority of the Government of the United States," *id.* § 701(b)(1).  Based on this, a few courts have held—without much analysis—that non-federal entities are not proper defendants in an APA case and therefore cannot be enjoined.  *See Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1298 (D.C. Cir. 2007); *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1035–36 (6th Cir. 1999).  But it appears that the substantial weight of authority goes the other way.  *See Milwaukee Inner-City Congregations for Hope v. Gottlieb*, 2013 WL 12234624, at *3–4 (W.D. Wis. Jan. 29, 2013) (noting the split of authority and citing cases from the First, Second, Fifth, Seventh, Ninth, and Tenth Circuits that have permitted injunctions against non-federal parties in APA cases) ("*MICAH*").

The Tenth Circuit's adherence to the majority view is made clear in *Ross v. Federal Highway Administration*, 162 F.3d 1046 (10th Cir. 1998).  *Ross* involved a stretch of proposed freeway in Kansas that Congress has specifically funded as a "demonstration project," meaning "a project intended to demonstrate novel road-building techniques."  *Id.* at 1049 & n.1.  After working through the EIS stages, Kansas decided to refuse federal funds as to a particularly contentious segment of the proposed freeway and to build that segment entirely with state funds, thus hoping to avoid further delay.

---

was receiving federal funds.  It would not be enough to show that Denver accepted funds from CBE that can ultimately be traced to the federal government.

*Id.* at 1050.  The plaintiffs then sued the Highway Administration and Kansas, claiming that the Highway Administration could not allow Kansas to "defederalize" the disputed segment.  *Id.*  The district court enjoined the Highway Administration and Kansas from taking further action on the disputed segment prior to additional environmental review. *Id.*

The Tenth Circuit affirmed this injunction "[o]n the unique facts of th[e] case."  *Id.* at 1051.  Those "unique facts" essentially amounted to the following: Congress had appropriated funds for the entire freeway project, and particularly as a demonstration project; Kansas had sought federal approval at every stage of the project up until its attempt to withdraw the disputed segment; and Kansas had spent more than $10 million of the federally appropriated money, including $108,000 on the disputed segment. Thus,

> [a]t the advanced stage of the trafficway project, it was simply too late for the state of Kansas to convert the [disputed] segment into a local project. . . .  The federal nature of the trafficway was so pervasive that the Kansas authorities could not rid the project of federal involvement simply by withdrawing the last segment of the project from federal funding.

*Id.* at 1052–53.

*Ross* distinguished the case before it from a previous Tenth Circuit decision, *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477 (10th Cir. 1990). There, a municipal entity sought federal highway money to defray the cost of an EIS in advance of a proposed bridge-building project.  *Id.* at 1479.  The Highway Administration in fact contributed close to $59,000 for that EIS.  *Id.*  But then the municipality decided to build the bridge entirely with municipal bond proceeds.  *Id.*  The

Tenth Circuit held that "the participation in and approval of the EIS in this case did not render the bridge project federal in nature."  *Id*. at 1484.  More specifically, *Ross* distinguished *Los Ranchos* on the grounds that, in *Los Ranchos*, "federal involvement ceased at the preliminary planning stages of the project," whereas in *Ross* itself there had been substantial federal funding for the entire project for many years.  *Ross*, 162 F.3d at 1053.

Ross was very concerned about the need to preserve state sovereignty as much as possible, *i.e.*, not to lightly subject the state to a federal statutory process that does not, by its terms, bind the states.  Reading *Ross* and *Los Ranchos* together, it appears that in the Tenth Circuit a non-federal entity may be enjoined in an APA case under a consent theory—the state or local government took federal money and participated in a federal process, so it may fairly be subjected to federal requirements—but such consent is not in all cases irrevocable.  In *Los Ranchos*, there was comparatively little federal involvement (although the municipality certainly took federal money) whereas in *Ross*, federal involvement was pervasive and long-standing.  Somewhere in between those two poles, a non-federal entity's participation with the federal government becomes irrevocable consent to federal statutory requirements, such as NEPA, which is enforceable through the APA.

In other circuits that permit APA injunctions against non-federal entities, the consent theory of jurisdiction (consent through participation in a federal process, consent through accepting federal money, or both) is the most prominent justification for subjecting non-federal entities to federal requirements and corresponding injunctions. *See MICAH*, 2013 WL 12234624, at *4 (citing cases).  Thus, the Tenth Circuit is

31

consistent with all of these cases, although perhaps with more solicitude for state and local sovereignty than other circuits.[10]

CDOT's position in this case is much closer to the *Ross* end of the spectrum than the *Los Ranchos* end, given CDOT's thorough, long-standing, and active consent to federal involvement, and its request for federal funds.  Indeed, CDOT has *not* moved to dismiss itself on grounds that it is not subject to a NEPA lawsuit via the APA.  CDOT therefore has effectively conceded that it must obey the dictates of this Court with respect to NEPA and the APA.

Given that, the Court has power to enjoin CDOT from further work on the PCL Alternative, and such an injunction would extend to enjoining CDOT from sending money to Denver for purposes of P2PH *if* the Court finds that P2PH constitutes action in furtherance of the PCL Alternative.  In such a scenario, sending money to Denver would be enjoinable just as much as any other activity in furtherance of the PCL Alternative.

The Court has already assumed for present purposes that CDOT views P2PH as integral to the PCL Alternative.  Under that assumption, the Court can enjoin CDOT from sending money to Denver for P2PH purposes.  But concluding as much returns us once again to the question of whether such an injunction would likely stop (or significantly slow down) Denver's efforts to build the various components of P2PH.  The

---

[10] The other major explanation for the power to enjoin non-federal entities is that offered by the Ninth Circuit (and apparently only the Ninth Circuit), namely, when federal and state projects are "sufficiently interrelated to constitute a single federal action for NEPA purposes." *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1092 (9th Cir. 2003).  This standard would likely be frowned upon in the Tenth Circuit to the extent it provides a basis for exercising jurisdiction different from consent (*i.e.*, willing state or local participation in a federal process).  In other words, if something can just happen to become "sufficiently interrelated" without any voluntary action on the part of state or local entities, it would infringe on the sovereignty the Tenth Circuit sought to protect in *Ross* and *Los Ranchos*.

Court now turns to that question directly.

   2.   Denver's Likely Actions If the Court Were to Enjoin CDOT

The Court ultimately must analyze Denver's likely intentions on a project-by-project basis.  However, the Court finds that the following four considerations apply to the analysis of all four projects.

First, the Denver City Council began committing the city to actions in furtherance of P2PH as early as October 2015, a few months before the final EIS and well over a year before the ROD.  (*See generally* DXs H–M.)  This shows that Denver saw utility in P2PH even though it could not be certain that the PCL Alternative would be selected or built.

Second, the City Council approved the first bond issue in September 2016, which still predates the ROD.  (*See* DX B.)  Thus, Denver began binding itself to P2PH financially without definite assurance that the PCL Alternative would be selected or built.

Third, Denver's public disclosures as part of its bond solicitation specifically declared that, "[d]ue to the essentiality of these improvements, the City anticipates completing Platte to Park Hill notwithstanding the receipt of [CDOT's expected] contributions."  (DX C at 17; DX D at 19.)  Disclosures in these sorts of bond solicitation documents can lead to liability under SEC Rule 10b-5 (among other statutes and regulations) if they are materially false or misleading.  *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 854–56 (9th Cir. 2001).  Whether a municipal project will be abandoned or not based on a certain contingency is plainly a material consideration for an investor.  Thus, given the potential legal liability, Denver's "notwithstanding" statement is not the sort of statement it could make lightly and without a considered evaluation of the

possible false or misleading nature of that statement.

Fourth, Ortega (the Zeppelin Plaintiffs' witness, and a consistent opponent of P2PH-related measures presented to the City Council) believes Denver is "is committed to the project as they proposed it."

With these considerations in mind, the Court now turns to the four projects comprising P2PH.

### a.   *Globeville Landing Outfall*

The evidentiary ledger strongly favors Defendants on the question of what Denver is likely to do with the Globeville Landing Outfall project.  It is fully funded, its contracts are approved, and no further City Council votes are needed to bring it to completion.  On that basis alone, it appears highly unlikely that CDOT's inability to contribute to P2PH would have any meaningful effect.  Moreover, construction is well underway.  Failing to complete it would leave Denver with a half-built "stranded investment."  Thus, even if CDOT's inability to contribute funds would have some sort of effect (which seems almost impossible at this point), the Court finds it likely that Denver would fund the project to completion in some other way.

Accordingly, Plaintiffs Zeppelin and Evans, whose injuries are tied to the Globeville Landing Outfall construction, lack standing to pursue Claims 4 and 5 of their Amended Petition.

### b.   *City Park Golf Course*

The evidentiary ledger is perhaps not quite as skewed toward Defendants with respect to the City Park Golf Course because construction efforts have, so far, amounted only to placement of some construction fencing and marking of certain trees.

34

Nonetheless, the crucial question is the effect of CDOT's inability to contribute funds.  In that regard, City Park Golf Course is like Globeville Landing Outfall: it is fully funded, its contracts are approved, and no further City Council votes are needed to bring it to completion.  The detention basin served by the City Park Golf Course is also in need of improvement, so Denver has an independent incentive to continue pursuing the project.  Ortega also specifically mentioned "neighborhoods adjacent to the golf course" as among those neighborhoods where it would be politically embarrassing to announce that construction had been cancelled or significantly delayed.

For all of these reasons, the Court finds it likely that Denver will proceed with the City Park Golf Course project regardless of CDOT's ability to contribute to P2PH.  Therefore, Plaintiff O'Connor, whose injuries are tied to this project, lacks standing to pursue Claims 4, 5, and 7 of the Amended Petition.  Plaintiff Lansing similarly lacks standing to the extent she asserts injuries flowing from P2PH's effect on the City Park Golf Course.

### c.    *The 39th Avenue Open Channel*

The City Council has not specifically appropriated funds for the 39th Avenue Open Channel or approved any construction contracts for that project.  Furthermore, Denver had earmarked CDOT's expected contributions for this project.  Thus, CDOT's failure to provide those contributions is much more significant in this context, as compared to the City Park Golf Course or the Globeville Landing Outfall.  The Court nonetheless finds that the balance of the evidence tips toward Defendants, for at least four reasons.

First, the neighborhood surrounding 39th Avenue is the other neighborhood

Ortega specifically mentioned where it would be politically embarrassing to announce that the planned construction had been cancelled or significantly delayed.

Second, Denver has already purchased the Market Lead right-of-way in which the 39th Avenue Open Channel is to be built.

Third, CDOT's total outstanding obligation under the IGA is $24.7 million, and Denver could make up all but $3.7 million through existing funds, the expenditure of which would require no City Council vote.  Obviously, going back to the City Council for the additional $3.7 million is much less politically fraught than requesting $24.7 million.

Fourth, and perhaps most importantly, the Globeville Landing Outfall and the 39th Avenue Open Channel are conceptually inseparable.  Without the volume of stormwater that the 39th Avenue Open Channel is designed to collect, the Globeville Landing Outfall becomes a boondoggle—it would have vastly more capacity than it could ever be expected to handle.  Thus, to the extent City Council action is needed to make up a shortfall with respect to the 39th Avenue Open Channel—even the full shortfall of $24.7 million—the City Council has a strong incentive to find those funds, if only to ensure that the already-fully-funded Globeville Landing Outfall realizes its purpose.

For all of these reasons, the Court finds it more likely than not that Denver will complete the 39th Avenue Open Channel even if it receives no more contributions from CDOT.  As a consequence, Plaintiffs Morse and Feder, whose injuries are tied to the 39th Avenue Open Channel, lack standing to pursue Claims 4 and 5 of the Amended Petition.

        d.     *Park Hill Golf Club*

Neither side presented much evidence about the Park Hill Golf Club.  What little evidence there was favors Defendants.

First, as noted, no City Council vote is needed to make up the shortfall from CDOT, save for $3.7 million.

Second, the Park Hill Golf Club portion of P2PH would address flooding in an area where a Denver firefighter actually lost his life while trying to rescue someone from floodwaters.  From the cold perspective of a pure cost-benefit analysis, a thoroughgoing rationalist might find one firefighter's death irrelevant, but it is also the sort of event that tends to have great persuasive value in the political sphere.

For these reasons, the Court finds it more likely than not that Denver will pursue the Park Hill Golf Club improvements even if CDOT contributes nothing more to P2PH.  Plaintiff Lansing, to the extent she claims injury flowing from P2PH's effect on the Park Hill Golf Club, lacks standing to pursue Claims 4 and 5 of the Amended Petition.

        e.     *Other Considerations*

At the evidentiary hearing, the Zeppelin Plaintiffs emphasized that they may have standing if CDOT's withdrawal from P2PH might slow down Denver's efforts, or reduce P2PH's scope.  The Zeppelin Plaintiffs have not convinced the Court that either outcome is more likely than not.  Again, Globeville Landing Outfall and City Park Golf Course are fully funded and underway.  As for the 39th Avenue Open Channel and Park Hill Golf Club, the effective shortfall would be $3.7 million, which is about 1% of the total P2PH budget of $298 million.  Moreover, the 39th Avenue Open Channel and Park Hill Golf Club improvements are not on any hard timetable at this point, so it is difficult to

judge what it would mean to slow them down, or how much slowing would amount to a material change sufficient to grant any of the Zeppelin Plaintiffs standing.

The Zeppelin Plaintiffs also raised possibilities such as growing voter discontent over the cost of P2PH, or the chance that the second bond issue planned for next year would yield less than expected given that an injunction against CDOT would arguably prevent Denver from representing to potential investors that it would be receiving contributions from CDOT.  But the Zeppelin Plaintiffs introduced no evidence from which this Court could discern the likelihood of either of these outcomes.

The Zeppelin Plaintiffs have the burden of persuading the Court that it is "likely, as opposed to merely speculative, that [their] injur[ies] will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).  Obviously this requires predicting the future, which no one can do with certainty, and so the Court has been careful to consider whether it is holding the Zeppelin Plaintiffs to too high a standard of proof.  Nonetheless, the Zeppelin Plaintiffs' various theories of redressability are far more speculative than Defendants' explanation of how Denver can proceed with P2PH regardless of CDOT's participation.  Consequently, the Zeppelin Plaintiffs have not carried their burden to show by a preponderance of the evidence that the injuries asserted in their Claims 4, 5, and 7 would be redressed by any order this Court has jurisdiction to issue.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  The Zeppelin Plaintiffs' APA § 705 Motion for Stay (ECF No. 32) is DENIED as to any request for an injunction based in Claims 4 or 5 of the Amended Petition, but

otherwise REMAINS PENDING and will be resolved as to the remaining theories there asserted (Claims 1 and 6) in due course;

2.      The Highway Administration's Motion to Dismiss Claims 4, 5, and 7 of the Zeppelin Plaintiffs' Amended Petition (ECF No. 45) is GRANTED; and

3.      CDOT's Motion to Dismiss Claims 4, 5, and 7 of the Zeppelin Plaintiffs' Amended Petition (ECF No. 47) is GRANTED.


Dated this 9th day of November, 2017.

BY THE COURT:

_____
William J. Martínez
United States District Judge