# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

### Judge William J. Martinez

Civil Action Nos.      17-cv-01661-MJW
                       17-cv-01679-EB

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFEE
PARK NEIGHBORHOOD ASSOCIATION; AND COLORADO LATINO FORUM,

      Plaintiffs,

   v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CARTER, in his official capacity as Division
Administrator,

      Defendants,

   and

COLORADO DEPARTMENT OF TRANSPORTATION, and SHAILEN P. BHATT, in his
official capacity as Executive Director of the Colorado Department of Transportation,

      Defendant-Intervenors.

---

## FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO SIERRA CLUB
## PLAINTIFFS' MOTION FOR STAY

---

Defendants Federal Highway Administration ("FHWA"), Elaine Chao, in her official

capacity as Secretary of Transportation, and John Carter, in his official capacity as Division

Administrator (collectively, "Federal Defendants"), hereby respond to the Motion for Stay of

Agency Action Pending Review of Merits filed by Sierra Club and other named plaintiffs

("Plaintiffs") in Case No. 17-cv-01679, ECF No. 88 ("Pls.' Mot."). Plaintiffs fail to establish

any of the four factors warranting a stay or preliminary injunctive relief to stop the challenged

project in this case, and their motion should be denied.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND .............................................................. 2

    I.     National Environmental Policy Act ....................................................................... 2

    II.    Federal-Aid Highway Act ...................................................................................... 3

    III.   The Clean Air Act ................................................................................................... 4

         A.    Air Quality Standards ............................................................................... 4

         B.    EPA's Transportation Conformity Regulations .......................................... 5

STANDARD OF REVIEW ..................................................................................................... 6

    I.     A Preliminary Injunction is an Extraordinary Remedy ........................................ 6

    II.    Review of Agency Action Under the Administrative Procedure Act ..................... 6

ARGUMENT ...................................................................................................................... 8

    I.     Plaintiffs Fail to Show a Likelihood of Success on the Merits of their
         Claims ................................................................................................................... 8

         A.    The Agencies' Analysis of the Project Impacts on Air Quality and
              Public Health Satisfies NEPA's "Hard Look" Requirement ...................... 9

              1.    The Agencies Thoroughly Considered and Examined the
                    Project Impacts on Air Quality and Public Health ......................... 9

              2.    Plaintiffs' Challenges to the Agencies' Air Quality and
                    Health Impact Analysis Have No Merit ....................................... 11

                    a.    NEPA Does Not Require the Agencies to Conduct A
                        Quantitative Health Impact Analysis for the Project ........ 12

                    b.    NEPA Does Not Require the Agencies to Conduct a
                        $PM_{2.5}$ Hot-Spot Analysis for the Project ........................... 14

         B.    FHWA Complied with FAHA §109(h) ..................................................... 15

              1.    Contrary to Plaintiffs' Assertion, No Separate Process is
                    Required to Demonstrate Compliance with §109(h) ................... 16

              2.    FHWA Met its §109(h) Obligations through its NEPA
                    Process ...................................................................................... 17

i

II.     Plaintiffs Fail to Demonstrate Irreparable Harm .................................................. 20

        A.     Plaintiffs' Speculative Harm from the Project's Air Pollutants are
               Insufficient to Demonstrate Immediate, Irreparable Injury ..................... 21

        B.     Plaintiffs' Alleged Harm from the "Irretrievable Commitment" of
               CDOT's "Limited Resources" is Insufficient to Demonstrate
               Irreparable Injury ...................................................................................... 24

III.    The Balance of Harms and Public Interest Do Not Favor a Preliminary
        Injunction ........................................................................................................... 26

CONCLUSION.................................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*American Trucking Ass'ns, Inc. v. E.P.A.*,
  283 F.3d 355 (D.C. Cir. 2002) .................................................................................. 15

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ................................................................................................. 21

*Arlington Coal. on Transp. v. Volpe*,
  458 F.2d 1323 (4th Cir. 1972) ................................................................................. 25

*Audubon Naturalist Soc'y v. U.S. Dep't of Transp*,
  524 F. Supp. 2d 642 (D. Md. 2007) .................................................................. 17, 19

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ..................................................................................................... 7

*Barnes v. FAA*,
  865 F.3d 1266 (9th Cir. 2017) ............................................................... 13, 14, 18, 19

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
  No. CV 12-9861-GS, 2016 WL 4650428 (C.D. Cal. Feb. 1, 2016) ........................ 15

*Biodiversity Conservation. All. v U.S. Forest Serv.*,
  765 F.3d 1264 (10th Cir. 2014) ............................................................................... 12

*Border Power Plant Working Grp. v. Dep't of Energy*,
  260 F. Supp. 2d 997 (S.D. Cal. 2003) ................................................................. 13, 19

*Califano v. Sanders*,
  430 U.S. 99 (1977) ..................................................................................................... 7

*Camp v. Pitts*,
  411 U.S. 138 (1973) .............................................................................................. 8, 15

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*,
  111 F.3d 1485 (10th Cir. 1997) ................................................................................. 6

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ................................................................................................... 7

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983) ................................................................................................... 23

*Coal. for the Advancement of Reg'l Transp. v. FHWA*,
  576 F. App'x 477 (6th Cir. 2014) ...................................................................... 13, 14

*Coal. for the Advancement of Reg'l Transp. v. FHWA*,
  959 F. Supp. 2d 982 (W.D. Ky. 2013) .................................................................... 13

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1998) ................................................................................. 24

*Ctr. For Food Safety v. Vilsack*,
   636 F.3d 1166 (9th Cir. 2011) ................................................................... 23

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ........................................................... 21, 22

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ................................................................................. 21

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ................................................................................... 8

*Forelaws on Bd. v. Johnson*,
   743 F.2d 677 (9th Cir. 1984) .................................................................... 26

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
   611 F.3d 692 (10th Cir. 2010) .................................................................. 24

*Friends of Southeast's Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ............................................................. 24, 26

*Heideman v. S. Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) ........................................................... 21, 22

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
   702 F.3d 1156 (10th Cir. 2012) ................................................................ 12

*Horton v. City of St. Augustine*,
   272 F.3d 1318 (11th Cir. 2001) ................................................................ 20

*Jersey Heights Neighborhood Ass'n v. Glendening*,
   174 F.3d 180 (4th Cir. 1999) ............................................................ 3, 6, 17

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .......................................................................... 3, 7, 13

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ................................................................................... 6

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) .............................................................................. 6, 21

*N.Y., Nat'l Res. Def. Council, Inc. v. Kleppe*,
   429 U.S. 1307 (1976) ............................................................................... 25

*Nat. Res. Def. Council, Inc. v. EPA*,
   16 F.3d 1395 (4th Cir. 1993) ...................................................................... 8

*Nat'l Wildlife Fed. v. U.S. Forest Serv.*,
   592 F. Supp. 931 (D.Or. 1984) ................................................................ 25

*Olenhouse v. Commodity Credit Corp.*,
   42 F.3d 1560 (10th Cir. 1994) .................................................................... 7

*Or. Nat. Res. Council Fund v. Goodman*,
  505 F.3d 884 (9th Cir. 2007) ........................................................................ 12

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................ 2, 3, 9, 19

*San Juan Citizens All. v. Stiles*,
  654 F.3d 1038 (10th Cir. 2011) ...................................................................... 2

*San Luis Valley Ecosystem Council v. U.S. & Wildlife Serv.*,
  657 F. Supp. 2d 1233 (D. Colo. 2009) ........................................................ 22

*Sierra Club v. Babbit*,
  59 F. Supp. 2d 1202 (E.D. Cal. 1999) ........................................................ 25

*Sierra Club v. EPA*,
  873 F.3d 946 (D.C. Cir. 2017) .............................................................. 14, 18

*Sierra Club v. Fed. Highway Admin.*,
  715 F. Supp. 2d 721 (S.D. Tex. 2010) ........................................................ 13

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989) ........................................................................ 25

*Sierra Club v. U.S. Dep't of Transp.*,
  310 F. Supp. 2d 1168 (D. Nev. 2004) ........................................ 13, 14, 15, 17, 19

*Sierra Club v. U.S. Forest Serv.*,
  593 F. Supp. 2d 1306 (N.D. Ga. 2008) ...................................................... 22

*Stop H-3 Ass'n v. Volpe*,
  53 F .Supp. 14 (D. Haw. 1972) .................................................................... 25

*Tinicum Twp. v. DOT*,
  685 F.3d 288 (3rd Cir. 2012) ...................................................................... 14

*Trinity Am. Corp. v. EPA*,
  150 F.3d 389 (4th Cir. 1998) ................................................................ 7, 8, 12

*United States v. Fisher*,
  805 F.3d 982 (10th Cir. 2015) ...................................................................... 1

*Utah Envtl. Cong. v. Russell*,
  518 F.3d 817 (10th Cir. 2008) ................................................................ 7, 12

*Valley Cmty. Preservation Comm'n v. Mineta*,
  373 F.3d 1078 (10th Cir. 2004) .............................................................. 26, 27

*Virginians for Appropriate Road v. Capka*,
  No. 7:07CV00587, 2009 WL 2160454 n.15 (W.D. Va. July 20, 2009) .................... 17

*W. Watersheds Project v. Bureau of Land Mgmt.*,
  No. 3:11-cv-00053-HDM-VPC, 2011 WL 1630789 (D. Nev. Apr. 28, 2011) ........ 23

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................................... 27

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ........................................................... 13

*Wildwest Inst. v. Bull*,
  547 F.3d 1162 (9th Cir. 2008) ........................................................... 24

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ............................................................... 6, 10, 20, 21

**STATUTES**

5 U.S.C. §§ 701-706 ............................................................................ 6

5 U.S.C. § 705 ..................................................................................... 6

5 U.S.C. § 706(2)(A) ............................................................................ 7

23 U.S.C. §109(h) ............................................................................... 3

23 U.S.C. § 121(b) ............................................................................. 26

42 U.S.C. § 4332(c) ........................................................................... 19

42 U.S.C. §§ 7408-7409 ...................................................................... 4

42 U.S.C. § 7409(b) ............................................................................ 4

42 U.S.C. § 7506(c)(1) ........................................................................ 5

**RULES**

Fed. R. App. P. 32(f) ......................................................................... 29

**REGULATIONS**

5 C.C.R. 1001-16 ............................................................................... 5

23 C.F.R. pt. 771 ......................................................................... 16, 17

23 C.F.R. § 771.101 ............................................................................ 3

23 C.F.R. § 771.105(a) .................................................................. 6, 16

23 C.F.R. § 771.105(b) ........................................................................ 3

23 C.F.R. § 771.105(d) ...................................................................... 19

23 C.F.R. § 771.107(b) ...................................................................... 17

23 C.F.R. § 771.109(b) ...................................................................... 20

23 C.F.R. § 771.123 .......................................................................... 16

23 C.F.R. § 771.125 .......................................................................... 16

vi

23 C.F.R. § 771.125(a)(1) ............................................................................................ 17

23 C.F.R. § 771.127 ...................................................................................................... 16

23 C.F.R. § 771.135(a) .................................................................................................. 16

40 C.F.R. pt. 50 ............................................................................................................... 4

40 C.F.R. § 50.6 .............................................................................................................. 9

40 C.F.R. § 93.104(d) ..................................................................................................... 6

40 C.F.R. § 93.105(c)(1)(1) ............................................................................................ 5

40 C.F.R. § 93.116(b) ..................................................................................................... 5

40 C.F.R. § 1502.2(f) .................................................................................................... 24

40 C.F.R. § 1505.3 ........................................................................................................ 20

40 C.F.R. § 1506.1(a)(2) ............................................................................................... 24

47 Fed. Reg. 21780 (May 20, 1982) ............................................................................ 16

47 Fed. Reg. 21781 (May 20, 1982) ............................................................................ 16

78 Fed. Reg. 3086 (Jan. 15, 2013) ................................................................................. 4

**OTHER AUTHORITIES**

I-70 East Environmental Impact Statement, http://www.i-70east.com/reports.html (Dec. 6, 2017)
................................................................................................................................... 9

## GLOSSARY OF ACRONYMS

| APA | Administrative Procedure Act |
|---|---|
| CAA | Clean Air Act |
| APCD | Colorado Department of Public Health & Environment, Air Pollution Control Division |
| CDOT | Colorado Department of Transportation |
| EPA | Environmental Protection Agency |
| FAHA | Federal Highway Act |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| MSATs | Mobile Source Air Toxics |
| PM | Particulate Matter |
| $PM_{2.5}$ | Particles with a diameter of less than or equal to 2.5 micrometers |
| $PM_{10}$ | Particles with a diameter of less than or equal to 10 micrometers |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| SIP | State Implementation Plan |

## INTRODUCTION

On January 19, 2017, FHWA signed a Record of Decision ("ROD") for the Colorado Department of Transportation's ("CDOT") highway project in Denver that will improve public safety, access, and mobility and relieve traffic congestion on a ten-mile stretch of I-70 between I-25 and Chambers Road ("Central 70" or the "Project").  The Project involves demolishing the aging and structurally-deficient viaduct that is endangering the lives of the thousands of people that travel on or below it every day; widening the existing highway one lane in each direction to decrease congestion and meet current design standards; and placing the highway below-grade, partially covering this lowered section with a four-acre park and community open space.

On July 10, 2017, Plaintiffs filed a 98-page complaint challenging the ROD.  They asserted eighteen claims, including ten claims under the National Environmental Policy Act ("NEPA"), seven claims under the Clean Air Act ("CAA"), and one claim under §109(h) of the Federal Highway Act ("FAHA").  Plaintiffs' current motion seeking injunctive relief, however, focuses on a NEPA claim and the §109(h) claim that challenge the sufficiency of FHWA's and CDOTs' (collectively, the "Agencies") air quality analysis.[1]

Plaintiffs have failed to show a likelihood of success on the merits of these claims, and their motion should be denied.  As explained below, the Agencies conducted a comprehensive NEPA analysis, which satisfies the requirements of §109(h), of the Project's effects on air

---

[1] Plaintiffs briefly mention other alleged NEPA violations in the motion that were not fully developed.  (Pls. Mot. 8, 10 (noting that the Agencies narrowly constructed the "Purpose and Need" statement of the Project and failed to consider reasonable alternatives).)  They also vaguely state that the Agencies' CAA conformity determination violates EPA's criteria and procedures (*see id.* at 2), but never raise this issue again and do not argue it in the "Likely [to] Prevail on the Merits" section.  Because Plaintiffs did not adequately present or develop any these arguments, they are waived for purposes of this motion and Federal Defendants therefore do not address them here.  *See United States v. Fisher*, 805 F.3d 982, 991 (10th Cir. 2015) ("inadequately presented" arguments in opening brief are waived).

quality in accordance with the applicable statutes and regulations; consulted with agencies with the technical expertise and satisfied their concerns, including the Environmental Protection Agency ("EPA") which is statutorily mandated with setting the air quality standards for certain air pollutants to protect the public health; and conducted a public engagement process, soliciting comments and responding adequately to those comments.  Contrary to Plaintiffs' assertion, neither NEPA nor §109(h) requires more.  Under the heightened deferential standard that applies here, Plaintiffs have failed to meet their heavy burden to show that it is likely that the Agencies' air quality analysis was arbitrary, capricious, or otherwise not in accordance with law.

Plaintiffs have also failed to show that they will suffer immediate, irreparable injury if an injunction is not granted.  They failed to produce the "clear and unequivocal" evidence required to show a concrete and immediate injury.  Plaintiffs' subjective fears of injury from the Project are insufficient to demonstrate the irreparable harm warranting an injunction.  Unlike Plaintiffs' speculative harms, the heightened risk of accidents, injury, and death from driving on a deficient I-70 and decaying viaduct is real and concrete.  Thus, the balance of equities and the public interest overwhelmingly favors denying Plaintiffs' motion and allowing the Project to proceed.

## STATUTORY AND REGULATORY BACKGROUND

### I.      National Environmental Policy Act.

NEPA "requires federal agencies to examine and disclose the environmental impacts of their proposed actions."  *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1042 (10th Cir. 2011). NEPA does not mandate a particular substantive result or outcome; rather, NEPA is only a procedural statute that requires agencies to take a "hard look" at the environmental consequences of their decisions.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).

An agency satisfies the "hard look" requirement when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny, and responds to all legitimate concerns that are raised. *Marsh v. Or.  Natural Res. Council*, 490 U.S. 360, 378-85 (1989).  As long as the adverse environmental effects of a proposed action are "adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Robertson*, 490 U.S. at 350.

## II.   Federal-Aid Highway Act.

The FAHA provides the statutory framework for the Federal-Aid Highway Program that gives financial assistance to states for mass transportation construction and improvement projects.  The FAHA, which is administered by FHWA, sets forth the requirements projects must meet for federal funding.  Specifically, §109(h) states that the Secretary of Transportation shall:

> promulgate guidelines designed to assure that *possible adverse economic, social, and environmental effects* relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project *are made in the best overall public interest*, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following: (1) air, noise, and water pollution; (2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services; (3) adverse employment effects, and tax and property value losses; (4) injurious displacement of people, businesses and farms; and (5) disruption of desirable community and regional growth.

23 U.S.C. §109(h) (emphasis added).

FHWA satisfies §109(h)'s mandate by and through its NEPA process, which incorporates the §109(h) considerations.  *See* 23 C.F.R. 771.101, 771.105(b), (d), 771.109(b).  Thus, compliance with §109(h) requirements is determined by examining whether FHWA' regulations implementing NEPA have been followed.  *See* § 771.105(a); *see also Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 184 (4th Cir. 1999).

### III.   The Clean Air Act.[2]

#### A.   Air Quality Standards.

The CAA directs EPA to develop primary and secondary National Ambient Air Quality Standards ("NAAQS") for air pollutants (also referred to as "criteria" pollutants).  42 U.S.C. §§ 7408-7409.  EPA has established NAAQS for six "criteria" pollutants, including carbon monoxide and particulate matter.  For particulate matter, EPA has established standards for particles with a diameter of less than or equal to 10 micrometers ("$PM_{10}$") to protect against exposures to coarse particular matter, and for particles with a diameter of less than or equal to 2.5 micrometers ("$PM_{2.5}$") to protect against exposures to fine particulate matter.  *See* 40 C.F.R. Part 50; *see also* 78 Fed. Reg. 3086 (Jan. 15, 2013).  "Primary" NAAQS are set at a level EPA determines is "requisite to protect public health" with an "adequate margin of safety."  42 U.S.C. § 7409(b).  "Secondary" NAAQS are set at a level EPA determines is requisite to protect the public welfare from any known or anticipated adverse effects.  *See id.*

EPA then designates areas in the country as either (i) "attainment," if the region's atmospheric concentration of the pollutant meets the standards; (ii) "nonattainment," if it does not; or (iii) "unclassifiable," if there is insufficient information.  *Id.* § 7407(d)(1)(A).  EPA may alter the designation when a region's atmospheric pollutant concentration changes.  *Id.* § 7407(d)(3).  Former nonattainment areas that are redesignated to attainment, but remain subject to maintenance requirements, are referred to as "maintenance" areas.  *Id.* §§ 7407(d)(3), 7505a.

---

[2] Although Plaintiffs' CAA claims are not a basis for this motion, the underlying allegations for the alleged NEPA and FAHA §109(h) violations asserted in this motion involve the Agencies' alleged failure to adequately analyze adverse impacts of air pollution.  (Mot. 13-34.)  Thus, the statutory and regulatory background of the CAA provide an important context for considering the issues presented in Plaintiffs' motion and is relevant for the Court's determination of whether Plaintiffs are likely to succeed on the merits of their NEPA and §109(h) claims.

B.     EPA's Transportation Conformity Regulations.

The CAA bars the federal government from supporting, funding, or approving "any activity which does not conform to a state implementation plan [SIP]."  42 U.S.C. § 7506(c)(1).  "Conforming" to a SIP means, in the transportation context, that anticipated emissions from a transportation activity will not interfere with the SIP goals of eliminating or reducing the severity and number of violations and realizing expeditious attainment of NAAQS, and further will not cause or contribute to a new violation, worsen an existing violation, or delay attainment of the NAAQS or a required interim reduction or other milestone.  *Id.* § 7506(c)(1)-(2).  The conformity requirements mandate that emissions resulting from approved projects will not interfere with NAAQS attainment.  *See id.*

EPA's transportation conformity regulations require a "hot-spot" analysis for non-exempt projects in carbon monoxide nonattainment and maintenance areas.[3]  In $PM_{10}$ and $PM_{2.5}$ nonattainment and maintenance areas, a hot-spot analysis is required only for certain types of projects, which include expanded highway projects that involve a significant increase in the number of diesel vehicles.  *See id.* §§ 93.116, 93.123(b).  The conformity regulations set forth the analysis and basic methodology for determining localized violations of the $PM_{2.5}$ and $PM_{10}$ NAAQS.  *See* §§ 93.102, 93.116, 93.123.

Project sponsors must consult with air quality planning agencies, state and local transportation agencies, EPA, and U.S. Department of Transportation "to develop a process to evaluate and choose models and associated methods and assumptions to be used in PM hot-spot analyses."  40 C.F.R. 93.105(c)(1)(1); 5 C.C.R. 1001-16.  Once the project sponsor completes

---

[3] Nonattainment areas for carbon monoxide are subject to additional requirements under 40 C.F.R. 93.116(b).  However, at the present time, there are no carbon monoxide nonattainment areas in the country.

the analyses, the Department of Transportation makes a project-level conformity determination, as required by the CAA and 40 C.F.R. 93.104(d), which is then incorporated into the project's record of decision.  *See* 23 C.F.R. § 771.105(a).

## STANDARD OF REVIEW

### I.    A Preliminary Injunction is an Extraordinary Remedy.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the moving party, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation omitted).  "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1489 (10th Cir. 1997). The movant's "requirement for substantial proof is much higher" for a motion for a preliminary injunction than it is for a motion for summary judgment.  *Mazurek*, 520 U.S. at 972.

To obtain such extraordinary relief, the movant must establish that (1) it is "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) the "injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).[4]  All four factors must be met, and the test is not altered simply because a plaintiff alleges an environmental injury or a violation of NEPA.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

### II.    Review of Agency Action Under the Administrative Procedure Act.

Plaintiffs' NEPA and §109(h) claims are subject to judicial review under the Administrative Procedure Act ("APA").  *See* 5 U.S.C. §§ 701-706 *et seq*.; *see also Jersey Heights Neighborhood Ass'n*, 174 F.3d at 186.  In the Tenth Circuit, "[r]eviews of agency action

---

[4] The same standard applies for motions to stay under 5 U.S.C. § 705.  (Pls.' Mot. 10.)

in the district courts [under the APA] must be processed *as appeals*." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (emphasis added).

An agency's action must be upheld unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under this deferential standard, an agency action is upheld if the agency has "examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574 (citation omitted). The court's role is solely to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park*, 401 U.S. at 416. While "this inquiry into the facts and the record is to be searching and careful, the ultimate standard of review is a narrow one." *Id.* The court should only assess whether the agency's decision is "within the bounds of reasoned decision making." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court should not "substitute its judgment for that of the agency or express a view about the Project." *Id.*

Agency determinations based upon highly complex and technical matters are entitled to great deference. *See Marsh*, 490 U.S. at 377-78 (stating that courts should defer to the agency's qualified experts "even if, as an original matter, a court might find contrary views more persuasive"). This is particularly true in cases where, as here, the regulatory framework at issue is exceedingly "complex and requires sophisticated evaluation of complicated data." *Trinity Am. Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998); *see also Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) ("Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise."). The

court does not "sit as a scientific body" in such cases, "meticulously reviewing all data under a laboratory microscopy." *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993).  Rather, if the agency "fully and ably explain[s] its course of inquiry, its analysis, and its reasoning sufficiently enough for [a court] to discern a rational connection between its decision-making process and its ultimate decision," courts will let the agency's decision stand.  *Trinity Am. Corp.*, 150 F.3d at 393 (internal quotation omitted).

The scope of judicial review under the APA is limited to the administrative record before the decision-maker.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  As the Supreme Court emphasized, "the focal point should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp*, 411 U.S. at 142.  Thus, "[t]he reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  The validity of an agency's action should "stand or fall" on the administrative record.  *Camp*, 411 U.S. at 143.

## ARGUMENT

## I.  Plaintiffs Fail to Show a Likelihood of Success on the Merits of their Claims.

Plaintiffs' complaint alleges eighteen claims under NEPA, §109(h), and the CAA. (Compl. ¶¶ 38-372, Case No. 17-cv-01679, ECF No. 1.)  Their preliminary injunction request, however, is based on only the following two claims: (1) an alleged NEPA violation for failure "to assess adverse health impacts from exposure to highway pollution, compare health impacts of alternatives and consider mitigation that could restore healthier air quality, or avoid or minimize additional harm to community health"; and (2) an alleged §109(h) violation for failure to "identify mitigation sufficient to eliminate or minimize such adverse health impacts and weigh

the cost of those measures in making the public determination." (Pls.' Mot. 24.) (quotations omitted). Plaintiffs have failed to establish a likelihood of success on the merits of these claims.

> **A.    The Agencies' Analysis of the Project Impacts on Air Quality and Public Health Satisfies NEPA's "Hard Look" Requirement.**

The purpose of NEPA is to ensure that federal "agencies take a 'hard look' at environmental consequences" of their proposed actions before deciding to proceed. *Robertson*, 490 U.S. at 350. The Agencies have satisfied their "hard look" obligation under NEPA.

> 1.    The Agencies Thoroughly Considered and Examined the Project Impacts on Air Quality and Public Health.

As explained more fully in CDOT's Response in Opposition to Sierra Club Plaintiffs' Motion for Stay, the Agencies conducted a comprehensive NEPA analysis of the Project's effects on air quality and public health in accordance with the CAA and EPA's guidance. (CDOT's Opp. 4-9, 11-17.) The record shows that the Agencies not only performed the hot-spot analysis required for carbon monoxide and $PM_{10}$,[5] but also evaluated the Project's emissions of all criteria pollutants, as well as mobile source air toxics ("MSATs"). (FEIS Attach. J at 45-52.)[6] The MSAT inventories showed that, due to improved mobility, reduced congestion, and cleaner vehicle emission standards, MSATs will decrease by 70 to 90 percent by 2035 relative to

---

[5] It is critical to note that $PM_{10}$ and $PM_{2.5}$ are not the same. *See* 40 C.F.R. 50.6 ($PM_{10}$) and 50.1 ($PM_{2.5}$). Plaintiffs conflate the two in an attempt to argue that EPA's conformity regulations required the Agencies to conduct a hot-spot analysis for both $PM_{10}$ and $PM_{2.5}$. That is not the case. As explained below, a $PM_{2.5}$ hot-spot analysis was not required for the Project because it is located within the Denver-Metro attainment area for the $PM_{2.5}$ NAAQS set by EPA. That is, conformity for $PM_{2.5}$ does not apply in the Denver area.

[6] The Final Environmental Impact Statement ("FEIS") and the ROD, which are part of FHWA's administrative record to be produced to the parties and lodged with the Court on December 15, 2017, are publicly available on the official Project website at http://www.i-70east.com/reports.html (last visited Dec. 6, 2017).

existing values regardless of which alternative is chosen, and that the Project will have a minimum effect on annual emissions within the Project study area.  (ROD 108.)[7]

Similarly, the Agencies' quantitative hot-spot analyses for carbon monoxide and $PM_{10}$ show that the Project will maintain conformity—i.e., not cause any new local violations, increase the frequency or severity of any existing violation, or delay timely attainment of the NAAQS.  (ROD 68, 89, 113-14, 160.)  The levels of both pollutants are projected to remain at levels at or below the NAAQS, which are designed to protect human health with an adequate margin of safety.  (*Id.* at 110, 158-60.)  Both analyses modeled the worst-case scenario locations within the project study area, ensuring that air quality conditions in other areas throughout the corridor, including all schools, parks, and open spaces, will be less than those resulting from the hot-spot analyses.  (*See id.*)  In fact, the background monitor used by the Agencies in calculating the Project's design value has recorded the highest single value of $PM_{10}$ by any metro Denver monitor near the Project area.  (*See id*.)  The values in the $PM_{10}$ hot-spot analysis therefore best represent the worst case scenario.  (*See id*.)

In conducting the air quality analysis, the Agencies consulted extensively with EPA and the Colorado Department of Public Health and Environment, Air Pollution Control Division ("APCD") on the approach and methodology.  (*Id.* at 109-10; ROD Attach. B at 9-26.)  APCD concurred with the findings of the Project's hot-spot analysis.  (*Id.* at 69.)  Likewise, on January 18, 2017, EPA confirmed that its analysis matched FHWA's hot-spot analysis for two of the

---

[7] Plaintiffs' consultant agrees that emissions from vehicles have diminished since the implementation of emission controls on motor vehicles under the CAA, and that Denver has met air quality standards for these pollutants in recent years.  (Decl. of George D. Thurston at 3, ECF No. 88-12 ("Thurston Decl.")).

volume sources that FHWA had modeled and found that the modeling used by the Agencies, which EPA was able to review, can be considered reasonable.  (ROD Attach. B at 17-18.)

In addition to the air quality analysis, the Agencies also evaluated the Project's potential impacts on human health.  (FEIS 5.20-1 to 5.20-22.)  The Agencies acknowledged and discussed the health impacts of the relevant air pollutants, and reviewed recent studies concerning the health effects of highway air pollution, summarizing their findings.  (FEIS Attach. J at 4-8, 57-64; FEIS at 5.20-12 to 5.20-22.)  With respect to MSATs, for example, the Agencies acknowledged studies that have found sufficient evidence linking asthma to traffic-related pollution, but also discussed other studies confirming that while highways are a source of MSATs, they were unable to find that highways were the only source of these pollutants.  (ROD 109.)  Reports have found that exposure to these pollutants comes from sources other than vehicles, including refineries, lawn mowers, and portable gas cans, and that identifying effects in community studies is challenging due to low ambient concentrations, exposures to multiple possible toxicants, and other confounding factors.  (*See id*.)  The Agencies also reviewed multiple studies concerning highway emissions and human health, including the City of Denver's Health Impact Assessment for Globeville and Elyria, and provided a summary of their findings.  (FEIS 5.20-12 to 5.20-22.)

In sum, the Agencies' highly complex and technical analysis of air quality and related consequences for health, conducted in compliance with the CAA and EPA regulations, satisfies NEPA's "hard look" standard and is entitled to great deference.  *Marsh*, 490 U.S. at 378-85.

        2.      <u>Plaintiffs' NEPA Challenges to the Agencies' Air Quality and Health Impact Analysis Have No Merit.</u>

Plaintiffs do not challenge the Agencies' hot-spot analyses in the current motion to stay or otherwise assert any CAA claims.  What they claim instead, is that NEPA requires *more* than

what the CAA and EPA require, *regardless* of compliance with the NAAQS.  Specifically,

Plaintiffs argue that the Agencies' air quality analysis violates NEPA because the Agencies

failed to "consider the life and death consequences for nearby neighborhoods and vulnerable

populations" *below* the NAAQS and failed to conduct a $PM_{2.5}$ hot-spot analysis, also *below* the

NAAQS.  (Pls.' Mot. 27-33.)  Each of these arguments fails.

### a.       NEPA Does Not Require the Agencies to Conduct A Quantitative Health Impact Analysis for the Project.

Plaintiffs argue that NEPA demands the Agencies "understand and disclose how many

will die or suffer lifelong diseases from pollution levels *not* prohibited by the NAAQs."  (Pls.'

Mot. 27.) (emphasis added).)  Plaintiffs have cited no case law, statute, regulation, guidance

document, or other authority to support that such a far-reaching analysis is required under NEPA

or is even technically feasible.  There is none.

Contrary to Plaintiffs' suggestion, NEPA "does not require the agency to use particular

methodologies."  *Biodiversity Conserv. All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1270 (10th Cir.

2014).  Nor does NEPA require a court to "decide whether an [EIS] is based on the best

scientific methodology available."  *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 897

(9th Cir. 2007).  The Tenth Circuit has made clear that "[c]ourts are not in a position to decide

the propriety of competing methodologies . . . but instead, should determine simply whether the

challenged method had a rational basis and took into consideration the relevant factors."

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1177-78

(10th Cir. 2012).  This is particularly true here where the regulatory framework is "exceedingly

complex and the analysis involves technical and scientific matters within the agency's

expertise."  *Trinity Am. Corp.*, 150 F.3d at 395; *see also Utah Envtl. Cong.*, 518 F.3d at 824.  As

explained above, the Agencies conducted a comprehensive NEPA analysis of the Project's

effects on air quality and public health, consistent with the CAA and EPA's guidance, and their complex and technical analysis is entitled to great deference. *Marsh*, 490 U.S. at 378-85.

Even if such analysis were required, Plaintiffs' argument that the Agencies must evaluate the adverse impacts *below* the NAAQS has no merit. There is no law, statute, regulation, or guidance that supports Plaintiffs' argument. To the contrary, courts have held that agencies are entitled to rely on EPA's judgment regarding the level of air pollution that is sufficiently protective of public health. *See, e.g.*, *Barnes v. FAA*, 865 F.3d 1266, 1273 (9th Cir. 2017) ("It was appropriate for the [agency] to defer to the EPA on the factual question of what level of airborne lead is safe for children."); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 311-12 (D.C. Cir. 2013) (approving of agency's use of NAAQS in completing NEPA analysis). As the courts have explained, EPA is statutorily required to set NAAQS at a level sufficient to protect human health with an adequate margin of safety, including children and other at-risk populations; thus, a determination that projects do not violate the NAAQS "logically indicates that they will not have a significant impact on public health." *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003).

Accordingly, agencies that rely on the NAAQS for their NEPA review "do not act arbitrarily or capriciously." *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004); *Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010) ("The Defendants' decision to consider air pollution issues through the same framework used by the EPA . . . cannot be considered arbitrary or capricious."); *Coal. for the Advancement of Reg'l Transp. v. FHWA*, 959 F. Supp. 2d 982, 1013 (W.D. Ky. 2013) ("[P]erforming and completing the conformity analyses described in the CAA satisfies Defendants' hard look requirements for air quality issues under NEPA."); *Coal. for the Advancement of Reg'l Transp. v. FHWA*, 576 F.

App'x 477, 492-93 (6th Cir. 2014) (finding that FHWA did not need to analyze ultra-fine particles because they are not regulated under the NAAQS) (citing *Tinicum Twp. v. DOT*, 685 F.3d 288, 296-98 (3d Cir. 2012)).  Thus, Plaintiffs' argument fails.

> **b.   NEPA Does Not Require the Agencies to Conduct a PM$_{2.5}$ Hot-Spot Analysis for the Project.**

Plaintiffs' argument that the Agencies are required under NEPA to perform a PM$_{2.5}$ hot-spot analysis fails for similar reasons.  As explained above, agencies are entitled to rely on the NAAQS for their NEPA analysis.  *See Barnes v. FAA*, 865 F.3d at 1273.  Here, the Denver-Metro Area is designated as a PM$_{2.5}$ attainment area.  (ROD 114); *see also Sierra Club v. EPA*, 873 F.3d 946, 950 (D.C. Cir. 2017) (finding that because the Project is "not located in a nonattainment or maintenance area for PM$_{2.5}$, . . . the [conformity] regulations require no PM$_{2.5}$ hot-spot analysis"); *Coal. for the Advancement of Reg'l Transp.*, 576 F. App'x at 492-93.  Accordingly, the Agencies' "decision not to further study the effects of PM$_{2.5}$ on a project specific scale was not arbitrary and capricious."  *Sierra Club*, 30 F. Supp. 2d at 1188.[8]

Even if the Agencies had been required by NEPA to conduct a PM$_{2.5}$ hot-spot analysis, Plaintiffs are wrong that such an analysis must consider the impacts *below* the PM$_{2.5}$ NAAQS set by EPA.  (Pls.' Mot. 27-28 ("The scientific evidence that EPA discussed regarding PM$_{2.5}$ shows health effects occur *below* levels prohibited by the NAAQS.  FHWA/CDOT may not assert NAAQS compliance as an alternative to considering the adverse health impacts that EPA

---

[8] Plaintiffs raised an identical argument three years ago when they challenged the widening of U.S. Highway 95 in northwest Las Vegas.  *See Sierra Club*, 310 F. Supp. 2d at 1188.  The District Court of Nevada rejected Plaintiffs' argument, in part, because Las Vegas, just like the Metro-Denver Area here, had not been designed as a nonattainment area for PM$_{2.5}$.  *See id.*

acknowledges . . .") (emphasis added)).[9]  This argument is nothing more than Plaintiffs' attempt

to relitigate their unsuccessful challenge to the EPA's NAAQS for $PM_{2.5}$.  In *American Trucking*

*Ass'ns v. EPA*, counsel for Plaintiffs argued, as in this case, that studies show that health effects

occur *below* levels prohibited by the NAAQS and that EPA should have adopted lower NAAQS

for $PM_{2.5}$.  283 F.3d 355, 372-74 (2002).  The D.C. Circuit rejected this argument finding

persuasive EPA's explanation regarding the inherent scientific uncertainties in evaluating the

impacts on human health, including the possibility that thresholds below the set $PM_{2.5}$ NAAQS

had little or no effect.  *See id.* at 374.  This Court should similarly reject Plaintiffs' argument,

especially in the context of NEPA, because, as explained above, an agency's reliance on the

NAAQS as a proxy for the effects of air pollution on human health is not arbitrary or capricious.

*See Sierra Club*, 310 F. Supp. at 1202.

 In sum, none of Plaintiffs' challenges to the Agencies' air quality analysis have merit,

and they are far from showing a likelihood of success on them.[10]

 **B. FHWA Complied with FAHA §109(h).**

 Similarly, Plaintiffs have failed to establish a likelihood of success on the merits of their

§109(h) claim.  Without providing any support, Plaintiffs argue that §109(h) creates an

augmented "substantive" standard that requires a separately identified three-step evaluation of air

---

[9] Plaintiffs rely on Dr. Thurston's declaration to support this argument.  (Psl.' Mot. at 14-16.) Plaintiffs, however, did not present the information in Dr. Thurston's declaration to the Agencies during the comment process.  Because the Court's review is limited to the administrative record before the agency, Dr. Thurston's declaration should not be considered in evaluating the merits of Plaintiffs' NEPA claim.  *See Camp*, 411 U.S. at 142.

[10] Because FHWA was not required under NEPA to conduct either a quantitative health impact analysis or a $PM_{2.5}$ hot-spot analysis for the Project, Plaintiffs' related arguments that FHWA acted upon incomplete information and failed to adequately consider mitigation measures and project alternatives also fail.  *See Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV 12-9861-GS(SSx), 2016 WL 4650428, at *61 (C.D. Cal. Feb. 1, 2016).

quality impacts, mitigation measures, and cost-analysis that must be documented in the FEIS and ROD with an explicit, and again separate, decision indicating how the various factors specified in §109(h) were considered in reaching the decision.  (Pls.' Mot. 30.)  They are wrong.

<blockquote>
1.  **Contrary to Plaintiffs' Assertion, No Separate Process is Required to Demonstrate Compliance with §109(h).**
</blockquote>

For more than thirty years, FHWA has made it clear that its §109(h) obligations are to be satisfied through the processes contained in its NEPA regulations.  *See* Environmental Impact & Related Procedures: Public Hearings & Location/Design Approval; Environmental Action Plans, 47 Fed. Reg. 21780 (May 20, 1982).[11]  The current regulations, set forth at 23 C.F.R. Part 771, describe FHWA's process for development and approval of its environmental documents to satisfy its environmental analysis under NEPA, including preparation of an EIS and the ultimate issuance of the ROD, which incorporate the §109(h) factors.  *See* 23 C.F.R. 771.123, 771.125, 771.127, 771.135(a).  Compliance with all such requirements are to be reflected in a single environmental document.  *See id.* § 771.105(a).

As part of its NEPA analysis, FHWA must evaluate alternative courses of action and make decisions "in the *best overall public interest* based upon a balanced consideration of the need for safe and efficient transportation; of the *social, economic, and environmental impacts* of the proposed transportation improvement; and of national, State, and local environmental protection goals."  *Id.* § 771.105(b) (emphasis added).  To fulfill its responsibilities under §109(h), FHWA is also required to incorporate "measures necessary to mitigate adverse

---

[11] The purpose of incorporating the §109(h) requirement into FHWA's NEPA regulations was to "minimize red tape and duplication without essentially changing the procedures for identification, evaluation, consideration, and mitigation of social, economic, and environmental (SEE) effects of highway projects," and to "consolida[te] sources and environmental guidance and regulation."  47 Fed. Reg. 21781.

impacts" of the proposed project. *Id.* §§ 771.105(d), 771.107(b), 771.125(a)(1) ("mitigation measures presented as commitments in the final EIS will be incorporated into the project . . .").

The regulations do not require a separate analytical or decisional process for compliance with §109(h). *See* 23 C.F.R. pt. 771. They establish no standard for consideration of alternatives in the §109(h) process separate from what is required to comply with NEPA. *See id.*; *see also Audubon Naturalist Soc'y of the Cent. Atl. States*, 524 F. Supp. 2d 642, 706 (D. Md. 2007). Thus, FHWA's §109(h) obligations are satisfied through the agency's NEPA analyses. *See, e.g.*, *Jersey Heights Neighborhoods Ass'n*, 174 F.3d at 186; *Sierra Club*, 301 F. Supp. 2d at 1204; *Audubon*, 524 F. Supp. 2d at 706-07; *Virginians for Appropriate Road v. Capka*, No. 7:07CV00587, 2009 WL 2160454, at *6 n.15 (W.D. Va. July 20, 2009).

## 2.    FHWA Met its §109(h) Obligations through its NEPA Process.

Plaintiffs argue that FHWA failed to meet §109 obligations because the ROD was not in the best overall public interest. (Pls.' Mot. 30-31.) They are wrong. As several courts have held, "the ROD *itself* constitutes the determination that the [Project] is in the 'best overall public interest.'" *Audubon*, 524 F. Supp. 2d at 706-07 (emphasis added); *Virginians for Appropriate Road*, 2009 WL 2160454, at *6 n.15 (same); *Jersey Heights Neighborhoods Ass'n*, 174 F.3d at 186 (same).[12] "[R]ecitation of the 'magic words' [are] not required to comply with the statute and make the public interest determination." *Audubon*, 524 F. Supp. 2d at 707.

Here, FHWA's ROD and its numerous supporting documents demonstrate that FHWA has complied fully with both NEPA and §109(h) requirements by analyzing the adverse impacts from the Project's air pollutants. *See* Section I.A, *supra*; *see also* ROD 4-5 (certification of

---

[12] FHWA's ROD certified that the Project "is in the best overall public interest, uses all practical means to restore and enhance the quality of the human environment, and avoids or minimizes any possible adverse effects." (ROD i.)

compliance with § 109(h) requirements); ROD 2-22, 94-48, & Attach. A (summary of alternatives considered); ROD 25-27, (summary of measures to minimize environmental impacts); ROD 3, 37-38 (consideration of efficient transportation and safety concerns); ROD 37-41, 99-107 (consideration of project impacts); ROD 43-66 & Ex. 14 (mitigation measures); ROD 67, 108-17, 158-161, Attachs. B & C, and Ex. 15-16 (consideration of adverse impacts from carbon monoxide and $PM_{10}$ and agency consultation regarding these impacts); ROD Ex. 15 (carbon monoxide hot-spot analysis); ROD Ex. 16 ($PM_{10}$ hot-spot analysis results); ROD Attach. F (comments on air quality documents); FEIS Attach. J (Air Quality Technical Report).

Nevertheless, Plaintiffs identify three alleged deficiencies with FHWA's § 109(h) analysis: (1) failure to consider the potential adverse health effects of $PM_{2.5}$; (2) failure to consider the health consequences of $PM_{10}$ exposure *below* the NAAQS; and (3) failure to consider the mitigation needed to eliminate the adverse impacts on health and consider the costs of eliminating or minimizing the adverse effects of air pollution.  Each is without merit.

$PM_{2.5}$ Hot-Spot Analysis.  Contrary to Plaintiffs' assertion, none of the §109(h) considerations require FHWA to conduct a $PM_{2.5}$ analysis.  As explained in Section A.2.b above, FHWA is entitled to rely on the NAAQS for its NEPA analysis, which incorporates the §109(h) requirements.  *See Barnes v. FAA*, 865 F.3d at 1273.  Thus, because the Denver-Metro Area is designated as a $PM_{2.5}$ attainment area, FHWA was not required to conduct a $PM_{2.5}$ hot-spot analysis.  (ROD 114)*; see also Sierra Club*, 873 F.3d at 950.  The Court should reject Plaintiffs' invitation to read this substantive requirement into §109(h) where none exists.

$PM_{10}$ exposure *below* the NAAQS.  As explained in Section A.1 above, FHWA performed the required $PM_{10}$ hot-spot analysis.  (ROD 113-14, 157-161.)  FHWA's $PM_{10}$ analysis determined that the Project will meet the EPA required NAAQS for $PM_{10}$.  (ROD 160.)

Notably, Plaintiffs do not challenge this determination, at least not in this motion.  What they complain of is that FHWA did not go one step further—namely, it did not analyze the adverse effects of PM$_{10}$ *below* the NAAQS.  (Pls.' Mot. 31.)  Plaintiffs' argument has no merit because agencies are entitled to rely on EPA on the factual question of what level of air pollution is sufficiently protective where EPA has established NAAQS for that pollutant.  *See Barnes*, 865 F.3d at 1273.  The NEPA regulations, which incorporate the §109(h) considerations, require no more.  *See Audubon*, 524 F. Supp. 2d at 708; *see also Border Power Plant Working Grp.*, 260 F. Supp. 2d at 1020 (S.D. Cal. 2003) ("The Court will not require that the agencies analyze the air impact on public health in a particular way, but rather will only ensure that the agencies' analysis is well-reasoned.").  Indeed, the regulations direct the agencies to incorporate the "view of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards."  42 U.S.C.S. § 4332(c).  The Agencies therefore did not act arbitrarily and capriciously by conducting their analysis in accordance with the prevailing NAAQS for PM$_{10}$.  *See Sierra Club*, 310 F. Supp. 2d at 1202.

Mitigation Measures and Cost-Analysis of Mitigation Measures.  Contrary to Plaintiffs' assertion (Pls.' Mot. 30-31), the NEPA/§109(h) regulations do not require that any specific actions be taken to mitigate environmental impacts (*see Robertson,* 490 U.S. at 353), nor do they support Plaintiffs' contention that FHWA has a "substantive" requirement under § 109(h) to undertake any particular cost-benefit analysis to eliminate or minimize the adverse impacts of air pollution.  *See Sierra Club*, 310 F. Supp. 2d at 1204.  The regulations require only that "measures necessary to mitigate adverse impacts be incorporated" into the project.  23 CFR 771.105(d); *see also Sierra Club*, 310 F. Supp. 2d at 1204 ("NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA

requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated.") (citation and quotation omitted)).

Here, the ROD considered mitigation measures to protect air quality, committed to the mitigation identified in the FEIS, and instituted a monitoring program to ensure that mitigation is carried out as suggested in the NEPA regulations at 40 C.F.R. 1505.3 and as stipulated in its own regulations at 23 C.F.R. 771.109(b).  (ROD 25-27, 43-66, 99-104, & Ex. 14; FEIS Chap. 9.) Among the mitigation measures is CDOT's commitment to install new windows, doors, and an HVAC system at Swansea Elementary School, and to install interior storm windows, furnace filters, and two portable or window-mounted air conditioners with air filtration in nearby homes. (ROD 26-27, 101.)  FHWA will require CDOT, as part of this approval, to implement these mitigation measures.  (ROD 43, 100.)  Indeed, Federal funding for the project is conditioned on the implementation of these features.  The ROD makes the commitments about implementing and monitoring the proposed measure legally binding.  (ROD 43.)  This mitigation analysis fulfills FHWA's obligations under NEPA and §109(h).

Because Plaintiffs are not likely to succeed on the merits, the Court need not evaluate the remaining *Winter* factors and should deny Plaintiffs' motion on this basis alone.  *See Winter*, 555 U.S. at 32; *see also Horton v. City of St. Augustine*, 272 F.3d 1318, 1326 (11th Cir. 2001) (reversing the grant of a preliminary injunction after deciding that the movant was not likely to succeed on the merits).

## II.     Plaintiffs Fail to Demonstrate Irreparable Harm.

Plaintiffs advance two theories to support their irreparable harm claim if the Project proceeds: (1) they and their families will suffer adverse health effects from exposure to additional concentrations of harmful pollutants during construction of the Project; and (2) CDOT

will irretrievably commit limited resources needed for any meaningful consideration of alternations.  (Pls.' Mot. 13.)  Neither has merit.  Plaintiffs therefore are not entitled to any preliminary injunctive relief.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (holding that, before a court may grant a permanent injunction, "[a] plaintiff must demonstrate . . . that it has suffered an irreparable injury").

### A. Plaintiffs' Speculative Harm from the Project's Air Pollutants are Insufficient to Demonstrate Immediate, Irreparable Injury.

Plaintiffs have failed to demonstrate irreparable harm from exposure to additional concentrations of harmful pollutants during construction of the Project that can justify a stay or preliminary injunction.  *See Winter*, 555 U.S. at 20; *Monsanto*, 561 U.S. at 157-58.  The Tenth Circuit has made it clear that to constitute irreparable injury, "an injury must be certain, great, actual and not theoretical."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation and internal quotation omitted).  "[T]he party seeking injunctive relief must [also] show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Id.*  (quotation omitted).

Contrary to Plaintiffs' assertion (Pls.' Mot. 33-34, citing *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002)), the Supreme Court has rejected a presumption of irreparable injury in environmental cases.  *See Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545-46 (1987); *see also Winter*, 555 U.S. at 21 (making it clear that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in the

original)).[13]  The gravity of the environmental harm is instead incorporated into the hardship balancing test, and thus no presumption of harm is necessary.  *Id*. at 545.

Even if a presumption of injury were allowed by the Supreme Court, such presumption does not relieve Plaintiffs of their burden of producing clear and unequivocal evidence of their alleged harm.  *See Davis*, 302 F.3d at 1115 ("Plaintiffs must still make a specific showing that the [presumed] environmental harm results in irreparable injury to their specific environmental interests.").  Plaintiffs fail to do so here.  They have produced no "clear and unequivocal" evidence to show that any presumptive injury from the Project is real or immediate.  A review of Plaintiffs' declarations fails to show a single allegation sufficient to establish an injury that is "certain, great, actual and not theoretical" to Plaintiffs' interests.[14]  *Heideman*, 348 F.3d at 1189.

---

[13] *See also San Luis Valley Ecosystem Council v. U.S. & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009) (declining to rely on the *Davis v. Mineta* presumption); *Sierra Club v. U.S. Forest Serv.*, 593 F. Supp. 2d 1306 (N.D. Ga. 2008) (same).

[14] *See, e.g.*, Decl. of Chrystal Roybal ¶¶ 6-7, 10, 15, 21 (ECF No. 88-3) (expressing concern about dust increasing during construction, forcing her family to be "stuck" inside the house and worsening the health of her family members with several illness); Decl. of Brenda Lovato ¶¶ 4, 15 (ECF No. 88-4) (expressing concern about the "toxic nature of the soil that will be dug up during construction . . . and the dust from construction"); Decl. of Mary Hernandez ¶¶ 10, 30 (ECF No. 88-5) (noting that she expects "fewer children, if any at all, will attend art class during the I-70 construction because of the disruption" and expressing concern about construction negatively affecting her family's health and well-being); Decl. of Joseph Elliot ¶¶ 15-16 (ECF No. 88-6) (expressing concern that the I-70 construction will "significantly and permanently harm the structural integrity of [his] home's foundation," and that he will be unable to open his windows or continue his daily activities due to the "dust and harmful air pollutants caused by the construction work"); Decl. of Yadira Sanchez ¶¶ 15-16 (ECF No. 88-7) (noting that her children, who have asthma, will avoid going outside the house and be forced to find new housing when construction begins); Decl. of Drew Dutcher ¶ 20 (ECF No. 88-8) (expressing concern about the health risks resulting from the dust created during excavation); Decl. of Alfonso Espino ¶ 21 (ECF No. 88-9) (expressing concern that he and his siblings would be subjected to toxic dust and particulate matter from emissions that will harm their health); Decl. of Bettie Cram ¶¶ 11, 20 (ECF No. 88-10) (noting that she expects to be exposed to both increased particulate matter from construction activities and toxic heavy metals); Decl. of Armando Payan ¶ 3 (ECF No. 88-11) (expressing concern that his health will suffer as a result of the increases in the emissions of particular matter during construction).

Plaintiffs' declarations allege harm only from construction and operation of the I-70, which will take about four years to construct. While these general statements may suffice to establish standing, they do not meet the higher bar to prove the immediate, irreparable harm for purposes of obtaining emergency injunctive relief. *See Ctr. For Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it.").

Likewise, none of the allegations show how construction of the Project creates an immediate, irreparable injury. No construction activities are *imminent*, nor will they be until summer 2018, which is around the same that the parties are scheduled to conclude briefing on the merits. *See* Decl. of Tony DeVito ¶ 4, Ex. 9 to CDOT's Opp.; *see also* ECF No. 68 (ordering completion of the parties' briefing on the merits by July 2, 2018)). "Future injury or conjectural hypothetical injury months from now cannot form the basis of an injunction at this stage." *W. Watersheds Project v. Bureau of Land Mgmt.*, No. 3:11-cv-00053-HDM-VPC, 2011 WL 1630789 at *6 (D. Nev. Apr. 28, 2011); *see City of L.A. v. Lyons*, 461 U.S. 95, 102-103 (1983) ("Abstract injury is not enough . . . the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (internal quotations omitted)). None of the declarations allege that Plaintiffs will suffer health problems *prior* to the construction phase. Their allegations focus only on the harm they will allegedly suffer once construction begins or when the Project is completed. Plaintiffs therefore have failed to demonstrate the immediate, irreparable injury necessary to warrant an injunction at this stage of the litigation.[15]

---

[15] Plaintiffs' alleged harm from the exposure of construction dust is also undermined by the fact that no matter what alternative, including the No-Action Alternative, demolition of the aging and structurally-deficient viaduct is necessary for the safe operation of I-70. (ROD 10.)

**B.    Plaintiffs' Alleged Harm from the "Irretrievable Commitment" of CDOT's "Limited Resources" is Insufficient to Demonstrate Irreparable Injury.**

Plaintiffs' alleged harm from the "irretrievably commitment" of CDOT's "limited resources" does not fare any better.  (Pls.' Mot. 22.)  Plaintiffs contend that they will be irreparably harmed when FHWA and CDOT execute the Project Agreement because "the Project [then] can be put to bid, contracts signed, and construction commenced," making CDOT's resources unavailable for "Project alternatives and/or mitigation . . . if this Court later determines that the ROD was issued improperly before full consideration of alternatives to reduce harmful effects."  (Pls.' Mot. 22-24.)  Plaintiffs' understanding of NEPA's "irreversible and irretrievable commitment of sources" regulation is misplaced.  Contrary to Plaintiffs' suggestion, nothing in this regulation prohibits CDOT, a non-federal entity, from spending its "finite resources for transportation projects" or any other projects.  (Pls.' Mot. 23.)  Rather, NEPA's §1506.1 prohibits a *federal* agency from taking any action that "limit[s its] choice of reasonable alternatives" identified in the decision-making process, *before* issuing its final decision.  40 C.F.R. § 1506.1(a)(2); *see also Wildwest Inst. v. Bull*, 547 F.3d 1162, 1168 (9th Cir. 2008).[16] Such prohibition extends to "commit[ting] resources," which would prejudice the federal agency's selection of project alternatives *before* the agency has completed the environmental analysis.  40 C.F.R. § 1502.2(f); *see also Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).  Cases construing this regulation have focused on the commitment of *natural* resources, not necessarily the agency's *financial* resources.[17]

---

[16] The Tenth Circuit's standard of proof for predetermination that an agency has made "an irreversible and irretrievable commitment of resources" is similar to that of the Ninth Circuit. *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 715 (10th Cir. 2010).

[17] *See, e.g.*, *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1063-64 (9th Cir. 1998) (involving logging); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1998) (involving the sale of oil

While a financial commitment can, in some instances, constitute an irreversible and irretrievable commitment, such injunctions have been granted only in cases where the agencies have yet to finalize the environmental analysis.  Plaintiffs' own cases support this argument (Pls.' Mot. 23).  *See, e.g.*, *Stop H-3 Ass'n v. Volpe*, 53 F .Supp. 14, 16-17 (D. Haw. 1972) (enjoining the agencies from expending approximately $2.5 million for design and engineering *before* FHWA's approval of the FEIS); *Arlington Coal. on Transp. v. Volpe*, 458 F.2d 1323, 1330, 1339 (4th Cir. 1972) (enjoining the agencies from authorizing further expenditures or constructing the highway because the agencies had failed to conduct *any* NEPA analysis).  That is not the case here.  As explained above, the Agencies already conducted a comprehensive NEPA analysis for more than ten years that culminated in the issuance of the ROD in January 2017.  Thus, nothing in the regulation nor in Plaintiffs' cases support their contention that entering into a full funding grant agreement nor signing a design/build contract *after* a final decision (here, the ROD) has been issued would cause irreparable harm to Plaintiffs.[18]

In any event, courts have declined to enjoin bids or ongoing contracts while a project is being challenged under NEPA.  *See, e.g.*, *New York Nat'l Res. Def. Council, Inc. v. Kleppe*, 429 U.S. 1307 (1976) (upholding Court of Appeal's decision that opening bids do not constitute an "irreversible commitment of resources" and recognizing that even after the bids are accepted, the Court of Appeals has the "power to declare the [contracts] invalid if the court determined that the

---

and gas leases); *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 592 F. Supp. 931 (D.Or. 1984) (involving timber sales).

[18] The other cases cited by Plaintiffs, in which the courts enjoined projects that were "substantially" or "nearly complete," are equally inapposite.  *See Sierra Club v. Babbit*, 59 F. Supp. 2d 1202, 1262 (E.D. Cal. 1999); *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989). Construction of Central 70 is not scheduled to begin until summer 2018 and will take four years to complete.  Thus, Plaintiffs' argument that "irreparable injury will result if construction is substantially completed during these proceedings" (Pls.' Mot. 24) is entirely meritless.

Government entered into [contracts] without compliance with the requirements of NEPA");

*Forelaws on Bd. v. Johnson*, 743 F.2d 677, 680-84 (9th Cir. 1984).  In *Johnson*, the Ninth Circuit

found that those "contracts . . . [we]re agreements with the flexibility to accommodate the

ongoing, changing relationship among [the agency], its customers, and the public interest."  *Id.*

So too here.  Like any construction contract, the Agencies could issue a change order if Plaintiffs

prevail on the merits.  This is particularly true here where FHWA retains full authority over the

Project.  *See Friends of Southeast's Future*, 153 F.3d at 1063 (finding no irreversible

commitment of resources where the government retained absolute authority to decide whether

any logging activities would take place).  FHWA will not reimburse the State for the

governments' proportionate share of the project's cost unless the Project has been completed "in

accordance with the plans and specifications."  23 U.S.C. § 121(b).

## III.     The Balance of Harms and Public Interest Do Not Favor a Preliminary Injunction.

Plaintiffs' fears from the Project's impacts on human health below the NAAQS are

insufficient to tip the balance of equities in their favor and are outweighed by the actual safety

risk that the hundreds of thousands of people who use I-70 every day face due to roadway

conditions that do not meet current design standards.  (FEIS 2-10.)  This safety risk is real.  From

2009 and 2012, there were 2,872 crashes and seven fatalities on I-70 within the Project area.

(*Id.*)  I-70 has more crashes than the state average for urban freeways.  (*Id.*)  Unlike Plaintiffs'

speculative injuries, the heightened risk of accidents, injury, and death from driving on a

deficient I-70 is real and concrete, and strongly weighs in favor of allowing the Project to

proceed.  *See Valley Cmty. Preservation Comm'n v. Mineta*, 373 F.3d 1078, 1087 (10th Cir.

2004) (recognizing that the "well-important public interest in safety on the roads and highways"

weighs in favor of completing projects that alleviate safety risks).

26

Removing the aging viaduct between Brighton Boulevard and Colorado Boulevard is also necessary to maintain safe operation of the I-70.  (ROD 10; FEIS 3-11.)  The two-mile long viaduct built in 1964 has already exceeded its expected 30-year lifespan by over 20 years and is classified as structurally deficient.  (FEIS 2-5.)  The viaduct is literally crumbling, with large pieces of concrete falling from the structure onto 46th Avenue.  (*Id.*)  While recent rehabilitations have extended its lifespan, any replacement project (whether a new viaduct or the proposed lowered Project) will take years to construct.  (*Id.*)  A preliminary injunction would shrink the limited time to replace this decaying bridge and further endangered the drivers and passengers of the 200,000 vehicles that on or below it every day.  (*Id.* at 2-8.)

These clear and present dangers to Denver residents heavily outweigh Plaintiffs' concerns about the additional air pollution from the Project during construction.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").  The balance of equities and the public interest overwhelmingly favor denying Plaintiffs' motion and letting the Project proceed.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction and permit the Project to move forward.

Respectfully submitted this 6th day of December, 2017.

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

*/s/ Mayte Santacruz*
Mayte Santacruz
Carter F. Thurman

United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Washington, D.C. 20004
(202) 305-0465 (Santacruz)
(202) 305-0444 (Thurman)
mayte.santacruz@usdoj.gov
carter.thurman@usdoj.gov

David A. Carson
United States Department of Justice
Environmental Natural Resources Division
Environmental Defense Section
999 18th Street
Denver, CO 80202
(303) 844-1349
david.carson@usdoj.gov

*Attorneys for Federal Highway Administration*

<u>Of Counsel:</u>
Brent Allen
Federal Highway Administration
Office of the Chief Counsel
Lakewood, Colorado
(720) 963-3692
brent.allen@dot.gov

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that Federal Defendants' Opposition to Sierra Club Plaintiffs' Motion for Stay complies with the word limit imposed by the Court.  (ECF No. 73.)  Excluding the portions of the brief described in Fed. R. App. P. 32(f), the brief contains 8,897 words.

<u>/s/ Mayte Santacruz</u>
MAYTE SANTACRUZ

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of December, 2017, I electronically filed Federal

Defendants' Opposition to Sierra Club Plaintiffs' Motion for Stay with the Clerk of the United

States District Court for the District of Colorado using the CM/ECF System, which will send

notification of such filing to the attorneys of record in these consolidated cases.


<u>/s/ Mayte Santacruz</u>
MAYTE SANTACRUZ