**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Actions No.       17-cv-01661-WJM-MEH
*Consolidated with*     17-cv-01679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; and JANET FEDER,

     *and*

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION;
CHAFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO
FORUM,

     Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CATER, in his official capacity as Division
Administrator,

     Defendants,

     *and*

COLORADO DEPARTMENT OF TRANSPORTATION, and
SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado
Department of Transportation,

     Defendant-Intervenors.

––––––––––––––––––––––

**DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO**
**SIERRA CLUB'S MOTION FOR STAY**

––––––––––––––––––––––

BRENT E. BUTZIN
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6638
brent.butzin@coag.gov

JOHN E. PUTNAM
NICHOLAS A. DIMASCIO
KAPLAN KIRSCH & ROCKWELL LLP
1675 Broadway, Suite 2300
Denver, CO  80202
(303) 825-7000
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Glossary ..................................................................................................................... viii

Index of Attachments .................................................................................................. ix

Introduction .................................................................................................................. 1

Legal Background ........................................................................................................ 2

        A.    NEPA ....................................................................................................... 2

        B.    Clean Air Act .......................................................................................... 3

Factual Background ...................................................................................................... 4

Standard of Review ...................................................................................................... 9

Argument .................................................................................................................... 10

    I.    Sierra Club cannot succeed on the merits. ........................................... 10

        A.    The Agencies took a hard look at the effects of the Project on air quality and public health. ....................................................... 11

        B.    FHWA properly determined that the Project is in the best overall public interest under the Federal-Aid Highway Act. ............................... 24

    II.    Sierra Club has not shown irreparable harm from the Central 70 Project. ........... 25

    III.    The balance of equities and public interest favor allowing the Project to proceed. ................................................................................................. 30

        A.    The balance of equities tips sharply in the Agencies' favor. ................... 30

        B.    Denial of the requested injunction would serve the public interest. ......... 32

        C.    The harms an injunction would inflict on the Project and public outweigh the Sierra Club's speculative environmental harms.................. 34

Conclusion ................................................................................................................. 36

# TABLE OF AUTHORITIES

## CASES

*Am Lung Ass'n v. EPA,*
    134 F.3d 388 (D.C. Cir. 1998) ..................................................................... 3, 12

*Ass'ns Working for Aurora's Residential Env't v. Colo. DOT,*
    153 F.3d 1122 (10th Cir. 1998) ....................................................................... 21

*Audubon Naturalist Soc'y v. U.S. DOT,*
    524 F. Supp. 2d 642 (D. Md. 2007) ........................................................... 14, 24

*Baltimore Gas & Elec. v. NRDC,*
    462 U.S. 87 (1983)............................................................................................. 2

*Barnes v. FAA,*
    865 F.3d 1266 (9th Cir. 2017) .................................................................. 12, 18

*Biodiversity Conserv. All. v. U.S. Forest Serv.,*
    765 F.3d 1264 (10th Cir. 2014) ....................................................................... 11

*Border Power Plant Working Group v. Dep't of Energy,*
    260 F. Supp. 2d 997 (S.D. Cal. 2003)............................................................. 12

*Citizens for Alt. to Radioactive Dumping v. U.S. Dep't of Energy,*
    485 F.3d 1091 (10th Cir. 2007) ....................................................................... 17

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.,*
    297 F.3d 1012 (10th Cir. 2002) ....................................................................... 21

*City of S. Pasadena v. Slater,*
    56 F. Supp. 2d 1106 (C.D. Cal. 1999) ............................................................ 16

*Coal. for Reg'l Transp. v. FHA,*
    576 F. App'x 477 (6th Cir. 2014) .................................................................... 15

*Coal. for Reg'l Transp. v. FHWA,*
    959 F. Supp. 2d 982 (W.D. Ky. 2013).............................................................. 13

*Coal. on Sensible Transp. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987)........................................................................... 19

*Colo. Rail Passenger Ass'n v. Fed. Transit Admin.,*
    843 F. Supp. 2d 1150 (D. Colo. 2011)................................................... 10, 21, 23

*Concerned Citizens v. U.S. Forest Serv.*,
No. CV-16-03115, 2017 U.S. Dist. LEXIS 144029 (D. Ariz. Sep. 6, 2017).................... 15

*Dominion Video Satellite v. EchoStar Satellite*,
356 F.3d 1256 (10th Cir. 2004) ....................................................................................... 9

*Durning v. Citibank*,
950 F.2d 1419 (9th Cir. 1991) ....................................................................................... 13

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ......................................................................................... 34

*Ecology Ctr. v. Castaneda*,
574 F.3d 652 (9th Cir. 2009) ......................................................................................... 19

*Forest Guardians v. U.S. Forest Serv.*,
495 F.3d 1162 (10th Cir. 2007) ................................................................................. 3, 17

*Friends of the Bow v. Thompson*,
124 F.3d 1210 (10th Cir. 1997). .................................................................................... 10

*Greater Yellowstone Coal. v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) ..................................................................................... 25

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ..................................................................................... 25

*Highway J Citizens Grp. v. U.S. DOT*,
656 F. Supp. 2d 868 (E.D. Wis. 2009)........................................................................... 24

*Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ..................................................................................... 12

*Keith v. Cal. Highway Com.*,
506 F.2d 696 (9th Cir. 1974) ......................................................................................... 16

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ................................................................................... 14, 34

*Lathan v. Volpe*,
350 F. Supp. 262 (W.D. Wash. 1972)............................................................................ 16

*Lee v. U.S. Air Force*,
354 F.3d 1229 (10th Cir. 2004) ..................................................................................... 17

*M.D. Mark v. Kerr-McGee,*
    565 F.3d 753 (10th Cir. 2009) ....................................................................... 10

*Maiden Creek Assocs. v. U.S. DOT,*
    823 F.3d 184 (3d Cir. 2016)........................................................................... 14

*Metro. Edison v. People Against Nuclear Energy,*
    460 U.S. 766 (1983)....................................................................................... 14

*Monsanto v. Geertson Seed Farms,*
    561 U.S. 139 (2010)....................................................................................... 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983)......................................................................................... 10

*N.M. Dep't of Game & Fish v. U.S. Dep't of Interior,*
    854 F.3d 1236 (10th Cir. 2017) ................................................................. 9, 25

*Nat'l Assoc. of Manufacturers v. EPA,*
    750 F.3d 921 (D.C. Cir 2014) ....................................................................... 18

*Nat'l Parks & Conserv. Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001) ........................................................................ 17

*NRDC v. Vilsack,*
    No. 08-cv-02371, 2011 U.S. Dist. LEXIS 87120 (D. Colo. Aug. 5, 2011)...................... 14

*Or. Nat. Res. Council Fund v. Goodman,*
    505 F.3d 884 (9th Cir. 2007) ........................................................................ 14

*P.R. Conservation Found. v. Larson,*
    797 F. Supp. 1066 (D.P.R. 1992)................................................................... 35

*Petrella v. Brownback,*
    787 F.3d 1242 (10th Cir. 2015) .................................................................... 25

*Pit River Tribe v. U.S. Forest Serv.,*
    615 F.3d 1069 (9th Cir. 2010) ...................................................................... 27

*Prairie Band Pottawatomie Nation v. FHA,*
    684 F.3d 1002 (10th Cir. 2012) .................................................................... 21

*Pub. Citizen v. DOT,*
    316 F.3d 1002 (9th Cir. 2003) ...................................................................... 16

*Pub. Citizen v. DOT*,
    541 U.S. 752 (2004) ................................................................................ 16, 17

*Rags Over the Ark. River v. Bureau of Land Mgmt.*,
    77 F. Supp. 3d 1038 (D. Colo. 2015) ......................................................... 3, 19

*San Juan Citizens All. v. Stiles*,
    654 F.3d 1038 (10th Cir. 2011) ...................................................................... 22

*San Juan Citizens All. v. Stiles*,
    No. 08-cv-00144-RPM, 2010 U.S. Dist. LEXIS 43119 (D. Colo. May 3, 2010) ............. 15

*Sierra Club v. EPA*,
    873 F.3d 946 (D.C. Cir. 2017) ..................................................................... 4, 7

*Sierra Club v. Federal Highway Administration*,
    715 F. Supp. 2d 721 (S.D. Tex. 2010) .............................................................. 13

*Sierra Club v. United States Department of Transportation*,
    310 F. Supp. 2d 1168 (D. Nev. 2004) ........................................................... 13, 24

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    433 F.3d 772 (10th Cir. 2006) ....................................................................... 12

*Tinicum Twp. v. U.S. DOT*,
    685 F.3d 288 (3d Cir. 2012) ...................................................................... 15, 19

*TOMAC v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ....................................................................... 18

*United States v. Fisher*,
    805 F.3d 982 (10th Cir. 2015) ........................................................... 10, 20, 22, 23

*Utahns v. U.S. DOT*,
    305 F.3d 1152 (10th Cir. 2002) ........................................................................ 3

*Valley Cmty. Pres. Comm. v. Mineta*,
    373 F.3d 1078 (10th Cir. 2004) .................................................................. 32, 33

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ................................................................................... 17

*W. Watersheds Project v. Salazar*,
    692 F.3d 921 (9th Cir. 2012) ......................................................................... 34

*WildEarth Guardians v. BLM*,
    8 F. Supp. 3d 17 (D.D.C. 2014) .................................................................. 17

*Wildearth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) .......................................................... 7, 12, 19

*WildEarth Guardians v. Nat'l Park Serv.*,
    703 F.3d 1178 (10th Cir. 2013) ................................................................ 21

*WildEarth Guardians v. Salazar*,
    880 F. Supp. 2d 77 (D.D.C. 2012) ...................................................... 17, 19

*WildEarth Guardians v. U.S. BLM*,
    870 F.3d 1222 (10th Cir. 2017) ................................................................ 14

*WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enf't*,
    104 F. Supp. 3d 1208 (D. Colo. 2015),................................................... 13

*Wilderness Workshop v. Bureau of Land Mgmt.*,
    531 F.3d 1220 (10th Cir. 2008) ................................................................ 34

*Winter v. NRDC*,
    555 U.S. 7 (2008).................................................... 9, 25, 29, 30, 34

*Wyoming v. USDA*,
    661 F.3d 1209 (10th Cir. 2011) ................................................................ 22

**STATUTES**

Administrative Procedure Act ("APA")

    5 U.S.C. § 705........................................................................................... 9

    5 U.S.C. § 706(2)(A)................................................................................. 9

Federal-Aid Highway Act

    23 U.S.C. § 109(h) ................................................................................. 24

National Environmental Policy Act ("NEPA")

    42 U.S.C. § 4332(C) ................................................................................. 2

Clean Air Act ("CAA")

    42 U.S.C. § 7407(d)(1)(A)(i)-(ii), (3)(E) ............................................... 4

42 U.S.C. § 7409(b)(1) .................................................................................. 1, 3, 12, 18

42 U.S.C. § 7410................................................................................................ 4

42 U.S.C. § 7506(c)(1)(B) ................................................................................ 4

42 U.S.C. § 7607(b) ......................................................................................... 18

State Statutes

    Colo. Rev. Stat. § 43-2-102 ........................................................................ 30

    Colo. Rev. Stat. § 43-4-802 .................................................................... 30, 33

    Colo. Rev. Stat. § 43-4-805 ........................................................................ 33

## RULES AND REGULATIONS

23 C.F.R. § 1.36................................................................................................ 29

23 C.F.R. § 630.112.......................................................................................... 29

23 C.F.R. § 771.101 .......................................................................................... 24

23 C.F.R. § 771.105(b) ..................................................................................... 24

40 C.F.R. § 93.116(a)......................................................................................... 4

43 C.F.R. § 93.125(c)(5).................................................................................. 28

5 C.C.R. 1001-3 § III.D.1 ................................................................................ 26

## FEDERAL REGISTER NOTICES

National Ambient Air Quality Standards for Particulate Matter,
    78 Fed. Reg. 3086 (Jan. 15, 2013) ........................................... 3, 4, 12, 14, 18, 25

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| APCD | Colorado Department of Public Health & Environment, Air Pollution Control Division |
| CAA | Clean Air Act |
| CDOT | Colorado Department of Transportation |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| KMP | Kiewit Meridiam Partners |
| MSATs | Mobile Source Air Toxics |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |

# INDEX OF ATTACHMENTS

| Ex. 1 | ROD Attachment C1 | Revised Elimination of I-270/I-76 Reroute Alternative Technical Memorandum |
|---|---|---|
| Ex. 2 | ROD Attachment C6 | Air Quality NEPA Comparison Technical Report Addendum |
| Ex. 3 | ROD Attachment C7 | Air Quality Conformity Technical Report Addendum |
| Ex. 4 | FEIS | Chapters 5.8 (Visual Resources), 5.10 (Air Quality), 5.20 (Human Health Conditions) |
| Ex. 5 | FEIS Attachment J | Air Quality Technical Report |
| Ex. 6 | FEIS Attachment Q | SDEIS Comments and Responses |
| Ex. 7 | SDEIS | Chapter 1 (Introduction) |
| Ex. 8 | SDEIS Attachment C | Alternative Analysis Technical Report |
| Ex. 9 | Second DeVito Declaration | |

## INTRODUCTION

The Colorado Department of Transportation ("CDOT"), with approval of the Federal Highway Administration ("FHWA"; collectively, the "Agencies"), plans to construct the Central 70 Project (the "Project") to relieve congestion and improve safety along a deteriorating section of I-70.  The Agencies conducted a Clean Air Act ("CAA") conformity analysis and concluded that Project emissions will not cause or contribute to any violation of the health-based National Ambient Air Quality Standards ("NAAQS").  Sierra Club's preliminary injunction motion does not challenge that conclusion or otherwise assert any CAA claims.

Instead, Sierra Club contends that the National Environmental Policy Act ("NEPA") imposes an additional duty to use "modeling tools" to "quantify" the potential health impacts of emissions *below* the levels permitted by the NAAQS.  (ECF_88_Mot. 29-32.)[1]  Under NEPA, however, courts must defer to an agency's reasonable choice of scientific methodologies.  Because the Environmental Protection Agency ("EPA") sets the NAAQS with an "adequate margin of safety" to "protect the public health," 42 U.S.C. § 7409(b)(1), courts have uniformly held that, within the NEPA process, agencies may rely on the NAAQS to gauge the potential health impacts of a project's emissions.

Here, not only did the Agencies follow the process for ensuring NAAQS compliance, the Agencies reviewed the health effects of *all* relevant air pollutants (including those for which there are no NAAQS and no conformity determination is required) and found the Project's contribution of those pollutants to be minimal compared with the no-action alternative.  Despite

---

[1] Citations refer to the ECF number in 17-cv-1661, the document name, and then the ECF header page number.  For exhibits to this brief, citations refer to the exhibit number, the document name, and then the document's pagination.

that conclusion, the Agencies adopted unprecedented mitigation, including constructing a four-acre cover over the highway and investing millions of dollars into the local elementary school and nearby homes, to minimize potential health consequences.  The Agencies therefore exceeded NEPA's hard-look standard, which does not dictate particular environmental results, but rather requires a good faith, objective evaluation of the issues.

Sierra Club also has not shown a likelihood of irreparable harm or that the balance of the equities or public interest favors an injunction.  CDOT's mitigation commitments will ensure that air quality in nearby neighborhoods remains healthy during construction and beyond.  Sierra Club's speculation that CDOT or its contractors will not implement those measures is insufficient to warrant preliminary relief.  Enjoining the Project would only jeopardize its many transportation, safety, and community benefits, as well as increase the cost to Colorado drivers. Because Sierra Club has met none of the factors for preliminary relief, this Court must deny the motion.

## LEGAL BACKGROUND

### A. NEPA

Under NEPA, federal agencies must prepare an environmental impact statement ("EIS") before taking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  NEPA ensures that agencies "consider every significant aspect of the environmental impact of a proposed action," and "inform the public that it has indeed considered environmental concerns in its decision-making process."  *Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 97, 107 (1983).  Because, "[a]t its heart, NEPA is a 'procedural' statute, not an 'environmental' statute," mere disagreement with a project on environmental

grounds is "not sufficient to warrant reversal." *Rags Over the Ark. River v. Bureau of Land Mgmt.*, 77 F. Supp. 3d 1038, 1052-53 (D. Colo. 2015).

NEPA requires that agencies take a "hard look" at the environmental impacts of their actions. *Utahns v. U.S. DOT*, 305 F.3d 1152, 1163 (10th Cir. 2002). In reviewing an EIS, courts apply a "rule of reason standard (essentially an abuse of discretion standard)." *Id.* The court's role is to determine whether "there is a reasonable, good faith, objective presentation of the topics," such that it "foster[s] both informed decision-making and informed public participation." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007).

### B.    Clean Air Act

EPA has set NAAQS for six "criteria" air pollutants, including $PM_{2.5}$ and $PM_{10}$ (particulate matter 2.5 or 10 micrometers or less in diameter, respectively). The CAA defines the "primary" NAAQS as "ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and *allowing an adequate margin of safety*, are requisite to *protect the public health*." 42 U.S.C. § 7409(b)(1) (emphasis added). Thus, EPA sets the NAAQS "not only to prevent pollution levels that have been demonstrated to be harmful but also to prevent lower pollutant levels that may pose an unacceptable risk of harm, even if the risk is not precisely identified as to nature or degree." 78 Fed. Reg. 3086, 3090 (Jan. 15, 2013). EPA also sets the NAAQS to protect "not only average healthy individuals, but also 'sensitive citizens'—children, for example, or people with asthma, emphysema, or other conditions rendering them particularly vulnerable to air pollution." *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998); *see also* 78 Fed. Reg. at 3090 n.1, 3127, 3155. When EPA last set the particulate-matter NAAQS, it expressly found that the "available evidence interpreted in

3

light of the remaining uncertainties does not justify a [lower] standard … as necessary to protect public health." *Id.* at 3162-64, 3177-79.

The CAA "directs federal agencies not to supply funds for any project that 'does not conform' to the applicable State Implementation Plan ('SIP') (required of states in order to assure the implementation and maintenance of the NAAQS, 42 U.S.C. § 7410)." *Sierra Club v. EPA*, 873 F.3d 946, 948 (D.C. Cir. 2017). As relevant here, "conformity" means that an action will not "cause or contribute to any new violation of any [NAAQS] in any area." 42 U.S.C. § 7506(c)(1)(B). EPA classifies areas as in "attainment," "nonattainment," or "maintenance" for each NAAQS standard. *See Id.* § 7407(d)(1)(A)(i)-(ii), (3)(E). Only areas designated as "nonattainment" or "maintenance" must demonstrate conformity for a particular NAAQS standard. *See Sierra Club*, 873 F.3d at 948 (citing 40 C.F.R. § 93.116(a)).

## FACTUAL BACKGROUND

I-70 is critical to Colorado's transportation system, carrying over 200,000 cars per day. (ECF_46-01_FEIS 49.)[2] Despite its vital role, I-70 needs to be reconstructed, especially the viaduct between Brighton to Colorado Boulevards. First, the viaduct is "structurally deficient," meaning that engineers have identified a "major defect" requiring replacement. (ECF_46-12_DeVito_Decl. ¶ 7; *see also* ECF_46-1_FEIS 46.) Second, demand along I-70 already exceeds capacity, causing congestion for up to ten hours per day and leading drivers to divert into surrounding neighborhoods. (*Id.* at 50, 131, 134, 141, 150.) Third, Denver is experiencing growth that will cause speeds as low as ten miles per hour and hour-long commutes between I-25

---

[2] All environmental documents for Central 70 are available at http://www.i-70east.com/reports.html.

and Tower Road.  (*Id.* at 47-48, 137, 141, 144.)  Fourth, I-70 has more accidents than average for urban freeways—2,872 collisions and seven fatalities in a three-year period—because it does not meet modern design standards.  (*Id.* at 51.)

CDOT has been planning I-70 improvements for over a decade.  The Agencies performed extensive public outreach, offered multiple comment opportunities, and responded to those comments.  (*Id.* at 35-37, 237-71; ECF_46-4_ROD 94-148; Ex._6_FEIS_Attach._Q 1-14, S-104 to S-127.)  Through that process, the Agencies developed a preferred alternative that includes removing the structurally deficient viaduct, lowering a section below grade, and widening I-70 to add express lanes.  (ECF_46-1_FEIS 64-71.)  The preferred alternative also provides a four-acre cover over part of the lowered section that will serve as a community park.



CDOT added the cover to "mitigate the adverse impacts to the Elyria and Swansea Neighborhood and to restore and enhance neighborhood cohesion, which was disrupted decades ago by the original I-70 construction." (*Id.* at 164.)[3]

**Exhibit 5.8-4    Vantage Point 2: Swansea Elementary School**



*Existing conditions*



*Partial Cover Lowered Alternative*

Before reaching a decision, the Agencies thoroughly evaluated potential impacts to air quality in a no-action alternative, which would not add lanes or increase the highway's capacity, and compared those impacts to two build alternatives: the preferred alternative and another alternative that would replace the viaduct entirely above ground. (ECF_46-1_FEIS 55-85.) The

---

[3] Additional visualizations appear at Ex._4_FEIS 5.8-11 to 5.8-15.

Agencies summarized the health effects of the six criteria pollutants,[4] seven priority Mobile Source Air Toxics ("MSATs"),[5] and fugitive dust.  (Ex._5_FEIS_Attach._J at 4-8.)  The Agencies also consulted EPA and Colorado's Air Pollution Control Division ("APCD") to develop an air-quality analysis protocol.  (Ex._5_FEIS_Attach._J_App'x_A at 1.)

Under the EPA- and APCD-approved protocol, the Agencies performed "hot-spot" analyses of carbon monoxide and $PM_{10}$, for which EPA has classified Denver as a "maintenance" area. *See Sierra Club*, 873 F.3d at 949 (summarizing hot-spot requirements).[6] The analysis used computer models to combine background concentrations of carbon monoxide and $PM_{10}$ with estimated future Project emissions.  (Ex._3_ROD_Attach._C7 at 5-9.)  The results showed that the Project would not cause or contribute to a NAAQS violation for carbon monoxide or $PM_{10}$.  (*Id.* at 10-13.)  The analysis also showed very little difference in $PM_{10}$ concentrations between the no-action alternative and build alternatives. (Ex._2_ROD_Attach._C6 at 9.)

The approved protocol did not require modeling or conformity analysis of other criteria pollutants, including $PM_{2.5}$, for which Denver has attained the NAAQS.  (*See* ECF_46-04_ROD 131.)  The Agencies nevertheless evaluated Project emissions of all criteria pollutants, as well as MSATs and road dust, through emissions inventories.  (*See* Ex._4_FEIS 5.10-23 to 5.10-25,

---

[4] Ozone, $PM_{2.5}$, $PM_{10}$, carbon monoxide, $NO_2$, $SO_2$, and lead.

[5] Benzene, formaldehyde, naphthalene, diesel particular matter, acrolein, 1,3 butadiene, and polycyclic organic matter.

[6] Although the Denver region is in "nonattainment" for ozone, no conformity or hot-spot analysis was required because ozone is a regional issue.  (*See* Ex._4_FEIS 5.10-3.)  *See also Wildearth Guardians v. Jewell*, 738 F.3d 298, 311-12 (D.C. Cir. 2013).

5.10-34; Ex._5_FEIS_Attach._J. 45-52 (summarizing methodology).) The inventories showed that, accounting for the Project, emissions of $PM_{2.5}$, $NO_x$ and VOCs (ozone precursors), and summertime emissions of carbon monoxide *will be lower in 2035* due, in part, to cleaner vehicle standards. (Ex._5_FEIS_Attach._J. 84-92.) The inventories also showed 70 to 90 percent reductions in MSATs. (*Id.* at 92-106.) For all pollutants, the inventories showed no meaningful difference between the no-action alternative and build alternatives. (*Id.* at 83-109.) The Agencies therefore concluded that air emissions were "not a discriminating factor in selection of a preferred alternative." (*Id.*)

The Agencies also evaluated the Project's potential impacts on human-health conditions. (Ex._4_FEIS 5.20-1 to 5.20-22.) The Agencies reviewed studies concerning highway emissions and human health, including Denver's Health Impact Assessment for neighborhoods near I-70. (*Id.* at 5.20-12 to 5.20-22.) The Agencies explained that the cover will improve health by reducing noise, enhancing safety, increasing connectivity for pedestrians and bicyclists, and affording a "greater sense of neighborhood cohesion by removing the dominant visual barrier created by the highway structure." (*Id.* at 5.20-3, 5.20-6 to 5.20-7.)

CDOT also adopted mitigation measures to protect air quality and avoid spreading hazardous materials. (*Id.* at 5.20-5 to 5.20-6, 5.20-10; *see also* ECF_46-01_FEIS 182-200; ECF_46-04_ROD 62, 67-69, 76-78.) Among those measures is CDOT's unprecedented commitment to install new windows, doors, and an HVAC system at Swansea Elementary School, and to install interior storm windows, furnace filters, and air conditioners with filtration in nearby homes. (ECF_46-04_ROD 41-42.) Given the air-quality analysis and CDOT's

mitigation, the Agencies concluded that any potential health impacts would be avoided or minimized.  (Ex._4_FEIS 5.20-10 to 5.20-11.)

In January 2017, FHWA approved the Project, which includes the preferred alternative's improvements between I-25 and Chambers Road.  (ECF_46-04_ROD 38, 45.)  Subsequently, in August, CDOT selected a preferred developer to help finance and build the Project.  CDOT and the developer entered into a contract on November 22, 2017.  (Ex._9_Second_DeVito_Decl. ¶ 3.)  CDOT expects the developer to reach financial close with its lenders no later than the end of January 2018, followed by CDOT's execution of a project agreement with FHWA in early 2018.  (*Id.* ¶ 4.)  CDOT does not expect construction on the highway to begin until summer 2018.  (*Id.*)

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief."  *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *see also Dominion Video Satellite v. EchoStar Satellite*, 356 F.3d 1256, 1261 (10th Cir. 2004) (right to relief must be "clear and unequivocal").  The movant must clearly show *all* the following factors: (1) she is likely to succeed on the merits; (2) she will suffer irreparable injury; (3) her threatened injury outweighs injury to the opposing party; and (4) the injunction would be in the public interest.  *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017).[7]

Courts apply the Administrative Procedure Act's ("APA") deferential arbitrary-and-capricious standard of review to NEPA claims.  5 U.S.C. § 706(2)(A).  Under that standard, the

---

[7] The same standard applies under 5 U.S.C. § 705.  (ECF_88_Mot. 13.)

court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). A court may set aside an agency's decision only if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997).

## ARGUMENT

## I.     Sierra Club cannot succeed on the merits.

In its brief, Sierra Club does not argue that Project emissions will cause or contribute to a NAAQS violation, nor does it assert that the air-quality modeling produced erroneous results. Sierra Club does initially assert, in one sentence, that the conformity analysis was inadequate. (ECF_88_Mot. 5.) But Sierra Club does not follow up by attempting to show a likelihood of success on any CAA claims. (*Id.* at 27-35.) Sierra Club therefore has waived any such arguments for purposes of its motion. *United States v. Fisher*, 805 F.3d 982, 991 (10th Cir. 2015) (arguments "inadequately presented" in opening brief are waived); *Colo. Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150, 1171 (D. Colo. 2011) (citing *M.D. Mark v. Kerr-McGee*, 565 F.3d 753, 768 n.7 (10th Cir. 2009)). Thus, this Court must assume that the Agencies correctly forecasted Project emissions and the Project will not cause or contribute to a NAAQS violation.

Sierra Club raises just two claims. First, under NEPA, Sierra Club contends the Agencies failed to "assess adverse health impacts from exposure to highway pollution, compare health

impacts of alternatives and consider mitigation that could restore healthier air quality."
(ECF_88_Mot. 27.)  Second, under the Federal-Aid Highway Act, Sierra Club argues that the
Agencies failed to "identify mitigation sufficient to 'eliminate[e] [sic] or minimiz[e]' such
adverse health impacts and weigh the cost of those measures in making the 'public interest'
determination."  (*Id.*)  Neither claim has merit.

A.    **The Agencies took a hard look at the effects of the Project on air quality and public health.**

1.    **The Agencies' methodology was reasonable and is due deference.**

The record shows that the Agencies did not "simply ignore" the effect of Project
emissions on public health.  (*Id.* at 31.)  The Agencies discussed the relevant air pollutants'
health impacts and reviewed recent studies concerning the health effects of highway emissions.
(Ex._5_FEIS_Attach._J at 4-8, 57-64; Ex._4_FEIS 5.20-12 to 5.20-22.)  Under an EPA- and
APCD-approved protocol, the Agencies conducted modeling of carbon monoxide and $PM_{10}$ to
ensure NAAQS conformity and prepared emissions inventories.  (Ex._3_ROD_Attach._C7 at 5-
13.)  The Agencies used the inventories to evaluate *all* criteria pollutants, as well as MSATs and
road dust.  (Ex._5_FEIS_Attach._J. at 83-109.)

At bottom, Sierra Club's complaint is with the *method* the Agencies used to analyze
potential air-quality related health impacts.  According to Sierra Club, "health effects occur
below levels prohibited by the NAAQS."  (ECF_88_Mot. 27.)  Sierra Club therefore believes
that "NEPA demands" use of the "best science," including "modeling tools," to quantify the
Project's impacts on various "health indicators," such as mortality and lung development.  (*Id.* at
8-9, 26-27.)  But NEPA "does not require the agency to use particular methodologies."
*Biodiversity Conserv. All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1270 (10th Cir. 2014).  "Courts

are not in a position to decide the propriety of competing methodologies . . . but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." *Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1177-78 (10th Cir. 2012) (quoting *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006)).  "This is particularly true when the dispute involves a technical judgment within the agency's area of expertise." *Id.*

The NAAQS are the most rational standard by which to assess air-quality related health impacts.  EPA sets the NAAQS "allowing an adequate margin of safety" to "protect the public health," including for sensitive populations, like children and people with asthma or emphysema. 42 U.S.C. § 7409(b)(1); *Am. Lung Ass'n*, 134 F.3d at 389.  Thus, by determining that the Project will not cause or contribute to any NAAQS violation—a determination Sierra Club does not challenge in its brief—the Agencies ensured that the Project poses no "unacceptable risk of harm," even to sensitive populations.  78 Fed. Reg. at 3090.

"If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health." *Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003).  Sierra Club may believe that "[p]ollutant concentrations allowed by the NAAQS are not 'safe' or risk free," but it cannot use NEPA to litigate its discontent with EPA's expert judgment.  (ECF_88_Mot. 18.)  It is "appropriate for [an agency] to defer to the EPA on the factual question of what level of airborne [pollution] is safe." *Barnes v. FAA*, 865 F.3d 1266, 1273 (9th Cir. 2017) (citing *WildEarth Guardians v. Jewell*, 738 F.3d 298, 311-12 (D.C. Cir. 2013)).

At least two courts have rejected the very argument that Sierra Club raises here.  In *Sierra Club v. Federal Highway Administration*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), the court held that "defendants' decision to consider air pollution issues through the same framework used by the EPA to enforce the Clean Air Act cannot be considered arbitrary or capricious."  And, in *Sierra Club v. United States Department of Transportation*, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004), the court held that "FHWA does not act arbitrarily and capriciously by relying on the prevailing NAAQS standard EPA has set."  *See also Coal. for Reg'l Transp. v. FHWA*, 959 F. Supp. 2d 982, 1013 (W.D. Ky. 2013) ("[P]erforming and completing the conformity analyses described in the CAA satisfies Defendants' hard look requirements for air quality issues under NEPA….").

Sierra Club identifies no authority holding that, under NEPA, agencies may not rely on the NAAQS to assess the health effects of a project's emissions.  The Tenth Circuit vacated the only case Sierra Club cites on that issue.  (ECF_88_Mot. 31 (citing *WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1227 (D. Colo. 2015), *vacated*, 2016 U.S. App. LEXIS 11052 (10th Cir. June 17, 2016).)  The case therefore has "no precedential authority whatsoever."  *Durning v. Citibank*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991).  And, in that case, the court merely held that conduct regulated under the CAA or subject to permitting is not *per se* "exempt from NEPA analysis."  *WildEarth Guardians*, 104 F. Supp. 3d at 1227-28.  This case does not raise that issue.

Sierra Club also lacks authority for its assertion that "NEPA demands" use of the "best science" and "modeling tools" to quantify potential health impacts of NAAQS-compliant air quality.  (ECF_88_Mot. 26-27.)  NEPA does not require courts to "decide whether an [EIS] is

based on the best scientific methodology available." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 897 (9th Cir. 2007); *see also Lands Council v. McNair*, 537 F.3d 981, 1003 (9th Cir. 2008) (en banc).  As the Tenth Circuit recently held, an agency's choice "not to adopt a modeling technique does not render the [agency's] EIS arbitrary and capricious." *WildEarth Guardians v. U.S. BLM*, 870 F.3d 1222, 1238 (10th Cir. 2017); *see also NRDC v. Vilsack*, No. 08-cv-02371, 2011 U.S. Dist. LEXIS 87120, at *30-31 (D. Colo. Aug. 5, 2011) (no modeling requirement); *Audubon Naturalist Soc'y v. U.S. DOT*, 524 F. Supp. 2d 642, 674-75 (D. Md. 2007) (same).

Nor does NEPA demand quantification of the health impacts of NAAQS-compliant air quality.  NEPA does not "require an agency to assess every impact of a proposed action—only its impact or effect on the physical environment." *Maiden Creek Assocs. v. U.S. DOT*, 823 F.3d 184, 190 (3d Cir. 2016).  "[A]lthough NEPA states its goals in sweeping terms of human health and welfare, these goals are *ends* that Congress has chosen to pursue by *means* of protecting the physical environment." *Metro. Edison v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983).  Thus, even if the Agencies could reliably "estimate lives saved, children protected from asthma, asthma attacks avoided or any other health indicators" from NAAQS-compliant air quality—and Sierra Club identifies no such reliable methodology—NEPA does not require such analysis.  (ECF_88_Mot. 11-12.)  When setting the particular-matter NAAQS, EPA emphasized large uncertainties and thin data regarding health effects below the NAAQS.  78 Fed. Reg. at 3162-64, 3177-79.

The Agencies followed a protocol approved by EPA and APCD, which have expertise in air quality and the health effects of air pollution.  The protocol did not require modeling of health

impacts at levels below the NAAQS.  (Ex._5_FEIS_Attach._J_App'x_A at 1-5.)  Agencies

reasonably may "stop short of … modeling" when modeling is not required by the relevant

protocol.  *Tinicum Twp. v. U.S. DOT*, 685 F.3d 288, 296 (3d Cir. 2012); *see also Coal. for Reg'l*

*Transp. v. FHA*, 576 F. App'x 477, 492 (6th Cir. 2014).  Here, the Agencies rationally decided to

use emissions inventories to evaluate the Project's impacts under NEPA.[8]  *See Tinicum*, 685 F.3d

at 296; *Concerned Citizens v. U.S. Forest Serv.*, No. CV-16-03115, 2017 U.S. Dist. LEXIS

144029, at *27 (D. Ariz. Sep. 6, 2017); *San Juan Citizens All. v. Stiles*, No. 08-cv-00144-RPM,

2010 U.S. Dist. LEXIS 43119, at *53-55 (D. Colo. May 3, 2010).

　　　The inventories showed that, by 2035, MSATs will decline 70 to 90 percent and several

criteria pollutants will decrease regardless of the Project.  For all pollutants, there were only

minor differences between the no-action and build alternatives.  (Ex._5_FEIS_Attach._J at 83-

109.)  Sierra Club incorrectly asserts that "exposure to fugitive dust will increase 43 percent by

2035 *as a result of the Project*."  (ECF_88_Mot. 27 (emphasis added).)  The Agencies' analysis

actually showed that an "increase in [vehicle miles traveled] in the corridor" will cause fugitive

dust to increase by that percentage even in the no-action alternative.  (Ex._5_FEIS_Attach._J at

109.)  And there was only a "slight difference" in road-dust emissions between the no-action

alternative and the build alternatives.  (*Id.*)  Accordingly, the Project itself is not responsible for

the increase in road-dust emissions that Sierra Club identifies.

---

[8] To be clear, the Agencies did use EPA's MOVES model for the CAA conformity analysis,
which Sierra Club's motion does not challenge.  (*See* Ex._3_ROD_Attach._C7 at 5-9.)  Instead,
Sierra Club is arguing that *NEPA* required the use of such models to quantify health impacts at
levels *below* the NAAQS.  (ECF_88_Mot. 30-32.)  As explained above, that argument is
incorrect.

Sierra Club also asserts that the Project will cause a 10 percent increase in $PM_{10}$ and a 14 percent increase in wintertime carbon monoxide.  (ECF_88_Mot. 27-28.)  Again, those effects occurred in the no-action alternative and there was little difference between that alternative and the build alternatives.  (Ex._5_FEIS_Attach._J at 84, 86.)  Moreover, the conformity analysis showed that, despite any such emissions increase, the Project will not cause or contribute to a NAAQS violation.  (Ex._3_ROD_Attach._C7 at 10-13.)  The Agencies therefore reasonably concluded that air quality was not a "discriminating factor."  (Ex._5_FEIS_Attach._J at 83-109; *see also* ECF_46-4_ROD 123-25, 170-76.)

Sierra Club cites (ECF_88_Mot. 30) a decades-old case holding, with no explanation, that an EIS "inadequately describe[d] the detrimental effects of air pollution on people (e.g., residents and drivers) in the vicinity of the corridor."  *Lathan v. Volpe*, 350 F. Supp. 262, 266 (W.D. Wash. 1972).[9]  Whatever the facts there might have been, the Agencies here thoroughly considered the Project's potential impacts on air quality and human health.  Sierra Club also cites (ECF_88_Mot. 30) a case holding that an agency's conformity analysis was deficient.  *City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1143 (C.D. Cal. 1999).  But Sierra Club raises no such claim in its motion.  Similarly, Sierra Club erroneously invokes (ECF_88_Mot. 32) two cases where agencies refused to analyze environmental impacts in an EIS.  *See Pub. Citizen v. DOT*, 316 F.3d 1002, 1024 (9th Cir. 2003), *rev'd,* 541 U.S. 752 (2004); *Nat'l Parks & Conserv. Ass'n*

---

[9] Sierra Club also cites (ECF 88 at 3) a subsequent appeal that says nothing about that agency's air-quality analysis.  *See Keith v. Cal. Highway Com.*, 506 F.2d 696 (9th Cir. 1974).

*v. Babbitt*, 241 F.3d 722, 731-36 (9th Cir. 2001).  Those cases have no bearing here, since the Agencies produced a detailed EIS.

The Agencies did not have to conclude that the Project would have absolutely no air-quality impact, as Sierra Club desires.  *Forest Guardians*, 495 F.3d at 1173.  NEPA required the Agencies only to take a hard look at potential impacts.  The analysis summarized above meets that standard, especially when judged by the "rule of reason" that governs judicial review. *Utahns*, 305 F.3d at 1163; *see also WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 32-33 (D.D.C. 2014) (upholding similar air-quality analysis under "rule of reason" standard); *WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 88-91 (D.D.C. 2012) (same).

### 2.    The Agencies adequately responded to scientific information identified by Sierra Club.

The Agencies reviewed recent studies concerning the health impacts of highway emissions and thoroughly responded to public comments.  (Ex._4_FEIS 5.20-12 to 5.20-22; Ex._5_FEIS_Attach._J at 57-64; Ex._6_FEIS_Attach._Q at 7-9; ECF_46-4_ROD 123-32.) Sierra Club nevertheless accuses the Agencies of ignoring such information.  For example, it cites Dr. George D. Thurston's summary of scientific studies.  (ECF_88_Mot. 10, 25.)  But Sierra Club did not present Dr. Thurston's analysis to the Agencies during the comment process. Objections not raised during the comment process are "forfeited."  *Pub. Citizen*, 541 U.S. at 764-75; *see also Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978).[10]  Nor can Sierra Club use that declaration here to attack EPA's determination that the NAAQS will protect

---

[10] Sierra Club also cannot use that declaration because it will not be in the administrative record. *See Citizens for Alt. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242, 1245 (10th Cir. 2004).

public health with an adequate margin of safety.  *See* 42 U.S.C. § 7409(b)(1); *Barnes*, 865 F.3d at 1273.

Sierra Club also incorrectly asserts that the Agencies ignored EPA's Integrated Science Assessments for $PM_{10}$, $PM_{2.5}$, and $NO_2$.  (ECF_88_Mot. 6-7, 10.)  EPA uses those Assessments to set the NAAQS.  *See* 78 Fed. Reg. at 3094 (summarizing revision process), 3162-64, 3177-79 (considering Assessments and determining lower NAAQS not scientifically justifiable).  By following the EPA-approved protocol for analyzing air quality and ensuring NAAQS compliance, the Agencies necessarily accounted for EPA's Assessments.  (*See* Ex._6_FEIS_Attach._Q at S-111 to S-113 (comment response).)  The Agencies assessed "air quality impacts likely to occur based on the regime with which [they were] faced" when conducting their analysis.  *TOMAC v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006); *see also Concerned Citizens*, 2017 U.S. Dist. LEXIS 144029, at *27.  Sierra Club wants to litigate whether EPA correctly set the NAAQS, but neither NEPA review nor this case is the proper forum.  *See* 78 Fed. Reg. at 3109 (Sierra Club requested lower NAAQS); *Nat'l Assoc. of Manufacturers v. EPA*, 750 F.3d 921 (D.C. Cir 2014) (upholding particulate-matter NAAQS); 42 U.S.C. § 7607(b) (NAAQS challenge must be filed in D.C. Circuit within 60 days).

Sierra Club cites a Denver Health Impact Assessment to assert that I-70 emissions affect neighborhood health.  (ECF_88_Mot. 10.)  The Agencies reviewed that study and responded to Sierra Club's comments.  (Ex._4_FEIS 5.20-14 to 5.20-16; Ex._6_FEIS_Attach._Q S-105 to S-114.)  As they explained, in addition to highway emissions, Denver's study identified numerous possible causes for poor health in nearby neighborhoods, including poverty, obesity, lack of medical access, insufficient activity, and pollution from stationary sources.  (*Id.* at S-108 to S-

110.)  The Agencies further explained that the additional study demanded by Sierra Club would be "subject to very large uncertainties" and "would not assist the decision makers in evaluating the choice among reasonable alternatives" given the air-quality analysis.  (*Id.* at S-105; *see also* ECF_46-4_ROD 123-25; Ex._6_FEIS_Attach._Q at 7.)

"'It is of course always possible to explore a subject more deeply and to discuss it more thoroughly,' but '[t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.'"  *WildEarth Guardians*, 880 F. Supp. 2d at 88 (quoting *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)); *see also WildEarth Guardians*, 738 F.3d at 312; *Tinicum*, 685 F.3d at 296.  NEPA does not require an agency respond to "every single scientific study or comment."  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009).  Nor is there any "authority requiring [an agency] to have relied on the best or most recent scientific evidence available."  *Rags Over the Ark. River*, 77 F. Supp. 3d at 1049.  The Agencies here fulfilled their duty to consider and respond to Sierra Club's demands for further study.

### 3. Sierra Club failed to challenge the Agencies' reasons for eliminating several alternatives.

Sierra Club briefly mentions four alternatives it believes would improve air quality. (ECF_88_Mot. 11.)  But nowhere does it address the Agencies' reasons for eliminating those alternatives.  One such alternative was to reroute I-70 and convert 46th Avenue into a six-lane arterial.  The Agencies eliminated that alternative for many reasons.  (ECF_46-4_ROD 110-13.) A travel analysis showed that traffic on arterial streets in east Denver would increase by 10 to 20 times current levels, resulting in major delays and safety problems.  (Ex._1_ROD_Attach._C1 at 3-11.)  Rerouting I-70 would replicate Colorado Boulevard along 46th Avenue, causing backups and safety issues directly outside homes and Swansea Elementary School.  (*Id.* at 9-10, 16.)

Rerouting I-70 also would:

- Increase neighborhood truck traffic by forcing delivery trucks and large vehicles to use 46th Avenue to reach industrial areas and businesses near I-70;

- Substantially increase out-of-direction travel for large volumes of traffic on I-70;

- Reduce safety by eliminating emergency access and route redundancy;

- Cost $3.2 billion—about three times as much as the preferred alternative— eliminating any possibility of near-term funding; and

- Raise stakeholder concerns, especially in Adams County and Commerce City communities that would host the rerouted I-70.

(*Id.* at 11-16; ECF_46-4_ROD 111-13.)

Some commenters also asked the Agencies to restrict truck traffic on I-70.  In response, the Agencies explained that "areas adjacent to I-70 East are highly industrial and rely heavily on the need for trucks to move in and out of the area with ease."  (*Id.* at 140.)  A heavy-vehicle traffic study showed that almost all trucks on I-70 make stops within the corridor.  (*Id.* at 141.)  Thus, if access to I-70 were restricted, trucks would have to "use local streets to access the local businesses in the area, negatively impacting safety and mobility in the nearby neighborhoods."  (*Id.* at 140.)  Moreover, unless there are safety issues (*e.g.*, adverse weather; construction zones), CDOT lacks authority to restrict I-70 truck traffic.  (*Id.*)

For purposes of its motion, Sierra Club has waived any challenge to the Agencies' decision to eliminate those alternatives.  *Fisher*, 805 F.3d at 991; *Colo. Rail Passenger Ass'n*, 843 F. Supp. 2d at 1171.  In its opening brief, Sierra Club does not engage the Agencies' reasoning, cite any cases concerning the proper scope of alternatives, or otherwise attempt to show that it is likely to succeed on a claim that the reroute and truck-restriction alternatives were reasonable.  (ECF_88_Mot. 27-35.)  Sierra Club does assert that the Agencies should have

evaluated the air-quality impacts of the alternatives above, but that assertion puts the cart before the horse.  (ECF_88_Mot. 11, 27.)

An agency need not "analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective."  *Prairie Band Pottawatomie Nation v. FHA*, 684 F.3d 1002, 1011 (10th Cir. 2012).  The Agencies had no duty to incorporate unreasonable alternatives into their air-quality analysis.  *See Colo. Rail Passenger Ass'n*, 843 F. Supp. 2d at 1168.  Because Sierra Club's opening brief fails to challenge the Agencies' reasons for eliminating as unreasonable the reroute and truck-restriction alternatives, Sierra Club cannot complain that the Agencies did not assess the impacts of those alternatives.

In any event, the Agencies properly eliminated those alternatives.  Absent a showing of "bad faith," the Tenth Circuit reviews an agency's selection of alternatives "only for reasonableness."  *Prairie Band*, 684 F.3d at 1011-12 (upholding elimination of alternative route).  A "rule of reason" applies, and an agency need only "briefly discuss the reasons for eliminating unreasonable alternatives from an EIS."  *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) (upholding elimination of "impractical" alternative).  An agency fulfills its duty when it gives "plausible" and "good faith" reasons for concluding that an alternative would be impractical or ineffective in meeting a project's purpose and need.  *Colo. Rail Passenger Ass'n*, 843 F. Supp. 2d at 1168-69; *see also Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030-32 (10th Cir. 2002); *Ass'ns Working for Aurora's Residential Env't v. Colo. DOT*, 153 F.3d 1122, 1130 (10th Cir. 1998).

The Agencies' analysis exceeds that standard.  They explained that the reroute and truck-restriction alternatives were infeasible, impractical, and would not meet the Project's purpose

and need.  (Ex._1_ROD_Attach._C1 at 3-16; ECF_46-4_ROD 110-13, 140-41.)  The Project aimed to "implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area."  (ECF_46-1_FEIS 46-52.)  The alternatives above instead would degrade safety, decrease access and mobility, and increase congestion.  The Agencies met their duty to give good reasons for eliminating those alternatives.

Sierra Club briefly mentions, in the background section of its brief, that it submitted comments arguing that the purpose-and-need statement was too narrow.  (ECF_88_Mot. 13.)  Again, Sierra Club does not raise that issue in the argument section of its brief, cite any cases, or otherwise attempt to show that it is likely to succeed on the merits of such a claim.  (*Id.* at 27-35.)  Sierra Club therefore has waived any challenge to the purpose-and-need statement.  A party must present its claims in a way that does not "compel the [court] to scavenge through his brief for traces of argument."  *Fisher*, 805 F.3d at 991.  Regardless, "agencies have considerable discretion to define the purposes and objectives of a proposed action, as long as they are reasonable."  *Wyoming v. USDA*, 661 F.3d 1209, 1244-45 (10th Cir. 2011).  The Agencies had no duty to incorporate Sierra Club's air-quality concerns into the Project's objectives because NEPA does not mandate "particular substantive environmental results."  *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1042 (10th Cir. 2011).

Sierra Club also briefly mentions, without record citations, two other supposed alternatives.  First, Sierra Club refers to "the Law Clinic's proposed full-length cover with pollutant removal," but the clinic did not propose such an alternative.  (ECF_88_Mot. 11.)  After issuance of the Draft EIS, the clinic asked the Agencies to reconsider the "tunnel and below grade alternatives."  (ECF_88-2_Mot._Ex._18 at 14.)  In response to that and other comments,

the Agencies revised the alternatives to include lowering and covering part of I-70, and they explained why entirely below-grade construction was infeasible.  (*See* Ex._8_SDEIS_Attach._C at 18-19, 31-44.)  The law clinic did not subsequently suggest that the Agencies consider a "full-length cover with pollutant removal."  (ECF_88_Mot. 11; Ex._7_SDEIS 1-7 (requiring resubmission of comments).)

Second, Sierra Club mentions "relocation assistance for high-risk residents within I-70's health hazard zone."  (ECF_88_Mot. 11.)  Again, Sierra Club provides no record citation, and it never proposed that specific concept.  In its comments, Sierra Club did briefly request "resources to allow residents to protect themselves from the pollution danger zone by moving away," but it did not limit that proposal to "high-risk residents," as it does now.  (Ex._6_FEIS_Attach._Q at S-127.)  The Agencies responded that "[m]oving residents out of the I-70 corridor is not necessary" since the Project will not cause any NAAQS violations, and relocating residents would be an "expensive measure that would impair neighborhoods" and result in questionable risk reduction, since "no relocation areas in the Denver metropolitan area have zero air pollutants."  (*Id.*)  Instead, the Agencies invested in the neighborhood by incorporating the cover and providing unprecedented mitigation for housing, schools, fresh food, pedestrian access, etc.  (ECF_46-4_ROD 40-42.)

Sierra Club's passing reference to supposed alternatives does not preserve an argument that it is likely to succeed on a claim that such alternatives were reasonable.  *Fisher*, 805 F.3d at 991; *Colo. Rail Passenger Ass'n*, 843 F. Supp. 2d at 1171.  Under the authority above, NEPA required the Agencies to consider only reasonable alternatives.  Because Sierra Club has not

even tried to show that the alternatives it mentions were reasonable (or even proposed), Sierra Club cannot complain that the Agencies did not assess the impacts of those alternatives.

**B.** **FHWA properly determined that the Project is in the best overall public interest under the Federal-Aid Highway Act.**

CDOT joins FHWA's arguments concerning Section 109(h) of the Federal-Aid Highway Act. The ROD found that FHWA complied with Section 109(h) by following 23 C.F.R. Part 771. (ECF_46-4_ROD 19-20.) *See* 23 C.F.R. §§ 771.101 ("This regulation also sets forth procedures to comply with 23 U.S.C. 109(h)."), 771.105(b), (d) (incorporating Section 109(h)).

As explained above, FHWA thoroughly evaluated the Project's "possible adverse economic, social, and environmental effects," including air quality and human health. 23 U.S.C. § 109(h). The ROD also requires mitigation to minimize potential harm and ensure the Project is in the best overall public interest. (ECF_46-4_ROD 40-42, 58-81.) Although Sierra Club may prefer to relocate I-70, the Agencies determined that option would be prohibitively costly and would not fulfill the "need for fast, safe and efficient transportation." 23 U.S.C. § 109(h). (Ex._1_ROD_Attach._C1 at 3-16.)

The record therefore is far from "devoid of any explanation" of how FHWA balanced improved mobility against potential health impacts. (ECF_88_Mot. 31.) Sierra Club is searching for "magic words." *Audubon Naturalist Soc'y v. U.S. DOT*, 524 F. Supp. 2d 642, 707 (D. Md. 2007). But no such incantation is required because the "ROD itself is a decision that the selected alternative is in the 'best overall public interest.'" *Id.*; *see also Sierra Club*, 310 F. Supp. 2d at 1204; *Highway J Citizens Grp. v. U.S. DOT*, 656 F. Supp. 2d 868, 894 (E.D. Wis. 2009). Sierra Club has no chance of success on the merits of its claims, so its motion must be denied.

**II.     Sierra Club has not shown irreparable harm from the Central 70 Project.**

Sierra Club must establish *all* four factors for preliminary injunctive relief.  *See Winter*, 555 U.S. at 23; *N.M. Dep't of Game & Fish*, 854 F.3d at 1246.  Because Sierra Club is unlikely to prevail on the merits, this Court "need not address" the remaining factors.  *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015).  Nevertheless, those factors—irreparable harm, balance of equities, and public interest—provide independent grounds to deny the motion.  To qualify as irreparable, an injury must be "certain, great, actual and not theoretical."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  The mere "possibility" of harm is insufficient; Sierra Club must make a "clear showing" that "irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  That is "not an easy burden to fulfill."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

Sierra Club asserts that construction emissions will cause irreparable harm because there is no safe threshold for particulate matter.  (ECF_88_Mot. 16-25.)  But there is no evidence that the particulate-matter NAAQS will be exceeded, and EPA determined that there was a "large amount of uncertainty" regarding health effects below levels specified in the current NAAQS.  78 Fed. Reg. at 3162-64, 3168, 3178-79.  The Project also includes extensive mitigation to minimize emissions and protect residents and Swansea Elementary School.  The Record of Decision ("ROD") includes 19 separate measures to ensure that "construction-related fugitive particle emissions will be minimized."  (ECF_46-4_ROD 41, 67-69.)  Many such measures also are required by APCD's regulations, including a control plan to implement "all available practical methods that are technologically feasible and economically reasonable and which

25

reduce, prevent and control [fugitive particulate] emissions."  5 C.C.R. 1001-3 § III.D.1.a.(i); *see also id.* § III.D.1.e. (enforcement).

Among other requirements, CDOT and its contractors must:

- Continuously monitor particulate matter during construction and immediately modify construction to prevent NAAQS violations;

- Cover, wet, and stabilize soils to prevent dust emissions;

- Use vacuum street sweepers and measures such as covering loads and washing wheels to reduce the spread of dust;

- Use construction equipment with the lowest emissions standards and/or retrofitted particulate traps, catalyst, and other systems;

- Use alternative-fuel construction equipment and trucks where reasonably available;

- Prohibit unnecessary idling and require proper maintenance to reduce emissions.

(ECF_46-4_ROD 67-69.)  The ROD also requires extensive measures to avoid spreading hazardous materials.  (*Id.* at 76-78; *see also* ECF_46-01_FEIS 182-200.)

CDOT's contractor, Kiewit Meridiam Partners ("KMP"), has contractually agreed to implement those and other measures.  (Ex._9_Second_DeVito_Decl. ¶ 6.)  Among other things, the contract requires KMP to "monitor" and "effectively control" fugitive particulate emissions and comply with all environmental laws and construction standards for hazardous-materials management.  (*Id.* at Attach. A 17-9, 17-24.)  KMP will:

- Use an automated system to "continuously monitor the real time data from the Project's PM-10 monitors" and send an alert at a level of 135 µg/m$^3$ to ensure "corrective actions" before exceeding the NAAQS (150 µg/m$^3$) (*id.* at 17-10 to 17-11);

- Ensure that diesel equipment will either "1) have engines meeting EPA Tier 4 standards, or 2) be EPA rated Tier 2 or Tier 3 that have been retrofitted" to reduce

emissions (*id.* at 17-12);

- Undertake reasonable efforts to "use alternatives to diesel engines and/or diesel fuels" (*id.* at 17-11); and

- Implement materials management, sampling, health and safety, and spill prevention plans to avoid spreading hazardous materials (*id.* at 17-28 to 17-31).

The measures above have proven effective in the real word.  For example, Denver is using similar measures to control emissions for the Globeville Landing Outfall project, which included extensive excavation in a Superfund site.  (*Id.* ¶ 9.)  Denver's publicly available air-quality monitoring data shows that its project has never come close to exceeding the particulate-matter NAAQS.  (*Id.* ¶¶ 9-10.)  Arsenic and lead emissions similarly were a small fraction of EPA allowable concentrations for residential locations.  (*Id.*)

The Project's mitigation and construction measures, which reflect decades of practice and experience, will minimize emissions and keep concentrations below federal standards.  (*Id.* ¶ 11.) Sierra Club cannot simply assume that exceedances will occur, mitigation measures will be ineffective, or that CDOT and KMP will violate legal requirements.  Courts "presume that agencies will follow the law."  *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1082 (9th Cir. 2010).

Sierra Club complains (ECF_88_Mot. 24) that CDOT will not monitor MSATs during construction.  But as the Agencies explained, there is no NAAQS against which to evaluate temporary MSAT construction emissions.  (ECF_88-16_Comment_Response 18; *see also* Ex._5_FEIS_Attach._J at 57-59 ("[T]here is no national consensus on air dose-response values assumed to protect public health and welfare for MSAT compounds.").)  Sierra Club also complains that the Agencies did not model construction emissions of particulate matter, but the

CAA imposes no such modeling requirement.  *See* 43 C.F.R. § 93.125(c)(5).  The Agencies used available information to estimate such emissions (Ex._4_FEIS 5.10-26, 5.10-42), and they explained that the measures above have proven effective to avoid NAAQS violations. (Ex._6_FEIS_Attach. Q at S-106, S-119.)  Nothing more was required.

Additionally, to minimize residents' exposure to particulate matter, CDOT has committed to provide storm windows, air conditioners, and furnace filters for homes between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard (corresponding to the areas of excavation), along with utility bill assistance during construction.  (ECF_46-4_ROD 41.)  Since the ROD, this initiative has been enhanced to provide central air conditioning, ventilation and heating systems, positive-pressure ventilation, and window and door replacement for many eligible homes.  (Ex._9_Second_DeVito_Decl. ¶ 12.)  CDOT also committed to and has completed replacing doors, windows, and heating, ventilation, and air-conditioning systems at Swansea Elementary School.  (ECF_46-4_ROD 42.)  Those mitigation measures are unprecedented in Colorado.

The upgraded systems will improve heating, cooling, and ventilation while reducing air infiltration and filtering pollution, including fugitive construction dust and emissions from nearby stationary sources, like refineries, power plants, and factories.  The Assessments cited by Sierra Club indicate that air-conditioning use likely reduces particulate matter and $NO_2$ exposure because people spend most of their time indoors and reducing air infiltration lowers indoor pollutant concentrations.  (*See* ECF_23-14_Particulate-Matter_Assessment at 11, 15 ("PM2.5 risk estimates increase as the percent of the population with access to air conditioning

decreases"); Particulate-Matter_Assessment at 3-168, 6-164;[11] $NO_2$_Assessment at 3-1, 3-62[12]). Thus, the planned home improvements further reduce existing risks and any potential for harm.

Sierra Club also has not demonstrated irreparable injury from the ultimate operation of the completed Project, which the Agencies showed would not cause or contribute to a NAAQS violation and would not meaningfully affect air-pollution levels compared to the no-action alternative.  (*See supra* Part I.A.)

Sierra Club argues that, once FHWA and CDOT sign a project agreement, federal funds will be committed and the Agencies will be unable to change course if the Court ultimately sets aside the ROD.  (ECF_88_Mot. 25-27.)  That is incorrect.  The project agreement will be subject to compliance with federal laws and will preserve the Agencies' flexibility in the unlikely event of a remand.  *See generally* 23 C.F.R. §§ 1.36, 630.112(a).  Nor has Sierra Club proven that a "large fraction" of the Project funding will be spent before this Court reaches the merits.  (*Id.* at 26.)  CDOT does not expect construction to begin until summer 2018, and construction will last for approximately four years.  The Project still will be in its very early stages upon completion of merits briefing.

Sierra Club's motion must be denied because it has not made the necessary "clear showing" that "irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.

---

[11] http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=494959

[12] http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=526855

III.    **The balance of equities and public interest favor allowing the Project to proceed.**

A.    **The balance of equities tips sharply in the Agencies' favor.**

The serious harms that an injunction would cause to the Agencies' ability to fulfill their missions on behalf of the public far outweigh Sierra Club's speculative injuries.  *See Winter*, 555 U.S. at 24-26.  First, CDOT has a fundamental interest in managing its facilities and protecting public safety.  *See* Colo. Rev. Stat. §§ 43-2-102, 43-4-802(1)-(2).  The I-70 viaduct was built in 1964 and is standing on borrowed time.  The two-mile-long viaduct has exceeded its expected 30-year lifespan by over 20 years and is structurally deficient.  (ECF_46-12_DeVito_Decl. ¶ 7; ECF_46-1_FEIS 46.)  "This means that engineers have identified a major defect in the bridge's support structure or deck."  (*Id.*)  The viaduct is crumbling, with large pieces of concrete falling onto 46th Avenue.  (*Id.*)

A 2017 inspection confirmed the structural deficiency and showed significant deterioration since the last inspection, "including an inventory of fatigue cracks and tears, girders skewed 45 degrees, exposed rebar, rust, and concrete spalling and delamination."  (ECF_46-12_DeVito_Decl. ¶ 7; ECF_46-18_Viaduct_Inspection).  "In June, another series of emergency repairs were necessary after several post tension rods (which essentially hug the structure together and were designed and installed to help distribute loading across the piers of the structure) catastrophically failed and sprung loose from the bridge."  (*Id.*)  While rehabilitation has extended the lifespan 10-15 more years, construction of *any* replacement would last at least four years.  (*Id.* ¶¶ 7, 13; ECF_46-1_FEIS 46.)  A preliminary injunction would erode the limited time to replace the viaduct, over which more than 200,000 vehicles travel every day.  (ECF_46-1_FEIS 49.)

Second, as discussed above, an injunction would prevent CDOT from implementing measures to address existing health and safety concerns for nearby residents.  Enjoining the Project would not stop current traffic congestion, maintenance on the deteriorating viaduct, or the need to replace the viaduct.  But enjoining the Project would delay the many improvements that the Project will provide the surrounding community, which CDOT has invested years in designing.

Third, an injunction would endanger CDOT employees by extending the duration of I-70's serious deficiencies.  I-70 suffers safety problems from obsolete designs, including shoulders as narrow as two feet, inadequate acceleration/deceleration lanes, and insufficient sight distances.  (*Id.* at 51.)  I-70 consequently has a higher-than-average accident rate and a history of fatalities.  (*Id.*)  This puts CDOT employees tasked with maintaining I-70 at heightened safety risk.  (ECF_46-12_DeVito_Decl. ¶ 6.)

Fourth, an injunction would financially injure CDOT and Colorado's people.  (ECF_46-13_Spector_Decl. ¶ 12.)  An injunction would disrupt the project procurement effort that CDOT has spent $40 million to undertake.  (*Id.* ¶ 5.)  And it would likely expose CDOT to construction cost increases of $50 million or greater, interest-rate risk that could cost $70 million, and $10-15 million in contractual costs with railroads and utilities.  (*Id.* ¶ 7.)  The best estimate of additional cost associated with a one-year delay from a preliminary injunction, not including interest rate risk, would be at least $60 million.  (*Id.* ¶ 12.)

These costs are not private financial harms that could be addressed through damages; they are public harms.  CDOT's funding comes from taxes and fees, such as the fuel tax and bridge fee, which all motor vehicle owners pay.  (ECF_46-4_ROD 142-44.)  Cost increases from

a preliminary injunction will reduce funds available for other needed bridge replacements, safety improvements, and other projects.  (ECF_46-13_Spector_Decl. ¶¶ 8-9.)  This would delay work on structurally deficient bridges in Huerfano, Otero, Park, Delta, Grand, Saguache, Sedgwick, and Archuleta counties.  (*Id.*)

>    **B.      Denial of the requested injunction would serve the public interest.**

Enjoining the Project would harm the public interest.  *See Valley Cmty. Pres. Comm. v. Mineta*, 373 F.3d 1078, 1087 (10th Cir. 2004).  An injunction would prolong the community divisions caused by the existing viaduct.  The Project will increase neighborhood connectivity by removing the viaduct, lowering a section of I-70, and constructing a four-acre cover for a public park.  (ECF_46-1_FEIS 64-71.)  The cover will benefit surrounding communities by removing a visual barrier, providing open space, and increasing mobility for drivers, pedestrians, and bicyclists.  (*Id.* at 161-66; Ex._4_FEIS 5.8-11 to 5.8-15, 5.20-3, 5.20-6 to 5.20-7.)

An injunction also would delay or stop the Project's other community benefits.  The Project will create 13,900 jobs across the local economy, from low-wage workers to high-wage professionals.  (ECF_46-1_FEIS 156, 160.)  The Project also will provide $2 million for affordable housing, $100,000 for fresh food initiatives, upgrades to Swansea Elementary School, safe routes to school, a local hiring initiative, and investment in air conditioning, heating, and other upgrades for nearby homeowners.  (ECF_46-4_ROD 40-42.)

Contractors have already begun inspecting the homes that will receive mitigation along I-70.  At least one third have serious health and safety issues, including carbon-monoxide leaks, unsafe systems, and lead paint.  (Ex._9_Second_DeVito_Decl. ¶ 13.)  These issues are being

remediated for the safety of residents and workers.  (*Id.*)  An injunction would prevent those improvements, leaving residents in dangerous, unhealthful conditions.

As noted above, Denver's health assessment study identified numerous possible causes for poor health in nearby neighborhoods, including poverty, obesity, lack of medical access, lack of activity, and pollution from stationary sources. (Ex._4_FEIS 5.20-14 to 5.20-16; Ex._6_FEIS_Attach._Q S-108 to S-110.)  The mitigation measures, cover, and bike/pedestrian improvements help address these issues, but would be delayed or lost through an injunction.

Further, an injunction would cause hundreds of thousands of people using I-70 every day to experience heightened risks of accidents and death.  Unlike Sierra Club's alleged injuries, these risks are not speculative.  More crashes occur on I-70 than the state average for urban freeways.  (ECF_46-1_FEIS 51.)  For example, from 2009 to 2012, there were 2,872 crashes and seven fatalities within the project area.  (*Id.*)  The deteriorating viaduct also poses additional safety risks for the drivers, pedestrians, and cyclists below.  (*Id.*)  An injunction would extend those unsafe conditions.

The Colorado Legislature has declared that "[t]here is an urgent present need to repair and replace structurally deficient and functionally obsolete bridges and improve highway safety in the state."  Colo. Rev. Stat. § 43-4-802(2)(b).  Accordingly, it created the bridge surcharge on motor-vehicle registrations to accelerate funding and construction of projects like Central 70.  *Id.* §§ 43-4-802(2)(c), 43-4-805.  An injunction would frustrate this clearly identified policy to protect public safety. The Tenth Circuit has stated that the "well-recognized important public interest in safety on the roads and highways" weighs in favor of completing projects that alleviate safety risks.  *Valley Cmty.*, 373 F.3d at 1087.

An injunction also would extend public harms from congestion.  This portion of I-70 is one of the region's most heavily traveled and congested corridors.  (ECF_46-1_FEIS 49.)  Some segments are congested for as many as ten hours per day.  (*Id.* at 50.)  Trips take approximately twice as long during morning and evening peak hours, resulting in over 66,000 excess vehicle hours traveled each day.  (*Id.* at 112, 117.)  A year's delay would cause travelers to lose almost 22 million additional hours that could not be spent with families, community, or recreation.  (*Id.*)  Congestion on I-70 also causes drivers to divert onto local streets, causing congestion and safety issues within nearby neighborhoods.  (*Id.* at 131, 134, 141, 150.)

### C.    The harms an injunction would inflict on the Project and public outweigh the Sierra Club's speculative environmental harms.

Sierra Club cites outdated cases to assert that environmental harm necessarily outweighs other harm, and it incorrectly contends that, outside "unusual circumstances," an injunction must issue for NEPA violations.  (ECF_88_Mot. 35-37.)  The Supreme Court has rejected those arguments.  Courts do not "presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances."  *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010).  "No such thumb on the scale is warranted."  *Id.*  Public-safety threats, job losses, frustration of state policy goals, and other factors can and sometimes do outweigh alleged environmental harms.  *See, e.g.*, *Winter*, 555 U.S. at 23-26; *Wilderness Workshop v. Bureau of Land Mgmt.*, 531 F.3d 1220, 1231 (10th Cir. 2008); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475-476 (9th Cir. 2010); *Lands Council*, 537 F.3d at 1005-1006.

This is one such time.  This case does not involve mere private economic harm.  As explained above, an injunction would cost the public at least $60 million and would:

- Jeopardize community investments that will improve neighborhood connectivity, health, and safety for nearby residents;

- Extend I-70 safety deficiencies;

- Increase risks to hundreds of thousands of people every day;

- Imperil 13,900 jobs;

- Frustrate state goals to improve highway safety;

- Delay other needed highway and bridge improvements; and

- Cause drivers to waste millions of hours in gridlock.

On the other side of the ledger is Sierra Club's assertion that air quality permitted by the NAAQS nevertheless creates an unquantified, yet unacceptable risk of harm—an assertion that EPA necessarily rejected in setting the NAAQS. The equitable inquiry here is not a close call. Harms to the Project and public far outweigh Sierra Club's alleged harms.

Sierra Club contends (ECF_88_Mot. 36) that harm to the Project is "self-induced," but the only case it cites for that contention involved an agency that entirely refused to examine environmental impacts before proceeding. *P.R. Conservation Found. v. Larson*, 797 F. Supp. 1066, 1068-72 (D.P.R. 1992). Here, the Agencies spent over a decade on the NEPA process, considered multiple rounds of public comment, and produced an EIS thoroughly examining all environmental impacts. (*See* ECF_46-1_FEIS 35-37, 237-71.) Only after completing that process, committing to unprecedented mitigation, and receiving final approval did CDOT select a developer. This case does not involve an "improper agency decision to steamroll the implementation of its plans." *Larson*, 797 F. Supp. at 1073.

Sierra Club cannot use the mere filing of its lawsuit to hold hostage this long-planned and desperately needed Project.  The harms a preliminary injunction would cause to the Project and public far outweigh the Sierra Club's unsubstantiated harm.

## CONCLUSION

Sierra Club has come nowhere close to showing the factors necessary for preliminary relief.  The Court therefore must deny Sierra Club's motion and allow the Project to proceed.

Respectfully submitted,

BRENT E. BUTZIN
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6638
Brent.Butzin@coag.gov

JOHN E. PUTNAM
NICHOLAS A. DIMASCIO
KAPLAN KIRSCH & ROCKWELL LLP
1675 Broadway, Suite 2300
Denver, CO  80202
(303) 825-7000
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

*Attorneys for Defendant-Intervenors*

DEC. 6, 2017

*s/ Nicholas A. DiMascio*
NICHOLAS A. DIMASCIO

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit imposed by the Court.  (ECF 73.)  Excepting

portions of the brief described in Fed. R. App. P. 32(f), the brief contains 9,469 words.


s/  *Nicholas A. DiMascio*
NICHOLAS A. DIMASCIO

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2017, I electronically filed the foregoing document and all of its attachments with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Melissa A. Hailey
Aaron D. Goldhamer
Keating Wagner Polidori Free, P.C.
1290 Broadway, Suite 600
Denver, CO 80203
(303) 534-0401
(303) 534-8333
mah@keatingwagner.com
agoldhamer@keatingwagner.com

James Jay Tutchton
Tuchton Law Office
6439 East Maplewood Avenue
Centennial, CO 80111
(720) 301-3843
jtutchtontlo@gmail.com

Robert E. Yuhnke
4050 Se Hosner Terrace
Gresham, OR  97080
(303) 499-0425
bob.yuhnke@prodigy.net

Andrea S. Gelfuso
Andrea Gelfuso, Attorney at Law
2402 South Holland Street
Lakewood, CO  80227
(303) 955-1910
agelfuso6@gmail.com

Carter F. Thurman
Mayte Santacruz
U.S. Department of Justice
Env't & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0465 (phone)
(202) 305-0506 (fax)
carter.thurman@usdoj.gov
mayte.santacruz@usdoj.gov

David A. Carson
United States Department of Justice
Env'l Natural Resources Division
Environmental Defense Section
Denver Place Building
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
(303) 844-1349
david.a.carson@usdoj.gov

Gregory Nicholas Corbin
Milligan Rona Duran & King, LLC
1627 Vine Street
Denver, CO  80206
(720) 414-2000
gnc@mrdklaw.com

s/  Nicholas A. DiMascio
NICHOLAS A. DIMASCIO