Exhibit 6:

Attachment Q to I-70 East Final Environmental Impact Statement and Section 4(f) Evaluation, January 2016





**COLORADO**
Department of
Transportation

**I-70 East Final Environmental Impact Statement**
**and Section 4(f) Evaluation**

**JANUARY 2016**

**VOLUME 3 OF 3, PART 1 OF 3**
**Attachment Q: Supplemental Draft EIS Comments and Responses**
*Agencies and Elected Officials, Businesses, and Special Interest Groups*



I-70EAST.COM

*This page intentionally left blank.*

# Supplemental Draft EIS Comments and Responses

## Supplemental Draft EIS Comment Period

The comment period on the Supplemental Draft EIS began on August 29, 2014 and was scheduled to end on October 13, 2014. Because of multiple requests for additional time, the review period was extended through October 31, 2014. Formal open houses/public hearings were held in September 2014.

During the comment period, nearly 900 individual submissions—many containing multiple comments—were received from the public, stakeholders, and agencies.

Comments received were posted on the project website, www.i-70east.com, shortly after the close of the comment period.

## How to find specific Responses to Comments

The comments received and responses are presented side-by-side in this document. Comments are organized into the following groups: Agencies and Elected Officials, Businesses, Special Interest Groups, and Citizens. Comments within each group are organized alphabetically, Citizens are alphabetized by last name (see Table of Contents).

Part 1 of Attachment Q includes:

- Frequently Received Comments and Response

- Comments from Agencies and Elected Officials

- Comments from Businesses

- Comments from Special Interest Groups

Part 2 and 3 of Attachment Q includes:

- Comments from Citizens

Each topic within the comments is coded with a letter, and responses to each letter can be found on the right. In some cases, when the

responses do not fit, they are continued on the next page.

The responses are structured to be comprehensive and address the content of the comments. Please refer to the main document of the Final EIS (Volume 1) for the list of Acronyms and Abbreviations.

Comments that provided either support or opposition for the project were reviewed by the project team and responded simply with a "comment noted."

The reader may be referred to other similar responses and/or the text in the Supplemental Draft EIS or Final EIS; this is done to create a more concise response and to help guide the reader to the sections where additional information about the content of the comment is contained.

A list of Frequently Received Comments was prepared and responded to in order to capture a majority of the topics that were commented on. The Frequently Received Comments start on page 1 of Part 1. Again, the responses address topics that were commented on by multiple reviewers and address the majority of the comments submitted. Many of the responses to individual comments refer the commenter to a specific response (or responses) for more details.

For each response to a frequently submitted comment, the response refers the commenter or reviewer to the topic and response number where the frequent responses can be located, an example is shown below:

> For information on the Steele/Vasquez interchange, please see PA6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

Comments that were received in Spanish are included along with responses, with translations (comments and responses) included on the following page.

## Sources of Comments Received

Comments on the Supplemental Draft EIS were submitted through a variety of methods including:

- Submittal – online form through the project website, emails to contactus@i-70east.com, written comments or letters, comment forms from the public hearings (submittal)

- Public hearing transcript – testimony from the public hearings

- Voice mail – recorded telephone messages



*This page intentionally left blank.*

TABLE OF CONTENTS

*This page intentionally left blank.*

# Table of Contents: Attachment Q

## Part 1:  Agencies and Elected Officials, Businesses, and Special Interest Groups

**Frequently Received Comment and Responses**

General Topics............................................1
Outreach Efforts ........................................1
Alternatives Analysis...................................2
Impacts and Mitigation Measures ................3
Preferred Alternative...................................6
Air Quality and Health.................................7
Property Impacts ........................................9
Environmental Justice Considerations ........10
Transportation and Traffic .........................11
Funding Strategies ...................................14

**Comentarios y Respuestas Recibidos con Frecuencia**

Temas Generales......................................19
Esfuerzos de Participación Pública.............20
Análisis de las Alternativas........................20
Impactos y Medidas Atenuantes ................21
Alternativa Preferida .................................24
La Calidad del Aire y la Salud....................26
Impactos a la Propiedad ............................29
Consideraciones de Justicia Ambiental.......30
Transporte y Tráfico..................................31
Estrategias de Financiamiento ..................34

**Agencies and Elected Officials**

U.S. Environmental Protection Agency ......A-1
U.S. Department of the Interior..................A-7
Aurora ...................................................A-9
City of Commerce City
    City Manager Brian McBroom and Staff...................................................A-11
    Commerce City Councilman Rene Bullock ...............................................A-27
Denver
    Mayor Michael B. Hancock and Denver Department of Public Works ....A-28
    Denver Councilwoman Jeanne Faatz ..A-90
    Denver Councilwoman Judy Montero ..A-91
    Denver Councilwoman Deborah Ortega .................................................A-96
    Denver Auditor Dennis Gallagher ......A-135
Denver Public Schools ..........................A-163

**Businesses**

B&C Steel, Inc............................................B-1
Blender Products, Inc..................................B-3
Conley D.C. Solutions, Inc. .......................B-5
Contage Salon  .........................................B-6
Denver Rescue Mission
    Brad Meuli.........................................B-7
    David Schunk......................................B-8
    Griff Freyschlag....................................B-9

Formula Roofing......................................B-10
The GrowHaus .......................................B-11
Iron & Metals, Inc. ..................................B-19
National Western Stock Show ..............B-20
North Park Transportation Co................B-21
Wright & McGill .....................................B-22

**Special Interest Groups**

Adams County Economic Development, Inc...................................S-1
American Institute of Architects Denver and American Society of Landscape Architects.................................................S-2
Bike Denver Board ....................................S-4
Chaffee Park Registered Neighborhood Association........................S-6
Clayton United............................................S-8
Clinica Tepeyac
    Jim Garcia...........................................S-9
    Flossie O'Leary....................................S-10
Colorado Latino Forum ............................S-12
Colorado Motor Carriers Association
    Art Ballah ...........................................S-13
    Gregory Fulton.....................................S-14
Conservation Colorado and  Southwest Energy Efficiency Project........................S-17
CoPIRG ...................................................S-27

Downtown Denver Partnership, Inc..........S-34
Globeville Civic Association #2................S-35
Globeville Elyria Swansea  Housing Advisory Group.......................................S-43
Globeville, Elyria, Swansea Organizers Group......................................................S-46
Habitat for Humanity of Metro Denver......S-79
Iliff School of Theology
    Rev. Dr. Miguel A. De La Torre and Dr. Tink Tinker .....................................S-83
    Jill Fleishman .....................................S-86
League of Women Voters of Colorado .....S-90
League of Women Voters of Denver .......S-94
Neighborhood Development Collaborative.............................................S-97
Sand Creek Regional Greenway............S-101
Sierra Club
    Becky English ....................................S-102
    Bob Yuhnke .......................................S-104
Unite North Metro Denver
    Sherri Rich ........................................S-128
    Thaddeus Tecza and Sullivan Green Seavy LLC ........................................S-145
Urban Land Conservancy......................S-186
Visit Denver ..........................................S-188

## Part 2: Citizens A through J

## PART 3: Citizens K through Z

*This page intentionally left blank.*

FREQUENTLY RECEIVED COMMENTS AND RESPONSES

*This page intentionally left blank.*

# Table of Contents: Frequently Received Comments and Responses

**General Topics** ................................................................................. 1

GEN1. What is the purpose of the I-70 East project? ........................................... 1

GEN2. What are the limits of the I-70 East project, and why were they selected? ...................... 1

GEN3. Why is the highway being widened to five lanes in each direction? .............................. 1

GEN4. How is CDOT using the American Planning Association's Peer Review in the project's decision making process? ............................................................................. 1

GEN5. Will there be a requirement for the contractor to hire from the impacted neighborhoods? ... 1

**Outreach Efforts** ................................................................................. 1

OUT1. How has CDOT involved the public and other project stakeholders in the decision making process? ............................................................................. 1

OUT2. How are public meeting notes and materials made accessible to the public and other interested parties? ............................................................................. 2

OUT3. How did CDOT ensure the Spanish-speaking community was involved in the process and had access to project materials? ....................................................... 2

**Alternatives Analysis** ......................................................................... 2

ALT1. Why can't CDOT select an alternative that has no impacts to the surrounding environment? ............................................................................. 2

ALT2. Are alternatives being considered that would remove I-70 East from its current alignment? 2

ALT3. Was the I-270/I-76 Reroute Alternative considered, and will CDOT perform a Supplemental Draft EIS on the Reroute Alternative? ............................................. 2

ALT4. Is the Revised Viaduct Alternative still being considered in the Final EIS? ...................... 3

**Impacts and Mitigation Measures** .......................................................... 3

IMP1. What plans does CDOT have to offset the project's impacts? ................................. 3

IMP2. How will water from heavy weather events be conveyed and treated in the lowered section? ............................................................................. 4

IMP3. How will the highway traffic noise be minimized in the adjacent neighborhoods after construction? ............................................................................. 4

IMP4. How will construction impacts to Swansea Elementary School be mitigated? ................. 4

IMP5. How is CDOT preserving the impacted historic properties within the study area? ............ 5

IMP6. How will CDOT handle hazardous materials identified and/or encountered within the project area? ............................................................................. 5

IMP7. How is CDOT planning to minimize dust during construction? ............................... 5

IMP8. How will noise be controlled and minimized during construction? ............................ 5

**Preferred Alternative** .......................................................................... 6

PA1. What are the benefits of the highway cover? ............................................. 6

PA2. Why was the cover provided as part of the Preferred Alternative? ................................ 6

PA3. Who will maintain the highway cover? ................................................. 6

PA4. What features will be included in the cover design? ................................................. 6

PA5. What will lighting be like under the cover? ................................................. 6

PA6. Will the Steele Street/Vasquez Boulevard interchange be closed with the Preferred Alternative? ............................................................................. 6

PA7. Why was the Managed Lanes Option identified as the preferred operational option? ........ 6

PA8. Does the Preferred Alternative include a second highway cover? .................................. 7

PA9. Does the Preferred Alternative reduce north-south connectivity? ........................................ 7

**Air Quality and Health** ......................................................................... 7

AQ1. Was a Health Impact Assessment performed for the I-70 East Final EIS? ...................... 7

AQ2. Why were additional transportation-related pollutants, including fine particulates (PM2.5) and oxides of nitrogen (NO2), not examined at the same level of detail given to carbon monoxide (CO) and coarse particulates (PM10)? ........................................ 7

AQ3. Will the highway improvements cause an increase in air pollution for local residents or Swansea Elementary School? ................................................. 8

AQ4. Will exposure to highway air pollution result in adverse health conditions? .................... 8

AQ5. What will air quality be like in and near the park planned for the highway cover in the Partial Cover Lowered Alternative, as well as inside the covered highway section itself? ... 8

AQ6. Will the Preferred Alternative worsen the air quality in the project area? ........................ 9

AQ7. How does CDOT plan to monitor the air quality in the adjacent neighborhoods and near Swansea Elementary School before, during, and after construction activities? ......... 9

**Property Impacts** ............................................................................... 9

PROP1. Does the Managed Lanes Option require additional right-of-way acquisition? ................. 9

PROP2. What property impacts will the Preferred Alternative have to the nearby neighborhoods? How will CDOT assist the displaced residents? .................................... 9

PROP3. Will CDOT replenish the housing stock in the neighborhood to mitigate the acquisition impacts? ............................................................................. 10

PROP4. Will residents in the vicinity of I-70 be provided assistance to move if they choose to move? ............................................................................. 10

PROP5. Will CDOT relocate Swansea Elementary School farther away from I-70 to lessen the impacts from the project? ................................................. 10

**Environmental Justice Considerations** ...................................................... 10

# Table of Contents: Frequently Received Comments and Responses

**EJ1.** Has CDOT accounted for impacts to the Environmental Justice communities? ................. 10

**EJ2.** Are there any high and adverse impacts to the Environmental Justice community as a result of the project? ........................................................................................................... 10

**EJ3.** What has CDOT done to minimize impacts to the Environmental Justice neighborhoods? ... 11

**Transportation and Traffic** ....................................................................................................... 11

**TRANS1.** Have other multi-modal forms of transportation been investigated for this corridor? ............ 11

**TRANS2.** How will the project improve walkability and bicycle routes for the neighborhoods, especially near the interchanges and along north-south street connections? ..................... 11

**TRANS3.** Will there be any changes to the intersection at 47th Avenue and York Street, and will CDOT provide a pedestrian overpass in this location? .................................................... 12

**TRANS4.** Does CDOT plan to widen I-70 west of the I-25/I-70 interchange, after I-70 East is widened? 12

**TRANS5.** How was traffic forecasting determined for the project? .................................................. 12

**TRANS6.** Which travel model was used to forecast future traffic demand along the I-70 East corridor? 12

**TRANS7.** Why wasn't the latest travel demand model (DRCOG Focus model) used to project future demand? ...................................................................................................................... 13

**TRANS8.** Can CDOT restrict truck traffic on I-70 through the Elyria and Swansea Neighborhood? ...... 13

**TRANS9.** How will the project impact truck traffic in the adjacent neighborhoods? ........................... 13

**TRANS10.** Where will the traffic on I-70 be diverted during construction? .......................................... 13

**TRANS11.** Has the change in driving trends been considered in developing the alternatives for this project? ......................................................................................................................... 13

**Funding Strategies** ................................................................................................................ 14

**FUND1.** How will CDOT protect local interests by limiting the investment of foreign companies in the I-70 East project? ....................................................................................................... 14

**FUND2.** Will ownership of the highway be transferred to a private company through a public-private partnership (P3) delivery method? ..................................................................................... 14

**FUND3.** How will the toll rates be set? ...................................................................................... 14

**FUND4.** Why isn't CDOT using the toll revenue to fund this project or other needed items in the surrounding communities? .............................................................................................. 14

**FUND5.** What is the project funding strategy? ............................................................................ 14

# Frequently Received Comments and Responses on the Supplemental Draft EIS

A list of Frequently Received Comments was prepared and responded to in order to capture a majority of the topics that were commented on. The responses address topics that were commented on by multiple reviewers and address the majority of the comments submitted. These topics include general, information, outreach efforts, alternatives analysis, impacts and mitigations, Preferred Alternative, air quality and health, property impacts, environmental justice, transportation and traffic, and funding strategies. Many of the responses to individual comments refer the commenter to a specific response (or responses) for more details.

## General Topics

### GEN1.   What is the purpose of the I-70 East project?

The purpose of the I-70 East project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70.

### GEN2.   What are the limits of the I-70 East project, and why were they selected?

The I-70 East project limits extend along I-70 between I-25 and Tower Road. The project area covers locations within Denver, Commerce City, and Aurora. This document focuses on the neighborhoods of Globeville, Elyria and Swansea, Northeast Park Hill, Stapleton, Montbello, Gateway, and a portion of Aurora.

Existing and forecasted traffic volumes were the main factor in determining the project limits on I-70. Forecasted traffic volumes for the year 2035 range from 95,000 to 270,000 vehicles per day between I-25 and Peña Boulevard, declining east of there. The western limit is I-25 because of the high diversion of traffic from I-70 to both northbound and southbound I-25. Between 40 percent and 50 percent of traffic traveling westbound on I-70 diverts onto I-25. Tower Road is the eastern limit because the traffic volumes drop substantially east of Peña Boulevard.

### GEN3.   Why is the highway being widened to five lanes in each direction?

The Final EIS traffic analysis used the 2035 DRCOG regional travel demand model to forecast horizon-year traffic volumes to determine the number of lanes that will be needed in the horizon year. This model uses planned employment and population data to determine traffic volumes, as discussed in Chapter 4, Transportation Impacts and Mitigation Measures of the Final EIS. This model also accounts for planned improvements to other modal networks, including transit.

Between Brighton Boulevard and I-270, both eastbound I-70 and westbound I-70 are projected to carry more than 10,000 vehicles per hour in the peak design period. Between I-270 and I-225, both eastbound I-70 and westbound I-70 are projected to carry upwards of 15,000 vehicles per hour in the peak design period.

Based on the Transportation Research Board's *Highway Capacity Manual*, to achieve a minimum level of service threshold for a freeway, approximately 2,000 passenger cars must pass per hour per lane. The planned Build Alternatives propose a five-lane cross-section including an additional lane in each direction between I-225 and I-270 to meet the forecasted capacity needs. Detailed traffic modeling confirms the proposed improvements. Additionally, the volumes and proposed number of lanes were compared to other freeways in metro Denver, further confirming the proposed cross sections. Detailed information on traffic volumes and forecasting is available in Chapter 4, Transportation Impacts and Mitigation Measures of the Final EIS. Additionally, CDOT and FHWA also considered the need for the highway lanes based on very recently released DRCOG projections of traffic for 2040 that are slightly lower than the 2035 estimates. Based on the segment-by-segment assessment, the agencies concluded that the Phase 1 project lane configurations were still appropriate. See Attachment E, *Traffic Technical Report* for more information.

### GEN4.   How is CDOT using the American Planning Association's Peer Review in the project's decision making process?

The American Planning Association (APA) conducted a peer review of the I-70 East project during the public comment period for the Supplemental Draft EIS. This review was performed independently from CDOT and FHWA, when the I-70 East project team normally is restricted from participating in such activities. The project team provided some information to answer APA's questions, but was precluded from responding in an in-depth manner at that time.

CDOT asked APA to submit the report as a comment to the Supplemental Draft EIS process, which would provide the project team an opportunity to respond directly to the questions and observations set forth in the report. The APA declined, saying that it was, "… offering our insights to Denver for your consideration as you move forward with next steps in relation to the project." The Final EIS provides new information and context relevant to the resulting report, addressing many of the questions it raises, in areas such as travel demand modeling or managed lanes.

### GEN5.   Will there be a requirement for the contractor to hire from the impacted neighborhoods?

CDOT is prohibited by federal law from requiring contractors on any federally funded project to hire from a particular location or neighborhood. However, CDOT has submitted an application and received approval under Special Experiment Project 14 (SEP-14) for the US DOT pilot program to execute geographic-based hiring preferences for the I-70 East project. Additionally, CDOT will facilitate opportunities to promote local hiring, including hosting local job fairs. CDOT is researching funding a local workforce development program aimed at job readiness training prior to construction. In general, community outreach will continue to be a very important part of the project, particularly as construction nears. CDOT will look to a variety of tools to ensure that local residents and businesses are well informed of the construction phasing and approach.

## Outreach Efforts

### OUT1.   How has CDOT involved the public and other project stakeholders in the decision making process?

CDOT has conducted continuous public involvement on the I-70 East project for more than 11 years, including door-to-door outreach and public and neighborhood meetings in the most directly impacted neighborhoods. As part of its outreach efforts, CDOT convened a committee of community and stakeholder representatives in 2009 after publication of the 2008 Draft EIS. This group, the Preferred Alternative Collaborative Team (PACT), met regularly over the course of one year

# Frequently Received Comments and Responses on the Supplemental Draft EIS

to help identify a preferred alternative. The information gathered during the outreach process has helped the project team refine the project alternatives. Stakeholder involvement will continue through final design and construction.

Some of the meetings, such as the Community Leaders meeting, are intended to be informal. Public meetings held by the I-70 East project team are held in the evenings with notices sent to the public and stakeholders two weeks prior to the meeting. CDOT has used many different public outreach techniques to invite the public to participate in the meetings. These techniques include, but are not limited to, email blasts, mailers, flyers, door-to-door canvassing, phone invitation, and a neighborhood informational kiosk.

To encourage public participation and to make the meetings accessible for the general public, all public meetings have been held at ADA-accessible locations in nearby neighborhoods including, but not limited to, Elyria and Swansea, Commerce City, Aurora, and Northeast Park Hill. Food, childcare, and Spanish translation also have been provided at all of CDOT's public meetings.

Comments received during public outreach efforts were considered by CDOT and were incorporated in the decision making process as appropriate. These changes include, but are not limited to, refinements to the mitigation commitments, updating the air quality analysis, keeping the Steele Street/Vasquez Boulevard interchange open, and coordinating with Denver on drainage solutions.

Please refer to Chapter 10, Community Outreach, of the Final EIS for details about the project's outreach efforts to the public and stakeholders.

## OUT2.   How are public meeting notes and materials made accessible to the public and other interested parties?

I-70 East project-specific public meetings are documented and the meeting notes from these meetings are available on the project website (http://www.i-70east.com/) and were available as hard copies upon request. Handout materials from meetings are translated into Spanish and translators are available at every meeting. Official public hearings on the 2008 Draft EIS and Supplemental Draft EIS included transcripts, which also are available on the project website. This documentation has been used to help inform the NEPA process.

## OUT3.   How did CDOT ensure the Spanish-speaking community was involved in the process and had access to project materials?

Spanish translators have been available throughout the process at every public meeting and at the project office during the Supplemental Draft EIS public comment period. The Executive Summary for the Supplemental Draft EIS and the Final EIS are published in both English and Spanish. The materials on the English website are translated to Spanish on a regular basis and are included on the Spanish version of the website (http://www.i-70east.com/index-es.html). All printed and electronic materials distributed to the public—including mailers, flyers, emails, newsletters, and posters—are bilingual in English and Spanish. Door-to-door outreach in the impacted communities also has been conducted with Spanish-speaking team members.

## Alternatives Analysis

## ALT1.   Why can't CDOT select an alternative that has no impacts to the surrounding environment?

In NEPA, there is typically a No-Action Alternative that has no impacts other than routine maintenance activities. The I-70 viaduct needs to be replaced because of its deteriorating structural conditions. Therefore, the No-Action Alternative for the I-70 East project cannot be a true "No-Action Alternative" due to safety issues. The No-Action Alternative replaces the viaduct, but does not add capacity in terms of additional lanes. However, this alternative does require adding width to the replaced structure. All alternatives that are under consideration, including the No-Action Alternative, expand the footprint of the roadway to meet current design and safety standards. See Chapter 3, Summary of Project Alternatives, of the Final EIS for more information on the alternatives.

## ALT2.   Are alternatives being considered that would remove I-70 East from its current alignment?

More than 90 alternatives have been considered during the EIS process, including alternatives that realign and reroute I-70, an alternative to avoid the environmental justice community of Elyria and Swansea, and an alternative that used local networks. One alternative that would have realigned a portion of the highway was advanced as an alternative in the

2008 Draft EIS, but was later eliminated through the public involvement process and because it was clear that the alternative did not meet the purpose and need of the project. Other alternatives that move the highway away from the current alignment were evaluated and found not to be reasonable alternatives. All alternatives currently being evaluated are located on the current alignment of I-70. See Chapter 3, Summary of Project Alternatives, of the Final EIS for more information on the alternatives development and analysis process.

## ALT3.   Was the I-270/I-76 Reroute Alternative considered, and will CDOT perform a Supplemental Draft EIS on the Reroute Alternative?

The I-270/I-76 Reroute Alternative was evaluated and eliminated in the early stages of the 2008 Draft EIS alternatives analysis process because it did not meet the project's purpose and need. Elimination of the alternative was reaffirmed in Section 3.5 of the 2014 Supplemental Draft EIS after additional analysis was performed because it does not meet the project's purpose to implement a transportation solution that improves safety, access, and mobility, and it does not address congestion on I-70. As discussed in Section 3.9 of the Final EIS, it is not a reasonable alternative because:

- Rerouting I-70 while leaving 46th Avenue at its current location encourages highway users to use 46th Avenue to reach their destinations rather than staying on I-70. Because of this, there will be a substantial increase in traffic volumes on 46th Avenue, which introduces safety, access, and mobility issues in the surrounding neighborhoods and also creates a barrier for bicyclists and pedestrians moving through the community.

- Based on the traffic analysis, traffic volumes forecasted for 2035 on 46th Avenue if I-70 was to be rerouted will be 10 to 20 times higher (more than 50,000 vehicles per day) than the traffic forecasted for 46th Avenue with the alternatives that leave the highway at its current location.

- Rerouting I-70 also will force delivery trucks and other large vehicles to use 46th Avenue frequently to reach the industrial areas and businesses located near the existing I-70.

- There would be an increase in out-of-direction travel, causing mobility issues. Of the traffic heading west on I-70, approximately 50 percent continues past I-25, staying on I-70. The Reroute

# Frequently Received Comments and Responses on the Supplemental Draft EIS

Alternative adds two miles of out-of-direction travel for these vehicles. Thirty-five percent of the traffic heading west on I-70 exits to southbound I-25. The Reroute Alternative adds four miles of out-of-direction travel for these vehicles, resulting in increased travel times.

- There will no longer be multiple east-west highway route choices in the area. The multiple route choices are beneficial for emergency access.

- This alternative requires more than 12 miles of major highway widening along I-270 and I-76. This increases the project construction cost to approximately $3.5 billion to $4 billion, which is twice as much as existing alignment alternatives.

- Many stakeholders—including Commerce City, Adams County, the North Area Transportation Alliance, and the Colorado Motor Carriers Association—have expressed continued opposition to this alternative.

Because it has been determined that the I-270/I-76 Reroute Alternative is not reasonable, an additional Supplemental Draft EIS to analyze the impacts for this alternative in more detail is not necessary. To see more details on the analysis performed on the I-270/I-76 Reroute Alternative, please see Attachment C, *Alternatives Analysis Technical Report Addendum*.

## ALT4.   Is the Revised Viaduct Alternative still being considered in the Final EIS?

The Revised Viaduct Alternative is a reasonable alternative and is considered and evaluated in the Final EIS. However, the Partial Cover Lowered Alternative with Managed Lanes has been identified as the Preferred Alternative. It provides more opportunities for mitigation in the Elyria and Swansea neighborhood and is more widely supported by the community and various stakeholders.

## Impacts and Mitigation Measures

### IMP1.   What plans does CDOT have to offset the project's impacts?

Many of the mitigation measures CDOT is committing to include are typical mitigation measures that would be part of any project. One example is Best Management Practices (BMPs), which are effective, feasible (including technological, economic, and institutional considerations) conservation practices and land and water management measures that avoid or minimize adverse impacts to natural and cultural resources. BMPs may include schedules for activities, prohibitions, maintenance guidelines, and other management practices. Physical BMPs may include items such as hay bales for erosion control or silt fencing.

Additionally, many of the resources evaluated involve regulatory items or procedures that need to be followed, and may include mitigation requirements. Typical BMPs and regulatory items are included in the estimate to construct the project, and are not called out separately unless there is specific reason for doing so. The majority of these items are captured within the specifications/construction plans for the project.

Examples of typical mitigation measures and standard BMPs and regulatory items to be provided include (note this is not an all-inclusive list):

- Compensate any person(s) whose property needs to be acquired for the Preferred Alternative according to the U.S. Constitution and the Uniform Relocation Assistance and Real Property Acquisition Policies Act (Uniform Act) of 1970, as amended.

- Follow the Programmatic Agreement with the State Historic Preservation Office (SHPO) for mitigation commitments to historic resources.

- Construct noise walls, as required, to minimize noise impacts for post-construction conditions.

- Conduct preconstruction paleontological surveys and continuous paleontological monitoring during all phases of construction.

- Return all parks and trail crossings to their pre-construction state, and maintain trail access during construction.

- Mitigate permanent impacts to Section 6(f) properties (certain public recreation and outdoor properties) in accordance with Section 6(f)(3) of the Land and Water Conservation Fund (LWCF) Act.

- Cover, wet, compact, or use chemical stabilization binding agents to control dust and excavated materials at construction sites.

- Use wind barriers and wind screens to prevent spreading of dust from the site.

- Cover all dump trucks leaving sites to prevent dirt from spilling onto streets.

- Prohibit unnecessary idling of construction equipment.

- Locate construction staging areas as far away as possible from residential uses.

- Comply with Senate Bill 40 (state wildlife and habitat protection), CDOT Impacted Black-Tailed Prairie Dog Policy, and CDOT Standard Specifications for protection of migratory birds.

- Mitigate unavoidable, permanent wetland impacts at a 1:1 ratio in a wetland mitigation bank in the South Platte River watershed.

- Return wetlands temporarily impacted to pre-construction conditions.

- Use best management practices for groundwater dewatering, treatment, and disposal during the construction process.

- Implement standard construction measures for stormwater erosion control.

- Investigate ways to maintain safe and efficient connections through the neighborhood during construction for all modes of transportation. This will mean active communication to the residents so that they are aware of temporary street closures and detours. It could also include working with RTD to minimize disruptions to service areas and schedules.

Comments received during public outreach efforts were considered by CDOT and reasonable and feasible mitigation ideas were incorporated in the project as appropriate. In response, the project team has developed additional mitigation measures beyond those required or normally

# Frequently Received Comments and Responses on the Supplemental Draft EIS

provided in Colorado to lessen the adverse impacts in the project study area. Any mitigation measures included in the Record of Decision for the project must and will be completed.

- Provide a covered segment over I-70, up to 1,000 feet long, where it will pass below grade through the Elyria and Swansea Neighborhood, including an urban landscape on top.

- Provide for a base level of landscaping on the highway cover necessary to provide an active community space for surrounding residents and local neighborhoods, support social and pedestrian connections in the Elyria and Swansea Neighborhood, and provide new space for the Swansea Elementary School.

- Provide funding to Community Resource Housing Development Corporation (CRHDC), which they will use to assist residential and business displacees with financial counseling and procurement of financing for replacement property and securing business and residential loans. CDOT has already provided funding to CRHDC as early mitigation.

- To reduce impacts from dust and noise during construction, for homes between 45th and 47th Avenues, from Brighton Boulevard to Colorado Boulevard:
  - Provide interior storm windows
  - Provide two portable or window-mounted air conditioning units with air filtration and assistance to pay for the potential additional utility costs during construction

- Provide $2 million to replace some low-income housing units acquired in the Elyria and Swansea Neighborhood through existing available programs.

- Facilitate opportunities to promote hiring individuals from the communities, such as job fairs with contractors. Other areas that CDOT is researching include investing funds in a local workforce development program aimed at job readiness training prior to construction and submitting an application for the US DOT pilot program to execute geographic-based hiring preferences for the I-70 East project.

- Contribute to existing programs that facilitate access to fresh food.

- Provide a robust and context-sensitive communications and outreach plan throughout construction to ensure residents are kept informed.

- Redesign and reconstruct the Swansea Elementary School playground, including building a playground in a temporary location during construction and rebuilding school parking facilities. Other mitigation measures for the school include:
  - Install new windows, doors, and a new heating and ventilation system (HVAC).
  - Build two additional classrooms.

- Collect representative soil samples of three or four recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities. Require contractor to implement standard dust control measures (specifically, for PM10), like watering, erosion control blankets, or reseeding, as a condition for conducting work. In addition, continuous PM10 monitors will be placed along portions of the project corridor where active construction is under way. These monitors will have "alert levels" to give early notice to onsite construction workers if there are high dust readings so they can address the problem immediately.

- Provide funding and participate in a documentary covering the history of I-70 East and its relationship to the Elyria and Swansea and Globeville neighborhoods. CDOT has already completed this task as early mitigation. This documentary is available on the project website at www.I-70east.com.

For more detail on and the full list of mitigation measures, refer to Section 5.23, Summary of Project Impacts and Mitigations, of the Final EIS.

## IMP2.   How will water from heavy weather events be conveyed and treated in the lowered section?

Project design for the Partial Covered Lowered Alternative provides capture and conveyance for the 1-percent annual chance (100-year) storm event and substantially reduces the risk of flooding north of I-70, compared to the existing conditions. An onsite drainage system will capture stormwater from the highway and an offsite drainage system will capture stormwater from the surrounding neighborhoods. Prior

to discharging to the receiving stream, the onsite drainage system will discharge to a water quality pond to provide water quality treatment. The outlets of the ponds are smaller than the inlets of the ponds, so runoff is temporarily stored in the ponds and releases over a period of a few days. During this time (CDOT requires a minimum drain time of 40 hours), sediment settles out of the runoff and is stored in the ponds. The runoff, with reduced sediments, discharges to the South Platte River. Permanent water quality BMPs are included in the design for these systems.

Denver is in the planning stages of its separate Two Basin Drainage Project. Depending on the timing of Denver's construction of the Two Basin Drainage Project, it could allow for the outflow of the I-70 East offsite system to be modified, reducing I-70 East impacts for the Preferred Alternative.

## IMP3.   How will the highway traffic noise be minimized in the adjacent neighborhoods after construction?

Noise impacts and mitigation measures were analyzed in accordance with CDOT's *Noise Analysis and Abatement Guidelines* (2015). Thorough analysis was conducted for each neighborhood and each alternative, including the noise reduction associated with the lowered highway and cover in the Partial Cover Lowered Alternative. Mitigation analyzed optimal noise wall placement and height for all impacted receptors. Analysis then determined if the optimal noise walls were feasible and reasonable per CDOT's standards. The Final EIS provides details and locations of sound walls that are found to be feasible and warranted. For more information regarding noise analysis and the proposed mitigation measures, see Section 5.12, Noise, of the Final EIS.

## IMP4.   How will construction impacts to Swansea Elementary School be mitigated?

CDOT has been working with DPS to develop construction mitigation measures for Swansea Elementary School. An alternate location for the school will not be implemented during the construction period.

Mitigation measures for the school include providing a new HVAC system, doors, and windows to reduce the dust and noise impacts to the school and its users, specifically during the roadway construction period. CDOT also will pay for the construction of two new classrooms. Providing additional classrooms prior to highway construction will help

# Frequently Received Comments and Responses on the Supplemental Draft EIS

mitigate some impacts by providing offsetting benefit to the community to enhance the overall quality of the school beyond the construction period. These upgrades will be completed before the construction starts.

CDOT has been coordinating with DPS and Swansea Elementary School's principal throughout the project to identify the school's needs and redesign the school site. The school playground will be temporarily reconfigured to move it away from the construction zone, with ultimate redesign of the school site included in the final design.

Finally, continuous PM10 air quality monitoring will be conducted in the area during construction to evaluate for any potential temporary increases in PM10 levels during construction. This system will alert contractors when increased construction mitigation measures are needed.

### IMP5.   How is CDOT preserving the impacted historic properties within the study area?

CDOT and FHWA recognize the significance of the historic resources within the project area. However, to meet the purpose and need of the project, historic resources will be adversely impacted. FHWA and CDOT are working closely with the State Historic Preservation Office (SHPO) and consulting parties to minimize potential effects and institute appropriate mitigation.

A draft Programmatic Agreement that provides a process to agree on mitigation of adverse effects and reevaluate eligibility and effects to historic properties, as appropriate, has been developed and is in review with SHPO and the consulting parties. The Programmatic Agreement also includes examples of mitigation measures that could be implemented. The Programmatic Agreement will be executed prior to the ROD and will be included as an attachment.

See Section 5.6, Historic Preservation, of the Final EIS for more information about the impacts to historic properties and the associated mitigation measures.

### IMP6.   How will CDOT handle hazardous materials identified and/or encountered within the project area?

CDOT will conduct appropriate surveys for asbestos, lead-based paint, and universal wastes prior to demolition of any building structures. If these materials are encountered, they will be removed in accordance with applicable regulations and guidelines.

If asbestos-containing materials are encountered, including buried utilities, CDOT will follow CDOT Specification 250.07, Asbestos-Containing Material Management, and CDOT Asbestos-Contaminated Soil Management Standard Operating Procedure. Additionally, depending on the type of contamination, this material will be cleaned up in accordance with either Section 5.5 of the Solid Waste Regulations, or Regulation No. 8 of the Air Quality Control Commission Regulations.

The Colorado Department of Labor and Employment, Division of Oil and Public Safety, regulates petroleum products and chemical USTs and certain petroleum-containing above-ground storage tanks (ASTs). Releases must be reported to the Division of Oil and Public Safety, and investigation and cleanup must be implemented, as required. Most USTs have had a spill or leak at some point in their life cycle. Small leaks may not be identified until the UST is taken out of service and formally closed.

Groundwater and soil sampling have been performed as part of the hazardous materials analysis for the EIS and the results are available in Section 5.18, Hazardous Materials, of the Final EIS.

Additionally, CDOT commits to collect representative soil samples of three or four recently cleaned-up residential properties pre-, during, and post-construction to test for lead and arsenic to ensure that the properties aren't re-contaminated due to construction activities. Any hazardous materials that have been exposed during construction will be identified and treated. This commitment was generated due in large part to comments received during the Supplemental Draft EIS regarding concerns with arsenic and lead.

Section 5.18, Hazardous Materials, of the Final EIS identifies various mitigation measures that will be implemented during construction to protect community and worker health and safety, as well as measures to manage and prevent the spread of contamination, if present.

### IMP7.   How is CDOT planning to minimize dust during construction?

Dust suppression measures (for example, stabilizing and covering loads of soil and debris during transport and storage, watering disturbed areas, and/or stabilizing and revegetating exposed areas after construction) will be implemented to control dust impacts.

Additionally, to reduce impacts from dust during construction and minimize the need for window ventilation, for homes between 45th and 47th Avenues, from Brighton Boulevard to Colorado Boulevard:

- Provide interior storm windows

- Provide two portable or window-mounted air conditioning units with air filtration and assistance to pay for the potential additional utility costs during construction

### IMP8.   How will noise be controlled and minimized during construction?

Measures will be taken to minimize noise during construction. Construction noise mitigation measures can be found in the FHWA's *Highway Construction Noise Handbook*. CDOT will require the contractor to use BMPs to reduce noise during construction. Additionally, to reduce impacts from noise during construction and minimize the need for window ventilation, for homes between 45th and 47th Avenues, from Brighton Boulevard to Colorado Boulevard:

- Provide interior storm windows

- Provide two portable or window-mounted air conditioning units with air filtration and assistance to pay for the potential additional utility costs during construction

This project will abide by the appropriate city codes as they pertain to construction noise. If noise levels during construction are expected to exceed the limits from the city codes, the contractor must obtain the necessary ordinance variance which typically includes additional mitigation measures. See the Final EIS, Attachment K, *Traffic Noise Technical Report*, under Section 6.4, Construction Noise, for further information.

In the vicinity of Swansea Elementary School, construction noise will be reduced to the maximum extent possible during school hours. If possible, construction should take place during times when school is not in session. If this is not possible, high construction noise activities should take place during non-school hours. Temporary noise shielding also could be used around the school playground and other outdoor areas of frequent use.

# Frequently Received Comments and Responses on the Supplemental Draft EIS

## Preferred Alternative

### PA1.    What are the benefits of the highway cover?

Incorporation of the highway cover will help reconnect the surrounding neighborhoods by providing easy and safe connections between these communities for all users, especially pedestrians and bicyclists. The inclusion of the highway cover with an urban landscape and a community space helps achieve some broader community goals of livability, quality schools, and safe streets along with supporting the existing communities along the corridor. In addition, the highway cover reduces noise impacts in adjacent areas. The cover will directly contribute to improved air quality, resulting in PM10 concentrations that are lower at Swansea Elementary School and the surrounding area than they would be in the future without the cover (No-Action Alternative). Additionally, the cover will indirectly improve neighborhood conditions by encouraging walking and bicycling for short trips to local destinations.

### PA2.    Why was the cover provided as part of the Preferred Alternative?

The Partial Cover Lowered Alternative was developed in response to the community's concerns to reconnect the Elyria and Swansea Neighborhood by removing the existing viaduct or the potential for a newly constructed viaduct, and placing the highway below ground level. By placing the highway below grade in this area, the visual barrier created by the existing viaduct will be eliminated. The 900 foot cover over the lowered section of I-70 will have a park or urban landscape on it that can draw in residents from both the north side and the south side of the highway, creating a seamless connection across the highway and providing additional connectivity within the neighborhood. It will be located between Clayton Street and Columbine Street and will not exceed 1,000 feet in length due to ventilation requirements mandated in fire and safety standards.

The cover for the highway was developed to mitigate the adverse impacts to the Elyria and Swansea Neighborhood and to restore and enhance neighborhood cohesion, which was disrupted decades ago by the original I-70 construction in the 1960s. The highway cover is intended to serve as an active community space for the surrounding residents and local neighborhoods, while also providing mitigation for Swansea Elementary School. To provide a seamless connection between the

highway cover and the school and a safe environment for students to use the cover facilities, 46th Avenue on the north side of the highway will be discontinued between Clayton Street and Columbine Street.

The landscaped cover also supports social connections in the Elyria and Swansea Neighborhood by creating a place where residents and visitors can gather and interact. The amenities and design in this space—such as playgrounds and sports fields— will be based on community input and needs.

### PA3.    Who will maintain the highway cover?

CDOT is responsible for the maintenance of the structure of the cover. Maintenance of the features and landscaping on the cover has not been determined at this time. CDOT is working with Denver and DPS to develop agreements for shared use on the cover and long-term operations and maintenance of the cover. The maintenance commitment plan will be developed and these agreements will be finalized before construction begins.

### PA4.    What features will be included in the cover design?

The cover is intended to be a shared space between the surrounding community and Swansea Elementary School. The landscaped cover also supports social connections in the Elyria and Swansea Neighborhood by creating a place where residents and visitors can gather and interact. The amenities and design in this space—such as playgrounds and sports fields— will be based on community input and needs. See Attachment P, *Cover Planning Efforts*, of the Final EIS for more information regarding cover planning.

### PA5.    What will lighting be like under the cover?

The lighting of the covered section will be designed to meet fire and safety requirements, as well as to avoid the "black hole effect," which was a major issue with the old I-70 Stapleton tunnels. The covered area of the highway will be well lit by using the latest lighting technologies to enhance drivers' safety and operations on the highway.



*This photo from the Twin Tunnels on I-70 outside of Idaho Springs, Colorado is an example of latest lighting technologies (on left) vs. old standards of lighting.*

### PA6.    Will the Steele Street/Vasquez Boulevard interchange be closed with the Preferred Alternative?

As identified in the Final EIS, the Steele Street/Vasquez Boulevard interchange will remain open as part of the Preferred Alternative design in response to the comments received during the Supplemental Draft EIS. Highway access would be provided through a split-diamond interchange at Steele Street/Vasquez Boulevard and Colorado Boulevard with slip ramps. The slip ramps allow for full movement at the interchange while minimizing traffic in the neighborhood and the footprint of the highway at the Steele Street/Vasquez Boulevard interchange. See Chapter 3, Summary of Project Alternatives, of the Final EIS for more information.

### PA7.    Why was the Managed Lanes Option identified as the preferred operational option?

The Managed Lanes Option is identified as the Operational Option of the Preferred Alternative because of its long-term operational flexibility and mobility benefits. Managed lanes provide drivers with flexibility by allowing them to pay a fee to bypass congestion in general-purpose lanes, improving reliability in travel times. It also allows CDOT to manage congestion over the long term, reducing the need for future expansion. The Managed Lanes Option also has a higher throughput potential, meaning it accommodates more people at a given time. This option accommodates express buses, vanpools, and other high-occupancy vehicles, providing increased service to those riders. This option also promotes the use of carpools to avoid congestion.

# Frequently Received Comments and Responses on the Supplemental Draft EIS

**PA8.  Does the Preferred Alternative include a second highway cover?**

A second cover is not included as part of the Preferred Alternative. However, to accommodate Denver's interest in constructing a second cover in the future, the Preferred Alternative includes an overall approach to design and construction that would not preclude the construction of a second cover over the highway from west of the Steele Street/Vasquez Boulevard interchange to east of Cook Street. If a second cover is pursued by others in the future, air quality would need to be analyzed.

**PA9.  Does the Preferred Alternative reduce north-south connectivity?**

The following north/south connections from Brighton Boulevard to Quebec Street are included, maintained, modified, or eliminated based on the analysis and continued coordination:

- Brighton Boulevard: vehicular connection under I-70 remains

- York Street: vehicular connection across I-70 is maintained as a one-way street

- Josephine Street: vehicular connection across I-70 is maintained as a one-way street

- Columbine Street: vehicular connection across I-70 is maintained as a two-way street

- Elizabeth Street: direct vehicular connection south of I-70 does not currently exist; Elizabeth Street between 47th Avenue and 46th Avenue North will be vacated to accommodate the school improvements

- Thompson Court: vehicular connection to 46th Avenue is maintained; access across I-70 does not currently exist

- Clayton Street: vehicular connection across I-70 is maintained as a two-way street

- Fillmore Street: vehicular connection across I-70 is added as a two-way street

- Milwaukee Street: vehicular connection to 46th Avenue is maintained; access across I-70 does not currently exist

- Steele Street/Vasquez Boulevard: vehicular connection across I-70 is maintained as a two-way street

- Cook Street: two-way vehicular connection across I-70 is added

- Madison Street: vehicular connection to 46th Avenue South is maintained; access to 46th Avenue must be made via the proposed Monroe Street one block east; access across I-70 does not currently exist

- Monroe Street: two-way vehicular connection across I-70 is added; new roadway is extended north and south to replace the eliminated Garfield Street connection

- Garfield Street: connection across I-70 is eliminated and replaced by the new Monroe Street connection

- Colorado Boulevard: vehicular connection over I-70 remains

- Dahlia Street: vehicular connection under I-70 remains

- Holly Street: vehicular connection under I-70 remains

- Monaco Street: vehicular connection under I-70 remains

- Quebec Street: vehicular connection under I-70 remains

For more information on the north/south connections that are proposed as part of the Preferred Alternative, please see Chapter 3, Summary of Project Alternatives, in the Final EIS.

## Air Quality and Health

**AQ1.  Was a Health Impact Assessment performed for the I-70 East Final EIS?**

Based on public comments, much of the concern for health relates to the air quality surrounding the highways. A health study (health impact assessment or health risk assessment) is not required by NEPA or the Clean Air Act and therefore it has not been performed for this project. The current health status of the affected communities has been thoroughly discussed in the DEH's Health Impact Assessment (September 2014). The Final EIS adds to the information discussed in the DEH study by showing how air quality is likely to change in the future under different project alternatives. The analyses conducted for the Final

EIS show that EPA's air quality standards for CO and PM10 will be met, PM10 levels will be better at Swansea Elementary School with the project than under the No-Action Alternative and MSATs will drop by 70 to 90percent regardless of which alternative is chosen. Potential impacts from the I-70 redevelopment project, including effects of each alternative on the ability to meet the health-based NAAQS, and on levels of MSATs, are discussed in detail in Section 5.20, Human Health Conditions, in the Final EIS.

As seen in the emissions inventories for NAAQS pollutants and MSATs, the difference between the alternatives (including the No-Action Alternative) in emissions is around 2 to 4 percent or less. See Attachment J, *Air Quality Technical Report*. Further, the emissions (and, therefore, likely concentrations) associated with I-70 East are substantially declining because of improved mobility, reduced congestion, and cleaner vehicle emission standards. For example, the MSAT emissions estimates prepared by APCD show that diesel particulate matter emissions are predicted to drop from 749 pounds per day in 2010 to 48 pounds per day (No-Action Alternative) or 49 pounds per day (Partial Cover Lowered with Managed Lanes) in 2035. Benzene emissions are predicted to drop from 133 pounds per day in 2010 to 26 pounds per day (No-Action Alternative) or 27 pounds per day (Partial Cover Lowered with Managed Lanes) in 2035. The other MSATs emissions will have similar reductions. See Attachment J, *Air Quality Technical Report* at Section 7.4. All of these emissions levels incorporate predicted increases in VMT in the corridor. Thus, a health impacts assessment would, at most, show very minor differences between alternatives with much lower impacts than historic or current levels in terms of air quality impacts. This would not affect choices among the reasonable alternatives.

**AQ2.  Why were additional transportation-related pollutants, including fine particulates (PM2.5), and oxides of nitrogen (NO2), not examined at the same level of detail given to carbon monoxide (CO) and coarse particulates (PM10)?**

The Air Quality protocols (available in Attachment J of the Final EIS, *Air Quality Technical Report*, Appendix A) were developed through interagency coordination between CDOT, the FHWA, the CDPHE, and the EPA. All agencies agreed to the protocols, which did not include PM2.5 or NOx modeling.

# Frequently Received Comments and Responses on the Supplemental Draft EIS

PM2.5 and NO2 were not modeled for roadside concentrations in the Final EIS because they are not pollutants of concern in the Denver area or the project area at the present time or for the foreseeable future. The Denver area has never violated the NAAQS for PM2.5 and is not in imminent danger of doing so based on current monitoring data and predicted trends. The current sixth-highest 24-hour value (which is the value used to determine compliance per EPA's regulation) for PM2.5 at CDPHE's I-25/8th Avenue monitoring site (which has higher ADT than the current I-70 East project area) is 30 µg/m3, compared to the standard of 35 µg/m3. Therefore, no hotspot modeling for PM2.5 is required. With regard to NO2, the EPA conformity regulations do not require hotspot modeling for NO2. See 40 C.F.R. Section 93.116.

PM2.5 and NO2 were examined through emissions inventories. There is very little variation in emissions between the Build Alternatives and the No-Action Alternative due to improved mobility, reduced congestion, and cleaner vehicle standards.

## AQ3.   Will the highway improvements cause an increase in air pollution for local residents or Swansea Elementary School?

The MSAT and NAAQS air quality analysis performed for the Final EIS shows that overall emissions will decrease in the future because of improved mobility, reduced congestion, and cleaner vehicle emission standards. For MSATs, the analysis showed that the I-70 East project will have a minimal effect on annual emissions within the study area (see Exhibit 5.10-21 of the Final EIS), with the various alternatives showing a range of annual MSAT emissions from 2.1 percent to 3.8 percent above the No-Action Alternative in the design year of 2035. The overall trend in MSAT emissions is clearly downward with all alternatives showing an approximately eight- to nine-fold decrease from current rates by 2035 (Exhibit 5.10-21 of the Final EIS).

Throughout the NEPA process, CDOT and FHWA have consulted extensively with the EPA and CDPHE on the approach and methods for the air quality analyses. This consultation has resulted in agreement on the analysis methodologies and the results of these analyses. The roadside (hotspot) CO and PM10 analyses used the current traffic estimates and emissions and pollutant dispersion models, and were reviewed by the EPA. The CO hotspot analysis showed that all alternatives will result in CO levels well below the NAAQS. The PM10 analysis showed that all alternatives will result in levels at or below the NAAQS for this pollutant. It is also worth noting that both analyses were

conducted at the worst-case scenario locations within the project study area, ensuring that air quality conditions in other areas will be less than those resulting from the hotspot analyses.

Additionally, modeling receptors were placed at Swansea Elementary School for the PM10 hotspot analysis, with the results presented in Exhibit 5.10-13 of the Final EIS to show that all of the locations modeled would remain well below the health-based NAAQS for PM10. Air monitoring will be conducted during construction activities to ensure that air quality at the school does not reach dangerous levels.

## AQ4.   Will exposure to highway air pollution result in adverse health conditions?

Current research states that exposure to highway air pollution can result in adverse health conditions; however, it is difficult to determine the extent the emissions from I-70 would affect the surrounding community. NAAQS limits set by EPA, protect human health. The modeled air quality values for the I-70 East project are below the NAAQS and demonstrate that there is no exceedance or impact from the project based on EPA's health-based standards for these pollutants. Therefore, there are no projected impacts from the project related to pollutants covered by the NAAQS.

The Health Effects Institute Special Report #16, Mobile-Source Air Toxics: A Critical Review of the Literature on Exposure and Health Effects, states the cancer health effects attributable to MSATs are difficult to discern because the majority of quantitative assessments are derived from study groups of workers with high concentration exposures and because some cancer potency estimates are derived from animal models. Exposure to many MSATs comes from sources other than vehicles, and identifying effects in community studies is challenging because of low ambient concentrations, exposures to multiple possible toxicants, and other confounding factors.

In January 2010, the Health Effects Institute released Special Report #17, investigating the health effects of traffic-related air pollution. The researchers felt that there was "sufficient" evidence for linking asthma to traffic related pollution. Evidence was "suggestive but not sufficient" for other detrimental health outcomes such as cardiovascular mortality. Study authors also noted that past epidemiological studies may not provide an appropriate assessment of future health associations because vehicle emissions are decreasing over time.

Finally, in 2011, three studies were published by the Health Effects Institute evaluating the potential for MSAT hot spots. In general, the authors confirmed that while highways are a source of air toxics, they were unable to find that highways were the only source of these pollutants. They determined that near-road exposures often were no different or no higher than background (or ambient) levels of exposure and, hence, no true hot spots were identified. These reports (Report Numbers 156, 158, and 160) are available from the Health Effects Institute's website: http://pubs.healtheffects.org/index.php.

Additionally, CDOT notes that while the incidence of some health effects (such as asthma, autism, and attention-deficit/hyperactivity disorder) in the U.S. population appears to have been increasing, motor vehicle emissions have declined. This decline in MSAT emissions is documented in Figure 13 of Attachment J, *Air Quality Technical Report*, of the Final EIS and for other pollutants at epa.gov/ttn/chief/trends/. This negative correlation between emissions trends and health effects trends illustrates the complexity of the issues. Health Risk Assessments that have been conducted for highways show health risks well below EPA's acceptable risk factors. For example the conclusion from the South Mountain Freeway Health Risk Contributions from Highway Projects found: "the MSAT risk estimates in the studies summarized above are correct, it means that the incremental risk of cancer from breathing air near a major roadway is several hundred times lower than the risk of a fatal accident from using a major highway."

The EPA's National Emission for Hazardous Air Pollutants for benzene emissions is based on a risk level of 100 cases of cancer per million. Meanwhile, the EPA's 2007 rule covering vehicles and fuels is designed to a risk level of approximately 5 cases of cancer in a million; 20 times less than the standard for the pollutant in general.

Also see Section 5.20, Human Health Conditions, of the Final EIS for project-specific information on the topic. AQ2 and AQ3 have information on declining emissions.

## AQ5.   What will air quality be like in and near the park planned for the highway cover in the Partial Cover Lowered Alternative, as well as inside the covered highway section itself?

Air quality around the cover was examined in the I-70/I-25 PM10 hotspot analysis, utilizing state-of-the-art modeling software to estimate the pollutant concentrations in the area. This analysis showed that all of

# Frequently Received Comments and Responses on the Supplemental Draft EIS

the areas around Swansea Elementary School and the cover were well below the ambient air quality standards for PM10. Additionally, Exhibit 5.10-13 of the Final EIS shows that modeled PM10 concentrations at Swansea Elementary School will be lower with the Partial Cover Lowered Alternative than with the No-Action Alternative or the Revised Viaduct Alternative, as a result of the cover adjacent to the school.

With regard to air quality within the covered highway section, the cover was designed to be short enough not to require artificial ventilation during normal operations. As the two directions will be separated by a full-height wall, the action of cars moving through each side of the covered section will keep air moving through so that pollutants do not accumulate to unhealthy levels. According to a fire safety and ventilation report prepared for the project (Appendix E to the *Air Quality Technical Report* of the 2014 Supplemental Draft EIS), traffic would have to be at a complete stand still for 27 minutes before the level of pollutants would rise to the point of requiring ventilation. In such a situation, or in case of a fire or other accident that could cause unhealthy air quality under the cover, an emergency ventilation system will be provided to clear the air and keep it safe for people inside. The design of the cover includes jet fans that will help move the air through the covered portion of the highway, when necessary.

With regard to air quality near the openings of the covered highway section, studies have shown that pollutant concentrations dissipate rapidly with distance from the tunnel openings. See the *Air Quality Technical Report*, Attachment J to the Final EIS for more information.

## AQ6.  Will the Preferred Alternative worsen the air quality in the project area?

By improving mobility and reducing congestion through increased capacity and reduced travel times along with the closure of the Pilot Travel Center truck stop as a result of the project, the Preferred Alternative is anticipated to generally improve air quality in the area compared to the No-Action Alternative. As seen in the emissions inventories for NAAQS pollutants and MSATs, the difference between the alternatives (including the No-Action Alternative) in emissions is around 2-4 percent or less, even though VMT will increase. See the *Air Quality Technical Report,* Attachment J to the Final EIS for more information.

In the I-70/I-25 PM10 hotspot analysis, for example, the modeled PM10 concentration for the Preferred Alternative is 57 µg/m3, whereas the No-Action Alternative concentration is 62 µg/m3. Nine of the 10 receptors at Swansea Elementary School show PM10 concentrations that are 10 µg/m3 lower for the Preferred Alternative than for the No-Action Alternative, with the same concentration between the two alternatives for the remaining receptor.

The design values for all alternatives at the I-25 hotspot and I-225 hotspot locations are equal to or below the 24-hour PM10 NAAQS of 150 µg/m3. The greatest difference between the No-Action Alternative and a Build Alternative occurs at the I-225 hotspot for the Revised Viaduct and Partial Covered Lowered Alternatives with Managed Lanes Option. These alternatives show increases of as much as 57 percent between modeled concentrations, but still below the NAAQS.

## AQ7.  How does CDOT plan to monitor the air quality in the adjacent neighborhoods and near Swansea Elementary School before, during, and after construction activities?

Prior to beginning the construction phase, the contractor will be required to produce a Fugitive Dust Control Plan for the project, which must be approved by the CDPHE's Air Pollution Control Division (APCD) as part of the air permitting process. The plan will be reviewed by APCD staff to ensure that BMPs are stipulated for the control of airborne dust from construction activities. Adherence to the plan during construction activities will minimize the effects of dust on surrounding communities.

The construction project team also will establish a Construction Air Quality Monitoring Plan, which will outline the specific monitoring needs, equipment, and processes used to measure, maintain, and report PM10 data. It will establish data capture and public data reporting protocols. The plan will include supporting documents that define concentration thresholds for alerting onsite construction management to rising dust levels that they need to implement extra dust suppression BMPs at the target site. A list of BMPs and construction activities will be included in this plan. The plan also will include quality control and action plan items required for EPA and APCD data reporting and equipment calibration and maintenance.

During construction, air monitoring will be conducted to ensure that dust control efforts are successful in preventing violations of air quality standards. The air quality monitoring conducted during construction on

the I-70 East project will focus on PM10 monitors in active construction areas along the corridor, as practicable, to monitor hourly PM10 concentrations. The purpose of this temporary monitoring will be to maintain awareness of dust generation from active ground-disturbing processes, such as demolition, excavation, rock crushing, etc.; to help in identifying localized rising dust levels; and to activate a responding BMP Implementation Plan if dust levels attain pre-determined thresholds.

Additionally, as noted in Section 5.18, Hazardous Materials, of the Final EIS, site-specific health and safety and materials management plans will be developed by CDOT to stipulate required response measures if hazardous materials are encountered during construction to ensure protection of worker and public health and safety.

## Property Impacts

### PROP1.  Does the Managed Lanes Option require additional right-of-way acquisition?

The Managed Lanes Option does not require more width or lanes than the General-Purpose Lanes Option west of I-270 (five general-purpose lanes in each direction for the general-purpose lanes option, three general-purpose lanes and two managed lanes in each direction for the managed lanes option). The Managed Lanes and General-Purpose Lanes Options both use the same width for analysis purposes. East of I-270, the Managed Lanes Option is wider than the General-Purpose Lanes Option in the ultimate configuration, because of additional ramps that will provide direct connections from the Managed Lanes to I-270, I-225, and Peña Boulevard.

### PROP2.  What property impacts will the Preferred Alternative have to the nearby neighborhoods? How will CDOT assist the displaced residents?

The Preferred Alternative will require the acquisition of property that will result in the relocation of 56 residential units and 18 businesses (including one non-profit organization).

# Frequently Received Comments and Responses on the Supplemental Draft EIS

CDOT will notify all impacted owners and renters of the intent to acquire an interest in their property, including providing a written offer of just compensation specifically describing those property interests. A right-of-way specialist will be assigned to each property owner to help them understand and navigate this process.

Residents (renters or owners) will not be required to move unless at least one comparable Decent, Safe, and Sanitary (DSS) replacement unit is available. DSS standards are established by federal regulations and conform to applicable local housing and occupancy codes. CDOT will provide comparable replacement housing that is DSS and within the resident's financial means, before any residents will be required to move. If such comparable replacement housing is not available, the regulations allow the agency to provide a replacement housing payment in excess of the statutory maximum as part of the Last Resort Housing process.

The Fifth Amendment of the U.S. Constitution provides that private property may not be taken for a public use without payment of just compensation. Additionally, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act) is a federally mandated program that applies to all acquisitions of real property or displacements of persons resulting from federal or federally assisted programs or projects, such as the implementation of these project alternatives. The Uniform Act was created to provide for and ensure that just compensation for government-acquired land is applied "uniformly." CDOT requires Uniform Act compliance on any project for which it has oversight responsibility, regardless of the funding source.

## PROP3.  Will CDOT replenish the housing stock in the neighborhood to mitigate the acquisition impacts?

To offset the loss of some residential units in the neighborhood, CDOT will provide $2 million in funding to develop affordable housing units in the Elyria and Swansea Neighborhood through available programs.

## PROP4.  Will residents in the vicinity of I-70 be provided assistance to move if they choose to move?

The only parties eligible for relocation benefits from CDOT are building occupants who are directly displaced by a CDOT acquisition as a result of this project and who meet the applicable requirements for eligibility. Relocation is not needed or appropriate for other residents because air pollutant concentrations will be below federal health standards and declining over the life of the project. Noise levels will be lowered

through the lowered section of I-70, the cover and sound walls. Moving residents of homes not needed for actual construction would be an expensive measure that would disrupt communities rather than improving them by displacing more people than the bare minimum necessary to safely meet the purpose and need.

## PROP5.  Will CDOT relocate Swansea Elementary School farther away from I-70 to lessen the impacts from the project?

Swansea Elementary School has been identified as a very important and valuable resource in the Elyria and Swansea Neighborhood. The project team researched the neighborhood to identify another suitable locations for the school. The only available location identified was where the Swansea Recreation Center currently resides. The community expressed opposition to moving the school to the recreation center site because of the adjacent railroad tracks. The decision to keep the school at its current location was made during outreach opportunities conducted to review alternative sites for the school, and surveys of parents at the school during the PACT process.

CDOT developed the Partial Cover Lowered Alternative to keep the school in its current location while minimizing impacts to it. The mitigation for the school redesigns and expands the school grounds and provides upgrades to the school building.

The residents of the Elyria and Swansea neighborhood are in favor of the school remaining at its current location with the Preferred Alternative. DPS also supports this decision.

## Environmental Justice Considerations

### EJ1.  Has CDOT accounted for impacts to the Environmental Justice communities?

CDOT recognizes that the project passes through environmental justice neighborhoods, and so provided an unprecedented level of public involvement tailored to meet the needs of these low-income and minority people to find ways to improve the project, and lessen the impact of the project. The I-70 East project team used a variety of tools to solicit input and involvement from stakeholders that addressed issues of diversity in language, level of literacy, and exposure to media including:

• Opening a project office within the project area

• All public meetings are conveniently located within the project area and accessible by public transportation

• Providing childcare, food, and translations at every public meeting

• Providing notifications and advertisements in both English and Spanish

• Provide announcements in local and regional media and at faith-based organizations

• Using local businesses to cater meetings and provide translation services

• Employing project area residents to lead and staff outreach efforts

• Distributing flyers door-to-door to area residences and businesses

• Providing several methods of contact with the project team including e-mail, telephone, website, postal mail, and walk-ins

• Providing all communication in both English and Spanish

CDOT performed critical analyses that focused on specific impacts in these underserved communities, including some that are mentioned in the 2014 DEH Health Impact Assessment: neighborhood and street connectivity, air quality, access to transit, bicycle and pedestrian facilities, and relocations. To address impacts of the highway project, CDOT has identified mitigation measures above and beyond standard mitigation measures to alleviate the impact on these neighborhoods. See Section 5.3, Environmental Justice, of the Final EIS for more information.

### EJ2.  Are there any high and adverse impacts to the Environmental Justice community as a result of the project?

The benefits of the project with the alternatives are fairly distributed in the project area. The project has avoided some impacts, minimized others, and mitigated all impacts that could not be avoided or minimized. Without considering the avoidance, minimization, and mitigation measures, the project will have a disproportionately high and adverse impact to the environmental justice communities. However, the I-70 East Project includes many innovative mitigation measures to offset

# Frequently Received Comments and Responses on the Supplemental Draft EIS

the impacts to the low-income and minority populations. Some of these mitigation measures include but are not limited to, providing residents close to the highway construction interior storm windows and two free portable or window-mounted air conditioning units with air filtration and assistance for the potential additional utility costs during construction, providing contributions to existing programs that facilitate access to fresh food, providing HVAC system and upgraded doors and windows for the Swansea Elementary School, and providing funding to CRHDC to assist residential and business displacees with financial counseling and procurement of financing for replacement property and securing business and residential loans. After considering the benefits of the Build Alternatives along with the avoidance, minimization, and mitigation, the Build Alternatives will not cause disproportionately high and adverse effects on any minority or low-income populations, in accordance with the provisions of Executive Order 12898 and FHWA Order 6640.23A. No further environmental justice analysis is required.

Additionally, the Managed Lanes Option raises environmental justice questions related to equity impacts: who can use the facility, will there be additional impacts, are there impacts to those who don't have cars, and has everyone been involved in the public process. The managed lanes will provide reduced travel times for users at all income levels, and provide a reliable trip through the corridor when drivers consider it worth the toll. While the pricing on managed lanes will provide more reliable options, it will be implemented with thorough consideration of equity impacts. Further, the improvements in north-south connectivity for pedestrian access and bicycle options will benefit mobility for those who live in the environmental justice neighborhoods and do not own cars.

See Section 5.3, Environmental Justice, of the Final EIS for more information.

### EJ3.   What has CDOT done to minimize impacts to the Environmental Justice neighborhoods?

The project team has consistently been receiving comments concerned about the impacts to the residential and business properties between Brighton Boulevard and Colorado Boulevard. The project has been modified at various stages of the NEPA process over the course of time. First the project team adjusted and refined the proposed Existing Alignment Alternatives (called the Revised Viaduct Alternative in the Supplemental Draft EIS and the Final EIS) after release of the 2008 Draft EIS and during the PACT process. It responded by moving 46th Avenue underneath the viaduct, thereby minimizing impacts to the surrounding

homes and businesses. Additional north-south connectivity also has been added to this alternative to improve community cohesion compared to the Existing Alignment Alternatives in the 2008 Draft EIS.

Next, to reduce the visual presence of the viaduct in these neighborhoods, improve connectivity, and improve safety in the area, the project team introduced a new alternative in the Supplemental Draft EIS: the Partial Cover Lowered Alternative, after listening to concerns raised during the PACT process. This alternative removes the viaduct between Brighton Boulevard and Colorado Boulevard and places the highway below grade in this area. It includes a highway cover between Columbine Street and Clayton Street with an urban landscape for community use. Removing the viaduct improves safety compared to the existing conditions by eliminating falling objects from the highway, removing the dark space under the viaduct, and eliminating the unsafe crossings as they exist currently under the viaduct. The support in the neighborhoods most affected by the project lead CDOT to identify this alternative as the Preferred Alternative.

In addition, the Partial Covered Lowered alternative will improve north-south connectivity, provide better pedestrian access and sidewalks, and improve bicycle options in the project area. These will benefit all residents in the environmental justice neighborhoods.

CDOT will also provide a level of mitigation never provided on other projects for residents close to the highway construction, to reduce impacts from dust and noise during construction and minimize the need for window ventilation, for homes between 45th and 47th Avenues, from Brighton Boulevard to Colorado Boulevard:

  • Provide interior storm windows

  • Provide two portable or window-mounted air conditioning units with air filtration and assistance to pay for the potential additional utility costs during construction

During the public involvement process, the project team heard from the residents of the impacted neighborhood that Swansea Elementary School is an important resource for them. Therefore, additional mitigation measures were developed so that the school can remain at its current location. These mitigation measures include providing a new HVAC system, doors, and windows to reduce the dust and noise impacts to the school and its users, specifically during the roadway construction period. CDOT also will pay for the construction of two new classrooms. Providing additional classrooms prior to highway construction will help

mitigate some impacts by providing offsetting benefit to the community to enhance the overall quality of the school beyond the construction period. These upgrades will be completed before the construction starts.

See Section 5.3, Environmental Justice, of the Final EIS for more information.

## Transportation and Traffic

### TRANS1.   Have other multi-modal forms of transportation been investigated for this corridor?

The purpose of this project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70 in the project area. This project began in 2003 as part of the I-70 East Corridor project, which looked at both highway and transit solutions including various rail and Bus Rapid Transit (BRT) routes. The process was a joint effort initially between both highway and transit agencies. In June 2006, the highway and transit elements of the project were separated since it was decided that they serve different travel markets, are located in different corridors, and have different funding sources. The East Corridor transit project will connect Denver International Airport to Union Station in Downtown Denver along Smith Road, south of I-70. Construction of the East Corridor transit project is currently underway and is anticipated to be complete in 2016. For more information about the transit project, visit: http://www.rtd-fastracks.com/ec_1.

### TRANS2.   How will the project improve walkability and bicycle routes for the neighborhoods, especially near the interchanges and along north-south street connections?

The proposed Preferred Alternative is consistent with Denver's bike plan and has evolved to follow Denver safety standards for bicycles and pedestrians. It will improve the bicycle and pedestrian experience in the project area by providing safe crossings across the highway and improving sidewalks and lighting in the impacted areas.

For more information on walkability and bicycle route improvements, see Chapter 4, Transportation Impacts and Mitigation Measures, of the Final EIS.

# Frequently Received Comments and Responses on the Supplemental Draft EIS

**TRANS3.   Will there be any changes to the intersection at 47th Avenue and York Street, and will CDOT provide a pedestrian overpass in this location?**

Although the project team heard concerns regarding the 47th Avenue and York Street intersection through the outreach process, these streets are not impacted by the highway project. Therefore, project improvements do not include any work at the 47th Avenue and York Street intersection. However, Denver has initiated an alternatives analysis for this area to identify potential safety improvements.

**TRANS4.   Does CDOT plan to widen I-70 west of the I-25/I-70 interchange, after I-70 East is widened?**

CDOT has no current or future plans to widen I-70 west of the I-25/I-70 interchange in Denver. Because of the long-term nature of transportation planning and funding, CDOT identifies transportation projects decades into the future (known as the 2035 long-range plan). This part of I-70 in Denver is not included in the long-range plan because traffic studies show that half of westbound traffic on I-70 East exits onto I-25. In fact, recent traffic projections show only a four percent growth in travel along the portion of I-70 west of the I-25/I-70 interchange during the next 30 years.

**TRANS5.   How was traffic forecasting determined for the project?**

Forecasting for this project was done using the 2035 DRCOG trip-based "Compass" travel demand model. Compass is a regional model that uses projected land use data, including population and employment growth, to project future traffic conditions. These projections were used to determine the number of lanes needed to accommodate future traffic growth. This model incorporates household and employment data for the region and accounts for programmed roadway and transit projects, including the East Corridor commuter rail line.

To further evaluate the traffic operations for the alternatives, the output from the DRCOG model was fed into a dynamic traffic assignment (DTA) model called "DynusT." DynusT simulates traffic supply and demand interactions on the network in greater detail for a sub-area of the

regional model. The sub-area is larger than the transportation impacts area to ensure it includes reasonable route diversions that could occur. The sub-area for this project extends west of Wadsworth to east of E-470 and extends south of Colfax Avenue to north of approximately 80th Avenue. This ensures that the model will take into account the effects of I-270, I-25, the I-25/I-70 interchange, and the local roadway network in the analysis. The model projects speeds, travel times, peak volumes, VMT, and local street volumes for the alternatives. For more information, see Chapter 4, Transportation Impacts and Mitigation Measures, of the Final EIS.

**TRANS6.   Which travel model was used to forecast future traffic demand along the I-70 East corridor?**

The 2035 Compass model developed by DRCOG was used to forecast future traffic demand along the I-70 East Corridor. During project scoping, the project team identified the DRCOG regional transportation plan as the basis for future travel forecasts within the study area. This decision has been confirmed throughout the project. This plan and its associated travel demand model includes anticipated population and employment growth for every municipality within DRCOG, as well as fiscally constrained improvements. The model also accounts for planned and programmed transit improvements in the region.

Travel demand models such as Compass provide output in the form of vehicle demand or volume. They provide data for decision makers to evaluate impacts to air quality, noise, and traffic flow resulting from transportation projects in metropolitan areas with intricate roadway networks and complex employment/population centers. The base models are typically owned and maintained by the local metropolitan planning organization, and in Denver that is DRCOG.

The model is regional in scope and encompasses the entire DRCOG transportation planning area which includes the nine counties of Adams, Arapahoe, Boulder, Broomfield, Clear Creek, Denver, Douglas, Gilpin, Jefferson and the SW portion of Weld County. DRCOG is required by law to model existing and future regional transportation systems (roadways and transit), as opposed to individual projects, to meet the Federal Transportation Planning requirements. A travel demand model is

essential for that process, and it is regularly validated through an FHWA Planning Certification Review which formalizes the on-going Federal oversight and evaluation of the MPO planning process.

The fundamental assumptions/characteristics behind the travel demand model include:

**#1: Growth of the region.** DRCOG uses the best economists and the State Demographer to estimate employment and population growth. This is the source of the current socio-economic data set used in all DRCOG models.

**#2: Model acceptance.** The model is accepted and certified by FHWA.

**#3: Network of roadways and transit.** The network coded into the model for the existing and future year conditions includes all projects contained in the DRCOG approved Regional Transportation fiscally constrained plan along with other roadway capacity projects to be completed by local governments.

**#4: Behavioral data.** Behavioral aspects of the model are derived from an extensive travel survey conducted by DRCOG and last collected in 2010. These surveys collect large amounts of data and are essential in helping the model relate people traits to travel choices. They are an infrequent and expensive undertaking and in the TDM community a survey from 2010 is considered recent and credible.

**#5: The travel demand model is not static.** The model is always changing as new land uses and roadway network elements become available. The model is updated frequently and calibrated to new traffic counts and estimates of region-wide VMT. The underlying behavioral assumptions may also change, as new tabulations of the Front Range Travel Counts become available.

Model inputs include:

- Socio-economic data (i.e. income, employment, etc.)

- Household and population data (i.e. number of individuals per household, either current or predicted future populations)

- Existing and future roadway network data (i.e. volumes, speeds, capacity, etc.)

# Frequently Received Comments and Responses on the Supplemental Draft EIS

- Transit network information including buses and trains (i.e. RTD FasTracks). DRCOG relies on RTD to code the transit portion of the model.

Highway and transit output data from the model are:

- Vehicular volumes on roads (flows on links)
- Speeds on links
- Network travel times
- Origin/destination patterns - These are represented by zone-to-zone trip tables, which are usually segmented by travel mode.
- Mode splits
- Emissions from cars and trucks
- Transit boardings or Park N Ride loadings

**TRANS7.   Why wasn't the latest travel demand model (DRCOG Focus model) used to project future demand?**

At the time that the project team was working on the 2008 Draft EIS and the Supplemental Draft EIS, the Focus model was not available or adopted by DRCOG. The Focus model was adopted by DRCOG in February 2015, well after the completion of the Supplemental Draft EIS and even after the start of the Final EIS process. Federal requirements mandate that NEPA studies use the current adopted regional travel demand model for analysis purposes, which was the DRCOG Compass model until February 2015 Along with the implementation of the Focus model, DRCOG began using a new land use model known as UrbanSim. UrbanSim was scheduled to be adopted at the same time as DRCOG's Focus model. Due to the timing of the adoption of both models, CDOT chose to continue using the DRCOG Compass model.

The project team has done a comparative analysis between the volumes from the Compass model being used in the Final EIS and the volumes that would have been generated by the newly adopted Focus model. This analysis found that the volumes from the Compass model are slightly higher than the Focus model volumes (typically, less than 5 percent difference for I-70), which does not change the number of lanes needed for this project. FHWA has reviewed the comparative analysis and has

agreed that the I-70 Final EIS can continue to use the volumes from the most recent Compass model, which the project is using to complete all analyses.

It should be noted that, before FHWA selects a preferred alternative in the ROD, the alternative will be included in the DRCOG's fiscally constrained regional transportation plan and it will be modeled with the Focus model software to demonstrate conformity with final air quality standards. See Attachment E, *Traffic Technical Report* for more information.

**TRANS8.   Can CDOT restrict truck traffic on I-70 through the Elyria and Swansea Neighborhood?**

Part of the purpose of the Interstate system is to promote economic development, and trucking is a major economic driver for the nation's economy. The areas adjacent to I-70 East are highly industrial and rely heavily on the need for trucks to move in and out of the area with ease. If truck access to I-70 were restricted, they would be forced to use local streets to access the local businesses in the area, negatively impacting safety and mobility in the nearby neighborhoods.

Except in limited circumstances (e.g., adverse weather, construction zones), per 23 CFR 658.11(d), the state of Colorado cannot deny truck access nor place restrictions on the Interstate System without FHWA approval. The request needs to be based on safety concerns. It requires an analysis of the impact to interstate commerce, and analysis and recommendations of alternative routes. A rebuilt I-70 East would significantly improve safety along this stretch of interstate for trucks and all other vehicles and surrounding neighborhoods.

CDOT conducted a heavy vehicle traffic study in order to determine how many heavy vehicles travel between I-270 and I-76 in a continuous journey. The through heavy vehicles represent less than three percent of the average, directional heavy vehicle traffic and less than one half of one percent of total directional traffic.

The collected data represents the total number of heavy vehicles that would be eliminated from the I-70 corridor if an I-270/I-76 reroute were implemented. Due to the low numbers of heavy vehicles passing all the way through the corridor and the off-peak travel distribution of those heavy vehicles, rerouting heavy vehicles to I-270/I-76 would not change the number of lanes required for the I-70 project.

**TRANS9.   How will the project impact truck traffic in the adjacent neighborhoods?**

While existing truck travel within the Elyria and Swansea Neighborhood is a concern of local residents, changes associated with the Build Alternatives would minimally impact these streets. In addition, the Pilot Travel Center truck stop will be closed as a result of the Build Alternatives that shift the highway northward, eliminating the truck traffic associated with this business.  Any potential changes to the designated truck routes and delivery routes will be coordinated with Denver to ensure impacts are minimized. This could be accomplished by setting up specific truck routes, establishing a prohibition on some roadways, and/or instigating specific delivery times based on input from local citizen groups.

**TRANS10.   Where will the traffic on I-70 be diverted during construction?**

A traffic management plan will be prepared by the contractor and reviewed by CDOT. CDOT will ensure that BMPs are used to minimize impacts during construction and provide safe and efficient connections through the neighborhoods during construction for all modes of transportation, including bicycles and pedestrians. CDOT will also ensure that BMPs are used to minimize impacts so that I-70 remains open and operational during construction.

**TRANS11.   Has the change in driving trends been considered in developing the alternatives for this project?**

Although recent studies have shown that people are driving less, the Denver metropolitan area will experience growth through 2035 that more than outweighs this trend. It is CDOT's responsibility to provide a transportation system that will accommodate this growth. Before conducting the analysis, future (2035) transportation system characteristics were identified. All I-70 project alternatives assume implementation of the transportation improvements identified in the DRCOG 2035 Metro Vision Regional Transportation Plan (MVRTP). This includes both programmed projects (those budgeted in the five-year Transportation Improvement Plan [TIP]) and planned projects (those not in the TIP, but included in the adopted DRCOG 2035 MVRTP). The more significant planned and programmed improvements to the

# Frequently Received Comments and Responses on the Supplemental Draft EIS

transportation system within the study area are shown in Chapter 4, Transportation Impacts and Mitigation Measures of the Supplemental Draft EIS.

In addition to planned roadway improvements, the analysis assumed the implementation of major transit system improvements within the Denver region as part of RTD's FasTracks program. Of most significance in the study area is the East Corridor commuter rail project, which will run from downtown Denver to Denver International Airport. The future traffic modeling accounted for these projects and their impact on travel demand.

The higher transit ridership due to expansion in transit was considered in the analysis of the Final EIS. Even with expanded transit use, the analysis shows an increase in ADT in the future, which requires additional lanes on the highway to accommodate the added traffic.

In addition, while some comments have pointed to national reductions in VMT following the recession of 2007-08, recent FHWA data has shown that VMT has been increasing again during the last 18 months and has reached pre-recession levels. For more information, see the FHWA website: https://www.fhwa.dot.gov/policyinformation/travel_monitoring/15juntvt/15juntvt.pdf.

## Funding Strategies

### FUND1.   How will CDOT protect local interests by limiting the investment of foreign companies in the I-70 East project?

CDOT sets limits for private concessionaires prior to issuing contracts. The High Performance Transportation Enterprise analyzes the financial needs of a project, including a company's expertise, not where the headquarters are located. Countries around the world—particularly in Canada, Australia, and Spain—have advanced new approaches to transportation projects, so a great deal of expertise is located internationally. Regardless of where the money comes from, U.S. corporate taxes must be paid by any private company hired by HPTE.

### FUND2.   Will ownership of the highway be transferred to a private company through a public-private partnership (P3) delivery method?

No. The public-private partnership being considered for I-70 East would involve a private partner in the design, construction, financing, operation, and long-term maintenance of I-70 East. However, CDOT maintains ownership of the highway at all times. Accountability to the public remains the same as it would for any other transportation project.

### FUND3.   How will the toll rates be set?

Managed Lanes are proposed for I-70 East strictly as a traffic management strategy, not to generate revenues or to use as part of a public-private partnership. Toll rates will be established by the High Performance Transportation Enterprise Board of Directors and will be set at a level necessary to maintain free-flow traffic conditions in these lanes. Existing general-purpose lanes will not be tolled.

### FUND4.   Why isn't CDOT using the toll revenue to fund this project or other needed items in the surrounding communities?

Tolling analysis performed by CDOT shows that the tolling revenue would not cover the cost of reconstructing the highway. State and federal law (C.R.S. 43-4-806 and Article 10, Section 18 of the State Constitution; 23 U.S.C. 129(3)) restrict the use of excess toll revenue. State law requires that toll revenue be spent within the corridor where the tolls are collected and on transportation-related improvements. Federal law limits the use of excess toll revenue to funding debt service, maintenance (reconstruction, resurfacing, and rehabilitation), and for other purposes for which federal funds can be spent under federal transportation law. Within these restrictions, it has been the practice of High Performance Transportation Enterprise to seek community input on the use of any excess tolls (revenue beyond what is needed to maintain the toll lanes).

### FUND5.   What is the project funding strategy?

The full construction of the Preferred Alternative would cost approximately $1.7 billion. Revenue sources for the I-70 East project include allocations from various state and local sources, but there remains a gap between the estimated cost of the project and the revenue available to build it. This is one of the reasons that CDOT is pursuing a P3 delivery method. Because of these funding limitations, the project will be constructed in phases over time. Chapter 8, Phased Project Implementation, discusses the proposed phases. The estimated cost of Phase 1 is $1.1 billion. To date, funding has been identified from the following sources for the I-70 East project:

- Bridge Enterprise Revenues ($850 million)

- Denver Regional Council of Governments (DRCOG)/Surface Transportation Program-Metropolitan Areas (STP-Metro)/ Congestion Mitigation/Air Quality (CMAQ) funds ($50 million)

- Senate Bill 09-228 funds ($180 million)

- Denver ($37 million)

Taxes would not be raised to pay for this project and CDOT is not looking at managed lanes as a way to finance construction of the I-70 East project.

Bridge Enterprise was formed by CDOT in 2009 as part of the FASTER (Funding Advancement for Surface Transportation and Economic Recovery) legislation to finance, repair, reconstruct, and replace structurally deficient bridges. It is funded from a bridge safety surcharge on vehicle registration based upon vehicle weight. Due to the concern of the funding impact of the I-70 viaduct replacement on long-term revenues available for rehabilitating other Colorado bridges, CDOT set out a goal to shape viaduct financing in a way that will retain 50 percent of bridge revenues for other needed projects across the state.

| Comments | | Comments | |
|---|---|---|---|
| Source: Submittal | | Source: Submittal | |
| Document Number: 754 | Name: Sierra Club - Bob Yuhnke | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |

Current Folder: **SDEIS Comments Responded to**

**Welcome:** contactus@i-70east.com

## Re: I-70 East EIS - SDEIS COMMENTS

**From:** "Bob Yuhnke"
**Date:** Fri, October 31, 2014 5:13 pm
**To:** contactus@i-70east.com
**Cc:** "English, Becky"

Dear CDOT and FHWA,

Attached for your review and consideration are comments submitted on behalf of the Sierra Club, Rocky Mountain Chapter, and Joe Elliott, Swansea resident.

Bob Yuhnke
303-499-0425

| Duration | D | EPA Regior | State | County | City | CBSA | Address | Site ID | POC | Exc | Events | Obs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 HOUR | | 8 | CO | Adams | Commerce | Denver-Au | 7101 Birch | 80010006 | 1 | None | | 121/105/1 |
| 24 HOUR | | 8 | CO | Adams | Commerce | Denver-Au | 7101 Birch | 80010006 | 2 | None | | 62/50/73 |
| 24 HOUR | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broac | 80310002 | 1 | None | | 354/301/3 |
| 24 HOUR | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broac | 80310002 | 2 | None | | 67/50/62 |
| 24-HR BLK | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broac | 80310002 | 3 | None | | 270 |
| 24-HR BLK | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broac | 80310002 | 3 | None | | 151 |
| 24 HOUR | | 8 | CO | Denver | Denver | Denver-Au | 971 W. Yur | 80310027 | 1 | None | | 75 |
| 24-HR BLK | | 8 | CO | Denver | Denver | Denver-Au | 971 W. Yur | 80310027 | 3 | None | | 131 |

The information on these pages has been reviewed. Responses to **specific comments** are included on the following pages.

| First Max | Second Ma | Third Max | Fourth Ma | 98th %ile | 2 3-yr averag | Weighted / | 3-yr average annual means |
|---|---|---|---|---|---|---|---|
| 41.9/33.7/ | 20/28.7/2( | 19.5/25.4/ | 18.3/19.3/ | 20 / 25 / 2 | 23 | 7.6 / 8.6 / ( | 8.1 |
| 20.9/25.8/ | 18.8/16.4/ | 13.2/15.5/ | 13.2/13.4/ | 19 / 26 / 2 | 24 | 7.2 / 7.9 / ( | 7.9 |
| 28.5 | 27.2 | 22.7 | 21 | 19 / 19 / 2 | 19 | 7.5 / 8.0 / 7 | 7.7 |
| 29.9 | 28.6 | 18.9 | 18.3 | 15 / 37 / 2 | 27 | 7.2 / 7.9 / ( | 7.9 |
| 36.4 | 36 | 30.2 | 30.2 | 28 (2013) | | 8.8 | NA |
| 44.3 | 39 | 37.5 | 28.5 | 29 (2014) | | 9.3 | NA |
| 48.3 | 34.9 | 29.9 | 25.1 | 35 (2014) | | 9.3 | NA |
| 57 | 44.3 | 35.3 | 30.3 | 35 (2014) | | 10.7 | NA |

| Comments | Responses to Comments |
|---|---|

**Source:** Submittal    **Document Number:** 754    **Name:** Sierra Club - Bob Yuhnke

**THE SUPPLEMENTAL DRAFT EIS FOR PROPOSED EXPANSION OF I-70 EAST MUST BE REVISED TO ADEQUATELY DISCLOSE IMPACTS OF AIR POLLUTANTS ON COMMUNITY HEALTH AND AIR QUALITY.**

By
**Robert E. Yuhnke**

**Executive Summary.**

The SUPPLEMENTAL DRAFT EIS (SDEIS) for the proposed expansion of I-70 EAST is Not Adequate because the impacts of air pollutants emitted from the Project on the health of near-by residents and on air quality are not investigated or disclosed, and alternatives and/or mitigation needed to enhance the health of nearby communities, and to prevent or avoid violations of national ambient air quality standards have not been identified.

**Health Impact Assessment Required.**

**A** Evidence documented by Denver Environmental Health (DEH) showing disparate health outcomes for residents in the Globeville/Elyria/Swansea neighborhoods and the city council districts where I-70 is located compared to other council districts in Denver, including a 50% higher incidence of mortality related to cardiovascular disease, 50,000 more years of life lost annually, and 40% greater rate of hospitalization of children for asthma, demonstrate that these residents are disproportionately affected by the diseases of air pollution. The contribution that emissions from current vehicle travel on heavily trafficked highways such as I-70 make to these adverse community health outcomes must be evaluated, disclosed to decisionmakers and the public, and considered in the evaluation of alternatives to determine the extent to which community health can be enhanced by reducing, not increasing, exposure to traffic pollution in these neighborhoods.

**Modeling of all Mobile Source-Related NAAQS Required.**

**B** Both emissions from an expected 30% increase in traffic traveling in the I-70 Project area, and emissions during construction of the project from heavy equipment, could cause violations of national ambient air quality standards (NAAQS) in the Project area. The Clean Air Act (CAA), Part C, requires that States adopt an implementation plan containing control measures to prevent violations of NAAQS in areas that currently attain the NAAQS. If violations of these air quality standards occur, the CAA requires that the plan for the area be revised to reduce ambient concentrations below the level of the NAAQS. 40 CFR §51.160. Violations trigger obligations to develop and implement a control strategy to eliminate the NAAQS violations, and imposes limitations on the permitting of new or modified sources. Preventing violations of the NAAQS protects public health by avoiding pollutant concentrations known to be harmful, is cheaper than requiring emission reductions after violations occur, and is less burdensome on other emission sources.

**Consideration of Alternatives and Mitigation Measures to Reduce Public Exposure to Harmful Pollutants, and to Ensure Attainment of NAAQS Required.**

**C** The proposed Project is proposed to accommodate at least a 30% increase in traffic and related increases in pollutant exposures in an area where traffic pollution is currently contributing to

**A** Section 5.20, Human Health Conditions, of the Final EIS contains an expanded discussion of environmental health issues in the Globeville and Swansea and Elyria neighborhoods, including the Health Impact Assessment conducted by DEH. It is important to consider that the neighborhoods in question also experience disproportionate levels of poverty, non-highway pollution from stationary sources (including the Xcel Cherokee Power Station, the Suncor Refinery, the Purina pet food facility, Metro Wastewater), and many other factors that have been identified by the DEH study. An additional health impact assessment is not required by NEPA or the Clean Air Act, would be subject to very large uncertainties, and would not assist the decision makers in evaluating the choice among reasonable alternatives. As seen in the emissions inventories for NAAQS pollutants and MSATs, the difference between the alternatives (including the No-Action Alternative) in emissions is around 2-4 percent or less; see Attachment J Air Quality Technical Report. This difference is much smaller than the large ranges of uncertainties associated with the development of a health impact assessment. Further, it is critical to consider that the emissions (and, therefore, likely concentrations) associated with I-70 East are substantially declining. For example, diesel particulate matter emissions are predicted to drop from 749 pounds per day in 2010 to 48 pounds per day (No Action) or 49 pounds per day (Partial Cover Lowered Managed Lanes) in 2035. Benzene emissions are predicted to drop from 133 pounds per day in 2010 to 26 pounds per day (No Action) or 27 pounds per day (Partial Cover Lowered Managed Lanes) in 2035. The other MSATs see similar reductions in emissions; see Section 7.4 of Attachment J, Air Quality Technical Report. All of these emissions levels incorporate predicted increases in VMT in the corridor.

**B** The air quality analyses have been updated for the Final EIS, and the Preferred Alternative would not cause the violation of any NAAQS. The Final EIS (Section 5.10, Air Quality, and Attachment J, Air Quality Technical Report) provides all air quality emissions and modeling that is required by law and useful to an informed decision among the alternatives. See also the response to comments W, X and Y.

**C** The Final EIS considers all reasonable alternatives that meet the purpose and need for the I-70 East Project. The 2008 Draft EIS, Supplemental Draft EIS, and Final EIS have considered the alternative of diverting future traffic to the I-76/I-270 alignment and found that the alternative would not meet the purpose and need; see the Appendix to Attachment C Alternatives Analysis Technical Report Addendum. Further, such an approach would be impractical because of its very large cost and diversion of traffic to local streets. The alternative would also likely increase regional emissions of greenhouse gases, ozone precursors and other pollutants by increasing the number of miles that must be driven, as well as cause congestion and idling emissions in areas (including the Globeville and Elyria and Swansea neighborhoods and schools) affected by diversion of traffic to local streets. Potential impacts from the I-70 project, including effects of each alternative on the ability to meet the health-based NAAQS, and on levels of MSATs are discussed in detail in the Final EIS Section 5.10, Air Quality. In addition, CDOT has committed to providing measures to mitigate for dust during construction; see AQ7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|
| Source: **Submittal**   Document Number: **754**   Name: **Sierra Club - Bob Yuhnke** | |

**C** adverse health impacts in nearby communities. Not included in the analysis are reasonable alternatives and mitigation measures that enhance the human environment by reducing public exposure to these harmful pollutants. At a minimum, the SDEIS must include an evaluation of measures such as, but not limited to, diverting future traffic to other interstate alignments (I-76 and I-270) where commercial and industrial uses are the predominant near-highway land use, dense urban neighborhoods are not in close proximity to the highway, and schools are not located next to the highway right-of-way. So long as the currently proposed cut-and-cover alternative in the existing I-70 alignment remains the preferred alternative, another mitigation measure that must be included is the buy-out of all nearby residents, and the re-location of school buildings located within the zone of adverse health impacts adjacent to the Project alignment.

**D** This SDEIS is not adequate under the National Environmental Policy Act (NEPA), or under the requirements of the Federal Aid Highway Act, 23 USC § 109(h), because the Draft Statement, along with the Air Quality Technical Report prepared as Attachment J for the I-70 East SDEIS, fails to –

**E** 1. investigate and disclose the impact that highway emissions are having on community health in the Project study area;

2. investigate and identify alternatives and/or mitigation measures that can enhance the human environment by reducing community exposure to harmful air pollutants, and avoid the adverse health effects that will result from increasing exposure to these pollutants that will result if traffic in the corridor is allowed to increase by 30%;

3. investigate and disclose likely violations of the NAAQS for PM2.5 and NO2 caused by those pollutants emitted from vehicles traveling on the completed project and in the area affected by the Project;

**F** 4. use credible scientific methods to investigate and disclose likely violations of the NAAQS for PM-10 caused by particulate matter (PM) emitted from or by vehicles traveling on the completed project and in the area affected by the Project;

**G** 5. investigate and disclose likely violations of the NAAQS for PM-10, PM2.5 and NO2 caused by those pollutants emitted from heavy equipment and traffic during construction of the Project;

**H** 6. investigate and identify alternatives and/or mitigation measures that are necessary and sufficient to prevent or avoid violations of the NAAQS for PM-10, PM2.5 and NO2;

**G** 7. demonstrate compliance with the obligations imposed by the Federal-Aid Highway Act, 23 USC §109(h), to estimate the costs of mitigation, compare those costs with the transportation benefits of the proposed Project, determine whether the Project is in the best overall public interest, and commit to implement any necessary mitigation; and

**J** 8. include a conformity determination for the Project as required by § 176(c) of the Clean Air Act (CAA) and implementing regulations. 40 CFR §§ 93.116, 123.

**I. Impact on Health of Emissions from Vehicle Miles Traveled Not Assessed or Disclosed.**

**K** Overall impacts of air pollution from the Project on community health are the primary concern of this comment. The adverse health outcomes among residents in the I-70 Project area reported by Denver Environmental Health [DEH ] in the community health status report released in September, 2014, demonstrate that these residents are currently experiencing serious adverse

2

---

**D** The Supplemental Draft EIS and Final EIS are fully compliant with the requirements of NEPA, the Clean Air Act, 23 U.S.C. Sec. 109(h) and other provisions, and have adequately addressed environmental health issues and air quality impacts, which are considered in Section 5.20, Human Health Conditions, of the Final EIS and the Air Quality Technical Report. The Final EIS considers the emissions of both NAAQS and MSAT pollutants for all of the alternatives during the period from 2010 to 2035, based on protocols and methodologies approved by EPA and CDPHE. As reported in the Final EIS Section 5.10, Air Quality, and Attachment J Air Quality Technical Report, total emissions of mobile source pollutants have been modeled and they are predicted to decline in the corridor considerably between 2010 and 2035 for all alternatives, even accounting for increases in VMT. No additional alternatives analysis or mitigation measures are required under NEPA or other federal requirements because the identified preferred alternative does not exceed the NAAQS.

**E** PM2.5 and NO2 were not modeled in the Supplemental Draft EIS because they are not pollutants of concern in the Denver area. The area has never been in nonattainment status for either pollutant and is not in imminent danger of becoming so based on current monitoring data. Furthermore, extrapolating the existing ratio of PM2.5 to PM10 to other scenarios in an effort to predict violations of the NAAQS is not scientifically valid, as particulate emissions in different size fractions come from multiple different sources, not all of which vary at the same rate with changes between build alternatives or traffic loads. See also responses to Comments W, X, and Y.

**F** Effects of PM10 emissions on the ambient air were analyzed using state-of-the-art modeling software, in accordance with EPA regulations and guidelines, to determine whether or not specific alternatives would exceed the NAAQS. See also the responses to Comments W, X, and Y.

**G** Construction impacts are not required to be assessed if construction will not last more than 5 years in any individual site (40 CFR 93.123(c)(5)), and there is no evidence there will be any exceedances of the NAAQS during the construction period based on the air quality analysis for the Final EIS. Monitoring supported data available nationwide, and—specific to Colorado highway construction—confirms that BMPs for dust control and suppression deployed by CDOT and other DOTs have been successful in keeping temporary construction dust from contributing to an exceedance or violation of the public health PM10 NAAQS.

**H** Air quality impacts have been adequately addressed in the Final EIS. PM2.5 and NO2 were not modeled in the Supplemental Draft EIS because they are not pollutants of concern in the Denver area. The area has never been in nonattainment status for either pollutant and is not in imminent danger of becoming so based on current monitoring data.

*Responses continue on the following page.*

| Comments |
|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |
|---|---|---|

**K** effects of current pollutant exposures, and that the impact of future increases in pollutant exposures must be fully disclosed in the EIS. *See* https://www.denvergov.org/Portals/746/documents/HIA/HIA%20Composite%20Report_9-18-14.pdf. The higher pollutant exposures expected from increasing traffic by 30% in these neighborhoods will significantly further degrade the health status of these communities. Sacrificing the health of children and increasing years of life lost to build a regional transportation facility is not an acceptable public policy. To ensure open disclosure and consideration of the consequences that Project emissions will have on health, a health impact assessment must be included in the current NEPA review because of the evidence provided by DEH showing that residents in these communities are now experiencing disparate health outcomes compared to other communities in Denver.

**A. Health Impacts of Exposure to Traffic Pollution Not Assessed or Disclosed in SDEIS.**

**L** The SDEIS contains no discussion of the current health status of these communities, and no investigation of the likely impact that increased vehicle emissions will have on community health. The impacts that Project emissions will have on air quality in the affected communities are only partially addressed. The SDEIS includes modeling to estimate future concentrations in the ambient air for only two transportation-related pollutants: PM-10 and carbon monoxide. The other two criteria pollutants emitted from highways that EPA has identified as having the greatest impact on health, and has recently required be monitored adjacent to highways, PM2.5 and NO2, are not evaluated for impact on future air quality. A shorthand method for using the modeled concentrations of PM-10 to estimate future PM2.5 concentrations indicates that Project emissions will worsen health status in the communities by nearly doubling current background concentrations, and violating the NAAQS for PM2.5.

In addition to determining the impact of Project emissions on the attainment of all the mobile source-related NAAQS, the SDEIS must include an assessment of the health impacts on the community that will result from the full mix of criteria and toxic air pollutants emitted from motor vehicles. Residents do not just breath one pollutant at a time, and the adequacy of national air quality standards to protect health do not account for the cumulative and synergistic effects on human health that result from exposure to the full array of criteria and toxic air pollutants emitted from highways.

**1. Adverse Health Outcomes Are Occurring Disproportionately in Communities Affected by I-70 Pollution.**

**M** The final DEH report identifies four metrics of health as demonstrating a significant disparity between community health in the four city council districts where I-70 is located, and especially Globeville/Elyria/Swansea (GES) neighborhoods, and other parts of Denver: 1) mortality caused by cardiovascular disease, 2) hospitalization of children for asthma, 3) cancer, and 4) obesity. In addition, the draft DEH report identified years of life lost as another important metric of community health which was significantly worse in the GES neighborhoods compared to the city as a whole.

**N** **i) Disproportionately High Cardiovascular Mortality.**

3

| Responses to Comments |
|---|

**I** The I-70 East Project complies with Federal Aid Highway Act, 23 USC §109(h). Motor vehicle emissions from the implementation of the No-Action Alternative and the Build Alternatives will not cause or contribute to any new localized carbon monoxide or particulate matter violations, nor will they increase the frequency or severity of any existing violations based on the hotspot analysis. Further, emissions of almost all pollutants will be considerably lower in 2035 for all alternatives, even with an increase in VMT. CDOT is committing to implement the road dust emissions control measures included in the PM10 hotspot modeling, but no other specific mitigation measures are necessary.

**J** The conformity determination was not required in the draft stage of the document, and is being made for the Final EIS, and a final conformity determination will be made in the ROD. See Section 5.1.2 of Attachment J to the Final EIS, Air Quality Technical Report, and Section 5.10.6 of the Final EIS for the conformity determination.

**K** The emissions modeling for this project shows that emissions of all health-related pollutants will decline considerably between 2010 and 2035 under all alternatives, with the sole exception of road dust. See Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health in the identified neighborhoods, Attachment J Air Quality Technical Report, and the response to Comment A.

It is important to consider that the DEH study points out that the neighborhoods in question also experience disproportionate levels of poverty, non-highway pollution from stationary sources, and many other factors that contribute to the health status of the communities. A health impact assessment is not required by NEPA or the Clean Air Act, would be subject to very large uncertainties, and would not assist the decision makers in evaluating the choice among reasonable alternatives. For information on impacts of the highway air pollution on human health, please see AQ2 and AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**L** The current health status of the communities is adequately discussed in Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the Globeville, Swansea and Elyria neighborhoods. See the response to Comment X for discussion of NO2 and PM2.5 as well as AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. With regard to the suggestion to model all air pollutants simultaneously in a health impact assessment, see the response to comment A and Attachment J Air Quality Technical Report.

For information on air quality in the project area, please see AQ3 and AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**M** Comment noted.

*Responses continue on the following page.*

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |
|---|---|---|

The data reported by DEH , HIA, Fig. 6, show that residents in the four city council districts where I-70 is located.(1, 8, 9, and 11) have the highest cardiovascular mortality rates. Residents in city council Districts 1 and 9 experience 30% greater cardiovascular mortality than dist 2 (213 vs. 155). In districts 8 and 11, respectively, cardiovascular mortality is 77% higher than dist 2 (275 vs. 155), and 74% higher (270 vs. 155). On average, cardiovascular mortality in these four council districts along I-70 is roughly 50% greater than other parts of the city. These are remarkably huge differences in cardiovascular mortality, the largest single cause of death in Denver and the U.S.

Increased community exposure to Project emissions will occur primarily in Districts 9 and 8. District 9 includes the GES and other neighborhoods along the east side of I-25 from the Auraria campus to the Commerce City line, including the neighborhoods along I-70 east of the mousetrap. The mortality rate in council district 9 is identical to the rate in council district 1 (213/ 100,000). District 1 includes the neighborhoods on the west side of I-25 from the Auraria campus north to the city line, including the neighborhoods along I-70 west of the mousetrap. Together, these two districts have significantly higher cardiovascular mortality rates than all other council districts except 8 and 11. In addition to emissions from I-70, residents in Dists 1 and 9 are exposed to emissions from I-25, residents in Dist 8 are most exposed to the additional pollution burden coming from the refineries, and district 11 is most exposed to emissions from the I-225 interchange, Pena Blvd and airport operations. A recent study at LAX indicates that residents along the path of aircraft take-offs and landings are exposed to aircraft emissions that are roughly comparable to the emissions from highways in these neighborhoods. It makes sense that all 4 of these council districts show greater rates of the diseases of air pollution, including cardiovascular disease, when compared to other council districts not exposed to emissions from major highways and other high emitting sources.

**[N]**

These data point an incriminating finger at air pollution from the high traffic volumes on interstate highways because all the council districts with higher pollution levels from both interstates and major stationary sources have elevated cardiovascular mortality rates. If higher mortality were observed only in one district, then air pollution could not account for the disparity between that district and both cleaner districts and districts with high pollution levels.

### ii) Disproportionately Higher Years of Life Lost.

These massively greater mortality rates from cardiovascular disease obviously contribute to increased years-of-life-lost. Missing from the final DEH report, but no less relevant to the need for a NEPA analysis of health risks, is the discussion of years-of-potential-life-lost (YPLL) that was included in the draft HIA, at p. 9 (published for comment in April). The draft described this metric as commonly "used as an indicator of health equity. Generally, this is a measure of premature death before the age of 75 compared across a population or geographic area. The assumption is that a higher number indicates inequitable social or physical determinants of health. Data from Denver Health indicate that 'years of potential life lost' is higher in Globeville and Elyria Swansea than in Denver overall."

**[O]**

The draft reported that years-of-life-lost, averaged across the community, is 3.5 years greater for the residents of GES neighborhoods compared to other Denver residents. This means residents of these neighborhoods are losing 50,000 years of life annually compared to other Denver

4

**[N]** These conclusions regarding the causality of cardiovascular impacts by I-70 were not reached by the DEH study or any other studies. Further, because the differences between the project alternatives in emissions are minimal, the choice among alternatives would not significantly affect cardiovascular health in the corridor. The DEH study also identifies other potential causal factors for cardiovascular health impacts, including diet, obesity, and smoking.

For information on Health Impact Assessments, please see AQ1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See also Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the corridor neighborhoods, Attachment J Air Quality Technical Report regarding highway-related health impacts analysis, and the response to Comment A regarding the decreasing emissions associated with the I-70 corridor and the minor differences among alternatives.

**[O]** The fact that DEH determined not to retain years of life in its final study suggests that its use could not be supported with the evidence and methods available. Based on the lack of causality in the DEH study, it is not clear how calculation of years of life lost would be necessary or appropriate. Because the differences between the project alternatives in emissions are minimal (and decreasing considerably for most pollutants), the choice among alternatives would not significantly affect years of life in the corridor.

For more information on Health Impact Assessments, please see AQ1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the corridor neighborhoods and Attachment J Air Quality Technical Report regarding highway-related health impacts analysis.

| Comments | |
|---|---|
| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |

## Comments

**O**

neighborhoods. Deletion of this metric in the final HIA is not explained anywhere. Purging this critical metric of community health from the report makes the report less valuable to residents and decisionmakers because of its importance as a measure for comparing community health among neighborhoods.

The fact that this key metric was deleted without explanation is highly suspicious. Without any explanation, the motive for removing this important metric must be questioned especially since DEH stated before the release of the final report that there would be no changes in the data included in the final compared to the draft. The lack of any explanation suggests an intent to deprive the public of important information, and effectively deceives the public regarding the significance of disparate health effects in these neighborhoods. This omission from the final DEH report further highlights the need for these disparate health outcomes to be explored in an EIS.

**P**

**iii) Disproportionately Higher Hospitalization of Children for Asthma.**

The other adverse health outcome for which the disparity between the GES neighborhoods and other areas of the City is quantified is hospitalization for childhood asthma. The final DEH report, Fig. 7, shows 40% greater incidence (38.6 vs. 28.5 admissions/1,000) of hospitalization of children in Elyria/Swansea, and 20% higher in Globeville than the rest of the city. The additional emissions from the train traffic on the main line running between Elyria and Swansea is a plausible explanation for the higher incidence in these neighborhoods. Certainly 40%, and even 20% more children hospitalized for asthma is a significant adverse health outcome for a community that also suffers from other adverse social and economic factors.

The facts that 1) the GES neighborhoods have 3.5 years shorter longevity, or 50,000 years of life lost, compared to other neighborhoods in Denver (which was shown by the YPLL data presented in the draft report, but purged from the final), 2) the residents in the districts along the I-70 corridor experienced 50% higher cardiovascular mortality than other parts of the city, and 3) that significantly more children in GES neighborhoods require hospital care for asthma strongly suggests that these adverse health outcomes are linked to air pollution. There is enough variability in socio-economic factors across the four council districts that comprise north Denver that socio-economic factors alone cannot account for higher cardiovascular mortality rates in all four I-70 districts. Some other extrinsic factor, such as air pollution, must be a causative factor.

**Q**

**2. The Disparate Adverse Health Outcomes Observed in Communities Along the I-70 Corridor Are Causally Related to Exposure to Traffic Pollutants.**

The DEH report does not offer any explanation for these disparate health outcomes other than air pollution. Air pollution is the only environmental factor identified in the report that is causally related to these diseases. Air pollution offers the only reasonable explanation for the elevated incidence in the GES neighborhoods of the four health outcomes identified by DEH as being significantly worse than other areas of Denver. Increased mortality associated with cardiovascular disease is one of the most significant adverse health outcomes identified by EPA as associated with exposure to PM2.5. The correlation between the observed health outcome among residents in the four I-70 districts and the health outcomes predicted by the health effects data reviewed by EPA is strong. Air pollution is also the only well-documented explanation for

5

## Responses to Comments

**P** It is important to consider that the DEH study points out that the neighborhoods in question also experience disproportionate levels of poverty, non-highway pollution from stationary sources, and many other factors that contribute to the health status of the communities. For information on impacts of the highway air pollution on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See also Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the corridor neighborhoods, Attachment J Air Quality Technical Report regarding highway-related health impacts analysis, and the response to Comment A regarding the decreasing emissions associated with the I-70 corridor and the minor differences among alternatives.

**Q** The DEH study does identify a greater incidence of asthma in the Globeville and Swansea and Elyria neighborhoods, along with a number of possible causes, including air pollution from traffic, industrial stationary sources, rail and other sources. As discussed elsewhere, air emissions associated with I-70 will decline between now and 2035 under all alternatives for most pollutants and the differences in the emissions of air pollutants among the alternatives are minor.

For more information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments |
|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**Q**

the higher incidence of hospitalization for asthma among children. Air pollution also includes indoor air pollution from smoking and other sources in the home, so not all of it comes from highways. But the health effects research reviewed by EPA includes studies showing the prevalence of childhood asthma is linked to increased exposure to air pollution from major traffic corridors. The HIA provides no evidence to show that smoking in the home differs enough between council districts to explain the significantly greater hospitalization of children for asthma.

### i) DEH Report Only Identifies Air Pollution As Causally Linked to Disparate Health Outcomes.

The DEH report does not offer any other explanation for these disparate health outcomes. Along with air pollution, the DEH report lists possible environmental factors contributing to adverse health outcomes -- noise from trains, traffic and industry, elevated summertime e-coli in the S. Platte, and soil contamination. *See* HIA, Environmental Quality, p. 19. But the report notes that soil contaminants have been removed from the community as part of the CERCLA clean-up of the areas around the former smelters. The HIA offers no plausible explanation for how these remaining environmental factors other than air pollution are linked to the adverse health outcomes that demonstrate worsened health for residents in the GES neighborhoods compared to other parts of Denver. EPA's analysis of the effects of air pollutants on health in the Integrated Science Assessments for PM and NO2 provides a scientific basis for linking PM to all of these adverse health outcomes, and NO2 to some of them. But none of the other environmental risk factors identified in the DEH report have any apparent causal relationship to these adverse health outcomes. For example, noise has never been identified as a cause of childhood asthma, and e-coli in the river is not linked to pre-mature mortality from cardiovascular disease. The only environmental factor listed in the report that is known to be associated with these diseases is air pollution.

**R**

Of the sources of air pollution in these neighborhoods, the HIA states: "Vehicle exhaust is the main source of air pollution in Denver." "The [GES] neighborhoods are close to sources of air pollution from vehicles on I-70 and I-25, which carry approximately 150,000 and 250,000 vehicles per day respectively, and are the main sources of air pollution. Stationary sources such as industrial plants also impact air quality." HIA, pp. 20, 19. The report claims that the highest traffic density in the city is downtown, but CDOT traffic measurements show that the highest traffic density in the metro area is actually at the mousetrap, in the center of Globeville and upwind of Elyria and Swansea where 326,000 vehicles pass through daily.

The communities near the mousetrap are exposed to the highest pollutant levels in Colorado. At the mousetrap the total daily trips passing through the interchange are 326,000, more than 30 percent more traffic than any other location in the state. Traffic counts reported by CDOT for 2012 show AADT at the mousetrap as (truck share shown in parenthesis)[1]

I-25 south of interchange: 243,000 (9.1%)
I-25 north of interchange: 198,000 (10.9%)

---
[1] Colorado Department of Transportation, Traffic Data Explorer, 2013. Available online at: http://dtdapps.coloradodot.info/Otis/TrafficData (last accessed October 30, 2013).

6

| Responses to Comments |
|---|

**R** The DEH study identified disparate health outcomes and identifies possible causes for these outcomes. It does not definitively establish any of the causal relationships and indicates that further study will be necessary and conducted to do so. DEH identified a number of potential causal factors, including obesity, lack of medical access, lack of activity, lower income, exposure to hazardous substances, etc. Air emissions were identified as a potential cause, too, including emissions from highways, railroads, refineries, power plants and other industrial facilities, including spikes in pollution occurring during upset conditions at stationary sources.

According to the DEH study: "Within the Denver metro area, the highest concentrations of air pollution are near the downtown area [several miles south of Globeville and Elyria Swansea]. Vehicle emissions are highest along I-25 near downtown, as is the traffic density within a one-mile radius of downtown Denver." While there are high levels of emissions along I-70 (and other transportation corridors), they are not the highest in the metropolitan area or state. According to the DEH study: "The average annual level of air pollution in Globeville and Elyria Swansea is not higher than other areas of metro Denver, for the air pollutants routinely measured. But North Denver neighborhoods are located closer to major sources of air pollution (e.g., refinery, power plant, asphalt roofing manufacturer), and occasional spikes are noticeable and measurable." The DEH also noted that concentrations of some pollutants are higher immediately adjacent to roadways like I-70, but fall off with distance. The monitored particulate matter concentrations in Commerce City are well below the applicable NAAQS.

For more information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

I-70 west of interchange: 150,000 (9.1%)
I-70 east of interchange: 140,000 (9.3%)

Especially important is the fact that the share of AADT represented by truck trips at the mousetrap is much higher than at other locations along I-25. CDOT's data show that approximately 40 percent more truck trips use the I-25 segments north and south of the mousetrap than on I-25 south of downtown at 8th Avenue. Together, the higher AADT and the greater number of truck trips show that the mousetrap is the location in the Denver CBSA where mobile source emissions are the highest.

**R**

In addition, regional air quality monitor data received by EPA from the CDPHE, Air Pollution Control Division, and reported on EPA's Air Data website, demonstrate that cumulative effect of traffic emissions combined with industrial pollution is greatest along the interstates. Monitored levels of total particulate matter pollution from all sources in the metro area are highest at the Birch Street monitoring station in Commerce City, located about 2 miles north of Denver city line, and 1.25 miles east of the I-76/I-270 interchange. In the SDEIS, CDOT determined that the pollution levels reported at this monitor are representative of background levels to which I-70 will add emissions from the highway.

Thus when total pollution burden (highway emissions plus existing background) is considered, the neighborhoods along I-70 experience the highest pollution concentrations in the metro area. Therefore it is consistent with the air quality data for the most adverse health outcomes to be observed in the four council districts where I-70 is located.

**ii) EPA Finds Causal Relationship Between Exposure to Traffic Pollutants, Cardiovascular Disease, Pre-Mature Mortality, Asthma and other Adverse Health Outcomes Observed in the I-70 Corridor.**

The U.S. Environmental Protection Agency (EPA) has now identified four criteria pollutants emitted from highways as presenting significant health risks that must be prevented through attainment of the NAAQS near highways: carbon monoxide (CO), PM-10, PM2.5, and nitrogen oxides (NO2).[2] This public health concern is reflected in requirements that states must now establish roadside monitors for PM2.5 and NO2 in addition to the long-standing requirement to monitor CO.[3] In addition to these four mobile source-related criteria pollutants, EPA has identified 92 mobile source air toxic (MSAT) pollutants. MSATs are governed by technology-based standards that must be met in emissions from tailpipes, but are not governed by ambient air standards that limit the concentrations of pollutants to which the public may be exposed. None of these standards take into account the interactions among these pollutants in the ambient air, or their cumulative impact on human health.

**S**

Together, these pollutants create a hazardous pall of pollution in the neighborhoods around highways that has been shown to contribute to cardiovascular and respiratory diseases among children, adults and the elderly that 1) increases the need for hospital and urgent care, 2) causes

---

[2] 40 CFR Part 50.
[3] 40 CFR Part 58; 77 Fed. Reg. at 39009 (June 29, 2012); 78 Fed. Reg. at 16,184 (March 14, 2013), *Revisions to Ambient Nitrogen Dioxide Monitoring Requirements*, Final Rule.

7

---

**S** EPA has found a variety of causal relationships between PM2.5, PM-10 and NO2 and health effects through its science-based NAAQS process. The Clean Air Act Section 109(b) creates a legal duty for EPA to set the NAAQS at levels necessary to protect public health, including an adequate margin of safety. Based on this duty, EPA has set NAAQS for PM2.5, PM10, NO2, and other pollutants that meet this requirement to adequately protect public health. EPA set new NAAQS for both PM2.5, PM10 and NO2 since the 2009 EPA sources cited in the comment; the agency set NAAQS thresholds for the pollutants (as reflected in the Supplemental Draft EIS and Final EIS) that represent the levels necessary for public health. EPA did not set "no threshold" or "zero pollutant" standards. Further, EPA's NAAQS process considers evidence of co-pollutants and mixtures of pollutants in the NAAQS setting process. Thus, findings of compliance with the NAAQS are critical information for decision makers.

The PM10 & CO hotspot analyses that were performed for the Final EIS (see Section 5.10 Air Quality and Attachment J, Air Quality Technical Report for details) predict no violation of these EPA health based standards. As discussed elsewhere, air emissions associated with I-70 will decline between now and 2035 under all alternatives for most pollutants and the differences in the emissions of air pollutants among the alternatives are minor.

For more information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal    Document Number: 754    Name: Sierra Club - Robert Yuhnke | |

**S**

pre-mature death that significantly shortens the lives of residents, 3) increases the prevalence of asthma among children which interferes with school attendance and education, and requires medical treatment and hospitalization, 4) interferes with normal lung development in children and adolescents that results in permanent, lifetime impairment of lung function, 5) increases the incidence of debilitating or fatal cancers, and 6) impairs immune function.

In its recent reviews of the adequacy of the NAAQS for PM2.5 and NO2, EPA has identified causal relationships between exposure to these pollutants and many of the adverse health outcomes associated with exposure to highway pollutants. In its review of the health effects literature available through 2009 as part of the Agency's determination to make the NAAQS for PM2.5 more protective, EPA found [bold in original] [4] –

- "**a causal relationship exists between short-term exposures to PM2.5 and mortality.**"
- "**a causal relationship exists between long-term exposures to PM2.5 and mortality.**"
- "**a causal relationship exists between short-term exposures to PM2.5 and cardiovascular effects.**"
- "**a causal relationship exists between long-term exposures to PM2.5 and cardiovascular effects.**"

Although EPA did not attribute these effects exclusively to fine particles emitted from motor vehicles, EPA did cite studies that establish a causal relationship between exposure to traffic PM, or one or more components of traffic PM emissions, and pre-mature mortality and emergency treatment for cardiovascular outcomes. For example, "multiple outcomes have been linked to a PM2.5 crustal/soil/**road dust** source, including cardiovascular mortality"; "studies have reported associations between other sources (i.e., traffic and wood smoke/vegetative burning) and cardiovascular outcomes (i.e., mortality and ED visits)"; "Studies that only examined the effects of individual PM2.5 constituents found evidence for an association between EC and cardiovascular hospital admissions and cardiovascular mortality";[5] "studies found an association between mortality and the PM2.5 sources: …, traffic"; "recent studies have suggested that PM (both PM2.5 and PM10-2.5) from .. road dust sources or PM tracers linked to these sources are associated with cardiovascular effects."[6]

In addition, EPA cited studies demonstrating a causal relationship between exposure to PM2.5 and childhood asthma: "road dust and traffic sources of PM have been found to be associated with increased respiratory symptoms in asthmatic children and decreased PEF in asthmatic adults."[7]

EPA also found a causal relationship between exposure to NO2 and childhood hospitalization for asthma: "Epidemiologic evidence exists for **positive associations of short-term ambient NO2 concentrations below the current [1983] NAAQS level with increased numbers of ED visits and hospital admissions for respiratory causes, especially asthma.** These associations are particularly consistent among children and older adults (65+ years) when all respiratory outcomes are analyzed together, and among children and subjects of all ages for asthma admissions."[8]

---

[4] *Integrated Science Assessment for Particulate Matter* (US EPA, December 2009), pp. 2-10, 2-11, 2-12.[hereinafter *ISA for PM*] available at: http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=216546.
[5] Note that "EC" is short-hand for "elemental carbon" which is primarily unburned carbon from fossil fuel combustion, and is a significant component of fine particles emitted from diesel and gasoline engines.
[6] *ISA for PM*, p. 2-26.
[7] *Id.*
[8] *Integrated Science Assessment for Oxides of Nitrogen – Health Criteria* (US EPA, July 2008), p. 5-11. available at: http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=194645.

8

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal    Document Number: 754    Name: Sierra Club - Robert Yuhnke | |

**[S]** More recent studies not available for EPA's 2008 *ISA for Oxides of Nitrogen*, or 2009 *ISA for PM*, confirm and strengthen these associations. All of the relevant research currently available that establishes the relationship between exposure to traffic pollution and the adverse health outcomes occurring in residents living along the I-70 corridor, including cardiovascular disease, pre-mature mortality, childhood asthma and cancer, should be included in an assessment of the relationship between adverse health outcomes observed in the I-70 Project area and traffic pollution.

**iii) EPA Finds No Threshold for Safe Exposure to Highway Pollutants.**

In addition to EPA's findings that there is a causal relationship between the mobile source-related pollutants emitted from highways and the disparate health outcomes reported by DEH in the communities along I-70, EPA also found that there is no safe level of exposure to these pollutants. In the *ISA for PM*, at p. 2-25, EPA concluded that "evidence from the studies evaluated supports the use of a no-threshold, log-linear model." EPA reached a similar conclusion with respect to NO2: " In studies that have examined concentration-response relationships between NO2 and health outcomes, the concentration-response relationship appears linear within the observed range of data, including at levels below the current standard. There is **little evidence of any effect threshold.**"[9] [Emphasis in original.]

**[T]** The most critical implication of these findings for purposes of assessing health impacts under NEPA is that evidence showing that concentrations of PM2.5 and NO2 are below the NAAQS for these pollutants cannot be relied upon to support a conclusion that exposure to existing concentrations of each of these pollutants is not contributing to the adverse health outcomes being observed in the near-highway communities along I-70.

However, no determination of pollutant exposures for near-highway communities can be made from information provided in the SDEIS because only background concentrations for PM-10 and CO are provided from a monitoring station outside the Project area, and no near-highway measurements are provided for any of the four mobile source-related criteria pollutants.

**3. Existing Adverse Health Outcomes in I-70 Project Area, and Likely Increase Adverse Health Outcomes from Higher Project Emissions, Not Adequately Disclosed by Modeling for Attainment of PM-10 and CO NAAQS.**

**[U]** The SDEIS air quality analysis is not a surrogate for a comprehensive health impact assessment because 1) the NAAQS are not an adequate surrogate for the health effects associated with exposure to the full array of pollutants emitted from highways, and 2) the modeling reported in the Air Quality Technical Report only includes two of the four NAAQS that establish limits on ambient concentrations of mobile source-related pollutants. Evidence provided in the SDEIS, but not analyzed or discussed for decisionmakers or the public, strongly suggests that Project emissions will cause the NAAQS for PM2.5 to be violated. Other highway pollution data suggest that the NAAQS for NO2 may be violated by Project emissions as well. Emissions of these pollutants from the Project must also be modeled to determine if these NAAQS will be violated.

**[V]** **i) NAAQS Not a Surrogate for Overall Highway Pollutant Exposures.**

[9] *ISA for Oxides of Nitrogen*, p. 5-15.

9

**[T]** As previously discussed in the responses to comments A, K and S, EPA has set NAAQS thresholds for pollutants including PM2.5, PM10 and NO2 (as reflected in the Supplemental Draft EIS and Final EIS) that represent the levels necessary for public health. By showing that the project is in compliance with the NAAQS, the EIS provides critical information for the decision makers. In addition, the lack of significant differences between alternatives, along with the substantially decreasing emissions of almost all pollutants show that there are no significant impacts associated with the choice among alternatives and that total air pollution emissions associated with I-70 East will be declining over time. The monitoring station that provides the background concentrations changed for the Final EIS, and was decided in coordination and agreement with CDOT, FHWA, CDPHE, and EPA; see Attachment J, Air Quality Technical Report for details.

For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, and air quality in the area please see AQ2 and AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**[U]** A review of the environmental health issues in the corridor neighborhoods is included in Section 5.20, Human Health Conditions, of the Final EIS, and a comprehensive health impact assessment is not required by NEPA or the Clean Air Act. The Air Quality protocols that determined which pollutants and the methodology used to analyze the air quality impacts of the project were developed through interagency coordination between CDOT, FHWA, CDPHE, and EPA. All agreed that PM2.5 and NO2 did not need to be modeled to predict concentrations in the Final EIS because they are not pollutants of concern in the Denver area or the project area, at the present time or in the foreseeable future. The results of the air quality analysis show that the No-Action and the Build Alternatives will not result in exceedances of the NAAQS, which have been set by the EPA to protect human health. For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See also responses to comments V, W, and X.

For information on air quality in the project area, please see AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

*Responses continue on the following page.*

| Comments | Responses to Comments |
|---|---|
| Source: Submittal  Document Number: 754  Name: Sierra Club - Robert Yuhnke | |

**V** All the air pollutants emitted from mobile sources in the I-70 corridor contribute to the adverse health effects experienced by residents in the neighborhoods along I-70. These include the four mobile source related criteria pollutants governed by a NAAQS pursuant to section 109 of the CAA, and the mobile source air toxic (MSATs) pollutants regulated pursuant to section 202(l). 42 U.S.C. § 7521(l).

EPA has listed pollutants as MSATs that cause chronic adverse health effects, such as cancer, and acute effects from short-term exposures (hours or days) such as asthma attacks. Congress listed benzene, 1,3 butadiene and formaldehyde as mobile source-related air toxics in the 1990 CAA amendments when it required EPA to set vehicle emission standards for these pollutants. *Id.* EPA included these three statutory MSATs and ten other mobile source-related toxic pollutants on a list of 33 priority pollutants targeted for control under EPA's Integrated National Urban Air Toxics Strategy.[10] This Strategy "established a list of urban HAPs ["hazardous air pollutants"] which pose the greatest threats to public health in urban areas, considering emissions from major, area and mobile sources."[11] EPA observed that "mobile sources are an important contributor to the urban air toxics problem."[12]

**V** The neighborhoods near I-70 suffer from some of the worst air in the state. More than half a million pounds of toxics were released into the air in Globeville, Swansea, and Elyria in 2012, according to EPA's Toxics Release Inventory – more than any other zip code in Colorado, and more than 20 percent of the state's total toxic air releases.[13] Denver County as a whole suffers from some of the worst diesel particulate pollution in the entire nation – ranking 9th out of the 3,109 counties nationwide. The lifetime cancer risk from diesel soot in Denver exceeds the risk of all other air toxics tracked by EPA. Diesel soot is a major component of PM2.5 near highways, and is a major source of the health risks linked to breathing fine particles. The average lifetime diesel soot cancer risk for a resident of Denver County is 1 in 1,938, which is 516 times greater than the EPA's acceptable cancer level of 1 in a million.[14] This diesel pollution is likely most concentrated at the mousetrap, where Colorado's two most heavily traveled highways – I-70 and I-25 -- intersect.

EPA's findings that exposure to MSATs poses serious threats to public health were significantly enhanced by research conducted by the South Coast Air Quality Management District to monitor and model exposures to 31 urban toxic air pollutants in the Los Angeles air basin. Four studies have now been completed in a series known as the *Multiple Air Toxics Exposure Study* (MATES). Beginning with MATES-II (March 2000), the measurements of toxic air pollutants in the ambient air throughout the Los Angeles basin provided compelling new evidence that the cancer risk attributable to public exposure to ambient concentrations of toxic air pollutants is much higher than had been previously suspected, and is attributable primarily to mobile source

---

[10] 64 Fed. Reg. 38,706 (July 19, 1999).
[11] *Id.* at 38,714.
[12] *Id.* at 38,705.
[13] EPA's TRI website at: http://www2.epa.gov/toxics-release-inventory-tri-program using zip code 80216.
[14] Clean Air Task Force website, Diesel Soot Health Impacts: Where You Live, Denver County. Available at: http://www.catf.us/diesel/dieselhealth/county.php?c=08031&site=0 (last accessed October 14, 2013).

**V** The Final EIS considers the emissions of both NAAQS and MSAT pollutants for all of the alternatives during the period from 2010 to 2035, based on protocols and methodologies approved by EPA and CDPHE. As reported in the Final EIS Section 5.10, Air Quality, and Attachment J Air Quality Technical Report, emissions of benzene, 1,3 butadiene, formaldehyde, diesel particulate matter and other MSATs have been modeled and they are predicted to decline in the corridor considerably between 2010 and 2035 for all alternatives, even accounting for increases in VMT. As an example, diesel particulate emissions are forecast to decline by a factor of 15 times during this period. Further, the difference between the alternatives in these much lower emissions is around 2-4 percent (e.g., 2 percent for diesel particulate matter). Thus, analyses of historic emissions, concentrations, or health impacts do not guide the choice among alternatives. According to the DEH Health Impact Assessment: "Within the Denver metro area, the highest concentration of air pollution are near the downtown area [several miles south of Globeville and Elyria Swansea]. Vehicle emissions are highest along I-25 near downtown, as is the traffic density within a one-mile radius of downtown Denver." While there are high levels of emissions along I-70 (and other transportation corridors), they are not the highest in the metropolitan area or state. According to the DEH study: "The average annual level of air pollution in Globeville and Elyria Swansea is not higher than other areas of metro Denver, for the air pollutants routinely measured. But North Denver neighborhoods are located closer to major sources of air pollution (e.g., refinery, power plant, asphalt roofing manufacturer), and occasional spikes are noticeable and measurable." While the MATES studies, conducted by the South Coast Air Quality Management District in the Los Angeles metropolitan area, have provided information about health impacts in the Los Angeles area, they do not provide information about the impacts of the alternatives under consideration for I-70 East. The levels of traffic, nearby stationary and other sources, airports, seaports, meteorology, modeling and other factors in the MATES studies in Los Angeles vary considerably from Denver generally and I-70 East particularly. Further, the MATES studies' conclusions regarding cancer and other health effects rely on health risk factors adopted by the State of California that have not been adopted by EPA or CDPHE. For example, cancer risks estimated in the MATES studies are dominated by diesel particulate matter based on carcinogenic dose-response relationships that EPA has not accepted. As discussed in the response to Comment A and elsewhere, I-70 Corridor-specific emissions are expected to drop considerably between now and 2035 and will not significantly vary among alternatives. The reductions in emissions are not gradual, but instead are very large reductions (e.g., 15-fold reduction in diesel particulate matter). While EPA's 2009 comments on the 2008 Draft EIS did suggest conducting more health study, it has agreed to the air quality analysis protocol used in the 2014 Supplemental Draft EIS and the Final EIS. It also did not argue for additional health impact assessment studies in its comments on the Supplemental Draft EIS or for dispersion modeling of PM2.5 or NO2. The Final EIS considers all reasonable alternatives to address the identified purpose and need. NEPA does not require FHWA to provide any detailed examination of alternatives that cannot meet the purpose and need of this project.

For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on air quality in the project area, please AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke | |

emissions. The total cancer risk from all sources, including traffic ("on-road mobile"), non-road mobile and stationary sources, averaged across the region was found to be 1400 per million. On-road vehicle emissions accounted for half of this risk, or 700 per million. This equates to about 1 cancer for each 1450 exposed people.

MATES-II also demonstrated that higher levels of exposure and risk occur near highways. The study found that the range of cancer risks varied significantly across the region, from 1,120 in a million in the cleanest neighborhoods to about 1,740 in a million in the most polluted. *Id.,* p. 7-1, ¶ 1. The Report found the greatest risk levels at locations where "the dominance of mobile sources is even greater than at other sites." *Id.,* ¶ 2. It also found that "model results, which are more complete in describing risk levels…than is possible with the monitored data, show that the higher risk levels occur… near freeways." *Id.,* p. ES-5, ¶ 2. "Results show that the higher pollutant concentrations generally occur near their emission sources." *Id.,* ¶ 4. These findings provide further evidence that neighborhoods near highways would experience higher concentrations than the regional averages. Based on all these observations, MATES-II concluded that "[f]or mobile source compounds such as benzene, 1-3 butadiene, and particulates associated with diesel fuels, higher concentration levels are seen along freeways and freeway junctions." *Id.,* p. 5-9.

MATES-IV (October, 2014),[15] the most recent iteration of the toxic air pollutant exposure research in the Los Angeles basin, shows significant reductions in toxic pollutant concentrations other than diesel particulate and associated cancer risks. But the most recent data does not support the conclusion that cleaner vehicles have eliminated the health risks from exposure to MSATs. The MSATs included in the study, benzene and 1,3 butadiene, "were down 35% and 11%, respectively." But this reduction was significantly less than the reductions in air toxics emitted from stationary sources. The remaining toxic emissions from mobile sources continue to present a significant health risk, especially in locales near highways and interchanges where concentrations are highest.

While diesel particles are counted as part of PM2.5 and are included in monitored concentrations, other components of diesel exhaust are MSATs, and MSATs emitted from gasoline vehicles are not emitted as particles, and are not counted as PM. Emitted as gases from diesel and gasoline vehicles, other MSATs include benzene, formaldehyde, 1,3 butadiene, and the other hazardous air pollutants listed by EPA in its Urban Air Toxics strategy. The AQ Technical Report lists some of these MSATs, and provides estimates of the reductions in emissions of these pollutants expected by 2035. However, the SDEIS does not link current emissions to the community exposures that are contributing to adverse health outcomes in nearby communities, and makes no effort to estimate the residual impact that future emission of these pollutants will have on human health during the 20 years after the Project comes into service.

The DEH report, Fig. 11, provides compelling proof that traffic emissions cause benzene pollution levels that are 3 to 5 times higher in neighborhoods near the interstates than in other areas away from major highways. [In response to inquiry, Gregg Thomas at DEH informed me

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

V

---

[15] MATES-IV (South Coast Air Quality Management District, 2014) available at : http://www.aqmd.gov/docs/default-source/air-toxic-studies/mates-iv/mates-iv-draft-report-10-1-14.pdf?sfvrsn=2.

11

| Comments | Responses to Comments |
|---|---|

Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke

that the units in Fig. 11 are modeled benzene concentrations.] This pattern of elevated exposure to a potent carcinogen near highways is likely typical of other MSATs emitted from highways. These modeling results provide a local example of the pollutant exposures that contribute to adverse health outcomes in these neighborhoods.

In its 2009 comments on the DEIS, EPA flagged this omission as a major flaw in the DEIS. As the results of the latest MATES-IV report shows, the health risks associated with exposure to MSATs remain significant. The use of trend data in the SDEIS to show gradual reductions in future exposure to these pollutants is not enough to justify FHWA's failure to provide an assessment of exposures in response to EPA's comment. The evidence available from MATES-IV establishes that these pollutants will continue to contribute to adverse health effects from continuing exposure to mobile source pollutants. FHWA offers no evidence to establish that no beneficial improvement in health could be achieved by implementing alternatives that remove traffic and pollution from these communities. The obligation under NEPA and FAHA remains to disclose the impact that future emissions of mobile source pollutants – both criteria and MSAT pollutants -- will have on community health. The available evidence that MSATs will continue to contribute to future overall adverse health outcomes in communities along the I-70 corridor. These impacts are a "significant impact on the human environment" that must be assessed and disclosed.

**ii) Not All Impacts of Highway-related Pollutants on National Ambient Air Quality Standards Have Been Investigated and Disclosed.**

The Air Quality Technical Report (AQ Report), supplemental draft environmental impact statement (SDEIS), claims, at p. 83, that –

> Motor vehicle emissions from the implementation of the No-Action and Build Alternatives in the study area have been evaluated. With the exception of PM for several of the project alternatives, the project is not expected to cause any new violations of any standard, increase frequency or severity of any existing violation, or delay timely attainment of the NAAQS.

This assertion is not correct because the AQ Report only includes modeling of expected ambient concentrations for CO and PM-10. An emissions inventory has been developed for PM2.5, but the ambient concentrations of PM2.5 have not been specifically modeled or reported. An emissions inventory has been reported for NO2, but no modeling has been conducted. No explanation is offered in the AQ Report for why PM2.5 and NO2 have not been modeled to determine the impact that emissions of these pollutants will have on attainment of the applicable NAAQS. In addition, the claim that one Build Alternative will not violate the NAAQS for PM-10 is not credible for the reasons discussed below.

Given EPA's findings that emissions of PM2.5 and NO2 from highways present a significant risk of causing violations of the NAAQS for those pollutants in neighborhoods near highways, and highway emissions studies that confirm those findings, emissions of those pollutants significantly impact the human environment and therefore trigger the obligation under NEPA to (i) investigate and disclose to the public and decisionmakers in the SDEIS the likelihood that emissions of those pollutants from the I-70 Project threaten to violate the NAAQS for PM2.5 and NO2, and (ii) to identify alternatives or mitigation measures sufficient to prevent or avoid any likely violations of such NAAQS. In addition, section 109(h) of the Federal-Aid Highway Act

W — CDOT, FHWA, CDPHE, and EPA have all coordinated regarding analysis needs, specifically including the pollutants for which there is a local air quality concern. They specifically identified PM10 and CO as a result of past nonattainment and current maintenance area status. And, the analysis was specifically tied to intersections with LOS below level C, which is usually tied to CO hotspots. The identification of the need to model hotspots specifically excluded PM2.5 and NO2, because these pollutants have never been pollutants of local air quality concern in the Denver Metropolitan area and all monitoring for these pollutants show concentrations well below NAAQS standards. EPA's general, nationwide concerns about PM2.5 and NO2 do not demonstrate that they are localized concerns with NAAQS likely to be violated in the Denver area. This is particularly the case where the emissions inventories for the I-70 East corridor show large reductions in PM2.5 tailpipe and NO2 emissions (the precursor to NO2). For example, the emissions analysis shows that PM2.5 emissions will drop from 0.74 tons per day in 2010 to 0.37 tpd for the No-Action Alternative or 0.38 tpd for the Partial Cover Lowered Managed Lane Alternative in January. NO2 emissions are predicted to drop from 15.38 tpd in 2010 to 3.40 tpd for the No-Action Alternative in 2035 or 3.50 for the Partial Cover Lowered Managed Lanes. Both pollutant inventories account for increases in VMT. Further, the difference between the No-Action and Partial Cover Lowered Managed Lanes Alternative was only 2.7 percent for PM2.5 emissions in 2035 and 3.5 percent for NO2. There is no specific basis for believing that NO2 NAAQS would be exceeded near I-70 other than that EPA has found exceedances in some high-traffic areas elsewhere in the country. However, actual monitoring data in Colorado shows that monitored levels of NO2 are well below short-term and long-term standards. This includes CDPHE's new NO2 near-road monitor at I-25 in Downtown Denver that experiences much higher, close-by vehicle counts than along I-70. See CDPHE/APCD, Colorado Annual Monitoring Network Plan 2015 (June 2015) at: http://www.colorado.gov/airquality/tech_doc_repository. aspx?action=open&file=2015AnnualNetworkPlan.pdf. In addition, the conformity regulations provide for hotspot analyses of PM and CO, not NO2. See also the responses to comments X and Y, as well as Attachment J Air Quality Technical Report.

For more information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

12

| Comments | Responses to Comments |
|---|---|

**Source:** Submittal   **Document Number:** 754   **Name:** Sierra Club - Robert Yuhnke

**W**

requires that any such mitigation measures needed to prevent violations of NAAQS be implemented in the ROD.  As discussed in more detail in the legal section of these comments, the failure to investigate and disclose potential violations of these NAAQS, and the failure to identify such violations and/or mitigation measures as are necessary to prevent of avoid such violations makes this SDEIS inadequate as a matter of law.

**PM2.5 Attainment.** EPA found the highest relative risk factors for the adverse health outcomes observed in the near-I-70 neighborhoods to be associated with exposure to PM2.5 (fine particles smaller than 2.5 micrometers in diameter), also referred to as soot. This is the air pollutant emitted from diesel trucks and gasoline vehicles, and particles that result from brake and pavement wear. But the impact of PM2.5 emitted from the Project on ambient air quality are not modeled in the AQ Technical Report, and not discussed in the SDEIS.

A short-hand approach for using the modeling results for PM-10 to approximate the concentrations of PM2.5 demonstrates that traffic emissions of PM2.5 from every Project scenario will violate the 24-hour NAAQS for PM2.5. Compliance with the annual NAAQS for PM2.5 is not discussed or demonstrated anywhere in the SDEIS.

The emissions inventory developed for the analysis and modeling of of PM-10 concentrations includes an emissions inventory for PM2.5, which constitutes a fraction of total PM-10. The inventory data show that PM-10 particles less than 2.5 µm in diameter comprise 57% of total PM-10 emissions from the I-70 Project. *See AQ Report*, Tables 22 and 23, p.69 (showing that daily total PM-10 emissions from traffic in the I-70 in January 2035 will be 0.7 tons/day, and of that total 0.4 t/d will be PM2.5).

**X**

The air quality modeling for PM-10 estimates that the cleanest build alternative (the lowered 10-lane scenario with a single 800 feet cover, an interchange at Vasquez Blvd/Steele St and managed lanes) will add 38 µg/m3 to daily (24-hr) background concentrations of PM-10. The emission inventory data states that of this 38 µg/m3 of PM-10 added by Project emissions, 57% which is PM2.5. Thus if the 43% of the PM-10 that is larger than 2.5 µm is removed from the calculation, the concentration that remains is particles in the PM2.5 size range. Thus the modeling demonstrates that traffic emissions from the project will add (38 x .57) 21.7 µg/m3 to daily concentrations of PM2.5 at the peak receptor locations.

Using the same methodology used in the AQ Report to estimate future 24-hour concentrations of PM-10, this 21.7 µg/m3 of PM2.5 must be added to the 98th percentile concentrations of PM2.5 measured at the monitoring station used to establish background air quality for the Project area. Background 24-hour concentrations of PM2.5 at the Commerce City monitoring station (Birch Street and 71st) , using EPA's methodology for calculating the 24-hour "design value,"[16] consistently exceed 20 µg/m3 in the project area. *See* Design Values for 2011, 2012, 2013 (attached hereto as Appendix A).

When the approximate 24-hour concentrations of PM2.5 added by Project emissions, as derived from the PM-10 modeling results, are added to background PM2.5 design values occurring at the Commerce City monitor, the modeling results for PM-10 demonstrate that even the cleanest

[16] 40 CFR Part 50, Appendix N.

13

**X** The project includes a PM10 hotspot analysis per EPA guidelines. The project does not include a PM2.5 hotspot analysis, for the reasons discussed in the response to comment U. The "short-hand approach" for extrapolating from PM10 dispersion modeling to reach conclusions regarding PM2.5 concentrations is not supported by any EPA or CDPHE regulations, guidance or protocols. The approach also relies on a fundamental error in applying the ratio of PM10 and PM2.5 emissions from Tables 22 and 23 of the Air Quality Technical Report from the Supplemental Draft EIS. However, these tables only account for the tailpipe, road wear and tire wear elements of PM2.5 and PM10 emissions, even though the vast majority of PM10 emissions (87 percent) modeled are from re-entrained road dust. The project follows the EPA PM10 hotspot analysis per EPA guidelines. See Tables 22, 23 and 35 of the Final EIS Attachment J Air Quality Technical Report. This error is critical, because most of the tailpipe emissions are very small diameter particulates that qualify as PM10 and PM2.5. However, the same assumption cannot be made of road dust, which is disproportionately PM10 and not PM2.5. The precise fraction of PM2.5 in road dust from paved roads is small and dependent on a multitude of factors, including the proportion of silt in soil material on roads, the precise formulation of traction materials applied for snow and ice, sweeping activities, region-wide measures to reduce road dust, rain and other wet conditions, etc. None of these factors were addressed in the methodology for the "short-hand approach." The difference is also critical because EPA requires road dust to be considered in PM2.5 hotspot analyses "only if EPA or the state air agency has made a finding that such emissions are a significant contributor to the PM2.5 air quality problem in a given nonattainment or maintenance area." EPA, Transportation Conformity Guidance for Quantitative Hot-Spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas at Sections 2.5.3 and 2.5.4 (Nov. 2013). In this circumstance neither CDPHE nor EPA have identified a PM2.5 air quality problem for Denver (to the contrary, CDPHE consistently finds monitored levels below NAAQS values) nor that road dust contributes to such a problem. Removing the road dust portion of the PM10 inventories modeled for the I-70 East alternatives drastically reduces PM2.5 emissions and the percentage that could be used under the "short-hand approach," such that it would not exceed NAAQS thresholds, even if such methodology were appropriate. As a result, the only credible evidence -- the monitored levels used by the agencies -- strongly supports the conclusion that there is no PM2.5 problem that would require or justify modeling PM2.5 concentrations and no risk of a PM2.5 NAAQS exceedance. Since the concentrations from dispersion models are directly proportional to emissions, the relative differences in concentrations between alternatives (modeled concentrations, not including background) would be the same for PM10 and any other pollutant.

| Comments | Responses to Comments |
|---|---|

Source: Submittal    Document Number: 754    Name: Sierra Club - Robert Yuhnke

Project alternative will contribute to 24-hour concentrations greater than 40 µg/m3. The 24-hour NAAQS is 35 µg/m3. The PM-10 modeling results for other Project alternatives show that PM2.5 emitted from these alternatives will add even more than 40 µg/m3 of PM2.5 to background 24-hour concentrations. Therefore, all Project alternatives will cause violations of the 24-hour NAAQS for PM2.5.

**X**

Given this evidence that the 24-hour NAAQS for PM2.5 will be violated, NEPA requires that the Draft EIS must consider Project alternatives or control strategies that will prevent or avoid these violations. See 40 CFR §§1502.1, 1502.2(d), 1502.14 and 1502.16(h). To determine whether alternatives or control strategies will be adequate to prevent NAAQS violations, the impact of Project emissions on PM2.5 concentrations must include a quantitative assessment of the expected magnitude of violations of both the 24-hour and annual NAAQS, and a quantitative demonstration that alternatives or control strategies will achieve sufficient reductions in emissions to ensure attainment at all receptor locations included in the modeling analysis.

**PM-10 Attainment.** The modeling results for PM-10 show that traffic emissions from five of the six "build" Project alternatives will violate the 24-hour NAAQS for PM-10. See AQ Report, Table 20, p.65. These violations are expected to exceed the PM-10 NAAQS (150 µg/m3) by 20 to 45 µg/m3. Only one "build" alternative (the lowered 10-lane scenario with a single 800 feet cover, an interchange at Vasquez Blvd/Steele St and managed lanes referred to as the "Basic Option") and the No-build alternative are modeled as exactly attaining the NAAQS.

Despite the requirement of 40 CFR §1502.14(e) that the Draft EIS identify a "preferred alternative," no alternatives are identified as preferred. Each alternative is treated as an available option for CDOT and FHWA to select. Therefore the Draft EIS must identify Project alternatives or control strategies that will prevent or avoid these modeled NAAQS violations for each of the available options. See 40 CFR §§1502.1, 1502.2(d), 1502.14 and 1502.16(h).

**Y**

In addition, the modeling result for the one lowered, managed lane option that allegedly does not violate the NAAQS is not credible. The emissions for the alternative that demonstrates attainment (the "Basic Option") is modeled to add only 38 µg/m3 to ambient concentrations of PM-10, whereas emissions from the other lowered, managed lane option (with two covers and no interchange at Vasquez Blvd/Steele St referred to as the "Modified Option") is expected to add 82 µg/m3 to background concentrations of PM-10, thereby causing concentrations at peak receptors to reach 195 µg/m3, violating the NAAQS by 45 µg/m3. See AQ Report, Table 20. Yet the expected winter day emissions of PM-10 from the two alternatives are virtually identical: 0.68 t/day. See AQ Report, Table 23 (p. 69). The discussion of PM emissions in the AQ Report, at p.68, explains that –

Although there are minor differences in emissions among the No-Action and Build Alternatives, there is no real discernible difference, since they are all very close in any given year. The particulate matter emissions are not a discriminating factor in the selection of a preferred alternative.

It is not plausible that virtually identical emissions from the two lowered, managed lane alternatives could produce daily ambient concentrations of PM-10 that differ by 45 µg/m3.

The traffic data for these two alternatives also does not explain the large (55%) difference in peak daily ambient concentrations of PM-10 added by the two alternatives (38 µg/m3 versus 82

14

**Y** The modeling analysis for PM10 was revised since the release of the Supplemental Draft EIS, in coordination with the EPA and the CDPHE. The higher predicted emissions from the Partial Cover Lowered Alternative, Modified Option was caused by the accumulation of emissions from both of the covers converging in one location between the two covers. With the Basic Option, there is only one cover, so this accumulation did not occur. The second cover is not included as part of the Preferred Alternative in the Final EIS, but if it is pursued by others in the future, air quality will need to be analyzed. The PM10 analysis performed for the Final EIS shows that all alternatives will result in levels at or below the NAAQS for this pollutant. For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

μg/m3).  The Basic Option has higher expected traffic (annual VMT = 2,959,000) on I-70, compared to expected traffic on the Modified Option (annual VMT = 2,935,000).  Total VMT in the Project study area differs between the two alternatives by less than 0.35%: Basic Option = 25,036,000 versus Modified Option = 25,125,000. [17]

**Y**

Given that the contribution added to ambient concentrations by the Modified Option (82 μg/m3) is much closer to the concentrations added by other alternatives without managed lanes, and without covers over segments of the lowered portion of the Project, the much lower contribution added by the Basic Option (38 μg/m3) is the implausible outlier. In the absence of any correlation between the significantly lower ambient concentrations for the Basic Option and key factors that could account for 55% lower concentrations, such as either lower total Project emissions or significantly lower traffic counts, the claim that the Basic Option will not contribute to violations of the NAAQS for PM-10 is not credible.

Information that would help better understand the modeling results is not provided in the AQ Technical report. Missing information includes data files showing inputs to the MOVES emission model and to the dispersion model runs.

**II. Construction Emissions.**

Neither the Draft EIS, nor the AQ Technical Report include any discussion of the likely impact that construction emissions will have on air quality or adverse health outcomes in the communities affected by emissions from heavy equipment during construction operations.

**Z**

Emissions during construction will be a much greater concern for this project than most highway projects because of the years of excavation and earth moving that will be required to dig the trench and haul the removed earth to a disposal site 20 or more miles away. For most projects, construction activities are limited to grading, laying a road bed and paving. Here, the years of excavation required will likely increase construction emissions by an order of magnitude compared to most projects.

Despite the potential significance of these emissions for community health, the SDEIS lacks any discussion of the mitigation measures available to CDOT to require contractors to use low sulfur fuels, employ low-emitting equipment that can minimize the impact of diesel fumes on local residents, and other mitigation measures identified in EPA's 2008 comment letter.

EPA has now added non-road emissions factors to the MOVES model for use in modeling the impact of activities such as construction on ambient air quality. This tool should be applied to the expected construction operations during the excavation of the I-70 trench in addition to more traditional highway construction activities to estimate the likely impact on air quality near the construction zone.

---

[17] *See* I-70 East Environmental Impact Statement, Traffic Technical Report, Figures 86 and 88, pp. 95-96.

15

**Z** Construction impacts are not required to be assessed if construction will not last more than 5 years in any individual site (40 CFR 93.123(c)(5)), and there is no credible evidence that there will be any exceedances of the NAAQS during the construction period. Monitoring supported data available nationwide and specific to Colorado highway construction confirms that BMPs for dust control and suppression deployed by CDOT and other DOTs have been successful in goal of keeping temporary construction dust from contributing to an exceedance or violation of the public health PM10 NAAQS.

Many mitigation measures have been identified in the Final EIS to offset the impacts of the project. For information on project mitigation measures, please see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding dust during construction have been adequately addressed in the Final EIS. For information on mitigating fugitive dust during construction, please see IMP7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke

**[Z]** In addition the alternatives and mitigation options discussed by EPA in 2009 should be committed to minimize public exposure during construction. Additional measures should be committed if emissions will potentially contribute to exceedances of short-term NAAQS.

**III. Legal Standards for Decisionmaking Not Satisfied by SDEIS.**

Three statutory regimes establish decisi0nmaking criteria relevant to the health and air quality issues of concern to local residents: 1) the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq.; 2) section 109(h) of the Federal Aid Highway Act (FAHA), 23 U.S.C. 109(h); and 3) the conformity requirements of section 176(c) of the Clean Air Act, 42 U.S.C. § 7506(c). The SDEIS fails to comply with each of these statutes because it does not –

**[A1]**
1. investigate all of the adverse impacts of emissions from the Project;
2. disclose to decisionmakers and the public all potential adverse impacts of the Project;
3. consider numerous reasonable alternatives, or mitigation measures, that can avoid or prevent some or all of the adverse health and air quality impacts;
4. include the costs of mitigation as required by FAHA;
5. does not contain any comparison of mitigation costs with transportation benefits to explain why the Project is in the "best overall public interest"; and
6. does not contain a conformity determination as required by the CAA.

**A. NEPA Rules Governing Federal Decisionmaking.**

The CEQ NEPA regulations that govern environmental statements require that an EIS must –
1) disclose to the public and the decisionmaker any "significant environmental impact" the proposed action will likely have, 40 CFR 1502.1; and
2) "inform decisionmakers and the public of reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment;" *id.*, and
3) "discuss means to mitigate adverse environmental impacts" which includes avoiding the impacts by not taking the action, or compensating for the impacts by providing alternative resources or environments." 40 CFR 1502.14(f), 1502.16(h), 1508.20.

**[B1]** The Supreme Court has interpreted these provisions to require that an EIS must consider alternatives and mitigation that can avoid or minimize the adverse impacts of a proposed project. As the Supreme Court observed, embedded in these requirements "is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson v. Methow Valley*, 490 U.S. 332, 352 (1989). The SDEIS for I-70 is inadequate because the project alternatives and mitigation options were not evaluated to determine whether they will "avoid or minimize" the adverse health impacts on the near-highway communities that will result from increased exposure to harmful pollutants, or avoid localized NAAQS violations that will likely be caused by emissions from the expanded highway. Equally important, the SDEIS fails to consider alternatives that will "enhance the quality of the human environment" by reducing pollutant exposures in the communities along I-70 below levels that are currently contributing to disparate adverse health outcomes for residents in communities near I-70.

Mitigation cannot be evaluated in the abstract; it must be evaluated with reference to the adverse impacts that are to be avoided. Here, the failure to estimate adverse health outcomes attributable

**[A1]** Refer to responses to comments B1, C1, D1, E1, and F1 for detailed information and responses to these points.

**[B1]** The Final EIS discloses project-related impacts for all alternatives and considers mitigation measures where there are project impacts. For example, see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q regarding mitigation to address emissions during the construction period. NEPA does not require FHWA to consider or implement alternatives that are not feasible and prudent, such as removing I-70 from this corridor or rerouting traffic to the I-76/I-270 corridor. Similarly, moving residents to other locations is not reasonable. It also isn't a feasible mitigation measure because no areas have been identified in the Final EIS analysis to exceed any state or federal air quality standard. No portion of the Denver metropolitan area experiences zero pollution levels from motor vehicles and there are no criteria provided that would allow CDOT to determine what areas are "safe and healthful." For example, some areas with lower PM2.5 may have higher ozone levels. The purpose of the EPA and CDPHE NAAQS and MSAT programs are to allow all areas to meet health standards and reduce overall risk. As discussed in detail in the Final EIS, all of the alternatives evaluated will experience significant reductions in emissions for all health-related pollutants (except for road dust), even with increases in VMT. Thus, any health effects below NAAQS thresholds or pollutants without EPA thresholds are expected to improve with time. The analysis of air quality shows that no exceedances of air quality standards are expected. Furthermore, extrapolating the existing ratio of PM2.5 to PM10 to other scenarios in an effort to predict violations of the NAAQS is not scientifically valid, as particulate emissions in different size fractions come from multiple different sources, not all of which vary at the same rate with changes between build alternatives or traffic loads. And, all of the alternatives are nearly identical from an air quality perspective, with only very small differences between them and none exceeding applicable standards. Accordingly, there is no requirement under NEPA to conduct further analyses or analyze mitigation.

For more information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

16

| Comments | Responses to Comments |
|---|---|
| Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke | |

**B1**

to current and future emissions from I-70, provides no basis for estimating the health benefits likely to accrue to the near-highway communities that could be achieved by reducing pollutant exposures through an alternative that, for example, would divert "through" traffic onto I-76 and I-270. Similarly, the mitigation needed to avoid violations of the NAAQS for PM2.5 or NO2 cannot be determined without modeling PM2.5 and NO2 emissions from the Project to determine the magnitude of likely violations of the NAAQS. The SDEIS fails to disclose these likely significant impacts, fails to determine the extent of the pollutant concentrations that would need to be reduced to avoid adverse health effects or NAAQS violations, and fails to consider any alternatives or mitigation sufficient to avoid the adverse health effects or NAAQS violations.

Both increased health impacts, 40 CFR 1508.27(b)(2), and the likelihood of violating an environmental standard such as a NAAQS, 40 CFR 1508.27(b)(10), are separate criteria for determining that an impact is "significant" for the purpose of triggering an investigation under NEPA. The failure of this SDEIS to address either the impact of Project emissions on health outcomes in the affected neighborhoods, or the likelihood that emissions will cause the NAAQS for PM2.5 and NO2 to be violated, makes the SDEIS deficient. The I-70 SDEIS falls short of these requirements because the air quality section includes a modeling analysis of only two of the criteria pollutants emitted from highways: CO and PM-10, but not the pollutants EPA has identified as most responsible for the adverse health effects of highways: PM2.5 and NO2. In addition, the SDEIS includes no discussion or analysis of the adverse health impacts associated with the total exposure to all the pollutants emitted from highways that will result from increasing traffic by 30% above current levels. The current SDEIS is deficient both because there is no consideration of the overall public health impact of exposure to all pollutants that will be emitted from the Project, and because the analysis of whether specific criteria pollutants will violate relevant NAAQS is lacking or deficient.

The short-hand approach using the modeling results for PM-10 emissions from the Project discussed above to approximate the impact of PM2.5 emissions on attainment of the NAAQS demonstrates why PM2.5 emissions from the Project "threaten a violation" of the NAAQS for PM2.5. This evidence may not be suitable for establishing expected concentrations of PM2.5 for the purpose of determining whether any proposed alternative or mitigation is sufficient to prevent a violation of the NAAQS, but it is suitable for the purpose of demonstrating that the Project threatens to violate the NAAQS. That threat triggers the obligations to determine what the impact that such emissions will have on attainment of the NAAQS, to ensure the scientific integrity of the methods used to assess the threat, 40 CFR § 1502.24, and to determine how much emission reduction is needed to avoid or prevent the violation.

In this case, where a violation of the CAA is threatened by causing or contributing to violations of a NAAQS, the methods prescribed by EPA for assessing the impact of highway emissions on NAAQS violations should be used because the use of a method not approved by EPA would not satisfy the requirement that an EIS "shall state how alternatives … will or will not achieve the requirements of … other environmental laws and policies." 40 CFR § 1502.2(d). The analysis for PM-10 and CO apply the methodologies prescribed by EPA in its Quantitative Guidance for making project-level conformity determinations. Those methodologies should be applied to assess the likely impacts of PM2.5 and NO2 emissions as well.

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |

**C1** The requirements of Section 109(h) are met, because the NEPA process has exhaustively considered the project on air pollution, health, economic, and other environmental considerations, and has taken steps to avoid and minimize impacts. Because I-70 is already in place and will stay in place under the No-Action Alternative, the Build Alternatives -- including the Preferred Alternative -- will have no air quality impacts. Further, for air quality, the project will not result in an increase in emissions as federal emissions standards and other regulations reduce emissions from motor vehicles. The Final EIS also includes a detailed list of mitigation measures and BMPs related to air quality.

For information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**B1**

Both the adverse health outcomes documented in the communities adjacent to I-70, and the likelihood that Project emissions will contribute to violations of one or more NAAQS, trigger the obligation under NEPA to consider alternatives and/or mitigation that can avoid or minimize these adverse impacts. 40 CFR § 1502.1 (duty to consider of alternatives that can avoid or minimize adverse impacts), §§ 1502.14 and 1502.16(e) (duty to compare alternatives based on their environmental impacts), §§ 1502.1(f) and 1502.16(h) (duty to disclose all means to mitigate adverse environmental impacts not avoided by preferred alternative), § 1508.20 (must consider mitigation that "avoid[s] the impact altogether" and "compensating for the impact by replacing or providing substitute resources or environments").

In addition to avoiding adverse environmental impacts, NEPA also requires consideration of "reasonable alternatives which would enhance the quality of the human environment." 40 CFR § 1502.1. This obligation implements the statutory directive that the Federal Government "use all practicable means … to the end that the Nation may – (2) assure for all Americans safe, healthful, [and] productive … surroundings; … and (6) enhance the quality of renewable resources." 42 U.S.C. § 4331(b). Consideration of alternatives that enhance the human environment serve the Congressional declaration that the "purposes" of NEPA include "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man…." 42 U.S.C. § 4321.

In this case, public health in the communities adjacent to I-70 is being impaired by exposure to air pollutants from highways. The proposed project provides an opportunity to reduce those impacts on human health by either 1) removing traffic and traffic-related pollution from the neighborhoods that are suffering from adverse health outcomes without interfering with regional mobility by redirecting through traffic around north Denver onto I-76 and I-270, or 2) offering to buy out residents in the zone of adverse health impacts to allow them to move to safe and healthful surroundings. The SDEIS does not consider either of these alternatives.

**B. Environmental Impacts of Project Not Evaluated under Supplemental Criteria Enacted for Highway Projects.**

Section 109(h) of the Federal-Aid Highway Act, enacted one year after NEPA, supplements the general procedures applicable to all major federal actions under NEPA by requiring a three-step evaluation of air quality impacts and mitigation measures to ensure that "final decisions on the project are made in the best overall public interest." 23 U.S.C. § 109(h). The first step is to determine the "possible adverse economic, social and environmental effects relating to any proposed project." *Id.* The second step is to determine "the costs of eliminating or minimizing such adverse effects and … (1) air…pollution." *Id.* The third step is to weigh "the costs of eliminating or minimizing such adverse effects" together with "the need for fast, safe and efficient transportation" to make a final decision whether the project is "in the best overall public interest." *Id.* FHWA's implementing regulation further requires that any measures necessary to mitigate these adverse effects be incorporated into the project. 23 C.F.R. § 771.105(d).

**C1**

The SDEIS fails to include consideration of any of these factors for the adverse effects of air pollution. There is no consideration at all of the potentially severe health effects of exposure to the mix of criteria pollutants and MSATs that will be emitted from the Project, not to speak of the costs of eliminating or minimizing the adverse health effects of community exposure to these

18

| Comments | Responses to Comments |
|---|---|
| Source: **Submittal**    Document Number: **754**    Name: **Sierra Club - Robert Yuhnke** | |

pollutants. Indeed, the administrative record is devoid of any mention of section 109(h) and the factors that it requires FHWA to consider.

Importantly, § 109(h) adds a requirement that before it can sign a ROD, FHWA must document the "adverse economic [and] social effects relating to any proposed project," and weigh these effects in deciding whether the Project is in the "best overall public interest." These are in addition to the environmental factors made relevant under NEPA. These include the economic costs of 1) adverse health effects, including loss of life, and 2) loss of value in homes that will be imposed on residents in neighboring communities by the emissions from the project. This provision also requires that FHWA and CDOT document the social effects that result from disruption to families after the loss of a parent from pre-mature death or hospitalization for the diseases of air pollution, and the effects on childhood development that are caused by impaired lung development and asthma attacks that interfere with school attendance and slow educational advancement among children.

**C1** Under this provision, FHWA must also determine "the costs of eliminating or minimizing such adverse effects and … (1) air…pollution." To eliminate the adverse effects of air pollution, emissions must be reduced to levels not expected to harm local residents, or local residents must be given the option to receive the value of their homes and move to a location outside the zone exposed to dangerous concentrations of air pollution. So long as FHWA and CDOT treats the expansion of I-70 as a preferred alternative, the evaluation of Project costs must include the cost of purchasing the homes of nearby residents within the zone of exposure to harmful levels of air pollution emitted from the Project.

FHWA must also explain how it weighs these factors in making the public interest determination required by FAHA. The SDEIS omits any discussion of the factors made relevant by the Act, and contains no explanation of how these factors are to be weighed in determining whether the Project is in the "best overall public interest."

Finally, the ROD for the Project must provide for the implementation of all mitigation measures that are relied upon to determine that the transportation benefits of the Project outweigh the adverse effects.

### C. SDEIS Does Not Include a Proposed CAA Conformity Determination.

**D1** The SDEIS discusses the tests that must be satisfied for the Project to be found in conformity under section 176(c) of the CAA, but does not propose to make a finding that the Project meets all of those tests and conforms. Instead, the AQ Technical Report asserts that a conformity determination is not necessary because the Project is not a "project of air quality concern."

### 1. I-70 is Project of Air Quality Concern.

**E1** EPA's Hot Spot conformity rule does not establish numeric criteria for exempting highway projects from the conformity requirement. When it revised the Hot Spot rule in 2006, EPA explained that "Clean Air Act section 176(c)(1)(B) is the statutory criterion that must be met by all projects in nonattainment and maintenance areas that are subject to transportation conformity." 71 F.R. 12,471(March 10, 2006). The I-70

19

---

**D1** The conformity determination was not required in the draft stage of the document, and is being made for the Final EIS. A final conformity determination will be made in the ROD. See Section 5.1.2 of Attachment J to the Final EIS, Air Quality Technical Report, and Section 5.10.6 of the Final EIS for the conformity determination.

**E1** In consultation with CDPHE and EPA, CDOT determined that the project was a project of local air quality concern. The Air Quality Technical Report has been revised, and is included as Attachment J to the Final EIS. The report now identifies the designation of the I-70 East project as a project of local air quality concern.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

Project is subject to transportation conformity because it is a source of PM-10 in a maintenance area for PM-10.[18]

EPA explained that the Hot Spot rule requires that "`all projects that have the potential to impact the air quality standards will be analyzed using appropriate methods before they receive Federal funding or approval.`" 71 F.R. 12,472 (March 10, 2006). In the case of I-70, the modeling for the Project makes clear that this Project has the potential to violate the NAAQS for PM-10 because all alternatives, except one build alternative and the No-build alternative, will cause the NAAQS to be violated. This modeling evidence demonstrates that the Project is a "project of air quality concern."

EPA did recognize authority under the Act to exempt projects from Hot Spot analyses, but EPA recognized that only it has that authority, and that it must be exercised through rulemaking.

> `EPA also believes it has discretion to not require analyses of localized impacts of projects if we have scientific evidence that PM2.5 and PM10 hot-spots are not a concern with respect to the standards. That is, even under the statutory standards of section 176(c)(1)(A) and (B), if EPA determines through rulemaking that certain types of projects will not cause or contribute to violations of any standard or delay attainment, EPA concludes that we have the authority to determine through the conformity rule that no additional analysis would be necessary to meet section 176(c)(1)(A) and (B).`

**E1** 71 F.R. 12,481(March 10, 2006). EPA has not adopted a rule exempting major interstate expansion projects from Hot Spot analysis, nor has it authorized transportation agencies to exempt projects from Hot Spot analysis on a case-by-case basis.

The Hot Spot rule also recognizes a procedure whereby the State, through its SIP, may exempt projects from hot spot analysis for PM-10. "`40 CFR 93.109(k) already allows PM10 areas with insignificant regional motor vehicle emissions to demonstrate, when appropriate, that individual projects will not create new localized violations or make existing violations worse. Projects in such cases would not require PM10 hot-spot analyses.`" 71 F.R. 12,489 (March 10, 2006). But Colorado has not made any finding that regional motor vehicle emissions are "insignificant" with respect to PM-10.

In the AQ Technical report, FHWA claims that it may exempt projects that do not involve a significant increase in diesel trucks. But that is not the test that EPA provided in the Hot Spot rule. The rule requires projects with a "significant number of diesel vehicles" to be analyzed for impacts on the NAAQS.

> `Section 93.123(b)(1) of today's final rule requires PM2.5 and PM10 hot-spot analyses for the following projects of air quality concern:
> Section 93.123(b)(1)(i): New or expanded highway projects that have *a significant number of* or a significant increase in diesel vehicles.`" [Emphasis added.] 71 F.R. 12,490 (March 10, 2006).

---

[18] 42 U.S.C. § 7506(c)(6).

20

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

EPA described an example of a highway expansion project that may be found not to be a "project of air quality concern":

> Projects that do not meet the criteria under Sec. 93.123(b)(1), such as any new or expanded highway project that primarily services gasoline vehicle traffic (i.e., does not involve a significant number or increase in the number of diesel vehicles).

**E1**
71 F.R. 12,491 (March 10, 2006). A project with a significant number of diesel vehicles, regardless of whether the project causes that number to increase, is a project of air quality concern.

An example of a project considered to have a significant number of diesel vehicles is a "highway or expressway that serves a significant volume of diesel truck traffic, such as facilities with greater than 125,000 annual average daily traffic (AADT) and 8% or more of such AADT is diesel truck traffic." Id. Such a project has 10,000 diesel vehicle trips per day. The AADT data posted by CDOT for current traffic on I-70, see p. 6 above, shows that I-70 currently carries over 13,000 trucks per day. The proposed Project is expected to carry at least 30% more traffic., or approximately 16,000 trucks per day. The total number of trucks is significant, and the Project is a "project of air quality concern" that must be analyzed for conformity.

**2. Conformity Determination Must be Included in SDEIS for Public Review and Comment.**

The Conformity Determination required by the CAA must be included in, and addressed by the review of the Project under NEPA. "EIS shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of ... other environmental laws and policies." 40 CFR 1502.2(d). See 40 CFR §§ 1501.6, 1502.25.

**F1**
The information developed to determine that one of the build alternatives (basic managed lane alternative) will not contribute to violations of the NAAQS has not been disclosed. In other project reviews, FHWA has made available information such as the inputs to MOVES to estimate emissions, and inputs to the dispersion model, and outputs from dispersion modeling to show receptor locations used for modeling, and the concentrations predicted at receptor locations. These kinds of information have not been provided in this SDEIS, or AQ Technical Report. Commenters request pursuant to NEPA and the Freedom of Information Act that all input and output files prepared for, or used in, the modeling analyses be made available for review by the public.

**IV. Assessment of Alternatives and Mitigation to Avoid Adverse Health Impacts and NAAQS Violations is Absent.**

**G1**
The SDEIS is fundamentally flawed under NEPA and FAHA because it omits any assessment of alternatives and mitigation measures that can 1) reduce the adverse health impacts likely to result from exposure to increased air pollution, and 2) reduce emissions to the levels needed to prevent NAAQS violations.

21

**F1** After completion of the Supplemental Draft EIS modeling, interagency consultation partners EPA and APCD reviewed the Air Quality Technical Report and modeling files. Both agencies suggested revisions to the modeling, as noted in the revised Air Quality Technical Report. These revisions have been incorporated in the Final EIS modeling which is documented in Attachment J Air Quality Technical Report to the Final EIS. The conformity determination is being made for the Final EIS, and a final conformity determination will be made in the ROD. See Section 5.1.2 of Attachment J to the Final EIS, Air Quality Technical Report, and Section 5.10.6 of the Final EIS for the conformity determination.

For information on how to obtain the input and output files for published documents, please use the project email: contactus@i-70east.com

**G1** As previously discussed in responses to Comments A, K and S, EPA has set NAAQS thresholds for pollutants including PM2.5, PM10 and NO2 (as reflected in the Supplemental Draft EIS and Final EIS) that represent the levels necessary for public health. By showing that the project is in compliance with the NAAQS and no violations are predicted, the EIS provides critical information for the decision makers. Construction impacts are not required to be assessed if construction will not last more than 5 years in any individual site (40 CFR 93.123(c)(5)), and there is no evidence that there will be any exceedances of the NAAQS during the construction period based on the air quality analysis for the Final EIS. Monitoring supported data available nationwide and specific to Colorado highway construction confirms that BMPs for dust control and suppression deployed by CDOT and other DOTs have been successful in goal of keeping temporary construction dust from contributing to an exceedance or violation of the public health PM10 NAAQS.

Many mitigation measures have been identified in the Final EIS to offset the impacts of the project. For information on project mitigation measures, please see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding dust during construction have been adequately addressed in the Final EIS. For information on mitigating fugitive dust during construction, please see IMP7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**G1** The SDEIS is also deficient for its failure to mitigate emissions from heavy duty diesel equipment used during construction.

**A. Alternatives to Reduce Pollutant Exposures in the I-70 Corridor.**

At a minimum, two alternatives should be considered to reduce emissions and pollutant exposures in the neighborhoods adjacent to I-70:

1) re-signing I-70 to route the 40% of traffic that is "through" traffic out of the neighborhoods where dense urban development and elementary schools are located within a few hundred meters of I-70 onto I-76 and I-270; and

2) routing all truck traffic off the current alignment between Washington Street and Colorado Blvd which would require through truck traffic to use I-76 and I-270, and local truck traffic to disperse on local streets leading to their local destination rather than concentrating on the current alignment next to schools and houses along the highway.

These alternatives are reasonable because they will add mobility for traffic traveling through the metro area, without significantly increasing the cost of mobility, while at the same time providing health benefits for communities along the current I-70 alignment. These alternatives have not been evaluated in prior NEPA documents.

Consideration of these alternatives should include traffic modeling and air quality modeling to answer the following questions for decisionmakers and the public:

**H1** a) how much reduction in traffic emissions within the I-70 Project study area could be achieved by diverting truck traffic away from the segment of I-70 where NAAQS violations are expected by requiring that trucks use I-76 and I-270?

b) would the reductions in PM emissions achieved by a truck diversion rule be sufficient to ensure attainment of every applicable NAAQS for mobile source-related pollutants (PM-10, PM2.5, NO2 and CO)?

c) would the diversion of trucks from I-70 and onto I-76/I-270 increase emissions enough in those corridors to cause NAAQS violations?

(d) if the diversion of truck traffic would not be sufficient to ensure that attainment of any NAAQS will not be maintained in the Project study area, would the diversion of through traffic from the current I-70 alignment onto I-76 and I-270 be sufficient to ensure attainment during the life of the Project?

(e) how much of the traffic expected to use the current I-70 alignment in 2035 would be through traffic (i.e., not expected to exit or enter between the Mousetrap and Colorado Blvd)?

(f) if through traffic were diverted onto I-76 and I-270, would emissions from those highways cause any NAAQS to be violated along those alignments?

(g) if any NAAQS violations are predicted at receptor locations along those highways, are any of those receptors in a location which EPA defines as "ambient air," 40 CFR § 50.1, i.e. a location outside the right-of-way owned by CDOT where the general public has access?

Without answers to these questions, informed decisions about these alternatives cannot be made.

CDOT Director Hunt has stated during public meetings that CDOT cannot limit truck or car access to segments of the interstate system, and that therefore the alternatives proposed here for

22

**H1** The Final EIS discloses project-related impacts for all alternatives and considers mitigation measures where there are project impacts. NEPA does not require FHWA to consider or implement alternatives that are not feasible and prudent, such as removing I-70 from this corridor or rerouting traffic to the I-76/I-270 corridor. Similarly, moving trucks to other alignments isn't a feasible mitigation measure because no routes can be identified that would not affect other neighborhoods, and limiting trucks could impact some commercial uses in this segment of the I-70 corridor that rely on trucking. The purpose of the EPA and CDPHE NAAQS and MSAT programs are to allow all areas to meet health standards and reduce overall risk. For information on alternatives that remove I-70 East from its current alignment, please see ALT2 and ALT3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on restricting truck traffic along I-70, please see TRANS8 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke | |

**H1**

evaluation are not permissible. This is an incorrect understanding of the law. CDOT may not have authority to limit vehicle access under statutes that it has authority to implement, but the State clearly has authority under the CAA to limit vehicle access if necessary to attain or maintain a NAAQS for mobile source-related pollutants. For example, the State may adopt measures pursuant to an indirect source review program to prevent a highway from attracting mobile sources, the emissions from which will cause or contribute to violations of a mobile source-related NAAQS. 42 U.S.C. § 7410(a)(5). When necessary to attain a mobile source-related NAAQS in a nonattainment area, or maintain a NAAQS in an attainment area, the State may also adopt directly into its SIP any of the transportation control measures authorized by CAA section 108(f)(1), including "(vii) programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use."

An EIS shall include reasonable alternatives not within the jurisdiction of the agency proposing the action. 40 CFR 1502.14(c). Thus the traffic diversion strategies described above should be considered in the EIS because Congress has delegated authority to the State to adopt such alternatives into its SIP as control measures.

**B. Alternatives to Allow Residents to Move from the Pollution Danger Zone.**

For comparison of health benefits, improved air quality and costs under § 109(h), an alternative that invests resources to allow residents to protect themselves from the pollution danger zone by moving away must also be evaluated. This alternative allows residents to reduce their exposure to emissions from the highway to zero, and to avoid any adverse health impacts. This option is the kind of mitigation contemplated by 40 CFR § 1508.20(e) by providing a substitute environment for the residents adversely affected by exposure to pollution from the Project.

**I1**

Together, the failure to investigate the impacts that Project emissions will have on air pollution standards, on community health, and to consider options that could prevent adverse air quality impacts and improve local health outcomes makes the SDEIS inadequate under NEPA. In addition, the failure to consider and adopt mitigation puts Denver at risk of becoming nonattainment under the CAA for PM2.5, and possibly for NO2 as well. There is no discussion of the regulatory burdens that such an outcome will have on sources of PM2.5 in the region, on regional transportation planning and transportation funding, and on the City.

**CONCLUSION.**

**J1**

The SDEIS is not adequate to satisfy the requirements of NEPA, FAHA or the CAA for the reasons discussed above. A ROD for the proposed I-70 Project may not be signed, or the project funded or approved until a revised SDEIS is prepared that remedies the described deficiencies and is made available for public review and comment.

Respectfully submitted,

Robert E. Yuhnke
Robert E. Yuhnke and Associates
(303) 499-0425
Colorado Attorney (#012686)

23

Joanne Spalding
Attorney, Sierra Club Law Program
85 Second Street
San Francisco, CA 94105
(415) 977-5725

**I1** Moving residents out of the I-70 corridor is not necessary because mitigation is not needed since there will be no air quality impacts as a result of the project and no violation of the NAAQS is predicted. This would be an expensive measure that would impair neighborhoods rather than improving them by displacing more people than the bare minimum necessary to safely meet the purpose and need. Further, because no relocation areas in the Denver metropolitan area have zero air pollutants (from vehicles or other sources), it is unclear how much risk would be reduced. Overall air quality and health are improving and will continue to improve with reductions in motor vehicle emissions, the closure of coal units at the nearby Cherokee Station, cleanup of old industrial sites and similar measures.

CDOT follows the Uniform Act for relocating businesses and residents impacted by the project. For information on relocation of residences that will not be acquired by the project, please see PROP4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**J1** The Supplemental Draft EIS and Final EIS are fully compliant with the requirements of NEPA, the Clean Air Act, the Federal Aid Highway Act, and other provisions. FHWA will take into account all public comment prior to making a final decision for the ROD.