Exhibit 9:

Second DeVito Declaration

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Actions No.      17-cv-01661-WJM-MEH
*Consolidated with*    17-cv-01679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE; JACQUELINE LANSING; and JANET FEDER,

      *and*

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as Secretary of Transportation; and JOHN M. CATER, in his official capacity as Division Administrator,

      Defendants,

      *and*

COLORADO DEPARTMENT OF TRANSPORTATION, and
SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado Department of Transportation,

      Defendant-Intervenors.

———————————————

## SECOND DECLARATION OF ANTHONY R. DEVITO IN SUPPORT OF CDOT'S OPPOSITION TO SIERRA CLUB'S MOTION FOR STAY

———————————————

I, Anthony R. DeVito, being competent to make this statement, do swear and affirm the following:

1.    I am the Central 70 Project Director.  This Declaration is based on my personal knowledge and information from business records which are maintained in the ordinary course of

business and from entries made therein at or near the time of the events so recorded. I am authorized to testify to the matters herein. If called as a witness, I could competently testify regarding the facts in this declaration.

2.      I have been employed by the Colorado Department of Transportation ("CDOT") since August 1991 and have served in my current role as the Central 70 Project Director since July 2015. The Central 70 Project Director oversees CDOT's efforts to implement Phase 1 of the preferred alternative identified in the I-70 East Final EIS and approved in the Record of Decision, known as the Central 70 Project. I am a licensed Professional Engineer in the State of Colorado (PE 30228 issued 2/7/1995).

3.      In January 2017, FHWA issued the Record of Decision ("ROD") for the Central 70 Project, which includes the preferred alternative's planned improvements to I-70 between I-25 and Chambers Road. Since that time, CDOT has been completing the procurement of the Project, including the selection of a private developer to help finance, design and build it. CDOT chose a preferred developer, Kiewit Meridiam Partners, in August 2017 and entered into an agreement with Kiewit Meridiam Partners to complete the design, help finance, and build, operate, and maintain Central 70 on November 22, 2017 ("KMP Agreement").

4.      Financial close with lenders for KMP is expected no later than the end of January, 2018, followed by execution of a Project Agreement with FHWA in early 2018. Apart from continuing preparatory work, such as utility relocations and demolition of acquired structures, actual construction of the redesigned highway is not expected to begin until Summer 2018.

5.      Under the ROD and State law, CDOT and its contractors must take the following steps, among others, to minimize emissions:

- Continuously monitor particulate matter during construction and immediately modify construction at levels defined to prevent NAAQS violations;

- Cover, wet and stabilize soils to prevent dust emissions;

- Use vacuum street sweepers and measures such as covering loads and washing wheels to reduce the spread of dust;

- Use construction equipment that meets the latest and lowest federal emissions standards and/or retrofitted particulate traps, catalyst, and other systems;

- Use alternative-fuel construction equipment and haul trucks where reasonably available;

- Prohibit unnecessary idling and require proper maintenance of construction equipment to reduce emissions.

- Locate construction staging areas as far away from residential areas as possible.

6.      These measures have been included in the KMP Agreement, which commits KMP to implement the mitigation provided in the ROD.   KMP's environmental mitigation and performance obligations are included in Schedule 17 of the KMP Agreement, which is Attachment A to this Declaration.  Among other things, KMP has committed to implement practices to "effectively control fugitive particulate emissions at all times on the Site, including during periods of inactivity.  The Developer shall monitor Project fugitive particulate emissions including those from construction equipment and stationary sources." Attachment A at 17-9.

7.      Schedule 17 of the KMP Agreement also requires KMP to do the following:

- "The Developer shall conduct continuous PM-10 monitoring during the Construction Period in accordance with 40 C.F.R. Part 58 (Ambient Air Quality Surveillance) adequate to characterize PM-10 concentrations along the active construction corridor." Attachment A at 17-10.

- "The Developer shall implement an automated PM-10 alert system that will communicate via both text messaging and email when a PM-10 monitored

level reaches a running eight hour average concentration of 135 µg/m$^3$. This alert system will continuously monitor the real time data from the Project's PM-10 monitors. The level of 135 µg/m$^3$ is specified in order to allow corrective actions to be implemented prior to exceeding the National Ambient Air Quality Standard ("NAAQS") of 150 µg/m$^3$. … Upon receiving an alert, the Construction Manager, in consultation with the EM, shall respond immediately to identify the source of the PM-10 event and implement effective BMPs for dust control." Attachment A at 17-10 to 17-11.

- "Diesel equipment on the construction site "for more than 10 total Calendar Days must either 1) have engines meeting EPA Tier 4 standards or 2) be EPA rated Tier 2 or Tier 3 that have been retrofitted with diesel particulate control technology, diesel oxidation catalysts, and/or engine preheaters." Attachment A at 17-12.

- "The Developer shall undertake Reasonable Efforts to use alternatives to diesel engines and/or diesel fuels, such as biodiesel, liquefied natural gas, compressed natural gas, fuel cells, and electric engines." Attachment A at 17-11.

- The developer is prohibited from keeping equipment idling for more than 5 minutes except under specified circumstances. Attachment A at 17-12 to 17-13.

8.     The measures in the ROD and KMP Agreement are effective in the real world for controlling particulate emissions from construction. The measures are part of or exceed the requirements of the State's regulations to ensure compliance with the federal air-quality standards for particulate matter.

9.     As an example of the effectiveness of the mitigation measures, the City and County of Denver has been using the same or less stringent measures to control emissions at the Globeville Landing Outfall drainage project immediately adjacent to Central 70. As part of my regular duties, I keep apprised of other projects near Central 70, including the Globeville Landing Outfall project, which was analyzed in the ROD for Central 70. The Globeville Landing Outfall project included extensive earth moving and excavation in a Superfund site.

Just as CDOT will, Denver has engaged in continuous air-quality monitoring and published reports and data from the monitoring. I have reviewed the air-quality monitoring results and am including an example summary of this data as Attachment B to this Declaration.[1]

10.     According to the air-quality monitoring results, during the course of the construction of the Globeville Landing Project, Denver has always been well below the Particulate Matter National Ambient Air Quality Standard and has never exceeded it. *See, e.g.*, Attachment B. The majority of particulate matter concentration peaks are at or below half of the standard; the single highest was below 80 percent of the standard. Denver also collected specific data regarding arsenic and lead air concentrations and found that they were a very small fraction of EPA allowable air concentrations for residential locations.

11.     Compliance with all of the mitigation and construction measures will minimize emissions and keep concentrations below federal standards during construction. They reflect decades of practice, regulation, and experience.

12.     Beyond the mitigation measures to minimize emissions, CDOT committed in the ROD to provide storm windows, portable air conditioners and furnace filters for the homes between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard (corresponding with the areas of excavation and the viaduct replacement), along with utility bill assistance during the period of construction. These mitigation measures are unprecedented in Colorado. Since FHWA issued the ROD, this initiative has been enhanced with partners to

---

[1] All of the City's air quality monitoring results for the Globeville Landing Outfall are made public and are available at https://www.denvergov.org/content/denvergov/en/environmental-health/environmental-quality/land-use-and-planning.html.

provide central air conditioning, ventilation and heating systems, positive pressure air ventilation, and window and door replacement for many of the homes in the program.

13.     These home-improvement measures collectively will allow residents to keep homes closed during construction to reduce infiltration of outside air and also filter particulate matter, including any fugitive construction dust.  Contractors have already started the process of providing the residential mitigation for homes along I-70.  So far, they have found that many of the homes inspected have serious health and safety issues, including carbon-monoxide leaks from defective heating systems, leaking hot water tanks, unsafe systems, hollow-core interior doors used as front doors, venting of moist air into attic spaces (potentially leading to mold and other issues), roofs with visible holes through the structure.  These issues are being remediated for the homes in the program both for the health and welfare of the residents and workers providing the home improvements, as well as to meet code requirements for home improvements.

I declare under penalty of perjury that the foregoing is true and correct.

Anthony R. DeVito, P.E.

Executed this 6th day of December, 2017, at Denver, Colorado.

# Attachment A

## KPM Agreement Schedule 17

## Schedule 17
## Environmental Requirements

**1.   GENERAL**

**1.1.   General Requirements**

1.1.1.   To the extent allowed by Law, subject only to the express provisions of this Agreement (including of this Schedule 17) and without limiting the Developer's own obligations to comply with all other Environmental Requirements applicable to the Project and the Work, the Department hereby delegates to the Developer, and the Developer hereby accepts, all the Department's obligations, commitments and responsibilities for environmental management and environmental compliance in accordance with the requirements identified in this Agreement and all applicable Environmental Law and Environmental Approvals. The Developer shall be responsible for creating environmental awareness among all Project personnel, ensuring completion of environmental tasks and mitigation, and documenting that the environmental aspects of the Construction Work and the O&M Work are completed in accordance with the foregoing delegation and all other applicable Environmental Law, Environmental Approvals and provisions of this Agreement. The Developer shall also assist the Department to implement any and all non-delegable obligations, commitments and responsibilities regarding applicable Environmental Law and Environmental Approvals. Unless specifically noted otherwise herein, the requirements of this Schedule 17 apply to all aspects of the Work, throughout both the Construction Period and the Operating Period.

1.1.2.   Except as provided otherwise in this Agreement (including in this Schedule 17), the Developer shall in performing the Work:

   a.      Comply with all Environmental Law;

   b.      Comply with all conditions and requirements imposed by all Environmental Approvals;

   c.      Comply with all conditions and requirements imposed by all other Governmental Approvals (including all Department Provided Approvals) and Permits;

   d.      Perform all commitments and mitigation measures set out in all Environmental Approvals, all other Governmental Approvals (including all Department Provided Approvals, other than commitments and measures assigned to the Department in the Central 70 Mitigation Measures Status as provided in the Reference Documents) and all Permits; and

   e.      Pursuant to Section 8.4 of the Project Agreement, prepare all information and submissions required by, or necessary to maintain in full force and effect, all Department Provided Approvals and all other Environmental Approvals.

1.1.3.   For certainty, the provisions of this Schedule 17, including all obligations of the Developer hereunder, are (except to the extent otherwise expressly provided herein) without prejudice to the Developer's rights and obligations arising as a result of the occurrence of any Supervening Event.

**2.   ENVIRONMENTAL COMPLIANCE WORK PLAN**

**2.1.   General Requirements**

2.1.1.   The Developer shall prepare an Environmental Compliance Work Plan ("ECWP") that specifically identifies all of the environmental goals and compliance requirements for the Project and the Developer's detailed plan to meet or exceed those goals and requirements, and which is consistent with and expands upon the draft ECWP submitted with the Proposal. The ECWP shall be submitted to the Department for Approval (or, in the case of certain of the discipline specific management plans listed in Section 2.1.2 of this Schedule 17 and incorporated in the ECWP, Acceptance as specified in Table 17-5 (*Deliverables*)) prior to issuance of NTP2.

At a minimum, the ECWP shall comply with this Schedule 17 and the requirements of Section 14 of Schedule 10 (*Design and Construction Requirements*) and include the following:

a.     All environmental elements defined in Exhibit 14 (*Central 70 Project Mitigation Measures*) of the ROD;

b.     All elements assigned to the Developer in the Central 70 Mitigation Measures Status as provided in the Reference Documents;

c.     All elements required by Environmental Law and Environmental Approvals;

d.     Description of the means and methods to meet all Environmental Requirements during both the Construction Period and the Operating Period (to include, for example, detailed procedures that the Developer shall utilize to meet Environmental Requirements for dewatering in both the Construction Period and the Operating Period and any Government Approvals for removal, management, and disposal of RHMs the Developer shall seek);

e.     Description of the process for tracking and documenting the progress and completion of all Environmental Requirements throughout the Construction Period and the Operating Period;

f.     Description of how the Developer's Process Control ("PC") and Independent Quality Control ("IQC") programs shall function to assure compliance with Environmental Requirements and this Agreement;

g.     Description of how information related to progress, completion and compliance with Environmental Requirements will be communicated to the Department and recorded in the Developer's DCS;

h.     Description of the roles, responsibilities and qualifications for all members of the Developer's environmental management team, including the Environmental Manager ("EM");

i.     All discipline specific management plans as required pursuant to Section 2.1.2 of this Schedule 17;

j.     Description of the frequency and purpose of environmental field reviews; and,

k.     Description of how site specific construction activities will meet all Environmental Requirements.

2.1.2.  For certainty, specific Environmental Requirements (for example requirements related to air quality) will be addressed in the ECWP through discipline specific management plans, including those listed in this Section 2.1.2. The ECWP shall incorporate these discipline specific management plans by reference and they shall be considered part of the ECWP. The ECWP shall include details of how each discipline specific management plan will be incorporated into the overall environmental management program. The plans listed below shall be submitted to the Department for Approval or Acceptance as required by Table 17-5 (*Deliverables*).

a.     Air Quality Monitoring, Maintenance, and Mitigation Plan;

b.     Construction Noise Mitigation and Monitoring Plan;

c.     Integrated Noxious Weed Management Plan;

d.     Materials Management Plan;

e.     Sampling and Analysis Plan;

f.     Health and Safety Plan;

g.     Spill Prevention Control and Countermeasures Plan; and

h.     BTPD Management Plan.

2.1.3.  The Developer shall monitor and improve the effectiveness of its ECWP and resubmit the ECWP annually for Approval (or, in the case of certain of the discipline specific management plans listed

in <u>Section 2.1.2</u> of this <u>Schedule 17</u> and incorporated in the ECWP, Acceptance as specified in <u>Table 17-5</u> (Deliverables)) upon the anniversary of the ECWP's initial Approval by the Department, or more frequently should any of the following conditions exist:

    a.    A plan or procedure no longer adequately addresses the matters it was originally intended to address;

    b.    A plan or procedure does not conform with the Project Agreement;

    c.    An audit by the Developer or the Department identifies a deficiency in the ECWP requiring an update;

    d.    Organizational structure changes require revision to the ECWP; or

    e.    The Developer is undertaking, or about to undertake, activities that are not covered within the current ECWP.

2.1.4.    For all ECWP updates submitted by the Developer to the Department (including updates to each discipline specific management plan) the Developer shall:

    a.    clearly identify in a cover sheet what changes were made in the plan update in order to expedite the Department's review; and

    b.    submit to the Department a comparison ("redline") copy of the ECWP, or the relevant parts thereof, together with an unmarked revised ("clean") copy of the ECWP.

**3.    INDEPENDENT QUALITY CONTROL PROGRAM**

The Developer's IQC program, as described in <u>Schedule 8</u> (*Project Administration*), shall assure compliance with all Environmental Requirements. The Developer shall perform IQC inspections to assure that the Construction Work meets and is being performed in accordance with this Agreement and all Environmental Requirements.

**4.    ENVIRONMENTAL STATUS AND MITIGATION COMPLETION REPORTS**

4.1.1.    The Developer shall report on the status of activities undertaken in accordance with the Environmental Requirements on a regular basis. During the period beginning with NTP1 through the Substantial Completion Date, the EM shall submit an Environmental Status Report ("<u>ESR</u>") monthly for Acceptance. During the Operating Period the Developer shall submit an ESR quarterly for Acceptance. The ESR shall be submitted no later than 10 Working Days following the end of the reporting period. The ESR shall:

    a.    Include the current status of compliance with the Environmental Requirements;

    b.    Include a section devoted specifically to water quality. This section shall summarize the water quality protection activities that have occurred during the reporting period and shall include a statement certifying that the Developer is in compliance with the CDPS-SCP, CDOT's MS4 Permit and the Construction Standards for Water Quality Control and Erosion Control. During the period beginning with the issuance of NTP1 through the second anniversary of Final Acceptance, the certification statement shall be signed by the Environmental Manager. After the second anniversary of Final Acceptance through the end of the Operating Period, the certification statement shall be signed by the Project Manager. If the certification statement cannot be signed, a separate Corrective Action Plan shall be submitted for Approval;

    c.    Document any pertinent environmental issues and include a narrative of the compliance actions and environmental activities which have occurred during the reporting period;

    d.    Include a summary of any stakeholder communications and Governmental Authority communications that have occurred during the reporting period;

    e.    Include a summary that lists the plan sets and submittals which have undergone environmental cross-disciplinary review since the last ESR;

    f.      Include dated photographs documenting environmental compliance and activities; and

    g.      Include any other content requirements specified in this Schedule 17 or other sections of the Project Agreement.

4.1.2.    All narratives shall include enough detail to fully document the environmental activities. If the Department requests additional information be included in an ESR, the Developer shall revise the ESR and resubmit the report for Acceptance.

4.1.3.    When all Environmental Requirements and environmental activities associated with the Construction Work that have been assigned to the Developer are complete, the Developer shall provide a Mitigation Completion Report. The Mitigation Completion Report shall document and certify the completion of all Environmental Requirements including environmental mitigation. The Developer shall submit the Mitigation Completion Report to, and obtain Acceptance thereof from, the Department prior to Final Acceptance.

## 5.    ENVIRONMENTAL MANAGER, PROFESSIONALS AND TASK FORCE MEETINGS

### 5.1.    Environmental Manager

5.1.1.    The Developer shall employ an Environmental Manager ("EM") as and when required by Section 16.1 of the Project Agreement and Schedule 27 (Key Personnel), which EM shall (without limiting Developer's obligations with respect to such compliance) be responsible for ensuring compliance with all Environmental Requirements and commitments. The Environmental Manager shall implement all the environmental design, construction and operational commitments, all Environmental Requirements, and all conditions of the Environmental Approvals for the Project. The EM shall have the authority to stop or redirect the Work at any time as needed. The EM shall be responsible for the following:

    a.      Be the primary liaison between the Developer and the Department on environmental issues.

    b.      Be the lead responder to the Department for all NCNs and NCRs, each as defined in Schedule 8 (Project Administration), issued for the Environmental Requirements.

    c.      Provide support to the Independent Quality Control Manager ("IQCM") to ensure compliance with Environmental Requirements is included in inspections.

    d.      Conduct a weekly field review of the entire Project. A summary of the field reviews shall be included in the ESR.

    e.      Coordinate the implementation of procedures to meet all Environmental Requirements.

    f.      Ensure full compliance with all Environmental Requirements in the Work.

    g.      Ensure that environmental tasks are performed by qualified environmental professionals and provide the resources to perform the Work needed to meet the Environmental Requirements. Activities performed by environmental professionals shall be reported in the ESR and include the resumes of the individuals performing the Work.

    h.      Lead environmental cross-disciplinary reviews of all design submittals in order to confirm compliance with all Environmental Requirements and environmental design commitments. A summary of these reviews shall be included in the ESR.

    i.      Perform reviews of proposed Developer Changes prior to submittal to the Department of any related Developer Change Notice pursuant to Schedule 24 (Change Procedure). The submittal of a proposed Developer Change Notice by the Developer to the Department shall include documentation that the EM has performed due diligence and that the proposed Developer Change complies with the Environmental Requirements. A summary of these reviews shall be reported in the ESR.

j.      Perform reviews equivalent to those described in Section 5.1.1.i of this Schedule 17 with respect to any Enterprise Change as required by the terms of an Enterprise Change Notice.

k.      Measure the number and severity of non-conformances with the Environmental Requirements and include a summary of the findings in the ESR.

l.      Implement improvement strategies to reduce the number and severity of non-conformances with the Environmental Requirements and include a summary of the findings in the ESR.

m.      Monitor Work for conformance with Environmental Requirements and include a summary of the findings in the ESR.

n.      Plan and implement the Environmental Compliance and Mitigation Training Program described in Section 6.1 of this Schedule 17.

o.      Lead a field review with the Department to review the Project and environmental issues every month. This field review can be counted as a substitute for the EM's weekly field review for the relevant week.

p.      Coordinate the participation of the appropriate members of the Developer's team for, and lead, environmental task force meetings as such meetings shall otherwise be conducted pursuant to Section 5.3 of this Schedule 17.

q.      Attend all public and stakeholder meetings related to the Project and participate as needed.

r.      Provide Mitigation Completion Report documenting and certifying the completion of all Environmental Requirements.

s.      Develop site specific procedures/plans to meet the Environmental Requirements.

5.1.2.  The EM's responsibilities shall not be delegated to production staff or other Persons without Department Approval.

**5.2.    Other Environmental Professionals**

5.2.1.  Where this Agreement requires work to be performed by a qualified environmental professional (e.g., a qualified wildlife biologist or a qualified highway noise specialist) the individual performing the work shall have the appropriate educational credentials and a minimum of two years' professional experience in the specific discipline, unless higher standards are specified. The qualifications of the environmental professional(s) performing the work shall be submitted to the Department as part of the ESRs and Mitigation Completion Reports (for example, the resumes of the biologists used during the prior month for completing Migratory Bird Treaty Act (MBTA) surveys shall be submitted with the ESR).

**5.3.    Environmental Task Force**

5.3.1.  The Developer shall conduct environmental task force meetings pursuant to Section 9.2.1 of Schedule 8 (*Project Administration*) and this Section 5.3.

5.3.2.  Environmental task force meetings shall be held on a weekly basis during the Construction Period. During the Operating Period, the Department may require such meetings on an as needed basis.

5.3.3.  The EM shall coordinate and lead the environmental task force meetings pursuant to Section 5.1.1.p of this Schedule 17. During the Operating Period, and after the required term for appointment of the EM set out in Schedule 27 (*Key Personnel*) has ended, the Developer's Project Manager (or, alternatively, an Approved designee) shall coordinate and lead such meetings.

6. **ENVIRONMENTAL COMPLIANCE AND MITIGATION TRAINING PROGRAM**

6.1. **General Requirements**

6.1.1.   The Developer shall develop and implement an Environmental Compliance and Mitigation Training Program ("ECMTP") for the Developer's personnel, including those of Subcontractors who will enter within the Site boundaries to perform Construction Work and Renewal Work. All such personnel shall complete this training prior to performing Construction Work and any Renewal Work on the Project. In addition, IQC inspectors, IQC supervisory staff, and the IQCM shall participate in the ECMTP. The ECMTP shall cover the Environmental Requirements for the Project and train personnel to stay in compliance with the Environmental Requirements.

6.1.2.   The ECMTP shall include the following elements:

   a.   Water quality requirements;

   b.   Wetlands and waters of the U.S.;

   c.   Maintaining approved limits of disturbance;

   d.   Tree and shrub protection;

   e.   Avoidance and minimization of impact to waterways and stormwater conveyances;

   f.   Seasonal work restrictions – trees, waterways, and migratory birds;

   g.   Pumping and dewatering operations;

   h.   Discovery of archaeological material or human remains;

   i.   Discovery of paleontological resources;

   j.   Hazardous Substances;

   k.   Historic property protection requirements;

   l.   Construction noise mitigation;

   m.   Dust and construction emissions mitigation;

   n.   Site general housekeeping measures;

   o.   Concrete and asphalt waste material management;

   p.   Spill prevention, response, and cleanup;

   q.   Protection and access requirements for parks and maintenance of trail detours;

   r.   Impacts and consequences for departure from approved operating procedures;

   s.   Additional topics as needed to maintain compliance with the Environmental Requirements; and

   t.   Responsibilities of production supervisors and inspectors in connection with environmental compliance.

The EM shall implement the ECMTP and submit it to the Department for Acceptance prior to issuance of NTP2. After NTP2 the Developer shall not allow any personnel to begin Work on the Site without completing the training required by the ECMTP. Construction Work conducted on the Site prior to the issuance of NTP2 shall be conducted under the environmental requirements of the CDOT Special Use Permit and otherwise subject to the early access and use provisions set out in Section 1.2 of Schedule 18 (*Right-of-Way*). The Developer shall revise the ECMTP regularly to reflect the most current policies, rules, and regulations and provide annual updates to the ECMTP to the Department for Acceptance 30 Calendar Days after the end of each Contract Year. The Developer shall keep records of the number of sessions and staff who has completed the ECMTP (for example, through the use of sign-in sheets, employee-specific identification numbers, hard hat decals etc.) and report this information monthly in the ESR.

7.        **DEPARTMENT PROVIDED ENVIRONMENTAL APPROVALS**

The Environmental Approvals listed in Table 17-1 were obtained prior to the Agreement Date by the Department. These represent a portion of the Department Provided Approvals. Subject to Section 8.4 of the Project Agreement, Law, the terms of the applicable Department Provided Approvals and, with respect to the Programmatic Agreement only, Section 12.1.5 of this Schedule 17, the Department hereby delegates to the Developer responsibility to perform all conditions, commitments and requirements contained in or arising out of these and all other Department Provided Approvals.

**Table 17-1        Department Provided Approvals**

| Environmental Approvals | Permitting Agency/Approval Agency |
|---|---|
| Record of Decision and Section 4(f) Evaluation | Federal Highway Administration ("FHWA") |
| Central 70 Reevaluation #1, dated September 18, 2017 | FHWA |
| Programmatic Agreement | State Historic Preservation Office ("SHPO"), CDOT and FHWA |

8.        **REQUIRED ENVIRONMENTAL APPROVALS**

8.1.1.    Pursuant to Section 8.4.2.a of the Project Agreement, the Developer shall be responsible for obtaining all Environmental Approvals (other than the Department Provided Approvals) required to perform its obligations under this Agreement. A non-exhaustive list of the Environmental Approvals that the Developer shall be required to obtain pursuant to Section 8.4.2.a of the Project Agreement is found in Table 17-2. Table 17-2 is provided for convenience only.

8.1.2.    For certainty, the Developer shall also obtain any additional Environmental Approvals not listed in Tables 17-1 or 17-2 as and when required pursuant to its obligations under this Agreement.

8.1.3.    The Developer shall provide copies of each Developer obtained Environmental Approval to the Department pursuant to Section 8.4.2.b of the Project Agreement and, in any event, prior to commencing any part of the Work that is regulated by such Environmental Approval. The Developer shall, subject to Section 49.1.1 of the Project Agreement, transmit the copies of each such Environmental Approval through the then current Document Control System.

8.1.4.    Pursuant to Section 8.4.3.b of the Project Agreement, and without limiting Developer's rights under the Project Agreement (including with respect to any Supervening Event), the Developer shall also be responsible for performing all necessary actions and shall bear all risk of delay and/or all risk of increased cost, in either case, associated with Governmental Approvals (including, for certainty, Department Provided Approvals) and with Permits to the extent provided for in such Section, including in certain circumstances by obtaining new, or modifications, renewals and extensions of existing, Governmental Approvals (including, for certainty, Department Provided Approvals) and Permits.

**Table 17-2        Required Environmental Approvals**

| Environmental Approvals | Permitting Agency/Approval Agency |
|---|---|
| Air Pollutant Emission Notice ("APEN") | Colorado Division of Public Health and Environment ("CDPHE") Air Pollution Control Division ("APCD") |
| Stationary Source Air Quality Permit | CDPHE APCD |
| Fugitive Dust Permit | CDPHE APCD |
| Asbestos Abatement Permit | CDPHE APCD |
| Demolition permits | CDPHE and all applicable Governmental Authorities |
| Historic Structures Demolition Permit | City and County of Denver Landmark Preservation Commission |

| Environmental Approvals | Permitting Agency/Approval Agency |
|---|---|
| Construction Noise Permit | All applicable Governmental Authorities |
| Temporary Noise Variance | All applicable Governmental Authorities |
| Clean Water Act Section 402 Construction Dewatering Permit | CDPHE Water Quality Control Division ("WQCD") |
| Construction Activities Stormwater Discharge Permit ("CASDP") | City and County of Denver ("CCD") – Wastewater Management |
| Colorado Discharge Permit System ("CDPS") Stormwater Construction Permit ("SCP") | CDPHE WQCD |
| Municipal Separate Storm Sewer System (MS4) Discharge Permit (CDOT MS4 discharge requirements) | CDPHE WQCD |
| Municipal Separate Storm Sewer System (MS4) Discharge Permit (outside CDOT ROW) | All applicable Governmental Authorities |
| Subterranean Dewatering or Well Development Permit | CDPHE WQCD |
| Construction Dewatering Permit | CDPHE WQCD |
| Remediation Activities Discharging to Surface Waters Permit | CDPHE WQCD |
| Remediation Activities Discharging to Groundwater | CDPHE WQCD |
| Individual Permit | CDPHE WQCD |
| Substitute Water Supply Plan | Colorado Division of Water Resources |
| Notice of Intent to Construct Dewatering Wells | Colorado Division of Water Resources |
| Well Construction and Test Reports | Colorado Division of Water Resources |
| Dewatering Systems Well Report | Colorado Division of Water Resources |
| Notification as Resource Conservation and Recovery Act ("RCRA") Generator (when the Developer is the Generator as determined pursuant to Section 23.6 of this Schedule 17; if the Department is the Generator as determined pursuant to Section 23.6 of this Schedule 17, the Department will submit this notification). | CDPHE Hazardous Materials and Waste Management Division |
| Stormwater Quality Discharge Permit for Construction Activities | City of Aurora |
| Sewer Use and Drainage Permit ("SUDP") | CCD |
| Well Abandonment Report (GWS-09) | State of Colorado, Office of State Engineer |
| Black Tailed Prairie Dog Removal Permit | Colorado Parks and Wildlife ("CPW") and City of Aurora |
| SB40 Certification/Approval | CPW |
| Nest Take Permit | The United States Fish and Wildlife Service ("USFWS") |
| Clean Water Act Section 404 Permit | United States Army Corps of Engineers ("USACE") |
| Special Use Permit | Colorado Department of Transportation |

8.1.5.   The Developer shall not pursue any new Environmental Approval, or seek to modify, renew or extend any existing Environmental Approval:

a.   that reflects any change to the Project not described in the Preferred Alternative and/or the Reference Documents without Department Approval of the proposed new, modified, renewed or extended Environmental Approval; and

      b.     where the Environmental Approval or possible changed element of the Project is subject to any agreements CDOT or the Enterprises has or have made with State and local Governmental Authorities in connection with the Project (for example, the Programmatic Agreement) without Department Approval of the proposed new, modified, renewed or extended Environmental Approval.

8.1.6.    The Department may, at its discretion, require the Developer to submit the Colorado Department of Transportation's Reevaluation Form (CDOT Form No.1399) in connection with the Developer obtaining any Environmental Approval, including any modification, renewal or extension thereof, and in connection with any Change made pursuant to <u>Schedule 24</u> (*Change Procedure*) and documented in a Change Order or a Directive Letter.

## 9.    ENVIRONMENTAL REQUIREMENTS FOR SPECIFIC ENVIRONMENTAL RESOURCES

### 9.1.    General

9.1.1.    The Environmental Requirements for specific environmental resources are set out in <u>Schedule 10A</u> (*Applicable Standards and Specifications*), the Central 70 Mitigation Measures Status, the FEIS, and the ROD. In addition, the Environmental Approvals and this <u>Schedule 17</u> contain additional Environmental Requirements and/or clarifications of Environmental Requirements for specific individual environmental resources.

9.1.2.    All environmental resources within and adjacent to the Site which are to be protected from disturbance during construction (for example wetlands and historic resources) shall be clearly shown on design Deliverables. The techniques and methods to be used for protection of the environmental resource (for example fencing and signage) shall be shown in the RFC Documents. The protective measures shall be put in place prior to work beginning in the area and maintained through the Construction Period.

## 10.    AIR QUALITY

### 10.1.    General Requirements

10.1.1.    The Developer shall comply with all applicable air quality regulations and shall prepare and submit an Air Quality Monitoring, Maintenance, and Mitigation Plan ("<u>AQ3MP</u>"), for Acceptance, prior to issuance of NTP2.

10.1.2.    The Developer shall be responsible for obtaining all air quality Permits necessary to complete the Work, including those listed in <u>Table 17-2</u>. The Developer shall have sole responsibility for compliance with all applicable air quality Environmental Approvals.

10.1.3.    Air Quality Monitoring, Maintenance, and Mitigation Plan

      a.     The Developer shall prepare and implement the AQ3MP using the CDOT Air Quality Monitoring, Maintenance, and Mitigation Template, which is included in the Reference Documents. All template section and subsection headings shall be used. If a Section or subsection is not applicable, the reason it is not applicable shall be specified. New sections or additional subsections shall be added as necessary to fully describe the AQ3MP, identify personnel responsibilities, describe technical methodologies, list assumptions, and present procedures and methods for documenting and reporting. The AQ3MP will include the following:

           i.     Fugitive Particulate Emission Control

             The Developer shall implement Best Management Practices ("<u>BMPs</u>") to effectively control fugitive particulate emissions at all times on the Site, including during periods of inactivity. The Developer shall monitor Project fugitive particulate emissions including those from construction equipment and stationary sources. The Developer shall perform and document a daily visual inspection of active Work sites within the construction site boundary with the goal of preventing off-Site transport of fugitive particulate emissions. If off-Site transport of fugitive particulate emissions occurs and is observed by the Developer or is reported to

the Developer, the EM and the Construction Manager shall immediately be informed. The Construction Manager, acting in consultation with the EM, shall investigate and ensure the implementation of appropriate additional BMPs to eliminate off-Site transport of fugitive particulate emissions.

ii.    Opacity Measurements

The Developer shall perform and document daily opacity readings from all stationary sources that are operated on the Site that are subject to opacity limits in Section II.A of Air Quality Control Commission Regulation No. 1 (5 CCR § 1001-3) and any applicable Permit conditions. The Developer's personnel performing opacity readings shall be certified according to State and Federal standards and the certification status maintained throughout the duration of the Construction Work. The personnel performing the daily opacity readings on stationary sources may be the same personnel inspecting the Site for fugitive particulate emissions. If opacity readings exceed allowable limits, the inspector shall immediately inform the EM and the Construction Manager. The Construction Manager, acting in consultation with the EM, shall ensure the implementation of effective BMPs as described in the Central 70 Mitigation Measures Status to reduce opacity levels to allowable limits.

iii.   PM-10 Monitoring

The Developer shall conduct continuous PM-10 monitoring during the Construction Period in accordance with 40 C.F.R. Part 58 (*Ambient Air Quality Surveillance*) adequate to characterize PM-10 concentrations along the active construction corridor. The AQ3MP shall specify the number, type, and location of PM-10 monitors that will make up the network and shall provide for hourly logging. At each station a PM-10 sampler will be installed in a climate controlled facility. The stations shall be designed to meet all applicable Federal, United States Environmental Protection Agency ("EPA"), and Colorado APCD standards. The Developer shall select PM-10 monitoring locations consistent with EPA siting criteria for surface data collection and shall provide rationale for location selection. Locations of the PM-10 monitors shall be adjusted during the Construction Period to accommodate construction phasing. The Developer shall calibrate the PM-10 monitors twice per week with no more than 4 Calendar Days between calibrations. Proposed locations of the PM-10 monitors shall be submitted to the Department for Acceptance at least two weeks prior to operating the monitor at the proposed location.

iv.    Meteorological Data Collection

The Developer shall continuously monitor meteorological conditions including on-site wind-speed and wind gusts, wind azimuths, barometric pressure, relative humidity, and temperature, to assist in making decisions regarding mitigation of fugitive particulate emissions. This data may be collected at the PM-10 monitors or the Developer may obtain data from existing local data sources. If data is obtained from local sources, the sources being used shall be listed in the AQ3MP.

v.     Project Independent Air Monitoring Data from Swansea Elementary

Air quality will be monitored at Swansea Elementary School as part of an independent research project that is not within the Developer's scope of Work. It is expected that the following criteria pollutants will be monitored: nitrogen dioxide (NO2), PM-10, and PM-2.5 as part of such independent research project. Additional pollutants may be added to the monitoring list. Monitoring results will be made available to the Developer. The Developer shall review such data as it

becomes available to identify trends to help determine if BMPs are being used effectively.

vi.     Automated PM-10 Alert System

The Developer shall implement an automated PM-10 alert system that will communicate via both text messaging and email when a PM-10 monitored level reaches a running eight hour average concentration of 135 µg/m³. This alert system will continuously monitor the real time data from the Project's PM-10 monitors. The level of 135 µg/m³ is specified in order to allow corrective actions to be implemented prior to exceeding the National Ambient Air Quality Standard ("NAAQS") of 150 µg/m³. The alert system shall inform the Construction Manager, EM, designated Department staff, and designated CDPHE Air Pollution Control Division staff of the PM-10 concentration and location of the alerting monitor. Upon receiving an alert, the Construction Manager, in consultation with the EM, shall respond immediately to identify the source of the PM-10 event and implement effective BMPs for dust control. This mitigation will continue until the next running eight hour PM-10 concentration from the alerting monitor is below 135 µg/m³. All actions associated with responding to a 135 µg/m³ or greater reading shall be communicated with the EM, designated Department staff, and designated CDPHE Air Pollution Control Division staff via email within one hour of the event.

vii.    Posting of PM-10 and Meteorological Data

The Developer shall collect and submit PM-10 and meteorological data to the Department in an electronic format. This data submittal is for the purpose of posting on the Project website and is separate from the reporting requirements under Section 10.1.4 of this Schedule 17. Data for each 24-hour period shall be submitted to the Department prior to the end of the following Working Day. The data shall be submitted in a format and manner specified by the Department that allows the Department to review the data and post selected data. The PM-10 data shall be submitted in the following formats: (1) actual data for each individual reading, (2) the eight hour running average, and (3) the average for each 24-hour period. Meteorological data shall include temperature, humidity, wind speed, and wind direction for each reading. The results of the PM-10 monitor calibration shall be included in the data submittal.

viii.   Air Quality BMPs

The Developer shall provide a list of air quality BMPs that the Developer will use for Construction Work and a description of how each will be implemented. BMPs are listed in the FEIS, ROD, and other Environmental Approvals.

ix.     Alternative Fuels

The Developer shall undertake Reasonable Efforts to use alternatives to diesel engines and/or diesel fuels, such as biodiesel, liquefied natural gas, compressed natural gas, fuel cells, and electric engines. The Developer shall include a section in the AQ3MP describing the decision-making metric and results of the alternative fuel evaluation. The Developer may select any metric or metrics that meets the Project needs and requirements as determined by reference to this this Schedule 17 and the Project Agreement.

10.1.4.  Air Quality Reporting

a.      The Developer shall maintain a daily log of air quality observations and mitigation measures during all phases of the Construction Work and shall provide a monthly report and the monthly log of data collected to the Department in the ESR. The log shall include a daily report of the following information:

    i.     A description and location of construction activities being conducted on that day that could negatively impact air quality, including, for example, excavation, clearing and grubbing, demolition, and utilizing unpaved staging areas and haul roads.

    ii.    A report on the daily visual inspection of the Site, including a description of any visible emissions.

    iii.   The results, time and location of all opacity readings.

    iv.   A report on any observed or off-Site transport of visible emissions, and any violation of any other emissions guideline in Regulation No. 1, Section III.D. The report shall describe the duration of the event, the mitigation measures deployed and actions taken, and the time it took to correct the problem.

    v.    A report on any violation and compliance deficiency of the AQ3MP or Environmental Approval relating to air quality. The report shall describe the duration, time, and location of the event; the mitigation measures deployed and actions taken; and the time it took to correct the problem.

b.    All hourly PM-10 and meteorological monitoring data and hourly eight-hour running average data from the PM-10 monitoring network and the meteorological monitoring station shall be recorded in a digital data logging unit and transmitted by a cellular or satellite system to an online data depository hourly managed by the Developer.

### 10.1.5.  Diesel Nonroad Construction Equipment

a.    For the purposes of this <u>Schedule 17</u>, the term Diesel Nonroad Construction Equipment ("<u>DNRCE</u>") shall refer to large (>50 hp), stationary and mobile, nonroad equipment, powered by compression-ignition (diesel) engines.

b.    All DNRCE that is on Site for more than 10 total Calendar Days must either 1) have engines meeting EPA Tier 4 standards or 2) be EPA rated Tier 2 or Tier 3 that have been retrofitted with diesel particulate control technology, diesel oxidation catalysts, and/or engine preheaters. Retrofit systems and technology shall be selected to bring Tier 2 and Tier 3 DNRCE up to Tier 4 standards or as close to Tier 4 standards as practicable. DNRCE with Tier 0 and Tier 1 engines are not allowed on the Site.

c.    Emission control technology shall be operated, maintained, and serviced as recommended by the emission control technology manufacturer.

d.    All mobile DNRCE that is on Site shall comply with the idling restrictions and opacity requirements of the City and County of Denver's Code of Ordinances, including *Chapter 4 Air Pollution Control, Article IV Mobile Sources.*

e.    The Developer shall ensure that all Subcontractors adhere to these requirements. The Developer shall maintain records of all DNRCE on Site at all times. The Developer shall submit a quarterly report to the Department summarizing the DNRCE present on the Site during the reporting period. The report shall include a table which lists: Equipment Type, Manufacturer, Model, Serial Number, Owner Information, Unique Identifier, Original Tier Level, and Retrofit Tier Level, Date brought on Site, Date removed from Site, and Number of Calendar Days on Site during the reporting period, and Total Number of Calendar Days on Site. The report shall also include a statement of certification by the Developer that all DNRCE on site during the reporting period have been listed in the Table. The quarterly report shall also include a list of DNRCE that the Developer plans to bring on to the Site during the next quarter.

### 10.1.6.  Construction Equipment Emissions Retrofit Program

For information, the Developer should be aware that funding may be available from the Regional Air Quality Council ("<u>RAQC</u>") to retrofit certain types of construction equipment to reduce emissions. The Developer may be eligible to participate in this program. The Developer shall use

Reasonable Efforts to participate in, and report to the Department the details of their participation in, any RAQC retrofit program(s). To the extent that the Developer becomes entitled to participate in such program, any funding provided to it thereunder shall be independent of any payment obligations under, or payment provisions of, this Agreement.

### 10.2. Vehicle Idling

Without limiting the Developer's obligation to comply with any higher standard as required by Law or otherwise under the Project Agreement, all vehicles and equipment owned, leased, rented, or otherwise under the Developer's control shall not be allowed to idle for more than five consecutive minutes, except for idling:

a.     when in operations queuing;

b.     to verify safe operating condition;

c.     for testing, servicing, repairing, or diagnostic purposes;

d.     necessary to accomplish work for which the vehicle/equipment was designed (such as operating a crane);

e.     to reach operating temperatures required by manufacturers' specifications; and

f.     necessary to ensure safe operations of the vehicle/equipment.

### 11.     NOISE

### 11.1.   General Requirements

The Department has performed a noise impact analysis with abatement recommendations as part of the preliminary design for the FEIS and the ROD. The Statement of Likelihood and recommendations of this analysis are included in Section 5.12 of the FEIS and in the Noise Technical Report (Attachment K) of the FEIS. The noise analysis was completed using the roadway geometry documented in the FEIS and updated where applicable in the ROD. The Developer shall perform all required noise modeling, analysis, reporting, and related work in accordance with this <u>Schedule 17</u> and the *CDOT Noise Analysis and Abatement Guidelines* dated January 15, 2015. For the purposes of this <u>Section 11</u> of this <u>Schedule 17</u>, the term "Noise Technical Report" includes all of the elements listed in Appendix B of the CDOT Noise Analysis and Abatement Guidelines.

### 11.2.   Noise Technical Report

11.2.1.   The Developer shall perform a noise analysis based on its final design in the same locations of analysis that were included in the FEIS and the ROD. These locations include Globeville, Elyria and Swansea, Stapleton, Montbello, Aurora, and Peoria Street. Results of the noise analysis shall be documented in a preliminary and final Noise Technical Report for each such area and submitted to the Department for Acceptance. For information, the FHWA Traffic Noise models ("<u>TNM</u>") used in the FEIS and the ROD analysis are available to the Developer as a Reference Document.

11.2.2.   The preliminary and final design noise analysis and Noise Technical Reports shall follow the format of the FEIS and the ROD analysis referenced above and include the same receiver locations as well as any new receivers that exist in the locations of analysis. The preliminary and final design noise analysis shall utilize the same model used in the FEIS and ROD.

11.2.3.   The Noise Technical Reports shall determine and document the noise effects of any changes from the Reference Design. The Noise Technical Reports shall include a detailed description of any changes to the horizontal layout and/or the vertical elevation from the Reference Design. The Noise Technical Reports shall document the locations where any changes from the Reference Design have removed or altered shielding (either natural or man-made) thereby changing the line-of-sight between the receptor and the traffic noise source. The noise analysis and Noise Technical Reports shall determine if any new neighborhoods have become eligible for noise abatement. If any new areas become eligible for noise abatement due to changes from the

Reference Design, the Developer shall include the analysis for recommended noise abatement in the noise analysis and report. The Developer shall assure proposed mitigation is consistent with mitigation standards identified in the FEIS and the ROD, as well as State and Federal guidelines. The Developer shall submit documentation with the noise analysis and Noise Technical Reports verifying that the analysis was performed by a qualified individual with expertise in the field of highway noise analysis in Colorado.

11.2.4. Top of existing noise barrier elevations shall be documented before the removal of any existing structure. If final design noise analysis determines that top of barrier or structure elevations are lower than their existing elevations, the Developer shall demonstrate that no new visual sight lines are created.

### 11.3.  New Noise Abatement

11.3.1. New noise abatement is required in the Elyria area as identified in Exhibit 49 of the ROD and in the mitigation descriptions found in Section 9.10 (Noise) of the ROD. Noise abatement measures recommended by the ROD cannot be removed from the Project unless adequate replacement acoustic benefit is restored and the change in abatement is Approved by the Department. New noise abatement is required in any additional areas required by <u>Section 11.3.4</u> of this <u>Schedule 17</u>. In all areas receiving new noise abatement the Developer shall optimize the design of the noise abatement infrastructure to maximize the number of receivers receiving a reduction of 5 dBA or greater per CDOT/FHWA guidelines.

11.3.2. The Developer shall submit a preliminary Noise Technical Report which contains the optimized design of the proposed noise abatement in the affected neighborhood. Acceptance of the preliminary Noise Technical Report is required before the Benefited Receptor Preference Survey can be conducted.

11.3.3. When the preliminary Noise Technical Report has been Accepted by the Department, the Developer shall conduct the Benefited Receptor Preference Survey as described in the CDOT Noise Analysis and Abatement Guidelines. The Developer shall provide all material necessary to conduct the survey including exhibits, flyers, door hangers, ballots and return mail envelopes. The Developer shall conduct a public meeting on the proposed noise abatement design. The Developer shall allow the Department the opportunity for ongoing over the shoulder review of all planning activities associated with the Benefited Receptor Preference Survey. The Developer shall submit for Approval the plan of the Benefited Receptor Survey, including the geographic limits of the survey, procedures for conducting the survey, and printed material and other media to be used for the survey at least 14 Calendar Days before beginning the survey.

11.3.4. Additional new noise abatement shall be required if changes from the Reference Design, or any new Type I action, trigger eligibility in accordance with the CDOT Noise Analysis and Abatement Guidelines. New noise abatement infrastructure requirements triggered by design changes from the Reference Design, or any new Type 1 Action, shall be the responsibility of the Developer.

11.3.5. After the Benefited Receptor Preference Survey is completed, a Final Noise Technical Report shall be completed to document the final design noise analysis, final geometry and details of the noise barriers. This report shall be submitted to the Department for Acceptance prior to the issuance of RFC Documents. If any design changes are made that may affect eligible receivers, the Final Noise Technical Report shall be updated and resubmitted for Acceptance.

### 11.4.  Existing Noise Abatement

11.4.1. All existing noise abatement structures that are removed, damaged, or otherwise impacted as a result of the Construction Work shall require full replacement. Replacement noise abatement structures shall be constructed to the structural and aesthetic requirements as set out in the Technical Requirements including <u>Section 14</u> of <u>Schedule 10</u> (*Design and Construction Requirements*). In the event that a noise abatement structure on the existing viaduct that is to remain in place (e.g. west of Washington Street) is damaged, the repair shall match the original design.

**11.5.    Additional Noise Abatement Requirements**

11.5.1.  Proposed noise walls shall be placed in locations that will accommodate the Ultimate configuration.

11.5.2.  Noise walls and other abatement measures shall follow the requirements set out in Section 14 of Schedule 10 (*Design and Construction Requirements*) and the Aesthetic Design Standards for Central 70 included in Schedule 10B (*Contract Drawings*).

11.5.3.  Noise walls shall be designed and constructed without open joints or gaps. Joints between noise wall Elements shall be minimized. Where joints are necessary, they will be designed is such a way that no light can pass through them. If a sealant is utilized to close any joint, it shall have a design life equal to or greater than the wall. Emergency access doors and hatches shall comply with the finish requirements of the Aesthetic Design Standards for Central 70 included in Schedule 10B (*Contract Drawings*). Proposed noise wall designs and location information shall be included in the Developer's public information program.

**11.6.    Construction Noise Mitigation and Monitoring**

11.6.1.  The Developer shall comply with all applicable local sound control and noise and vibration ordinances and regulations, including Chapter 36, Noise Control, of the Revised Municipal Code of the City of Denver. All required noise permits shall be acquired by the Developer prior to issuance of NTP2.

11.6.2.  Central 70 Mitigation Measures Status contains mitigation measures for construction noise and vibration. The Developer shall implement a Construction Noise Mitigation and Monitoring Plan ("CNMMP") that incorporates the mitigation measures outlined in the FEIS, the ROD, and the procedures identified in the FHWA Construction Noise Handbook. The Developer shall submit the CNMMP to the Department for Acceptance prior to issuance of NTP2. The CNMMP shall be comprehensive and provide accurate and detailed information to minimize, monitor and mitigate construction-related noise and include the following compliance procedures with mitigation measures outlined in the FEIS and the ROD:

    i.      Compliance procedures with applicable noise ordinances or variances granted for the Project;

    ii.     Methodology to establish baseline ambient conditions;

    iii.   Identification of construction methods (for example, location of stationary equipment, truck traffic through residential areas, use of vibratory equipment such as pile driving, crusher plants etc.) for the Project;

    iv.   Identification of sensitive receptors, for both day and night construction and other Project-related activities;

    v.     Procedures for monitoring and reporting noise levels for the Project;

    vi.   Methodology to prevent, minimize and mitigate noise impacts related to demolition, debris removal, hauling, construction equipment, and construction activities.

    vii.  Implementation plan to construct noise barriers prior to roadway construction;

    viii. Implementation plan to replace noise barriers as they are removed in locations that have existing noise barriers; and

    ix.   Implementation plan to meet construction noise minimization requirements around the Swansea Elementary School.

## 12. HISTORIC RESOURCES

### 12.1. General Requirements

12.1.1. The Developer shall perform all mitigation measures assigned to the Developer in this Schedule 17, the Programmatic Agreement, and in the Central 70 Mitigation Measures Status.

12.1.2. The Developer shall include the line work showing the Area of Potential Effect ("APE") boundary on all design drawings.

12.1.3. If the Developer's Work results in any changes in effects to the historic resources described in the FEIS and the ROD or in changes to the APE, the Developer shall obtain all required Environmental Approvals. The Developer shall document those changes and provide the Department with all necessary information and reevaluations for coordination with SHPO under Section 106 of the National Historic Preservation Act and Section 4(f) of the Department of Transportation Act. This shall include the enlargement of existing easements (temporary or permanent), or any additional easements (temporary or permanent), property acquisitions, Utility Relocations or alterations from work that has obtained concurrence from SHPO as documented in the Reference Documents, or resources that were not previously cleared as part of the Section 106 consultation and Section 106 Determinations of Eligibility and Effects report (Attachment I to the FEIS). The Developer shall not impact historic resources until the Section 106 consultation process is complete and Approved by the Department, FHWA, and SHPO. The Developer shall also be responsible for updating the Section 4(f) evaluation and obtaining Approval for any modifications to the Section 4(f) evaluation. Additionally (and without limiting Developer's obligations pursuant to the Project Agreement to obtain demolition permits as otherwise required from time to time to perform the Work), if the Developer purchases property in the Developer's name, the Developer shall obtain any required demolition permits for historic structures within the City and County of Denver from the Denver Landmark Preservation Commission.

12.1.4. The Developer shall protect in place all identified historic resources that are to remain through the Construction Period. Protection measures shall include fencing and additional measures referenced in Central 70 Mitigation Measures Status and/or the Programmatic Agreement. The Developer will maintain standard BMPs to minimize temporary impacts resulting in dust, debris, and auditory degradation.

12.1.5. The Programmatic Agreement is included in the Reference Documents and applies to this Project pursuant to Section 7 of this Schedule 17 and Section 8.1.1.d of the Project Agreement. The following paragraphs reference the stipulations in the Programmatic Agreement and allocate obligations under such stipulations as between the Department and the Developer (provided that, for certainty, all obligations under the stipulations not expressly referenced herein as having been retained by the Department have been delegated to the Developer pursuant to Section 7 of this Schedule 17):

    a.    Stipulation I, Reduction of Impacts. The Developer shall commit to reduce impacts to historic resources where feasible.

    b.    Stipulation II, Section 106 Consultation Process. If necessary the Department will consult with the SHPO and other consulting parties as required pursuant to Section 8.4.4 of the Project Agreement. The Developer shall provide all support required for Section 106 consultation in compliance with its obligations under Section 12.1.3 of this Schedule 17 and Section 8.4 of the Project Agreement.

    c.    Stipulation III, Mitigation; I. Archival Documentation. The Department will conduct the required archival documentation for the specific historic resources documented in the ROD. The Developer shall complete the required documentation for any remaining resources, including those identified post-ROD. The Developer shall complete any required archival documentation required due to changes to the APE or changes to the Reference Design.

d.  Stipulation III, Mitigation; 2. Aesthetic Design. The Department will conduct the necessary coordination with SHPO and the consulting parties during the development of the Aesthetic Design Standards for Central 70 included in Schedule 10B (*Contract Drawings*) as required pursuant to Section 8.4.4 of the Project Agreement. The Developer shall design and construct the Project in accordance with the Aesthetic Design Standards, the Contract Drawings and all relevant Reference Documents.

e.  Stipulation III, Mitigation; 3. Brick-Lined Sewers. The Developer shall be responsible for any mitigation requirements for impacts to brick-lined sewers outside those identified in the FEIS and ROD.

f.  Stipulation III, Mitigation; 4. Creative Mitigation. The Department has completed this creative mitigation requirement.

g.  Stipulation III, Mitigation; 5 Creative Mitigation. The Developer is not responsible for this mitigation requirement.

h.  Stipulation III, Mitigation; 6. Additional Projects. The Department shall consult with SHPO and the Consulting Parties as required pursuant to Section 8.4.4 of the Project Agreement if additional projects are required. The Developer shall provide all support required for Section 106 consultation in compliance with its obligations under Section 12.1.3 of this Schedule 17 and Section 8.4 of the Project Agreement.

i.  Stipulation III, Mitigation; 7. Historic Preservation Standards and Professional Qualifications. All work related to historic resources performed by Developer shall conform to the *Secretary of Interior's Standards and Guidelines for Archaeology and Historic Preservation* (48 FR 190:44716-44742).

j.  Stipulation IV, Coordination with the National Environmental Policy Act. The Developer's and the Department's compliance with the Programmatic Agreement will fulfill this requirement.

k.  Stipulation V, Coordination with Section 4(f) of the Department of Transportation Act of 1966 (Section 4(f)). The Developer's and the Department's compliance with the Programmatic Agreement will fulfill this requirement.

l.  Stipulation VI, Construction Phase Post-Review Discoveries. If Unexpected Historically Significant Remains are discovered, the Developer shall immediately stop work in the vicinity of the discovery and inform the Department. The Developer shall protect the Unexpected Historically Significant Remains from degradation. The Department will consult with the SHPO and consulting parties as required pursuant to Section 8.4.4 of the Project Agreement.

m.  Stipulation VII, Emergency Situations. The Developer is not responsible for management of this stipulation.

n.  Stipulation VIII, Administrative Provisions. The Developer is not responsible for management of this stipulation.

## 13. SWANSEA ELEMENTARY SCHOOL

### 13.1. General Requirements

13.1.1. Prior to beginning Construction Work in the Swansea Elementary School area, the Developer shall construct the temporary wall as described in Section 14 of Schedule 10 (*Design and Construction Requirements*). The temporary wall shall remain in place until the Cover Planning Area 2 (as depicted in the I-70 Cover Plans) is open to the public.

13.1.2. The Developer shall minimize construction activities and construction impacts around Swansea Elementary School during school hours. The Developer shall include mitigation activities associated with Swansea Elementary School in the CNMMP, the AQ3MP and all other applicable plans. The Developer shall include the Swansea Elementary School Principal and appropriate

Denver Public School District personnel in all relevant activities to be conducted by the Developer pursuant to Schedule 14 (*Strategic Communications*) and keep them fully informed of all activities adjacent to the school.

13.1.3. Construction staging shall not occur within 500 feet of Swansea Elementary School except during the period of active construction of Cover Planning Area 1 (as depicted in the I-70 Cover Plans).

## 14. PALEONTOLOGY

### 14.1. General Requirements

14.1.1. The Developer shall retain a professional paleontologist, permitted through the Office of the State Archaeologist. During the Construction Period when the Denver and Arapahoe Formations are not exposed, the Developer's paleontologist shall spot check the Site weekly. During the Construction Period when bedrock of the Denver and Arapahoe Formations are exposed, the Developer's paleontologist shall provide continuous paleontological monitoring.

14.1.2. The Developer's paleontologist shall communicate with the Department to provide seven Calendar Days' notification to the Department's paleontologist informing them when work in the Denver and Arapahoe Formations is scheduled.

14.1.3. The Developer's paleontologist shall provide all reports required by the terms of their permits to the appropriate Governmental Authority and submit copies to the Department. The Developer's paleontologist shall provide a monthly summary of their activity on the Site to be included in the ESR. The Developer's Paleontologist shall provide Paleontological Annual Reports to the Department for Acceptance detailing work completed and fossils collected and curated to the Department. When all earthwork is completed, the Developer's paleontologist shall provide an end of Project Paleontological Summary Report to the Department for Acceptance.

14.1.4. During the Construction Period, the Developer's paleontologist shall communicate directly with the Department's paleontologist and allow on going over the shoulder review of all field activities. The Developer shall immediately notify the Department in the event of any discovery.

14.1.5. Upon discovery of any paleontological resources, the Developer shall immediately cease Work in the vicinity of the discovery, fence off the area, and allow the Developer's paleontologist to conduct sampling or excavation of specimens by hand or with mechanized equipment. If the paleontologist collects any specimens, all materials shall be curated following guidance provided in 8 CCR § 1504-7 – Historical, Prehistorical, and Archaeological Rules and Procedures. The Developer shall not resume Construction Work in the area until receiving formal notification from the Developer's paleontologist allowing Construction Work to resume.

## 15. PARKS AND RECREATION

### 15.1. General Requirements

15.1.1. The Developer shall reconfigure the Swansea Elementary School site and replace all playground facilities as required by Section 14 of Schedule 10 (*Design and Construction Requirements*).

15.1.2. During the Construction Period, segments of the South Platte River Greenway Trail and the Sand Creek Greenway Trail may be subject to temporary detours. Pursuant to Section 2.11.19 of Schedule 10 (*Design and Construction Requirements*) the Developer shall provide trail detours that comply with the Americans with Disabilities Act of 1990 ("ADA"). The Developer shall provide trail detour signage that complies with the ADA and Part 6F of the FHWA *Manual on Uniform Traffic Control Devices.*

15.1.3. Any reconstructed trail segment shall be rebuilt at minimum to match the existing facility. Any reconstructed trail segment shall be built to the Local Agency's current design and construction standards. Trail surfacing on any rebuilt trail segments will be constructed with new material and have smooth transitions to the undisturbed segments.

**16. VEGETATION**

The Developer shall minimize tree removal and disturbance to native plant communities, especially wetlands, prairie dog towns, riparian areas, and upland trees and shrubs. All native and non-native trees outside of Senate Bill 40 ("SB 40") jurisdictional areas that are removed that are over four inches diameter at breast height shall be replaced with native trees on a 1:1 basis. All riparian shrubs outside of SB 40 jurisdictional areas that are removed shall be replaced with native shrubs based on areal coverage on a 1:1 basis. The riparian areas are shown in the Reference Documents. New and replacement vegetation shall conform to Section 14 of Schedule 10 (*Design and Construction Requirements*). Additional requirements to avoid, minimize, and mitigate for impacts to vegetation are found in the FEIS and the ROD.

**17. SENATE BILL 40 WILDLIFE CERTIFICATION**

**17.1. General Requirements**

17.1.1. The Developer shall evaluate the final design to determine if and how the SB 40 Application Criteria apply as defined by CDOT's *Guidelines for Senate Bill 40 Wildlife Certification*. The Developer shall not perform Construction Work within SB 40 jurisdictional areas until CPW issues a Programmatic or Formal SB 40 Certification.

17.1.2. If a Programmatic SB 40 Certification is required pursuant to Law and CDOT's *Guidelines for Senate Bill 40 Wildlife Certification*, the Developer shall prepare and submit to the Department the applicable SB 40 Certification application package for Approval, with all documentation required by the CPW Regional Wildlife Manager. Upon Approval, the Department will submit the application package to CPW. Approval of the application package by the Department does not constitute approval by CPW.

17.1.3. If a Formal SB 40 Certification is required pursuant to Law and CDOT's *Guidelines for Senate Bill 40 Wildlife Certification*, the Developer shall prepare and submit to the Department the applicable SB 40 Certification application package for Approval, with all documentation required by the CPW Regional Wildlife Manager. Upon Approval, the Department will submit the application package to CPW. Approval of the application package by the Department does not constitute approval by CPW.

17.1.4. In SB 40 jurisdictional areas, trees removed during construction, whether native or nonnative, shall be replaced with native trees at a 1:1 replacement ratio based on a stem count of all trees with a diameter at breast height of two inches or greater. Shrubs removed during construction, whether native or nonnative shall be replaced with native shrubs on a 1:1 ratio based on their pre-construction areal coverage.

17.1.5. Tree and shrub mitigation for SB 40 impacts shall also conform to the requirements set out in Section 14 of Schedule 10 (*Design and Construction Requirements*).

**18. INTEGRATED NOXIOUS WEED MANAGEMENT PLAN**

**18.1. General Requirements**

18.1.1. The Developer shall take actions as necessary to control all noxious weeds throughout the Construction Period and the Operating Period. The Developer shall implement proactive procedures to eradicate the occurrences of List A species on the Site. The Developer shall implement proactive procedures to eliminate the occurrences of List B species in areas of the Site where the ground has been disturbed by the Work, and reduce the occurrences of List B species on the remainder of the Site.

18.1.2. The Developer shall submit an Integrated Noxious Weed Management Plan ("INWMP") to the Department for Acceptance prior to the issuance of NTP2. The INWMP shall be implemented during the Construction Period and the Operating Period and will include identification of noxious weeds in the area, weed management goals and objectives (specific to levels of disturbance), and preventive and control methods. The INWMP shall convey that List A species are eradicated throughout the Project; management of List B species may vary based on disturbance activities

and Colorado Department of Agriculture and local requirements (for example, elimination of List B species in disturbed areas and management for suppression in areas with no ground disturbing activities).

18.1.3.  The INWMP shall also include a requirement for recurring noxious weed surveys. During the Construction Period the noxious weed survey shall be conducted monthly from March 1 through October 31. During the Operating Period the noxious weed survey shall be conducted three times per year spread evenly over the growing season. The Developer shall create a monthly Schedule of Planned Noxious Weed Management Activities based on the findings of the latest noxious weed survey that shall be submitted to the Department for Information.

18.1.4.  The Developer shall submit a Noxious Weed Survey and Summary of Treatment Activities Report to the Department for Acceptance for each month beginning with March and continuing through October during the Construction Period and three times per year during the Operating Period. The Noxious Weed Survey and Summary of Treatment Activities Report shall include the noxious weed survey that was completed during the reporting period and a summary of the treatment activities that were implemented.

18.1.5.  The INWMP shall address the control methods (chemical, biological, cultural, etc.) that will be put in place to identify control methods for List C species, stop the continued spread of List B species and to eradicate the occurrences of any List A species.

18.1.6.  The Developer shall assign a qualified representative to be responsible for implementing the INWMP. This representative shall be directly responsible for weed identification, mapping, scheduling herbicide application, noxious weed herbicide selection, and developing criteria for topsoil salvage (for example, topsoil inspection and/or sampling protocols). A résumé documenting the representative's qualifications shall be included in the Noxious Weed Survey and Summary of Treatment Activities Report.

18.1.7.  The IQC program shall include monitoring of noxious weed management activities (such as treatment of stockpiles and collection of weed-free certifications of mulch and imported soil).

18.1.8.  Noxious weeds observed in and near the construction area at the start of construction will be treated with herbicides or physically removed to prevent seeds blowing into disturbed areas during construction. Noxious weeds identified during construction shall be identified and treated.

18.1.9.  Additional requirements of the INWMP shall include:

   a.   Initial identification and mapping of the baseline conditions for List A, List B, and List C noxious weed species present on the Site prior to the issuance of NTP2;

   b.   Schedule and procedures for mechanical and chemical practices prior to topsoil salvage and earthwork operations. Potential areas of topsoil salvage shall be assessed for presence and abundance of noxious weeds prior to salvage. Topsoil from infested areas, as defined in the INWMP, shall be treated by spraying, taking the topsoil off-Site, or by burying the topsoil during construction;

   c.   Noxious weed management practices in sensitive areas (on-site wetlands and threatened and endangered species habitat);

   d.   Procedures for the inspection and washing of the Developer's vehicles before they are used for construction to ensure they are free of soil and debris capable of transporting noxious weed seeds or roots;

   e.   Areas of temporary disturbance shall be reclaimed in phases throughout the Project and seeded using a permanent native seed mixture. If areas are complete and permanent seeding cannot occur due to the time of year, mulch and mulch tackifier shall be used for temporary erosion control and weed prevention until seeding can occur;

   f.   Only certified weed-free mulch and bales shall be used;

g.  Weed control will use the principles of integrated pest management to treat target weed species efficiently and effectively by using a combination of two or more management techniques (biological, chemical, mechanical and/or cultural). Weed-control methods shall be selected based on the management goal for the species, the nature of the existing environment and methods recommended by the Colorado Department of Agriculture. The presence of important wildlife habitat or threatened or endangered species habitat shall be considered when choosing control methods;

h.  The Developer shall identify and delineate areas of noxious weed infestations and include written instructions in the INWMP detailing herbicide or other appropriate weed control measures required for weed infestations identified during the monitoring work;

i.  Noxious weed management after earthwork operations and stabilizing has been completed shall require chemical and mechanical methods that do not disturb native seeding and mulching areas;

j.  Weed-infested staging areas shall not be allowed. Staging areas shall be mowed and cleared of noxious weeds and sprayed with the appropriate herbicide, or as referenced in the Colorado Department of Agriculture species fact sheets;

k.  Topsoil salvaged from the Site and stockpiled for reuse on the Site shall be treated in accordance with the methodology described in the INWMP to eliminate noxious weeds prior to salvage. The topsoil stockpiles shall be monitored during the monthly noxious weed Surveys and treatment shall be implemented as needed; and

l.  If imported topsoil is used for any part of the Project, the topsoil shall be inspected and certified noxious weed free.

## 19.  VISUAL

The Developer shall comply with the aesthetic Element requirements of the Technical Requirements and Section 14 of Schedule 10 (*Design and Construction Requirements*).

## 20.  WATER QUALITY CONTROL AND WATER RESOURCES

### 20.1.  General Requirements

20.1.1.  The Developer shall retain and utilize a SWMP Administrator as required by the Project Special Provisions revision of Section 208 in Appendix A to this Schedule 17 (hereafter referred to as "Section 208"). The Developer's Process Control ("PC") program shall retain and utilize Erosion Control Inspector(s) as required by Section 208.

20.1.2.  Water quality activities shall be conducted in accordance with Section 208.

20.1.3.  The ECWP shall include an organization chart identifying the key personnel responsible for implementing the Developer's water quality compliance activities. The plan shall specifically identify the individuals and positions who shall serve in the roles referenced in Section 208. The plan shall include a detailed description of the roles that the PC and the IQC programs shall be assigned in the quality control and quality assurance of water quality activities. The plan shall provide details of how the Developer shall respond in the event of recurring nonconformance events.

20.1.4.  The IQC program shall include compliance with water quality requirements as part of all inspection and field reviews and shall issue Nonconformance Reports ("NCRs") if required to bring the Project into compliance with the CDPS-SCP, CDOT's MS4 permit, and the Construction Standards for water quality and erosion control. The IQC program shall retain and utilize inspector(s) who have successfully completed the Transportation Erosion Control Supervisory Certificate Training ("TECS") as provided by the Department. One TECS certified inspector shall be required for every 40 acres of total disturbed area, or portion thereof, which is at any time actively receiving temporary and interim stabilization measures as defined in Section 208.04(e) of Section 2.08.

20.1.5. The IQC program shall audit the SWMP Notebook monthly during the period from the issuance of NTP2 until Final Acceptance. The material to be audited includes CDOT Form No. 1388 and all items required in Section 208.03(d)1. As part of this audit, all such items required in Section 208.03(d)1 (*e.g.* the Daily Inspection Forms (CDOT Form No. 1388), Form 1176 Inspection Reports, documentation of the corrective action for any findings, Form 105, all other correspondence relating to water quality, and any reports of reportable spills submitted to CDPHE) shall be scanned and entered into the DCS in electronic format. A summary of the audit, any audit findings, and the scanned material shall be submitted to the Department monthly.

20.1.6. The Developer shall determine the specific Governmental Approvals and Permits required for the Work. The Developer will be responsible for obtaining and will be the designated entity under all of the water quality permits related to construction activities.

20.1.7. The Developer shall immediately notify the Department of any suspected illicit or improper connections or discharges into any storm sewer system discovered during construction of the Project.

20.1.8. The Developer shall design, construct, and maintain temporary and permanent water quality elements in a manner that prevents or, to the fullest extent practicable, minimizes the creation of mosquito breeding habitat.

20.1.9. If during the Construction Period the Developer's dewatering practices result in a Consumptive Use of the water, the Developer shall obtain all applicable Permits and Governmental Approvals for such Consumptive Use. If required, the Developer shall also obtain a Substitute Water Supply Plan from the Colorado Division of Water Resources for all temporary dewatering activities. The Developer shall document compliance with the foregoing requirements and submit such documentation with the ESR.

20.1.10. If any dewatering activities are required during the Operating Period, the Developer shall design, operate, and maintain the dewatering system so that no Consumptive Use of the water occurs. The Developer shall document compliance with the foregoing requirement and submit such documentation information with the ESR.

## 21.    WETLANDS/WATERS OF THE U.S. AND SECTION 404 PERMIT

### 21.1.    General Requirements

21.1.1. Impacts to jurisdictional wetlands shall not exceed those impacts described in the FEIS and the ROD and are shown in the Existing Wetland Delineation provided in the Reference Documents. The Developer shall further minimize impacts to wetlands as the design is finalized to the fullest practicable extent.

21.1.2. The Developer shall obtain a Clean Water Act, Section 404 Permit for impacts to wetlands and waters of the U.S. The Developer shall be responsible for mitigating unavoidable impacts to such wetlands and waters. It is anticipated that a Nationwide Permit 14 (Linear Transportation Projects) will apply to this Project because impacts to jurisdictional wetlands based on the Preferred Alternative are less than the 0.5 acre threshold. The actual Permit requirements are subject to the Developer's design and approval by the U.S. Army Corps of Engineers.

21.1.3. Concurrent with any mitigation requirements mandated by the Section 404 Permit, the Developer shall mitigate for both jurisdictional and non-jurisdictional permanent wetland impacts at a 1:1 ratio per CDOT policy. Mitigation in a wetland mitigation bank located in the South Platte River watershed is acceptable to the Department. The Developer shall comply with the requirements and special conditions outlined in the Section 404 Permit and 401 Certification.

21.1.4. If wetland impacts exceed the thresholds identified in the 2006 *Memorandum of Agreement between FHWA and CDOT Regarding the Programmatic Approval of Wetland Findings*, the Developer shall submit a Wetland Finding Report for Approval prior to impacting wetlands. A CDOT Functional Assessment of Colorado Wetlands ("<u>FACWet</u>") shall be performed if a Wetland Finding is required.

21.1.5. The Developer shall protect any wetlands within the Site or adjacent to it that are to remain undisturbed. Protected wetlands shall be fenced and marked with signs (and included on design drawings) to keep Project personnel and equipment out. Water quality BMPs shall be utilized to keep sediment out of any protected wetland. The Developer shall restore any wetlands that are temporarily impacted.

## 22.   WILDLIFE

### 22.1.   Black-tailed Prairie Dogs

22.1.1. There are existing Black-tailed prairie dog ("BTPD") colonies within the Site that could be impacted during the Construction Period. The CDOT *Impacted Black-tailed Prairie Dog Policy* applies if BTPD colonies are impacted. CPW also regulates certain activities associated with impacts to BTPD. Local Agencies for the Project may have regulating policies to address BTPD populations, as well. The Developer shall be responsible for complying with applicable Law associated with BTPD. When there are conflicting policies, the most stringent policy shall be followed.

22.1.2. Prior to conducting any activities that could potentially impact BTPD, the Developer shall submit a BTPD Management Plan for Department Acceptance. This plan will be submitted to Governmental Authorities for approval, as required by their policies. At a minimum, the plan shall comport with the obligations identified in Section 5.13.5 of the FEIS, C.R.S. § 35-7-203, and the CDOT *Impacted Black-Tailed Prairie Dog Policy*.

22.1.3. The plan shall outline the anticipated impacts and how the Developer shall comply with CDOT policies, Local Agency requirements and Environmental Requirements. If BTPDs are relocated or removed during the burrowing owl nesting season (March 15 through October 31), the affected habitat shall be surveyed by a qualified wildlife biologist for the presence of burrowing owls no more than seven Calendar Days prior to initiating relevant construction activities.

### 22.2.   Migratory Bird Treaty Act

The Developer shall comply with the Migratory Bird Treaty Act ("MBTA") at all times. Protection of migratory birds under the MBTA shall be in accordance with the Project Special Provisions to this Schedule 17.

### 22.3.   Colorado Butterfly Plant (*Gaura neomexicana*)

Suitable habitat for the Federally threatened Colorado butterfly plant occurs along the South Platte River and Sand Creek. The Developer shall have a qualified botanist conduct surveys for this species during the flowering season within and adjacent to the areas of disturbance at the South Platte River and Sand Creek prior to the commencement of construction activities in these areas. If these areas remain undisturbed between the initial survey and subsequent flowering seasons, the areas shall be re-surveyed each flowering season. Impacts to these areas shall not occur until surveys are complete and it is confirmed that the species is not present. If Colorado butterfly plants are found, the Developer shall notify the Department immediately. Prior to impacting the Colorado butterfly plant, the Developer shall obtain all required Environmental Approval(s) as required pursuant to this Agreement.

### 22.4.   Ute Ladies'-tresses Orchid (*Spiranthes diluvialis*)

Suitable habitat for the Federally threatened Ute ladies'-tresses orchid may occur along the South Platte River and Sand Creek. The Developer shall have a qualified botanist conduct surveys for this species during the flowering season within and adjacent to the areas of disturbance at the South Platte River and Sand Creek prior to the commencement of construction activities in these areas. If these areas remain undisturbed between the initial survey and subsequent flowering seasons, the areas shall be re-surveyed each flowering season. Impacts to these areas shall not occur until surveys are complete and it is confirmed that the species is not present. If Ute ladies'-tresses orchid are found, the Developer shall notify the Department immediately. Prior to impacting the Colorado butterfly plant, the Developer shall obtain all required Environmental Approval(s) as required pursuant to this Agreement.

**22.5.    Burrowing Owl (Athene cunicularia)**

High-quality habitat for the State-threatened burrowing owl occurs in association with BTPD colonies that are located throughout the Site area. The Developer shall have a qualified biologist perform burrowing owl surveys following CPW protocols no more than seven Calendar Days prior to the commencement of Construction activities. The survey shall occur during the burrowing owl nesting season (March 15 to October 31) prior to the removal of any BTPD within the Site. If nesting pairs are identified, the Developer shall notify the Department immediately and Construction Work shall not occur within 150 feet of an active nest site between March 15 and October 31, or as determined necessary by a Department wildlife biologist. If a nest becomes occupied after the start of construction activities in any part of the Site, a seasonal buffer zone shall be required during the burrowing owl nesting season to prevent violation of the Migratory Bird Treaty Act.

**23.    RECOGNIZED HAZARDOUS MATERIALS**

**23.1.    General Requirements**

23.1.1.  "Recognized Hazardous Materials" (RHMs) are any Hazardous Substances (including soil or water contaminated with Hazardous Substances) present on, in or under any part of the Site (including on or in any building or structure, including any bridge), at concentration levels or in quantities that are required to be investigated, removed, treated, stored, transported, managed and/or remediated:

a.      pursuant to Law, provided that (for certainty) Developer's responsibility shall not extend to RHMs outside the Site except with respect to Developer Releases of Hazardous Substances; or

b.      pursuant to Developer's obligations under this Agreement, including under Section 23.1.2 of this Schedule 17.

For certainty, RHMs may be naturally occurring or man-made, exist on the surface or subsurface, in groundwater or surface water, or structures to be demolished or modified as part of the Work, and may be mixed with soil, water, building materials, and/or other waste materials. For certainty, RHMs include any materials contaminated with Hazardous Substances above the residential screening levels set forth in and defined as "RSL-R's" in the BRMMP).

23.1.2.  Except as provided otherwise in this Agreement (including in this Schedule 17), and without prejudice to the Parties' responsibilities under Section 23.6 of this Schedule 17, the Developer shall be responsible for the identification, investigation, removal, treatment, storage, transportation, management, and/or disposal of RHMs during the Term in compliance with Environmental Law, any applicable Governmental Approvals and Permits, the terms of this Agreement, and the Construction Standards, including Project Special Provisions revision of Section 250 in this Schedule 17 (hereafter referred to as "Section 250"). The Developer shall provide all qualified staff and equipment to respond to RHMs in accordance with and to the extent required by such requirements.

23.1.3.  For certainty, if Developer's performance of its obligations pursuant to Section 23.1.2 of this Schedule 17 would entitle it to seek compensation or relief pursuant to Section 15 of the Project Agreement as the result of the occurrence of a Supervening Event, the Department may, pursuant to Section 14 of the Project Agreement and Schedule 24 (Change Procedure), require an Enterprise Change, to be documented in a Change Order or a Directive Letter, to the effect that the Department (or its designee) shall assume responsibility, in whole or in part, for the identification, management, removal and/or disposal of RHMs in connection with such Supervening Event.

**23.2.    Background Information**

23.2.1.  The Department has completed environmental surveys within the Right-of-Way that have identified RHMs and potential RHMs. Information regarding RHMs are identified in a variety of documents, including the following:

a.   The Hazardous Materials section of the FEIS and the Hazardous Materials Technical Report within Attachment H of the FEIS describes the results of an environmental records search for Hazardous Substances that was conducted by the Department;

b.   The Limited Subsurface and Groundwater Investigation Report that summarizes the limited subsurface and groundwater investigations focused on the Preferred Alternative ground disturbance areas provided in the Reference Documents;

c.   The Asbestos and Limited Lead-Based Paint Inspection reports provided in the Reference Documents, which reports document sampling for asbestos containing building materials and lead-based paint on bridges;;

d.   Certain Phase I Environmental Site Assessments ("ESAs") as described in Section 2.2.5 of Schedule 18 (*Right-of-Way*).

e.   City and County of Denver Limited Phase II Environmental Site Assessment for the National Western Center Redevelopment Project; and

f.   EPA Record of Decision for the Vazquez Boulevard/Interstate 70 Superfund Site.

23.2.2.  Without limiting its obligations under any other provision of this Agreement or its rights under this Agreement arising as a result of the occurrence of any Developer Change documented in a Change Order or any Supervening Event, the Developer shall read, conduct diligence of and be deemed to have knowledge of, all environmental due diligence materials referenced in Section 23.2.1.d of this Schedule 17 as and when available to it.

### 23.3.   Supplemental RHM Diligence

If the Developer deems it prudent for planning, scheduling, regulatory or other purposes, the Developer may conduct investigations to identify and evaluate RHMs. Subject to the express terms of this Agreement, such additional investigations shall be at the sole cost and responsibility of the Developer.

### 23.4.   Groundwater

23.4.1.  The substances identified in the column headed "Chemical Name" in Appendix C to this Schedule 17 include substances documented in the Reference Documents as existing in the groundwater prior to the Setting Date. For certainty, Appendix C, including the concentration levels of such substances included in the "Value" Column of Appendix C:

a.   has been provided only for purposes of the definition of Unexpected Groundwater Contamination Conditions in Part A and Annex A (*Definitions and Abbreviations*) to the Project Agreement, Section 8.4.4.f of Schedule 10 (*Design and Construction Requirements*) and Section 23.4.4.b.i of this Schedule 17; and

b.   shall otherwise be treated as Project Information, including for purposes of Section 3.1 of the Project Agreement and Schedule 2 (*Representations and Warranties*).

23.4.2.  The Developer is responsible for the identification, investigation, removal, treatment, storage, transportation, management and/or disposal of RHMs in the groundwater during the Term (whether or not any such RHM involves a substance identified in Appendix C) as and to the extent provided pursuant to Section 23.1.2 of this Schedule 17.

23.4.3.  Developer shall maintain records of all costs and expenses incurred in connection with its and its Subcontractors' performance of the obligations described in Section 23.4.2, including records of all costs and expenses of the types specified in Paragraphs a., b. and c. of the definition of Excess Groundwater Costs in Part A of Annex A (*Definitions and Abbreviations*) to the Project Agreement (whether or not such costs and expenses are incurred in connection with any Unexpected Groundwater Contamination Condition).

23.4.4.  In order for Developer to establish the existence of any Unexpected Groundwater Contamination Condition, the following conditions must be satisfied:

a.  Developer shall have provided notice to the Department of any such suspected Unexpected Groundwater Contamination Condition. In order to be valid, such notice shall include effluent sampling results from a groundwater discharge point that indicate one or more RHMs exceed the discharge limits applicable to such discharge point under the applicable dewatering permit (referred to in this Section 23.4.4 as the "Exceedance Chemicals").

b.  Developer shall promptly supplement its initial notice pursuant to Section 23.4.4.a of this Schedule 17 with the following additional information:

   i.  sample results that indicate, at the time of such exceedance, the Exceedance Chemicals at the pre-treatment effluent sample location (defined as the point in the treatment process after which solids have been removed or at the initial dewatering point if total suspended solids ("TSS") at such initial point are less than 30 milligrams per liter ("mg/L") for such discharge point also:

      A.  exceeded the applicable value set out in Appendix C to this Schedule 17 with respect to any RHM listed in such Appendix; or

      B.  indicated the presence of an RHM that is not listed in Appendix C to this Schedule 17; and

   ii.  sample results that indicate TSS at the pre-treatment effluent sample location for such discharge point (collected at the same time as the pre-treatment sample) were less than 30 mg/L.

   For purposes of this Section 23.4.4.b, TSS may be determined by laboratory analysis or by an alternative method, so long as the Developer provides proof of concept and obtains Department Approval of such alternative method in advance of submitting such data.

c.  After the Department's receipt of any Developer notice (and supplemental information) that complies with Section 23.4.4.a and 23.4.4.b of this Schedule 17, the Department shall collect contamination confirmation samples from the same location as the pre-treatment effluent sample reported in such notice as follows. The Department shall collect:

   i.  an initial sample within 24 hours of receipt of Developer's notice; and

   ii.  follow-up samples every seven Calendar Days thereafter (or, at Department's discretion, more frequently) until the condition is determined to not exist or to have ended pursuant to Section 23.4.5 of this Schedule 17.

   In order to confirm the existence or continuation, as applicable, of either the condition set out in Section 23.4.4.b.i.A of this Schedule 17 or the condition set out in Section 23.4.4.b.i.B of this Schedule 17, any sample collected by the Department pursuant to this Section 23.4.4.c must meet the standards for a valid sample set out in Sections 23.4.4.a of this Schedule 17 (but only with respect to establishing the initial existence of a condition) and 23.4.4.b.ii of this Schedule 17.

   During the Department's sampling process, the Department shall in all cases provide Developer an opportunity to collect split samples upon written request by Developer provided a reasonable period of time in advance of such sampling.

23.4.5.  If the conditions in either Section 23.4.4.b.i.A or Section 23.4.4.b.i.B of this Schedule 17 have been satisfied as confirmed by at least an initial Department sample collected pursuant to Section 23.4.4.c.i of this Schedule 17, such Unexpected Groundwater Contamination Condition shall be considered to exist and be continuing from the date on which Developer first collected the effluent sampling that was the basis for the results referenced was Section 23.4.4.a. of this Schedule 17 to, and ending on, the earlier of:

a.  the date of the second consecutive sample collected pursuant to Section 23.4.4.c.ii of this Schedule 17 that fails to demonstrates the satisfaction of either the condition set out in

Section 23.4.4.b.i.A or the condition set out in Section 23.4.4.b.i.B (other than due to a failure to meet the standard for a valid sample set out in Section 23.4.4.b.ii of this Schedule 17); and

b.    the date of the first sample collected pursuant to Section 23.4.4.c.ii of this Schedule 17 that fails to meet the standard for a valid sample set out in Section 23.4.4.b.ii of this Schedule 17.

23.4.6. If, as a result of such sample collection and analysis, no Unexpected Groundwater Contamination Event is found to have occurred, the Developer shall reimburse the Department for all costs and expenses incurred by the Department in performing sample collection and analysis pursuant to Section 23.4.4.c of this Schedule 17, provided that the Department may at any time, in its discretion, delegate the performance of all or any such activities to the Developer.

## 23.5.    Coordination with Governmental Authorities

23.5.1. State and Federally regulated facilities (e.g., sites listed on the National Priorities List, or otherwise under EPA order or agreement, leaking underground storage tanks, and other facilities under State or Federal regulatory jurisdiction) are located within the Project. The Developer is responsible for any notification and coordination with appropriate Governmental Authorities, including CDPHE, EPA, CCD Department of Environmental Health, Colorado Department of Labor and Employment, Division of Oil and Public Safety, Colorado Division of Water Resources, and Tri-County Health Department and for obtaining any Governmental Approvals and Permits required for the management and/or disposal of RHMs within or associated with such facilities.

23.5.2. The Department shall be invited to all meetings with and copied in all communications to Government Authorities regarding the management or disposal of RHMs associated with the Project.

## 23.6.    Generator Status and Hazardous Substance Liability and Cost Recovery

23.6.1. As between the Department and the Developer:

a.    the Developer shall be deemed the sole generator under 40 C.F.R. Part 262 and the arranger under CERCLA Section 107(a) with respect to any Developer Release of Hazardous Substances; and

b.    the Department shall be deemed the sole generator under 40 C.F.R. Part 262 and the arranger under CERCLA Section 107(a) with respect to any Hazardous Substances for which the Developer is not identified as the generator and arranger pursuant to Section 23.6.1.a of this Schedule 17; provided that, to the extent that the Developer fails to utilize disposal sites or transporters of such Hazardous Substances in accordance with the MMP, or to otherwise follow the requirements of the MMP pursuant to Section 23.8.2 of this Schedule 17 necessary to preserve the Department's generator and arranger status, the Developer shall be deemed to be the generator and arranger of such Hazardous Materials, notwithstanding this Section 23.6.1.b.

23.6.2. Notwithstanding Section 23.6.1 of this Schedule 17, and subject always to the Developer's rights arising as a result of the occurrence of a Supervening Event or of any Developer Change documented in a Change Order, and to the Enterprises' responsibilities under Section 23.6.1.b of this Schedule 17, the Developer shall remain responsible for:

a.    RHM manifests (including generator signature only to the extent of the Developer's responsibilities under Section 23.6.1.a of this Schedule 17), transport, recordkeeping, handling and remediation pursuant to this Agreement, including Section 23.1.2 of this Schedule 17 and the MMP; and

b.    complying with all Environmental Requirements, including provisions set out in the BRMMP and in each of the MMP, SAP, HASP, CDOT's *Procedures for Hazardous Materials Spills That Occur on State and Federal Highways Within Colorado as a Result of a Highway Transportation Incident* for traffic incidents and the SPCC Plan, including in

each case by maintaining documentation of all pertinent certifications required thereunder for all Subcontractors (which certifications shall be made available to the Department upon request).

23.6.3.  To the extent the Department:

a.      assumes responsibility, in whole or in part, for the identification, management, removal and/or disposal of RHMs pursuant to Section 23.1.3 of this Schedule 17; or

b.      is otherwise liable for costs associated with RHMs in connection with a Supervening Event in accordance with Section 15 of the Project Agreement,

the Department may take such actions necessary to preserve its claims against other potentially responsible parties for any such costs, including actions necessary to assure that any such costs are directly or indirectly incurred by the Department consistent with the National Contingency Plan, 40 C.F.R. Part 300, provided such actions do not adversely affect the Project Schedule or increase Developer's costs or liability (except to the extent such adverse effects, costs or liability are taken into account in connection with the resolution of such Supervening Event).

**23.7.    Traffic Incident and Construction-related Spills**

The Developer shall comply with:

a.      the CDOT *Procedures for Hazardous Materials Spills that Occur on State and Federal Highways Within Colorado as a Result of a Highway Transportation Incident* with respect to spills resulting from vehicle traffic incidents; and

b.      the SPCC Plan with respect to construction-related spills.

**23.8.    Materials Management Plan**

23.8.1.  The Developer shall prepare, implement and comply with a Materials Management Plan ("MMP") for applicable handling, storage and suitable disposal of RHMs during the Term. The MMP shall be written to assure compliance with all Environment Requirements and shall incorporate the Beneficial Reuse and Materials Management Plan provided in the Reference Documents (the "BRMMP"). Any changes proposed to the BRMMP (as it is incorporated in the MMP) shall, to the extent initiated by the Developer and not made as a result of any Change made pursuant to Schedule 24 (*Change Procedure*) and documented in a Change Order or a Directive Letter, be submitted to the Department for Approval in advance and shall also require subsequent approval by CDPHE. All RHMs shall be tracked from identification to final disposition. Subject to Section 23.1.3 of this Schedule 17, the Developer shall identify, manage, remove and dispose of RHMs in accordance with Section 23.1.2 of this Schedule 17. Notwithstanding any standards for reuse of soils set forth in BRMMP, the MMP shall not allow the reuse of any soils contaminated with concentrations of chemical constituents above standards for unrestricted reuse (as defined in the BRMMP) in any portion of the Site located west of Colorado Boulevard.

23.8.2.  The MMP shall identify potential RHMs, their locations (including locations of RHMs on plan sheets), the extent of impact, proposed corrective actions, waste management procedures, avoidance measures, investigation measures, and a contingency plan for addressing unforeseen conditions. In addition, the MMP shall define the method for abating RHMs (e.g., lead-based paint, lead-containing paint, asbestos and universal wastes) in structures. The plan shall outline the approach to implementing the MMP and identify the qualifications of personnel required to perform activities required under the plan and shall incorporate the information regarding RHMs in structures documented in the SSAR's prepared under Section 23.13 of this Schedule 17. In addition to meeting the requirements of Section 250, the MMP shall demonstrate that the Developer shall manage all RHMs, including soils, groundwater, surface water, and other contaminated substances, in a manner to prevent exposure to proposed Project personnel, the public, the Environment and Improvements, to prevent any contamination of non-contaminated areas, and in compliance with the Environmental Requirements. The Department shall:

a.   be responsible for designating off-Site disposal sites for RHMs that are to be removed from the Site (except in respect of RHMs that are the subject of a Developer Release of Hazardous Substances, in relation to which the Developer shall be so responsible);

b.   provide a list of such sites Developer may use for disposal or treatment of, and of transporters the Developer may use for transport for disposal or treatment of, such RHMs, which list shall be incorporated into the MMP; and

c.   provide for execution by Department representatives of, or provide appropriate authorization to Developer to act as the Department's agent with respect to execution of, manifests and other documentation as necessary to maintain the Department's status as sole generator and arranger with respect to such RHMs pursuant to Section 23.6.1 of this Schedule 17.

Once disposal sites are located and selected (whether by the Department or, with respect to Developer Releases of Hazardous Substances, by the Developer), the Developer shall ensure that all requirements of the transporter and the receiving disposal facility and all Environmental Requirements are complied with and are properly documented.

23.8.3.   In the MMP, the Developer shall provide provisions to characterize and classify RHM into categories as appropriate for the Project, including:

a.   Solid waste (hazardous and non-hazardous as defined under the RCRA) requiring off-Site disposal and/or treatment;

b.   Contaminated soils requiring off-Site disposal;

c.   Soils to be stockpiled for further characterization;

d.   Soils with concentrations of waste constituents below regulatory action levels set forth in the BRMMP that can be reused with or without restriction;

e.   Soils that can be reused for CCD projects in accordance with Section 4D of the Denver IGA and the Guidance for Central 70 Project Reuse of Excess Soil on City and County of Denver Owned Properties as provided in the Reference Documents;

f.   Wastewater requiring off-Site disposal and/or treatment;

g.   Impacted water to be held for further characterization;

h.   ACM discovered during construction or demolition;

i.   Lead-based paint associated with structures, signage, light posts, etc;

j.   Waste material to be contained for further characterization;

k.   Contaminated groundwater requiring on-site treatment or off-Site disposal;

l.   Circumstances in which a separate comprehensive plan for the long-term cleanup and monitoring of RHMs may be required in accordance with Section 23.9.1 of this Schedule 17;

m.   Identification of the location and method selected for any treatment or disposal of RHMs pursuant to this Schedule 17; and

n.   Conditions requiring Developer personnel to call the MT to screen for RHM.

23.8.4.   The MMP shall include a standard template to be used for the Monthly Statement of Recognized Hazardous Materials Management (see Section 23.15 of this Schedule 17) and the Recognized Hazardous Materials Management Completion Report (see Section 23.16 of this Schedule 17). These reports shall include a narrative description of all RHM-related activities conducted by the Developer (excluding those items for which the Department has retained responsibility under Section 23.1.3 of this Schedule 17) and tracking of all such RHMs including their point of origination, remediation activities, location of disposal (on or off-Site) and completed waste profiles, manifest forms, and bill-of-lading forms for proper transportation and disposal of

materials off-Site, including the items required in Section 5 (Reporting) of the BRMMP. The work to complete the Monthly Statement of Recognized Hazardous Materials Management and the Recognized Hazardous Materials Management Completion Report shall be considered incidental and therefore shall not be included in any Supervening Event Submission. This information shall be available at all times for review by the Department. Without limiting the foregoing, the following information shall be included for all RHMs (e.g., soil, groundwater):

a.  GPS or survey information mapped on plan sheets identifying the point of origination of the RHM, the applicable vertical horizon (as defined in the BRMMP) and all sampling locations;

b.  Field screening/monitoring results;

c.  Laboratory analytical results;

d.  Disposition including temporary stockpiling, use on-site, use off-Site, disposal, etc.;

e.  GPS, survey, or other locational data that meets the requirements of the BRMMP and is mapped on plan sheets showing the location of soils contaminated with Hazardous Substances above RSL-R's that have in been reused on site in accordance with the BRMMP;

f.  Management practices;

g.  Transportation methods;

h.  Disposal information, including manifests (hazardous and non-hazardous);

i.  Permits or Governmental Approvals;

j.  Required submittals to Governmental Authorities, Railroads and Utility Owners for Permits and Government Approvals;

k.  Import material source and sampling documentation;

l.  HSO daily diary, as required in Section 250;

m.  In the Monthly Statement of Recognized Hazardous Materials Management, the identification of any separate comprehensive plans for the long-term cleanup and monitoring of RHMs submitted for Acceptance in accordance with Section 23.9.1 of this Schedule 17 during the preceding month or under which response actions are being conducted during such month, and

n.  In the Recognized Hazardous Materials Management Completion Report, identification of all separate comprehensive plans for the long-term cleanup and monitoring of RHMs under which such RHMs were addressed

23.8.5.  The MMP shall be submitted for Approval by the Department prior to issuance of NTP2.

23.8.6.  The Developer is responsible for all requirements associated with development and implementation (including administration, monitoring, sampling and reporting) of the MMP.

**23.9.    Long-Term Clean Up Plans**

23.9.1.  To the extent that the MMP (as amended and supplemented from time to time) does not address long-term cleanup and/or monitoring of any RHMs for which the Developer is responsible, the Developer shall develop and submit to the Department for Acceptance a comprehensive plan (including a completion schedule) for the long-term cleanup and monitoring of such RHMs through the end of the Operating Period.

23.9.2.  Upon Acceptance of such a comprehensive plan, the Developer shall be responsible for completing any and all remediation, monitoring and/or related responsibilities related to the relevant RHMs in compliance with such plan through the end of the Operating Period.

**23.10.  Sampling and Analysis Plan**

23.10.1. The Developer shall prepare a Sampling and Analysis Plan ("SAP") to identify and characterize potential RHMs that may be encountered during the Term, and to outline processes for monitoring/screening of RHM for storage, handling, and disposal during the Term. In addition to complying with Section 250, the SAP shall include, at a minimum:

    a.      Data quality objectives;

    b.      Sample collection procedures for all RHMs (e.g., soil, water, asbestos, paint, universal wastes), including field screening, borehole drilling, monitoring well construction, soil sampling and/or groundwater sampling methods, and decontamination;

    c.      Quality control;

    d.      Field equipment calibration procedures/frequency;

    e.      Quality assurance objectives (data); and

    f.      Provisions for corrective action, if needed.

23.10.2. The SAP shall be submitted for Approval by the Department prior to issuance of NTP2.

**23.11.  Health and Safety Plan**

23.11.1. The Developer shall designate a Health and Safety Officer (HSO) to prepare and implement a Health and Safety Plan ("HASP") in compliance with 29 C.F.R. Parts 1910 and 1926. Since RHMs have been identified within the Right-of-Way, the HASP shall comply with the requirements of 29 C.F.R. § 1910.120 or 29 C.F.R. § 1926.65, paragraph (b)(4). The Developer shall in the HASP furnish documentation to the Department that the requirements for the HSO specified in Section 23.21.2 of this Schedule 17 have been met. The HASP shall be submitted to the Department for Acceptance and distributed to all employees who are required pursuant to Law to have access to the HASP. The HASP shall be displayed or made available on-site at all times. The Developer shall develop and maintain on-site all industrial hygiene information, including "right-to-know" information. In addition to meeting the requirements of Section 250, the Developer shall maintain documentation and promptly provide information to the Department, as requested, regarding potential or actual exposure to workers and/or the public. The Developer shall maintain records of all related incidents and notify the Department and appropriate Governmental Authorities immediately. The HASP shall be considered a "living document" and, as such, be amended as construction and operation of the Project progresses during the Term. The HSO who prepares and implements the HASP shall at all times meet the requirements specified in Section 23.21.2 of this Schedule 17.

23.11.2. Due to the presence of solid waste landfills with the potential for asbestos containing building materials, all workers involved in soil disturbing activities shall complete the 2-Hour Asbestos Awareness Training in accordance with OSHA and 29 C.F.R. § 1926.1101. The Developer shall be responsible for completing and documenting OSHA training and implementing OSHA requirements for the Work.

23.11.3. The HASP shall be submitted for Acceptance by the Department prior to issuance of NTP2.

**23.12.  Spill Prevention Control Countermeasure Plan**

23.12.1. The Developer shall prepare a SPCC Plan for Acceptance by the Department according to 40 C.F.R. Part 112, and Section 208.06 to this Schedule 17. The SPCC Plan shall be considered a "living document" and, as such, be amended as construction and operation of the Project progresses during the Term.

23.12.2. The SPCC Plan shall be submitted for Acceptance by the Department prior to issuance of NTP2.

**23.13.  Structure Surveys**

23.13.1. Asbestos containing building materials ("ACBM"s), lead-containing paint ("LCP"), lead-based paint ("LBP"), and universal wastes or regulated materials that could not be disposed at a Subtitle

D landfill (e.g., Hazardous Waste as defined by the Resource Conservation and Recovery Act; Universal Wastes as defined by the EPA and 6 CCR Part 273 of the Colorado Hazardous Waste Regulations; chlorofluorocarbons as defined by the Clean Air Act; and polychlorinated biphenyls as defined by the Toxic Substances Control Act) may be present on various components of the Project (e.g., residential and commercial building improvements, bridge girders, railings, light poles, abutments). Prior to performing any demolition or rehabilitation activities on any part of the Site of any structures, bridges, removal of Utility Service Lines or any other features that may contain these materials, the Developer shall submit to the Department for Acceptance a Site-wide Structure Survey Assessment Plan ("SSAP"). The SSAP shall be developed in accordance with Section 250.04, CDPHE Air Pollution Control Commission's Regulation 8 Part B, OSHA and other requirements of Environmental Law. The SSAP shall define the Developer's approach and methodology for completing the survey to document the presence of ACBMs, LBP, LCP, universal waste and regulated materials. In addition, the SSAP shall define the required qualifications for personnel who will implement the assessment plan including the Certified Asbestos Building Inspector. The Developer shall implement the SSAP prior to conducting any Work that could disturb ACBMs, LBP, LCP, universal waste and regulated materials.

23.13.2. Upon completion of each structure survey, and prior to the initiation of abatement or demolition activities, the Developer shall submit to the Department for Acceptance a Structure Survey Assessment Report ("SSAR") in respect of each survey that was completed (e.g., one report for each parcel or bridge). Each SSAR shall detail the methodology, results and conclusions of the relevant survey, including the abatement requirements, and at a minimum shall contain:

a.     Tables summarizing the quantitates, friability and locations of ACBM; materials that do not contain asbestos; OSHA-regulated materials (from trace amounts up to one percent asbestos-containing materials); LBP and LCP quantities and locations and locations and quantities of universal waste or regulated materials;

b.     Figures depicting the asbestos and paint sampling locations; locations of ACBM and OSHA-regulated materials; locations of LBP and LCP; and locations of universal waste or regulated materials; and

c.     Appropriate supporting materials such as photographic logs, scaled drawings, laboratory reports, and personnel and laboratory accreditations.

23.13.3. The Developer is responsible for the development of the SSAP, completion of the survey and development of the SSAR. These activities shall be considered incidental and therefore shall not be included in any Supervening Event Submission.

23.13.4. Subject to Section 23.1.3 of this Schedule 17 and Section 2 of Schedule 18 (*Right-of-Way*), the Developer shall, in accordance with the Environmental Requirements, properly remove, abate, segregate according to disposal requirements, and dispose of all waste generated as part of demolition of any buildings or other structures in accordance with Environmental Law. All abatement of ACBM shall be completed by a Certified General Abatement Contactor.

23.13.5. The Developer shall avoid sanding, cutting, burning, or otherwise causing the release of lead from paint on selected painted components. OSHA Regulation 1926.62 (29 C.F.R. § 1926.62) shall be consulted for worker protection prior to removal of painted components.

23.13.6. If painted metal components are to be removed and recycled, they must be recycled in accordance with Section 250.04. The recycling facility shall be notified of the potential presence of LCP/LBP.

23.13.7. The Developer shall comply with all requirements for containing flaked-off paint material and other residue and waste materials that may be generated during removal and transportation of painted structures, including wastewater from power washing operations. At no time will wastewater from power washing operations be allowed to discharge to the surface or any water body. Any encapsulate used to treat the lead-based paint shall render the coated paint non-leachable by not exceeding the threshold of 5 milligrams per liter as confirmed by the Toxicity Characteristic Leaching Procedure ("TCLP") for lead.

23.13.8. The Developer shall be responsible for the removal and disposal of OSHA-regulated materials as identified in 29 C.F.R. § 1926.1101. These activities shall be considered incidental and therefore shall not be included in any Supervening Event Submission.

23.13.9. Within 30 Calendar Days of completion of abatement activities the Developer shall submit to the Department for Acceptance a Structure Survey Completion Report (SSCR) for each parcel or structure (e.g., one report for each parcel or bridge). The SSCR shall include documentation detailing what abatement was completed including material types and quantities, clearance tests, disposal manifests for all material that was disposed at a permitted facility and any other relevant documentation.

**23.14. Asbestos in Soils**

A number of solid waste landfills, which have the potential to contain asbestos containing building materials, were identified at the Right-of-Way in the EIS. In addition, when any discarded material is encountered that contains or consists of any of the following: construction, renovation and demolition debris (regardless of how it was generated), building or facility components, components of building systems (HVAC, plumbing, electrical, control, fire protection, roofing), components of pavement or drainage systems, industrial or machinery components, and/or mechanical components from motorized vehicles, or where asbestos-contaminated soil is discovered, the Developer shall conduct inspections and/or abatement in accordance with CDPHE Section 5.5 of the Solid Waste Regulations, CDOT Regulated Asbestos Contaminated Soil Management Standard Operating Procedure (provided in the Reference Documents), Section 250, and relevant OSHA, and other Environmental Requirements. For certainty, the document CDOT Regulated Asbestos Contaminated Soil Management Standard Operating Procedure incorporates current CDPHE guidance, and as such shall take precedence over Section 250 if the two documents conflict.

**23.15. Monthly Statement of Recognized Hazardous Materials Management**

The Developer shall submit Monthly Statements of Recognized Hazardous Materials Management to the Department for Acceptance summarizing all Developer activities associated with the management, removal and disposal of RHMs during the Construction Period, including applicable documentation from the Health and Safety Officer's daily diary as required in Section 250. The reports shall include the requirements in Section 23.8.4 of this Schedule 17 and the reporting requirements included in Section 5 (Reporting) of the BRMMP. During the Operating Period, the Monthly Statement of Recognized Hazardous Materials Management shall be submitted monthly, but only if RHMs were handled during that month. After CDOT's Acceptance each submittal shall be submitted to CDPHE for review.

**23.16. Recognized Hazardous Materials Management Completion Report and Environmental Covenant/Notice of Environmental Use Restriction**

Within 60 Calendar Days following Substantial Completion, the Developer shall submit a Recognized Hazardous Materials Management Completion Report for Approval documenting how the MMP, BRMMP, and any plans prepared pursuant to Section 23.9 of this Schedule 17 were implemented and detailing how RHMs were identified, handled and disposed by the Developer. Such Report shall also include all necessary information for the Department to record an environmental covenant or notice of environmental use restriction against the Site pursuant to the requirements of the BRMMP and plan sheets mapping the location of soils contaminated with Hazardous Substances above the RSL-R's (as defined in the BRMMP) reused within the Site. For certainty, the Developer's coordination with the Department and CDPHE on the preparation and submittal of all required documents to record an environmental covenant or notice of environmental use restriction is a condition for the Approval of the Recognized Hazardous Materials Management Completion Report. For clarity, the recording of any such environmental covenant or notice of environmental use restriction is considered a Governmental Approval for which the Developer is responsible under this Agreement.

**23.17.   Unexpected Hazardous Substances**

23.17.1. In the event that any Unexpected Hazardous Substances are encountered or discovered, the Developer shall submit a remedial plan as part of any Detailed Supervening Event Submission. The remedial plan shall describe the Developer's approach including a sampling plan; means and methods of management, and the disposal facility; the required personnel for remediating the Unexpected Hazardous Substance; the estimated cost of implementing the remedial plan; and the required coordination with Governmental Authorities and associated Governmental Approvals and Permits. The remedial plan shall be subject to Department Acceptance and may, upon such Acceptance, be used to satisfy the Developer's applicable obligations under Section 23.9 of this Schedule 17. For certainty, the Department's Acceptance of a remedial plan shall not in any way bind or commit the Department with respect to the subject matter of the Detailed Supervening Event Submission.

23.17.2. Any Supervening Event Submission made with respect to any Unexpected Hazardous Substances Event shall be made pursuant to Section 15.1.2 of the Project Agreement and shall be subject to Developer, on and prior to the date of such submission, having complied with the remedial plan Accepted by the Department pursuant to Section 23.17.1 of this Schedule 17 in all material respects.

23.17.3. Notwithstanding the foregoing, for certainty, the Developer shall at all times be responsible for the field monitoring, sampling, tracking, and reporting of RHMs. These activities shall be considered incidental and therefore shall not be included in any remedial plan or Supervening Event Submission, whether or not such RHMs are considered Unexpected Hazardous Substances.

**23.18.   Residential Properties Sampling Plan**

To document that adjacent residential properties are not re-contaminated with heavy metals due to construction activities, the Developer shall prepare and implement a Residential Properties Sampling Plan that outlines the procedures for pre, during and post-construction lead and arsenic sampling at four residential properties. The Developer shall identify the properties to be sampled in coordination with the USEPA, obtain permission to complete the sampling from the property owner, and shall submit the plan to the Department for Acceptance and USEPA and the CCOD for approval prior to issuance of NTP2.

**23.19.   Import Materials**

23.19.1. For each source of imported fill material, the Developer shall obtain the Department's Acceptance prior to bringing the material on site and the identification of, and the screening and sampling for, the following constituents shall be considered incidental and therefore shall not be included in any Supervening Event Submission, provided that any such Acceptance shall not, for certainty, constitute an Acceptance of any resulting Developer Release of Hazardous Substances. The Developer is responsible for the sampling and testing of import materials and shall test the material at a minimum frequency of one sample for every 2,000 cubic yards from each source area for the following constituents:

a.      Volatile organic compounds (EPA Method 8260b);

b.      Semi-volatile organic compounds (EPA Method 8270);

c.      Total petroleum hydrocarbons (EPA Method 8015);

d.      RCRA 8 metals (EPA Method 6010 and 7471);

e.      Pesticides (EPA Method 8081);

f.      Polychlorinated biphenyls (EPA Method 8082); and

g.      Asbestos (PLM).

**23.20.  Other Requirements**

23.20.1. The Developer is responsible for any reporting or notification with respect to RHMs required by Governmental Authorities, including CDPHE, EPA, CCD Department of Environmental Health, Colorado Department of Labor and Employment, Division of Oil and Public Safety, and Tri-County Health Department.

23.20.2. The Developer is responsible for contacting the Colorado Division of Water Resources, CDPHE or the Colorado Department of Labor and Employment, Division of Oil and Public Safety, if groundwater monitoring or supply wells will be disturbed by the Construction Work in order to determine the status and any requirements for well protection, replacement or abandonment. Non-operational monitoring and supply wells shall be abandoned in accordance with Colorado Division of Water Resources well-abandonment requirements. The discovery of and abandonment or replacement (at the existing or new location) of a well is considered incidental and therefore shall not be included in any Supervening Event Submission.

23.20.3. The Developer shall conduct a preliminary survey of any private property or buildings that may be affected by dewatering to establish existing conditions and then shall monitor roadways for any settlement caused by dewatering. The Developer shall repair any damage to roadways, private property, or buildings caused by dewatering operations.

23.20.4. Except as provided otherwise in this Agreement (including in this Schedule 17), the Developer shall be responsible for all removal or management of RHMs encountered or discovered, and any backfill screening and placement required, in connection with Utility Work conducted pursuant to any URA or with another part of the Work conducted in connection with any other access or use agreement with a Utility Owner.

**23.21.  Required Personnel**

23.21.1. The Developer shall designate a RHM Manager from the Agreement Date to the end of the Construction Period who has at least 10 years of experience managing RHMs and who shall report to the EM. The individual who is the RHM Manager can also fill the role of the Compliance Manager (during the Construction and Operating Periods, as applicable), defined in the BRMMP, if the individual satisfies both the RHM Manager and Compliance Manager qualifications. The RHM Manager is responsible for:

a.      Implementing the MMP;

b.      Ensuring the Developer follows all Environmental Requirements applicable to RHM:

c.      Leading bi-weekly (every two weeks) meetings with the Department to review the status of RHMs; and,

d.      Notifying the Department in writing within 8 hours of any encountering or discovery of RHM (including Releases thereof) affecting the Site or the Work.

23.21.2. The Developer shall designate a Health and Safety Officer ("HSO") in accordance with the requirements below and shall staff such position from the Agreement Date to the end of the Term. The HSO who prepares and implements the HASP shall possess the following minimum qualifications:

a.      Be a Certified Industrial Hygienist;

b.      Completed OSHA training in accordance with 29 C.F.R. § 1910.120(e) including 40-hour ( § 1910.120(e)(3)(i)) and management and supervisor training ( § 1910.120(e)(4);

c.      Completed the minimum training and medical surveillance requirements established by the Occupational Safety and Health Administration (OSHA) and the Environmental Protection Agency (EPA) for a supervisory Site Safety Official per 29 C.F.R. § 1962.65;

d.      Completed training and certification in accordance with the Air Quality Control Commission Regulation No. 8 Part B (State and EPA-Certified Asbestos Building Inspector ("CABI"));

e.    Have a thorough knowledge of all applicable OSHA, EPA, State, and local regulations as they pertain to the protection of the environment and the safety and health of the workers and public; and

f.    Have at least 10-years of experience working on and developing health and safety programs for projects that require the handling, treatment, storage and disposal of RHMs.

23.21.3. In addition, in accordance with Section 250.03(b) of this Schedule 17, the Developer shall designate a Monitoring Technician(s) ("MT") who has completed the 40 hour HAZWOPER and eight hour OSHA Supervisory training. The MT shall be responsible for the identification and monitoring of Hazardous Substances during the Term. The MT shall also be a State and EPA-CABI and meet the requirements of a Qualified Project Monitor as defined in the Colorado Solid Waste Regulation Section 5.5.3 and shall meet the requirements outlined in the MMP. In accordance with the BRMMP, the MT is required to be on-site during all soil-disturbing activities west of Colorado Boulevard. East of Colorado Boulevard, the MT is not required to be onsite at each soil disturbing face if the BRMMP Compliance Manager (CM) determines no impacted materials will likely be encountered; if impacted materials are encountered during construction, work shall stop until a CM or MT is onsite to complete the appropriate screening and sampling in accordance with the BRMMP. The designated MT can delegate activities to other MTs, who meet the qualifications of the MT.

23.21.4. The Developer shall certify that the procedures, health and safety precautions, and methods described in the MMP, SAP and HASP are in accordance with the OSHA, CDPHE, OPS and EPA standards and all other Environmental Requirements.

## 24.    ENERGY

The Developer shall implement the energy mitigation measures referenced in the ROD to the fullest extent practicable. The Developer shall submit an update quarterly as part of the ECWP update which documents the Developer's procedures and programs to save energy.

## 25.    DELIVERABLES

At a minimum, the Developer shall submit the following Deliverables to the Department for Information, Acceptance, or Approval in accordance with the specified timeframes:

**Table 17-5    Deliverables**

| Deliverable | Information, Acceptance or Approval | Schedule |
|---|---|---|
| Environmental Compliance Work Plan ("ECWP") | Approval (or Acceptance, but only with respect to any discipline specific management plan incorporated therein that requires Acceptance and not Approval in accordance with this Table 17-5) | Prior to issuance of NTP2 and annually thereafter in accordance with Section 2.1.3 of this Schedule 17 |
| Environmental Status Report ("ESR") | Acceptance | 10 Working Days following the end of the reporting period (monthly during the Construction Periods; quarterly during the Operating Period) |
| Mitigation Completion Report | Acceptance | Prior to Final Acceptance |
| Environmental Compliance and Mitigation Training Program | Acceptance | Prior to issuance of NTP2 |

| Deliverable | Information, Acceptance or Approval | Schedule |
|---|---|---|
| Environmental Compliance and Mitigation Training Program Annual Update and Report | Acceptance | Annually, 30 Calendar Days after the end of the Contract Year |
| Air Quality Monitoring, Maintenance, and Mitigation Plan ("AQ3MP") | Acceptance | Prior to issuance of NTP2, updated annually |
| Proposed Locations of PM-10 Monitors | Acceptance | Two weeks prior to operating the monitor |
| Environmental Approvals (all) | Information | Per the requirements of Environmental Law and this Agreement |
| Migratory Bird Nest Survey | Information | Prior to impacting existing structures or vegetation that may contain active bird nests and prior to specific activities (e.g., clearing), consistent with CDOT and CPW guidance and policy |
| Preliminary Noise Technical Reports | Acceptance | Prior to conducting Benefited Receptor Preference Survey |
| Benefited Receptor Preference Survey supporting material | Approval | 14 Calendar Days prior to conducting Benefited Receptor Preference Survey |
| Final Noise Technical Reports | Acceptance | Prior to issuance of RFC Documents and at the time of any update required pursuant to Section 11.3.5 of this Schedule 17 |
| Construction Noise Mitigation and Monitoring Plan ("CNMMP") | Acceptance | Prior to issuance of NTP2, updated annually |
| Paleontological Annual Reports | Acceptance | Annually, 60 Calendar Days after the end of the reporting period |
| Paleontological Summary Report | Acceptance | 60 Calendar Days after earthwork is completed |
| SB 40 Certification Application Package | Approval | Prior to construction work in SB 40 area |
| Integrated Noxious Weed Management Plan ("INWMP") | Acceptance | Prior to issuance of NTP2, updated annually |
| Wetland Finding Report (if required) | Approval | Prior to impacting wetlands |
| BTPD Management Plan | Acceptance | Prior to impacting BTPD |

| Deliverable | Information, Acceptance or Approval | Schedule |
|---|---|---|
| Materials Management Plan ("MMP"), including any changes relative to the Beneficial Reuse and Materials Management Plan ("BRMMP") | Approval | Prior to issuance of NTP2, updated annually |
| Long-Term Clean Up Plan(s) | Acceptance | As and when required pursuant to Section 23.9 of this Schedule 17 |
| Sampling and Analysis Plan ("SAP") | Approval | Prior to issuance of NTP2, updated annually |
| Residential Soils Sampling Plan | Acceptance | Prior to issuance of NTP2, updated annually |
| Health and Safety Plan ("HASP") | Acceptance | Prior to issuance of NTP2, updated annually |
| Spill Prevention Control and Countermeasures Plan ("SPCC Plan") | Acceptance | Prior to issuance of NTP2, updated annually |
| Structure Survey Assessment Plan ("SSAP") (Project-wide document) | Acceptance | Prior to the demolition of any structure or other relevant components of the Project |
| Structure Survey Assessment Report ("SSAR") (per parcel or structure) | Acceptance | Prior to the demolition of any structure |
| Structure Survey Completion Report ("SSCR") (per parcel or structure) | Acceptance | Within 30 Calendar Days after completion of abatement activities. |
| Import Materials Documentation | Acceptance | Prior to bringing the materials onto the Site |
| Remedial Plan | Acceptance | As part of Schedule 21 (*Form of Supervening Event Submission*) |
| Environmental Approval | Approval | Prior to conducting Work where an Environmental Approval is required, including any Work that has not been approved in the ROD |
| Monthly Statement of Recognized Hazardous Materials Management | Acceptance | 10 Working Days after the end of each month as per Section 23.15 of this Schedule 17, followed by submittal to CDPHE |
| Recognized Hazardous Materials Management Completion Report | Approval | 60 Calendar Days after Substantial Completion |
| Schedule of Planned Noxious Weed Management Activities | Information | Monthly, five Calendar Days prior to the beginning of each month (March through October) |

| Deliverable | Information, Acceptance or Approval | Schedule |
|---|---|---|
| Noxious Weed Survey and Summary of Treatment Activities Report | Acceptance | Monthly, within 10 Working Days of the end of each month (March through October) during the Construction Period. Three times per year during the Operating Period. |
| Protected Environmental Resources shown in all Plan Sets | Acceptance | To be included with each plan set submittal |
| Asbestos, Lead-Based Paint and Regulated Materials Survey Report | Acceptance | 15 Working Days prior to demolition |
| Dewatering or Remediation Plan | Acceptance | Prior to discharge as required by the permit |
| Summary Report of IQC Water Quality Documentation Audit | Information | Monthly, within 7 Calendar Days of the end of the month. |
| Diesel Nonroad Construction Equipment ("DNRCE") Report | Information | Quarterly, within 10 Working Days of the end of the reporting period. |
| BTPD Management Plan | Acceptance | Prior to conducting activities that could potentially impact BTPD, updated annually. |
| Level II Historic Archival Photographs and Measured Drawings (One submission per resource) | Acceptance | 10 Working Days prior to demolition or construction activities on affected parcels. |
| Level II Historic Documentation for Submittal to SHPO (One submission per resource) | Acceptance | Within 6 months of demolition of the resource. |

**26.    APPENDICES**

Appendix A        Project Special Provisions
Appendix B        Known Hazardous Substances Parcels
Appendix C        Groundwater Benchmark Concentrations

**Appendix A**
**Project Special Provisions**

The following specifications modify and take precedence over the Standard Specifications. The requirements of <u>Schedule 10A</u> (*Applicable Standards and Specifications*) apply to these Project Special Provisions.

**PROJECT SPECIAL PROVISIONS**

|  | <u>Pages</u> |
|---|---|
| Index | 17-40 |
| Revision of Section 208 – Erosion Control | 17-41 to 17-65 |
| Revision of Section 240 – Protection of Migratory Birds | 17-66 to 17-68 |
|     Biological Work Performed by the Contractor's Biologist | |
| Revision of Section 250 – Environmental, Health, and Safety Management | 17-69 to 17-81 |

## REVISION OF SECTION 208
## EROSION CONTROL

Section 208 is hereby deleted from the Standard Specifications for this project and replaced with the following:

### DESCRIPTION

**208.01** This work consists of constructing, installing, maintaining, and removing when required, Best Management Practices (BMPs) during the life of the Contract, including the period during which final stabilization is achieved, to prevent or minimize erosion, sedimentation, and pollution of any State waters as defined in subsection 107.25, including wetlands.

The Contractor shall coordinate the construction of temporary BMPs with the construction of permanent BMPs to assure effective and continuous erosion and sediment control throughout the Construction Period.

When a condition of this Project Special Provision 208 or a Noncompliance Notice or Noncompliance Report by the Department or the Contractor requires that an action be immediate or taken immediately, it shall be understood that the Contractor shall at once begin effecting completion of the action and pursue it to completion in a manner acceptable to the Department, and in accordance with the Colorado Discharge Permit System Stormwater Construction Permit (CDPS-SCP) requirements.

### MATERIALS

**208.02** Erosion control materials are subject to acceptance in accordance with subsection 106.01. The IQC program shall verify and document that erosion control materials installed on Site have met the required acceptance criteria, including Certificates of Compliance (COC) and are on the Approved Products List (APL). Erosion control materials shall be subject to the following approval process:

| Material | Approval Process | Notes: |
|---|---|---|
| Erosion Bales (Weed Free) | COC | The Contractor shall provide a transit certificate number or a copy of the transit certificate as supplied from the producer. |
| Silt Fence | COC | |
| Silt Berm | APL | |
| Erosion Log (Type 1 and 2) | COC | |
| Silt Dikes | COC | |
| Pre-fabricated Concrete Washout Structures (above ground) | APL | |
| Pre-fabricated Vehicle Tracking Pad | APL | |
| Aggregate Bag | COC | |
| Storm Drain Inlet Protection (Type I, II and III) | APL | |

**-2-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

The material for BMPs shall conform to the following:

(a)   *Erosion Bales.* Material for erosion bales shall consist of Certified Weed Free hay or straw. The hay or straw shall be certified under the Colorado Department of Agriculture Weed Free Forage Certification Program and inspected as regulated by the Weed Free Forage Act, Title 35, Article 27.5, CRS. Each certified weed free erosion bale shall be identified by blue and orange twine binding the bales.

The Contractor shall not place certified weed free erosion bales or remove their identifying twine until the IQC has inspected and accepted them.

The Contractor may obtain a current list of Colorado Weed Free Forage Crop Producers who have completed certification by contacting the Colorado Department of Agriculture, Weed Free Forage Program, 305 Interlocken Pkwy, Broomfield, CO 80021, Contact: Weed Free Forage Coordinator at (303) 869-9038. Also available at www.colorado.gov/ag/csd.

Bales shall be approximately 5 cubic feet of material and weigh at least 35 pounds. Stakes shall be wood and shall be 2 inch by 2 inch nominal.

(b)   *Silt Fence*. Silt fence posts shall be wood with a minimum length of 42 inches. Wood posts shall be 1.5 inch by 1.5 inch nominal. Geotextile shall be attached to wood posts with three or more staples per post.

Silt fence geotextile shall conform to the following requirements:

**Physical Requirements for Silt Fence Geotextiles**

| Property | Wire Fence Supported Requirements | Self-Supported Requirements Geotextile Elongation <50% | Test Method |
|---|---|---|---|
| Grab Strength, lbs | 90 minimum | 124 minimum | ASTM D 4632 |
| Permittivity sec-1 | 0.05 | 0.05 | ASTM D 4491 |
| Ultraviolet Stability | Minimum 70% Strength Retained | Minimum 70% Strength Retained | ASTM D 4355 |

Silt Fence (Reinforced). Silt fence posts shall be metal "studded tee" T-post with a minimum length of 66 inches. Metal posts shall be "studded tee" with .095 inch minimum wall thickness. Wire fabric reinforcement for the silt fence geotextile shall be a minimum of 14 gauge, with a maximum mesh spacing of 6 inches. Geotextile shall be attached to welded wire fabric with ties or nylon cable

-3-
## REVISION OF SECTION 208
## EROSION CONTROL

ties 12 inch O.C. at top, mid and bottom wire. Welded wire fabric shall be attached to the post with a minimum three 12 gauge wire ties per post. Vinyl or rubber safety caps shall be installed on all T-post.

(c) *Temporary Berms*. Temporary berms shall be constructed of compacted soil.

(d) *Temporary Slope Drains*. Temporary slope drains shall consist of fiber mats, plastic sheets, stone, concrete or asphalt gutters, half round pipe, metal or plastic pipe, wood flume, flexible rubber or other materials suitable to carry accumulated water down the slopes. Outlet protection riprap shall conform to Section 506. Erosion control geotextile shall be a minimum Class 2, conforming to subsection 712.08.

(e) *Silt Berm*. Silt berm shall consist of an ultraviolet (UV) stabilized high-density polyethylene, shall be triangular in shape, and shall have the following dimensions:

| Width | 6 – 11 inches |
|---|---|
| Height | 6 – 10 inches |
| Weight | 0.3 – 1.4 lbs./sq. ft. |
| Percent Open Area | 30 – 50% |

Securing spikes shall be 10 to12 inch x 0.375 inch diameter (minimum).

(f) *Rock Check Dam*. Rock Check dams shall be constructed of stone. Stone shall meet the requirements of Section 506.

(g) *Sediment* Trap. In constructing an excavated Sediment Trap, excavated soil may be used to construct the dam embankment, provided the soil meets the requirements of subsection 203.03. Outlet protection riprap shall be the size specified in the Contract and shall conform to Section 506. Erosion control geotextile shall be a minimum Class 1, conforming to subsection 712.08.

(h) *Erosion log*. Shall be one of the following types unless otherwise shown on the plans:

(1) Erosion Log (Type 1) shall be curled aspen wood excelsior with a consistent width of fibers evenly distributed throughout the log. The casing shall be seamless, photo-degradable tube netting and shall have minimum dimensions as shown in Table 208-1, based on the diameter of the log called for on the plans. The curled aspen wood excelsior shall be fungus free, resin free, and free of growth or germination inhibiting substances.

(2) Erosion Log (Type 2) shall consist of a blend of 30-40 percent weed free compost and 60-70 percent wood chips. The compost/wood blend material shall pass a 50 mm (2 inch) sieve with a minimum of 70 percent retained on the 9.5 mm (3/8 inch) sieve and comply to subsection 212.02 for the remaining compost physical properties. The compost/wood chip blend may be pneumatically shot into a geotextile cylindrical bag or be pre-manufactured. The geotextile bag shall consist of material with openings of 1/8 to 3/8 inches of HDPE or polypropylene mesh (knitted, not extruded), and contain the compost/wood chip material while not limiting water infiltration.

**-4-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

Erosion log (Type 1 and Type 2) shall have minimum dimensions as shown in <u>Table 208-1</u>, based on the diameter of the log.

**Table 208-1**
**NOMINAL DIMENSIONS OF EROSION LOGS**

| Diameter Type 1 (Inches) | Diameter Type 2 (Inches) | Length (feet) | | Weight (minimum) (pounds/foot) | Stake Dimensions (Inches) |
|---|---|---|---|---|---|
| | | Min. | Max. | | |
| 9 | 8 | 10 | 180 | 1.6 | 1.5 by 1.5 (nominal) by 18 |
| 12 | 12 | 10 | 180 | 2.5 | 1.5 by 1.5(nominal) by 24 |
| 20 | 18 | 10 | 100 | 4.0 | 2 by 2 (nominal) by 30 |

Stakes to secure erosion logs shall consist of pinewood or hardwood.

(i)   *Silt Dikes*. Silt dikes shall be pre-manufactured triangular shaped urethane foam covered with a woven geotextile fabric. The fabric aprons shall extend a minimum of two feet beyond each side of the triangle.

Each silt dike shall have the following dimensions:

| Dimension | Length |
|---|---|
| Center height | 8 to 10 inches |
| Base        16 to 21 inches | |
| Section length | 3 to 7 feet |
| Section width including fabric extensions | 5.6 feet |

Staples shall be 6 gauge and at least 8 inches long.

(j)   *Concrete Washout Structure*. The Contractor shall construct a washout structure that will contain washout from concrete placement and construction equipment cleaning operations. Embankment required for the concrete washout structure may be excavated material, provided that this material meets the requirements of Section 203 for embankment.

A pre-fabricated concrete washout structure can be used in lieu of the above specified concrete washout. It shall consist of a watertight container designed to contain liquid and solid waste from concrete washout. It shall not be placed in an area where a spill would reach a surface water or other drainage structure.

(k)   *Vehicle Tracking Pad*. Aggregate for the vehicle tracking pad shall be crushed natural aggregate with at least two fractured faces that meets the following gradation requirements:

| Sieve sizePercent by weight | Passing Square Mesh Sieves |
|---|---|
| 75 mm (3 inch) | 100 |
| 50 mm (2 inch) | 0-25 |
| 19.0 mm (¾ inch) | 0-15 |

-5-
## REVISION OF SECTION 208
## EROSION CONTROL

Recycled crushed concrete or asphalt shall not be used for vehicle tracking pads.

Erosion Control Geotextile shall be Class 2 and conform to the requirements of subsection 712.08.

Pre-fabricated vehicle tracking pads can be used and shall have the following properties.

Minimum overall dimensions of the modular systems shall be:

| | |
|---|---|
| Width of pad along edge of roadway | 14 feet |
| Length of pad | 30 feet |

| | |
|---|---|
| Weight (min.) (lbs./sq. ft.) | 8 |
| Crush strength (min.) (psi) | 400 |

(l) *Aggregate Bag.* Aggregate bags shall consist of crushed stone or recycled rubber filled fabric with the following properties:

| Diameter (inches) | Weight (minimum) (pounds per foot) |
|---|---|
| 6-8 | 6 |
| 10 | 10 |
| 12 | 15 |

Rubber used in bags shall be clean, 95 percent free of metal and particulates.

Crushed stone contained in the aggregate bags shall conform to subsection 703.09, Table 703-7 for Class C.

The aggregate bag shall consist of a woven geotextile fabric with the following properties:

| Property | Requirement | Test Method |
|---|---|---|
| Grab Tensile Strength | 90 lbs. min. | ASTM D 4632 |
| Trapezoid Tear Strength | 25 lbs. min. | ASTM D 4533 |
| Mullen Burst | 300 psi | ASTM D 3786 |
| Ultraviolet Resistance | 70% | ASTM D 4355 |

(m) *Storm Drain Inlet Protection.* Storm drain inlet protection shall consist of aggregate filled fabric with the following dimensions:

**-6-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

| Storm Drain Inlet Protection Properties | Protection Types | | |
|---|---|---|---|
| | [1]Type I | [2]Type II | [3]Type III |
| Diameter | 4 in. | 4 in. | N/A |
| Minimum Section Length | 7 ft. | 5 ft. | 5 ft. |
| Apron Insert | --- | 30 in. or sized to grate | 30 in or sized to grate |
| [1]Type I protection shall be used with Inlet Type R. | | | |
| [2]Type II protection shall be used with Combination Inlet. Option A or B | | | |
| [3]Type III protection Inlet Vane Grate only. Option A or B | | | |

The storm drain inlet protection (Type I, II and III) shall consist of a woven geotextile fabric with the following properties:

| Property | Test Method | Unit | Requirement |
|---|---|---|---|
| Grab tensile strength | ASTM D 4632 | lbs. | minimum 350X280 |
| Mullen Burst Strength | ASTM D 3786 | lbs. | 600 |
| Trapezoid Tear Strength | ASTM D 4533 | lbs. | minimum 110X95 |
| Percent Open Area | COE-22125-86 | % | 28 |
| Water Flow Rate | ASTM D 4491 | gal./min./sq. ft. | 250 |
| Ultraviolet Resistance | ASTM D 4355 | % | 70 |

Curb roll for storm drain inlet protection (Type I and II) shall have an approximate weight of 7 to 10 pounds per linear foot of device. The device shall be capable of conforming to the shape of the curb. Aggregate contained in the storm drain inlet device shall consist of gravel or crushed stone conforming to Table 703-7 for Class C.

Storm drain inlet protection (Type III) shall have insert containment (option A) or insert without storage capacity (option B).

**CONSTRUCTION REQUIREMENTS**

**208.03 Project Review, Schedule, and Transportation Erosion Control Supervisor.** Prior to NTP2 and following approval of SWMP RFC documents, an on-site Environmental Pre-Construction Conference shall be held. The conference shall led by the Contractors Environmental Manager and SWMP Administrator. In addition the following people shall attend:

(1)    Independent Quality Control Manager (IQCM),

(2)    Independent Quality Control (IQC)program Inspector(s),

-7-
## REVISION OF SECTION 208
## EROSION CONTROL

(3)    The Superintendent,

(4)    Supervisors or Foremen of subcontractors working on the project,

(5)    The Department's Region Water Pollution Control Manager (RWPCM),

(6)    The Department Project Environmental Representative(s),

(7)    Local Governmental representatives as designated by the Department.

(8)    Additional personnel as designated by the Department.

At this conference, the attendees shall discuss the SWMP, CDPS-SCP, CDOT and local Municipal Separate Storm Sewer (MS4) requirements, sensitive habitats on site, wetlands, other vegetation to be protected, and the enforcement mechanisms for not meeting the requirements of the Project Agreement.

Prior to beginning construction the Contractor shall evaluate the project site for storm water draining into or through the site. When such drainage is identified, BMPs (i.e., Control Measures) shall be used if possible to divert stormwater from running on-site and becoming contaminated with sediment or other pollutants. The diversion may be accomplished with a temporary pipe or other conveyance to prevent water contamination or contact with pollutants. Run-on water that cannot be diverted shall be treated as construction runoff and adequate BMPs shall be employed.

The SWMP Administrator shall evaluate all non-stormwater coming onto the site, such as springs, seeps, and landscape irrigation return flow. If such flow is identified, BMPs shall be used to protect off-Site water from becoming contaminated with sediment or other pollutants.

The SWMP Administrator shall review existing inlets and culverts to determine if inlet protection is needed due to water flow patterns. Prior to beginning construction, inlets and culverts needing protection shall be protected and the location of the implemented BMP added to the SWMP site map.

Prior to construction, the Contractor shall implement appropriate BMPs for protection of wetlands, sensitive habitat and existing vegetation from ground disturbance and other pollutant sources, in accordance with the approved project schedule as described in subsection 208.03(b).

When additional BMPs are required and approved by the SWMP Administrator, the Contractor shall implement the additional BMPs and the SWMP Administrator shall record and describe them on the SWMP site map.

(a)    *Erosion and Sediment Control Activities*. The erosion and sediment control activities shall be included in the weekly meeting update. The project schedule shall specifically indicate the sequence of clearing and grubbing, earthwork operations, and construction of temporary and permanent erosion control features and stabilization. Project schedule shall include erosion and sediment control work for haul roads, borrow pits, storage and asphalt or concrete batch sites, and

**-8-**
## REVISION OF SECTION 208
## EROSION CONTROL

all areas within the project limits. If necessary, the SWMP Administrator shall update proposed sequencing of major activities in the SWMP.

(b)   *Erosion Control Management (ECM).* Erosion Control Management for this project shall consist of Erosion Control Inspection and the Administration of the Stormwater Management Plan (SWMP). All ECM staff shall have working knowledge and experience in construction, and shall have successfully completed the TECS as provided by the Department. The Superintendent will not be permitted to serve in an ECM role. The Contractors Erosion Control Inspector and the SWMP Administrator may be the same person in projects involving less than 40 acres of disturbed area.

1.   Stormwater Management Plan (SWMP) Administration. The SWMP shall be maintained by a SWMP Administrator. The SWMP Administrator shall have completed the TECS certification training as provided by the Department. In the case of a project requiring only one TECS, the SWMP Administrator may also be the Erosion Control Inspector for the project. The name of the SWMP Administrator shall be recorded on SWMP Plan Section 3.B. The SWMP Administrator shall have full responsibility to maintain and update the SWMP Plan and identify to the Superintendent critical action items needed to conform to the CDPS-SCP as follows:

(1)   Complete the SWMP Notebook as described in subsection 208.03 (d).

(2)   Participate in the Environmental Pre-construction Conference

(3)   Attend Weekly Water Quality Meetings (WWQM)

(4)   Attend all Department water quality control inspections. The Contractor and the Contractor's SWMP Administrator will be notified a minimum of five days in advance of each inspection by the Department water quality staff.

(5)   Coordinate with the Superintendent to implement necessary actions to reduce anticipated or presently existing water quality or erosion problems resulting from construction activities.

(6)   Coordinate with the Superintendent to ensure that all labor, material, and equipment needed to install, maintain, and remove BMPs are available as needed.

(7)   During construction, update and record the following items on the SWMP site map as changes occur:

(i)   Limits of Construction (LOC)

(ii)   Areas of Disturbance (AD)

(iii)   Limits of Disturbance (LDA)

(iv)   Limits of cut and fill.

**-9-**
## REVISION OF SECTION 208
## EROSION CONTROL

(v)     Areas used for storage of construction materials, equipment, soils, or wastes.

(vi)    Location of any dedicated asphalt or concrete batch plants.

(vii)   Location of construction offices and staging areas.

(viii)  Location of work access routes during construction.

(ix)    Location of borrow and waste.

(x)     Location of temporary, interim and permanent stabilization.

(xi)    Location of outfall(s)

(xii)   Arrows showing direction of surface flow

(xiii)  Structural and non-structural BMPs

(xiv)   LDA and LOC lines as defined in subsection 107.25

(8)    Amend the SWMP whenever there are: additions, deletions, or changes to BMPs. SWMP revisions shall be recorded immediately. Items shall be dated and initialed by the SWMP Administrator. Specifically, amendments shall include the following:

(i)     A change in design, construction, operation, or maintenance of the site which would require the implementation of new or revised BMPs; or

(ii)    Changes when the SWMP proves to be ineffective in achieving the general objectives of controlling pollutants in stormwater discharges associated with construction activity.

(iii)   Changes when BMPs are no longer necessary and are removed.

(9)    Complete vegetative survey transects as required in accordance with CDOT Erosion Control and Stormwater Quality Guide.

(10)   Start a new site map before the current one becomes illegible. All site maps shall remain in the SWMP notebook.

(11)   Document all inspection and maintenance activities. The SWMP and documentation shall be kept on the project site.

(12)   When adding or revising BMPs on the SWMP, add a narrative explaining what, when, where, why, and how the BMP is being used, and add a detail to the SWMP notebook.

(i)     How to install and inspect the BMP

-10-
**REVISION OF SECTION 208**
**EROSION CONTROL**

(ii)    Where to install the BMP

(iii)    When to maintain the BMP

(13)    If using existing topography, vegetation, etc. as a BMP, label it as such on the SWMP site map; add a narrative as to when, where, why, and how the BMP is being used.

(14)    Indicate BMPS in use or not in use by recording on Standard Plans M-208-1, M-216-1, and M-615-1 in the SWMP notebook.

(15)    Record on the SWMP, the approved Method Statement for Containing Pollutant Byproducts.

(16)    Update the potential pollutants list in the SWMP notebook and Spill Response Plan throughout construction.

2.    Erosion Control Inspection.

Erosion control inspection shall be performed by TECS certified staff assigned as Erosion Control Inspector (ECI) to the project. One ECI is required for every 40 acres of total disturbed area which is currently receiving temporary and interim stabilization measures as defined in subsection 208.04 (e). An ECI shall not be responsible for more than 40 acres in the project. Accepted permanent stabilization methods as defined in subsection 208.04 (e) will not be included in the 40 acres.

ECI duties shall be as follows:

(1)    Coordinate with the SWMP Administrator on reporting the results of inspections.

(2)    Review the construction site for compliance with the Stormwater Construction Permit.

Inspect with the Superintendent and the IQC Manager (or their designated representatives) the stormwater management system at least every seven calendar days. Post storm event inspections shall be conducted within 24 hours after the end of any precipitation or snow melt event that may cause surface erosion. If no construction activities will occur following a storm event, post-storm event inspections shall be conducted prior to commencing construction activities, but no later than 72 hours following the storm event. The occurrence of delay in inspections shall be documented in the inspection report. Form 1176 shall be used for all 7 day inspections and inspections following storm events. The Contractor shall notify the Erosion Control Inspector when a storm event occurs. The Contractor shall notify the EM and the Department when post-storm event inspections and 7-day inspections are scheduled. The Department and the EM may attend at their discretion. The Contractor shall communicate findings to the Independent Quality Control (IQC) team and EM. Failure to perform inspections on time will result in non-compliance points in accordance with subsection 208.09.

-11-
## REVISION OF SECTION 208
## EROSION CONTROL

Inspections are not required at sites when construction activities are temporarily halted, when snow cover exists over the entire site and melting conditions do not pose a risk of surface erosion. This exception shall be applicable only during the period where melting conditions do not exist, and applies to the routine 7 day inspections and the post-storm event inspections. The following information shall be documented on Form 1176 for use of this exclusion: dates when snow cover occurred, date when construction activities ceased, and date melting conditions began.

The order of precedence for required inspections shall be as follows:

(i)     Headquarter water quality inspections

(ii)    Region water quality inspections

(iii)   Post-storm event inspections

(iv)    7 day inspections

When one of the listed inspections is performed, the inspections listed below it need not be performed on that day if the required personnel participated in the inspection.

For example: A 7 day inspection is not required on the same day a headquarters or Region inspection is conducted. A sheet shall be placed in the inspections area of the SWMP Notebook to refer to the date inspection performed.

(3)   Follow all other agency Stormwater requirements and inspections unless a waiver or other agreement has been made.

(4)   The ECI shall immediately report to the Contractor's Superintendent and the SWMP Administrator the following instances of noncompliance:

(i)     Noncompliance which may endanger health or the environment.

(ii)    Spills or discharge of hazardous substance or oil which may cause pollution of waters of the State.

(iii)   Discharge of stormwater which may cause an exceedance of a water quality standard.

(iv)    Upset conditions that occur on site.

(5)   Spills, leaks, or overflows that result in the discharge of pollutants shall be documented on the Form 1176 by the ECI. The ECI shall record the time and date, weather conditions, reasons for spill, and how it was remediated.

(d)   *Documentation Available on the Project.* The following Contract documents and references will be made available for reference at the project field office during construction:

**-12-**
## REVISION OF SECTION 208
## EROSION CONTROL

1. SWMP Notebook. The Contractor will provide a SWMP Notebook at the Preconstruction Conference, which is and shall become and remain the property of the Department. The Contractor shall provide the contents required for the entire notebook, as detailed below. The notebook shall be stored in the Contractor's field office or at another on-site location approved by the Department. The SWMP Administrator shall modify and update the notebook when changes occur in site conditions to reflect current conditions; except when changes to the notebook cannot be reasonably achieved at the time of field condition changes, such as when obtaining specifications from the manufacturer or engineering design for a retention structure. In such cases, the Contractor will make revisions as soon as practicable, but in no case more than 72 hours after the change(s) in control measure installation and/or implementation occur at the site. In such cases, a notation must also be included with the SMWP that includes the date, type and location of the change(s) in the field. The following Contract documents and reports shall be kept, maintained, and updated in the notebook under the appropriate items by the SWMP Administrator:

   (1) SWMP Plan Sheets - Notes, tabulation, sequence of major activities, area of disturbance, existing soil data, existing vegetation percent cover, potential pollutant sources, receiving water, non-stormwater discharges and environmental impacts.

   (2) Site Map and Plan Title Sheet -Construction site boundaries, ground surface disturbance, limits of cut and fill, flow arrows, structural BMPs, non-structural BMPs, Springs, Streams, Wetlands and surface water. Also included on the sheets is the protection of trees, shrubs and cultural resources.

   (3) Specifications - Standard and Project special provisions related to Stormwater and Erosion Control.

   (4) Standard Plans M-208-1, M-216-1 and M-615-1.

   (5) BMP Details not in Standard Plan M-208-1 - Non-standard details.

   (6) Weekly meeting sign in sheet.

   (7) Calendar of Inspections -Calendar of inspections marking when all inspections take place.

   (8) Form 1176 – Weekly meeting notes and inspection report.

   (9) Region and Headquarter Water Quality Reports, Non-conformance Notice (NCNs) Non-conformance Records (NCRs) relating to Water Quality.

   (10) Description of Inspection and Maintenance Methods - Description of inspection and maintenance methods implemented at the site to maintain all BMPs identified in the SWMP and Items not addressed in the design.

   (11) Spill Response Plan - Reports of reportable spills submitted to CDPHE

**-13-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

(12) List and Evaluation of Potential Pollutants - List of potential pollutants as described in subsection 107.25 and approved Method Statement for Containing Pollutant Byproducts.

(13) Other Correspondence e.g., agreements with other MS4s, approved deferral request, CDPHE audit documentation, and other miscellaneous documentation.

(14) TECS Certifications of the SWMP Administrator and all of the Contractor's ECIs, keep current through the life of the project.

(15) Environmental Pre-construction Conference – Conference agenda with a certification of understanding of the terms and conditions of the CDPS-SCP and SWMP. The certification shall be signed by all attendees. A certification shall also be signed by all attendees of meetings held for new subcontractors beginning work on the project that could adversely affect water quality after the Environmental Pre-construction Conference has been held.

(16) All Project Environmental Permits - All project environmental permits and associated applications and certifications, including, CDPS-SCP, Senate Bill 40, USACE 404,temporary stream crossings, dewatering, biological opinions and all other permits applicable to the project, including any separate CDPS-SCP obtained by the Contractor for staging area on private property, asphalt or concrete plant, etc.

(17) Photographs Documenting Existing Vegetation – Project photographs shall be time stamped on paper with a maximum of four colored images per 8 ½ inch by 11 inch sheet and/or a digital copy of all photographs on CD-ROM/Flash Drive in (JPG format), documenting existing vegetation prior to construction commencing. On the bottom of each photograph shall be a description using Station Number or Mile Post of where the photograph was taken.

(18) Permanent Water Quality Plan Sheets - Plan sheets and specifications for permanent water quality structures, riprap.

The Contractor will provide and insert permanent water quality plan sheets once released for construction. The Contractor shall also provide and insert all other documents and reports as they become available during construction.

The Contractor shall submit a complete electronic copy of the SWMP notebook to the Department prior to commencement of construction and monthly SWMP notebook electronic updates throughout the duration of construction.

The SWMP Administrator shall finalize the SWMP for delivery to the Department within 30 days of close out of the CDPS-SCP. SWMP completeness shall be approved by the Department, corrections to the SWMP shall be at the Contractor's expense. The following Reference materials shall be used:

(1) CDOT Erosion Control and Stormwater Quality Guide.

**-14-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

(2)   CDOT Erosion Control and Stormwater Quality Field Guide.

(3)   CDOT Specifications and Standards.

(e)   *Weekly Meetings.* The Environmental Manager and SWMP Administrator shall conduct a Weekly Water Quality Review ("WWQR") meeting. The Superintendent and IQC water quality staff shall attend and participate. Supervisors involved in construction activities that could adversely affect water quality shall attend. The Department shall be notified in advance of this meeting and may attend at their discretion. The meeting shall follow an agenda prepared by the SWMP Administrator and have a sign in sheet on which the names of all attendees shall be recorded. The Developer shall take minutes of the meeting including notes of water quality comments and action items at each weekly meeting. Meeting minutes shall be provided to the Department. The agenda and sign in sheets shall be placed in the SWMP notebook. The Department and IQC staff may add items to the agenda at their discretion. At this meeting the following shall be discussed and documented on Form 1176:

(1)   Requirements of the SWMP.

(2)   Problems that may have arisen in implementing the site specific SWMP or maintaining BMPs.

(3)   Unresolved issues from inspections and concerns from last inspection

(4)   BMPS that are to be installed, removed, modified, or maintained.

(5)   Planned activities that will effect stormwater in order to proactively phase BMPs.

(6)   Recalcitrant inspection findings

All subcontractors who were not in attendance at the Environment Pre-construction conference shall be briefed on the project by the Engineer, Superintendent, and the SWMP Administrator prior to start of work. The SWMP Administrator shall record the names of these subcontractors as an addendum to the list of attendees, and added the SWMP Notebook.

(f)   *Items to Be Completed Prior to SW Permit Close Out.*

(1)   Reclamation of Washout Areas. After concrete operations are complete, washout areas shall be reclaimed in accordance with subsection 208.05(n).

(2)   Upon completion of final stabilization the Department will perform a final site inspection of the project area to confirm final stabilization requirements have been met. The Department will issue approval in writing to the Contractor. The Contractor shall not close-out the CDPS-SCP until receipt of this approval.

**-15-**
## REVISION OF SECTION 208
## EROSION CONTROL

**208.04 Best Management Practices (BMPs) for Stormwater.**

The SWMP Administrator shall modify the SWMP to clearly describe and locate all BMPs implemented at the site to control potential sediment discharges.

Vehicle tracking control shall be used at all vehicle and equipment exit points from the site to prevent sediment exiting the Limits of Construction (LOC) of the project site. The SWMP Administrator shall record vehicle tracking control pad locations on the SWMP site map.

New inlets and culverts shall be protected during their construction. Appropriate protection of each culvert and inlet shall be installed immediately. When riprap is called for at the outlet of a culvert, it shall be installed within 24 hours of completion of each pipe. The Contractor shall remove sediment, millings, debris, and other pollutants from within the newly constructed drainage system in accordance with the CDPS-SCP, prior to use, at the Contractor's expense. All removed sediment shall be disposed of outside the project limits in accordance with all applicable regulations.

Concrete products wasted on the ground during construction shall include, but shall not be limited to: excess concrete removed from forms, spills, slop, and all other unused concrete are potential pollutants that shall be contained or protected by an approved BMP at a pre-approved containment area. The concrete shall be picked up and recycled in accordance with 6 CCR 1007-2 (CDPHE Regulations Pertaining to Solid Waste Sites and Facilities) at regular intervals, as directed. The uses of recycled concrete from approved recycling facilities shall be in accordance with Section 203.

(a)  *Unforeseen Conditions.* The Contractor shall design and implement erosion and sediment BMPs for correcting conditions unforeseen during the design of the project, or for emergency situations, that develop during construction. The Department's "Erosion Control and Stormwater Quality Guide" shall be used as a reference document for the purpose of designing erosion and sediment BMPs. The Contractor may install non-standard BMPs or BMPs with non-standard measures and methods without prior approval. The ICQM and EM shall review all non-standard BMPs. The Contractor shall modify and/or replace the non-standard measures and methods if found unsuitable or ineffective by the IQCM, EM, or the Department. All non-standard BMPs shall be documented in Section 5 of the SWMP Notebook.

(b)  *Other Agencies.* If City and County of Denver, City of Aurora, CDPHE, US Army Corps of Engineers (USACE), or the Environmental Protection Agency (EPA) reviews the project site and requires additional measures to prevent and control erosion, sediment, or pollutants, the Contractor shall cease and desist activities resulting in pollutant discharge and immediately implement these measures. If the work may negatively affect another MS4, the Contractor shall cease and desist activities resulting in the discharge and shall implement appropriate measures to protect the neighboring MS4, including installing additional measures.

(c)  *Work Outside the Right of Way.* Disturbed areas, including staging areas, which are outside CDOT ROW and outside easements acquired by CDOT for construction, are the responsibility of the Contractor. These areas may be subject to a separate CDPS-SCP, additional environmental clearance and/or other permits. The Contractor shall acquire these permits and submit copies to the

**-16-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

Department prior to any disturbance. These permits, shall be acquired and all erosion and sediment control work performed at the Contractor's expense. These areas are subject to inspections by CDOT or any other agency, as agreed upon in writing.

(d)   *Construction Implementation*. The Contractor shall incorporate BMPs into the project as outlined in the accepted schedule.

(e)   *Stabilization*. Once earthwork has started, the Contractor shall continue erosion BMPs until permanent stabilization of the area has been completed and accepted. Clearing, grubbing and slope stabilization measures shall be performed regularly to ensure final stabilization. Failure to properly maintain erosion control and stabilization methods, either through improper phasing or sequencing will require the Contractor to repair or replace sections of earthwork. The Contractor shall schedule and implement the following stabilization measures during the course of the project:

(1)   Temporary Stabilization. At the end of each day, the Contractor shall stabilize disturbed areas by surface roughening, vertical tracking, or a combination thereof. Disturbed areas are locations where actions have been taken to alter the existing vegetation and/or underlying soil of a site, such as clearing, grading, road bed preparation, soil compaction, and movement and stockpiling of top soils. Other stabilization measures may be implemented, as approved. The maximum area of temporary stabilization shall not exceed 34 acres.

(2)   Interim Stabilization. Stockpiles and disturbed areas as soon as known with reasonable certainty that work will be temporarily halted for 14 days or more shall be stabilized using one or more of the specified following methods:

(i)     Application of 1.5 tons of mechanically crimped certified weed free hay or straw in combination with an approved organic mulch tackifier.

(ii)    Placement of bonded fiber matrix in accordance with Section 213.

(iii)   Placement of mulching (hydraulic) wood cellulose fiber mulch with tackifier, in accordance with Section 213.

(iv)   Application of spray-on mulch blanket in accordance with Section 213. Magnesium Chloride, Potassium Chloride and Sodium Chloride, or other salt products, will not be permitted as a stabilization method.

Protection of the interim stabilization method is required. Reapplication may be required as approved.

(3)   Summer and Winter Stabilization. Summer and winter stabilization is defined as months when seeding will not be permitted. As soon as the Contractor knows shutdown is to occur, interim stabilization shall be applied to the disturbed area. Protection of the interim stabilization method is required. Reapplication of interim stabilization may be required as directed.

**-17-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

(4)   Permanent Stabilization. Permanent stabilization is defined as the covering of disturbed areas with seeding, mulching with tackifier, soil retention coverings, and such non-erodible methods such riprap, road shouldering, etc., or a combination thereof as required by the Contract. Other permanent stabilization techniques may be proposed by the Contractor, in writing, and shall be used when approved in writing by the Department. Permanent stabilization shall begin within 48 hours after topsoil placement, soil conditioning, or combination thereof starts and shall be pursued to completion.

(5)   Final Stabilization. Final stabilization is defined as when all ground disturbing activities at the site have been completed, and uniform vegetative cover has been established with an individual plant density of at least 70 percent of pre-disturbance levels, or equivalent permanent physical erosion reduction methods have been employed. The Department will perform a final site inspection of the project area to confirm final stabilization has been met. The Department will issue approval in writing to the Contractor. The Contractor shall not close-out the CDPS-SCP until receipt of this approval.

(f)   *Maintenance*. Erosion and sediment control practices and other protective measures identified in the SWMP as BMPs for stormwater pollution prevention shall be maintained in effective operating condition until the CDPS-SCP has been closed-out. BMPs shall be continuously maintained in accordance with good engineering, hydrologic and pollution control practices, including removal of collected sediment when silt depth is 50 percent or more of the height of the erosion control device. When possible, the Contractor shall use equipment with an operator rather than labor alone to remove the sediment.

Maintenance of erosion and sediment control devices shall include replacement of such devices upon the end of their useful service life as recommended by the Contractor. Maintenance of rock check dams and vehicle tracking pads shall be limited to removal and disposal of sediment or addition of aggregate. Damages resulting from failure to maintain BMPs shall be paid at the contactors expense.

Complete site assessment shall be performed as part of comprehensive inspection and maintenance procedures, to assess the adequacy of BMPs at the site and the necessity of changes to those BMPs to ensure continued effective performance. Where site assessment results in the determination that new or replacement BMPs are necessary, the BMPs shall be installed to ensure continuous effectiveness. When identified, BMPs shall be maintained, added, modified or replaced as soon as possible, immediately in most cases.

New or replaced BMPs will be paid for by the Contractor. Devices damaged due to the Contractor's negligence shall be replaced at Contractor's expense.

From the time seeding and mulching work begins until the date the Contract work is accepted, the Contractor shall maintain all seeded areas. Damage to seeded areas or to mulch materials shall be immediately restored. Damage to seeded areas or to mulch materials due to Contractor negligence shall be immediately restored at the Contractor's expense. Restoration of other damaged areas will be paid for by the Contractor.

-18-
## REVISION OF SECTION 208
## EROSION CONTROL

Temporary BMPs may be removed upon completion of the project, as determined by the Water Quality Partial Acceptance walk-through. If removed, the area in which these BMPs were constructed shall be returned to a condition similar to that which existed prior to its disturbance. Removed BMPs shall become the property of the Contractor.

If a project delay occurs, the Contractor shall be responsible to continue erosion and sediment control operations beyond the original contract time.

Sediment removed during maintenance of BMPs and material from street sweeping may be used in or on embankment, provided it meets conditions of Section 203 and is distributed evenly across the embankment.

Whenever sediment collects on the paved surface, the surface shall be cleaned. Street washing will not be allowed. Storm drain inlet protection shall be in place prior to shoveling, sweeping, or vacuuming. Sweeping shall be completed with a pickup broom or equipment capable of collecting sediment. Sweeping with a kick broom will not be allowed.

Material from pavement saw cutting operations shall be cleaned from the roadway surface during operations using a vacuum. A BMP, such as a berm, shall be placed to contain slurry from joint flushing operations until the residue can be removed from the soil surface. Aggregate bags, erosion

logs or other permeable BMPs shall not be used. Residue shall not flow into driving lanes. It shall be removed and disposed of in accordance with subsection 107.25(b) 13. Material containment and removal will not be paid for separately, but shall be included in the work.

**208.05 Construction of BMPs.** BMPs shall be constructed in accordance with Standard Plans M-208-1, M-216-1 and with the following.

(a)   *Seeding, Mulching, Sodding, Soil Retention Blanket*. Seeding, mulching, sodding, and soil retention blanket shall be performed in accordance with Sections 212, 213, and 216.

(b)   *Erosion Bales*. The bales shall be anchored securely to the ground with wood stakes.

(c)   *Silt Fence*. Silt fence shall be installed in locations specified in the Contract prior to any grubbing or grading activity.

(d)   *Temporary Berms*. Berms shall be constructed to the dimensions shown in the Contract, and sufficiently compacted to prevent erosion or failure. If the berm erodes or fails, it shall be immediately repaired or replaced at the Contractor's expense.

(e)   *Temporary Diversion*. Diversions shall be constructed to the dimensions shown in the Contract, and graded to drain to a designated outlet. The berm shall be sufficiently compacted to prevent erosion or failure. If the diversion erodes or fails, it shall be immediately repaired or replaced at the Contractor's expense.

**-19-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

(f)   *Temporary Slope Drains*. Temporary slope drains shall be installed prior to installation of permanent facilities or growth of adequate ground cover on the slopes. All temporary slope drains shall be securely anchored to the slope. The inlets and outlets of temporary slope drains shall be protected to prevent erosion.

(g)   *Silt Berm*. Prior to installation of silt berms, the Contractor shall prepare the surface of the areas in which the berms are to be installed such that are they free of materials greater than 2 inches in diameter and are suitably smooth for the installation of the silt berms, as approved. Silt berms shall be secured with spikes. The Contractor shall install the silt berm in a manner that will prevent water from going around or under the silt berm. Silt berms shall be installed on top of soil retention blanket.

(h)   *Rock Check Dam*. Rock shall be installed at locations shown on the plans. Rock check dams shall conform to the dimensions shown on the plans.

(i)   *Riprap Outlet Protection*. Geotextile used shall be protected from cutting or tearing. Overlaps between two pieces of geotextile shall be 1 foot minimum. Riprap size shall be as shown on the plans.

(j)   *Storm Drain Inlet Protection*. Prior to installation, the Contractor shall sweep the surface of the area in which the storm drain inlet protection devices are to be installed such that the pavement is free of sediment and debris. The ends of the inlet protection Type 1 and Type 2 shall extend a minimum of 1 foot past each end of the inlet.

The Contractor shall remove all accumulated sediment and debris from the surface surrounding all storm drain inlet protection devices after each rain event or as directed. The Contractor shall remove accumulated sediment from Type II and III containment area when it is more than a maximum one third full of sediment, or as directed.

The Contractor shall protect storm drain facilities adjacent to locations where pavement cutting operations involving wheel cutting, saw cutting, sand blasting, or abrasive water jet blasting are to take place.

(k)   *Sediment Trap*. Sediment traps shall be installed to collect sediment laden water and to minimize the potential of pollutants leaving the project site. Locations shall be as shown on the plans or as directed.

Sediment traps shall be constructed prior to disturbance of upslope areas and shall be placed in locations where runoff from disturbed area can be diverted into the trap.

The area under the embankment shall be cleared, grubbed and stripped of any vegetation and roots.

Fill material for the embankment shall be free of roots or other vegetation, organic material, large stones, and other objectionable material.

-20-
## REVISION OF SECTION 208
## EROSION CONTROL

Sediment shall be removed from the trap when it has accumulated to one half of the wet storage depth of the trap and shall be disposed of in accordance with subsection 208.04(f).

(l) *Erosion Logs*. Erosion logs shall be embedded 2 inches into the soil. Stakes shall be embedded to a minimum depth of 12 inches. A shallower depth may be permitted if rock is encountered, however non-standard installation methods are subject to the requirements of 208.04 (a) Unforeseen Conditions.

The Contractor shall maintain the erosion logs during construction to prevent sediment from passing over or under the logs.

(m) *Silt Dikes*. Prior to installation of silt dikes, the Contractor shall prepare the surface of the areas in which the silt dikes are to be installed such that they are free of materials greater than two inches in diameter and are suitably smooth for the installation of the silt dikes.

(n) *Concrete Washout Structure*. The concrete washout structure shall meet or exceed the dimensions shown on the plans or be used in accordance with manufacturer's recommendations.

Concrete washout structure shall conform to standard plan M-208-1 and shall meet the following requirements:

(1)  Structure shall contain all washout water.

(2)  Stormwater shall not carry wastes from washout and disposal locations.

(3)  The site shall be located a minimum of 50 horizontal feet from State waters and shall meet all requirements for containment and disposal as defined in subsection 107.25.

(4)  The site shall be signed as "Concrete Washout".

(5)  The site shall be accessible to appropriate vehicles.

(6)  Freeboard capacity shall be included into structure design to reasonably ensure the structure will not overtop during or because of a precipitation events.

(7)  The Contractor shall prevent tracking of washout material out of the washout structure.

(8)  Solvents, flocculents, and acid shall not be added to wash water.

(9)  The structure shall be surrounded on three sides by a compacted berm.

(10)  The structure shall be fenced with orange plastic construction fencing to provide a barrier to construction equipment and to aid in identification of the concrete washout area.

(11)  Concrete waste, liquid and solid, shall not exceed 2/3 the storage capacity of the washout structure.

-21-
## REVISION OF SECTION 208
## EROSION CONTROL

Pre-fabricated concrete washout structures shall meet the following requirements:

(1)   Structure shall contain all washout water.

(2)   Structure shall be located 50 horizontal feet away from State waters, and shall be confined so that no potential pollutants will enter State waters and other sensitive areas are as defined in the Contract. The site shall be delineated with orange plastic fence or other means and signed as "Concrete Washout".

(3)   The site shall be accessible to appropriate vehicles.

(4)   Freeboard capacity shall be included into structure design to reasonably ensure the structure will not overtop during or because of a precipitation event.

(5)   Solvents, flocculants, and acid shall not be added to wash water.

(6)   Concrete waste, liquid and solid, shall not exceed 2/3 the storage capacity of the washout structure.

(7)   Prefabricated structures cannot be moved when they contain liquid, unless otherwise approved.

(8)   The concrete washout structure shall be completed and ready for use prior to concrete placement operations.

(9)   Washout areas shall be checked and maintained as required. On site permanent disposal of concrete washout waste is not allowed.

All liquid and solid wastes, including contaminated sediment and soils generated from concrete washout shall be hauled away from the site and disposed of properly at the Contractor's expense.

(o)   *Vehicle Tracking Pad (VTP)*. Vehicle tracking pads shall be constructed to the minimum dimensions shown in the Contract. Dimensions of the VTP may be modified to meet site conditions, however non-standard dimensions are subject to the requirements of 208.04 (a) Unforeseen Conditions. Construction of approved vehicle tracking pads shall be completed before any disturbance of the area.

The Contractor shall maintain each vehicle tracking pad during the entire time that it is in use for the project. The vehicle tracking pad shall be removed at the completion of the project unless otherwise directed by the Department. Additional aggregate may be required for maintenance and will be paid for by the Contractor.

(p)   *Detention Pond*. Permanent detention ponds shown on the construction plans may be used as temporary BMPs if all the following conditions are met:

-22-
## REVISION OF SECTION 208
## EROSION CONTROL

(1) The pond is designated as a construction BMP in the SWMP.

(2) The pond outfall and outlet are designed and implemented for use as a BMP during construction in accordance with good engineering, hydrologic, and pollution control practices. The stormwater discharges from the outfall shall not cause degradation or pollution of State waters, and shall have BMPs, as appropriate.

(3) All silt shall be removed and the pond returned to the design grade and contour prior to project acceptance

(q) *Aggregate Bag.* Aggregate bags shall be placed on a stable surface, consisting of pavement, grass or gravel. Aggregate bags shall be placed to conform to the surface without gaps. Discharge water shall not cause erosion.

(r) *Surface Roughening.* Surface roughening creates horizontal grooves along the contour of the slope. Roughening may be accomplished by furrowing, scarifying, ripping or disking the soil surface to create a 2 to 4 inch minimum variation in soil surface. Surface roughening will not be paid for separately, but shall be included in the work.

(s) *Vertical Tracking.* Vertical tracking involves driving a tracked vehicle up and down the soil surface and creating horizontal grooves and ridges along the contour of the slope. Sandy soils or soils that are primarily rock need not be tracked. Vertical tracking will not be paid for separately, but shall be included in the work.

**208.06 Materials Handling and Spill Prevention.** The SWMP Administrator shall clearly describe and record on the SWMP, all practices implemented at the site to minimize impacts from procedures or significant material that could contribute pollutants to runoff. Areas or procedures where potential spills can occur shall have a Spill Response Plan in place as specified in subsections 107.25(b) 6 or 208.06(c). Construction equipment, fuels, lubricants, and other petroleum distillates shall not be stored or stockpiled within 50 horizontal feet of any State waters or more if the Contractor determines necessary. Equipment fueling and servicing shall occur only within approved designated areas.

(a) *Bulk Storage Structures.* Bulk storage structures for petroleum products and other chemicals shall have impervious secondary containment or equivalent adequate protection so as to contain all spills and prevent any spilled material from entering State waters. Secondary containment shall be capable of containing the combined volume of all the storage containers plus at least 10 percent freeboard. For secondary containment that is used and may result in accumulation of stormwater within the containment, a plan shall be implemented to properly manage and dispose of all accumulated stormwater which is deemed to be contaminated (e.g., has an unusual odor or sheen).

(b) *Lubricant Leaks.* The Contractor shall inspect equipment, vehicles, and repair areas daily to ensure petroleum, oils, and lubricants (POL) are not leaking onto the soil or pavement. Absorbent material or containers shall be used to prevent leaking POL from reaching the soil or pavement. The Contractor shall have onsite approved absorbent material or containers of sufficient capacity to contain any POL leak that can reasonably be foreseen. The Contractor shall inform all Spill

**-23-**
**REVISION OF SECTION 208**
**EROSION CONTROL**

Response Coordinators in accordance with the Spill Response Plan if unforeseen leakage is encountered. All materials resulting from POL leakage control and cleanup shall become the property of the Contractor and shall be removed from the site. Control, cleanup, and removal of by-products resulting from POL leaks shall be performed at the Contractor's expense.

(c)   *Spill Response Plan*. A spill Response Plan shall be developed and implemented to establish operating procedures for handling potential pollutants and preventing spills.

The Response Plan shall contain the following information:

(1)   Identification and contact information of each Spill Response Coordinator

(2)   Locations of areas on project site where equipment fueling and servicing operations are permitted.

(3)   Location of cleanup kits.

(4)   Quantities of chemicals and locations stored on site.

(5)   Label system for chemicals and Safety Data Sheets (SDS) for products.

(6)   Clean up procedures to be implemented in the event of a spill that does not enter State waters or ground water.

(7)   Procedures for spills of any size that enter surface waters or ground water, or have the potential to do so. CDOT's Erosion Control and Stormwater Quality Guide contains Spill notification contacts and phone numbers required in the Spill Response Plan.

(8)   A summary of the employee training provided.

Information in items (1) through (8) shall be updated in the SWMP Notebook when they change.

**208.07 Stockpile Management.** Material stockpiles shall be located 50 horizontal feet away from State waters, and shall be confined so that no potential pollutants will enter State waters and other sensitive areas as defined in the Contract

Erodible stockpiles (including topsoil) shall be contained with acceptable BMPs at the toe (or within 20 feet of the toe) throughout construction. The SWMP Administrator shall describe, detail, and record the sediment control devices on the SWMP.

**208.08 Limits of Disturbance.** The Contractor shall limit construction activities to those areas within the limits of disturbance shown on the plans and cross-sections. Construction activities, in addition to the Contract work, shall include the on-site parking of vehicles or equipment, on-site staging, on-site batch plants, haul roads or work access, and all other action which would disturb existing soil conditions.

-24-
## REVISION OF SECTION 208
## EROSION CONTROL

Construction activities beyond the limits of disturbance due to Contractor negligence shall be restored to the original condition by the Contractor at the Contractor's expense. The SWMP Administrator shall tabulate additional disturbances not identified in the CDPS-SCP application and indicate changes to locations and quantities on the SWMP. The Contractor shall report the changes and additional disturbances to the IQC, EM, the Department, Water Quality Control Division of CDPHE and all other involved agencies.

The Contractor shall pursue and stabilize all disturbances to completion.

**208.09 Failure to Perform Erosion Control.** Failure to implement the Stormwater Management Plan is a violation of the CDPS–SCP and CDOT specifications. The Department is obligated to implement enforcement mechanisms in accordance with CDOT's MS4 Permit COS000005 for Stormwater Management and erosion control Best Management Practices. Penalties may be assessed to the Contractor by the appropriate agencies. Penalties will be assessed by the Department as Noncompliance Points in accordance with Schedule 6 (*Performance Mechanism*). All fines assessed to the Department for the Contractor's failure to implement the SWMP will be deducted from moneys due the Contractor in accordance with Schedule 6 (*Performance Mechanism*).

Noncompliance Points will be applied for failure to comply with the CDPS-SCP and the Construction Standards, including the following:

(1)     Failure to include erosion control in the project schedule or failure to include erosion control in each schedule update as specified in subsection 208.03(b).

(2)     Failure of the Contractor to perform the inspections required by subsection 208.03(c) 2.

(3)     Failure of the Contractor to implement necessary actions required by the Engineer as required by subsection 208.03(c).

(4)     Failure to amend the SWMP and implement BMPs as required by subsection 208.04.

(5)     Failure to keep documentation and records current.

(6)     Failure to construct or implement erosion control or spill containment measures required by the Contract, or failure to construct or implement them in accordance with the Contractor's approved schedule as required by subsection 208.06(c).

(7)     Failure to limit temporary stabilization to 34 or fewer acres as required by subsection 208.04 (e).

(8)     Failure to replace or perform maintenance on an erosion control feature after notice from the Department or from a water quality inspection as required by subsection 208.04(f).

(9)     Failure to remove and dispose of sediment from BMPs as required.

-25-
## REVISION OF SECTION 208
## EROSION CONTROL

(10)   Failure to install and properly utilize a concrete washout structure for containing washout from concrete placement operations.

(11)   Failure to perform stabilization as required by subsection 208.04 (e).

(12)   Failure of the Superintendent or designated representative to attend inspections as required by subsection 208.03(c) and record findings in the appropriate form.

(13)   Failure to prevent discharges not composed entirely of stormwater from leaving the Construction Site.

(14)   Failure to provide the survey of Permanent Water Quality BMPs when required on the project in accordance with 208.10.

If systemic Nonconforming Work associated with failure to perform erosion control is identified by the Developer or identified by the Department by the issuance of a corrective action request (CAR) notice to the Developer, the Developer shall submit a Corrective Action Plan for Approval to the Department as required by Schedule 8 (*Project Administration*).

## REVISION OF SECTION 240
## PROTECTION OF MIGRATORY BIRDS
## BIOLOGICAL WORK PERFORMED BY THE CONTRACTOR'S BIOLOGIST

Section 240 is hereby added to the Standard Specifications as follows:

### DESCRIPTION

**240.01** The Contractor shall schedule clearing and grubbing operations and Work on structures to avoid taking (pursue, hunt, take, capture or kill; attempt to take, capture, kill or possess) migratory birds protected by the Migratory Bird Treaty Act ("MBTA"). The Contractor shall retain a qualified wildlife biologist for this Project. The wildlife biologist shall have a minimum of three years of experience conducting migratory bird surveys and implementing the requirements of the MBTA. The Contractor shall submit documentation of the biologist's education and experience.

The wildlife biologist shall survey the location of each protected nest, bird species, the protection method used, and the date installed. A copy of these records shall be submitted to the Department for acceptance.

(a)   *Vegetation Removal.*

When possible, vegetation shall be cleared prior to the time when active nests are present. Vegetation removal activities shall be timed to avoid the migratory bird breeding season which begins on April 1 and runs to August 31. All areas scheduled for clearing and grubbing between April 1 and August 31 shall first be surveyed within the Work limits for active migratory bird nests. The Contractor's wildlife biologist shall also survey for active migratory bird nests within 50 feet outside work limits. The Contractor's personnel shall enter areas outside the Right-of-Way in accordance with (e) Permission to Enter Property. The Contractor shall avoid all active migratory bird nests. The Contractor shall avoid the area within 50 feet of the active nests or the area within the distance recommended by the wildlife biologist until all nests within that area have become inactive. Inactive nest removal and other necessary measures shall be incorporated into the Work as follows:

1.   Tree and Shrub Removal or Trimming. Tree and shrub removal or trimming shall occur before April 1 or after August 31 if possible. If tree and shrub removal or trimming must occur between April 1 and August 31, a survey for active nests shall be conducted by the wildlife biologist within the seven Calendar Days immediately prior to the beginning of Work in each area of tree and shrub removal or trimming. The survey shall be conducted for each phase of tree and shrub removal or trimming.

2.   If an active nest containing eggs or young birds is found, the tree or shrub containing the active nest shall remain undisturbed and protected until the nest becomes inactive. The nest shall be protected by placing fence (plastic) a minimum distance of 50 feet from each nest to be undisturbed. This buffer dimension may be changed if determined appropriate by the wildlife biologist and Approved by the Department. Work shall not proceed within the fenced buffer area until the young have fledged or the nests have become inactive. If the fence is knocked down or destroyed by the Contractor, the Department will suspend the Work, wholly or in part, until the fence is satisfactorily repaired at the Contractor's expense. Time lost due to such suspension will not be considered a basis for adjustment of time charges, but will be charged as contract time.

**-2-**
**REVISION OF SECTION 240**
**PROTECTION OF MIGRATORY BIRDS**
**BIOLOGICAL WORK PERFORMED BY THE CONTRACTOR'S BIOLOGIST**

(b)    *Surveys*

1.    Due to the potential for encountering ground nesting birds' habitat, if Work occurs between April 1 and August 31, the area shall be surveyed by the Contractor's wildlife biologist within the seven Calendar Days immediately prior to ground disturbing activities.

2.    The wildlife biologist shall conduct dusk and dawn surveys of Bald Eagle roosts within seven Calendar Days prior to the start of any Construction during the winter season, November 15 to March15. If a Bald Eagle roost is identified, Construction activity shall not proceed within 0.25 mile of active nocturnal roost sites between November 15 and March 15.

3.    The wildlife biologist shall conduct raptor nest surveys within 0.5 mile of the Site prior to the start of Construction and annually during the appropriate season. This survey can be done with binoculars. If Construction activities are located within the CPW recommended buffer zone for specific raptors, "NO WORK" zones shall be established around active sites during Construction according to the CPW standards or as recommended by the wildlife biologist in consultation with the CPW. The "NO WORK" zone shall be marked with either fencing or signing. Work shall not proceed within a "NO WORK" zone until the wildlife biologist has determined that the young have fledged or the nest is unoccupied.

(c)    *Work on structures*

1.    The Contractor shall prosecute Work on structures in a manner that does not result in a taking of migratory birds protected by the Migratory Bird Treaty Act ("MBTA"). The Contractor shall not prosecute the Work on structures during the primary breeding season, April 1 through August 31, unless he takes the following actions:

   A.    The Contractor shall remove existing nests after August 31 and prior to April 1 of the following year.

   B.    During the time that the birds are trying to build or occupy their nests, between April 1 and August 31, the Contractor shall monitor the structures at least once every three Calendar Days for any nesting activity.

   C.    If the birds have started to build any nests, they shall be removed before the nest is completed. Water shall not be used to remove the nests if nests are located within 50 feet of any surface waters.

   D.    Installation of netting may be used to prevent nest building. The netting shall be monitored and repaired or replaced as needed. Netting shall consist of a mesh with openings that are ¾ inch by ¾ inch or less.

2.    If an active nest become established, i.e., there are eggs or young in the nest, all Work that could result in abandonment or destruction of the nest shall be avoided until the young have fledged or the nest is unoccupied as determined by the wildlife biologist and Approved by the

-3-
### REVISION OF SECTION 240
### PROTECTION OF MIGRATORY BIRDS
### BIOLOGICAL WORK PERFORMED BY THE CONTRACTOR'S BIOLOGIST

Department. The Contractor shall prevent construction activity from displacing birds after they have laid their eggs and before the young have fledged.

3.   If the Project continues into the following spring, this cycle shall be repeated. When Work on the structure is complete, the Contractor shall remove and properly dispose of netting used on the structure.

(d)   *Taking of a Migratory Bird*

The taking of a migratory bird shall be reported to the USFWS and the Department. The Contractor shall be responsible for all penalties levied by the USFWS for the taking of a migratory bird.

(e)   *Permission to Enter Property*

CDOT Form 730, *Permission to Enter Property*, shall be obtained by the Contractor to facilitate the wildlife biologist's ground surveys within adjacent property within 50 ft. of Work limits, where the Contractor's wildlife biologist has determined ground nesting bird habitat may be present. If Permission to Enter Property is denied by a property owner, the Contractor shall record the denial and place the record in the Project file to document that due diligence was pursued.

## SECTION 250
## ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

Section 250 of the Standard Specifications is hereby deleted for this project and replaced with the following:

### DESCRIPTION

**250.01**  This work consists of protection of the environment, persons, and property from contaminants that may be encountered on the Project. This includes monitoring the work for encounters with contaminants or suspected soil and groundwater contaminants; the management of solid, special, and hazardous waste; and management of visual emissions associated with hazardous waste, when encountered on the project.

**250.02**  The Contractor shall furnish all personnel, materials, equipment, laboratory services and traffic control necessary to perform the contamination monitoring, testing, and site remediation when required. Traffic control shall be in accordance with the requirements of Section 630.

Monitoring equipment used to detect flammable gas, oxygen level, and toxic gas shall be capable of detection to meet the following standards:

| Instrument Detection | | |
|---|---|---|
| **Constituent** | **Threshold Limit** | **Increments** |
| Flammable Gas | 1% LEL | 1% |
| Oxygen | 19% | 0.1% |
| Toxic Gas | 1 PPM | 1 PPM |
| LEL = lower explosive limit<br>PPM = parts per million | | |

### CONSTRUCTION REQUIREMENTS

**250.03  General**. Prospective bidders, including subcontractors, are required to review the environmental documents available for this project included in Schedule 29 (*Reference Documents*).

This project is in the vicinity of property associated with petroleum products, heavy metal based paint, landfill, buried foundations, abandoned utility lines, industrial area or other sites which can yield Hazardous Substances or produce dangerous gases. These Hazardous Substances or gases can migrate within or into the construction area and could create hazardous conditions. The Contractor shall use appropriate methods to reduce and control known landfill materials, industrial gases, and visible emissions from asbestos encounters and hazardous substances which exist or migrate into the construction area. The Contractor shall follow CDOT's *Regulated Asbestos Contaminated Soil Management Standard Operating Procedure, dated October 20, 2016* for proper handling of asbestos-contaminated soil, and follow all applicable Solid and Hazardous Waste Regulations for proper handling of soils encountered that contain any other substance mentioned above.

Encountering suspected contaminated material, including groundwater, old foundations, building materials, demolition debris, or utility lines that may contain asbestos or be contaminated by asbestos, is possible at some point during the construction of this project. When suspected contaminated material, including groundwater, is encountered or brought to the surface, the procedures under subsection 250.03(d) and 250.05 shall be followed.

**-2-**
**SECTION 250**
**ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT**

Transportation of waste materials on public highways, streets and roadways shall be done in accordance with Title 49, Code of Federal Regulations (C.F.R.). All labeling, manifesting, transportation, etc. of waste materials generated on this project shall be coordinated with the Department. All hazardous waste manifests for waste materials generated on this project shall list the Colorado Department of Transportation as the generator of the waste materials except as otherwise noted. If the Contractor contaminates the site, the Contractor shall be listed as the generator on the hazardous waste manifests, permits, and other documents for such material.

If waste materials must be handled in a permitted treatment, storage and disposal (TSD) facility, the facility shall be coordinated with the Department. The hazardous waste transportation phase of the work involves insurance required by law and regulations. If the waste materials are determined to be hazardous, the Contractor must submit proof that the transportation company is covered by the appropriate type and amount of insurance required by laws and regulations governing the transportation of hazardous waste.

The Contractor alone bears the responsibility for determining that the work is accomplished in strict accordance with all applicable federal, state and local laws, regulations, standards, and codes governing special waste, petroleum and hazardous substance encounters and releases.

A Health and Safety Officer, Monitoring Technician, and Health and Safety Plan (HASP) are required in accordance with Section 23.21.2, 23.21.3 and 23.11 of Schedule 17, respectively.

(a)   *Health and Safety Officer (HSO)*. The Contractor shall designate a HSO in accordance with Section 23.21.2 of Schedule 17. The HSO can delegate task to their designee as long as the designee meets the training and certification requirements stated above for the HSO.

The HSO shall *be* equipped with the following:

1.   Communication equipment as required in subsection 250.03(d)2.A. and a vehicle.

2.   Monitoring and detection equipment for flammable gas, oxygen sufficiency, toxic gas, radiological screening and other hazards. This includes, as required, a combustible gas indicator, flame ionization or photo ionization detector, oxygen meter, radiation monitor with Geiger Mueller detector and other foreseeable equipment.

3.   Depth gauging equipment, sampling equipment and sampling containers.

4.   Personal protective equipment (PPE), when required. PPE must be selected which will provide protection from the specific hazards which are likely to be encountered during work on the project.

The HSO shall recommend and supervise those actions which will minimize the risk of Hazardous Substance related injury to the workers, Department personnel, the general public, property and the environment. The HSO shall prepare written procedures for the monitoring of confined space entry and working in or near excavations, including but not limited to trenches and drill holes associated with this project. The HSO shall ensure that all hazardous substance and solid waste related testing, sampling, monitoring and handling for this project to ensure compliance with applicable statutes

-3-
### SECTION 250
### ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

and regulations, and other applicable environmental requirements under subsections 107.01 and 107.02.

The HSO shall be available for consultation and assistance with contaminated materials related testing, sampling, and field monitoring as required on the project.

The HSO shall prepare a daily diary which shall be submitted to the Department on a monthly basis in the Monthly Statement of Recognized Hazardous Materials Management. The diary shall contain a chronological log of activities on the project including: dates and times on site, equipment used and calibrations, field monitoring results, visual observations, conversations, directives both given and received related to health and safety.

(b) *Monitoring Technician (MT).* The Contractor shall designate monitoring technicians to be responsible for monitoring of Hazardous Substances during work on the project in accordance with Section 23.21.3 of Schedule 17. The MT shall have a minimum of two years of actual field experience in assessment and remediation of hazardous substances that may be encountered during highway construction projects. The MT shall be experienced in the operation of monitoring devices, identifying substances based upon experience and observation, and field sampling (for testing) of all media that may be found on the site. Completion of the 40 hour hazardous waste and 8 hour supervisory training required by OSHA and U.S. EPA rules and regulations, which complies with the accreditation criteria under the provisions of the proposed 29 C.F.R. 1910.121 is required prior to beginning work. The Contractor shall furnish documentation at the Preconstruction Conference that demonstrates these requirements have been met.

The MT shall be equipped with the following:

1. Communication equipment as required in subsection 250.03(d)2.A. and a vehicle.

2. Monitoring and detection equipment for flammable gas, oxygen sufficiency, toxic gas, radiological screening and other hazards. This includes, as required, a combustible gas indicator, flame ionization or photo ionization detector, oxygen meter, radiation monitor with Geiger Mueller detector and other foreseeable equipment.

3. Personal protective equipment, when required. PPE must be selected which will provide protection from the specific hazards which are likely to be encountered during work on the project.

The MT shall be present on site and perform monitoring as required by 250.03(d) when work is being performed in areas of known or suspected Hazardous Substances.

The MT shall monitor for compliance with regulations, the project Health and Safety Plan and the Materials Management Plan, the Contract, and the environmental documents for the project. The MT shall immediately notify the Environmental Manager and the HSO of any hazardous condition.

(c) *Health and Safety Plan (HASP).* The HSO shall prepare a written HASP for the project focused on Hazardous Substances, formatted as shown in Appendix B, *Occupational Safety and Health Guidance Manual for Hazardous Waste Site Activities*, DHHS (NIOSH) Publication Number 85-

**-4-**
**SECTION 250**
**ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT**

115, available from the Superintendent of Documents, U.S. Government Printing Office, including all applicable sections from 29 C.F.R. 1910 and 29 C.F.R. 1926.

Within five calendar days after Acceptance by the Department, the HSO shall distribute signed and stamped (or sealed) copies of the accepted HASP to each emergency response agency servicing the project area and the HASP designated emergency hospital. Earth or demolition work

shall not occur until after the HASP is accepted and the HASP has been distributed. The HASP shall also be available to the Contractor's employees, their representatives, and officials of OSHA, EPA, Colorado Department of Public Health and Environment (CDPHE), local government health department, Federal Highway Administration, and other appropriate agencies, as requested. The Contractor will distribute the accepted HASP to appropriate Department personnel. The HASP shall be kept current and shall be revised by the HSO as warranted by changes in the field conditions.

All on-site workers (Contractor's, Department's, Utilities', and others) shall be briefed by the HSO on the contents of the HASP and any revisions thereof. The HSO shall conduct briefings (group or individual) to inform all new employees, subcontractors, utility companies and other on-site workers of the HASP contents prior to their entry on site. All personnel involved in excavation or other soil disturbing activities shall receive the required two-hour Asbestos Awareness training by a Certified Asbestos Inspector, when asbestos discoveries are anticipated, or discoveries are made.

A signature log of all briefing attendees shall be kept and provided in the Environmental Status Report (see Schedule 17, Section 4).

The Contractor shall provide, as required, eye wash equipment and stations, emergency showers, hand and face washing facilities and first aid equipment.

The Contractor shall provide, as required, decontamination facilities for personnel and equipment employed in the work. The exact procedure for decontamination and frequency shall be included in the accepted HASP. Decontamination facilities shall meet the criteria set forth in the Code of Federal Regulations (29 C.F.R. and 40 C.F.R.).

(d)  *Precautions and Procedures.* The following minimum precautions and procedures shall be followed during the construction of the project:

1.  General construction precautions:

   A.  All monitoring and piezometer wells and test borings shall be established or abandoned by the Contractor as regulated by the State Engineer's Office. Copies of all required permits, notification, and abandonment documents shall be submitted to the Department as part of the Monthly Statement of Recognized Hazardous Materials Management.

   B.  The Contractor shall properly handle all investigation derived waste generated by this project. Documentation shall be submitted to the Department as part of the Monthly Statement of Recognized Hazardous Materials Management of all tests performed for

-5-
## SECTION 250
## ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

TSD determination; classification of waste; hauling records; TSD acceptance; manifest (if required); etc. in accordance with applicable laws and regulations.

2.  For construction on a known or potentially contaminated site, the following conditions shall apply, in addition to those listed in subsection 250.03(d)1:

A.  The HSO, or their designee identified in the HASP, shall be on site or readily available by radio, telephone or pager at all times during the work. When on site, the HSO, or their designee identified in the HASP, shall have an operational portable or mobile

cellular telephone available for immediate use in areas where such service is available. When on site in cellular telephone non-service areas, the HSO, or their designee identified in the HASP, shall have available, for immediate use, radio access to a site with telephone service. The HSO shall be notified at least 24 hours prior to the start of confined space entry, storage tank removal, drilling, excavation, trenching, or dewatering operations.

B.  The HSO shall designate the onsite monitoring equipment for flammable gases, oxygen deficient or enriched atmosphere, and toxic gases, such as but not limited to, a flame ionization detector, photoionization detector, combustible gas indicator, and oxygen meter. This designated equipment shall be on site during all construction operations and be utilized during trenching, drilling, excavating, confined space entry, underground storage tank removal, and other appropriate construction operations. The exact equipment to fulfill this requirement shall be specified in the accepted HASP. The HSO, or their designee identified in the HASP, shall conduct or supervise the monitoring. The monitoring equipment shall be calibrated as recommended by the manufacturer.

C.  When drilling, trenching, or excavating in the presence of detectable concentrations of explosive gases, the soil shall be wetted and the operating equipment shall be provided with spark proof exhausts.

D.  The Contractor, through the HSO, is responsible for ensuring that 29 C.F.R. 1926 is fully complied with during the construction of the project.

E.  Affected excavation operations shall be discontinued and personnel shall be removed from the affected excavation sites where any of the following levels are detected:

(1)  20.0 percent or more LEL flammable gas, or 10.0 percent in an underground or confined space,

(2)  Permissible Exposure Limit (PEL) of any toxic gas,

(3)  19.5 percent or less oxygen,

(4)  25.0 percent or more oxygen,

-6-
### SECTION 250
### ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

    (5)    Greater than 2 mrem/hr. (Beta particle & photon radioactivity),

    (6)    Greater than 15 pCi/L (Gross alpha particle activity), or

    (7)    Other action levels as determined by the HSO.

    (8)    Uncovering of suspect Asbestos Containing Material (ACM), including but not limited to, buried facility components, active or abandoned utility lines, buried foundations and demolition debris, or miscellaneous ACM dispersed in the soil. The Contractor shall follow the procedures outlined in the *CDOT's Regulated Asbestos Contaminated Soil Management Standard Operating Procedure, dated October 20, 2016*, HASP and 29 C.F.R. 1926 to address these conditions.

F.    Personnel shall be issued and utilize appropriate Health and Safety equipment as determined by the HSO.

G.    Personnel shall avoid the area immediately downwind of any excavation unless the excavation is monitored and declared safe.

H.    The operators of excavating, trenching, or drilling equipment shall wear appropriate PPE as required in the HASP.

I.    Exhaust blowers shall be present at the location where required in the accepted HASP.

J.    The Contractor shall accomplish the work with employees who have been trained and equipped as required by the HASP and applicable provisions of 29 C.F.R. 1910 and 29 C.F.R. 1926.

K.    Fire extinguishers, electrical equipment and wiring shall conform to the applicable requirements of 29 C.F.R. 1926 and 49 C.F.R..

L.    Smoking shall not be permitted within 50 feet of any excavation.

3.    For construction within 1000 feet of a known or potentially contaminated site, the following conditions, in addition to those listed in subsection 250.03(d) shall apply:

A.    The areas under construction shall be checked with a combustible gas indicator before excavation begins to determine if flammable or combustible gas is in the area.

B.    Excavations, trenches and drill holes shall be monitored by the HSO, or their designee identified in the HASP, for flammable gas, toxic gas and oxygen deficiency or enrichment. This shall be carried out continuously unless the presence of flammable, combustible or toxic gas, or oxygen deficiency or enrichment in the area can be ruled out by the HSO, or their designee identified in the HASP.

C.    When flammable or toxic gas is found in the area, those precautions and procedures in subsection 250.03(d)2 shall apply.

**-7-**
## SECTION 250
## ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

**250.04  Heavy Metal Based Paint Management**. When the work includes the removal of paint or items covered with paint which may contain lead, chromium or other heavy metals, the requirements of this subsection shall apply in addition to the requirements of subsection 250.03.

The requirements of the HASP shall be in accordance with OSHA Publication Number 3142, *Working with Lead in the Construction Industry.*

Paint Removal and Waste Disposal work shall be performed in accordance with 29 C.F.R. 1926.62, State and local air quality regulations, the Steel Structures Painting Council (SSPC) Guide for Containing Debris Generated During Paint Removal Operations, the *Industrial Lead Paint Removal Handbook* (SSPC 91-18), and the references contained therein.

The following minimum precautions and procedures shall be followed unless modified in the approved HASP or its updates:

> The Contractor shall contact the CDPHE, Air Pollution Control Division to ascertain if an air pollution permit is required for the cleaning or demolition work. If an air pollution permit is required, the Contractor shall obtain the permit. The Contractor shall furnish the Department with a copy of the permit application and the permit issued prior to starting cleaning or demolition activities. A copy of the Air Pollution Emission Notice (APEN) shall be provided to the Department, if such notice is required under the Colorado Air Quality Control Commission's regulations. The processing of air pollution permits in non-attainment areas, or where public hearings are required, likely will take more than 90 days.

(a)    The Contractor shall contain paint chips, corrosion residues, and spent abrasives, herein referred to as waste materials, resulting from the cleaning or demolition operations. The Contractor shall not deposit or release waste material into the water, air or onto the ground below or adjacent to the structure. The Contractor shall conduct cleaning operations to minimize the waste materials produced. Prior to beginning the work, the Contractor shall submit to the Department for acceptance, a detailed methods statement for capturing, testing, and disposing of the removed materials.

(b)    Abrasives utilized for blast cleaning shall be low-dusting and low waste. Unless approved otherwise, vacuum blasting or wheel blasting shall be used.

(c)    The Contractor shall sample and test the waste material for lead, chromium, and other paint associated heavy metals using the Toxicity Characteristic Leaching Procedure (TCLP) Test, Method 1311 of the EPA publication, Test Methods for Evaluating Solid Waste 846. Sample collection methodology and frequency shall be defined in the Sampling and Analysis Plan (see Section 23.10 of Schedule 17) with an adequate number of samples taken to be representative of all waste material collected. If the waste material does not pass the TCLP test, it shall be disposed of in a permitted TSD facility as designated in writing by the Department. The waste materials handling, including a description of sample collection methodology, testing performed, test results and comparison of test results with hazardous waste requirements shall be documented in the Monthly Statement of Regulated Hazardous Materials Management and Recognized Hazardous Materials Completion Report. The waste material shall not be held at an unpermitted TSD facility site in excess of Resource Conservation and Recovery Act (RCRA) temporary storage time limits.

**-8-**
**SECTION 250**
**ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT**

(d)   When an item coated with paint is removed, all loose paint shall be removed and collected from the item within 24 hours of the time it is removed or placed onto the ground. All loose paint shall be removed and collected from a painted item before it is removed from the site. The Contractor shall contain loose paint until it is removed and collected. Loose paint is defined as that which can be removed by manual scraping methods. Over waterways, the Contractor shall capture all paint debris by the method specified in the methods statement. The paint debris shall be collected on a daily basis and shall be stored in a properly labeled, tightly sealed container and placed in a secured location at the end of each working day.

(e)   All painted steel components which are not designated to be salvaged shall be recycled. Contractor possession of the steel for future use shall be considered a form of recycling. Prior to transport of the components off-Site, the Contractor shall obtain a letter from the recipients of the painted steel components stating that they have been fully informed of the contents of the paint and are capable of handling the paint. If the Contractor is to maintain future possession of the steel, the Contractor shall supply this letter. If there will be more than one recipient of the painted material, one letter shall be obtained from each recipient. The Contractor shall provide a copy of each letter to the Department. If the painted steel components will be recycled by melting, the letter from the recipient is not required. The Contractor shall submit a letter stating the destination of the painted steel components and that they will be melted.

(f)   When the work consists of the removal of a bridge or components of a bridge coated with paint which has been assumed to contain lead, chromium, other heavy metals, or a combination thereof the Contractor shall capture paint debris which is dislodged during removal operations. The Contractor may choose any method for dismantling the bridge, subject to the following required construction sequence limitations:

　　1.   The concrete deck shall be removed prior to removal of the steel superstructure.

　　2.   If the methods statement indicates that girders will be dropped to the ground during dismantling, all debris from the concrete deck removal operation shall be removed from the area below the bridge before any girders are dropped into this area.

　　3.   Girders may be cut and dropped only if the span is located entirely over land.

**250.05  Material Handling**. This work consists of the additional handling of groundwater and soils to be excavated for construction of the project which are suspected or known to be contaminated. This work also includes stockpiling or containerization, analytical sampling and testing, and final disposition of contaminated groundwater and soils requiring special handling.

There is the potential of encountering contaminated groundwater and soil, which has not been summarized in the plans or specifications, at unknown locations on the site. Suspected contaminated soil and groundwater shall be handled as follows:

(a)   *Materials Handling (Stockpile& Containerization).* The Beneficial Reuse and Materials Management Plan defines the requirements for reusing soils on site. Health and safety monitoring and strict fugitive dust control shall be conducted during the placement of these soils. If analysis indicates that groundwater samples are designated as uncontaminated, as determined by the

**-9-**
**SECTION 250**
**ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT**

criteria shown in the Contract or as determined by the CDPHE, the groundwater shall be handled in accordance with subsection 107.25.

Stockpiled and containerized materials shall be secured in compliance with the following provisions until they are determined to be uncontaminated:

1. The Contractor shall not store the material for more than 90 days.

2. The Contractor shall prevent any runoff from infiltrating the ground or running out of the containment area.

3. Soils and groundwater containing different contaminants shall be placed in separate containers or stockpiles.

4. The Contractor shall prevent the dispersion of materials or the dilution or mixing of containers and stockpiles.

   The ground surface on which the contaminated soils will be placed shall be covered with plastic sheeting which will withstand the placement and removal of stockpiled materials without breaching. Alternatively, the Developer may place impacted soils, that are not saturated with any contaminant or water, on six inches of clean fill to eliminate the plastic sheeting. Upon final disposition of the stockpile, the six inches must be removed with the stockpile in accordance with the stockpile disposition; however, the disposal of the six inches of soil is considered incidental since it is a means and methods decision and shall not be included in any Supervening Event Submission.

5. The ground surface shall be graded to drain toward the edge of the soil piles and the berm or trench around them shall be covered by plastic sheeting.

6. Proper security shall be provided in accordance with 40 C.F.R..

(b) *Solid Waste Disposal.* Soils determined to be contaminated and not allowed to be reused on the project, but not hazardous, as established by criteria in the Contract or as determined by CDPHE or other regulatory agencies having jurisdiction, shall be handled and disposed of in accordance with all applicable Environmental Laws. The Contractor shall haul this material to a solid waste disposal facility.

(c) *Contaminated Groundwater Disposal.* Groundwater determined to be contaminated as established by CDPHE or other regulatory agencies having jurisdiction, shall be handled and disposed of in accordance with all applicable Environmental Law.

(d) *Hazardous Waste Disposal.* Soils and groundwater that are designated or suspected to be hazardous shall be containerized *immediately* upon excavation or upon discovery. Confirmed Hazardous Waste shall be labeled and transported to a permitted TSD facility or to a hazardous waste disposal facility approved by the Department.

**-10-**
**SECTION 250**
**ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT**

(e)   *Additional Requirements.* Stockpiled or containerized material characterized as uncontaminated, contaminated or hazardous shall be stored and disposed of in a manner consistent with current established federal, state, and local regulations for waste materials.

Materials with contaminants not specifically regulated shall be disposed of by the Contractor as directed, in consultation with CDPHE. All areas where wastes are generated shall be reviewed by the Environmental Manager and HSO to identify potential contaminant sources that may result in a contaminated waste stream.

Contaminated groundwater and soils, which have been identified as solid waste or hazardous waste, requiring disposal according to federal, state, and local regulations, shall be transported in accordance with 49 C.F.R. by the Contractor to an appropriately permitted treatment facility, landfill, incinerator or asphalt plant or other facility approved to accept the waste. CDPHE and the landfill or other treatment or disposal facility shall be notified by the Environmental Manager or HSO of the material to be disposed of and the corresponding analytical test results prior to shipment, if required. Potentially contaminated water collected from the lined trench of a stockpile shall be treated as required by Colorado Wastewater Discharge Permit System (CDPS) permits, 29 C.F.R. and 40 C.F.R..

**250.06 Sample delivery**. This work consists of the collection, containerization and delivery of material samples for analysis to the testing facility designated in the Contract.

Environmental Protection Agency (EPA) protocol and standards shall be followed in the collection, containerization and transport of samples to be analyzed, including the documentation of the proper chain of custody of all samples. The Contractor shall collect sufficient sample material to perform the required analysis and is responsible for ensuring that appropriate climate control has been provided for sample transport. Sample delivery shall be made within the maximum allowable holding time for each sample type, not to exceed 24 hours, excluding weekends. The time period required for sample collection and delivery to the testing facility will not be considered an excusable delay.

The Contractor shall provide the Department with a copy of documentation indicating that proper chain of custody requirements have been followed for all samples.

The Department may request splits of samples, in advance of collection, which shall be provided at no additional cost by the Contractor.

**250.07 Asbestos-Containing Material Management**. Known or suspected locations that could involve encounters with ACM during excavation and other soil disturbing construction activities are identified in the (Reference Documents) (Schedule 29). Unexpected discoveries of ACM may be made during excavation and soil disturbing construction activities. When any discarded material is encountered that contains or consists of any of the following: construction, renovation and demolition debris (regardless of how it was generated), building or facility components, components of building systems (HVAC, plumbing, electrical, control, fire protection, roofing), components of pavement or drainage systems, industrial or machinery components, and/or mechanical components from motorized vehicles, the Developer shall conduct inspections in accordance with CDPHE Section 5.5 of the Solid Waste Regulations to determine whether such debris is regulated asbestos contaminated soil. Asbestos contaminated soil, shall be properly managed or remediated, in accordance with subsection 250.07(a) and

-11-
### SECTION 250
### ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

the CDOT *Regulated Asbestos Contaminated Soil Management Standard Operating Procedure, dated October 20, 2016.*

All asbestos related activities shall be performed by Colorado certified asbestos professionals, contractors, or consultants. Certifications are issued by the CDPHE, Air Pollution Control Division. An appropriately certified professional shall manage the management and disposal of asbestos contaminated soil and other

ACM. The Air Pollution Control Division within CDPHE is the only unit that certifies such professionals. The Contactor shall furnish a copy of the license to the Department in the Environmental Status Report.

(a)   *Regulatory Compliance.* Asbestos-contaminated soil management is governed by 6 CCR 1007-2, Section 5, which includes and references regulatory compliance with Asbestos Hazard Emergency Response Act (AHERA) Colorado *Regulation* 8. Inspection and reporting protocol and demolition standards are governed by AHERA. Demolition and notification standards are governed by National Emission Standards for Hazardous Air Pollutants (NESHAPS). Colorado Regulation 8 governs all asbestos abatement activities on facilities and facility components, demolition, permitting, and certification of Certified Asbestos Professionals in the State of Colorado. Colorado Regulation 8 is more stringent than AHERA and NESHAPS and supersedes federal regulations. Conflicting regulatory requirements between AHERA and NESHAPS, if not specifically addressed in Colorado Regulation 8, shall be addressed and approved protocol negotiated with CDPHE. The Contractor shall conform to all current regulations, policy directives, or both, issued by the EPA, CDPHE, and the Department.

(b)   *Asbestos Management and Visual Inspections* Asbestos management must be performed by a certified asbestos professional in accordance with current regulations. Final Inspections of the area of asbestos-contaminated soil removal <u>shall</u> be performed by an appropriately certified asbestos consultant to determine what, if any, controls must be instituted to allow future activity in the excavation area. All final visual inspections <u>shall</u> be conducted only when soil is dry.

(c)   *Permitting and Notification.* A 24-hour notification to CDPHE is required within 24-hours of any unexpected discovery of regulated asbestos containing soil during a soil disturbing activity and prior to implementation of CDOT's approved *Regulated Asbestos Contaminated Soil Management Standard Operating Procedure, dated October 20, 2016.* Removal of asbestos-containing material on a facility component, that is located on or in soil that will be disturbed, with asbestos quantities above the following trigger levels must be permitted and abated in accordance with the requirements of Air Quality Control Commission Regulation No. 8 (5 CCR 1001-10, Part B):

1.   260 linear feet on pipes,

2.   160 square feet on other surfaces, or

3.   The volume of a 55-gallon drum.

All permit applications shall be submitted to the CDPHE a minimum of 10 days prior to start of work for approval. The permit application and notification shall be submitted simultaneously. The Contractor shall obtain all required State and local permits and shall be responsible for all associated fees.

-12-
## SECTION 250
## ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT

(d) *CDOT's Regulated Asbestos Contaminated Soil Management Standard Operating Procedure, dated October 20, 2016.* Asbestos contaminated soil shall be managed in accordance with 6 CCR 1007-2, Section 5, Asbestos Waste Management Regulations. The Contractor shall comply with procedures detailed in the CDPHE regulations as specified in 250.07 (a), and CDOT's approved *Regulated Asbestos Contaminated Soil Management Standard Operating Procedure, dated October 20, 2016,* including the following minimum requirements:

1. Immediate actions and implementation of interim controls to prevent visible emissions, exposure, and asbestos contamination in surrounding areas.

2. Soil characterization.

3. Training required for all personnel involved in excavation and other soil disturbing activities, when asbestos discoveries are anticipated, or discoveries are made. Asbestos Awareness Training shall be given by a qualified and Certified Asbestos Building Inspector with a minimum of six months experience inspecting asbestos contaminated soil and who otherwise meets the requirements of current regulations.

4. Assessment for the presence and extent, within the proposed area of disturbance, of potential asbestos discoveries, whether expected or unexpected, by a Certified Asbestos Building Inspector.

5. Investigation and sampling required for risk assessment and management. Investigation, if required, shall be conducted by a Certified Asbestos Building Inspector.

6. Risk assessment and determinations for further management or abatement.

   A. Risk assessment and determinations must be made by a Certified Asbestos Building Inspector.

   B. Soil remediation is not necessarily required, depending on the circumstances.

7. Submit 24-hour Notification of RACS Disturbance.

(e) *Risk Assessment and Determinations for Further Management Or Remediation.* Risk assessment and determinations for further management or remediation must be closely coordinated with the Department.

**250.08   Methamphetamine Lab Sites**. Demolition of former Methamphetamine (meth) labs is enforced by the Governing Authority, which varies from county to county. The Contractor shall demolish all buildings that are identified as former meth labs, as listed in public listings by the Governing Authority.

**-13-**
**SECTION 250**
**ENVIRONMENTAL, HEALTH AND SAFETY MANAGEMENT**

The Contractor shall provide evidence of demolition to the Governing Authority, obtain receipt of such evidence by the Governing Authority, and shall submit these to Department immediately following demolition.

Septic tank removal at known meth lab sites shall undergo preliminary assessment by an Industrial Hygienist or Certified Industrial Hygienist to determine proper removal and disposal. Work shall proceed in accordance with the recommendations of the Hygienist.

**Appendix B**
**Known Hazardous Substances Parcels**

| Parcel # |
|---|
| PE-197 |
| AP-86, AP-86A, AP-86B |
| AP-91, AP-93, AP-93A |
| AP-96 |
| AP-94 |
| AP-88 |
| AP-55 |
| AP-52 |
| IU |

| Railroad Parcel # |
|---|
| **UPRR** |
| AP-Construction License Permit 26 |
| **BNSF** |
| AP-TE-90; AP-TE-90A |
| AP-PE-90; AP-PE-90A |
| **DRIR** |
| AP-136; AP-136B |
| AP-PE-136A |

**Appendix C
Groundwater Benchmark Concentrations**

| Analytical Suite | Analyte | Value (µg/L) | Analytical Suite | Analyte | Value (µg/L) |
|---|---|---|---|---|---|
| **Dissolved Metals (Field Filtered)** | Iron | 8,400 | | 1,2,4-trichlorobenzene | PL |
| | Manganese | 2,500 | | 1,2-dichlorobenzene | PL |
| **Potentially Dissolved Metals (Preserved, Lab Filtered)** | Arsenic | PL | | 1,3-dichlorobenzene | PL |
| | Cadmium | 1.6 | | 1,4-dichlorobenzene | PL |
| | Chromium (hexavalent) | 61 | | 1,4-Dioxane | 1.8 |
| | Chromium (Trivalent) | PL | | 2,4,6-trichlorophenol | PL |
| | Copper | 39 | | 2,4-dichlorophenol | PL |
| | Lead | 18 | | 2,4-dimethylphenol | PL |
| | Manganese | 2,755 | | 2,4-dinitrophenol | PL |
| | Nickel | PL | | 2,4-Dinitrotoluene | PL |
| | Selenium | 7.7 | | 2-chloronaphthalene | PL |
| | Silver | PL | | 2-chlorophenol | PL |
| | Thallium | PL | | 4,6-Dinitro-2-methylphenol | PL |
| | Uranium | PL | | 4-nitrophenol | PL |
| | Zinc | PL | | Acenaphthene | PL |
| **Total Metals (Preserved, Unfiltered)** | Aluminium | 260,000 | | Anthracene | PL |
| | Arsenic | 64 | | Benz(a)anthracene | 2.5 |
| | Barium | 3,000 | | Benzidine | PL |
| | Beryllium | 16 | | Benzo(a) pyrene | 2.5 |
| | Cadmium | 4.2 | | Benzo(b)fluoranthene | 2.5 |
| | Chromium | 157 | | Benzo(g,h,i)perylene | 2.5 |
| | Chromium$_{III}$ | 120 | | Benzo(k)fluoranthene | 2.5 |
| | Chromium$_{VI}$ | 62 | | Bis(2-chloroethyl)ether | PL |
| | Iron | 330,000 | | Bis(2-ethylhexyl) phthalate | PL |
| | Lead | 235 | | Butyl benzyl phthalate | PL |
| | Molybdenum | PL | **Semi-Volatile Organic Compounds** | Chrysene | 2.5 |
| | Nickel | 210 | | Dibenz(a,h)anthracene | 2.5 |
| | Thallium | 3.8 | | Diethylphthalate | PL |
| | Uranium | 60 | | Dimethyl phthalate | PL |
| **Volatile Organic Compounds** | 1,1,1-trichloroethane | PL | | Di-n-butyl phthalate | PL |
| | 1,1,2,2-tetrachloroethane | PL | | Diphenylhydrazine | PL |
| | 1,1,2-trichloroethane | PL | | Fluoranthene | PL |
| | 1,1-dichloroethane | PL | | Fluorene | PL |
| | 1,1-dichloroethene | 35 | | Hexachlorobenzene | PL |
| | 1,2-dichloropropane | 25 | | Hexachlorobutadiene | PL |
| | 1,4-Dioxane | 1.8 | | Hexachlorocyclopentadiene | PL |
| | 2-Chloroethylvinyl ether | PL | | Hexachloroethane | PL |
| | Acrolein | PL | | Indeno(1,2,3-c,d)pyrene | 2.5 |
| | Benzene | 50 | | Isophorone | PL |
| | Bromoform | PL | | Naphthalene | PL |
| | Bromomethane | PL | | Nitrobenzene | PL |
| | Carbon tetrachloride | PL | | N-Nitrosodimethylamine | PL |
| | Chlorobenzene | PL | | N-nitrosodi-n-propylamine | PL |
| | Chloroform | PL | | Pentachlorophenol | 5.5 |
| | cis-1,2-dichloroethene | 700 | | Phenol | PL |
| | Ethylbenzene | PL | | Pyrene | PL |
| | Trichloroethene | 50 | | | |
| | Tetrachloroethene | 50 | | | |
| | Toluene | PL | | | |
| | trans-1,2-dichloroethene | 500 | | | |
| | Vinyl chloride | 20 | | | |
| | Xylene Total | PL | | | |
| **Other** | pH (Field, SU) | NL | | | |
| | Nitrate (as N) | 50,000 | | | |
| | TSS | NL | | | |

**Notes:**

PL    = Value set at the maximum permissible level (from time to time) under the applicable discharge Permit for the point of discharge.

µg/L  = Concentrations in micrograms per liter.

NL    = No Limit, Developer responsible for meeting discharge standard regardless of influent concentrations.

SU    = pH values to be measured in standard units.

Attachment B:

GLO Air Quality Monitoring Summary

# Globeville Landing Outfall Air Quality Summary (6/1/2017)

