**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE;
JACQUELINE LANSING; JANET FEDER;

*and*

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE
PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CARTER, in his official capacity as Division
Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and SHAILEN P. BHATT, in his
official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

SIERRA CLUB PETITIONERS' REPLY IN SUPPORT OF ITS MOTION FOR STAY OF
AGENCY ACTION PENDING REVIEW ON THE MERITS
(Case No. 17-cv-1679-WJM-MEH)

---

ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

COUNSEL FOR PETITIONERS

**GLOSSARY OF TERMS**

APA:  Administrative Procedures Act

CAA:  Clean Air Act

CDOT:  Colorado Department of Transportation

DEIS:  Draft Environmental Impact Statement

FEIS:  Final Environmental Impact Statement

F-AHA:  Federal Aid Highway Act

FHWA:  Federal Highway Administration

MSAT:  Mobile Source Air Toxics

NEPA:  National Environmental Policy Act

NO2:  Nitrogen Dioxide

PCL:  Partial Cover Lowered

PM:  Particulate Matter

PM2.5:  fine particles 2.5 μm or smaller that penetrate into the lungs

PM10:  thoracic particles 10 μm or smaller that penetrate into the lungs

ROD:  Record of Decision

SDEIS:  Supplemental Draft Environmental Impact Statement

# TABLE OF CONTENTS

GLOSSARY OF TERMS ................................................................................................................. 1

TABLE OF CONTENTS ............................................................................................................... 2

I. PETITIONERS SHOW IRREPARABLE HARM. ................................................................ 4

A.   HARM FROM INCREASED EXPOSURE TO PM. ....................................................................... 4
B.   HARM FROM IRRETRIEVABLY COMMITTING RESOURCES. ................................................... 7

II. PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS. ................................. 8

A.   DEFENDANTS DID NOT DISCLOSE SIGNIFICANT HEALTH IMPACTS OR CONSIDER MITIGATION NECESSARY
TO ELIMINATE OR MINIMIZE HEALTH EFFECTS. ......................................................................... 8
1.   NAAQS ARE INADEQUATE TO PROTECT THIS COMMUNITY'S HEALTH. ................................ 11
2.   FHWA FAILED TO ASSESS ADVERSE HEALTH IMPACTS AND THE HEALTH BENEFITS OF ALTERNATIVES AND
MITIGATION MEASURES. ................................................................................................................. 16
3.   RECORD CONTAINS NO EVIDENCE SUPPORTING NO SIGNIFICANT HEALTH IMPACT. ............ 19
4.   DEFENDANTS' DUTY TO CONSIDER NEW DATA OR CUMULATIVE EFFECTS OF POLLUTANTS CANNOT BE
WAIVED. .......................................................................................................................................... 24
B.   NEPA'S PROCEDURAL REQUIREMENTS DO NOT WAIVE F-AHA'S SUBSTANTIVE STANDARDS. ............. 26
C.   FEASIBLE MITIGATION MEASURES ARE AVAILABLE. ......................................................... 29

III. BALANCE OF HARMS FAVORS PROTECTING HEALTH. ........................................ 29

IV. PROTECTING HUMAN HEALTH IS IN THE PUBLIC INTEREST. ......................... 30

CONCLUSION ............................................................................................................................ 30

**Introduction**

The Record of Decision ("ROD") for the I-70 Project should be stayed because its most critical impact—injury to the health of Denver residents in Elyria-Swansea and Globeville and children who attend Swansea Elementary and other area schools—is life-threatening, demonstrable, presently-occurring, and will worsen when construction begins, but has largely been swept under the rug. Petitioners' Motion for Stay ("Motion") should be granted because:

1) Petitioners' members will suffer immediate concrete harm from exposure to increased concentrations of Particulate Matter ("PM") and potentially hazardous dust from disturbing 34 known hazardous waste sites when trench excavation, earth moving, viaduct demolition work, and other construction begins;

2) Petitioners are likely to prevail on one or both claims addressed in this Motion:

a. The Federal Highway Administration ("FHWA") violated the National Environmental Policy Act ("NEPA") by failing to investigate and disclose that increasing I-70 emissions endanger human health by contributing to increased premature deaths, hospitalizations, asthma onset and attacks, and by failing to consider alternatives and mitigation that could avoid or minimize these impacts; and

b. FHWA violated the Federal-Aid Highway Act ("F-AHA") by failing to identify "the costs of eliminating or minimizing such adverse effects" and weigh those costs together with "the need for fast, safe and efficient transportation" to determine if the Project is "in the best overall public interest";

3) Equities favor protecting public health from known injuries, irreversible effects, and premature death proven to be caused by the diseases of air pollution (i.e., cardiovascular disease,

asthma, chronic obstructive pulmonary disease and cancer), and the many costs associated with medical treatment, emergency care, hospitalization, lost work and school days, and a myriad of personal and professional disruptions, as compared to the cost of delay for the transportation agencies; and

4) "[T]he public interest associated with completion of the Project must yield to the obligation to construct the Project in compliance with the relevant environmental laws." *Davis v. Mineta*, (abrogated on other grounds by *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016)).

## I. Petitioners Show Irreparable Harm.[1]

### A.  Harm From Increased Exposure to PM.

The FHWA, and Intervenor Colorado Department of Transportation ("CDOT")(collectively "Defendants") do not dispute Petitioners' recitation of EPA's findings that "short-term" exposure (hours to a few days) to pollutants emitted from heavy diesel equipment and in dust made airborne by earthmoving, cause or contribute to pre-mature mortality, cardiovascular and respiratory diseases (e.g., bronchitis and chronic obstructive pulmonary disease), and acute asthma attacks.[2] Nor do Defendants dispute that Petitioners' members will be exposed to increased concentrations of PM when construction commences.

Expert testimony from Dr. George Thurston submitted in support of Petitioners' Motion confirms Denver Department of Environmental Health ("DEH") evidence that Petitioners'

---

[1] Citations reference this matter's ECF number and the document's pagination. Record citations are to the "Excerpts from the Administrative Record" filed with ECF_88_Motion, unless not included therein, then included in the attached Appendix.

[2] ECF_88_Motion, 2-5.

members currently suffer adverse health impacts from exposure to air pollution, despite compliance with the National Ambient Air Quality Standards ("NAAQS") for PM, and will suffer additional harm from expected increased exposure to PM and other pollutants, even if air quality continues to meet the PM NAAQS.[3] Dr. Thurston's testimony establishes that increased short-term exposure to fine particles (PM2.5), thoracic particles (PM10), and coarse particles (PM10 – PM2.5) causes increased premature mortality and asthma-onset among young children, exacerbates cardiovascular and respiratory diseases and triggers asthma attacks requiring emergency care for children and adults. These effects constitute irreparable harm.

Petitioners members' declarations establish that they live in the first or second block adjacent to the construction zone and are highly vulnerable to suffer the effects of increased exposure to construction emissions and potentially hazardous dust because they, their children or grandchildren have asthma or other respiratory conditions, or are elderly (Bette Cram is 95 years old)[4], and spend important parts of their daily lives outdoors walking for exercise, working in their gardens, or enjoying sun in their yards.

This evidence meets Petitioners' burden to: 1) establish imminent injury for standing to challenge the ROD on the merits, and 2) demonstrate that the inevitable increased exposure to PM from heavy duty diesel construction equipment, earthmoving, demolition, and other work will cause irreparable harm to members' health if construction commences.

Defendants do not deny that residents near I-70 will be exposed to increased PM when construction begins. Defendants acknowledge the risk of harm by committing to install storm

---

[3] ECF_88-12_Ex._28_Thurston, 18-19; ECF_88-1_Ex._1_DEH, 16-17.
[4] ECF_88-3–88-11_Exhibits_19–27.

5 – Sierra Club Petitioners' Reply in Support of Stay

windows and air-conditioning in homes within one block of the right-of-way to reduce indoor exposures and control fugitive dust. Defendants do not claim these measures will prevent increased exposure to fine particles emitted from heavy-duty diesel equipment or to all fugitive dust emitted from earthmoving and demolition, nor do they explain why they offer no protection to homes beyond this limited perimeter where 190,000 truckloads of material will be transported. Defendants monitor ambient air pollutants at Swansea Elementary,[5] but have not committed to monitor the actual construction along the 1.8-mile-long trench, or implement any actions to protect residents outside so they may safely enjoy their porches and gardens, visit neighbors, walk, jog or bicycle. To remain safe, Petitioners' members will be forced to remain indoors with windows closed for up to four years—or more.

These limited measures do not satisfy FHWA's burden under F-AHA to "eliminate or minimize" exposures during construction. Clearly these measures are insufficient to prevent incremental exposures that Dr. Thurston explains will harm Petitioners' members during construction.

Defendants respond that this harm will not occur before summer 2018. During case management plan discussions, Petitioners asked Defendants to defer construction until this case is decided on the merits. Defendants refused, indicating that the Project Agreement between FHWA and CDOT, 23 U.S.C. §106, would likely be signed by November's end, and construction commenced by late winter. This Motion's schedule was based on those conversations. Petitioners continue to invite Defendants to stipulate that they will not begin

---

[5] First report available at:
http://www.denvergov.org/content/dam/denvergov/Portals/771/documents/EQ/Air%20Quality/6203%20Report%20Q3%20FINAL.PDF Accessed Dec. 22, 2017.

6 – Sierra Club Petitioners' Reply in Support of Stay

construction until this Court decides the merits. Absent this commitment, Defendants may begin construction once they execute the federal Project Agreement. The threat of harm is sufficiently imminent that Petitioners seek relief to protect their members' health from harm if construction commences.

### B. Harm From Irretrievably Committing Resources.

FHWA concedes that NEPA

> … prohibits a *federal* agency from taking any action that "limit[s its] choice of reasonable alternatives" identified in the decision-making process, *before* issuing its final decision. 40 C.F.R. §1506.1(a)(2); *see also Wildwest Inst. v. Bull*, 547 F.3d 1162, 1168 (9th Cir. 2008). §1502.2(f). Such prohibition extends to "commit[ting] resources," which would prejudice the federal agency's selection of project alternatives *before* the agency has completed the environmental analysis. 40 C.F.R. §1502.2(f).[6]

Petitioners contend that FHWA has not "completed the environmental analysis." If the Court finds Petitioners are likely to prevail on their NEPA or F-AHA claims, then FHWA has not completed its legally-required environmental analysis. If so, 40 C.F.R. §1502.2(f)'s requirement that "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision" should apply until a lawful environmental analysis is completed. If resources are irretrievably committed before completing a lawful environmental analysis, Petitioners will be harmed by dissipation of resources that may be wasted or needed for adequate mitigation or other measures.

---

[6] ECF_94_FHWA_Resp., 24.

7 – Sierra Club Petitioners' Reply in Support of Stay

**II. Petitioners Are Likely to Prevail on the Merits.**

    **A.  Defendants Did Not Disclose Significant Health Impacts or Consider Mitigation Necessary to Eliminate or Minimize Health Effects.**

Petitioners' NEPA and F-AHA challenges focus on FHWA's failure to 1) investigate and disclose the impacts of Project pollution on community health, and 2) identify mitigation measures sufficient to eliminate or minimize those impacts.

CDOT, but not FHWA, incorrectly contends NEPA does not require consideration of health impacts because health is not an impact on the physical environment.[7] NEPA requires agencies to prepare a "detailed statement" describing the "environmental impact" of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C)(emphasis added). CEQ regulations implementing NEPA define "health" as an environmental impact, including within the meaning of "*significantly* as used in NEPA." 40 C.F.R. §§1508.8, 1508.27.[8] "CEQ's interpretation of NEPA is entitled to substantial deference." *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988)(overruled on other grounds by *Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992), *quoting Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

In NEPA, Congress directed the "Federal Government to use all practicable means … [to] (2) assure for all Americans safe, *healthful* … surroundings; [and] (3) attain the widest range of beneficial uses of the environment without degradation, risk to *health* or safety," 42 U.S.C. §4331(b)(emphasis added). Taken together with CEQ's regulations, it is clear that health is a "relevant factor" that must be addressed in the I-70 EIS. *See Natural Resources Defense Council,*

---

[7] ECF_96_Response, 14.
[8] *See* ECF_88_Motion, 25-26.

8 – Sierra Club Petitioners' Reply in Support of Stay

*Inc. v. U.S. E.P.A.*, 638 F.3d 1183, 1190 (9th Cir. 2011)("Generally, we must set aside an agency's action where it failed to consider mandatory factors set forth by statute or in a regulation."); *Woods Petroleum Corp. v. Department of Interior*, 47 F.3d 1032, 1039 (10th Cir. 1995)("[T]he Secretary must analyze *all* relevant factors articulated in the 1982 BIA guidelines."); *Arkansas Medical Soc., Inc. v. Reynolds*, 6 F.3d 519, 530 (8th Cir. 1993)(agency "must consider the relevant factors … designated in the statute….").

Nothing in the record disputes that increased cardiovascular mortality or asthma attacks requiring hospital treatment are "significant" impacts on the "human environment."[9] In agreeing that DEH "thoroughly discuss[ed]" "the current health status of the communities,"[10] Defendants concede these ongoing adverse health effects.

Defendants also do not dispute that PM emissions will increase significantly as traffic increases.[11] Nor do Defendants point to record evidence or any expert testimony contesting either the research that Dr. Thurston relied upon or his expert conclusion that:

> the increased air pollution exposure to residents living or going to school near to traffic (such as along I-70 in Denver) and its related exposures to particulate matter air pollution, including PM10, will be at significantly increased risk of both short- and long term adverse health effects.[12]

Instead, Defendants focus on and dispute Petitioners' request for a "health impact assessment" ("HIA") to address NEPA's requirement to compare the health impacts of alternatives, and NEPA and F-AHA requirements to measure the effectiveness of mitigation measures to "eliminate or minimize" health impacts. Defendants contend they fulfilled their

---

[9] ROD, 109 (EAR-0358).
[10] *Id.*
[11] ECF_88_Motion, 24-25.
[12] ECF_88-12_Thurston, 19.

obligation to consider health impacts by determining Project emissions will not violate the PM10 and carbon monoxide NAAQS, that emissions of mobile source air toxic pollutants will decline over the Project's life,[13] and discussing a few inconclusive health studies from 2010 or earlier. In support, they point to their discussion of "human health conditions," FEIS §5.20, and their responses to comments on "Air Quality and Health."[14] Defendants admit that air pollution contributes to poor community health, but note there are other "possible causes for poor health in nearby neighborhoods," "in addition to highway emissions."[15]

Despite admitting that highway pollution contributes to poor community health and PM exposure will increase significantly, Defendants identify no discussion of the causal relationship between exposure to highway pollution and the undisputed and disproportionately higher incidence of diseases of air pollution in communities adjacent to interstate highways, or the likely impact on community health from increased future PM exposure. Defendants make no attempt to estimate the reduction in health impacts in north Denver neighborhoods that could be achieved by routing I-70 onto the I-270/I-76 alignment, implementing any of three other commenter-requested mitigation measures,[16] or the limited storm window and air conditioner mitigation adopted in the ROD.

---

[13] ECF_94_FHWA_Resp., 18-19.
[14] (EAR-0209)
[15] ECF_96_CDOT_Resp., 18.
[16] ECF_88_Motion, 8-9.

**1. NAAQS Are Inadequate to Protect This Community's Health.**

Contrary to Defendants' arguments that Petitioners failed to challenge the adequacy of the NAAQS to protect health,[17] Sierra Club's contested this approach both in the SDEIS and FEIS. In SDEIS comments, Sierra Club requested:

> a health impact assessment must be included in the current NEPA review because of the evidence provided by DEH showing that residents in these communities are now experiencing disparate health outcomes compared to other communities in Denver.[18]

Sierra Club explicitly stated that NAAQS are inadequate to protect health:

> In addition to determining the impact of Project emissions on the attainment of the NAAQS, the SDEIS must include an assessment of the health impacts on the community that will result from the full mix of criteria and toxic air pollutants emitted from motor vehicles. Residents do not just breath one pollutant at a time, and the adequacy of national air quality standards to protect health do not account for the cumulative and synergistic effects on human health that result from exposure to the full array of criteria and toxic air pollutants emitted from highways.[19]

In the FEIS, §5.20, FHWA declined to prepare an HIA to assess impacts of Project emissions on community health, largely because it concluded that ***toxic emissions*** from traffic are expected to decrease. Sierra Club challenged this singular focus on air toxics by renewing its request for an HIA:

> This response also ignores the vast body of health effects research that links the adverse health outcomes being reported in north Denver communities to both PM2.5 specifically, and to the full mix of air pollution emitted from highways. Most of the literature does not link these health effects to mobile source air toxic (MSATs) pollutants. The fact that MSAT emissions are expected to decline over the life of the Project does not relieve CDOT of the duty to investigate the likely health impacts of community exposure to

---

[17] ECF_96_CDOT_Resp., 11.
[18] SDEIS Comments (EAR-0223).
[19] SDEIS Comments (EAR-0223).

11 – Sierra Club Petitioners' Reply in Support of Stay

increasing concentrations of PM10 and PM2.5, and the overall mix of criteria pollutants and MSATs emitted from highways.[20]

Sierra Club emphasized that reliance on the NAAQS to protect health is contradicted by DEH's compelling evidence that, despite attaining the PM2.5 and PM10 NAAQS, diseases of air pollution are more prevalent in north Denver neighborhoods near the interstates than in other Denver neighborhoods:

> DEH reported much greater frequency of the hospitalization of children with asthma and higher rates of death from cardiovascular disease. These are the two health outcomes that EPA identified as most causally linked to exposure to PM2.5.[21]

Nothing in the record explains why Defendants assume that the NAAQS adequately protect health. To the contrary, evidence in the record demonstrates that while air quality complies with the NAAQS, health in the communities exposed to I-70 pollution is already devastated by the diseases of air pollution.

FHWA admits that "[t]he current health status of the affected communities has been thoroughly discussed in the DEH's *Health Impact Assessment*."[22] Presumably this recognition of "the current health status of the affected communities" acknowledges that community health status is relevant to understanding the significant impacts of pollution from the Project. Furthermore, FHWA validates DEH's community health data showing elevated cardiovascular mortality and emergency treatment of children for asthma, compared to other Denver neighborhoods. By implication, combining this validation of DEH's data with the FEIS' acknowledgment that "[h]ighway traffic is the main source of air pollution in the [Globeville,

---

[20] FEIS Comments (EAR-0324–5).
[21] *Id.*
[22] ROD, 108. (EAR-0357)

12 – Sierra Club Petitioners' Reply in Support of Stay

Elyria, Swansea] communities,"[23] FHWA accepts the inference from the DEH report that air pollution from highways is a significant contributor to these adverse health outcomes even when NAAQS are attained.

Instead of assessing the effects of current baseline exposure to highway pollution to determine its contribution to impaired community health and candidly disclosing the likely cumulative health impacts from increased future exposures, Defendants claim "air quality in the project area or the Denver region is not anticipated to worsen over existing conditions."[24] This statement in the FEIS flatly contradicts the Air Quality Technical Report, which states that PM emissions from the Project and ambient PM concentrations near the Project will increase significantly as a result of increased future traffic.[25] This misrepresentation of the facts disingenuously misleads both the decisionmaker and the public by covering up the threat to neighborhood health as a result of increased Project emissions.

FHWA never responded to Sierra Club's comment that because the vast body of health effects evidence attributes most harm to PM, the health effects discussion must therefore focus on PM. Daily PM emissions are over 4 tons per day and will increase to nearly 6 tons per day,[26] whereas air toxics emissions (except diesel PM) are *pounds* per day.[27] Nor did Defendants ever discuss cumulative health consequences from exposure to the complex pollutant mixture emitted

---

[23] FEIS §5.20-15 (EAR-0078).

[24] FEIS, §5.20-20 (EAR 0083).

[25] ECF_88_Motion, 24-25.

[26] Fugitive road dust is currently 3.5 tons/day, and is expected to increase to 5 tons/day. *See* FEIS, Exhibit 5.10-25 (EAR-0345). Total PM tailpipe emissions (including PM2.5) is currently 0.6 tons/day (1200 pounds), and is expected to increase to near 0.7 tons (1400 pounds) by 2035. *Id.,* Exhibit 5.10-16 (EAR-0343).

[27] 2015 Toxic air pollutant emissions range from a few pounds/day to 140 pounds/day for benzene, formaldehyde 75 pounds/day, and diesel PM 368 pounds/day. *Air Quality Technical Report,* §7.4, Tables 28–33. (EAR-0349–354).

from highways, including nitrogen oxides, carbon monoxide and mobile source air toxics inhaled along with the tons of PM.

Sierra Club submitted more recent data than the outdated, inconclusive studies cited in the FEIS. Specifically, Sierra Club submitted 2015 research showing that carbon particles emitted from highways, rather than non-carbon particles from other PM sources, are more responsible for cardiovascular mortality:

> Nor does the FEIS review and consider the more recent health effects research published since the SDEIS was prepared that conclusively links the adverse health effects associated with PM to the portion of PM emitted from highways. Highways emit particles containing carbon from fuel combustion, tire wear and asphaltic road surface material. The most recent research published by a team from the Keck School of Public Health at USC, and another study published by the California Office of Environmental Health Hazard Assessment identifies carbon particles as the component of PM2.5 most associated with cardiovascular disease.[28]

Dr. Thurston identified additional research demonstrating the heightened potency of highway particles.[29] Defendants failed to discuss evidence that carbon—EC ("elemental carbon") and OC ("organic carbon")—in vehicle exhaust might account for greater cardiovascular mortality observed near highways because these contaminants are more potent causes of cardiovascular disease than data available to EPA in its 2009 *ISA*.

While the FEIS mentions these studies,[30] FHWA did not consider the role carbon PM may play in exacerbating health effects from highway pollution. FHWA merely acknowledged

---

[28] Sierra Club FEIS Comments (EAR-0325), *citing* "Near-Roadway Air Pollution and Coronary Heart Disease: Burden of Disease and Potential Impact of a Greenhouse Gas Reduction Strategy in Southern California," Ghosh, et al (EHP, July 2015) http://dx.doi.org/10.1289/ehp.1408865; "Associations of Mortality with Long-Term Exposures to Fine and Ultrafine Particles, Species and Sources: Results from the California Teachers Study Cohort," Ostro, B, et al. (EHP, January 2015) http://dx.doi.org/10.1289/ehp.1408565. Accessed Dec. 22, 2017.
[29] ECF_88-12_Ex_28_Thurston, 11.
[30] *See* FEIS §5.20-22 (EAR-0085).

14 – Sierra Club Petitioners' Reply in Support of Stay

that the results reported in "Near Roadway Air Pollution and Coronary Heart Disease," "suggest that a large burden of preventable coronary heart disease mortality is attributable to near-roadway air pollution and is likely to increase even with decreasing exposure by 2035 due to the vulnerability of an aging population."[31] With regard to the study "Associations of Mortality with Long-Term Exposures to Fine and Ultrafine Particles, Species and Sources," FHWA acknowledged that:

> using an emissions-based model, the research team observed significant positive associations between ischemic heart disease mortality and both fine and ultrafine particle species and sources. The results of this research project suggest that the exposure model effectively measured local exposures and facilitated the examination of the relative toxicity of particle species.[32]

Sierra Club also referenced a study showing that when annual PM2.5 exposures were reduced by 3 µg/m$^3$ (from 14.5 to 11.5 µg/m$^3$) over a ten year period (2001-2010), cardiovascular mortality dropped by 21% and stroke by 30%, with benefits observed even among high-risk obese and high-cholesterol populations.[33] This study identified improved health throughout Arkansas, where both 2001 and 2010 annual mean PM2.5 concentrations were below the annual NAAQS (15 µg/m$^3$).[34] Sierra Club pointed to the Arkansas study as evidence that significant health benefits could be achieved for residents in the Globeville/Elyria/Swansea neighborhoods if PM concentrations were reduced to regional background levels by moving I-70 traffic from north Denver's dense urban residential neighborhoods to the more rural, mostly

---

[31] FEIS §5.20-22. (EAR-0085).
[32] *Id.* (EAR-0085).
[33] *Trends of Non-Accidental, Cardiovascular, Stroke and Lung Cancer Mortality in Arkansas Are Associated with Ambient PM2.5 Reductions,* M. Chalbot, et al., College of Public Health, University of Arkansas (2014).
[34] NAAQS for PM2.5, 40 C.F.R. §50.7 (2000).

commercial/industrial I-270 corridor.[35] Nevertheless, Defendants did not include the Arkansas study in the FEIS or consider its findings. Defendants provided no discussion of potential health benefits for north Denver residents from reduced PM exposures. Clearly, data from the Arkansas study supports a finding that reduced exposures will benefit health and increased exposures will cause injury, even in NAAQS-compliant areas.

      2.   **FHWA Failed to Assess Adverse Health Impacts and the Health Benefits of Alternatives and Mitigation Measures.**

Defendants failed to evaluate and report any health impacts that would result from increased community exposure to PM. The ROD includes a lengthy discussion of an emissions analysis predicting lower future concentrations of MSATs and health effects evidence related to MSAT exposure,[36] but includes no comparable discussion of the predicted increases in PM emissions or the likely effects of such increased exposures on community health. FHWA never responded to Sierra Club comments that the NAAQS were inadequate to protect community health for the I-70 Project because community health data shows adverse health effects, even though air quality complied with the applicable NAAQS. Instead, the ROD focused exclusively on modeling analyses to support the conclusion that the PM10 and carbon monoxide NAAQS would continue to be maintained even as traffic and PM emissions increase.[37] Defendants entirely ignore the Project's most important impact on north Denver communities—the degradation of community health. It is arbitrary and capricious for FHWA not to assess health impacts when community health data demonstrate severe adverse health effects occurring when

---

[35] Sierra Club FEIS Comment (EAR-325–326).
[36] ROD, 108-110 (EAR-0357–359).
[37] ROD, 110-115 (EAR-0357–364).

air quality complies with the NAAQS. No evidence in the record supports the presumption that NAAQS compliance ensures no significant health impacts from exposure to highway pollution.

Analyzing air quality does not satisfy the obligation to consider the impact of air pollution on health. Increasing pollution exposures affect health, but modeling pollutant exposures is only a step in the evaluation of health impacts. Petitioners requested that Defendants use a health impact assessment (HIA), which is an assessment tool described in detail and recommended by the National Research Council ("NRC") for evaluating health impacts under NEPA.[38] First applied to projects in San Francisco, a number of States have prepared HIAs to assess project health impacts.[39] Citing the NRC's description of integrating HIAs into the NEPA process, EPA's Office of Federal Activities issued 2015 guidance directing regional NEPA coordinators to advance HIA use:

> HIA … provides evidence-based recommendations to address disproportionate health effects, mitigate potential adverse health effects, and bolster potential beneficial health effects of the proposed decision.[40]

Although Federal agencies have rarely used HIAs, State health agencies perform HIAs in their role as NEPA cooperating agencies.[41]

---

[38] *See Improving Health in the United States: The Role of Health Impact Assessment* (National Research Council, National Academies Press, 2011). Available:https://www.nap.edu/read/13229/chapter/9#159.
[39] *Id.*, Appendix A, pp. 150-159.
[40] "Memorandum: Promoting the Use of Health Impact Assessment to Address Human Health in Reviews Conducted Pursuant to the National Environmental Policy Act and Section 309 of the Clean Air Act" (U.S. EPA, Office of Federal Activities and Office of Research and Development, November 15, 2015). Available: https://www.epa.gov/sites/production/files/2016-03/documents/hia_memo_from_bromm.pdf Accessed Dec. 22, 2017.
[41] *See Using Health Impact Assessments to Enhance the Environmental Regulatory Process: Case Studies and Key Messages* (Association of State and Territorial Health Officials, 2017). Available at: http://www.astho.org/Environmental-Health/Using-HIA-to-Enhance-the-Environmental-Regulatory-Process/ Accessed Dec. 22, 2017.

17 – Sierra Club Petitioners' Reply in Support of Stay

Here, FHWA simply rejected using HIA to quantify health impacts without adopting any other method to assess adverse Project impacts or the benefits of alternatives or mitigation for community health. FHWA merely declared that "a health study (health impact assessment or health risk assessment) is not required by NEPA or the CAA and, therefore, it has not been performed for this project."[42] Defendants suggest that Petitioners merely cavil with the agencies over favored methodologies. This misses the point. Defendants adopted **no** methodology to evaluate health impacts -- they simply refused to assess health impacts.

This failure violates multiple obligations under NEPA. Although Defendants claim an HIA is not required,[43] NEPA requires FHWA to:

> provide full and fair discussion of significant environmental impacts and … inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.[44]

An impact like health effects requires *some* scientifically credible, comprehensible metric to assess and explain adverse impacts to the decisionmaker and the public:

> The EIS requirement serves two important functions: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*Rags Over the Arkansas River v. BLM*, 77 F.Supp.3d 1038, 1047 (D.Co. 2015), quoting

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA also requires a method for comparing the impacts of alternatives. "The EIS must also 'rigorously explore and objectively evaluate all reasonable alternatives' to a proposed action

---

[42] ROD, 108 (EAR-0357).
[43] ECF_95_FHWA_Resp., 12; ECF_96_CDOT_Resp., 11.
[44] 40 C.F.R. §1502.1.

in comparative form, so as to provide a 'clear basis for choice among the options.'" *WildEarth Guardians v. U.S. Forest Serv.*, 828 F.Supp.2d 1223, 1236 (D. Colo. 2011)(quoting 40 C.F.R. §1502.14). NEPA requires the effectiveness of mitigation measures be evaluated to determine how a Project's adverse impacts can be avoided or minimized. The EIS "must include a 'reasonably complete [discussion of mitigation measures] in order to properly evaluate the severity of the adverse effects of a proposed project before making a final decision.'" *Rags Over the Arkansas,* 77 F.Supp.3d, 1051. Defendants have not applied any methodology to satisfy these obligations.

Defendants contend HIA would provide no useful information to compare alternatives because emissions from each alternative are not significantly different. But the similarity does not excuse disclosing their impacts, or identifying effective mitigation. Traffic modeling for the I-270 alternative demonstrates the potential for achieving a 65% to 80% reduction in traffic emissions in north Denver neighborhoods.[45] Failing to disclose health impacts deprives the public and decisionmakers of the opportunity to consider how many lives might be saved, heart attacks avoided, asthma attacks prevented, and overall health benefits that could be achieved. The lack of an assessment tool defeats all NEPA's objectives.

### 3.  Record Contains No Evidence Supporting No Significant Health Impact.

Defendants contend that because the NAAQS will be attained, they may presume, without more, that increased exposure to traffic pollution will cause no significant impact, and therefore they have no obligation to assess health impacts and "no specific mitigation measures

---

[45] ECF_88_Motion, 8.

are necessary for the project to proceed." FEIS §5.20-4. This presumption is not supported by the record.

DEH's report establishes that residents near I-70 currently suffer disproportionately greater incidence of diseases of air pollution, despite NAAQS compliance. The FEIS reports that exposure to highway pollution will significantly increase. Expert testimony from Dr. Thurston establishes that:

> increasing exposures to PM10 and PM2.5 at levels below the NAAQS will increase both the incidence of asthma attacks and asthma on-set in the community, increase personal risk for those already diagnosed with asthma, and increase risk of suffering acute effects and mortality from cardiovascular disease.[46]

Dr. Thurston found that incrementally greater PM2.5 concentrations recorded at the near-highway monitor in Globeville, compared to other metro monitors, are consistent with increased incidences of the diseases of air pollution.[47] He also referenced recent findings by the World Health Organization that concentrations below the EPA PM2.5 NAAQS are harmful, and published research showing that coarse particle concentrations measured at the Globeville monitor harm health. This evidence confirms I-70 neighbors will suffer increasing harm from expected increased exposures to PM, even if concentrations meet the NAAQS. This evidence demonstrates that by not assessing the health impacts of increased exposure to PM, Defendants failed to consider relevant evidence of a significant impact, ignored a relevant factor, were unreasonable, and violated their duty to disclose all significant impacts.[48]

---

[46] ECF_88_12_Ex_28_Thurston, 18.
[47] *Id.*, 14-15.
[48] Petitioners will move to supplement the agency record with Dr. Thurston's Declaration (ECF_88_12) and the studies cited for his analysis of the health effects research and conclusions regarding the health risks associated with exposure to highway pollutants to demonstrate Defendants failed to consider a critical relevant factor (health impacts) and to examine evidence relevant to determining those impacts.

Defendants do not contest the relevance or probity of the scientific research that Dr. Thurston relies on for his conclusions or the validity of his conclusions that increased PM exposure will further degrade the health of residents in communities affected by highway pollution. Astoundingly, Defendants assert they may lawfully ignore evidence of harm by relying on predictions that air quality will comply with the applicable NAAQS. Defendants rely on the presumption that because the Clean Air Act requires that NAAQS protect public health, pollutant levels allowed by the NAAQS are harmless and not "significant" for NEPA purposes.[49] This contention is not based on evidence in the record; but is rebutted by all the evidence of harm.

Petitioners do not challenge the NAAQS; Petitioners challenge the contention that air quality below the NAAQS has no significant impact on health. "NEPA does not contain substantive environmental standards but instead establishes procedural requirements designed to ensure that agencies take a "hard look" at the environmental consequences of their actions." *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1154 (9th Cir. 2006). The EIS must discuss all "significant impacts." An assessment of health impacts may be excluded from the EIS only if the record shows that I-70 emissions will have no significant impact on health. In the face

---

The Court ordered Plaintiffs to file only one motion to supplement the record no later than February 12, 2018. ECF_67_Amended_Courtroom_Minutes

Presently, Petitioners rely on the holding that "In dealing with scientific and technical evidence, extra-record evidence 'may illuminate whether an [environmental impact statement] has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under the rug' " *Wilderness Workshop v. Crockett*, 2012 WL 1834488 (D. Colo 2012), *citing Citizens for Alt. to Radioactive Dumping v. U.S. Dep't of Energy,* 485 F.3d 1091, 1096 (10th Cir.2007); *Colorado Environmental Coalition v. Lujan*, 803 F.Supp. 364, 370-71 (D.Colo. 1992)(admitting extra-record evidence for certain limited purposes); *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1162 (9th Cir. 2006, abrogated on other grounds by *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008))(admitting extra-record evidence to support motion for preliminary injunction).
[49] ECF_94_FHWA_Resp., 13; ECF_96_CDOT_Resp., 12.

of diverse sources and compelling evidence of harm to residents exposed to current emissions, Defendants cannot point to any evidence in the record that NAAQS compliance has avoided all significant harm to health in areas affected by I-70 emissions. Evidence of future increases in pollutant exposures demands that Defendants take a "hard look" at the health consequences of community exposures, even if air quality complies with the NAAQS.

Defendants, not Petitioners, challenge EPA's conclusions drawn from available data when it completed the *Integrated Science Assessment for Particulate Matter* in 2009. Dr. Thurston relies on EPA's analysis that produced the cardiovascular mortality risk curve to characterize risks below the NAAQS.[50] Dr. Thurston notes that EPA's "data clearly illustrate that air pollution deaths occur below the existing PM2.5 NAAQS (35 $\mu g/m^3$ for the daily standard, and 12 $\mu g/m^3$ for the annual standard)."[51] Defendants do not challenge that conclusion with contradictory evidence. Instead, they point to the uncertainty that EPA found relevant to its NAAQS decision. But the widening confidence interval that EPA found at lower concentrations is related to the magnitude of the mortality effect (i.e., numbers of deaths) allowed by the NAAQS, not whether deaths will occur at levels below the NAAQS.

Most importantly, EPA made no findings that support the presumption of "no significant effect" that Defendants claim. Rather, in its final NAAQS decision, EPA expressly rejected that presumption: "no population threshold, below which it can be concluded with confidence that PM2.5-related effects do not occur, can be discerned from the available evidence." 78 Fed. Reg. 3086, 3098 (January 15, 2013).

---

[50] ECF_88-12_Ex_28_Thurston, 13-14.
[51] *Id.*, 13.

22 – Sierra Club Petitioners' Reply in Support of Stay

Furthermore, the D.C. Circuit standard to review the EPA's NAAQS decisions also discredits the notion that the NAAQS was set at levels that assure safe air quality. The Court rejected industry petitioners' claim that EPA violated the Clean Air Act by not determining a "safe" level, concluding that precedent "requires only that EPA 'engage in reasoned decision-making,' not that it definitively identify pollutant levels below which risks to public health are negligible." *American Trucking Associations, Inc. v. E.P.A.*, 283 F.3d 355, 370 (D.C. Cir. 2002)(citations omitted).

None of the other decisions allegedly recognizing the claimed presumption of no significant impact are controlling in this Court. The Tenth Circuit case cited by Defendants does not adopt the NAAQS presumption. In *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers,* 702 F.3d 1156 (10th Cir. 2012), the EIS for an intermodal rail/truck terminal included both modeled truck emissions showing PM NAAQS attainment ***and*** a health risk assessment for cancer. The ACOE did not rely on NAAQS compliance to find no significant cancer risk.

While *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003) found that NAAQS compliance "logically indicates" no significant impact on public health, as in *Hillsdale*, that inference was not used to avoid a health impact assessment. The inference was supported by independent evidence submitted with the application "evaluat[ing] potential acute, chronic, and cancer health effects" and "modeling data … analyzed to ensure that they would result in no negative health impacts." *Border Power* at 2020. Here,

record evidence disproves the inference. Although the Colorado District decision Plaintiffs cited[52] was *vacated as moot*, its logic remains persuasive.

The cases Defendants cite in support of the presumption do not 1) address evidence of mortality effects at levels below the NAAQS in EPA's *ISA*; 2) consider EPA's explicit rejection of the claimed presumption; 3) acknowledge the D.C. Circuit's standard for reviewing NAAQS decisions; 4) review an agency record containing compelling evidence that residents exposed to highway PM levels compliant with the NAAQS are suffering demonstrable disparately greater incidence of the diseases of air pollution, or 5) weigh expert testimony presenting substantial scientific evidence rebutting the claimed presumption by showing that adverse health effects are observed in areas compliant with the NAAQS. "[A] presumption may be rebutted." *Village of Logan v. U.S. Dept. of Interior*, 2013 WL 12084730 (D.N.M. 2013)(emphasis in original). For all of these reasons, the presumption of no significant impact that Defendants rely on has no basis in EPA's factual findings, the published peer-reviewed scientific literature, the record before the Court, or the law. The claimed presumption must be rejected as a lawful reason for FHWA's failure to perform its duty under NEPA and F-AHA to review the evidence of adverse health effects to assess and disclose the significant impacts that increased PM emissions from I-70 will have on community health.

### 4. Defendants' Duty to Consider New Data or Cumulative Effects of Pollutants Cannot be Waived.

Even if the presumption of no significant impact is applied, it is limited to the health effects associated with exposure to the pollutant that the NAAQS regulates and is limited to the

---

[52] *See* ECF_88_Motion, 28.

evidence of harm that EPA reviewed in 2009. A presumption founded on 8-year-old data cannot excuse FHWA's failure to consider evidence in the record of health impacts of exposure to pollution emitted from I-70, or evidence of harm caused by exposure to PM that was not available to EPA in 2009, or its failure to consider the evidence of health impacts associated with the cumulative exposure to the full array of pollutants emitted from highways.

Beyond the data EPA reviewed in 2009, the current record includes the evidence of harm reported by DEH. In addition, Dr. Thurston points to two other sources of evidence that people exposed to increasing concentrations of PM will be harmed: 1) evidence of adverse health effects suffered by populations exposed to all highway pollutants, and 2) new data on the effects of exposure to PM published since 2009 when EPA last closed the record on its review of the science. Studies discussed by Dr. Thurston report health effects observed among populations exposed to highway pollution rather than individual pollutants.[53] These investigations account for the cumulative and synergistic health effects of exposure to the full array of pollutants included in the complex mixture emitted from highways. EPA did not consider those studies in its review of the NAAQS for PM because its decision under the Clean Air Act was intentionally focused on the narrow issue of the effects of **only** PM, not the effects of all highway pollution. The NAAQS for PM cannot presumptively protect against the additive or synergistic effects of PM when PM is only one of multiple pollutants in highway emissions. Nor could a presumption based on data available in 2009 extend to more recent evidence of harm associated with exposures to air quality compliant with the PM NAAQS—such as the Arkansas study, the WHO

---

[53] ECF_88-12_Ex_28_Thurston, 3.

analysis of global data, and the meta-analysis of the adverse effects of coarse particles (PM10 –

PM2.5)—discussed by Dr. Thurston.[54]

By not considering any of this evidence of harm to estimate the adverse health effects of

current exposures and predicted future exposures to PM and the mix of pollutants I-70 emits,

FHWA has failed to perform its fundamental NEPA obligation to disclose significant impacts.

Thus, FHWA's action is arbitrary and capricious under the APA because it failed to "examine

the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs.*

*Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 30 (1983).

### B.  NEPA's Procedural Requirements Do Not Waive F-AHA's Substantive Standards.

FHWA does not dispute that F-AHA Section 109(h) enacted a substantive requirement

that projects be found in "the best overall public interest" and that F-AHA identifies factors

relevant to that determination.[55] F-AHA requires weighing costs of mitigation sufficient to

"eliminate or minimize"[56] a project's adverse impacts against its transportation benefits. FHWA

acknowledges that F-AHA **requires** that highway projects **implement** mitigation needed to

"eliminate or minimize" adverse effects:

> To fulfill its responsibilities under §109(h), FHWA is also required to incorporate "measures necessary to mitigate adverse impacts" of the proposed project. *Id.* §§771.105(d), 771.107(b), 771.125(a)(1) ("mitigation measures presented as commitments in the final EIS will be incorporated into the project . . .").[57]

---

[54] ECF_88-12_Ex_28_Thurston, 16-18.
[55] ECF_88_Motion, 32; ECF_94_FHWA_Resp., 3.
[56] ECF_88_Motion, 24.
[57] ECF_94_FHWA_Resp., 16-17.

Petitioners' claim is based on FHWA's failures to identify mitigation sufficient to "eliminate or minimize" the Project's adverse health effects, determine their costs, and weigh those costs in its public interest determination. Reasoned decisionmaking at least requires an explanation, based on record evidence, how FHWA made its public interest determination. Remand is required when "the record before the agency does not support the agency action, [or] if the agency has not considered all relevant factors…." *Sierra Club v. Hodel*, 848 F.2d at 1093.

FHWA's response is largely a *non-sequitur.* It argues "regulations do not require that any specific actions be taken to mitigate environmental impacts" or prescribe "any particular cost-benefit analysis to eliminate or minimize the adverse impacts of air pollution."[58] Although Petitioners requested that FHWA consider specific mitigation actions, their claim is not limited to FHWA's failure to determine impacts mitigated by these specific measures and weigh their costs. FHWA simply failed to consider F-AHA's statutory factors in their public interest determination.

Defendants commit to install storm windows and air conditioners in the first block of homes along the construction zone, but never address whether this mitigation is sufficient to "eliminate or minimize" the Project's adverse effects. Absent any record finding sufficient mitigation, FHWA asserts that because emissions will comply with the NAAQS "no specific mitigation measures are necessary for the project to proceed."[59] FHWA's assertion that NAAQS compliance equals "no significant impact" for this Project is not supported in the record. Because

---

[58] ECF_94_FHWA_Resp., 19.
[59] FEIS §5.20-4 (EAR-0067).

the record evidences current and future harms to residents' health, FHWA cannot bypass its statutory duties under F-AHA.

FHWA implies that integrating the §109(h) determination into FHWA's Part 771 regulations implementing NEPA eliminates the statutory public interest determination. NEPA does not subsume or supersede requirements of other laws. Indeed, CEQ rules require that an EIS "state how alternatives…will or will not achieve the requirements of…other environmental laws…" 40 C.F.R. §1502.2(d). FHWA's NEPA regulations require FEISs to "document compliance with requirements of all applicable environmental laws…." 23 C.F.R. §771.133. Section 109(h) is no exception.

The same Congress that enacted NEPA, legislated separate and additional requirements for highway projects in §109(h). The "best overall public interest" determination is a substantive standard governing agency decisionmaking. NEPA sets no such standard.  Congress required that the public interest determination include weighing specific factors, including costs of mitigating adverse impacts. Simply installing storm doors and windows in the first block of homes cannot satisfy F-AHA, because this does not eliminate adverse health impacts throughout the neighborhood and does not protect indoor air in other blocks.

FHWA appears to argue that because "NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated," §109(h) requires no more.[60] Defendants ***never*** discussed whether mitigation fully eliminates or minimizes the health consequences of Project emissions.

---

[60] ECF_94_FHWA_Resp., 19-20.

### C.  Feasible Mitigation Measures are Available.

CDOT argues that Petitioners did not properly challenge Defendants' rejection of requested mitigation measures to reduce community health impacts.[61] Petitioners present these examples to demonstrate that feasible measures are available to eliminate Project health impacts.[62] Defendants did not evaluate the health benefits or costs of these (or any other) measures. CDOT claims it rejected the truck diversion strategy for transportation reasons[63] and rejected relocation assistance because of costs, but the record has no cost analysis. Petitioners' Motion does not seek adjudication of claims that Defendants unlawfully discarded these measures. Petitioners reserve these claims for the merits briefing.

## III. Balance of Harms Favors Protecting Health.

FHWA argues that crash risks on I-70 tip the balance in favor of beginning construction before Plaintiffs' claims are decided. Defendants' legitimate concern about crash impacts highlight the unreasonableness of their disregard for the comparable or greater risks of air pollution. Defendants identify seven fatalities from "2009 to 2012" in "the project area"[64] which includes a one-mile buffer around the new highway lanes. By comparison, DEH reported 213 cardiovascular deaths per 100,000 residents for Denver Council District 9 (including Globeville, Elyria and Swansea), compared to 160 deaths/100,000 for Districts 2 and 5.[65] The incremental deaths in the neighborhoods adjacent to I-70 are potentially attributable to the impacts of highway pollution, although some of the incremental risk is likely attributable to other factors.

---

[61] ECF_96_CDOT_Resp., 23-24.
[62] ECF_88-1_Motion, 8.
[63] ECF_96_CDOT_Resp., 34.
[64] *See* ECF_96_CDOT_Resp., 31.
[65] ECF_88-1_DEH_Study, Fig. 6, 16.

An HIA assessing pollution exposures and risks would clarify community mortality attributable to I-70, but clearly the annual mortality effect is greater than the 3-year crash risk. FHWA cites *Valley Cmty. Preservation Comm'n v. Mineta*, 373 F.3d 1078, 1087 (10th Cir. 2004), as favoring projects that improve safety, but that case did not involve eliminating adverse impacts on human health. The decision does not support the conclusion that the harms of pollution exposure may be disregarded to dispense with the balancing of harms required by§109(h) to determine if the Project is in "the best overall public interest" before allowing the Project to proceed.

**IV. Protecting Human Health is in the Public Interest.**

"[T]he public interest indisputably includes the public health." *Bahnzaf v. F.C.C.*, 405 F.2d 1082, 1097 (D.C. Cir. 1968). Here, the duty to protect public health from environmental threats enhances the Tenth Circuit's conclusion that "the public interest associated with completion of the Project must yield to the obligation to construct the Project in compliance with the relevant environmental laws." *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).

<u>Conclusion</u>

For the reasons set forth above and in the Motion, Petitioners request the Court stay FHWA's ROD pending a decision on the merits.

Respectfully submitted,

  /s/Robert E. Yuhnke
ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

  /s/Andrea S. Gelfuso
ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

  /s/Gregory N. Corbin
GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of December, 2017, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

/s/ Gregory N. Corbin
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section, P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Melissa A. Hailey
Aaron D. Goldhamer
1290 Broadway, Suite 600
Denver, CO 80203
mah@keatingwagner.com
agoldhamer@keatingwagner.com

Brent E. Butzin, Esq.
Assistant Attorney General
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Brent.butzin@coag.gov

James Jay Tutchton
Tutchton Law Office
6439 East Maplewood Avenue
Centennial, CO 80111
jtutchtontlo@gmail.com

*Attorneys for Defendant-Intervenors*

*Attorneys for Zeppelin Plaintiffs*