**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Nos. 17-cv-01661-WJM-MEH
17-cv-01679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE; JACQUELINE LANSING; JANET FEDER; SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

    Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as Secretary of Transportation; and JOHN M. CARTER, in his official capacity as Division Administrator,

    Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado Department of Transportation,

    Defendant-Intervenors.

---

**ZEPPELIN PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO DKT. 97**

---

*Question 1: Is there any relief the Court can grant under Claims 4 and/or 5 that the Court cannot grant under Claim 6 (or Claim 1)?*

**Yes.** If the Zeppelin Plaintiffs were to prevail on Claims 4 and/or 5, FHWA/CDOT would have to analyze all the direct, indirect, and cumulative impacts of P2PH, including P2PH's ecological, aesthetic, historic, cultural, economic, social, and health effects. See 40 C.F.R. § 1508.25 (requiring action agency to analyze the direct, indirect, and cumulative impacts of the proposed action, as well as all connected and similar actions); 40 C.F.R. § 1508.8 (listing

all types of impacts that must be addressed for actions subject to an EIS).[1]  Neither this type nor level of analysis would flow from success on Claims 1 or 6.

Should Plaintiffs prevail on Claim 1, FHWA/CDOT would have to conduct a more thorough and legally adequate analysis of how exposure to hazardous materials during the destruction of the viaduct and excavation of the highway trench impacts human health and the environment.  See First Amended Complaint, Dkt. 25, at ¶ 227.  While this would be an affirmative analysis by FHWA/CDOT, the scope of this analysis would focus on the highway trench, not P2PH, which consists of construction activities at Globeville Landing Park, City Park Golf Course, along 39th Avenue, and at Park Hill Golf Course.

Should Plaintiffs prevail on Claim 6, FHWA/CDOT would have to conduct a more thorough and legally adequate analysis of "the impact on the environment which results from the incremental impact of [Central 70] when added to [P2PH]."  40 C.F.R. 1508.7 (defining "cumulative impact").  While this analysis would touch P2PH, it would not include an analysis of P2PH's direct and indirect impacts because would assume that Central 70 and P2PH are wholly separate projects, and would thus utilize only the City of Denver's data on the impacts of P2PH, rather than forcing an independent investigation or study on the part of FHWA/CDOT. See generally Ex. 3, CONSIDERING CUMULATIVE EFFECTS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT, Council on Environmental Quality (1997) ("CEQ Guidance").

---

[1] On January 2, 2018, Plaintiffs acquired new information from Denver showing that Denver is using CDOT dollars to fund 4.4% of the construction of Globeville Landing Outfall ("GLO") and 100% of the property acquisitions for P2PH (most of which are along 39th Avenue).  Ex. 1, P2PH budget; Ex. 2, Second Declaration of Kimberly Morse (authenticating Ex. 1).  Irrespective of whether CDOT still has the ability, after making these payments, to "materially influence" P2PH, these paymenets reinforce Plaintiffs' claims that P2PH is connected to Central 70.

See also N.M. ex rel. Richardson v. BLM, 565 F.3d 683, 705 (10th Cir. 2009) (citing CEQ publication as persuasive authority on interpreting NEPA regulations).  Thus, "[a]lthough cumulative effects analysis is similar in many ways to the analysis of project-specific effects, there are key differences."  Ex. 3 at p. 47.

One "key difference" of the cumulative impacts analysis is that it is performed *after* the action agency has analyzed the direct and indirect impacts of the "major federal action," which is the primary subject of the EIS.  Id. at p. 11 ("Identifying the major cumulative effects issues of a project involves defining the following: [a] the direct and indirect effects of the proposed action; [b] which resources, ecosystems, and human communities, are affected; and [c] which effects on these resources are important from the cumulative effects perspective.").  This sequence makes sense because the point of analyzing cumulative impacts is to identify additive (or equalizing) impacts across otherwise unrelated projects in the same geographic area.  See 40 C.F.R. 1508.7.  See also Ex. 3 at p. 13 (Table 2-1) (how to identify potential cumulative effects issues) and p. 42 (how to determine magnitude of cumulative impacts).

As the CEQ Guidance explains:

> The proposed action may affect several resources either directly or indirectly… In a broad sense, all the impacts on affected resources are probably cumulative; however, the role of the analyst is to narrow the focus of the cumulative effects analysis to important issues of national, regional, or local significance… The analyst should ask basic questions such as whether the proposed action will have effects similar to other actions in the area and whether the resource have been historically affected by cumulative actions… Not all potential cumulative effects issues identified during scoping need to be included in the EA or an EIS.  Some may be irrelevant or inconsequential to decisions about the proposed action and alternatives.  Cumulative effects analyst should "count what counts," not produce superficial analyses of a long laundry list of issues that have little relevance to the effects of the proposed action or the eventual decisions.

Id. at p. 12.

3

Consequently, if FHWA/CDOT were forced to perform only a cumulative impacts analysis pursuant to Claim 6, the agencies would evaluate merely those types of impacts from P2PH that are also associated with Central 70 and, from that narrowed class of P2PH impacts, would evaluate only those that are likely to reach the geographic area affected by Central 70. For this reason, the cumulative impacts analysis will necessarily omit whole categories of actual and likely significant impacts from P2PH.

The 39th Avenue portion of P2PH is an excellent example why this difference is significant. Construction of both the lowered portion of the highway (Central 70) and the 39th Avenue open channel (P2PH) will require the excavation of soils from Operating Unit 1 of the VB/70 Superfund site. Consequently, both projects will disturb and spread contaminated soils, which may cause deleterious impacts to human health and/or the environment. Although the spread of contaminated soils is an effect common to both projects, under Claim 6, FHWA/CDOT would have no obligation to discuss the human health or environmental impacts of excavation along 39th Avenue *if* they concluded the plume of fugitive dust caused by construction of the open channel does not overlap with the plume of fugitive dust caused by digging the highway trench. Accordingly, although the human health and environmental impacts from the spread of contaminated soils during construction along 39th Avenue may very well be significant – and analyzed as direct and indirect impacts pursuant to Claims 4 or 5 – any forthcoming cumulative impacts analysis may not discuss or disclose these P2PH impacts because FHWA/CDOT might determine they are not additive to the human health and environmental impacts from Central 70.[2]

---

[2] Note this is *not* the case for construction at Globeville Landing Park, which is immediately adjacent to, and overlaps with, the Central 70 project area. The GLO is being built in Operating Unit 2 of the Superfund site, involves the disturbance and spread of contaminated soils, and thus

4

Another "key difference" of the cumulative impacts analysis is that it relies on data gathered and produced by entities other than the action agency to evaluate additive (or equalizing) impacts across projects. Again, as the CEQ Guidance explains:

> Obtaining information on cumulative effects issues is often the biggest challenge for the analyst. Gathering data can be expensive and time consuming. Analysts should identify which data are needed for their specific purpose and which are readily available. In some cases, federal agencies or the project proponent will have adequate data; in other cases, local or regional planning agencies may be the best source of information. Public involvement can often direct the analyst to useful information or, itself, serve as an invaluable source of information, especially about the societal setting, which is critical for evaluating effects on human communities. In any case, when information is not available from traditional sources, analysts must be resourceful in seeking alternative sources. Table 3-2 lists some of the possible types and sources of information that may be of use for cumulative effects analysis.

Ex. 3 at p. 31. See also id. at p. 32 (Table 3-2) (listing possible sources of existing data).

Accordingly, any forthcoming analysis of the cumulative impacts from Central 70 and P2PH would rely on data gathered and made available by Denver. This data is sparse, as Denver has no obligation to analyze and disclose the full range of direct or indirect impacts to human health and the environment from the four components of P2PH so long as the agencies continue to perpetuate the fiction that P2PH is not connected to Central 70.

The 39th Avenue portion of P2PH again serves as an illustrative example of why this difference matters. Plaintiffs know of three reports prepared on behalf of Denver by Pinyon Environmental, Inc., which seek to document the historical uses of the P2PH project area and identify potential soil contaminants. See Ex. 4, 2015 Report; Ex. 5, 2016 Report; Ex. 6, 2017

---

also presents impacts to human health and the environment. These impacts were not fully analyzed in the FEIS and ROD, but presumably would be captured in any forthcoming cumulative impacts analysis because they *are* additive to the impacts to human health and the environment from digging the highway trench.

5

Report.  This investigation is based on a small sample size, suffers from admitted gaps in data, and – most importantly – serves as baseline documentation only.  Ex. 5 at p. 27 (recommending that Denver create a project-specific materials management plan for the entire project corridor prior to construction).  These Pinyon studies are not risk assessments.  They make no attempt to identify potential threats to human health or the environment posed by the spread of known contaminants along 39th Avenue or to identify mitigation measures that could be used to reduce those threats or levels of harm.  See Ex. 7, Letter from Christine O'Connor to Denver City Council (urging the Council to vote no on approving a contract for construction of the 39th Avenue open channel until Denver completes a "satisfactory environmental assessment"); Ex. 8, Third Declaration of Christine O'Connor, at ¶¶ 3-5.

The inadequacy of these Pinyon studies mean that even if FHWA/CDOT *wanted* to include the human health or environmental impacts from digging the 39th Avenue open channel in a cumulative impacts analysis for Central 70, there would be inadequate data to support that analysis.  This example shows why any forthcoming analysis of the cumulative impacts of Central 70 and P2PH will be less robust than an analysis of direct and indirect impacts of P2PH itself, which would be required only if Plaintiffs prevailed on Claims 4 or 5.  Success on Claims 4 or 5 means FHWA/CDOT would have to undertake an affirmative study of all the impacts from all four components of P2PH.  That is quite different from success on Claim 6, which would force FHWA/CDOT to review the previously available data on P2PH only for those impacts that substantively and geographically overlap with the impacts of Central 70.

A third "key difference" of the cumulative impacts analysis is that it does not add the cost of other (distinct and separate) projects evaluated to the cost of the "major federal action" at

6

issue in the EIS. This is another distinction with a difference. The current cost estimate for P2PH is $300,000,000. So long as the agencies continue to deny P2PH is connected to Central 70 (something that success on Claims 4 or 5 would preclude), FHWA/CDOT can continue to ignore this particular project expense and continue to misrepresent the true cost of Central 70.

One of the reasons FHWA/CDOT eliminated from further study a project alternative that would have taken I-70 out of Globeville and Elyria/Swansea was because that alternative was too expensive. See Dkt. 25 at ¶¶ 132, 169. The alternatives analysis is the "heart" of the EIS process. N.M. ex rel. Richardson, 565 F.3d at 708 (citing 40 C.F.R. § 1502.14). When the action agency has injected cost as a reason for selecting between alternatives, it cannot provide the public with misleading information. See High Country Conservation Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174, 1182 (D. Colo. 2014) (citing Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446-448 (4th Cir. 1996)) ("it is essential that the EIS not be based on misleading economic assumptions"). It is only through success of Claims 4 and/or 5 that the true cost of Central 70 will be disclosed and utilized in the alternatives analysis.

> ***Question 2: Does the Court have the power to enter an order finding, under the connected and/or similar action doctrines, that Defendants improperly excluded P2PH from their deliberations?***

**Yes.** Pursuant to the APA, this Court *shall* hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(A). "Agency decisions are arbitrary when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

7

product of agency expertise.'" Utahns v. U.S. DOT, 305 F.3d 1152, 1164 (10th Cir. 2002) (quoting Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)).

As Plaintiffs have explained in prior briefing and elicited through hearing testimony, if not for Central 70's need for 100-year flood protection, Denver would not have deviated from the 5-year flood protection standard in this area, and would not have had the capacity to plan for or construct the TBDP (now known as P2PH). In short, but for Central 70, P2PH would not have been conceived. Because of P2PH's connection to the highway project, CDOT was heavily involved in the early planning stages of P2PH, and solidified its partnership agreement with Denver for the financing and design of P2PH in the IGA. The IGA was signed prior to the date FHWA/CDOT issued the FEIS on Central 70. CDOT therefore *knew* when it issued the FEIS that it was misrepresenting which requisite off-site drainage component it would utilize and help finance for the benefit of the PCL Alternative.

FHWA/CDOT's deliberate choice to carve P2PH out of the Central 70 analysis – even though the PCL Alternative requires this off-site drainage component to function as designed – is arbitrary, capricious, and contrary to law. See Ross v. FHA, 162 F.3d 1046, 1052 (10th Cir. 1998) (it is unlawful for an action agency to segment a portion of a "major federal action" from the primary project in order to avoid NEPA review). Plaintiffs respectfully contend that the Court not only has the power to enter an order finding that Defendants improperly excluded P2PH from their deliberations, but that the APA demands these actions be declared unlawful.

> ***Question 3: Does the Court have the power to enter an order requiring Defendants to develop a new EIS/ROD that rectifies this error, even though Defendants cannot now exercise material control or influence over P2PH?***

**Yes.** Should this Court find that FHWA/CDOT violated the APA, it has the power to

8

remand the NEPA analysis back to the agencies.  Indeed, the U.S. Supreme Court has held that vacatur and remand is the presumptive remedy for APA violations.  See Fed. Election Comm'n v. Akins, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case.").  See also e.g., Colo. Envtl. Coalition v. Office of Legacy Mgmt., 819 F.Supp.2d 1193, 1224 (D. Colo. 2011); Davis Mts. Trans-Pecos Heritage Ass'n v. FAA, 116 Fed. Appx. 3, 7 (5th Cir. 2004); Native Ecosystems Council v. U.S. Forest Service, 866 F.Supp.2d 1209, 1233 (D. Idaho 2012) (all remanding NEPA analysis back to the action agency to prepare a supplemental EIS consistent with the Court's opinion).  Thus, if the Court finds that the FEIS and ROD do not comply with NEPA because they did not analyze P2PH as a connected or similar action to Central 70, the Court can and should set aside the FEIS and ROD and remand the NEPA analysis back to FHWA/CDOT so they can generate a supplemental EIS that includes the requisite analysis.

Plaintiffs acknowledge that FHWA/CDOT's decision to "jumpstart" one portion of the project (the GLO) two years prior to issuing the ROD may cloud the Court's otherwise straightforward task of fashioning an effective remedy.  However, Defendants and the City of Denver should not be rewarded for their subterfuge.  The Court has wide discretion to formulate equitable remedies in this case, and so long as such remedies provide Plaintiffs with some relief from their injuries, jurisdiction is proper.  See Pit River Tribe v. U.S. Forest Service, 615 F.3d 1069, 1084 (9th Cir. 2010) ("courts have discretion to formulate equitable relief to remedy a NEPA violation"); Larson v. Valente, 456 U.S. 228, 243, n. 15 (1982) ("a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his every injury.").

9

Here, success on Claims 4 or 5 would force FHWA/CDOT to analyze the true scope, cost, and impact of the PCL Alternative and circulate that analysis for public comment. Because a new and transparent process might ultimately influence FHWA/CDOT's decision on whether and how to move forward with Central 70, Plaintiffs' harms are redressable. See Motion to Reconsider, Dkt. 91, at 7-8 (citing Plaintiff Declarations). See also WildEarth Guardians v. U.S. Dept. of Agriculture, 795 F.3d 1148, 1156 (9th Cir. 2015) (quoting Salmon Spawning & Recovery All. v. Gutierrez, 545 F.3d 1220, 1226 (9th Cir. 2008) (the "relaxed redressability requirement for procedural claims" is satisfied when "the relief requested – that the agency follow the correct procedures – may influence the agency's ultimate decision").

The primary goal of NEPA is to foster informed decision making by forcing agencies to evaluate the impacts of their projects before construction begins. Plaintiffs acknowledge that at least one portion of this project (the GLO) may be completed before FHWA/CDOT are able to finalize a supplemental analysis. But Plaintiffs are also keenly aware that the "unusual standing question" with which the Court must grapple was created by the same unlawful conduct that gives rise to this action. Order, Dkt. 97, at 2.

The point of Claims 4 and 5 is to force FHWA/CDOT to explain that the PCL Alternative requires an elaborate and very expensive off-site drainage component, which significantly increases the geographical reach, cost, and deleterious impacts of this project. Plaintiffs' goal for these Claims is that a more informed process will lead to a more informed (and better) result. The opportunity for a legally adequate process and change of course on Central 70 still exists regardless of what Denver chooses to do while FHWA/CDOT complete their supplemental analysis. That is because no part of Central 70/P2PH other than GLO is currently under

10

construction.  See Ex. 8 at ¶ 7.  This Court should not reward FHWA/CDOT's unlawful conduct and possibly incentivize other agencies to improperly segment projects by concluding that the "jumpstart" of one portion of this project precludes accountability on the remainder.

Plaintiffs respectfully contend that the Court's third question is one more accurately directed at the issue of mootness rather than the issue of standing.  As Judge Jackson of this Honorable Court stated in 2015 when opinion on a NEPA case:

> [The defendant] contends that [Plaintiffs'] injury is nonredressable because its mining activities are substantially complete such that vacatur and remand of the approved mining plans would not redress the injury [under NEPA].  This argument more aptly sounds in mootness, not redressability.  The doctrine of standing, unlike mootness, addresses "whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court." Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1263 (10th Cir. 2004).  As of October 15, 2014, [Defendant] was still mining coal under its permit revision…  Therefore, at the time of filing – February 27, 2013 – the plaintiff's injuries were certainly redressable through vacatur and remand.
>
> Standing and mootness are closely related but distinct doctrines. "The Supreme Court has described the doctrine of mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" Utah Animal Rights Coal., 371 F.3d at 1263 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 68, n. 22 (1997)).  "'In deciding whether a case is moot, the crucial question is whether granting a present determination of the issues offered will have some effect in the real world.  When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot.'" Abdulhaseeb v. Calbone, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009)).  "A federal court has no power to give opinions upon moot questions or declare principles of law which cannot affect the matter in issue in the case before it." S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997) (citing Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992)).
>
> "Ordinarily, a NEPA claim no longer presents a live controversy when the proposed action has been completed and when no effective relief is available." Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426, 428 (10th Cir. 1996).  "However, courts still consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it determines that an agency failed to comply with NEPA." Id. at 428-29.

11

<u>WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't</u>, 104 F.Supp.3d 1208, 1221-22 (D. Colo. 2015) (reversed on other grounds).  <u>See</u> <u>also</u> <u>Airport Neighbors</u>, 90 F.3d at 428-429 ("[A]lthough the fact that the upgrade of Runway 321 has been completed renders moot any claim relating to the *construction* of the runway, we may still consider whether Respondents complied with NEPA by adequately addressing the environmental impacts resulting from the enhanced *use* of the runway.") (emphasis in original).

Claims 4 and 5 are not rendered moot because the GLO is under construction and/or CDOT apparently can no longer materially control P2PH.  The relevant inquiry is whether the Court can afford some type of effective relief under the circumstances.  <u>See</u> <u>Airport Neighbors</u>, at 428 (citing <u>Neighborhood Transp. Network, Inc. v. Pena</u>, 42 F.3d 1169, 1172 (8th Cir. 1994); <u>Sierra Club v. Penfold</u>, 857 F.2d 1307, 1318 (9th Cir. 1988)) ("Ordinarily, a NEPA claim no longer presents a live controversy when the proposed action has been completed and when no effective relief is available.").  Neither Central 70 nor P2PH (even when viewed in isolation) is substantially complete.  Thus, the Court can afford effective relief by vacating the FEIS and ROD and remanding the NEPA analysis back to FHWA/CDOT for a supplemental EIS that affirmatively analyzes the direct and indirect impacts of P2PH.  These impacts *are* impacts of Central 70, and forcing the agencies to complete a legally adequate and transparent process, which will no doubt engage larger swaths of the Denver community, and possibly change the course of action on Central 70, is effective relief.

Respectfully submitted this 5th day of January, 2018.

                                KEATING WAGNER POLIDORI FREE, P.C.

By:   *s/ Melissa A. Hailey*
       Melissa A. Hailey, CO Reg. #42836
       Aaron D. Goldhamer, CO Reg. #41016
       1290 Broadway, Suite 600
       Denver, CO 80203
       Tel: (303) 534-0401
       Fax: (303) 534-8333
       mah@keatingwagner.com
       agoldhamer@keatingwagner.com

           *~ and ~*

       James Jay Tutchton, CO Reg. #21138
       Tutchton Law Office
       6439 East Maplewood Avenue
       Centennial, CO 80111
       Tel: (720) 301-3843
       jtutchtontlo@gmail.com

       *Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

      I hereby certify that on this 5th day of January, 2018, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record as follows:

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Brent E. Butzin, Esq.
Assistant Attorney General
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Brent.butzin@coag.gov

*Attorneys for Defendant-Intervenors*

Robert E. Yuhnke, Esq.
Robert E. Yuhnke & Associates

4050 SE Hosner Terrace
Gresham, OR 97080
Bob.yuhnke@prodigy.net

Andrea S. Gelfuso, Esq.
Andrea Gelfuso, Attorney at Law
2402 South Holland Street
Lakewood, CO 80227
Agelfuso6@gmail.com

Gregory Nicholas Corbin
Milligan Rona Duran & King, LLC-Denver
1627 Vine Street
Denver, CO 80206
gnc@mrdklaw.com

*Attorneys for Sierra Club Plaintiffs*

*s/ Melissa A. Hailey*