**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

KYLE ZEPPELIN; BRAD EVANS; CHRISTINE O'CONNOR; KIMBERLY MORSE; JACQUELINE LANSING; and JANET FEDER;

    *and*

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

    Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION,
ELAINE CHAO, in her official capacity as Secretary of Transportation; and
JOHN M. CARTER, in his official capacity as Division Administrator,

    Defendants,

    *and*

COLORADO DEPARTMENT OF TRANSPORTATION, and
MICHAEL P. LEWIS, in his official capacity as Executive Director of the Colorado Department of Transportation,[1]

    Defendant-Intervenors.

---

## ORDER DENYING THE ZEPPELIN PLAINTIFFS' MOTION FOR STAY AND MOTION TO RECONSIDER

---

A portion of Interstate 70 ("I-70") in northeast Denver was constructed in the

1960s as a 1.2-mile viaduct running through and above Denver's Elyria-Swansea and

---

[1] Michael P. Lewis has succeeded Shailen P. Bhatt as CDOT's executive director, and is therefore automatically substituted per Federal Rule of Civil Procedure 25(d).

Globeville neighborhoods ("Viaduct"). This structure has apparently caused concern for some time in light of its age and the increase in traffic that naturally attends population growth. Defendant Federal Highway Administration ("Highway Administration") and Intervenor-Defendant Colorado Department of Transportation ("CDOT") (together, "Defendants") have decided that the best way to deal with the Viaduct is to tear it down and rebuild the roadway below grade at a depth of up to 40 feet. This plan has become known as the "PCL Alternative." "PCL" is short for "partial cover lowered," with "lowered" referring to the fact that the freeway would run below-grade, and "partial cover" referring to a plan to build an at-grade cover over a roughly 1,000-foot stretch of the lowered freeway, turning that stretch into a tunnel.

The Highway Administration needs to approve the PCL Alternative, and plans to provide some funds to CDOT for the project. The Highway Administration thus was required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 *et seq.*, to prepare an environmental impact statement ("EIS") thoroughly considering the various effects of the PCL Alternative and other alternatives (such as modifying the viaduct or re-routing the freeway).

Plaintiffs Kyle Zeppelin, Brad Evans, Christine O'Connor, Kimberly Morse, Jacqueline Lansing, and Janet Feder (together, "Zeppelin Plaintiffs") are among those seeking to stop Defendants, at least temporarily, from proceeding with the PCL Alternative. The Zeppelin Plaintiffs primarily argue that, in preparing the EIS and connected documents, Defendants intentionally and unlawfully excluded full consideration of a major stormwater project currently being pursued by the City and County of Denver ("Denver"). This project is now commonly referred to as "Platte to

Park Hill" or "P2PH," although it has also been known (and is sometimes still referred to) as the "Two Basins Drainage Project" or "TBDP." The Court will refer to this project as P2PH. It involves destruction and rebuilding of Denver's Globeville Landing Park, to accommodate a new stormwater outfall into the South Platte River ("Globeville Landing Outfall," referred to in many documents as the "GLO"); construction of a new open channel and greenway along a portion of Denver's 39th Avenue ("39th Avenue Open Channel"); partial destruction and rebuilding of Denver's City Park Golf Course to increase its capacity to detain water during a major storm event; and a certain amount of construction for the same purpose at another golf course, the Park Hill Golf Club.

It is undisputed that CDOT is providing millions of dollars to assist Denver in constructing P2PH. For this and other reasons, the Zeppelin Plaintiffs believe that P2PH, although being built by Denver, is actually a component of the PCL Alternative, given that it will catch and divert a significant amount of rainfall that would otherwise flow toward and potentially flood the lowered portion of I-70. Thus, the Zeppelin Plaintiffs assert that Defendants were required by NEPA to include full consideration of every aspect of P2PH in their EIS. The Zeppelin Plaintiffs further allege that the P2PH construction process, and its ultimate results, will harm them in various ways.

Irrespective of P2PH and its alleged connection to the PCL Alternative, the Zeppelin Plaintiffs additionally believe that Defendants have not adequately studied and disclosed potential consequences of the excavation necessary to place the freeway below grade, given that such excavation will necessarily disturb contaminated soils. The Zeppelin Plaintiffs, or some of them, worry that contaminated dust generated during the construction process might escape the construction zone and cause harm to them.

3

The Zeppelin Plaintiffs have sued under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, which gives this Court power to vacate Defendants' decision and require them to redo the NEPA process before considering again whether to pursue the plan to lower I-70 below grade. The Zeppelin Plaintiffs' specific claims for relief may be summarized as follows:

- **Claim 1.** <u>APA & NEPA (failure to analyze impacts of digging the freeway trench)</u>: The PCL Alternative will require digging through contaminated soils, and Defendants failed to examine how disturbing these hazardous materials will affect human health and the environment.

- **Claim 2.** <u>APA & NEPA (failure to include mitigation measures as part of digging the trench)</u>: Similar to Claim 1, arguing that Defendants did not explain how workers and members of the public can avoid exposure to contaminants dug up during construction.

- **Claim 3.** <u>APA & NEPA (inaccurate cost estimates)</u>: The $1.1 billion cost estimate for the PCL Alternative does not include the costs required to remediate hazardous materials encountered during construction.

- **Claim 4.** <u>APA & NEPA (failure to analyze "connected action")</u>: P2PH is a "connected action" as defined in NEPA regulations (40 C.F.R. § 1508.25(a)(1)), and Defendants failed to account for it in the EIS.

- **Claim 5.** <u>APA & NEPA (failure to analyze "similar action")</u>: Alternatively, P2PH is a "similar action" as defined in NEPA regulations(40 C.F.R. § 1508.25(a)(3)), and Defendants failed to account for it in the EIS.

- **Claim 6.** <u>APA & NEPA (failure to analyze cumulative impacts)</u>:

4

Alternatively, P2PH qualifies as a "cumulative impact" as defined in NEPA regulations (40 C.F.R. §§ 1508.25(c)(3) & 1508.7), and Defendants failed to account for it in the EIS.

- **Claim 7.** <u>APA & § 4(f) of the U.S. Department of Transportation Act of 1966 (failure to avoid destruction of a public park as part of a highway project)</u>: P2PH is a necessary part of the PCL Alternative, and P2PH requires destruction of City Park Golf Course, which is a public park.

APA lawsuits normally take months and sometimes years to resolve. The Zeppelin Plaintiffs have therefore filed an APA § 705 Motion for Stay ("Motion for Stay," ECF No. 32), which seeks relief in the nature of a preliminary injunction to stop the PCL Alternative from progressing while the Court considers the merits of their claims. That motion specifically seeks an injunction based on Claims 1, 4, 5, and 6. (*Id.* at 27 & n.6.)[2]

As will be recounted in more detail below, the Court has already held proceedings specifically addressing Claims 4, 5, and 7, and dismissing them for lack of subject matter jurisdiction, while reserving ruling on Claims 1 and 6. No party argues that the Court lacks subject matter jurisdiction over Claim 1 or Claim 6, and the purpose of this Order is to resolve the Zeppelin Plaintiffs' Motion to Stay as to those two claims on their merits. Also before the Court is the Zeppelin Plaintiffs' Motion to Reconsider the Court's order dismissing Claims 4, 5, and 7. (ECF No. 91.) For the reasons explained below, the Court denies the Motion to Reconsider and denies the Motion to

_____

[2] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

Stay as to Claims 1 and 6 (thus denying it in its entirety).

## I. PROCEDURAL BACKGROUND

In August 2003, the Highway Administration published a notice in the Federal Register that it intended to prepare an EIS encompassing, among other things, potential "variations of the horizontal and vertical alignment of I-70 as well as capacity and safety improvements" from the I-25/I-70 interchange to Peña Boulevard—a stretch of freeway the Highway Administration dubbed the "I-70 East Corridor." 68 Fed. Reg. 49839, 49839 (Aug. 19, 2003). CDOT and other governmental entities would participate with the Highway Administration in this process. *Id.*

Three years later, the Highway Administration announced that, for purposes of the EIS, the "I-70 East Corridor" would be narrowed in scope to considerations of freeway alterations, and that mass transit-related considerations would be handled in a separate EIS. 71 Fed. Reg. 37637, 37637–38 (June 30, 2006).

Defendants published their first draft EIS ("DEIS") in November 2008. (*See* Administrative Record ("R.") (ECF No. 99) at 6693.) Among the purposes acknowledged in the DEIS for the overall project was a need to address the Viaduct, the "current sufficiency rating of [which] is 44 out of a possible 100, which is considered structurally deficient, functionally obsolete, and requiring replacement." (R. at 6697.)

In 2014, Defendants issued a supplemental draft EIS ("SDEIS"). (R. at 9843.) This document announced that the two "realignment" alternatives had been eliminated, and that a new alternative—the PCL Alternative—had been proposed. (R. at 9878.) Defendants issued the final EIS ("FEIS") in January 2016. (R. at 17558.) Finally, in January 2017, Defendants issued their Record of Decision ("ROD"). (R. at 1.) The

ROD announces that Defendants had selected the PCL Alternative as the preferred

course of action.  (R. at 2, 14–16.)

## II.  ANALYSIS OF MOTION TO RECONSIDER
## DISMISSAL OF CLAIMS 4, 5, AND 7

### A.    Article III Standing Generally

Understanding the parties' dispute regarding Claims 4, 5, and 7 requires keeping

in mind the general principles of Article III standing.  Article III of the U.S. Constitution

restricts federal courts to deciding "cases" and "controversies."  *See* U.S. Const. art. III,

§ 2, cl. 1.  These words have been interpreted to restrict federal courts from giving

"advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), meaning that a federal

court may not resolve questions in the abstract, but instead may only resolve "disputes

arising out of specific facts when the resolution of the dispute will have practical

consequences to the conduct of the parties," *Columbian Fin. Corp. v. BancInsure, Inc.*,

650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element

test for Article III standing:

> First, the plaintiff must have suffered an "injury in fact"—an
> invasion of a legally protected interest which is (a) concrete
> and particularized, and (b) "actual or imminent, not
> 'conjectural' or 'hypothetical.'"  Second, there must be a
> causal connection between the injury and the conduct
> complained of . . . .  Third, it must be "likely," as opposed to
> merely "speculative," that the injury will be "redressed by a
> favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain

alterations incorporated).  As will become clear below, whether the Zeppelin Plaintiffs

have standing to assert Claims 4, 5, and 7 turns on whether any order from this Court

could redress their claimed injuries.

**B.      Background**

        1.      <u>Plaintiffs' Alleged Injuries</u>

Plaintiff Zeppelin lives and works in the Globeville neighborhood through which the Viaduct runs, and through which the PCL Alternative will run if constructed.  (ECF No. 1-1 ¶¶ 6, 11.)  He understands that the entire path of the PCL Alternative traverses a Superfund site, and he fears that the excavation process will expose him and his family to contaminated dust and other pollutants.  (*Id.* ¶ 17.)  He also understands that the Globeville Landing Outfall (a component of P2PH) is being constructed through the same Superfund site, and he fears that the construction will spread contaminants, potentially harming him, his family, and his business investments on the South Platte River.  (*Id.* ¶¶ 19–22.)  Zeppelin also generally opposes urban freeways as regressive and damaging to health, economic vitality, and social cohesion.  (*Id.* ¶¶ 8–9.)

Plaintiff Evans works full-time in the Globeville neighborhood, one block from Globeville Landing Park and three blocks from the Viaduct.  His concerns are essentially the same as Zeppelin's.  (ECF No. 1-2 ¶¶ 2, 7, 9, 14.)

Plaintiff O'Connor often recreates at City Park Golf Course and enjoys its open space, trees, vistas, and historic significance.  (ECF No. 1-6 ¶¶ 18–20.)  She fears that the closure and reconstruction of City Park Golf Course as part of P2PH will temporarily, and perhaps permanently, impair her enjoyment of this public space.  (*Id.*)  She also worries about construction of the PCL Alternative itself, particularly that it "will lead to multiple lane closures, slower traffic, and increase[d] . . . travel time.  I am concerned about sitting in traffic on I-70 during construction and breathing toxic dust."  (*Id.* ¶ 21.)

Plaintiff Lansing enjoys using both the Park Hill Golf Club and City Park Golf Course. Her concerns are essentially the same as O'Connor's. (ECF No. 1-17 ¶¶ 22–26.)

Plaintiff Morse lives four blocks south of where the 39th Avenue Open Channel (a component of P2PH) will be constructed. (ECF No. 1-12 ¶ 2.) The 39th Avenue Open Channel will be excavated through the same Superfund site that underlies Globeville Landing Park and the Viaduct. (*Id.* ¶ 4.) "There is no question in my mind," says Morse, "that the dust created by construction of the 39th Avenue . . . Open Channel will reach my property. I am concerned that this dust poses a health risk to me and my family." (*Id.*) She also worries about being exposed to contaminated dust escaping from the PCL Alternative construction site. (*Id.* ¶ 14.)

Plaintiff Feder lives immediately south of the proposed 39th Avenue Open Channel—part of the proposed construction will take place just on the other side of her north wall. (ECF No. 25-1 ¶¶ 2, 4, 7–8, 14.) Her worries about contaminated dust are the same as Morse's, but even more acute, and she worries about the noise and general disruption attendant to construction so close to her home. (*Id.* ¶¶ 9–12, 15.)

Finally, each of the Zeppelin Plaintiffs claims that their "procedural interests" have been harmed (ECF No. 25 ¶¶ 47, 52, 57, 62, 67, 72), meaning Defendants' "failure to analyze the direct and indirect impacts of P2PH through the . . . NEPA process [that led to the selection of the PCL Alternative]" (ECF No. 91 at 9).

2.    Proceedings Regarding Subject Matter Jurisdiction

As noted above, the Zeppelin Plaintiffs' Motion to Stay asserted a right to preliminary relief under their Claims 1, 4, 5, and 6.

Claim 1 focuses on the potential health effects of excavating the trench through which the PCL Alternative will run. There is no question that the Zeppelin Plaintiffs have standing to assert Claim 1 because they assert injury-in-fact to legally protected interests (personal health, economic value, aesthetic enjoyment, etc.) that they fear will be caused by the trench's excavation, and this Court can redress that injury because, if Claim 1 has merit, the Court may enjoin Defendants from constructing the PCL Alternative while Defendants redo their EIS. Nothing about Claim 1 turns on whether P2PH, or any portion of it, is built.[3]

Unlike Claim 1, Claim 6 is not entirely divorced from P2PH. Rather, Claim 6 essentially assumes that P2PH will be built, and claims that Defendants failed to adequately consider the PCL Alternative's cumulative effect on the environment alongside P2PH. There is no question that the Zeppelin Plaintiffs have standing to assert Claim 6 for the same reasons that they have standing under Claim 1. In other words, the Court could enjoin the construction of the PCL Alternative while Defendants take a harder look at P2PH and its effects and then reconsider whether the PCL Alternative should still be built in light of P2PH.[4]

Claims 4 and 5 are more problematic. Claim 7, which the Zeppelin Plaintiffs did not assert in their Motion to Stay, shares the same problems. Claims 4, 5, and 7 all argue, in essence, that Defendants unlawfully deemed P2PH to be an independent development outside of their control, as opposed to an integral system for preventing stormwater from flooding the below-grade freeway. Therefore, say the Zeppelin

[3] Whether Claim 1 justifies a preliminary injunction is addressed below in Part III.D.

[4] Whether Claim 6 justifies a preliminary injunction is addressed below in Part III.E.

Plaintiffs, Defendants' selection of the PCL Alternative was unlawfully ill-informed because Defendants did not adequately investigate P2PH's various effects, did not account for its costs, and otherwise did not develop the sort of record that NEPA requires before an agency can choose one alternative over another.[5] The Zeppelin Plaintiffs claim they have been injured by this unlawful conduct because construction of P2PH's various components could harm their health, their livelihoods, and so forth; and because Defendants have disregarded the Zeppelin Plaintiffs' respective procedural interests in ensuring that Defendants follow the appropriate statutory procedures.

Setting aside procedural interests for the moment (they are the crux of the Motion to Reconsider), Claims 4, 5, and 7 implicitly assume that an injunction against the PCL Alternative would effectively act as an injunction against P2PH. Defendants challenged this assumption through their motions to dismiss for lack of subject matter jurisdiction. (ECF Nos. 45, 47.) Defendants emphasized that Denver, not CDOT or the Highway Administration, is building P2PH, and Denver is not a defendant in this lawsuit. Thus, there is a serious question whether any relief (preliminary or final) awarded by this Court against the Highway Administration and/or CDOT would stop Denver's progress on P2PH. If the answer is no, then this Court cannot issue an order that would redress the Zeppelin Plaintiffs' feared injuries from exposure to contaminated dust kicked up during excavation of the Globeville Landing Outfall or the 39th Avenue Open Channel, from

---

[5] Claim 7 is actually not a NEPA claim, but a claim seeking similar relief under the U.S. Department of Transportation Act of 1966, as codified at 23 U.S.C. § 138 and 49 U.S.C. § 303. Those sections prohibit the Highway Administration from approving any project that requires use of public park land unless there is no feasible and prudent alternative. Claim 7 relates specifically to City Park Golf Course, and assumes that construction planned at City Park Golf Course in furtherance of P2PH is an integral part of the PCL Alternative.

loss of aesthetic enjoyment at City Park Golf Course, and so forth.  Such inability to redress a claimed injury triggers Article III standing concerns.

The Court found that Defendants' motions raised a substantial factual question regarding Denver's intentions concerning P2PH and its ability to carry on if CDOT was required to withhold its support, financial or otherwise.  The Court therefore held an all-day evidentiary hearing on November 3, 2017.  Before that hearing, the Court informed the parties that it would assume a premise the Zeppelin Plaintiffs hoped to prove, namely, that Denver agreed to pursue P2PH as a way of assisting CDOT to protect the PCL Alternative from flooding.  The question for the parties at the evidentiary hearing was essentially as follows: Regardless of *why* Denver agreed to pursue P2PH in the first place, is Denver *now* so committed to the project that it will not abandon it or reduce it in scale, even if CDOT withdraws funding and/or other participation?

After considering all the evidence submitted at the evidentiary hearing, and for the reasons explained in the Court's resulting Order Regarding Subject Matter Jurisdiction (ECF No. 90), the Court found that the Zeppelin Plaintiffs had not carried their burden to show that Denver would likely abandon or reduce the scope of P2PH, even if the Court were to grant the relief the Zeppelin Plaintiffs sought against Defendants.  The Court held that it therefore lacked subject matter jurisdiction over the Zeppelin Plaintiffs' Claims 4, 5, and 7.  The portion of the Zeppelin Plaintiffs' Motion for Stay seeking preliminary injunctive relief under Claims 4 and 5 was correspondingly denied.

C.     **The Significance of Procedural Injury**

The Zeppelin Plaintiffs Motion to Reconsider emphasizes their claim of

procedural injury, which they believe is a sufficient basis for standing even if the Court cannot stop Denver from pursuing P2PH. (ECF No. 91 at 5, 7–11.) However, the Court's rulings in the Order Regarding Subject Matter Jurisdiction already foreclosed this argument, and so reconsideration is inappropriate.

The doctrine of "procedural injury" is a special relaxation of "the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 573 n.7. It is applied in NEPA cases because NEPA does not dictate the outcome of a government agency's decision; it only requires that the agency make a sufficiently well-informed decision. Consequently, although a plaintiff can assert that an agency relied on an inadequate EIS to make a decision that will injure the plaintiff's health, aesthetic interests, and so forth, the plaintiff cannot assert that an *adequate* EIS would lead the agency to make a different decision. Thus, the plaintiff cannot represent to a court that a judgment against the agency *would* prevent the feared injury, only that it *could* prevent that injury, or in other words, that the agency might select a different course of action after preparing an adequate EIS. Under most circumstances, this disconnect between the injury and redressability would deprive a federal court of jurisdiction. However, the Supreme Court has held that Congress can "loosen the strictures of the redressability prong" by granting a procedural right, such as the right to ensure that a government agency acts in an environmentally well-informed manner. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). In such situations, "could" is good enough for redressability purposes; the plaintiff need not establish "would." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017).

"Unlike redressability, however, the requirement of injury in fact is a hard floor of

Article III jurisdiction that cannot be removed by statute." *Summers*, 555 U.S. at 497. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* at 496. Thus, the procedures in question must be "designed to protect some threatened concrete [*i.e.*, non-procedural] interest of [the plaintiff] that is the *ultimate basis of his standing*." *Lujan*, 504 U.S. at 573 n.8 (emphasis added).

The concrete interests that form the ultimate basis, if any, of the Zeppelin Plaintiffs' standing as to Claims 4, 5, and 7 are their interests in personal health, economic value, recreational opportunity, and aesthetic enjoyment that may be impaired by P2PH. (*See* Part II.B.1, above.) However, after receiving evidence on the question, the Court found that the Zeppelin Plaintiffs had failed to rebut Denver's assertions that it will go forward with P2PH regardless of whether Defendants build the PCL Alternative and regardless of whether CDOT continues to contribute to P2PH. (ECF No. 90 at 33–38.) In other words, the Zeppelin Plaintiffs will continue to suffer injury to their concrete, non-procedural interests even if the Court were to rule in their favor on any one of Claims 4, 5, or 7. Thus, the Zeppelin Plaintiffs cannot make the relaxed redressability showing that vacating and remanding the FEIS *could* redress their injuries because Denver will go forward with P2PH **regardless** of any decision Defendants might make on remand. *See, e.g.*, *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008) (procedural injury insufficient to confer Article III standing where the underlying concrete injury would happen irrespective of any decision an agency may make on remand).

In the Motion to Reconsider, the Zeppelin Plaintiffs emphasize that the vacatur

and remand would give them additional opportunity to comment on the environmental consequences of P2PH. (ECF No. 91 at 2, 6–9.) They claim that "forcing [Defendants] to supplement the [FEIS] analysis to reveal and circulate for public comment the true scope, cost, and impact of this project will redress their procedural harms." (*Id.* at 9.) This argument only highlights the flaws in the Zeppelin Plaintiffs' Motion. First, the Supreme Court has explicitly characterized "be[ing] denied the ability to file comments" as the sort of procedural injury that must be backed up by "some concrete interest that is affected by the deprivation." *Summers*, 555 U.S. at 496. Second, it is not enough that some extra quantum of procedure would redress a procedural harm—it must be reasonably capable of leading the agency to make a decision that would redress the underlying substantive harm. See *New Mexico*, 854 F.3d at 1215.

The Zeppelin Plaintiffs also argue that a fuller analysis circulated for public comment "might influence [Defendants'] ultimate decision that sinking the highway 40 feet below ground in a contaminat[ed] portion of Denver is indeed the preferred course of action." (ECF No. 91 at 6.) But this is a reference to the injuries asserted in Claims 1 and 6, not Claims 4, 5, and 7. The Zeppelin Plaintiffs seem to be saying that a ruling in their favor on Claims 4, 5, and/or 7 could permit this Court to issue an injunction against constructing the PCL Alternative, which would in turn remedy the injuries *that are the basis of Claims 1 and 6.* In other words, the legal theory under Claims 4, 5, and 7 would become the basis for remedy to the harms asserted under Claims 1 and 6.

The Supreme Court has already spoken on this issue, however, and has rejected this "commutative" theory of standing, foreclosing the legal scenario whereby a plaintiff borrows the injury of one cause of action in an effort to sustain standing in another.

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *Id.* Thus, even with emphasis on procedural injury, the Zeppelin Plaintiffs still lack of Article III standing to assert Claims 4, 5, and 7. The Motion to Reconsider will be denied.

## III. ANALYSIS OF MOTION TO STAY

### A. Legal Standard

A stay of agency action under APA § 705 is a provisional remedy in the nature of a preliminary injunction. *See Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980). Its availability turns on the same four factors considered under a traditional Federal Rule of Civil Procedure 65(a) analysis. *See, e.g.*, *Hill Dermaceuticals, Inc. v. U.S. Food & Drug Admin.*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007). Those factors are: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and that (4) the injunction would not adversely affect the public interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010).

The Tenth Circuit previously endorsed an alternate standard that relaxed the likelihood of success requirement when the other three factors tipped strongly in the movant's favor. *See, e.g.*, *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). The Tenth Circuit recently abrogated this standard, announcing that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Diné*

*Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).[6]

## B.  NEPA's General Requirements and Scope of Judicial Review

Under NEPA, "major Federal actions significantly affecting the quality of the human environment" must be preceded by an EIS.  42 U.S.C. 4332(2)(C).  The EIS requirement serves two important functions: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  The EIS is one of NEPA's "'action-forcing' procedures" to ensure that agencies take a "hard look" at the environmental consequences of proposed actions.  *Id.* at 350.

The Court reviews an agency's NEPA process under the deferential abuse of discretion standard of review.  *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991).  As the Supreme Court has observed, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is

_____

[6] *Diné Citizens* abrogated any "relaxed" test, but said nothing about more stringent tests. For example, if the injunction will (1) alter the status quo, (2) mandate action by the defendant, or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits, the Tenth Circuit has held the movant must meet a heightened burden.  *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir.2004) (*en banc*). Specifically, the proposed injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Id.*  But, no party makes any argument based on this higher standard.  The Court therefore need not address it, nor whether *Diné Citizens* affected it in any way.

to insure that the agency has considered the environmental consequences".  *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (per curiam).

The Tenth Circuit has held that the district court's objective in reviewing an EIS "is not to 'fly speck' the environmental impact statement, but rather, to make a pragmatic judgment whether the environmental impact statement's form, content and preparation foster both informed decision-making and informed public participation." *Custer Cnty. Action Assoc. v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001).  The Court is to apply "a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat [NEPA's] goals of informed decision making and informed public comment."  *Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1323 (10th Cir. 2004).[7]

## C.    Likelihood of Success: Claims 4 and 5

The Court has already found that the Zeppelin Plaintiffs lack standing to assert their Claims 4 and 5.  Considerations connected to the standing analysis further show that, even assuming Article III standing exists, the Zeppelin Plaintiffs are not likely to succeed on either Claims 4 or 5, and therefore are not entitled to a preliminary injunction based on those claims.

Claim 4 asserts that the PCL Alternative and P2PH are "connected actions" that must be analyzed in a single EIS under 40 C.F.R. § 1508.25(a)(1).  Claim 5 asserts that

---

[7] "Judicial review of an agency decision is generally limited to review of the administrative record.  The circumstances which warrant consideration of extra-record materials are extremely limited." *Custer Cnty.*, 256 F.3d at 1028 n.1 (citations and internal quotation marks omitted).  The Zeppelin Plaintiffs cite to extra-record materials in their Motion to Stay, although they do not acknowledge them as such until their reply brief, where they announce in a footnote that they "will be filing a Motion to Supplement the Record."  (ECF No. 54 at 7 n.3.) The Zeppelin Plaintiffs have not attempted to argue that they will likely succeed on such a motion.  Therefore, the Court will not consider their extra-record evidence at this stage.

the PCL Alternative and P2PH are, in the alternative, "similar actions" that Defendants should have analyzed in a single EIS under 40 C.F.R. § 1508.25(a)(3). In either event, "[t]he EIS process is supposed to inform the decision-maker. This presupposes he has judgment to exercise." *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1482 (10th Cir. 1990). Indeed, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). But the Court has already found, as a factual matter, that Denver is more likely than not going forward with P2PH no matter what Defendants might choose to do. Thus, if the Court were to vacate the FEIS and remand for further analysis of P2PH as a connected or similar action, it "would put [Defendants] in the awkward position of evaluating the impacts of and developing alternatives to [an action] that it has no ability to influence or stop." (ECF No. 93 at 8.) In other words, Defendants would be developing a record to inform discretion that does not exist. At most, Defendants could engage in a cumulative impacts analysis that is already the subject of the Zeppelin Plaintiffs' Claim 6.

A futile remand is not an appropriate remedy. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("Where the preparation of an EIS would serve no purpose in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS." (internal quotation marks omitted)); *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001) (remand to agency not required if it would be futile); *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 36 n.10 (D.D.C. 2016) (same). For this reason, the Zeppelin Plaintiffs are unlikely to succeed on Claim 4 or 5, assuming they have standing to assert those

claims.

The Court now turns to the claims which the Zeppelin Plaintiffs indisputably possess standing to assert, and for which remand would not necessarily be futile.

**D.      Likelihood of Success: Claim 1**

The Zeppelin Plaintiffs argue that Defendants did not take the requisite "hard look" at the effects of hazardous materials that construction crews will likely encounter when digging the freeway trench.  (ECF No. 32 at 32–33.)

The FEIS extensively documents the contaminated areas that construction crews will likely excavate.  (R. at 18182–90, 18193–95, 19289–22622; *see also* R. at 199–200 (supplemental information in the ROD).)  The FEIS also acknowledges,

> Hazardous materials may impact the health and safety of construction workers, environmental resources, and community residents located within the project corridor and surrounding area.  Also, encountering hazardous materials during construction can impact the cost of construction, as contaminated media generated during construction must be managed in accordance with federal and state regulations.

(R. at 18181–82.)  The FEIS further announces,

> Construction of the proposed alternatives will likely encounter sites contaminated by hazardous materials. Construction activities associated with the alternatives have the potential to release hazardous materials at these locations into soil or groundwater.  They could also lead to exposure of workers or the public to these materials if proper health[] [and] safety protocols are not followed and remediation efforts are not applied.

(R. at 18191.)  The FEIS then sets forth procedures for avoiding contaminated sites if possible, and handling them appropriately if they cannot be avoided, including through containment, removal, and disposal according to specified standards.  (R. at 18196–97.) "Additionally," says the FEIS,

the following construction mitigation measures will avoid or minimize the effects of the alternatives on hazardous materials including:

- Prepare and implement a project-specific Health and Safety Plan and Materials Management Plan to address potential hazardous materials that are encountered during construction; these plans will consist of specific measures to protect worker and public health and safety, as well as programs to manage contaminated materials during construction.

- In the event that unknown contaminated media is encountered during construction, stop working until the contamination is properly evaluated and measures are developed to protect worker health and safety in accordance with the project-specific Health and Safety Plan and Materials Management Plan.

- Implement standard construction measures for fugitive dust control, as well as stormwater erosion and sediment controls, to minimize the spread of contaminated soil. During the construction phase, require the contractor to file and abide by a dust management plan to minimize the effects of dust on surrounding communities. Additionally, conduct air monitoring to determine whether dust control efforts are successful in preventing violations of air quality standards.

(R. at 18197–98.)

The Zeppelin Plaintiffs argue that this is insufficient.  They say that

the public remains uninformed of the true impacts of digging the I-70 ditch because [Defendants] have failed to disclose the type and level of risk and mechanism(s) of potential injury associated with four years of exposure to contaminated dust during construction in the Superfund site. The Zeppelin Plaintiffs are concerned about, and deserve to know, what type and magnitude of risk these toxic materials pose to them, their families, their homes, and their businesses.

(ECF No. 32 at 33.)  The Court understands this argument to be saying that Defendants

had an obligation to include a general background section on how specific contaminants

21

can affect the human body, and/or a discussion of the likely effects of these contaminants on nearby individuals *if mitigation measures fail*.

On this record, the Zeppelin Plaintiffs are not likely to succeed in proving it was an abuse of discretion for Defendants not to include a general background section on the effect of the various contaminants on the human body.  The point of accounting for hazardous materials is to avoid exposing humans to those materials because it is already established that they can be harmful.  The Zeppelin Plaintiffs make no argument why they have a right to learn from the EIS itself the general effects of exposure to contaminants.  Indeed, the Zeppelin Plaintiffs' Motion to Stay quotes EPA correspondence discussing the health effects of materials that construction crews will likely encounter when digging the trench.  (ECF No. 32 at 16–17.)  The Zeppelin Plaintiffs cite no authority for the proposition that the EIS must likewise include this background information, with which they are already familiar.

The Zeppelin Plaintiffs have also failed, on this record, to demonstrate a likelihood of success in proving that Defendants abused their discretion by choosing not to evaluate what might happen if mitigation measures are unsuccessful.  In particular, the Zeppelin Plaintiffs have not shown that Defendants had any reason to believe that mitigation measures will fail.  Nor do the Zeppelin Plaintiffs cite any cases where an agency was found to have acted arbitrarily and capriciously when it did not predict the likelihood of failure and analyze the ensuing consequences.

"[T]he FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project."  *Wyoming v. USDA*, 661 F.3d 1209, 1251 (10th Cir. 2011) (internal quotation marks omitted).  On the record

currently presented, the Zeppelin Plaintiffs have not shown that Defendants

unreasonably excluded any analysis that the Zeppelin Plaintiffs believe should have

been included.  The Court will not order a stay of agency action based on the Zeppelin

Plaintiffs' Claim 1.

**E.      Likelihood of Success: Claim 6**

"The requirements of [NEPA] have been augmented by longstanding regulations

issued by the Council on Environmental Quality ('CEQ'), to which [the Court] owe[s]

substantial deference."  *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 703

(10th Cir. 2009).  Those regulations direct federal agencies to consider, among other

things, the cumulative environmental impacts of their proposed actions.  40 C.F.R.

§ 1508.25(c).

> Cumulative impact is the impact on the environment which
> results from the incremental impact of the action when
> added to other past, present, and reasonably foreseeable
> future actions regardless of what agency (Federal or non-
> Federal) or person undertakes such other actions.
> Cumulative impacts can result from individually minor but
> collectively significant actions taking place over a period of
> time.

*Id.* § 1508.7.  The Zeppelin Plaintiffs' Claim 6 asserts that Defendants did not

adequately discharge their duty to consider the cumulative effects of P2PH.

The Court finds helpful the D.C. Circuit's approach to determining whether a

cumulative impacts satisfies NEPA:

> [A] meaningful cumulative impact analysis must identify five
> things: (1) the area in which the effects of the proposed
> project will be felt; (2) the impacts that are expected in that
> area from the proposed project; (3) other actions—past,
> present, and proposed, and reasonably foreseeable—that
> have had or are expected to have impacts in the same area;
> (4) the impacts or expected impacts from these other

actions; and (5) the overall impact that can be expected if
the individual impacts are allowed to accumulate.

*TOMAC v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (internal quotation marks omitted).

Here, the FEIS contains a chapter titled "Cumulative Impacts." (R. at 18283–316.) That chapter addresses potential cumulative impacts in nine subject areas: land use, relocations and displacements, social and economic conditions, historic preservation, air quality, noise, wetlands and other waters of the United States, water quality, and environmental justice. (*See* R. at 18285.) P2PH, referred to as the "Two Basin Drainage Project," is listed as a "[f]uture" development project. (R. at 18291.) P2PH is discussed for its specific effects in the areas of land use (R. at 18293), relocations and displacements (R. at 18295), wetlands and other waters of the United States (R. at 18309), water quality (R. at 18311), and environmental justice (R. at 18313).

These discussions tend to be repetitive. With respect to land use, relocations and displacements, and environmental justice, the FEIS notes that P2PH requires approximately 120 acres of property acquisition, which would not be happening at the same time as the property acquisitions required for the PCL Alternative, but could still be disruptive socially and economically. (R. at 18293–96, 18313–14.) With respect to wetlands and water quality, the FEIS notes that P2PH will provide 100-year storm protection and "desired redundancy" to the PCL Alternative's stormwater diversion system, which will be designed to mitigate impacts on wetlands and water quality. (R. at 18309–12.)

The ROD updates the FEIS's consideration of P2PH (there denominated

24

"TBDP") because Defendants learned from Denver that Denver's design for the Globeville Landing Outfall would conflict with the PCL Alternative's intent to run its own stormwater outfall in the Globeville Landing area. (R. at 146.) Defendants chose to redesign the conflicting part of the PCL Alternative's stormwater diversion system to connect with the infrastructure Denver was building for the Globeville Landing Outfall, "creating a combined outfall system." (*Id.*) Consequently, the ROD supplements the FEIS with a full analysis (not just a cumulative effects analysis) of the combined outfall's impacts, in particular, a discussion of its effects on parks and recreational resources (R. at 163–68), on floodplains and drainage/hydrology (R. at 187–92), on wetlands and other waters of the United States (R. at 192–94), and on water quality (R. at 194–98). (*See also* R. at 564–73, 4940–91 (updates to the FEIS's "technical report" addenda that discuss some of these matters in greater detail).)

Taken at face value, the foregoing appears to satisfy the D.C. Circuit's five-part test. The Zeppelin Plaintiffs nonetheless argue that the existing cumulative impacts analysis is insufficient under NEPA because P2PH is supposedly only "fleetingly mention[ed]" in the FEIS, which "makes no effort to discuss the cumulative ecological, economic, or health impacts posed by [P2PH] and [the PCL Alternative]." (ECF No. 32 at 31.) The Zeppelin Plaintiffs understand, however, that Defendants are only required to evaluate "those types of impacts from P2PH that are also associated with [the PCL Alternative]" and "are likely to reach the geographic area affected by [the PCL Alternative]." (ECF No. 102 at 4.) And from this subset, the only alleged problem that the Zeppelin Plaintiffs specifically point out is fugitive dust, emphasizing that the FEIS "d[oes] not analyze the dangers to human health and the environment that will be

cumulatively caused by the disturbance and spread of hazardous soils between Brighton and Colorado Boulevards [referring to digging the trench for the lowered section of freeway], at Globeville Landing Park, and along 39th Avenue." (*Id.* at 31–32.) In other words, the Zeppelin Plaintiffs believe that Defendants did not adequately consider the potential air-quality effects of digging through a Superfund site to build the lowered section of freeway while other excavation was occurring elsewhere in the same Superfund site.

On the present record, the Court cannot say that the Zeppelin Plaintiffs are likely to succeed on this argument, for essentially the same reason that Claim 1 appears currently unlikely to succeed, namely, it presupposes that dust control measures will fail. (*See, e.g.*, ECF No. 102 at 4 (hypothesizing a potential "overlap" between the "plume of fugitive dust caused by construction of the [39th Avenue Open Channel]" and the "plume of fugitive dust caused by digging the highway trench").) The Zeppelin Plaintiffs do not meaningfully respond to Defendants' argument that the potential for harmful release of contaminated dust is speculative. (*See* ECF No. 46 at 29; ECF No. 54 at 14–16.)

It is well-settled that "cumulative impacts that are too speculative or hypothetical to meaningfully contribute to NEPA's goals of public disclosure and informed decisionmaking need not be considered." *Wyoming*, 661 F.3d at 1253. Accordingly, the Court will not order a stay of agency action based on the Zeppelin Plaintiffs' Claim 6.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     The Zeppelin Plaintiffs' APA § 705 Motion for Stay (ECF No. 32) is DENIED; and

2.     The Zeppelin Plaintiffs' Motion to Reconsider (ECF No. 91) is DENIED.


Dated this 22nd day of January, 2018.

                                        BY THE COURT:

                                        _____
                                        William J. Martinez
                                        United States District Judge