# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

––––––

Argued September 19, 2017          Decided October 24, 2017

No. 16-1097

SIERRA CLUB, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND E. SCOTT PRUITT,
ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION
AGENCY,
RESPONDENTS

––––––

On Petition for Review of Agency Action of
the United States Environmental Protection Agency

––––––

*Robert E. Yuhnke* argued the cause and filed the briefs for petitioners.

*Meghan E. Greenfield*, Trial Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the briefs were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *John C. Cruden*, Assistant Attorney General at the time the brief was filed. *Sue S. Chen*, Trial Attorney, entered an appearance.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:   The petitioners—environmental and community organizations—contend that the Environmental Protection Agency has violated the Administrative Procedure Act and the Clean Air Act by modifying, without notice and comment, its prior understandings of how to measure a proposed transportation project's impact on ambient levels of $PM_{2.5}$ and $PM_{10}$. (The first is particulate matter 2.5 micrometers or less in diameter; the second is particulate matter 10 micrometers or less in diameter.)  The parties agree that the modification would, at the margin, make it less likely than before that a project would run afoul of various legal restrictions on the affected projects. As petitioners see it, the EPA's new viewpoint violates the Clean Air Act's substantive requirements.

For want of jurisdiction we do not reach the substance of either the APA or the Clean Air Act arguments.  In the case of $PM_{2.5}$, petitioners have shown no instance where the change would be likely to have any adverse effect on them or their members; they therefore lack standing.  In the case of $PM_{10}$, the EPA's new provisions are not binding on the agency or affected parties and therefore do not constitute "final action" within the meaning of the Clean Air Act provision on which petitioners rely for our jurisdiction, 42 U.S.C. § 7607(b)(1).

\* \* \*

Under the Clean Air Act, the EPA has established National Ambient Air Quality Standards ("NAAQS") for various pollutants including $PM_{2.5}$ and $PM_{10}$.  To prevent uses of federal money that would take an area out of compliance with the NAAQS, the Act bars federal instrumentalities from supporting projects that would tend to do so.  The Act directs

3

federal agencies not to supply funds for any project that "does not conform" to the applicable State Implementation Plan ("SIP") (required of states in order to assure the implementation and maintenance of the NAAQS, 42 U.S.C. § 7410), and defines conformity to the SIP as including assurance that the project will not

> (i) cause or contribute to any new violation of any [NAAQS] in any area;

> (ii) increase the frequency or severity of any existing violation of any [NAAQS] in any area; or

> (iii) delay timely attainment of any [NAAQS] . . . .

42 U.S.C. § 7506(c)(1)(B).

EPA regulations governing "conformity" determinations for federally funded transportation plans possibly affecting $PM_{2.5}$, $PM_{10}$, or carbon monoxide substantially replicate this language. 40 C.F.R. § 93.116. (A separate set of regulations applies to federal actions other than highways and mass transit. See Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed. Reg. 63,214 (Nov. 30, 1993).) To define the conformity requirement's scope, the regulations employ the Act's classifications of areas with respect to "attainment" of the standard for a particular pollutant. Under the Act, an area of a state that fails to comply with a given NAAQS is rated "nonattainment"; one that formerly did not comply but now does, but has yet to satisfy some transitional criteria, is designated "maintenance." An area is in "attainment" if it not only meets the standard but is not subject to the qualifications that would land the area in the "maintenance" category. 42 U.S.C. § 7407(d)(1)(A)(i)-(ii), (3)(E). The regulation applies

4

conformity requirements only to areas designated "nonattainment" or "maintenance." 40 C.F.R. § 93.116(a).

Congress charged the EPA Administrator, with the concurrence of the Secretary of Transportation, with promulgating "criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects." 42 U.S.C. § 7506(c)(4)(B). For CO and PM, the EPA created a so-called "hot-spot" analysis. It specified that project sponsors (typically state departments of transportation) should combine the baseline concentration with the expected increment resulting from the project, and compare the sum with the concentration permitted by the NAAQS. 40 C.F.R. § 93.123(c)(1); see also 75 Fed. Reg. 79,370, 79,370/3-79,371/1.

In 2006, when the EPA first revised the hot-spot regulations to apply to $PM_{2.5}$, the regulations said that the hot-spot analysis "must be based on quantitative analysis methods" for projects of local air quality concern, including "[n]ew highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles." 40 C.F.R. § 93.123(b)(1), (b)(1)(i). But they also said that quantitative methods would not take effect "until EPA release[d] modeling guidance on this subject and announce[d] in the Federal Register that these requirements are in effect." 40 C.F.R. § 93.123(b)(4). Until then, rather vaguely described "qualitative" methods were to prevail. In fact, and of some importance for our analysis, the mandate to use quantitative methods took effect only after a two-year grace period following the EPA's issuance of the preferred methodology in December 2010. See 40 C.F.R. § 93.111(a)-(b); 75 Fed. Reg. at 79,370/2.

5

The EPA issued that guidance after employing notice and comment procedures specified by a settlement with environmental groups. See 75 Fed. Reg. 29,537, 29,538/1; see also Joint Appendix ("J.A.") 299-302. It announced the release in the Federal Register. See 75 Fed. Reg. at 79,370/2. The Guidance essentially required a summing of *monitored* PM on a specified extreme day (for the baseline) with the *modeled* PM increment for a specified extreme day (for the future). See Transportation Conformity Guidance for Quantitative Hot-spot Analyses in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas (EPA-420-B-10-040, Dec. 2010) ("2010 Guidance"), *available at* nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1009HVH.TXT. (In some cases, the baseline was to be adjusted by an estimate of possible changes independent of the project. See 40 C.F.R. § 93.123(c)(2); 2010 Guidance at § 8.3.3.) If the total (called the design value) was lower than the NAAQS, the project conformed. The rules for $PM_{2.5}$ and $PM_{10}$ differed simply in their identification of the extreme days to be evaluated.

The 2015 Guidance—issued as we said without notice and comment—expressed an alteration of the EPA's view of the proper methodology for the design value for both $PM_{2.5}$ and $PM_{10}$. Given that we are not reaching the merits, and that all parties agree that at the margin the alteration tends to reduce the likelihood of a non-conformity finding, we need not describe the change. It essentially involved altering the designation of the extreme days for which the calculations were to be made. See Transportation Conformity Guidance for Quantitative Hot-spot Analyses in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas (EPA-420-B-15-084, Nov. 2015) ("2015 Guidance"), *available at* nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100NMXM.pdf.

In both 2010 and 2015, the guidance documents further explained that, pursuant to 40 C.F.R. § 93.105(c), an

6

interagency consultation process "must be used to develop a process to evaluate and choose models and associated methods and assumptions to be used in PM hot-spot analyses." 2015 Guidance, § 2.3; 2010 Guidance, § 2.3.  This consultation process requires that the state department of transportation sponsoring a project work with the EPA, the Department of Transportation, and relevant state agencies during the design and implementation of the hot-spot analysis. After the state department of transportation completes its analysis, it submits it to the Department of Transportation for a final conformity determination.  40 C.F.R. § 93.104; 2015 Guidance, § 2.9.2.

\* \* \*

We find that petitioners lack standing to challenge the 2015 Guidance regarding $PM_{2.5}$, and that we have no statutory jurisdiction under 42 U.S.C. § 7607(b)(1) to rule on their $PM_{10}$ claim because the 2015 Guidance imposes no binding norm.

*$PM_{2.5}$*.  The environmental organizations assert standing on the basis of the additional exposure to pollutants that they believe the change from the 2010 to the 2015 Guidance will inflict on their members.  See *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1005 (D.C. Cir. 2014). Specifically, they point to possible effects on the legal viability of three highway projects—I-70 East in Colorado, South Mountain Freeway in Arizona, and I-710 in California. Their difficulty lies in their having failed to adduce evidence that the change will have any effect on any of the projects. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

7

The first two—I-70 East in Colorado and South Mountain Freeway in Arizona—are not located in a nonattainment or maintenance area for PM$_{2.5}$, so for these projects the regulations require no PM$_{2.5}$ hot-spot analysis.  That ends the matter as to those projects.

The third project, I-710 in California, is within a nonattainment zone for PM$_{2.5}$.  But petitioners have made no showing that the 2015 methodology will be used by the I-710 project sponsors or that applying that methodology would make any difference.  The only evidence in the record with regard to the I-710 project's conformity analysis is a 2012 draft Environmental Impact Study ("EIS").  J.A. 245-58.  That study was not based on *either* the 2015 or the 2010 methodology:  It was drafted in the two-year grace period between the EPA's release of guidance for use of quantitative methods and the date on which their use became obligatory. See 40 C.F.R. §§ 93.111(b), 93.123(b)(4); J.A. 257.  And it obviously preceded release of the 2015 Guidance—in fact by more than three years.

A supplemental draft EIS was released for the I-710 project in July 2017.  Even if this post-filing development could alter our standing analysis, see *Wheaton College v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) ("[S]tanding is assessed at the time of filing . . . ."), it too would be of no help to petitioners.  The supplemental draft EIS explains that no quantitative hot-spot analysis has yet been conducted for PM$_{2.5}$ and that the I-710 project sponsors are in the process of developing the methodology they will use:  "The PM hotspot analysis protocol is under development, and the interagency consultation process regarding this protocol has been initiated."  See California State Department of Transportation & Los Angeles County Metropolitan Transit Authority, I-710 Corridor Project Recirculated Draft Environmental Impact Report/Supplemental Draft Environmental Impact Statement

8

and Section 4(f) Evaluation, p. 3.13-15, *available at* http://www.dot.ca.gov/d7/env-docs/docs/RDEIR_SDEIS% 20July%202017.pdf. But nothing appears to suggest that the project will fall in that critical margin between the 2010 and the 2015 methods.

Thus petitioners have failed to establish that the 2015 $PM_{2.5}$ methodology will be used or that its use would result in a conformity determination different from the one that would have resulted if the 2010 methodology had applied—the latter a point counsel for petitioners conceded at oral argument. Oral Argument 7:30-7:47.

The government concedes that petitioners have established injury for purposes of standing to challenge the revised $PM_{10}$ hot-spot methodology. Oral Argument 21:30-22:06. We have no reason to doubt the concession, but we need not address the question in view of our lack of statutory jurisdiction over the $PM_{10}$ claims. See *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("[A] federal court [may] choose among threshold grounds for denying audience to a case on the merits."). Even if we were to find that petitioners have standing to challenge the $PM_{10}$ provisions, that finding would not create standing to challenge those for $PM_{2.5}$. Standing is not evaluated "in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); see also *Davis v. FEC*, 554 U.S. 724, 733–34 (2008); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Because petitioners have not identified "any concrete application" of the 2015 $PM_{2.5}$ methodology "that threatens imminent and concrete harm to the interests of their members," see *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-95 (2009), we hold that they lack standing as to that aspect of the 2015 Guidance.

9

*PM₁₀*.    Under the Clean Air Act, this Court has jurisdiction over a petition for review of any "nationally applicable regulations promulgated, or *final action* taken, by the Administrator under this chapter . . . ."      42 U.S.C. § 7607(b)(1) (emphasis added).  In the absence of final agency action, we lack jurisdiction to hear an administrative challenge.  *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 879 (D.C. Cir. 2015); *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 193 (D.C. Cir. 2011).

In a case under the Clean Air Act, "the term 'final action' is synonymous with the term 'final agency action' as used in Section 704 of the APA."   *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004).  For a purported guidance document, the basic question is "whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule."  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015).   "Policy statements 'are binding on neither the public nor the agency,' and the agency 'retains the discretion and the authority to change its position . . . in any specific case.'"   *Id.* (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)).

In resolving the issue, we typically consider (1) "the actual legal effect (or lack thereof) of the agency action in question on regulated entities"; (2) "the agency's characterization of the guidance"; and (3) "whether the agency has applied the guidance as if it were binding on regulated parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252-53 (D.C. Cir. 2014).

In their claim that the change in the PM₁₀ methodology is binding on project sponsors and on the relevant agencies,

10

petitioners disregard both the plain language of the Guidance and the way it has been administered.

In both 2010 and 2015, the EPA explained that the recommended $PM_{10}$ methodology was just that—a recommendation.  The Guidance explicitly states that the EPA was open to considering better, alternative methods:

> More advanced methods of calculating a $PM_{10}$ design value, such as combining modeled and monitored concentrations on a quarterly basis, may be considered on a case-by-case basis by the EPA Regional Office, OTAQ [Office of Transportation Air Quality], and OAQPS [Office of Air Quality Planning and Standards].  Any alternative methods for calculating $PM_{10}$ design values must be evaluated and chosen through the process established by each area's interagency consultation procedures (40 C.F.R. § 93.105(c)(1)(i)).

2015 Guidance, § 9.3.4; 2010 Guidance, § 9.3.4.

Contrary to petitioners' assertions, this is not a case in which the guidance document signals that the agency "will not be open to considering approaches other than those prescribed" therein.  See *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 384 (D.C. Cir. 2002); see also *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988).  We said of the guidance at issue in *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000), that "from beginning to end . . . [it] reads like a ukase.  It commands, it requires, it orders, it dictates."  *Id*. at 1023.  This is no ukase.  As the quoted passage shows, it affirmatively invites the affected agencies to consider and apply improvements.

The EPA's vow to remain flexible was not just talk, as shown by its conduct under identical language in the 2010

11

Guidance.   In August 2014, as part of the interagency consultation process, the EPA and the project sponsors for the I-70 East and South Mountain Freeway projects discussed how to properly perform the hot-spot analysis required by 40 C.F.R. § 93.123.    See J.A. 195-97, 225-26.    In two substantially contemporaneous communications with the project sponsors, the EPA explained that it had "recently provided technical assistance for another project" and that now "[a]nother option is available" for calculating the $PM_{10}$ design value.  J.A. 197, 227.  "Based on implementation of the PM Hot-spot guidance to date," the EPA said that it "believe[d] that there is further flexibility in what air quality monitoring data is used for design value calculations for PM hot-spot analyses" and that the relevant project sponsors could adopt "a slightly revised methodology for $PM_{10}$ design value calculations."    J.A. 197, 227.    The new possibility was ultimately to appear as the key novelty in the 2015 Guidance.

On its face and as applied, the 2015 changes to the $PM_{10}$ methodology are not binding.   Petitioners contend that we should nonetheless find that the 2015 Guidance is a legislative rule because it purports to change another legislative rule.  We agree, of course, that an amendment to a legislative rule must itself be legislative.  *Huerta*, 785 F.3d at 718; *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).    But petitioners are mistaken in their premise that the 2010 Guidance was itself a legislative rule.

As we have just discussed, the 2010 $PM_{10}$ methodology was not applied with unyielding rigidity; instead, the EPA modified its approach over time.  And while the release of the Guidance in 2010 had the effect of triggering the effective date of the requirement that project sponsors use quantitative (as opposed to qualitative) methods to perform the hot-spot analysis, that consequence flowed from the *issuance* of the Guidance, not its substance.

12

Petitioners counter that the 2010 Guidance must be a legislative rule because it was promulgated with notice and comment. Even if petitioners were right that full APA procedures were used in the release of the 2010 Guidance (a point the EPA contests), an agency's decision to embrace additional process cannot convert a guidance document into a legislative rule. See *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 394 (D.C. Cir. 2013). The EPA makes a host of guidance documents available for public comment. See Significant Guidance Documents, *available at* https://www.epa.gov/laws-regulations/significant-guidance-documents. That doesn't transform them into legislative rules. Petitioners' theory, if adopted, would discourage agencies from pursuing the very public engagement they seek.

In short, the $PM_{10}$ design value methodology found in the 2015 Guidance "does not express a final agency action, and so we lack jurisdiction under the Clean Air Act, 42 U.S.C. § 7607(b), to consider" it. See *Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1354 (D.C. Cir. 2012).

\* \* \*

Because the petitioners lack standing with respect to the revised $PM_{2.5}$ methodology and because we lack jurisdiction under the statute for their challenge to the revised $PM_{10}$ methodology, the petition for review is

*Dismissed*.