**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE
PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CARTER, in his official capacity as Division
Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and SHAILEN P. BHATT, in his
official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

**PETITIONER'S MOTION TO SUPPLEMENT**
**THE ADMINISTRATIVE RECORD**
(Case No. 17-cv-1679-WJM-MEH)

---

ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

COUNSEL FOR PETITIONERS

## INTRODUCTION

Petitioners Sierra Club, Elyria and Swansea Neighborhood Association, Colorado Latino Forum, and Chaffee Park Neighborhood Association (collectively "Petitioners") move to supplement the Administrative Record ("AR" or "Record") filed in this case. The Federal Highway Administration ("FHWA") and Defendant-Intervenors, Colorado Department of Transportation ("CDOT") (collectively "Defendants") oppose this motion.

Petitioners seek to add expert testimony and peer-reviewed scientific studies as evidence that Defendants failed to examine relevant evidence and consider relevant factors in this decision, and to provide expert explanations of highly complex technical matters to aid the Court in understanding what Defendants did or failed to do.

## ARGUMENT

### The Attached Documents are Relevant to Petitioners' Health Claims and Necessary to Establish FHWA's Failure to Consider Relevant Factors Such as Health Impacts.

The extra-record materials submitted with this motion qualify under recognized exceptions to supplement the Record because they contain or explain evidence and/or factors relevant to the agency decision that Defendants did not consider before issuing the Record of Decision approving the I-70 East Phase 1 (Central) Project ("Project"). An action that fails to consider "relevant factors," or "relevant evidence," is arbitrary and capricious.

A court's review under "Section 706(2)(A) [of the APA] requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. §706(2)(A). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416…. The agency must have examined the relevant data and articulated a rational connection between the facts found and the decision made, supported by substantial evidence in the record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. I s. Co.*, 463 U.S. 29, 43 … (1983); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575–76 (10th Cir.1994). Where an agency fails to consider evidence relevant to the final decision, its rationale and justification may be undermined. By its very nature, evidence which the agency fails to consider is frequently

> not in the record. Accordingly, in order to allow for meaningful, in-depth, probing review, such extra-record evidence is often properly included in the Administrative Record.

*Ctr. for Native Ecosystems v. Salazar,* 711 F. Supp. 2d 1267, 1279-80 (D. Co. 2010). If Petitioners allege that an agency failed to consider a relevant factor or failed to examine evidence relevant to its decision, they bear the burden to establish that the agency did not consider relevant factors or examine relevant evidence. The expert testimony and other materials submitted to supplement the AR meet this burden.

In addition, Petitioners' claims related to air quality modeling and assessing the health impacts of exposure to air pollutants are complex and highly technical. Courts recognize that matters involving technical or scientific complexity may require explanation by experts. "NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record." *Sierra Club v. Peterson,* 185 F.3d 349, 370 (5th Cir.1999). "The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omission to its attention." *Id.* Petitioners also rely on this exception to supplement the record with expert testimony intended to assist the Court's understanding of scientific data and technical analysis that explain Petitioners' claims that Defendants ignored relevant factors and did not examine relevant evidence.

Petitioners' claims under the National Environmental Policy Act ("NEPA")[1] and the Federal-Aid Highway Act ("F-AHA")[2] arise from evidence in the Final Environmental Impact Statement's ("FEIS") Air Quality Technical Report, FEIS Attachment J[3], showing that exposure to fugitive dust will increase 43% by 2035[4] and tailpipe emissions of PM10 will increase 10%

---

[1] Petition For Review, Part II, Doc. No. 1
[2] Petition for Review, Part III, Doc. No. 1
[3] AR 014442 *et seq.*
[4] AR 023511

between 2015 and 2035 due to the Project.[5] The PM10 air quality modeling analysis in the conformity determination shows Project emissions will add at least 41 µg/m3 of PM10, from 113 µg/m3 to 154 µg/m3.[6]  Furthermore, carbon monoxide emissions will increase by 14% by 2035.[7]

Defendants violated NEPA and F-AHA by failing to investigate and disclose that increased I-70 emissions endanger human health by contributing to increased premature deaths, hospitalizations, and asthma onset and attacks, and by failing to consider alternatives and mitigation that could avoid or minimize these impacts.[8] Defendants have a duty under NEPA to investigate, identify and consider project alternatives and mitigation measures that could restore and enhance the human environment by reducing exposure to air pollutants, thereby enhancing the health of neighborhood residents and students attending schools in the Project area.[9]

Defendants acknowledge in section 5.20 of the FEIS[10] that air pollution **does** impact community health, but failed to evaluate and report any health impacts that would result from increased community exposure to PM, and failed to evaluate any alternatives or mitigation to reduce pollutant exposures and improve community health. Instead, Defendants contend, first, that because the NAAQS for $PM_{10}$ and carbon monoxide will be maintained, they may presume that increased exposures to traffic pollution will cause no significant human health impacts. By relying on this presumption of no significant health impacts, Defendants contend they have no obligation to assess health impacts, and "no specific mitigation measures are necessary for the project to proceed."[11]

Defendants point to no evidence in the Record that air quality attaining applicable NAAQS has "no significant impact on health." FHWA's presumption is not founded on

---

[5] AR 014533
[6] AR 004790
[7] AR 014536
[8] Petition for Review, Part II, First, Second NEPA Claims. Doc. No. 1
[9] Petition for Review, Part II, Third NEPA Claim.
[10] AR 018227 *et seq.*
[11] AR 018230

evidence. To the contrary, the vast body of scientific research evaluated by the U.S. Environmental Protection Agency ("EPA") when it strengthened the $PM_{2.5}$ NAAQS in 2009, and research published since 2009 in peer-reviewed journals, demonstrates overwhelmingly that adverse health outcomes are causally related to pollutants emitted from highways at concentrations allowed by the NAAQS. FHWA's failure to examine scientific evidence of health impacts even when PM10 and carbon monoxide NAAQS are attained, is a failure to examine relevant evidence of the impacts of Project emissions.

In addition, Defendant's failure to examine evidence of harm to health extends to their failure to consider impacts on community health from exposure to increased pollution from the Project. Defendants' failure to consider health impacts is a failure to consider a critically important NEPA factors and requirements to disclose significant impacts on the environment, 40 C.F.R. §1502.1, compare alternatives, §1502.14, and determine the mitigation needed to avoid adverse impacts, §§1502.14(f), 1502.16(h). The failure to consider health impacts also constitutes a failure to consider a critically important factor relevant to the final determination of whether the Project is "in the best overall public interest" as required by 23 U.S.C. §109(h). Petitioners move to supplement the Record with expert testimony to establish that Defendants failed to examine evidence relevant to determining impacts on human health from increased exposure to air pollutants emitted from the Project.

### 1. Declaration of Dr. George D. Thurston, "The Adverse Human Health Effects of Traffic Related Air Pollution" (attached as Exhibit 28).

To meet their burden to establish that FHWA did not examine relevant evidence of significant harm to human health linked to pollutant exposures or consider significant impacts on human health, Petitioners submit expert testimony from Dr. George D. Thurston, Professor of Environmental Medicine at the New York University School of Public Health.[12]

---

[12] Exhibit 28 was submitted in support of Petitioners' Motion for Stay (ECF 88) to establish facts necessary to show that Petitioners' members will suffer irreparable harm from construction emissions and provide evidence that

In his report, Dr. Thurston reviews data analyzed by EPA in its last assessment of the health effects of PM[13] showing that EPA acknowledged the NAAQS was not set to prevent all adverse health effects. He also analyzes research in forty-two journal articles published since 2009 supporting the conclusion that "adverse health risks caused by exposure to PM and the mixture of gaseous and vapor co-pollutants from traffic-related sources will increase if exposures to these pollutants are increased," and "increasing exposures to PM10 and PM2.5 at levels below the NAAQS will increase both the incidence of asthma attacks and asthma onset in the community, increase personal risk for those already diagnosed with asthma, and increase risk of suffering acute effects and mortality from cardiovascular disease." Dr. Thurston explains that exposure to increased concentrations from construction and future vehicle emissions will cause greater health risks and adverse health outcomes – even if the NAAQS are met.

Dr. Thurston analyzed data and relied on research studies (see the bibliography to his testimony), that are published and available evidence of adverse health impacts that Defendants failed to examine. Given the magnitude of consequences for community residents, failure to examine this evidence is arbitrary and capricious.

> **2. Published Peer-Reviewed Evidence Relevant to Determining Adverse Impacts on Health from Increased Exposure, and Benefits to Community Health from Reduced Exposure to Highway Pollution (attached as Exhibit 31).**

In addition to Dr. Thurston's testimony and the journal articles he reference, Petitioners submit health effects research published in peer-reviewed journals listed and summarized in Exhibit 31. This research was not discussed by Dr. Thurston in his testimony, but these articles include additional data relevant to determining the health consequences of increased exposure to

---

Petitioners are likely to prevail on the merits, because Defendants failed to examine evidence relevant to determining impacts on health, and failed to consider impacts on health as a relevant factor in their decision to approve the I-70 Project.

[13] *Integrated Science Assessment for PM* (2009). *See* Thurston Declaration.

pollutants emitted from highways, and the health benefits that can be achieved by reducing public exposure to these pollutants.

> **3. Declaration of Jonathan Heller, "Health Impact Assessment: A Tool To Support Decision Making For Transportation Projects" (attached as Exhibit 34).**

Dr. Heller's Declaration is submitted to assist the Court's understanding of the analytical principles and procedures implemented in Health Impact Assessments ("HIA")  and the role that HIAs can play in helping decision makers understand the health status of communities, how that health status may be affected, for the better or the worse, by programs, projects or actions proposed by agencies or private actors, and how to assess alternatives or mitigation strategies to minimize adverse impacts or restore and enhance community health. His testimony reviews the development over the last decade of HIAs as a decision-making tool and its applicability to transportation decision making. Notably, Dr. Heller discusses the policies and guidelines adopted by FHWA and US DOT that recognize the value of this methodology as a decision-making tool and encourage the use of analytical approaches used in HIA's for decision making in the transportation context. These analytical approaches adopted by FHWA and US DOT are highly appropriate for assessing health impacts in the I-70 context. Dr. Heller's testimony explains the standard approaches and methods for data collection and analysis normally applied when performing an HIA to assess health impacts. These standard approaches and methods were defined and understood by HIA practitioners, the U.S. DOT and FHWA at the time the I-70 Project's SDEIS and FEIS were being prepared. These approaches were available to Defendants when the Sierra Club, in public comments on the SDEIS and FEIS, requested an HIA be done as part of the review of I-70 Project impacts and evaluation of alternatives and mitigation.

Dr. Heller's testimony qualifies to supplement the Record on three grounds. First, HIA analytical methods define the type, scope and scientific rigor of the evidence relevant to assessing the health impacts of a transportation project. Dr. Heller describes and defines the

evidence relevant to assessing health impacts that Defendants omitted from the NEPA review of the I-70 Project. Second, his testimony identifies the factors relevant to assess health, including the need to establish a baseline health status for the affected community, how that baseline status will be affected by the Project, and how mitigation measures can be applied to avoid adverse impacts and improve health status. Third, many aspects of an HIA's assessment of health impacts are not simple or inherently self-evident components of decision-making. Dr. Heller's testimony is also submitted to help the Court understand how the scope of data collection and policy analysis by using the HIA framework satisfies the impact analysis required by NEPA.

### 4. Declaration of Dr. Gregory Rowangould, "Modeling PM2.5 Emissions from Phase 1 of the I-70 Central Project" (attached as Exhibit 33).

Petitioners' Eighth NEPA Claim alleges that Defendants failed to consider the health impacts of increased community exposure to fine particles smaller than 2.5 µm in diameter, regulated by the NAAQS for PM2.5.[14] Commenters requested that Defendants model PM2.5 emissions from the Project as prescribed by EPA guidance for determining whether highway emissions will violate the NAAQS. Commenters also asserted that the impact of PM2.5 emissions is a "significant impact," as defined by 40 C.F.R. § 1502.27(b)(10), because the emissions inventory disclosed in the SDEIS showed that total PM2.5 emissions (*i.e.,* tailpipe plus fugitive road dust) would increase over the life of the Project, that increasing PM10 emissions had been modeled and were expected to nearly exceed the NAAQS for PM10, and that monitoring data obtained near the Mousetrap showed significantly higher PM2.5 than other monitors in the metro area not located near a heavily trafficked highway.[15] Together, these facts demonstrate that the Project "threatened" to violate the NAAQS, which triggered the obligation to use credible scientific modeling to investigate whether the Project would violate the NAAQS. NEPA regulations require that compliance with the NAAQS must be demonstrated using the

---

[14] 40 C.F.R. §50.13.
[15] Sierra Club Comments on SDEIS, FEIS, Attachment Q, p. S-117, S-120-122 (AR )

scientific methods required under the Clean Air Act because an EIS "shall state how alternatives … will or will not achieve the requirements of … other environmental laws and policies." 40 CFR § 1502.2(d). Whether highway emissions will or will not achieve the NAAQS for PM2.5 can only be determined by applying the emissions and air quality models and procedures prescribed under the Clean Air Act for making that determination.

Modeling using prescribed procedures is also required to determine the magnitude of a violation since the evaluation of mitigation measures depends on the amount of emission reduction needed to avoid the violation. Knowing the magnitude of the increased pollutant exposure that will be suffered by the community is also relevant to assessing the mitigation needed to avoid or eliminate adverse health impacts.

FHWA acknowledged that compliance with the PM2.5 NAAQS cannot be determined by:

> extrapolating the existing ratio of PM2.5 to PM10 to other scenarios in an effort to predict violations of the NAAQS is not scientifically valid, as particulate emissions in different size fractions come from multiple different sources, not all of which vary at the same rate with changes between build alternatives or traffic loads.[16]

But FHWA did exactly that: they applied no other methodology for determining whether emissions will violate the NAAQS. Instead they assumed compliance for PM2.5 because PM10 allegedly complied with the less protective NAAQS for PM₁₀.

To meet Petitioners' burden to establish that Defendants failed to consider a relevant factor, i.e., violation of the PM2.5 NAAQS, and failed to consider evidence relevant to determining a possible NAAQS violation and the emission reductions needed for mitigation, Petitioners employed Dr. Gregory Rowangould, a published air quality modeling expert, to model future PM2.5 emissions expected from the Project. Using the exact same EPA-approved models, the same future year traffic estimates, wind data inputs and assumptions used by FHWA when it modeled the I-70 Project for PM₁₀, Dr. Rowangould shows that Project emissions are

---

[16] FEIS, Attachment Q, Response to Comment B1, p. S- 120.

expected to violate the 24-hour NAAQS for PM$_{2.5}$. This modeling shows what FHWA would have found had it performed the modeling procedures required by EPA to estimate Project impacts on NAAQS compliance.

Dr. Rowangould's testimony and report provide relevant evidence showing the Project's impact on NAAQS compliance that FHWA did not, but should have, considered during its review of the Project. This evidence demonstrates that FHWA failed to fulfill its obligation under 40 C.F.R. §1502.22 to obtain "information relevant to reasonably foreseeable significant impacts…." In addition, this evidence demonstrates that FHWA disregarded an important factor, i.e., NAAQS compliance, relevant to assessing Project environmental impacts, and that it failed to honor its obligation under §1502.24 to "insure … the scientific integrity of the discussions and analyses in environmental impact statements." By not using EPA-approved modeling tools to assess impacts on air quality standards set to protect the environment, FHWA also failed to obtain the evidence relevant to estimating increased public exposure to a deadly pollutant that will have serious impacts on community health. For these reasons, Dr. Rowangould's report on PM2.5 should supplement the record.

Finally, Dr. Rowangould's report provides the Court a detailed explanation of highly technical matters related to EPA's procedures for assessing the impact of highway emissions on air quality. These are matters not likely to be easily understood by any lay person not trained in air quality modeling without analysis and explanation by a qualified expert. *See Sierra Club v. Peterson,* 185 F.3d at 370, *supra.*

**5. Declaration of John Brink, "Estimates of Fugitive Dust Emissions from Construction Activities for the I-70 East Phase 1 Expansion Project" (attached as Exhibit 35).**

In his report, Mr. Brink provides evidence relevant to showing what impact fugitive dust emissions from construction activities will likely have on community exposure to PM$_{10}$ during the construction phase of the Project. Mr. Brink, an experienced former EPA environmental

analyst, applies EPA guidance for estimating fugitive dust emissions from highway construction to data obtained from the NEPA record and the I-70 Project website to estimate total fugitive dust emissions (construction plus traffic emissions) from I-70 during the construction phase. Mr. Brink demonstrates that total dust emissions during construction will exceed by 12% the fugitive dust emissions expected from traffic in 2035. The future traffic emissions of fugitive dust were used by FHWA in the $PM_{10}$ air quality modeling analysis performed for the conformity determination which showed that the NAAQS for $PM_{10}$ would be attained by less than 1 $\mu g/m^3$.[17] Increasing fugitive dust by 12% creates the high probability that the NAAQS will be violated during construction thereby exposing nearby residents to significantly greater health risks.

This evidence is relevant to Petitioners' claim that FHWA failed to consider the impacts of Project emissions on community health, and failed to identify mitigation sufficient to avoid adverse health impacts. This evidence qualifies for admission to supplement the record for the same reasons argued for admission of Dr. Rowangould's report of modeling PM2.5 emissions.

### 6. Declaration of Dr. Gregory Rowangould, "Report of Investigation of Modeling Results for Receptor Locations Selected for Modeling Emissions of PM10 From the I-70 Central Project" (attached as Exhibit 32).

Dr. Rowangould's declaration is relevant to Petitioners' Clean Air Act claims challenging the determination that emissions of $PM_{10}$ from the Project "will not (i) cause or contribute to a new violation of any standard in any area," as required by 42 U.S.C. §7506(c)(1)(B).[18] During the comment period on the draft conformity determination and before submitting its detailed comments, the Sierra Club requested documentation of all data used to make the determination:

> The hot-spot analysis contained in the Draft Air Quality Conformity Technical Report posted on the I-70 Central website on December 16, 2016, ("Draft Conformity Report") contains dramatically different results for both emissions from the proposed Project and the background data used to determine the "design value" for

---

[17] For details regarding the modeling results for PM10, *see* Declaration of Dr. Gregory Rowangould, "Report of Investigation of Modeling Results for Receptor Locations Selected for Modeling Emissions of PM10 From the I-70 Central Project" (Petitioners' Exhibit 32).

[18] *See* Petition for Review, Part IV.

PM10 compared to the results published in the Air Quality Technical Report published as Attachment J to the Final Environmental Impact Statement in January, 2016. These differences are so large that they draw into question the credibility of the latest hot-spot analysis. The credibility of the current analysis is especially suspect in view of the failure to provide any of the underlying data used to obtain these results, and the failure to offer any rational explanation for the differences.[19]

Among other things, the Sierra Club requested:

> 4) Comparative plots showing the changes in receptor locations that were offered as an explanation in the NEPA comparison report as accounting for some of the change in the ambient impact of Project emissions between the 2035 and 2040 modeling runs.

In its comments (filed on the deadline for comment), the Sierra Club renewed its request for an explanation:

> Full and comprehensive disclosure is especially important in situations such as this where the results from one analysis to the next is so fundamentally different. Despite the acknowledgement that traffic will increase between 2035, which was the analysis year for the last analysis, and 2040, which is the analysis year for this analysis, the ambient impact of emissions is predicted to decrease from 61 ug/m3 to 41 ug/m3, a 34% decrease. In addition, the latest NEPA report claims that the emissions inventory has not changed. The NEPA report issued with the proposed conformity determination states, at 2, that Items not updated in this document include the emissions inventory of health-based National Ambient Air Quality Standards (NAAQS). *** If emissions from the project did not change, then some explanation is necessary to inform the public and decisionmakers about the ambient impact of the same emissions could have decreased by 34%.[20]

Citizen commenters who asked for explanations of how the agencies reached their conclusions, received responses from Vanessa Henderson [CDOT] such as the following:

> The model data is being provided upon request.  Please let me know if you would like me to send it to you; note that the files are large and a lot of them require modeling software to open.  I just want to verify that you are able to accept them through your email before I send the files.

The Sierra Club and other commenters received the data files without any explanation of how the data was derived or modified since the 2035 modeling analysis was performed. To assist in understanding how the raw data might address questions raised in the Request for Documentation, the Sierra Club sought the assistance of experts to evaluate

---

[19] ROD, Attachment F, p. 62.
[20] ROD, Attachment F, p.269.

the limited data files provided after the Request for Documentation was submitted. Commenters received the following response explaining that CDOT did not provide enough information for anyone to understand the basis for the differences between the 2035 and 2040 analyses:

> … although CDOT has provided technical model files (AERMOD dispersion, MOVES emission factors, speeds, truck percentages, etc.), this data does not clearly explain changes from the FEIS AQ analysis. One would have to perform an in-depth technical review in order to answer key critical questions about differences in the new analysis.[21]

No response to this request was forthcoming. As a result, persons and groups affected by the decision were forced to invest extremely limited resources to employ an independent modeling expert with the experience to open the modeling data files and make sense of how the modeling had been performed.

Dr. Rowangould's declaration and report are the result of that investigation. *See* Exhibit 32. Dr. Rowangould, an expert in modeling the impact of highway emissions on air quality, found that the agencies had applied one primary modeling procedure to determine the impact of Project emissions at over 3,200 receptor locations, but followed a different procedure to model the concentrations at the seven receptor locations where emissions would be highest.[22] In an effort to understand why these seven receptor were modeled separately, Dr. Rowangould ran the primary modeling procedure for all receptors, and discovered that emissions would violate the NAAQS at five of the seven receptors separately modeled.[23]

None of this information was disclosed in the ROD, Air Quality Conformity Technical Report. After a comprehensive search of the record, Petiitoners' counsel have found no documents in the AR that disclose to the decisionmaker that these different modeling procedures were applied to obtain different results from different receptors, or why. Before filing this

---

[21] ROD, Attachment F, p. 271.
[22] Rowangould, "Report of Investigation of Modeling Results for Receptor Locations Selected for Modeling Emissions of PM10 From the I-70 Central Project," pp. 8-9.
[23] *Id.,* p. 10.

motion, counsel requested that FHWA search for any documents explaining these procedures that might have been omitted from the AR. Government counsel stated that no documents have been identified that contain such an explanation.

Dr. Rowangould's report qualifies for admission as a supplement to the Record on numerous grounds. First, this report must be included in the Record for anyone, including the Court, to understand what the agencies did, since they provided no explanation in the Record. Second, the results of Dr. Rowangould's independent modeling of Project emissions demonstrate that Defendants failed to disclose, examine, and consider evidence relevant to the conformity determination, to wit, modeling results that show Project emissions will cause a violation of the NAAQS if standard modeling procedures prescribed by EPA are applied. Furthermore, this report will assist the Court's and public's understanding of highly complex technical issues.

Dr. Rowangould's report also demonstrates that Petitioners were severely prejudiced by FHWA's failure to "provid[e] reasonable public access to technical and policy information considered by the agency at the beginning of the public comment period," as required by EPA's Hot-spot conformity rule. 40 C.F.R. §93.105(e).[24] In addition, EPA's Hot-spot conformity Guidance requires that information needed to support a conformity finding be included in documentation by the transportation agency making the conformity determination. Hot-spot Guidance, §3.10.[25] The Guidance specifically lists "Air quality modeling data, including the air quality model used, modeling inputs and results, and description of the receptors employed in the analysis." FHWA violated §93.105(e) of the Hot-spot conformity rule by failing to disclose prior to publishing the notice commencing the public comment period the "technical and policy

---

[24] The D.C. Circuit Court of Appeals has construed the congressional delegation of rulemaking authority to EPA by 42 U.S.C. §7506(c)(4)(B) as establishing "the unqualified requirement in the statute that the federal government not approve a transportation activity unless that activity has complied with the conformity rules." *Sierra Club v. EPA,* 129 F.3d 137, 140 (D.C. Cir. 1997).
[25] *See* https://www3.epa.gov/otaq/stateresources/transconf/documents/420b15084.pdf.

information considered by the agency," including the multiple modeling procedures, the use of different inputs for different receptors, and how the different procedures conform to, or diverge from EPA's modeling guidance. Rational decision-making and a meaningful public comment opportunity require disclosure and an explanation why Defendants used different procedures.

Dr. Rowangould's report is relevant to Petitioners' claim that Due Process and the right to public involvement guaranteed by the Hot-spot conformity rule must be enforced by remanding the decision to re-open the comment period so that the affected public has an opportunity to object to this modeling procedure on the record.

**7. Declaration of Albert Melcher: [INSERT TITLE OF ATTCHMNT] (attached as Exhibit 36).**

Mr. Melcher's declaration contains notes from the September 1, 2015 meeting at the Colorado FHWA Division Office, during which Sierra Club representatives and former Attorney General JD MacFarlane presented concerns about the I-70 Project NEPA review to John Cater and FHWA staff.  FHWA did not include notes of this meeting in the Record. Mr. Melcher's notes provide evidence that concerns were communicated to the FHWA decisionmaker regarding the severity of public health impacts being suffered by residents in the Globeville, Elyria and Swansea neighborhoods, and the need to invest substantial federal resources in protecting these communities from even more serious health impacts in the future as exposure to highway pollutants increase. Sierra Club representatives expressed their concern that CDOT had failed to investigate, disclose, consider, avoid and minimize the adverse health effects suffered by residents along the I-70 corridor, and asked FHWA to exercise its oversight responsibilities to ensure that alternatives and mitigation to protect residents were adopted and implemented.

The issues raised at this meeting and FHWA's failure to respond or otherwise address these issues, is additional evidence that FHWA failed to consider a relevant factor by not giving meaningful consideration to Project impacts on public health.

### 8. Colorado Department of Transportation's Response to Request Under the Colorado Open Records Act for Documents Related to the Environmental Review of the I-70 Central Project, March 4, 2016. (attached as Exhibit 37).

Petitioners served a request on CDOT under the Colorado Open Records Act. The request asked CDOT for information regarding various air quality concerns related to the Project. First, Petitioners asked for information related to any investigation of the expected concentrations of PM2.5 in the Project area. CDOT admits that nothing beyond an "emissions inventory" was completed for PM2.5.

Second, Petitioners asked for original scientific investigation into the potential air quality and public health benefits of alternatives that would reduce traffic. CDOT acknowledges that "none of [the 90+ alternatives considered] was evaluated or assessed for air quality or health impacts." Further, "[n]o original evaluation was completed for health."

Third, Petitioners asked for any reviews of scientific literature discussing the causal connections between exposure to PM2.5 as a result of the Preferred Alternative and adverse health incomes. CDOT stated that "No investigation, evaluation, or review of literature was conducted specific to north Denver neighborhoods, the Preferred Alternative, and health."

This CORA request and CDOT's response is not in the Record. Similar to many of the documents above, this evidence is relevant to Petitioners' claim that FHWA failed to consider the impacts of Project emissions on community health and failed to identify mitigation sufficient to avoid adverse health impacts.

## **CONCLUSION**

For the reasons set forth above, Petitioners respectfully request that the Court grant this motion to supplement the Record.

Dated: March 9, 2018                          Respectfully submitted,

                                              /s/Robert E. Yuhnke
                                              ROBERT E. YUHNKE  (CO Bar No. 12686)
                                              4050 SE Hosner Terrace
                                              Gresham, OR 97080
                                              (303) 499-0425
                                              bob.yuhnke@prodigy.net

                                              ANDREA S. GELFUSO  (CO Bar No. 19773)
                                              2402 S. Holland Street
                                              Lakewood Co 80227
                                              (303) 955-1910
                                              agelfuso6@gmail.com

                                              GREGORY N. CORBIN  (CO Bar No. 48468)
                                              Milligan Rona Duran & King LLC
                                              1627 Vine St.
                                              Denver, CO 80206
                                              Tel. 720-414-2000
                                              gnc@mrdklaw.com

## CERTIFICATE OF COMPLIANCE WITH D.COLO.LCivR 7.1(a)

Pursuant to D.COLO.LCivR 7.1(a), counsel for the Petitioners has conferred with counsel for FHWA and CDOT regarding the substance of this motion. FHWA and CDOT oppose the relief requested herein.

/s/ Gregory N. Corbin
Gregory N. Corbin

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of March, 2018, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

/s/ Gregory N. Corbin
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
Environment & Natural Resources Section
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Brent E. Butzin, Esq.
Assistant Attorney General
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Brent.butzin@coag.gov

*Attorneys for Defendant-Intervenors*