**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as Secretary of Transportation; and JOHN CATER, in his official capacity as Division Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and MICHAEL P. LEWIS, in his official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

**LEAVE TO FILE GRANTED ON MARCH 19, 2018**

PETITIONER'S CORRECTED MOTION TO CONDUCT LIMITED DISCOVERY,
COMPLETE THE RECORD, AND TAKE JUDICIAL NOTICE
(Case No. 17-cv-1679-WJM-MEH)

| | |
|---|---|
| ROBERT E. YUHNKE  (CO Bar No. 12686)<br>4050 SE Hosner Terrace<br>Gresham, OR 97080<br>(303) 499-0425<br>bob.yuhnke@prodigy.net | GREGORY N. CORBIN  (CO Bar No. 48468)<br>Milligan Rona Duran & King LLC<br>1627 Vine St.<br>Denver, CO 80206<br>Tel. 720-414-2000<br>gnc@mrdklaw.com |
| ANDREA S. GELFUSO  (CO Bar No. 19773)<br>2402 S. Holland Street<br>Lakewood Co 80227<br>(303) 955-1910<br>agelfuso6@gmail.com | COUNSEL FOR PETITIONERS |

## INTRODUCTION

The Sierra Club, Elyria and Swansea Neighborhood Association ("ESNA"), Chaffee Park Neighborhood Association, and Colorado Latino Forum ("CLF") (collectively "Petitioners") move to complete the Administrative Record ("AR" or "Record") designated by the Federal Highway Administration ("FHWA"). FHWA and Defendant-Intervenors, Colorado Department of Transportation ("CDOT") (collectively "Defendants") oppose this motion.

The modeling procedures used to determine whether this Project will exceed the National Ambient Air Quality Standards ("NAAQS") for PM10 are critical to determine whether Defendants complied with the Clean Air Act's ("CAA") transportation conformity requirements. 42 U.S.C. §7506(c). For the reasons discussed below, Petitioners move to discover all documents and other information related to Defendants' failure to disclose one or more emissions modeling runs showing that Project emissions will violate the PM10 NAAQS. Petitioners further move that all documents and other information regarding this issue be included in the Record.

During the public comment period for the Record of Decision, Petitioners Sierra Club and ESNA requested all modeling files created during air quality modeling of Project emissions. Defendants produced raw data only—in the form of electronic modeling files that require specialized software to view—with no explanation or information comprehensible to a lay person seeking to understand the modeling analysis.[1] Petitioner CLF employed Dr. Gregory Rowangould, an independent air quality modeling expert, to review these materials. Dr. Rowangould's examination has raised concerns about the validity of Defendants' modeling.[2]

Dr. Rowangould confirmed that Defendants calculated PM10 emissions using a modeling procedure consistent with U.S. Environmental Protection Agency ("EPA") Guidance, by performing an initial ("primary") modeling run using 3,525 "receptors" located in areas accessible to the public. However, Dr. Rowangould determined that this run omitted seven PM10

---

[1] *See* Record of Decision, Attachment F (AR 006457-69 and 006472-83).
[2] Declaration of Dr. Gregory Rowangould, attached as Exhibit 32. Dr. Rowangould's declaration is attached to demonstrate the need for discovery. Petitioners also move that his declaration supplement the Record. *See* Petitioners' Motion to Supplement the Administrative Record, filed concurrently with this motion.

receptors closest to the highway and in locations where emissions would be greatest. Inconsistent with EPA guidance, Defendants then ran seven separate modeling runs for each omitted receptor, using different input parameters than those used to model the other 3,525 receptors. The I-70 Project modeling files and Record provide no justification for these actions.

When Dr. Rowangould re-ran the model with consistent data inputs for all 3,532 receptors, including the seven receptors omitted from the primary modeling run, Project emissions ***violate the NAAQS at five receptors.*** *See* Exhibit 32. EPA rules and guidance require that the NAAQS must be met at all locations in the "ambient air," which are locations "where the public has access." 40 C.F.R. §50.1(e).

Petitioners seek discovery of all information related to Defendants' failure to disclose modeling results that included all receptor locations and decisions to perform seven separate modeling runs for seven receptors, including: (1) whether all modeling results, including results showing pollutant concentrations for all receptors was disclosed to the decision maker; (2) who decided to perform separate modeling runs for the seven receptors omitted from the primary modeling run; (3) how the alternative input parameters were selected for the seven separate modeling runs; (4) whether Defendants disclosed the use of different input parameters for the seven separate modeling runs to EPA pursuant to 40 C.F.R. §93.105's interagency consultation procedures for selecting modeling procedures for a conformity determination; (5) whether EPA approved use of modeling inputs inconsistent with EPA's modeling guidance for hot-spot analyses; and (6) who decided not to disclose to the public the fact that modeling using consistent input parameters showed NAAQS violations and that alternative input parameters were used for separate modeling runs for each of seven receptors where Project emissions would be highest. Discovery regarding these issues will provide the Court with information relevant to whether the decision maker considered all relevant evidence when making the conformity determination required by 42 U.S.C. §7506(c)(1)(B), *i.e.*, that Project emissions "will not (i) cause or contribute to any new violation of any standard in any area;" and whether the FHWA's decision was arbitrary and capricious.

Petitioners also move to admit into the Record five documents in Defendants' files[3] that set forth guidelines and policy statements related to the impact of highway pollution on health. All five documents (attached as Exhibits 38-42) were issued by agency officials and/or agency experts and posted on agency websites. These documents are relevant to Petitioners' claims that Defendants failed to consider a "relevant factor" under both NEPA and section 109(h) of the Federal-Aid Highway Act ("F-AHA") because they discuss U.S. DOT policies, findings, guidelines and procedures related to health impacts associated with highway projects that were not applied to or considered during the I-70 Project decision.[4]

Each document is admissible because it was before FHWA when the decision was made, was considered directly or indirectly by FHWA, and is appropriately part of the agency record, despite its omission from the original or corrected Record. In the alternative, the Court should order that the five documents supplement the Record because they provide information necessary to show that Defendants ignored relevant NEPA factors. Also, the Court may judicially notice the five documents because they include information published by reliable government sources and comprise facts not subject to reasonable dispute.

## BACKGROUND

Petitioners seek review of FHWA's Record of Decision, I-70 East ROD 1: Phase 1 (Central 70 Project) ("ROD") that approves and authorizes federal funding to expand approximately 10 miles of Interstate 70 from six to ten primary travel lanes, plus an additional four auxiliary lanes, including through several densely populated urban north Denver neighborhoods. FHWA's approval violated NEPA, F-AHA, and CAA. Defendants' NEPA violations include failing to evaluate and disclose significant adverse human health impacts to residents and children attending area schools from increased concentrations of particulate matter

---

[3] These documents are in the files of one or more of the following agencies: U.S. Department of Transportation ("U.S.DOT"), FHWA (an agency of U.S.DOT), and CDOT, FHWA's longtime state-agency partner in the Project.
[4] Petitioners conferred with Defendants regarding these documents. Attached as Exhibit 43 is a copy of the conferral requests and FHWA's response to each document or set of documents requested.

and other air pollutants, and failing to consider reasonable alternatives to minimize adverse community health impacts by reducing exposures to harmful pollutants.

Defendants' F-AHA violations include failing to assess human health impacts from Project emissions to identify "possible adverse…environmental effects relating to [the] proposed project" from "air pollution," determine the "costs of eliminating or minimizing such adverse effects," and weigh such adverse effects and costs to make "final decisions on the project…in the best overall public interest." 23 U.S.C. §109(h). Defendants' CAA conformity determination violates EPA's criteria and procedures and withholds evidence from the decision maker and public that Project emissions will exceed the PM10 NAAQS and violate the CAA's transportation conformity provisions.

FHWA lodged the Record initially on December 14, 2017, by filing a notice, declaration, and index. (Doc. No. 98). The following day, FHWA delivered an electronic version on hard drives. The Record consists of approximately 1.2 terabytes of data, including 183,318 pages of documents and nearly 1 terabyte of "native-format and data files" (modeling files requiring specialized software and expertise to review). In his declaration, FHWA's Chris Horn declared that all documents considered directly or indirectly by FHWA Division Administrator John Cater were produced, "except those records protected by attorney-client, attorney-work product, or deliberative process privileges in compliance with agency policy." (Doc. No. 98-1 at ¶ 6).

## ARGUMENT

A court reviewing a matter under the Administrative Procedure Act must determine whether the administrative record contains "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993). Although a court must presume that an agency properly designated the record, petitioners may overcome the presumption by moving either to complete the record—"adding materials the agency considered but failed to include in the record"—or supplement the record—"adding materials the agency did not consider, but should nonetheless be included in the record to permit a proper evaluation of the agency's decision." *Colorado Environmental Coalition v. Office of*

*Legacy Management*, 2017 WL 897838, *1 (D. Colo. Mar. 7, 2017) (citing *Ctr. For Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1274 (D. Colo. 2010)).

### A. Petitioners Should Be Allowed to Conduct Discovery Related to Modeling, and Discovered Documents Should be in the Record.

Petitioners move to conduct discovery related to the removal of seven receptors from the conformity determination modeling. While a record receives a presumption of regularity, the "agency may not, however, skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question." *E.g., Envtl. Def. Fund v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978). Petitioners have twice requested that missing documents be added to the Record. FHWA twice added documents to the Record, explaining its omissions as "inadvertent." Limited discovery is appropriate, in part because Defendants have excluded pertinent documents. *See Ctr. For Biological Diversity v. US Bureau of Land Management*, 2007 WL 3049869 (N.D. Ca. Oct. 18, 2007) (ordering agency to search for and produce documents, in part, because plaintiffs' previous inquiries led additional material); *Forest Guardians v. Kempthorne*, 2008 U.S. Dist. WL 11337359 (S.D. Cal. Apr. 1, 2008) (permitting discovery after the agency supplemented the record twice).

The omission of information from the Record regarding the modeling process used to demonstrate conformity is extremely troubling. There is no explanation in the Record for the removal of receptor locations. [5] This is particularly critical because of Dr. Rowangould's discovery that "seven receptors located **where maximum concentration was depicted** in the Conformity Determination Air Quality Technical Report were missing from the primary AERMOD modeling files . . . ."[6]. The Record holds no explanation why seven separate "supplemental" runs were performed, *id*., or why *these* seven of 3,532 receptors were excluded from the primary modeling run. Nor does the Record explain why the seven receptors "contained different emission source parameters that caused AERMOD to produce lower $PM_{10}$

---

[5] Ex. 32, Attachment B, at 2.
[6] *Id.* (emphasis added).

concentration estimates . . . ." *Id.* Moreover, when Dr. Rowangould ran the modeling using the primary modeling run's emission source parameters for *all* the receptors, he found that the NAAQS would be violated. Petitioners should be permitted to conduct discovery to obtain all documents, including meeting notes and communications, and all other information regarding these issues. *See Water Supply and Storage Company v. U.S. Department of Agriculture*, 910 F. Supp. 2d 1261 (D. Colo. 2012) (including a team members' meeting notes in the record and holding that the agency considered evidence contained in the notes because consideration is implicit in the idea of discussion.)

### B.  Five Specifically-Identified Documents Should Be Included in the Record.

The five documents attached to this motion as Exhibits 38-42 should be included in the Record because: (1) documents in the FHWA's files relevant to the decision should be included in the Record, not just those documents selected by the agency; (2) to the extent the Court finds the documents were not before the FHWA, they should supplement the Record to provide the Court with the information necessary to determine whether FHWA considered all relevant factors; and (3) even if some of the offered documents are not admitted as part of the formal record, judicial notice of the documents is appropriate.

#### 1.  *The Five Specifically-Identified Documents are Necessary to Complete the Record.*

Effective judicial review of an agency action critically depends on a full and comprehensive record. Generally, the reviewing Court has "wide latitude in correcting omissions from the agency record under review." *Consumers Union v. Federal Power Commission*, 510 F.2d 656, 661 (D.C. Cir. 1974). A court may order the record completed when the documents at issue: (1) were known to the agency at the time it made its decision; (2) "are directly related to the decision"; and (3) "are adverse to the agency's position." *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1987).

The Supreme Court early on required that judicial review of agency action "be based on the full administrative record that was before the [agency] at the time [it] made its decision." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419-20 (1972). The "full

7 – Petitioner's Motion to Complete the Record

administrative record" required by *Overton Park* has been held to include all documents expressly considered by an agency, and documents before the agency at the time it acted even if it did not expressly base its decision on those documents.

> The whole administrative record, however, "is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record…. The 'whole' administrative record …consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position."

*Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (quoting *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 32 (N.D. Tex. 1981) (emphasis in original). "An agency may not submit an administrative record to the court which…omits documents present in the agency's file which bear upon matters before the court." *National Wildlife Fed'n v. Burford*, 677 F. Supp. 1445, 1457 (D. Mont. 1985).

### a. Faced With A Defective and Incomplete Record, Petitioners Have Twice Requested That FHWA Provide a Complete Record.

Petitioners' initial Record review was obstructed by major deficiencies in the software used to compile the record, including but not limited to: (a) the purportedly "searchable index" that often cases linked to the wrong files and prevented effective access to 17,000 pages of documents;[7] (b) security software discovered two files that later turned out to be inactive remnants of a ransomeware infection; and (c) multiple PDFs were not produced in a searchable format. In addition, no privilege log was produced; FHWA has since explained that no documents were withheld for privilege.

On January 17, 2018, Petitioners requested that the Defendants fix the technical deficiencies with the Record and complete the Record with numerous documents that Petitioners identified as missing; on January 26, 2018, FHWA replaced the hard drive and filed a corrected Record. (See Doc. No. 105). On February 16, 2018, Petitioners sent Defendants a list of additional documents that Petitioners asserted should be in the Record; Petitioners identified at

---

[7] The documents were in the Record, but the deficiency was with the usability of the index.

least a dozen attachments to emails omitted from the Record[8] and numerous omitted Meeting Notes.[9] After conferral, FHWA produced additional documents to correct Record and provided Petitioners with specific responses to its request to complete the record.[10] [11]

### b. The Five Specifically-Identified Documents are Relevant to Petitioners' Claims.

The documents subject to this motion are material to Petitioners' claims and relevant to the issues before the Court. Petitioners contend that Defendants failed to consider a "relevant factor" under NEPA and/or section 109(h) of the F-AHA and failed to examine evidence relevant to assessing or evaluating a relevant factor. The following five disclose policies, guidelines and procedures recommending agencies consider health impacts associated with highway projects:

1. "Health in Transportation Corridor Planning Framework (FHWA)" (attached as Exhibit 38)[12] is a position paper posted on FHWA's website that contains recommended policies and guidance for the integration of health determinants as factors to be considered in the review of proposed corridor-scale transportation projects. This "Corridor Planning Framework" is relevant to Petitioners' NEPA and F-AHA claims because it describes a framework for decision makers to incorporate consideration of health impacts into transportation project planning. The decision-making framework describes a six-step process "to support agency efforts to incorporate health into corridor planning studies." (Exhibit 38 at p. 2). The Corridor Planning

---

[8] Attachments omitted from the record included attachments to interagency consultation emails between EPA and CDOT (e.g. the "Air Quality Addendum" attached to an email sent on October 16, 2014 from Tim Russ of EPA to CDOT; a "CDPHE I/M Excel spreadsheet and the Colorado I/M Compliance factor document" attached to an email sent between EPA and FHWA on January 11, 2017; and "DRCOG Compass model time periods and Air Quality Study Area map," attached to an email from CDOT to the Colorado Air Pollution Control Division sent on February 28, 2013.

[9] Meeting notes omitted from the record include those for the Air Quality Cooperating Agency (October 2016); Agency Coordination meeting (March 19, 2013); Swansea Coordination Meeting (September 10, 2014); Denver CDOT Technical Meeting (Feb. 24, 2011), and several Project Management Meetings from 2003 to 2006.

[10] See attached Exhibit 43.

[11] Additionally, on February 26, 2018 Petitioners conferred with Defendants regarding documents and other materials that Petitioners contend should supplement the Record. Those documents are the subject of the related Motion to Supplement filed concurrently with this motion.

[12] Also available at https://www.fhwa.dot.gov/planning/health_in_transportation/planning_framework/the_framework/fhwahep16014.pdf, published on or before March 18, 2016.

9 – Petitioner's Motion to Complete the Record

Framework directs decision makers "to understand how incorporating health will impact the transportation priorities and investments. Goal setting can formalize the intent to incorporate health."[13] To do so, the Corridor Planning Framework poses multiple questions for decision makers to answer.[14] [15]:

NEPA regulations define "health" as an environmental impact within the meaning of "*significantly* as used in NEPA." 40 C.F.R. §§1508.8, 1508.27. The Corridor Planning Framework provides guidance to FHWA decision makers regarding how to weigh health impacts in making project decisions. The Corridor Planning Framework should be in the Record because it identifies criteria for considering health impacts in FHWA decision-making. It makes clear that health impacts are a relevant factor to be considered in corridor planning and that FHWA policy guidance does not support FHWA's failure to consider the health impacts of the I-70 Project.

Additionally, the Corridor Planning Framework provides examples of how FHWA transportation projects can incorporate health effects as part of the evaluation process. For example, in 2013, the state of Minnesota, assisted by U.S. DOT, developed and used a Health Impact Assessment "as a tool to inform public decisions." (*Id.* at p. 35).

2. "Frequently Asked Questions" (attached as Exhibit 39)[16] is a document in question-and-answer format in which U.S. DOT explains how transportation affects public health. This document is relevant to Petitioners' claims because it reveals that at the Department level U.S. DOT considers health impacts to be a relevant factor in its decisionmaking process. It discusses

---

[13] *Id.,* p. 21.

[14] "What is the full range of strategies to address the needs and priorities identified for the corridor? Which strategies are most relevant to the transportation needs? Which strategies support desirable health outcomes? Which strategies address both the transportation needs and the desired health outcomes? Which strategies will be evaluated? What is the potential impact of the desired health outcome on the community/target population? Can the health outcome be measured quantitatively? If not, how will it be evaluated? Is the desired health outcome needed by the corridor population? Do they care about this outcome? Does the desired health outcome address health disparities among the population in this corridor? How long will it take transportation interventions to result in measurable health change? Can health impacts on individual population groups be measured? If so, who will be responsible measuring? How will the information collected be used?" *Id.,* p.25

[15] "How will health in the community change if this alternative is implemented? How much change is anticipated and over what timeframe? Do the alternatives meet the needs of specific population groups? Do the alternatives disproportionally affect (positively or negatively) the health of specific population groups?" *Id.*, p. 29

[16] Also available at https://www.fhwa.dot.gov/planning/health_in_transportation/faq/faq.pdf.

how the U.S. DOT and FHWA "address health through transportation planning and decision-making." (Exhibit 39 at p.1).

For example, Question 7 asks "How are health effects addressed in Federal actions?". The answer states: "FHWA routinely includes detailed assessments of health effects, such as safety, air and water quality, and noise, in environmental documents." *Id*. at p.3. This answer demonstrates that U.S. DOT considers evidence of air pollution health effects to be relevant to its evaluation of projects. In addition, Question 10 asks how a health impact assessment ("HIA") can be used during the transportation planning process. The answer acknowledges that an HIA "can inform transportation planning and decision-making…." (*Id*. at p. 5) This answer makes clear that U.S. DOT considers an HIA a useful tool for transportation decision-making.

3. "Transportation Health Tool" ("THT") (attached as Exhibit 40)[17] is a decision-making tool developed by the U.S. DOT in conjunction with the Centers for Disease Control. This document is relevant because its purpose is to provide practitioners with easy access to data to analyze the health impacts of the transportation facilities.

In the literature section of the THT website, U.S. DOT acknowledges that motor vehicles are "a leading source of air pollutants that affect human health" and that "[m]any scientific studies have linked breathing particulate matter to significant health problems, including asthma, chronic bronchitis, and heart attacks. Diesel particulate matter is of particular concern because long-term exposure is likely to cause lung cancer." Further, the THT cites several studies that discuss health outcomes, such as "Effects on Respiratory Health of a Reduction in Air Pollution from Vehicle Exhaust Emissions."

The THT is another example of a programmatic decision by U.S. DOT that health impacts should be accounted for through the application of a systematic, analytical methodology that requires collection of community health data and analysis of expected health impacts. The THT supports Petitioners' claims that it is arbitrary and capricious for FHWA to approve the I-

---

[17] Available at https://www.transportation.gov/mission/health/cleaner-air, first published on October 26, 2015.

11 – Petitioner's Motion to Complete the Record

70 Project without undertaking the kind of investigation of health impacts that the THT is designed to accomplish.

    4. "Areawide Coordinated Cumulative Effects Analysis—Phase I" ("Cumulative Effects Analysis") (attached as Exhibit 41)[18] is a report authored for CDOT and was prepared in cooperation with FHWA. The Cumulative Effects Analysis discusses how cumulative impacts on the environment might be identified and studied in the context of transportation projects. The study concluded that an Areawide Coordinated Cumulative Effects Analysis (ACCEA) was "feasible and can provide valuable support to both project-specific assessments of cumulative impacts as well as regional accounting of environmental resources relevant to transportation planning." The study goes on to state that:

> The study results will facilitate the NEPA process by making information about cumulative effects analysis, environmental assessments, and environmental impact statements more readily available to those who are responsible for identifying and mitigating adverse environmental effects. The products of this project will be used to provide (1) general guidance and options for ACCEA transportation-related analysis in Colorado; and (2) review of opportunities for a coordinated approach in the Denver region.

Most importantly the study acknowledges that:

> (1) Transportation Conformity determinations are of limited value in NEPA and cumulative effects assessments; (2) There is evidence of environmental degradation, as well as human health impacts, due to air pollution at levels below the National Ambient Air Quality Standards; and (3) NEPA environmental assessments are required to consider "<u>any</u> adverse environmental effects" of the proposed action (emphasis added), thus any anticipated adverse effects related to air pollution, direct and indirect, will be included in cumulative effects analyses.[19]

---

[18] Available at https://www.codot.gov/programs/research/pdfs/2008/accea.pdf, published July 2008 (last accessed February 16, 2018).
[19] Exhibit 41, p. 42 (emphasis in original)

The Cumulative Effects Analysis appears on CDOT's website[20] and it supports Petitioners' arguments regarding the human health impacts of highway emissions and that those impacts must be disclosed during the NEPA process.

  5. "Fine Particulate Air Pollution and Life Expectancy in the United States" (attached as Exhibit 42)[21] is one of a series of studies on FHWA's website regarding the health impacts of highway pollution found as links on the THT (Exhibit 40).[22] This study concludes: "A reduction in exposure to ambient fine-particulate air pollution contributed to significant and measurable improvements in life expectancy in the United States."[23] This document is relevant because it provides the Court with the details of the effects of air pollution on respiratory health and shows that respiratory health and its relationship with decreases in particulate matter should have been considered during the decisionmaking process.

Each of these documents was available on the agencies' websites and before the agencies at the time the I-70 decision was made. Each document contains information relevant to the decision. And each document should have informed FHWA's decision been included in the Record.

    **c. *The Five Specifically-Identified Documents Were Before the FHWA and Should be a Part of the Record.***

A complete administrative record is comprised of all of the documents and materials the agency considered. *Bar MK Ranches v. Yuetter*, 994 F.2d at 739. The administrative record "properly consists of all relevant documents before the agency at the time of the decision, not simply those that the agency relied upon in reaching its decision." *Wilderness Society, Center for Native Ecosystems v. Wisely*, 524 F. Supp. 2d 1285, 1295 (D. Colo. 2007); *see also County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 71 (D.D.C. 2008) ("The 'whole record'

---

[20] *See e.g. Merritt Parkway Conservancy v. Mineta*, 424 F. Supp. 2d 396 (D. Conn. 2006) (completing the administrative record with documents contained in the state agency's file because the state and federal departments of transportation worked closely on a highway construction project.)
[21] Referenced by the Transportation and Health Tool on the Department of Transportation's website and available at http://www.nejm.org/doi/full/10.1056/NEJMsa0805646, updated on U.S. DOT's website Monday, October 26, 2015
[22] Referenced by the Transportation and Health Tool on the Department of Transportation's website and available at http://www.nejm.org/doi/full/10.1056/NEJMsa0805646, updated on U.S. DOT's website Monday, October 26, 2015
[23] *Id. at p.1.*

13 – Petitioner's Motion to Complete the Record

include[s] materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision."(citation omitted))

For the court to order an agency to complete the record, a petitioner must identify the following context for those documents: "(1) when the documents were presented to the agency; (2) to whom; (3) and under what context." *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1275 (D. Colo. 2010) (citing *WildEarth Guardians v. Salazar*, 713 F. Supp. 2d 1243, 1254 (D. Colo. 2010)). The petitioner must also show that the relevant agency decision makers either directly or indirectly considered the documents. *Id.* Documents are indirectly considered by the relevant agency decision makers when the documents are the work and recommendations of subordinates upon which the relevant agency decision makers based their decision. *Id.* at 1277. The agency lodging the administrative record cannot exclude information "on the grounds that it did not 'rely' on the excluded information in its final decision." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005). And this Court has specifically held that the administrative record includes documents beyond those that "literally pass[ed] before the eyes of the final agency decisionmaker[s]." *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1275–76.

### 2. Alternatively, the Court Should Supplement the Record with These Documents Because the Documents Demonstrate FHWA Failed to Consider Relevant Factors.

Each of the five documents should be included in the Record but also, each in turn could also be admitted under one of the extra-record exceptions discussed in detail in the Motion to Supplement the Record, filed herewith and incorporated herein by reference, namely that the documents demonstrate the "agency ignored relevant factors it should have considered or considered factors left out of the formal record." *Water Supply & Storage Co. v. United States Dep't of Agric.*, 910 F. Supp. 2d 1261, 1267 (D. Colo. 2012). As discussed above, the documents demonstrate that one relevant factor to transportation projects is the effect on human health. Thus, this Court may order the Record be supplemented with these documents.

### 3. Documents Available from Agency Websites are also Subject to Judicial Notice and May be Relied Upon by the Reviewing Court in Reviewing the Agency Action.

If the Court determines that the five specifically-identified documents are not admissible on the grounds cited above, the Court should nevertheless take judicial notice of the documents and rely upon them in this matter. Pursuant to Federal Rule of Evidence 201(b)(2), at any stage of this matter, the Court may take judicial notice of a fact that is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." The Court may take judicial notice of public documents, including the "records and reports of administrative bodies." *Oregon Ass'n of Homes for the Aging, Inc. v. Oregon*, 5 F.3d 1239, 1243 n.2 (9th Cir. 1992) (abrogated on other grounds) (judicial notice of documents showing federal agency's interim approval of state's final rule); *see also New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, n.22 (10th Cir. 2009) (judicial notice of fact referenced on federal and state agency websites) (citing *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (judicial notice of information found on the internet); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004)). Information on a federal agency's official website is subject to judicial notice. *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003). One circuit has even held that a district court abused its discretion by withdrawing judicial notice of information from a federal agency's official website. *Id.; see also, In re Wellbutrin SR/Zyban Antitrust Litigation*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) (citing cases in which courts have taken judicial notice of government documents available on the world wide web). And a court "may take judicial notice of a record of a state agency not subject to reasonable dispute." *City of Sausalito v. O'Neill*, 386 F.3d at 1223 n.2.

## CONCLUSION

For the reasons set forth above, Petitioners respectfully request that the Court grant this motion to conduct limited discovery and to include the requested documents in the Record

Dated: March 16, 2018                    Respectfully submitted,

  /s/Gregory N. Corbin
ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

## CERTIFICATE OF COMPLIANCE WITH D.COLO.LCivR 7.1(a)

Pursuant to D.COLO.LCivR 7.1(a), counsel for the Petitioners has conferred with counsel for FHWA and CDOT regarding the substance of this motion. FHWA and CDOT oppose the relief requested herein.

/s/ Gregory N. Corbin
Gregory N. Corbin

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of March, 2018, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

/s/ Gregory N. Corbin
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

Brent Allen
Federal Highway Administration
Office of the Chief Counsel
Western Legal Services Division
Lakewood, Colorado
Brent.allen@dot.gov

*Of Counsel for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Harry Scott Morrow
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
harry.morrow@coag.gov

*Attorneys for Defendant-Intervenors*