# Exhibit 36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as Secretary of Transportation; and JOHN M. CARTER, in his official capacity as Division Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and SHAILEN P. BHATT, in his official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

EXHIBIT 36
DECLARATION OF ALBERT MELCHER
(Case No. 17-cv-1679-WJM-MEH)

---

ROBERT E. YUHNKE (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

COUNSEL FOR PETITIONERS

# DECLARATION
# of Albert G. Melcher

1. My name is Albert G. Melcher. I reside at 13801 East Yale Avenue, Apt. 326, Aurora, Colorado 80014.
2. I earned the degree of Master of Science from Thayer School of Engineering, Dartmouth College in 1954.
3. I am a retired Captain, Civil Engineer Corps, USNR.
4. I served on –
    - Colorado Highway Commission (predecessor to the Colorado Transportation Commission which establishes policies and regulations that govern the Colorado Department of Transportation (CDOT)) from 1967 to 1969,
    - Board of Directors of the Colorado Regional Transportation District (RTD) from 1969 to 1973,
    - Various transportation committees of the Denver Regional Council of Governments (DRCOG).
    - Member, national American Planning Association (APA) and served on its Transportation Committee 2004-2010.
5. I have been involved with the implementation of the National Environmental Policy Act (NEPA) since 1970, when I contributed to writing the first NEPA implementation procedures for the U.S. Army Corps of Engineers after the Act was enacted.

6. In recent years I have been Transportation Chair of the Sierra Club Rocky Mountain Chapter (SCRMC).
7. In that capacity I served as the Sierra Club Representative on the formal I-70 East Citizen Advisory Committee (CAC) of the Environmental Impact Statement (EIS) project of CDOT from its commencement in 2004 through 2008, when I left the Committee. However, I have remained active in reviewing the overall project and environmental documents on behalf of the Sierra Club.
8. On September 1, 2015, I participated in a meeting requested by the Sierra Club with Mr. John Cater, Division Administrator, Colorado Division, Federal Highway Administration (FHWA), and other participants at Director Cater's offices, 12300 West Dakota Avenue, Lakewood Colorado 80228.
9. Others in attendance were: former Colorado Attorney General, J. D. MacFarlane, attorney Robert Yuhnke and Rebecca English, both representing the Sierra Club; Mr. Chris Horn, FHWA Project Engineer for the I-70 East project; Attorney Advisor Mystery Bridger, Western Legal Services Division, FHWA, and one other FHWA attorney whose name I did not record.
10. The purpose of this Declaration is to certify that the attached transcription of notes I took represent my best recollection of the issues raised and positions stated during the meeting. Some of these notes were taken during the meeting, and others were written later after the meeting adjourned.
11. These notes are submitted for inclusion in the administrative record of the I-70 Central Project decision because no record of that meeting appears in the

Administrative Record filed by the Federal Highway Administration in this proceeding.

I declare pursuant to 28 U.S.C. § 1746, subject to the penalty of perjury under the laws of the United States, that the above stated facts, and the facts stated in the transcribed notes of the meeting with Division Director Cater, attached hereto, incorporated herein and identified as Attachment 1, are true and correct to the best of my knowledge and belief.

**Executed at Aurora, Colorado, this 19th day of February, 2018.**

**Albert G. Melcher**

# Exhibit 36
# Attachment – 1

Meeting Notes --- FHWA Colorado Division
Sept 1, 2015; 10:30 AM

Purpose: of the meeting was to allow the Sierra Club representatives to present and discuss their concerns and those of The Club regarding the lack of any consideration in the SDEIS of public health impacts associated with community exposure to air pollutants emitted from the I-70 East project, and the need to fully explore those impacts and to address Environmental Justice (EJ) implications of the project.

Greeted by John Cater, who introduced FHWA staff:
Chris Horn, Project engineer; Mystery Bridger, Division legal counsel;

Cater stated that FHWA normally did not meet while EIS being prepared, but wanted to hear what we had to say. "We're not here to discuss anything. Just here to listen."

Sierra Club's presentation opened by Becky English who requested meeting. Introduced Bert, as a former Colo Highway Commission member, JD MacFarlan, former Colo AG, and Bob Yuhnke, former senior attorney at EDF who helped write parts of the CAA, and is working with the Club on the I-70 Project.

Yuhnke, who is a leading national expert on air pollution, health effects and environmental and pollution control laws, explained that Club and neighborhood groups especially concerned about health impacts of increased exposure to air pollutants because community health status reported by Denver Health shows especially high incidence of diseases of air pollution among residents of neighborhoods along I-70. Yuhnke recounted meeting that Club had with Sheilen Bhatt, Director of CDOT in July. He reported that Bhatt did not seem to be taking the health issue seriously, and told Club representatives that we should meet with feds if we were concerned about Environmental Justice issues. So we requested this meeting to ask feds to assert their oversight role to assure that health impacts of the project were taken seriously, and that the I-270 alternative be given full consideration as a way to remove pollution from the neighborhoods where residents are dying prematurely.

Mr. Yuhnke explained that the diseases disproportionately affecting the neighborhoods along I-70--ardiovascular disease and asthma -- are the diseases that EPA found to be causally linked to PM pollution in the *Integrated Science Assessment* prepared for EPA's last review of the PM NAAQS.

Cater responded that those diseases have other causes too.

Yuhnke replied that the other causes would be present in other Denver neighborhoods, but the incidence of these diseases is much higher in the neighborhoods along the interstates.

Yuhnke said we wanted to meet to share new studies since the comment period closed that help focus the causal relationship on highway pollution. He presented copies of

three national studies relevant to the Sierra Club concerns on EJ and health impacts. These are:

(1) Press Release February 25, 2015 By California Office of Environmental Health Hazard Assessment; Subject; “Study finds long-term exposure to ultrafine particle air pollution associated with death from heart disease.”
(2) Article published by “Environmental Health Perspectives” of the National Health Institute of Environmental Health Sciences; titled “Near-Roadway Air Pollution and Coronary Heart Disease: Burden of Disease and Potential Impact of a Greenhouse Reduction Strategy in Southern California,” published 7 July 2015.
(3) Article from International Journal of Environmental Research and Public Health titled “Trends of Non-Accidental, Cardiovascular, Stroke and Lung Cancer Mortality in Arkansas Associated with Ambient PM2.5 Reductions” published by the University of Arkansas for Medical Sciences, 21 July 2014.

Mr. Yuhnke discussed the implications of these studies for public health in the Globeville-Swansea-Elyria neighborhood affected by the I-70 East project. He emphasized that the severe adverse effects from air pollution are associated with cumulative impact of exposure to multiple pollutants emitted from highways; not just PM, or NO2 from highway. He mentioned that EPA highlighted the health risks of these pollutants emitted form highways in its last review of the national standards, but neighborhoods near highways are exposed to all the highway pollutants. We came to ask that FHWA carefully investigate these health impacts to explore how the community could be protected from the excess deaths that were occurring.

MacFarlan offered his opinion that the law required this kind of investigation to determine the effects that are occurring from exposure to existing pollution, and to consider alternatives that could protect local residents. He warned that FHWA was taking on a high litigation risk if they did not.

My subject was focused on the Civil Rights issues of adverse impacts on a minority and low-income community that will suffer disproportionate impacts on a range of effects.

I presented Cater with an excerpted version of a very important and relevant US Department of Transportation Secretarial Order from Federico Pena issued in 1997 and to which I and others referred in various meetings and public workshops in the first years of the I-70 CAC. (This Order has been re-issued in more recent years, especially in 2012 as U.S. Department of Transportation Order 56102(a). The 1997 document is US Department of Transportation Order on Environmental Justice, Federal Register April 15, 1997, signed by Federico F. Pena, Secretary of Transportation.

The excerpted version appended hereto has my highlights on the items that I briefly noted in my discussion and that I emphasized as relevant.
These are:

(1) disproportionate impacts are to be avoided if practicable;
(2) the affected public is to be informed of impacts;
(3) discrimination impacts are to be identified and avoided;

(4) alternatives to avoid or minimize impacts are to be considered;
(5) proposals shall be carried out only if mitigation measures or alternatives are not practicable;
(6) adverse effects include bodily impairment, illness, death, community cohesion, and economic vitality.

I also mentioned that the impacts from the highway needed to be considered together with community exposure to a variety of sources, especially the existing I-25 with its heavy severe diesel truck traffic, and cumulative heath impacts from air, contaminated soil dust and related sources of impacts such as regional ozone levels. The Sierra Club nationally and in this situation has worked diligently to reduce adverse public health conditions and is greatly concerned here. There are feasible alternatives which can alleviate the situation, including re-routing interstate onto I-270, or removing diesel trucks from segment between Washington and Colorado Blvds.

I briefly mentioned the high attention that had been devoted to the EJ and health impacts, especially of air pollution, in the CAC and public meetings of the early years of the Draft EIS process. I stated that these policies had been given only *pro forma* attention by CDOT and there were not sincere efforts to meet the intent of this EJ guidance and EJ in general.

Mr. Cater responded and stated that he would have additional EJ documents sent to me.

Also appended is the email sent by him later September 1 and my draft response to his email which I sent soon thereafter; the final would not have had any significant changes from my draft.

*Albert G. Melcher MS Captain Civil Engineer Corps USNR Retired*
*Transportation and Environment Policy Consulting*
*13801 East Yale Avenue Apt. 326*
*Aurora CO 80014*
*Phone 720-748-2405* *a.melcher@comcast.net*

Appended Documents:
(1) Excepts with highlights by Melcher of 1997 US Department of Transportation Order on Environmental Justice, Federal Register April 15, 1997, signed by Federico F. Pena, Secretary of Transportation, as presented to FHWA September 1, 2015
(2) Email from John Cater, FHWA, September 1, 2015
(3) Email from Mystery Bridger, FWHA, September 1, 2015
(4) Draft response by A. Melcher to Mr. Cater's email.

# Exhibit 36
# Attachment – A

# US Department of Transportation Order on Environmental Justice

[Federal Register: April 15, 1997 (Volume 62, Number 72)]
[Notices]
[Page 18377-18381]
From the Federal Register Online via GPO Access
[wais.access.gpo.gov]
[DOCID:fr15ap97-103]

---

## EXCERPTS

### I. Text of Federal Register on comments

(Page 3 Par. 5) the emphasis continues to be on the actual implementation of NEPA, Title VI, the URA and ISTEA planning requirements so as to prevent disproportionately high and adverse human health or environmental effects of DOT's programs, policies and activities on minority populations and low-income populations.

(Page 3 Par. 7) the Department believes that Option B is consistent with existing law and best accomplishes the objectives of the Executive Order. Option B (now incorporated in paragraphs 8a, 8b and 8c of the final Order) provides that disproportionate impacts on low-income and minority populations are to be avoided, if practicable, that is, unless avoiding such disproportionate impacts would result in significant adverse impacts on other important social, economic, or environmental resources. Further, populations protected by Title VI are covered by the additional provisions of paragraph 8b. \

---

### II From Executive Order

1b. Executive Order 12898 requires each Federal agency, to the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, to achieve environmental justice as part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects, including interrelated social and economic effects, of its programs, policies, and activities on minority populations and low-income populations in the United States.

5(b)(2) Steps shall be taken to provide the public, including members of minority populations and low-income populations, access to public information concerning the human health or environmental impacts of programs, policies, and activities, including information that will address the concerns of minority and low-income populations regarding the health and environmental impacts of the proposed action.

7(b) These requirements will be administered so as to identify, early in the development of the program, policy or activity, the risk of discrimination so that positive corrective action can be taken. In implementing these requirements, the following information should be obtained where relevant, appropriate and practical:
--Population served and/or affected by race, color or national origin, and income level;

--Proposed steps to guard against disproportionately high and adverse effects on persons on the basis of race, color, or national origin;
--present and proposed membership by race, color, or national origin, in any planning or advisory body which is part of the program.

7c. Statutes governing DOT operations will be administered so as to identify and avoid discrimination and avoid disproportionately high and adverse effects on minority populations and low-income populations by: (1) identifying and evaluating environmental, public health, and interrelated social and economic effects of DOT programs, policies and activities, (2) proposing measures to avoid, minimize and/or mitigate disproportionately high and adverse environmental and public health effects and interrelated social and economic effects, and providing offsetting benefits and opportunities to enhance communities, neighborhoods, and individuals affected by DOT programs, policies and activities, where permitted by law and consistent with the Executive Order,

(3) considering alternatives to proposed programs, policies, and activities, where such alternatives would result in avoiding and/or minimizing disproportionately high and adverse human health or environmental impacts, consistent with the Executive Order, and

8c. The Operating Administrators and other responsible DOT officials will ensure that any of their respective programs, policies or activities that will have a disproportionately high and adverse effect on minority populations or low-income populations will only be carried out if further mitigation measures or alternatives that would avoid or reduce the disproportionately high and adverse effect are not practicable. In determining whether a mitigation measure or an alternative is ``practicable," the social, economic (including costs) and environmental effects of avoiding or mitigating the adverse effects will be taken into account.

8f. Adverse effects means the totality of significant individual or cumulative human health or environmental effects, including interrelated social and economic effects, which may include, but are not limited to: bodily impairment, infirmity, illness or death; air, noise, and water pollution and soil contamination; destruction or disruption of man-made or natural resources; destruction or diminution of aesthetic values; destruction or disruption of community cohesion or a community's economic vitality; destruction or disruption of the availability of public and private facilities and services; vibration; adverse employment effects; displacement of persons, businesses, farms, or nonprofit organizations; increased traffic congestion, isolation, exclusion or separation of minority or low-income individuals within a given community or from the broader community; and the denial of, reduction in, or significant delay in the receipt of, benefits of DOT programs, policies, or activities.

**From:** Bridgers, Mystery (FHWA)
**Sent:** Tuesday, September 01, 2015 2:32 PM
**To:** Cater, John (FHWA); Horn, Chris (FHWA)
**Cc:** Allen, Brent (FHWA)
**Subject:** Links to current EJ orders

http://www.fhwa.dot.gov/environment/environmental_justice/
http://www.fhwa.dot.gov/environment/environmental_justice/ej_at_dot/orders/order_56102a/

These links should provide access to all of our current public environmental justice information and resources.

*Mystery Bridgers*
**Attorney Advisor**
**Federal Highway Administration**
**Western Legal Services Division**
**12300 West Dakota Avenue**
**Lakewood, CO 80228**
**(720) 963-3200**

This electronic mail and the attachments hereto may contain attorney-client privileged or confidential material and/or attorney work product, and may not be forwarded, reviewed, reused, or reproduced without the express, written consent of the sender, and are for the use and review of the intended recipient only. If you have received this communication in error please delete or destroy any copies and immediately contact the sender at (720) 963-3200.



**Albert Melcher**

**From:** John.Cater@dot.gov
**Sent:** Tuesday, September 01, 2015 3:37 PM
**To:** a.melcher@comcast.net
**Cc:** Mystery.Bridgers@dot.gov
**Subject:** Links to current EJ orders

Bert
It was good to meet you today and discuss concerns regarding the I-70 East project.
Below are two links which provide access to our current FHWA environmental justice policies. Please share these with the other Sierra Club representatives. Thanks

*John Cater*
*Division Administrator*
*FHWA Colorado Division*
*720 963 3003*

---

**From:** Bridgers, Mystery (FHWA)
**Sent:** Tuesday, September 01, 2015 2:32 PM
**To:** Cater, John (FHWA); Horn, Chris (FHWA)
**Cc:** Allen, Brent (FHWA)
**Subject:** Links to current EJ orders

http://www.fhwa.dot.gov/environment/environmental_justice/
http://www.fhwa.dot.gov/environment/environmental_justice/ej_at_dot/orders/order_56102a/

These links should provide access to all of our current public environmental justice information and resources.

***Mystery Bridgers***
**Attorney Advisor**
**Federal Highway Administration**
**Western Legal Services Division**
**12300 West Dakota Avenue**
**Lakewood, CO 80228**
**(720) 963-3200**

This electronic mail and the attachments hereto may contain attorney-client privileged or confidential material and/or attorney work product, and may not be forwarded, reviewed, reused, or reproduced without the express, written consent of the sender, and are for the use and review of the intended recipient only. If you have received this communication in error please delete or destroy any copies and immediately contact the sender at (720) 963-3200.

