**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB;
ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION;
CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and
COLORADO LATINO FORUM,

      Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION,
ELAINE CHAO, in her official capacity as Secretary of Transportation; and
JOHN M. CARTER, in his official capacity as Division Administrator,

      Defendants,

      *and*

COLORADO DEPARTMENT OF TRANSPORTATION, and
MICHAEL P. LEWIS, in his official capacity as Executive Director of the Colorado
Department of Transportation,[1]

      Defendant-Intervenors.

---

## ORDER DENYING PLAINTIFFS' MOTION TO STAY

---

A portion of Interstate 70 ("I-70") running through northeast Denver was

constructed in the 1960s as a 1.2-mile viaduct running through and above Denver's

Elyria-Swansea and Globeville neighborhoods ("Viaduct"). This structure has

apparently caused concern for some time in light of its age and the increase in traffic

that naturally attends population growth. Defendant Federal Highway Administration

---

[1] Michael P. Lewis has succeeded Shailen P. Bhatt as CDOT's executive director, and is therefore automatically substituted per Federal Rule of Civil Procedure 25(d).

("Highway Administration") and Intervenor-Defendant Colorado Department of Transportation ("CDOT") (together, "Defendants") have decided that the best way to deal with the Viaduct is to tear it down and rebuild the roadway below grade at a depth of up to 40 feet. For reasons explained below, this plan has become known as the "PCL Alternative." Given that the Highway Administration needed to approve the PCL Alternative, and will provide some funds to CDOT for the project, the Highway Administration was required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 *et seq.*, to prepare an environmental impact statement ("EIS") thoroughly considering the various effects of the PCL Alternative and other alternatives (such as doing nothing, or modifying the viaduct).

Plaintiffs Sierra Club, Elyria and Swansea Neighborhood Association, Chaffee Park Neighborhood Association, and the Colorado Latino Forum ("Plaintiffs") claim that Defendants did not fulfill their NEPA and other statutory duties when choosing to approve the PCL Alternative.[2] Plaintiffs have sued under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, which gives this Court the power to vacate Defendants' decision and require them to redo the NEPA process before considering again whether to pursue the plan to lower I-70 below grade.

Because it usually takes months and often years to fully resolve APA claims, Plaintiffs have filed the motion currently before the Court, a Motion for Stay of Agency

---

[2] The Court has previously distinguished the "Sierra Club Plaintiffs" from another group of Plaintiffs, the "Zeppelin Plaintiffs," because this action started out as two separate actions brought by these two separate groups. *See, e.g.*, *Zeppelin v. Fed. Highway Admin.*, ___ F. Supp. 3d ___, ___ n.3, 2017 WL 6947923, at *2 n.3 (D. Colo. Nov. 9, 2017) (ECF No. 90). The Court need not distinguish the Zeppelin Plaintiffs from the Sierra Club Plaintiffs any longer because the Zeppelin Plaintiffs have since dismissed their portion of the consolidated case. (*See* ECF No. 109.)

Action Pending Review on the Merits ("Motion to Stay"). (ECF No. 88.). Plaintiffs invoke APA § 705, empowering this Court to grant what is, in all material respects, a preliminary injunction against any further action on the PCL Alternative while this Court adjudicates Plaintiffs' challenge.

For the reasons explained below, the Court denies Plaintiffs' Motion to Stay.

## I. THE CLEAN AIR ACT & "NAAQS"

As will become clear below, many of the parties' arguments require an understanding of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, particularly as it relates to federally funded transportation projects. The Court therefore begins with a summary of the relevant statutory and regulatory requirements.

As part of the CAA, Congress charged the Environmental Protection Agency ("EPA") with setting National Ambient Air Quality Standards ("NAAQS") for certain pollutants. 42 U.S.C. § 7409. The NAAQS are specifically described as "ambient air quality standards the attainment and maintenance of which in the judgment of the [EPA], based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health." *Id.* § 7409(b)(1).[3]

Once a NAAQS is promulgated or revised, each state must adopt and submit to the EPA for approval a State Implementation Plan ("SIP") that "provides for implementation, maintenance, and enforcement of [the NAAQS] in each air quality control region (or portion thereof) within such State." *Id.* § 7410(a)(1). Each SIP must

---

[3] To be precise, the foregoing quotation refers to "primary" NAAQS. The CAA also requires the EPA to establish "secondary" NAAQS, which are designed to eliminate "any known or anticipated adverse effects associated with the presence of [a particular] air pollutant in the ambient air." *Id.* § 7409(b)(2). Secondary NAAQS are not relevant to the questions currently before the Court.

"include enforceable emission limitations and other control measures, means, or techniques . . . , as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the [CAA's] applicable requirements."  *Id.* § 7410(a)(2)(A).

The federal government may not "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which" would jeopardize or interfere with a SIP's ability to achieve or maintain NAAQS compliance. *Id.* § 7506(c)(1).  Thus, as relevant to the Highway Administration, it may not fund or approve a highway project if the resulting emissions would push the relevant geographic region out of NAAQS compliance.  *Id.* § 7506(c)(1)–(2).

## II.  BACKGROUND

### A.  Beginnings of the Present Project

In August 2003, the Highway Administration published a notice in the Federal Register that it intended to prepare an EIS encompassing, among other things, potential "variations of the horizontal and vertical alignment of I-70 as well as capacity and safety improvements" from the I-25/I-70 interchange to Peña Boulevard—a stretch of freeway the Highway Administration dubbed the "I-70 East Corridor."  68 Fed. Reg. 49839, 49839 (Aug. 19, 2003).  CDOT and other governmental entities would participate with the Highway Administration in this process.  *Id.*

Three years later, the Highway Administration announced that, for purposes of the EIS, the "I-70 East Corridor" would be narrowed in scope to considerations of freeway alterations, and that mass transit-related considerations would be handled in a separate EIS.  71 Fed. Reg. 37637, 37637–38 (June 30, 2006).

4

**B.      The DEIS**

Defendants published their first draft EIS ("DEIS") in November 2008.  (*See* Administrative Record ("R.") (ECF No. 99) at 6693.)  Among the purposes acknowledged in the DEIS for the overall project was a need to address the Viaduct, the "current sufficiency rating of [which] is 44 out of a possible 100, which is considered structurally deficient, functionally obsolete, and requiring replacement."  (R. at 6697.)

The DEIS evaluated five potential actions: (1) "no-action," meaning tearing down and rebuilding the viaduct "without any added capacity";[4] (2) "existing [alignment]," which would rebuild the viaduct with added lanes; (3) "existing [alignment], tolled," which would rebuild the viaduct with added lanes, including toll lanes; (4) "realigned," which would essentially route all I-70 traffic in central Denver onto I-270 and I-76, thus avoiding the viaduct (which would then be torn down and returned to its previous status as 46th Avenue in Denver); and (5) "realigned, tolled," which is the same as "realigned" but with the addition of toll lanes.  (R. at 6698–99.)

As particularly relevant here, the DEIS contained a discussion of air quality effects of the various proposals, including the need to maintain NAAQS compliance.  (R. at 7033–58.)  This discussion included a lengthy section regarding a category of toxic compounds sometimes emitted from automobiles known as mobile source air toxics ("MSATs").  (R. at 7040–49.)  The DEIS described MSATs as "a relatively new area of potential concern in the air quality field."  (R. at 7040.)  The DEIS announced that Defendants could not "predict with confidence the [MSAT-related] project-specific

_____

[4] The "no-action alternative" was not a true no-action alternative, in the sense of preserving the Viaduct as-is, because the Viaduct is not structurally sound enough to continue as-is indefinitely.  (*See* R. at 6755.)

health impacts . . . associated with the alternatives" due to a "lack of a national consensus on an acceptable level of risk and other air quality criteria assumed to protect the public health and welfare, as well as the reliability of available technical tools."  (R. at 7041.)  Nonetheless, for comparative purposes, the DEIS quantified the levels of MSAT emissions expected to result from the various alternatives.  (R. at 7049.)

The University of Denver Sturm College of Law's Environmental Clinic submitted comments on the DEIS.  (R. at 9435.)  Among the Clinic's major concerns was the air pollution analysis:

> There is now compelling and unambiguous scientific evidence that demonstrate that diverse air pollutants from trucks and motor vehicles (including diesel particulate matter, fine and ultrafine particulate matter) cause an increased risk of asthma, heart disease and cancer in those living immediately adjacent to interstate highways. Moreover, contrary to [Defendants' position], using available data and reliable models, [Defendants] could readily quantify these health risks, and compare the alternatives with respect to them. . . .  Accordingly, we request that before the I-70 East EIS is finalized, the agency quantify the increased incidence of asthma, heart disease and cancer in those who will live, work and recreate immediately adjacent (< 400m) to the various proposed alternatives, as a result of being exposed to elevated levels of air pollutants from vehicles on I-70 East.

(R. at 9450.)  The Clinic specifically criticized "the common, but nevertheless incorrect, assumption that because NAAQS standards are theoretically set at a level to protect human health, an EIS that confirms that these standards will not be exceeded constitutes an adequate analysis of 'no significant impact' with regards to public health." (R. at 9450 n.1.)

The Clinic also expressed concern that all of the contemplated alternatives would in some measure continue to bisect the affected neighborhoods, thus perpetuating the

lack of community cohesion that resulted from I-70's original construction through those neighborhoods.  (R. at 9443–44.)  The Clinic encouraged Defendants to think more broadly about alternatives, including "below grade construction" and "use of tunnels." (R. at 9445.)

## C.     The SDEIS

In 2014, Defendants issued a supplemental draft EIS ("SDEIS").  (R. at 9843.) This document announced that the two "realignment" alternatives had been eliminated. (R. at 9878.)  Such realignment along I-270 and I-76, Defendants concluded, would, among other things: (1) create more traffic congestion in the area, including by forcing more heavy trucks onto local streets, given the number of industrial areas and businesses located along the existing I-70 route; (2) eliminate the redundancy that currently exists by having I-70 through northeast Denver and I-270/I-76 through the northern suburbs; and (3) cost more (estimated at about $4 billion, as compared to less than $2 billion for other alternatives) because it would require twelve miles of major highway widening.  (R. at 10839–43.)

The SDEIS also announced a new alternative under consideration (R. at 9878), which has become known as the "PCL Alternative."    PCL is short for "Partial Cover Lowered" and refers to a plan to demolish the Viaduct, reconstruct that portion of the freeway mostly below grade, and then to cover a part of that lowered section, creating a short tunnel.  (R. at 9880.)

Like the original DEIS, the SDEIS contained a discussion of likely air quality effects of the proposed alternatives.  (R. at 10209.)  And, like the original DEIS, the SDEIS contained a quantitative inventory of expected MSAT emissions, but no

discussion of how those emissions might affect public health.  (R. at 10246–47.)  The

SDEIS predicted an "overall decreasing trend in MSATs" for all alternatives, including

the no-action alternative.  (R. at 10247.)  The air quality analysis concluded that, overall,

NAAQS would be maintained.  (R. at 10249.)

Plaintiff Sierra Club submitted comments on the SDEIS.  (R. at 15601.)  Sierra

Club's comments largely criticized Defendants for failing to conduct an analysis

specifically of "the impact that highway emissions are having on community health" in

the Globeville and Elyria-Swansea neighborhoods.  Sierra Club specifically pointed

Defendants to a 2014 study from the Denver Department of Environmental Health

("DEH Study") which showed "a significant disparity between community health in the

four city council districts where I-70 is located" as compared to other parts of Denver.

(R. at 15605–06.)  Sierra Club asserted that these populations were suffering from "the

diseases of air pollution" and that the DEH Study's data "point an incriminating finger at

air pollution from the high traffic volumes on interstate highways."  (R. at 15607.)  Sierra

Club insisted that "[t]he SDEIS air quality analysis is not a surrogate for a

comprehensive health impact assessment because," as relevant here, "the NAAQS are

not an adequate surrogate for the health effects associated with exposure to the full

array of pollutants emitted from highways."  (R. at 15612.)

**D.    The FEIS & ROD**

Defendants issued the final EIS ("FEIS") in January 2016.  (R. at 17558.)  The

FEIS contains a chapter titled "Human Health Conditions," which is "a new inclusion for

the Final EIS and was not included in the Supplemental Draft EIS."  (R. at 18227.)  This

chapter contains a subsection specifically regarding air quality, and is largely focused

on NAAQS conformity. (R. at 18230–32.) With respect to NAAQS, this subsection concludes that

> the NAAQS limits set by the EPA protect human health. The modeled values for the I-70 East project are below the NAAQS and demonstrate that there is no exceedance or impact from the project based on the EPA's health-based standards for these pollutants. Therefore, there are no projected impacts from the project related to NAAQS.

(R. at 18231.) Also, with respect to MSATs (for which NAAQS do not exist), this subsection reports that

> CDOT conducted a mobile source air toxic emissions analysis for the area affected by the project, and the analysis estimates that emissions in the project design year will be roughly 80 percent lower than current emissions. Additionally, the emissions for all of the Build Alternatives vary from 2.1 percent to 3.8 percent higher than the No-Action Alternative.

(*Id.*)

Finally, in January 2017, Defendants issued their Record of Decision ("ROD"). (R. at 1.) The ROD responds to comments, such as those from Sierra Club, that Defendants should have specifically studied the air-pollution-related human health consequences of the various alternatives. Relevant portions of that response are as follows:

> A health study (health impact assessment or health risk assessment) is not required by NEPA or the CAA and, therefore, it has not been performed for this project. The current health status of the affected communities has been thoroughly discussed in the [DEH Study] (September 2014). The Final EIS added to the information discussed in the [DEH Study] by showing how air quality is likely to change in the future under different project alternatives. . . .

> The MSAT analysis performed for the Final EIS showed that overall emissions will decrease in the future because of

improved mobility, reduced congestion, and cleaner vehicle emission standards. For MSATs, the analysis showed that the I-70 East Project will have a minimal effect on annual emissions within the study area, with the various alternatives showing a range of annual MSAT emissions from 2.1 percent to 3.8 percent above the No-Action Alternative in the design year of 2035. The overall trend in MSAT emissions is clearly downward, with all alternatives showing an approximately eight- to nine-fold decrease from current rates by 2035.

The Health Effects Institute Special Report #16, *Mobile-Source Air Toxics: A Critical Review of the Literature on Exposure and Health Effects* (2008), states that the cancer health effects attributable to MSATs are difficult to discern . . . .

In January 2010, the Health Effects Institute released Special Report #17, investigating the health effects of traffic-related air pollution. The researchers felt that there was "sufficient" evidence for linking asthma to traffic-related pollution. Evidence was "suggestive but not sufficient" for other detrimental health outcomes such as cardiovascular mortality. Study authors also noted that past epidemiological studies may not provide an appropriate assessment of future health associations because vehicle emissions are decreasing over time.

Finally, in 2011, three studies were published by the Health Effects Institute evaluating the potential for MSAT hot spots. In general, the authors confirmed that while highways are a source of air toxics, they were unable to find that highways were the only source of these pollutants. They determined that near-road exposures often were no different or no higher than background (or ambient) levels of exposure and, hence, no true hot spots were identified. . . .

Additionally, while the incidence of some health effects (such as asthma, autism, and attention-deficit/hyperactivity disorder) in the U.S. population appears to have been increasing, motor vehicle emissions have declined. . . .

* * *

Thus, a health impacts assessment would, at most, show very minor differences between alternatives with much lower

impacts than historic or current levels in terms of air quality
impacts.

(R. at 121–23.)

### III. APA § 705 STANDARD

A stay of agency action under APA § 705 is a provisional remedy in the nature of

a preliminary injunction. *See Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980). Its

availability turns on the same four factors considered under a traditional Federal Rule of

Civil Procedure 65(a) analysis. *See, e.g.*, *Hill Dermaceuticals, Inc. v. U.S. Food & Drug*

*Admin.*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007). Those factors are: (1) a likelihood of

success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to

the non-moving party, and that (4) the injunction would not adversely affect the public

interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). A preliminary

injunction is an extraordinary remedy; accordingly, the right to relief must be clear and

unequivocal. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th

Cir. 2010).

The Tenth Circuit previously endorsed an alternate standard that relaxed the

likelihood of success requirement when the other three factors tipped strongly in the

movant's favor. *See, e.g.*, *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration*

*Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). The Tenth Circuit recently abrogated

this standard, announcing that "any modified test which relaxes one of the prongs for

preliminary relief and thus deviates from the standard test is impermissible." *Diné*

*Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir.

2016).[5]

## IV. ANALYSIS: LIKELIHOOD OF SUCCESS

### A.    Legal Standard Applicable to the Merits

Under NEPA, "major Federal actions significantly affecting the quality of the

human environment" must be preceded by an EIS.  42 U.S.C. 4332(2)(C).  The EIS

requirement serves two important functions: "It ensures that the agency, in reaching its

decision, will have available, and will carefully consider, detailed information concerning

significant environmental impacts; it also guarantees that the relevant information will be

made available to the larger audience that may also play a role in both the

decisionmaking process and the implementation of that decision."  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989).  The EIS is one of NEPA's "'action-

forcing' procedures" to ensure that agencies take a "hard look" at the environmental

consequences of proposed actions.  *Id.* at 350.

The Court reviews an agency's NEPA process under the deferential abuse of

discretion standard of review.  *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d

190, 194 (D.C. Cir. 1991).  As the Supreme Court has observed, "once an agency has

made a decision subject to NEPA's procedural requirements, the only role for a court is

---

[5] *Diné Citizens* abrogated any "relaxed" test, but said nothing about more stringent tests.
For example, if the injunction will (1) alter the status quo, (2) mandate action by the defendant,
or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the
merits, the Tenth Circuit has held the movant must meet a heightened burden.  *See O Centro
Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir.2004) (*en banc*).
Specifically, the proposed injunction "must be more closely scrutinized to assure that the
exigencies of the case support the granting of a remedy that is extraordinary even in the normal
course" and "a party seeking such an injunction must make a strong showing both with regard to
the likelihood of success on the merits and with regard to the balance of harms."  *Id.*  But, no
party makes any argument based on this higher standard.  The Court therefore need not
address it, nor whether *Diné Citizens* affected it in any way.

to insure that the agency has considered the environmental consequences." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (per curiam).

The district court's objective in reviewing an EIS "is not to 'fly speck' the environmental impact statement, but rather, to make a pragmatic judgment whether the environmental impact statement's form, content and preparation foster both informed decision-making and informed public participation." *Custer Cnty. Action Assoc. v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001). The Court is to apply "a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in [an EIS] are merely flyspecks, or are significant enough to defeat [NEPA's] goals of informed decision making and informed public comment." *Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1323 (10th Cir. 2004).[6]

## B. Did Defendants Permissibly Choose Not to Evaluate Health Effects of Pollution Below NAAQS-Permitted Levels?

Per CAA requirements, Defendants determined that the PCL Alternative would not push the relevant geographic region out of NAAQS compliance. (*See* Parts I & II.D, above.) In the "Introduction" section to their Motion to Stay, Plaintiffs offer a one-

---

[6] "Judicial review of an agency decision is generally limited to review of the administrative record. The circumstances which warrant consideration of extra-record materials are extremely limited." *Custer Cnty.*, 256 F.3d at 1028 n.1 (citations and internal quotation marks omitted). Plaintiffs rely heavily on an extra-record declaration from Dr. George D. Thurston, a professor at the NYU School of Medicine who researches the human health effects of air pollution. (*See* ECF No. 88 at 8, 13–22; ECF No. 88-12.) Plaintiffs do not acknowledge the extra-record status of Dr. Thurston's submission until their reply brief, where they announce in a footnote that they "will move to supplement the agency record" based on a particular exception to the review-on-the-record-only presumption. (ECF No. 100 at 21–22 n.48.) This argument is inexcusably late for consideration as part of Plaintiffs' Motion to Stay; it is insufficiently developed; and in any event, Plaintiffs "have not attempted to argue that they will likely succeed on [this argument]. Therefore, the Court will not consider their extra-record evidence at this stage." *Zeppelin v. Fed. Highway Admin.*, 2018 WL 496840, at *8 n.7 (D. Colo. Jan. 22, 2018).

sentence, citation-free attack on this conclusion (*see* ECF No. 88 at 5),[7] but the remainder of their Motion to Stay does not elaborate and makes no attempt to demonstrate a likelihood of success on this argument.  For purposes of the Motion to Stay, therefore, the Court deems it conceded that the PCL Alternative will not endanger NAAQS compliance.

This leads to the parties' primary point of dispute: whether Defendants permissibly relied on their NAAQS-compliance determination as a proxy for concluding that human health would not be significantly affected by the PCL Alternative, and in particular, whether NEPA required Defendants to investigate human health effects of air pollution levels below what NAAQS would permit.  For a number of reasons, the Court concludes that Plaintiffs have not met their burden to demonstrate a likelihood of success on this claim.

As noted above (Part I), the EPA sets NAAQS with "an adequate margin of safety . . . to protect the public health."  42 U.S.C. § 7409(b)(1).  Given this, the case law is nearly unanimous that federal agencies may rely on NAAQS compliance to conclude that human health will not be seriously affected by a transportation project. *See Barnes v. FAA*, 865 F.3d 1266, 1273 (9th Cir. 2017) ("It was appropriate for the FAA to defer to the [relevant NAAQS] on the factual question of what level of airborne lead is safe for children."); *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F. Supp. 2d 982, 1012–13 (W.D. Ky. 2013) (rejecting argument that Highway Administration needed to evaluate air pollution effects beyond the NAAQS-

---

[7] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in documents with prefatory material such as a table of contents.

compliant analysis; holding that "performing and completing the conformity analyses described in the CAA satisfies Defendants' hard look requirements for air quality issues under NEPA"), *aff'd*, 576 F. App'x 477 (6th Cir. 2014); *Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010) ("The defendants' decision to consider air pollution issues through the same framework used by the EPA to enforce the Clean Air Act cannot be considered arbitrary or capricious."), *aff'd*, 435 F. App'x 368 (5th Cir. 2011); *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004) (". . . EPA is statutorily commanded to set NAAQS at a level sufficient to protect human health. [The Highway Administration] does not act arbitrarily and capriciously by relying on the prevailing NAAQS standard EPA has set." (citation omitted)); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020–21 (S.D. Cal. 2003) (". . . the Court finds that plaintiff's argument is merely one involving methodology. The Court will not require that the agencies analyze the air impact on public health in a particular way, but rather will only ensure that the agencies' analysis is well-reasoned. . . . The logic of their argument is indeed well-reasoned: If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health.").

The only potential exception Plaintiffs could locate was U.S. District Judge R. Brooke Jackson's decision in *WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enforcement*, 104 F. Supp. 3d 1208 (D. Colo. 2015), *order vacated and appeal dismissed*, 652 F. App'x 717 (10th Cir. 2016). This case was a challenge to a federal agency's approval of mining plans for two coal mines in Colorado.

*Id.* at 1214, 1216–18.  In resolving the challenge, Judge Jackson noted a "peripheral" argument from the agency that it was somehow exempt from analyzing air pollution effects.  *Id.* at 1227–28.  For reasons that are not entirely clear, Judge Jackson includes this passage in explaining his rejection of the agency's argument:

> The question posed by the plaintiff is not whether the increased mining will result in a release of particulate matter and ozone precursors in excess of the NAAQS, but whether the increased emissions will have a significant impact on the environment.  One can imagine a situation, for example, where the particulate and ozone emissions from each coal mine in a geographic area complied with Clean Air Act standards but, collectively, they significantly impacted the environment.

*Id.* at 1227.  This is the passage Plaintiffs emphasize here.  (*See* ECF No. 88 at 31.)

Plaintiffs' emphasis is misplaced; there is simply not enough context to understand what Judge Jackson was actually deciding.  For example, it is not clear whether his "one can imagine" scenario was inspired by a specific argument from the parties, or was instead something he developed himself.  It is also not clear if Judge Jackson was talking about some sort of regional NAAQS standard that might be violated by locally NAAQS-compliant operations, and if not, it is also unclear the standard by which he believed regional air pollution effects should be judged.  Finally, and most importantly, Judge Jackson was not presented, and did not decide, the question at issue here: whether agencies can rely on NAAQS to satisfy their NEPA obligation to evaluate air pollution's impact *on human health*.  In short, Plaintiffs' citation to Judge Jackson's decision does not persuade the undersigned that they are any more likely to prevail on this claim.

Moreover, even if there might be a reason in some cases to investigate the

effects on human health of exposure to NAAQS-permitted levels of pollution, Plaintiffs fail to propose an administratively predictable and judicially manageable standard for determining when NEPA requires such an investigation.  *Cf. Vieth v. Jubelirer*, 541 U.S. 267, 307–08 (2004) (Kennedy, J., concurring in judgment) (in the partisan gerrymandering context, noting the present lack of "basis on which to define clear, manageable, and politically neutral standards").  Indeed, there are a number of obstacles to any such standard.  To begin, this is basically a methodological question— evaluating air pollution effects through NAAQS conformity modeling or through some other way.  "Courts are not in a position to decide the propriety of competing methodologies . . . .  This is particularly true when the dispute involves a technical judgment within the agency's area of expertise."  *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1177–78 (10th Cir. 2012) (internal quotation marks and citation omitted).  Moreover, the idea that NAAQS may not, in a particular case, protect human health with an adequate margin of safety is an implicit challenge to the NAAQS itself.  Challenges to NAAQS must be filed in the D.C. Circuit within sixty days of their promulgation.  42 U.S.C. § 7607(b)(1).

Plaintiffs heavily emphasize the 2014 DEH Study (*see* Parts II.C & II.D, above) which, they argue, is sufficient to trigger a health assessment of below-NAAQS pollution effects (*see* ECF No. 88 at 10–11, 15–16, 18, 27–28; ECF No. 100 at 5–6, 10, 12–14, 21, 26, 30).  Even assuming that all of the above-mentioned problems with such an analysis could be resolved, the Court would find that the DEH Study was not enough in this case to create a NEPA obligation to perform the sort of health assessment Plaintiffs demand.  The portion of the DEH Study on which Plaintiffs place the most reliance is

one-and-a-half pages long, with three out of eleven total paragraphs addressing air pollution—and in that context, the DEH Study only mentions a higher incidence of asthma in the Globeville and Elyria-Swansea neighborhoods. (ECF No. 88-1 at 19–20.) All other "diseases of air pollution" (as Plaintiffs describe them) are actually attributed to other factors such as obesity, lack of physical activity, and other unhealthy behaviors such as smoking. Elsewhere, the DEH Study reports that "average annual air pollution in the neighborhoods is not higher than other areas of Denver, [although] at times the neighborhoods experience spikes in poor air quality depending on location, time of day, and weather." (ECF No. 88-1 at 22.) In any event, the DEH Study is not an empirically rigorous document, as it generally reports only on correlations, without any inquiry into causation, contrary to the scientific method. And, importantly, it utterly fails to control for, among other things, the contribution made to the prevailing health of the communities adjacent to I-70 by adverse socioeconomic factors apart from proximity to the freeway.

Beyond the particular deficiencies of the DEH Study, however, the central difficulty of Plaintiffs' argument remains front and center: the articulation of a clear, administratively manageable standard by which agencies may discern when NEPA requires them to investigate further into the possible adverse health consequences of a proposed action, when there is little dispute that such an action will not exceed NAAQS-permitted levels of pollution. With Defendants bereft of such a standard here, the Court has difficulty anticipating that on the merits it will conclude they acted arbitrarily and capriciously by relying on the prevailing NAAQS emissions limits the EPA has set.

The foregoing does not resolve Plaintiffs' challenge with respect to MSATs

because there currently exist no NAAQS for MSATs.  But, on this record, the Court still sees little to no likelihood of Plaintiffs showing that Defendants were arbitrary and capricious in choosing to inventory MSATs and predict change over time, as opposed to evaluating specific health effects.  Defendants concluded that there was little difference in the expected output of MSATs as between all of the alternatives evaluated in the FEIS, including the no-action alternative.  (*See* Part II.D, above.)  Plaintiffs' Motion to Stay does not challenge that conclusion.  Thus, if the no-action alternative would lead to substantially the same effects as the other alternatives, the agency's decisionmaking process would not be materially enhanced by deeper analysis into what will happen no matter what decision the agency makes.

What Plaintiffs really seem to be saying through their MSATs argument is that Defendants should have evaluated the relative health benefits of the I-270/I-76 realignment options that dropped out at the SDEIS phase.  (*See* Part II.C, above; ECF No. 88 at 11–12 (arguing that Defendants failed to evaluate "health indicators that could be used to compare the health impacts of the re-route alternatives"); *id.* at 26 ("CDOT's traffic modeling of the re-route alternative strongly suggests that a comprehensive assessment of the health risks caused by exposure to highway pollution will show that the I-270 alternative to widening I-70 will achieve significant health benefits.").)  If this is what Plaintiffs wish to argue, they have skipped a step.

"An agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective." *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1011 (10th Cir. 2012) (internal quotation marks omitted; alterations incorporated).  Thus, to argue

that Defendants should have evaluated the comparative health effects of the realignment alternatives is necessarily to argue that the realignment alternatives should not have been eliminated from consideration.  But that is a wholly separate argument, which Plaintiffs have not made.  *Cf. id.* (discussing the standard for "reviewing an agency's choice of which alternatives to eliminate at the scoping stage").

For all these reasons, Plaintiffs have not met their burden to show a likelihood of success on their NEPA claim as presented in the Motion to Stay.

## C. Were Defendants Required to Engage in a Separate "Substantive" Analysis Under the Federal-Aid Highways Act?

Plaintiffs additionally argue that the "substantive requirements" of the Federal-Aid Highways Act ("FAHA"), 23 U.S.C. §§ 101 *et seq.*, also mandate additional health impacts analyses.  (ECF No. 88 at 33–35.)  The Court agrees with Defendants, however, that FAHA imposes no requirements different from NEPA.

FAHA requires the Secretary of Transportation to

> promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid [highway] system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:
>
> (1) air, noise, and water pollution;
>
> (2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;
>
> (3) adverse employment effects, and tax and property value losses;

>    (4) injurious displacement of people, businesses and farms;
>    and
>
>    (5) disruption of desirable community and regional growth.

23 U.S.C. § 109(h).  Since 1982, the Highway Administration has taken the view that its

own NEPA-implementing regulations establish a process that satisfies both its NEPA

and FAHA § 109(h) obligations.  *See* 47 Fed. Reg. 21780, 21781 (May 20, 1982)

("Current NEPA procedures as implemented by the FHWA assure that [factors to be

considered under § 109(h)] are well integrated into the highway decisionmaking process

from project planning through construction.  Basically, the NEPA process provides a

framework for the highway project development process.").  Those regulations are

found at 23 C.F.R., part 771.  Among other things, they announce "the policy of the

[Highway] Administration that * * * [t]o the fullest extent possible, all environmental

investigations, reviews, and consultations be coordinated as a single process, and

compliance with all applicable environmental requirements be reflected in the

environmental review document required by this regulation [*i.e.*, by part 771]."

23 C.F.R. § 771.105(a).

    Given this, the Court is persuaded by the analysis of the District of Maryland that

FAHA § 109(h) imposes no requirements different from or in addition to the Highway

Administration's NEPA obligations.  *See Audubon Naturalist Soc'y of the Cent. Atl.

States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 706–07 (D. Md. 2007).  To

hold otherwise would be contrary to the Highway Administration's interpretation of a

statutory scheme it supervises, and such interpretations are "entitled to substantial

deference."  *Id.* at 707.  Plaintiffs do not attempt an argument to the contrary.

    The Court therefore holds that FAHA § 109(h) does not create "substantive

requirements" apart from NEPA's requirements.  Because Plaintiffs have not shown that they are likely to succeed on the NEPA claim presented in their Motion to Stay, they likewise fail to show a likelihood of success on their FAHA claim.

## V.  CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Stay (ECF No. 88) is DENIED.

Dated this 3rd day of April, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge