**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE
PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CATER, in his official capacity as Division
Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and MICHAEL LEWIS, in his
official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

PETITIONERS' OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER ON THE SCOPE
OF THE ADMINISTRATIVE RECORD, DENYING THE MOTION TO SUPPLEMENT THE
ADMINISTRATIVE RECORD
(Case No. 17-cv-1679-WJM-MEH)

---

ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com




COUNSEL FOR PETITIONERS

Petitioners object to Magistrate Judge Hegarty denial of Petitioners' Motion to Supplement the Administrative Record ("AR") with expert testimony submitted to demonstrate that Defendants failed to consider one or more relevant factors, or examine relevant evidence in Defendants' approval of the ROD for I-70 Central Project. Petitioners request reconsideration of Petitioners' Motion pursuant to 28 U.S.C. §636(b)(1)(A) and Fed. R. Civ. P. 72(a). The standard of review is whether the Order is clearly erroneous or contrary to law.

## I.  Evidence Needed to Perform Probing Review of Record.

Petitioners submitted nine exhibits with their original Motion to Supplement the Record. Here Petitioners object to the denial of three exhibits: (1) Declaration of Dr. Gregory Rowangould and the report "Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project" (ECF No. 128-4); (2) "Declaration of Gregory Rowangould Regarding Receptors Used for Modeling PM10" and the "Report of Investigation of Receptor Locations Selected for Modeling Emissions of PM10 from the I-70 Project" (ECF No. 128-3); and (3) "Declaration of George D. Thurston," "The Adverse Human Health Effects of Traffic-Related Air Pollution" (ECF No. 128-1).

### A.  "Modeling PM2.5 Emissions" -- Air Quality and Health Impacts of Violations of PM2.5 NAAQS Not Considered or Disclosed.

Petitioners' claims under the National Environmental Policy Act ("NEPA")[1] and the Federal-Aid Highway Act ("F-AHA")[2] are that the impacts on community health that will result from increased exposure to Project emissions of fine particulate matter (PM2.5) and carbon monoxide were not disclosed to the decisionmaker or to affected residents and families with children in affected schools, and that these impacts were not evaluated by the decisionmaker along with the health benefits of alternatives or mitigation to avoid or eliminate adverse effects. Petitioners' claims arise from evidence in the Final Environmental Impact Statement's ("FEIS")

---

[1] Petition For Review, Part II (Doc. No. 1).
[2] Petition For Review, Part III (Doc. No. 1).

Air Quality Technical Report, FEIS Attachment J[3], showing that emissions of fugitive dust kicked up by traffic will increase 43% by 2035,[4] tailpipe emissions of PM10 will increase 10% between 2015 and 2035 due to the Project,[5] and carbon monoxide emissions will increase by 14% by 2035.[6] The FEIS also reveals that in 2035 57.5% of modeled tailpipe emissions of PM10 are PM2.5.[7] The fraction of road dust that is fine particles, i.e., PM2.5, is not disclosed in the FEIS, but EPA emissions guidance reports that 25% of road dust is PM2.5.[8]

The I-70 Project was determined—under EPA's transportation guidance[9] for quantitative hot-spot analysis—to be of "local air quality concern"[10] because it is an "expanded highway project[ ] that ha[s] a significant increase in the number of diesel vehicles."[11] EPA explained in its hot-spot rulemaking that the diesel vehicle test was adopted because:

> Projects of air quality concern are anticipated to have the potential to increase local PM2.5 concentrations, and as a result, PM2.5 hot-spot analyses are needed for such projects to ensure that the local air quality impacts of such projects are considered prior to receiving federal funding or approval.

71 Fed. Reg. 12467, 12471 (March 10, 2006). While the increase in diesel vehicles is the same test for identifying projects of air quality concern for both PM10 and PM2.5, a quantitative hot-spot analysis was only performed for emissions of PM10.

Projects of air quality concern trigger a "hot-spot analysis"[12] to estimate the impact that increased emissions will have on concentrations in the ambient air which can then be compared

---

[3] FEIS, Attachment J (AR 023395 *et seq.*)
[4] FEIS, Attachment J, Section 7.4.9 (AR 023511)
[5] FEIS, Attachment J, Table 23 (AR 023486)
[6] FEIS Attachment J, Table 24 (AR 023488)
[7] *Id.*, Air Quality Technical Report, Tables 22, 23 (ratio of PM2.5 emissions in 2035 (0.38 tpd) to PM10 emissions (0.66 tpd = 57.5%)) (AR 023486)
[8] AP-42, §13.2.1.5(1); incorporated by reference in EPA's Hot-spot Guidance, §6.3. (AR 105911)
[9] "Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas" (EPA-420-B-15-084, November 2015). (AR 105826). ["Hot-spot Guidance"].
[10] FEIS, Attachment J , Section 4.2 (AR 023418)
[11] FEIS, Attachment J, Section 3.4 (AR 023412)
[12] "*Hot-spot analysis* is an estimation of likely future localized CO, PM10, and/or PM2 5 pollutant concentrations and a comparison of those concentrations to the national ambient air quality standards. Hot-spot analysis assesses impacts on a scale smaller than the entire nonattainment or maintenance area, including, for example, congested

with the NAAQS. U.S. EPA's Hot-spot Guidance identifies the factors that must be included in a hot-spot analysis to "estimate[e] likely future localized … PM2.5 pollutant concentrations and [to make] a comparison of those concentrations to the national ambient air quality standards."[13] By definition, a hot-spot analysis "uses an air quality dispersion model to determine the effects of emissions on air quality."[14] Another factor addresses the cumulative impact of the project by determining "estimated pollutant concentrations … based on the total emissions burden which may result from the implementation of the project, summed together with future background concentrations…. Background concentrations do not include the emissions from the project itself."[15] A third factor involves the methodology for combining the modeled concentrations from the project with background air quality to calculate a "design value [which] is a statistic that describes a future air quality concentration in the project area that can be compared to a particular NAAQS."[16]

EPA's Hot-spot Guidance explains that each of these required elements for performing a "hot-spot analysis" are necessary to make a technically valid comparison of project emissions with a PM NAAQS:

> . . . emissions modeling, air quality modeling, and representative background concentrations are all necessary as part of a quantitative PM hot-spot analysis in order to demonstrate conformity requirements. [A]n approach that would involve comparing only emissions between the build and no-build scenarios, without completing air quality modeling or considering representative background concentrations, would not be technically supported.[17]

A hot-spot analysis was performed for PM10. The air quality modeling analysis shows Project emissions will add at least 41 $\mu g/m^3$ of PM10, from 113 $\mu g/m^3$ to 154.1 $\mu g/m^3$, a fraction

---

roadway intersections and highways or transit terminals, and uses an air quality dispersion model to determine the effects of emissions on air quality." 40 C.F.R. §93.101 "Definitions."
[13] Hot-spot Guidance, "Section 1.3: Definition of A Hot Spot Analysis. (AR 105816)
[14] 40 C.F.R. §93.101
[15] Hot-spot Guidance, "Section 8: Determining Background Concentrations from Nearby and Other Emission Sources." (AR 105932)
[16] Id., Section 9. (AR 105942)
[17] Id.§2.4.3. (AR 105826).

less than the NAAQS.[18]  But PM2.5 (also known as "fine particles" or "soot") was not modeled even though it makes up a large fraction of PM emitted from highways, and is the pollutant that EPA found to be most responsible for the mortality effects of PM.[19]

By not using a dispersion model to determine PM2.5 concentrations from project emissions, and not adding project PM2.5 emissions to emissions from background sources, the factors EPA identifies in its Hot-spot Guidance as technically necessary to determine whether PM2.5 emissions will violate the NAAQS, Defendants failed to consider factors relevant to determining compliance with the NAAQS, failed to use the "best science" to determine NAAQS compliance, and failed to examine relevant data.

### Rowangould Modeling Report Demonstrates EIS Failed to Include Data And Methodologies Relevant to Determining Compliance With PM2.5 NAAQS.

Dr. Gregory Rowangould performed the dispersion modeling required by EPA's Hot-spot Guidance using the same traffic information, the same dispersion model and the same receptor locations used by FHWA to estimate emissions of PM10. Dr. Rowangould explained that:

> This modeling analysis was performed using the same emissions model (MOVES) and air quality model (AERMOD) required by EPA for modeling highway emissions, and applies the same assumptions and inputs, with one exception described in the report,  as those used by the Federal Highway Administration to model emissions of $PM_{10}$ from the Project for the conformity determination. I exercised no independent judgment regarding the estimation of traffic, traffic emissions, the use of meteorological data to model dispersion, or the selection of receptor locations for modeling future expected concentrations. I replicated as closely as possible the decisions made by FHWA in its modeling analysis of $PM_{10}$ to avoid any possible discrepancy with the procedures implemented by FHWA to model Project $PM_{10}$ emissions.

---

[18] ROD, Attachment C7, Table 2 (AR 004791). The NAAQS for PM10 is 150 μg/m$^3$, but EPA treats levels below 155 μg/m$^3$ as in compliance. See 40 C.F.R. §50.6, Appendix K.
[19] National Ambient Air Quality Standards for Particulate Matter, Final Rule, 78 Fed. Reg. 3086 (January 15, 2013)

Rowangould Declaration, ¶ 16. (ECF No. 128-4, Ex. 33 at 3-4). He combined modeled PM2.5 concentrations with background air quality as required by EPA's Hot-spot Guidance. *See* Rowangould Report, ECF No. 128-4, Ex. 33, Att. B at 4.

Petitioners submit the Report of this modeling analysis to demonstrate that Defendants failed to consider the relevant factors defined by EPA's Hot-spot Guidance, and failed to examine relevant evidence needed to determine the impact that Project emissions will have on attainment of the NAAQS.

Defendants' failure to consider these factors resulted in their failure to consider significant impacts on the human environment. The modeling results show that Project emissions are expected to cause or contribute to violations of the 24-hour NAAQS for PM2.5 triggering numerous consequences not considered by FHWA in the EIS. NAAQS violations will cause the area to be designated nonattainment for PM2.5 under the Clean Air Act,[20] thereby triggering the obligation to develop a State Implementation Plan ("SIP") to attain the NAAQS,[21] the obligation to establish a motor vehicle emission budget that requires the metropolitan planning organization to adopt a regional transportation plan that reduces motor vehicle emissions causing the NAAQS violations,[22] and to impose stringent limitations on the permitting of new industrial sources.[23] FHWA will not be able to support its position that the Project will have no significant health impacts because air quality will violate the NAAQS. Expected violations and adverse health consequences require that FHWA consider mitigation to eliminate or minimize these impacts on air quality and health under NEPA and F-AHA.

### B. Investigation of Receptor Locations – Modeling Files Are Incomprehensible Without Report of Investigation.

---

[20] 42 U.S.C. §7407(d).
[21] *Id.,* §7410(a),(d).
[22] *Id.* §7506(c)(1); 40 C.F.R. §93.118.
[23] *Id.,* §7503.

This report is essential for anyone—clients, counsel or the Court—to understand what FHWA did when it modeled Project emissions for the conformity determination. Rowangould's report explains what was found by opening otherwise incomprehensible data files, applying the software used to run the data files through modeling software, and describing the results. When asked during the comment period about how receptors were modified for the conformity determination, FHWA did not provide any explanation. Just data files. Without this report of his expert investigation, the Court could not know that only those receptors that would otherwise show a violation of the NAAQS were modified, and how they were modified. Without that information, FHWA's action could not be reviewed with respect to how the action deviates from EPA's modeling guidance, and the lack of technical explanation or justification in the AR.

C. **Thurston Declaration – Explanation of Data and Conclusions Reached By EPA Regarding Protections of NAAQS.**

The Declaration of Dr. George D. Thurston was introduced initially in support of Petitioners' Motion to Stay construction of the I-70 Project. See (ECF No. 128-1, Ex. 28). It was offered for three purposes: (1) for standing to establish that Petitioners members will suffer harm from increased exposure to rising concentrations of PM10 and PM2.5 even if concentrations do not violate a NAAQS for PM10 or PM2.5; (2) for interim relief to establish that Petitioners' members will experience irreparable harm from impaired health as a result of immediate increased exposure to PM emitted when demolition, excavation and construction activities commence; and (3) for showing likelihood to prevail on the merits of the claim under NEPA that Defendants failed to consider impacts on community health at exposures below the NAAQS and the claim under F-AHA that Defendants failed to identify mitigation measures to eliminate or minimize impacts, weigh their costs in determining if the Project is in the best overall public interest, and implement adequate mitigation. Thurston's testimony is judicially admissible for

findings regarding standing and irreparable harm. The Motion to Supplement the AR is necessary only for the purpose of Petitioners' merits claims based on the AR.

Thurston's opinion testimony is directly related to his conclusion derived from his personal research and peer reviewed research published since EPA's last review of the science that residents will suffer immediate harm from increased exposure to PM during excavation and construction. This portion of the testimony is offered, and is judicially admissible, to support standing and irreparable harm. But a portion of the testimony, pp. 12-14, is focused on explaining the data before U.S. EPA which provided the basis for EPA's conclusion that the latest NAAQS is not set at a level that prevents all adverse effects: "no population threshold, below which it can be concluded with confidence that PM2.5-related effects do not occur, can be discerned from the available evidence." 78 Fed. Reg. 3086, 3098 (January 15, 2013)(emphasis added).  Petitioners ask that the portion of the testimony explaining the data EPA considered when making its decision to revise the NAAQS for PM2.5 be admitted to supplement the AR for review of Petitioners' merits claims.

The portion of Thurston's testimony that explains the data considered by EPA is not offered to present an opinion that contradicts an opinion adopted by FHWA experts based on the facts. FHWA has not identified any facts that it reviewed for making the presumption that no significant impacts on health occur at levels below the NAAQS. That conclusion is merely an inference drawn from a mistaken view of the action EPA took. If FHWA relies on EPA's action, then the evidence before EPA is relevant to that reliance, and EPA's inferences from that evidence must control unless FHWA has identified independent evidence that supports the presumption of "no significant impacts." Thurston's testimony explains the facts EPA developed relevant to adverse health effects resulting from exposures allowed by the NAAQS. It is presented to show that Defendants failed to consider "relevant data" when deciding to deny that health effects below the level of the NAAQS occur, and need to be acknowledged and mitigated.

## II.   DENIAL OF MOTION TO SUPPLEMENT AR IS CLEARLY ERRONEOUS AND CONTRARY TO LAW.

For their Motion to Supplement, Petitioners rely on three recognized exceptions to the rule that judicial review is limited to the agency's AR: failure to consider a relevant factor, failure to examine relevant evidence, and providing expert assistance to the Court in understanding the complex technical issues related to modeling PM emitted from highways.

### A. Relevant Factors.

Petitioners contend that Defendants failed to consider a number of relevant factors, including their failure to consider the adverse impacts on community health that will result from: (1) exposure to PM2.5 concentrations that violate the NAAQS; and (2) exposure to particulate matter (PM) concentrations below the level of the NAAQS that are not prevented by the NAAQS and that more current evidence shows are occurring.

> [T]he Tenth Circuit has repeatedly recognized an exception when "the record is deficient because the agency ignored relevant factors it should have considered in making its decision." *See*, e.g., *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1028 n. 1 (10th Cir.2001) (quoting *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir.1985)). Most relevant to Plaintiffs' challenge, the Tenth Circuit has tacitly recognized the relevance of extra-record evidence in NEPA cases where there are gaps or inadequacies in the NEPA process. *See Citizens for Alt. to Radioactive Dumping v. U.S. Dep't of Energy,* 485 F.3d 1091, 1096 (10th Cir.2007) (quoting Lee, 354 F.3d at 1242) ("In dealing with scientific and technical evidence, extra-record evidence 'may illuminate whether an [environmental impact statement] has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under the rug' ") (alterations in original).

*Wilderness Workshop v. Crockett,* 2012 WL 1834488, at 5-6 (D. Co. 2012). The Ninth Circuit has on a number of occasions supplemented the record with evidence showing that significant effects have not been taken into account:

…the district court may extend its review beyond the administrative record and permit the introduction of new evidence in NEPA cases where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable

alternative, or otherwise swept stubborn problems or serious criticism under the rug."
*National Audubon Society v. U.S. Forest Service,* 46 F.3d 1437, 1447 (9th Cir. 1993); citing
*County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1384–85 (2d Cir.1977), *cert.*
*denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978)).

Here, Petitioners move to supplement the AR with 1) a modeling study that shows the
enormous gap left by FHWA's refusal to use the best science described in EPA's Hot-spot
Guidance to meet its obligation under NEPA[24] to determine whether Project emissions will, or
will not, meet the requirement of the Clean Air Act that the NAAQS for PM2.5 not be violated;
and 2) expert testimony explaining the evidence that demonstrates cardiovascular mortality
effects below the level of the NAAQS that was considered by EPA when setting the NAAQS for
PM2.5, but not considered by FHWA when asserting without any evidentiary support that no
adverse health effects occur below the level of the NAAQS.

**B. Relevant Evidence.**

Courts for decades have declared that the initial obligation of agencies engaged in
reasoned decisionmaking under the Administrative Procedure Act (APA) is to examine the
"relevant evidence." The Supreme Court in *Motor Vehicle Manufacturers Ass'n v. State Farm*
*Mutual,* 463 U.S. 29, 43 (1983) declared "[t]he agency must have examined the relevant data,"
and more recently reiterated that "we insist that an agency 'examine the relevant data and
articulate a satisfactory explanation for its action.'" *F.C.C. v Fox Television Stations,* 556 U.S.
502, 513 (2009).

An action that fails to consider such "relevant factors," or "relevant evidence," is
arbitrary and capricious. This Court has recognized that it is permissible to supplement the
record in determining whether the agency has failed to examine the relevant data.

A court's review under "Section 706(2)(A) [of the APA] requires a finding that the actual
choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law.' 5 U.S.C. §706(2)(A). To make this finding the court must consider

---

[24] 40 C.F.R. §1502.2(d).

> whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416…. The agency must have examined the relevant data and articulated a rational connection between the facts found and the decision made, supported by substantial evidence in the record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. I s. Co.*, 463 U.S. 29, 43 … (1983); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575–76 (10th Cir.1994). Where an agency fails to consider evidence relevant to the final decision, its rationale and justification may be undermined. By its very nature, evidence which the agency fails to consider is frequently not in the record. Accordingly, in order to allow for meaningful, in-depth, probing review, such extra-record evidence is often properly included in the Administrative Record.

*Ctr. for Native Ecosystems v. Salazar,* 711 F. Supp. 2d 1267, 1279-80 (D. Co. 2010).

Here each of Petitioners' three exhibits are submitted for the purpose of demonstrating evidence relevant to Defendants' final decision that was identified in comments as necessary and relevant to its obligation, but not developed or considered by the agency. "NEPA's regulatory requirements impose specific obligations on agencies faced with incomplete or unavailable information," that bars agencies from "argu[ing] that *Plaintiffs* have the burden to demonstrate that the information they claim is missing meets both the 'relevant' and 'essential' prongs of [40 C.F.R.] § 1502.22." *Native Village of Hope Point v. Salazar*, 730 F. Supp. 2d 1009, 1017-18 (D. Ak. 2010) (finding that agency's failure to obtain the relevant data was arbitrary and warranted remand) (emphasis in the original).

**C. Technical Terms, Complex Subject Matter.**

This Court has also supplemented the AR with expert testimony to assist the Court in understanding complex technical information, such as the modeling data files involved in the report disclosing FHWA's modification of the modeling of seven receptor locations for the PM10 conformity determination.

> [A] reviewing court may go outside the administrative record for certain limited purposes, such as: (1) where the administrative record fails to disclose the factors considered by the agency; (2) where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position; and (3) where necessary to explain technical terms or complex subject matter involved in the action. *Franklin Savings Ass'n. v. Director, Office of Thrift Supervision,* 934 F.2d 1127, 1137 (10th Cir.), cert. denied, 503 U.S. 937 (1991).

*Colorado Environmental Coalition v. Lujan*, 803 F.Supp. 364, 370 (1992).

### 1. Hot-spot Modeling for PM2.5.

The decision by Magistrate Judge Hegarty not to supplement the record with this evidence is clearly erroneous based on a misunderstanding of what the Defendants did not do compared to the data and analyses required by EPA's Hot-spot Guidance to model PM2.5 and is contrary to law because the testimony presented by Dr. Rowangould explains the data and methods required by EPA rather than reflects a difference of opinion between himself and FHWA's experts.

Judge Hegarty misunderstands the record and Dr. Rowangould's modeling analysis when he describes the differences between the emissions analysis performed by FHWA and the air quality modeling analysis performed by Dr. Rowangould:

> Dr. Rowangould's declaration disputes the methodology FHWA used to determine emissions of PM2.5. FHWA calculated emissions inventories—an accounting of the amount of pollutants discharged into the atmosphere—by inputting traffic data, meteorological data, vehicle fleet data, and fuel and control specifications into the EPA MOVES model. (AR 23448). Dr. Rowangould's conclusion that the emissions estimates would have been higher if FHWA performed a hot spot analysis demonstrates a mere disagreement as to the appropriate method for analyzing and calculating PM2.5 emissions. Plaintiffs may not supplement the record with documents disputing the reliability of FHWA's methodology.

Order on Scope of AR, at 12 (ECF No. 136).

Dr. Rowangould did not use a different "method" for calculating PM2.5 emissions. His modeling analysis used EPA's MOVES model. He explains that to model emissions of PM2.5 he used the same inputs and "look-up table" used by the agencies to develop the emissions inventory for PM10 they prepared to model PM10 concentrations.[25] He used the agency's inputs and look-up table to obtain from MOVES the emissions factors for PM2.5.

---

[25] "Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project," ECF No. 128-4, Ex. 33 at 6.

The emissions inventories discussed by Judge Hegarty end with estimates of total project emissions, but no information about pollutant concentrations. An emissions inventory does not perform the next step in a hot-spot analysis which requires the use of a dispersion model to determine how the emissions are dispersed in the atmosphere,[26] and what the expected concentrations will be at receptor locations in the ambient air. Because a NAAQS is expressed as a concentration in the ambient air, an emissions inventory does not provide concentration information that can be used to compare with a NAAQS. The next step in the hot-spot analysis for PM2.5 uses the emission factors obtained from MOVES as input to AERMOD, the atmospheric dispersion model the agencies selected to model concentrations of PM10 in the ambient air.[27]  By failing to model the dispersion of emissions in the ambient air, FHWA failed to provide a factual basis in the AR for making a judgment regarding the impact that future Project PM2.5 emissions would have on NAAQS compliance.

The modeling of Project *emissions* performed by Dr. Rowangould did not differ from the emissions modeling performed by the agencies. He followed their procedures, and adopted the same outputs from their traffic data. He did not critique their approach or offer any contradictory opinion. Rather he used the emissions factors obtained from MOVES to complete the dispersion modeling required by EPA for a hot-spot analysis using the same model and assumptions used by the agencies for modeling PM10 concentrations.[28] He used the results to combine the Project impact with background air quality in the manner prescribed by EPA's Guidance to calculate a design value for comparison with the NAAQS.[29] The purpose of this analysis is to demonstrate that the agencies failed to consider factors identified by EPA as necessary for comparing project emissions with the NAAQS. When all the "relevant factors" for determining the impact that

---

[26] Hot-spot Guidance, Section 7.3: Selecting an Appropriate Air Quality Model. AR 105916.
[27] *See* Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project, ECF No. 128-4, Ex. 333 at 6-7.
[28] *Id.,* at 8-13.
[29] *Id.*, at 13-15.

Project emissions will have on air quality, it is clear that the consequences of failing to include these factors has the effect of omitting significant adverse effects from the EIS.

This is a case "when the record is deficient, because the agency ignored relevant factors it should have considered." *American Mining Congress v. Thomas,* 772 F.2d 617, 626 (10th Cir. 1985). Magistrate Hegarty acknowledged that "courts have recognized an exception specific to NEPA cases when extra-record evidence 'may illuminate whether an [environmental impact statement ("EIS")] has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism . . . under the rug.' *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (*quoting Lee v. U.S. Air Force,* 354 F.3d 1229, 1242 (10th Cir.2004))." Order, at 6. But he erroneously concluded that

> Plaintiffs may not supplement the record with documents disputing the reliability of FHWA's methodology. *See Lee*, 354 F.3d at 1243–44 (stating that evidence indicating a "disagreement regarding the reliability of the methodology [the agency used] and whether it has been applied accurately in this EIS . . . is an insufficient basis for admitting extrarecord evidence . . . ."); *San Luis & Delta-Mendota Water Auth.*, No. 09-CV-407 OWW DLB, 2009 WL 5084082, at *4 (E.D. Cal. Dec. 16, 2009) (denying a motion to supplement, because "[t]hese documents either synthesize existing data in different ways or utilize different models to evaluate existing data. They do not raise entirely new 'factors' for consideration and therefore cannot be considered under the 'relevant factors' exception.").

Here Petitioners do not dispute the reliability of FHWA's methodology for estimating emissions, or use different models to evaluate existing data. Indeed, Petitioners explicitly apply the identical methodology using the same model for performing that first step in a hot-spot analysis, i.e. estimating emissions. Here Dr. Rowangould merely completes the remaining steps that EPA requires be performed for project of "local air quality concern" to compare project emissions with the NAAQS by using a dispersion model to determine concentrations in the ambient air, and adding those concentrations to background to determine the cumulative impact of the Project for

comparison with the NAAQS. By failing to apply the sophisticated dispersion modeling tool developed by EPA for this purpose, FHWA failed to take "a 'hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information.'" *Custer County Action Assn v. Garvey,* 256 F.3d 1024, 1034 (10th Cir. 2001).

This Report identifies both the gaps in the FHWA analysis, i.e., the relevant factors not considered, and the missing evidence relevant to addressing these factors. It provides the missing information needed to understand what relevant factors were omitted, and the relevant data the agency has not examined. It therefore satisfies the criteria for supplementing the AR. The Court should grant Petitioners' Motion to Supplement the AR with this Report.[30]

**2. Report of Investigation of Receptor Locations.**

Judge Hegarty relied upon the information presented by Dr. Rowangould to decide that the record "may not be complete" which was the reason for ordering limited discovery. It would not have been possible for the Court to know the record may not be complete without relying on the information provided by Dr. Rouwangould's PM10 Report. ECF No. 128-3, Ex. 32. For the same reason, the Court will need to refer to the report when reviewing Defendant's answers to discovery, and whether the agency actions are reasonable. For this reason, the record should be supplemented with the Rowangould PM10 report.

---

[30] In his opinion, Magistrate Judge Hegarty notes, but does not decide, Defendants' argument that it was not enough for Petitioners to have demanded in comments that FHWA model PM2.5 as required by EPA's hot-spot analysis procedures. Defendants contend Petitioners waived the opportunity to present the Rowangould evidence by not submitting it during the comment period. Professor Rowangould could not have performed the modeling analysis during the comment period on the FEIS because he relied upon the computerized data files containing the traffic and roadway data used by the agencies to estimate PM10 emissions from the Project for 2040 traffic. The data files available during the comment period on the FEIS (January 2016) were for 2035, which was not the correct analysis year required by EPA's conformity rule. The agencies changed the horizon year to 2040 to model emissions for the conformity determination, and changed the traffic model used to estimate future traffic. The traffic model used for 2040 estimated 12,000 fewer trips per day than the traffic estimated for 2035. Had Petitioners modeled 2035 traffic volumes, the results would be challenged as overestimating emissions, thereby discrediting the credibility of the analysis. The traffic data files for 2040 were not available until the comment period (January 2017) on the conformity determination for PM10. Comment on the FEIS was not opened again.

**3. Thurston testimony.**

The AR should be supplemented with pages 12-14 of Dr. Thurston's testimony (ECF No. 128-1, Ex. 28) because it provides an explanation for the Court of the evidence in the EPA *Integrated Science Assessment for PM* that is relevant to FHWA's determination that health effects below the level of the NAAQS are not a relevant factor in disclosing the impacts of Project emissions, or in the consideration of mitigation needed to protect community health. FHWA's omission of this factor goes to the heart of its obligations under NEPA and F-AHA to identify health impacts and provide meaningful protection for the affected families.

## CONCLUSION

Magistrate Judge Hegarty's Order should be vacated with respect to Exhibit 28 (Thurston Declaration), Exhibit 32 (Rowangould Declaration and "Report of Investigation of Receptor Locations Selected for Modeling"), and Exhibit 33 (Rowangould Declaration and report: "Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project Emissions of PM10 from the I-70 Project.").

Dated: April 20, 2018                        Respectfully submitted,

  /s/Robert E. Yuhnke
ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

  /s/Andrea S. Gelfuso
ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

  /s/Gregory N. Corbin
GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of April, 2018, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

/s/ Gregory N. Corbin
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

Brent Allen
Federal Highway Administration
Office of the Chief Counsel
Western Legal Services Division
Lakewood, Colorado
Brent.allen@dot.gov

*Of Counsel for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Harry Scott Morrow
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO  80203
(720) 508-6000
harry.morrow@coag.gov

*Attorneys for Defendant-Intervenors*