1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLORADO

3    Case No. 17-cv-01661-WJM-MEH
     _____

4    SIERRA CLUB, et al.,

5         Plaintiffs,

6    vs.

7    FEDERAL HIGHWAY ADMINISTRATION, et al.,

8         Defendants,

9    COLORADO DEPARTMENT OF TRANSPORTATION, and

10   SHAILEN P. BHATT,

11        Intervenor Defendants.

12   _____

13        Proceedings before MICHAEL E. HEGARTY, United

14   States Magistrate Judge, United States District Court for the

15   District of Colorado, commencing at 1:35 p.m., March 28,

16   2018, in the United States Courthouse, Denver, Colorado.

17   _____

18        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

19   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

20   _____

21              APPEARANCES

22        ANDREA GELFUSO, GREGORY CORBIN, and ROBERT YUHNKE,

23   Attorneys at Law, appearing for the Plaintiffs.

24   _____

25              SCHEDULING CONFERENCE

1                    APPEARANCES (Continued)

2              CARTER THURMAN, BRENT ALLEN, DAVID CARSON, MAYTE

3     SANTACRUZ, Attorneys at Law for Federal respondents.

4              JOHN PUTNAM, NICHOLAS DiMASCIO, Attorneys at Law,

5     appearing for the Intervenor Defendants.

6     _____

7                    P R O C E E D I N G S

8              (Whereupon, the within electronically recorded

9     proceedings are herein transcribed, pursuant to order of

10    counsel.)

11             THE COURT:  Case Number 17-cv-01661 and

12    17-cv-01679, Sierra Club, et el., vs. Federal Highway

13    Administration, et al.  Appearances, please, starting with

14    petitioners.

15             MR. YUHNKE:  Robert Yuhnke, lead counsel for

16    petitioners.

17             THE COURT:  Thank you.

18             MS. GELFUSO:  Andrea Gelfuso, petitioners.

19             THE COURT:  Thank you.

20             MR. CORBIN:  Greg Corbin, also for the petitioners.

21             THE COURT:  Good afternoon.

22             For the defense -- respondents.

23             MS. SANTACRUZ:  Good afternoon, Your Honor.  Mayte

24    Santacruz for Federal respondents.

25             THE COURT:  Okay.

1          MR. THURMAN:  And Carter Thurman for Federal

2   respondents.

3          THE COURT:  All right.

4          MR. ALLEN:  Brent Allen, Agency counsel for FHWA.

5          MR. CARSON:  David Carson, Federal respondents.

6          THE COURT:  Thank you.

7          MR. PUTNAM:  John Putnam for the Colorado

8   Department of Transportation.

9          THE COURT:  Very good.

10          MR. DiMASCIO:  Nick DiMascio, also for the Colorado

11   Department of Transportation.

12          THE COURT:  Okay.  So who will be speaking for the

13   petitioners this morning -- this afternoon?  Just you,

14   Mr. Yuhnke?

15          MR. YUHNKE:  Your Honor, I will present part of the

16   presentation, and my colleague, Mr. Corbin, will present

17   part.

18          THE COURT:  Very good, thank you.

19          And how about on the respondents' side.

20          MS. SANTACRUZ:  Your Honor, I will be doing a

21   portion of the presentation and Mr. Carter Thurman is going

22   to be doing the other presentation.

23          THE COURT:  Okay.

24          UNIDENTIFIED SPEAKER:  And CDOT reserves the

25   opportunity to make some additional comments.

4

1            THE COURT:  If necessary.

2            UNIDENTIFIED SPEAKER:  Yes.

3            THE COURT:  Very good.  Okay, thank you.

4            Any preliminary matters before we get started?

5            MR. YUHNKE:  No.

6            THE COURT:  Okay.  So how many in the gallery is

7       first time in federal court?  Anybody?  All right.  So I'm

8       going to take just a few minutes to explain what it is we're

9       doing.

10            When I was practicing law, I was with the United

11      States Attorney's Office and defended then Federal decisions,

12      including probably Federal Highway Administration decisions

13      regarding issuance of EISs or any kind of environmental

14      decisions.  So pretty familiar with the process.

15            Probably about 15, 20 years ago I actually set up

16      this administrative procedure's docket in this court when I

17      was an assistant U.S. Attorney.  John Kane and I set the

18      whole thing up because I did the majority of the APA work on

19      the Federal side, and so that's how we even created an APA

20      docket.  There wasn't one before that.

21            So, anyway, I have a lot of familiarity with the

22      issues we're talking about, having litigated those

23      extensively myself and having had some cases as a federal

24      judge.

25            So what we're doing today, Members of the Gallery,

5

 1    is trying to determine what the record should look like that

 2    the Court will look at to determine whether the Government's

 3    decision was arbitrary, capricious, and abuse of discretion

 4    or otherwise not in accordance with the law.

 5            So all we're doing right now is trying to determine

 6    which documents should be in the record that goes to U.S.

 7    District Judge William Martinez.

 8            I'm a U.S. Magistrate Judge, and in many of Judge

 9    Martinez' cases, I handle these kind of preliminary matters,

10    assembling the records.  Then when they're all assembled, the

11    parties will file briefs to the Court -- in this case, Judge

12    Martinez -- and Judge Martinez will issue a decision.

13            Every decision I make, even today when I'm making a

14    decision about what the record should look like, is

15    appealable to Judge Martinez immediately anyway.  So whatever

16    I decide in regard to the pending motions, either party can

17    appeal to Judge Martinez and he can issue a different

18    decision or he can affirm my decision.

19            So it's a long process, especially in a case like

20    this, an important process, obviously, but that's what we're

21    doing today.  So it's just in one stage in a multi-stage

22    federal case.

23            And do you even have a briefing schedule on the

24    merits?  You do?  When is your first brief going to be due?

25            MS. SANTACRUZ:  April 29 is the first one.

1            THE COURT:  All right.

2            MR. YUHNKE:  Your Honor, the way the order reads is

3    either April 29 or it's 30 days after you rule on these

4    motions.

5            THE COURT:  All right, good.

6            And so no matter, if that's beyond -- my ruling

7    will come down, most likely, next week and that's timing

8    considerations in connection with Judge Martinez, so that's

9    what will probably happen.  But let's say there was a delay

10   of some kind, you -- you believe no matter what, that 30 days

11   between the time of knowing what the record looks like and

12   the first brief will be enough?

13           MR. YUHNKE:  We do --

14           THE COURT:  Okay.

15           MR. YUHNKE:  -- yes.

16           One point I should point out, though, is that we've

17   requested discovery in this motion to complete the record.

18   And if that discovery is granted, we would ask that the

19   briefing schedule be modified to allow the issues that are

20   related to the discovery to be taken out of the opening

21   brief, but to keep the schedule for the remaining issues that

22   are not implicated by the discovery.

23           THE COURT:  Okay.  So you would file a supplemental

24   brief that would incorporate the information you've learned

25   during discovery?  Is that what you would propose or --

1          MR. YUHNKE:  We would process taking what are

2     called the Clean Air Act conformity issues --

3          THE COURT:  Okay.

4          MR. YUHNKE:  -- out of the initial briefing and

5     reserving those until we finish the discovery, but we would

6     keep the page numbers the same --

7          THE COURT:  Okay.

8          MR. YUHNKE:  -- the word limits the same.

9          THE COURT:  And how would that be advantageous?

10    Because, you know, Judge Martinez is not going to want to

11    issue serial decisions.  He's going want to have the complete

12    record and the complete briefing in front of him all at once.

13    It's just very awkward for to us deal with staggered briefs.

14         The thing is, his Chambers is not going to start

15    working on it until the last brief is in on the last issue.

16         MR. YUHNKE:  I see.

17         THE COURT:  It's just the way it works because we

18    have plenty of other cases that are fully briefed all at

19    once, and why would you spend your time working on something

20    for which all you're doing is a partial when you have to

21    await the final briefing, integrate that into what you've

22    already written?  It just is not efficient from our

23    standpoint.

24         I'm not speaking for him, per se, but I'm telling

25    you the way I, you know, can see it happening, is he would

8

1   wait until the matter is fully briefed and then start

2   reviewing it.  We don't even typically start reviewing these

3   things until the final brief comes in because there is plenty

4   of motions that are fully briefed right now.

5           Anyway, that's -- one other consideration is -- is

6   this Civil Justice Reform Act timeline where cases become old

7   or motions become old, if you are familiar with that at all.

8   But probably 15 years ago, at least, some judges around the

9   country were very slow in getting cases decided, so the Civil

10  Justice Reform Act put them on a naughty list that goes back

11  to Congress, if your motions are more than six months old.

12  And that's six months -- in this case, if you filed the

13  motion in April, it wouldn't be old until March 30 of next

14  year because it was filed after March 30, and so it's -- if

15  you understand -- it rolls over March 30 and September 30.

16  So anything filed between March and September is not old

17  until the next March.

18          So -- and that often drives a district judge's

19  to-do list is when things are becoming old and when they'll

20  go on a report back to Congress, not that they care that much

21  because they're appointed for life, but it just matters to

22  some of them.  And so your motion would not be old until

23  March 31 of 2019 no matter what.

24          So anyway, the couple considerations you might

25  think about in determining how you want to brief the matter,

1    you -- I don't think I would get in your way if you wanted to

2    stagger the briefs and the issues, but I don't think it would

3    be the most efficient way to proceed and it's not going to

4    get you a decision any earlier than it otherwise would, so

5    just think about that.  You don't have to decide right now

6    because we just -- it's kind of a -- not a ripe issue until

7    we know whether it's going to be discovered in the case.

8                MR. YUHNKE:  Yes.

9                THE COURT:  All right.  Anything else before we

10   launch into argument?  I guess, did you want to make some

11   kind of opening remarks?

12               MR. YUHNKE:  Yes, Your Honor, I would like to.

13               THE COURT:  Go ahead.  You have the floor.

14               MR. YUHNKE:  The central issue in this case is

15   whether or not the agencies have had adequate information

16   developed regarding the consequences of this project with

17   regard to the impacts it will have on community health.

18               When this project was first built in the 1960s,

19   there was no NEPA, there was no Clean Air Act, there was very

20   little evidence of the harm that air pollution causes to

21   public health.  Decisions were made in ignorance of the

22   public health consequences that would be visited upon these

23   communities by putting a major heavily traffic highway

24   through their neighborhoods.  NEPA was passed to remedy that,

25   to require that these agencies understand the consequences of

1    their decisions before they make them.  And NEPA also

2    requires agencies to use their resources and authorities to

3    restore and enhance the environment, and in this case, to

4    investigate the ways in which they could relieve these

5    communities of the harm they suffered over the last 50 years.

6            Now, in this case, all of the issues that we're

7    raising are related to health.  The consequences that this

8    project will have with regard to health has not been

9    explored, and we -- our burden is to demonstrate the ways in

10   which the agencies have failed to consider health.  And so

11   the documents that we've presented as exhibits are all for

12   the purpose of meeting our burden of showing how the agencies

13   did not consider health, which is relevant factor.  It's a

14   relevant factor by the fact that it's identified in NEPA

15   itself, as the primary purpose of NEPA is to protect health,

16   and it's also mentioned in the CEQ regulations as an impact

17   that is included within the scope of NEPA, an impact on the

18   human environment.

19           So in this case what we're faced with is a record

20   where the agencies have acknowledged that air pollution has

21   impacts on health and they've acknowledged some -- some

22   general evidence of the kinds of health impacts that are

23   related to exposure to air pollutants from highways, but what

24   they've not done, and consistently all of our -- our issues

25   really focus on this one question, what they've not done is

1    translate how that evidence informs the agencies regarding

2    the consequences for health within the community.

3            So they talk about acknowledging that the air

4    pollutants of concern here, which are primarily two forms of

5    particulate, PM10, which is smaller than 10 microns in size,

6    which are the particles that go into the upper lungs, and

7    PM2.5, which are the fine particles that go deep into the

8    lung and include particles that actually pass through the

9    lung into the bloodstream.  Those are the pollutants that the

10   EIS acknowledges will increase over the course of this

11   project, and increase significantly.

12           The road dust they say will increase 43 percent,

13   tail pipe emissions will increase about 10 percent.  And when

14   taken together, those have been modeled for PM10 only, and

15   that's one of our issues that they did not model for PM2.5,

16   shows that they will add 41 micrograms of PM10 to the

17   background concentrations.

18           That increase in exposure has not been translated

19   into health consequences for the community.  And what we

20   pointed out in our comments was that EPA has clearly

21   identified certain health outcomes as being the health

22   outcomes that are the diseases of air pollution.  Included

23   primarily among those where the causal connection is

24   strongest, and this is EPA, is cardiovascular disease, which

25   intuitively is not obvious, but it has to do with the fact

 1    that these particles actually enter the bloodstream.  And the

 2    other major health outcome that is not disputed in the

 3    literature is the impact on children with regard to

 4    developing asthma in the first place and then experiencing

 5    asthmatic episodes requiring hospitalization or urgent care.

 6           And what we have in this record, which the agencies

 7    have acknowledged, is the research done by the City of Denver

 8    for these communities that shows that those two disease

 9    outcomes are particularly elevated in these neighborhoods

10    compared to other neighborhoods in Denver.  For example, the

11    cardiovascular mortality in these neighborhoods is 213 per

12    hundred thousand, whereas in other areas in Denver that are

13    not affected by the interstate highways it's 160 per 100,000.

14           THE COURT:  This isn't just I:70?  Would it be 270,

15    25, 225 as well, corridors there in Denver, the testing that

16    you're talking about that shows higher concentrations?  Is it

17    just along I:70 or is it along the other interstate highways?

18           MR. YUHNKE:  These are -- the cardiovascular

19    diseases reported for the council district, city council

20    Districts 8 and 9.  8 includes the Elyria, Swansea and

21    Globeville areas.  So it's those neighborhoods, and District

22    9 and going east in 11.  So those are the council districts

23    that are along I:70.

24           THE COURT:  Okay.

25           MR. YUHNKE:  And those are the ones with the

13

```
 1    elevated incidence of cardiovascular mortality and elevated

 2    incidences of hospitalization of children for asthma, which

 3    is 40 percent higher in those neighborhoods than in other

 4    neighborhoods in Denver.

 5            So the disease outcomes that we're seeing in the

 6    community actually match what EPA says the health effects

 7    literature has been telling us, that these are the diseases

 8    of air pollution and they're showing up in these

 9    neighborhoods.

10            So what the agencies have acknowledged is that

11    these health outcomes are occurring and that they incorporate

12    into the EIS a recognition that this reflects the baseline

13    health status, but what they don't do is then look at how the

14    increase in exposure to these pollutants will affect that

15    health status in the community.  So that's the piece of the

16    puzzle that's missing.

17            They're not saying to the community, to the people

18    who will be affected or to the decision maker, these

19    increases in exposures will result in X number of more deaths

20    or X number of more hospitalizations of children or more

21    children actually coming down with asthma because of their

22    increased exposures.  That's the missing piece.

23            THE COURT:  Was that information in front of the

24    Agency when it issued its decision?

25            MR. YUHNKE:  This is -- this is information that we
```

14

 1   asked them to develop.  It's information that we felt they

 2   had an obligation to acquire and it's information that could

 3   have been acquired had they followed the procedures that are

 4   posted on the Agency website, which my colleague will speak

 5   to, and if they had used a modeling tool for PM2.5 that would

 6   tell us how much more exposure there would be to PM2.5, which

 7   they did not do.

 8           And if they had looked at the literature that

 9   Dr. Thurston discusses -- Dr. Thurston is the professor of

10   Environmental Medicine at NYU School of Medicine, who

11   submitted testimony for the Court to see what evidence was

12   available to the agencies that they did not consider that

13   would show that these impacts are quantifiable.  For example,

14   an 8 -- he reports that the studies showing that an 8/10ths

15   increase -- 8/10ths of a microgram increase in the pollutants

16   that come from diesel, which is known as elemental carbon --

17   it's the black soot that you see coming out of diesel

18   trucks -- is associated with a 6 percent increase in

19   cardiovascular mortality.

20           So there are ways to quantify how many more deaths

21   from cardiovascular disease will happen, none of which has

22   been done here, and that's the kind of information that needs

23   to be available to the decision maker to make an informed

24   judgment about whether or not these impacts are appropriate.

25           And in addition, we have two statutes involved

1    here.  We have post-NEPA, which you're probably familiar with

2    given your role in this over the years, but we also have

3    another statute that Congress passed.  The same Congress in

4    the same year that NEPA was signed passed another amendment

5    to the Federal-Aid Highway Act, requiring that the analysis

6    go further.  So while NEPA is focused on comparing

7    alternatives and considering mitigation, the supplemental

8    statute in section 109(h) 23 U.S. Code requires that the

9    Agency make a determination of whether or not this project --

10   once the preferred alternative is selected and (inaudible)

11   the comparison alternatives, is that preferred alternative in

12   the best overall public interest.  That's the language from

13   the statute.  It's a public interest test.  And public health

14   impacts are in that public interest determination.

15           THE COURT:  How are you hindered from making the

16   argument you just made to me under the current record?

17   Because you're making this argument, you're -- you'll be

18   obviously permitted to include that information backed by

19   scientific studies in your briefing.  So what I need to know

20   is, in what manner does the current record hinder you from

21   presenting the argument you just made?

22           MR. YUHNKE:  The argument that I just made I can

23   make, but there are responses that the Government has made.

24   For example, their primary argument is that they did not have

25   to look at these impacts on community health because all of

1    the exposures will be below the level of the national ambient

2    air quality standards.  So they have made a assumption that

3    if the air quality does not violate the standard, they can

4    assume that there will be no significant adverse impacts.

5              THE COURT:  And that's a legal issue that Judge

6    Martinez will have to decide, correct?

7              MR. YUHNKE:  It's a legal issue, but it's also a

8    factual issue.  It's a factual issue as to whether or not the

9    evidence shows that there actually are adverse impacts below

10   the ambient standard, because what Judge Martinez will have

11   to decide will depend on what's in the record.  And the

12   record that they developed did not include that.

13             What we argue was that the evidence from the

14   community shows that there are adverse impacts occurring

15   because these disparate health outcomes are occurring, but

16   the ambient standard hasn't been violated in these

17   neighborhoods for almost 20 years, but the health outcomes

18   are still happening.

19             So the question was whether or not EPA and the

20   professional peer-reviewed literature supports an inference

21   that there are no health effects below the ambient standard

22   or are there.

23             And so what Dr. Thurston's testimony focuses on is

24   the evidence that was in front of the EPA back in 2009 when

25   they last reviewed the science of particulate matter, and he

1    points out for the Court that EPA clearly identified health

2    consequences occurring below the level of the standard and

3    that EPA did not state that it was setting a standard at the

4    level that would protect against all adverse health and that

5    there is a body of literature since then that confirms that

6    these health effects are actually greater than what EPA

7    acknowledged in 2009.

8            THE COURT:  Is there precedent in the decisions

9    that EPA can't just simply rely on published standards saying

10   that the air quality is -- is below the threshold and,

11   therefore, we need not consider it?  Is there a precedent on

12   that issue?

13           MR. YUHNKE:  There are at least four courts,

14   appellate courts, that have accepted the agency's arguments

15   that they do not need to further investigate the impacts on

16   health if the air quality will be below the level of the

17   ambient standard, but in each one of those cases there was no

18   record to show that there actually are adverse health

19   consequences occurring below the level of the standard.  So

20   that's one of the reasons why we felt it was incumbent upon

21   us to come forward with the evidence to show that these

22   impacts are occurring even though the standard is met.  It's

23   for the Court to have a record in front of it to address that

24   issue.

25           THE COURT:  And why wasn't that evidence placed in

1       the record then before the decision?

2               MR. YUHNKE:  Well, we argued that the -- that the

3       agencies have the obligation.  We flagged the issue, we said,

4       you cannot rely on the ambient standard because adverse

5       health effects, number one, are occurring in the community

6       now, even though there are no adverse -- no violations of the

7       ambient standard, plus we've presented a few, a handful of

8       studies that were presented as examples of the kind of

9       research that has been developed since EPA last reviewed the

10      evidence, and we asked the agencies to conduct the

11      investigation, which is their duty under NEPA.  The CEQ

12      regulations clearly state in 1500.2 that it's the agency's

13      obligation to develop the evidence to sustain its decision.

14              Our obligation was to flag the ways in which it

15      failed to do that, which we did in our comments.  And so it

16      was only after they didn't do that that it was clear that we

17      would have to come forward with this kind evidence.

18              THE COURT:  Well, if you said there is four cases

19      and they go back two years, four years, ten years --

20              MR. YUHNKE:  Yes.

21              THE COURT:  -- aways, okay.  So if you were aware

22      of those cases, couldn't you anticipate that EPA would say,

23      We're not required to engage in those health studies because

24      it's below the ambient standard?  So you knew that would be

25      their litigating position, so wouldn't you have had the

1    opportunity then in the administrative process to say,

2    Despite precedent, here is the science showing that there are

3    health effects below those standards that have been

4    identified by the EPA and this is why you need to study it

5    even if there are cases before today have said that you

6    don't, those cases are wrong science and you need to in this

7    situation?  And then when they don't, you would have a basis

8    for argument then in this court, rather than waiting until

9    after the record is complete and a decision is made to bring

10   that kind of evidence in.  Do you get the gist of my

11   question?

12           MR. YUHNKE:  I understand your question, and the --

13   the answer is multifold.  Number one, we pointed out that

14   the -- that the most critical fact is the fact that these

15   adverse health outcomes were already occurring in the

16   neighborhoods affected by the existing I:70 emissions, even

17   though the ambient standard was being met.  So we were

18   stating that the record does not support the inference that

19   you want to draw from EPA's standard.

20           And the D.C. Circuit decision in reviewing EPA's

21   standard, which was a case that I litigated, the D.C. Circuit

22   said that we are not demanding that EPA set the standard at a

23   level that assures that the air will be safe.  That's not

24   what the Clean Air Act requires, that's not what EPA has done

25   here.  And EPA itself, which is something that we pointed

1    out, EPA itself in its decision on the ambient standard said

2    this standard does not protect against all adverse health

3    effects.  There are health effects occurring below the level

4    of standard.  That was -- that was subject of the litigation

5    back in 2002 whether or not that was lawful.

6              So while some other circuits, the Ninth and the

7    Fifth are the ones that I'm aware of offhand, have said that

8    the Agency could rely upon that assumption, those issues, the

9    D.C. Circuit decision, and the fact that health effects are

10   actually occurring, were not in the record before those

11   courts.  So we wanted to make sure that the record here was

12   complete.

13             And at the time that we were submitting our

14   comments, we went by the case law that said where our

15   obligation was, which we discussed in the reply brief on this

16   motion where the Supreme Court has said our obligation -- and

17   that's in the Public Citizen case -- our obligation is to

18   flag our objections to what the Agency has done and to state

19   our position, which we did clearly and in some detail.

20             It was not our obligation to actually go out and

21   find all the evidence, but the case law is clear that once we

22   come here to argue that they failed to account for something,

23   then we have an obligation to show what they did not

24   consider, which is what Dr. Thurston's testimony is submitted

25   for.

21

1          THE COURT:  Right.  It just seems to me that what

2    you're doing is arguing for an additional obligation that

3    case law hasn't placed on the EPA and so --

4          MR. YUHNKE:  This is Federal, of course.

5          THE COURT:  Pardon, Federal Highway Administration.

6    And so if they got up here and said, you know, we've -- what

7    you just said is, We met our obligation at the briefing -- at

8    the administrative level, they can stand up right now and

9    say, We've met our obligation at the Record of Decision

10   level.  This is what the Courts have told us to do.  That's

11   not a good enough argument though for you right now.  You

12   want a higher obligation than what some other Courts have

13   placed on them.

14         Now, what you're saying is the scientific

15   information wasn't front of those other Courts --

16         MR. YUHNKE:  Yes.

17         THE COURT:  -- but again I just don't -- I haven't

18   yet heard you explain why you couldn't have put that

19   scientific information in front of the Agency at the

20   administrative level.  Would you have been prevented from

21   doing that by anybody?

22         MR. YUHNKE:  Well, I would repeat that we put some

23   studies in front of the Agency.

24         THE COURT:  But what you're arguing is that the

25   studies you're wanting haven't even been created, that they

22

1   need to go out and create those studies, so that actually the

2   scientific data doesn't exist yet?

3          MR. YUHNKE:  The impact that the increased

4   emissions will have on this community is missing.

5          THE COURT:  Right.  It hasn't been generated yet,

6   that information has not been generated.

7          MR. YUHNKE:  The evidence that exposures below the

8   level of the ambient standard existed in EPA's record and

9   that was something we did cite to and that is something that

10  was available to them, but which they did not discuss.  The

11  EPA's assessment of the scientific evidence from 2009 we

12  cited in comments a couple of times, and it's not discussed

13  anywhere in the record.

14         So the question is, Did we have an obligation to go

15  beyond that?  That's really what you're asking.

16         THE COURT:  My question is, Did you have an

17  opportunity?

18         MR. YUHNKE:  I would say we had an opportunity to

19  do more.  The cost was something that there were no

20  clients --

21         THE COURT:  Sure.

22         MR. YUHNKE:  -- who were available to do that, and

23  I think that the public has a right to insist that the

24  Government perform its obligation to look at the science, and

25  especially when the issue is called out in the comments, and

23

1    there is some evidence pointing to the fact that they have

2    not acknowledged health effects occurring below the level of

3    the standard.

4            THE COURT:  Right.  This is probably going to be a

5    while, so if people would like to make some room, or actually

6    if you guys want to come up and sit in the jury box, you're

7    welcome to do that, okay.  It might be your only opportunity

8    to sit in a jury box in a federal courtroom.

9            (Inaudible discussion.)

10           THE COURT:  Go ahead.

11           MR. YUHNKE:  So the -- there is three exhibits that

12   fall into category of health effects.  One is Exhibit 28,

13   which is the testimony from Dr. Thurston, which addresses

14   this -- this question of what evidence was available showing

15   that health effects do occur below the level of the standard,

16   and also showing that increases in exposure will result in

17   increased adverse health -- health outcomes in the community.

18           And part of the Government argument was that they

19   didn't -- they didn't want to look at those outcomes.  I --

20   it's a question of how you go about doing it.  They argue

21   that the methodology wasn't available, but one of the things

22   that -- that we're going to ask to be -- that we have moved

23   to complete the record are methodologies that the Agency,

24   Federal Highway Administration and USDOT posted on their

25   website to identify the methodology for integrating health

24

1   impact assessments into the decision-making process, which

2   they did not apply in this case.

3          THE COURT:  Well, do you think it would be

4   inappropriate to cite to those sources in your briefing in

5   this case rather than just have them in the record, but you

6   cite to those web pages in your brief in footnote?

7          MR. YUHNKE:  Well, there is -- this is an issue

8   that my colleague is more prepared to address than I, but the

9   basic question is whether or not the Court can take judicial

10  notice of those documents if they are not in the record.  So

11  in an abundance of caution, we're asking that they be added

12  to the record.

13         THE COURT:  Understood.  Well, no, I don't think

14  you have to take judicial notice.  Briefs on these sort of

15  issues often cite to scholarly articles, law review articles,

16  studies, footnote them, attach them.  That's -- that's where

17  I'm having a little bit of a problem.  I think there is more

18  than one way to skin a cat and this might be, you know, a

19  solution to looking for a problem.

20         So I'm not -- I'm not sure that we have to go

21  through that formal trouble of expanding the record, which as

22  you know under precedent is difficult to do, when there might

23  be another way to get material before Judge Martinez, and

24  if -- if he believes it's worthwhile, he'll consider it, and

25  if he doesn't, he won't, which is the same thing that he

1   would do if it was in the record as a matter of part of the

2   decision.

3          MR. YUHNKE:  Well, I think the case is law is not

4   that difficult.  The case law recognizes two exceptions that

5   we rely upon here.  One is that the Agency failed to consider

6   a relevant factor, and we can submit evidence for the purpose

7   of demonstrating that a relevant factor was omitted from

8   Agency consideration, and all of these documents relating to

9   health are related to health as a relevant factor.

10          The second issue is a failure of an agency to

11   consider relevant evidence or data, and the data that

12   Dr. Thurston discusses is the evidence that the Agency didn't

13   consider, even though we asked them to do an investigation.

14   So I think the Court needs to have in front of it in order to

15   determine whether or not the agencies properly or improperly

16   addressed these issues, what the evidence is that they

17   declined to go investigate.  That's what it's being submitted

18   for.  And those exceptions are well recognized.

19          THE COURT:  Understood.

20          MR. YUHNKE:  And one -- one of those documents that

21   fall into the category of health impacts is the report by

22   Dr. Jonathan Heller, who has summarized the literature of

23   health impact assessment to demonstrate how that technology

24   or methodology has evolved over the last ten years to become

25   an effective administrative tool for agencies to evaluate

1    health impacts.  And it's something that my colleague will

2    reference again, but that the documents from the Federal

3    Highway Administration website identify health impact

4    assessment as a tool that's available for evaluating health

5    impacts, but there is no mention of that guidance in the

6    record.  There is no rationale for the Agency to argue that

7    it should not be applied in this circumstance.

8            So what we've presented from Dr. Heller is an

9    explanation of how that methodology would be applied had it

10   been applied in accordance with Agency guidance, and I think

11   it's important -- we're submitting it because it provides a

12   demonstration for the Court, for Judge Martinez, about the

13   kinds of evidence that was not examined that should have been

14   examined, and that's why it's being offered to meet that

15   burden.

16           Now, there is some modeling studies that we have

17   also offered, and I don't know if we want to -- if you would

18   like to hear from the Government on this point before we go

19   on or should we go through our whole presentation first?

20           THE COURT:  No, we'll stay with this issue.  So

21   let's hear from the Government.

22           MR. YUHNKE:  Okay.

23           THE COURT:  Okay.

24           MR. THURMAN:  Good afternoon, Your Honor.

25           THE COURT:  Good afternoon.

1          MR. THURMAN:  Carter Thurman for the Federal

2   Highway Administration.  Petitioners' request to supplement

3   the record should be denied for the two reasons that we've

4   been discussing this morning.  The first is that the

5   materials that petitioner submit don't show that FHWA failed

6   to examine a relevant factor, and I know there is some

7   discussion this morning about a second exception, a relevant

8   evidence exception, and we would take the position that

9   that's not a standard that has been -- I think the word was

10  routinely applied.

11          And then, second, petitioners, as you mentioned,

12  Your Honor, or hinted at, could not submit the material for

13  the first time in court, thereby depriving the agencies the

14  opportunity to accept the material, look at the material, and

15  respond to the material in the appropriate manner.

16          And so for the first issue, while the Tenth Circuit

17  has recognized certain exceptions to the record review rule,

18  it stressed that all of those exceptions are extremely

19  limited.  And here there are two exceptions that are being --

20  I think there are actually three exceptions that are being

21  argued, the failure to analyze a relevant factor, whether or

22  not the record is so complex or there is some technical

23  matter that needs explaining, and then the relevant factor --

24  relevant evidence standard.

25          And plaintiffs cite the -- I think they only cite

28

1    Native Ecosystems vs. Salazar case for the proposition that

2    one of the exceptions is whether or not the evidence is

3    relevant.

4         And while the Court in Salazar was analyzing

5    whether supplementation was appropriate, it clearly cites the

6    Tenth Circuit case in Custer County which outlined number by

7    number the five exceptions that are recognized in the Tenth

8    Circuit for supplementation, and those five exceptions do not

9    include a relevant evidence exception.

10        And further, it's not clear from the Salazar case

11   that they're even applying a relevant evidence standard.  The

12   Court simply notes that while it's appropriate in some

13   manners to allow supplementation, that's where it's necessary

14   to determine whether an agency considered relevant factors.

15        And so despite the petitioners' claim that relevant

16   evidence is often admitted in the Tenth Circuit, any

17   deviation from the record review rule requires a strong

18   showing, and that makes sense.  To accept a relevant evidence

19   standard would essentially require this Court to be applying

20   a discovery standard in a de novo trial setting, and that is

21   in line with Owen House's (ph) explanation that limiting

22   judicial review to the record protects the integrity of the

23   administrative process.

24        And additionally, even if the relevant evidence

25   standard was applied in Salazar, that case involved an

1    agency's decision to delist a species under the Endangered

2    Species Act.  In their the documents in dispute were -- were

3    documents that were created by the Agency in furtherance of

4    their statutory and regulatory obligations to consult with

5    other agencies about that delisting process.

6            In contrast here, none of the documents were

7    created by the Agency.  These documents were not created in

8    furtherance of the I:70 project.  They were not required to

9    be completed by statute or regulation.

10           To the second issue is the issue of whether

11   petitioners were required to bring this information forward

12   to the agencies during the NEPA process.  And here the

13   agencies have been planning the I:70 improvements for over a

14   decade.  They performed extensive public outreach, numerous

15   comments and opportunities.  And in fact, petitioners did

16   participate in this process.  They submitted information.

17   The Agency took that information and reviewed that

18   information and responded in comments.

19           And an example of this is the Heller declaration.

20   I think it's Exhibit 34 to plaintiffs' motion to supplement.

21   And this declaration, as I understand it, explains the

22   analytical principles and procedures that are implemented

23   when a health impact assessment is performed.  And, however,

24   the agencies reviewed petitioners' comments on HIAs during

25   the comment.

1          In here, if we look to the FEIS, attachment Q at

2     part 1, we'll find the 23-page comment letter by the Sierra

3     Club.  The first section is entitled Health Impact

4     Assessments are Required, and right next to those comments,

5     you'll see a response from the Agency explaining why the HIA

6     is inappropriate in this instance.

7          Now, petitioners take issue with the idea again

8     that they were required to retain experts and provide their

9     expert opinions during the NEPA process, but that is the

10    process that the APA and NEPA envisions, and Your Honor

11    outlined that process pretty -- very accurately a few moments

12    ago when the example was given when if this information would

13    have been submitted to the Agency during the NEPA process, it

14    would have given the Agency the ability to evaluate and

15    respond to plaintiffs' experts' evidence, to even modify the

16    NEPA analysis if it's warranted, to place both the

17    petitioners' opinions and the agencies' opinions in the

18    record so that the public, the agencies, other agencies and

19    this Court could review it under the record and the decision

20    that was made.

21          THE COURT:  Did the Government consider an SIR in

22    this case at any time?

23          MR. THURMAN:  I'm sorry, Your Honor.

24          THE COURT:  An SIR?  Does anybody know what an SIR

25    is?

1            MR. THURMAN:  The supplemental information report?

2            THE COURT:  Yes.

3            MR. THURMAN:  Yes.  I am -- I would have to check

4    with Agency counsel if we ever considered that.

5            THE COURT:  Mr. Yuhnke, do you know what that is?

6            MR. YUHNKE:  I've never seen one done.  I've seen

7    some litigation about it.

8            THE COURT:  So it was common when I was doing this

9    kind of work, and what would happen is if after the Record of

10   Decision was issued, the Government came into information

11   that might have impacted its decision, it did a supplemental

12   information report with the concurrence usually of

13   petitioner.  Took a while sometimes, six months to a year,

14   but it was essentially a supplement that allowed the

15   Government to go ahead and consider evidence that we might

16   all agree could be relevant, you know, without the Government

17   conceding that its initial decision was invalid.  Just

18   wondered if it was considered here, whether or not it would

19   be considered an appropriate situation.

20           MR. THURMAN:  I don't know that it has been

21   considered at this point.

22           THE COURT:  Okay.

23           MR. THURMAN:  And so --

24           THE COURT:  Yes, go ahead.

25           MR. ALLEN:  Your Honor, this would be different

32

1    than a supplemental (inaudible).

2            THE COURT:  Yes.  It's different than a

3    supplemental.  It's called an SIR, supplemental information

4    report.  It was very common.  We used to do them all the

5    time.  It was just an addendum to the original Record of

6    Decision and, you know, it basically honestly was intended by

7    the Government to bolster its position and sometimes it met

8    the concerns of the petitioners and sometimes it didn't.  It

9    wouldn't affect the ability of the petitioners to continue

10   with their challenge.  It just would give everyone an

11   opportunity to consider additional information, and if that

12   made a difference, it makes a difference arranged if it

13   doesn't, it doesn't.  I don't know.

14           MR. ALLEN:  I'm not familiar with those.  As far as

15   I know, I've not heard of one at FHWA.  We do have a process

16   for doing supplemental Environment Impact Statements.  We

17   require withdrawing the ROD, but as far as a post-ROD

18   analysis --

19           THE COURT:  Sure.

20           MR. ALLEN:  -- there is no mechanism that exists at

21   the Agency that I'm aware of.

22           THE COURT:  Yeah, I'm not sure that it's a formal

23   mechanism that exists in any regulation or policy, but it

24   used to be done all the time.  So just a thought.

25           MR. THURMAN:  That would conclude my big points

1    about why the supplementation motion should be denied.

2         THE COURT:  Okay.  The major point that maybe has

3    some traction is this.  There was data that could be

4    generated that wasn't, so obviously they couldn't put that in

5    front of the Government unless they had spent a lot of money

6    conducting an investigation and analysis that they claim the

7    Government should have.  So their position would be, Why

8    should we have to spend that kind of money when it's actually

9    the Federal Highway Administration's obligation to spend it

10   and engage in those tests and analysis about how many more

11   incidence of cardiovascular disease or asthma-related

12   episodes might occur at such and such an increase in

13   particulate.

14        So I think Mr. Yuhnke said that that work hasn't

15   done, the information is not there, but could be there.

16   Well, how do you respond to that?

17        MR. THURMAN:  There are a lot of questions that

18   could be answered.  The question that needs to be answered in

19   this hearing is whether or not they met the motions -- the

20   standard for supplementation --

21        THE COURT:  Right.

22        MR. THURMAN:  -- but also eventually will have to

23   determine whether the agency's ROD, their decision stands on

24   the record, and whether we were justified in relying on case

25   law out there that tells us what our standards are and what

1    analysis has to be done.

2          THE COURT:  Right.  Things do change over time and

3    precedent, you know, is overruled or at least not agreed with

4    by certain courts, so that's how we develop case law, one

5    case at a time, but I understand.  I mean, it seems safe

6    given the fact that there is precedent, okay.

7          Mr. Yuhnke, do you want to wrap up?

8          MR. YUHNKE:  On A couple of points.

9          THE COURT:  Wait, hold on.  Yes, please.

10         MR. DiMASCIO:  Just to pick up on your question

11   about the sum men tail information report.  One thing I do

12   want to point out to Your Honor is that this NEPA process was

13   an extremely long endeavor.  I believe -- and I can't

14   remember the precise number of years.  I think it was close

15   to a decade long from start to finish.  There was a draft EIS

16   produced.  There was a supplemental draft EIS produced.

17   There was a final EIS produced on which they also took

18   comment.  There was a draft conformity determination and then

19   finally a ROD.  And in each one of those stages there was the

20   opportunity to present comment and engage with the Agency on

21   the substance of the decision-making.

22         At some point you've got to call it good and the

23   process has to come to an end.

24         THE COURT:  Well, at any time during that process

25   did these petitioners or any other entity ever say to the

1    Federal Highway Administration, here is some scientific

2    analysis that shows that even at levels below ambient

3    standards health impacts are significant, look at it?  Was

4    that done?  Was that argument presented?

5            MR. DiMASCIO:  There were -- I can't name the

6    precise comments, but there were comments provided by the

7    Sierra Club that I think, you know, maybe broadly could be

8    described to state that type of assertion.  To the extent

9    that they actually cited to specific studies or specific

10   information that they thought was relevant to that issue, it

11   was specifically responded to by the agencies at the

12   administrative record point that my colleague gave you.

13           THE COURT:  Okay.

14           MR. DiMASCIO:  And so to the extent that the

15   information was, in fact, placed in front of the Agency, the

16   Agency did respond to those -- to those comments and give its

17   explanation for why further development of that information

18   was not warranted.

19           And so --

20           THE COURT:  What was that explanation?

21           MR. DiMASCIO:  Well, just to briefly summarize, so

22   I think -- and I hope Your Honor will understand, opposing

23   counsel -- we don't obviously entirely agree with opposing

24   counsel's characterization of our argument.  I think if you

25   would like to know the nuance of how -- of how position, best

1    place to look is in ECF number 96 where we lay out our

2    opposition to their motion for a stay, and that goes into

3    detail into the reasons for the legal argument for why the

4    agency's analysis here was sufficient.

5            But to paraphrase or briefly summarize what that

6    argument is, essentially what the Clean Act Air says -- and I

7    don't have all these citations at my fingertips here right

8    now -- but what the Clean Air Act says is that EPA is

9    required to set the National Ambient Air Quality standards at

10   a level with an adequate margin of safety to protect the

11   public health.  And that includes with respect to sensitive

12   populations.

13           There are certain procedures that are prescribed by

14   the Clean Air Act in order to investigate conformity with

15   those NAAQs.  Those include hot spot modeling in certain

16   circumstances.  The only time hot spot modeling is

17   specifically required is when an area is non-attained or

18   maintenance area for those facts.  And so that's why the

19   Agency did the conformity analysis that it did that's in the

20   record for PM10.  PM2.5 is a pollutant for which the Denver

21   area is in attainment and so no hot spot analysis was

22   required; but the agencies didn't stop there.  They also

23   under NEPA did an additional analysis of all of these air

24   pollutants using a different technique called an inventory

25   analysis, which essentially looks at these modeling to

1    predicts the types of emitters that you're going to have in

2    the future and figure out what volume of pollutants would be

3    attributable to the project.

4            And what analysis showed was that there was a

5    negligible difference between the no-action alternative and

6    any of the action alternatives.  And so for NEPA purposes

7    what the Agency essentially concluded was, even if the

8    project is built, there is not going to be a significant

9    change in the volume of emissions compared to if they did

10   nothing and didn't do the project.

11           So that -- that in a nutshell I think is -- is the

12   legal argument that underlies the briefing that's pending

13   before Judge Martinez.  And the explanation that you'll find

14   in the record, in the comment responses, is that this

15   additional study that they -- that the plaintiffs are

16   demanding simply wouldn't -- it's either not required by the

17   Clean Air Act, which again those standards are set in order

18   to protect public health by the EPA, which is an agency that

19   has much more expertise in the health of effects of air

20   pollutants than even the Federal Highway Administration does,

21   with all due respect to the Federal Highway Administration,

22   of course.  And they did an inventory analysis that -- they

23   took a different approach essentially than what the

24   plaintiffs are asking now that they should have done.

25           And it seems that what the plaintiffs think that

1    they should have done is to somehow quantify, as opposing

2    counsel was saying, you know, the number of additional asthma

3    attacks that would -- that would result, or the number of

4    additional cases of cardiovascular disease that would result

5    from air emissions that are compliant with the NAAQs, and to

6    get down to that level of quantification is simply

7    something -- I mean, number one, it would be extremely

8    difficult to do.  And if they thought they had a methodology

9    for doing it, the question is, why didn't they present it to

10   the Agency and say, Here is the methodology that you should

11   follow, and this is why if you don't do this methodology, we

12   think that you'll be in noncompliance with your legal

13   obligations.

14        THE COURT:  And you're saying they did not do that.

15        MR. DiMASCIO:  They did not do that.  They never

16   did that until they came into this Court and filed expert

17   declarations to that effect.

18        Now, this argument that -- that we're hearing

19   about, oh, all we have to do is raise an issue, and then

20   subsequently if we just put the issue on the table, it's the

21   agency's duty to go out and develop all of this information

22   that we haven't given it, well, Your Honor, that is flatly

23   contradicted by Tenth Circuit precedent.

24        In New Mexico Environmental Improvement vs. Thomas,

25   it's a Tenth Circuit case, that rejected just that argument.

1    It said, you have a duty as a participant in the

2    administrative process, to raise the information that you

3    think the Agency needs to look at.  If you think that

4    additional information is needed, you need to -- or

5    additional analysis, if you have it, put your cards on the

6    table and allow the Agency to evaluate it.

7         And the whole reason for that process is to improve

8    the agency's decision-making.  So it would create a perverse

9    incentive if you were to allow this standard that they've

10   essentially made up, if we just raise an issue, then we can

11   throw whatever evidence we want in in the court.  That would

12   create this perverse incentive.  You just throw a bunch of

13   comments in the record on various types of information that

14   you think, you know, theoretically could be out there and

15   developed, and then later you sandbag the Agency by coming

16   into Court and attacking the ruling based on information that

17   could have been available to you at the time.

18        THE COURT:  Understood.

19        MR. DiMASCIO:  So to take Dr. Thurston's

20   declaration as an example, you know, there is no reason that

21   that analysis and those studies in Dr. Thurston's declaration

22   couldn't have been put in front of the Agency during the

23   comment process.  It was all available.  They just chose to

24   hire him after the ROD was --

25        THE COURT:  Would it have been appropriate for them

1     to attach it as an exhibit and cite to it in their briefing

2     on their merits here?

3          MR. DiMASCIO:  It would be entirely inappropriate

4     to do that.  It's an expert declaration that is outside the

5     record and that the Tenth Circuit's case decision in Lee (ph)

6     says is inappropriate to supplement the record.

7          THE COURT:  Well, it's -- you would -- you would

8     argue it's inappropriate for the record in any circumstance,

9     even if it was submitted before the ROD.

10          MR. DiMASCIO:  If it were submitted before the ROD

11     and the Agency -- if it were given to the Agency and they

12     placed it in their comments and they said, Here is

13     Dr. Thurston's analysis of all of these studies that show why

14     there are health impacts below the NAAQs and we would like

15     you to take this into consideration and analyze this

16     information before you make your decision on the project,

17     then the Agency would take a look at that and presumably

18     would have an obligation to respond to that comment in the

19     record.  You would see in the comment responses some

20     response.  If they didn't, then petitioners would be standing

21     here saying that the Agency had violated its duty to respond

22     to comments.

23          THE COURT:  So there is nothing wrong with it, per

24     se, it's just the timing what you're saying?

25          MR. DiMASCIO:  I think the timing is a big -- is a

1    big piece of it, yeah.  And the fact that it's being

2    submitted in Court in the first instance.

3            Now, let me put it this way.  If the Agency comes

4    back and explains why it disagrees with the -- with the

5    statements that Dr. Thurston is making, his analysis of the

6    studies and why there are health impacts below the NAAQs, if

7    it comes back and disagrees and it provides its expert

8    explanation for why it disagrees with Dr. Thurston's

9    analysis, then the Agency has the authority to rely on its

10   own experts.  The case law is very clear that when you get

11   this kind of conflicting expert information, the Agency can

12   clearly rely on its own experts in order to refute an expert

13   declaration that was put into the record.

14           So I'm not saying that if it had been put into

15   record, it would create a problem, but I am saying that the

16   fact that it wasn't put into the record and the Agency never

17   had an opportunity to analyze it and give its explanation is

18   not an excuse for putting it into the -- for supplementing it

19   into the record in court afterwards.  And the Lee (ph) case

20   and the New Mexico Environmental Improvement vs. Thomas case

21   are very clear on that point.

22           THE COURT:  So let's say that they did include it

23   if in their briefing, you would move to strike it, it sounds

24   like?

25           MR. DiMASCIO:  If they cited that declaration in

1    their merits briefing, then we would move to strike it, yes.

2          THE COURT:  Can I ask you a couple questions that

3    don't go directly to the issues in front of us, but I'm

4    interested anyway?

5          MR. DiMASCIO:  Sure.

6          THE COURT:  Did the ROD recommend any changes or is

7    there any mitigation that it put into the project?

8          MR. DiMASCIO:  There is a lot of mitigation built

9    in the ROD, sure.

10          THE COURT:  Okay.

11          MR. DiMASCIO:  There is an entire section of the

12    ROD that details multiple mitigation measures.  And what was

13    the first part your question again?  Did it recommend any

14    changes?

15          THE COURT:  Right, in the project.

16          MR. DiMASCIO:  In the project, yes.  I mean,

17    throughout the course of this project certainly there were

18    changes that -- that were made.  So initially, for example,

19    the cover over I:70 was not included in the design of the

20    project.  That was something that came out of the comment

21    process on the draft EIS.  It was in response to concerns

22    from the community about the impact of expanding the highway.

23          And it was only in the supplemental draft EIS that

24    the Agency kind of shifted over and said, Well, we're going

25    to make this covered design the preferred alternative for the

1    project because we think it's better for the community as a

2    whole, it will help to mitigate some of the health impacts

3    that are being -- that are of concern to the community.  It

4    will help to connect these divided neighborhoods that have

5    been divided since the 1950s when the highway was built.  So,

6    yeah, there was a lot of development over the nine-plus year

7    process.  There was a lot of development in the design of the

8    project in response to community input and concern.

9              THE COURT:  Okay.

10             MR. DiMASCIO:  Unless there are any further

11   (inaudible).

12             THE COURT:  You're up.

13             MR. YUHNKE:  Your Honor, if I may, I would like to

14   offer a little bit of rebuttal to some of the points that

15   counsel made --

16             THE COURT:  Of course.

17             MR. YUHNKE:  -- and then move on to the next

18   exhibit.

19             THE COURT:  Very good.

20             MR. YUHNKE:  First of all, with -- what's really

21   critical here I think is the way the administrative process

22   is structured and what the various burdens at each stage.

23   And the case law I think is quite clear that the obligation

24   of the public that will be affected by a project is limited

25   to identifying the relevant factors that the Agency has not

44

1    addressed making it clear in our comments what we think they

2    missed, and if we don't raise those issues in the comments,

3    then we are clearly out of court, there is no question about

4    that.

5             Now, the New Mexico case study cites, stands for

6    that proposition.  It was not a case where the New Mexico

7    Agency was essentially disposed of by the Court on the

8    grounds that the Agency failed to submit evidence.  What they

9    didn't do was to object to a methodology that EPA used for

10   making the determination that the standard had not been met.

11            So what the Court held was that because New Mexico

12   was silent on EPA's methodology, did not file objections,

13   that they could not then come into Court and argue that EPA

14   applied an improper methodology.

15            THE COURT:  But what about the proposition that a

16   comment can't just shotgun 10 or 15 issues without providing

17   any scientific or analytic or evidentiary basis and suddenly

18   that puts an obligation on the Government to look at each one

19   of those 10 or 15?  I think that's kind of what he said that

20   can't happen, that that burden is not on the Government

21   when -- when somebody raises issues that, you know, either

22   may or may not be there, but in any event, they don't provide

23   a much background or support for the proposition?

24            MR. YUHNKE:  Well, I think that the Government does

25   have an obligation to respond if a comment says, Here is a

1    relevant factor and here is the kind of evidence that would

2    allow you to address that factor and you do not address it in

3    this EIS -- in this draft, supplemental, whatever.

4          And at that point the Government can either respond

5    by saying, We don't think that's a significant impact and

6    describe whatever reasons they have for making a finding that

7    it's not significant because under NEPA everything is -- you

8    know, if it's not significant, you don't have to address it.

9          THE COURT:  Sure.

10         MR. YUHNKE:  And if it is significant, do you.  And

11   here all of the issues that we are raising today were raised

12   in comments.  We filed over 80 pages of comments at the SDEIS

13   stage.  I think it was 24 pages.  At the FEIS stage, it was

14   close to 40 pages.  And then we filed comments on the

15   conformity determination just before the ROD.  Those comments

16   went into significant detail.

17         With regard to the issues that are addressed by

18   Dr. Thurston's testimony, for example, you know, there were

19   three critical questions.  One is, are there health effects

20   occurring below the level of the ambient standard, which

21   we -- we called out with some level of detail and offered a

22   couple of studies.

23         THE COURT:  Can I stop you right there?  I have a

24   question.  Again, it not go directly to what we're doing

25   today, but has that -- have those ambient standards been

1    challenged as insufficient, inadequate in any kind of

2    proceeding?

3              MR. YUHNKE:  Yes.  That was the case that I

4    litigated in the D.C. Circuit back in 2002.

5              THE COURT:  Okay.  And the decision was?

6              MR. YUHNKE:  The decision from the D.C. Circuit was

7    that -- that what we relied upon in that case was EPA's

8    admission that there were still health effects that would be

9    occurring below the level of the ambient standard.

10             THE COURT:  Right.

11             MR. YUHNKE:  And we argued that the statute didn't

12   allow them.

13             THE COURT:  Right.

14             MR. YUHNKE:  And the D.C. Circuit held, We are not

15   going to hold EPA to a test of determining what level is

16   safe.

17             THE COURT:  Right.  So isn't that essentially then

18   a political question?  I mean, if you want relief on that

19   one, you need to go to Congress and have them direct that

20   these standards be changed?  Isn't that a decision that --

21             MR. YUHNKE:  Those -- those standards apply under

22   the Clean Air Act, but they do not determine the limits of

23   what the Agency duties duty is under NEPA and under the

24   Federal-Aid Highway Act.

25             THE COURT:  No, but your argument is those

1    standards are insufficient.  I mean, now --

2              MR. YUHNKE:  Yes, they are --

3              THE COURT:  We now know much more than what

4    those --

5              MR. YUHNKE:  No, we're not arguing -- we're not

6    challenging the standards in this case.

7              THE COURT:  No, I know you're not directly

8    challenging the standards because you can't.

9              MR. YUHNKE:  We can't.

10             THE COURT:  But you are essentially saying that the

11   standards don't meet public health requirements.

12             MR. YUHNKE:  And we're saying that EPA acknowledged

13   that when they set the standards.  We challenged that.

14             THE COURT:  Right.

15             MR. YUHNKE:  The D.C. Circuit said, We're not going

16   to hold EPA to a tighter standard than the one they applied

17   themselves.  And that all acknowledges that there are health

18   effects occurring below the level of the standard.  So in the

19   context of NEPA, that represents a health effect, a

20   recognition that health effects are occurring that should be

21   disclosed to the public and the decision maker in making the

22   judgment as to whether or not this -- this project is, quote,

23   in the overall best public interest, which is the phrase from

24   the Federal-Aid Highway Act.

25             That determination of how many more deaths will

48

1    occur is relevant to the public interest and must be

2    considered, but it wasn't.

3            THE COURT:  Yet I just see -- I envision a Court

4    having a hard time saying that a decision by the FHA is, you

5    know, not in compliance with the law or is arbitrary or

6    capricious when they're relying on prevailing law in

7    rendering the decision and then deciding that it would not be

8    appropriate to look at the effects if, in fact, the ambient

9    standards are being met.  I'm envisioning a problem there for

10   the petitioners on that particular issue.

11           MR. YUHNKE:  But that prevailing law includes the

12   decision from the D.C. Circuit, which acknowledged that

13   health effects are occurring below the level of the

14   (inaudible).

15           THE COURT:  Right, but apparently --

16           MR. YUHNKE:  And that that's legally permissible

17   and in this case we're --

18           THE COURT:  Politically permissible, right.

19   Congress has made a decision or the Government has made a

20   decision that, yes, there might be health impacts, but below

21   the standard it's just not -- we're deciding that it's not

22   enough.  That's basically what has happened, right?

23           MR. YUHNKE:  But what NEPA requires the Agency to

24   do is to make a judgment about whether or not the

25   environmental consequences of a particular action are

1    justified.

2              THE COURT:  Right.

3              MR. YUHNKE:  It doesn't -- NEPA doesn't say you

4    can't do this.  It says you just need to make an informed

5    decision understanding what the consequences are, and in this

6    case the consequences are extreme.  They include mortality,

7    they include childhood health, and those consequences were

8    not discussed in this document.

9              THE COURT:  So you're saying you believe that the

10   Government did not consider those consequences?

11             MR. YUHNKE:  They say they didn't have to and they

12   didn't.

13             THE COURT:  Okay.

14             MR. YUHNKE:  And there were three issues that we

15   raised in our comments.  One was that EPA acknowledged that

16   the standard didn't protect against all health effects.  The

17   second one was that there is new evidence that emerged since

18   EPA took its action in 2012 and the new evidence shows that

19   the effects are even greater than what EPA understood to be

20   the case back in 2012, and third is that setting standards

21   under the Clean Air Act is on a pollutant by pollutant basis.

22             And when EPA sets a standard, it sets it just for

23   the health effects of that pollutant.  So when they're

24   looking at the evidence of PM10, they're not looking at the

25   evidence of the consequences of the PM10 being admitted along

1    with the nitrogen oxides, the carbon monoxide, the PM2.5, the

2    benzene, the formaldehyde, the acetylene, the 1,3-Butadiene,

3    all the other hazardous pollutants that are in this plume

4    coming off the highway.

5          THE COURT:  Right.

6          MR. YUHNKE:  And that's the kind of evidence that's

7    never been evaluated by EPA as part of a standard setting

8    process from which any inferences can be drawn.  And when we

9    raise that issue, that what they needed to look at was the

10    consequences of being exposed to this complex mix of

11    pollutants in the community, there was no answer.

12          THE COURT:  Okay.

13          MR. YUHNKE:  There is nothing in this record that

14    addresses that issue.  And that's one of the things that

15    Dr. Thurston addresses to explain how you would go about

16    looking at that and why it's important for the purpose of

17    understanding what relevant impact this decision, relevant

18    factor in making this decision was ignored.

19          THE COURT:  But what is it in the record that put

20    the Government on notice that they need to look at this

21    dangerous cocktail versus looking at the particulates in

22    isolation one by one?

23          MR. YUHNKE:  Yes, in our comments we raised that

24    issue twice --

25          THE COURT:  Okay.

1          MR. YUHNKE:  At the SDEIS stage, and at the FEIS

2     stage.

3          THE COURT:  Okay, all right.

4          MR. YUHNKE:  Yes.  In some detail.

5          THE COURT:  Very good.

6          MR. YUHNKE:  And counsel was talking about

7     protecting the administrative process.  That again comes back

8     to where the burdens lie.  We want to protect the

9     administrative process too, and from our standpoint, what

10    that means is that when we raise these issues, it should be

11    addressed rather than ignored, and this is an example of this

12    cumulative impact is an issue that was ignored.  And to

13    protect the administrative process, we're asking the Court on

14    the merits briefing, which is not in front of you right now,

15    to remand this so that the Agency can consider these impacts.

16    That's the central issue in the NEPA litigation --

17         THE COURT:  Sure.

18         MR. YUHNKE:  -- what did they miss.  We want to

19    protect the administrative process very much.  And when they

20    say that they responded to comments that this process has

21    dragged on for years, yes, in 2008 there was a draft EIS

22    release and the central comments from the environmental

23    community, which were then filed by the law clinic at DU, was

24    the failure to address health effects.

25         And laying out in those comments some of the

1  methodologies that had been available had been identified by

2  then, 2008, we identified health impact assessment in our

3  comments, which was a methodology that had been developed

4  more carefully, more comprehensively than what was available

5  in 2008 and they rejected that, but it's not that we didn't

6  propose a methodology.  We specifically asked for Health

7  Impact Assessment and Health Impact Assessment is something

8  that my co-counsel will address because it was on the Federal

9  Highway Administration website as a methodology that they

10  recognized as being appropriate for addressing health impact

11  Assessments and there is no word about it in this decision

12  about why that methodology wasn't used.

13        So let's go on, I think, Mr. DiMascio's discussion

14  of the PM2.5 methodology as the segue into the next exhibits.

15  What we've submitted to supplement the record is a modeling

16  analysis of PM2.5 emissions.  This is a modeling analysis

17  that was prepared by Dr. Greg Rowangould, who was a professor

18  in the School of Engineering at University of New Mexico, and

19  his specialty is air pollution modeling of highways.  He does

20  work for EPA, he does research, he is published in the field.

21        And what he did was to take all the inputs that the

22  Agency used for the PM10 modeling, but apply the models, the

23  EPA-prescribed models for PM2.5 to get results for what the

24  Agency would have found had they run the EPA models.

25        And that modeling shows that the ambient standard

53

1    will be violated, and it uses no independent methodologies

2    developed by Professor Rowangould.  It only applies the

3    methodologies that EPA requires for hot spot analysis.

4           Now, when counsel says that there is no requirement

5    for a conformity determination for PM2.5, that's correct

6    because the Denver metropolitan area was never in violation

7    of the PM2.5 standard, but the point that we raised in our

8    comments was that modeling should be performed because there

9    is a statutory requirement in another section of the Clean

10   Air Act, in part C, which is referred to as prevention of

11   significant deterioration, where the statute says that an

12   ambient standard shall not be in an area that attains the

13   standards.

14          So it's one -- you know, one part of the Act says

15   you're in violation, you got to bring it down, you got to

16   comply.  Another part of the Act says you're not in

17   violation, but make sure you don't get in violation.  And

18   that part of the Act requires some assessment of what --

19   whether or not the admissions from this project will violate

20   the ambient standard.

21          That was -- that was not done.  When he describes

22   the emission inventory methodology that they use, it's

23   important to understand what that tells you.  The emission

24   inventory simply tells you what the emissions from the

25   project will be.  It doesn't tell you what happens to them

54

1    when they get released into the atmosphere, how do they get

2    disbursed, who will be exposed to how much.  It doesn't

3    account for background, you know, what's coming from other

4    sources in the area.

5            And in our briefs we cited to EPA guidance, the EPA

6    guidance for hot spot analysis, which says specifically the

7    approach that they took is not technically supported for the

8    purpose of comparing emissions from a highway with the impact

9    that will have on the ambient standard.

10           So we're not -- this is not a case of -- of

11   methodology, this agreement between Dr. Rowangould and their

12   expert.  This is a case where EPA has set up the guidance

13   stating how you determine whether or not a highway will

14   violate an ambient standard and they didn't follow it.  And

15   the reason why we asked Dr. Rowangould to apply the

16   methodology, not developed by him -- it's not his independent

17   opinion, he's applying the methodology that EPA prescribed --

18   was to see whether or not there actually would be a violation

19   of the ambient standards because that tells us how much they

20   missed in the EIS.

21           If this project is going to cause a violation in

22   the ambient standard, that triggers a whole array of

23   obligations under the Clean Air Act.  It being (inaudible)

24   area would be designated non-attainment.  That then triggers

25   the planning obligations to develop the state implementation

1   plan.  It requires DRCOG to modify the regional

2   transportation plan, to make sure that the emissions in I:70

3   are reduced to the level where they would comply with the

4   ambient standard.

5           So instead of triggering all those obligations,

6   there should be some acknowledgment upfront.  That's what

7   NEPA is all about.  What will the consequences of this

8   project be if it goes forward?  And so the purpose of Dr.

9   Rowangould's testimony or his report, his technical report,

10   is to show that if they had followed EPA's guidance, they

11   would have seen that it was going to cause a violation of the

12   ambient standard; that it was going to increase community

13   exposures to PM2.5 by 14 micrograms, which is large, and that

14   that would have health consequences, all of which was not

15   discussed.  But without Dr. Rowangould's report showing what

16   you would find if you followed EPA's guidance, there is no

17   way for the Court to judge how important or insignificant

18   this issue is.  So we offer it for that purpose, to

19   demonstrate relevant evidence of a factor that wasn't taken

20   into account.

21           THE COURT:  But again, that's something you can

22   argue in your brief, right?

23           MR. YUHNKE:  We can't -- we can't argue the fact

24   that the viol- -- that the ambient standard will be violated

25   in the brief without evidence in the record that showing that

56

1    it will be violated.

2          THE COURT:  Right, but how can the -- how can the

3    Highway Administration be held to have not considered

4    something that wasn't before them?

5          MR. YUHNKE:  Because it should have been before

6    them.  They should have conducted the investigation in

7    accordance with EPA's guidance.  The regulation -- the CEQ

8    regulation under NEPA in 1502.2(d) states that the EIS will

9    evaluate whether or not the project will or will not violate

10   requirements under another environmental statute.  This was

11   called out in our comments.

12         THE COURT:  What you're saying is they did not

13   engage in an analysis they should have?

14         MR. YUHNKE:  Yes.

15         THE COURT:  And --

16         MR. YUHNKE:  And that violates NEPA.

17         THE COURT:  Right, but you don't need any

18   underlying data to establish that point.  All you have to do

19   is they did not engage in an analysis --

20         MS. GELFUSO:  No.

21         THE COURT:  -- that they legally were required to.

22         MR. YUHNKE:  We need underlying data to show that

23   this is not a fly spec.  You know, the case law is riddled

24   with all these cases saying that there is no evidence here to

25   show that this -- that this particular consequence that the

 1    plaintiffs are complaining about is consequential, and so we

 2    have that burden.  At this stage of the proceedings, in the

 3    administrative process, we have that burden.  We have to show

 4    that this is a significant impact that they missed, not just

 5    something they missed, but something significant they missed.

 6    And without this kind of evidence, I don't think we -- we

 7    would satisfy that burden.

 8            THE COURT:  But what you're saying is we only know

 9    it's significant because the work was actually done later

10    after the Record of Decision.  We only know it should have

11    been done by the Highway Administration because we know the

12    outcome right now, right?  That's what you're saying.

13            MR. YUHNKE:  Yes, but without that there would be

14    no basis for complaining about it.

15            THE COURT:  Right, but it's kind of a

16    chicken-and-and-egg issue, isn't it?

17            MR. YUHNKE:  Yes.  It goes back to this question of

18    whose burden appears when.  You know, the Supreme Court has

19    said again and again that the test, among other things, is

20    whether or not we cite this in -- what page of our brief?

21            THE COURT:  So here is my problem with what you're

22    saying.  You're saying before the Record of Decision was

23    issued, it wasn't a -- it wasn't a substantial enough issue

24    because you didn't have the underlying data to prove that it

25    is, but there might be dozens of studies that the Government

58

1    could engage in before a Record of Decision and they don't.

2    And then after the Record of Decision, you -- somebody

3    engages in those studies and they find out, oh, in fact, here

4    is an issue and now it's substantial, now it's material,

5    where it wasn't material before, but yet in a proceeding like

6    this, we can only hold the Government to what it should have

7    done and --

8              MR. YUHNKE:  Yes.

9              THE COURT:  -- not by arm-chair quarterbacking

10   after the fact.  You can't -- you can't just say in hindsight

11   they should have done this because we now know this, right?

12             MR. YUHNKE:  I don't think that's the point.  The

13   point -- the point is, that EPA spelled out the procedure for

14   determining whether or not highway emissions will violate an

15   ambient standard.

16             THE COURT:  Right.

17             MR. YUHNKE:  And they didn't follow that procedure.

18             THE COURT:  And stop there.  If they didn't follow

19   that procedure, you have that argument already, you'll make

20   that argument in front of Judge Martinez and he'll either

21   agree with you or he won't.

22             MR. YUHNKE:  Well, I think unless the Court is

23   aware that if you apply the appropriate procedure, it would

24   show a violation of the Clean Air Act.

25             THE COURT:  But that's irrelevant to a Court.  The

1  outcome is irrelevant.  Procedure is important, though.  So

2  if the Government should have gone through a procedure and it

3  didn't, that alone is significant to a Court to say your

4  decision is not supported by the law or it's arbitrary and

5  capricious.  The outcome could be favorable to the Government

6  or unfavorable to the Government, but if they didn't even

7  engage in a process that you're arguing they should have

8  engaged in, your argument is complete at that moment, no

9  matter what the outcome of the test would have been; isn't

10  that true?

11       MR. YUHNKE:  Their argument is that using the

12  methodology they used, which doesn't account for some of

13  these relevant factors, like background and dispersion, that

14  the impacts would be inconsequential, and that's an argument

15  that I don't see how we overcome without having evidence in

16  the record to show what the consequences would be if they had

17  applied the proper procedure.  That's why we offer it.

18       It's -- it's important here to -- I agree with you

19  that the key issue is procedure.  This Court and Judge

20  Martinez is not in the role of deciding whether or not the

21  ambient standard will be met or not met.

22       THE COURT:  Right.

23       MR. YUHNKE:  Your obligation is to determine

24  whether or not they considered that as a factor.  And in this

25  case they did address it as a factor, they recognized it as a

1    factor, but they didn't consider the relevant evidence

2    because the relevant evidence is defined by EPA in its

3    guidance.  And so it's a relevant evidence case --

4              THE COURT:  Okay.

5              MR. YUHNKE:  -- which is something that we did

6    address in our briefs where the Supreme Court has said again

7    and again, quote, We insist that an agency, quote, examine

8    the relevant data and articulate a satisfactory explanation

9    for its action.  It's the Agency duty to examine the

10   evidence.  That's the grounds on which we're raising this.

11   We're presenting what the relevant evidence is so the Court

12   can understand what the consequences are of not considering

13   it.  It's not to make the decision about whether the ambient

14   standard would be met or not.

15             THE COURT:  Okay.

16             MR. YUHNKE:  And it's the same issue with another

17   exhibit that we submitted, which is the exhibit showing the

18   magnitude of the increase in emissions during construction

19   phase.

20             Now, Counsel, in response to your -- your inquiry

21   about was there any change in the project or any mitigation

22   in ROD, the mitigation in the ROD, there is pages of it, but

23   it has very little to do with air pollution.  And there are

24   17 mitigation measures for air pollution, but all of them are

25   for mitigation during the construction phase.  None of them

61

1    relate to mitigation of the impacts that will result as

2    traffic increases over the planning period addressed in the

3    EIS.

4           So there isn't any mitigation against the health

5    effects that are being ignored here, you know, the

6    cardiovascular effects and that kind of thing.  So one of the

7    things that -- so again, the modeling that we submitted

8    relating to construction emissions was submitted to show that

9    kinds of evidence that they should have considered and

10   didn't.

11          So they do acknowledge that there will be increased

12   emissions during construction, and we ask them in our

13   comments to model those because EPA has developed modeling

14   tools for modeling those kind of emissions, to anticipate how

15   significant those emissions will be with regard to impacts on

16   community health because the construction phase carries on

17   here for four years, so people are going to be exposed for a

18   long period of time to these emissions.

19          And that study looked at the fact that there is

20   evidence available from the record, along with EPA guidance,

21   to show that the emission increases from construction are

22   likely to violate the ambient standard, which is a very

23   significant impact.  That's a relevant factor in deciding

24   whether or not the mitigation is adequate.  And this analysis

25   accounts for most of the mitigation because it's factored in

1    EPA's guidance and again, it's submitted not for the Court to

2    decide that if there is going to be a violation of the

3    ambient standard, but to demonstrate the kind of evidence

4    that they didn't consider in informing themselves of the

5    consequences of the project.

6          And then the last two items in our -- in our

7    submission.  One are the notes of a meeting that was had with

8    the director of the Colorado Division of Federal Highway

9    Administration.

10          THE COURT:  Right, well, that's stop there.  That's

11    a strong one in my opinion, I'm not sure you have to argue

12    that because I'm definitely on your side right now on the

13    notes.

14          MR. YUHNKE:  Okay.

15          THE COURT:  So, I mean, I'll hear from the

16    Government on that so you don't need to address that anymore.

17          MR. YUHNKE:  And the last one was the response that

18    we got from CDOT.  We had submitted to a request at the

19    beginning of the comment period on the FEIS asking them for

20    any documents that showed an investigation into health

21    effects and how they conducted that investigation and what

22    results they obtained from it because there was no discussion

23    of that in the FEIS.  And we asked for a response before the

24    close of the comments so we could use that information to

25    develop our comments.  We got a response two days after the

1    comment period closed, so we were not able to put their

2    response in the record at that time.  We would have

3    otherwise.

4           And that response said we didn't conduct any of

5    those investigations, and we think it's important for the

6    Court to have that admission from the Agency to proceed on.

7           THE COURT:  And I'm leaning your way on that one

8    too.

9           MR. YUHNKE:  Thank you, Your Honor.  I will . . .

10          THE COURT:  We'll see what they have to say about

11   that.

12          MR. YUHNKE:  Yes.

13          MR. THURMAN:  If appropriate, can we take a quick

14   break.

15          THE COURT:  Yeah.  How many minutes?

16          MR. THURMAN:  Ten.

17          THE COURT:  Well, just let me know when you're

18   ready as soon as you can.  We'll be in recess.

19          (Recess was taken.)

20          THE COURT:  Back on the record in 17-cv-1661 and --

21   weren't there two cases? -- 1679.

22          Please proceed, Mr. Thurman.

23          MR. THURMAN:  Thank you, Your Honor, and I'll

24   quickly address the -- I believe the remaining articles and

25   documents that were discussed moments ago.

1          First, with the Rowangould PM2.5 declaration, the

2     Clean Air Act, as I think everyone agrees, does not require a

3     hot spot analysis for PM2.5 in the Denver area for this

4     project.  That was recently ruled as recently as December of

5     last year, and I believe it was Sierra Club's own case that

6     the D.C. Circuit ruled.

7          Now, it appears what's happening is that

8     petitioners are trying to get -- make the hook for this type

9     of analysis NEPA, and they're trying to say that NEPA is

10    requiring a hot-spot analysis under Clean Air Act guidelines

11    that would be implemented and used for a conformity

12    determination to do a PM2.5 analysis.  And as the D.C.

13    Circuit ruled, a conformity determination for PM2.5 is not

14    required for this project in the Denver area.

15         And to kind of just bolster the point that we

16    didn't fail to consider the impacts of 2.5, the agencies did

17    analyze PM2.5 in an inventory analysis and, again, we feel

18    that this is just the petitioners attacking the methodology

19    with which we did analyze PM2.5.

20         For Mr. Brink's (ph) declaration, and this is

21    the -- Mr. Brink's declaration provided estimates of fugitive

22    dust emissions during the construction process.  Even as

23    petitioners point out in their brief, FHWA did consider

24    fugitive dust emissions, and Mr. Brink's declaration again

25    does nothing more than attack how the agency handled and

1    considered fugitive dust.  And again, in the ROD, there are

2    numerous mitigation measures for fugitive dust.

3           And, moreover, getting back to this whole point of

4    what could have and should have been submitted during the

5    NEPA process, everything that Mr. Brink relies on in

6    developing his analysis or his declaration is -- it's a

7    manipulation of the data that was already disclosed in the

8    NEPA process, so everything was available.  This could have

9    been brought forward during the NEPA process for the agencies

10   to consider.

11          THE COURT:  So you're saying all the data is there,

12   he just assembles it and argues it, which can be done in the

13   briefing in this case?

14          MR. THURMAN:  I mean, if the suggestion is that

15   they could attach the Brink declaration --

16          THE COURT:  No, no, no, no.  I mean, they could --

17   they could lift wholesale portions of it.

18          MR. THURMAN:  And make some type of expert attack?

19          THE COURT:  Not an expert attack, but an argument.

20          MR. THURMAN:  I mean, they can definitely attack

21   the sufficiency of the record and the Agency's decision of

22   regarding their analysis of fugitive dust.

23          THE COURT:  Well, they're clearly going to do that.

24          MR. THURMAN:  Right, but to the extent that they

25   plan to or would be able to tie that information together in

1    an expert declaration on the merits briefing --

2              THE COURT:  I understand.

3              MR. THURMAN:  Yeah.  Lastly, or the second-to-last

4    is the meeting notes that were discussed from a -- I believe

5    it was a 2015 meeting between the petitioners and Federal

6    Highways.

7              THE COURT:  Right.

8              MR. THURMAN:  Again, they argue this is evidence

9    that we failed to consider a relevant factor, but again, they

10   have not attempted to in their briefing argue how this meets

11   one of the supplementation standards.  And it's also

12   factually wrong; contrary to their assertions, the FEIS

13   specifically addresses, again, health impacts, the ROD

14   addresses health impacts.  And numerous other documents

15   again, address the same topics that these meeting notes

16   discuss that were, arguably in petitioners' view, not

17   considered by FHWA.

18             And again, these are meeting notes that were, I

19   presume, transcribed or kind of a memo to the record that

20   were transcribed from petitioners themselves.  Until after

21   the ROD was signed, FHWA had never seen these documents, they

22   had not been considered.

23             THE COURT:  Well, no, the documents hadn't been

24   considered, but the documents purport to reproduce an actual

25   discussion that did occur, right?

1          MR. THURMAN:  Right.

2          THE COURT:  It's just a way of the petitioner

3    saying these arguments were made and this information was

4    presented to the Highway Administration.

5          MR. THURMAN:  Sure.  And I think that

6    information -- the same information comes in through the

7    comments and responses that were taken and received

8    throughout the entire NEPA process.

9          These are notes that were transcribed by the

10   petitioners themselves, apparently.  There was no third party

11   there transcribing notes during this meeting about what was

12   said, what was not said.  This is petitioners submitting

13   their own notes about their recollection of a meeting three

14   years ago.

15         THE COURT:  Maybe not their recollection, but

16   contemporaneous notes made during the -- the meeting itself,

17   right?

18         MR. THURMAN:  Right.

19         THE COURT:  And attested to?

20         MR. THURMAN:  Correct.

21         And then, lastly, the CORA request, I'll just be

22   very brief and I believe my colleague will have a few more

23   points.

24         CDOT's response to an open records request should

25   not have an impact on the impacts -- or should not have

1    bearing on the impacts that FHWA actually considered in the

2    NEPA process.  This is CDOT's response to an open records

3    request, and what should be analyzed or what was considered

4    or not considered are the NEPA documents themselves, not a

5    response from the state agency to petitioners.

6             THE COURT:  Well, all they're trying do is to prove

7    that something wasn't done, correct?  That's what their

8    response was from the State of Colorado, we didn't engage in

9    this process or analysis?

10            MR. THURMAN:  I mean, that is correct, that's their

11   argument.  And again, we would say the same argument can be

12   made from the record and, again, in all these

13   circumstances --

14            THE COURT:  Are you saying that's completely

15   redundant?

16            MR. THURMAN:  I have not cross-referenced

17   everything in the CORA request with the record, no.

18            THE COURT:  Okay.

19            MR. THURMAN:  I think that's all I have.

20            THE COURT:  Anything further?  Oh, go ahead.

21            MR. DiMASCIO:  Just very briefly, Your Honor.  A

22   couple of points of cleanup on -- in response to Sierra

23   Club's counsel's argument.

24            I think there was a statement that there is nowhere

25   in the record that explains why the Agency did not do a

1    Health Impact Assessment, and this is with respect to the

2    Heller --

3            THE COURT:  I think he said Health Impact

4    Assessment is not even mentioned in the record.

5            MR. DiMASCIO:  Yes.  So let me provide you with

6    some pinpoint citations.

7            Federal Highway Administration did, in fact,

8    consider the previous Denver-conducted Health Impact

9    Assessment for these varying neighborhoods.  That's at

10   AR18238-248.  And they responded to comments specifically

11   explaining why an additional Health Impact Assessment would

12   not be helpful in this particular case.  That's at AR121 to

13   23, AR24381 and AR24711.  So there's three separate places

14   where you can find the Agency's explanation for why it didn't

15   believe that an additional Health Impact Assessment was

16   warranted.

17           It did not have Mr. Heller's explanation for why he

18   thought one was warranted before it at the time it made that

19   explanation because the plaintiffs never provided it during

20   the (inaudible) process.

21           There was also an assertion that there is nowhere

22   in the record -- and again, I'm paraphrasing here -- that

23   explains kind of this idea of the cocktail of --

24           THE COURT:  Right.

25           MR. DiMASCIO:  -- pollutants and why there -- you

1    know, there are health impacts, that we just somehow limited

2    ourselves to the NAAQs pollutants that are covered.  And let

3    me walk you through where you can find additional information

4    about these other pollutants and how the agency analyzed

5    them.

6              THE COURT:  And how they interact with one another

7    or have a cumulative impact together?

8              MR. DiMASCIO:  That specific point about how they

9    interact with each other, I'm not sure that there is going to

10   be a specific breakdown or scientific analysis of how they

11   might interact.  I think that's kind of a

12   frontiers-of-science-type question.  And if there were, for

13   example, studies of how they interact, that's exactly the

14   type of material that we would have expected to be provided

15   during the comment process so that we could review it and

16   fold it into the analysis.

17             To the extent that they provided it -- and I don't

18   remember each study that they provided and the response to

19   them.  But to the extent that they did cite studies, the

20   record does contain an explanation of recent studies of the

21   impacts of highway pollution on human health.

22             In the human health chapter, there is a specific

23   chapter that addresses human health.  It's at 18227 to 48.

24   There is also a discussion of each one of these pollutants in

25   their individual capacities and what they do.  That's at

71

1    23406 to 10 and 23459 to 66.  That last part is an extensive

2    discussion -- discussion of mobile source air toxics and the

3    most up-to-date science on how to evaluate them and what

4    their impacts are to health.

5         I would also direct Your Honor to the conformity

6    analysis, which is the way that the Agency engaged in an

7    analysis of the effects of those primary NAAQs, pollutants.

8    That's at 4786 to 94.

9         Additionally, the inventory -- the methodology for

10   the inventory analysis -- and this is again very important

11   for Your Honor to understand -- that under NEPA, the way the

12   Agency evaluated the potential effects of this project on all

13   of the air pollutants that are summarized at that AR record

14   cite that I gave you earlier, not just the NAAQ's pollutants,

15   but all of them, the way the Agency went about analyzing

16   those is by using modeling to prepare emissions' inventories

17   that showed the volume of these pollutants that would be

18   produced in the no-action alternative and in the action

19   alternative, to do a comparison of those -- of those amounts

20   and then decide, Is this a decision-making factor for us?

21        What that analysis showed was that there was a very

22   small negligible difference between the no-action alternative

23   and the action alternative.  And that's where the Agency kind

24   of stopped its NEPA analysis and then provided this

25   additional chapter that I pointed you to on the human health

1    impacts that ties together the results of that air quality

2    analysis with what's known about the baseline health

3    conditions in these neighborhoods.  That was the Agency's

4    analysis of that whole broad volume of information about

5    every type of air pollutant that we're talking about here.

6              So it's not accurate to say that there is nothing

7    in the record on this point.

8              And there is also the comment responses both to the

9    final EIS, which are at 24381-83, and the comment responses

10   in the ROD, which are at 180 -- AR180 to 116, both of which

11   contain specific answers to why wasn't further study done on

12   the health impacts of this particular project to the

13   community.  There are specific explanations that respond to

14   those comments in the record.

15             So that's the whole volume of information that I

16   would point you to on that last -- on that last point because

17   I don't think it's accurate to say there is nothing in the

18   record on those issues.

19             I think Mr. Carter [sic] covered well the

20   Rowangould PM2.5 declaration.  That's Exhibit Number 33.

21             The only thing that I would add on that is if that

22   type of declaration is allowed to come in, the question that

23   it raises is, When do Federal Highway's experts, the modelers

24   who do these types of analysis, and EPA's experts for that

25   matter, get a chance to critique the assumptions and

1   methodology that's used by this person to come to his

2   conclusions?  Are we then supposed to prepare our own

3   declarations that do that type of analysis or pull apart his

4   modeling assumptions in order to contradict what he has to

5   say?  And if we are supposed to do that, then aren't we

6   engaging in the very battle of the experts that the record

7   limitation is intended to prevent us from having to go

8   through?

9           The reality of this -- of this particular

10  declaration is that Sierra Club has a very extreme theory

11  that, even though the Clean Air Act doesn't require a

12  hot-spot analysis, somehow NEPA creates the requirement do

13  that very same Clean Air Act hot-spot analysis.

14          And they can't cite any case law to that effect.

15  But let's just assume that they find a way of convincing the

16  Court that we were legally required to do effectively what is

17  a hot-spot analysis under the Clean Air Act, but NEPA was

18  what made us do that.  We have to follow all of the same

19  guidance, all the same rules that we would use -- that EPA

20  wants us to use if we're doing a Clean Air Act analysis, but

21  the Clean Air Act is not the statutory source of that

22  requirement.  It's actually NEPA.

23          Let's assume that they win on that argument, then I

24  guess what we have to do is go back and do that modeling

25  analysis.  And this PM2.5 kind of modeling analysis

1   hypothetical exercise that Dr. Rowangould has engaged in to

2   show that there would be a violation, I think Your Honor is

3   absolutely correct, they could just make their argument. they

4   don't need there declaration.  They just make their argument.

5   And if we actually have a legal duty to do an analysis, a

6   whole analysis that we just didn't do, then we go back and do

7   the analysis.

8            As to -- and again, I would point -- the main Tenth

9   Circuit authority on this point is Thomas.  Again, you know,

10  you've got to put your information into the record before the

11  Agency.

12           And so turning to the CORA request, because I

13  believe that's the last document of the set that we have just

14  discussed, that document should not come in for a couple of

15  reasons.  It simply doesn't show that it -- either CDOT or

16  the Federal Highway Administration entirely failed to

17  consider a factor:  Public health.  That's what they're --

18  that's what they're trying to use it for.

19           They're essentially trying to selectively quote --

20  they like a couple of statements in that CORA response that

21  they like to pull out of context in order make it seem like

22  the agencies didn't do any kind of analysis here.  That's

23  what they want do -- that's what they want do with that

24  document.

25           What it actually says is that the agencies didn't

1    evaluate the environmental impact of certain alternatives

2    because those alternatives were unreasonable and so they

3    didn't have an obligation to evaluate the environmental

4    impacts of those alternatives.  It also says that they didn't

5    do an original investigation into health impacts in north

6    Denver.  But the very next sentence goes on to explain that

7    they did summarize how the air quality analysis that they did

8    do, the two major components of which being a conformity

9    analysis and an inventory analysis under NEPA.

10           They went on to -- it says that they went on to

11   summarize how that air quality analysis relates to the health

12   concerns in those neighborhoods.  That's in the health

13   effects chapter of the final EIS.  And they summarized

14   studies on that topic that were performed by others.

15           That analysis that it's referring to in the CORA

16   request is actually in the record.  It's at AR18227 to 48.

17   So all this document does, it's completely duplicative of the

18   information that's actually on the face of the record.

19           If they want to make an argument that we didn't

20   consider certain health impacts, what they should do is they

21   should make the argument based on the record that's in front

22   of the Court.  And this CORA request, which was not

23   considered -- it's not considered by Federal Highways, it's

24   completely outside the NEPA process, it's like -- it's like a

25   Freedom of Information Act requesting under state law.  It's

1    not part of the NEPA process.  It doesn't belong in Federal

2    Highways' administrative record for this project decision.

3            That's all I have.

4            THE COURT:  Thank you.  Any wrap-up?

5            MR. YUHNKE:  This will be the wrap-up on this

6    portion, and then we'll move to the motion to (inaudible).

7            THE COURT:  Yes, very good.

8            MR. YUHNKE:  The point that I was making about the

9    mix of pollutants is that they do not discuss what you were

10    asking:  What are the consequences of being exposed to this?

11            What we pointed out was that there are studies in

12    the literature, and we submitted a couple that show how you

13    go about this, which is to look at those studies that account

14    for health effects as a result of exposure to highway

15    pollution.  Rather than measuring each pollutant separately,

16    you look at communities that are exposed to the entire mix

17    from a highway and how does their health outcomes differ from

18    communities that are not so exposed.

19            It's not at the edge of science.  It's in the

20    literature.  And that's the -- when I said that they did not

21    conduct that kind of investigation of the consequences in the

22    community of being exposed to that full mixture, that's what

23    I was talking about.

24            THE COURT:  Yeah, I think he -- I use the term,

25    interact with one another, which may not be scientifically

1    that great of a term, and that's I think what he was

2    responding to, is that would be the edge of science, the

3    interaction, but the cumulative effect maybe is definitely

4    within the science.

5         MR. YUHNKE:  And within the scope of NEPA as a

6    relevant factor.

7         And then when they tried to explain that the

8    methodology that they used for assessing the impacts of

9    pollutants, the emission inventory approach, does not tell

10   you what people are exposed to.  It simply was used in the

11   EIS for the purpose of comparing alternatives, how much

12   different would these alternatives be, and all the

13   alternatives that they considered were in the I-70 corridor

14   in the same alignment.  It's just are they going to put the

15   highway back on a viaduct or are they going to put it below

16   grade and the difference between those because the traffic

17   was almost identical for every one of them, the emissions

18   were not any different.  But that's not the question here.

19        The question here is, What happens when you expose

20   people to pollutant levels that are significantly higher in

21   2040 than they were in 2015? which is their baseline year.

22   What's going to happen to the community?  And then related to

23   that is our claim under NEPA that they have an obligation to

24   also look at ways of enhancing community health by restoring

25   healthful air quality, removing traffic from the

78

1    neighborhoods, and removing the pollutant exposures.  That

2    was not addressed.  And this kind of evidence is relevant to

3    that investigation.

4           Now, with regard to this question of not having a

5    conformity requirement for PM2.5, that's not the issue

6    because what is the issue is that there is a statutory

7    requirement that Colorado not allow the ambient standard to

8    be violated.  And then the issue is what methodology properly

9    applies.

10          And EPA's methodology for hot-spot analysis is not

11   limited to conformity.  The hot-spot analysis was developed

12   for conformity because in the statute Congress said you have

13   to make sure that highways will not violate an ambient

14   standard.

15          But that's the question here, Will this highway

16   violate an ambient standard?  And while it's not a conformity

17   determination, it's a determination under another section of

18   statute.  And EPA's methodology specifically says, we quoted

19   in the briefs, The methodology that was used here, the

20   emission-inventory approach, is not technically supportable

21   for the purpose of comparing highway emissions with an

22   ambient standard.  It's -- it's not regard to which section

23   of the statute applies; it's whether or not it's a

24   scientifically credible methodology.

25          And, you know, it's not our expert that's offering

1   this methodology, it's EPA having prescribed what you need to

2   do and accounting for, among other things, background

3   cumulative effect of other sources.  That approach that they

4   took simply doesn't do that.  That's why they can come to the

5   conclusion that it's not going to do anything in terms of

6   violating an ambient standard because they leave out the

7   important factors.

8            And in the Silverton Snowmobile case, this Court

9   reviewed the comparison in methodology issues and said an

10   agency will be given deference for the methodology it chooses

11   as long as it provides a rational basis and as long as it can

12   demonstrate that methodology addresses relevant factors.

13           And the methodology that they have used does not

14   address the cumulative impacts because it does not account

15   for background air quality and it does not account for

16   dispersion.  So it's not a rational basis, which is what EPA

17   is saying.  In their guidance, it's not a rational basis for

18   determining whether or not this project is going to violate

19   the ambient standard.  So that's the critical issue there.

20           And it's also important to recognize that we could

21   not have submitted the report that Dr. Rowangould prepared at

22   the time of the FEIS because our comments at that time was

23   that they were analyzing the wrong year.  They were analyzing

24   2035; whereas, EPA's rules said you should be analyzing 2040,

25   the same year as the Regional Transportation Plan.

1             So if we had taken their analysis for 2035 and the

2    FEIS and used all of those inputs, which is what

3    Dr. Rowangould did, he created no new inputs, used exactly

4    the same inputs that they use for PM10, and he used them for

5    PM2.5, is the amount of traffic, where the traffic is

6    occurring, what the wind dispersion characteristics are, he

7    did not exercise any independent judgment, he used exactly

8    their inputs for PM10 to show what would happen, but that

9    could not have happened at the FEI stage, because all the

10   inputs changed.  For the conformity determination, they used

11   2040 and the traffic changed and they used other inputs that

12   were different.  So we had to use the 2040 data, and this

13   could not have been submitted earlier in the process.

14             THE COURT:  Thank you.

15             MR. YUHNKE:  And one other point.

16             We also argue in the briefs that we think this

17   should be submitted under the technical evidence exception

18   where the courts have recognized that for courts to

19   understand complex technical issues, it's appropriate for the

20   Court to accept testimony that helps the Court understand it.

21   And we think this is one of those examples, or this kind of

22   testimony clearly falls into that category to help Judge

23   Martinez understand what the modeling is all about, what was

24   left out.

25             THE COURT:  Very good.

1          MR. YUHNKE:  Thank you.

2          THE COURT:  Thank you.

3          MR. YUHNKE:  The motion to -- excuse me

4    (inaudible).

5          THE COURT:  Right behind you.  There is mobile ones

6    right here, see on the stands.

7          MR. YUHNKE:  The motion to complete the record

8    includes our request for discovery and is overlapping with

9    one of the exhibits in the motion to supplement.  So we're

10   going to address that here under both motions, and that has

11   to do Dr. Rowangould's analysis of what modeling was done for

12   the conformity determination for PM10.  So this is a Clean

13   Air Act issue.  This is not NEPA.

14         The analysis that was performed showed dramatically

15   different results compared to the analysis that was done for

16   the FEIS.  The final analysis for the conformity

17   determination predicted that the project would add 41

18   micrograms, where the FEIS said 61 micrograms, which is a

19   huge difference.

20         So nothing in the conformity determination

21   explained why that huge difference resulted.  They did

22   explain that they changed three things.  They changed the

23   traffic because they changed from 2075 to 2040 and actually

24   concluded that the traffic would be less than 2040 than 2075,

25   but that's not an issue here.

82

1          And they explained that there was some minor

2     changes in configuration of the project that might affect

3     emissions and that the receptor locations were moved.

4          Now, the receptor locations are these dots on the

5     map here, on this graphic, which was generated by

6     Dr. Rowangould for us, but the receptor locations are created

7     by the modeling software.

8          This is part of EPA's approach for estimating what

9     future emissions will do to air quality.  So you can't go out

10    and measure it because it doesn't exist yet.  You have to do

11    it by modeling.  And these receptor locations were those

12    receptor locations chosen by the agencies.  We didn't change

13    any of these.  There is no original inputs here.

14         And we asked in preliminary requests for production

15    of documents for an explanation of how their receptor

16    locations were changed, and all we got back from them was a

17    set of modeling files.  It was nearly a terabyte of data

18    without any text, no explanation, no analysis, just modeling

19    files.  If you tried to open them, they were totally

20    incomprehensible.  I mean, no one on our team could make any

21    sense of it.  So at that point, we asked them for more

22    explanation in our -- in our comments for what they did and

23    it was never received.

24         Now, ultimately, they explained in the ROD that

25    they changed the elevation of some of the release points for

1   the highway, but they didn't tell us which release points or

2   why they changed them or how they changed them.

3          So we employed Dr. Rowangould's services to help us

4   understand this.  And he ran the modeling files, which they

5   provided to us, and he saw that in the general modeling one

6   that they did, all the receptor locations in red were

7   reported and that their receptor locations here marked in

8   yellow were not reported, and that, instead, they ran

9   separate model runs for each one of these receptor locations.

10          And that if you look at the results, if you run all

11   of the receptor locations using the inputs for those 3,552

12   receptors and ask the model to give you results for these

13   seven locations, what you see is that at these locations

14   where the numbers are 42 and above, the ambient standard

15   would be violated, which violates EPA's criteria for

16   conformity determination.

17          But the modeling that they did separately for each

18   receptor location produced a lower result, but without any

19   explanation for the differences other than to say that they

20   changed the release heights of the highway, but not telling

21   us how much they changed the release heights or why they

22   changed the release heights or whether they went out and

23   actually looked at the highway elevation to determine that

24   there was justification for it.  But, basically, what it

25   amounts to is if that if you were driving along -- this is

1   the -- the interchange lanes moving from I-25, which is just

2   this area here, onto I-70, these are the exit lanes from I-25

3   that take you around over onto I-70.  So it's included in the

4   project area and it's part of the impact area because this --

5   this will be one of the areas where the traffic increases

6   significantly.

7          And so we were not able to submit comments on this

8   because none of this was comprehensible during the period

9   when the commentary was open, and we had to conduct this

10  modeling analysis to understand it.  And we still have not

11  received adequate explanations of what was done, and that's

12  why we're asking for an opportunity to take some limited

13  discovery, to ask them exactly what they did and who approved

14  it, whether or not this was a modification to the modeling

15  guidance that EPA looked at and approved.

16         We asked them for documentation of information that

17  they gave to EPA to explain what they were doing and they're

18  basically saying those documents don't exist.  It doesn't say

19  they -- they explained it to EPA, that they haven't said they

20  haven't explained it to EPA, but we would like to take some

21  discovery to understand exactly what was done.  And where

22  that leads, I can't tell you whether this is a bad faith

23  issue or not.

24         You know, we're not at a stage where we have enough

25  evidence to say this is a bad faith, but we feel that we

1    should have an opportunity to learn exactly what was done so

2    that we can understand why and whether it was done in bad

3    faith.

4              THE COURT:  Are the changes material, depending on

5    the height that they measured?

6              MR. YUHNKE:  Yes.  These numbers at 42 and above

7    violate the ambient standard.

8              THE COURT:  Okay.

9              MR. YUHNKE:  Their analysis --

10             THE COURT:  So the standard is 42?

11             MR. YUHNKE:  The standard -- the standard is

12   effectively 154.9.

13             THE COURT:  Okay.

14             MR. YUHNKE:  The background is 113.  And when you

15   add these numbers of 42 and above, you violate the standard

16   because it's the combination of background and what the

17   project will emit that is used to determine what the final

18   expected future concentration will be.

19             THE COURT:  Okay.  So you're saying, essentially,

20   they gerrymandered the information to fit?

21             MR. YUHNKE:  That's the question.  That's the

22   question we feel we need answers to.

23             THE COURT:  You don't know the answer, but you

24   suspect it might be yes?

25             MR. YUHNKE:  We suspect the answer might be yes,

1    but I'm not here yet to make that accusation.

2              THE COURT:  Understood.  What would you expect,

3    30(b)(6)?

4              MR. YUHNKE:  I'm not sure what you're referring to.

5              THE COURT:  Is there a litigator in the house?  A

6    30(b)(6) deposition is a deposition where you identify topics

7    that somebody has to speak and they get to designate who

8    speaks to those topics.

9              MR. YUHNKE:  Oh.

10             THE COURT:  And prepare a person, educate them and

11   have them speak to those topics.  That's a Rule 30(b)(6)

12   deposition.

13             MR. YUHNKE:  What we proposed in the motion was to

14   submit some requests for production and interrogatories and

15   possibly requests for admissions, and in response -- whatever

16   the response is to that, especially the interrogatories,

17   determine whether or not deposition would be necessary.

18             THE COURT:  Okay.

19             MR. YUHNKE:  It may not be.

20             THE COURT:  Exactly what are you proposing as far

21   as numbers of requests?

22             MR. YUHNKE:  In terms of the numbers of

23   interrogatories?

24             THE COURT:  Yes.

25             MR. YUHNKE:  Well, the rule here in this district

87

1    is 25.

2              THE COURT:  Well, that's a normal civil case, yes.

3    This is unique, so.

4              MR. YUHNKE:  That's the normal civil case.  I think

5    I don't have an answer to that that I would want to be stuck

6    with, but I would say 10 or 15, somewhere in that category.

7              THE COURT:  Okay.  By the way, I'm not asking that

8    question, presuming that I'm going to allow it, okay, because

9    your response is zero.  I just want to see what you envision

10   as far as the scope.

11             MR. YUHNKE:  It's -- but it's limited to those

12   issues.

13             THE COURT:  Right.

14             MR. YUHNKE:  The scope of the discovery would be

15   quite limited.

16             THE COURT:  Right.

17             MR. YUHNKE:  And, Greg, do you know want to speak

18   to the -- Greg has done work on this.  I'm going to ask him.

19             THE COURT:  The younger guy always has done the

20   work.

21             MR. YUHNKE:  Pardon me?

22             THE COURT:  I said the younger guy always has done

23   the work.

24             MR. YUHNKE:  Not always.

25             THE COURT:  The more senior person gets to present

1     it, but -- go ahead.

2              MR. CORBIN:  I would say there are just a few

3     points which are all in our brief, and I think Bob may have

4     already covered them, so I'll try to be very brief,

5     especially given the time.

6              And those are that if you look at Exhibit 43, it's

7     where we -- it demonstrates our previous request to Federal

8     Highways and our conferral process about trying to figure

9     out, Well, what's going on here.  And if you look at -- I

10    believe it's previous comments where we've asked -- I can't

11    remember where we previously asked, but it's in our brief.

12    But we've asked a few times about these receptors and why

13    they're different, why they're special.  And the only answer

14    we can come up with is, if they're not special, they violate

15    the NAAQs.

16             THE COURT:  Well, you say that you asked for

17    explanations and weren't given satisfactory explanations.

18             MR. YUHNKE:  During the conferral process in

19    anticipation of this motion.

20             THE COURT:  Right.  So is there a doctrine out

21    there that says that you've been effectively barred from

22    commenting by the Government's actions?  Is there such a

23    legal doctrine?

24             MR. YUHNKE:  Well, that's our claim.  Our claim,

25    Your Honor, in the petition for review is the seventh Clean

1    Air Act claim, and it recites the language in the EPA

2    conformity rule, which, basically summarizing, says that an

3    Agency shall make available to the public at the time that a

4    conformity determination is proposed for comment all of the

5    technical information that was available to the Agency at the

6    time that it performed the conformity determination.

7            And so at this stage, we still don't have all of

8    that information.  So we are arguing that this was a

9    violation of the public involvement rule, and that we should

10   be given an opportunity in form of relief to reopen the

11   common period and to make a record.

12           THE COURT:  Okay, I understand.

13           MR. YUHNKE:  And the only other part, Your Honor,

14   is that this technical report that explains all of this we

15   believe falls under the rubric of being appropriately

16   supplementing the record as a technical analysis to inform

17   the Court of what's happened, it falls under that category.

18           MS. SANTACRUZ:  Good afternoon, Your Honor.

19           In the interest of time, I'm going to try to keep

20   my remarks very brief.  We made most of our arguments in

21   the -- in the motion in our response, and in light of your

22   familiarity with the law, we're just going to try to keep it

23   as brief as possible.

24           With regards to the discovery -- with regards to

25   this motion, they asked for three specific -- three different

90

1    things in this motion.  They started with the -- which, at

2    the very least two of them, discovery went up on as improper

3    way of using this mechanism.  When we envision -- when we got

4    together -- when all the parties got together back in August,

5    September, this was never an issue that was brought out by

6    these plaintiffs or by the other set of plaintiffs.

7         When Your Honor -- when we spoke with Your Honor a

8    couple months after that, they never brought this issue up.

9    On December -- and they've known about this issue.  On

10   December 29, they send a request for discovery to CDOT asking

11   for specifically these documents, and they did not do that to

12   Federal Highway.

13        During that conferral process, which began in early

14   February, that was before your -- that was around the time,

15   the same time that the parties were negotiating extending the

16   brief and extending the briefing schedule, this was never

17   mentioned by the plaintiffs to us.  They have known about

18   this, and at the last second, in a way of masking their --

19   their request, they are including it as a motion to -- motion

20   for discovery, motion to complete the record, and a motion to

21   take judicial notice.  That is the first point that I want to

22   bring.

23        With respect to discovery, I just want to let the

24   Court -- again remind the Court that this is an APA case,

25   challenged under the APA, and the Supreme Court has made it

1    very clear that an Agency's -- Agency's actions challenged

2    under the APA shall stand on the Agency's administrative

3    record.

4           The Tenth Circuit has taken even a step further

5    saying -- directing the district courts to review these types

6    of cases as appeals.  Consistent with that standard, the

7    Tenth Circuit has not allowed, or there has not been a case

8    in which they have permitted limited discovery.  They have --

9    I could not find any and they have not cited any.

10          If they had find any, they would have cited them.

11   The only cases that they relied on are cases -- two cases

12   from California where the Court allowed limited discovery in

13   order to -- where there was a strong clear evidence, strong

14   showing from the plaintiffs that there was bad faith from the

15   part of the -- bad faith -- indicative of bad faith, strong

16   showing that the Agency was involved in bad faith in creating

17   the record.  In this case, they have not made that showing.

18          The only other document -- case that they cite, it

19   is a District Court of Colorado case by Judge Kane from

20   January 4, 2010.  It's the Colorado Environmental Coalition

21   vs. Office of Legacy Management.  And in that case, the Court

22   allowed discovery for two purposes.

23          One was to establish subject matter jurisdiction,

24   which that is not the case here before the Court.  The other

25   reason was limited discovery for -- to complete the record,

1    but only when it was clear by the magistrate judge -- the

2    magistrate judge denied the limit -- the request for

3    discovery, and then because it had defined the scope of the

4    challenge narrowing.  That's what the district court

5    preempted.  In that case, the district court said the

6    magistrate judge narrowed the scope of the challenge only to

7    the FONSI.

8            And after reviewing the complaint, the district

9    court said, Judge Kane said -- Wiley, I'm sorry, Judge Wiley

10   said --

11           THE COURT:  Judge Daniel.

12           MS. SANTACRUZ:  Daniel?  Oh.

13           THE COURT:  Wiley is his first name.

14           MS. SANTACRUZ:  Judge Daniel.  Thank you.

15           THE COURT:  Sure.

16           MS. SANTACRUZ:  He said -- it's not only after

17   reviewing the complaint, they were not only challenging the

18   FONSI, they were challenging the 15 mineral leases that were

19   executed as a result of that.  They were very significant.

20           So by doing that, it was not more like a motion for

21   discovery, but more like a motion to complete the record

22   because once he expanded the scope of the challenge action,

23   then he said, Okay, these documents can properly come in --

24   into the record.  But it was not a motion for -- for

25   discovery, even though it was brought up as a motion for

93

1    discovery.

2              Okay.  So in contrast of those cases, the

3    plaintiffs in this case -- the petitioners in this case, have

4    not met the heavy burden to show that discovery is required

5    in this APA case.

6              THE COURT:  Was it true that you did a data dump

7    that no reasonable person could have interpreted?

8              MS. SANTACRUZ:  There are many documents.  This is

9    a very -- one of the large, if not the largest case --

10   administrative records that I've worked on.  There is about a

11   one terabyte of -- we tried very hard -- well, Your Honor,

12   part of it to try to provide only a limited administrative

13   record to make it easier on the plaintiffs -- the

14   petitioners.

15             We did not get anywhere with that so we told them,

16   like, Look, there are many models, especially the Excels, the

17   Native files, it's very large.  Let's try to work out

18   something, whether it was search terms, anything.  They -- we

19   just could not agree to it because they wanted to review

20   everything -- they wanted to review everything in the

21   administrative record.  And we ended up, yes, send- -- they

22   have a hard drive with over 140,000 files, I believe, and one

23   terabyte of Native files.

24             I lost my train of thought, I'm sorry.

25             The petitioners say that there is no explanation as

1   to why those receptors were changed.  Very briefly, we

2   concluded in the -- in our opposition, but the record, the

3   ROD, does explain that the Federal Highway initially assumed

4   that all their receptors were at ground level.  It was a very

5   conservative assumption that it was making; that this is done

6   with EPA guidance that was later issued in 2015.  Federal

7   Highway refined its methodology to account for the true

8   release heights of emissions at selected receptors.

9          Petitioners are asserting that that explanation --

10  that that explanation is included in there, it's a one

11  paragraph?  But all the models, everything that they asked

12  for, to begin with, and that we wanted to, at some point

13  during that conferral process tried to come up with a way to

14  give it to them, they wanted everything.

15          And now the way I see it is, like, Well, you gave

16  us too much, just -- and I think that at this point is, like,

17  you wanted -- We wanted to give you what you wanted, and we

18  gave you all, because we couldn't resolve this issue.

19          But the answers are all there in the modeling --

20  about the models, all the numbers, what it was, the

21  adjustment in the release and the heights elevations.

22  Everything is there.

23          THE COURT:  So the actual elevations are there?

24          MS. SANTACRUZ:  The elevations are there, Your

25  Honor.

1            THE COURT:  The original and the revised?

2            MR. ALLEN:  The original elevations -- may I?

3            MS. SANTACRUZ:  Yes.  Thank you.

4            MR. ALLEN:  Okay.  The original elevations for

5    those seven receptors were zero, but that is not reflected in

6    a model because the final model that was used has the actual

7    elevations for those seven receptors.

8            THE COURT:  Okay.

9            MS. SANTACRUZ:  During that conferral process,

10   they -- they tried to serve discovery requests, which we

11   responded, subject to -- without making any objection,

12   because this is an APA case, we said, All the documents that

13   we have provided, this is all we have.

14           And even if there were to be a discovery, Your

15   Honor, the scope of the motion that they requested, they seek

16   documents.  Never have they mentioned again -- they've never

17   mentioned any discovery prior to this, they've never

18   mentioned taking any depositions of anyone.  The limit in

19   their motion is for documents.

20           And so far during the conferral process, we have

21   told them that all the documents that are related to this

22   issue are already there.  So even if there were to be

23   discovery, there is nothing else to be discovered because

24   everything is in the modeling.

25           And ultimately -- and if the Court determines that,

1    for some reason, the explanation that is provided in the ROD

2    is insufficient, that is -- that's -- our opposition is that

3    that's on the merits.  The Court should determine whether

4    that explanation is sufficient or not.  If it believes that

5    it's not sufficient, then the proper course at that point is

6    to remand for additional -- for the Federal agency to fill in

7    whatever gaps are in the record, not to allow plaintiffs to

8    go on this fishing expedition that they didn't even know --

9    they didn't even know what they're going to get.  They

10    acknowledge that -- or what they're looking for.

11            And I don't know if you want me to address this

12    point, the five specific documents that they're also -- that

13    they also want to include in this motion.

14            THE COURT:  Well, we can wait until --

15            MS. SANTACRUZ:  Okay.

16            THE COURT:  Yeah, go ahead.

17            MR. DiMASCIO:  If I may, Your Honor.  Your Honor,

18    may I?

19            THE COURT:  Yes, you always may.  It looks like

20    your participation has been necessary, right.

21            MR. DiMASCIO:  Well, in my estimation.  Maybe not

22    in everybody else's.  So I just want to start back at the

23    beginning on this, if I may.

24            The standard here for discovery under the Tenth

25    Circuit law -- and I don't think there is any dispute about

1    this -- there needs to be clear evidence that either the

2    record is incomplete or of agency bad faith before a Court

3    can order discovery in an APA case.  It's very unusual, very

4    limited.

5              And so what they're trying to do is use this

6    declaration from Dr. Rowangould to show those two -- those

7    two factors.  So I want to walk through why they don't get

8    there, according to the standard.

9              THE COURT:  You could probably tread lightly on the

10   bad faith and focus on the other.

11             MR. DiMASCIO:  Yeah, sure.

12             So what they're doing is they're using the

13   Rowangould declaration to try to show or to argue,

14   essentially, that the receptor placement somehow influenced

15   or skewed the results of this PM10 that was done.  And if you

16   look at pages 8 to 10 of the Rowangould -- Rowangould's PM10

17   declaration, he essentially comes to two conclusions.

18             He says, first on page 8, that the -- that some

19   receptors had erroneously been placed in the road, which is

20   not a correct way of placing the receptors, which he himself

21   says was not a correct way to do it.  And then he says the

22   release heights at seven locations has been adjusted to match

23   the roadway conditions.

24             Now, our point on this is that the administrative

25   record already contains that very explanation, so it's kind

1   of puzzling to us why --

2            THE COURT:  Well, he would have -- that's the only

3   place he would have gotten it, right?

4            MR. DiMASCIO:  In the administrative record.

5            THE COURT:  Right.

6            MR. DiMASCIO:  Well, his declaration was

7   produced -- sorry, this declaration was produced after the

8   ROD came out.

9            THE COURT:  No, I understand that.

10           MR. DiMASCIO:  And so in the ROD at AR125 to 126,

11  there is an explanation for those two very -- the two things

12  that I just pointed out that are his conclusions, they're

13  already in there at AR125 and 126.  At AR125, it specifically

14  says that Federal Highways removed receptors from the roadway

15  because they had been improperly placed there.

16           And at AR126, it also explains that they had

17  originally assumed that all of these emissions were taking

18  place at ground level and that was not true.  It wasn't

19  reflective of the roadway conditions at those particular

20  locations.  And what it led to was conservatively high

21  predictions of PM10 concentrations at those different places.

22           THE COURT:  But how was the mistake made in the

23  first place?

24           MR. DiMASCIO:  Well, it wasn't so much a -- that,

25  like the roadway elevations issue --

99

1          THE COURT:  Right.

2          MR. DiMASCIO:  -- wasn't so much a mistake as it

3    was an assumption that they had used in their original --

4    like, when the modeler was going through the process of doing

5    his modeling, he had made this assumption.  He just set the

6    release heights to zero across the board, which didn't

7    reflect actual conditions on the ground.

8          And so when he found out that these receptor

9    locations happened to be in an area that -- where the maximum

10   receptor, what's called the maximum receptor is -- it's kind

11   of the highest concentrations in the area, and that's right

12   there on the -- on the charts, that it shows where the

13   maximum receptor is, it's in that area.

14         So as they were doing the modeling analysis and

15   refining their approach and they look at it and they say,

16   Hey, these were unusually high concentrations in this area,

17   well, let's take a closer look at what the roadway

18   elevations.  Oh, the roadway elevations are higher than at

19   ground level.  If we adjust the receptor heights at that

20   level to match the true roadway height, it brings down the

21   concentrations.

22         That's what's explained in the ROD at AR126, okay.

23   So --

24         THE COURT:  So you're saying there is nothing left

25   to discover?

1            MR. DiMASCIO:  That's correct.  There is nothing

2    left to discover because the two -- let's go back to the two

3    factors.

4            They have to show there is clear evidence that the

5    record is incomplete or bad faith.  Well, I've just explained

6    to you where on the face of the record it explains what

7    happened with these seven receptors.

8            And in terms of the underlying data, I mean, there

9    are as-built design standards for the roadway in that area in

10   the record where you can look up the actual physical height

11   of each and every pylon and grade.  It's very detailed.  It's

12   like 250 pages.  It's in the record as well.  As well as if

13   you look in the modeling files and you have the expertise to

14   analyze them, you can see what the roadway elevations were

15   set to.  So you can trace the Agency's path on this decision.

16           There -- now, so what they really want to use this

17   Rowangould expert opinion for is not simply to explain

18   anything, they want his conclusions.

19           Page 9 of his expert opinion says, The original

20   heights were more consistent with EPA guidance, okay.  That's

21   his Conclusion Number 1.  They would like to use his

22   declaration to argue that it was more consistent with EPA

23   guidance to put the roadway elevations at zero than to have

24   them reflect the true release heights.  But as we pointed

25   out, there is EPA guidance in the record at AR122902 to 06

1    that specifically explains that the release heights should

2    reflect -- they should be as realistic as feasible, is what

3    the EPA says.  So that's also in the record.

4          The model -- and then he goes on to model the

5    receptors at ground level and say, Well, if you assume that

6    they're all at ground level, there is a NAAQ's violation.

7          So what they would like to use this -- this expert

8    opinion for is to say, the conclusion is, if you follow our

9    methodology, you get a NAAQ's violation and our methodology

10    is more consistent with EPA guidance and so your decision is

11    arbitrary and capricious.

12          That is not a reason to supplement the record with

13    an expert declaration under the Tenth Circuit's decision in

14    Lee, nor have they shown bad faith or clear evidence of bad

15    faith or of an incomplete record in order to obtain

16    discovery, which as my co-counsel has already explained,

17    there is nothing left to discover.

18          The conferral process that went on here before we

19    came into your court was extremely robust.  The Agencies went

20    back and forth with the Sierra Club plaintiffs; answered all

21    of their questions.  There is an attachment to their motion

22    that shows all of Federal Highways' specific answers to their

23    specific questions.  And they've already explained, there is

24    nothing more; there is no more documents for them to get.

25    They want to know whether or not EPA got this information.

102

1        If you look at Exhibit 4 to the Government's

2    response on this motion, there is an e-mail that specifically

3    explains from -- from Federal Highways.  This is Exhibit 4 to

4    Document Number 123, there is an explanation from Federal

5    Highways' counsel.  And it specifically says that EPA

6    received the air MOD and input/output files -- the same air

7    MOD input and output files that were also given to the

8    plaintiffs that contain all of this very information.  And

9    EPA subsequently came back and said, Yep, you did it right.

10   So that explanation is already in there.

11        What else are they -- what else are they asking to

12   get?  I can only find two indications on the face of their

13   brief of what it is that they think they're going to get from

14   discovery.

15        The first seems to be a single modeling run with

16   all the receptors at ground level.  But as we've already

17   explained, it doesn't exist because that's not how a modeler

18   does his work.  He produced the model that he felt was the

19   most reflective of the correct way to model this exercise and

20   he provided an explanation of what his methodology was.

21   There is nothing more on this.  There is not like a draft

22   model out there that we know of, that I know of, that they're

23   going to find -- they're going to find through discovery.

24        They also want to know how the inputs changed and

25   whether it was explained to the decision-maker.  And again,

103

1    I've already gone through exactly how that -- where that

2    appears on -- on the face of the record.

3            So it seems to me that the Rowangould PM10

4    declaration is neither appropriate for supplementation into

5    the record, nor is it appropriate to order discovery here.

6            As to what the plaintiffs were given during the

7    comment process, the modeling files themselves were promptly

8    provided upon request.  So it's not as if they -- as if the

9    draft conformity determination was just a set of modeling

10   files.

11           There is a draft conformity determination that is

12   an explanation of the modeler's process in the conformity

13   determination.  That narrative explanation, including with

14   the receptor locations, methodology that he followed, was

15   provided to the public and opened up for public comment.

16           Subsequently, Sierra Club, maybe about 12, 13 days

17   into the comment process, sent in a letter essentially

18   saying, We would like all of your modeling files and an

19   explanation of everything that you've done in this modeling

20   exercise.  And what the response from the Agency was was to

21   respond within a day to all of these requests by providing

22   them with access to the hard copy -- the technical files that

23   contained the information.

24           Now, there is no reason, if they really wanted to

25   dig in at the level that they're digging in now, they

1    couldn't have hired an expert to be on staff to take those

2    files at that time and do the type of in-depth analysis and

3    provide within the comment process, you know, this kind of

4    redone-modeling exercise that they're now providing to the

5    Court.  They absolutely had an opportunity to do that during

6    the comment process; it's just that they chose not to until

7    six months after the ROD had already been issued.

8           So -- and we cited to the portions of the record in

9    our brief, AR53981 to 54002 and AR54275 to 293, those are

10   examples of the communications conveying these files during

11   the -- during the process to the plaintiffs and their counsel

12   at the time.  So there was no -- no one was hiding the ball

13   here.

14          It's just that they were looking at this in a level

15   of granularity that I think, you know, if they wanted to dig

16   in at that level, what they should have had is their expert

17   ready to go, receive the files, do the analysis within the --

18   within the comment period.

19          THE COURT:  As part of that process, would you ever

20   provide your own expert to sit down with them and their

21   expert and explain how it was done?  Has that ever happened?

22          MR. DiMASCIO:  I can't speak to does it ever

23   happen.  I think, you know, if they -- I think, based on the

24   course of communications that went on in this process, if

25   you -- if you look at the speed with which the Agency

1    responded to these inquiries, which was, like I said, like in

2    a matter of days they had produced all of these files, like,

3    that underlie their analysis, you know.  Within the comment

4    period, I think they were happy to engage in back and forth.

5            But it's just that, you know, you provide access to

6    the data and then you wait for follow-up and, you know, to

7    the extent that what they were requesting was specific

8    explanations of what ended up happening in the files, the

9    Agency's approach was, Okay, we understand you want to know

10   what happened with our analysis, so we'll -- so we'll explain

11   it.  And they went through the process of making sure they

12   had an accurate complete explanation on those points in the

13   ROD, which is what I've -- what I've pointed you to.  That's

14   the Agency working through the process in a diligent manner

15   the way it's supposed to.

16           THE COURT:  Okay.

17           MR. YUHNKE:  May I?

18           THE COURT:  Please.

19           MR. YUHNKE:  I hate to say this, but I think there

20   has been some misrepresentation of what happened here.

21           There was no explanation in the original proposal

22   for the conformity determination of -- in the form of a

23   narrative of what the modeler went through.

24           The only explanation was that they said they moved

25   the receptor location without identifying which receptors or

106

1    why.

2         We were able to find out that some of them were

3    moved legitimately out of the project right-of-way; they

4    don't belong there, they belong in the ambient air where

5    people breathe it.  And so that was something that we had to

6    discover on our own.

7         But when he says that they provided explanation in

8    the ROD, that explanation is what we asked for during the

9    comment period, and we received none of that.  All we

10   received were the data files.

11        And, yes, we took those data files to an expert and

12   we asked him to tell us what they meant -- represented.  And

13   he said that he -- within the time allowed, he couldn't

14   analyze -- because at that point, we had less than ten days

15   on the comment period -- he couldn't possibly run all these

16   files, set them up, run them with the software for the models

17   and determine what happened.

18        THE COURT:  And you can't request an extension of

19   the comment period?

20        MR. YUHNKE:  We did.  We requested a comment -- an

21   extension exactly for that purpose.  We even submitted the

22   response that we got from that expert explaining what would

23   need to be done as the reason for the request of the

24   extension and it was denied.

25        THE COURT:  Was that already an extended period or

1    was that the original?

2         MR. YUHNKE:  No, that was only a 30-day period.

3    One of our issues is that we believe it should be 45 days in

4    the first instance and that they only gave us 30 days and

5    would not extend.

6         THE COURT:  Okay.

7         MR. YUHNKE:  Then there are the other documents

8    that are included in the motion to complete the record and my

9    colleague will address them.

10        THE COURT:  Very good.

11        MR. CORBIN:  Good afternoon, Your Honor.

12        THE COURT:  Good afternoon.

13        MR. CORBIN:  Looking at the time and wanting to

14   afford my brothers and sisters over here enough time for them

15   to respond, I'll be brief.  All of our argument I want to

16   make is in the record, but I want to explain some of the

17   context because I think that's important for these documents.

18        These five documents, what they really represent is

19   that first issue we discussed.  We started with health -- we

20   started with health impacts, we started with -- I hate to say

21   it, but we're talking about people's lives and loss of lives.

22   And we're talking about, you know, serious health impacts to

23   this community.  It has been happening for 50 years, as

24   Mr. Yuhnke pointed out.  And what these documents represent

25   is an understanding that Federal Highways and CDOT both

1    understand that health impacts are serious; that they occur

2    below levels of the NAAQs, below the ambient standards; that

3    they both -- they acknowledge that point.  They acknowledge

4    that NEPA requires discussion of health impacts.

5           And then what the -- the last thing they do is

6    these documents actually provide Federal Highways and CDOT

7    the methodology in which to review health impacts.

8           So if you just very briefly -- I -- trying to

9    forecast arguments so that my follow-up will be as short as

10   possible, you know, some of the arguments made in the briefs

11   were about what these are intended for.

12          Document 38, which is the Health and Transportation

13   Corridor Planning Framework, I think, you know, throughout

14   this process we refer to this as I-70 corridor.  I can't -- I

15   assume there is a more technical explanation where there is a

16   distinguishing between a project that's a corridor and what's

17   not a corridor, but the health impacts aren't different and

18   the methodology for assessing health impacts isn't different.

19          The Frequently Asked Questions, again this is where

20   we actually -- if we have time, I think Mr. Yuhnke actually

21   has a fuller knowledge of the history of what order these

22   documents arrived at.  But the frequently asked questions,

23   two of them, Question 3 and Question 10, specifically

24   address, What are the opportunities to address health through

25   transportation?  And they talk about doing so early in the

1    process.

2         10 also says, How can -- how can Health Impact

3    Assessment be used in transportation planning and

4    decision-making?  And then in both -- in Frequently Asked

5    Questions, which is about decision-making and planning and

6    projects, they -- they refer to the health -- transportation

7    and health tool, which is Exhibit 40.  And it says this is

8    a -- the tool uses health and transportation indicators to

9    help inform health supportive state and regional

10   transportation policies and project decisions.  Now, that's

11   what these tools are intended for, is for project decisions.

12        Quickly, that's the transportation health tool, as

13   well.  It talks about cleaner air.  And that's actually

14   the -- where the reference to the study, which is Exhibit 42,

15   comes from, is from the Federal Highways -- I guess USDOT's

16   website.

17        And in our opening brief -- and I believe we may

18   address it as well in the reply -- we discuss the context of

19   these; we discuss when they were first made available online;

20   and we also discuss, you know, what their purpose is -- what

21   their purpose would be to add to this litigation.

22        The one that I want to spend just one more -- a

23   little bit longer with is the Exhibit 41, which is -- was

24   made in 2008 in combination with C -- you know, you look at

25   page -- page 4, this is based on the ECF page numbering, and.

1    It says, you know, Sponsoring Agency, Colorado Department of

2    Transportation and Research.  It says, Supplementary Notes

3    Prepared in Cooperation with the U.S. Department of

4    Transportation, Federal Highway Administration.  It's from

5    July 2008.

6           And then around page -- it's labeled as page 41,

7    but the ECF page number is somewhere, is -- pardon me -- ECF

8    page 55, it starts to talk about air quality.  And

9    specifically later on it says, Regarding air quality

10   considerations, it's acknowledged that transportation

11   conformity determinations are of limited value in NEPA and

12   cumulative effects assessments.  There is evidence that

13   environmental degradation, as well as human health impacts,

14   due to air pollution at levels below the NAAQs and NEPA

15   environmental assessments are required to consider any

16   adverse environmental effects.

17          So this is a document created by, I believe, the

18   University of Denver -- University of Colorado Denver, excuse

19   me, College of Architecture and Planning, sponsored by CDOT

20   in cooperation with USDOT that says there is going to be

21   health impacts below the NAAQs.  And we need this document to

22   demonstrate -- to help us demonstrate that point, that it's

23   an acknowledged thing in the -- in USDOT, Federal Highways

24   and CDOT.

25          I feel -- I would feel remiss if I didn't at least

1    touch on our alternative arguments as to judicial notice and

2    supplementation.

3            I think here, the briefs really discuss

4    supplementation is -- if you look at the motion to

5    supplement, we say these are the types of things that should

6    have been in the record.  If they're not, they're relevant to

7    the health impact issues and they're relevant to that

8    significant impact.  So I don't want to belabor that point

9    because we've discussed that one at length.

10           Judicial notice, as we discussed, there is Rule 201

11   that allows the courts to take judicial notice.  As you

12   pointed out I believe in the very first argument you asked,

13   Well, can you just cite to these?  I think the answer is

14   partially yes and partially no.  I believe that we could cite

15   to these.  Courts all the time take, you know, studies,

16   academic studies under advisement as they're making their

17   decisions.

18           THE COURT:  Right.

19           MR. CORBIN:  It's necessary to this process.  I

20   think where these miss out is that when you take judicial

21   notice, you take judicial notice of a specific fact, rather

22   than of a document.  I guess you could take judicial notice

23   of the existence of a document; but that's the purpose of

24   judicial notice is -- you know, the case law shows that there

25   is certain facts that you would have to take judicial notice

1    of.  And I believe our reply brief kind of asks this question

2    rhetorically.  If we have to also prove supplementation in

3    the judicial notice process, then what's the difference

4    between supplementation and judicial notice?

5            And so I think that's the distinction.

6            THE COURT:  Right.  But judicial notice is such a

7    narrow -- narrowly construed rule.  It has to be not subject

8    to dispute because it is generally known in the jurisdiction

9    or it can be readily determined from accurate sources.  I'm

10   not sure the Government will agree that those elements are

11   met for us to take judicial notice.

12           I -- you know, you generally don't take judicial

13   notice of scientific studies because they're subject to

14   debate, right?

15           MR. CORBIN:  That is right.  We would ask you to

16   look at -- there are a few cites in our brief that discuss

17   when a Court has taken judicial notice and even goes so far

18   as to say it can't be in reasonable dispute when it's on the

19   Federal Government's website.  Now, there may be some --

20           THE COURT:  Wow, that's a big statement.

21           MR. CORBIN:  I believe --

22           THE COURT:  So you're admitting, on behalf of your

23   client -- wait a second, I want to get this down.

24           You're admitting, on behalf of the Sierra Club,

25   that if the Federal Government says it, it is an absolutely

1    established fact?  Is that the argument?

2          MR. CORBIN:  Oh, boy.  I want to clarify that

3    totally.  I won't belabor that point.  I feel that you're

4    picking on me a little bit there.

5          THE COURT:  No, I'm just going to the logical

6    conclusion.

7          MR. CORBIN:  But the real issue there is that these

8    documents that discuss the Agency's policies, what those are

9    and what their understandings of frameworks and methodologies

10   are, that's on their website and that's what we're asking to

11   be included.

12         I may have broadly stated the statement from the

13   prior court.  But the statement remains that policies, at the

14   very least, guidance documents, the findings on which Federal

15   agencies rely, these documents I think -- I think I would say

16   that they -- their policies -- their assertions of what those

17   are can't be of reasonable dispute.

18         THE COURT:  Well, the fact that they exist on their

19   website might be subject to judicial notice because the

20   Government is not going to disagree that something exists on

21   its website if it does, in fact, exist on its website.  The

22   accuracy of it, the veracity of it, might be something that

23   you can't take judicial notice of, but the existence of it,

24   yes, I agree.

25         MR. CORBIN:  Sure, I agree as well, Your Honor.

114

1          And I'll also note that in their response brief,

2     they didn't really get into whether they would dispute the

3     veracity of these.  So I don't know -- I don't think my reply

4     brief really addresses that issue.  I think we really are

5     discussing -- I think the dispute is about whether this -- in

6     order to get it into the record, judicial notice is the

7     proper avenue to do so.

8          And on that bigger issue, I think we have the case

9     law that does support taking judicial notice of Agency

10    website documents in Federal -- or I'm sorry, in APA cases.

11         THE COURT:  Right.  And that would be Judge

12    Martinez's decision.  I'm certainly not going to take

13    judicial notice because it's not my role to do so.

14         MR. CORBIN:  Okay.  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         MR. CORBIN:  And I guess the last point I'll make,

17    and I make this in my reply brief as well, but I wanted to

18    touch on it now.

19         One of the just bigger picture issues of these

20    sorts of documents is, Well, when does it come before the

21    Agency?  And I think that's really where the argument is

22    going.

23         And it's really -- I'll admit third-party

24    documents, absolutely at some point you have to be very

25    specific about, When did you present this to them, under

1    what -- under what context?  And I think these Federal

2    Highways' policies that have dates on them that explain their

3    methodologies that they're able to use that are used for

4    putting out to the state's agencies, out to the divisions,

5    that that explains the who, when, and under what context they

6    have these documents.

7         And I would say that, at the very least, Document

8    41 goes so far as to be very specific in that it was used in

9    the C-40 EA, C-470, I'm sorry, EA and under -- I don't think

10   that that would argue that Division Administrative Cater (ph)

11   did not see that document because it was part of his decision

12   in that case.  So that's all I have on this.

13        THE COURT:  Thank you.

14        MS. SANTACRUZ:  Thank you, Your Honor.

15        So I'm going to address those three points very

16   quick.  They are advancing -- petitioners are advancing three

17   theories under which they want those five documents to come

18   in.

19        The first one is the motion to complete the record;

20   second, motion to supplement the record; and the third one,

21   which you already discussed at length, is the judicial notice

22   portion of it.

23        The motion to complete the record -- and they all

24   have -- all three have different standards.  Motion to

25   complete the record, the Court has made it very clear, Judge

1    Kane made it very clear in Center for Native Ecosystems vs.

2    Salazar and WildEarth Guardians vs. U.S. Forest Service, that

3    there is a two -- that there must be clear evidence -- well,

4    there is a presumption.  There is a presumption that the

5    administrative record is -- there is a presumption of

6    regularity; that the record that was compiled, that was

7    lodged, that was certified by the Agency has deference and it

8    was -- and it's regular.

9            In order for -- the Court went through the specs

10   and said, came up with two -- with a two-prong test.  The

11   first one, which petitioners' counsel discussed, is they need

12   to present clear evidence of three questions:  When was this

13   presented to the Agency with respect to this project?  To

14   whom?  And under what context?

15           Petitioners have not met that initial burden.

16   Assuming they meet that burden, then they need to go through

17   the second step, which is, as the Court has -- as the Court

18   said in Salazar, the proper touchstone -- touchstone

19   (inaudible) that decision-makers actual consideration in the

20   relevant decision.

21           Other than pointing out to the fact that these

22   documents are in DOT's website or in CDOT's website, they

23   haven't pointed to anywhere in the record, none of them come

24   up with clear evidence showing that these documents were ever

25   presented to -- to the decision-maker with particular -- in

117

1    this case.  They have not met that standard.

2            With the motion to supplement, it was just like a

3    sort of an after-thought, a very brief paragraph that they

4    included in this motion.  Whether it was in -- they didn't --

5    they ran out of page limits on the other one, they included

6    it as a back-up argument in this one without providing any

7    analysis as to why it would meet that standard, the motion to

8    supplement standard.

9            As a court judge -- and I like this part of it

10   where it says in Salazar, that the motion to supplement is a

11   mass of a different tail.  It's completely different from the

12   standard on the motion to complete the record.  In this case,

13   they have not met that standard.

14           They wanted to -- they specifically want to bring

15   these documents for that -- for one specific narrow

16   exception, which is the -- the Agency failed to consider a

17   relevant factor.

18           As we have explained for the past four hours

19   already, and my colleague here, Mr. DiMascio, did a great job

20   of outlining and going over the different parts of the record

21   where we explain the public health effect that this project

22   is going to have, the relevant factor information.  It's

23   already in there.

24           And with respect to the supplement argument,

25   these -- these documents were created, most of them,

1    especially the Number 42, the article from the New England

2    Journal, in 2009.  If they wanted to -- the Agency to

3    consider this document, why not include that as part of the

4    record, during the multiple comment periods that they had an

5    opportunity to submit it.

6            Same thing with the -- the document, the report.

7    It was a research paper, and I will let my colleague speak to

8    that a little bit more.  But with respect to that record, 41,

9    was created, not even by Federal Highway, it wasn't even

10   created by CDOT.  It was a paper, a graduate research paper,

11   that was created by faculty and graduate students in the

12   University of Denver.  It was -- it was -- it's not a

13   policy -- none of these documents -- contrary to what

14   petitioners are asserting, they are not policies.

15           Exhibit 38, for example, and 41 as well, the

16   graduate student -- student report, in the Exhibit 38, the

17   Health and Transportation Corridor Planning Framework, very

18   first page it says, This is not an official policy of the

19   U.S. Department of Transportation.  This report does not

20   constitute a standard specification or regulation.

21           The next page, it says that this framework does not

22   provide answers or outcomes.  These are just resources.

23   These are tools.  So for the stakeholders that are funding

24   them doing, whether it's a regional or a statewide,

25   countywide, citywide transportation, like, these are the

119

1    things that you may want to consider.  We're not telling you

2    to consider every single project that you -- that you come

3    across; these are just things to keep in mind while you're

4    going through the process.

5             Unless the Court has specific questions about any

6    of these documents, I will move on to the judicial notice

7    portion of it, which -- and like we said in our -- in our

8    opposition, Rule 21 of the Federal Rule of Evidence was not

9    designed to circumvent the standards applicable to

10   administrative review cases.

11            Petitioners' counsel did mention some of the

12   cases -- they cite some of the cases in their reply.  None of

13   them are applicable in this case.  New Mexico -- for example,

14   New Mexico ex rel. Richardson, which is a Tenth Circuit case

15   from 2009, the issue was mootness.  It was not even about the

16   administrative record.  And it took judicial notice only of

17   the fact -- only a specific fact, which was the fact that the

18   Fish and Wildlife release falcons into the wildlife.  It was

19   just -- it was not a document.  It was just for something

20   very specific, but it was not even in dispute.  And the --

21   the Agency, in fact, did not dispute.

22            In this case, all of the documents and all the

23   things that they want -- the petitioners want to include for

24   a judicial notice, we start by -- by disputing the fact that

25   they're even policies.  They're not regulations, they're not

1    policies.  They're just resources to assist the stakeholders

2    that are working on transportation, regional metropolitan

3    transportation cases, not even project level -- projects like

4    this one.

5              Thank you.

6              MR. DiMASCIO:  I just want to also agree with

7    Ms. Santacruz, that I think this is a really easy for you.

8              The supplementation issue on these five documents

9    was waived.  It wasn't appropriately briefed, there was no

10   argument in the opening brief.  They tried to use pages in

11   their motion to complete the record to brief an issue that

12   really went to supplementing the record, which I really think

13   is an improper way to put the issue.

14             We have tried to address the documents on their

15   face in the alternative, but I really think the appropriate

16   thing to do here is just to deny the motion to supplement out

17   of hand for waiver.

18             The -- and the other thing is on Exhibit 41, which

19   is the one that the plaintiffs spent some time concentrating

20   on.  This is the Area-Wide Coordinated Cumulative Effects

21   Analysis document that's found on CDOT's website, that

22   contains the very same disclaimer that Ms. Santacruz pointed

23   out; it is not an official position of CDOT or Federal

24   Highways.  It's a research paper that was done, you know, in

25   coordination -- I don't know if it was funded or there is

1    some kind of coordination between CDOT.  But it expressly

2    says this is not a guidance document, it is not a policy.

3    It's for broad level, high level planning when you're trying

4    to organize and prioritize various projects in a region,

5    essentially, and analyze the cumulative effects of all those

6    projects across a huge region, as opposed to a specific -- a

7    specific project like this.

8            The other thing that I would say about this

9    document is that they like this quotation, which he read

10   on -- opposing counsel read on page 42, which has to do with,

11   you know, some statements that conformity determination is of

12   limited use in the NEPA analysis.

13           The response on the merits to that is that --

14   again, I've said this many times today -- the Agency's

15   analysis did not stop at a conformity determination.  It went

16   on -- they went on and they did the NEPA analysis that was

17   appropriate to the NEPA framework using this inventory

18   analysis, comparing alternatives, emissions inventories and

19   alternatives.

20           And so, I mean, really what they like about this

21   document is that quotation and that's why they want it in;

22   but it doesn't show that the Agency completely overlooked the

23   factor of human health with respect to NEPA because of the

24   analysis that I've already pointed out that they did.

25           And I think that, yeah, Ms. Santacruz did a great

1    job on the judicial notice.

2            THE COURT:  Thank you.

3            MR. CORBIN:  So I think I'll ignore judicial

4    notice, because, as you said, that's really something that

5    you declined to allow at this point.

6            THE COURT:  I won't use it as a basis for my

7    decision.

8            MR. CORBIN:  Right.  So I'll focus on just a few

9    brief comments.

10           One, the disclaimers say these aren't regulations,

11   these aren't policies.  That's absolutely what they say.

12   They're provided to the public, to policymakers, to

13   decision-makers, to project planners as guidance.  That's

14   what they're for.  They provide guidance on what health

15   impacts there are going to be.

16           And that's exactly what they used it for on the

17   C-470.  They cited to it in the C-470.  That's why the 41 is

18   so surprising that it was included in the record in the

19   beginning.  It's something they've relied on the past on a

20   highway decision in this area.

21           The second thing I'll say is from, I believe it's

22   County of San Miguel v. Kempthorne, it explicitly says, It is

23   axiomatic that documents created by an agency itself or

24   otherwise located in its files were before it.  That's where

25   we base a lot of our understanding of this from.

1          And I guess I need to return one second back to

2     that disclaimer.  And that is one of -- at least one of the

3     documents, the transportation and health tool doesn't have a

4     disclaimer like that.  So I'm not sure what to make of that

5     document other than the Frequently Asked Questions refer to

6     it as for policymakers and planners in making highway

7     decisions.  So that's how we understand it to be used.

8          The last thing I'll say is, just to bring this back

9     to why we ask for these documents -- I guess two quick -- two

10    quick things.

11         One is this idea of waiver, we explicitly say what

12    our argument is in our briefs.  That's before you.  I won't

13    tell you more than what's in there.  That's -- that's what's

14    in there.

15         The second thing, relying on other papers occurs

16    all the time.  CDOT did it on this motion.  They explicitly

17    said, We totally rest on Federal Highways' analysis on this.

18    So any sort of waiver argument here is a little strange.

19         I'll add in that we do mention the explicit

20    exception we think this falls under.  This wasn't a way to,

21    you know, sneak around the page limits on this

22    supplementation motion because I'm not sure whether this

23    document -- these documents would be for motion to complete

24    or motion to supplement if you were to determine they weren't

25    before the Agency because we really do believe they were

1    before the Agency.  It didn't make sense for us to mention

2    documents in two separate pleadings.

3            So the final thing I'll say is that the relevant

4    factor of the majority of these documents we've discussed

5    today, from Exhibit 28 to 31, 34 on up through all the

6    numbers we've provided to you, is that they really are about

7    health and about this community's health.  They're about the

8    people who are likely to suffer from the increases in the air

9    pollution that, in these documents they acknowledge, will

10   lead to cardiovascular disease, cardiovascular death,

11   childhood asthma, childhood asthma flareups.  And,

12   truthfully, it also leads to lung cancer.

13           And they do talk about this in their ROD, some of

14   the ideas of this.  But it happens on increases in health

15   impacts and that's why these are so crucial to our case

16   because we need -- we need to demonstrate that these are

17   exactly the reasons why this community commented so much on

18   this project, why they're fighting to this day because real

19   people are affected by it.  And I think that's where I would

20   like to rest.

21           Thank you.

22           THE COURT:  Thank you.  Are we all good?  All

23   right.  Again, I should have a decision out within the week,

24   a week from now.  And thank you for your arguments.  They

25   were very informative.  So we'll be in recess.

125

1          UNIDENTIFIED SPEAKER:  All rise.

2          THE COURT:  Anything further?

3          UNIDENTIFIED SPEAKER:  Yeah, one thing.

4          THE COURT:  Go ahead.

5          UNIDENTIFIED SPEAKER:  One thing, Your Honor.  If

6    your decision were to come out after, I believe April -- or

7    April 1, I guess, then we would be asking for that change in

8    the briefing schedule and maybe you could mention that in

9    your order as well.

10         THE COURT:  Will do, understood.  Thank you.

11          (Whereupon, the within hearing was then in

12   conclusion at 4:56 p.m.)

13

14   I certify that the foregoing is a correct transcript to the

15   best of my ability to hear and understand the audio recording

16   and based on the quality of the audio recording from the

17   above-entitled matter.

18

19   /s/ Dyann Labo                    April 27, 2018

20   Signature of Transcriber              Date

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com