**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as Secretary of Transportation; and JOHN M. CATER, in his official capacity as Division Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and MICHAEL LEWIS, in his official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

**MOTION FOR RECONSIDERATION OF PETITIONERS' MOTION FOR STAY
(Case No. 17-cv-1679-WJM-MEH)**

---

ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

COUNSEL FOR PETITIONERS

Petitioners Sierra Club, Elyria and Swansea Neighborhood Association, Chafee Park Neighborhood Association, and Colorado Latino Forum move to reconsider the decision (ECF No. 135, "Order") denying their Motion to Stay Agency Action pending a disposition on the merits. The Court held Petitioners are not likely to prevail on the merits of the two claims presented: 1) that the EIS failed to address the impacts that increased exposure to particulate matter (PM) resulting from the Project will have on community health, and 2) that the EIS failed to explain the factors relied upon to make the determination required by the Federal Aid Highway Act that the project must be "in the best overall public interest." Specifically, Petitioners seek reconsideration of the determination that FHWA may rely on the NAAQS to determine no significant impact on health in the circumstances presented by this case. After conferral, counsel for Defendants and Intervenor-Defendants state they oppose this motion.

Petitioners seek reconsideration because the Project Agreement required by 23 U.S.C. §106 has now been executed by Defendants and Colorado DOT (CDOT). *See* Notice filed concurrently herewith. This allows contracts to be executed and construction to begin. Petitioners believe that their members will soon be at risk of suffering significant harm to their health and well-being as a result of increased exposure to emissions as soon as construction commences. Therefore, Petitioners move pursuant to Fed. R. Civ. P. Rule 54(b) to reconsider and revise the Order denying a Stay for the reasons set forth herein.

## I.      Standard of Review.

The Administrative Procedure Act ("APA") provides the standard for review for agency action under statutes that do not include an applicable standard, including NEPA and the F-AHA. 5 U.S.C. §704. "The reviewing court shall … hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.,* §706(2)(A). *Wild Earth Guardians v. U.S. BLM,* 870 F.3d 1222, 1233 (10th Cir. 2017). An EIS is inadequate, and therefore not in accordance with the National

Environmental Policy Act ("NEPA"), if the agency has not "adequately considered and disclosed the environmental impact of its actions." *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir. 2002) (*quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983)). This duty to "adequately consider and disclose" extends to "'every significant aspect of the environmental impact of a proposed action....'" *Rags Over the Arkansas v. BLM,* 77 F. Supp.3d 1038, 1047 (D. Colo. 2015).

Similarly, the EIS is inconsistent with the F-AHA if it fails to disclose and consider the "possible adverse economic, social and environmental effects relating to any proposed project;" determine "the costs of eliminating or minimizing such adverse effects and ... (1) air...pollution;" and weigh "the costs of eliminating or minimizing such adverse effects" together with "the need for fast, safe and efficient transportation" to make a final decision on the project "in the best overall public interest." 23 U.S.C. §109(h).

In addition, "an agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *Wild Earth Guardians,* 870 F.3d at 1233. In the context of the facts in this case, Petitioners contend that presuming no significant impact on health entirely fails to consider an important impact of the Project on the community, "that runs counter to the evidence before the agency," and renders the EIS inadequate.

## II.     NEPA Claims.

The Court relies primarily on two points for its determination that Petitioners are not likely to prevail on the merits: (1) case law from other circuits affirming agency reliance on the NAAQS, and (2) a review of the facts in this case that omits important aspects of the factual

predicate for Petitioners' claims. Petitioners argued in comments, and here, that NAAQS compliance does not support a presumption of no significant health impact because: (1) the facts in the Administrative Record (AR) rebut the presumption, (2) EPA acknowledged that the NAAQS for PM2.5 was not set at a level that supports the presumption, and (3) published scientific research rebuts the presumption. In addition, FHWA fails to identify facts in the AR that support the presumption.

### A. Presumption Rebutted by Community Health Data.

In comments, the Sierra Club pointed to data reported in the community health study published by Denver Department of Environmental Health (the "DEH Study") as establishing that the neighborhoods affected by highway emissions are suffering a significantly greater incidence of the diseases linked to air pollution than other neighborhoods in Denver.[1] The Court too easily dismisses the significance of these data.

First, the Court discusses only the asthma data when the highly disparate incidence of cardiovascular disease[2] is at least as, if not more compelling than the asthma data. The disproportionate incidence of cardiovascular mortality is compelling because: (1) EPA found the causal connection between PM2.5 and cardiovascular disease to be the strongest of any adverse

---

[1] FEIS Attachment Q, SDEIS Comment (AR 024714).

[2] Sierra Club's Comments on the SDEIS noted that on average, cardiovascular mortality in the four council districts along I-70 (1,8, 9 and 11) is roughly 50% greater than other parts of the city. These are remarkably huge differences in cardiovascular mortality, the largest single cause of death in Denver and the U.S.

Increased community exposure to Project emissions will occur primarily in Council Districts 9 and 1. District 9 includes the GES and other neighborhoods along the east side of I-25 from the Auraria campus to the Commerce City line, including the neighborhoods along I-70 east of the mousetrap. The mortality rate in Council District 9 is identical to the rate in District 1 (213/ 100,000). District 1 includes the neighborhoods on the west side of I-25 from the Auraria campus north to the city line, including the neighborhoods along I-70 west of the mousetrap. Together, these two districts have significantly higher cardiovascular mortality rates than all other council districts except 8 and 11. In addition to emissions from I-70, residents in Districts 1 and 9 are exposed to emissions from I-25, residents in District 8 are most exposed to the additional pollution burden coming from the refineries, and District 11 is most exposed to emissions from the I-225 interchange, Pena Blvd and airport operations. *Id.*

3 – Petitioners' Motion for Reconsideration of Motion to Stay

health outcome,[3] (2) EPA cited studies that establish a causal relationship between exposure to traffic PM, or one or more components of traffic PM emissions, and pre-mature mortality and emergency treatment for cardiovascular outcomes;[4] and (3) the DEH Study[5] and monitoring data[6] confirm that neighborhoods with the highest rates of cardiovascular mortality correlate with highest pollutant levels.

Sierra Club also noted that emergency treatment for childhood asthma is highest in the neighborhoods most affected by highway air pollution, and that "EPA cited studies demonstrating a causal relationship between exposure to PM2.5 and childhood asthma: 'road dust and traffic sources of PM have been found to be associated with increased respiratory symptoms in asthmatic children and decreased PEF in asthmatic adults.'"[7]

The Court faults "the DEH Study [because it] is not an empirically rigorous document, as it generally reports only on correlations, without any inquiry into causation, contrary to the scientific method." Order, at 18. But the DEH study was not cited by the Sierra Club for

---

[3] Sierra Club's Comments on the SDEIS noted that: In its recent reviews of the adequacy of the NAAQS for PM2.5 and NO2, EPA has identified causal relationships between exposure to these pollutants and many of the adverse health outcomes associated with exposure to highway pollutants. In its review of the health effects literature available through 2009 as part of the Agency's determination to make the NAAQS for PM2.5 more protective, EPA found [bold in original]
 • **"a causal relationship exists between short-term exposures to PM2.5 and mortality."**
 • **"a causal relationship exists between long-term exposures to PM2.5 and mortality."**
 • **"a causal relationship exists between short-term exposures to PM2.5 and cardiovascular effects."**
 • **"a causal relationship exists between long-term exposures to PM2.5 and cardiovascular effects."**
*Integrated Science Assessment for Particulate Matter* (US EPA, December 2009), pp. 2-10, 2-11, 2-12. (hereinafter "*ISA for PM*") available at: http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=216546.
[4] *See* SDEIS comments quoting EPA's *ISA for PM,* p. 2-26 ("multiple outcomes have been linked to a PM2.5 crustal/soil/**road dust** source, including cardiovascular mortality"; "studies have reported associations between other sources (i.e., traffic and wood smoke/vegetative burning) and cardiovascular outcomes (i.e., mortality and ED visits)"; "Studies that only examined the effects of individual PM2.5 constituents found evidence for an association between EC and cardiovascular hospital admissions and cardiovascular mortality";5 "studies found an association between mortality and the PM2.5 sources: …, traffic"; "recent studies have suggested that PM (both PM2.5 and PM10-2.5) from .. road dust sources or PM tracers linked to these sources are associated with cardiovascular effects.") FEIS Attachment Q, S-112. (AR 024718)
[5] *See* DEH Study, Fig. 11 (hot spots range from 5.5 to 7.4 compared to green zones 0.71 to1.2)(AR 146934).
[6]. ROD Attachment E, FEIS Comments (AR 005375).
[7] FEIS Attachment Q, SDEIS Comments quoting *ISA for PM,* p. 2-26. (AR 024718).

4 – Petitioners' Motion for Reconsideration of Motion to Stay

causation, but for what the FHWA noted it is: a study of "[t]he current health status of the affected communities."[8] The Sierra Club cited EPA's *ISA for PM* for a comprehensive analysis of all the published science to establish causation between these adverse health outcomes reported by DEH in the DEH Study and air pollution from highways noted by the *ISA for PM*. EPA's criteria for finding a causal relationship are rigorous.[9]

FHWA does not dispute EPA's findings that these health outcomes are causally linked to air pollution. FHWA acknowledged that:

> The DEH [S]tudy identified disparate health outcomes and identifies possible causes for these outcomes. It does not definitively establish any of the causal relationships and indicates that further study will be necessary and conducted to do so. DEH identified a number of potential causal factors, including obesity, lack of medical access, lack of activity, lower income, exposure to hazardous substances, etc. Air emissions were identified as a potential cause, too, including **emissions from highways,** railroads, refineries, power plants and other industrial facilities, including spikes in pollution occurring during upset conditions at stationary sources. (Emphasis added)[10]

Having acknowledged that the neighborhoods affected by emissions from I-70 are experiencing "disparate health outcomes," that "emissions from highways" are a "potential cause," and "that further study will be necessary to" "definitively establish … causal relationships" to determine the magnitude of the adverse effects on community health, the burden falls on the agency to inform the decisionmaker and the public. These admissions do not constitute a finding that emissions from I-70 are not a cause of the "disparate health outcomes" occurring in the adjacent communities. Rather they recognize that highway emissions are a "potential cause" of adverse

---

[8] ROD. (AR 000121).

[9] *Integrated Science Assessment* (2009), p. 1-21, Table 1.3 ("Evidence is sufficient to conclude that there is a causal relationship with relevant pollutant exposures. That is, the pollutant has been shown to result in health effects in studies in which chance, bias, and confounding could be ruled out with reasonable confidence. For example: a) controlled human exposure studies that demonstrate consistent effects; or b) observational studies that cannot be explained by plausible alternatives or are supported by other lines of evidence (e.g., animal studies or mode of action information). Evidence includes replicated and consistent high-quality studies by multiple investigators.")

[10] FEIS Attachment Q, SDEIS Comments (AR  024716).

health outcomes that would be exacerbated when exposures increase as a result of construction emissions, and from future traffic.

      The Court suggests that Defendants might have resolved the causation question by relying on the contention in the DEH Study that "average annual air pollution in the neighborhoods is not higher than other areas of Denver…." Order, at 18. But this unsupported contention is refuted by the evidence in the record. First, DEH itself reported the results of a modeling study showing that concentrations of highway pollutants in neighborhoods close to the interstates range from 5 times to 10 times greater than neighborhoods a mile away.[11] Second, Sierra Club pointed to the data recorded at the monitoring site near the I-25/I-270 interchange used by FHWA to determine background air quality as the highest in the metro area. FHWA did not dispute that fact. In comments on the FEIS, the Sierra Club submitted data from the two "near- highway" monitors required by EPA in its 2013 PM2.5 NAAQS revision.[12][13] The monitoring data showed that PM2.5 measured at both locations were 30% to 40% higher than the monitored levels at locations not near highways that were available to DEH in 2014.

> The I-25 monitor … shows one annual concentration for 2015 that is nearly 30% higher than the concentrations measured at Welby which is the site CDOT chose to represent background. The peak 24-hour concentrations at the I-25 site exceed the NAAQS, but not the 98th%ile value which is used to measure attainment. However, the 98th%ile value at this site is also 30% above the background site.[14]

The new PM2.5 monitor in Globeville began operating October 1, 2015. Data available from this site before the comment deadline showed PM2.5 measured for the last quarter of 2015 averaged 14 µg/m3,[15] which was more than 40% greater than at the background monitor, and greater than

---

[11] *See* DEH Study, Fig. 11 (hot spots range from 5.5 to 7.4 compared to green zones 0.71 to1.2) (AR 146934).
[12] ROD Attachment E, FEIS Comments (AR 005375).
[13] *See* 78 Fed. Reg. 3086, 3238 (January 15, 2013) (" requiring a modest network of near-road compliance PM2.5 monitors is necessary to provide characterization of concentrations in near-road environments including for comparison to the NAAQS.')
[14] ROD, Attachment E, FEIS Comments, , (AR 005375).
[15] *Id.*

the annual PM2.5 NAAQS (12 µg/m$^3$). Both the modeling in the DEH Study and the measurements at the new near-highway monitors[16] confirmed that exposures to PM2.5 are significantly greater in communities adjacent to the interstates than in other metro neighborhoods. But FHWA did not acknowledge these new data in the ROD or admit that the unsupported contention in the DEH Study was contradicted by monitored air quality data.

NEPA and §109(h) create the duty to make an informed decision based upon an understanding of the adverse health consequences of the Project. NEPA requires consideration of "the incremental impacts"[17] on health which requires an assessment of the total health burden that will result when the community is exposed to additional emissions from the Project. Even if all of the cardiovascular mortality and childhood treatment for asthma found in other parts of Denver were attributable to contributing factors other than air pollution, and air pollution from highways contributes only to some of the 50% greater incidence of cardiovascular disease and the 40% increase in children hospitalized for asthma in the near-highway neighborhoods, the evidence creates a strong inference that Project emissions add to the community health burden caused by other factors, and that future increases in community exposures will exacerbate that burden. FHWA points to no evidence that Project emissions have no significant health impact.

Section 109(h) adds the further obligation to weigh "the costs of eliminating or minimizing such adverse effects" against transportation benefits to determine if the Project is "in the best overall public interest." FHWA, not DEH, must investigate what portion of the disparate health outcomes are caused by exposure to existing pollution, and to what extent that burden on community health will be exacerbated by exposure to the higher future concentrations of PM10, PM2.5 and CO that will result from increased traffic in the corridor. However, the agency claims

---

[16] ROD Attachment E, FEIS Comments (AR 005375).
[17] 40 C.F.R. §§1508.8 Effects; 1508.7 Cumulative Impacts.

7 – Petitioners' Motion for Reconsideration of Motion to Stay

that it may avoid an investigation to determine health impacts by demonstrating that Project emissions will not exceed the applicable NAAQS.[18]

### B. EPA's NAAQS Record Contradicts Presumption of No Significant Impact.

FHWA contends that it may rely on the NAAQS to assert the presumption of no significant impact of health if Project emissions do not violate the NAAQS. Petitioners challenged this contention in comments that quoted EPA's findings in the *Integrated Science Assessment for PM*.[19] Based on its review of hundreds of studies, EPA concluded that:

> Overall, the limited evidence from the studies evaluated supports the use of a no-threshold, log-linear model, which is consistent with the observations made in studies that examined the PM-mortality relationship.[20]

> Using a variety of statistical methods, the concentration-response curve was found to be indistinguishable from linear, and, therefore, little evidence was observed to suggest that a threshold exists in the association between long-term exposure to PM2.5 and the risk of death.[21]

The studies that EPA reviewed showed statistically significant respiratory effects at 24-hour mean concentrations as low as 7.3 µg/m³,[22] and significant mortality effects at long term mean

---

[18] Petitioners challenge FHWA's determinations that Project emissions will not violate the NAAQS for PM2.5 and PM10. *See* ECF No. 1, Petition for Review, Eighth NEPA Claim, Clean Air Act Claims. Petitioners do not contest here the Court's conclusion, at 14, that for the purposes of this Motion to Stay Petitioners did not develop these claims.

[19] *See,* FEIS, Attachment Q, SDEIS Comments (AR 024718). EPA's *ISA for PM* is in the AR because the comment both quoted from the *ISA for PM* and included the url, at n.4. *See e.g. Consolidated Irrig. Dist. v. Superior Court,* 205 Cal.App.4th 697, 702 (2012) (interpreting under the California corollary to NEPA that "written evidence…submitted" includes (1) documents named in a comment letter along with a specific Web page address (URL) containing that document.)

  Should the Court determine that EPA's *ISA for PM* is not included in the AR by virtue of its inclusion in the Sierra Club SDEIS comments, Petitioners request that the Court take judicial notice of the contents of the *ISA*. As a published federal agency document containing the criteria for decision required by the Clean Air Act, 42 U.S.C. §7408(a)(2), that was noticed for public comment and made available to the public by reference published in 74 Fed. Reg. 66353-66354 (December 15, 2009), and cited by EPA in its final rulemaking as the source of data relied upon for its NAAQS decision, the *ISA* qualifies as the kind of reliable source that meets the requirements for judicial notice pursuant to Fed. R. Ev. 201. *See Simon v. Taylor,* 252 F.Supp. 3d 1196, 1239 (D. N.M. 2017).

[20] *ISA for PM,* p. 2-25.

[21] *ISA for PM,* p. 2-26.

[22] *ISA for PM,* p. 2-14, Fig. 2-1 (Asthma exacerbation).

concentrations beginning at 10.7 µg/m$^3$.[23] The 24-hour NAAQS—set at 35 µg/m$^3$—and the annual NAAQS—set at 12 µg/m$^3$—are not set at levels that prevent these reported effects. EPA based its final decision to tighten the PM2.5 NAAQS on its 2009 *ISA for PM*.[24] In the rulemaking EPA confirmed its finding that:

> evidence- and risk-based approaches using information from epidemiological studies to inform decisions on PM2.5 standards are complicated by the recognition that no population threshold, below which it can be concluded with confidence that PM2.5-related effects do not occur, can be discerned from the available evidence.[25]

In its decision to revise the standard, EPA acknowledged numerous studies identified by commenters showing significant effects below the level of the final standards, including

> [s]tudies of short-term exposure demonstrate that PM2.5 air pollution increases the risk of hospital admissions for heart and lung problems even when you exclude days with pollution concentrations at or above the current daily standard of 35 [µg/m$^3$]. Daily concentrations must be capped at lower levels to protect against peak exposure days that occur due to local and seasonal sources of emissions.[26]

EPA also acknowledged excluding "studies of diesel pollution and traffic-related pollution."[27] Petitioners do not challenge these actions here, but rather note that evidence of harm below the level of the NAAQS was not weighed, or not given significant weight in EPA's standard setting.

Agencies which seek to rely on EPA's judgment in setting NAAQS also need to acknowledge EPA's factual findings based on its review of the science. The NAAQS was set at a point along a continuum of effects which includes evidence of effects below the level of the NAAQS. EPA's factual findings acknowledge that adverse health effects occur below the level of the NAAQS. Those findings do not support a presumption that exposures allowed by the

---

[23] *Id.,* p. 2-15, Fig. 2-2.
[24] 78 Fed. Reg. 3086, 3095 ("the EPA is basing its decision in this review on studies and related information included in the Integrated Science Assessment, Risk and Exposure Assessment, and Policy Assessment, which have undergone CASAC and public review. The rigor of that review makes these studies, and their integrative assessment, the most reliable source of scientific information on which to base decisions on the NAAQS.")
[25] *Id.,* 3098.
[26] *Id.,* 3110.
[27] *Id.*

9 – Petitioners' Motion for Reconsideration of Motion to Stay

NAAQS are risk free. Rather they invite the familiar NEPA inquiry whether emissions from a particular source in proximity to an exposed population causes "significant" risks of adverse health outcomes. Under §109(h), the operative determination is whether adverse effects are "possible." Petitioners suggest that a "clear, administratively manageable standard by which agencies may discern when NEPA requires them to investigate further into the possible adverse health consequences of a proposed action, when there is little dispute that such an action will not exceed NAAQS-permitted levels of pollution" is defined by EPA's acknowledgement that the NAAQS is not set to protect against all observed adverse health effects.

### C.  Determination of "Significance" Should be Informed by Current Research.

The presumption of no significant impact may also be rebutted by more recent science. EPA's last PM2.5 review is based on data published before 2009. Courts have recognized a general obligation under NEPA to "consider any new and significant information regarding environmental impacts before [granting an approval]." *Mass. v. U.S. Nuclear Regulatory Comm.*, 522 F.3d 115, 127 (1st Cir. 2008). "A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions, even after release of an EIS." *Stop H-3 Assn. v. Dole*, 740 F.2d 1442, 1463 (9th Cir. 1984) (*citing Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023–24 (9th Cir.1980). Under its statutory obligation "to make decisions that are based on understanding of environmental consequences, and take actions that protect, restore and enhance the environment,"[28] FHWA has a duty to investigate more recent evidence not available to EPA in 2009 that reveals health effects at levels below the NAAQS.

For example, EPA's *ISA for PM* cited studies showing that carbon in diesel exhaust may be more potent that other constituents of PM but did not take the potency of specific sources into

---

[28] 40 C.F.R. §1500.1 Purpose.

account in standard setting. Sierra Club urged Defendants to consider 2015 research showing that carbon particles emitted from highways may account for greater cardiovascular mortality.

> Highways emit particles containing carbon from fuel combustion, tire wear and asphaltic road surface material. The most recent research published by a team from the Keck School of Public Health at USC,[29] and another study published by the California Office of Environmental Health Hazard Assessment[30] identifies carbon particles as the component of PM2.5 most associated with cardiovascular disease.[31]

Defendants failed to discuss the evidence that carbon particles—EC ("elemental carbon"), and OC ("organic carbon")—in vehicle exhaust might account for the disparate cardiovascular mortality observed near the interstates in north Denver because these contaminants are more potent causes of cardiovascular disease than the risk EPA considered when it set the NAAQS. FHWA merely acknowledged that "a large burden of preventable coronary heart disease mortality is attributable to near-roadway air pollution and is likely to increase even with decreasing exposure by 2035 due to the vulnerability of an aging population,"[32] but did not discuss the implications for health where exposures will increase. With regard to the second study FHWA acknowledged that:

> using an emissions-based model, the research team observed significant positive associations between ischemic heart disease mortality and both fine and ultrafine particle species and sources. The results of this research project suggest that the exposure model effectively measured local exposures and facilitated the examination of the relative toxicity of particle species.[33]

Sierra Club also referenced a study showing that when annual exposures to PM2.5 were reduced to levels below the NAAQS (from 14.5 to 11.5 µg/m³) over a ten-year period (2001-2010), the

---

[29] "Near-Roadway Air Pollution and Coronary Heart Disease: Burden of Disease and Potential Impact of a Greenhouse Gas Reduction Strategy in Southern California," Ghosh, et al (EHP, July 2015) http://dx.doi.org/10.1289/ehp.1408865.
[30] "Associations of Mortality with Long-Term Exposures to Fine and Ultrafine Particles, Species and Sources: Results from the California Teachers Study Cohort," Ostro, B, et al. (EHP, January 2015) http://dx.doi.org/10.1289/ehp.1408565.
[31] FEIS Comments, 14.
[32] FEIS §5.20-22.
[33] *Id.*

incidences of cardiovascular mortality dropped by 21% and stroke dropped by 30%, with benefits observed even among high-risk obese and high-cholesterol populations.[34] This study shows that significant health benefits could be achieved for residents if PM concentrations were reduced.

The evidence in the AR, including evidence of disparate health outcomes in the community for the diseases EPA found are causally linked to PM2.5, EPA's acknowledgment that the dose-response between exposure to PM2.5 and cardiovascular disease is linear, has no known threshold, and that the NAAQS does not prevent all observed effects, and more recent evidence showing effects below the NAAQS, it is not a reasonable for FHWA to presume that exposures below the NAAQS have no health impact. And FHWA points to no record evidence supporting the presumption that the NAAQS prevents all health impacts from highway pollution.

### D.  Cases from Other Circuits Do Not Define EPA's Duty Regarding NAAQS.

The D.C. Circuit has exclusive jurisdiction to review EPA NAAQS decisions. 42 U.S.C. §7607(b). That Court has not interpreted the CAA to require standards that ensure the level of protection presumed by FHWA. The Court rejected claims that EPA violated the Act by not determining a "safe" level, "require[ing] only that EPA 'engage in reasoned decision-making,' not that it definitively identify pollutant levels below which risks to public health are negligible." *American Trucking Associations, Inc. v. E.P.A.*, 283 F.3d 355, 370 (D.C. Cir. 2002) (citations omitted). The cited decisions from other circuits that arguably require more protective NAAQS, Order at 15, were not interpretations reached in review of EPA's standard setting. The D.C. Circuit decision is the only interpretation that governs EPA's NAAQS decisions. This Court should apply the D.C. Circuit's construction when interpreting the measure of protection that may be presumed from the NAAQS.

---

[34] *Trends of Non-Accidental, Cardiovascular, Stroke and Lung Cancer Mortality in Arkansas Are Associated with Ambient PM2.5 Reductions,* M. Chalbot, et al., College of Public Health, University of Arkansas (2014).

Furthermore, none of the other decisions cited by this Court address EPA's findings in the *ISA for PM* and EPA's acknowledgement in its final PM2.5 NAAQS decision that the standard does not offer the level of protection presumed by FHWA. The records reviewed in the other cases do not present evidence of disparate adverse health outcomes in the affected community for the diseases EPA has found to be causally related to the pollutants to which the community is exposed. Those cases did not present the record presented here, did not consider that EPA itself acknowledged that adverse effects occur below the level of the NAAQS, or discuss the standard applied by the D.C. Circuit to EPA's NAAQS decisions. For these reasons, those decisions are not on point and should be disregarded.

### III.     Federal-Aid Highway Act, § 109(h).

Petitioners also move the Court to reconsider its holding "that FAHA § 109(h) imposes no requirements different from or in addition to the Highway Administration's NEPA obligations."[35] The effect of this interpretation is to treat as superfluous or surplusage the separate and supplemental provisions in the Highway Act amendments of 1970 that Congress enacted ***one year after*** NEPA. The text of §109(h) added a further obligation after a project is determined to be the "preferred alternative" based on the comparison of alternatives required by NEPA. The project may only be approved if it is "in the best overall public interest" based on weighing "the costs of eliminating or minimizing such adverse effects" against "the need for fast, safe and efficient transportation." These statutorily defined factors apply only to highway projects and are not found in NEPA.

The Court's interpretation disregards canons of statutory construction. First, the Court's "construction violates the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988); *Cf. South Carolina v. Catawba Indian Tribe*, Inc., 476 U.S. 498, 510 n.22 (1986) ("It is an

---

[35] Order Denying Stay, at 21 (ECF #135).

'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (*quoting United States v. Menasche*, 348 U.S. 528, 538–539, (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' *Montclair v. Ramsdell*, 107 U.S. 147, 152, rather than to emasculate an entire section"). It is axiomatic that the Act "…'should be interpreted so as not to render one part inoperative.'" *Department of Revenue of Oregon v. ACF Industries*, 510 U.S. 332, 340-341 (1994). "EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. American Trucking Associations*, 531 U.S. 457, 485 (2001).

U.S. DOT has never construed §109(h) as having no substantive consequence. The initial regulations implementing §109(h) declared that their purpose is

> to assure that: (2) Final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services and the cost of eliminating or minimizing adverse effects.[36]

Reports "shall include (A) Identification of the adverse effects, (B) Appropriate measures to eliminate or minimize the adverse effects, (C) the estimated costs (expressed in either monetary, numerical, or qualitative terms) of the measures considered."[37] When these provisions were integrated into Part 771 in 1982, FHWA responded to concerns that "the congressional intent of section 109(h) … is far different from the environmental reporting requirements in the NEPA…." by explaining that "[t]he action to … consolidate nonduplicative requirements will not deemphasize the full intent of section 109(h) including the congressional intent regarding decisions on highway projects." 47 Fed. Reg. 21,780, 21,781. "[R]ecission of Part 795 … does not eliminate the 109(h) requirements…." *Id.*, 21,782. "Section 109(h) will be complied with through the procedures contained in 23 CFR Part 771." *Id.* The Part 771 regulations require that "the final EIS … should document compliance with requirements of all applicable environmental

---

[36] 23 C.F.R. Part 790, §790.1.
[37] *Id.,* § 790.8.

laws, Executive Orders, and other related requirements." 23 CFR §133. From the beginning, U.S. DOT has recognized that §109(h) imposes a substantive requirement that must be satisfied, and not expressed any intent that those requirements are satisfied by merely satisfying the procedural requirements of NEPA. Those substantive requirements have not been satisfied for the reasons discussed above and in the Motion for Stay.

**CONCLUSION**

WHEREFORE, Petitioners move the Court to reconsider its decision that Petitioners are not likely to prevail on the merits, and to grant the Motion to Stay.

Dated: May 1, 2018                              Respectfully submitted,

                                                 /s/Robert E. Yuhnke
                                                ROBERT E. YUHNKE  (CO Bar No. 12686)
                                                4050 SE Hosner Terrace
                                                Gresham, OR 97080
                                                (303) 499-0425
                                                bob.yuhnke@prodigy.net

                                                 /s/Andrea S. Gelfuso
                                                ANDREA S. GELFUSO  (CO Bar No. 19773)
                                                2402 S. Holland Street
                                                Lakewood Co 80227
                                                (303) 955-1910
                                                agelfuso6@gmail.com

                                                 /s/Gregory N. Corbin
                                                GREGORY N. CORBIN  (CO Bar No. 48468)
                                                Milligan Rona Duran & King LLC
                                                1627 Vine St.
                                                Denver, CO 80206
                                                Tel. 720-414-2000
                                                gnc@mrdklaw.com

## CERTIFICATE OF COMPLIANCE WITH D.COLO.LCivR 7.1(a)

Pursuant to D.COLO.LCivR 7.1(a), counsel for the Petitioners has conferred with counsel for FHWA and CDOT regarding the this motion. FHWA and CDOT oppose the relief requested herein.

/s/ Gregory N. Corbin
Gregory N. Corbin

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2018, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

/s/ Gregory N. Corbin
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

Brent Allen
Federal Highway Administration
Office of the Chief Counsel
Western Legal Services Division
Lakewood, Colorado
Brent.allen@dot.gov

*Of Counsel for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Harry Scott Morrow
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO  80203
(720) 508-6000
harry.morrow@coag.gov

*Attorneys for Defendant-Intervenors*

17 – Petitioners' Motion for Reconsideration of Motion to Stay