**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-1661-WJM-MEH
*Consolidated with* 17-cv-1679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFFEE
PARK NEIGHBORHOOD ASSOCIATION; and COLORADO LATINO FORUM,

Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION, ELAINE CHAO, in her official capacity as
Secretary of Transportation; and JOHN M. CATER, in his official capacity as Division
Administrator, Defendants,

v.

COLORADO DEPARTMENT OF TRANSPORTATION, and MICHAEL LEWIS, in his
official capacity as Executive Director of the Colorado Department of Transportation,

Defendant-Intervenors.

---

PETITIONERS' OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER ON THE SCOPE
OF THE ADMINISTRATIVE RECORD, DENYING THE MOTION TO SUPPLEMENT THE
ADMINISTRATIVE RECORD AND THE MOTION TO COMPLETE THE
ADMINISTRATIVE RECORD
(Case No. 17-cv-1679-WJM-MEH)

---

ROBERT E. YUHNKE  (CO Bar No. 12686)
4050 SE Hosner Terrace
Gresham, OR 97080
(303) 499-0425
bob.yuhnke@prodigy.net

ANDREA S. GELFUSO  (CO Bar No. 19773)
2402 S. Holland Street
Lakewood Co 80227
(303) 955-1910
agelfuso6@gmail.com

GREGORY N. CORBIN  (CO Bar No. 48468)
Milligan Rona Duran & King LLC
1627 Vine St.
Denver, CO 80206
Tel. 720-414-2000
gnc@mrdklaw.com

COUNSEL FOR PETITIONERS

Petitioners object to Magistrate Judge Hegarty's denial of Petitioners' separate Motions to Complete and Supplement the Administrative Record (ECF No. 127, "Motion to Complete"; ECF No. 128, "Motion to Supplement"). *Order on the Scope of the Administrative Record* (Apr. 6, 2018) (ECF No. 136, "Order").[1] The Order rejects completing the Administrative Record ("AR") with agency materials posted on agency websites[2] to help federal, state, and local governments evaluate health impacts from highway emissions, holding they were not before those agencies. The Order also rejects supplementing the AR with documents and expert declaration showing Defendants failed to consider one or more relevant factors or examine relevant evidence in approving the Project's Record of Decision ("ROD").

## STANDARD OF REVIEW

These objections are filed pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. §636(b)(1)(A), under which the standard of review is whether the Order is clearly erroneous or contrary to law.

## ARGUMENT

I.   **Denial of the Motion to Supplement was Clearly Erroneous or Contrary to Law.**

Here Petitioners object to the denial of three exhibits: (A) Declaration of Dr. Gregory Rowangould and the report "Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project" (ECF No. 128-4, Ex. 33) ("PM2.5 Modeling Report"); (B) "Declaration of Gregory Rowangould Regarding Receptors Used for Modeling PM10" and the "Report of Investigation of Receptor Locations Selected for Modeling Emissions of PM10 from the I-70 Project"(ECF No. 128-3, Ex. 32) ("PM10 Receptor Report"); and (C) "Declaration of George D. Thurston," "The Adverse Human Health Effects of Traffic-Related Air Pollution" (ECF No. 128-1, Ex. 28).

---

[1] Petitioners incorporate their initial filings (ECF Nos. 127 and 128) and Replies (ECF Nos. 132 & 133). This Objection is filed pursuant to the Court's order at ECF No. 141.

[2] These documents are in the files of one or more of the following agencies: the U.S. Department of Transportation ("USDOT"), the Federal Highway Administration ("FHWA") (part of USDOT), and the Colorado Department of Transportation ("CDOT"), FHWA's longtime state partner in the I-70 Central Project ("Project").

These exhibits are submitted to demonstrate evidence relevant to Defendants' final decision, identified in comments as necessary, and relevant to its obligation to disclose and mitigate impacts, but not considered by the Agency.

Contrary to the Order, Petitioners' experts' materials meet four recognized exceptions to the rule against judicial consideration of extra-judicial evidence. First, expert materials may supplement the record to demonstrate that the agency ignored relevant factors:

> [T]he Tenth Circuit has repeatedly recognized an exception when "the record is deficient because the agency ignored relevant factors it should have considered in making its decision." *See, e.g.*, *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1028 n. 1 (10th Cir. 2001) (quoting *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir.1985)).

*Wilderness Workshop v. Crockett*, 2012 WL 1834488, at *5 (D. Colo. May 21, 2012). This exception helps ensure that serious environmental consequences are addressed:

> [Courts] permit the introduction of new evidence in NEPA cases where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug."

*Nat'l Audubon Soc'y v. U.S. Forest Serv.,* 46 F.3d 1437, 1447 (9th Cir. 1993) (quoting *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1384–85 (2nd Cir.1977)).

Second, expert materials may supplement the record to demonstrate gaps or inadequacies in the NEPA process:

> The Tenth Circuit has tacitly recognized the relevance of extra-record evidence in NEPA cases where there are gaps or inadequacies in the NEPA process. *See Citizens for Alt. to Radioactive Dumping v. U.S. Dep't of Energy,* 485 F.3d 1091, 1096 (10th Cir. 2007) (quoting *Lee*, 354 F.3d at 1242) ("In dealing with scientific and technical evidence, extra-record evidence 'may illuminate whether an [environmental impact statement] has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under the rug' ") (alterations in original).

*Wilderness Workshop v. Crockett,* 2012 WL 1834488, at *5 (D. Colo. May 21, 2012).

Third, agency action that fails to consider "relevant evidence" is arbitrary and capricious and expert materials may be used for this purpose. "The agency must have examined the relevant data," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983), and "we insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *FCC v Fox Television Stations*, 556 U.S. 502, 513 (2009); quoting *Motor Vehicle Mfrs. Ass'n*, 462 U.S. at 43.

> [T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416 . . . . The agency must have examined the relevant data and articulated a rational connection between the facts found and the decision made, supported by substantial evidence in the record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 . . . (1983); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575–76 (10th Cir. 1994). Where an agency fails to consider evidence relevant to the final decision, its rationale and justification may be undermined. By its very nature, evidence which the agency fails to consider is frequently not in the record. Accordingly, in order to allow for meaningful, in-depth, probing review, such extra-record evidence is often properly included in the Administrative Record.

*Native Ecosystems,* 711 F. Supp. 2d at 1279-80. And the duty to examine evidence relevant to project impacts does not end. "A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions, even after release of an EIS." *Stop H-3 Assn. v. Dole*, 740 F.2d 1442, 1463 (9th Cir. 1984) (citing *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023–24 (9th Cir. 1980)). NEPA bars agencies from "argu[ing] that *Plaintiffs* have the burden to demonstrate that the information they claim is missing meets both the 'relevant' and 'essential' prongs of [40 C.F.R.] § 1502.22 . . . ." *Native Village of Hope Point v. Salazar*, 730 F. Supp. 2d 1009, 1018 (D. Ak. 2010) (agency's failure to obtain relevant data was arbitrary and warranted remand).

Finally, expert testimony is admitted to supplement administrative records to assist the Court's understanding of complex technical information such as the modeling data files involved in the report disclosing FHWA's modification of the modeling of seven receptor locations for the

PM10 conformity determination.

> [A] reviewing court may go outside the administrative record for certain limited purposes, such as: (1) where the administrative record fails to disclose the factors considered by the agency; (2) where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position; and (3) where necessary to explain technical terms or complex subject matter involved in the action.

*Colo. Envtl. Coal.* v. Lujan, 803 F. Supp. 364, 370 (1992) (citing *Franklin Savings Ass'n. v. Director, Office of Thrift Supervision,* 934 F.2d 1127, 1137 (10th Cir. 1991), *cert. denied*, 503 U.S. 937 (1991)). The Petitioners' experts' materials meet these exceptions.

### A.  PM2.5 Modeling Report Demonstrates Failure to Consider NAAQS Violation.

NAAQS compliance is a "relevant factor" because the NEPA rules require that an EIS "shall state how alternatives … will or will not achieve the requirements of … other environmental laws." The Clean Air Act requires that a NAAQS not be violated in an area (such as Denver) designated in attainment. 42 U.S.C. §7473(a)(4). The PM2.5 Modeling Report qualifies under all four exceptions: the modeling results demonstrate that Project emissions will violate the PM2.5 NAAQS, a serious impact that was not considered in weighing health impacts or for determining mitigation and costs that are relevant to making the public interest determination required by §109(h). The Report also demonstrates that FHWA's emissions inventory failed to consider the evidence EPA identified in its hot-spot guidance as relevant to a technically valid determination of the impact that highway emissions have on NAAQS compliance, *i.e.*, atmospheric dispersion and cumulative impact with other sources. In addition, the Report explains the modeling that aids the Court in understanding a complex technical issue.

Judge Hegarty's decision not to supplement the record with this evidence is clearly erroneous based on his misunderstanding of what the PM2.5 Modeling Report shows, *i.e.*, Defendants failed the complete the steps that EPA deems necessary for a technically valid analysis. The Order is contrary to law because Dr. Rowangould does not offer a different

opinion; the PM2.5 Modeling Report explains the results when EPA Guidance is followed.

Judge Hegarty misunderstands the differences between the emissions analysis performed by FHWA and the air quality modeling analysis performed by Dr. Rowangould:

> FHWA calculated emissions inventories—an accounting of the amount of pollutants discharged into the atmosphere—by inputting traffic data, meteorological data, vehicle fleet data, and fuel and control specifications into the EPA MOVES model. (AR 23448). Dr. Rowangould's conclusion that the emissions estimates would have been higher if FHWA performed a hot spot analysis demonstrates a mere disagreement as to the appropriate method for analyzing and calculating PM2.5 emissions. Plaintiffs may not supplement the record with documents disputing the reliability of FHWA's methodology.

Order, at 12.

Petitioners do not dispute FHWA's methodology for calculating emissions. The argument turns on EPA's explanation that emissions cannot be compared with the NAAQS. Emissions are only the first step in estimating concentrations in the ambient air for comparison with the NAAQS. Dr. Rowangould did not use a different "method" for calculating PM2.5 emissions. His modeling analysis used the same MOVES model as FHWA, used the same traffic inputs and "look-up table" used by FHWA to develop the emissions inventory for PM10 to model PM10 concentrations.[3] The only difference was obtaining from MOVES the emissions for PM2.5.

The emissions inventories discussed by Judge Hegarty end with estimates of project *emissions*,[4] but provide no information about pollutant *concentrations*. An emissions inventory does not satisfy the second step in EPA's hot-spot analysis which requires the use of a dispersion model to determine how the emissions are dispersed in the atmosphere,[5] and what the expected concentrations will be at receptor locations in the ambient air. NAAQS are a concentration in the

---

[3] "Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project," at 6; (ECF No. 128-4).

[4] *See* FEIS Attachment J, Air Quality Technical Report, PM2.5 Emissions Inventory, Table 22 (AR 023486) These inventories obtained from EPA's MOVES model only include vehicle emissions, not road dust. Road dust estimates are reported separately. *See Id.*, §7.4.9 (AR 023511)

[5] Hot-spot Guidance, Section 7.3: Selecting an Air Quality Model (AR 105916).

ambient air.[6] An emissions inventory does not provide a concentration that can be compared with a NAAQS. The third step in the hot-spot analysis for PM2.5 uses the emission factors obtained from MOVES as inputs to AERMOD—the atmospheric dispersion model the agencies selected to model concentrations of PM10 in the ambient air.[7] By failing to model concentrations in the ambient air for PM2.5, FHWA failed to provide a factual basis in the AR for making a judgment regarding the impact that future Project PM2.5 emissions would have on NAAQS compliance.

Judge Hegarty clearly did not understand that Dr. Rowangould's emissions modeling did not differ from FHWA's emissions modeling. Dr. Rowangould explained, Declaration ¶ 16, that he carefully replicated FHWA's procedures in modeling PM10 concentrations:

> This modeling analysis was performed using the same emissions model (MOVES) and air quality model (AERMOD) required by EPA for modeling highway emissions, and applies the same assumptions and inputs, with one exception described in the report, as those used by the Federal Highway Administration to model emissions of PM10 from the Project for the conformity determination. I exercised no independent judgment regarding the estimation of traffic, traffic emissions, the use of meteorological data to model dispersion, or the selection of receptor locations for modeling expected future concentrations. I replicated as closely as possible the decisions made by FHWA in its modeling analysis of PM10 to avoid any possible discrepancy with the procedures implemented by FHWA to model Project PM10 emissions.[8]

Dr. Rowangould did not critique their approach or offer any contradictory opinion. Rather he used the emissions factors obtained from MOVES to complete the dispersion modeling required by EPA for a hot-spot analysis used by the agencies for modeling PM10 concentrations.[9] He used Project PM2.5 concentrations to combine with background air quality, as prescribed by EPA's Guidance, to calculate a design value for comparison with the NAAQS.[10]

---

[6] 40 C.F.R. §50.13 "PM2.5".
[7] *See* Rowangould, Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project, at 6-7; (ECF No. 128-4).
[8] Rowangould Declaration at ¶16; (ECF No. 128-4).
[9] Rowangould, Modeling PM2.5 Emissions from Phase I of the I-70 East (Central 70) Project, at 8-13; (ECF No. 128-4).
[10] *Id.*, at 13-15.

This is a case "when the record is deficient, because the agency ignored relevant factors it should have considered." *American Mining Congress v. Thomas,* 772 F.2d 617, 626 (10th Cir. 1985). Magistrate Hegarty acknowledged the correct standard for supplementing the AR, but erroneously concluded that

> Plaintiffs may not supplement the record with documents disputing the reliability of FHWA's methodology. *See Lee*, 354 F.3d at 1243–44 (stating that evidence indicating a "disagreement regarding the reliability of the methodology [the agency used] and whether it has been applied accurately in this EIS . . . is an insufficient basis for admitting extrarecord evidence . . . ."); *San Luis & Delta-Mendota Water Auth.*, No. 09-CV-407 OWW DLB, 2009 WL 5084082, at *4 (E.D. Cal. Dec. 16, 2009) (denying a motion to supplement, because "[t]hese documents either synthesize existing data in different ways or utilize different models to evaluate existing data. They do not raise entirely new 'factors' for consideration and therefore cannot be considered under the 'relevant factors' exception.").

Here Petitioners do not dispute the reliability of FHWA's methodology for estimating emissions, or use different models to evaluate existing data. Indeed, Petitioners explicitly apply the ***identical*** methodology using the same model for performing that first step in a hot-spot analysis, *i.e.* estimating emissions. Dr. Rowangould merely completes the remaining steps that EPA requires be performed for project of "local air quality concern" to compare project emissions with the NAAQS by using a dispersion model to determine concentrations in the ambient air, and adding those concentrations to background to determine the cumulative impact of the Project for comparison with the NAAQS.

Judge Hegarty's decision is erroneous because he fails to understand that this analysis demonstrates that FHWA failed to consider serious Project impacts on air quality and health by omitting relevant factors identified by EPA as necessary for comparing project emissions with the NAAQS. Rowangould's PM2.5 Modeling Report is necessary for the Court to understand that the consequences of failing to include these relevant factors has the effect of omitting significant adverse effects from the EIS. By failing to apply the dispersion modeling tool

(AERMOD) developed by EPA and failing to consider the cumulative impact by not adding Project concentrations to background, FHWA failed to take "a 'hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information.'" *Custer County Action Assn v. Garvey,* 256 F.3d 1024, 1034 (10th Cir. 2001). The Court should grant Petitioners' Motion to Supplement the AR with the PM2.5 Modeling Report.[11]

**B.  Dr. Rowangould's PM10 Receptor Report Investigation and Declaration.**

Dr. Rowangould's PM10 investigation (ECF No. 128-3, Ex. 32) is essential for anyone—clients, counsel or the Court—to understand how FHWA modeled Project emissions of PM10. Dr. Rowangould explains what he found in otherwise incomprehensible data files. Despite requests during the comment period, FHWA did not explain modifications made in seven separate modeling runs, each performed for a separate receptor location. It only provided raw data files that were incomprehensible to the general public. The Sierra Club explained in its request to extend the comment period to allow more than 10 days to review the data files, that the files were not even comprehensible to experts who reviewed them. Without Dr.

---

[11] In his opinion, Magistrate Judge Hegarty notes, but does not decide, Defendants' argument that it was not enough for Petitioners to have demanded in comments that FHWA model PM2.5 as required by EPA's hot-spot analysis procedures. Defendants contend Petitioners waived the opportunity to present the Rowangould evidence by not submitting it during the comment period. Dr. Rowangould could not have performed the modeling analysis during the comment period on the FEIS because he relied upon the computerized data files containing the traffic and roadway data used by the agencies to estimate PM10 emissions from the Project for the conformity determination. The data files available during the comment period on the FEIS (January 2016) were for 2035, which was not the correct analysis year required by EPA's conformity rule. The agencies changed the horizon year to 2040 to model emissions for the conformity determination and changed the traffic model used to estimate future traffic. The traffic model used for 2040 estimated 12,000 fewer trips per day than the traffic estimated for 2035. Had Petitioners modeled 2035 traffic volumes, the results would be challenged as overestimating emissions, thereby discrediting the credibility of the analysis. The traffic data files for 2040 were not available until the comment period (January 2017) on the conformity determination for PM10. Comment on the FEIS was not opened again.

Rowangould's investigation—which required that the data files be set up and run with EPA modeling software—the Court would certainly not know how these modifications occurred, how or why they were made, or that they included receptors that otherwise would show a NAAQS violation. Without this information, the Court cannot meaningfully review FHWA's deviation from EPA's modeling guidance and the lack of technical explanation or justification for this deviation in the AR or Petitioners' Seventh CAA claim that it was denied its due process right to comment.

Moreover, the Order contradicts itself by relying on Dr. Rowangould's investigation and Declaration to order limited discovery because the record "may not be complete." It would not have been possible for the Court to know the record may not be complete without relying on the PM10 Receptor Report. For the same reason, the Court will need to refer to the PM10 Receptor Report when reviewing Defendant's answers to discovery and whether the agency actions are reasonable. For these reasons, the Order erred by not supplementing the AR with the PM10 Receptor Report.

### C.  Dr. George D. Thurston's Declaration Summarizing Health Effects Evidence.

Petitioners challenge the Project EIS for not considering the impacts on community health caused by exposure to current emissions from I-70 and Defendants' failure to disclose and mitigate health impacts that will result from future increases in pollutant exposures. Defendants contend they have no such obligation by asserting a presumption that pollutant concentrations allowed by the NAAQS do not cause significant impacts. Petitioners move to supplement the AR with pages 12-14 of Dr. Thurston's testimony that explains for the Court the evidence in EPA's *Integrated Science Assessment for PM*[12] (*ISA*) that is relevant to, and contradicts, FHWA's presumption. EPA's *ISA* is the assessment of the health effects research required by law upon

---

[12] *Integrated Science Assessment for Particulate Matter* (U.S. EPA, Dec. 2009) at 2-10, 2-11, 2-12; also filed at ECF No. 88-14.

which the PM NAAQS decisions are based. 42 U.S.C. §7408(a)(2). This section of

Dr. Thurston's expert testimony explains for the Court the basis for EPA's conclusion in the

latest revision of the PM NAAQS that the dose-response curve for cardiovascular effects of

PM2.5 is linear, and has no threshold. EPA itself found that effects occur below the level of the

NAAQS. FHWA's presumption has no basis in fact, either in AR for the I-70 decision, or in

EPA's NAAQS decision.

The Thurston Declaration qualifies under three exceptions: (1) failure to consider

relevant factor by not perform its obligations under NEPA and F-AHA to identify health impacts

and provide meaningful mitigation for the affected families; (2) failure to examine the evidence

showing that the presumption it relies upon has no factual basis; and (3) to assist the Court in

understanding a complex technical issue.

The Order dismisses Dr. Thurston's report as a disagreement among experts and dispute

over FHWA methodology. Order at 8. This is incorrect. FHWA made no expert examination of

this evidence and formulated no methodology for evaluating it. Instead, FHWA relies solely on

court decisions that recognize this presumption, but do not consider the contradiction between

EPA's findings in the *ISA* and the asserted presumption. Dr. Thurston explains that FHWA failed

to examine the evidence EPA considered, and the conclusions it drew from the evidence: "no

population threshold, below which it can be concluded with confidence that PM2.5-related

effects do not occur, can be discerned from the available evidence." 78 Fed. Reg. 3086, 3098

(January 15, 2013). There is no dispute among experts.

Second, the Order concludes Petitioners offered Dr. Thurston's report as a matter of

general reference that it holds cannot be a limited exception to the rule against use of extra-

record materials. This is also incorrect. Because FHWA has no recognized agency expertise in

the field of health effects, and Congress has entrusted those judgments under the Clean Air Act

to EPA, FHWA must defer to EPA's conclusions. Since FHWA has identified no independent

evidence that compliance with the PM NAAQS guarantees no adverse health effects,

Dr. Thurston's testimony is relevant and admissible to establish that FHWA failed to examine

evidence relevant to determining whether pollutant exposures will impact community health.

Therefore, his Declaration should be added to the AR for that purpose.

**II.    Denial of the Motion to Complete is Clearly Erroneous or Contrary to Law.**

Petitioners object to the Order's cursory exclusion of all five USDOT/FHWA policy

guidance documents (including a recommended study). All five were "before" the Secretary

when the Project was approved. All five contain agency policy and guidance that define and

identify the relevant evidence necessary to examine health impacts from increased emissions as a

"relevant factor." All five were created by the agency and include information known to

Defendants at the time the I-70 decision was made. They should have been included in the AR

because they were "before the Secretary." For the Court to determine whether Defendants failed

to consider a relevant factor—the Project's increased emissions impacting human health—or

failed to engage in reasoned decisionmaking, the Court needs to weigh the agency actions in the

light of the policies and guidance adopted by the agency.[13]

The Supreme Court requires courts reviewing agency actions to review "the full

administrative record that was before the Secretary at the time he made his decision." *Overton

Park*, 401 U.S. at 420.[14] The "whole record," 5 U.S.C. §706, includes all documents expressly

considered by an agency and documents before the agency when it acted, even if it did not

expressly base its decision on those documents.[15] Reviewing courts generally have "wide latitude

---

[13] As discussed in Section II-D, below, Petitioners also object to denial of their alternative
request to supplement the AR with these materials. The Magistrate Judge declined to consider
judicial notice of these materials as "an issue better left to the judicial officer who decides the
merits of this appeal." Order at 24, n. 10.

[14] Abrogated on other grounds in *Califano v. Sanders*, 430 U.S. 99 (1977).

[15] *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)(quoting *Exxon Corp. v.
Dep't of Energy*, 91 F.R.D. 26, 32 (N.D. Tex. 1981).

in correcting omissions from the agency record under review." *Consumers Union v. Federal Power Commission*, 510 F.2d 656, 661 (D.C. Cir. 1974).

### A. Petitioners met the standards to complete the Administrative Record.

The Order concludes wrongly that Petitioners failed to set forth "(1) when the documents were presented to the agency; (2) to whom; (3) and under what context." Order at 20, quoting *Native Ecosystems*, 711 F. Supp. 2d at 1275, and misinterprets what comprises a "full administrative record". These documents were considered because they were before the agency.

First, "it is axiomatic that documents created by an agency itself or otherwise located in its files were before it." *County of San Miguel v. Kempthorne,* 587 F. Supp. 2d 64, 76 (D.D.C. 2008) (internal citations omitted).

> It strains the Court's imagination to assume that the administrative decision-makers reached their conclusions without reference to a variety of internal memoranda, guidelines, directives, and manuals . . . . DOE may not unilaterally determine what shall constitute the administrative record and thereby limit the scope of this Court's inquiry.

*Tenneco Oil Co. v. U.S. Dep't of Energy*, 475 F. Supp. 299, 317 (D. Del. 1979).

Second, the documents were or should have been known to agency managers and subordinates because neither the documents nor the DOT/FHWA offices that generated them are obscure; these are publicly-posted documents from Headquarters Offices with delegated responsibility for policy and guidance. A field office's refusal to address them or decision to ignore them is neither an excuse nor a justification to exclude them from the AR.[16]

Third, the "context" of their "presentation" is that USDOT/FHWA or CDOT created them as guidance for transportation planning professionals, including agency professionals. These are not the "two to four statistics on a project" that concerned the Court in *Native Ecosystems*, 711 F. Supp. 2d at 1277-8. They are the agency's developed principles regarding the

---

[16] Petitioners note Defendants have not presented affidavits from Division Administer Cater or any other "decisionmaker" in which they affirm they have no knowledge of these materials.

need to consider health impacts from highway projects. It is illogical and perverse to require citizens to present an agency with that agency's own documents or prove that agency decisionmakers saw their own documents, particularly when the agency presented them to the public as templates to be applied when making the kinds of decisions at issue here.

The Order's application of these pre-conditions is clearly erroneous because it takes an overly narrow view of identifying the Project decision makers and their responsibilities.[17] In *Overton Park,* a challenge to a highway funding decision by FHWA's predecessor agency acting under the USDOT Secretary's F-AHA authority, the Supreme Court remanded to review the AR "that was before the Secretary" and did not limit the AR to materials reviewed by subordinate officials. 401 U.S. at 420. The I-70 Project was authorized under the same Act, under which States "submit to the Secretary for approval such plans, specifications and estimates for each proposed project as the Secretary may require." 23 U.S.C. §106(a)(1). When the ROD was signed in January 2017, USDOT Secretary Foxx, not FHWA, was authorized by Congress to "enter into a formal project agreement with the State transportation department recipient formalizing the conditions of the project approval." §106(a)(2). The "full administrative record" "before the Secretary at the time he made his decision," *Overton Park*, 401 U.S. at 420, includes guidelines, policies, and other materials issued by the Secretary and Administrator and their subordinates, including in this instance, Project documents signed by FHWA's Colorado Division Director.

---

[17] Review is "generally based on the full administrative record that was before all decision makers, including in this case the Deciding Officer and the Reviewing Officers, at the time of the decision." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)(citing *Overton Park*, 401 U.S. at 420).

The Secretary's authorities are delegated to various offices, including the Office of the Under Secretary for Policy (49 C.F.R. §§1.24 and 1.25)[18] and FHWA (49 C.F.R. §§1.84 & 1.85). US DOT regulations require that:

> In exercising powers and performing duties delegated by this part or redelegated pursuant thereto, officials of the Department of Transportation are governed by applicable laws, Executive Orders and regulations and by policies, objectives, plans, standards, procedures, and limitations as may be issued from time to time by or on behalf of the Secretary, or, with respect to matters under their jurisdictions, by or on behalf of the Deputy Secretary, the Under Secretary, the General Counsel, an Assistant Secretary, the Inspector General, or an Administrator.

49 C.F.R. §1.3(a) (Aug. 16, 2012).[19] Within FHWA, "redelegation of authority does not relieve the redelegating official of overall responsibility for control over policy, review of operations, standardization of procedures and methods, and in the final analysis, performance stemming from exercise of the delegated authority." FHWA Order M110.1A (July 7, 2006), 1-1-4.

> In exercising the authorities delegated or redelegated herein, Associate Administrators, … Division Administrators, … and their respective delegates shall be governed by all applicable laws, executive orders, and regulations and by policies, objectives, plans, standards, procedures, and limitations as may be issued from time to time by or on behalf of the Secretary or the Administrator.

*Id.* at 6. Thus, these materials were "directly or indirectly" "before" all Project decision makers.

**B.  The Order allows Defendants to skew the Administrative Record.**

The Order's refusal to complete the AR allows Defendants to skew the AR. It fails to acknowledge that an AR cannot exclude unfavorable information. In addition to the documents and materials an agency credits, the AR must include those "that the agency considered and

---

[18] The Office of the Under Secretary for Policy provides "leadership in the Department's development of policies and programs to protect and enhance the safety, adequacy, and efficiency of the transportation system and services, "and ensures "uniform departmental implementation" of NEPA "within the [DOT]." 49 C.F.R. §§1.24 & 1.25(b). These NEPA duties are further delegated to the Assistant Secretary for Transportation Policy. *Id.* at §1.25(a)(2).
[19] DOT updated its delegations in April 2016; this section is unchanged. 81 Fed. Reg. 19819 (Apr. 5, 2016).

rejected in reaching its final conclusion." *Cherokee Nation v. Jewell,* 2013 WL 5329787 (N.D. Okla. Sept. 20, 2013).[20] An agency may not limit review to the AR it compiled and submitted and exclude other documents that were clearly "before the Secretary at the time he made his decision." *Overton Park,* 401 U.S. at 420. "To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). In *Kent County Delaware Levy Court v. U.S. EPA*, 963 F.2d 391 (D.C. Cir. 1992), the court supplemented the AR with documents in agency files based on "petitioners … *prima facie* showing that the agency excluded from the record evidence adverse to its position." And the agency cannot exclude information "on the grounds that it did not 'rely' on the excluded information in its final decision." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005).

The Order also errs by requiring that decisionmakers see all documents.[21] *Native Ecosystems* held that an AR includes documents beyond those that "literally pass[ed] before the eyes of the final agency decisionmaker[s]." 711 F. Supp. 2d at 1275–76. Moreover, failure to show intentional omission or bad faith is not a proper reason to deny completing the AR.

> [I]f … an agency could exclude documents and materials from the administrative record by intentionally deciding not to review them, [it] could significantly skew the record in its favor. This is inconsistent with the meaningful judicial review required by *Overton Park*.

*Id.* at 1281. The Court ordered the AR supplemented with documents that "should have been considered by the Respondents in reaching the challenged decision…." *Id.*

*Native Ecosystems* explains that the "rationale for limiting the record to those documents directly or indirectly considered by relevant agency decisionmakers is grounded in the need to

---

[20] Citing *Thompson*, 885 F.2d at 555; *WildEarth Guardians v. U.S. Forest Serv*., 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1295 (D. Colo. 2007) (documents "considered" are "not simply those that the agency relied upon in reaching its decision").
[21] Order at 21.

afford adequate deference to agency expertise while ensuring meaningful judicial review of the full administrative record." 711 F. Supp. 2d at 1275. The Order does just the opposite—it sanctions Defendants' efforts to ignore their own agencies' considered guidance and policies.

### C.  The Order omits Agency Policies and Guidance for Health Impact Assessments.

The excluded documents call for evaluating health impacts, and most advocate the use of Health Impact Assessments ("HIAs") as an important tool to integrate health into transportation decisionmaking. Beginning as early as 2004 and continuing into the 2016 FEIS, Defendants rejected public requests for an HIA.[22] The excluded agency documents[23] call for use of HIA's to integrate health into transportation decision-making.[24] Defendants refused to address their agencies' guidance or provide a detailed explanation for failing to do so in the AR. As the excluded documents explain, HIA's identify project impacts on human health, evaluate potential mitigation benefits, and disclose these issues to the public and decisionmakers.

### D.  The Order's Denial of Supplementation, as an alternative, is Erroneous.

The Order rejects Petitioners' alternate request to supplement the AR with five documents because the AR held "significant evidence" that Defendants considered the health impacts of the PCL Alternative. Order at 22. To the contrary, the AR documents cited show the Order's rationale is clearly erroneous and that Defendants failed to analyze health impacts.

**Corridor Planning Framework:** The Order cites AR 121-23 as "significant evidence" that FHWA considered health impacts, but here FHWA responds to public concerns regarding "the air quality surrounding the highway" by stating that a health study is not required by NEPA or the CAA and was therefore not performed. The Order also cites AR 18,227-48; the few pages that address Project air quality FHWA does not discuss health impacts or analyze impacts from

---

[22] *E.g.,* AR 72650 & AR 121 (by that or other names, *e.g.,* Health Impact Assessment, health study, health risk assessment, or "HEA".
[23] ECF No. 127-2 & 3, Ex. 38 and 39.
[24] *Id.,* Ex. 39 at 4. *See also* https://www.transportation.gov/mission/health/cleaner-air

the PCL alternative because: "there are no projected impacts from the project related to NAAQS."[25] The Order also cites AR 23,406-10, a general discussion of the health impacts of the NAAQS pollutants and the MSAT components of mobile source emissions that is not an analysis of the Project's actual health impacts.

**FAQ's**: The Order rejects the FAQ's because the AR contains FHWA's "detailed" assessment of the health effects as they relate to the PCL Alternative, "such as safety, air and water quality, and noise." Order at 22. As support, the Order cites AR 10209-372, from the 2014 Supplemental DEIS ("SDEIS") analysis which differed significantly from the FEIS Air Quality Conformity Determination and cannot support a finding that Defendants considered a relevant factor or made a detailed assessment of Project health effects in the FEIS and ROD.

**THT**: As above, the Order's AR citations do not support its conclusion that the AR already contains "significant" evidence that Defendants considered health impacts; use of DOT's Transportation Health Tool would allow FHWA to generate the very health impacts data that the FEIS and ROD lack, and should be used in developing, or at least included in the AR.

**"Fine Particulate Air Pollution and Life Expectancy"**: The Order rejects this study because "the record indicates FHWA reviewed the effects of air pollution on respiratory health." Order at 24. However, the Order's references—a single page from the Health Impacts section of the FEIS discussing three studies (AR 18248), two pages from the FEIS Air Quality Technical Report consisting of a chart of NAAQS standards with no discussion of respiratory effects (AR 23408-09), and a single page describing the health effects of MSATs in vehicle exhaust—do not provide the detailed review of ***increasing*** air pollution's effects on respiratory health provided on Defendants' own website and critical to this Court's review of the impacts of this Project.

---

[25] AR at 18,231.

**ACCEA:** Finally, the Order rejects the ACCEA as a disagreement over methodology. Order at 23. This is incorrect.[26] It is an issue of scientific integrity.

> Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.

40 C.F.R. §1502.24.[27] Thus, Defendants avoid examining health impacts of increased emissions, and, because the scientific integrity of Defendants' methodology is in doubt, the gap in the AR raises questions about whether Defendants have demonstrated that their basis for avoiding consideration of health is likewise in doubt.

## CONCLUSION

For these reasons, Petitioners' object to the Magistrate Judge's Order (ECF No. 136) and request that Petitioners' Motions to Complete and Motion to Supplement (ECF Nos. 127 & 128) be granted with respect to the exhibits discussed in this pleading.

---

[26] ECF No. 127-5, Ex. 41 at 42.

[27] *See also Environmental Defense v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69 (D.D.C. 2007) (agency manipulated mitigation model to fit cost-benefit analysis); *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683 (10th Cir. 2009) (in the absence of evidence, BLM's claim of no harm to aquifer is arbitrary and capricious); *High Country Conservation Advocates v. U.S. Forest Service*, 52 F. Supp. 3d 1174 (D. Co. 2014) (agency's technical information is misleading).

Dated: May 2, 2018                     Respectfully submitted,

                                        /s/Robert E. Yuhnke
                                       ROBERT E. YUHNKE  (CO Bar No. 12686)
                                       4050 SE Hosner Terrace
                                       Gresham, OR 97080
                                       (303) 499-0425
                                       bob.yuhnke@prodigy.net

                                        /s/Andrea S. Gelfuso
                                       ANDREA S. GELFUSO  (CO Bar No. 19773)
                                       2402 S. Holland Street
                                       Lakewood Co 80227
                                       (303) 955-1910
                                       agelfuso6@gmail.com

                                        /s/Gregory N. Cobrin
                                       GREGORY N. CORBIN  (CO Bar No. 48468)
                                       Milligan Rona Duran & King LLC
                                       1627 Vine St.
                                       Denver, CO 80206
                                       Tel. 720-414-2000
                                       gnc@mrdklaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 2nd day of May, 2018, I filed a true and accurate copy of the foregoing with the Clerk of Court via the CM/ECF system, which provided immediate electronic notice of the same to all counsel of record, as indicated below.

<u>/s/ Gregory N. Corbin</u>
Gregory N. Corbin

Carter F. Thurman, Esq.
Mayte Santacruz, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Carter.thurman@usdoj.gov
Mayte.santacruz@usdoj.gov

David A. Carson
U.S. Department of Justice-Denver-ENRS
999 17th Street
South Terrace, Suite 370
Denver, CO 80212
David.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

Brent Allen
Federal Highway Administration
Office of the Chief Counsel
Western Legal Services Division
Lakewood, Colorado
Brent.allen@dot.gov

*Of Counsel for Federal Defendants*

John E. Putnam, Esq.
Nicholas A. DiMascio, Esq.
Kaplan Kirsch & Rockwell, LLP
1675 Broadway, Suite 2300
Denver, CO 80202
jputnam@kaplankirsch.com
ndimascio@kaplankirsch.com

Harry Scott Morrow
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO  80203
(720) 508-6000
harry.morrow@coag.gov

*Attorneys for Defendant-Intervenors*