# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Nos.    17-cv-01661-WJM-MEH
                     17-cv-01679-WJM-MEH

SIERRA CLUB; ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION; CHAFEE PARK NEIGHBORHOOD ASSOCIATION; AND COLORADO LATINO FORUM,

       Plaintiffs,

    v.

ELAINE CHAO, in her official capacity as Secretary of Transportation; FEDERAL HIGHWAY ADMINISTRATION; and JOHN M. CATER, in his official capacity as Division Administrator, Federal Highway Administration, Colorado Division,

       Defendants,

    and

COLORADO DEPARTMENT OF TRANSPORTATION,

       Defendant-Intervenor.

---

**FEDERAL DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' INTERROGATORIES**

---

    Federal Defendants Elaine Chao, in her official capacity as Secretary of Transportation, Federal Highway Administration ("FHWA"), and John M. Cater, in his official capacity as Division Administrator of FHWA's Colorado Division (collectively, "Federal Defendants"), by and through their attorneys, and pursuant to Rules 33 of the Federal Rules of Civil Procedure ("FRCP"), the Local Rules of this Court, and the April 6, 2018 Order of Magistrate Judge Michael E. Hegarty on the Scope of the Administrative Record, ECF No. 136 ("Judge Hegarty's Order") hereby object and respond to Interrogatories from Plaintiffs Sierra Club, Elyria and Swansea Neighborhood Association, Chaffee Park Neighborhood Association, and Colorado Latino Forum ("Plaintiffs") as follows:

## GENERAL OBJECTIONS

1.      Federal Defendants object to each interrogatory on the ground that each includes multiple subparts in violation of FRCP Rule 33.

2.      Federal Defendants object to each interrogatory on the ground that they are compound, with each interrogatory asking multiple inquiries, thereby exceeding the five interrogatories permitted by Judge Hegarty's Order.

3.      Federal Defendants object to each interrogatory on the ground that they are overbroad, vague, ambiguous and confusing.

4.      Federal Defendants object to each interrogatory, definition, and instruction to the extent they purport to impose any requirement or discovery obligation beyond those permitted by Judge Hegarty's Order, including, but not limited to, any interrogatory, definition, and instruction that exceeds the scope of the interrogatories permitted by Judge Hegarty's Order.

5.      Federal Defendants object to each interrogatory, definition, and instruction to the extent that it seeks information protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney-work product doctrine, or any other applicable privilege.

6.      Federal Defendants object to each interrogatory, definition, and instruction that seeks information already in Plaintiffs' possession.

7.      Federal Defendants do not concede that any of the information contained herein is relevant or admissible.  Federal Defendants reserve the right to object, on grounds of competency, relevance, materiality or otherwise to the use of this information for any purpose, in whole or in part, in this action or any other action.

8.      Federal Defendants incorporate by reference every general objection set forth above into each specific response set forth below.  A specific response may repeat a general objection for

emphasis or some other reason.  The failure to include any general objection in any specific

response does not waive any general objection to that request.

9.       Federal Defendants reserve the right to supplement, amend, or otherwise revise the

responses to Plaintiffs' interrogatories.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

### Interrogatory No. 1.
**Context:** None of the CDOT-Provided AERMOD Data Files contains the results of a modeling
run that includes all the receptor locations in the modeling domain surrounding the interchange
between I-25 and I-70. The files "AERMOD-V I-70 & I-25 Phase 1 ML.inp" and "AERMOD-
V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr.plt" includes modeled concentrations for
1,567 receptors in the modeling domain that surrounds the interchange between I-25 and the I-70
Project, but do not include concentrations for seven receptors located in public parking lots to the
east of the exit ramp from NB I-25 onto EB I-70.

Describe with particularity all changes in AERMOD model inputs between the general
AERMOD modeling run that included all receptor locations except the seven omitted receptors,
and the separate AERMOD modeling run performed for each of the seven omitted receptors,
including but not limited to, the change in release height used for each modified volume source
and the location of each modified volume source, the information used to determine the nature,
magnitude and extent of each such change in AERMOD model inputs, and the source of such
data including any investigation performed to determine the actual release height such as any on-
site or geo-mapping measurements of roadway (source) and receptor elevations.

### Objections and Response to Interrogatory No. 1:
Federal Defendants object to this interrogatory on the ground that it contains multiple subparts in
violation of FRCP Rule 33.  Federal Defendants further object on the ground that this request is
compound and, together with the remaining interrogatories, exceeds the number of
interrogatories permitted by Judge Hegarty's Order.  *See* ECF No. 136 at 19 (permitting
Plaintiffs to serve only five interrogatories).[1]  Federal Defendants further object on the ground

---

[1] In addition to permitting "Plaintiffs to serve five interrogatories on FHWA and/CDOT related
only to FHWA's decision to separately model the seven receptor locations," Judge Hegarty's
Order instructed FHWA to produce non-privileged documents discussing or explaining the basis
for its decision to separately model the seven receptor locations.  *See* ECF No. 136 at 19.
Federal Defendants respond that, after performing a reasonable search, they are not aware of
non-privileged documents in their possession, custody, or control that are responsive to this
request, other than the documents produced by Federal Defendants to Plaintiffs as part of the
corrected Administrative Record on January 26, 2018, and the documents provided to Plaintiffs
via email on March 1, 2018, which will be included in the final Administrative Record that
Federal Defendants will lodge with the Court and produce to Plaintiffs once the Court resolves
Plaintiffs' Rule 72(a) objections to Judge Hegarty's Order.

that this interrogatory is overbroad, vague, ambiguous and confusing.  Federal Defendants interpret this interrogatory as asking about the differences between the inputs used in the Conformity Determination's modeling runs for the seven I-70 EB onramp receptors[2] and the 1,567 remaining receptors[3] surrounding the I-25/I-70 interchange ("the I-25/I-70 interchange modeling domain"), and a description of how the differing input value was determined.  To the extent this interrogatory is requesting such information, Federal Defendants respond as follows:

The only difference in the model inputs between the modeling runs of the I-70 EB onramp receptors and the remaining receptors are the roadway surface heights above ground level, which were used to calculate the volume source release heights used in the dispersion model calculations.

Volume source release heights (center of volume) above ground for the I-70 EB onramp receptors were determined in accordance with EPA's PM Hot-spot Guidance by considering: 1) the actual roadway surface heights above ground level (i.e., the elevated highway) and 2) the release heights above the roadway surface (refer to Response to Interrogatory No. 2).  The actual roadway surface heights above ground-level were determined from local government contour maps[4] and as-built drawings for the onramp.  In contrast, the modeling for the remaining receptors conservatively assumed that all roadway surfaces are located at ground level.  Put simply, the modeling for the I-70 EB onramp receptors took the actual volume source release heights above ground into account while the modeling for the remaining receptors did not, with the latter resulting in a more conservative estimate and the former in a more realistic prediction.

Federal Defendants direct Plaintiffs to the corrected Administrative Record produced to Plaintiffs on January 26, 2018 ("Record") for additional information responsive to this interrogatory, including EPA's PM Hot-spot Guidance located at AR 105780-782 (recommending the modeler to include "source release height … (i.e., meters above the ground)" and make such parameter "as realistic as feasible"), FHWA's Record of Decision ("ROD") located at AR 124-26 (describing air quality modeling updates conducted according to EPA's 2015 PM Hot-spot Guidance), the as-built drawings for the highway located at AR 174059 (typical N/B), 174130-131 (wall), 174194-195 (ramp 3 profiles), and the modeling files located at "AERMOD Input & Output Files, located in Internal Records>Air Quality>Air Quality Modeling Files>ROD AQModeling>PM10>…" (indicating the precise heights used).

---

[2] The term "I-70 EB onramp receptors" in these responses refers to the seven receptors adjacent to the I-25NB and I-70EB onramp.  In their Interrogatories, Plaintiffs refer to these receptors as "the seven omitted receptors."  For simplicity and clarity, we will refer to these seven receptors as the "I-70 EB onramp receptors."

[3] The term "remaining receptors" in these responses refers to all other receptors (1,567) in the I-70/I-25 interchange modeling domain except the seven I-70 EB onramp receptors.

[4] The heights harvested from these map sets are shown in the modeling input files included in the Record (*see* "AERMOD Input & Output Files, located in Internal Records>Air Quality>Air Quality Modeling Files>ROD AQModeling>PM10>…").  The map sets are available for public download at https://www.denvergov.org/opendata/dataset/city-and-county-of-denver-contours-one-foot-2014.

**Interrogatory No. 2**
**Context:** U.S. EPA's "Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas," U.S. EPA, Office of Transportation Air Quality (EPA-420-B-15-084 November 2015), Appendix J3, §3.1 Physical characteristics and locations of sources in AERMOD, prescribes two alternative methods for calculating the release height above the roadway surface to be used for modeling emissions from light duty and heavy duty vehicles on highways.

Explain with particularity how the methods used for determining the release height of vehicle emissions in each of the eight separate model runs (the general AERMOD model run performed for all receptors except the seven omitted receptors, and the separate model run performed for each of the seven omitted receptors) conforms to, or varies from, the methodology prescribed in Appendix J of the referenced EPA "Transportation Conformity Guidance" document, and the authority relied upon for each method that does not conform to the methodology prescribed in the referenced EPA "Transportation Conformity Guidance", including but not limited to, any communication from U.S. EPA expressly authorizing the use of the methodology employed.

**Objections and Response to Interrogatory No. 2:**
Federal Defendants object to this interrogatory on the ground that it contains multiple subparts in violation of FRCP Rule 33.  Federal Defendants further object on the ground that this request is compound and, together with the remaining interrogatories, exceeds the number of interrogatories permitted by Judge Hegarty's Order.  *See* ECF No. 136 at 19 (permitting Plaintiffs to serve only five interrogatories).  Federal Defendants further object on the ground that the terms "eight separate model runs" and "general AERMOD model run" are vague and ambiguous, and not defined in Plaintiffs' Interrogatories.  Federal Defendants further object on the ground that this interrogatory is overbroad, vague, ambiguous and confusing.  Federal Defendants interpret this interrogatory as asking for an explanation of the differences between the method that was used to determine the release height above the roadway surface for the seven I-70 EB onramp receptors and the methodology described in EPA's PM Hot-spot Guidance for determining such heights, as well as any communications with EPA authorizing any deviation from EPA's PM Hot-spot Guidance.  To the extent this interrogatory is requesting such information, Federal Defendants respond as follows:

To calculate the release height above the roadway surface, FHWA used EPA's PM Hot-spot Guidance; specifically, the traffic volume weighted approach based on light-duty and heavy-duty vehicle fractions (option b).  Federal Defendants direct Plaintiffs to the Record produced to Plaintiffs on January 26, 2018 for additional information responsive to this interrogatory, including EPA's PM Hot-spot Guidance describing option b, located at AR 105779.  No alternative or different methods were employed.  As such, Federal Defendants are not aware of communications that are responsive to this interrogatory.

**Interrogatory No. 3.**
**Context:** U.S. EPA's "Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas," U.S. EPA, Office of Transportation Air Quality (EPA-420-B-15-084 November 2015), Appendix J, J.5.1 Modeling Complex Terrain, states:

5

For most highway and transit projects, the analyst should apply the non-DFAULT option in AERMOD and assume flat, level terrain.  There may be some cases where significant concentrations result from nearby elevated sources.  In these cases, interagency consultation should be used on a case-by-case basis to determine whether to include terrain effects and use the DFAULT option.  In those cases, AERMAP should be used to prepare input files for AERMOD; consult the AERMOD and AERMAP user guides and the latest AERMOD Implementation Guide for information on obtaining and processing relevant terrain data.

Regarding the decision to include terrain effects in the PM10 modeling for the I-70 Project, identify and describe with particularity all communications involved in the interagency consultation, including but not limited to, all persons who undertook interagency consultation on behalf of FHWA and all persons, including but not limited to, staff, contractors and/or consultants, representing the other agencies participating in interagency consultation process on the I-70 Project (U.S. EPA, Colorado Department of Transportation and Colorado Department of Public Health and Environment), the date(s) when such consultation occurred, the information presented and considered during interagency consultation to make this decision, including but not limited to, any source elevation data and any description of the modeling procedure that FHWA intended to use to account for terrain effects, and any communication from U.S. EPA expressly authorizing the procedure employed in making the Conformity Determination.

**Objections and Response to Interrogatory No. 3:**
Federal Defendants object to this interrogatory on the ground that it contains multiple subparts in violation of FRCP Rule 33.  Federal Defendants further object on the ground that this request is compound and, together with the remaining interrogatories, exceeds the number of interrogatories permitted by Judge Hegarty's Order.  *See* ECF No. 136 at 19 (permitting Plaintiffs to serve only five interrogatories).  Federal Defendants further object on the ground that this request exceeds the scope of the interrogatories permitted by Judge Hegarty's Order. *See id.* (limiting the interrogatories "only to FHWA's decision to separately model the seven receptor locations").  Federal Defendants further object on the ground that the term "terrain effects" is vague and ambiguous, and not defined in Plaintiffs' Interrogatories.  Federal Defendants further object on the ground that this interrogatory is overbroad, vague, ambiguous, and confusing.  Federal Defendants interpret this interrogatory as seeking information related to any communications between FHWA, EPA, CDOT, and CDPHE made during interagency consultation regarding FHWA's alleged decision to include "terrain effects" in the modeling for PM10, and the identity of the individuals involved in those consultations.  To the extent this interrogatory is requesting such information, Federal Defendants respond as follows:

"Terrain effects" were not included in the PM10 modeling for any of the receptors in the I-25/I-70 interchange modeling domain.  Consistent with EPA's PM Hot-spot Guidance, the non-DFAULT option was applied in AERMOD to assume flat, level terrain.  Federal Defendants direct Plaintiffs to the Record produced to Plaintiffs on January 26, 2018 for additional information responsive to this interrogatory, including EPA's PM Hot-spot Guidance recommending the use of the non-DFAULT option, located at AR 105785-786.  Federal Defendants are not aware of communications that are responsive to this interrogatory.

**Interrogatory No. 4.**
**Context:** The AERMOD/AERMAP user guide, available at
https://www3.epa.gov/ttn/scram/models/aermod/aermap/aermap_userguide_v11105.pdf,
provides the following guidance regarding modeling in complex terrain:

> 1.1 Overview. Regulatory dispersion models applicable for simple to complex
> terrain situations require information about the surrounding terrain. With the
> assumption that terrain will affect air quality concentrations at individual receptors,
> AERMAP first determines the base elevation at each receptor and source. For complex
> terrain situations, AERMOD captures the essential physics of dispersion in complex
> terrain and therefore needs elevation data that convey the features of the surrounding
> terrain. In response to this need, AERMAP searches for the terrain height and location
> that has the greatest influence on dispersion for each individual receptor. This height is
> the referred to as the hill height scale. Both the base elevation and hill height scale data
> are produced by AERMAP as a file or files which can be directly inserted into an
> AERMOD input control file.

Identify all FHWA staff and ultimate decisionmaker involved in the decision to modify release
heights at a few select source points along the most heavily traveled traffic lanes instead of
employing the AERMOD system that includes AERMAP to characterize the elevation of all
sources and receptors in a modeling domain to account for the physical effects of complex
terrain on dispersion of pollutants emitted from the I-70 Project, and the technical authority
relied upon for not employing the EPA-approved modeling system designed for that purpose.
For each person identified in response hereto, in addition to the information requested in the
instructions, provide a curriculum vitae, list of publications, office address, telephone number
and email address.

**Objections and Response to Interrogatory No. 4:**
Federal Defendants object to this interrogatory on the ground that it contains multiple subparts in
violation of FRCP Rule 33.  Federal Defendants further object on the ground that this request is
compound and, together with the remaining interrogatories, exceeds the number of
interrogatories permitted by Judge Hegarty's Order.  Federal Defendants further object on the
ground that the terms "ultimate decisionmaker," "the most heavily traveled traffic lanes," and
"complex terrain" are vague and ambiguous, and not defined in Plaintiffs' Interrogatories.
Federal Defendants further object on the ground that this interrogatory is overbroad, vague,
ambiguous and confusing.  Federal Defendants interpret this interrogatory as seeking the identity
of the FHWA official(s) involved in and responsible for the decision to modify only the volume
source release heights above ground for the I-70 EB onramp receptors rather than for all 1,574
receptors in the I-25/I-70 interchange modeling domain using the EPA's AERMOD/AERMAP
programs to account for the physical effects of complex terrain on the dispersion of pollutants
emitted from the Central 70 project.  To the extent this interrogatory is requesting such
information, Federal Defendants respond as follows:

The EPA's AERMAP program was not used because it is not applicable to the scenario
presented by the Central 70 project.  The AERMAP program is used in conjunction with the
AERMOD program to model emission dispersion when "complex terrain" is involved.  EPA

defines "complex terrain" as terrain exceeding the source release heights being modeled.  *See* 40 C.F.R. Part 51, Guideline on Air Quality Models, Appendix W, 4.1(d).  This type of terrain is not present in the I-25/I-70 interchange modeling domain.  EPA cautions against considering complex terrain for emission releases near ground-level from transportation projects and FHWA adhered to this guidance in constructing its models.  One potential exception is when there are elevated emission releases from a highway in conjunction with elevated terrain.  However, there are no complex terrain features exceeding the elevated volume source release heights for the Central 70 project, thus use of AERMAP would not be appropriate.

The decision to modify only the source release heights for the I-70 EB onramp receptors rather than all receptors was made by Dr. Michael Claggett, FHWA's Air Quality Modeling Specialist, in consultation with other FHWA staff, including Chris Horn, Senior Area Engineer, and Jeff Houk, Air Quality Specialist.  Federal Defendants are producing a copy of Dr. Claggett's curriculum vitae along with these responses.  Contact with Dr. Claggett may be arranged only through Federal Defendants' undersigned counsel of record.

**Interrogatory No. 5.**
**Context:** Defendants stated is response to Petitioners' inquiry about possible omissions from the Administrative Record that no other modeling analyses were performed than those included in the Record filed with the Court.

Identify and describe in detail the procedure or methodology used to identify the seven omitted receptors for which a separate modeling run was performed without knowing the results from a prior modeling run that identified these receptor locations as the locations where violations of the PM10 NAAQS would occur if the inputs for the AERMOD modeling performed for all other receptor locations were used to predict concentrations at the seven omitted receptors.

**Objections and Response to Interrogatory No. 5:**
Federal Defendants object to this interrogatory on the ground that it contains multiple subparts in violation of FRCP Rule 33.  Federal Defendants further object on the ground that this request is compound and, together with the remaining interrogatories, exceeds the number of interrogatories permitted by Judge Hegarty's Order.  *See* ECF No. 136 at 19 (permitting Plaintiffs to serve only five interrogatories).  Federal Defendants further object on the ground that this interrogatory is overbroad, vague, ambiguous, and confusing.  Federal Defendants interpret this interrogatory as seeking an explanation of the process by which FHWA determined that a separate modeling run for PM10 at the seven I-70 EB onramp receptors was necessary.  To the extent this interrogatory is seeking such information, Federal Defendants respond as follows:

FHWA followed the process outlined in EPA's regulations for constructing air quality models. *See* 40 CFR Part 51, Guideline on Air Quality Models, Appendix W.  The process is layered and iterative in which the model evolves from simple and coarse to progressively more complex and detailed as conditions require.  As the regulation explains:

a. It is desirable to begin an air quality analysis by using simplified and conservative methods followed, as appropriate, by more complex and refined methods.  The purpose of this approach is to streamline the process

and sufficiently address regulatory requirements by eliminating the need of more detailed modeling when it is not necessary in a specific regulatory application. . . .

b. There are two general levels of sophistication of air quality models. The first level consists of screening models that provide conservative modeled estimates of the air quality impact of a specific source or source category based on simplified assumptions of the model inputs . . .

c. The second level consists of refined models that provide more detailed treatment of physical and chemical atmospheric processes, require more detailed and precise input data, and provide spatially and temporally resolved concentration estimates. As a result, they provide a more sophisticated and, at least theoretically, a more accurate estimate of source impact and the effectiveness of control strategies.[5]

In accordance with this EPA regulation, FHWA began by creating a first level screening model using the most basic assumptions and inputs. This rough model serves several purposes, including establishing the modeling domain (the area of receptors being evaluated) and identifying and correcting setup errors (receptors that are too close to the highway edge, receptors in exclusion zone, etc.). AR 105930; 105786-788. In the I-25/I-70 interchange modeling domain, the screening model revealed potential violations of the PM10 NAAQS at the seven I-70 EB onramp receptors based on the very simplified and conservative inputs applied. As explained further below, the seven I-70 EB onramp receptors were segregated from the I-25/I-70 interchange modeling domain for more refined examination.

A more detailed first level screening of the remaining receptors, which still applied conservative and simplified assumptions in its inputs (e.g., roadway surface heights at ground level), confirmed that even under these worst-case scenario conditions, the Central 70 project would not cause or contribute to violations of the PM10 NAAQS at the 1,567 remaining receptors in the I-25/I-70 interchange modeling domain. Those results were accepted to demonstrate conformity for those locations and are contained in the following files that Federal Defendants produced to Plaintiffs as part of the Record on January 26, 2018:

- AERMOD-V I-70 & I-25 Phase 1 ML.inp
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr.plt.

Since the first level screening process revealed potential PM10 NAAQS violations at the seven I-70 EB onramp receptors, EPA's regulations called for more refined modeling at those locations to obtain "a more accurate estimate of source impact and the effectiveness of control strategies."[6] Accordingly, FHWA constructed a more realistic refined model for those receptors building off the initial first level screening model it already had. This refined model took into account the separation distance between the volume source release heights and receptor height due to the

---

[5] *Id.* at § 2.2(a)-(c).
[6] *Id.*

elevated roadway (see answer to Interrogatory No. 1 above). This more accurate model revealed that there would be not be a violation of the PM10 NAAQS when inputs to the model were more accurate and reflective of actual conditions. Those results were accepted to demonstrate conformity for those locations and are contained in the following files that Federal Defendants produced to Plaintiffs as part of the Record on January 26, 2018:

- AERMOD-V I-70 & I-25 Phase 1 ML SR1.inp
- AERMOD-V I-70 & I-25 Phase 1 ML SR2.inp
- AERMOD-V I-70 & I-25 Phase 1 ML SR3.inp
- AERMOD-V I-70 & I-25 Phase 1 ML SR4.inp
- AERMOD-V I-70 & I-25 Phase 1 ML SR5.inp
- AERMOD-V I-70 & I-25 Phase 1 ML SR6.inp
- AERMOD-V I-70 & I-25 Phase 1 ML SR7.inp
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR1.plt
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR2.plt
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR3.plt
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR4.plt
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR5.plt
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR6.plt
- AERMOD-V_I-70_I-25_Phase1ML2040_PM10_5yrAvg24hr_SR7.plt

Collectively, the results from the second level refined modeling for the seven I-70EB onramp receptors, and the more detailed first level screening for the remaining receptors in the domain, were used to demonstrate conformity with respect to the I-25/I-70 interchange modeling domain, and are therefore part of FHWA's Record. A separate copy of the initial, rough first level screening model was not retained because it was only an interim work product that informed the final models included in the Record. For that reason, it was never a stand-alone record that was considered by the decisionmaker.

## VERIFICATION OF RESPONSES

On behalf of Federal Defendants, and in my capacity as FHWA's Air Quality Modeling Specialist, I have read the foregoing Responses, which are based on a diligent and reasonable effort to obtain information responsive to Plaintiffs' Interrogatories.  I reserve the right to make changes in or additions to any of these Responses if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  Subject to these limitations, I verify under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing Responses are true and correct.

Executed on April 27, 2018 in Santa Fe, New Mexico.

Dr. Michael Claggett
Air Quality Modeling Specialist
Federal Highway Administration

## **VERIFICATION OF OBJECTIONS**

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

*/s/ Mayte Santacruz*
Mayte Santacruz
Carter F. Thurman
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Washington, D.C. 20004
(202) 305-0465 (Santacruz)
(202) 305-0444 (Thurman)
mayte.santacruz@usdoj.gov
carter.thurman@usdoj.gov

David A. Carson
United States Department of Justice
Environment and Natural Resources Division
South Terrace – Suite 370
999 18th Street
Denver, Colorado 80202
(303) 844-1349
david.a.carson@usdoj.gov

*Attorneys for Federal Defendants*

Of Counsel:
Brent Allen
Federal Highway Administration
Office of the Chief Counsel
Lakewood, Colorado
(720) 963-3692
brent.allen@dot.gov

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing *Federal Defendants' Responses and Objections to Plaintiffs' Interrogatories* was sent on April 27, 2018, via electronic mail to the following counsel of record for Plaintiffs:

> Robert E. Yuhnke
> 4050 Se Hosner Terrace
> Gresham, OR  97080
> (303) 499-0425
> bob.yuhnke@prodigy.net
>
> Andrea Gelfuso, Attorney at Law
> Andrea S. Gelfuso
> 2402 South Holland Street
> Lakewood, CO  80227
> (303) 955-1910
> agelfuso6@gmail.com
>
> Gregory Nicholas Corbin
> Milligan Rona Duran & King, LLC
> 1627 Vine Street
> Denver, CO  80206
> (720) 414-2000
> gnc@mrdklaw.com

*/s/ Mayte Santacruz*
MAYTE SANTACRUZ

# Curriculum Vitae

## Dr. Michael Claggett
Air Quality Modeling Specialist
Federal Highway Administration

*Michael Claggett, Ph.D.*

## Professional Qualifications

Michael Claggett is a technical expert on Federal transportation air dispersion and emissions modeling.  He is an environmental engineer whose specialty is designing studies to assess the effects of transportation projects and industrial plants on ambient air quality and public health.  He has conducted research on the accuracy and precision of air quality models used nationally to predict concentrations near highways and industrial sources.  He has developed and taught workshops and graduate-level courses on air quality modeling.  Currently, Dr. Claggett works for the Federal Highway Administration as an air quality modeling specialist.  Prior to his appointment, he worked as an air quality consultant.  His clients included State Departments of Transportation (DOTs), private industry, and governmental agencies.

Dr. Claggett has performed numerous air quality impact assessments for State DOTs to satisfy the requirements of the National Environmental Policy Act (NEPA), Clean Air Act, and project-level conformity on Federal-aid highway projects; along with urban mobile source emission inventories as part of the transportation planning process and regional transportation conformity assessments. He has also worked on a variety of ambient air and meteorological monitoring investigations.  He has conducted various air dispersion modeling studies of hazardous air pollutants for industry including supporting human health and ecological risk assessments; demonstrating compliance with U.S. Environmental Protection Agency (EPA) and state regulations on hazardous air pollutants; and emergency response planning.  He has provided expert testimony in court cases and licensing hearings.  Dr. Claggett has international experience in air quality modeling, having conducted studies in England, Italy, Hong Kong, and Russia and making technical presentations at international workshops and conferences in China and Canada.  He completed a Russian air dispersion model for predicting atmospheric levels of pollutants contained in industrial stack emissions.

As an expert in air quality modeling, Dr. Claggett has developed computer models for predicting concentrations near signalized highway intersections; as well as, for predicting occurrences of fog on highways near large industrial sources of water vapor.  He has also developed computer models for predicting concentrations in the cavity region of a building wake due to plume downwash; in urban complex terrain; and for conditions of long-range plume transport.  He has created computer programs to assist with the regulatory application of models.

Articles by Dr. Claggett have appeared in several professional journals including *Atmospheric Environment* and the *Transportation Research Record* and several professional magazines, including *TR News* and *EM Magazine*.  He co-authored two chapters in the EPA's 1979 update of *Air Quality Criteria for Carbon Monoxide* and was a contributing author to a 1982 *Report to Congress on Implications of a 0.4 gram/mile NOx Emission Standard for Light Duty Vehicles*.

*Michael Claggett, Ph.D.*                                                                                           2

## Education

Ph.D., Civil Engineering (major in Environmental Engineering), The University of Tennessee, Knoxville, Tennessee; 1996.

M.S., Environmental Engineering, The University of Tennessee, Knoxville, Tennessee; 1976.

B.S., Engineering Physics, Western Kentucky University, Bowling Green, Kentucky; 1974.

## Transportation-Related Professional Experience

<u>Air Quality Modeling Specialist, Federal Highway Administration (FHWA), 2002-present.</u>

- Member of an FHWA work group collaborating with the U.S. EPA on the development of their "Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas".  Member of the team who developed training on the guidance, as well as delivered training in Atlanta, Sacramento, Seattle, and Phoenix.

- Provided technical assistance on several FHWA air quality analysis policy initiatives, including the carbon monoxide categorical finding, NEPA carbon monoxide analysis streamlining, and guidance on mobile source air toxics analysis in NEPA documents.

- Provided technical assistance to various FHWA Divisions, Metropolitan Planning Organizations (MPOs), and State Air Quality Agencies in the regional conformity determination process on linking mobile source emissions and travel demand models to prepare emissions inventories, plus reviewing and commenting on work performed. Developed the Easy Mobile Inventory Tool (EMIT) for use in rural and small urban areas without travel models to develop emissions inventories for regional conformity determinations based on methodologies contained in the National Highway Institute course on Estimating Regional Mobile Source Emissions.  Provided technical assistance to numerous FHWA Divisions and State DOTs on completing hot-spot analyses for project-level conformity determinations.

- Conducted traffic analysis, emissions modeling, and dispersion modeling for FHWA Divisions and State DOTs on several high-profile highway projects.  These include traffic and quantitative MSAT analysis for the I-93 project in NH; the Intercounty Connector project in MD; the US 395 project in WA; and the Northwest Corridor project in GA, plus traffic and hot-spot air dispersion modeling analysis for the Centennial Corridor project in CA and the Central 70 project in CO.

- Currently working on modernizing the CAL3 series of highway air dispersion models (CALINE3, CAL3QHC, and CAL3QHCR) and tools (CAL3i) to assist with the implementation of regulatory mobile source emissions and highway air dispersion models.

- Investigated the effects of congested travel speeds on mobile source emissions and provided technical assistance and best practices on assessing emission reductions due to congestion mitigation and air quality projects.

- Constructed a MOVES national-scale $CO_2e$ emissions inventory for past, present, and future calendar years contrasted with growth in travel. Compared national-scale MOVES emissions with EPA's predecessor mobile source emission model, MOBILE6.2. Evaluated $CO_2e$ emissions due to vehicles operating on highways as a function of speed for MOVES versus MOBILE and as a function of demand versus capacity ratios for MOVES. Developed the concept of an affected transportation network with identifying key traffic metrics for evaluating $CO_2e$ emissions and energy use for a set of project alternatives. Prior to the availability of MOVES, investigated the effects of congested travel speeds on $CO_2e$ emissions and energy use and incorporated methodology into EMIT for predicting regional trends.

- Led a diverse group of professionals, including professors, researcher, government agency representatives, and consultants as chair of the Air & Waste Management Association's (A&WMA) Transportation & Air Quality Reference Publication task force. Served as Chair of the Transportation Division of Technical Council and Chair of the On and Off Road Mobile Sources Technical Council Committee of A&WMA. Also, served as chair to develop technical sessions and workshops on transportation and air quality at the Transportation Research Board Annual Meetings and A&WMA's Annual Conference & Exhibitions.

- Conducted professional briefings regarding FHWA activities in highway air quality at TRB subcommittee meetings, AASHTO subcommittee meetings, and A&WMA annual conferences. Topics included policy updates (updated CO categorical finding, updated MSAT guidance, NEPA CO analysis streamlining, EPA's Appendix W final rule); research (near-road research program, transportation pooled fund program, other planned initiatives); analysis tools (MSAT FAQs, CAL3i tool, CMAQ toolkit, traffic noise model 3.0), and training (FHWA, NHI, and NTI).

<u>Independent Environmental Consultant, Knoxville, Tennessee, 1994-2002</u>

Representative transportation air quality experience:

- Team member in a research project to develop a nationwide training course entitled "Fundamentals of Air Quality for Highway Planning and Development" for the Federal Highway Administration. Four course modules were authored, pertaining to air quality assessment using air dispersion modeling.

- Senior technical consultant of an air quality assessment for the proposed upgrading of Georgia State Route 400 in Atlanta. This highway is the main transportation corridor providing access from north Fulton County to Perimeter Center, Buckhead, and downtown Atlanta. Line source emissions and dispersion modeling was performed to predict CO concentrations along the

proposed project corridor and 3 signalized intersections associated with the project.  A case analysis of historical meteorology and ambient monitoring data was carried out to characterize the dispersion conditions that occur on days when highest ambient CO concentrations were measured in the project area.

- Project director of an investigation of a dense fog event on a bridge across a lake in northeast Texas.  The lake is used as a cooling lake by a nearby electric power plant to release waste heat into the atmosphere.  As the waste heat is dissipated, some of the lake water evaporates.  When the warm, moist air rises, it mixes with colder air above.  Under certain meteorological conditions, the water vapor in the air can condense into tiny droplets causing "steam fog" on the lake.  The cooling lake can initiate fog events or intensify natural fog events to cause restricted visibility on the bridge.  Expert testimony was provided in 2 court cases pertaining to a serious automobile accident that occurred on the bridge.

- Adjunct professor at The University of Tennessee teaching a graduate-level course on air dispersion modeling in the Civil and Environmental Engineering Department, which included emission and dispersion modeling of highway sources.

Senior Project Manager and Staff Consultant in the Air Quality Services Group, IT Corporation, Knoxville, Tennessee, 1986-1994.

Representative transportation air quality experience:

- Project manager of an air quality assessment of a major toll road in Atlanta.  Compliance with air quality standards was determined based on a combination of ambient air monitoring and line source dispersion modeling for carbon monoxide and lead emissions.  At the time, the EPA guideline model was not applicable for predicting CO concentrations near signalized intersections operating at over-capacity conditions.  Consequently, the Georgia Intersection Model was developed for that purpose.  Model predictions were compared to ambient air quality measurements made at an intersection near the project corridor.  The results of the analysis were presented to the EPA in Research Triangle Park (with the direct involvement of the Commissioner of the GA DOT and the FHWA GA Division) and the methodology was approved for use in the assessment.  The results of the assessment were included as part of the Environmental Impact Statement (EIS) to satisfy the requirements of NEPA.

- Staff consultant for an air quality assessment of a proposed facility in Alabama for the static test firing of redesigned rocket motors for the space shuttle.  Air dispersion modeling was employed to determine compliance of the facility with the National Ambient Air Quality Standards and state hazardous air pollutant guidelines.  The assessment was included as part of the EIS to satisfy the requirements of NEPA.

- Evaluated the ventilation requirements for a vehicular tunnel under the planned Atlanta Financial Center on the right-of-way of Georgia State Route 400.  The primary design criterion was to maintain acceptable CO concentrations within the tunnel in the event of a major traffic

stoppage. Secondly, the minimum ventilation required for fire protection was determined. The feasibility of natural ventilation in providing the design ventilation rate was examined. An emergency mechanical ventilation system was specified to provide the design ventilation rate in the event of an accidental spill of hazardous chemicals from a tanker truck in the tunnel.

- Project manager of an air dispersion modeling study to assess the release of 1,3-butadiene during a train derailment in San Antonio. Expert testimony was provided in a court case.

- Manager of a project to assess the ambient air quality expected at a proposed transit station in the median of a major multilane highway in Atlanta. The minimum ventilation rate for the station was specified based on predictions of maximum air pollutant concentrations resulting from the operation of motor vehicles on the adjacent highway. Furthermore, since air rights over the transit station could be sold, the minimum ventilation system requirements were computed assuming the station would be in a vehicular tunnel.

Project Manager, Enviro-Measure, Inc. (acquired by IT Corporation in 1986), Knoxville, Tennessee, 1977- 1986

Representative transportation air quality experience:

- Project manager of an 18-month study to quantify the accuracy and precision of air dispersion models used nationally to predict CO emissions from automobiles and its subsequent dispersion in the ambient air near an urban freeway and an urban arterial signalized intersection. Two separate field experiments were designed and conducted over a 6-month period, operating 18 monitoring stations at 2 locations in Chicago. Extensive CO, meteorology, traffic, and tracer release measurements were collected concurrently for use in the model predictions. Results of this study were presented at the Annual Meeting of the Transportation Research Board and published in *Atmospheric Environment*. Subsequently, the EPA used the field data to evaluate their CAL3QHC line source dispersion model and Caltrans used the field data in their development of the CALINE4 model.

- Project manager of an air quality impact assessment of the proposed Freedom Parkway in Atlanta that provides access to the Carter Library and adjacent Carter Center. Air dispersion modeling was performed to predict the air quality impact of CO emissions from vehicles within the project corridor and numerous signalized intersections affected by the project. The Georgia Intersection Model was used to predict vehicular emissions at signalized intersections. Background CO concentrations in the project corridor were projected based on an urban background CO monitoring program.

- Performed an air quality analysis of the proposed Northern Wake Expressway outside of Raleigh. The planned facility is a 27 mile, six-lane divided, controlled-access highway to be constructed in a new corridor. The proposed beltway was planned to provide access to the Raleigh-Durham Airport and Research Triangle Park. As many as three alternative alignments were evaluated at four different locations along the project corridor. The build and no-build

conditions were analyzed using mobile source emissions and dispersion models for the present case and the design year considering 140 highway links and 80 receptor locations.

- Completed an air quality assessment of the proposed U.S. 311 bypass near High Point.  Four alternative corridors plus the no-build alternative were evaluated for the existing condition, estimated time of completion, and design year.  Line source emissions and dispersion modeling was performed considering 600 highway links and 92 receptor locations.

- Evaluated the air quality impact of a proposed 6-level parking deck providing 1530 parking spaces for state employees and visitors of the Capitol complex in Raleigh.  Mobile source emissions and air dispersion modeling was performed for receptors located near the parking deck; near 2 signed intersections to be constructed to provide access to the parking deck; and near 2 signalized intersections affected by the project.

- Staff consultant for an air quality analysis of 3 transportation improvement alternatives proposed to provide a major north-south corridor for downtown Memphis.  In addition to a proposed new limited access facility, one alternative provided for restricted automotive use in the downtown area along with the construction of 3 transportation mode-change terminals on the fringes of the central business district.  The maximum air quality impact associated with the project was due to automotive CO emissions from the mode-change terminals.

- Co-author of two chapters in the EPA's 1979 update of *Air Quality Criteria for Carbon Monoxide*.  One chapter presented the analytical methods available for measuring ambient CO concentrations while the other presented an analysis of ambient CO concentrations observed throughout the U.S.

- Manager of an air quality impact assessment of the proposed relocation of 3 major rail routes through Augusta.  Ambient (local plus background) concentrations of particulate matter, sulfur oxides, hydrocarbons, carbon monoxide, and nitrogen oxides were determined due to emissions from locomotives; switch engines in rail yards; and queuing automobiles at railroad/street grade crossings.  Twelve rail system alternatives were evaluated for the build and no-build condition for three different time periods.

- Directed a monitoring program where background CO samples were collected and analyzed at 7 sites throughout the downtown Atlanta area, 24-hours a day, every third day for 6 months.  The results of the study were used to support several air quality impact assessments.

- Conducted an air quality analysis for the proposed replacement of an urban highway bridge providing access to downtown Chattanooga.  An inspection of the bridge found the structure to be unsound, requiring immediate repairs and its ultimate closure or replacement.  Line source emissions and air dispersion modeling was performed for 3 replacement options plus the closure option for the existing condition and 2 future years.

*Michael Claggett, Ph.D.*                                                                                     7

- Provide technical assistance on completing modeling for a noise impact analysis for a highway project for the Tennessee Department of Transportation

- Staff consultant of an evaluation of the potential for fog occurrences on the proposed Cooper River crossing of the Mark Clark Expressway in North Charleston.  An ambient air monitoring and dispersion modeling study was performed to assess the frequency and severity of foggy conditions near a proposed bridge adjacent to a kraft paper mill, which is a large industrial source of water vapor emissions.  A computer model was developed to predict the likely number of hours per year of fogging and icing on the bridge.  Model predictions were compared to on-site measurements.  The study was performed in support of a court case.

- Completed an air monitoring survey design for an ambient ozone measurement study in Columbus.  The survey design established two monitoring locations:  an urban fringe site and a transport site, both in the predominantly downwind direction of the urban core during the ozone season.  Ambient ozone monitoring was conducted continuously at both sites for a year.

- Performed an air quality analysis of the proposed I-85 upgrade project in Atlanta using mobile source emissions and air dispersion modeling to predict the local and background components of future ambient CO concentrations along the highway corridor.  The accuracy of model predictions was evaluated through a comparison with available air quality data collected in the study area.

- Completed line source emissions and air dispersion modeling and utilized background air monitoring measurements to predict ambient CO concentrations along the proposed I-75/I-85 project corridor in Atlanta.  The assessment methodology employed was verified by comparing model predictions to ambient CO measurements made at the I-20 interchange by the Fulton County Health Department.

- Staff consultant conducting ambient air monitoring as part of an emergency response program for a major train derailment in Livingston.  The wreck caused tank cars carrying hazardous chemicals to rupture, spill their contents, and catch fire resulting in the evacuation of 2,000 people.  Air measurements for various hazardous chemicals were made, including:  vinyl chloride, perchloroethylene, styrene, dioxin, toluene diisocynate, inorganic lead, tetraethyl lead, fluorides, and cyanide.  Air dispersion modeling of the train derailment was performed to support testimony for a court case.

Task Manager, Allinson, Inc., Warwick, Rhode Island, 1976-1977

Established a project office in Nashville.  Responsible for managing an air quality assessment of a major interstate in Knoxville.  Compliance with the National Ambient Air Quality Standards for carbon monoxide was demonstrated by line source emissions and dispersion modeling and background air monitoring performed in the project corridor.

<u>M.S. Program, Environmental Engineering, University of Tennessee, Knoxville, TN, 1975-1976</u>

Claggett's Master's studies were funded in part by a U.S. EPA fellowship.  His Master's project was a comparison of 3 line source dispersion models by performing a sensitivity analysis and a statistical analysis of predicted versus measured concentrations, the results of which were published in technical journals with co-authors. Additional Master's work included:  1) establishing quality assurance programs for ambient air quality monitoring instrumentation for the local air pollution control department and 2) developing a computer program for archiving ambient air monitoring data, performing statistical data analyses, and preparing air quality data reports.

## Professional Affiliations

Member of the Transportation and Air Quality Committee of the Transportation Research Board, The National Academies of Sciences, Engineering, and Medicine

Officer of Technical Council of the Air & Waste Management Association

## Peer-Reviewed Publications

Claggett, Michael, 2014, "Comparing Predictions from the CAL3QHCR and AERMOD Models for Highway Applications", in *Air Quality 2014, Volume 2*, pp. 18-26, Transportation Research Record No. 2428, National Academy of Sciences, Washington, DC.

Claggett, Michael, 2010, "Implications of the MOVES2010 Model on Mobile Source Emission Estimates", in *Transportation and Air Quality:  A Look at the Driving Forces Behind Current Trends and Standards*, pp. 10-15, EM:  The Magazine for Environmental Managers, Air & Waste Management Association, Pittsburg, Pennsylvania.

Chen, Hao, Song Bai, Douglas Eisinger, Deb Niemeier, and Michael Claggett, 2009, "Predicting Near-Road PM2.5 Concentrations:  Comparative Assessment of CALINE4, CAL3QHC, and AERMOD", in *Environment 2009*, pp. 26-37, Transportation Research Record No. 2123, National Academy of Sciences, Washington, DC.

Houk, Jeffrey and Michael Claggett, 2009, "Air Quality Management:  Successes and Emerging Challenges", in *TR News 262*, pp. 8-11, National Academy of Sciences, Washington, DC.

Claggett, Michael and Jeffrey Houk, 2008, "Comparing MOBILE6.2 and Emfac2007 Emission Factors", in *Environment and Energy 2008*, pp. 51-57, Transportation Research Record No. 2058, National Academy of Sciences, Washington, DC.

Claggett, Michael and Terry L. Miller, "Methodology for Evaluating Mobile Source Air Toxics Emissions:  Transportation Project Alternatives", in *Air Quality 2006*, pp. 32-41, Transportation Research Record No. 1987, National Academy of Sciences, Washington, DC.

Claggett, Michael and Terry L. Miller, 2006, "Variability of Mobile Source Air Toxic Emission Factors with MOBILE6.2", in *Air Quality 2006*, pp. 103-109, Transportation Research Record No. 1987, National Academy of Sciences, Washington, DC.

Tang, Tianja, Michael Claggett, Joon Byun, Mike Roberts, Jessica Granell, and Dale E. Aspy, 2005, "MOBILE6.2 Modeling of Exhaust Air Toxic Emission Factors:  Trend and Sensitivity Analysis", in *Energy and Environmental Concerns 2005*, pp. 99-106, Transportation Research Record No. 1941, National Academy of Sciences, Washington, DC.

Houk, Jeffrey and Michael Claggett, 2004, "Survey of Screening Procedures for Project-Level Conformity Analyses", in *Energy and Environmental Concerns 2004*, pp. 50-58, Transportation Research Record No. 1880, National Academy of Sciences, Washington, DC.

Miller, Terry L. and Michael Claggett (contributing authors), 1982, *Report to Congress on Implications of a 0.4 gram/mile $NO_x$ Emission Standard for Light Duty Vehicles*, U.S. Environmental Protection Agency.

Claggett, Michael, John Shrock, and Kenneth E. Noll, 1981, "Carbon Monoxide Near an Urban Intersection", *Atmospheric Environment*, Vol. 15, No. 9, pp. 1633-1642.  Also presented to the Transportation Research Board Committee on Transportation and Air Quality at the 59th Annual Meeting, Washington, DC.

Miller, Terry L. and Michael Claggett (contributing authors), 1979, *Air Quality Criteria for Carbon Monoxide*, U.S. Environmental Protection Agency.

Noll, Kenneth E., Terry L. Miller, and Michael Claggett, 1978, "A Comparison of Three Highway Line Source Dispersion Models", *Atmospheric Environment*, Vol. 12, No. 9 pp. 1323-1329. Translated to Japanese and published in the *Journal of Environmental Pollution Control*, Vol. 16, No. 4, pp 402-408.

Noll, Kenneth E., Terry L. Miller, and Michael Claggett, 1977, "Comparative Analysis of HIWAY, California, and CALINE2 Line Source Dispersion Models", in *Environmental and Conservation Concerns in Transportation:  Energy, Noise, and Air Quality*, pp 53-58, Transportation Research Record 648, National Academy of Sciences, Washington, DC.